**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| In re: KRISJENN RANCH, LLC | § | Case No. 20-50805 |
| | § | |
| **Debtor** | § | |
| | § | |
| KRISJENN RANCH, LLC and | § | |
| KRISJENN RANCH, LLC-SERIES | § | |
| UVALDE RANCH, and KRISJENN | § | |
| RANCH, LLC-SERIES PIPELINE | § | |
| ROW as successors in interest to | § | |
| BLACKDUCK PROPERTIES, LLC, | § | Chapter 11 |
| Plaintiffs | § | |
| v. | § | |
| | § | |
| DMA PROPERTIES, INC., and | § | |
| LONGBRANCH ENERGY, LP, | § | Adversary No. 20-_____ |
| Defendants | § | |

**ORIGINAL ADVERSARY COMPLAINT
REQUESTING DECLARATORY JUDGMENT**

COMES NOW KrisJenn Ranch, LLC ("Debtor" or "KrisJenn"), KrisJenn Ranch, LLC-Series Uvalde Ranch, and Krisjenn Ranch, LLC-Series Pipeline Row as successors in interest to Black Duck Properties, LLC (collectively the "Plaintiffs") by and through their undersigned attorney, and file this Original Adversary Complaint, brought pursuant to Bankruptcy Rule 7001, and would show the Court as follows:

**SUMMARY**

1. Debtor owns a pipeline and right of way that is the subject of this dispute (respectively, the "Pipeline" and "ROW" and collectively the "Express Pipeline"). The Express Pipeline and KrisJenn Ranch are each encumbered by a $6 million loan. The Debtor is currently unable to sell the Express Pipeline because the Defendants are improperly claiming a perpetual interest in these properties. More specifically, Defendants claim they should receive a share of

1

profits from the operations and sale of the Express Pipeline for all time, regardless of whom is buying, selling, or using these properties. This interpretation is so broad that no person will purchase the Express Pipeline. Failure to monetize the Express Pipeline has caused Debtor to default on the $6 million secured obligation necessitating its chapter 11 bankruptcy filing. This case seeks to interpret Debtor's and Defendants' rights in the subject contract so that Debtor can sell the Express Pipeline and pay the secured lender.

## JURISDICTION AND VENUE

2. Debtors filed a Chapter 11 Bankruptcy Petition in this Court on April 27, 2020—Case No. 20-5080.

3. Jurisdiction is conferred on this Court pursuant to the provisions of Section 1334 of Title 28 of the United States Code in that this proceeding is a core proceeding under 157(b)(2)(k) of Title 28. Jurisdiction is also conferred as this proceeding is related to the above-captioned Chapter 11 case under Title 11 and concerns property of the Debtor in that case. Therefore, the Court has both personal and subject matter jurisdiction to hear this case pursuant to Section 1334 of Title 28 of the United States Code and Sections 157(b)(2)(k) and 157(c) of Title 28 of the United States Code.

4. This proceeding is a core proceeding because it involves resolving third party interests that encumber Debtor's property pursuant to 157(b)(2)(k) of Title 28.

5. This proceeding is also a non core proceeding that is related to the chapter 11 case because it concerns the property of the Debtor and those concerns must be resolved for the Debtor to effect its plan of reorganization.

6. Bankruptcy courts have jurisdiction over matters that are "related to" the bankruptcy. *In re Denney*, 171 F.3d 1016, 1022 (5th Cir.1999). A matter is "related to" a case

under title 11 if the adversary proceeding's outcome may both: (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate." *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). An adversary proceeding falls within the court's "related to" jurisdiction if "the outcome of that proceeding could conceivably have an effect on the estate being administered in bankruptcy." *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987).

7. Resolution of the issues alleged in the Summary of this Adversary Complaint are critical to Debtor's ability to reorganize, making jurisdiction over this action clearly appropriate pursuant to Section 157(c).

## PARTIES

8. KrisJenn Ranch, LLC is a Texas limited liability company doing business in Guadalupe County, Texas and having its principal place of business in Uvalde County, Texas. KrisJenn Ranch, LLC has two series, KrisJenn Ranch, LLC-Series Uvalde Ranch and KrisJenn Ranch, LLC-Series Pipeline Row. Kristen Ranch, LLC has filed its bankruptcy along with its two series as a single Debtor.

9. DMA Properties, Inc. ("DMA") is a South Carolina corporation with its address of 896 Walnut Street at US 123 BYP, Seneca, South Carolina. DMA has done business in the State of Texas but is not registered to do business in the State of Texas. DMA may be served by mailing a copy of the summons and Complaint to its registered agent and president, Daniel Moore.

10. Longbranch Energy, LP ("Longbranch") is a Louisiana limited partnership doing business in Texas at 706 Southview Circle, Center, Texas 75935. Darin Borders is the President of Darin Borders, Inc., the general partner of Longbranch. The registered agent for service of process is Ken Simmons, 298 Pico Street, Many, Louisiana, 71449 or the Company may be

served by mailing a copy of the summons and Complaint to its registered agent or to its president, of its General Partner, Darin Borders.

