# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| *In re*: | § | CHAPTER 11 |
| | § | |
| KrisJenn Ranch, LLC, | § | |
| | § | |
| *Debtor* | § | CASE NO. 20-50805 |
| | § | |
| | § | |

| | | |
|---|---|---|
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | ADVERSARY NO. 20-05027 |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| DMA Properties, Inc. and Longbranch Energy, LP, | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

| | | |
|---|---|---|
| DMA Properties, Inc., | § | |
| | § | |
| *Cross-Plaintiff/Third-Party Plaintiff* | § | |
| | § | |
| v. | § | |
| | § | |
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, Black Duck Properties, LLC, Larry Wright, and John Terrill, | § | ADVERSARY NO. 20-05027 |
| | § | |
| | § | |
| | § | |
| | § | |
| *Cross-Defendants/Third-Party Defendants* | § | |
| | § | |

1

## COUNTERCLAIMS AND THIRD-PARTY CLAIMS

DMA Properties, Inc. ("DMA") files the following counterclaims and third-party claims.

### Parties

1.      DMA Properties is a South Carolina corporation. Its principal place of business is located at 88 Wild Swan Lane, Minnesott Beach, North Carolina 28510.

2.      KrisJenn Ranch, LLC is a Texas limited liability company. It can be served via its registered agent, Larry Wright, at 410 Spyglass Rd., McQueeney, Texas 78123.

3.      KrisJenn Ranch, LLC–Series Uvalde Ranch is a Texas limited liability series. It can be served via its registered agent, Larry Wright, at 410 Spyglass Rd., McQueeney, Texas 78123.

4.      KrisJenn Ranch, LLC–Series Pipeline ROW is a Texas limited liability series. It can be served through registered agent Larry Wright at 410 Spyglass Rd., McQueeney, Texas 78123.

5.      Black Duck Properties, LLC is a Texas limited liability company doing business in Shelby County. It can be served via its registered agent, Larry Wright, at 410 Spyglass Rd., McQueeney, Texas 78123.

6.      Larry Wright is an individual residing at 410 Spyglass, McQueeney, Texas 78123 and may be served at his residence or wherever he may be found.

7.      John Terrill is an individual residing at 12712 Arrowhead Lane, Oklahoma City, Oklahoma 73120 and may be served at his residence or wherever he may be found.

**Jurisdiction and Venue**

8.     This Court has personal jurisdiction over KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, Wright, and Terrill, because all are residents of Texas and/or Texas entities doing business in Texas.

9.     This Court has jurisdiction over these counterclaims and third-party claims under 28 U.S.C. § 1334 because this proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(k) concerning the determination of the validity extent, or priority of liens. Additionally, this proceeding is a core proceeding under § 157(b)(2)(I) concerning determination of the dischargeability of particular debts.

10.     In the alternative, to the extent these proceedings or claims do not qualify as core proceedings under § 157(b), this Court has jurisdiction over these proceedings under 28 U.S.C. § 157(c) because these proceedings are related to the underlying Chapter 11 bankruptcy case and concern the property of the Debtor in that case. Those concerns must be resolved before the Debtor can effectuate a plan of reorganization.

11.     Bankruptcy courts have jurisdiction over matters that are "related to" the bankruptcy. *See In re Denney*, 171 F.3d 1016, 1022 (5th Cir. 1999). A matter is "related to" a bankruptcy if the outcome of the proceeding may (1) alter the rights, obligations, and choices of action of the debtor; and (2) have an effect on the administration of the estate. *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). An adversary proceeding falls within the court's "related to" jurisdiction if "the outcome of that proceeding could conceivably have an effect on the estate being administered in bankruptcy." *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987).

### Summary of Dispute

12.     DMA asserts these claims to protect (1) DMA's 20% net-profits interest in a potentially lucrative pipeline right-of-way (2) DMA's 50% interest in the note payments from Bigfoot Energy Services, LLC. Defendant Larry Wright—Moore's former partner—and his entities have spent the last few years trying to steal that property. Because Wright refuses to honor the deal he made with Moore and has actively sought to defraud Moore and DMA, DMA now brings these claims so that this Court may recognize and enforce DMA's rights.

### Factual Background

**A.      Wright and Moore form Black Duck Properties, LLC in 2016.**

13.     In 2015, Frank Daniel Moore—the founder and controlling member of DMA—relocated to Texas for two years to help investors identify opportunities in the oil and gas industry.

14.     In Texas, Moore reconnected with Larry Wright, a professional poker player whom Moore had previously met through an investment deal.

15.     After Wright indicated that he was interested in investing with Moore and that he had funds that he was eager to invest, both men agreed that Moore would provide "sweat equity" on future investments while Wright would provide capital to fund the deals.

16.     Following these discussions, Moore and Wright began seeking investment opportunities, and Moore learned from Darin Borders—one of Moore's contacts in the oil and gas industry—that an entity was considering selling four saltwater disposal (SWD) wells.

17.     Moore performed due diligence on the wells and successfully negotiated a lower price for all four SWD wells.

4

18.     As the deal came together, Wright told Moore they should form one limited liability company (LLC) to handle future deals. Moore agreed, and they named the new entity Black Duck Properties, LLC.

19.     Moore and Wright agreed that Wright's entity—KrisJenn Ranch, LLC—would own 50% of Black Duck, while Moore's own entity—SCMED Oilfield Consulting—would own the other 50%. The stated purpose of the new entity was "[t]o purchase property and options" related to saltwater disposal (SWD) wells "as well as other properties in the state of Texas." Wright, through KrisJenn Ranch, would provide the funding while Moore, through SCMED, would "introduc[e] opportunities" and "bring buyers" if appropriate. Wright confirmed that both SCMED and KrisJenn Ranch would seek buyers, as "[i]t should take all our joint efforts."

20.     About a year later, Black Duck bought a saltwater disposal well in Panola County known as the Harris SWD. Moore found a buyer for the well—Bigfoot Energy Services, LLC. But given the significant upfront repair costs to bring the well into regulatory compliance, Black Duck and Bigfoot agreed that Black Duck would owner-finance Bigfoot's purchase of the Harris SWD.

21.     In March 2017, Bigfoot paid $50,000 as a down payment and gave Black Duck a $450,000 promissory note for the remainder of the purchase price. Secured by the Harris SWD, the note requires quarterly payments in June, September, December, and March of each year until repayment is complete.

