# Exhibit 2: Declaration of Darin Borders

CAUSE NO. 19-1489-CV-C

| | | |
|---|---|---|
| Larry M. Wright, Krisjenn Ranch, LLC, and Krisjenn Ranch, LLC-Series Uvalde Ranch, as successors to Black Duck Properties, LLC<br>*Plaintiffs*, <br><br>v.<br><br>Frank Daniel Moore, DMA Properties, Inc., Darin Borders, and Longbranch Energy, LP,<br>*Defendants*. | § § § § § § § § § § § § § § § | In the District Court<br><br><br><br><br><br>25th Judicial District<br><br><br><br><br><br><br>Guadalupe County, Texas |

**DECLARATION OF DARIN BORDERS**

1. My name is Darin Borders. I am over 18 years of age, am of sound mind, and am capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. Attached to this declaration are true and accurate copies of the following documents which I discuss in this declaration:

   Exhibit 7:   Purchase Agreement

   Exhibit 8:   Longbranch Assignment

   Exhibit 11:  July 13, 2017 Email

   Exhibit 12:  Extension of Closing Date

   Exhibit 15:  Black Duck Deed

   Exhibit 16:  KrisJenn Ranch Deed of Trust

   Exhibit 17:  Loan Documents

   Exhibit 25:  TCRG Deed

1

Exhibit 26:   April 9, 2018 Email Chain 1

Exhibit 27:   April 9, 2018 Email Chain 2

Exhibit 28:   April 9, 2018 Email Chain 3

Exhibit 29:   April 10, 2018 Email Chain

Exhibit 31:   April 16, 2019 Email

3. I am the principal for Longbranch Energy, LP.

4. In 2015, I called Moore asked if he knew anyone who might be interested in collaborating on the purchase of four saltwater disposal (SWD) wells. Moore asked if he could try to obtain the wells, and I said yes.

5. After Moore secured the opportunity to buy the wells at a lower price than expected, he asked me if I wanted to join with him and a man named Larry Wright in purchasing the wells. Through my entity, Longbranch, I agreed to pay 1/3 of the purchase prices to buy the wells.

6. Working together, Moore and I were able to secure buyers for two SWD wells before closing. Neither Longbranch nor Black Duck (Wright and Moore's entity) had to pay any money to purchase these wells. Instead, both entities made a profit at closing.

7. In the summer of 2015, I told Moore about a pipeline right-of-way that ran across my family's property in East Texas. I had previously determined that this right-of-way would be a good investment. I contacted Rod Roberts, President of Express Pipeline Connection, LLC, which owned the right-of-way. Roberts indicated he would be willing to sell the right-of-way for $5 million and requested a $25,000 payment to secure the right

2

to purchase the asset. Only after receiving the $25,000 would he allow us to view the deeds and supporting documents of the right-of-way.

8. Moore came and met me in Shelby County, and we walked along part of the right-of-way. An old pipeline, which appeared to be in disrepair, was located in some places along the right-of-way but did not run continuously through the right-of-way. Moore agreed with me that the right-of-way might be a good asset for oil and gas companies operating in East Texas. Moore mentioned several potential investors and developers for the right-of-way who Moore would be willing to contact.

9. Moore and I subsequently secured by contract the right to purchase the right-of-way for $5 million through Longbranch. In late 2015, Moore and I collectively paid the $25,000 earnest money. On February 19, 2016, Roberts and I memorialized our agreement in writing. A copy of that agreement is attached as Exhibit 7 (the Purchase Agreement).

10. The Purchase Agreement defined the assets we sought to buy from Express. Based on my conversations with Roberts and Moore, I understood the term "P-21" to refer to the pipe in the right-of-way and the term "Express Pipeline" to the right-of-way.

11. Through the Purchase Agreement, we set a 60-day due diligence period and set closing for April 19, 2016. Through the Purchase Agreement, we also allowed several extensions of the closing date and due diligence period.

