# Exhibit 23:
# TCRG LLC Agreement

# COMPANY AGREEMENT

## OF

## TCRG EAST TEXAS PIPELINE 1, LLC

Dated as of March 13, 2018

THE SECURITIES REPRESENTED BY THIS INSTRUMENT OR DOCUMENT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE. WITHOUT SUCH REGISTRATION, SUCH SECURITIES MAY NOT BE SOLD OR OTHERWISE TRANSFERRED AT ANY TIME, EXCEPT UPON DELIVERY TO THE COMPANY OF AN OPINION OF COUNSEL SATISFACTORY TO THE MANAGER OF THE COMPANY THAT REGISTRATION IS NOT REQUIRED FOR SUCH TRANSFER OR THE SUBMISSION TO THE MANAGER OF THE COMPANY OF SUCH OTHER EVIDENCE AS MAY BE SATISFACTORY TO THE MANAGER TO THE EFFECT THAT ANY SUCH TRANSFER OR SALE WILL NOT BE IN VIOLATION OF THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS OR ANY RULE OR REGULATION PROMULGATED THEREUNDER.  IN ADDITION, THE INTERESTS ISSUED UNDER THIS AGREEMENT MAY BE SOLD OR TRANSFERRED ONLY IN COMPLIANCE WITH THE RESTRICTIONS ON TRANSFER SET FORTH HEREIN.

## COMPANY AGREEMENT
## OF
## TCRG EAST TEXAS PIPELINE 1, LLC

**THIS COMPANY AGREEMENT** (this "Agreement") **OF TCRG East Texas Pipeline 1, LLC,** a Texas limited liability company (the "Company"), is made and entered into as of February 28, 2018 (the "Effective Date"), by and among Synergy Midstream, LLC, an Oklahoma limited liability company having its principal place of business at 12036 North May, Oklahoma City, OK 73120  ("Synergy" or the "Class A Member"), and One Industries Group, L.P., a Texas limited partnership having its principal place of business at 5201 Camp Bowie Blvd., Ste. 200, Fort Worth, Texas 76107 ("One Industries" or "Class B Member").

## RECITALS:

**WHEREAS,** the parties hereto desire to form the Company for the purpose of acquiring certain assets of Black Duck Properties, LLC (the "Black Duck Assets") as set forth in Exhibit A, attached hereto and incorporated herein, pursuant to that certain Purchase and Sale Agreement dated _____(the "PSA");

**WHEREAS,** in order to effectuate the foregoing, the parties hereto desire to enter into this Agreement as set forth herein.

## AGREEMENT

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements contained herein and other valuable consideration (the receipt and sufficiency of which hereby are acknowledged by each party hereto), the parties hereto, intending to be legally bound, do hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1.    Definitions.  The following terms, as used herein, shall have the following respective meanings:

 "Act" shall mean the Texas Limited Liability Company Act (Tex. Bus. Org. Code, Title 3, Chapter 101, et seq.), as in effect on the Effective Date and as it may be amended hereafter from time to time.

"Adjusted Capital Account Balance" means, with respect to any Member for any period, the balance, if any, in such Member's Capital Account as of the end of such period, after giving effect to the following adjustments:

(a)    Credit to such Capital Account any amounts that such Member is obligated to restore or is deemed obligated to restore as described in the penultimate sentences of Regulation Section 1.704-2(g)(1) and 1.704-2(i)(5); and

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

(b)     Debit to such Capital Account the items described in Regulation Sections 1.704- 1(b)(2)(ii)(d)(4), (5) and (6).

"Affiliate" means, (a) with respect to Synergy at any given time, (i) any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with Synergy, (ii) any child, spouse, sibling, grandchild or any lineal descendant by birth or adoption of Synergy (collectively, the "Permitted Synergy Family Members"), or (iii) trusts or wholly owned limited partnership for the benefit of the Permitted Synergy Family Members, and (b) with respect to One Industries at any given time, (i) any Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with One Industries, (ii) any child, spouse, sibling, grandchild or any lineal descendant by birth or adoption of One Industries (collectively, the "Permitted One Industries Family Members"), or (iii) trusts or wholly owned limited partnerships for the benefit of the Permitted One Industries Family Members.  For the purposes of this definition "control" when used with respect to any specified Person means the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities of fifty percent (50%) or more, by contract or otherwise, and the term "controlled" has the meaning correlative to the foregoing.

"Agreement" shall mean and refer to this Company Agreement of the Company and all Exhibits referred to herein and attached hereto, each of which is hereby made a part hereof, as amended and in effect from time to time.

"Approval" (and any variation thereof) of a Member means the prior written consent or approval of such Member, which may be granted or withheld in its sole discretion unless otherwise expressly provided to the contrary in this Agreement.  If any Member is an Entity, such Approval shall be valid only if given by a duly authorized officer, manager, partner, member or other agent of such Member.  Use of the term "reasonable" in connection with the term "Approval" or any variation thereof or with the term "satisfactory" means that such Approval shall not be withheld, conditioned or delayed unreasonably.  If the Approval of any Member to any action is required under this Agreement and such Member shall not have given notice of approval or disapproval of such action to the other Member within ten (10) Business Days after receipt of the notice requesting that such Approval be given, such Member shall, unless otherwise provided hereunder, be deemed to have provided its Approval.

"Approval of the Members" has the meaning set forth in Section 9. below.

"Asset Value" with respect to any Company Asset means:

(a)     The fair market value when contributed of any asset contributed to the Company by any Member;

(b)     The fair market value on the date of distribution of any asset distributed by the Company to any Member as consideration for a Membership Interest in the Company;

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

(c)     The fair market value of all Property at the time of the happening of any of the following events:

(i)     the admission of a Member to, or the increase of a Membership Interest of an existing Member in the Company in exchange for a Capital Contribution or for the provision of services to or for the benefit of the Company; or

(ii)     the liquidation of the Company under Regulation Section 1.704-l(b)(2)(ii)(g); or

(d)     The Basis of the asset in all other circumstances.

"Bankruptcy" with respect to a Person means any one of the following:

(a)     Filing a voluntary petition in bankruptcy or for reorganization or for adoption of an arrangement under the Bankruptcy Law, as defined below;

(b)     Making a general assignment for the benefit of creditors;

(c)     The appointment by a court of a receiver for all or a portion of the property of the Person;

(d)     The entry of an order for relief in the case of an involuntary petition filed against the Person under the Bankruptcy Law, as defined below; or

(e)     The assumption of custody or sequestration by a court of competent jurisdiction of all or substantially all of the Person's property.

"Bankruptcy Law" as used herein means Title 11, U.S. Code, or any similar federal or state law for the relief of debtors.

"Basis" means, with respect to any asset of the Company, the adjusted basis of such asset for federal income tax purposes; provided, however, (a) if any asset is contributed to the Company, the initial Basis of such asset shall equal its fair market value on the date of contribution, and (b) if the Capital Accounts of the Members are adjusted pursuant to Regulation Section 1.704-l(b) to reflect the fair market value of any asset of the Company, the Basis of such asset shall be adjusted to equal its respective fair market value as of the time of such adjustment in accordance with such Regulation. The Basis of all Company Assets shall be adjusted thereafter by depreciation and amortization as provided in Regulation Section 1.704-l(b)(2)(iv)(g) and any other adjustment to the basis of such assets other than depreciation or amortization

"Black Duck Assets" has the meaning set forth in the Recitals above.

"Business" has the meaning set forth in Section 2.4.

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

"Business Day" means any day excluding (i) Saturday, (ii) Sunday, (iii) any day which is a legal holiday under the laws of the State of Texas, and (iv) any day on which banking institutions located in such state are generally not open for the conduct of regular business.

"Call Amount" has the meaning set forth in Section 3.2(b) below.

"Capital Account" shall mean, with respect to any Member, the Capital Account maintained for such Member in accordance with the provisions of Section 4.1.

"Capital Contribution" or "Capital Contributions" shall mean the amount of cash and the net fair market value of any property contributed to (or deemed contributed to) the capital of the Company by the Members pursuant to this Agreement. The term "Capital Contributions" with respect to a Member shall include (i) the contributions of such Member made (or deemed to be made) pursuant to Sections 3.1 and 3.2 and (ii) a Member's payments made to third party creditors of the Company after the Effective Date with respect to Company obligations unless and until reimbursed by the Company to the extent the same are reimbursable by the Company under this Agreement.

"Capital Receipts" shall mean (A) the sum of the proceeds received by the Company from the sale, exchange, or any other disposition of all or substantially all of the Black Duck Assets, reduced by (B) the sum of (i) all expenditures made by the Company in connection with such sale, exchange, or other disposition, plus (ii) loan repayments made from such proceeds that are required by the terms of any agreement to which the Company is subject or that are otherwise Approved by the Members, plus (iii) amounts thereof retained as operating reserves under this Agreement as Approved by the Manager.

"Capital Transaction" as used herein shall mean the sale, exchange or other disposition of all or substantially all of the Company Assets

"Certificate" shall mean the certificate of formation required to be filed with the Texas Secretary of State in accordance with the Act, as amended from time to time.

"Class A Member" means the Member identified as the Class A Member on Exhibit B.

"Class B Member" means the Member identified as the Class B Member on Exhibit B.

"Closing Date" shall mean the date on which the fee interest in the Black Duck Assets is acquired by the Company.

"Code" shall mean the Internal Revenue Code of 1986, as amended and in effect from time to time (or any corresponding provision of succeeding law).

"Commencement Date" has the meaning set forth in Section 2.8 below.

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

"Company" shall mean TCRG East Texas Pipeline 1, LLC, a Texas limited liability company, and its successors and assigns.

"Company Assets" shall mean all of the personal and real property owned by the Company during its existence.

"Company Minimum Gain" shall have the meaning ascribed to the term "partnership minimum gain" in Regulations Section 1.704-2(d)(1).

"Depreciation" for any Fiscal Year or other period means the cost recovery deduction with respect to an asset for such year or other period as determined for federal income tax purposes, provided that if the Asset Value of such asset differs from its Basis at the beginning of such year or other period, depreciation shall be determined as provided in Regulation Section 1.704-l(b)(2)(iv)(g)(3).

"Effective Date" shall mean the date that is set forth above in the heading to this Agreement.

"Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, joint-stock company, cooperative, association or other firm or any governmental or political subdivision or agency, department or instrumentality thereof.

"Environmental Laws" shall mean any federal, state, or local statute, code, ordinance, rule, regulation, permit, consent, approval, license, judgment, order, writ, judicial decision, common law rule, decree, agency interpretation, injunction or other authorization or requirement whenever promulgated, issued, or modified, including the requirement to register underground storage tanks, relating to:

(a)      emissions, discharges, spills, releases, or threatened releases of pollutants, contaminants, hazardous substances, materials containing hazardous substances, or hazardous or toxic materials or wastes into ambient air, surface water, groundwater, watercourses, publicly or privately owned treatment works, drains, sewer systems, wetlands, septic systems, or onto land;

(b)      the use, treatment, storage, disposal, handling, manufacturing, transportation, or shipment of hazardous substances, materials containing hazardous substances, or hazardous and/or toxic wastes, material, products, or by-products (or of equipment or apparatus containing hazardous substances) as defined in or regulated under any statutes and their implementing regulations including but not limited to: the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Chpt. 82, § 6901 et seq., the Comprehensive Environmental Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act, 42 U.S.C. Chpt.103, § 9601 et seq., and/or the Toxic Substance Control Act, 15 U.S.C. Chpt. 53, and/or 42 U.S.C. Chpt. 30, § 1261 et. seq., each as amended from time to time; or

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

(c)      otherwise relating to the pollution or the protection of human health or the environment.

