**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| *In re*: | § | |
| | § | Chapter 11 |
| KrisJenn Ranch, LLC, | § | |
| | § | |
| *Debtor* | § | Case No. 20-50805 |
| | § | |

| | | |
|---|---|---|
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC, | § § § § § | |
| | § | Adversary No. 20-05027 |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| DMA Properties, Inc. and Longbranch Energy, LP, | § § | |
| | § | |
| *Defendants*. | § | |

| | | |
|---|---|---|
| DMA Properties, Inc. and Frank Daniel Moore, | § § | |
| | § | |
| *Cross-Plaintiffs/Third-Party Plaintiffs,* | § | |
| | § | |
| v. | § | Adversary No. 20-05027 |
| | § | |
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, Black Duck Properties, LLC, Larry Wright, and John Terrill, | § § § § § | |
| | § | |
| *Cross-Defendants/Third-Party Defendants.* | § | |

1

### DMA PROPERTIES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DMA'S OWNERSHIP INTEREST IN THE BIGFOOT NOTE PAYMENTS

DMA moves for partial summary judgment and asks the Court to rule, as matter of law, that DMA owns 50% of the note payments made by Bigfoot Energy Services.

### INTRODUCTION

This adversary proceeding concerns the assets of a business divorce and the attempts of Larry Wright (through Debtor KrisJenn Ranch and the other Debtors) to steal property owned by his former business partner, Daniel Moore. The assets of the business divorce included (1) a pipeline right-of-way running through four counties in East Texas and (2) payments from a promissory note for an unrelated well in another county. Moore's entity, DMA, received property interests in both assets.

By separate motions for partial summary judgment, DMA asks the Court to recognize DMA's interest in both assets. In Docket Entry 28, Moore's entity DMA asked the Court to recognize DMA's partial ownership of the pipeline right-of-way. In this motion, DMA asks the Court to recognize DMA's 50% ownership interest in payments on the promissory note.

### JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 because this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), & (O). To the extent that this is not a core matter, DMA has already consented to the entry of a final order by the Court under 28 U.S.C. § 157(c). *See* Consent [#18].

Additionally, venue is proper in this Court under 28 U.S.C. §§ 1408 & 1409. The Debtor remains as a debtor-in-possession. This motion is made under Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056.

## FACTUAL AND ARGUMENT SUMMARY

In 2018, Moore agreed to resign from Black Duck Properties, LLC, the company he and Wright jointly owned through their entities, in exchange for some of Black Duck's assets. Among other things, Black Duck gave DMA "entitlement" to 50% of the payments made on a $450,000 promissory note from Bigfoot Energy Services, LLC. In doing so, Black Duck and Wright expressly warranted that Black Duck's interest in the promissory note was free and clear of all debt and liens.

Yet now Wright claims that, unbeknownst to Moore and in violation of the Black Duck company agreement, he had secretly pledged the Bigfoot note as collateral to one of his entities—Debtor KrisJenn Ranch. Wright also now claims that KrisJenn Ranch foreclosed on 100% of the Bigfoot note and that DMA has no right to its 50% share of the payments. But Wright has not shown—because he cannot—that KrisJenn Ranch ever had a security interest in the Bigfoot note.

The plain, unambiguous language of the contract between DMA and Black Duck concerning the Bigfoot note payments confirms three dispositive legal conclusions: (1) DMA is the owner of 50% of the Bigfoot promissory-note payments; (2) because DMA owns that 50% free of any encumbrances, KrisJenn Ranch could only receive Black Duck's interest in the remaining 50% of the note payments; and (3) having warranted that DMA took the 50% interest in the Bigfoot note payments free and clear from all liens and debts, Wright and KrisJenn Ranch are estopped from arguing that KrisJenn Ranch has any interest in DMA's portion of the Bigfoot note payments.

DMA therefore asks the Court to rule, as a matter of law, that DMA owns half of the Bigfoot note payments.

FACTUAL BACKGROUND

**A.      Bigfoot buys the Harris SWD from Black Duck.**

Early in 2016, Larry Wright and Daniel Moore formed Black Duck Properties, LLC. Ex. 1 (Moore Decl.) ¶4.[1] Wright's entity, KrisJenn Ranch, LLC, owned 50% of Black Duck; Moore's entity, SCMED Oilfield Consulting, owned the other 50%. Ex. 1 (Moore Decl.) ¶4; Ex. 2 (Dec. 2, 2015 Email Chain) at 2. The stated purpose of the new entity was "[t]o purchase property and options" related to saltwater disposal (SWD) wells "as well as other properties in the state of Texas." Ex. 2 (Dec. 2, 2015 Email Chain) at 2; Ex. 1 (Moore Decl.) ¶5. Wright, through KrisJenn Ranch, would provide the funding while Moore, through SCMED, would "introduc[e] opportunities" and "bring buyers" if appropriate. Ex. 2 (Dec. 2, 2015 Email Chain) at 1; Ex. 1 (Moore Decl.) ¶5. Wright confirmed that both SCMED and KrisJenn Ranch would seek buyers, as "[i]t should take all our joint efforts." Ex. 2 (Dec. 2, 2015 Email Chain) at 1; Ex. 1 (Moore Decl.) ¶5.

