# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| *In re*: | § § § § § § | Chapter 11 |
| KrisJenn Ranch, LLC, | | |
| *Debtor* | | Case No. 20-50805 |

| | | |
|---|---|---|
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC, | § § § § § § § § § § § § § § | Adversary No. 20-05027 |
| *Plaintiffs*, | | |
| v. | | |
| DMA Properties, Inc. and Longbranch Energy, LP, | | |
| *Defendants*. | | |

| | | |
|---|---|---|
| DMA Properties, Inc. and Frank Daniel Moore, | § § § § § § § § § § § § § § | Adversary No. 20-05027 |
| *Cross-Plaintiffs/Third-Party Plaintiffs*, | | |
| v. | | |
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, Black Duck Properties, LLC, Larry Wright, and John Terrill, | | |
| *Cross-Defendants/Third-Party Defendants*. | | |

### DMA PROPERTIES, INC.'S REPLY IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON DMA'S NET-PROFITS INTEREST AGREEMENT

The DMA Agreement means what it says: DMA is entitled to "20% . . .of the Net Profits from Black Duck Properties, LLC or its successors or assigns" received from "the operation use, maintenance or sale (including partial sales or conveyances of the pipe and related facilities commonly known as the P-21 or Express pipeline"—an entitlement that "attach[es] and run[s] with the P-21 or Express pipeline . . . ." Ex. 20 (DMA Agreement). That language unambiguously conveys to DMA a 20% net-profits interest in the "P-21" pipeline and the associated "Express" right-of-way, a property interest that attaches and runs with the land. As a matter of law, DMA owns a 20% net-profits interest in the pipeline and right-of-way.

Discussing the text of the DMA Agreement for less than two pages in its response, KrisJenn attempts to fabricate ambiguity so it can improperly introduce parol evidence: an out-of-context email and a sham affidavit. And then—again running away from the plain language of the DMA Agreement—KrisJenn argues the DMA Agreement is only a personal covenant while conceding that DMA is entitled to the net profits that flow "to a successor or assign of Black Duck's ownership interest." Resp. at 6. Both cannot be true.

As the DMA agreement provides and as KrisJenn's admission confirms, DMA's net-profits interest is a real-property interest satisfying the requirements of a covenant that runs with land.

### ANALYSIS

**I. The DMA Agreement unambiguously conveyed a net-profits interest in the right-of-way.**

    **A. DMA offers the only reasonable interpretation of the disputed language.**

The plain language of the parties' agreement shows that DMA received a net-profits interest in the pipeline and right-of-way. Because there is only one reasonable way

to interpret this plain language, it is unambiguous and must be construed by the Court as a matter of law.

In relevant part, the DMA Agreement states that DMA shall be paid 20% of "Net Profits" from Black Duck "or its successors and assigns." *See* Ex. 20 (DMA Agreement). The DMA Agreement defines "Net Profits" as profits generated by Black Duck "or its successors or assigns" from the "operation, use, maintenance or sale" of "the pipe and related facilities commonly known as the P-21 or Express pipeline." *Id.* In turn, and as explained in greater detail below, "P-21 or Express pipeline" means all rights-of-way, easements, and leases related to the pipeline. Finally, the DMA Agreement specifies that the net-profits interest "shall attach and run" with the pipeline and right-of-way. *Id.*

Attempting to manufacture ambiguity, KrisJenn argues there is uncertainty as to whether the term "successors and assigns" includes subsequent purchasers of the right-of-way. Resp. [#66] at 6. But, under Texas law, "if a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *Ibe v. Jones*, 836 F.3d 516, 527 (5th Cir. 2016) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)). And courts applying Texas law are required to read contract terms in the context of the contract as a whole. *SCA Promotions, Inc. v. Yahoo!, Inc.*, 868 F.3d 378, 382 (5th Cir. 2017) (stating that a court "must examine the entire contract to harmonize and give effect to all of its provisions so that none will be rendered meaningless" (quotation marks omitted)). Only then can a court determine whether an ambiguity exists. *See id.*

Here, a plain reading of the DMA Agreement is that "successors and assigns" includes all subsequent purchasers and owners of the right-of-way. *See* Mot. Summ. J. [#28] at 11. Most tellingly, the DMA Agreement states that the "obligation to pay the Net Profits Share *shall attach and run with* the P-21 or Express pipeline and [Black Duck] binds its *successors and assigns* to payment of the Net Profits Share." Ex. 20 (DMA Agreement) at 1 (emphasis added). KrisJenn cannot invent an ambiguity by disregarding those express

3

terms. Reading the whole agreement together, "successors and assigns" clearly encompasses *all* subsequent purchasers and owners of the right-of-way and the pipeline.

