## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| **KRISJENN RANCH, LLC** | § | |
| *Debtor* | § | **Case No. 20-50805** |
| | § | |

---

| | | |
|---|---|---|
| **KRISJENN RANCH, LLC and** | § | |
| **KRISJENN RANCH, LLC-SERIES** | § | |
| **UVALDE RANCH, and KRISJENN** | § | |
| **RANCH, LLC-SERIES PIPELINE** | § | |
| **ROW as successors in interest to** | § | |
| **BLACKDUCK PROPERTIES, LLC,** | § | |
| *Plaintiffs* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **DMA PROPERTIES, INC., and** | § | |
| **LONGBRANCH ENERGY, LP,** | § | **Adversary No. 20-05027** |
| *Defendants* | § | |

---

| | | |
|---|---|---|
| **DMA PROPERTIES, INC** | § | |
| *Cross-Plaintiff/Third Party Plaintiff* | § | |
| **v.** | § | |
| **KRISJENN RANCH, LLC,** | § | |
| **KRISJENN RANCH, LLC-SERIES** | § | |
| **UVALDE RANCH, and KRISJENN** | § | |
| **RANCH, LLC-SERIES PIPELINE ROW,** | § | **Adversary No. 20-05027** |
| **BLACK DUCK PROPERTIES, LLC,** | § | |
| **LARRY WRIGHT, and JOHN TERRILL** | § | |
| *Cross-Defendants/Third-Party Defendants* | § | |

**KRISJENN RANCH, LLC, KRISJENN RANCH, LLC-SERIES UVALDE RANCH, AND KRISJENN RANCH, LLC-SERIES PIPELINE ROW, AS SUCCESSORS IN INTEREST TO BLACK DUCK PROPERTIES, LLC'S RESPONSE TO DMA PROPERTIES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DMA'S OWNERSHIP INTEREST IN THE <u>BIGFOOT NOTE PAYMENTS</u>**

TO THE HONORABLE CHIEF BANKRUPCY JUDGE RONALD B. KING:

COME NOW Debtors, Plaintiffs, and Counter-Defendants KrisJenn Ranch, LLC, KrisJenn

Ranch, LLC-Series Uvalde Ranch, and KrisJenn Ranch, LLC-Series Pipeline Row (collectively the

1

"Debtors"), and file this Response to DMA Properties, Inc.'s Motion for Partial Summary Judgment on DMA's Ownership Interest in the Bigfoot Note Payments, and would respectfully show as follows:

## SUMMARY OF THE ARGUMENTS

DMA and Moore argue that DMA owns 50% of a certain Bigfoot note payment (the "Note Payment"). In support, DMA argues: (1) the plain language of a February 3, 2018 Email Agreement (the "Email Agreement") and the Harris SWD Agreement gives DMA the right to receive 50% of the Note Payments; (2) such right is a property right, rather than a contractual right; (3) DMA took an interest in the Note Payment free from any encumbrances; and (4) Wright and KrisJenn are estopped from asserting any interest in DMA's purported portion of the Note Payment.

Debtors respond as follows: (1) the Harris SWD Agreement is not supported by consideration; (2) DMA does not have a direct ownership interest in the Note Payment; it merely has a contract with Black Duck Properties, LLC ("Black Duck"); (3) DMA's argument regarding encumbrances is irrelevant because Black Duck could voluntarily transfer the Note Payment to its lender in lieu of foreclosure; and (4) the debt's owed to Black Duck were both known and disclosed to Moore, Moore has unclean hands, and DMA's equitable arguments are without merit.

## BACKGROUND

In its background of facts, DMA spends an extensive amount of time making disparaging statements about Larry Wright. DMA also attaches a litany of exhibits that are not relied on, nor even mentioned in its motion.

The pertinent facts are as follows. Black Duck was formed on December 28, 2015. *See* Ex. B. Its original Members were KrisJenn and SCMED. *Id.*

The Black Duck Operating Agreement (the "Operating Agreement") required that its members make an initial contribution of $500 each. *Id.* All contributions had to be made "in cash." Ex. B ¶ 4.02. Contributions in-kind were not permitted. *Id.*

Section 4.02 of the Operating Agreement states that "no member will be required to make any Capital Contributions to the Company beyond those described in this Agreement . . . ." *Id.*

Section 4.05 of the Operating Agreement states that "if the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the Managers' consent may advance all or part of the needed funds to or on behalf of the Company. An advance described in this Section 4.05 constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution." *Id.* at ¶ 4.05 (Advances by Members) (emphasis added).

