## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| *In re*: | § | CHAPTER 11 |
| | § | |
| KrisJenn Ranch, LLC, | § | |
| | § | |
| *Debtor* | § | CASE NO. 20-50805 |

| | | |
|---|---|---|
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC, | § § § § § | |
| | § | ADVERSARY NO. 20-05027 |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| DMA Properties, Inc. and Longbranch Energy, LP, | § § | |
| | § | |
| *Defendants*. | § | |

| | | |
|---|---|---|
| DMA Properties, Inc., Frank Daniel Moore, and Longbranch Energy, LP, | § § | |
| | § | |
| *Counterplaintiffs and Third-Party Plaintiff,* | § § | |
| | § | |
| v. | § | |
| | § | ADVERSARY NO. 20-05027 |
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, Black Duck Properties, LLC, Larry Wright, John Terrill, and McLeod Oil, LLC, | § § § § § | |
| | § | |
| *Counterdefendants/Third-Party Defendants.* | § § | |

1

## COUNTERCLAIMS AND THIRD-PARTY CLAIMS

Longbranch Energy, LP ("Longbranch") files the following counterclaims and third-party claims.

### Parties

1. Longbranch Energy is a Texas limited partnership. Its principal place of business is 706 Southview Circle, Center, Texas 75935. Darin Borders is the general partner of Longbranch.

2. DMA Properties is a South Carolina corporation. Its principal place of business is located at 88 Wild Swan Lane, Minnesott Beach, North Carolina 28510.

3. KrisJenn Ranch, LLC is a Texas limited liability company. It can be served via its registered agent, Larry Wright, at 410 Spyglass Rd., McQueeney, Texas 78123.

4. KrisJenn Ranch, LLC–Series Uvalde Ranch is a Texas limited liability series. It can be served via its registered agent, Larry Wright, at 410 Spyglass Rd., McQueeney, Texas 78123.

5. KrisJenn Ranch, LLC–Series Pipeline ROW is a Texas limited liability series. It can be served through registered agent Larry Wright at 410 Spyglass Rd., McQueeney, Texas 78123.

6. Black Duck Properties, LLC is a Texas limited liability company doing business in Shelby County. It can be served via its registered agent, Larry Wright, at 410 Spyglass Rd., McQueeney, Texas 78123.

7. Larry Wright is an individual residing at 410 Spyglass, McQueeney, Texas 78123 and may be served at his residence or wherever he may be found.

8.      John Terrill is an individual residing at 12712 Arrowhead Lane, Oklahoma City,

Oklahoma 73120 and may be served at his residence or wherever he may be found.

9.      McCleod Oil is a Texas limited liability company. It can be served through its

registered agent, John W. McLeod, Jr. G.S. Trust, at 700 N. Wildwood Drive, c/o John W.

McLeod, Jr., Irving, Texas 75061.

### Jurisdiction and Venue

10.     This Court has personal jurisdiction over KrisJenn Ranch, LLC, KrisJenn Ranch,

LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Wright,

because all are residents of Texas and/or Texas entities doing business in Texas.

11.     This Court has jurisdiction over these counterclaims and third-party claims under 28

U.S.C. § 1334 because this proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(k)

concerning the determination of the validity extent, or priority of liens. Additionally, this

proceeding is a core proceeding under § 157(b)(2)(I) concerning determination of the

dischargeability of particular debts.

12.     In the alternative, to the extent these proceedings or claims do not qualify as core

proceedings under § 157(b), this Court has jurisdiction over these proceedings under 28

U.S.C. § 157(c) because these proceedings are related to the underlying Chapter 11

bankruptcy case and concern the property of the Debtor in that case. Those concerns must

be resolved before the Debtor can effectuate a plan of reorganization.

13.     Bankruptcy courts have jurisdiction over matters that are "related to" the

bankruptcy. *See In re Denney*, 171 F.3d 1016, 1022 (5th Cir. 1999). A matter is "related to" a

bankruptcy if the outcome of the proceeding may (1) alter the rights, obligations, and choices

of action of the debtor; and (2) have an effect on the administration of the estate. *In re Bass*,

171 F.3d 1016, 1022 (5th Cir. 1999). An adversary proceeding falls within the court's "related to" jurisdiction if "the outcome of that proceeding could conceivably have an effect on the estate being administered in bankruptcy." *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987).

