IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: § <br> **KRISJENN RANCH, LLC,** § <br> *Debtor* § <br> § | | **Chapter 11** <br><br> **Case No. 20-50805** |
| **KRISJENN RANCH, LLC and** § <br> **KRISJENN RANCH, LLC-SERIES** § <br> **UVALDE RANCH, and KRISJENN** § <br> **RANCH, LLC-SERIES PIPELINE** § <br> **ROW as successors in interest to** § <br> **BLACKDUCK PROPERTIES, LLC,** § <br> *Plaintiffs* § <br> § <br> v. § <br> § <br> **DMA PROPERTIES, INC., and** § <br> **LONGBRANCH ENERGY, LP,** § <br> *Defendants* § | | **Adversary No. 20-05027** |
| § <br> **DMA PROPERTIES, INC.,** § <br> *Cross-Plaintiff/Third Party Plaintiff* § <br> § <br> v. § <br> § <br> **KRISJENN RANCH, LLC,** § <br> **KRISJENN RANCH, LLC-SERIES** § <br> **UVALDE RANCH, and KRISJENN** § <br> **RANCH, LLC-SERIES PIPELINE ROW,** § <br> **BLACK DUCK PROPERTIES, LLC,** § <br> **LARRY WRIGHT, and JOHN TERRILL,** § <br> *Cross-Defendants/Third-Party* § <br> *Defendants* § | | **Adversary No. 20-05027** |

**DEBTORS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON DMA'S CLAIMS**

TO THE HONORABLE CHIEF BANKRUPCY JUDGE RONALD B. KING:

*Debtors' Motion for Partial Summary*                                                                                                                                                      1
*Judgment On DMA's Claims*

COME NOW Debtors, Plaintiffs, and Counter-Defendants KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series Uvalde Ranch, and KrisJenn Ranch, LLC-Series Pipeline Row (collectively the "Debtors"), and file this Motion for Partial Summary Judgment, and would respectfully show as follows:

## SUMMARY OF THE ARGUMENTS

DMA's tort claims arising from the Bigfoot Note Agreement are barred by the economic loss rule because they sound in contract rather than tort. The duties DMA complains of in its tort claims arise from the contract, and DMA is precluded from pleading tort claims for a cause of action that sounds in contract simply to seek exemplary damages.

DMA's claims for unjust enrichment and declaratory relief are alternate ways to plead its breach of contract claim. Because the Court has already ruled on DMA's contractual claim regarding the Bigfoot Note Payment, these ancillary and alternative claims have been rendered moot under the United States Constitution.

DMA's claims for Breach of Contract must fail as a matter of law because DMA does not have privity of contract with Debtors. Every breach of contract requires the defendant to be in privity of contract with the plaintiff. Here, Debtors were never in privity of contract with DMA. The Pipeline Agreement was between Black Duck and DMA. Because Debtors did not have contractual privity with DMA on the Pipeline Agreement, DMA's breach of contract claim fails as a matter of law.

DMA's money had and received claim fails because DMA, at most, would be entitled to 20% of the net profits from the sale of the Pipeline. Debtors have never received profits from the sale of the Pipeline. Therefore, Debtors cannot be liable for a money had and received claim when the Debtors have never received money that is due to DMA from the sale of the Pipeline.

DMA cannot provide evidence supporting its claim of tortious interference with the Pipeline Agreement. Debtors simply purchased the Pipeline from TCRG after DMA scuttled that deal. DMA is unable to show how this action tortiously interfered with the contract between Black Duck and DMA. Alternatively, Series Pipeline ROW exercised its own legal rights when it purchased the Pipeline from TCRG. As such, Series Pipeline ROW is not liable for any alleged tortious interference of the Pipeline Agreement under the affirmative defense of justification.

## BACKGROUND

In February 2016, Darrin Borders, through his entity Longbranch Energy, LP ("Longbranch"), secured the right to purchase the Pipeline and its Right of Way (respectively, the "Pipeline" and "ROW"). Longbranch did not have the monetary resources to close this transaction and, therefore, sold and assigned the right to purchase the Pipeline and ROW to Black Duck. *See* Ex. C. Black Duck was owned by SCMED Oilfield Consulting, LLC ("SCMED") and KrisJenn Ranch, LLC ("KrisJenn"). *See* Ex. B. During its formation, Black Duck raised $1,000 in initial capital. *Id.* at ¶ 4.01. Black Duck's Operating Agreement states that no further capital contributions could be compelled, and that all subsequent funding to the company would be a loan from the members. *See* Ex. B, ¶ 4.02. As such, all members of Black Duck knew that its operations would be funded by and through loans from its inception. *See* Ex. A.

