IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: § <br> **KRISJENN RANCH, LLC,** § <br> *Debtor* § <br> § | | Chapter 11 <br><br> Case No. 20-50805 |
| _____ | | |
| **KRISJENN RANCH, LLC and** § <br> **KRISJENN RANCH, LLC-SERIES** § <br> **UVALDE RANCH, and KRISJENN** § <br> **RANCH, LLC-SERIES PIPELINE** § <br> **ROW as successors in interest to** § <br> **BLACKDUCK PROPERTIES, LLC,** § <br> *Plaintiffs* § <br> § <br> **v.** § <br> § <br> **DMA PROPERTIES, INC., and** § <br> **LONGBRANCH ENERGY, LP,** § <br> *Defendants* § | | <br><br><br><br><br><br><br><br><br><br> Adversary No. 20-05027 |
| _____ | | |
| § <br> **DMA PROPERTIES, INC,** § <br> *Cross-Plaintiff/Third Party Plaintiff* § <br> § <br> **v.** § <br> § <br> **KRISJENN RANCH, LLC,** § <br> **KRISJENN RANCH, LLC-SERIES** § <br> **UVALDE RANCH, and KRISJENN** § <br> **RANCH, LLC-SERIES PIPELINE ROW,** § <br> **BLACK DUCK PROPERTIES, LLC,** § <br> **LARRY WRIGHT, and JOHN TERRILL,** § <br> *Cross-Defendants/Third-Party* § <br> *Defendants* § | | <br><br><br><br><br><br><br><br> Adversary No. 20-05027 |

**KRISJENN RANCH, LLC, KRISJENN RANCH, LLC-SERIES UVALDE RANCH, AND KRISJENN RANCH, LLC-SERIES PIPELINE ROW, AS SUCCESSORS IN INTEREST TO BLACK DUCK PROPERTIES, LLC'S SECOND AMENDED ADVERSARY COMPLAINT**

COME NOW KrisJenn Ranch, LLC ("KrisJenn"), KrisJenn Ranch, LLC-Series Uvalde Ranch, and Krisjenn Ranch, LLC-Series Pipeline Row as successors in interest to Black Duck Properties, LLC (collectively the "Debtors") by and through their undersigned attorney, and file this Second Amended

Adversary Complaint, brought pursuant to Bankruptcy Rule 7001, and would show the Court as follows:

## I.
## SUMMARY

1. Debtors own a pipeline and right of way that is the subject of this dispute (respectively, the "Pipeline" and "ROW"). Pipeline, ROW, and KrisJenn Ranch are each encumbered by a $6 million loan. The Debtor is currently unable to sell the Pipeline and ROW because the Defendants are improperly claiming a perpetual interest in these properties. More specifically, Defendants claim they should receive a share of profits from the operations and sale of the Pipeline and ROW for all time, regardless of whom is buying, selling, or using these properties. This interpretation is so broad that no person will purchase the Pipeline. Failure to monetize the Pipeline has caused Debtor to default on the $6 million secured obligation necessitating its chapter 11 bankruptcy filing.

2. Black Duck Properties, LLC ("Black Duck") was an entity owned by KrisJenn and SCMED Oilfield Consulting, LLC ("SCMED"). SCMED and DMA are wholly owned by Frank Daniel Moore.

3. Black Duck held title to the Pipeline and ROW before the disputes in this case arose. Black Duck sold the Pipeline to TCRG East Texas Pipeline 1, LLC ("TCRG") for $2.5 million and a 16% gross interest in the revenues generated by the Pipeline. After the deal was consummated, Defendants contacted TCRG and informed them that Defendants had a 20% perpetual interest in the Pipeline and ROW that ran with the land. They stated that TCRG would continue to owe each Defendant 20% net profits from the Pipeline and ROW in addition to the 16% gross revenues owed to KrisJenn. These efforts effectively scuttled the deal with TCRG.

4. Before Defendants interference with the TCRG deal, all of Black Duck's assets were transferred to KrisJenn because Black Duck could not honor its debts to KrisJenn. Black Duck subsequently wound up.

5. After TCRG sought to undue the purchase of the Pipeline due to Defendants interference. KrisJenn repurchased the Pipeline from TCRG using one of its series, KrisJenn Ranch, LLC-Series Pipeline ROW. KrisJenn had to take a loan from Mcleod Oil ("Mcleod") in order to make this repurchase.

