# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| *In re*: | § § | Chapter 11 |
| KrisJenn Ranch, LLC, | § § | |
| *Debtor* | § § § | Case No. 20-50805 |

| | | |
|---|---|---|
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC, | § § § § § § § | |
| *Plaintiffs*, | § § | Adversary No. 20-05027 |
| v. | § § § | |
| DMA Properties, Inc. and Longbranch Energy, LP, | § § § § | |
| *Defendants*. | § | |

| | | |
|---|---|---|
| DMA Properties, Inc. and Frank Daniel Moore, | § § § | |
| *Cross-Plaintiffs/Third-Party Plaintiffs*, | § § § | |
| v. | § § § | Adversary No. 20-05027 |
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, Black Duck Properties, LLC, Larry Wright, and John Terrill, | § § § § § § | |
| *Cross-Defendants/Third-Party Defendants*. | § § | |

1

## DMA'S RESPONSE IN OPPOSITION
## TO MOTION FOR PARTIAL SUMMARY JUDGMENT

DMA Properties, Inc. ("DMA") opposes the motion for partial summary judgment by KrisJenn Ranch, LLC and its series (collectively, "KrisJenn") on Moore's fraud, breach-of-contract, and tortious-interference claims.

### BACKGROUND

This dispute centers on the attempt of one man (Larry Wright) to steal a deal involving a pipeline right-of-way in East Texas. Daniel Moore and Darin Borders located and secured the right to purchase the right-of-way, without any involvement from Wright. When Wright learned about the deal, he begged to be a part of it and offered to fund the deal if Moore and Borders would include him. Moore and Borders eventually agreed to let Wright participate if he would put up the money to buy the right-of-way. Since that time, Wright has repeatedly schemed to dispose of the right-of-way while disregarding Moore and Borders's interests.

**A.     Moore and Borders secure the option to purchase the right-of-way.**

In the summer of 2015, Darin Borders and Daniel Borders located a potentially lucrative right-of-way in East Texas. Ex. 1 (Moore Decl.) ¶17.[1] Borders's entity (Longbranch) secured the right to purchase the right-of-way, and Moore and Borders paid $25,000 in earnest money to the pipeline's owner, Express Pipeline Connection, LLC. Ex. 1 (Moore Decl.) ¶20; Ex. 2 (Borders Decl.) ¶9. On February 19, 2016, Longbranch and Express memorialized Longbranch's right to purchase the right-of-way in writing. *See* Ex. 7 (Purchase Agreement).

**B.     Wright offers to fund the purchase of the right-of-way, and Longbranch assigns the Purchase Agreement to Black Duck in exchange for a 20% interest.**

When Wright learned about the deal, he begged to be a part of it, and Borders and Moore agreed to include Wright on the deal if he would fund the purchase of the right-of-way. Ex. 1

---

[1] In support of this response, DMA cites the declarations previously submitted in response to Wright's state-court motion for summary judgment (which was denied). Although DMA has only attached the exhibits relevant to this motion, all of the exhibits cited in the declarations can be found in the docket as attachments to DMA's prior summary-judgment motion. *See* DMA Mot. Summ. J. [#28].

2

(Moore Decl.) ¶23. Wright reimbursed Moore and Borders for the $25,000 the two men had already paid. Ex. 1 (Moore Decl.) ¶24; Ex. 2 (Borders Decl.) ¶12. Borders, on behalf of Longbranch, agreed to assign the Purchase Agreement to Moore and Wright's jointly owned entity, Black Duck Properties, LLC.[2] Ex. 1 (Moore Decl.) ¶24; Ex. 2 (Borders Decl.) ¶12. In exchange, Wright and Moore, on behalf of Black Duck, agreed that Longbranch would possess a 20% net-profits share that would attach and run with the right-of-way. Ex. 1 (Moore Decl.) ¶24; Ex. 2 (Borders Decl.) ¶12; Ex. 8 (Longbranch Assignment).

