# Exhibit 1: Declaration of Frank Daniel Moore

CAUSE NO. 19-1489-CV-C

| | | |
|---|---|---|
| Larry M. Wright, Krisjenn Ranch, LLC, and Krisjenn Ranch, LLC-Series Uvalde Ranch, as successors to Black Duck Properties, LLC<br>*Plaintiffs*,<br><br>v.<br><br>Frank Daniel Moore, DMA Properties, Inc., Darin Borders, and Longbranch Energy, LP,<br>*Defendants*. | § § § § § § § § § § § § § § § | In the District Court<br><br><br><br><br><br>25th Judicial District<br><br><br><br><br><br><br><br>Guadalupe County, Texas |

**DECLARATION OF FRANK DANIEL MOORE**

1. My name is Frank Daniel Moore, and I go by my middle name, Daniel. I am over 18 years of age, am of sound mind, and am capable of making this declaration. The facts stated in this declaration are within my personal knowledge and are true and correct.

2. Attached to this declaration are true and accurate copies of the following documents which I discuss in this declaration:

> Exhibit 3:     December 2, 2015 Email Chain
>
> Exhibit 4:     February 19, 2016 Email Chain
>
> Exhibit 5:     March 10, 2016 Email Chain
>
> Exhibit 6:     Black Duck Company Agreement
>
> Exhibit 7:     Purchase Agreement
>
> Exhibit 8:     Longbranch Assignment
>
> Exhibit 9:     February 21, 2017 Email 1
>
> Exhibit 10:    February 21, 2017 Email 2

1

    Exhibit 11:    July 13, 2017 Email

    Exhibit 12:    Extension of Closing Date

    Exhibit 13:    July 17, 2017 Email Chain 1

    Exhibit 14:    July 17, 2017 Email Chain 2

    Exhibit 15:    Black Duck Deed

    Exhibit 16:    KrisJenn Ranch Deed of Trust

    Exhibit 17:    Loan Documents

    Exhibit 18:    February 4, 218 Email Chain

    Exhibit 19:    February 7, 2018 Email Chain

    Exhibit 20:    DMA Agreement

    Exhibit 21:    Letter of Intent

    Exhibit 23:    TCRG LLC Agreement

Exhibit 25: TCRG Deed

    Exhibit 26:    April 9, 2018 Email Chain 1

    Exhibit 27:    April 9, 2018 Email Chain 2

    Exhibit 28:    April 9, 2018 Email Chain 3

    Exhibit 30:    April 11, 2018 Email Chain

    Exhibit 31:    April 16, 2019 Email

3. I am the principal for both SCMED Oilfield Consulting, LLC and DMA Properties, Inc.

4. In 2015, my wife and I agreed to move from South Carolina to Texas because I was frequently flying to Texas to investigate and work on investment opportunities in the oil

2

and gas industry and my work trips caused me to miss time with my family. My wife and I decided that the move would be temporary, and we would return to the Carolinas in two years to be close to family. We also wanted our two girls to enroll in one school for their entire time in grade school.

5. Shortly after relocating to Texas, I reconnected with Larry Wright, who is a professional poker player. Wright and I had previously met during another deal where I helped another investor. Wright and I agreed to seek some investment opportunities together because Wright liked how I handled myself in the prior deal and he had funds available for investment. The general idea was that I would provide the "sweat equity" while Wright provided funds.

6. Following these conversations, Wright and I began looking for investment opportunities. From one of my contacts in the Texas oil and gas industry, Darin Borders, I learned that Nuverra Environmental Solutions was considering selling four saltwater disposal (SWD) wells. Borders asked me if he knew anyone who might be interested in collaborating on the purchase of the wells and expressed frustration at the owner's reluctance to sell the SWD wells. Thinking that the SWD wells might be a good opportunity to work on with Wright, I asked if I could try to obtain the wells and Borders said yes.

7. After performing due diligence on the SWD wells, reaching out to other contacts in the oil and gas industry, and negotiating with the owner, I was able to get Nuverra to commit to selling its four SWD wells at a lower price than advertised. I told Wright about the wells and suggested we purchase them. But because I learned about the wells from

3

Borders, I asked Wright if all three of us could work together on the wells. Wright agreed and then I reached out to Borders, who also agreed to collaborate on the purchase. Both Wright and Borders agreed to cooperate on the SWD well deal. Through his entity, Longbranch Energy, LP, Borders agreed to pay 1/3 of purchase prices. Wright agreed he would pay the remaining 2/3.