## BACKGROUND

11. KrisJenn purchased the KrisJenn Ranch (the "Ranch") in 2013 for $3,952,000 and then invested an additional $840,000 in the Ranch. At such time, the Ranch was encumbered by a $5.9 million loan from Mcleod Oil ("Mcleod").

12. Black Duck Properties, LLC ("Black Duck") was formed to purchase the Express Pipeline for $5 million plus closing costs. KrisJenn owned a 50% interest in Black Duck, and DMA owned the other 50% interest in Black Duck.

13. In 2017, KrisJenn loaned $4.1 million to Black Duck, and Larry Wright loaned Black Duck an additional $1.2 million. The $4.1 million that KrisJenn Ranch, LLC loaned to Black Duck was obtained through a loan between KrisJenn Ranch, LLC and Asilo Investments, Ltd. ("Asilo").

14. Longbranch entered into a contract to purchase the Express Pipeline on February 19, 2016 (the "Longbranch Contract").

15. In June of 2016, the Longbranch Contract was assigned to Black Duck from Longbranch primarily via an Agreement for Assignment and Assumption of Specific Contract (the "Longbranch Assignment").

16. On August 11, 2017, the Express Pipeline was purchased by Black Duck.

17. The Longbranch Assignment states:

1. Consideration: [LONGBRANCH] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [BLACK DUCK] or its successors or assigns during the period of time beginning on the date . . . above.

    a. Net profits shall mean gross revenues actually received by [BLACK DUCK], or its successors or assigns directly from the operation, use,

4

    maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

   b. [BLACK DUCK'S] obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [BLACK DUCK] binds its successors and assigns to the payment of the Net Profits Share.

18. On February 7, 2018, DMA sold its 50% interest in Black Duck back to the company in exchange for a deal similar to the Longbranch Assignment; this agreement was between DMA and Black Duck (the "DMA Assignment") and stated as follows.

1. Consideration: DMA Properties, Inc. shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from Black Duck Properties, LLC or its successors or assigns during the period of time beginning on the date . . . above.

   a. Net profits shall mean gross revenues actually received by Black Duck Properties, LLC., or its successors or assigns directly from the operation, use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

   b. Black Duck Properties, LLC.'s obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and Black Duck Properties, LLC. binds its successors and assigns to the payment of the Net Profits Share.

Collectively the Longbranch Assignment and the DMA Assignment are referred to as the "Assignment Agreements."

19. In 2018, Black Duck sold the Express Pipeline to TCRG East Texas Pipeline 1, LLC ("TCRG") for $2.5 million, and—as part of the deal—Black Duck retained 16% of the gross profit from the Express Pipeline. The aggregate, projected profit to Black Duck and other interested parties was $48,000 per day.

5

20. Later in 2018, KrisJenn Ranch, LLC became a successor in interest to Black Duck. Black Duck was unable to pay its debts to KrisJenn Ranch, LLC and it therefore foreclosed on its note with Black Duck. Shortly thereafter, Black Duck ceased being a going concern and was eventually wound up, with KrisJenn Ranch, LLC being the successor in interest to the Black Duck note.

21. The initial $2.5 million received from TCRG sale was allocated to pay the debts encumbering the Express Pipeline. No profits were anticipated on the sale to TCRG until the $48,000 daily payments had satisfied the outstanding principal balance and interest owed on the Black Duck note.

22. In 2019, shortly after the TCRG purchase, Longbranch and DMA threatened TCRG with litigation. Contrary to all prior communications with the Debtor, the Defendants claimed that were entitled to receive a share of *any* income generated by the Express Pipeline in perpetuity, regardless of who owns the Express Pipeline or how many subsequent sales of the Express Pipeline take place. It is likely that this position was fabricated simply because the Defendants did not like the terms of the proposed deal.

23. Nevertheless, to avoid litigation with TCRG, KrisJenn Ranch, LLC agreed to repurchase the Express Pipeline. KrisJenn Ranch, LLC repurchased the Express Pipeline through one of its series—KrisJenn Ranch, LLC Series Pipeline Row ("Series Pipeline")—by obtaining an additional $2.5 million in financing from Mcleod. This increased the total amount of the loan from Mcleod to $5.9 million and both KrisJenn Ranch, LLC Series Pipeline Row and KrisJenn Ranch, LLC Series Uvalde Ranch were added as borrowers to the Mcleod note.

24. KrisJenn is presently unable to sell the Express Pipeline because Defendants claim to have perpetual interests in them. Consequently, no purchasers are willing to purchase or

6

operate the Express Pipeline for fear that DMA and Longbranch will file lawsuits asserting the same claims they alleged in the TCRG matter. The basis of the Defendants' claims are a latent or patent ambiguity in the Assignment Agreements.