**B.      Moore, along with Borders, secures the option to purchase a right-of-way in east Texas.**

22.     At the same time that they were discussing the SWD wells, Moore and Borders also took steps to purchase the pipeline right-of-way at issue in this case.

23.     In the summer of 2015, Borders talked to Moore about a right-of-way running from Angelina County through Nacogdoches and Rusk Counties and across Shelby County in East Texas.

24.     Borders contacted Rod Roberts, the president of Express Pipeline Connection, LLC—the then-owner of the right-of-way. Roberts eventually admitted that he would be willing to sell the right-of-way for $5 million and requested a $25,000 payment to secure the right to purchase the asset.

25.     Moore and Borders subsequently secured by contract the right to purchase the right-of-way for $5 million through Longbranch (Borders's entity).

26.     On February 19, 2016, Borders and Roberts memorialized their agreement in writing. *See* Ex. 1 (the Purchase Agreement). The Purchase Agreement defined the assets Longbranch sought to buy and Express sought to sell as:

> Ownership interest in certain pipe and related facilities (commonly known as the P-21 pipeline) shown on the plat attached hereto as Exhibit "A". and described on Exhibit "B" attached hereto, and the rights-of-way, easements, contracts, permits and leases described in Exhibit "C" attached hereto (collectively herein referred to as the "Express Pipeline").

27.     The Purchase Agreement set a 60-day due-diligence period and set closing for April 19, 2016. It also allowed several extensions of the closing date and due-diligence period.

C.   **Wright offers to fund the purchase of the right-of-way, and Longbranch assigns the Purchase Agreement to Black Duck in exchange for a 20% net-profits interest that attached and ran with the right-of-way.**

28.   When Wright learned about the right-of-way deal, he begged to be a part of it, claiming it was on his "bucket list" to do a pipeline. Wright immediately volunteered to supply all funds to purchase the right-of-way, representing that he had the cash on hand to fully fund the acquisition and maintenance of the right-of-way until a developer could be secured.

29.   Borders and Moore consented to Wright's role as the right-of-way funder through Black Duck. Wright reimbursed Moore and Borders for the $25,000 the two men had already paid, and Borders, on behalf of Longbranch, orally agreed to assign the Purchase Agreement to Black Duck. Wright and Moore, on behalf of Black Duck, orally agreed to give Longbranch a 20% net-profits share that would attach and run with the right-of-way.

30.   Longbranch and Black Duck confirmed their agreement in writing. Ex. 2 (Longbranch Assignment). The Longbranch Assignment expressly states:

> [Longbranch] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors or assigns during the period of time beginning on the date first written above (the "Period").
>
> a.   Net Profits shall mean gross revenues actually received by [Black Duck], or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.
>
> b.   [Black Duck's] obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to the payment of the Net Profits Share.

31.   Moreover, Longbranch and Black Duck specifically agreed "to execute such other and additional legal instruments, consents, ratifications and other matters as may be

reasonably required in order to effectuate the intent of this Assignment." Ex. 2 (Longbranch Assignment).

32.     Moore, Borders, and Wright all understood that Longbranch was giving up its right to purchase the right-of-way in exchange for a 20% net-profits share in the right-of-way that attached and ran with the land—and was binding on Black Duck's successors and assigns. At no point did Longbranch indicate it was unable or unwilling to make the earnest money payments to Express to keep the Purchase Agreement alive.

**D.     Black Duck delays closing on the right-of-way but eventually closes.**

33.     Because due diligence required consulting voluminous boxes of paper records, due diligence took much longer than 60 days. Black Duck extended the closing date multiple times, paying earnest money for each extension.

34.     While Black Duck—through the efforts of Moore and Borders—was performing its due diligence, Moore and Borders sought to identify buyers for the right-of-way. Although Moore, Borders, and Wright met and communicated with the leadership of several companies that expressed interest in purchasing the asset, interested investors repeatedly indicated that they were unwilling to purchase the right-of-way before Black Duck closed on the asset. After all, if Black Duck failed to close, these investors could always secure the right-of-way for themselves.

35.     Despite these realities, Wright pushed to find a buyer before closing and as part of negotiations with investors made false representations that Black Duck had already closed on the right-of-way. When Moore learned that Wright was falsely representing that the right-

of-way had closed, Moore confronted Wright and demanded that Wright fully disclose the status of the right-of-way deal.

36.     In response to Moore's confrontation, Wright purported to clarify his representations but still misrepresented key facts, including the extent of Borders's and Moore's interests in the right-of-way. For example, Wright claimed Borders "stayed on as a 15% partner" and that Moore only "own[ed] 35%" of Black Duck's "85% of Contract" to purchase the right-of-way.

37.     Ultimately, Black Duck was unable to find a buyer for its interest in the right-of-way without first closing on it.

38.     As the new closing date approached (July 14, 2017), Wright sought to obtain an additional extension. Because Moore's two years in Texas had finished, Moore was in the process of moving his family from Texas to North Carolina and had limited Internet access. Moore was not giving up on or abandoning the Purchase Agreement and never indicated he was doing so.

39.     Longbranch, Black Duck, and Express agreed to extend the closing date once again, to August 14, 2017.

40.     On July 13, 2017, Express's attorney emailed Wright, Moore, and Borders a copy of a contract memorializing that extension agreement and asked that a signed copy of the extension agreement be returned to him. Wright returned a signed copy of that agreement on July 14, 2017. But because Moore was traveling and had limited Internet access, he sent two emails—one on Friday, July 14, 2017 and one on Monday, July 17, 2017—granting Wright full authority to sign on the agreement on his behalf. But Moore expressly directed

9

Wright in writing that "I do not want any documents signed on my behalf (goes without saying) that we have not discussed and agreed prior to one of you signing for me."

41.    On August 14, 2017, Black Duck closed on the right-of-way. A little over a month later, Borders notarized and recorded the Longbranch Assignment in Shelby County.

42.    At all times before closing, Wright represented to Moore and Borders that he was a wealthy man and could easily fund the purchase of the right-of-way using his own funds. But Moore learned much later that Wright borrowed $4.1 million through KrisJenn Ranch to close the purchase of the right-of-way. Wright secured that loan through a first lien deed of trust on his ranch and certain minerals in Webb County, Texas.