12. I learned from Moore that Wright had volunteered to be the funder for the right-of-way. We agreed that Wright could fund the right-of-way through Black Duck. Wright reimbursed the full $25,000 that had already been paid to Express. On behalf of

3

Longbranch, I orally agreed to assign the Purchase Agreement to Black Duck. Wright and Moore, on behalf of Black Duck, orally agreed to give Longbranch a 20% net-profits share in the right-of-way that would attach and run with the land.

13. All three of us—Wright, Moore, and myself—confirmed our understanding in writing. That writing is attached to this declaration as Exhibit 8 (Longbranch Assignment). I executed the agreement on behalf of Longbranch, and Wright, Cohle, and Moore executed the agreement on behalf of Black Duck.

14. All three of us—Wright, Moore, and myself—understood that Longbranch was giving up the right to purchase the right-of-way in exchange for a 20% net-profits share in the right-of-way that attached and ran with the land.

15. At no point did I or Longbranch indicate it was unable or unwilling to make the earnest money payments to Express to keep the Purchase Agreement alive.

16. The deeds and other supporting documents for the right-of-way were only available in paper. No electronic versions were available. Due diligence required consulting multiple boxes of paper records and took much longer than 60 days. Black Duck extended the closing date multiple times, paying earnest money for each extension.

17. While Black Duck—through the efforts of Moore and myself—was performing its due diligence, Moore, Cohle, I sought developers for the right-of-way. The three of us and Wright met and communicated with the leadership of several companies who expressed interest in developing or purchasing the asset.

18. But interested investors repeatedly indicated that they were unwilling to commit to developing or purchasing the right-of-way before Black Duck closed on the asset. If

4

Black Duck failed to close, these investors could always secure the right-of-way for themselves. But Wright continued to push to find a buyer before closing.

19. Ultimately, Black Duck was unable to find a buyer for its interest in the right-of-way without first closing on it.

20. As the new closing date approached (July 14, 2017), Wright sought to obtain an additional extension. Because Moore's two years in Texas had finished, Moore was in the process of moving his family from Texas to North Carolina and had no internet access. Moore never indicated he was giving up on or abandoning the Purchase Agreement.

21. Longbranch, Black Duck, and Express agreed to extend the closing date once again to August 14, 2017. On July 13, 2017, Express's attorney, emailed Wright, Moore, Cohle, and myself a copy of the contract memorializing that extension agreement. The attorney's email is attached as Exhibit 11 (July 13, 2017 Email). The extension agreement is attached as Exhibit 12 (Extension of Closing Date).

22. Over a year after Black Duck had assumed Longbranch's Purchase Agreement, on August 14, 2017, Black Duck finally closed on the right-of-way. The deed Black Duck received is attached as Exhibit 15 (Black Duck Deed). At all times before closing, Wright represented to Moore and me that he was a wealthy man and could easily fund the purchase of the right-of-way using his own funds.

23. Long after I assigned the right to purchase the right-of-way to Black Duck and recorded that assignment, I learned that KrisJenn Ranch had recorded a deed of trust claiming that it had borrowed $4.1 from Asilo Investments, Ltd. on allegedly the same day

5

that Black Duck closed on the right-of-way. Attached as Exhibit 16 (KrisJenn Ranch Deed of Trust) is a copy of the recorded deed of trust.

24. Wright also represented that his capital contribution was to be his consideration for his interest in the right-of-way. But I later discovered that Wright recorded documents claiming that KrisJenn Ranch lent Black Duck $4.1 million dollars. Those documents are attached as Exhibit 17 (Loan Documents).

25. On October 2, 2017, I had the Longbranch Assignment notarized and recorded it in Shelby County.

26. In February 2018, I learned Moore was resigning from Black Duck and was taking a 20% net-profits share in the right-of-way that attached and ran with the land, just like I had taken in exchange for assigning the right to purchase the right-of-way to Black Duck.

27. On April 4, 2018, I first learned that the right-of-way had likely been sold. That day, Wright set up a meeting with me but did not notify or invite Moore. I understood the purpose of the meeting was to introduce me to the new owner of the right-of-way, indicating the sale had closed.