"Fiscal Year" means the taxable year of the Company for federal income tax purposes, which shall be a calendar year.

"Funding Percentages" shall mean the percentages set forth as such for each Member on Exhibit B attached hereto.

"Hazardous Materials" means any substance that is toxic, ignitable, reactive or corrosive and that is regulated by statute, regulation, order or judicial decision, by any local government, the State of Texas or the United States Government and includes any and all materials or substances that are defined as "hazardous waste," "extremely hazardous waste" or a "hazardous substance" pursuant to state, federal or local governmental law.  "Hazardous Materials" includes, but is not restricted to, asbestos-containing materials, polychlorobiphenyls and petroleum.

"Including" or "including" shall mean "including, without limitation."

"Income Tax Regulations" or "Regulations" shall mean the final or temporary regulations promulgated from time to time under the Code or, if no final or temporary regulations with respect to a tax issue then are in effect, proposed regulations then in effect.

"Initial Capital Contributions" has the meaning set forth in Section 3.1 below.

"Liquidator" as used herein shall have the meaning assigned to it in Section 18.1(b).

"Manager" whether, one or more, shall mean the manager of the Company as may be designated as such from time to time by the Class B Member pursuant to the terms of this Agreement, which shall initially be Texas Capitalization Resource Group, Inc. an individual resident of the State of Texas.

"Members" shall mean, collectively, Synergy, One Industries and any other Person admitted as a Member under this Agreement, for so long as such Person remains a Member pursuant to the terms of this Agreement, and a "Member" shall mean any one such Person.

"Membership Interests" shall mean the ownership interest of a Member in the Company (which shall be considered personal property for all purposes), consisting of (i) such Member's interest in Profits, Losses, allocations of other items of income, gain, deduction, and loss and distributions, (ii) such Member's right to vote or grant or withhold Approvals with respect to Company matters as provided herein or in the Act, and (iii) such Member's other rights and privileges as provided in this Agreement.

"Member Nonrecourse Debt" has the meaning set forth for the term "partner nonrecourse debt" in Regulations Section 1.704-2(b)(4).

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

"Member Nonrecourse Debt Minimum Gain" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i)(2).

"Member Nonrecourse Deductions" has the meaning set forth for the term "partner nonrecourse deductions" in Regulations Section 1.704-2(i).

"Net Cash Flow," with respect to any Fiscal Year, shall mean (A) the sum of all cash receipts of the Company during such year from all sources (including any funds released during such Fiscal Year from cash reserves previously established), minus (without duplication) (B) (i) Capital Receipts, (ii) Net Mortgage Proceeds, and (iii) Operating Costs for such year (including, but not limited to, such reserves established during the Fiscal Year as shall be approved by the Manager from time to time).

"Net Mortgage Proceeds" shall mean (A) the sum of (i) the proceeds of any loan made to the Company and the proceeds from refinancing any such loans, plus (ii) any amount released from cash escrow accounts established under any loan to the Company, reduced by (B) the sum of (i) any amounts required to fund the Company's capital expenditures, as shall be set forth in the Approved Development Budget or otherwise approved by the Manager, (ii) any and all expenses incurred by the Company in connection with such loan or refinancing, (iii) amounts used, as shall be approved by the Manager, to repay other indebtedness of the Company plus (iv) amounts thereof retained as reserves under this Agreement as shall be approved by the Manager.

"Notices" has the meaning set forth in Section 20.5 below.

"Operating Costs" shall mean the sum of (i) all cash expenditures of the Company made during the Fiscal Year for current costs and expenses including, but not limited to (A) payments of interest and principal or other monetary obligations due under any loan made to the Company; (B) accounting, legal and auditing fees; (C) taxes payable by the Company; (D) public or private utility charges; (E) sales, use, payroll taxes and withholding taxes related thereto; and (F) all other operating costs, expenses and capital expenditures actually paid with respect to the Company's business; plus (ii) such operating reserves established during the Fiscal Year as shall be approved by the Manager from time to time.

"Participating Members" has the meaning set forth in Section 3.2(b) below.

"Percentage Interests" shall mean the percentages set forth as such for each Member on Exhibit B attached hereto.

"Permitted Transfers" has the meaning set forth in Section 14.1.

"Person" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such person where the context so admits.

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

"Profit" and "Loss" means, for federal income tax purposes, for each Fiscal Year or other period, an amount equal to the Company's taxable income or tax loss for the Fiscal Year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(a)    any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss will be added to taxable income or tax loss;

(b)    any expenditures of the Company described in Section 705(a)(2)(B) of the I.R.C. or treated as Section 705(a)(2)(B) expenditures under Regulation Section 1.704-l(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss, will be subtracted from taxable income or tax loss;

(c)    gain or loss resulting from any disposition of Company Assets with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Asset Value of the property, notwithstanding that the adjusted tax basis of the property differs from its Asset Value;

(d)    in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or tax loss, there will be taken into account depreciation, amortization, and other cost recovery deductions for the taxable year or other period as determined in accordance with Regulation Section 1.704-l(b)(2)(iv)(g);

(e)    any items specially allocated pursuant to Section 5.3 shall not be considered in determining Profit or Loss; and

(f)    any increase or decrease to capital accounts as a result of any adjustment to the book value of Company Assets pursuant to Regulation Section 1.7041(b)(2)(iv)(f) or (g) shall constitute an item of Profit or Loss as appropriate.

"Side Letter" has the meaning set forth in Section 20.18 below.

"Sound Accounting Principles" means those sound and appropriate accounting principles and practices which are consistently applied for all periods so as to properly reflect the financial condition, and the results of operations and the cash flows of the Company.

"Substituted Member" has the meaning set forth in Section 15.1 below.

"Tax Matters Member" shall have the meaning set forth in Section 12.6.

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

## ARTICLE II
## FORMATION OF THE COMPANY

Section 2.1.    Formation.  The Members hereby form a limited liability company pursuant to the terms of this Agreement and the relevant provisions of the Act. The Manager identified in the Certificate has caused the Certificate to be filed in the Office of the Secretary of State of Texas in accordance with the requirements of the Act and has obtained approval to do business in the State in which the Black Duck Assets are located.  From time to time, the Manager shall cause to be filed, and the Members agree to execute such further certificates of formation, qualifications to do business, fictitious name certificates, or like filings in such jurisdictions as may be necessary or appropriate in connection with the conduct of the Company's business or to provide notification of the limitation of liability of the Members under applicable law.  The Certificate is hereby adopted and incorporated by reference in this Agreement. In the event of any inconsistency between the Certificate and this Agreement, the terms of the Certificate shall govern.

Section 2.2.    Name of Company.  The name of the Company shall be "TCRG East Texas Pipeline 1, LLC" or such other name as may be approved by the Manager from time to time.

Section 2.3.    Permitted Business.  The business of the Company shall be:

(a)    Only to engage in the Business described under Section 2.4 of this Agreement; and

(b)    To exercise all other powers necessary and reasonably connected with the Company's Business (as limited hereinabove) which may legally be exercised by limited liability companies under the Act.

Section 2.4.    Purposes of the Company.    The purposes of the Company are to (collectively, the "Business"):

(a)    to acquire, construct, develop, maintain, own, operate, lease, hold and sell or otherwise dispose of the Black Duck Assets; and

(b)    to carry on and engage in any and all other general business activities incidental or reasonably related to the foregoing, including, without limitation, borrowing money from any source, whether secured or unsecured, contracting for necessary or desirable services of professionals and others, acquiring, developing and owning the Black Duck Assets, all of the foregoing to be subject to the more specific terms and conditions set forth below in this Agreement.

The Company shall not, except as permitted by this Agreement, engage in any other activity or business and no Member shall (in his or its capacity as such) have any authority to hold himself out as a general agent of the Company.

Section 2.5.  <u>Place of Business</u>.  The principal place of business of the Company shall be located at 5201 Camp Bowie Blvd., Suite 200, Fort Worth, Texas 76107 or such other place as the Manager may from time to time determine.

Section 2.6.  <u>Registered Office and Registered Agent</u>.  The Company's registered agent in Texas shall be Robert L. Patton, Jr.  and the Company's registered office in Texas shall be 5201 Camp Bowie Blvd, Ste. 200, Fort Worth, TX 76107.  Such registered agent registered office may be changed from time to time in accordance with the Act if approved by the Manager.

Section 2.7.  <u>Members; Funding Percentages; Percentage Interests</u>.

(a)  The respective Funding Percentages, Initial Capital Contributions, and the Percentage Interests in the Company of the Members are as set forth on <u>Exhibit B</u> hereto. All references in this Agreement to <u>Exhibit B</u> are references to such <u>Exhibit B</u> as amended from time to time pursuant to this Agreement.

(b)  Unless the context otherwise clearly indicates, the terms "interest" or "interests" in the Company shall include the interests of all Members in the Company.  A Member's "interest" in the Company shall mean and include its share of the capital of the Company, its share of the Profits and Losses, its share of the distributions of the Company, its Capital Account, and its other rights and obligations under this Agreement.

Section 2.8.  <u>Term of Company</u>.  The term of the Company shall commence on the date the Certificate is filed (such date, the "<u>Commencement Date</u>") and shall survive until terminated and its business and assets liquidated in accordance with the provisions of <u>Article XVIII</u>.

Section 2.9.  <u>Definitions</u>.  Capitalized terms that are used in this Agreement shall have the meanings ascribed to such terms in <u>Article I</u> or are defined on the page(s) of this Agreement.

## ARTICLE III
## CAPITAL CONTRIBUTIONS
## AND ADDITIONAL CONTRIBUTIONS

Section 3.1.  <u>Initial Capital Contributions</u>.  At or prior to the closing of the acquisition of the Black Duck Assets, the Members shall contribute to the Company the amounts identified as Initial Capital Contributions opposite each Member's name set forth on <u>Exhibit B</u> attached hereto (the "<u>Initial Capital Contributions</u>").

Section 3.2.  <u>Additional Capital Contributions by Members</u>.

(a)  No Member shall be required to make any additional Capital Contribution or loans to the Company except as may be agreed to otherwise in this Agreement.

<u>No Restoration Obligation</u>.  No Member will have any obligation to restore any negative balance in its Capital Account upon liquidation or dissolution of the Company.

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

Section 3.3.     Return of Capital.  Except as herein provided with respect to distributions during the term of the Company or upon its liquidation, no Member has the right to demand a return of such Members' Capital Contributions to the Company (or the balance of such Member's Capital Account). Further, no Member has the right (i) to demand and receive any distribution from the Company in any form other than cash or (ii) to bring an action of partition against the Company or its property.  Except as expressly provided herein, no Member shall be entitled to or shall receive interest on such Member's Capital Contributions to the Company or Capital Account.  No Member may withdraw any capital from the capital of the Company except as expressly provided herein or under the Act.  No Member shall have any priority over any other Member with respect of the return of any Capital Contribution, except as expressly provided herein.