About a year later, Black Duck bought a saltwater disposal well in Panola County known as the Harris SWD. Ex. 1 (Moore Decl.) ¶7. Moore found a buyer for the well— Bigfoot Energy Services, LLC. *Id*. But given the significant upfront repair costs to bring the well into regulatory compliance, Black Duck and Bigfoot agreed that Black Duck would owner-finance Bigfoot's purchase of the Harris SWD. *Id*.

In March 2017, Bigfoot paid $50,000 as a down payment and gave Black Duck a $450,000 promissory note for the remainder of the purchase price. Ex. 3 (Bigfoot Promissory Note); Ex. 1 (Moore Decl.) ¶7. Secured by the Harris SWD, the note requires quarterly payments in June, September, December, and March of each year until repayment is complete. Ex. 3 (Bigfoot Promissory Note) at 1–2; Ex. 1 (Moore Decl.) ¶7.

---

[1] In support of this motion, DMA cites the declaration that Moore submitted in support of the motion for partial summary judgment in Panola County (which was never heard) and includes all the exhibits cited therein for completeness. *See* Ex. 1 (Moore Decl.).

**B.** **Wright forces Moore out of Black Duck, and Moore agrees to resign in exchange for some of Black Duck's assets, including an entitlement to 50% of Bigfoot's note payments.**

In January 2018, Wright grew increasingly hostile toward Moore and told him to resign from Black Duck. Ex. 1 (Moore Decl.) ¶8. After several hostile conversations, Moore agreed to resign. *Id.* Shortly thereafter, Moore sent Wright an email confirming the terms of his resignation from Black Duck and his relinquishment of his 50% interest in Black Duck and its assets. Ex. 4 (Email Agreement); Ex. 1 (Moore Decl.) ¶9. Among other things, the email agreement granted Moore:

> No less than 50% carried interest and 50% entitlement on all terms and conditions and monies owed to the Note to Black Duck Properties and Big Foot regarding the Harris SWD. Harris SWD is 100% FREE AND CLEAR OF ANY AND ALL DEBTS.

Ex. 4 (Email Agreement) at 3 (emphasis in original). Wright and Black Duck expressly agreed to these terms by email. *Id.* at 1.

A little later, Moore and Wright signed formal documents memorializing the terms of the Email Agreement. Ex. 1 (Moore Decl.) ¶10. David Strolle—a lawyer who appears to have represented both Black Duck and KrisJenn Ranch simultaneously—drafted a version of those formal documents. *Id.*

One of those documents, titled the Harris SWD Agreement, "address[es] the obligations regarding the Harris SWD" from "the binding 'Email Agreement' ( attached as Exhibit A ) dated Feb. 3, 2018." Ex. 5 (Harris SWD Agreement) at 1; Ex. 1 (Moore Decl.) ¶10. The Harris SWD Agreement confirms that "DMA Properties . . . is entitled to receive 50% of all Gross Monies" paid on the Bigfoot note to "Black Duck Properties including its successors and assigns." Ex. 5 (Harris SWD Agreement) at 1.

The Harris SWD Agreement further states:

> In the event and for any reasons whatsoever Big Foot including but not limited to any of its successors and assigns fails to make the payments, then it is understood that DMA Properties, Inc. is a 50% carried interest party

5

> and will be entitled to 50% of any and all scenarios or outcomes including
> the full terms and conditions regarding the FULL original agreement by
> and between Black Duck Properties, LLC and Big Foot including but not
> limited to the Note payment and its terms and conditions.

*Id.*

Finally, the Harris SWD Agreement specifies that, even though DMA owns 50% of the note payments, "Black Duck Properties, LLC and its successors and assigns" would continue collecting Bigfoot's note payments but would mail DMA its portion of the payments "within three days of the funds being available." *Id.*

**C.  Black Duck forwards the first two payments to DMA and then abruptly stops paying DMA its share of the payments.**

After Moore's resignation, DMA received 50% of Bigfoot's March 2018 note payment and 50% of Bigfoot's June 2018 note payment (made in July 2018). Ex. 1 (Moore Decl.) ¶12. But Moore never received DMA's portion of the September 2018 note payment. *Id.* When Moore reached out to Wright to learn why, Wright offered a series of explanations on why payment was late.