KrisJenn tries to avoid this language through a convoluted interpretation that, frankly, makes no sense and ignores the actual text of the agreement. KrisJenn argues that "successors and assigns" refers only to a single "successor or assign of Black Duck's ownership interest." Resp. [#66] at 6. But that interpretation ignores the plain language of the agreement, which refers to *plural* "successors and assigns"—not just one "successive company acquiring ownership in Black Duck's place," as KrisJenn argues. Resp. [#66] at 6. And besides, why would DMA's interest attach to profits "that flow from" a single "successive company acquiring ownership in Black Duck's place," but not "subsequent purchasers"? The short answer is that it doesn't. The DMA Agreement does not have any limitation—it binds all "successors and assigns."

The DMA Agreement conveyed a 20% interest—in all profits generated by the right-of-way—that attaches and runs with the right-of-way and binds all "successors and assigns." KrisJenn's interpretation—that the net-profits interest somehow does not run with the land—is unreasonable because the contract expressly states the opposite. *See* DMA Agreement at 1 ("[T]he Net Profits Share shall attach and run . . . ."). *See Amoco Prod. Co. v. Tex. Meridian Res. Expl. Inc.*, 180 F.3d 664, 668–69 (5th Cir. 1999) ("A contract provision is not ambiguous where only one of two competing interpretations is reasonable . . . ." (quotation marks omitted)).

Because DMA offers the only reasonable interpretation of DMA's net-profits interest, the Court should construe the disputed language as a matter of law and declare that DMA has a 20% net profits interest in the right-of-way. *See SCA Promotions*, 868 F.3d at 383 (rejecting an unreasonable alternate interpretation and endorsing the interpretation that is consistent with the contract as a whole).

4

### B. The DMA Agreement defines "P-21 or Express pipeline" by incorporating additional documents by reference.

As DMA explained in its motion, the term "P-21 or Express pipeline" is a defined term that means "certain pipe and related facilities (commonly known as the P-21 pipeline) . . . and the rights-of-way, easements, contracts, permits and leases." *See* Mot. Summ. J. at 10. The DMA Agreement incorporates this definition by reference by expressly incorporating "the binding 'EMAIL AGREEMENT'" between Moore and Wright. DMA Agreement at 2.

KrisJenn now argues that the DMA Agreement could not have incorporated any terms by reference because it contains a merger clause. *See* Resp. at 10. But that argument misunderstands how merger clauses work: they exclude things that are *not* part of the agreement. By contrast, documents that are incorporated by reference *are* considered part of the agreement for purposes of the merger clause. For the same reason, Texas courts routinely conclude that merger clauses have no bearing on whether a contract incorporates other documents by reference. *See, e.g., Phytel, Inc. v. Smiley*, 2013 WL 1397085, at*3 (Tex. App.—Dallas April 5, 2013, no pet.) (concluding merger clause did not negate incorporation by reference).

### II. Even if the Court goes outside the agreement's text, parol evidence confirms the meaning of the DMA Agreement's plain language.

As explained above, the DMA Agreement unambiguously conveys to DMA a 20% net-profits interest in the pipeline and right-of-way. Since the agreement is unambiguous, Texas law bars KrisJenn from using extrinsic evidence to alter the plain meaning of the contract's terms. *See, e.g., First Bank v. Brumitt*, 519 S.W.3d 95, 109–10 (Tex. 2017).

Nevertheless, DMA briefly addresses the parol evidence that KrisJenn cites and misconstrues. Resp. [#66] at 4–5.