At all pertinent times, Moore was aware that Black Duck had extensive operational expenses. In fact, Moore's participation in Black Duck was predicated on a superior understanding of saltwater disposal operations. He readily knew that there were costs associated with purchasing, vetting, maintaining, and reselling saltwater disposal wells. Moreover, he knew that Black Duck had only raised $1,000 in capital and would be required to borrow money in order to fund its operations. Thus, from the inception of Black Duck, Moore necessarily understood that Black Duck would have to borrow money to operate. Wright repeatedly informed Moore that KrisJenn was lending money to Black Duck. Further, Moore's correspondence with Wright show that he was provided with notice of such loans. *See* Ex. C.

After SCMED failed to participate in Black Duck, monetarily or otherwise, Wright asked Moore to leave the company. Ex. A. Contrary to Moore's allegations, Wright was not hostile. Rather, he was just disappointed and justifiably felt that he should not be obliged to share benefits with a partner who had not earned his keep.

As such, Moore negotiated a separation from Black Duck on behalf of SCMED. Ex. A. Moore caused SCMED to surrender its ownership interest in Black Duck to the company. *Id.* At the same time, Moore crafted a contract whereby the Note Payments would be remitted to DMA. *Id.* As such, it was Moore who intentionally structured the separation agreement so that DMA would provide no

consideration to Black Duck and, at best, would be a third-party beneficiary to the Harris SWD Agreement. *See* Ex. A.

Since the time SCMED separated from Black Duck, only $63,688.63 of the Note Payments could potentially be owed to DMA. All other funds have been remitted into the registry of the Panola County Court.

## LEGAL STANDARD

"A party is entitled to summary judgment if it can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing FED. R. CIV. P. 56(c)). "Once a movant who does not have the burden of proof at trial makes a properly supported motion, the burden shifts to the nonmovant to show that a summary judgment should not be granted." *Ragas*, 136 F.3d at 458 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–25 (1986)). "When ruling on a motion for summary judgment, 'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Ragas*, 136 F.3d at 458.

## ARGUMENT

### I.    DMA PROVIDED NO CONSIDERATION FOR THE HARRIS SWD AGREEMENT

DMA provided no consideration in return for the Harris SWD Agreement. *See* Ex. A. It provided no funds, services, or other things of value. *Id.* The transfer to DMA was completely gratuitous. Lack of consideration occurs when the contract, at its inception, does not impose obligations upon both parties. *Burges v. Mosley*, 304 S.W.3d 623, 628 (Tex. App.—Tyler 2010, no pet.) A contract that lacks consideration is unenforceable. *Federal Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 409 (Tex. 1997). As such, DMA cannot enforce its contract unless it can prove that it is a third-party beneficiary. *See* Dkt. 6 ¶ 96. DMA does not argue it is a third-party beneficiary in its Motion for Partial Summary Judgment.

### II.    DMA MERELY HAS A CONTRACT WITH BLACK DUCK TO REMIT 50% OF THE NOTE PAYMENTS

4

DMA does not have a property right to the Note Payments.  If the Harris SWD Agreement was intended to confer an assignment of the Note Payments to DMA, then it would have done exactly that. The Bigfoot Note was not assigned to DMA, in whole or in part; rather, DMA chose to enter into a contract with Black Duck whereby Black Duck is obligated to remit a portion of the Note Payments.

Moreover, DMA's actions since the time of the Harris SWD Agreement belie its position in this case.  If DMA actually owned the Note Payments, why did it not collect those payments for itself?  Why did DMA rely on Black Duck to collect and remit such payments?  The answer is that DMA did not own the Note Payments, and it only had a contractual right to receive a portion of the Note Payments from Black Duck.

When Black Duck wound-up its operations it distributed its assets to KrisJenn, in partial satisfaction of its loan.  Black Duck was under no obligation to transfer its liabilities as well.  Moreover, it would make no sense for KrisJenn to assume Black Duck's liabilities.  As such, it is only Black Duck, and not KrisJenn, who is contractually obliged to remit payment to DMA.  DMA is not without recourse; however, its right to sue for breach of contract is limited to a claim against Black Duck because Black Duck is the only party with privity of contract.