### Summary of Dispute

14.     Longbranch asserts these claims to protect Longbranch's 20% net-profits interest in a potentially lucrative pipeline right-of-way. Defendant Larry Wright and his entities have spent the last few years scheming to steal that property and ignore Longbranch's interest. Longbranch now brings these claims so that this Court may recognize and enforce Longbranch's rights.

### Factual Background

**A.      Borders and Moore secure the option to purchase a right-of-way in east Texas.**

15.     In the summer of 2015, Darin Borders talked to Frank Daniel Moore about a right-of-way running from Angelina County through Nacogdoches and Rusk Counties and across Shelby County in East Texas.

16.     Borders contacted Rod Roberts, the president of Express Pipeline Connection, LLC—the then-owner of the right-of-way. Roberts eventually admitted that he would be willing to sell the right-of-way for $5 million and requested a $25,000 payment to secure the right to purchase the asset.

17.     Moore and Borders agreed to work together on the right-of-way project and share profits related to the project equally (50% each).

18.     Moore and Borders subsequently secured by contract the right to purchase the right-of-way for $5 million through Longbranch.

19.     On February 19, 2016, Longbranch and Roberts memorialized their agreement in

writing. *See* Ex. 1 (the Purchase Agreement). The Purchase Agreement defined the assets

Longbranch sought to buy and Express sought to sell as:

> Ownership interest in certain pipe and related facilities (commonly known as
> the P-21 pipeline) shown on the plat attached hereto as Exhibit "A". and
> described on Exhibit "B" attached hereto, and the rights-of-way, easements,
> contracts, permits and leases described in Exhibit "C" attached hereto
> (collectively herein referred to as the "Express Pipeline").

20.     The Purchase Agreement set a 60-day due-diligence period and set closing for

April 19, 2016. It also allowed several extensions of the closing date and due-diligence period.

**B.      After Wright offers to fund the purchase of the right-of-way, Longbranch
        assigns the Purchase Agreement to Black Duck but retains 20% net-profits
        interest that attaches and runs with the right-of-way.**

21.     Borders and Moore had intended to find the right partner who could either develop

the right-of-way or would be willing to hold the right-of-way until the right developer came

along.

22.     Almost immediately after Longbranch executed the Purchase Agreement with

Express, Wright volunteered to supply all funds to purchase the right-of-way, representing

that he had the cash on hand to fully fund the acquisition and maintenance of the right-of-

way until a developer could be secured.

23.     Borders and Moore consented to Wright's role as the right-of-way funder through

Black Duck because Wright represented that he could fund the deal himself or maintain the

right-of-way until a suitable developer was located. If Moore and Borders had known that

Wright lacked the means to hold onto the right-of-way until a developer could be secured,

and that Wright instead wanted to "flip" the right-of-way at the earliest opportunity, they would never have agreed to assign the Purchase Agreement to Black Duck.

24.     After Wright reimbursed Moore and Borders for the $25,000 the two men had already paid, Borders, on behalf of Longbranch, orally agreed to assign the Purchase Agreement to Black Duck. Wright and Moore, on behalf of Black Duck, orally agreed that Longbranch would retain a 20% net-profits share that would attach and run with the right-of-way.

25.     Longbranch and Black Duck confirmed their agreement in writing. Ex. 2 (Longbranch Assignment). The Longbranch Assignment expressly states:

> [Longbranch] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors or assigns during the period of time beginning on the date first written above (the "Period").
>
> a.  Net Profits shall mean gross revenues actually received by [Black Duck], or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.
>
> b.  [Black Duck's] obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to the payment of the Net Profits Share.

26.     Moreover, Longbranch and Black Duck specifically agreed "to execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of this Assignment." Ex. 2 (Longbranch Assignment).

27.     Moore, Borders, and Wright all understood that Longbranch was giving up its right to purchase the right-of-way while retaining a 20% net-profits share in the right-of-way that

attached and ran with the land—and was binding on Black Duck's successors and assigns.
At no point did Longbranch indicate that it was unable or unwilling to make the earnest
money payments to Express to keep the Purchase Agreement alive or that Longbranch lacked
the ability to close on the right-of-way.

### C.    Black Duck closes on the right-of-way.

28.    On August 14, 2017, Black Duck closed on the right-of-way. A little over a month
later, Borders notarized and recorded the Longbranch Assignment in Shelby County.