KrisJenn provided approximately $5 million in loans to Black Duck in order to fund the purchase of the Pipeline and ROW. *See* Ex. A. Of this amount, KrisJenn secured $4.1 million from another lender on a short term loan. *See* Ex. A. KrisJenn contributed these funds because SCMED, by and through Moore, falsely and fraudulently claimed that it could promptly secure a buyer for the Pipeline and ROW. *See* Ex. A.

SCMED was unable to locate a buyer for the Pipeline and ROW, and thereafter failed to actively participate in Black Duck. *See* Ex. A. SCMED subsequently surrendered its ownership in Black Duck in return for a promise that Black Duck would pay 20% of its profits from the funds received by Black Duck in relation to the maintenance, sale, use, and operation of the Pipeline to DMA (the "Pipeline Agreement"). *See* Ex. D. At all relevant times, and continuing to the present date, Black Duck has honored the Pipeline Agreement. It did, in fact, find a purchaser for the Pipeline—TCRG. It did, in fact, include DMA's net profits interest in the transaction. In particular, Black Duck agreed that 20% of the estimated daily profits from the TCRG deal would be paid to DMA. *See* Ex. A. The daily payments were estimated to be $48,000 and, as a result, DMA was estimated to receive $10,000 a day after Black Duck's acquisition costs had been satisfied. *See* Ex. A.

DMA and Moore was not satisfied with this result. They contacted TCRG directly and demanded to receive 20% of TCRG's net profits, rather than 20% of the net profits received by Black Duck. *See* Ex. A. This position was not supported by any law and, moreover, was directly contrary to the clear language of the Pipeline Agreement. *See* Ex. D. DMA has a 20% net profits interest in Black Duck's profits from the sale, maintenance, operation, or use of the Pipeline—not a subsequent purchaser's profits. *See* Ex. D. Nevertheless, DMA and Moore repeatedly threatened TCRG with litigation and convinced its principals that Wright had lied about DMA's interest under the Pipeline Agreement. *See* Ex. A. These representations were categorically false, and all parties to the transaction were well aware that they would receive the net profits interest that were promised by Black Duck. *See* Ex. A.

DMA now claim that the Debtors—who were not a party to the agreement between Black Duck and DMA—have breached a contract and committed various torts against DMA in this

transaction. Debtors file this motion for partial summary judgment to narrow the issues for trial and dismiss those claims that have no legal or factual basis.

## LEGAL STANDARD

"A party is entitled to summary judgment if it can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing FED. R. CIV. P. 56(c)). "Once a movant who does not have the burden of proof at trial makes a properly supported motion, the burden shifts to the nonmovant to show that a summary judgment should not be granted." *Ragas*, 136 F.3d at 458 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–25 (1986)). "When ruling on a motion for summary judgment, 'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Ragas*, 136 F.3d at 458.

## ARGUMENT

### I. DMA'S BIGFOOT NOTE CLAIMS ARE BARRED BY THE ECONOMIC LOSS RULE AND ARE MOOT.

#### A. *Economic Loss Rule*

DMA's conversion, money had and received, and breach of fiduciary duty claims relating to the Bigfoot Note payments are barred by the economic loss rule. "The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014). "Although the principles of contract and tort causes of action are well settled, often it is difficult to determine the type of action that is brought." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 617 (Tex. 1986). The Court "must look to the substance of the cause of action and not necessarily the manner in which it was pleaded." *Id.* at 617–18.

*Debtors' Motion for Partial Summary*      5
*Judgment On DMA's Claims*

"The contractual relationship of the parties may create duties under both contract and tort law." *Id.* at 618. "The acts of a party may breach duties in tort or contract alone or simultaneously in both." *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991) (quoting *Reed*, 711 S.W.2d at 618). "The nature of the injury most often determines which duty or duties are breached." *Sharyland Water Supply Co. v. City of Alton*, 354 S.W.3d 407, 417 (Tex. 2011) (quoting *DeLanney*, 809 S.W.2d at 495). "When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone." *Id.*