6. This case seeks to interpret Debtors' and Defendants' rights in the subject contracts so that Debtor can sell the Pipeline and ROW, and pay the secured lender.

7. This case also seeks damages from the Defendants' tortious interference with the TCRG contract.

## II.
## JURISDICTION AND VENUE

8. Debtors filed a Chapter 11 Bankruptcy Petition in this Court on April 27, 2020—Case No. 20-5080.

9. Jurisdiction is conferred on this Court pursuant to the provisions of Section 1334 of Title 28 of the United States Code in that this proceeding is a core proceeding under 157(b)(2)(k) of Title 28. Jurisdiction is also conferred as this proceeding is related to the above-captioned Chapter 11 case under Title 11 and concerns property of the Debtor in that case. Therefore, the Court has both personal and subject matter jurisdiction to hear this case pursuant to Section 1334 of Title 28 of the United States Code and Sections 157(b)(2)(k) and 157(c) of Title 28 of the United States Code.

10. This proceeding is a core proceeding because it involves resolving third-party interests that encumber Debtors' property pursuant to 157(b)(2)(k) of Title 28.

11. This proceeding is also a non-core proceeding that is related to the chapter 11 case because it concerns the property of the Debtor and those concerns must be resolved for the Debtor to effect its plan of reorganization.

12. Bankruptcy courts have jurisdiction over matters that are "related to" the bankruptcy. *In re Denney*, 171 F.3d 1016, 1022 (5th Cir. 1999). A matter is "related to" a case under title 11 if the

adversary proceeding's outcome may both: (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate." *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). An adversary proceeding falls within the court's "related to" jurisdiction if "the outcome of that proceeding could conceivably have an effect on the estate being administered in bankruptcy." *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987).

13. Resolution of the issues alleged in the Summary of this Adversary Complaint are critical to Debtor's ability to reorganize, making jurisdiction over this action clearly appropriate pursuant to Section 157(c).

## III.
## PARTIES

14. KrisJenn Ranch, LLC is a Texas limited liability company who has appeared in this case and may be served through its counsel of record.

15. DMA Properties, Inc. ("DMA") is a South Carolina corporation who has appeared in this case and may be served through its counsel of record.

16. Longbranch Energy, LP ("Longbranch") is a Louisiana limited partnership who has appeared in this case and may be served through its counsel of record.

## IV.
## BACKGROUND

17. KrisJenn purchased the KrisJenn Ranch (the "Ranch") in 2013 for $3,952,000 and then invested an additional $840,000 in the Ranch. At such time, the Ranch was encumbered by a $5.9 million loan from Mcleod.

18. Black Duck was formed to purchase the Pipeline and ROW for $5 million plus closing costs. KrisJenn owned a 50% interest in Black Duck, and DMA owned the other 50% interest in Black Duck.

19. In 2017, KrisJenn loaned $4.1 million to Black Duck, and Larry Wright loaned Black Duck an additional $1.2 million. The $4.1 million that KrisJenn Ranch, LLC loaned to Black Duck was obtained through a loan between KrisJenn Ranch, LLC and Asilo Investments, Ltd. ("Asilo").

20. Longbranch entered into a contract to purchase the Pipeline and ROW on February 19, 2016 (the "Longbranch Contract").

21. In June of 2016, the Longbranch Contract was assigned to Black Duck from Longbranch primarily via an Agreement for Assignment and Assumption of Specific Contract (the "Longbranch Assignment").

22. On August 11, 2017, the Pipeline and ROW was purchased by Black Duck.

23. The Longbranch Assignment states:

1. Consideration: [LONGBRANCH] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [BLACK DUCK] or its successors or assigns during the period of time beginning on the date . . . above.

    a. Net profits shall mean gross revenues actually received by [BLACK DUCK], or its successors or assigns directly from the operation, use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

    b. [BLACK DUCK'S] obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [BLACK DUCK] binds its successors and assigns to the payment of the Net Profits Share.