C. **Wright pressures Moore to withdraw from Black Duck, and Moore agrees to withdraw in exchange for a 20% net-profits interest in the right-of-way and other consideration.**

Black Duck closed on the right-of-way on August 14, 2017. Ex. 1 (Moore Decl.) ¶35. Not long afterwards, Wright grew increasingly hostile toward Moore and began to pressure Moore to give up his 50% interest in Black Duck. Ex. 1 (Moore Decl.) ¶40. After several phone conversations, Moore relented to Wright's demands that he resign. *Id.*

On February 3, 2018, Moore drafted an email with the terms of his resignation from Black Duck that he and Wright had orally agreed to. *Id.* ¶41. In exchange for relinquishing his 50% interest in Black Duck—which included 50% interest in all of Black Duck's assets such as the right-of-way—Moore would receive, among other things, "[n]o less than 20% Carried Interest in the P-21 Express Pipeline . . . under the same terms and conditions as the [Longbranch Assignment]" through his entity DMA Properties, Inc. Ex. 18 (Feb. 4, 2018 Email Agreement). On February 4, 2018, Wright agreed to Moore's terms via email. *Id.*

Formal documents, dated February 7, 2018, memorialize the terms of Moore's email resignation. Ex. 1 (Moore Decl.) ¶42. One of those documents was the DMA Agreement. In relevant part, the DMA Agreement states:

> DMA Properties shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from Black Duck Properties, LLC or its successors or assigns . . .

---

[2] Moore owned 50% of Black Duck through SCMED Oilfield Consulting, LLC and Wright owned 50% through KrisJenn Ranch, LLC. Ex. 6 (Black Duck Company Agreement).

3

    a. Net Profits shall mean gross revenues actually received by Black Duck Properties, LLC., or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

    b. Black Duck Properties, LLC.'s obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and Black Duck Properties binds its successors and assigns to the payment of the Net Profits Share.

Ex. 20 (DMA Agreement).

Moore entered the February 4 Email Agreement in his personal capacity (as well as on behalf of SCMED) and entered the DMA Agreement in his capacity as a principal of DMA. And the DMA Agreement expressly states that it was intended to "satisf[y] the duties ( in the Email Agreement ) regarding only the P-21 Express Pipeline[,]" thereby directly incorporating the February 4 Email Agreement. Ex. 20 (DMA Agreement). The two agreements—the February 4 Email Agreement and the DMA Agreement—therefore form one contract: the contract between Moore and Wright (and all the relevant entities) that Moore would withdraw from Black Duck in exchange for, among other things, a 20% net-profits interest in the right-of-way. Moore is thus a party in privity with respect to both agreements. DMA, the entity that Moore choose to hold the assets that he received per the terms of the business divorce, is the third-party beneficiary.

**D.    Wright immediately sells the right-of-way.**

Two days after the documents memorializing Moore's resignation were drawn up, Wright executed plans to sell the right-of-way to John Terrill through an entity that Terrill planned to form (TCRG). Terrill's commitment to buy "the East Texas right-of-way (also known as the Express Gas Pipeline)" is dated February 9, 2018. Ex. 21 (Letter of Intent). According to the Letter of Intent, Terrill agreed to purchase Black Duck's right-of-way for $2.5 million, with Black Duck retaining a 16% carried interest in a future waterline. *Id.* As Terrill later declared under oath, he and Wright had been working on this deal since December 2017—well before Wright pushed Moore out of Black Duck. Ex. 22 (Terrill Aff.).

4

**E.     Moore and Borders begin to uncover Wright's schemes.**

Moore eventually learned about the deal, but only after he had already relinquished his interest in Black Duck. When Moore and Borders asked Wright about the potential sale, Wright said that Terrill knew all about Longbranch's and DMA's interests and even had copies of their agreements. Ex. 1 (Moore Decl.) ¶48; Ex. 2 (Borders Decl.) ¶31. But when Moore and Borders reached out to Terrill, Terrill told a different story: Wright had not disclosed the previously assigned interests, and Terrill did not intend to honor them. Ex. 1 (Moore Decl.) ¶49; Ex. 2 (Borders Decl.) ¶32.