8. As the deals for the SWD wells came together, Wright suggested we form one limited liability company (LLC) to handle future deals. Wright indicated that one LLC would make it easier to complete multiple deals and would eliminate the need to create a separate agreement or LLC for each. I thought that sounded like a good idea, and Wright asked his son-in-law, Hagan Cohle, to help with our LLC.

9. To form the LLC, Wright, Cohle and I all shared how we wanted the LLC to be structured via email. One of those emails is attached to this declaration as Exhibit 3 (Dec. 2, 2015 Email Chain). Wright's entity, KrisJenn Ranch, LLC, would own 50% of the new entity while my entity, SCMED Oilfield Consulting, would own the other 50%. Cohle would act as a manager, chiefly functioning as our entity's treasurer. As the December 2, 2015 email shows, the stated purpose of the new entity would be "[t]o purchase property and options from [the owner of the SWD wells] as well as other properties in the state of Texas." KrisJenn Ranch, LLC would be responsible for "provid[ing] earnest money for transactions." SCMED Oilfield Consulting would "introduc[e] opportunities" and "bring buyers" if appropriate. But I made no commitments to finding opportunities or buyers. Wright confirmed that both SCMED and KrisJenn Ranch would seek buyers as "[i]t should take all our joint efforts."

4

10. I never intended, through personally or through my entity to contribute financial resources.

11. Wright asked Cohle to reach out to an attorney he knew, Michael Rodgers of Granstaff, Gaedke & Edgmon, P.C., to help form the LLC. Cohle did so, sharing how we had agreed to structure the new entity.

12. Rodgers completed the paperwork to form Black Duck Properties, LLC for us. I was not involved in the drafting of the company agreement and assumed that Rodgers would share all information regarding the formation of Black Duck with all three of us—Wright, Cohle, and myself at the same time. I believed that Rodgers was serving as the attorney for the Black Duck Properties and was unaware of any special relationship between Rodgers and Wright.

13. In forming Black Duck, Rodgers learned that SCMED Oilfield Consulting, LLC was no longer a legal entity. Attached as Exhibit 4 (Feb. 19, 2016 Email Chain) is my email exchange with Rodgers. Rodgers asked me if he had my permission to have SCMED Oilfield Consulting, LLC reinstated. I consented and passed along the appropriate information to Rodgers, but it appears Rodgers never reinstated SCMED Oilfield Consulting, LLC.

14. In February 2016, Wright, Cohle, and I met at a Mexican restaurant in Comal County. Wright informed me that the purpose of the meeting was to complete the paperwork necessary to form Black Duck. Wright asked me to sign several one-paged documents, which already had Wright and Cohle's signatures on them. One of these documents was a single page of Black Duck's company agreement—the endorsement

5

page. The rest of the company agreement was missing. When I asked where the rest of the document was, Wright said the attorney (Rodgers) was still finalizing the document but the company agreement merely included what we had already agreed to and contained protections if either any one of us died or got divorced. Based on Wright's representations and the fact that Cohle and Wright had already signed the document, I added my signature.

15. About a month later, I received copies of the documents pertaining to Black Duck's formation for the first time from Cohle via email. The email where I receiver the formation documents is attached as Exhibit 5 (March 10, 2016 Email Chain). One of those documents was the Black Duck Company Agreement which is attached as Exhibit 6 (Black Duck Company Agreement).

16. Working together, Borders and I were able to secure buyers for two SWD wells before closing. Neither Longbranch nor Black Duck had to pay any money to purchase these wells. Instead, both entities made a profit at closing, and Black Duck's profit was divided evenly between Wright's and my entities.

17. About the same time as we were working together on the SWD wells, Borders and I began investigating buying a pipeline right-of-way that is in east Texas. Borders told me about a right-of-way, and I went out to look at the right-of-way. Part of the right-of-way ran across Borders's family's property.

18. From Borders, I learned that the owner of the right-of way was Express Pipeline Connection, LLC. The president of Express, Rod Roberts, was willing to sell the right-of-way for $5 million but wanted $25,000 to secure the right to purchase the asset. Only after

receiving the $25,000 would he allow us to view the deeds and supporting documents of the right-of-way.