25. Prior to bankruptcy petition filing, the parties were involved in three lawsuits in state court. There is pending litigation in Texas State Court, Panola County, 123rd Judicial District, Case No. 2019-355 between DMA and the Plaintiffs.[1] There is also pending litigation in Texas State Court, Shelby County, 273rd Judicial District, Case No. 19-CV-34877 between Longbranch Energy, L.P. and the Plaintiffs.[2] There is also pending litigation originally filed in Texas State Court, Guadalupe County, Case No. 19-CV-35048 between Plaintiffs and Longbranch and DMA. The Guadalupe County case is a mirror image of the claims between the Parties in the first two cases and was transferred to Shelby County. Cause numbers 19-CV-34877 and19-CV-35048 seek Declaratory Judgment from the Court interpreting terms of a contract that is in dispute. The parties to the state court cases have filed pleadings in the cases and have only just begun the discovery process. No trial dates have been set, and no depositions have been taken even though the cases are many months old.

26. On April 27, 2020, KrisJenn filed for Chapter 11 bankruptcy protection. Plaintiffs now bring this suit for a declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202. It is critical to the reorganization of debtor to quickly interpret the parties' contract and monetize the pipeline.

## DECLARATORY JUDGMENT

---

[1] DMA is a Cross-Plaintiff in this case, and the KrisJenn parties are the Defendants. The original Plaintiff of the Panola County case, Bigfoot energy, is not a party to these proceedings.

[2] Longbranch is the Plaintiff in this case, and the KrisJenn parties are the Defendants. DMA is a cross-plaintiff in this case.

7

27. Debtor incorporates by reference the factual allegations contained in the preceding paragraphs.

28. Pursuant to 28 U.S.C. § 2201, Debtor requests that this Court construe and interpret the Longbranch Assignment and the DMA Assignment to ascertain and declare the respective rights, obligations, and liabilities of the Debtor to Longbranch and DMA, respectively.

29. Specifically, Plaintiffs seek a judicial declaration that Longbranch and DMA have no contractual or property rights in the Express Pipeline except those borne from the Net Profits generated from the operation and sale of the Express Pipeline by KrisJenn.

30. The core issue is what is meant by the phrase "its successors or assigns" in the Assignment Agreements. The Debtor contends the parties intended this phrase to mean that if Black Duck had an assignee or successor (i.e. a company purchased the Debtor and assumed all of its rights and duties), then that company would have to honor the terms of the Assignment Agreements. Debtor contends this means that if the assignee or successor to Black Duck sold the Express Pipeline, it would have to pay the Defendants their profit share interest after all debt and costs of sale were paid. If any residual interest was retained by the assignee or successor as part of the sale, then Defendants would share in that residual agreement. But absent any retained interest, the purchaser would have no further obligations to the assignee or successor or Defendants.

31. Defendants contend that "its successors or assigns" does not relate to a corporate successor or assignee of Black Duck but to any person or entity who ultimately owns the Express Pipeline in perpetuity. Defendants further contend that upon any sale of the Express Pipeline, the Defendants should receive a percentage of the sale *and* rights to a percentage of all operating profits earned by the purchaser of the pipeline from its operations. Under the Defendants

8

interpretation of the Assignment Agreements, if the pipeline was sold again, Defendants would receive a percentage of that sale and continue receiving a percentage of the operating profits from the next buyer. This process would go on in perpetuity. Debtor claims that Defendants position is not legally defensible and is disingenuous because Defendants have made it perfectly clear in subsequent email correspondence that they understood and agreed with Debtor's interpretation of the Assignment Agreements.

32. First, the parties have clearly stated in post contract writings that the Assignment Agreements are to be interpreted as stated by the Debtor.

33. Next, the position is not legally defensible for two reasons. First, the Assignment Agreements, as interpreted by Defendants, cannot run with the land. To run with the land, the covenant must 1) touch and concern the land; (2) relate to a thing in existence, such as a tangible piece of property, or specifically binds the parties and their assigns; (3) the original parties to the covenant must intend for it to run with the land; (4) the successors to the burden must have notice; and (5) the parties must be in privity of estate at the time the covenant was made. The alleged agreement does not satisfy these 5 elements, and therefore, cannot run with the land as suggested by Defendants.

34. Second, the covenant as interpreted by Defendants violates the rule against perpetuities.

35. The Agreements were freely entered into by the parties, and were supported by valuable consideration. By granting the declaratory relief requested herein, this Court will clarify an ongoing and continuing dispute as to the parties' rights, obligations and liabilities.

36. Plaintiffs have incurred costs and reasonable and necessary attorney's fees in seeking this declaratory judgment.

## ATTORNEY'S FEES

37. It was necessary for the Debtor to retain the undersigned counsel to represent its interests in connection with this litigation and the prosecution of its claim. Debtor requests that the Court award its reasonable and necessary attorney's fees.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs asks for declaratory relief as stated in this Complaint, as well as recovery of reasonable and necessary attorney's fees, court costs, and such other and further relief to which they may be justly entitled.

Respectfully submitted,

MULLER SMEBERG, PLLC

By: /s/ *Ronald J. Smeberg* .
RONALD J. SMEBERG
State Bar No. 24033967
MULLER SMEBERG, PLLC
111 W. Sunset Rd.
San Antonio, TX 78209
210-664-5000 (Tel)
210-598-7357 (Fax)
ron@smeberg.com
ATTORNEY FOR DEBTOR