43.    Wright also represented that his capital contribution was to be his consideration for his interest in the right-of-way. Yet Wright now claims that his capital contribution was a loan to Black Duck.

44.    Wright and KrisJenn Ranch's alleged loans to Black Duck were neither disclosed nor authorized by Moore, who was a manager of Black Duck and whose entity owned 50% of Black Duck. Black Duck's company agreement required transactions to be approved by disinterested management and, absent a special resolution (which did not exist here), also required the agreement of all managers to encumber Black Duck's assets. Such approval was never granted.

45.    Additionally, although the "loan documents" purport to evidence a loan transaction consummated on August 14, 2017, those documents—involving an undisclosed wrap-around

deed of trust using the right-of-way as collateral—were not executed or notarized until January 18, 2018.[1]

### E. Wright forces Moore out of Black Duck, and Moore agrees to resign in exchange for some of Black Duck's assets, including a running 20% net-profits interest in the right-of-way and an entitlement to 50% of Bigfoot's note payments.

46.     Meanwhile, throughout the fall of 2017, Black Duck sought a buyer for the right-of-way or an investor to finance the right-of-way's development. Wright repeatedly objected to potential investors and deal terms, preventing a deal from being reached. Unbeknown to Moore, on January 19, 2018, Wright had recorded the undisclosed loan documents in Nacogdoches County.

47.     At the end of January 2018, Wright grew increasingly hostile toward Moore, complaining that Moore had failed to secure a buyer for the right-of-way even though Moore had no such obligation. Swearing at Moore, Wright repeatedly stated that Moore had screwed up and that the right-of-way deal had failed. Wright told Moore that Moore needed to give up his interest in Black Duck. After several hostile conversations, Moore agreed to resign from Black Duck in exchange for a carried interest in the right-of-way and 50% of all note payments .

48.     On February 3, 2018, Moore drafted an email with the terms of his resignation. Moore and Wright had already orally agreed on those terms. In exchange for relinquishing his 50% interest in Black Duck—which included his 50% interest in all of Black Duck's assets,

---

[1] Additionally, the trustee on the deed of trust—David Strolle—is a lawyer at the firm that drafted Black Duck's company agreement. Strolle also appears to have prepared the loan documents—yet never disclosed those loan documents to Moore or to Moore's entity, which was a 50% partner in Black Duck.

including the right-of-way—Moore would receive "[n]o less than 20% Carried Interest in the P-21 Express Pipeline . . . under the same terms and conditions as the [Longbranch Assignment]" through his entity DMA. Ex. 3 (Email Agreement). Moore requested the same terms and conditions as the Longbranch Assignment because he knew that it gave Borders a 20% net-profits share in the right-of-way itself that would attach and run with the right-of-way, binding not only Black Duck but also its successors and assigns.

49.     Moore, via DMA, would also receive "[n]o less than 50% carried interest and 50% entitlement on all terms and conditions and monies owed to the Note to Black Duck Properties and Big Foot regarding the Harris SWD." *Id.*

50.     Wright and Black Duck expressly agreed to the written terms of Moore's resignation via email, including the representation that the "Harris SWD is 100% FREE AND CLEAR OF ANY AND ALL DEBTS." *Id.*

51.     A little later, Moore and Wright signed formal documents memorializing the terms of the Email Agreement. Wright did not disclose to Moore or DMA the secret indebtedness to KrisJenn Ranch, LLC that Wright now claims.

52.     One of the resignation documents—the DMA Agreement—states:

> DMA Properties shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from Black Duck Properties, LLC or its successors or assigns . . .
>
> a.  Net Profits shall mean gross revenues actually received by Black Duck Properties, LLC., or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

      b.   Black Duck Properties, LLC.'s obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and Black Duck Properties binds its successors and assigns to the payment of the Net Profits Share.

Ex. 4 (DMA Agreement).

53.     And, like the Longbranch Assignment, the DMA Agreement specifically states that Black Duck and DMA "agree to execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of this Agreement." *Id.*

54.     Another of the resignation documents, titled the Harris SWD Agreement, "address[es] the obligations regarding the Harris SWD" from "the binding 'Email Agreement' (attached as Exhibit A ) dated Feb. 3, 2018." Ex. 5 (Harris SWD Agreement) at 1. The Harris SWD Agreement confirms that "DMA Properties . . . is entitled to receive 50% of all Gross Monies" paid on the Bigfoot note to "Black Duck Properties including its successors and assigns." Ex. 5 (Harris SWD Agreement) at 1.

55.     The Harris SWD Agreement states:

In the event and for any reasons whatsoever Big Foot including but not limited to any of its successors and assigns fails to make the payments, then it is understood that DMA Properties, Inc. is a 50% carried interest party and will be entitled to 50% of any and all scenarios or outcomes including the full terms and conditions regarding the FULL original agreement by and between Black Duck Properties, LLC and Big Foot including but not limited to the Note payment and its terms and conditions.

*Id.*

**F.    Following Moore's resignation from Black Duck, Wright immediately sells the right-of-way for $2.5 million and a 16% carried interest in a future waterline.**

56.    Two days after the documents memorializing Moore's resignation were drawn up, Wright executed plans with another man, John Terrill, to sell the right-of-way to Terrill.

57.    Terrill's commitment to buy "the East Texas right-of-way (also known as the Express Gas Pipeline)" is dated February 9, 2018. Ex. 6 (Letter of Intent). According to the Letter of Intent, Terrill agreed to purchase Black Duck's right-of-way for $2.5 million, with Black Duck retaining a 16% carried interest in a future waterline. *Id*. As it turns out, Terrill and Wright had secretly been working on this deal since December 2017—well before Moore had resigned from Black Duck.

58.    On March 13, 2018, Terrill and Mr. Bobby Patton drafted documents to form a new LLC—TCRG East Texas Pipeline 1, LLC—for the "purpose of acquiring certain assets of Black Duck." Ex. 7 (TCRG LLC Agreement). One of Patton's entities, One Industries Group, L.P., took a 75% stake in TCRG while Terrill's entity, Synergy Midstream, LLC, took a 25% stake. *Id*.

59.    Shortly thereafter, on March 22, 2018, Wright and Patton executed the purchase agreement where Black Duck agreed to sell the right-of-way to TCRG. Ex. 8 (TCRG Purchase Agreement).