28. The meeting was held around lunchtime on April 4, 2018 at a restaurant in Joaquin, Texas. At the meeting, I met with Wright, Terrill, and Terrill's father. Wright said he had sold the right-of-way and indicated that Terrill was the new owner. Wright claimed Terrill needed to see the right-of-way and review the deeds. I agreed to take the men out to the right-of-way and hand over the deeds and supporting documents.

29. After lunch, I drove out to the right-of-way, and Wright followed in his vehicle with Terrill and Terrill's father. We walked along some of the right-of-way. As we

6

departed the right-of-way for my office, Terrill hopped in my truck. During the ride, I told Terrill about my 20% interest in the right-of-way. When Terrill asked if my interest was recorded, I confirmed that it had been recorded.

30. Once at my office, I gave Terrill the paper copies of the deeds and supporting documents for the right-of-way. After the meeting was over, I called Moore and informed him about the meeting. We then called Wright via a three-way call. Wright grew angry that I had called Moore and swore at both of us.

31. Toward the end of the call, Wright promised to send Moore and I copies of the proposed deal and confirmed that the buyers knew all about our interests and even had copies. For the first time, Wright claimed the sale of the right-of-way had not yet closed. After the call, Wright never shared copies of the proposed deal or sent confirmation that Terrill knew about our interests.

32. Given Wright's silence, Moore emailed Terrill a copy of the DMA Agreement and copied Wright and me. A copy of that email is attached as Exhibit 26 (Apr. 9, 2018 Email Chain 1). I then also shared the Longbranch Assignment with Terrill. A copy of that email is attached as Exhibit 27 (Apr. 9, 2018 Email Chain 2). Moore than had a phone conversation with Terrill. After the call, Moore relayed his conversation with Terrill to Wright and me via email. A copy of that email is attached as Exhibit 28 (Apr. 9, 2018 Email Chain 3).

33. On April 10, 2018, I emailed Wright and requested copies of the closing documents. A copy of that email is attached as Exhibit 29 (April 10, 2018 Email). Wright claimed that he was out of the U.S. and that he would send copies of the deal when he

7

returned to the U.S. on Tuesday. Wright included a short description of alleged terms of the deal: Terrill's group paid a $500k down payment and closed with an additional $2 million for all assets owned by Black Duck that were received from Roberts in 2017. In exchange for these assets, Wright claimed Black Duck also received a 15% carried interest in the new joint venture. Moore and I would each receive 20% of the 15% carried interest for the life of the project while Wright would receive the remaining 60% of the 15% interest.

34. I only learned that deal had closed months after the deed conveying to TCRG Black Duck's interest in the rights and properties "collectively referred to herein as the 'Express Pipeline'" was recorded on June 6, 2018. A copy of that deed is attached as Exhibit 25 (TCRG Deed). It took several months and review of countless emails to discover the extent of Wright's and Terrill's lies.

35. Until this lawsuit was filed, Moore and I continued investigating Black Duck's sale of the right-of-way and sought a peaceful solution with TCRG, Wright, and Wright's entities. In the spring of 2019, Wright emailed Moore and me that if Moore did not stop his conversations with TCRG, then Wright would "end the 20% and file [m]alicious charges against you and all your forfeited Companies in the State of Texas." A copy of that email is attached as Exhibit 31 (Apr. 16, 2019 Email). Likewise, Wright threatened "to kill the 20% each of you own."

36. If I had thought I was only receiving a 20% interest in Black Duck's profits rather than a 20% net-profits share in the right-of-way that attached and ran with the land, I would not have given up the right to purchase the entire right-of-way.

My name is **Darin Borders**, my date of birth is **January 24th 1975**, and my address is **3134 Fm 2913 Center, Texas 75935**.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in **Shelby** County, State of **Texas**, on the **16th** day of January 2020.

*/s/ Darin Borders*
Darin Borders

9