Section 3.4.     No Third Party Beneficiaries.  **THE PROVISIONS OF THIS ARTICLE III ARE NOT INTENDED TO BE FOR THE BENEFIT OF AND SHALL NOT CONFER ANY RIGHT ON ANY CREDITOR OR OTHER PERSON (OTHER THAN A MEMBER IN SUCH MEMBER'S CAPACITY AS A MEMBER) TO WHOM ANY DEBTS, LIABILITIES OR OBLIGATIONS ARE OWED BY THE COMPANY OR ANY OF THE MEMBERS.**

## ARTICLE IV
## CAPITAL ACCOUNTS/ALLOCATIONS

Section 4.1.     Capital Accounts.  A separate Capital Account will be maintained for each Member in accordance with Regulation Section 1.704-1(b)(2)(iv). Consistent therewith, the Capital Account of each Member will be determined and adjusted as follows:

(a)     Each Member's Capital Account will be credited with:

(i)     Any contributions of cash made by such Member to the capital of the Company plus the Basis of any property contributed by such Member to the capital of the Company (net of any liabilities to which such property is subject or which are assumed by the Company);

(ii)     The Member's distributive share of Profit and items thereof allocated to such Member and other items of income or gain specially allocated to the Member pursuant to Section 4.3; and

(iii)     Any other increases required by Regulation Section 1.704-1(b)(2)(iv).

(b)     Each Member's Capital Account will be debited with:

(i)     Any distributions of cash made from the Company to such Member plus the fair market value of any property distributed in kind to such Member (net of any liabilities to which such property is subject or which are assumed by such Member);

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

(ii)     The Member's distributive share of Loss and items thereof allocated to such Member and other items of loss or deduction specially allocated to the Member pursuant to Section 4.3; and

(iii)    Any other decreases required by Regulation Section 1.704-1(b)(2)(iv).

The provisions of this Section 4.1 relating to the maintenance of Capital Accounts have been included in this Agreement to comply with Section 704(b) of the Code and the Regulations promulgated thereunder and will be interpreted and applied in a manner consistent with those provisions.

Section 4.2.    Allocation of Profits and Losses.

(a)    *Profits*. Subject to the allocation of Profits from a Capital Transaction under Section 4.2(c) below, and the special allocation provisions of Section 4.3 of this Agreement, the Profits of the Company for any Fiscal Year (or portion thereof) shall be allocated as follows:

(i)     First, to the Members in accordance with their Percentage Interests until the aggregate Profits allocated to the Members pursuant to this Section 4.2(a)(i) for the current Fiscal Year and all previous Fiscal Years is equal to the aggregate Losses allocated to the Members pursuant to Section 4.2(b)(ii) for all previous Fiscal Years;

(ii)    Second, to the Members until the aggregate Profits allocated to the Members pursuant to this Section 4.2(a)(ii) for the current Fiscal Year and all previous Fiscal Years is equal to the cumulative amount of cash distributed to the Members pursuant to Section 5.1 or Section 5.2 for the current Fiscal Year and all previous Fiscal Years; and

(iii)   Third, the balance, if any, to the Members in accordance with their Percentage Interests.

(b)    *Losses*. Subject to the allocation of Losses from a Capital Transaction under Section 4.2(c) below and the special allocation provisions of Section 4.3 of this Agreement, the Losses of the Company for any Fiscal Year (or portion thereof) shall be allocated as follows:

(i)     First, to the Members in accordance with their Percentage Interests until the aggregate Losses allocated pursuant to this Section 4.2(b)(i) for the current Fiscal Year and all previous Fiscal Years is equal to the aggregate Profits previously allocated to the Members pursuant to Section 4.2(a)(v) hereof; provided that Losses shall not be allocated pursuant to this Section 4.2(b)(i) to the extent such allocation would cause any Member to have or increase any deficit balance in its Adjusted Capital Account Balance at the end of such Fiscal Year; and

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

    (ii)  Thereafter, to the Members in proportion to, and to the extent of, the remaining positive Adjusted Capital Account Balances.

    (c)  Allocation of Profits and Losses from Capital Transaction.  In the event of a Capital Transaction (including in the year in which the Company liquidates pursuant to Article XVIII and all subsequent years (and for any prior years with respect to which the due date without regard to extensions for the filing of the Company's federal income tax return has not passed as of the date of the liquidation)), all items of income, gain, loss and deduction of the Company shall be allocated among the Members in a manner reasonably determined by Manager to cause to the nearest extent possible the Capital Account of each Member to equal the amount to be distributed to such Member pursuant to Section 5.2.

 Section 4.3.  Special Allocations.

    (a)  Minimum Gain Chargeback. Notwithstanding any other provision of this Article IV, if there is a net decrease in Company Minimum Gain during any Fiscal Year, then each Member shall be allocated such amount of income and gain for such year (and subsequent years, if necessary) determined under and in the manner required by Regulation Sections 1.704-2(f) and (g) as is necessary to meet the requirements for a minimum gain chargeback as provided in that Regulation.

    (b)  Member Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Article IV except Section 4.3(a), if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, any Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt determined in accordance with Regulation Section 1.704-2(i)(5), shall be allocated such amount of income and gain for such year (and subsequent years, if necessary) determined under and in the manner required by Regulation Section 1.704-2(i)(4) as is necessary to meet the requirements for a chargeback of Member Nonrecourse Debt Minimum Gain as is provided in that Regulation.

    (c)  Qualified Income Offset. If a Member unexpectedly receives any adjustment, allocation or distribution described in Regulation Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of Company income and gain shall be specifically allocated to such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, any negative Capital Account balance of such Member as quickly as possible, provided that an allocation pursuant to this Subsection shall be made only if and to the extent that such Member would have a negative Capital Account balance after all other allocations provided for in Section 4.2 and this Section 4.3 tentatively have been made as if this Subsection (c) were not in this Agreement.

    (d)  Limitation on Losses. Notwithstanding anything else contained in this Agreement, Losses allocated to any Member pursuant to Section 4.2 of this Agreement shall not exceed the maximum amount of Losses that may be allocated without causing such Member to have a negative Adjusted Capital Account Balance at the end of the Fiscal Year for which the allocation is made.

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

(e)    <u>Code Section 754 Adjustment</u>. To the extent that an adjustment to the Basis of any asset pursuant to Code Section 734(b) or Code Section 743(b) is required to be taken into account in determining Capital Accounts as provided in Regulation Section 1.704-l(b)(2)(iv)(m), the adjustment shall be treated (if an increase) as an item of gain or (if a decrease) as an item of loss, and such gain or loss shall be allocated to the Members consistent with the allocation of the adjustment pursuant to such Regulation.

(f)    <u>Membership Nonrecourse Deductions</u>.  Membership Nonrecourse Deductions (as determined under Regulation Section 1.704-2(c)) for any Fiscal Year shall be allocated among the Members in proportion to their Percentage Interests.

(g)    <u>Member Nonrecourse Deductions</u>. Any Member Nonrecourse Deductions shall be allocated pursuant to Regulation Section 1.704-2(i) to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which it is attributable.

(h)    <u>Purpose and Application</u>. The purpose and the intent of the special allocations provided for in this <u>Section 4.3</u>, are to comply with the provisions of Regulation Sections 1.704-1(b) and 1.704-2, and such special allocations are to be made so as to accomplish that result.  However, to the extent possible, the Manager, in allocating items of income, gain, loss, or deduction among the Members, shall take into account the special allocations, in such a manner that the net amount of allocations to each Member shall be the same as such Member's distributive share of Profits and Losses would have been had the events requiring the special allocations not taken place. The Manager shall apply the provisions of this <u>Section 4.3</u> in whatever order the Manager reasonably believes will minimize any economic distortion that otherwise might result from the application of the special allocations.

Section 4.4.    <u>Code Section 704(c) Tax Allocations</u>.  Solely for tax purposes, and in accordance with Code Section 704(c), income, gain, loss, and deductions with respect to property contributed to the Company by a Member shall be shared among the Members so as to take account of the variation between the basis of the property to the Company for federal income tax purposes and its fair market value at the time of its contribution.  If the value of any property of the Company reflected in the Members' Capital Accounts is adjusted pursuant to Regulation Section 1.704-1(b)(2)(iv), thereafter, allocations of depreciation, depletion, amortization, and gain or loss with respect to such property shall be determined so as to take into account the variation between the adjusted tax basis and the adjusted value of such property as reflected in the Members' Capital Accounts in the same manner as under Code Section 704(c).  The Manager shall make allocations pursuant to Code Section 704(c) pursuant to any reasonable method set forth in Regulation Section 1.704-3.

Section 4.5.    <u>Curative Allocations Regarding Payments to Related Companies of Members</u>.  To the extent that compensation paid to a Member or an Affiliate of one or more Members by the Company, ultimately is determined not to be a payment to a third party, a payment to a Member other than in its capacity as such under Code Section 707(a), or a guaranteed payment under Code Section 707(c), such Member or Members shall be specially allocated gross income

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

of the Company in an amount equal to the amount of such compensation, and such Member or Member's Capital Account shall be adjusted to reflect the payment of such compensation.  If the Company's gross income for a Fiscal Year is less than the amount of such compensation paid in such year, such Member or Members shall be specially allocated gross income of the Company in the succeeding year or years until the total amount so allocated equals the total amount of such compensation.

**ARTICLE V**
**DISTRIBUTIONS**

Section 5.1.    <u>Net Cash Flow from Operations</u>.  The Manager shall, at or prior to the end of each Fiscal Year, determine the amount of Net Cash Flow, if any, and cause the Company to distribute or otherwise apply Net Cash Flow no later than forty-five (45) days after the end of each Fiscal Year, in each case, subject to the terms of <u>Section 5.3,</u> to the Members, pari passu, in accordance with their Percentages Interests.

Section 5.2.    <u>Net Mortgage Proceeds and Capital Receipts</u>.  Subject to any requirements imposed on the Company by any lender to the Company, the Manager shall, as soon as reasonably practicable following the occurrence of any event giving rise to Net Mortgage Proceeds or Capital Receipts, determine the amount of Net Mortgage Proceeds and Capital Receipts, if any, and distribute or otherwise apply Net Mortgage Proceeds and Capital Receipts, within sixty (60) days after receipt thereof by the Company, in each case, subject to the terms of <u>Section 5.3,</u> to the Members, pari passu, in accordance with their Percentage Interests; provided however, that no distributions shall be made to the Class A Member unless and until such time as the Class B Member has received one hundred percent (100%) of the amount of any and all loan or loans to the Company or advances money on its behalf in accordance with Section 9.6, as debts due from the Company.