First, on October 2, 2018, Wright claimed that Bigfoot told him the September 2018 payment was still in the mail and promised that DMA would receive its portion of the payment shortly. Ex. 1 (Moore Decl.) ¶13. On October 22, 2018, Moore again reached out to Wright via email about the missing September 2018 payment. Ex. 6 (Oct. 22, 2018 Email Chain) at 2; Ex. 1 (Moore Decl.) ¶14. Wright did not respond. Ex. 1 (Moore Decl.) ¶14.

Eight days later, Moore followed up again. Ex. 6 (Oct. 22, 2018 Email Chain) at 2; Ex. 1 (Moore Decl.) ¶14. This time Wright claimed that he had a death in the family and was under IRS audit. Ex. 6 (Oct. 22, 2018 Email Chain) at 2; Ex. 1 (Moore Decl.) ¶14. About a week later, Moore contacted Wright a fourth time. Ex. 1 (Moore Decl.) ¶15. When Wright finally responded two days later, he again claimed he was under audit but also asserted—for the first time—that Moore and DMA owed him money. Ex. 7 (Nov. 8,

2018 Email Chain) at 1–2; Ex. 1 (Moore Decl.) ¶15. Moore denied that he or DMA owed Wright any money. Ex. 7 (Nov. 8, 2018 Email Chain) at 1; Ex. 1 (Moore Decl.) ¶15.

At no point in any of these communications did Wright assert that DMA was not entitled to 50% of Bigfoot's note payments. Ex. 1 (Moore Decl.) ¶16.

### D. Wright attempts to steal DMA's portion of the note payments, invoking a foreclosure allegedly authorized by a secret and fraudulent deed of trust.

Only after extensive research and conversations with Robert Sherman—the manager of Bigfoot—did an accurate picture of Wright's attempted theft begin to take shape.

On October 12, 2018—just 10 days after Wright initially told Moore that DMA's money was forthcoming—attorney David Strolle sent a letter to Bigfoot on behalf of KrisJenn Ranch. Ex. 8 (October 12, 2018 Letter). The letter purported to provide "formal notice" of an assignment transferring 100% of Black Duck's interest in the Bigfoot note to KrisJenn Ranch. *Id.* at 1.

Mr. Strolle's October 12, 2018 letter included a copy of the alleged assignment, which states that Black Duck transferred its interest in Bigfoot Energy's note to KrisJenn Ranch, LLC and KrisJenn Ranch, LLC, a Texas Limited Liability Company-Series Uvalde Ranch as partial payment of the balance due on a note dated August 14, 2017 for $4.1 million between KrisJenn Ranch as lender and Black Duck as borrower. Ex. 9 (Assignment of Note) at 1. The assignment represents that KrisJenn Ranch "foreclosed" on the August 14, 2017 promissory note. *Id.*

But that alleged note and the loan it claims to secure were never disclosed to or authorized by Moore, who was a manager of Black Duck and whose entity owned 50% of Black Duck in August 2017. Ex. 1 (Moore Decl.) ¶¶17–18. Indeed, Black Duck's company agreement required transactions to be authorized by disinterested management and required transactions to be authorized via a meeting of the managers, through a committee designated by the managers, or by a manager to whom special authority had been

delegated. *See* Ex. 10 (Black Duck Company Agreement) at 3, 19–20, 23-24; Ex. 1 (Moore Decl.) ¶¶20, 22. Such authorization was never requested or granted. Ex. 1 (Moore Decl.) ¶¶21, 23.

Nor is there any evidence that the Bigfoot note is collateral for the alleged loan. The alleged note purports to identify "Security for Payment" as follows:

> This Note is secured by the following Deeds of Trust of even date herewith:
>
> [a]  The Express Gas Pipeline and related facilities rights-of-way, easements and permits, leaves and other rights, executed by Borrower for the benefit of Lender
>
> (collectively with all other real and personal property secured by said Deeds of Trust, the "Collateral"). Other security may exist for this Note. This Note, the above-mentioned Deed of Trust and any other documents between Borrower and Lender pertaining to this Note may be referred to as the "Loan Documents."

Ex. 11 (Alleged Note) at 2.[2]

The Deed of Trust only lists "[t]he Express Gas Pipeline system and related facilities, rights-of-way, easements and permits, leases, and other rights and properties situated in the State of Texas" as described in the attached deed as collateral. Ex. 12 (Deed of Trust) at 1. Neither the Alleged Note, the Deed of Trust, or its attached deed (collectively, Alleged Loan Documents) mention or refer to the Bigfoot note or the Harris SWD.