First, Larry Wright's affidavit should be excluded in its entirety because it is a "sham affidavit" that "impeaches prior testimony without explanation." *Eure v. Sage Corp.*, 61 F. Supp. 3d 651, 658 (W.D. Tex. 2014) (quotation omitted). Wright has

5

previously testified that "the original intent" was that the "[DMA] agreement does grow with the land." Ex. 34 (Excerpt of May 21, 2020 Hearing Tr.) at 68:6–8. Then, when Wright's attorney asked Wright to clarify what he meant by "runs with the land," Wright answered, "That's a very ambiguous statement, 'runs with the land[.]'" Now, Wright claims in an affidavit that he thought "runs with the land" referred to the pipeline "physically running through the land." Resp. Resp. Ex. A ¶8. Because it contradicts his prior testimony without explanation, Wright's self-serving affidavit should be excluded.

Second, KrisJenn's out-of-context email should be disregarded. KrisJenn contends that a September 2016 email—sent over a year before Moore left Black Duck—is an "admission" that the DMA would only receive 20% of Black Duck's profits, rather than 20% of the profits generated by the right-of-way. But when this email was sent, Black Duck had not yet closed on or acquired the right-of-way.

Given the pre-closing context, the email makes sense. Then, Moore had a 50% interest in Black Duck, and Black Duck did not own the right-of-way. Moore's email was discussing what would happen if Black Duck *never* closed on the right-of-way and instead sold its option to another buyer. But in August 2017, Black Duck successfully closed on the right-of-way, and Moore became a 50% owner of the right-of-way through Black Duck. Six months *after* Black Duck closed, Moore and Wright executed the DMA Agreement and exchanged his 50% interest in Black Duck for a 20% net-profits interest in the pipeline and right-of-way.

Contemporaneous emails corroborate that DMA owns a 20% net-profits interest in the right-of-way. For example, February 2018 correspondence between Wright and Moore shows that the parties agreed DMA would receive "[n]o less than 20% Carried interest in the P-21 Express Pipeline." Ex. 18 (Feb. 4, 2018 Email). This confirms what the unambiguous language of the DMA Agreement already states: DMA received a 20% interest in the pipeline and the right-of-way itself—not just a 20% interest in Black Duck's profits. What's more, no other interpretation makes sense. Moore was already a 50%

owner of Black Duck when the DMA Agreement was signed. Why would he have wanted to trade a 50% interest in Black Duck for only a 20% interest in Black Duck's profits?

**III. DMA's net-profits interest is a property interest that attaches and runs with the land.**

    **A.    DMA's net-profits interest is a real-property interest.**

Interest in profit from the use of real property has been recognized as a real-property interest for hundreds of years. *See, e.g.*, *Tex. & P. Ry. Co. v. Durrett*, 57 Tex. 48, 52 (1882) (recognizing profit a prendre, the right to take something from the land to earn a profit, as a property interest); *see also State v. S. Pac. R. Co.*, 24 Tex. 80, 124-25 (1859) (discussing the right of a company to build a road and collect tolls from the use of that road). DMA's net-profits interest in the use of the right-of-way is no different and is a property interest.

When evaluating whether a profits interest is a real-property interest, courts look to the item from which the profits are derived—the underlying asset. *See In re Energytec, Inc.*, 739 F.3d 215, 224 (5th Cir. 2013) (finding the underlying asset to be "a gas pipeline system and the rights-of-way required for its placement" and the interest to be in the fees "for the use of [that] real property"). The general rule, which applies here, is that when profits come from real property, interest in those profits is itself a real-property interest. *See In re Houston Bluebonnet, L.L.C.*, 16-34850, 2020 WL 930111, at *11 (Bankr. S.D. Tex. Feb. 21, 2020) (finding a net proceeds interest in an oil and gas lease to be a real-property interest); *T-Vestco Litt-Vada v. Lu-Cal One Oil Co.*, 651 S.W.2d 284, 292 (Tex. App.—Austin 1983, writ ref'd n.r.e.) (concluding interest in profit from well operations is "an interest in land").[1]