At this point in the lawsuit, it is imperative that DMA come to understand the legal definitions of the words "successor" versus "successors-in-interest."  Black's Law Dictionary defines the two terms as follows:

> **successor.**  A corporation that, through amalgamation, consolidation, or other assumption of interest is vested with the rights and duties of an earlier corporation.
>
> **successor in interest.**  One who follows another in ownership or control of property.

In this case, KrisJenn is a "successor-in-interest" to Black Duck's ownership or control of certain property.  It is not a "successor" to Black Duck as a matter of law.  To suggest otherwise would simply ignore the legal repercussions of winding-up a company.  As such, KrisJenn has the right to collect the Note Payment, but it has no contractual or statutory obligation to remit the Note Payment to DMA.

DMA may not like this result, but it is legally permissible. DMA should have consulted with an attorney if it wished to effectuate this transaction in a more secure way. DMA cannot now ask this Court to rewrite the Harris SWD Agreement simply because it does not like the result.

## III.  DMA'S ARGUMENT REGARDING ENCUMBRANCES IS NOT RELEVANT

On or about February 3, 2018, SCMED ceased to be an owner of Black Duck. At that point in time, Black Duck was wholly owned and exclusively controlled by KrisJenn. Thereafter, Moore individually, or in his capacity as an agent of SCMED, had no right to dictate how Black Duck was operated or managed.

At the time SCMED resigned, Black Duck owed KrisJenn $4.1 million plus applicable interest. *See* Ex. A. Wright provided Moore with notice of his intent to cause Black Duck to borrow funds from KrisJenn before such loan was made. *See* Ex. A. Moore knew that such a loan was necessary because he knew that Black Duck had only raised $1,000 in capital during its formation. *See* Ex. B. As such, Moore approved and acquiesced to such loans. Ex. A.

After SCMED resigned, KrisJenn decided to wind-up Black Duck and pay its creditors. Black Duck's assets at such time were whatever rights were borne from the sale of the P-21 Express Pipeline and Right of Way (the "Pipeline"), and the Bigfoot Note. Because Moore interfered with the sale of the Pipeline by claiming an interest that "ran with the land," any potential benefit from the sale of the Pipeline was rendered meaningless. As a result, Black Duck's only valuable asset at the time of its dissolution was the Bigfoot Note. Among other things, Black Duck's debts to KrisJenn were as follows:

- 2017 Property Taxes for P-21 Express Pipeline: $19,464.84.
- Legal Fees and Accounting Fees (P-21): $24,114.08.
- Consulting and Research Costs for Right of Way: $7,883.00
- Express Pipeline Extension Fee: $50,000.00
- Principal amount of loan from KrisJenn: $4.1 million
- Estimated Interest on KrisJenn Note (08/14/2017-02/03/2018): $191,044.20
- Purchase Price for Harris SWD: $103,000.00

- Legal and Accounting Fees (Harris SWD): $11,256.15
- Lease Payment (Harris SWD): $7,500.00
- Longbranch Service Fees: $6,200.00

*See* Ex. A.

Black Duck transferred the Bigfoot Note to KrisJenn, its lender, in partial satisfaction of these extensive debts. *See* Ex. A. DMA complains extensively about the veracity of the foreclosure between KrisJenn and Black Duck. Because Wright solely and exclusively owned both Black Duck and KrisJenn after SCMED resigned, Wright had the unmitigated right to effectuate such a "friendly foreclosure." This foreclosure was completed with the advice and counsel of a licensed attorney, and Moore simply has no standing to complain. *See* Ex. A.

Moreover, DMA's argument regarding foreclosure and encumbrances is simply irrelevant. While Black Duck chose to transfer its assets formally through a foreclosure procedure, such procedures were wholly unnecessary. Black Duck had the absolute right to transfer its assets to KrisJenn without conducting a foreclosure. In other words, Black Duck was permitted to transfer its assets to KrisJenn in lieu of foreclosure.

## IV.    DMA'S EQUITABLE ARGUMENTS ARE WITHOUT MERIT

When Moore chose to divorce SCMED from Black Duck, he chose to make DMA one of many creditors to which Black Duck owed debts. Thereafter, it was Moore's own actions which placed Black Duck in a position where it was compelled to wind-up. At such time, Black Duck chose to transfer its remaining assets to KrisJenn, its primary creditor, in partial satisfaction of its debts. DMA and Moore cannot complain about these circumstances as they were the primary persons to cause them to be a reality.