29.    At all times before closing, Wright represented to Moore and Borders that he was a
wealthy man and could easily fund the purchase of the right-of-way using his own funds. But
Longbranch learned much later that Wright borrowed $4.1 million through KrisJenn Ranch
to close the purchase of the right-of-way. Wright secured that loan through a first lien deed
of trust on his ranch and certain minerals in Webb County, Texas.

30.    KrisJenn Ranch then purported to loan the money it had borrowed to Black Duck via
a second loan that was undisclosed to either Borders or Moore.

31.    Although the "loan documents" purport to evidence loan transactions
consummated on August 14, 2017, those documents—involving an undisclosed wrap-around
deed of trust using the right-of-way as collateral—were not executed or notarized until
January 18, 2018.[1]

---

[1] Additionally, the trustee on the deed of trust—David Strolle—is a lawyer at the firm that
drafted Black Duck's company agreement. Strolle also appears to have prepared the loan
documents—yet never disclosed those loan documents to Moore or to Moore's entity,
which was a 50% partner in Black Duck.

**D.     Wright sells the right-of-way for $2.5 million and a 16% carried interest in a future waterline.**

32.     Eventually, Wright executed plans with another man, John Terrill, to sell the right-of-way to Terrill. Terrill's commitment to buy "the East Texas right-of-way (also known as the Express Gas Pipeline)" is dated February 9, 2018. According to the letter of intent, Terrill agreed to purchase the right-of-way for $2.5 million, with Black Duck retaining a 16% carried interest in a future waterline.

33.     On March 13, 2018, Terrill and Mr. Bobby Patton drafted documents to form a new LLC—TCRG East Texas Pipeline 1, LLC—for the "purpose of acquiring certain assets of Black Duck." One of Patton's entities, One Industries Group, L.P., took a 75% stake in TCRG while Terrill's entity, Synergy Midstream, LLC, took a 25% stake.

34.     Shortly thereafter, on March 22, 2018, Wright and Patton executed the purchase agreement where Black Duck agreed to sell the right-of-way to TCRG.

35.     On April 3, 2018, Wright and Patton executed the deed transferring the right-of-way from Black Duck to TCRG. Conducting only minimal due diligence and completing the purchase quickly, TCRG received a quitclaim deed for the right-of-way. The TCRG deed expressly disclaimed any warranties about the right-of-way.

**E.     Moore and Borders begin to uncover Wright's schemes.**

36.     On April 4, 2018, Moore and Borders first learned that the right-of-way had likely been sold. Wright had set up a morning meeting with Borders but did not notify or invite Moore of the meeting. As Borders understood it, the purpose of the meeting was to introduce him to the new owner of the right-of-way, indicating the sale had closed.

37.     Borders attended the meeting and met with Wright, Terrill, and Terrill's father. Wright claimed Terrill needed to see the right-of-way and review the deeds. Borders agreed to take the men out to the right-of-way and hand over the deeds and supporting documents.

38.     After the meeting, Borders, Wright, Terrill, and Terrill's father drove out to the right-of-way. During the ride back, Borders told Terrill about his 20% interest in the right-of-way.

39.     After visiting the right-of-way, Borders, Wright, Terrill, and Terrill's father visited Longbranch's office, where Borders gave Wright and Terrill the paper copies of the deeds and supporting documents for the right-of-way.

40.     After the meeting was over, Borders called Moore and informed him about the meeting. The two men then called Wright via a three-way call. Wright grew angry that Borders had called Moore and swore at both men.

41.     Toward the end of the call, Wright promised to send Moore and Borders copies of the proposed deal and claimed that Terrill knew about Longbranch's and DMA's interests, and even had copies of the agreements documenting those interests. Wright also asserted that the sale of the right-of-way had not yet closed.

42.     Wright never shared copies of the proposed deal with Borders and Moore or sent confirmation that Terrill knew about Longbranch's and DMA's interests.

43.     Given the radio silence from Wright, Moore emailed Terrill a copy of the DMA Agreement and copied Borders and Wright. Borders also shared the Longbranch Assignment with Terrill. Terrill responded by asking Moore to call him.

44.     After the call, Moore relayed his conversation with Terrill to Borders and Wright via email. Moore indicated that Terrill claimed (1) the right-of-way-deal was 100% closed; (2) he had first learned of Longbranch's and DMA's interest from Borders on April 4; (3) Terrill and his group did not intend to honor Longbranch's and DMA's interests; and (4) Terrill had been working on the right-of-way deal for a long time.