In this case, DMA's only purported injury is the economic loss to the subject of the Bigfoot Note contract. Thus, DMA's causes of action relating to the Bigfoot Note payments sound in contract alone. DMA pleads various torts in order to claim it has a right to exemplary damages due to the Debtors' alleged conduct regarding the Bigfoot Note payments. Here, as in *Reed*, DMA's only possible injury, if any, would be the loss of payments it expected under the Bigfoot Note Agreement. "This can only be characterized as a breach of contract, and breach of contract cannot support recovery of exemplary damages." *Reed*, 711 S.W.2d at 618. "To support an award of exemplary damages in this case, the plaintiff must prove a distinct tortious injury with actual damages." *Id.* This is a burden DMA cannot meet in this case because the only possible damages DMA sustained from the breach of the Bigfoot Note Agreement were the loss of the benefit of the bargain. *See id.* at 617–18 (holding a Court "must look to the substance of the cause of action and not necessarily the manner in which it was pleaded"). Because DMA's tort claims relating to the Bigfoot Note payments sound in contract, and cannot support recovery of exemplary damages, the economic loss rule bars recovery of these claims as a matter of law. Therefore, the Court should render judgment in favor of Debtors on DMA's conversion, money had and received, and breach of fiduciary duty claims relating to the Bigfoot Note payments.

### B. Mootness

The Court should render judgment in favor of Debtors on DMA's unjust enrichment and declaratory judgment claims relating to the Bigfoot Note payments because they are moot under Article III of the United States Constitution.

"Article III of the Constitution limits federal-court jurisdiction to 'cases' and 'controversies.'" *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016). The Supreme Court has "interpreted this requirement to demand that 'an actual controversy . . . be extant at all stages of review, not merely at the time the complaint is filed.'" *Id.* (alterations in original) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, the action can no longer proceed and must be dismissed as moot." *Gomez*, 577 U.S. at 160–61 (quotations omitted).

Here, DMA has prevailed in summary judgment on its breach of contract claim regarding the Bigfoot Note payments. DMA's unjust enrichment claim (claim 5 related to the Bigfoot Note Payment) and claim for declaratory relief (claim 6 related to the Bigfoot Note Payment) are claims that essentially flow from, or plead in the alternative of, DMA's breach of contract claim. Because DMA's breach of contract claim relating to the Bigfoot Note payment has been resolved by summary judgment, these claims are moot as a matter of law. Therefore, judgment in favor of Debtors should be rendered on these claims to narrow the case to issues that are actually in contention for trial.

**II. DMA'S BREACH OF CONTRACT CLAIM REGARDING THE PIPELINE FAILS BECAUSE THERE IS NO PRIVITY OF CONTRACT BETWEEN DMA AND THE DEBTORS**

"Breach of contract requires pleading and proof that (1) a valid contract exists; (2) the plaintiff performed or tendered performance as contractually required; and (3) the defendant

breached the contract by failing to perform or tender performance as contractually required; and (4) the plaintiff sustained damages due to the breach." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019). "Under the general law of contracts, a party must show either privity or third-party-beneficiary status in order to have standing to sue for breach of contract." *Ostrovits & Gwinn, LLC v. First Specialty Ins. Co.*, 393 S.W.3d 379, 387 (Tex. App.—Dallas 2012, no pet.); *see also Shawn Ibrahim, Inc. v. Houston-Galveston Area Local Dev. Corp.*, 582 S.W.3d 753, 767–68 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("To maintain a breach of contract action, a plaintiff must show privity of contract . . . ."). "Privity exists if the defendant was a party to an enforceable contract with either the plaintiff or someone who assigned his or her cause of action to the plaintiff." *Ostrovits & Gwinn, LLC*, 393 S.W.3d at 387; *see also First-Citizens Bank & Tr. Co. v. Greater Austin Telecomm.*, 318 S.W.3d 560, 566 (Tex. App.—Austin 2010, no pet.) ("For purposes of standing, privity is established by proving that the defendant was a party to an enforceable contract with either the plaintiff or a party who assigned its cause of action to the plaintiff."); *Assoc. Int'l Ins. Co. v. Scottsdale Ins. Co.*, 862 F.3d 508, 510 (5th Cir. 2017) (analyzing privity of contract as a necessary component to maintain a breach of contract action under Texas law).

Here, DMA does not have privity of contract with Debtors. DMA entered into a contract with Black Duck, not Debtors. *See* Ex. D. In this case, privity can only exist if Debtors were a party to an enforceable contract with DMA, or if DMA was assigned a contractual right from someone who had an enforceable contract with the Debtors. In this case, neither scenario has occurred. Debtors were never a party to the contract DMA is seeking to enforce in this case. Therefore, DMA does not have standing to bring suit against Debtors because it lacks the required privity of contract with Debtors as a matter of law.