24. On February 7, 2018, SCMED, an entity wholly owned by Frank Daniel Moore, sold its 50% interest in Black Duck back to the company in exchange for a deal similar to the Longbranch Assignment. This agreement was between DMA, also wholly owned by Moore, and Black Duck (the "DMA Assignment") and stated as follows:

1. Consideration: DMA Properties, Inc. shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from Black Duck Properties, LLC or its successors or assigns during the period of time beginning on the date . . . above.

    a. Net profits shall mean gross revenues actually received by Black Duck Properties, LLC., or its successors or assigns directly from the operation,

      use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

    b. Black Duck Properties, LLC.'s obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and Black Duck Properties, LLC. binds its successors and assigns to the payment of the Net Profits Share.

Collectively the Longbranch Assignment and the DMA Assignment are referred to as the "Assignment Agreements."

25. In 2018, Black Duck sold the Pipeline and ROW to TCRG for $2.5 million, and—as part of the deal—Black Duck retained 16% of the gross profits from the Pipeline and ROW. The aggregate, projected profit to Black Duck and other interested parties was $48,000 per day.

26. The initial $2.5 million received from the TCRG sale was allocated to pay the debts encumbering the Pipeline and ROW. No profits were anticipated on the sale to TCRG until the $48,000 daily payments had satisfied the outstanding principal balance and interest owed on the loan made from KrisJenn to Black Duck used to purchase the Pipeline and ROW.

27. Later in 2018, KrisJenn became a successor in interest to Black Duck. Black Duck was unable to pay its debts to KrisJenn Ranch, LLC and it therefore foreclosed on its note with Black Duck. Shortly thereafter, Black Duck ceased being a going concern and was eventually wound up, with KrisJenn being the successor in interest to all of Black Duck's remaining assets.

28. In 2019, shortly after the TCRG purchase, Longbranch and DMA threatened TCRG with litigation. Contrary to all prior communications with the Debtor, the Defendants claimed they were entitled to receive a share of *any* income generated by the Pipeline and ROW in perpetuity, regardless of who owns the Pipeline and ROW or how many subsequent sales of the Pipeline and ROW take place. It is likely that this position was fabricated simply because the Defendants did not like the terms of the proposed deal.

29. Nevertheless, to avoid litigation with TCRG, KrisJenn agreed to repurchase the Pipeline and ROW. KrisJenn repurchased the Pipeline and ROW through one of its series—KrisJenn Ranch, LLC-Series Pipeline Row ("Series Pipeline")—by obtaining an additional $2.5 million in financing from Mcleod. This increased the total amount of the loan from Mcleod to $5.9 million and all of the Debtors were added as borrowers to the Mcleod note.

30. KrisJenn is presently unable to sell the Pipeline and ROW because Defendants claim to have perpetual interests in them. Consequently, no purchasers are willing to purchase or operate the Pipeline or ROW for fear that DMA and Longbranch will file lawsuits asserting the same claims they alleged in the TCRG matter. The basis of the Defendants' claims are a latent or patent ambiguity in the Assignment Agreements.

31. Prior to bankruptcy petition filing, the parties were involved in three lawsuits in state court. There is pending litigation in Texas State Court, Panola County, 123rd Judicial District, Case No. 2019-355 between DMA and the Plaintiffs.[1] There is also pending litigation in Texas State Court, Shelby County, 273rd Judicial District, Case No. 19-CV-34877 between Longbranch Energy, L.P. and the Plaintiffs.[2] There is also pending litigation originally filed in Texas State Court, Guadalupe County, Case No. 19-CV-35048 between Plaintiffs and Longbranch and DMA. The Guadalupe County case is a mirror image of the claims between the Parties in the first two cases and was transferred to Shelby County. Cause numbers 19-CV-34877 and 19-CV-35048 seek Declaratory Judgment from the Court interpreting terms of a contract that is in dispute. The parties to the state court cases have filed pleadings in the cases and have only just begun the discovery process. No trial dates have been set, and no depositions have been taken even though the cases are many months old.

---

[1] DMA is a Cross-Plaintiff in this case, and the KrisJenn parties are the Defendants. The original Plaintiff of the Panola County case, Bigfoot energy, is not a party to these proceedings.

[2] Longbranch is the Plaintiff in this case, and the KrisJenn parties are the Defendants. DMA is a cross-plaintiff in this case.

*Debtors Second Amended Complaint* 7

32. On April 27, 2020, KrisJenn filed for Chapter 11 bankruptcy protection. Debtors now bring this suit for a declaratory judgment under both Federal Rule of Civil Procedure 57 and 28 U.S.C. §§ 2201 and 2202. It is critical to the reorganization of debtor to quickly interpret the parties' contract and monetize the pipeline.