If Moore had known or suspected that Wright had crafted a scheme to sell the right-of-way and then claim that Moore only had an interest in Black Duck's profits, Moore would not have agreed to resign from Black Duck. Ex. 1 (Moore Decl.) ¶53. Nor would Moore have given up his right to 50% of Black Duck's assets for 20% of its profits from the sale of the right-of-way. *Id.*

**F.     Wright threatens to "kill the 20% each of you own."**

Though Moore and Borders continued to seek an amicable solution with TCRG, Wright, and Wright's entities, Wright was not so inclined. In the spring of 2019, Wright emailed Moore and Borders that if Moore did not stop his settlement conversations with TCRG, then Wright would "end the 20% and file [m]alicious charges against you and all your forfeited Companies in the State of Texas." Ex. 31 (Apr. 16, 2019 Email). Likewise, Wright threatened "to kill the 20% each of you own." *Id.*

Eventually, TCRG forced Wright to rescind the sale because of misrepresentations made by Wright. Ex. 35 (Compromise Settlement Agreement). But instead of rescinding the sale through Black Duck, Wright shut down Black Duck and used the transaction as an excuse to shuffle the right-of-way to one of his KrisJenn entities. Ex. 36 (TCRG Repurchase Agreement). Wright and KrisJenn now claim that Moore and Borders's net-profits interests were merely interests in Black Duck's profits—a position which makes no sense given that both

5

interests attach and run with the right-of-way. Ex. 8 (Longbranch Assignment); Ex. 20 (DMA Agreement).

### G. This Court previously granted partial summary judgment in favor of DMA on the Bigfoot Note Agreement.

When Moore resigned from Black Duck, Moore and Wright also agreed that Moore would receive "[n]o less than 50% carried interest and 50% entitlement" to promissory note that Bigfoot Energy Services, LLC had given Black Duck for the Harris saltwater disposal well. Ex. 18 (Feb. 4, 2018 Email Agreement). Wright and Moore formalized that element of their agreement via the Harris SWD Agreement—which also incorporates the February 4, 2018 Email Agreement. Under the Harris SWD Agreement, DMA was entitled to receive 50% of payments made on the Bigfoot Note. Ex. 41 (Harris SWD Agreement) at 1. The Harris SWD Agreement provides that Black Duck, its successors, and its assigns must deposit Bigfoot's note payment "into [their] account within no more than three business days from receiving the payment" and then must mail DMA its portion of the payment "within three business days of the funds being available." *Id.* Beginning in October 2018, Wright pocketed DMA's share of Bigfoot note payments until DMA raised the alarm with Bigfoot and Bigfoot filed an interpleader action to make its note payments into a court registry. On October 21, 2020, this Court granted partial summary judgment in favor of DMA, recognizing DMA's entitlement to 50% of the note payments made by Bigfoot. Order [#110].

## LEGAL STANDARD

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

6

When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

## ARGUMENT

I. **DMA's tort claims related to the Bigfoot Note Agreement are not barred by the economic loss rule.**

The economic loss rule precludes recovery in tort when (1) the tort claim is premised on breach of a duty created by the contract rather than a duty imposed by law; and (2) the injury is only the economic loss to the subject of the contract. *Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*, 2009 WL 150942, at *19–20 (S.D. Tex. Jan. 21, 2009). When a tort claim is premised on a duty imposed by law, the economic loss rule does not apply. Here, KrisJenn argues that DMA's conversion, money had and received, and breach of fiduciary duty claims are barred by the economic loss rule. Mot. Summ. J. [#118]. Actually, though, none of those claims are barred by the economic loss rule.

First, the economic loss rule does not bar DMA's conversion claim. As the Fifth Circuit has recognized, "Texas courts have consistently found claims for both conversion and breach of contract based on a single set of facts and a single injury." *Nat'l Un. Fire Ins. Co. of Pittsburg, Pa. v. Care Flight Air Ambulance Serv.*, 18 F.3d 323, 327–28 (5th Cir. 1994); *see also SPP SWD Burns Ranch, LLC v. Kent*, No. 5:14-CV-88, 2015 WL 12841097, at *3 (S.D. Tex. Jan. 8, 2015) ("Texas law imposes no limitation on bringing both conversion and breach of contract claims based on a single set of facts and a single injury, nor is there a requirement that the damages stemming from such claims be separate and distinct.").