19. I thought the right-of-way could be a valuable asset and agreed to work on the project with Borders. I discussed with Borders several investors and developers that I though might be interested in the right-of-way and that I would be willing to contact.

20. Borders and I subsequently secured by contract the right to purchase the right-of-way for $5 million through Longbranch. In late 2015, Borders and I split collectively paid the $25,000 earnest money to Express. On February 19, 2016, Borders and Roberts executed a written agreement confirming the right to purchase the right-of-way. A copy of that agreement is attached as Exhibit 7 (the Purchase Agreement).

21. The Purchase Agreement defined the assets we sought to buy from Express. Based on my conversations with Roberts and Borders, I understood the term "P-21" to refer to the pipe in the right-of-way and the term "Express Pipeline" to the right-of-way.

22. Through the Purchase Agreement, we set a 60-day due diligence period and set closing for April 19, 2016. Through the Purchase Agreement, we also allowed several extensions of the closing date and due diligence period.

23. As an offhanded remark when Wright and I were meeting the same Mexican restaurant we had visited when signing the Black Duck formation documents, I mentioned that I was working with Borders on a pipeline right-of-way. When Wright learned about the right-of-way deal, he begged to be a part of it, claiming it was on his bucket list to do a pipeline. Wright immediately volunteered to supply all funds to purchase the right-of-

7

way, claiming that he had the cash on hand to fully fund the acquisition and maintenance of the right-of-way until a developer could be secured.

24. I told Borders that Wright had volunteered to be the funder for the right-of-way. We agreed that Wright could fund the right-of-way through Black Duck, of which I owned 50%. Wright reimbursed the full $25,000 that had already been paid to Express. Borders, on behalf of Longbranch, orally agreed to assign the Purchase Agreement to Black Duck. Wright and I, on behalf of Black Duck, orally agreed to give Longbranch a 20% net-profits share that would attach and run with the right-of-way.

25. All three of us—Wright, Borders, and myself—confirmed our understanding in writing. That writing is attached to this declaration as Exhibit 8 (Longbranch Assignment). Borders executed the agreement on behalf of Longbranch, and Wright, Cohle, and I executed the agreement on behalf of Black Duck.

26. All three of us—Wright, Borders, and myself—understood that Longbranch was giving up the right to purchase the right-of-way in exchange for a 20% net-profits share in the right-of-way that attached and ran with the land.

27. At no point did Longbranch indicate it was unable or unwilling to make the earnest money payments to Express to keep the Purchase Agreement alive.

28. The deeds and other supporting documents for the right-of-way were only available in paper. No electronic versions were available. Due diligence required consulting multiple boxes of paper records and took much longer than 60 days. Black Duck extended the closing date multiple times, paying earnest money for each extension.

8

29. While Black Duck—through the efforts of Borders and myself—was performing its due diligence, Borders, Cohle, I sought developers for the right-of-way. The three of us and Wright met and communicated with the leadership of several companies who expressed interest in developing or purchasing the asset. But interested investors repeatedly indicated that they were unwilling to commit to developing or purchasing the right-of-way before Black Duck closed on the asset. If Black Duck failed to close, these investors could always secure the right-of-way for themselves.

30. But Wright pushed to find a buyer before closing and as part of negotiations with investors made false representations that Black Duck had already closed on the right-of-way. When I learned that Wright was falsely representing that the right-of-way had closed, I became extremely uncomfortable. I confronted Wright via email and demanded that Wright to fully disclose the status of the right-of-way deal. A copy of that email is attached as Exhibit 9 (Feb. 21, 2017 Email 1). In response to my comments, Wright purported to clarify his representations but still mispresented key facts including the extent of Borders and my interest in the right-of-way. A copy of Wright's misrepresentations is attached as Exhibit 10 (Feb. 21, 2017 Email 2). For example, Wright claimed Borders "stayed on as a 15% partner" and that I only "own[ed] 35%" of Black Duck's "85% of Contact" to purchase the right-of-way. These statements were false.

31. Ultimately, Black Duck was unable to find a buyer for its interest in the right-of-way without first closing on it.

32. As the new closing date approached (July 14, 2017), Wright sought to obtain an additional extension. Because my family's two years in Texas had finished, I was in the

9

process of moving my family from Texas to North Carolina and had no Internet access. I never gave up on or abandoned the Purchase Agreement and never indicated I wanted to do so.