60.    On April 3, 2018, Wright and Patton executed the deed transferring the right-of-way from Black Duck to TCRG. Ex. 9 (TCRG Deed). Conducting only minimal due diligence and completing the purchase quickly, TCRG received a quitclaim deed for the right-of-way. *Id.* The TCRG deed expressly disclaimed any warranties about the right-of-way. *Id.*

14

**G.      Moore and Borders begin to uncover Wright's schemes.**

61.      On April 4, 2018, Moore and Borders first learned that the right-of-way had likely been sold. Wright had set up a morning meeting with Borders but did not notify or invite Moore of the meeting. As Borders understood it, the purpose of the meeting was to introduce him to the new owner of the right-of-way, indicating the sale had closed.

62.      Borders attended the meeting and met with Wright, Terrill, and Terrill's father. Wright claimed Terrill needed to see the right-of-way and review the deeds. Borders agreed to take the men out to the right-of-way and hand over the deeds and supporting documents.

63.      After the meeting, Borders, Wright, Terrill, and Terrill's father drove out to the right-of-way. During the ride back, Borders told Terrill about his 20% interest in the right-of-way.

64.      Following the drive to the right-of-way, Borders and Terrill visited Borders's office, where Borders gave Terrill the paper copies of the deeds and supporting documents for the right-of-way.

65.      After the meeting was over, Borders called Moore and informed him about the meeting. The two men then called Wright via a three-way call. Wright grew angry that Borders had called Moore and swore at both men.

66.      Toward the end of the call, Wright promised to send Moore and Borders copies of the proposed deal and claimed that Terrill knew about Borders's and Moore's interests, and even had copies of the agreements documenting those interests. Wright also asserted that the sale of the right-of-way had not yet closed.

67.      Wright never shared copies of the proposed deal with Borders and Moore or sent confirmation that Terrill knew about Borders's and Moore's interests.

68.     Given the radio silence from Wright, Moore emailed Terrill a copy of the DMA Agreement and copied Borders and Wright. Borders also shared the Longbranch Assignment with Terrill. Terrill responded by asking Moore to call him.

69.     After the call, Moore relayed his conversation with Terrill to Borders and Wright via email. Moore indicated that Terrill claimed (1) the right-of-way-deal was 100% closed; (2) he had first learned of Borders and Moore's interest from Borders on April 4; (3) Terrill and his group did not intend to honor Borders and Moore's interests; and (4) Terrill had been working on the right-of-way deal for a long time.

70.     On April 10, 2018, Borders emailed Wright and requested copies of the closing documents. Wright claimed that he was out of the United States and that he would send copies of the deal when he returned to the country on Tuesday, April 17, 2018. But just three days later, on April 13, 2018, Wright participated in a poker tournament in Florida, where he won $6,380.

71.     In his response to Borders's email, Wright also provided a short description of the alleged terms of the deal: Terrill's group paid a $500,000 down payment and closed with an additional $2 million for all assets owned by Black Duck that were received from Roberts in 2017. In exchange for these assets, Wright claimed Black Duck also received a 16% carried interest in the new joint venture. Wright said Borders and Moore would each receive 20% of the 16% carried interest for the life of the project while Wright would receive the remaining 60% of the 16% interest.

72.     On April 11, 2018, Wright's attorney, David Strolle, emailed Moore and told him to stop contacting any person concerning "the P-21 Express Gas Pipeline/ROW." Strolle

claimed that the right-of-way deal had not yet closed and that Moore's actions jeopardized the closing.

73.    On or about April 20, 2018, TCRG funded the purchase of the right-of-way.

74.    Moore and Borders finally learned that deal had closed months after the deed conveying to TCRG Black Duck's interest in the rights and properties "collectively referred to herein as the 'Express Pipeline'" was recorded on June 6, 2018. *See* Ex. 9 (TCRG Deed) at 1-2.

75.    It took several months and review of countless emails to discover the extent of Wright's and Terrill's lies. After uncovering some of Wright's lies, Moore recorded his interest in the right-of-way in Angelina, Rusk, Shelby, and Nacogdoches Counties.

76.    If Moore had known or suspected that Wright had crafted a scheme to sell the right of way and claim Moore only had an interest in Black Duck's profits (instead of a running net-profits interest that attached to the right-of-way), he would not have agreed to resign from Black Duck. Nor would Moore have given up his right to 50% of Black Duck's profits in exchange for 20% of its profits from the sale of the right-of-way (which was, by far, Black Duck's most valuable asset).

**H.    Black Duck abruptly stops paying DMA its share of Bigfoot's note payments for the Harris SWD, and Wright attempts to steal DMA's property.**

77.    After Moore's resignation, DMA received 50% of Bigfoot's March 2018 note payment and 50% of Bigfoot's July 2018 note payment. But Moore never received DMA's portion of the September 2018 note payment. When Moore reached out to Wright to learn why, Wright offered a series of different explanations on why payment was late. But at no

point in any of these communications did Wright assert that DMA was not entitled to 50% of Bigfoot's note payments.

78.    While Wright was offering Moore reasons why DMA's portion of the note payment was late, Wright was taking steps to steal Moore's interest in the note payments. On October 12, 2018, attorney David Strolle sent a letter to Bigfoot on behalf of KrisJenn Ranch. Ex. 10 (October 12, 2018 Letter). The letter purported to provide "formal notice" of an assignment transferring 100% of Black Duck's interest in the Bigfoot note to KrisJenn Ranch. *Id.* at 1.

79.    Mr. Strolle's October 12, 2018 letter included a copy of the alleged assignment, which states that Black Duck transferred its interest in Bigfoot Energy's note to KrisJenn Ranch, LLC and KrisJenn Ranch, LLC–Series Uvalde Ranch as partial payment of the balance due on a note dated August 14, 2017 for $4.1 million between KrisJenn Ranch as lender and Black Duck as borrower. Ex. 11 (Assignment of Note) at 1. The assignment represents that KrisJenn Ranch "foreclosed" on the August 14, 2017 promissory note. *Id.*

80.    But, as previously mentioned, that alleged note and the loan it claims to secure were never disclosed to or authorized by Moore, who was a manager of Black Duck and whose entity owned 50% of Black Duck in August 2017. Nor is there any evidence that the Bigfoot note was ever listed as collateral for the alleged loan.