Section 5.3.    <u>Distributions in Liquidation</u>.  Subject to <u>Section 18.1(c)</u> below, distributions in connection with the liquidation and winding up of the Company shall be made in the following order of priority:

        (a)    First, to the payment of the reasonable expenses incurred in dissolution and termination;

        (b)    Second, to the payment of creditors of the Company (other than the repayment of any loans from the Members) except secured creditors whose obligations will be assumed or otherwise transferred on a liquidation of the Company property or assets, and thereafter to the repayment, pro rata, of all such loans from the Members, if any; and

        (c)    Third, the balance, if any, shall be paid and/or distributed to the Members in accordance with their respective positive Capital Account balances.

Notwithstanding anything contained in this Agreement to the contrary, in connection with the winding up and liquidation of the Company, to the extent that the allocation of Profit and Loss would not result in each Member having a Capital Account balance equal to the amount it would otherwise receive pursuant to <u>Section 5.2</u> (the "Target Final Balances"), then the Members agree,

to the extent necessary, to allocate Company items of income, gain, loss, and deduction for the taxable year in which winding up occurs, as well as any prior tax years that are still open, to produce such Target Final Balances.

Section 5.4.    General Distribution Rules.  This Section 5.4 is subject to Section 5.5 of this Agreement. The timing and amount of all distributions shall be in accordance with Sections 5.1, 5.2, 5.3 and 18.1(c).  All distributions of cash shall be made to the Members shown on the records of the Company to have been Members on the date of the distribution.  All distributions, upon request by a Member, shall be made by wire transfer in immediately available funds to such Member's account specified in such request.  Distributions of Net Cash Flow, Net Mortgage Proceeds and Capital Receipts made to a Member with respect to any Fiscal Year shall be deemed to be advances on account of such Member's share of the distributable amounts thereof and shall be subject to the terms, including, but not limited to any restrictive covenants, of any indenture, mortgage, lease agreement, or instrument to which the Company is a party or by which the Company or the Black Duck Assets are or may be bound.  For purposes of this Agreement, the term "distributable" with respect to such distributions shall mean the amount of such distributions as finally determined for the Fiscal Year in respect of which they were made.  Any over-distribution thereof to any Member in respect of a Fiscal Year shall be repaid by such Member to the Company and distributed to the Member(s) which has received an under-distribution on the later to occur of (i) thirty (30) days after the end of such Fiscal Year, or (ii) thirty (30) days after the Company has given notice thereof to such Member, which notice shall be given as soon as is practicable after the end of such Fiscal Year.

Section 5.5.    Special Distribution Rules.  Notwithstanding anything to the contrary in this Agreement, other than for distributions made for the purpose of addressing Member's tax liabilities for the applicable Fiscal Year, no distributions shall be made to any Class A Member unless and until such time as one hundred percent (100%) of all debts due from the Company have been paid in connection with any and all loans to the Company or other advances of money on the Company's behalf made pursuant to Section 9.6 of this Agreement.

# ARTICLE VI
# REPRESENTATIONS AND WARRANTIES

Section 6.1.    In General.  As of the date hereof, each of the Persons specified below hereby makes each of the representations and warranties applicable to such Person as set forth in this Article VI, and such warranties and representations shall survive the execution of this Agreement.  Notwithstanding anything in this Agreement to the contrary, each Person making such representation and warranty shall indemnify and hold harmless the Company and the other Members for any breach or violation thereof.

Section 6.2.    Representations and Warranties of the Members.  Each Member hereby represents and warrants to the Company and the other Members that:

(a)    If such Member is an Entity, it is duly organized or duly formed, validly existing, and in good standing under the laws of the jurisdiction of its incorporation or formation and has the corporate, partnership, or other power and authority to own its property

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

and carry on its business as owned and carried on at the date hereof and as contemplated hereby. Such Member is duly licensed or qualified to do business and in good standing in each of the jurisdictions in which the failure to be so licensed or qualified would have a material adverse effect on its financial condition or its ability to perform its obligations hereunder. Such Member has the individual, corporate, partnership or other Entity power and authority to execute and deliver this Agreement and to perform its obligations hereunder and, if such Member is a corporation, partnership or other Entity, the execution, delivery, and performance of this Agreement has been duly authorized by all necessary corporate or partnership action.

(b)     Neither the execution, delivery, and performance of this Agreement nor the consummation by such Member of the transactions contemplated hereby (i) will conflict with, violate, or result in a breach of any of the terms, conditions, or provisions of any law, regulation, order, writ, injunction, decree, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any mediator, applicable to such Member or any of its Affiliates, (ii) will conflict with, violate, result in a breach of, or constitute a default under any of the terms, conditions, or provisions of the certificate of formation, bylaws, company agreement, or partnership agreement of such Member or any of its Affiliates, if such Member is a corporation, limited liability company or partnership, or of any material agreement or instrument to which such Member or any of its Affiliates is a party or by which such Member or any of its Affiliates is or may be bound or to which any of its material properties or assets is subject, (iii) will conflict with, violate, result in a breach of, constitute a default under (whether with notice or lapse of time or both), accelerate or permit the acceleration of the performance required by, give to others any material interests or rights, or require any consent, authorization, or approval under any indenture, mortgage, lease agreement, or instrument to which such Member or any of its Affiliates is a party or by which such Member or any of its Affiliates is or may be bound, or (iv) will result in the creation or imposition of any lien upon any of the material properties or assets of such Member or any of its Affiliates; or (v) will conflict with, violate or result in a breach of any contract, agreement, covenant or understanding to which such Member or any of its Affiliates is a party or is otherwise bound.

(c)     Any registration, declaration or filing with or consent, approval, license, permit or other authorization or order by, any governmental or regulatory authority, domestic or foreign, that is required in connection with the valid execution, delivery, acceptance, and performance by such Member under this Agreement or the consummation by such Member of any transaction contemplated hereby has been completed, made, or obtained on or before the Effective Date.

(d)     There are no actions, suits, proceedings, or investigations pending or, to the knowledge of such Member or any of its Affiliates, threatened against or affecting such Member or any of its Affiliates or any of their properties, assets, or businesses in any court or before or by any governmental department, board, agency, or instrumentality, domestic or foreign, or any mediator which could, if adversely determined (or, in the case of an investigation could lead to any action, suit, or proceeding, which if adversely determined could) reasonably be expected to materially impair such Member's ability to perform its

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member; and such Member or any of its Affiliates has not received any currently effective notice of any default, and such Member or any of its Affiliates is not in default, under any applicable order, writ, injunction, decree, permit, determination, or award of any court, any governmental department, board, agency, or instrumentality, domestic or foreign, or any mediator which could reasonably be expected to materially impair such Member's ability to perform its obligations under this Agreement or to have a material adverse effect on the consolidated financial condition of such Member.

(e)     Such Member is acquiring its interest in the Company based upon its own investigation, and the exercise by such Member of its rights and the performance of its obligations under this Agreement will be based upon its own investigation, analysis, and expertise.  Such Member's acquisition of its interest in the Company is being made for its own account for investment, and not with a view to the sale or distribution thereof.

(f)     No broker has been involved in the formation of the Company or the transactions provided for herein, including, but not limited to, the acquisition of the Black Duck Assets, and no commission, finders' fee or other compensation is due any broker or other agent.

(g)     Such Member is (i) sophisticated in real estate transactions, (ii) has been provided such financial and other material information concerning the Company and the Black Duck Assets that the Company intends to acquire as of the Closing Date as it has requested or may require in connection with its investment in the Company and this Agreement, (iii) is able, either directly or through its agents and representatives, to evaluate such information, and (iv) is able to bear the financial risk of loss presented by an investment in the Company (which includes the risk of loss of such Member's entire investment), particularly in light of the risks that would be disclosed by a careful examination of such information and this Agreement, and the fact that the performance of the Company and its assets is subject to unpredictable real estate values and governmental and other risks of subdivision and development.

## ARTICLE VII
## RIGHTS AND OBLIGATIONS OF MEMBERS AND MANAGER

Section 7.1.     Limited Liability.  No Member shall be personally liable for any debts, liabilities, or obligations of the Company; provided that each Member shall be responsible (i) for the making of any Capital Contribution required to be made to the Company by such Member pursuant to the terms hereof and (ii) for the amount of any distribution made to such Member that must be returned to the Company pursuant to the terms hereof or the Act.

Section 7.2.     Liability of a Member to the Company.  When a Member has received a distribution made by the Company in violation of this Agreement or the Act, the Member is liable to the Company for a period of three years after such a prohibited distribution for the amount of the distribution wrongfully received.

Section 7.3.    Exculpation.  No partner, shareholder, member or other holder of an equity interest in a Member or any manager, officer, director or employee of any of the foregoing, shall be personally liable for the performance of any such Member's obligations under this Agreement, but the foregoing shall not relieve any partner, shareholder, member, equity holder, manager, officer, director or employee of any Member of its obligations to such Member.

Section 7.4.    Survival of Obligations.  Dissolution of the Company for any cause shall not release any party from any liability which at the time of dissolution or termination has already accrued to any party, nor affect in any way the survival of the rights, duties, and obligations of any party provided for in Articles VII, XII, XIII and XV of this Agreement.

Section 7.5.    Other Activities.  Each of the Members and its Affiliates shall be free to engage in any other businesses or activities and to receive the income and benefits thereof (and no other party shall have any interest therein by reason of this Agreement), and no Member shall have any duty or obligation to present to the Company or any other Member any such other business opportunities that are outside the scope or the purposes of the Business.

Section 7.6    Liability of Manager.

(a)    Notwithstanding anything contained herein to the contrary, the Manager shall not be liable, responsible or accountable in damages or otherwise to the Company or any Member for any acts performed in good faith and within the scope of this Agreement except if such Manager is adjudicated liable by a court of competent jurisdiction to have engaged in gross negligence, willful misconduct or fraud or to have breached a fiduciary duty (to the extent such exists under the Act or any other applicable law). The Company (but not any Member) shall indemnify, defend and hold the Manager harmless from any loss, damage, liability, cost or expense (including reasonable attorneys' fees and expenses and court costs) arising out of any act or failure to act by the Manager to the fullest extent provided for in the Act, including a negligent act or failure to act, if such act or failure to act is in good faith, within the scope of this Agreement and is not attributable to gross negligence, willful misconduct, fraud or a breach of a fiduciary duty (to the extent such exists under the Act or any other applicable law and is not effectively waived by this Agreement).

(b)    To the fullest extent permitted by the Act, the Manager, in performing its duties and obligations as manager under this Agreement, shall be entitled to act or omit to act at the direction of Member or Members that designated such person to serve as the Manager, provided that such Person has acted in good faith and considering only such factors, including the separate interests of the designating Member(s), as such the Manager or Member(s) choose to consider, and any action of the Manager or failure to act, taken or omitted in good faith reliance on the foregoing provisions shall not, as between the Company and the other Members, on the one hand, and the Manager or Member(s) designating such the Manager, on the other hand, constitute a breach of any duty (including any fiduciary or other similar duty, to the extent such exists under the Act or any other applicable law) on the part of such the Manager or Member(s) to the Company or any other Manager or Member of the Company. To the fullest extent permitted by the Act and except for the terms of this Agreement, other than any such duties set forth in this Agreement as the

COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC

Manager may have to Member or Members that designated such Manager to serve as the Manager, no Manager, shall have any duty, fiduciary or otherwise, to the Company or to any Member. To the fullest extent permitted by applicable law, any act or omission of the Manager, the effect of which may cause or result in loss or damage to the Company or the Members, if done in good faith to promote the best interests of the Company, shall not subject the Manager to any liability to the Members.