Even more telling, the Deed of Trust—the document purporting to provide security for the $4.1-million loan allegedly made on August 14, 2017—was not executed or notarized until January 18, 2018. Ex. 12 (Deed of Trust) at 26. David Strolle—the same

---

[2] Although KrisJenn Ranch provided a copy of the Alleged Note with its Answer, it failed to also provide the Deed of Trust. DMA's Counsel found the alleged Deed of Trust in the property records of Nacogdoches County, one of the counties through which the Express Gas Pipeline runs.

lawyer who drafted a version of the formal documents for Moore's resignation (which included the Harris SWD Agreement)—is named as the trustee. *Id.* at 1.

Nor is there any evidence that KrisJenn Ranch perfected a security interest in the Bigfoot note by recording a UCC-1 financing statement with the Texas Secretary of State.[3] Instead, Wright and KrisJenn Ranch claimed in July 2019 that any loan secured by the right-of-way was paid; they filed a release of lien in Rusk County that "acknowledge[d] its payment and release[d] the property from the lien." Ex. 13 (Release of Lien).

**E.      Bigfoot files an interpleader action in Panola County, Texas.**

In September 2019, Bigfoot filed an interpleader action in Panola County and began paying its note payments into the Panola County court registry. In the Panola County case, DMA filed a summary-judgment motion, asserting a 50% interest in the Bigfoot note payments as a matter of law. DMA's motion was set for a hearing on May 6, 2020. But just before the Panola County court was scheduled to hear DMA's motion for summary judgment on the Bigfoot note payments, the KrisJenn Ranch entities filed for bankruptcy on April 27, 2020.

**F.      DMA renews its request for summary judgment here, asking this Court to find it owns 50% of the Bigfoot note payments as a matter of law.**

DMA is entitled to judgment as a matter of law on its ownership of one half of the Bigfoot note proceeds. The plain language of the Email Agreement and the Harris SWD Agreement conveyed to DMA a right to 50% of Bigfoot's note payments. The following table summarizes the current status of DMA's property:

---

[3] Counsel for DMA inquired with the Texas Secretary of State and found no record that KrisJenn Ranch filed a UCC-1 to record a security agreement with Black Duck.

| Bigfoot Note Payments | DMA's Share of Note Payments | Status of Property | | DMA's Outstanding Share |
|---|---|---|---|---|
| March 2018- June 2018 | $31,844.30 | Received | | None |
| September 2018- June 2019 | $63,688.60 | Kept by Black Duck/KrisJenn Ranch/Wright | | $63,688.60 |
| September 2019- Present | $63,688.60 | Paid into Panola County Court Registry | | $63,688.60 |
| **Total:** | **$159,221.50** | | | **$127,377.20** |

*See* Ex. 1 (Moore Decl.) ¶¶30-32.

As of this motion, DMA therefore owns and is owed at least $127,377.20. Wright cannot use his entities to play shell games with DMA's property. And more to the point, this scheme fails under Texas law. DMA is the owner of 50% of the note payments, and Wright and his entities are barred as a matter of law from claiming they own DMA's 50% share.

### LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute of material fact concerning a claim. FED. R. CIV. P. 56(a) (made applicable to this proceeding by FED. R. BANKR. P. 7056); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing the evidence on a motion for summary judgment, the Court must view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But only disputes over facts that might affect the outcome of the suit can preclude entry of summary judgment. *Anderson*, 477 U.S. at 248.

ANALYSIS

**I.     DMA owns 50% of the Bigfoot note payments.**

The plain, unambiguous language of the contract between DMA and Black Duck "entitle[s]" DMA to 50% of the Bigfoot note payments. Under Texas law, when the words used in a contract are subject to one reasonable interpretation, the contract is unambiguous and no genuine factual dispute concerning the contract's meaning exists. *Gonzalez v. Denning*, 394 F.3d 388, 392–93 (5th Cir. 2004) (applying Texas law). Because the Email Agreement and Harris SWD Agreement are subject to one reasonable interpretation—DMA owns 50% of all the Bigfoot note payments—the Court should recognize DMA's right to 50% of the Bigfoot note proceeds as a matter of law.

**A.     The plain language of the Email Agreement and Harris SWD Agreement gives DMA an entitlement to 50% of Bigfoot's note payments.**

Two documents control this motion: the Email Agreement and the Harris SWD Agreement. The Harris SWD Agreement explicitly incorporates the terms of the Email Agreement by reference: "this 'Harris SWD Agreement' is ONLY to address the obligations regarding the Harris SWD mentioned in the 'Email Agreement.'" Ex. 5 (Harris SWD Agreement) at 1. The Harris SWD Agreement defines "Email Agreement" as "the binding 'Email Agreement' ( attached as Exhibit A ) dated Feb. 3, 2018." The Email Agreement and the Harris SWD Agreement thus form a single contract. *See In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) ("Documents incorporated into a contract by reference become part of that contract."); *see also SCA Promotions, Inc. v. Yahoo!, Inc.*, 868 F.3d 378, 383 (5th Cir. 2017) (quoting *In re 24R, Inc.*, 324 S.W.3d at 567).