---

[1] The *Wayne Harwell* court held—without any discussion or citations—that an interest in cash flow from land is not an interest in land for purposes of satisfying horizontal privity. *Wayne Harwell Properties v. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997, writ denied). That holding runs counter to the principle that an interest in profit from land is an interest in real property. *See, e.g.*, *Verde Minerals, LLC v. Koerner*, 2:16-CV-199, 2019 WL 9171010, at *5 (S.D. Tex. Nov. 7, 2019) (defining a royalty as a "share of the product or profit reserved by the owner for permitting another to use the property"); *Parker v. Petro–Lewis Corp.*,

The corollary is that when profits are *not* derived from the real property, then any interest in profits is personal property. *See Berthelot v. Brinkmann*, 322 S.W.3d 365, 371 (Tex. App.—Dallas 2010, pet. denied) (finding a percent interest in a corporation was a personal interest);[2] *San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 641 (Tex. 2000) (concluding "notes, net-profit agreements, and reserve-account cash" from a "real estate development project" were personal property).

Here, under the plain language of the DMA Agreement, DMA has a net-profits interest in the use of a right-of-way. *See* Part I above. It is undisputed that the right-of-way is real property. DMA's interest is therefore a real-property interest.

KrisJenn cites cases where the underlying asset was personal property, incorrectly claiming that net-profits interests are categorically personal property except for those interests deriving from "oil and gas properties." *See* Resp. at 11–14 (citing *Lang*, 35 S.W.3d at 640 (net-profit agreement in development project) and citing *Berthelot*, 322 S.W.3d at 370–71 (net cash gain in corporation)).

KrisJenn provides no support for its theory that a different rule applies when a profits interest deals with "oil and gas properties" than to a right-of-way on the surface of the land. Anglo-American courts, including the Texas Supreme Court, rejected that theory long ago. *See Durrett,* 57 Tex. at 52. But even if there were such a category, the

---

663 S.W.2d 905 (Tex. App.—San Antonio 1983, no writ) (treating net-profits interest in minerals as an interest in land). And decisions applying Texas law have characterized *Wayne Harwell* as applying a "much-criticized doctrine that has been explicitly rejected by this latest Restatement." *See Energytec*, 739 F.3d at 222.

[2] KrisJenn mistakenly characterizes *Berthelot* as finding a net-profits interest from operations of a gas-processing plant to be a personal interest. Resp. at 13. The *Berthelot* court, however, used "net profits from the operations of a gasoline plant production" as shorthand for the "definition set out above," which clarified that the underlying asset at issue was not real property at all but instead a profits interest in personal property. 322 S.W.3d at 365, 371 (defining the interest as a percentage of the "net cash gain of Scurry Natural Gasoline Company" under a specific contract, from the sale of plant products, from an ownership interest a gas plant, and from the sale of salvage material from the same gas plant less certain costs).

right-of-way here—which is to be used for the conveyance of oil and gas products—falls within it. DMA's net-profits interest is a real-property interest.

### B. The requirements for a real covenant are also satisfied.

KrisJenn does not dispute that, under the traditional four-factor test for property covenants, DMA's net-profits interest relates to a thing in existence and the successor to the burden had notice. The other two requirements—that DMA's net-profits interest touch and concern land and that DMA's interest was intended by the original parties to run with the land—are likewise established.

On the touch-and-concern requirement, DMA's net-profits interest passes both tests even though it needs to pass only one. Like the right to transportation fees from a pipeline and right-of-way in *Energytec*, DMA's net-profits interest impacts both (1) "the owner's interest in the pipeline" and (2) "the pipeline's value in the eyes of prospective buyers." 739 F.3d at 224; Resp. at 7 (claiming prospective buyers are unwilling to purchase the right-of-way because of DMA's interest).[3]

The original parties also intended DMA's net-profits interest to run with the land. When evaluating this factor, courts "first look[] to the text of the instrument itself to determine if there is language expressly stating that the covenant binds successors." *Houston Bluebonnet*, 2020 WL 930111, at *13 (quoting *Fort Worth 4th Street Partners, L.P. v. Chesapeake Energy Corp.*, 882 F.3d 574, 578 (5th Cir. 2018)). Here, the DMA Agreement expressly binds successors—and explicitly declares that DMA's net-profits