Further, Moore has unclean hands. Moore's participation in Black Duck was nothing more than an effort to abuse his partner. Not only did he fail to make any valuable contribution, he actively tried to harm his business partner at all pertinent times. For example, when the rights to acquire the P-21

Pipeline were acquired, KrisJenn was the party that paid $1.125 million in earnest money. This massive risk was predicated on Moore's promise and assurance that he could promptly find a buyer for the Pipeline. Not only did Moore fail to find a buyer, he packed-up his belongings and moved to South Carolina leaving Wright in the lurch. As a result, Wright was desperate for a loan extension and the seller of the Pipeline graciously agreed (for a $50,000 extension fee). However, the seller would only offer this extension if both Wright and Moore signed the loan extension paperwork. In other words, Moore only needed to sign a piece of paper to keep his partner from losing $1.125 million. Moore's response to the seller's very reasonable request is a testament to his vindictiveness:

> Let me try again. We all expected things that didn't happen and would have appreciated a lot. Darren Borders tells me Rod says if we do not have the sign[ed] documents by 2pm then the deal [i]s dead and he is keeping Larry's f____ing money. Simple question: Are you telling me that if I do not personally send you the signature w[ith] notary today or Monday then your groups illusion or opinion is that Larry's out of his money and the deal is off? I am traveling across the country with 3 kids, dogs, wife, etc.. I have never dealt with demands like yours before. You run a hard line when it's time to sign shit the way you want it… but do nothing to put documents together when requested by the group that's paid $925k… what is your stance? I am ready to quit the kitty shit.

Ex. D.

In addition, Moore's efforts to scuttle the TCRG deal are egregious and without excuse. In sum, Moore called the purchaser of the Pipeline and convincingly threatened a lawsuit predicated on the assumption that his net profits interest was enforceable against the purchaser because it "ran with the land." That assertion is wrong as a matter of law, but even if Moore believed it to be true, there would be no rational explanation for scaring away a buyer of the Pipeline who had offered lucrative terms. Rather, he could have allowed the transaction to be consummated, received payments of approximately $10,000 per day, and then taken up his legal claims with the purchaser if he believed them to be true. The only rational explanation for Moore's efforts to thwart the TCRG deal is that he is a vindictive person who will do anything to harm Larry Wright.

WHEREFORE PREMISES CONSIDERED Debtors pray that this Court issue an order denying DMA Properties, Inc.'s Motion for Partial Summary Judgment on DMA's Ownership Interest in the Bigfoot Note Payments, and for such further relief as the Court may deemed them justly entitled.

Dated: October 6, 2020.

Respectfully submitted,

MULLER SMEBERG, PLLC

By:    /s/ *John Muller*
      C. John Muller IV
      State Bar No. 24070306
      john@muller-smeberg.com
      Ronald J. Smeberg
      State Bar No. 24033967
      ron@smeberg.com
      Ezekiel J. Perez
      State Bar No. 24096782
      zeke@muller-smeberg.com
      MULLER SMEBERG, PLLC
      111 W. Sunset Rd.
      San Antonio, TX 78209
      Telephone: 210-664-5000
      Facsimile: 210-598-7357

ATTORNEYS FOR DEBTORS

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system by notice of electronic filing or via email on the 6th day of October 2020:

Michael Black
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, Texas 78209
210-829-2022
210-829-2021 fax
mblack@burnsandblack.com
Attorneys for Longbranch Energy, LP
and DMA Properties, Inc.

Christopher S. Johns
Christen Mason Hebert
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

Timothy Cleveland
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
Attorneys for DMA Properties, Inc.

Natalie Wilson
LANGLEY & BANACK, INC.
745 East Mulberry Avenue | Suite 700
San Antonio, TX 78212
210-736-6600
lwilson@langleybanack.com
Attorneys for DMA Properties, Inc.

Jeffery Duke
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, Texas 77494
jduke@dbmmlaw.com
Counsel for Longbranch Energy, LP

William Germany
BAYNE, SNELL, & KRAUSE
1250 NE Loop 410, Ste. 725
San Antonio, Texas 78209
T- (210) 824-3278
F- (210) 824-3937
wgermany@bskaw.net
Attorney for Larry Wright

OFFICE OF THE UNITED STATES TRUSTEE
903 San Jacinto Blvd, Room 230
Austin, Texas 78701
shane.p.tobin@usdoj.gov
United States Trustee

                          /s/ *John Muller*
                         C. John Muller IV