45.     On April 10, 2018, Borders emailed Wright and requested copies of the closing documents. Wright claimed that he was out of the United States and that he would send copies of the deal when he returned to the country on Tuesday, April 17, 2018. But just three days later, on April 13, 2018, Wright participated in a poker tournament in Florida, where he won $6,380.

46.     In his response to Borders's email, Wright also provided a short description of the alleged terms of the deal: Terrill's group paid a $500,000 down payment and closed with an additional $2 million for all assets owned by Black Duck that were received from Roberts in 2017. In exchange for these assets, Wright claimed Black Duck also received a 15% carried interest in the new joint venture. Wright said Borders and Moore would each receive 20% of the 15% carried interest for the life of the project while Wright would receive the remaining 60% of the 15% interest. Later, Wright contradicted this account by claiming that Longbranch only had an interest in a potential waterline.

47.     On or about April 20, 2018, TCRG funded the purchase of the right-of-way.

48.     Moore and Borders finally learned that deal had closed months after the deed conveying to TCRG Black Duck's interest in the rights and properties "collectively referred to herein as the 'Express Pipeline'" was recorded on June 6, 2018.

49.     It took several months and review of countless emails to discover the extent of Wright's and Terrill's lies. If Longbranch had known or suspected that that Wright had crafted a scheme to sell the right of way and claim Longbranch only had an interest in Black Duck's profits (instead of a running net-profits interest that attached to the right-of-way), it would not have transferred its option to purchase the right of way to Black Duck in the first place.

**F.     Wright threatens to "kill the 20% each of you own" of the right-of-way and again claims that KrisJenn Ranch had foreclosed on its alleged loan to Black Duck.**

50.     Moore and Borders continued investigating Black Duck's sale of the right-of-way and sought a peaceful solution with TCRG, Wright, and Wright's entities. But in the spring of 2019, Wright emailed Moore and Borders that if Moore did not stop his conversations with TCRG, then Wright would "end the 20% and file [m]alicious charges against you and all your forfeited Companies in the State of Texas." Ex. 3 (April 16, 2019 Email). Likewise, Wright threatened "to kill the 20% each of you own."

51.     TCRG eventually rescinded the sale of the right-of-way and claimed Wright had failed to fully disclose Longbranch's and DMA's net-profits interests in the pipeline right-of-way. Wright—through another of his entities, KrisJenn Ranch, LLC Series Pipeline ROW (Series Pipeline)—refunded TCRG's $2.5 million and accepted the return of the right-of-way.

52.     Wright and his entities now claim that KrisJenn "foreclosed" on an alleged $4.1 million note (dated August 14, 2017) between KrisJenn as lender and Black Duck as borrower. But contradicting that assertion, KrisJenn Ranch and Wright claimed in July 2019

that the loan secured by a lien on the right-of-way was paid; they filed a release of lien in Rusk County that "acknowledge[d] its payment and release[d] the property from the lien." Ex. 4 (Release of Lien).

53.     Black Duck, KrisJenn Ranch, LLC, and KrisJenn Ranch, LLC–Series Uvalde Ranch have provided no records of any foreclosure (despite repeated requested for such records).

**G.      Wright has repeatedly tried to escape from his agreements with Longbranch.**

54.     Wright has lied to Longbranch and disregarded his agreements time and again. He agreed that Longbranch retained a 20% net-profits interest in the right-of-way following execution of the Longbranch Assignment, but then denied that Longbranch had any such interest. He also conspired with his entities to sell the right-of-way in disregard of Longbranch's interest in the right-of-way.

55.     To resolve these issues, Longbranch filed suit in Shelby County on June 26, 2019, seeking a declaration of who owns what share of the right-of-way (Longbranch suit). That same day, Wright and some of his entities filed a parallel suit in the 25th Judicial District in Guadalupe County seeking the same declaratory relief (Wright suit).

56.     But, because Guadalupe County was not a proper venue, the 25th District Court transferred the Wright suit to Shelby County.

57.     In Shelby County, the district court heard Wright's motion for summary judgment, which asked the court to construe the Longbranch Assignment and the DMA Agreement in Wright's favor as a matter of law—just like KrisJenn Ranch is asking for the Court to do here. The Shelby County court unequivocally denied Wright's request for summary judgment and, eventually, consolidated the Wright suit into the Longbranch suit.

58.     With Wright's discovery obligations finally coming due in the Shelby County

lawsuits, Wright filed for bankruptcy for his KrisJenn entities.