### III. DMA'S MONEY HAD AND RECEIVED CLAIM FAILS BECAUSE DEBTORS DO NOT HOLD ANY MONEY FROM THE SALE OF THE PIPELINE.

"A claim for 'money had and received' is equitable in nature." *Plains Exp. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015). "Money had and received is a category of general assumpsit to restore money where equity and good conscience requires refund." *Id.* (citations omitted). "A cause of action for money had and received is not premised on wrongdoing, but 'looks only to the justice of the case and inquires whether the defendant has received money which rightfully belongs to another." *Id.* (citations omitted). "To prove a claim for money had and received, a plaintiff must show that a defendant holds money which in equity and good conscience belongs to him." *Id.* (citations omitted).

Here, DMA does not dispute that it is only entitled to the net profits generated from the Pipeline. Black Duck had to take approximately $5 million in loans in order to purchase the Pipeline. *See* Ex. A. DMA will not be entitled to any money received by Black Duck that is generated from the Pipeline until after the principal balance and interest on these loans are repaid. Black Duck sold the Pipeline to TCRG for $2.5 million and a 16% gross profits interest. *See* Ex. A. The 16% interest was projected to generate approximately $48,000 a day and would be allocated toward paying off the remaining balance on the loans. *See* Ex. A. Only after this debt was paid off would DMA be entitled to receive a 20% net profits interest in Black Duck's 16% gross interest in funds generated from the Pipeline. *See* Ex. A. However, DMA scuttled the deal with TCRG by threatening TCRG with baseless lawsuits claiming to have a 20% interest in the Pipeline that ran with the land. *See* Ex. A. DMA's actions ensured that Debtors never received a profit from the sale of the Pipeline. Because the transactions with the Pipeline have never resulted in a profit, Debtors have never received net profits that would be subject to DMA's claimed interest.

There is not a single factual circumstance in the development of these transactions where Debtors would have held money that was owed to DMA because the expenses incurred in acquiring the Pipeline were not, and still have not been, fully reimbursed. DMA's claim for money had and received must fail as a matter of law because DMA cannot support any factual assertion that Debtors hold money pertaining to the Pipeline that belongs to DMA.

## IV. DMA'S TORTIOUS INTERFERENCE CLAIM FAILS BECAUSE IT CANNOT SATISFY ALL OF THE REQUIRED ELEMENTS.

The Texas Supreme Court has "identified the elements of tortious interference with an existing contract as: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Financial Review Serv., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000). A judgment, as a matter of law, for the Defendant of a tortious interference claim could be proper if (1) the Plaintiff fails to present evidence about one of the elements of the tort, (2) the Defendant conclusively negates one of the elements, or (3) the Defendant conclusively establishes its justification defense. *Id.*[1]

Here, DMA has provided no evidence the Debtors committed a willful and intentional act or interference with the February 3, 2018 Email Agreement or the DMA Agreement. Debtors simply repurchased the Pipeline through Series Pipeline ROW to avoid any potential issues with TCRG due to DMA's interference with the TCRG deal. DMA can provide no evidence of Debtors willful and intentional interference with DMA's contract with Black Duck. DMA's recourse for any damages regarding the loss of the Pipeline is through Black Duck, not the Debtors, because

---

[1] Although the *Prudential* court reviewed that case under a directed verdict standard, the test for legal sufficiency should be the same for summary judgments and directed verdicts. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005); *see also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 135 (2000) ("The standard for judgment as a matter of law under Rule 50 [(Directed Verdict)] mirrors the standard for summary judgment under Rule 56.").

Debtors simply repurchased the Pipeline from TCRG after DMA threatened to sue TCRG. *See* Ex. A. Moreover, DMA cannot show that Debtors' action proximately caused DMA's injuries, or that DMA suffered any actual damages. DMA had a right to recover 20% of the net profits received by Black Duck in relation to the Pipeline. *See* Ex. D. Black Duck never received net profits from the Pipeline because of DMA's tortious interference with the TCRG deal. *See* Ex. A. It was DMA and Moore's conduct that caused its own injury, if any, regarding the Pipeline. DMA now blindly asserts that Debtors somehow tortiously interfered with the Pipeline Agreement between Black Duck and DMA. DMA's assertions are not supported by the facts. Therefore, the Court should rule DMA's tortious interference claim fails as a matter of law because DMA is unable to present evidence supporting the elements of the tort.