33. Debtors also seek damages proximately caused by DMA and Longbranch's tortious interference with the TCRG contract.

## V.
## DECLARATORY JUDGMENT

34. Debtors incorporate by reference the factual allegations contained in the preceding paragraphs.

35. Pursuant to 28 U.S.C. § 2201, Debtors request that this Court construe and interpret the Longbranch Assignment and the DMA Assignment to ascertain and declare the respective rights, obligations, and liabilities of the Debtor to Longbranch and DMA, respectively.

### A. *Whether the Assignment Agreements Run With the Land.*

36. Debtors seek a judicial declaration that Longbranch and DMA have no contractual or property rights in the Pipeline and ROW except those borne from the Net Profits generated from the operation and sale of the Pipeline and ROW by Black Duck.

37. The core issue is what is meant by the phrase "its successors or assigns" in the Assignment Agreements. The Debtors contend the parties intended this phrase to mean that if Black Duck had an assignee or successor (i.e. a company purchased Black Duck and assumed all of its rights and duties), then that company would have to honor the terms of the Assignment Agreements. Debtors contend this means that if the assignee or successor to Black Duck sold the Pipeline and ROW, the assignee or successor to Black Duck would have to pay the Defendants their profit share interest after all debt and costs of sale were paid. If any residual interest was retained by the assignee or successor

as part of the sale, then Defendants would share in that residual agreement. But absent any retained interest, the purchaser would have no further obligations to the assignee or successor or Defendants.

38. Defendants contend that "its successors or assigns" does not relate to a corporate successor or assignee of Black Duck but to any person or entity who ultimately owns the Pipeline and ROW in perpetuity. Defendants further contend that upon any downstream sale of the Pipeline and ROW, the Defendants should receive a percentage of the sale *and* rights to a percentage of all operating profits earned by the purchaser of the Pipeline and ROW from its operations. Under the Defendants interpretation of the Assignment Agreements, if the Pipeline and ROW was sold again, Defendants would receive a percentage of that sale and continue receiving a percentage of the operating profits from the next buyer. This process would go on in perpetuity. Debtors claim that Defendants position is not legally defensible and is disingenuous because Defendants have made it perfectly clear in subsequent email correspondence that they understood and agreed with Debtors' interpretation of the Assignment Agreements.

39. First, the parties have clearly stated in post contract writings that the Assignment Agreements are to be interpreted as stated by the Debtor.

40. Next, the position is not legally defensible because the Assignment Agreements, as interpreted by Defendants, cannot run with the land. To run with the land, the covenant must 1) touch and concern the land; (2) relate to a thing in existence, such as a tangible piece of property, or specifically binds the parties and their assigns; (3) the original parties to the covenant must intend for it to run with the land; (4) the successors to the burden must have notice; and (5) the parties must be in privity of estate at the time the covenant was made. The alleged agreement does not satisfy these five elements, and therefore, cannot run with the land as suggested by Defendants.

**B. Whether KrisJenn is a successor or a successor in interest to Black Duck.**

41. Debtors ask this Court to declare whether KrisJenn is a successor or a successor in interest to Black Duck.

42. Black's Law Dictionary defines the two terms as follows:

> **successor.** A corporation that, through amalgamation, consolidation, or other assumption of interest is vested with the rights and duties of an earlier corporation.
>
> **successor in interest.** One who follows another in ownership or control of property.

43. Debtors contend that KrisJenn is a successor in interest to Black Duck's assets. Defendants contend KrisJenn is a successor to Black Duck's assets.

### C. *Whether funds paid by KrisJenn into Black Duck are capital contributions or loans to Black Duck.*

44. Pursuant to 28 U.S.C. § 2201, Debtors requests that this Court construe and interpret the Black Duck Operating Agreement to ascertain and declare the respective rights, obligations, and liabilities of the Debtors, Black Duck, and SCMED, respectively.

45. Black Duck only raised $1,000 in capital contributions at its formation. It was contemplated that funds used to purchase assets of the company would be provided by its Members.

46. KrisJenn was the only Member to provide funds to Black Duck in order to purchase assets.

47. Debtors contend these funds constituted loans to Black Duck under the Operating Agreement. DMA, as a purported third-party beneficiary of SCMED, claims the funds provided by KrisJenn were capital contributions to the company.