Second, the economic loss rule does not bar DMA's claim for money had and received. Money had and received is an equitable quasi-contract claim, not a tort claim, and as a result,

no economic loss rule applies. *See generally Villareal v. First Presidio Bank*, 744 F. App'x 204 (5th Cir. 2018) (unpublished) (characterizing money had and received as a claim "based on quasi-contract"). Unsurprisingly, in this context, KrisJenn has not identified a single case holding that money-had-and-received claims can be barred by the economic loss rule.

Third, the economic loss rule does not bar DMA's fiduciary breach claims. As Courts in this District have previously recognized, Texas courts have declined to apply the economic loss rule to fiduciary relationships resembling escrow agreements, because such arrangements give rise to fiduciary duties independent of the contract. *See, e.g.*, *Osherow v. York*, No. 5:17-CV-483–DAE, 2019 WL 6048017, at *7 (W.D Tex. Aug. 5, 2019). Here, DMA's fiduciary breach claims are based on Wright and Black Duck's breaches of fiduciary duties as "custodians and agents of payment for amounts belonging to DMA." DMA Am. Countercls. [#172] ¶¶198–99. These are paradigmatic escrow-agent duties,[3] and since they arise by operation of law, the economic loss rule does not apply.

## II. DMA's unjust enrichment and declaratory claims related to the Bigfoot Note Agreement are not moot.

Mischaracterizing the Court's grant of partial summary judgment as only pertaining to DMA's "breach of contract claim regarding the Bigfoot Note payments",[4] KrisJenn argues that DMA's unjust enrichment and declaratory claims are "moot." Mot. Summ. J. [#118] at 7.

But these claims are not moot. This Court has not yet entered a final judgment in favor of DMA on its claim for breach of the DMA Agreement, and until a final judgment is entered (and any appeals are resolved), DMA remains entitled to pursue alternative theories of relief.

---

[3] As the alleged successor in interest to Black Duck's interest in the Bigfoot note, KrisJenn assumed those fiduciary duties. *Id.*

[4] DMA moved for partial summary judgment on the Harris SWD Agreement asking the Court to recognize its entitlement to 50% of the Bigfoot note payments. The Court granted DMA's motion for partial summary judgment, finding "DMA's got a right to payments of 50 percent under the note." Oct. 13, 2020 Hearing Tr. at 41:15-44:10.

Tellingly, KrisJenn's motion does not identify as single case dismissing alternative claims for relief as moot following a grant of partial summary judgment.

Further, as far as DMA is aware, KrisJenn has not conceded that it is liable for breach of the DMA Agreement. If KrisJenn is willing to stipulate to liability under the DMA Agreement and make DMA completely whole (paying the attorneys' fees and other expenses DMA incurred), *then* DMA's alternative claims for relief *might* be moot. *Cf. Hooks v. Landmark Indus.*, 797 F.3d 309, 313 (5th Cir. 2015) (discussing circumstances in which offer of judgment can moot pending claims). But until KrisJenn agrees it is liable for breach of contract and fully remedies its breach, it remains possible that KrisJenn will appeal the Court's summary-judgment ruling. If that happens, DMA might have to rely on its alternative claims for relief. *Cf. id.* ("A plaintiff's claim is not moot as long as he has a concrete interest, however small, in the outcome of the litigation.").

### III. DMA can sue KrisJenn for breach of the DMA Agreement and the February 4, 2018 Email Agreement.

KrisJenn argues that it is not liable on DMA's breach of contract claims because it is not in privity of contract with DMA. Mot. Summ. J. [#118] at 7–8. That argument fails for at least two reasons.