33. Longbranch, Black Duck, and Express agreed to extend the closing date once again to August 14, 2017. On July 13, 2017, Express's attorney, emailed Wright, Borders, Cohle, and myself a copy of the contract memorializing that extension agreement. The attorney's email is attached as Exhibit 11 (July 13, 2017 Email). The extension agreement is attached as Exhibit 12 (Extension of Closing Date). Express's attorney asked that a signed copy of the Extension of Closing Date Agreement be returned to him. Cohle and Wright returned a signed copy of the Extension of Closing Date Agreement on July 14, 2017.

34. But because I was traveling and had no Internet access, I sent two emails via my phone—one on Friday, July 14, 2017 and one on Monday, July 17, 2017—"grant[ing] Larry Wright and/or Hagan Cohle full authority to sign on my behalf any and all documents that may require my signature to extend or close the transaction between Black Duck Properties and Lancer Resources et al." One of these emails is attached as Exhibit 13 (July 17, 2017 Email Chain 1). However, I expressly directed Wright in writing that "I do not want any documents signed on my behalf (goes without saying) that we have not discussed and agreed prior to one of you signing for me." This email is attached as Exhibit 14 (July 17, 2017 Email Chain 2).

35. Over a year after Black Duck had assumed Longbranch's Purchase Agreement, on August 14, 2017, Black Duck finally closed on the right-of-way. The deed Black Duck received is attached as Exhibit 15 (Black Duck Deed). At all times before closing, Wright

10

represented to Borders and me that he was a wealthy man and could easily fund the purchase of the right-of-way using his own funds.

36.     I later learned that KrisJenn Ranch had recorded a deed of trust claiming that it had borrowed $4.1 from Asilo Investments, Ltd. on allegedly the same day that Black Duck closed on the right-of-way. Attached as Exhibit 16 (KrisJenn Ranch Deed of Trust) is a copy of the recorded deed of trust.

37.     Wright represented that his capital contribution was to be his consideration for his interest in the right-of-way. But I later discovered that Wright recorded documents claiming that KrisJenn Ranch lent Black Duck $4.1 million dollars. Those documents are attached as Exhibit 17 (Loan Documents).

38.     I did not know about any loan from KrisJenn Ranch to Black Duck and did not authorize any such loan, individually or through Black Duck.

39.     Throughout the fall of 2017, Black Duck sought a buyer for the right-of-way or an investor to finance the right-of-way's development. Wright repeatedly objected to potential investors and deal terms, preventing a deal from being reached.

40.     At the end of January 2018, Wright grew increasingly hostile toward me. Wright complained that I had failed to secure a buyer for the right-of-way even though I had no such obligation. Swearing at me, Wright repeatedly stated that I had screwed up and that the right-of-way deal had failed. Wright pressured me to give up my interest in Black Duck. After several hostile conversations, I decided to resign from Black Duck.

41.     On February 3, 2018, I drafted an email with the terms of my resignation that Wright and I had agreed on orally. A copy of that email is attached as Exhibit 18 (February

11

4, 2018 Email Chain). In exchange for relinquishing my 50% interest in Black Duck—which included 50% interest in all of Black Duck's assets—I requested, among other things, "[n]o less than 20% Carried Interest in the P-21 Express Pipeline . . . under the same terms and conditions as the [Longbranch Assignment]" through my entity DMA Properties, Inc. I requested the same terms and conditions as the Longbranch Assignment because I knew that document gave Borders a 20% net-profits share in the right-of-way, a right I wanted for giving up my ownership of Black Duck. On February 4, 2018, Wright agreed to my terms via email.

42. Wright directed me to call David Strolle at Grandstaff, Gaedke & Edgmon, P.C. to create the documents confirming my resignation term. Strolle drafted formal documents, dated February 7, 2018, memorializing the terms of my email resignation. One of those documents was the DMA Agreement, a copy of which is attached as Exhibit 20. The DMA Agreement used the same language as the Longbranch Assignment

43. The same date on the documents confirming my resignation terms—February 7, 2018—Wright and I discussed via email how those terms would play out if Black Duck received cash for the sale of the right-of-way. A copy of that full email chain is attached as Exhibit 19 (Feb. 7, 2018 Email Chain). We confirmed that Wright and Black Duck would owe Borders and I 20% of any net-profits from the cash payment. In that email, we did not discuss how Borders and my interests would affect a carried interest in the right-of-way or a buyer's rights.