**I.    Wright threatens to "kill the 20% each of you own" of the right-of-way and again claims that KrisJenn Ranch had foreclosed on its alleged loan to Black Duck.**

81.    Moore and Borders continued investigating Black Duck's sale of the right-of-way and sought a peaceful solution with TCRG, Wright, and Wright's entities. But in the spring of 2019, Wright emailed Moore and Borders that if Moore did not stop his conversations with

18

TCRG, then Wright would "end the 20% and file [m]alicious charges against you and all your forfeited Companies in the State of Texas." Ex. 12 (April 16, 2019 Email). Likewise, Wright threatened "to kill the 20% each of you own."

82.    Despite Wright's threats, Moore and Borders continued discussions with TCRG, which eventually led TCRG to demand that Wright rescind the sale of the right-of-way. Wright—through another of his entities, KrisJenn Ranch, LLC Series Pipeline ROW (Series Pipeline)—refunded TCRG's $2.5 million and accepted the return of the right-of-way.

83.    Wright and his entities now claim that KrisJenn Ranch "foreclosed" on the alleged loans Black Duck owed. But contradicting that assertion, KrisJenn Ranch and Wright claimed in July 2019 that the loan secured by a lien on the right-of-way was paid; they filed a release of lien in Rusk County that "acknowledge[d] its payment and release[d] the property from the lien." Ex. 13 (Release of Lien).

84.    Black Duck, KrisJenn Ranch, LLC, and KrisJenn Ranch, LLC–Series Uvalde Ranch have provided no records of any foreclosure (despite repeated requested for such records).

**J.    Wright has repeatedly tried to escape from his agreements with DMA and Moore.**

85.    Wright has lied to Moore and DMA and disregarded his agreements with and promises to Moore (and Moore's entities) time and again. Wright told Moore, his partner, that he would provide capital to fund Black Duck's investments, but later represented his capital contribution was an unauthorized "loan" to Black Duck. He transferred to Moore's entity, DMA, a 20% net-profits interest in the right-of-way and a 50% interest in Bigfoot note in exchange for Moore's departure from Black Duck, but then denied that DMA had any

such interest. And he conspired with his entities and with Terrill and TCRG to sell the right-of-way behind Moore's back and in disregard of DMA's interest in the right-of-way.

86.     Wright has treated Borders no better, also denying that Borders had any interest in the right-of-way. To resolve the issue, Borders (via Longbranch) filed suit in Shelby County on June 26, 2019, seeking a declaration of who owns what share of the right-of-way (Longbranch suit). That same day, Wright and some of his entities filed a parallel suit in the 25th Judicial District in Guadalupe County seeking the same declaratory relief (Wright suit).

87.     But, because Guadalupe County was not a proper venue, the 25th District Court transferred the Wright suit to Shelby County.

88.     In Shelby County, the district court heard Wright's motion for summary judgment, which asked the court to construe the Longbranch Assignment and the DMA Agreement in Wright's favor as a matter of law—just like KrisJenn Ranch is asking for the Court to do here. The Shelby County court unequivocally denied Wright's request for summary judgment and, eventually, consolidated the Wright suit into the Longbranch suit.

89.     Simultaneously with the Shelby County proceedings, Bigfoot filed an interpleader action in Panola County so it could pay its note payments into the court registry. In that case, DMA filed a summary-judgment motion, asserting a 50% interest in the Bigfoot note payments as a matter of law. DMA's motion was originally set for a hearing on May 6, 2020.

90.     With Wright's discovery obligations finally coming due in the Shelby County lawsuits[2] and DMA's Panola County summary-judgment motion set for a hearing, Wright

---

[2] DMA and Moore were forced to file a motion to compel Wright, KrisJenn Ranch, LLC, and Black Duck to respond to discovery in the Shelby County court.

filed for bankruptcy for his KrisJenn entities. Around the same time, DMA learned that Wright and KrisJenn Ranch, LLC had covertly borrowed $5.9 million from McLeod Oil, LLC and extended McLeod an option to purchase the right-of-way for $6,000,000.

91.     Now, in a fourth court, Moore and DMA again seek to protect their property from Wright's fraud and his attempts to escape his promises.

## Claims Related to the Pipeline Right of Way

### Claim 1: Breach of Contract

**(against Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW)**

92.     The preceding paragraphs are incorporated by reference for this claim.

93.     The February 4, 2018 Email Agreement and the DMA Agreement are valid, enforceable contracts. DMA attaches the February 4, 2018 Email Agreement as Exhibit 3 and the DMA Agreement as Exhibit 4 to this pleading. Both contracts are incorporated by reference.

94.     By these contracts, Wright, on behalf of himself and Black Duck, agreed that Moore would receive, among other things, "[n]o less than 20% Carried Interest in the P-21 Express Pipeline . . . under the same terms and conditions as the [Longbranch Assignment]" through his entity DMA.

95.     By resigning from Black Duck and relinquishing his 50% interest, Moore performed or substantially performed his contractual obligations.

96.     DMA is the intended third-party beneficiary of the February 3, 2018 Email Agreement and the DMA Agreement.

97.     DMA is a proper party to sue for breach of the February 3, 2018 Email Agreement and the DMA Agreement.

98.     KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW are the successors to Black Duck.

99.     In addition and alternatively, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW were assignees of the obligation to pay DMA 20% of net profits earned through the P-21/Express right-of-way because DMA's net-profits share attached and ran with the right-of-way.

100.    Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Wright materially breached the February 3, 2018 Email Agreement and the DMA Agreement in multiple respects, injuring Moore and DMA.

101.    DMA seeks its actual damages and/or specific performance of the contract, including the obligation to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the DMA] Agreement." Ex. 4 (DMA Agreement).

### Claim 2: Money Had and Received

**(against Wright, KrisJenn Ranch, LLC, Black Duck, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW)**

102.    The preceding paragraphs are incorporated by reference for this cause of action.

103.    Wright, KrisJenn Ranch, LLC, Black Duck, KrisJenn Ranch, LLC–Series Uvalde Ranch hold the entirety of the proceeds from the multiple sales of the right-of-way.

104.    20% of the net profits from the sales of the right-of-way belong to DMA in equity and good conscience.

105.    DMA's injury resulted from Wright's gross negligence, malice, or actual fraud, which entitles DMA to exemplary damages under Texas Civil Practice and Remedies Code §41.003(a).