(c)     Members (in their own names and in the name and on behalf of the Company) hereby:

(i)     agree that (A) the terms of this <u>Section 7.6</u>, to the extent that they modify or limit a duty or other obligation, if any, that a Member or the Manager may have to the Company, or any other Member, pursuant to the Act or other applicable law, are reasonable in form, scope and content; and (B) if this <u>Section 7.6</u>  is in conflict with a duty, if any, that the Manager may have to the Company or another Member, pursuant to the Act or any other applicable laws, the terms of this <u>Section 7.6</u> shall control to the fullest extent permitted by the Act and any other applicable laws;

(ii)     waive to the fullest extent permitted by the Act, any duty (fiduciary or otherwise) or other obligation, if any, that a Member, in its capacity as such, may have to the Company or another Member, pursuant to the Act or any other applicable law, to the extent necessary to give effect to the terms of this <u>Section 7.6</u>, including any contractual appraisal rights or claims of oppression or similar minority rights that may be permitted under the Act or other applicable law; and

(iii)     acknowledge, affirm and agree that they would not be willing to make any investment in the Company, nor would the Manager be willing to serve as the Manager, in the absence of this <u>Section 7.6</u>.

(d)     The Company may purchase and maintain insurance, to the extent and in amounts the Manager deems reasonable, on behalf of the Manager and other Persons as the Manager shall determine, against any liability that may be asserted against or expenses that may be incurred by that Person in connection with the activities of the Company, regardless of whether the Company would have the power to indemnify that Person against the liability under this Agreement. The Company shall have no obligation to fund indemnification of any Person to the extent the liability is covered by insurance.

## ARTICLE VIII
## INDEMNIFICATION

Section 8.1.     <u>General</u>.  In expansion of, and not in limitation of the terms of <u>Section 7.6</u>, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Black Duck Assets) shall indemnify, save harmless, and pay all judgments and claims against each Member and Manager or any officers, directors, or similarly situated management officials of such Member or Manager relating to any liability or damage incurred by reason of any act performed or

omitted to be performed by such Member, Manager, officer, director or management official in connection with the business of the Company, including attorneys' fees incurred by such Member, Manager, officer, director or management official in connection with the defense of any action based on any such act or omission, which attorneys' fees may be paid as incurred, including all such liabilities under federal and state securities laws (including the Securities Act of 1933, as amended) as permitted by law.

      Section 8.2.    <u>Environmental</u>.  In expansion of, and not in limitation of the terms of <u>Section 7.6</u>, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Black Duck Assets) shall indemnify and hold harmless, to the maximum extent permitted by law, each Member and Manager from and against any and all liabilities, sums paid in settlement of claims, obligations, charges, actions (formal or informal), claims (including, without limitation, claims for personal injury under any theory or for real or personal property damage), liens, taxes, administrative proceedings, losses, damages (including, without limitation, punitive damages), penalties, fines, court costs, administrative service fees, response and remediation costs, stabilization costs, encapsulation costs, treatment, storage or disposal costs, groundwater monitoring or environmental study, sampling or monitoring costs, other causes of action, and any other costs and reasonable expenses (including, without limitation, reasonable attorneys', experts', and consultants' fees and disbursements and investigative laboratory, and data review fees) imposed upon or incurred by any Member or Manager (whether or not indemnified against by any other party) arising from and after the date of this Agreement directly or indirectly out of:

            (a)     the past, present, or future treatment, storage, disposal, generation, use, transport, movement, presence, release, threatened release, spill, installation, sale, emission, injection, leaching, dumping, escaping, or seeping of any Hazardous Materials, or material containing or alleged to contain Hazardous Materials at or from any past, present or future properties or Company Assets; and/or

            (b)     the violation or alleged violation by the Company or any third party of any Environmental Law with regard to the past, present, or future ownership, operation, use, or occupying of any property or asset of the Company.

      In expansion of, and not in limitation of the terms of <u>Section 7.6</u>, in addition, the Company, its receiver, or its trustee (in the case of its receiver or trustee, to the extent of the Black Duck Assets) shall indemnify and hold harmless, to the maximum extent permitted by law, each Member and Manager from and against any and all liabilities, sums paid in settlement of claims, obligations, charges, actions (formal or informal), claims (including, without limitation, claims for personal injury under any theory or for real or personal property damage), liens, taxes, administrative proceedings, losses, damages (including, without limitation, punitive damages), penalties, fines, court costs, administrative service fees, response and remediation costs, stabilization costs, encapsulation costs, treatment, storage or disposal costs, sampling or monitoring costs, other causes of action, and any other costs and reasonable expenses (including, without limitation, reasonable attorneys', experts', and consultants' fees and disbursements and investigative laboratory, and data review fees) imposed upon or incurred by any Member or Manager (whether or not indemnified against by any other party) arising from and after the date of this Agreement

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

directly or indirectly out of the introduction or presence of, or exposure of persons or property to, mold at or from any past, present or future properties or Company Assets.

Section 8.3.    Limitations.

(a)    Notwithstanding anything to the contrary in any of Sections 8.1 and 8.2 above, no Manager or Member shall be indemnified from any liability for fraud, bad faith, willful misconduct, or gross negligence.

(b)    Notwithstanding anything to the contrary in any of Sections 8.1 and 8.2 above, in the event that any provision in any of such Sections is determined to be invalid in whole or in part, such Sections shall be enforced to the maximum extent permitted by law.

## ARTICLE IX
## MANAGEMENT OF THE COMPANY

Section 9.1.    General.

(a)    To the fullest extent permitted by the Act, (i) the business and affairs of the Company shall be managed by or under the direction of the Manager, and (ii) the power to act for or to bind the Company shall be vested exclusively in the Manager.  Subject to obtaining any necessary approvals hereunder, each Manager shall have the power and authority to execute and deliver contracts, instruments, filings, notices, certificates, and other documents of whatsoever nature on behalf of the Company (including, without limitation, the Certificate and any amendment thereto and any other certificate required or permitted to be filed by or on behalf of the Company pursuant to the Act or like law of any other jurisdiction) without the necessity of joinder of any other Manager.  The number of Managers of the Company shall be one (1), who shall be appointed by the Class B Member.  The Manager need not be a Member or resident of the State of Texas.  In expansion of, and not in limitation of the terms of Section 7.6, the Manager will not be liable or accountable, in damages or otherwise, to the Company or to the Members for anything the Manager may do or refrain from doing within the scope and authorization of this Agreement, except in the case of a willful breach of a material provision of this Agreement or gross negligence or willful misconduct in connection with the business and affairs of the Company.  The Manager shall not be entitled to receive compensation for its services as Manager.

(b)    The initial Manager of the Company shall be Robert L. Patton, Jr.  Upon the resignation or withdrawal of Robert L. Patton, Jr.  as a Manager, the Class B Member shall promptly appoint a successor.

(c)    Notwithstanding any provisions hereof to the contrary, the Manager shall have the power and authority, on behalf of the Company, to (i) acquire the Black Duck Assets, (ii) execute, on behalf of and in the name of the Company, a property management agreement, including, without limitation, a property management agreement by and between the Company and an Affiliate of One Industries, the Class B Member, and/or the Manager (iii) execute, on behalf of and in the name of the Company, all documents reasonably required, in

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

the judgment of the Manager, to obtain any and all loans from such lender(s) as approved by the Manager, in the Manager's sole discretion, including all amendments, extensions, renewals, replacements, increases, refinancings, and modifications thereof; and (iv) execute, on behalf of and in the name of the Company, all documents reasonably required in the judgment of the Manager to construct, develop, maintain, own, operate, lease, and hold the Black Duck Assets.

(d)     Unless authorized to do so by this Agreement or by the Manager, no Member (in its capacity as such), agent, or employee of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose However, the Members may act by a duly authorized attorney-in-fact.

(e)     The Manager may, from time to time, designate one or more persons to be officers of the Company. No officer need be a resident of the State of Texas, a Member or an officer or employee of the Manager. Any such officers so designated shall have such authority and perform such duties as the Manager may, from time to time, delegate to them. The Manager may assign titles to particular officers. Unless the Manager decide otherwise, if the title is one commonly used for officers of a business corporation formed under the Act (or any successor statute), the assignment of such title shall constitute the delegation to such officer of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made to such officer by the Manager pursuant to this <u>Section 9.1(e)</u> and the other terms and provisions of this Agreement. Each officer shall hold office until his successor shall be duly designated and shall qualify or until his death or until he shall resign or shall have been removed in the manner provided in this Agreement. Any number of offices may be held by the same person. No officer shall be entitled to any salary or other compensation.  Any officer may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the Manager. The acceptance of a resignation shall not be necessary to make it effective, unless expressly so provided in the resignation. Any officer may be removed as such, either with or without cause, by the Manager; provided, however, that such removal shall be without prejudice to the contract rights, if any, of the person so removed. Designation of an officer shall not of itself create contract rights. Any vacancy occurring in any office of the Company may be filled by the Manager.

Section 9.2.     <u>Affiliate Agreements</u>.  Except as otherwise expressly provided herein, when any service or activity to be performed on behalf of the Company is performed by an Affiliate of a Member, the fees and any other payments thereunder shall not exceed prevailing market rates and the terms thereof must otherwise be competitive in the Fort Worth, Texas Metropolitan Statistical Area and be at least as favorable to the Company as are generally available in arm's length transactions between unrelated parties for similar properties and services.  If any transaction by a Member with respect to Company business with an Affiliate occurs, the affiliated Member shall promptly notify the Members of such transaction and the terms and conditions thereof.

Section 9.3.     <u>Reserved</u>.

Section 9.4.     <u>Reserved</u>.

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

Section 9.5.    Approvals by Members.  Notwithstanding anything else contained in here to the contrary, the term "Approved by" or "approved by" or "Consented to by" or "consented to by" or "Consent of" or "consent of" or "satisfactory to" means (a) with respect to an approval by the Class A Member, a decision or action which has been consented to in writing by the Class A Member, (b) with respect to an approval of the Class B Member, a decision or action which has been consented to in writing by the Class B Member, and (c) with respect to an approval of the Members, a decision or action which has been approved to in writing by both the Class A Member and the Class B Member.