That contract grants DMA ownership of 50% of Bigfoot's note payments. The Email Agreement states that DMA was to receive "[n]o less than 50% carried interest and 50% entitlement on all terms and conditions and monies owed on the Note to Black Duck Properties and Big Foot regarding the Harris SWD." Ex. 4 (Email Agreement) at 3. In

11

granting DMA that 50% ownership right, Black Duck and Larry Wright warranted that the "Harris SWD [note] is 100% FREE AND CLEAR OF ANY AND ALL DEBTS." *Id.* The Harris SWD Agreement confirms that "DMA Properties, Inc. is entitled to receive 50% of all Gross Monies . . . for the remainder of all payments due to Black Duck Properties, LLC from Big Foot." Ex. 5 (Harris SWD Agreement) at 1. Such plain language shows that the parties intended to grant DMA a right to 50% of all payments on the Bigfoot note. *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017) (reiterating that Texas courts interpret contracts according to "the parties' true intent as expressed by the plain language they used").

Other provisions of the contract support that conclusion as well. First, the contract expressly states, "DMA Properties, Inc. is entitled to receive 50% of all Gross Monies received by Black Duck Properties, LLC *including its successors and assigns*[.]" Ex. 5 (Harris SWD Agreement) at 1 (emphasis added). DMA therefore maintains a right to the payments even if the payments are made to Black Duck's assignee. That is because DMA has a right to 50% of the note proceeds, not merely a right to payment from Black Duck. It makes no difference whether Black Duck assigned the Bigfoot note to KrisJenn Ranch or not. DMA still owns 50% of the note payments.

Second, the contract clarifies that DMA possesses a right to 50% of whatever recourse is available if Bigfoot fails to make payments on the note:

> In the event and for any reasons whatsoever Big Foot including but not limited to any of its successors and assigns fails to make the payments, then it is understood that DMA Properties, Inc. is a 50% carried interest party and will be entitled to 50% of any and all scenarios or outcomes including the full terms and conditions regarding the FULL original agreement by and between Black Duck Properties, LLC and Big Foot including but not limited to the Note payment and its terms and conditions.

*Id.* As this language makes clear, DMA has more than a right to receive 50% of the payments made to Black Duck—it also has a right in "all scenarios or outcomes" after default. That is because DMA owns 50% of the note payments.

Third, the Email Agreement allowed Moore "and or assigns [] until Feb. 23, 2018 to buy out of the remaining 50% of the Harris [SWD note] from Larry Wright for . . . $124,193.00." Ex. 4 (Email Agreement) at 3. Moore could only buy the "remaining" 50% of the note if he (through DMA) owned the other 50%.

Contradicting these terms, KrisJenn Ranch argued in state court that DMA only has a right to payment from Black Duck and thus only has a breach-of-contract claim against Black Duck. But that argument offends a long-held doctrine of contract interpretation: Courts applying Texas law examine and consider the entire writing "to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless." *Dallas/Fort Worth Int'l Airport Bd. v. INet Airport Sys., Inc.*, 819 F.3d 245, 248 (5th Cir. 2016) (quoting *El Paso Field Services, L.P. v. MasTec N. Am., Inc.,* 389 S.W.3d 802, 805 (Tex. 2012)).

KrisJenn Ranch's interpretation renders meaningless the contractual provisions that set out DMA's rights if payments are not made to Black Duck. Such provisions include DMA's right to 50% of payments received by Black Duck's "successors and assigns" and DMA's right to "50% of any and all scenarios or outcomes," including Bigfoot's default. Ex. 5 (Harris SWD Agreement) at 1. KrisJenn Ranch's interpretation also renders meaningless Moore's option to buy the "remaining 50%" of the Bigfoot note. Ex. 4 (Email Agreement) at 3.

The only way to harmonize and give effect to all provisions in the Email Agreement and the Harris SWD Agreement is to find that the parties intended to convey to DMA a right to 50% of Bigfoot's note payments.

**B.      Under Texas law, DMA's right to half of the note proceeds is a property right.**

DMA's "carried interest in" and "entitle[ment] to" 50% of the payments on the Bigfoot note is a property right—that means DMA *owns* half of Bigfoot's note payments.

13

DMA's right to a 50% of all note payments is an "ownership interest in the loan and the collateral[.]" *Asset Restructuring Fund, L.P. v. Liberty Nat. Bank and Resolution Trust Corp.*, 886 S.W.2d 548, 552 (Tex. App.—Austin 1994, writ denied) (following "[t]he majority view" that when a party purchases a percentage of a loan then that party "has an ownership or trust interest in the loan and underlying collateral, not just the collections from the loan"). Put another way, DMA's right to 50% of the note payments is a property right in the note. *See Brown v. Lee*, 371 S.W.2d 694, 696 (Tex. 1963) ("[T]he right to receive insurance proceeds payable at a future but uncertain date is 'property.'").