---

[3] KrisJenn's efforts to distinguish *Energytec* (based the court's discussion of a restriction on assignment) fall flat. The Fifth Circuit separately concluded that the transportation fee touched and concerned the land, explaining that "[w]henever the owner of the 'land,' i.e., the pipeline and the rights-of-way, wants to transport natural gas along its length, the fee to [the grantee] is to be paid"—thus impacting the owner's interest. *Energytec*, 739 F.3d at 225. Here, too, DMA's net-profits interest impacts the owner's interest. Whenever the owner of the right-of-way wants to transport a substance along its length, 20% of net profit is to be paid to DMA. The touch-and-concern requirement is thus satisfied.

9

interest "shall attach and run" with the pipeline and right-of-way. Mot. Ex. 20 (DMA Agreement).

Indeed, KrisJenn itself effectively concedes that that DMA's net-profits interest is a covenant running with the land because it admits that the DMA Agreement binds successors and assigns.[4] Resp. at 2, 6. After all, if DMA possessed a mere personal covenant with Black Duck (as KrisJenn supposes), then the explicit language binding successors and assigns makes no sense. KrisJenn's interpretation is unreasonable as a matter of law since the Court must "examine and consider *the entire writing* in an effort to harmonize and give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983) (emphasis original).

Because the DMA Agreement meets the requirements for a covenant running with land, DMA's net-profits interest is a real-property interest.

    **C.**    **Any privity requirement is satisfied.**

It is undisputed that vertical privity is established here, as DMA was the original grantee of the 20% net-profits interest. KrisJenn argues only that DMA cannot prove horizontal privity. Resp. at 16-17. But this argument fails for multiple reasons.

First, DMA Agreement's was recorded, eliminating the need for the horizontal-privity requirement altogether. *See Energytec*, 739 F.3d at 223 (concluding that recording satisfies "the Restatement's perception of the rational for the privity requirement").

Second, the principle of horizontal privity has been "explicitly rejected" by the Restatement of the Law of Property and only a minority of cases require horizontal privity. *Energytec*, 739 F.3d at 222. In its most recent case on the requirements for real covenants, the Texas Supreme Court found a covenant to run with the land based on vertical privity alone, even though horizontal privity was not established. *Inwood N. Homeowners' Ass'n,*

---

[4] KrisJenn's statements that Black Duck "has no successors or assigns" (Resp. at 2) are belied by its pleadings and the very caption of this case. *See* Am. Compl. (Dkt. #3) ¶29; Am. Answer to DMA's Compl. (Dkt. #61) at 2, ¶165.

*Inc. v. Harris*, 736 S.W.2d 632, 633-635 (Tex. 1987) (finding privity was satisfied even though the covenant was created in a declaration and was not as part of any transfer of interest). Subsequent Texas cases have likewise recognized covenants can run with the land even when they are created without any conveyance. *See, e.g.*, *Harris County Flood Control Dist. v. Glenbrook Patiohome Owners Ass'n*, 933 S.W.2d 570, 574 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (covenants in declaration); *Fallis v. River Mountain Ranch Prop. Owners Ass'n, Inc.*, 04-09-00256-CV, 2010 WL 2679997, at *9 (Tex. App.—San Antonio July 7, 2010, no pet.) (same). Because horizontal privity is no longer a requirement for a covenant to run with land, DMA does not need to establish horizontal privity to prove its net-profits interest is a real covenant.

Third, even if horizontal privity were still a requirement under Texas law, horizontal privity would still be satisfied here. Horizontal privity "is the relationship between the parties to the covenant." *Energytec*, 739 F.3d at 222 (quoting 9 RICHARD R. POWELL, POWELL ON REAL PROPERTY §60.04[3][c][iv] (2010)). And for there to be horizontal privity, there must be "simultaneous existing interests or mutual privity between the original parties as either landlord and tenant or grantor and grantee." *Id.* (internal quotation omitted). In this case, horizontal privity existed when Moore (through his entity) conveyed his 50% ownership interest in Black Duck and its assets—which included the right-of-way—to KrisJenn in exchange for the 20% net-profits interest.