59.     Around the same time, DMA learned that Wright and KrisJenn Ranch, LLC had

(a) covertly borrowed $5.9 million from McLeod Oil, LLC after the TCRG deal fell through,

and (b) extended McLeod an option to purchase the right-of-way for $6,000,000. Wright

and KrisJenn later modified their loan agreement with McLeod to add the right-of-way "as

additional collateral under the Loan Agreement and as additional 'Mortgaged Property.'"

60.     Now, in a third court, Longbranch again seeks to protect its property from Wright's

attempts to escape his promises.

### Causes of Action

#### Claim 1: Breach of Contract

**(against Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series
Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW)**

61.     The preceding paragraphs are incorporated by reference for this claim.

62.     The Longbranch Assignment is a valid, enforceable contract.

63.     Wright, on behalf of himself and Black Duck, agreed that Longbranch would retain a

20% net-profits share that attaches and runs with the "P-21 or Express pipeline," inclusive

of the related right-of-way, and that binds Black Duck's successors and assigns in exchange

for conveying the Purchase Agreement to Black Duck.

64.     By assigning the Purchase Agreement to Black Duck, Longbranch performed or

substantially performed its contractual obligations.

65.     KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn

Ranch, LLC–Series Pipeline ROW are the successors to Black Duck.

66.     In addition and alternatively, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW were assignees of the obligation to pay Longbranch 20% of net profits earned through the P-21/Express right-of-way because Longbranch's net-profits share attached and ran with the right-of-way.

67.     Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Wright materially breached the Longbranch Assignment in multiple respects, injuring Longbranch.

68.     Longbranch seeks its actual damages and/or specific performance of the contract, including the obligation to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the Longbranch Assignment]."

### Claim 2: Money Had and Received

**(against Wright, KrisJenn Ranch, LLC, Black Duck, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW)**

69.     The preceding paragraphs are incorporated by reference for this cause of action.

70.     Wright, KrisJenn Ranch, LLC, Black Duck, KrisJenn Ranch, LLC–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC–Series Pipeline ROW hold the entirety of the proceeds from the multiple sales of the right-of-way.

71.     20% of the net profits from the sales of the right-of-way belong to Longbranch in equity and good conscience.

72.     Longbranch's injury resulted from Wright's gross negligence, malice, or actual fraud, which entitles Longbranch to exemplary damages under Texas Civil Practice and Remedies Code §41.003(a).

## Claim 3: Tortious Interference with Contract

### (against Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW)

73.     The preceding paragraphs are incorporated by reference for this cause of action.

74.     The Longbranch Assignment is a valid, enforceable contract.

75.     Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, willfully and intentionally interfered with this contract, through the conduct described above.

76.     Longbranch has been proximately injured as a result of this interference.

77.     Longbranch seeks actual damages resulting from this interference as well as injunctive relief prohibiting Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, from continuing to interfere with Wright and Black Duck's obligations to Longbranch under the Longbranch Assignment.

## Claim 4: Fraud/Fraudulent Inducement
### (against Wright)

78.     The preceding paragraphs are incorporated by reference for this cause of action.

79.     Wright made multiple material misrepresentations to convince Moore and Borders to allow him to become part of their right-of-way deal. Wright represented to Moore and Borders that he was a wealthy man. Wright further represented to Moore and Borders that he had cash on hand to fully fund building the first line in the right-of-way and/or the acquisition and maintenance of the right-of-way until Wright, Moore, and Borders (including through their entities) identified a suitable developer to build the first pipeline in the right-

of-way. Wright also represented that his capital contribution would be consideration for his inclusion in the right-of-way deal.

80.     Those representations were false.

81.     Those representations were also material, as Moore and Borders would not have allowed Wright to become part of the deal and would not have had Longbranch transfer the option agreement (for purchasing the right-of-way) to Black Duck if they had known the real facts.

82.     When Wright made those statements, he knew those representations false and/or made those misrepresentations recklessly, as a positive assertion, and without knowledge of their truth.

83.     Wright made each of those representations with the intent that Moore and Borders act on it.

84.     Moore and Borders each relied on each of the representations and thereby agreed to have Longbranch assign the option to purchase the right-of-way to Black Duck.

85.     Borders's and Longbranch's reliance on the representation caused injury to Longbranch. Moore and Borders would have maintained 50% ownership in the option agreement and related right-of-way project—and together would have controlled the option and the project. Due to Wright's fraud, Moore and Borders lost control of the project, conveyed their interest in the right-of-way to Black Duck, lost the opportunity to sell the project or enter into a joint venture or partnership with a capable developer, and suffered damages thereby.