"Justification is an affirmative defense to tortious interference with [a] contract . . . ." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 80. "[A]s an affirmative defense, a defendant may negate liability on the ground that its conduct was privileged or justified." *Id.* at 77–78. "The justification defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Id.* at 80. "[I]f a trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, the defendant has conclusively established the justification defense, and the motive is irrelevant." *Id.* "Alternatively, if the defendant cannot prove justification as a matter of law, it can still establish the defense if the trial court determines that the defendant interfered while exercising a colorable right, and the jury finds that, although mistaken, the defendant exercised that colorable right in good faith." *Id.*

Even if DMA could factually support all the elements for its claim of tortious interference—which it cannot—it would not matter because Debtors had an absolute right to

purchase the Pipeline from TCRG after DMA and Moore scuttled that deal. Debtors are free to purchase any asset they desire in furtherance of their business.

Here, Black Duck sold the Pipeline to TCRG in exchange for $2.5 million and a 16% gross interest in the funds generated by the Pipeline. *See* Ex. A. Black Duck would have been obligated to pay DMA 20% of whatever net profits were generated from the Pipeline after the KrisJenn loan was paid off. Black Duck affirmatively made plans to pay DMA 20% of its net profits on the sale to TCRG; however, DMA was not satisfied and demanded to receive 20% of TCRG's net profits. *See* Ex. A. DMA and Moore subsequently threatened a lawsuit against TCRG claiming to have a 20% interest in the Pipeline that "ran with the land." *See* Ex. A. Because Black Duck was defunct and without funding at this time, Series Pipeline ROW purchased the Pipeline from TCRG to avoid litigation. *See* Ex. A.

Series Pipeline ROW simply purchased the Pipeline from TCRG after Moore and DMA scuttled the deal between Black Duck and TCRG. Series Pipeline ROW had a legal right to purchase the Pipeline from TCRG its action were justified as a matter of law. Alternatively, Series Pipeline ROW's purchase of the Pipeline from TCRG was at least a colorable right exercised in good faith, and sufficient to establish the defense of justification.

WHEREFORE PREMISES CONSIDERED Debtors pray that this Court issue an order granting Debtors' Motion for Partial Summary Judgment on DMA Properties, Inc.'s Bigfoot Note claims, breach of contract claim, money had and received claim, and tortious interference claim, and for such further relief as the Court may deem them justly entitled.

Dated: October 26, 2020.

Respectfully submitted,

MULLER SMEBERG, PLLC

By: /s/ *John Muller*
C. John Muller IV
State Bar No. 24070306
john@muller-smeberg.com
Ronald J. Smeberg
State Bar No. 24033967
ron@smeberg.com
Ezekiel J. Perez
State Bar No. 24096782
zeke@muller-smeberg.com
MULLER SMEBERG, PLLC
111 W. Sunset Rd.
San Antonio, TX 78209
Telephone: 210-664-5000
Facsimile: 210-598-7357

ATTORNEYS FOR DEBTORS

**CERTIFICATE OF SERVICE**

   I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system by notice of electronic filing or via email on the 26th day of October 2020:

Michael Black
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, Texas 78209
210-829-2022
210-829-2021 fax
mblack@burnsandblack.com
Attorneys for Longbranch Energy, LP
and DMA Properties, Inc.

Christopher S. Johns
Christen Mason Hebert
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

Timothy Cleveland
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
Attorneys for DMA Properties, Inc.

Natalie Wilson
LANGLEY & BANACK, INC.
745 East Mulberry Avenue | Suite 700
San Antonio, TX 78212
210-736-6600
lwilson@langleybanack.com
Attorneys for DMA Properties, Inc.

Jeffery Duke
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, Texas 77494
jduke@dbmmlaw.com
Counsel for Longbranch Energy, LP

William Germany
BAYNE, SNELL, & KRAUSE
1250 NE Loop 410, Ste. 725
San Antonio, Texas 78209
T- (210) 824-3278
F- (210) 824-3937
wgermany@bskaw.net
Attorney for Larry Wright

OFFICE OF THE UNITED STATES TRUSTEE
903 San Jacinto Blvd, Room 230
Austin, Texas 78701
shane.p.tobin@usdoj.gov
United States Trustee

        /s/ *John Muller*
        C. John Muller IV