48. The Assignment Agreements and the Black Duck Operating Agreement were freely entered into by the parties, and were supported by valuable consideration. By granting the declaratory relief requested herein, this Court will clarify an ongoing and continuing dispute as to the parties' rights, obligations and liabilities.

49. Plaintiffs have incurred costs and reasonable and necessary attorney's fees in seeking this declaratory judgment.

## VI.
## TORTIOUS INTERFERENCE WITH A CONTRACT

50. Debtors incorporate by reference the factual allegations contained in the preceding paragraphs.

51. KrisJenn had a valid contract with TCRG for the sale of the Pipeline and ROW.

52. Defendants knew or had reason to know of KrisJenn's contract with TCRG and KrisJenn's interest in the contract.

53. Defendants willfully and intentionally interfered with KrisJenn's contract with TCRG when they harassed TCRG claiming to have a perpetual 20% interest in TCRG's ownership of the Pipeline and ROW that ran with the land.

54. Defendants interference proximately cause injury to KrisJenn, which resulted in the following actual damage or loss:

   a. The loss of the TCRG deal, which would have resulted in KrisJenn earning approximately $48,000 a day for as long as the Pipeline and ROW were in use, subject to DMA and Longbranch's respective 20% interest in the daily payments;

   b. $2.5 million KrisJenn used to repurchase the Pipeline and ROW from TCRG after DMA and Longbranch scuttled the deal.

   c. Interest and fees paid for the loans from Asilo and the Mcleods to purchase and repurchase the Pipeline and ROW. Black Duck, KrisJenn, and SCMED intended to purchase and resell the Pipeline and ROW quickly to avoid continued payments on the loans obtained to purchase the assets.

# VII.
# ATTORNEY'S FEES

55. It was necessary for the Debtor to retain the undersigned counsel to represent its interests in connection with this litigation and the prosecution of its claim. Debtors request that the Court award its reasonable and necessary attorney's fees.

WHEREFORE PREMISES CONSIDERED Debtors asks for declaratory relief and adjudication on its tortious interference claims as stated in this Complaint, as well as recovery of reasonable and necessary attorney's fees, court costs, and such other and further relief to which they may be justly entitled.

Dated: November 3, 2020

                      Respectfully submitted,

                      MULLER SMEBERG, PLLC

        By:   /s/ *John Muller*
                    C. John Muller IV
                    State Bar No. 24070306
                    john@muller-smeberg.com
                    Ronald J. Smeberg
                    State Bar No. 24033967
                    ron@smeberg.com
                    Ezekiel J. Perez
                    State Bar No. 24096782
                    zeke@muller-smeberg.com
                    MULLER SMEBERG, PLLC
                    111 W. Sunset Rd.
                    San Antonio, TX 78209
                    Telephone: 210-664-5000
                    Facsimile: 210-598-7357

                    ATTORNEYS FOR DEBTORS

## CERTIFICATE OF SERVICE

  I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system by notice of electronic filing or via email on the 3rd day of November 2020:

Michael Black
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, Texas 78209
210-829-2022
210-829-2021 fax
mblack@burnsandblack.com
Attorneys for Longbranch Energy, LP
and DMA Properties, Inc.

Christopher S. Johns
Christen Mason Hebert
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

Timothy Cleveland
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
Attorneys for DMA Properties, Inc.

Natalie Wilson
LANGLEY & BANACK, INC.
745 East Mulberry Avenue | Suite 700
San Antonio, TX 78212
210-736-6600
lwilson@langleybanack.com
Attorneys for DMA Properties, Inc.

Jeffery Duke
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, Texas 77494
jduke@dbmmlaw.com
Counsel for Longbranch Energy, LP

William Germany
BAYNE, SNELL, & KRAUSE
1250 NE Loop 410, Ste. 725
San Antonio, Texas 78209
T- (210) 824-3278
F- (210) 824-3937
wgermany@bskaw.net
Attorney for Larry Wright

OFFICE OF THE UNITED STATES TRUSTEE
903 San Jacinto Blvd, Room 230
Austin, Texas 78701
shane.p.tobin@usdoj.gov
United States Trustee

             /s/ John Muller
             C. John Muller