First, as a third-party beneficiary under the DMA Agreement and the February 4, 2018 Email Agreement, DMA is entitled to enforce both agreements. *See, e.g., S. Tex. Water Auth. v. Lomas*, 223 S.W.3d 304, 306 (Tex. 2007) (holding third parties can sue on contracts under which they are an intended third-party beneficiary). Moore and Wright (on behalf of himself and Black Duck) intended to transfer 50% ownership of the Bigfoot note payments to DMA. *See Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 900 (Tex. 2011) ("In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling." (quotation omitted)).

Moore expressly resigned from his role as manager of Black Duck and relinquished his ownership interest (through SCMED) in Black Duck in exchange for a 50% ownership of the

9

Bigfoot note payments through DMA (among other things). Ex. 1 (Moore Decl.) ¶9. The terms of Moore's departure from Black Duck were confirmed in the February 4, 2018 Email Agreement and the DMA Agreement (among other places). Ex. 18 (Feb. 4, 2018 Email Agreement); Ex. 20 (DMA Agreement). The plain language of those documents states that "Larry Wright and Daniel Moore have agreed to remove Daniel Moore from all aspects that involve BLACK DUCK PROPERTIES, LLC" for "transfer [of] the following items from Black Duck and to DMA Properties, INC or any other [e]ntity owned by Daniel Moore [or] of Daniel[']s choice . . . ." Ex. 18 (Feb. 4, 2018 Email Agreement) at 3; *see also City of Hous. v. Williams*, 353 S.W.3d 128, 145-46 (Tex. 2011) (finding contract created third-party beneficiary where it expressly granted benefits to specific third parties).

Second, KrisJenn is liable for breach of the DMA Agreement because Wright has used the KrisJenn entities and Black Duck to commit actual fraud. Under Texas law, members of a limited liability company may be liable for the company's contractual obligations when the company is used to perpetrate an "actual fraud" on the plaintiff for the direct benefit of the defendant." TEX. BUS. ORG. CODE § 21.223.[5] In the veil-piercing context, actual fraud is defined as conduct "'involv[ing] dishonesty of purpose or intent to deceive.'" *Spring Street Partners–IV, LP v. Lam*, 730 F.3d 427, 442–43 (5th Cir. 2013) (alteration in original) (citing *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd)); *see also Matter of Ritz*, 832 F.3d 560, 567 (5th Cir. 2016).

As Moore argued at length in his response,[6] Wright has repeatedly used Black Duck and KrisJenn in an attempt to defraud Moore and Borders of their interests in the right-of-way. After Moore left Black Duck, Wright—through KrisJenn—owned 100% of Black Duck's membership interests. *See* Ex. 6 (Black Duck Company Agreement) at 41; Ex. 18 (Feb. 4, 2018 Email

---

[5] Section 21.223 applies to domestic corporations as well as limited liability companies and foreign companies. *See* TEX. BUS. ORG. CODE § 101.002(a); *id*. § 9.203.

[6] To avoid unnecessary redundancy, DMA incorporates Moore's summary-judgment response here by reference.

Agreement). Wright used his control over both entities to execute an "assignment" in October 2018 that represented KrisJenn has "foreclosed" on a note to Black Duck as well as "collateral which includes [Black Duck's] interest in the Express Gas Pipeline." Ex. 37 (Assignment of Note). And later, when TCRG accused Wright of fraud and forced Wright to rescind the sale, Wright used his control over Black Duck and the KrisJenn entities to redirect the right-of-way to KrisJenn Ranch, LLC–Series Pipeline ROW, instead of to Black Duck. Wright has subsequently argued that this transfer wiped out DMA's interest in the right-of-way. What's more, there's little dispute that Wright ignored nearly all corporate formalities when transferring assets and liabilities between his entities. Indeed, KrisJenn previously argued that its series couldn't even be recognized as separate entities because Wright had failed to keep adequate books and records and commingled funds between the series. *See* Resp. Mot. Sever [#28] at 4.