44. Many months later, while I was investigating the alleged sale of right-of-way to TCRG, I received a copy of a letter dated February 19, 2018. A copy of that letter is attached as Exhibit 21 (Letter of Intent).

45. I also received a copy of TCRG's LLC agreement and the purchase agreement through which it appears Black Duck agreed to sell the right-of-way to TCRG. A copy of the LLC agreement is attached as Exhibit 23 (TCRG LLC Agreement) and a copy of the purchase agreement is attached as Exhibit 24 (TCRG Purchase Agreement).

46. I had first learned the right-of-way had likely been sold on April 4, 2018. Borders called me that afternoon and informed me about a meeting he had attended with Wright and a man named John Terrill. I learned that Terrill had apparently bought the right-of-way. Borders and I called Wright and joined him to the call to discuss the alleged sale.

47. When we joined Wright to the call, Wright became very angry and swore at both of us.

48. After Wright seemed to calm down and toward the end of the call, he promised to send Borders and I copies of the proposed deal and confirmed that the buyers knew all about our interests and even had copies. For the first time, Wright claimed the sale of the right-of-way had not yet closed. After the call, Wright never shared copies of the proposed deal with Borders and I or sent confirmation that Terrill knew about our interests.

49. Because I hadn't heard from Wright and I wanted to make sure that Terrill had the DMA Agreement, I emailed Terrill a copy of the DMA Agreement and copied Borders and Wright. A copy of that email is attached as Exhibit 26 (Apr. 9, 2018 Email Chain 1). Terrill responded to my email and asked me to call him. After the call, I typed

13

up the notes of my conversation with Terrill and emailed them to Borders and Wright. A copy of that email is attached as Exhibit 28 (Apr. 9, 2018 Email Chain 3). From Terrill, I learned:

- the right-of-way deal had 100% closed;
- Terrill claimed he had first learned of Borders my interests from Borders on April 4;
- Terrill and his group were not going to honor anything beyond what Wright represented; and
- Terrill had been working on this right-of-way deal for a long time.

50. On April 11, 2018, Strolle emailed me and told me to stop contacting any person concerning "the P-21 Express Gas Pipeline/ROW." A copy of that email is attached as Exhibit 30 (April 11, 2018 Email Chain). Strolle claimed that the right-of-way deal had not yet closed and that my actions were jeopardizing the closing.

51. I only learned that deal had closed months after the deed conveying to TCRG Black Duck's interest in the rights and properties "collectively referred to herein as the 'Express Pipeline'" was recorded on June 6, 2018. A copy of that deed is attached as Exhibit 25 (TCRG Deed). It took several months and review of countless emails to discover the extent of Wright's and Terrill's lies. After uncovering some of Wright's lies, I recorded my interest in the ROW in Angelina, Rusk, Shelby, and Nacogdoches Counties.

52. Until this lawsuit was filed, Borders and I continued investigating Black Duck's sale of the right-of-way and sought a peaceful solution with TCRG, Wright, and Wright's entities. In the spring of 2019, Wright emailed Borders and me that if I did not stop

14

conversations with TCRG, then Wright would "end the 20% and file [m]alicious charges against you and all your forfeited Companies in the State of Texas." A copy of that email is attached as Exhibit 31 (Apr. 16, 2019 Email). Likewise, Wright threatened "to kill the 20% each of you own."

53. If I had known or suspected that Wright, with the help of Strolle, Strolle's firm, and Terrill, had crafted a scheme to sell the right of way and claim I only had an interest in Black Duck's profits, I would not have agreed to resign from Black Duck. And If I thought I was only receiving a 20% interest in Black Duck's profits rather than a 20% net-profits share in the right-of-way that attached and ran with the land, I would not have given up my 50% ownership stake in Black Duck.

**THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK.**

My name is Frank Daniel Moore, my date of birth is April 12th, 1979, and my address is 88 Wild Swan Lane, Minnesott Beach, NC 28510.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Pamlico County, State of NC, on the 16th day of January 2020.

_____
Frank Daniel Moore