**Claim 3: Breach of Fiduciary Duty**
**(against Wright and Black Duck)**

106.    The preceding paragraphs are incorporated by reference for this cause of action.

107.    Black Duck and Wright had a fiduciary relationship with DMA, and Black Duck and Wright acted as custodians and agents of payment for DMA.

108.    Black Duck and Wright received the entirety of the payments from the sale of the right-of-way—20% of the $2.5 million Black Duck received from TCRG. Upon receipt, Black Duck and Wright were supposed to process those payments and pay 20% to DMA.

109.    By failing to process and pay 20% of net profits to DMA, Black Duck and Wright breached fiduciary duties arising out of this relationship.

110.    DMA was damaged as a result of the breach and seeks actual damages as well as an accounting of Black Duck, imposition of a constructive trust on all property and proceeds received by Wright and/or his entities in connection with the right-of-way, and disgorgement of profits received by Wright and/or his entities (including but not limited to KrisJenn Ranch, LLC–Series Pipeline ROW).

## Claim 4: Aiding and Abetting Breach of Fiduciary Duty

**(against Black Duck, KrisJenn Ranch LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Terrill)**

111.    The preceding paragraphs are incorporated by reference for this cause of action.

112.    As explained in Claim 3, Wright and Black Duck breached fiduciary duties owed to DMA.

113.    Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and/or Terrill aided and abetted those fiduciary breaches.

114.    Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW are controlled and/or owned by Wright.

115.    Wright utilized these entities to aid and abet his breaches of fiduciary duty.

116.    Additionally, Terrill aided and abetted Wright's breaches of fiduciary duty by cooperating with Wright's attempts to deny and ignore DMA's 20% interest in all profits earned through the right-of-way.

117.    Although Terrill understood that Wright and Black Duck owed fiduciary duties to DMA, Terrill aided and abetted Wright's efforts to breach those fiduciary duties through concealment of the sale and denial of DMA's right to 20% of all profits earned through the right-of-way.

118.    Terrill also lied to Borders regarding the status of the sale of the right-of-way in order to conceal details of the sale from Borders, Moore, and DMA.

119.    DMA seeks actual damages resulting from these efforts to aid and abet Wright's fiduciary breaches.

120.    DMA also seeks disgorgement of all ill-gotten profits, interests, and funds procured by Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and/or Terrill as a result of Wright's and Black Duck's breaches of fiduciary duty. DMA further seeks the imposition of a constructive trust on all property and proceeds received by Wright and/or his entities in connection with the right-of-way, and disgorgement of profits received by Wright and/or his entities (including but not limited to KrisJenn Ranch, LLC–Series Pipeline ROW).

## Claim 5: Tortious Interference with Contract

### (against Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and Terrill)

121.    The preceding paragraphs are incorporated by reference for this cause of action.

122.    The February 3, 2018 Email Agreement and the DMA Agreement are valid, enforceable contracts.

123.    Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Terrill willfully and intentionally interfered with these contracts, through the conduct described above, including the conduct described in Claims I, III, and IV.

124.    DMA has been proximately injured as a result of this interference.

125.    DMA seeks actual damages resulting from this interference as well as injunctive relief prohibiting Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Terrill from continuing to interfere with Wright and Black Duck's obligations to Moore and DMA under the February 3 Email Agreement and DMA Agreement.

## Claim 6: Fraud (in the alternative)

### (against Wright and Black Duck)

126.     The preceding paragraphs are incorporated by reference for this cause of action.

127.     Black Duck and Wright represented to Moore and DMA that DMA would receive, among other things, a 20% net-profits interest in the P-21/Express right-of-way that attached and ran with the right-of-way.

128.     Black Duck and Wright's representations to Moore and DMA were material and false statements of fact.

129.     Alternatively, Black Duck and Wright's representations were false promises of future performance. At the time they made those promises, Black Duck and Wright had no intention of performing or honoring them.

130.     Black Duck and Wright knew that their representations were false and intended Moore and DMA to rely on them.

131.     Moore and DMA justifiably relied on Black Duck and Wright's false representations when Moore resigned from Black Duck and relinquished his ownership stake. That reliance was both reasonable and substantial.

132.     Black Duck and Wright's false representations directly and proximately caused injury to Moore and DMA.

133.     Black Duck and Wright knew, or reasonably should have known, that Moore and DMA would rely on their promises.

134.     Moore and DMA's injury resulted from Black Duck and Wright's actual fraud, gross negligence, or malice, entitling Moore and DMA to exemplary damages.

135.    Moore and DMA also seek disgorgement of all ill-gotten profits, interests, and funds procured by Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and/or Terrill as a result of Wright's and Black Duck's fraud. Moore and DMA further seek the imposition of a constructive trust on all property and proceeds received by Wright and/or his entities in connection with the right-of-way, and disgorgement of profits received by Wright and/or his entities (including but not limited to KrisJenn Ranch, LLC–Series Pipeline ROW) as a result of their fraud.

### Claim 7: Aiding and Abetting Fraud (in the alternative)

**(against Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and/or Terrill)**

136.    The preceding paragraphs are incorporated by reference for this cause of action.

137.    As explained in Claim VII, Wright and Black Duck made false and material misrepresentations to Moore and DMA, and Moore and DMA relied upon those representations when Moore resigned from Black Duck and relinquished his ownership stake. That reliance was both reasonable and substantial and caused injury to Moore. It was also reasonably foreseeable that Moore and DMA would rely on those representations.

138.    Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and/or Terrill aided and abetted Wright and Black Duck's fraud, through the conduct described above, including the conduct described in Claims I, II, IV and V.

139.    Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW are controlled and/or owned by Wright.

140.    Wright utilized these entities to aid and abet his fraud.

27

141.    Additionally, Terrill aided and abetted Wright's fraud by cooperating with Wright's attempts to extend unauthorized loans to Black Duck and with Wright's attempts to conceal the impending sale of the right-of-way from Moore.

142.    Terrill understood that Wright was concealing material facts from Moore and DMA in order to induce Moore and DMA to agree to the February 3 Email Agreement and DMA Agreement.

143.    Terrill aided and abetted Wright's efforts to defraud Moore and DMA through concealment of the impending sale and through Wright's attempts to take unauthorized actions on behalf of Black Duck.

144.    Terrill also lied to Borders regarding the status of the sale of the right-of-way in order to conceal details of the sale from Borders, Moore, and DMA.