Section 9.6    Loans. Notwithstanding anything else contained herein to the contrary: (i) the Members and any Affiliate of any Member may, but shall not be required to, loan money to the Company if necessary to achieve the purposes of the Company as set forth in Section 2.4, and the Company may accept such a loan from any Member or any Affiliate of any Member with the Approval of the Class B Member; (ii) if any Member shall make any loan or loans to the Company or advance money on its behalf in accordance with this Section 9.6, the amount of any such loan or advance shall not be treated as a Capital Contribution but shall be a debt due from the Company and documented as such; (iii) the amount of any such loan or advance by a lending Member or any Affiliate of any Member shall bear interest at a rate equal to or less than prevailing market rates in the market where the Black Duck Assets is located, but in no event in excess of the maximum rate permitted by law. No Member shall be obligated to make any loan to the Company. Notwithstanding anything else contained herein to the contrary, the Manager, without the consent of the Class A Member, shall be permitted to refinance any First Lien Loan or other loan or indebtedness by obtaining a loan from the Class B Member and/or any Affiliate of the Class B Member at any time, subject to Section 9.2. In connection therewith, the Class A Member agrees to  cooperate with the Manager and Class B Member, including, without limitation, upon request from the Class B Member and/or the Manager, to sign applications, affidavits and other documentation, including, without limitation, any written Member consents related to: (ww) any Approvals by Members; (xx) any refinancing and/or renewal or modification of any First Lien Loan or other loan or indebtedness, (yy) additional capitalization of the Company by the Class B Member and/or its Affiliates, and/or (zz) any loans from the Class B Member and/or its Affiliates to the Company in accordance with the terms of this Section 9.6, provided, such cooperation does not require any of the Class A Member or its Affiliates to agree to become personally liable on, or in respect of, or to guarantee, any indebtedness of the Company; provided further, however, the terms of this sentence shall not be construed to create any Approval rights of the Class A Member.

## ARTICLE X
## MEETINGS OF MEMBERS

Section 10.1.    Place of Meetings and Meetings by Telephone.  Meetings of Members shall be held at any place designated by the Manager.  In the absence of any such designation, meetings of Members shall be held at the principal place of business of the Company.  Any meeting of the Members may be held by conference telephone or similar communications equipment so long as all Members participating in the meeting can hear one another, and all Members participating by telephone or similar communications equipment shall be deemed to be present in person at the meeting.

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

Section 10.2.     Call of Meetings.  Meetings of the Members may be called at any time by any Member for the purpose of taking action upon any matter requiring the vote or authority of the Members as provided in this Agreement or upon any other matter as to which such vote or authority is deemed by the Members to be necessary or desirable. Meetings of the Members shall be called promptly by the Manager upon the written request of any Member.

Section 10.3.     Notice of Meetings of Members.  All notices of meetings of Members shall be sent or otherwise given in accordance with Section 20.5 not less than five (5) nor more than ninety (90) days before the date of the meeting.  The notice shall specify (i) the place, date, and hour of the meeting, and (ii) the general nature of the business to be transacted.

Section 10.4.     Manner of Giving Notice.  Notice of any meeting of Members shall be given personally or by telephone to each Member or sent by first class mail, by telegram or telecopy (or similar electronic means), or by a nationally recognized overnight courier, charges prepaid, addressed to the Member at the address of that Member appearing on the books of the Company or given by the Member to the Company for the purpose of notice.  Notice shall be deemed to have been given at the time when delivered either personally or by telephone, or at the time when deposited in the mail or with a nationally recognized overnight courier, or when sent by telegram or telecopy (or similar electronic means).

Section 10.5.     Adjourned Meeting, Notice.  Any meeting of Members, whether or not a quorum is present, may be adjourned from time to time by the vote of all Members represented at that meeting, either in person or by proxy.  When any meeting of Members is adjourned to another time or place, notice need not be given of the adjourned meeting, unless a new record date of the adjourned meeting is fixed or unless the adjournment is for more than sixty (60) days from the date set for the original meeting, in which case the Manager shall set a new record date and shall give notice in accordance with the provisions of Sections 10.3 and 10.4. At any adjourned meeting, the Company may transact any business that might have been transacted at the original meeting.

Section 10.6.     Quorum, Voting.  At any meeting of the Members, a duly authorized representative of both the Class A Member and the Class B Member must be present in order to have a quorum.  Except as otherwise required by this Agreement or applicable law, all matters shall be determined by a vote of the Members necessary to provide for Approval of the Class A Member and the Class B Member.

Section 10.7.     Waiver of Notice by Consent of Absent Members.  The conduct of a meeting of Members, however called and noticed and wherever held, shall be as valid as though taken at a meeting duly held after regular call and notice if a quorum is present either in person or by proxy and if either before or after the meeting each person entitled to vote to provide for Approval of the Members who was not present in person or by proxy signs a written waiver of notice or a consent to a holding of the meeting or an approval of the minutes.  The waiver of notice or consent need not specify either the business to be transacted or the purpose of any meeting of Members.  Attendance by a person at a meeting shall also constitute a waiver of notice of that meeting, except when the person objects at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened and except that attendance at a meeting is not a waiver of any

right to object to the consideration of matters not included in the notice of the meeting if that objection is expressly made at the beginning of the meeting.

Section 10.8.    Member Action by Written Consent Without a Meeting.  Except as provided in this Agreement, any action that may be taken at any meeting of Members may be taken without a meeting and without prior notice if a consent in writing setting forth the action so taken is signed by the Members necessary to provide for Approval of the Members.  Any such written consent may be executed and given by telecopy or similar electronic means.  Such consents shall be filed with the Company and shall be maintained in the Company's records.

Section 10.9.    Record Date for Member Notice, Voting, and Giving Consents.

(a)    For purposes of determining the Members entitled to vote or act at any meeting or adjournment thereof, the Manager may fix in advance a record date which shall not be greater than ninety (90) days nor fewer than five (5) days before the date of any such meeting.  If the Manager do not so fix a record date, the record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the Business Day immediately preceding the day on which notice is given, or if notice is waived, at the close of business on the Business Day next preceding the day on which the meeting is held.

(b)    The record date for determining Members entitled to give consent or approval to action in writing without a meeting, (i) when no prior action of the Manager has been taken, shall be the day on which the first written consent is given or (ii) when prior action of the Manager has been taken, shall be (x) such date as determined for that purpose by the Manager, which record date shall not precede the date upon which the resolution fixing it is adopted by the Manager and shall not be more than twenty (20) days after the date of such resolution or (y) if no record date is fixed by the Manager the record date shall be the close of business on the day on which the Manager adopts the resolution relating to that action.

(c)    Only Members of record on the record date as herein determined shall have any right to vote or to act at any meeting or give consent or approval to any action relating to such record date.

Section 10.10.    Proxies.  Every Member entitled to vote or act on any matter at a meeting of Members shall have the right to do so either in person or by proxy, provided that an instrument authorizing such a proxy to act is executed by the Member in writing and dated not more than eleven (11) months before the meeting, unless the instrument specifically provides for a longer period.  A proxy shall be deemed executed by a Member if the Member's name is placed on the proxy (whether by manual signature, typewriting, telegraphic transmission, or otherwise) by the Member or the Member's attorney-in-fact.  A valid proxy that does not state that it is irrevocable shall survive continue in full force and effect unless (i) revoked by the person executing it before the vote pursuant to that proxy by a writing delivered to the Company stating that the proxy is revoked, by a subsequent proxy executed by or attendance at the meeting and voting in person by the person executing that proxy or (ii) written notice of the death or incapacity of the maker of that proxy is received by the Company before the vote pursuant to that proxy is counted. A proxy purporting to be executed by

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

or on behalf of a Member shall be deemed valid unless challenged at or prior to its exercise and the burden of proving invalidity shall rest on the challenger.

## ARTICLE XI
## RECORDS AND INSPECTION

Section 11.1.    <u>Maintenance and Inspection of Membership Interest Register</u>.    The Company shall maintain at its principal place of business a record of its Members, giving the names and addresses of all Members and the Percentage Interest held by each Member.  Subject to such reasonable standards (including standards governing what information and documents are to be furnished and at whose expense) as may be established by the Manager from time to time, each Member has the right to obtain from the Company from time to time upon reasonable demand for any purpose reasonably related to the Member's interest as a Member of the Company a record of the Company's Members.

Section 11.2.    <u>Maintenance and Inspection of Limited Liability Company Agreement</u>.  The Company shall keep at its principal place of business the original or a copy of this Agreement as amended to date, which shall be open to inspection by the Members at all reasonable times during office hours.

Section 11.3.    <u>Maintenance and Inspection of Other Records</u>.  The accounting books and records, minutes of proceedings of the Members and the Company and any committees or delegates of the Company, and all other information pertaining to the Company that is required to be made available to the Members under the Act shall be kept at such place or places designated by the Manager or in the absence of such designation, at the principal place of business of the Company. The minutes shall be kept in written form and the accounting books and records and other information shall be kept either in written form or in any other form capable of being converted into written form.  The books of account and records of the Company shall be maintained, for tax purposes only, in accordance with Sound Accounting Principles during the term of the Company, wherein all transactions, matters, and things relating to the business and properties of the Company shall be currently entered.  Subject to such reasonable standards (including standards governing what information and documents are to be furnished and at whose expense) as may be established by the Manager from time to time, minutes, accounting books and records, and other information shall be open to inspection upon the written demand of any Member at any reasonable time during usual business hours for a purpose reasonably related to the Member's interests as a Member.  Any such inspection shall be made in person or by agent or attorney and shall include the right to copy and make extracts.

Section 11.4.    <u>Inspection by the Members</u>.  The Members shall have the right at any reasonable time to inspect all books, records, and documents of every kind and the physical properties of the Company for a purpose reasonably related to his or her position as a Member.  This inspection by a Member may be made in person or by an agent or attorney and the right of inspection includes the right to copy and make extracts of documents.

COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC

## ARTICLE XII
## FINANCIAL REPORTS, TAX MATTERS, ETC.

Section 12.1.    <u>Financial Reports</u>.  The Manager shall cause to be prepared (i) as of the end of each Fiscal Year of the Company, (ii) as of the date of liquidation of the Company, and (iii) as of such additional dates as the Manager may determine appropriate financial statements showing the assets, liabilities, capital, profits, expenses, losses, and recovered and unrecovered capital expenditures of the Company and a statement showing all amounts credited and debited to each Member's Capital Account and of each Member's distributive share, for federal income tax purposes (which shall be determined in accordance with Sound Accounting Principles), of income, gains, deductions, losses, and credits (or items thereof) arising out of Company operations, as required by law, and a further statement reconciling any difference between the Member's respective Capital Accounts as shown in such financial statements and their Capital Accounts as determined in accordance with the provisions of this Agreement. A copy of each such report shall be delivered to each Member within ninety (90) days after each such applicable date.

Section 12.2.    <u>Monthly Reports</u>.  The Manager shall prepare on a monthly basis and furnish to the Members, with respect to the Company, a balance sheet and income statement.

Section 12.3.    <u>Company Funds</u>.  Pending application or distribution, the funds of the Company shall be deposited in such bank accounts, or invested in such interest-bearing or non-interest bearing investments, including, without limitation, federally insured checking and savings accounts, certificates of deposit, government issued or backed securities, or mutual funds investing primarily in such types of securities, as shall be designated by the Manager.  Such funds shall not be commingled with the funds of any other person.  Withdrawals therefrom shall be made upon such signatures as the Manager may designate.  Deposits of Company funds into any federally unsecured institution shall not be limited by the amount of available federal deposits insurance.

Section 12.4.    <u>Tax Returns</u>.  The Manager shall cause the Company to prepare all income tax and other tax returns of the Company.  The Manager shall file all such returns and furnish to each Member a copy of all such returns together with all schedules thereto and such other information which each Member may reasonably request in connection with such Member's own tax affairs.