The fact that Black Duck collected the note payments from Bigfoot does not destroy DMA's property right. The Harris SWD Agreement provides that Black Duck, its successors, and its assigns must deposit Bigfoot's note payment "into [their] account within no more than three business days from receiving the payment" and then must mail DMA its portion of the payment "within three business days of the funds being available." Ex. 5 (Harris SWD Agreement) at 1. In processing Bigfoot's payment, Black Duck served as the collection agent and trustee of DMA's money. *See Sereboff v. Mid Atlantic Medical Services, Inc.* 547 U.S. 356, 363–64 (2006) ("It is a familiar rul[e] of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing."). As the trustee, Black Duck had a duty to mail DMA its portion of the Bigfoot note payments, not a right to the entirety of the Bigfoot note payments.

DMA's property right—an ownership interest in proceeds—continues even if the payment mechanism changes. *See McLaurin v. McLaurin*, 968 S.W.2d 947, 950 (Tex. App.—Texarkana 1998, no pet. h.) (finding that alteration of a payment schedule did not affect the underlying ownership right to proceeds). It makes no difference whether Bigfoot's payments are made to Black Duck or KrisJenn Ranch; DMA's property right to 50% of the note proceeds survives. *See* Ex. 5 (Harris SWD Agreement) at 1 (stating that

14

"Black Duck Properties, LLC and its successors and assigns" would deposit and mail to DMA its portion of the note payment).

In light of the plain language of the Email Agreement and the Harris SWD Agreement, DMA owns 50% of the Bigfoot note payments as a matter of law. *See Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 490 (5th Cir. 2007) (reiterating that interpreting an unambiguous contract is a question of law under Texas law).

## II.    Because DMA took its 50% interest free of any encumbrances, KrisJenn Ranch (at most) owns only Black Duck's interest in the remaining 50%.

Wright "fully accept[ed] and approve[d] the terms and conditions" of the Email Agreement, including the statement that the Bigfoot note was "100% FREE AND CLEAR OF ANY AND ALL DEBTS." Ex. 4 (Email Agreement) at 1, 3. Now, Wright claims—through his entity KrisJenn Ranch—that he owns 100% of the note payments because of a secret debt. But that claim fails. Wright represented that the Bigfoot note was unencumbered, and he did more than that: he warranted that no valid obligation to KrisJenn Ranch or anyone else existed when DMA took its 50% interest in the note.

First, KrisJenn Ranch's alleged loan to Black Duck was not disclosed to or authorized by Moore, who was a manager of Black Duck and whose entity owned 50% of Black Duck when the loan was purportedly made. Ex. 1 (Moore Decl.) ¶18. Black Duck's Company Agreement required that disinterested management approve a transaction. Ex. 10 (Black Duck Company Agreement) at 23–24; Ex. 1 (Moore Decl.) ¶22. Wright, whose entity allegedly loaned Black Duck $4.1 million, thus could not participate in—let alone unilaterally authorize—Black Duck's decision to borrow money. Ex. 10 (Black Duck Company Agreement) at 23–24; Ex. 1 (Moore Decl.) ¶22. No approval by disinterested management exists for the alleged loan. Ex. 1 (Moore Decl.) ¶23.

Further, to pledge collateral, the Black Duck Company Agreement required the transaction to be authorized via a meeting of the managers, through a committee designated by the managers, or by a manager to whom special authority had been

delegated. *See* Ex. 10 (Black Duck Company Agreement) at 20-21; Ex. 1 (Moore Decl.) ¶20. No such authorization was ever obtained or even sought. Ex. 1 (Moore Decl.) ¶21. The pledge was therefore invalid.

Second, even if the alleged loan had been valid, KrisJenn Ranch's purported interest in the Bigfoot note did not attach before DMA took its 50% interest. In general,[4] a security interest attaches to collateral and becomes enforceable against the debtor "only" if "one of the following conditions is met:"

> (A)   the debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned;

> (B)   the collateral is not a certificated security and is in the possession of the secured party under Section 9.313 pursuant to the debtor's security agreement;

> (C)   the collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 8.301 pursuant to the debtor's security agreement; or

> (D)   the collateral is deposit accounts, electronic chattel paper, investment property, letter-of-credit rights, or electronic documents, and the secured party has control under Section 7.106, 9.104, 9.105, 9.106, or 9.107 pursuant to the debtor's security agreement.

TEX. BUS. & COM. CODE §9.203(b)(3).