And, as explained above, KrisJenn effectively concedes that that DMA's net-profits interest satisfies the requirements for a real covenant when it admits that the DMA Agreement binds successors and assigns. Resp. at 2, 6. If DMA possessed only a personal covenant with Black Duck, the explicit language binding successors and assigns would have no meaning. KrisJenn's interpretation of the DMA agreement is unreasonable as a matter of law. The reasonable interpretation—based on the language of the profits-interest agreement itself—is that DMA's interest runs with the land and binds successors and assigns. DMA's profits interest is a real covenant.

## CONCLUSION AND PRAYER

For these reasons, DMA is entitled to judgment as a matter of law that it owns a 20% net-profits interest in the pipeline and right-of-way.

Respectfully submitted,

/s/ Christopher S. Johns
Christopher S. Johns
State Bar No. 24044849
Christen Mason Hebert
State Bar No. 24099898
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

/s/ Timothy Cleveland
Timothy Cleveland
State Bar No. 24055318
Austin H. Krist
State Bar No. 24106170
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
akrist@clevelandterrazas.com

/s/ Natalie F. Wilson
Natalie F. Wilson
State Bar No. 24076779
LANGLEY & BANACK
745 East Mulberry Avenue, Suite 700
San Antonio, Texas 78212
210-736-6600
210-735-6889 fax
nwilson@langleybanack.com

Andrew R. Seger
State Bar No. 24046815
KEY TERRELL & SEGER
4825 50th Street, Suite A
Lubbock, Texas 79414
806-793-1906
806-792-2135 fax
aseger@thesegerfirm.com

*Attorneys for Frank Daniel Moore and DMA Properties, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2020 a true and correct copy of the foregoing document was transmitted to each of the parties via the Court's electronic transmission facilities and/or via electronic mail as noted below. For those parties not registered to receive electronic service, a true and correct copy of the foregoing document was served by United States Mail, first class, postage prepaid, at the address noted below.

| | |
|---|---|
| Ronald J. Smeberg<br>Charles John Muller, IV<br>MULLER SMEBERG, PLLC<br>111 W. Sunset<br>San Antonio, TX 78209<br>ron@smeberg.com<br>john@muller-smeberg.com<br><br>*Counsel for KrisJenn Ranch, LLC, Krisjenn Ranch, LLC, Series Uvalde Ranch, KrisJenn Ranch, LLC, Series Pipeline Row* | Michael Black<br>BURNS & BLACK PLLC<br>750 Rittiman Road<br>San Antonio, TX 78209<br>mblack@burnsandblack.com<br><br>Jeffery Duke<br>DUKE BANISTER MILLER & MILLER<br>22310 Grand Corner Drive, Suite 110<br>Katy, TX 77494<br>jduke@dbmmlaw.com<br><br>*Counsel for Longbranch Energy, LP* |
| Ronald J. Smeberg<br>THE SMEBERG LAW FIRM, PLLC<br>2010 W Kings Hwy<br>San Antonio, TX 78201-4926<br>ron@smeberg.com<br><br>*Counsel for Black Duck Properties, LLC* | Shane P. Tobin<br>OFFICE OF THE U.S. TRUSTEE<br>903 San Jacinto Blvd, Room 230<br>Austin, Texas 78701<br>shane.p.tobin@usdoj.gov<br><br>*United States Trustee* |
| William P Germany<br>BAYNE, SNELL & KRAUSE<br>1250 N.E. Loop 410, Suite 725<br>San Antonio, TX 78209<br>wgermany@bsklaw.com<br><br>*Counsel for Larry Wright* | John Terrill<br>12712 Arrowhead Lane<br>Oklahoma City, OK 73120<br><br>*Third Party-Defendant, pro se* |
| Laura L. Worsham<br>JONES, ALLEN & FUQUAY, L.L.P.<br>8828 Greenville Avenue<br>Dallas, TX 75243<br>lworsham@jonesallen.com<br><br>*Counsel for McLeod Oil, LLC* | |

    /s/ Christopher S. Johns
    Christopher S. Johns