## Claim 5: Fraud (in the alternative)

### (against Wright)

86.     The preceding paragraphs are incorporated by reference for this cause of action.

87.     Black Duck and Wright represented to Longbranch that it would retain a 20% net-profits interest in the P-21/Express right-of-way that attached and ran with the right-of-way, that Black Duck would bind its successors and assigns of the right-of-way to this obligation, and that Longbranch's 20% net-profits interest would be binding on subsequent owners of the right-of-way.

88.     Black Duck and Wright's representations to Longbranch were material and false statements of fact.

89.     Alternatively, Black Duck and Wright's representations were false promises of future performance. At the time they made those promises, Black Duck and Wright had no intention of performing or honoring them.

90.     Black Duck and Wright knew that their representations were false and intended Longbranch to rely on them.

91.     Longbranch justifiably relied on Black Duck and Wright's false representations when Longbranch assigned the Purchase Agreement to Black Duck.

92.     Black Duck and Wright's false representations directly and proximately caused injury to Longbranch. If Longbranch had known that Wright lacked the means to hold on to the right-of-way until a developer could be secured, or that Wright had no intention of honoring Longbranch's interest in the right-of-way, Longbranch would never have assigned the Purchase Agreement to Black Duck.

93.     Black Duck and Wright knew, or reasonably should have known, that Longbranch would rely on their promises.

94.     Longbranch's injury resulted from Black Duck and Wright's actual fraud, gross negligence, or malice, entitling Longbranch to exemplary damages.

95.     Additionally, Wright used the KrisJenn entities to perpetrate his fraud on Longbranch for his personal benefit by utilizing KrisJenn and its series to effect a sham foreclosure on the right-of-way. At the time of the alleged foreclosure, Wright controlled both Black Duck as well the KrisJenn entities.

96.     Longbranch also seeks disgorgement of all ill-gotten profits, interests, and funds procured by Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW as a result of Wright's and Black Duck's fraud, including disgorgement of those entities' interest in the right-of-way. Longbranch further seeks the imposition of a constructive trust on all property and proceeds received by Wright and/or his entities in connection with the right-of-way, and disgorgement of profits received by Wright and/or his entities (including but not limited to KrisJenn Ranch, LLC–Series Pipeline ROW) as a result of their fraud.

### Claim 6: Unjust Enrichment

### (against Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and Terrill)

97.     The preceding paragraphs are incorporated by reference for this cause of action.

98.     Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, were enriched at Longbranch's expense.

99.     That enrichment was unjust for the reasons described herein, and there is no other adequate remedy available at law.

### Claim 7: Declaratory Relief

**(against Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and McLeod Oil, LLC)**

100.    The preceding paragraphs are incorporated by reference for this claim.

101.    There exists a genuine, justiciable controversy between Longbranch and Black Duck Properties, LLC, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, KrisJenn Ranch, LLC–Series Pipeline ROW, and McLeod Oil, LLC about the rights and obligations of the parties under the Longbranch Assignment.

102.    A declaratory judgment from this Court would resolve that controversy.

103.    Longbranch requests that the Court enter a declaratory judgment construing the Longbranch Assignment and declaring that Longbranch retained, among other things, a 20% net-profits share that attaches and runs with the P-21/Express right-of-way.

104.    Longbranch has incurred costs and reasonable and necessary attorneys' fees in seeking this declaratory judgment and/or in defending against Plaintiffs' declaratory judgment. Longbranch requests all costs recoverable in connection with this claim, including an award of such reasonable and necessary attorney's fees as are equitable and just.

### Attorneys' Fees

105.    Longbranch seeks to recover its reasonable attorneys' fees incurred in connection with these claims, including under Chapters 37, 38, and 41 of the Texas Civil Practice and Remedies Code.