### IV. DMA's claim for money-had-and-received hinges on disputed fact issues.

KrisJenn asserts that it is entitled to summary judgment on DMA's claim for money-had-and-received because KrisJenn has not received any net profits from sales of the pipeline. However, calculation of KrisJenn's net profits hinges on the dispute over the money Wright paid to close on the right-of-way: Moore claims Wright's payment was Wright's capital contribution to Black Duck, and Wright claims that the payment was a loan to Black Duck. As explained in Moore's response, Wright initially represented that the funds he used to close on the right-of-way were a capital contribution to Black Duck, not a loan. Ex. 1 (Moore Decl.) ¶¶23–24, 36–38. If the funds were a capital contribution, then they should not be considered in calculating Black Duck's net profits. Under KrisJenn's own interpretation of the DMA Agreement,[7] that would mean that Moore should have received 20% of the profits from the sale

---

[7] KrisJenn argues that DMA was entitled to receive 20% of net profits, as well as Black Duck's successors and assigns. By contrast, DMA argues that it is entitled to receive 20% of net profits generated by the right-of-way, because DMA's interest is a real covenant that attaches and runs with the right-of-way.

to TCRG. Factual disputes therefore preclude summary judgment on DMA's money-had-and-received claim because the parties have submitted conflicting evidence regarding the nature of Wright's payments for the right-of-way.

## V. DMA's tortious-interference claims hinge on disputed fact issues.

### A. Fact issues exist as to whether KrisJenn tortiously interfered.

KrisJenn also argues that Moore "can provide no evidence" that KrisJenn interfered with the DMA Agreement or the February 4, 2018 Email Agreement. Mot. Summ. J. [#117] at 10. Yet DMA has identified multiple pieces of evidence raising fact issues as to whether KrisJenn tortiously interfered with those agreements. For example, DMA has put forward evidence that Wright caused KrisJenn to make an unauthorized loan to Black Duck and to place an invalid lien on the right-of-way. Ex. 1 (Moore Decl. ¶¶37–38). Wright and KrisJenn later claimed that they foreclosed on that unauthorized loan and the collateral, including Black Duck's interest in the right-of-way. Ex. 37 (Assignment of Note).

More fundamentally, Wright used his control over both Black Duck and KrisJenn to try and wipe out DMA's 20% net-profits interest in the right-of-way. To avoid Black Duck's obligations, Wright used his control over Black Duck and KrisJenn to orchestrate a transfer of the right-of-way to KrisJenn. Ex. 36 (TCRG Repurchase Agreement); Ex. 35 (Compromise Settlement Agreement). Wright then terminated Black Duck, and Wright now claims that he is no longer obligated to honor the net-profits interests because he has transferred the right-of-way to KrisJenn. Ex. 40 (Certificate of Termination). And when TRCG demanded that Black Duck rescind its purchase of the right-of-way, Wright used KrisJenn Ranch, LLC–Series Pipeline ROW to reacquire the right-of-way to add another layer of corporate identify to avoid Black Duck's promises.

In short, Wright has repeatedly used his control over Black Duck and KrisJenn to play shell games with the right-of-way to escape from DMA's 20% net-profits interest under the

DMA Agreement. Genuine fact issues thus preclude summary judgment on DMA's claims that KrisJenn tortiously interfered with that agreement.

### B. Fact issues exist as to whether KrisJenn's interference proximately caused injury to Moore/SCMED and DMA.

KrisJenn next argues that even if it tortiously interfered, DMA cannot show that KrisJenn's conduct proximately caused any damages to DMA. Mot. Summ. J. [#117].

Yet DMA has already put forward evidence of both proximate causation and damages. Wright claims that he does not have to honor DMA's 20% net-profits interest because the right-of-way has been shuffled from Black Duck to KrisJenn. *See id.* at 9–10. And if the Court concludes that the interest is a personal covenant only enforceable against Black Duck, then Wright (and KrisJenn) will have successfully rendered DMA's net-profits interest worthless by shutting down Black Duck and transferring the right-of-way to KrisJenn. At a minimum, these actions by Wright raise fact issues as to proximate causation and damages, making summary judgment inappropriate.