145.    DMA seeks actual damages resulting from these efforts to aid and abet Wright's fraud.

146.    Moore and DMA also seek disgorgement of all ill-gotten profits, interests, and funds procured by Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and/or Terrill as a result of Wright's and Black Duck's fraud. Moore and DMA also seek the imposition of a constructive trust on all property and proceeds received by Wright and/or his entities in connection with the right-of-way, and disgorgement of profits received by Wright and/or his entities (including but not limited to KrisJenn Ranch, LLC–Series Pipeline ROW) as a result of their fraud.

## Claim 8: Civil Conspiracy

### (against Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Terrill)

147.    The preceding paragraphs are incorporated by reference for this cause of action.

148.    Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Terrill reached a meeting of the minds and intentionally conspired to defraud Moore and DMA in the manner described in Claims VI and VIII, including but not limited to the meeting of the minds to cause Black Duck to become secretly indebted to Wright and the KrisJenn Ranch entities for the purpose of "foreclosing" to exclude Moore from the right-of-way. Terrill, Black Duck, KrisJenn Ranch, LLC–Series Pipeline ROW, and Wright also had a meeting of the minds to exclude DMA's net-profits interest in the right-of-way from their transaction.

149.    Moore and DMA suffered damages that were proximately caused by the unlawful acts taken by Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Terrill.

## Claim 9: Unjust Enrichment

### (against Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Terrill)

150.    The preceding paragraphs are incorporated by reference for this cause of action.

151.    Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and/or Terrill were enriched at DMA's expense.

152.    That enrichment was unjust for the reasons described herein, and there is no other adequate remedy available at law.

### Claim 10: Declaratory Relief

### (against Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW)

153.  The preceding paragraphs are incorporated by reference for this claim.

154.  There exists a genuine, justiciable controversy between DMA and Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW about the rights and obligations of the parties under the February 3, 2018 Email Agreement and DMA Agreement.

155.  A declaratory judgment from this Court would resolve that controversy.

156.  DMA requests that the Court enter a declaratory judgment construing the February 3, 2018 Email Agreement and DMA Agreement and declaring that DMA received, among other things, a 20% net-profits share that attaches and runs with the P-21/Express right-of-way and that this interest was received in exchange for Moore's resignation from Black Duck and agreement to surrender of his 50% ownership stake in Black Duck and its assets.

157.  DMA has incurred costs and reasonable and necessary attorneys' fees in seeking this declaratory judgment and/or in defending against the plaintiff's declaratory judgment. DMA requests all costs recoverable under §37.009 of the Texas Civil Practice and Remedies Code, including an award of such reasonable and necessary attorney's fees as are equitable and just.

### Attorneys' Fees

158.  DMA seeks to recover its reasonable attorneys' fees incurred in connection with these claims, including under Chapters 37, 38, and 41 of the Texas Civil Practice and Remedies Code.

## Claims Related to the Bigfoot Note Payments

### Claim 1: Breach of Contract

**(KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW)**

159.   The preceding paragraphs are incorporated by reference for this claim.

160.   The February 3, 2018 Email Agreement and Harris SWD Agreement are valid, enforceable contracts. DMA attaches the February 3, 2018 Email Agreement as Exhibit 3 and the Harris SWD Agreement as Exhibit 5 to this pleading. Both contracts are incorporated by reference.

161.   By these contracts, Wright, on behalf of himself and Black Duck, agreed that DMA would receive "50% carried interest and 50% entitlement" on Bigfoot Energy's note.

162.   Among other things, Wright, on behalf of himself and Black Duck, agreed that Black Duck— "including its successors and assigns"—would pay DMA 50% of Bigfoot Energy's note payments within three business days of the funds being available.

163.   By resigning from Black Duck and relinquishing his 50% interest, Moore performed or substantially performed his contractual obligations.

164.   DMA is the intended third-party beneficiary of the February 3, 2018 Email Agreement and the Harris SWD Agreement. DMA is a proper party to sue for their breach.

165.   KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW are the successors to Black Duck.

166.   In addition and alternatively, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW were assignees of the

obligation to pay DMA its portion of Bigfoot Energy's payments and Black Duck's 50% interest in the Bigfoot Energy note.

167.     Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW materially breached the February 3, 2018 Email Agreement and the Harris SWD Agreement in multiple respects, injuring DMA.

168.     DMA seeks the amounts due to it under the February 3, 2018 Email Agreement and Harris SWD Agreement as well as any other damages.

## Claim 2: Conversion

### (KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW)

169.     The preceding paragraphs are incorporated by reference for this claim.

170.     DMA had a right to immediate possession of 50% of Bigfoot Energy's note payments under the February 3, 2018 Email Agreement and Harris SWD Agreement.

171.     Half of the proceeds from those note payments are DMA's property.

172.     Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW (in addition to Larry Wright) wrongfully exercised dominion and control over DMA's personal property—its 50% of the Bigfoot Energy note payments for September 2018, December 2018, March 2019, and June 2019—in a manner inconsistent with DMA's rights.

173.     Cross-Defendants refused to return DMA's property on demand. Cross-Defendants' acts amounted to a clear repudiation of DMA's rights.

174.     In the alternative, a demand for the return of the property would have been useless.

175.     Cross-Defendants' wrongful acts injured DMA, which resulted in the loss of the use of the converted property and the loss of profits from the converted property.

176.     DMA seeks half of the proceeds from the note payments it is due and compensation for its loss of use of the converted property and loss of profits.

177.     DMA's injury resulted from the Cross-Defendants' malice, which entitles DMA to exemplary damages.

### Claim 3: Money Had and Received

**(KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW)**

178.     The preceding paragraphs are incorporated by reference for this cause of action.

179.     Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW (in addition to Larry Wright) hold the entirety of Bigfoot Energy's September 2018, December 2018, March 2019, and June 2019 note payments.

180.     50% of the proceeds from those note payments belong to DMA in equity and good conscience.

181.     DMA seeks damages in the amount of at least $79,610.73.

182.     DMA' injury resulted from the Cross-Defendants' gross negligence, malice, or actual fraud, which entitles DMA to exemplary damages under Texas Civil Practice and Remedies Code §41.003(a).