Section 12.5.    <u>Tax Elections</u>.  At the request of either the transferor or transferee in connection with a transfer of a Membership Interest in the Company Approved by the Members, the Manager shall cause the Company to make the election provided for in Code Section 754 and maintain a record of the adjustments to the tax basis of Property resulting from that election. Any such transferee shall pay all costs incurred by the Company in connection with such election and the maintenance of such records.

Section 12.6.    <u>Tax Matters Member</u>.  The Manager shall designate, from time to time, the Member that shall act as the Tax Matters Member on behalf of the Company.

(a)    The Tax Matters Member shall, within ten (10) Business Days of receipt thereof, forward to each Member a photocopy of any material correspondence relating to the

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

Company received from the Internal Revenue Service outside of the ordinary course of the Company's business.  The Tax Matters Member shall, within ten (10) Business Days thereof, advise each Member in writing of the substance of any material conversation held with any representative of the Internal Revenue Service outside of the ordinary course of the Company's business.

        (b)    Any costs incurred by the Tax Matters Member for retaining accountants and/or lawyers on behalf of the Company in connection with any Internal Revenue Service audit of the Company shall be expenses of the Company.  Any accountants and/or lawyers retained by the Company in connection with any Internal Revenue Service audit of the Company shall be selected by the Tax Matters Member and the fees therefor shall be expenses of the Company.

## ARTICLE XIII
## NONDISCLOSURE OF INFORMATION

Section 13.1.  <u>Confidentiality</u>.  All disclosures of trade secrets, know-how, financial information, or other confidential information made by the Company to any Member or made by any Member under or in connection with this Agreement, shall be received and maintained in confidence by the recipient during the term hereof and for three (3) years after termination of the Company and each Member shall treat all such trade secrets, know-how, financial information or other confidential information as confidential except:

    (a)    as to the persons directly responsible for the performance of the obligations of this Agreement and for the effective operation of the Company;

    (b)    as to the professional advisers of the Members and the Company;

    (c)    as to such disclosures to customers, actual or prospective financial institutions, lenders to or other actual or prospective equity investors in the Black Duck Assets and other persons, as are necessary for the effective carrying on of business by the Company;

    (d)    as to such information as is required by law to be disclosed by the Members or the Company; and

    (e)    as to such information as is or may fall within the public domain otherwise than in violation of the provisions of this <u>Section 13.1</u>.

Section 13.2.  <u>Duty of Care</u>.  Each Member will take such steps as lie within its power to assure that all officers and employees of the Company, to whom confidential information is disclosed, take all proper precautions to prevent the unauthorized disclosure and use of the confidential information referenced in <u>Section 13.1</u>.

## ARTICLE XIV
## TRANSFERABILITY

Section 14.1.    Restrictions on Transferability.  Except for a Permitted Transfer (defined below), no transfer of (i) all or any part of a Member's Membership Interest in the Company (including the transfer of any rights to receive or share in profits, losses, income or the return of contributions) or (ii) all or any part of the equity interest in an Entity which is a Member shall be effective unless and until approved as provided in the following sentence and written notice (including the name and address of the proposed purchaser, transferee, or assignee and the date of such transfer) has been provided to the Company and the non-transferring Members.  Unless a Permitted Transfer, if all of the non-transferring Members necessary to provide for Approval of the Members do not consent in writing to the proposed sale or assignment of a transferring Member's Membership Interest, which consent may be withheld in their sole discretion, such Membership Interest (or any rights therein or associated therewith) may not be transferred and any such purported transfer shall be null and void.  The following transfers of a Member's Membership Interest in the Company or of the equity interests in an Entity which is a Member shall be permitted at any time or from time to time (the "Permitted Transfers"):  (ww) a transfer of any or all of the Membership Interests to and/or by the Class A Member and/or an Affiliate of the Class A Member; (xx) a transfer of all or any part of the equity interests in the Class A Member and/or an Affiliate of the Class A Member; (yy) a transfer of any or all of the Membership Interests to and/or by the Class B Member and/or an Affiliate of the Class B Member; or (zz) a transfer of all or any part of the equity interests in the Class B Member and/or an Affiliate of the Class B Member.

Notwithstanding anything herein to the contrary, no transfer of a Member's Membership Interest shall be permitted to occur if such transfer would cause the Company to terminate under Code Section 708(b)(1)(B) in the opinion of the Manager.

Section 14.2.    Restrictions on Resignation.  Notwithstanding anything to the contrary contained herein or under the Act, except in connection with a Permitted Transfer, no Member shall have the right to resign or withdraw from the Company without the written consent of the Manager.  In the event a Member attempts to resign or withdraw in violation of the foregoing provision, (i) the Company shall not be obligated to pay any amounts to the Member, nor to distribute any of the Black Duck Assets to the Member or any interest therein, (ii) the Member shall be deemed to have forfeited any rights to legal or beneficial ownership of its Membership Interest, and (iii) the Company may recover from the resigning or withdrawing Member damages for breach of this Agreement.

## ARTICLE XV
## SUBSTITUTED MEMBERS

Section 15.1.    Substituted Members.  Any transferee acquiring the Membership Interest of a Member pursuant to a Permitted Transfer (provided that such transferee is an Affiliate (as described in clause (a) or clause (b)(i) of the definition of Affiliate) of either One Industries or Synergy) or as otherwise permitted under Article XIV shall be admitted as a substituted Member (a "Substituted Member") with respect to the Membership Interest transferred concurrently with the effectiveness of the transfer (provided that such transferee, unless already a Member, shall, as a condition to such

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

admission, execute a counterpart of this Agreement, agreeing thereby to be bound by all of the terms and conditions hereof), and upon the satisfaction of such condition to admission as a Substituted Member specified herein, such Substituted Member shall be entitled to all of the rights and benefits under this Agreement of the transferor of such Membership Interest.  Any other transferee shall be admitted as a substituted Member on such terms and conditions as may be Approved by the Members. No purported transfer of any Membership Interest, or any portion thereof or interest therein, in violation of the terms of this Agreement (including any transfer occurring by operation of law) shall vest the purported transferee with any rights, powers, or privileges hereunder, and no such purported transferee shall be deemed for any purposes as a Member hereunder or have any right to vote or consent with respect to Company matters, to inspect Company records, to maintain derivative proceedings, to maintain any action for an accounting or to exercise any other rights of a Member hereunder or under the Act.

## ARTICLE XVI
## COVENANT AGAINST PARTITION/RESIGNATION

Section 16.1.    Waiver of Partition.  No Member shall, either directly or indirectly, take any action to require partition, file a bill for Company accounting or appraisement of the Company or of any of its assets or properties or cause the sale of any Company Property, and notwithstanding any provisions of applicable law to the contrary, each Member (and each of his legal representatives, successors, or assigns) hereby irrevocably waives any and all rights it may have to maintain any action for partition or to compel any sale with respect to his Membership Interest, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

Section 16.2.    Covenant Not to Resign or Dissolve.  Notwithstanding any provision of the Act to the contrary, to the fullest extent permitted by the Act, each Member hereby covenants and agrees that the Members have entered into this Agreement based on their mutual expectation that all Members will continue as Members and carry out the duties and obligations undertaken by them hereunder and that, except as otherwise expressly required or permitted hereby, each Member hereby covenants and agrees not to (a) take any action to file a certificate of dissolution or its equivalent with respect to itself, (b) take any action that would cause a voluntary Bankruptcy of such Member, (c) withdraw or attempt to withdraw from the Company, (d) exercise any power under the Act to dissolve the Company, (e) transfer all or any portion of its Membership Interest in the Company, (f) petition for judicial dissolution of the Company, or (g) demand a return of such Member's contributions or profits (or a bond or other security for the return of such contributions or profits) without the unanimous consent of the Manager.

## ARTICLE XVII
## ADDITIONAL MEMBERS

Section 17.1.    Additional Members.  Subject to the Manager first providing the Members the opportunity to participate in any additional capital calls in accordance with the terms of Section 3.2(b), (i) additional Members may be admitted to the Company only with the Approval of the Members; and (ii) the Capital Contribution and the Percentage Interest of any additional Member shall be determined in accordance with the terms of such Approval.  Any additional Member shall

execute a counterpart of this Agreement, agreeing thereby to be bound by all of the terms and provisions hereof; provided that prior to or concurrently with the admission of an additional Member, the Members shall adopt such amendments to this Agreement as they deem appropriate to cause the provisions hereof that contemplate only two Members to be appropriately modified to operate in the context of three or more Members.

## ARTICLE XVIII
## TERMINATION AND LIQUIDATION OF THE COMPANY

Section 18.1.    Termination.

(a)    The Company shall be terminated upon the earliest to occur of the following:

(i)    the occurrence of any event that causes a termination of the Company under the Act, unless the business of the Company is continued by the consent of all remaining Members within ninety (90) days following the occurrence of any such event;

(ii)    all or substantially all of the Company's assets and properties have been sold, taken in condemnation, or otherwise disposed and reduced to cash; or

(iii)    a termination of the Company is Approved by the Members.

(b)    Upon termination of the Company, the Manager or, if the Bankruptcy, withdrawal or dissolution of the Manager has caused the dissolution of the Company, such other person as is Approved by the Class B Member (such person being herein referred to as the "Liquidator") shall proceed to wind up the business and affairs of the Company in accordance with the terms hereof and the requirements of the Act.  A reasonable amount of time shall be allowed for the period of winding up in light of prevailing market conditions and so as to avoid undue loss in connection with any sale of Company Assets.  This Agreement shall remain in full force and effect during the period of winding up.

(c)    In connection with the winding up of the Company, before the later to occur of the end of the Fiscal Year of the Company or the ninetieth day after the liquidation of the Company within the meaning of Regulation Section 1.704-1 (b)(2)(ii)(g), the Company Assets shall be distributed in accordance with Section 5.3 above; provided, however, with the Approval of the Members, a pro rata portion of the distributions that would otherwise be made to the Members under (iii) above may be distributed to a trust established for the benefit of the Members for the purposes of liquidating Company Assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the Company.  The assets of any trust established under this Section 18.1 will be distributed to the Members from time to time by the trustee of the trust upon Approval of the Members in the same proportions as the amount distributed to the trust by the Company would otherwise have been distributed to the Members under this Agreement.

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

(d)     If distributions are insufficient to return to any Member the full amount of such Member's Capital Contributions, such Member shall have no recourse against any other Member.  No Member shall have any obligation to restore, or otherwise pay to the Company, any other Member, or any third party, the amount of any deficit balance in such Member's Capital Account upon dissolution and liquidation.  Following the completion of the winding up of the affairs of the Company and the distribution of its assets, the Company shall be deemed terminated and the Liquidator shall file a certificate of cancellation in the Office of the Secretary of State of the State of Texas as required by the Act.

Section 18.2.     Deemed Liquidation.  If no event resulting in termination of the Company has occurred, but the Company is deemed terminated for federal income tax purposes within the meaning of Code §708(b)(1)(B), the Company shall not be wound up and dissolved but its assets and liabilities shall be deemed to have been contributed to a new Company for federal income tax purposes and shall operate and be governed by the terms of this Agreement.