Because Bigfoot's note is a note for a loan—which does not meet any of the criteria listed in subsection (C) or (D)—only subsection (A) and (B) could possibly apply here. This means KrisJenn Ranch must show that Black Duck "authenticated a security agreement that provides a description" of the Bigfoot note before DMA took its interest or that KrisJenn Ranch took possession of the Bigfoot note before DMA took its interest.

---

[4] Section 9.203 lists exceptions to the requirements in subsection (b), but none of those exceptions applies here. *See* TEX. BUS. & COM. CODE §9.203(b)(3)(c)–(i).

KrisJenn Ranch cannot meet that burden. *See* TEX. BUS. & COM. CODE §9.108(a) (stating that a "description" is "sufficient" where "it reasonably identifies what is described"). Neither the Alleged Note, the Deed of Trust, or its attached deed (collectively, Alleged Loan Documents) mention or refer to the Bigfoot note or the Harris SWD. *See* Ex. 11 (Alleged Note); Ex 12 (Deed of Trust). KrisJenn Ranch thus does not have an authenticated security agreement that describes the Bigfoot note.

Nor can KrisJenn Ranch show that it took possession of the Bigfoot note before Black Duck granted DMA its 50% interest. For KrisJenn Ranch to have taken possession of the Bigfoot note, it must show that a majority of the managers authorized that transfer. Ex. 10 (Black Duck Company Agreement) at 20-22; Ex. 1 (Moore Decl.) ¶20. No such authorization was granted. Ex. 1 (Moore Decl.) ¶21.

Instead, given Wright's representation and warranty that the Bigfoot note was "100% FREE AND CLEAR OF ANY AND ALL DEBTS," the undisputed evidence is that the Bigfoot note was unencumbered by any obligation to KrisJenn Ranch when Black Duck granted DMA its 50% interest. Ex. 4 (Email Agreement) at 3.

Once Black Duck granted DMA that 50% interest, Black Duck could only pledge its remaining 50% interest to KrisJenn Ranch. Indeed, Black Duck could not pledge as collateral property to which it no longer had any rights. *See* TEX. BUS. & COM. CODE §9.203(b)(2) (providing that a security interest does not attach unless "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party"). Nor could Black Duck assign or convey something it did not own to a third party. *See McLaurin*, 968 S.W.2d at 950; *see also Winters v. Slover*, 251 S.W.2d 726, 729 (Tex. 1952) (noting that a party "could not mortgage more than he owned"); *Duhig v. Peavy-Moore Lumber Co.*, 144 S.W.2d 878, 879 (Tex. 1940) (noting that a deed "of course, does not actually convey what the grantor does not own").

As a result, regardless of whether Black Duck assigned its 50% interest to KrisJenn Ranch or whether KrisJenn Ranch actually foreclosed on Black Duck's 50% interest,

17

KrisJenn Ranch has claim only to Black Duck's 50% interest. To conclude otherwise would allow Wright—through self-dealing transactions between Black Duck and KrisJenn Ranch—to steal DMA's property.

**III.     Wright and KrisJenn Ranch are estopped from asserting any interest in the Bigfoot note.**

While acting as a manager of Black Duck and principal of KrisJenn Ranch—which owned 50% of Black Duck at the time—Wright represented that the Bigfoot Note was "100% FREE AND CLEAR OF ANY AND ALL DEBTS." Ex. 4 (Email Agreement) at 3. Moore relied on that representation in resigning from Black Duck and relinquishing his share of Black Duck in exchange for 50% ownership of the Bigfoot note proceeds via DMA, among other things. Ex. 1 (Moore Decl.) ¶24. Wright and KrisJenn Ranch cannot now claim that they had an interest in the Bigfoot note based on an unauthorized and undisclosed debt. Under both the doctrine of quasi-estoppel and its corollary, estoppel by contract, KrisJenn Ranch is estopped from arguing that it owns 100% of the Bigfoot note.

"Quasi-estoppel precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken." *Lopez v. Munoz, Hockema & Reed L.L.P.,* 22 S.W.3d 857, 864 (Tex. 2000). Wright's representation that the Bigfoot Note was free and clear of all debts precludes KrisJenn Ranch's current position that the note was indebted to KrisJenn Ranch all along. *See Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 721–22 (Tex. App.—Dallas 2004, no pet.) (noting that under estoppel by contract—a specific form of quasi-estoppel—a "party to a contract will not be permitted to take a position inconsistent with the contract to the prejudice of another").

KrisJenn Ranch cannot accept "the benefits of a transaction"—full ownership of Black Duck after Moore stepped away—and then "subsequently tak[e] an inconsistent position to avoid corresponding obligations or effects." *Freezia v. IS Storage Venture, LLC,* 474 S.W.3d 379, 387 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Rather, Wright and KrisJenn Ranch are forestalled "from denying the truth of the recitals in the"

contract. *Id.* at 387–88; *see Coffey v. Singer Asset Finance Co., L.L.C.,* 223 S.W.3d 559, 569–70 (Tex. App.—Dallas 2007, no pet.) (holding that, where a party had represented that she had the power to pledge the collateral for the loan, she was estopped from disavowing such power to invalidate the loan).