## Prayer for Relief

With respect to the pipeline right-of-way, Longbranch respectfully requests:

a. a declaration that Longbranch received a 20% net-profits share that attaches and runs with the P-21/Express right-of-way;

b. a judicial declaration as to how Longbranch's 20% net-profits share is to be paid going forward;

c. an injunctive order that Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC, a Texas Limited Liability Company–Series Uvalde Ranch, and/or KrisJenn Ranch, LLC-Series Pipeline ROW specifically perform the Longbranch Assignment, including the obligation to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the Longbranch Assignment]";

d. an award of money damages for the loss of, or damage to the value of, the 20% net-profits share under the Longbranch Assignment;

e. an award of money damages for harm resulting from the torts of Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC, a Texas Limited Liability Company–Series Uvalde Ranch, and KrisJenn Ranch, LLC-Series Pipeline ROW;

f. an award of reasonable and necessary attorneys' fees incurred in this action;

g. an award of exemplary damages;

h. the disgorgement of and/or imposition of a constructive trust on any interests (including but not limited to property interests and contractual interests in or related to the right-of-way), proceeds, profits, or ill-begotten funds received by Wright, Black Duck, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC, a Texas Limited Liability Company–Series Uvalde Ranch, and KrisJenn Ranch, LLC-Series Pipeline ROW as a remedy for fraud and/or unjust enrichment;

i. an accounting to determine the amount of funds improperly withheld from Longbranch in connection with profits earned through the right-of-way;

j. pre- and postjudgment interest and costs of suit; and/or

k. any other legal or equitable relief to which Longbranch may show itself to be justly entitled.

Respectfully submitted,

/s/ Christopher S. Johns
Christopher S. Johns
State Bar No. 24044849
Christen Mason Hebert
State Bar No. 24099898
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

/s/ Timothy Cleveland
Timothy Cleveland
State Bar No. 24055318
Austin H. Krist
State Bar No. 24106170
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
akrist@clevelandterrazas.com

Michael Black
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, TX 78209
mblack@burnsandblack.com

Jeffery Duke
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, TX 77494
jduke@dbmmlaw.com

Andrew R. Seger
State Bar No. 24046815
KEY TERRELL & SEGER
4825 50th Street, Suite A
Lubbock, Texas 79414
806-793-1906
806-792-2135 fax
aseger@thesegerfirm.com

*Counsel for Longbranch Energy, LP*

### CERTIFICATE OF SERVICE

I hereby certify that on October___, 2020 a true and correct copy of the foregoing document was transmitted to each of the parties via the Court's electronic transmission facilities and/or via electronic mail as noted below. For those parties not registered to receive electronic service, a true and correct copy of the foregoing document was served by United States Mail, first class, postage prepaid, at the address noted below.

| | |
|---|---|
| Ronald J. Smeberg<br>Charles John Muller, IV<br>MULLER SMEBERG, PLLC<br>111 W. Sunset<br>San Antonio, TX 78209<br>ron@smeberg.com<br>john@muller-smeberg.com<br><br>*Counsel for KrisJenn Ranch, LLC,*<br>*Krisjenn Ranch, LLC, Series Uvalde*<br>*Ranch, KrisJenn Ranch, LLC, Series*<br>*Pipeline Row* | Michael Black<br>BURNS & BLACK PLLC<br>750 Rittiman Road<br>San Antonio, TX 78209<br>mblack@burnsandblack.com<br><br>Jeffery Duke<br>DUKE BANISTER MILLER & MILLER<br>22310 Grand Corner Drive, Suite 110<br>Katy, TX 77494<br>jduke@dbmmlaw.com<br><br>*Counsel for Longbranch Energy, LP* |
| Ronald J. Smeberg<br>THE SMEBERG LAW FIRM, PLLC<br>2010 W Kings Hwy<br>San Antonio, TX 78201-4926<br>ron@smeberg.com<br><br>*Counsel for Black Duck Properties, LLC* | Shane P. Tobin<br>OFFICE OF THE U.S. TRUSTEE<br>903 San Jacinto Blvd, Room 230<br>Austin, Texas 78701<br>shane.p.tobin@usdoj.gov<br><br>*United States Trustee* |
| William P Germany<br>BAYNE, SNELL & KRAUSE<br>1250 N.E. Loop 410, Suite 725<br>San Antonio, TX 78209<br>wgermany@bsklaw.com<br><br>*Counsel for Larry Wright* | John Terrill<br>12712 Arrowhead Lane<br>Oklahoma City, OK 73120<br><br>*Third Party-Defendant, pro se* |
| Laura L. Worsham<br>JONES, ALLEN & FUQUAY, L.L.P.<br>8828 Greenville Avenue<br>Dallas, TX 75243<br>lworsham@jonesallen.com<br><br>*Counsel for McLeod Oil, LLC* | |

/s/ Christopher S. Johns
Christopher S. Johns