### C. Fact issues preclude summary judgment on KrisJenn's affirmative defense of justification.

Finally, KrisJenn argues it is entitled to summary judgment on its affirmative defense of justification because all its actions were privileged or justified as a matter of law. Mot. Summ. J. [#117] at 11–12. The only evidence that KrisJenn cites is an affidavit from Wright. *See id.* [#117-1] Ex. A (Wright Aff.).

The affirmative defenses of justification and privilege do not apply when "there is interference by illegal or tortious means, such as misrepresentation or fraud." *Lamont v. Vaquillas Energy Lopeno Ltd.,* 421 S.W. 3d 198 (Tex. App.—San Antonio 2013, pet. denied). As outlined above, fact issues exist as to whether Wright used KrisJenn to defraud Moore and Borders's of their interests in the right-of-way. These fact issues preclude judgment on KrisJenn's affirmative defenses of justification and privilege. To rehash:

(1) Wright promised to transfer a 20% net-profits interest in the right-of-way to DMA in exchange for Moore's resignation as manager and relinquishment of his ownership interest.

(2) Once Moore withdrew from Black Duck, Wright then used his control over KrisJenn and Black Duck to sell the right-of-way to TCRG (while not disclosing the net-profits interest) and allegedly foreclosed on Black Duck's assets.

(3) After TCRG learned about the net-profits interests and demanded that Black Duck rescind the sale, Wright terminated Black Duck as an entity and then shuffled the right-of-way to KrisJenn.

(4) Wright now claims this shuffle eliminated DMA's net-profits interest, because only Black Duck was obligated to pay that interest—and Wright shut down Black Duck when he transferred the right-of-way to KrisJenn.

Wright should not be allowed to use KrisJenn as a puppet to cover for his attempts to breach the DMA Agreement and the February 4 Email Agreement. Since fact issues exist regarding whether Wright was justified in using KrisJenn to disregard DMA's net-profits interest, the Court should deny summary judgment on KrisJenn's affirmative defense of justification.

## CONCLUSION

For these reasons, DMA respectfully asks that the Court deny KrisJenn's motion for summary judgment in its entirety.

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2020, a true and correct copy of the above and foregoing instrument was served via the Court's electronic transmission facilities on those parties registered for such notice and served via first class mail, postage prepaid on the parties below.

| | |
|---|---|
| Charles John Muller, IV<br>Email: john@muller-smeberg.com<br>Muller Smeberg, PLLC<br>111 W. Sunset<br>San Antonio, TX 78209<br><br>Ronald J. Smeberg<br>Email: ron@smeberg.com<br>The Smeberg Law Firm, PLLC<br>2010 W Kings Hwy<br>San Antonio, TX 78201-4926<br><br>*Counsel to Plaintiffs Krisjenn Ranch, LLC and its Series* | Michael Black<br>Email: mblack@burnsandblack.com<br>Burns and Black PLLC<br>750 Rittiman Road<br>San Antonio, TX 78209<br><br>Jeffery Duke<br>Email: jduke@dbmmlaw.com<br>Duke Banister Miller & Miller<br>22310 Grand Corner Drive, Suite 110<br>Katy, TX 77494<br><br>*Counsel to Defendant Longbranch Energy, LP* |
| Ronald J. Smeberg<br>Email: ron@smeberg.com<br>The Smeberg Law Firm, PLLC<br>2010 W Kings Hwy<br>San Antonio, TX 78201-4926<br><br>*Counsel to Third-Party Defendant Black Duck Properties, LLC* | Shane P. Tobin<br>Email: shane.p.tobin@usdoj.gov<br>Office of the U.S. Trustee<br>903 San Jacinto Blvd, Room 230<br>Austin, Texas 78701<br><br>*United States Trustee* |
| William P. Germany<br>Email: wgermany@bsklaw.com<br>BAYNE, SNELL & KRAUSE<br>1250 N.E. Loop 410, Suite 725<br>San Antonio, Texas 78209<br><br>*Counsel to Third-Party Defendant Larry Wright* | John Terrill<br>12712 Arrowhead Lane<br>Oklahoma City, OK 73120<br><br>*Third Party Defendant, pro se* |

/s/ *Christopher Johns*
Christopher Johns