### Claim 4: Breach of Fiduciary Duty

**(KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW)**

183.     The preceding paragraphs are incorporated by reference for this cause of action.

184.    Black Duck Properties, LLC and Wright had a fiduciary relationship with DMA. Black Duck Properties, LLC and Wright were custodians and agents of payment for the amounts belonging to DMA. As described in the Harris SWD Agreement, Black Duck and Wright received the entirety of each Bigfoot Energy note payment. Black Duck and Wright were then supposed to process Bigfoot Energy's payment and pay 50% to DMA.

185.    KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW are allegedly the successors of Black Duck or the assignees Black Duck's interest in the Bigfoot Energy note. KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW assumed Black Duck and Wright's fiduciary duty to DMA.

186.    Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW (in addition to Larry Wright) breached their fiduciary duty to DMA—a duty which includes the duty of loyalty and utmost good faith and a duty to refrain from self-dealing.

187.    Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW's breach of fiduciary duty injured DMA by depriving DMA of its 50% portion of Bigfoot Energy's note payments. The breach benefited Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW by allowing these entities to misappropriate DMA' interest in the Bigfoot Energy note and portion of the note payments.

188.    DMA's injury resulted from Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW's malice,

fraud, or gross negligence, which entitles DMA to exemplary damages under Texas Civil Practice and Remedies Code §41.003(a).

## Claim 5: Unjust Enrichment

### (KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW)

189.    The preceding paragraphs are incorporated by reference for this claim.

190.    Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW were enriched at DMA's expense.

191.    That enrichment was unjust, and there is no other remedy available at law.

## Claim 6: Declaratory Relief

### (KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW)

192.    The preceding paragraphs are incorporated by reference for this claim.

193.    There exists a genuine, justiciable controversy between DMA and Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW about the rights and obligations of the parties under the February 3, 2018 Email Agreement and Harris SWD Agreement.

194.    A declaratory judgment from this Court would resolve that controversy.

195.    DMA requests that the Court enter a declaratory judgment construing the February 3, 2018 Email Agreement and Harris SWD Agreement that DMA has a carried interest in and a right to 50% of Bigfoot Energy's note payments and construing how future note payments will be divided and paid.

196.    DMA has incurred costs and reasonable and necessary attorneys' fees in seeking this declaratory judgment.

## Attorneys' Fees

197.    DMA seeks to recover its reasonable attorneys' fees incurred in connection with these claims.

## PRAYER FOR RELIEF

With respect to the pipeline right-of-way, DMA respectfully requests:

a.    a declaration that DMA received a 20% net-profits share that attaches and runs with the P-21/Express right-of-way and that such interest was received in exchange for Moore's resignation from Black Duck and agreement to surrender of his 50% ownership stake in Black Duck and its assets;

b.    a judicial declaration as to how DMA's 20% net-profits share is to be paid going forward;

c.    an injunctive order that Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC, a Texas Limited Liability Company–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC-Series Pipeline ROW specifically perform the February 3, 2018 Email Agreement and the DMA Agreement, including the obligation to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the DMA] Agreement[;]"

d.    an award of money damages for the loss of, or damage to the value of, the 20% net-profits share under the February 3 Email Agreement and DMA Agreement;

e.    an award of money damages for harm resulting from the torts of Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC, a Texas Limited Liability Company–Series Uvalde Ranch, KrisJenn Ranch, LLC-Series Pipeline ROW, and/or Terrill;

f.    an award of reasonable and necessary attorneys' fees incurred in this action;

g.    an award of exemplary damages;

h.    the disgorgement of—and/or imposition of a constructive trust on—any profits or ill-begotten funds received by Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC, a Texas Limited Liability Company–Series Uvalde Ranch, KrisJenn Ranch, LLC-Series Pipeline ROW, or Terrill as a remedy for fraud and/or unjust enrichment;

    i.   an accounting to determine the amount of funds improperly withheld from DMA in connection with profits earned through the right-of-way;

    j.   pre- and postjudgment interest and costs of suit; and/or

    k.   any other legal or equitable relief to which DMA may show itself to be justly entitled.

With respect to the Bigfoot note payments, DMA respectfully requests:

    a.   a judicial declaration that DMA has a carried interest in and a right to 50% of Bigfoot Energy's note payments;

    b.   a judicial declaration as to how Bigfoot Energy's future note payments are to be paid;

    c.   an award of the money Bigfoot Energy paid into the registry of the Panola County court registry and an award of monetary damages so that DMA receives its share of Bigfoot Energy's note payments from September 2018 to present and is compensated for its injuries;

    d.   an award to Bigfoot Energy of the reasonable and necessary attorneys' fees incurred in this action out of any funds—either in the Panola County court registry or as part of future note payments—due to Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW;

    e.   an award to DMA of its reasonable and necessary attorneys' fees incurred in defending this action and asserting cross-claims;

    f.   an award of exemplary damages against Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW;

    g.   the imposition of a constructive trust on Bigfoot Energy's note payments as a remedy for breach of fiduciary duty and unjust enrichment;

    h.   pre- and postjudgment interest and costs of suit; and/or

    i.   any other legal or equitable relief to which DMA may show itself to be justly entitled.

Respectfully submitted,

/s/ Michael Black
Michael Black
State Bar No. 02384400
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, Texas 78209
210-829-2022
210-829-2021 fax
mblack@burnsandblack.com

*Attorneys for Longbranch Energy, LP and DMA Properties, Inc.*

/s/ Christopher S. Johns
Christopher S. Johns
State Bar No. 24044849
Christen Mason Hebert
State Bar No. 24099898
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

/s/ Timothy Cleveland
Timothy Cleveland
State Bar No. 24055318
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com

*Attorneys for DMA Properties, Inc.*

CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system by notice of electronic filing or via email on the 1st day of June 2020:

Mr. Ronald J. Smeberg
MULLER SMEBERG, PLLC
111 West Sunset Road
San Antonio, Texas 78209
ron@smeberg.com

*Counsel for KrisJenn Ranch, LLC,*
*KrisJenn Ranch, LLC–Series Uvalde Ranch,*
*and KrisJenn Ranch, LLC–Series Pipeline ROW*

Shane P. Tobin
OFFICE OF THE UNITED STATES TRUSTEE
903 San Jacinto Blvd, Room 230
Austin, Texas 78701
shane.p.tobin@usdoj.gov

*United States Trustee*

Jeffery Duke
State Bar No. 24056609
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, Texas 77494
jduke@dbmmlaw.com

*Counsel for Longbranch Energy, LP*

/s/ Michael Black
Michael Black