## ARTICLE XIX
## RESERVED

## ARTICLE XX
## MISCELLANEOUS

Section 20.1.     Amendment.     Except as expressly provided in this Agreement, this Agreement may be modified or amended only upon the written agreement of both the Class A Member and the Class B Member.

Section 20.2.     Checks, Drafts, Evidence of Indebtedness.     All checks, drafts, or other orders for the payment of money, notes, or other evidence of indebtedness issued in the name of or payable to the Company shall be signed or endorsed in such manner and by such person or persons as shall be designated from time to time in accordance with the resolution of the Manager.

Section 20.3.     Contracts and Instruments, How Executed.     The Manager, except as otherwise provided in this Agreement, may authorize any Manager(s) or agent(s) to enter into any contract or execute any instrument in the name of and on behalf of the Company and this authority may be general or confined to specific instances; and unless so authorized or ratified by the Manager (or otherwise specified in this Agreement), no agent shall have any power or authority to bind the Company by any contract or engagement or to pledge its credit or to render it liable for any purpose or for any amount.

Section 20.4.     Representation of Shares of Other Entities Held by the Company.     The Manager, or any other person authorized by the Manager, is authorized to vote or represent on behalf of the Company any and all shares of any corporation, partnership, trust, or other entity, foreign or domestic, standing in the name of the Company. The authority granted herein may be exercised in person or by a proxy duly executed by such designated person.

Section 20.5.     Notices.     All notices, demands, requests, consents, approvals, and other communications (collectively "Notices"), required or permitted to be given hereunder, shall be in

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

writing and sent by (i) hand delivery, (ii) electronic transmission (whether by email, facsimile or similar device), (iii) registered or certified mail, postage prepaid, return receipt requested; or (iv) special delivery service (e.g., Federal Express, DHL, UPS, etc.); addressed to the Person to be so notified as follows:

If to Class A Member:

> Synergy Midstream, LLC
> John M. Terrill, Manager
> 12036 North May
> Oklahoma City, OK 731290
> Telephone: 405-254-3900
> Cell- 405-706-3831
> Email : john@synergyadvisorsgroup.com

If to the Class B Member:

> One Industries Group, L.P.
> By its General Partner, One Industry, Inc.
> 5201 Camp Bowie Blvd, Ste. 200
> Fort Worth, TX 76107
> Telephone: 817-626-9898
> Telecopier: 817624-1374
> Email: Patton@tcrg.com

With a copy to:

> Craig M. Crockett
> THE CROCKETT FIRM
> 5201 Camp Bowie Blvd. Suite 200
> Fort Worth, Texas 76107
> Telephone: 817-810-0400
> Telecopier: 817-719-9450
> E-Mail: craig@crockettfirm.com

Each Notice sent in accordance with the requirements of this section shall be deemed effectively given upon actual receipt.  Each Person designated herein to receive any Notice or a copy thereof may change the address at which, or the Person to whom, Notice or a copy thereof is to be delivered, by Notice given in accordance with the requirements of this section.  Any Notice to any additional Member not specifically listed by name and address herein, or to any assignee, shall be given, in a similar manner, to such Person at the address thereof on the books and records of the Company.

Section 20.6.   <u>Governing Law</u>.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Texas.

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

Section 20.7.    <u>Headings</u>.  The Article and Section headings of this Agreement are for convenience only, do not form a part of this Agreement, and shall not in any way affect the interpretation hereof.

Section 20.8.    <u>Extension Not a Waiver</u>.  No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to a Member or the Company shall impair or affect the right of such Member or the Company thereafter to exercise the same. Any extension of time or other indulgence granted to a Member hereunder shall not otherwise alter or affect any power, remedy or right of any other Member or of the Company, or the obligations of the Member to whom such extension or indulgence is granted.

Section 20.9.    <u>Creditors Not Benefited</u>.  Nothing contained in this Agreement is intended or shall be deemed to benefit any creditor of the Company or any creditor of any Member, and no creditor of the Company shall be entitled to require the Company or the Members to solicit or accept any Capital Contribution or other contribution for the Company or to enforce any right which the Company or any Member may have against any Member under this Agreement.

Section 20.10.    <u>Publicity</u>.  No Member shall issue any press release or otherwise publicize or disclose the terms of this Agreement or the terms of the Members' acquisition of the Membership Interests in the Company, without the consent of the other Members, except as such disclosure may be made in the course of normal reporting practices by a Member to its partners, shareholders, consultants or members or as otherwise required by law. Nothing herein shall prohibit or limit a Member's or its Affiliates' ability to market the Black Duck Assets for sale or lease.

Section 20.11.    <u>Construction</u>.  No oral explanation of or oral information relating to this Agreement offered by any party hereto shall alter the meaning or interpretation of this Agreement.

Section 20.12.    <u>Further Action</u>.  Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

Section 20.13.    <u>Variation of Pronouns</u>.  All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the person or persons may require.

Section 20.14.    <u>Successors and Assigns</u>.  Subject to the restrictions on transfer set forth in <u>Article XIV</u>, this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

Section 20.15.    Reserved.

Section 20.16.    <u>Ambiguities</u>.  All of the parties to this Agreement have participated in the negotiation and drafting hereof.  Accordingly, it is understood and agreed that the general rule that ambiguities are to be construed against the drafter shall not apply to this Agreement. In the event that any language of this Agreement is found to be ambiguous, each party shall have an opportunity,

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

in any legal proceeding, to present evidence as to the actual intent of the parties with respect to any such ambiguous language.

Section 20.17.   Entire Agreement.  The terms and conditions contained herein (including all Exhibits hereto) constitute the entire agreement between the Members concerning the subject matter hereof, and shall supersede all previous communications, either oral or written, between the parties hereto, and no agreement or understanding varying or extending this Agreement shall be binding upon either Member unless in writing, signed by a duly authorized officer or representative of each Member.

Section 20.18.   Side Letters. Notwithstanding anything herein contained to the contrary, it is hereby acknowledged and agreed that the Manager and/or the Class B Member on their own behalf or on behalf of the Company without the approval of any Member or any other Person, may enter into an agreement (each, a "Side Letter") with one or more other Members that has the effect of establishing a right under, or altering or supplementing the terms of, this Agreement with regard to such Member(s)' Membership Interest(s) and attendant rights and obligations under this Agreement, provided that such Side Letter does not affect or diminish the rights, interest or obligations of any Member other than the Member(s) party to such Side Letter. The parties hereto agree that any terms contained in a Side Letter with a Member will govern the relationship of such Member with the Company notwithstanding the provisions of this Agreement; provided, however, that nothing in such a Side Letter shall be construed to affect or diminish the rights, interest or obligations of the other Members.

Section 20.19.   Counterparts. This Agreement may be executed in a number of identical counterparts that, when taken together, shall constitute collectively one (1) agreement; in making proof of this Agreement, it shall not be necessary to produce or account for more than one such counterpart with each party's signature. Further, this Agreement may be executed by the parties hereto by facsimile or by portable document format ("PDF") signature, such that execution of this Agreement by facsimile or PDF signature shall be deemed effective for all purposes as though this Agreement was executed as a "blue ink" original.

Section 20.20.   Attorney Representations. The parties each acknowledge that Craig M. Crockett has prepared this Agreement on behalf of and in the course of such attorneys' representation of Texas Capitalization Resource Group, Inc. and that the parties have had the opportunity to seek the advice of independent counsel as to this Agreement and the tax consequences of this Agreement.

[signatures appear on following page]

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

IN WITNESS WHEREOF, this Agreement is executed effective for all purposes as of the Effective Date.

**CLASS A MEMBER:**

Synergy Midstream, LLC, an Oklahoma limited liability company

By its Manger

By: _____ 3/22/18
John Terrill

**CLASS B MEMBER:**

One Industries Group, L.P. , a Texas limited partnership

By its General Partner, One Industry, Inc.

By:_____
Robert L. Patton, Jr. President

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

## EXHIBIT A

As used herein, the term 'Black Duck Assets' means the assets of Black Duck Properties, LLC ("Black Duck" or "Seller") being sold to the Company pursuant to that certain Purchase and Sale Agreement dated _____between the Company and Black Duck and includes the following:

(a) All of Seller's right, title and interest in and to (i) the estates and rights arising under those certain Right of Way Agreements (the "ROW Agreements") as identified on Exhibit "A" forming fifty-three (53) right of way tracts of land through approximately sixty-five (64) contiguous miles of rights of way in, on, through and under Angelina, Nacogdoches and Rusk and Shelby counties in the State of Texas together with all improvements and fixtures thereon, if any, and all easements, rights-of-way, licenses, interests, rights, and appurtenances to the extent appertaining, if any, and any Permits, Personal Property, and Intangible Property free and clear of all liens, claims, easements, rights-of-way, reservations, restrictions, encroachments, tenancies and any other type of encumbrance (collectively, the "Encumbrances").

(b) All of Seller's right, title and interest in and to  the estates and mineral rights created by those certain oil and gas leases and mineral estates (the 'Leases'), described in Exhibit 'B', and (ii) all oil, gas, water disposal and other wells located on the Leases or on lands pooled therewith (the 'Wells'), including, but not limited to, the Wells in, on, through and under Angelina, Nacogdoches and Rusk counties in the State of Texas, together with all of Seller's interest in the rights and appurtenances incident thereto together with all improvements and fixtures thereon, if any, and all easements, rights-of-way, licenses, interests, rights, and appurtenances to the extent appertaining solely to the Land, if any, and any Permits, Personal Property, and Intangible Property free and clear of all Encumbrances.

(c) All of Seller's right, title and interest in and to that certain tract of land and minerals located in in, on, through and under Angelina, Nacogdoches and Rusk counties in the State of Texas, as (the "Land"), together with all improvements and fixtures thereon, if any, and all easements, rights-of-way, licenses, interests, rights, and appurtenances to the extent appertaining solely to the Land, if any, and any Permits, Personal Property, and Intangible Property free and clear of all Encumbrances.

(d)    All of Seller's rights in, to and under any and all oil or gas product purchase and sale contracts, gas processing or transportation agreements, leases, permits, rights-of-way, easements, licenses, and options which appear of record or in the real property records or which have been otherwise disclosed to Purchaser;

(e) All of Seller's interest in fixtures, personal property, facilities and equipment, used or held for use or charged to the Leases, the Wells or the ROW Agreements for the production, treatment, transportation, sale or disposal of oil, gas, and other minerals or water produced; and

All books, files, data and records in Seller's possession relating to the Leases or Wells, or the maintenance or operation thereof, that Seller is not otherwise precluded from transferring to a third party by proscription of contract (the 'Records').

**COMPANY AGREEMENT OF TCRG EAST TEXAS PIPELINE 1, LLC**

**EXHIBIT B**

FUNDING PERCENTAGES, INITIAL CAPITAL CONTRIBUTIONS, AND

PERCENTAGE INTERESTS

| Name of Members | Funding Percentages | Initial Capital Contributions | Percentage Interests |
|---|---|---|---|
| Class A Member: | | | |
| Synergy | 25.00% | $250.00 | 25.00% |
| Class B Member: | | | |
| One Industries | 75.00% | $750.00 | 75.00% |
| **TOTALS** | **100.00%** | **$1,000.00** | **100.00%** |