"[I]t would be unconscionable to allow" Wright—through his entity KrisJenn Ranch—to "maintain a position inconsistent with the one to which he acquiesced." *Freezia*, 474 S.W.3d at 387. Wright and KrisJenn Ranch are estopped from claiming that KrisJenn Ranch can take DMA's property right based on a hidden debt.

### CONCLUSION AND PRAYER

DMA is entitled to judgment as a matter of law for three independent reasons: (1) DMA owns 50% of the promissory-note payments; (2) Black Duck could not pledge what it did not own and, in any case, failed to pledge the promissory note at all; and (3) having warranted the note payments were free and clear of all liens and debts, Wright and KrisJenn Ranch are estopped from arguing that KrisJenn Ranch has any interest in DMA's portion of the note payments. DMA Properties respectfully asks the Court to grant this motion, construe the Email Agreement and the Harris SWD Agreement as a matter of law, and rule that DMA owns 50% of the Bigfoot note payments.[5]

---

[5] If the Court enters an order granting DMA's requested declaratory relief, DMA will seek release of the total amount of its property from the Panola County court registry, 50% of Bigfoot's note payments from September 2018 to present. As of the date this motion is filed, that amounts to $127,377.20.

Respectfully submitted,

/s/ Christopher S. Johns
Christopher S. Johns
State Bar No. 24044849
Christen Mason Hebert
State Bar No. 24099898
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

/s/ Timothy Cleveland
Timothy Cleveland
State Bar No. 24055318
Austin H. Krist
State Bar No. 24106170
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
akrist@clevelandterrazas.com

/s/ Natalie F. Wilson
Natalie F. Wilson
State Bar No. 24076779
LANGLEY & BANACK, INC.
745 East Mulberry Avenue, Suite 700
San Antonio, Texas 78212
210-736-6600
210-735-6889 fax
nwilson@langleybanack.com

Andrew R. Seger
State Bar No. 24046815
KEY TERRELL & SEGER
4825 50th Street, Suite A
Lubbock, Texas 79414
806-793-1906
806-792-2135 fax
aseger@thesegerfirm.com

*Attorneys for Frank Daniel Moore and DMA Properties, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2020, a true and correct copy of the foregoing document was transmitted to each of the parties via the Court's electronic transmission facilities and/or via electronic mail as noted below. For those parties not registered to receive electronic service, a true and correct copy of the foregoing document was served by United States Mail, first class, postage prepaid, at the address noted below.

| | |
|---|---|
| Ronald J. Smeberg<br>Charles John Muller, IV<br>MULLER SMEBERG, PLLC<br>111 W. Sunset<br>San Antonio, TX 78209<br>ron@smeberg.com<br>john@muller-smeberg.com<br><br>*Counsel for Plaintiffs KrisJenn Ranch, LLC, Krisjenn Ranch, LLC, Series Uvalde Ranch, KrisJenn Ranch, LLC, Series Pipeline Row* | Michael Black<br>BURNS & BLACK PLLC<br>750 Rittiman Road<br>San Antonio, TX 78209<br>mblack@burnsandblack.com<br><br>Jeffery Duke<br>DUKE BANISTER MILLER & MILLER<br>22310 Grand Corner Drive, Suite 110<br>Katy, TX 77494<br>jduke@dbmmlaw.com<br><br>*Counsel for Defendant Longbranch Energy, LP* |
| Ronald J. Smeberg<br>THE SMEBERG LAW FIRM, PLLC<br>2010 W Kings Hwy<br>San Antonio, TX 78201-4926<br>ron@smeberg.com<br><br>*Counsel for Third-Party Defendant Black Duck Properties, LLC* | Shane P. Tobin<br>OFFICE OF THE U.S. TRUSTEE<br>903 San Jacinto Blvd, Room 230<br>Austin, Texas 78701<br>shane.p.tobin@usdoj.gov<br><br>*United States Trustee* |
| William P Germany<br>BAYNE, SNELL & KRAUSE<br>1250 N.E. Loop 410, Suite 725<br>San Antonio, TX 78209<br>wgermany@bsklaw.com<br><br>*Counsel for Larry Wright* | John Terrill<br>12712 Arrowhead Lane<br>Oklahoma City, OK 73120<br><br>*Third Party-Defendant, pro se* |

Laura L. Worsham
JONES, ALLEN & FUQUAY, L.L.P.
8828 Greenville Avenue
Dallas, TX 75243
lworsham@jonesallen.com

*Counsel for McLeod Oil, LLC*

/s/ Christopher S. Johns
Christopher S. Johns