# Exhibit 6:
# Black Duck Company Agreement

**COMPANY AGREEMENT**

OF

# BLACK DUCK PROPERTIES, LLC

A Texas Limited Liability Company

Dated as of December 28, 2015

# COMPANY AGREEMENT

## OF

## *BLACK DUCK PROPERTIES, LLC*

A Texas Limited Liability Company

This **COMPANY AGREEMENT** of *BLACK DUCK PROPERTIES, LLC* (this "Agreement"), dated as of December 28, 2015, is (a) adopted by the Managers (as defined below); and (b) executed and agreed to, for good and valuable consideration, by the Members (as defined below).

## ARTICLE I
## DEFINITIONS

1.01    **Definitions.**  As used in this Agreement, the following terms have the following meanings:

1.01.01       "Act" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

1.01.02       "Bankrupt Member" means (except to the extent a Required Interest consents otherwise) any Member (a) that (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a proceeding of the type described in subclauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member's or of all or any substantial part of the Member's properties; or (b) against which a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and One Hundred and Twenty days (120) have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and Ninety (90) days have expired without the appointment's having been vacated or stayed, or Ninety (90) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

1.01.03       "Business Day" means any day other than a Saturday, a Sunday, or a holiday on which national banking associations in the State of Texas are closed.

1.01.04    "Capital Contribution" means any contribution by a Member to the capital of the Company.

1.01.05    "Certificate of Formation" has the meaning given that term in Section 2.01.

1.01.06    "Code" means the Internal Revenue Code of 1986 and any successor statute, as amended from time to time.

1.01.07    "Commitment" means, subject in each case to adjustments on account of Dispositions of Membership Interests permitted by this Agreement, (a) in the case of a Member executing this Agreement or a Person acquiring that Membership Interest, the amount specified for that Member as its Commitment on Exhibit A, and (b) in the case of a Membership Interest issued pursuant to Section 3.04, the Commitment established pursuant thereto.

1.01.08    "Company" means *BLACK DUCK PROPERTIES, LLC*, a Texas Limited Liability Company.

1.01.09    "Company Agreement" has the meaning given that term in the introductory paragraph.

1.01.10    "Default Interest Rate" means a rate per annum equal to the lesser of (a) three percent (3%) plus a varying rate per annum that is equal to the prime interest rate as defined and publicly quoted by the Wall Street Journal that is also the base rate on corporate loans at large United States money center commercial banks, from time to time as its prime commercial or similar reference interest rate, with adjustments in the varying rate to be made on the same date as any change in that rate, and (b) the maximum rate permitted by applicable law.

1.01.11    "Delinquent Member" has the meaning given that term in Section 4.03.01.

1.01.12    "Dispose," "Disposing," or "Disposition" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest, or other disposition or encumbrance (including without limitation, by operation of law), or the acts thereof.

1.01.13    "General Interest Rate" means a rate per annum equal to the lesser of (a) the varying rate per annum that is equal to the prime interest rate as defined and publicly quoted by the Wall Street Journal that is also the base rate on corporate loans at large United States money center commercial banks, from time to time as its prime commercial or similar

reference interest rate, with adjustments in that varying rate to be made on the same date as any change in that rate, and (b) the maximum rate permitted by applicable law.

1.01.14 "Lending Member" has the meaning given that term in Section 4.03.01.02.

1.01.15 "Manager" means any Person named in the Certificate of Formation as an initial Manager of the Company and any person hereafter elected as a Manager of the Company as provided in this Agreement, but does not include any Person who has ceased to be a Manager of the Company.

1.01.16 "Member" means any person executing this Agreement as of the date of this Agreement as a Member or hereafter admitted to the Company as a Member as provided in this Agreement, but does not include any Person who has ceased to be a Member of the Company.

1.01.17 "Membership Interest" means the interest of a Member in the Company, including, without limitation, rights to distributions (liquidating or otherwise), allocations, information, and to consent or approve.

1.01.18 "Permitted Transferee" has the meaning given that term in Section 3.03.02

1.01.19 "Person" includes an individual, corporation, business trust, estate, trust, custodian, trustee, executor, administrator, nominee, partnership, registered limited liability partnership, limited partnership, association, limited liability company, government, governmental subdivision, governmental agency, governmental instrumentality, and any other legal or commercial entity, in it own or representative capacity. Any of the foregoing entities may be formed under the laws of this state or any other jurisdiction..

1.01.20 "Proceeding" has the meaning given that term in Section 8.01.

1.01.21 "Required Interest" means one or more Members having among them more than Fifty-One percent (51%) of the Sharing Ratios of all Members.

1.01.22 "Sharing Ratio" with respect to any Member means a fraction (expressed as a percentage), the numerator of which is that Member's Commitment and the denominator of which is the sum of the Commitments of all Members.

1.01.23 "Super Majority" means those Members who hold Membership Units that exceed Eighty Percent (80%) of the Company's total Membership Units.

*BLACK DUCK  PROPERTIES, LLC*
**Company Agreement**
3

1.01.24    "TBOC" means the Texas Business Organizations Code and any successor statute, as amended from time to time.

1.01.25    Other terms defined herein have the meaning so given them.

1.02    **Construction.** Whenever the context requires, the gender of all words used in this Agreement includes the masculine, feminine, and neuter. All references to Articles and Sections refer to articles and sections of this Agreement, and all references to Exhibits are to Exhibits attached hereto, each of which is made a part hereof for all purposes.

## ARTICLE II
## ORGANIZATION

2.01    **Formation.** The Company has been formed as a Texas Limited Liability Company by the filing of a Certificate of Formation (the "Certificate") under and pursuant to the Act and issuance of a Certificate of Formation for the Company by the Secretary of State of Texas.

2.02    **Name.** The name of the Company is *"BLACK DUCK PROPERTIES, LLC"* and all Company business must be conducted in that name or such other names that comply with applicable law as the Members may select from time to time.

2.03    **Registered Office, Registered Agent, Principal Office in the United States; Other Offices.** The registered office of the Company required by the Act to be maintained in the State of Texas shall be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Management may designate from time to time in the manner provided by law. The registered agent of the Company in the State of Texas shall be the initial registered agent named in the Articles or such other Person or Persons as the Management may designate from time to time in the manner provided by law. The principal office of the Company in the United States shall be at such place as the Management may designate from time to time, which need not be in the State of Texas, and the Company shall maintain records there as required by Sections 3.151 and 101.501 of the Act and shall keep the street address of such principal office at the registered office of the Company in the State of Texas. The Company may have such other offices as the Management may designate from time to time.

2.04    **Purposes.** The purposes of the Company are those set forth in the Certificate.

2.05    **Foreign Qualification.** Prior to the Company's conducting business in any jurisdiction other than Texas, the Company must comply, to the extent procedures are available and those matters are reasonably within the control of the Management, with all requirements necessary to qualify the Company as a foreign Limited Liability Company in that jurisdiction. When necessary, each Member shall execute, acknowledge, swear to, and deliver all certificates and other

instruments conforming with this Agreement that are necessary or appropriate to qualify, continue, and terminate the Company as a foreign Limited Liability Company in all such jurisdictions in which the Company may conduct business.

2.06    **Term.**  The Company commenced on the date the Secretary of State of Texas issued a Certificate of Formation for the Company and shall continue in existence for the period fixed in the Certificate for the duration of the Company, or such earlier time as this Agreement may specify.

2.07    **Mergers and Exchanges.**  The Company may be a party to (a) a merger, or (b) an exchange or acquisition of the type described in Chapter 10 of Title 1 of the Act, subject to the requirements of Section 6.02.01.

2.08    **No State-Law Partnership.**  The Members intend that the Company not be a partnership (including, without limitation, a limited partnership) or joint venture. Additionally, no Member or Manager will be considered a state-law partner or joint venturer of any other Member or Manager.  It is intended that the Company, while it qualifies under the provisions of IRS Rev.Proc. 2002-69, will be considered a domestic eligible entity with a single owner electing to be disregarded as a separate entity for federal income tax purposes pursuant to Federal Treasury Regulation 301.7701-3; if other Members are added, the Company will be considered a partnership for federal income-tax purposes and the Members and Managers will be considered partners for federal income-tax purposes only. This Agreement may not be construed to suggest otherwise.

### ARTICLE III
### MEMBERSHIP; DISPOSITIONS OF INTERESTS

3.01    **Initial Members.**  The initial Members of the Company are the Persons executing this Agreement as of the date of this Agreement as Members, each of which is admitted to the Company as a Member effective contemporaneously with the execution by such Person of this Agreement.

3.02    **Representations and Warranties.**  Each Member hereby represents and warrants to the Company and each other Member that (a) if that Member is a Corporation, it is duly organized, validly existing, and in good standing under the law of the state of its incorporation and is duly qualified and in good standing as a foreign corporation in the jurisdiction of its principal place of business (if not incorporated therein); (b) if that Member is a Limited Liability Company, it is duly organized, validly existing, and (if applicable) in good standing under the law of the state of its organization and is duly qualified and (if applicable) in good standing as a foreign Limited Liability Company in the jurisdiction of its principal place of business (if not organized therein); (c) if that Member is a partnership, trust, or other entity, it is duly formed, validly existing, and (if applicable) in good standing under the law of the state of its formation, and if required by law is duly qualified to do business and (if applicable) in good standing in the jurisdiction of its principal place of

*BLACK DUCK  PROPERTIES, LLC*
**Company Agreement**
5

business (if not formed therein) and the representations and warranties in clause (a), (b) or (c), as applicable, are true and correct with respect to each partner (other than limited partners), trustee, or other member thereof; (d) that Member has full Corporate, Limited Liability Company, partnership, trust, or other applicable power and authority to execute and agree to this Agreement and to perform its obligations hereunder and all necessary actions by the Board of Directors, Shareholders, Managers, Members, Partners, Trustees, Beneficiaries, or other Persons necessary for the due authorization, execution, delivery, and performance of this Agreement by that Member have been duly taken; (e) that Member has duly executed and delivered this Agreement; and (f) that Member's authorization, execution, delivery, and performance of this Agreement do not conflict with any other agreement or arrangement to which that Member is a party of by which it is bound.

### 3.03    Restrictions on the Disposition of an Interest.

3.03.01        Except as specifically provided in this Section 3.03, a disposition of an interest in the Company may not be effected without the consent of (a) a majority of the Managers who are Members (excluding the Manager who is making such Disposition); or (b) if there are no Managers of the type described in clause (a), a Required Interest. Any attempted Disposition by a person of an interest or right, or any part thereof, in or in respect of the Company other than in accordance with this Section 3.03 shall be, and is hereby declared, null and void *ab initio*.

3.03.02        The following provisions of this Section 3.03.02 shall control, notwithstanding the general restriction of Section 3.03.01 above:

3.03.02.01        Divorce. In the event the marriage of a Member and his or her spouse shall be dissolved by reason of divorce and in conjunction therewith the spouse of such Member shall be or become entitled to receive or is awarded under and by virtue of the decree and judgment of the court granting such divorce (or under and by virtue of a property settlement agreement entered into between such Member and his spouse, whether or not same is incorporated in the decree of divorce) any Membership Interest owned and held by the Member at or prior to the time of such divorce, the spouse of such Member shall be deemed to have offered to sell such Membership Interest (the "Offered Interests") to the persons described in this Section 3.03.02.01 for the Agreement Price and under the Agreement Terms defined below. For purposes of this Section 3.03.02.01, the date that the divorce is final shall be the Deemed Offer Date.

A.        The divorcing Member shall have sixty (60) days from the Deemed Offer Date to elect to purchase the Offered Interests awarded to his or her spouse.

**BLACK DUCK  PROPERTIES, LLC**
**Company Agreement**
6

B.     If the divorcing Member shall not elect or shall in writing waive such right to buy all of the Offered Interests within sixty (60) days of the Deemed Offer Date, the descendants of the Divorcing Member shall have ninety (90) days from the Deemed Offer Date in which to elect to buy any part or all of the Offered Interests that such divorcing Member did not elect to buy. Said descendants shall elect to buy such Offered Interests in such proportion as they shall agree upon.

C.     If the descendants of the divorcing Member shall not elect or shall in writing waive such right to buy all of the Offered Interests within ninety (90) days from the Deemed Offer Date, the other Members shall have one hundred twenty (120) days from the Deemed Offer Date in which to elect to buy all, but not less than all, of the Offered Interests that such descendants did not elect to buy. The other Members may elect to buy such Offered Interests in proportion to their respective Membership Interests (excluding the Offered Interests) or in such other proportion as they shall agree upon.

D.     If the divorcing Member, descendants and non-divorcing Members do not, in the aggregate, agree to buy all of the Offered Interests within one hundred twenty (120) days of the Deemed Offer Date, the Company may, within one hundred fifty (150) days of the Deemed Offer Date, buy all, and not less than all, of the Offered Interests that the descendants and non-divorcing Members did not elect to buy.

E.     If the Company does not agree to buy all of the Offered Interests as provided above, the Offered Interests that have not been sold may be held by the spouse of the divorcing Member, in part or in whole, and/or may be offered for sale to a party not mentioned above.

3.03.02.02     Death of a Member. On the death of any Member, his or her executor, trustee or administrator (as the case may be) shall immediately be deemed to have offered to sell all of the deceased Member's Membership Interest (the "Offered Interests") to the persons described in this Section 3.03.02.02 at the Agreement Price and on the Agreement Terms. For purposes of this Section 3.03.02.02, the date of death of the Member shall be the Deemed Offer Date.

A.     The Surviving Members shall have one hundred twenty (120) days from the Deemed Offer Date in which to elect to buy any part or all of the Offered Interests. The surviving Members may elect to buy such Offered Interests in proportion to their respective Membership Interests (excluding the Offered Interests) or in such other proportion as they shall agree upon.

B.      If the surviving Members do not, in the aggregate, agree to buy all of the Offered Interests within one hundred twenty (120) days of the Deemed Offer Date, the Company may, within one hundred fifty (150) days from the Deemed Offer Date, buy all, and not less than all, of the Offered Interests that the descendants and surviving Members did not elect to buy.

C.      If the Company does not agree to buy all of the Offered Interests within one hundred fifty (150) days of the Deemed Offer Date, the Offered Interests that have not been sold may be held, in part or in whole, by the heirs of the deceased Member and/or may be offered for sale to a party not mentioned above.

D.      For purposes of this Section 3.03.02.02, the term "death" includes the death of all of the natural beneficiaries of a trust and, for a non-natural person, dissolution, liquidation, merger, termination or the like.

3.03.02.03      Incapacity of a Member.  If a Member is determined to be an Incapacitated Member as defined below, he or she shall immediately be deemed (for purposes of this Section 3.03.02.03, the "Deemed Offer Date") to have offered to sell to the other Members all of the Incapacitated Member's Membership Interest (the "Offered Interests") at the Agreement Price and on the Agreement Terms.

A.      The other Members shall have sixty (60) days from the Deemed Offer Date in which to elect to buy all or any part of the Offered Interests of the Incapacitated Member. The other Members may elect to buy such offered Membership Interests in proportion to their respective Membership Interests (excluding the Offered Interests) or in such other proportion as they shall agree upon.

B.      If the Members do not, in the aggregate, agree to buy all of the Offered Interests within the option period provided above, the Company may, within ninety (90) days Deemed Option Date, buy all, and not less than all, of the Offered Interests that the other Members did not elect to buy.

C.      If the Company does not agree to buy all of the Offered Interests within ninety (90) days of the Deemed Offer Date, the Offered Interests that have not been sold may be held, in whole or in part, by the estate of the Incapacitated Person and/or may be offered for sale to a party not mentioned above.

D.     A Member is an "Incapacitated Member" if the Member is: (i) is under a legal decree of incompetency (the date of such decree being deemed to be the date on which such incapacity occurred); or (ii) is subject to a medical determination that the Member, because of a medically determinable disease, injury, or other mental or physical disability, is mentally unable to manager his own legal or financial affairs, and that such disability is determined or reasonably expected to last at least twelve (12) months, based on then-available medical information.   A medical determination of disability will exist upon the receipt by the Company of the written opinion of a physician who has examined the Member whose disability is in question. If the Company disagrees with the opinion of such physician (the "First Physician"), it may engage at its own expense another physician (the "Second Physician") to examine the Member whose disability is in question. The Second Physician shall confer with the First Physician and, if they together agree in writing that the Member is or is not disabled, their written opinion shall be conclusive as to such disability. If the First and Second Physicians do not agree, they shall choose a third consulting physician (the expense of which shall be borne by the Company), and the written opinion of a majority of these three (3) physicians shall be conclusive as to such disability. The date of any written opinion that is conclusive as to such disability is the date on which such disability, if that is the conclusion, will be deemed to have occurred.  Each Member hereby consents to such examination, to furnish any medical information requested by any examining physician, and to waive any applicable physician-patient privilege that may arise because of such examination. All physicians except the First Physician selected hereunder must be board-certified in the specialty most closely related to the nature of the disability alleged to exist.

3.03.02.04     Agreement Price.  The "Agreement Price" shall be the fair market value as agreed upon by the transferring Member and the purchaser.  If the fair market value cannot be agreed upon, then the Member and the purchaser shall engage a business valuation specialist as appointed by the Company's CPA to determine the fair market value which determination shall be binding.

3.03.02.05     Agreement Terms.  The buyer(s) shall pay the Agreement Price for any Offered Interests hereunder in cash, wire transfer, or other immediately available funds.  The purchase of the Offered Interests pursuant to this Agreement shall take place at a closing, held at 1:00 P.M. on the thirtieth (30th) day after the date on which the last option to buy has expired or been executed, or on which the last buyer becomes obligated to buy the Offered Interest, at the Company's primary place of business, or at any other place to which the parties agree.

**BLACK DUCK  PROPERTIES, LLC**
**Company Agreement**
9

3.03.02.06.    Special Irrevocable Offer.  Any Member ("Offering Member") may at any time send to all or any of the other Members ("Offeree Member") a Special Irrevocable Offer.  The Special Irrevocable Offer is an irrevocable written offer to purchase all of the Offeree Member's Membership Interests for a stated price ("Stated Price") and on stated terms ("Stated Terms") that shall include full payment at closing by good check or other immediately available funds.  A Special Irrevocable Offer is valid only if accompanied by the Offering Member's deposit with an Escrow Agent of an assignment form (approved by the Company) assigning the Offering Member's Membership Interest to the Offeree Member and the Offering Member's good check for the entire Stated Price.  The Offeree Member shall have thirty (30) days from the Special Irrevocable Offer to send a Special Written Notice to the Offering Member to either accept the offer or reject the offer by agreeing to purchase the Offering Member's Membership Interest for the Stated Price and on the Stated Terms.  The Special Written Notice shall only be valid if the Offeree Member deposits with the Escrow Agent a copy of the Special Written Notice and deposits with the Escrow Agent either (i) an assignment form assigning the Offeree Member's Membership Interest tot the Offering Member if the Offeree Member accepted the offer or (ii) a good check in the amount of the Stated Price if the Offeree Member rejected the offer.  Failure to respond to the Special Irrevocable Offer within the thirty (30) day period shall constitute the Offeree Member's acceptance of the Offering Member's offer.  All fees charged by the Escrow Agent shall be paid by the Company.

3.03.03        Subject to the provisions of Section 3.03.02, 3.3.03.04, 3.03.05, and 3.03.06, (a) a Person to whom an interest in the Company is transferred has the right to be admitted to the Company as a Member with the Sharing Ratio and the Commitment so transferred to such Person, if (i) the Member making such transfer grants the transferee the right to be so admitted, and (ii) such transfer is consented to in accordance with Section 3.03.01; (b) a Permitted Transferee under the circumstances described in Section 3.03.02 has the right to be admitted to the Company as a Member with the Sharing Ratio and the Commitment so transferred to the Permitted Transferee; and (c) the Company or (with the permission of the Company, which may be withheld in its sole discretion) a Lending Member may grant the purchaser of a Delinquent Member's interest in the Company at a foreclosure of the security interest therein granted pursuant to Section 4.03.02 the right to be admitted to the Company as a Member with such Sharing Ratio and such Commitment (no greater than the Sharing Ratio and the Commitment of the Member effecting such Disposition prior thereto) as they may agree.

3.03.04      The Company may not recognize for any purpose any purported Disposition of all or part of a Membership Interest unless and until the other applicable provisions of this Section 3.03 have been satisfied and the Managers have received, on behalf of the Company, a document (a) executed by both the Member effecting the Disposition (or if the transfer is on account of the death, incapacity, or liquidation of the transferor, its representative) and the Person to which the Membership interest or part thereof is Disposed; (b) including the notice address of any person to be admitted to the Company as a Member and its agreement to be bound by this Agreement in respect of the Membership Interest or part thereof being obtained; (c) setting forth the Sharing Ratios and the Commitments after the Disposition of the Member effecting the Disposition and the Person to which the Membership Interest or part thereof is Disposed (which together must total the Sharing Ratio and the Commitment of the Member effecting the Disposition before the Disposition); and, (d) containing a representation and warranty that the Disposition was made in accordance with all applicable laws and regulations (including securities laws) and, if the Person to which the Membership Interest or part thereof is Disposed is to be admitted to the Company, its representation and warranty that the representations and warranties in Section 3.02 are true and correct with respect to that Person. Each Disposition and, if applicable, admission complying with the provisions of this Section 3.03.04 is effective as of the first day of the calendar month immediately succeeding the month in which the Managers receive the notification of Disposition and the other requirements of this Section 3.03 have been met.

3.03.05      For the right of a Member to Dispose of a Membership Interest or any part thereof or of any person to be admitted to the Company in connection therewith to exist or be exercised, (a) either (i) the Membership Interest or part thereof subject to the Disposition or admission must be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (ii) the Company must receive a favorable opinion of the Company's legal counsel or of other legal counsel acceptable to the Managers to the effect that the Disposition or admission is exempt from registration under those laws; and, (b) the Company must receive a favorable opinion of the Company's legal counsel or of other legal counsel acceptable to the Managers to the effect that the Disposition or admission, when added to the total of all other sales, assignments, or other Dispositions within the preceding twelve (12) months, would not result in the Company's being considered to have terminated within the meaning of the Code. The Managers, however, may waive the requirements of this Section 3.03.05.

3.03.06      The Member effecting a Disposition and any Person admitted to the Company in connection therewith shall pay, or reimburse the Company for, all costs incurred by the company in connection with the Disposition or admission [including, without limitation, the legal fees incurred in connection with the legal opinions referred to in section 3.03.05] on or before the tenth (10th) day after the receipt by that Person of the Company's invoice for the amount due. If payment is not made by the date due, the Person owing the

*BLACK DUCK  PROPERTIES, LLC*
**Company Agreement**
**11**

amount shall pay interest on the unpaid amount from the date due until paid at a rate per annum equal to the Default Interest Rate.

3.03.07    It is these Regulations' intent that while this Company qualifies under the provisions of IRS Rev. Proc. 2002-69 as having one owner, this Company's tax status shall be that of a domestic eligible entity with a single owner electing to be disregarded as a separate entity pursuant to Federal Treasury Regulation 301.7701-3.  However, if the company has more than one owner, it's tax status shall be that of a partnership. Except as allowed by the Code and any corresponding rules and regulations, it is intended that this Company will not allow free transferability of interest.  To the extent possible, this Agreement will be read and interpreted to prohibit the free transferability of interest of any Member.  Any attempted Disposition by a Person of any interest or right in the Company other than in accordance with this section 3.03 will be null and void *ab initio*.

3.04    **Additional Members.**  Additional Persons may be admitted to the Company as Members and Membership Interests may be created and issued to those Persons and to existing Members at the direction of (a) a majority of the Managers who are Members, or (b) if there are no Managers who are Members, a Required Interest, on such terms and conditions as the Managers may determine at the time of admission.  The terms of admission or issuance must specify the Sharing Ratios and the Commitments applicable thereto and may provide for the creation of different classes or groups of Members and having different rights, powers, and duties. The Managers shall reflect the creation of any new class or group in an amendment to this Agreement indicating the different rights, powers, and duties, and such amendment need be executed only by the Managers. Any such admission must comply with the provisions of Section 3.03.05(a) and (b) and is effective only after the new Member has executed and delivered to the Managers a document including the new Member's notice address, its agreement to be bound by this Agreement, and its representation and warranty that the representation and warranties in Section 3.02 are true and correct with respect to the new Member. The provisions of this section 3.04 shall not apply to dispositions of Membership Interests.

3.05    **Interest in a Member.**  A Member that is not a natural person may not cause or permit an interest, direct or indirect, in itself to be disposed of such that, after the Disposition, (a) the Company would be considered to have terminated within the meaning of section 708 of the Code, or (b) without the consent of the Managers and a Required Interest, that Member shall cease to be controlled by substantially the same persons who control it as of the date of its admission to the Company. On any breach of the provisions of clause (b) of the immediately preceding sentence, the Company shall have the option to buy, and on exercise of that option the breaching Member must sell, the breaching Member's Membership Interest, all in accordance with Article XI as if the breaching Member were a Bankrupt Member.

3.06    **Information.**

3.06.01        In addition to the other rights specifically set forth in this Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to Sections 3.153 and 101.502 of the Act under the circumstances and subject to the conditions therein stated. The Members agree, however, that the Managers from time to time may determine, due to contractual obligations, business concerns, or other considerations, that certain information regarding the business, affairs, properties, and financial condition of the Company should be kept confidential and not provided to some or all other Members, and that it is not just or reasonable for those Members or assignees or representatives thereof to examine or copy that information.

3.06.02        The Members acknowledge that, from time to time, they may receive information from or regarding the Company in the nature of trade secrets or that otherwise is confidential, the release of which may be damaging to the Company or Persons with which it does business. Each Member shall hold in strict confidence any information it receives regarding the company that is identified as being confidential (and if that information is provided in writing, that is so marked) and may not disclose it to any Person other than another Member or a Manager, except for disclosures (a) compelled by law (but the Member must notify the Managers promptly of any request for that information, before disclosing it if practicable), (b) to advisers or representatives of the Member or Persons to which that Member's Membership Interest may be Disposed as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this Section 3.06.02, or (c) of information that Member also has received from a source independent of the Company that the Member reasonably believes obtained that information without breach of any obligation of confidentiality. The Members acknowledge that breach of the provisions of this Section 3.06.02 may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Section 3.06.02 may be enforced by specific performance.

3.07    **Liability to Third Parties.** No Member or Manager shall be liable for the debts, obligations or liabilities of the Company, including under a judgment decree or order of a court.

3.08    **Withdrawal.** A Member does not have the right or power to withdraw from the Company as a Member.

3.09    **Lack of Authority.** No Member (other than a Manager or an officer) has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company. Except as otherwise specifically provided in this Agreement to the contrary, no Member will have the right to (a) participate in the control of the Company's business affairs; (b) transact any business of or in the

name of the Company; (c) have any power or authority to bind or obligate the Company; or (d) require partition of the Company's property or to compel any sale or appraisal of the Company's assets.

# ARTICLE IV
## CAPITAL CONTRIBUTIONS

4.01    **Initial Contributions.**  Contemporaneously with the execution by such Member of this Agreement, each Member shall make the Capital Contributions described for that Member in Exhibit A. In exchange for each contribution, the contributing Member will receive a Membership Unit for each dollar value and a fraction of a Membership Unit for each fraction of a dollar value contributed by that Member.

4.02    **Subsequent Contributions.**  Without creating any rights in favor of any third party, each Member shall contribute to the Company, in cash, on or before the date specified as hereinafter described, that Member's Sharing Ratio of all monies that in the judgment of the Managers are necessary to enable the Company to cause the assets of the Company to be properly operated and maintained and to discharge its costs, expenses, obligations, and liabilities; provided, however, that a Member is not obligated to contribute a total amount that, when added to all Capital Contributions that Member previously has made pursuant to Section 4.01 or this Section 4.02, exceeds that Member's Commitment.    The Managers shall notify each Member of the need for Capital Contributions pursuant to this Section 4.02 when appropriate, which notice must include a statement in reasonable detail of the proposed uses of the Capital Contributions and a date (which date may be no earlier that the fifth business day following each Member's receipt of its notice) before the Capital Contributions must be made.    Notices for Capital Contributions must be made to all Members in accordance with their Sharing Ratios. No member will be required to make any Capital Contributions to the Company beyond those described in this Agreement, otherwise agreed to in writing by the Members from whom such additional Capital Contribution is sought, or as may be required by a non-waivable provision of the TBOC.

4.03    **Failure to Contribute.**

4.03.01        If a Member does not contribute by the time required all or any portion of a Capital Contribution that Member is required to make as provided in this Agreement, the Company may exercise, on notice to that Member (the "Delinquent Member"), one or more of the following remedies:

4.03.01.01      taking such action (including, without limitation, court proceedings) as the Managers may deem appropriate to obtain payment by the Delinquent Member of the portion of the Delinquent Member's Capital Contribution that is in default, together with interest thereon at the Default Interest Rate from the

*BLACK DUCK   PROPERTIES, LLC*
**Company Agreement**
14

date that the Capital Contribution was due until the date that it is made, all at the cost and expense of the Delinquent Member;

4.03.01.02    permitting the other Members in proportion to their Sharing Ratios or in such other percentages as they may agree (the "Lending Member," whether one or more), to advance the portion of the Delinquent Member's Capital Contribution that is in default, with the following results:

4.03.01.02.01  the sum advanced constitutes a loan from the Lending Member to the Delinquent Member and a Capital Contribution of that sum to the Company by the Delinquent Member pursuant to the applicable provisions of this Agreement,

4.03.01.02.02  the principal balance of the loan and all accrued unpaid interest thereon is due and payable in whole on the tenth (10th) day after written demand therefor by the Lending Member to the Delinquent Member,

4.03.01.02.03  the amount lent bears interest at the Default Interest Rate from the day that the advance is deemed made until the date that the loan, together with all interest accrued on it, is repaid to the Lending Member,

4.03.01.02.04  all distributions from the Company that otherwise would be made to the Delinquent Member (whether before of after dissolution of the Company) instead shall be paid to the Lending Member until the loan and all interest accrued on it have been paid in full to the Lending Member (with payments being applied first to accrued and unpaid interest and then to principal),

4.03.01.02.05  the payment of the loan and interest accrued on it is secured by a security interest in the Delinquent Member's Membership Interest, as more fully set in Section 4.03.02, and

4.03.01.02.06  the Lending Member has the right, in addition to the other rights and remedies granted to it pursuant to this Agreement or available to it at law or in equity, to take any action (including, without limitation, court proceedings) that the Lending Member may deem appropriate to obtain payment by the Delinquent Member of the loan and all accrued and unpaid interest on it, at the cost and expense of the Delinquent Member;

*BLACK DUCK  PROPERTIES, LLC*
**Company Agreement**
**15**

4.03.01.03    exercising the rights of a secured party under the Uniform Commercial Code of the State of Texas, as more fully set forth in Section 4.03(b); or

4.03.01.04    exercising any other rights and remedies available at law or in equity.

4.03.02    Each Member grants to the Company, and to each Lending Member with respect to any loans made by the Lending Member to that Member as a Delinquent Member pursuant to Section 4.03.01.02, as security, equally and ratably, for the payment of all Capital Contributions that Member has agreed to make and the payment of all loans and interest accrued on them made by Lending Members to that Member as a Delinquent Member pursuant to Section 4.03.01.02, a security interest in and a general lien on its Membership Interest and the proceeds thereof, all under the Uniform Commercial Code of the State of Texas. On any default in the payment of a Capital Contribution or in the payment of such a loan or interest accrued on it, the Company or the Lending Member, as applicable, is entitled to all the rights and remedies of a secured party under the Uniform Commercial Code of the State of Texas with respect to the security interest granted in this Section 4.03.02. Each Member shall execute and deliver to the Company and the other Members all financing statements and other instruments that the Managers or the Lending Member, as applicable, may request to effectuate and carry out the preceding provisions of this Section 4.03.02. At the option of the Managers or a Lending Member, this Agreement or a carbon, photographic, or other copy hereof may serve as a financing statement.

4.04    **Return of Contributions.**  A Member is not entitled to the return of any part of its Capital Contributions or to be paid interest in respect of either its capital account or its Capital Contributions. An unrepaid Capital Contribution is not a liability of the Company or of any Member. A Member is not required to contribute or to lend any cash or property to the Company to enable the Company to return any Member's Capital Contributions.

4.05    **Advances by Members.**  If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the Managers' consent may advance all or part of the needed funds to or on behalf of the Company. An advance described in this Section 4.05 constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

4.06    **Capital Accounts.** If and when the company has more than a single Member and the Company elects to taxed as a partnership for Federal income-tax purposes, a capital account shall be established and maintained for each Member as provided below; otherwise, the Company shall be a domestic eligible entity with a single owner electing to be disregarded as a separate entity for income federal income tax purposes pursuant to Federal Treasury Regulation 301.7701-3 and this Section 4.06 shall not apply.

4.06.01    Each Member's capital account shall be increased by (a) the amount of money contributed by that Member to the Company, (b) the fair market value of property contributed by that Member to the Company (net of liabilities secured by the contributed property that the Company is considered to assume or take subject to under section 752 of the Code), and (c) allocations to that Member of Company income and gain (or items thereof), including income and gain exempt from tax and income and gain described in Treas. Reg. § 1.704-1(b)(2)(iv)(g), but excluding income and gain described in Treas. Reg. § 1.704-1(b)(4)(i).

4.06.02    Each Member's capital account shall be decreased by (a) the amount of money distributed to that Member by the Company, (b) the fair market value of property distributed to that Member by the Company (net of liabilities secured by the distributed property that the Member is considered to assume or take subject to under section 752 of the Code), (c) allocations to that Member of expenditures of the Company described in section 705(a)(2)(B) of the Code, and (d) allocations of Company loss and deduction (or items thereof), including loss and deduction described in Treas. Reg. § 1.704-1(b)(2)(iv)(g), but excluding items described in clause 4.06.02(c) above and loss or deduction described in Treas. Reg. § 1.704-1(b)(4)(i) or § 1.704-1(b)(4)(iii). The Members capital accounts also shall be maintained and adjusted as permitted by the provisions of Treas. Reg. § 1.704-1(b)(2)(iv)(f) and as required by the other provisions of Treas Reg. §§ 1.704-1(b)(2)(iv) and 1.704-1(b)(4), including adjustments to reflect the allocations to the Members of depreciation, depletion, amortization, and gain or loss as computed for tax purposes, as required by Treas. Reg. §1.704-1(b)(2)(iv)(g). A Member that has more than one Membership Interest shall have a single capital account which reflects all of its Membership Interests, regardless of the class of Membership Interests owned by that Member and regardless of the time or manner in which those Membership Interests were acquired. On the transfer of all or part of a Membership Interest, the capital account of the transferor that is attributable to the transferred Membership Interest or part thereof shall carry over to the transferee Member in accordance with the provisions of Treas. Reg. § 1.704-1(b)(2)(iv)(l).

# ARTICLE V
## ALLOCATIONS AND DISTRIBUTIONS

If and when the company has more than a single Member, all items of income, gain, loss, deduction and credit shall be allocated, and distributions shall be made, with respect to each Member as provided below.  If there is but a single member pursuant to the provisions of IRS Rev. Proc. 2002-69, (i) the Company shall be a domestic eligible entity with a single owner electing to be disregarded as a separate entity pursuant to Federal Treasury Regulation 301.7701-3, (ii) these Sections 5.01 and 5.02 shall not apply, (iii)  all items of income, gain, loss, deduction and credit of the Company shall be allocated 100% to such single member, and (iv) distributions may be made to such Member in any manner not prohibited by the Act.

5.01    **Allocations.**

5.01.01        Except as may be required by section 704(c) of the Code and Treas. Reg. § 1.704-1(b)(2)(iv)(f)(4), all items of income, gain, loss, deduction and credit of the Company shall be allocated among the Members in accordance with their Sharing Ratios.

5.01.02        All items of income, gain, loss, deduction, and credit allocable to any Membership Interest that may have been transferred shall be allocated between the transferor and the transferee based on the portion of the calendar year during which each was recognized as owning that Membership Interest, without regard to the results of Company operations during any particular portion of that calendar year and without regard to whether cash distributions were made to the transferor or the transferee during that calendar year; provided, however, that this allocation must be made in accordance with a method permissible under section 706 of the Code and the regulations thereunder.

5.02    **Distributions.**

5.02.01        From time to time (but at least once each calendar year) the Managers shall determine in their reasonable judgment to what extent (if any) the Company's cash on hand exceeds its current and anticipated needs, including, without limitation, for operating expenses, debt service, acquisitions, and a reasonable contingency reserve.  If such an excess exists, the Managers shall cause the Company to distribute to the Members, in accordance with their Sharing Ratios, an amount in cash equal to that excess.

5.02.02        From time to time the Managers also may cause property of the Company other than cash to be distributed to the Members, which distribution must be made in accordance with their Sharing Ratios and may be made subject to existing liabilities and obligations.  Immediately prior to such a distribution, the capital accounts of the Members shall be adjusted as provided in Treas. Reg. § 1.704-1(b)(2)(iv)(f).

*BLACK DUCK   PROPERTIES, LLC*
**Company Agreement**
**18**

5.02.03     If Management elects, distributions of profits, losses, or return of capital may be withheld to accomplish the Company's business purposes as may be established from time to time.

# ARTICLE VI
# MANAGEMENT

6.01  **Management by Managers.**  Except for situations in which the approval of the Members is required by this Agreement or by nonwaivable provisions of applicable law, and subject to the provisions of Sections 6.02 and 6.03 below, (a) the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of the Managers; and (b) the Managers may make all decisions and take all actions for the Company not otherwise provided for in this Agreement, including, without limitation, the following:

6.01.01     Entering into, making, and performing contracts, agreements, and other undertakings binding the Company that may be necessary, appropriate, or advisable in furtherance of the purposes of the Company and making all decisions and waivers thereunder;

6.01.02     Opening and maintaining bank and investment accounts and arrangements, drawing checks and other orders for the payment of money, and designating individuals with authority to sign or give instructions with respect to those accounts and arrangements;

6.01.03     Maintaining the assets of the Company in good order;

6.01.04     Collecting sums due the Company;

6.01.05     To the extent that funds of the Company are available therefor, paying debts and obligations of the Company;

6.01.06     Acquiring, utilizing for Company purposes, and disposing of any asset of the Company;

6.01.07     Borrowing money or otherwise committing the credit of the Company for Company activities and voluntary prepayments or extensions of debt;

6.01.08     Selecting, removing, and changing the authority and responsibility of lawyers, accountants, and other advisers and consultants;

*BLACK DUCK  PROPERTIES, LLC*
**Company Agreement**
19

6.01.09      Obtaining insurance for the Company;

6.01.10      Determining distributions of Company cash and other property as provided in Section 5.02; and,

6.01.11      Establishing a seal for the Company.

6.02    **Restrictions.** Notwithstanding the provisions of Section 6.01, the Managers may not cause the Company to do any of the following without complying with the applicable requirements set forth below:

6.02.01      Sell, lease, exchange or otherwise dispose of (other than by way of a pledge, mortgage, deed of trust or trust indenture) all or substantially all of the Company's property and assets (with or without good will), other than in the usual and regular course of the Company's business, without obtaining the approval of a Required Interest;

6.02.02      Be a party to (a) a merger, or (b) an exchange or acquisition of the type described in Article 5.02 of the TBOC, without complying with the applicable procedures set forth in the Act; or,

6.02.03      Amend or restate the Certificate without complying with the applicable procedures set forth in the Act.

6.03    **Actions by Managers, Committee, Delegation of Authority and Duties.**

6.03.01      In managing the business and affairs of the Company and exercising its powers, the Managers shall act (a) collectively through meetings and written consents pursuant to Sections 6.06 and 6.08; (b) through committees pursuant to Section 6.03.02; and (c) through Managers to whom authority and duties have been delegated pursuant to Section 6.03.03.

6.03.02      The Managers may, from time to time, designate one or more committees, each of which shall be comprised of one or more Managers. Any such committee, to the extent provided in such resolution or in the Certificate or this Agreement, shall have and may exercise all of the authority of the Managers, subject to the limitations set forth in the Act. At every meeting of any such committee, the presence of a majority of all the members thereof shall constitute a quorum, and the affirmative vote of a majority of the members present shall be necessary for the adoption of any resolution. The Managers may dissolve any committee at any time, unless otherwise provided in the Certificate or this Agreement.

6.03.03    The Managers may, from time to time, delegate to one or more Managers such authority and duties as the Managers may deem advisable. In addition, the Managers may assign titles (including, without limitation, president, vice president, secretary, assistant secretary, treasurer and assistant treasurer) to any such Manager. Unless the Managers decide otherwise, if the title is one commonly used for officers of a business corporation formed under the TBOC, the assignment of such title shall constitute the delegation to such Manager of the authority and duties that are normally associated with that office, subject to any specific delegation of authority and duties made pursuant to the first sentence of this Section 6.03.03. Any number of titles may be held by the same Manager. Any delegation pursuant to this Section 6.03.03 may be revoked at any time by the Managers.

6.03.04    Any Person dealing with the Company, other than a Member, may rely on the authority of any Manager or officer in taking any action in the name of the Company without inquiry into the provisions of this Agreement or compliance herewith, regardless of whether that action actually is taken in accordance with the provision of this Agreement.

6.03.05    Except as otherwise provided in this Agreement, the Management will perform its duties with respect to the Company and will devote such time and effort to the Company's business and operations as the Management believes is reasonably necessary to manage the Company's affairs prudently but only to the extent that the Company has funds available to permit the Managers to perform such duties. The Managers and their respective affiliates and all officers, directors, employees, and agents acting in that capacity, will not be liable to the Company or its Members for any losses sustained or liabilities incurred as a result of any act or omission of such Person if they acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the Company. If a question arises as to a Manager regarding the Manager's liability in connection with the Manager's duties under the Agreement to the Company or another Member of the Company, the Managers will have no more duty or liability in connection with those duties than if the Managers were acting as a member of the board of directors of a Texas corporation that was carrying out the duties and responsibilities of the corporation.    .

6.04    **Number and Term of Office.** The number of Managers will be the number set forth in the Certificate. Each Manager will continue as a manager until the Manager's earlier death, dissolution, bankruptcy, resignation, or removal. Managers need not be Members.

6.05    **Vacancies; Removal; Resignation.** A Super Majority may remove a Manager. The vacancy caused by the removal may be filled by a Required Interest. Any vacancy occurring in the Managers may be filled by a Required Interest. A manager appointed to fill a vacancy will serve in place of the Manager's predecessor. Any Manager may resign at any time. Such resignation shall be made in writing and shall take effect at the time specified therein, or if no time be specified, at the time of its receipt by the remaining Managers. The acceptance of a resignation shall not be

necessary to make it effective, unless expressly so provided in the resignation.

6.06  **Meetings.**

6.06.01      Unless otherwise required by law or provided in the Certificate or this Agreement, a majority of the total number of Managers fixed by, or in the manner provided in, the Certificate or this Agreement shall constitute a quorum for the transaction of business of the Managers, and the act of a majority of the Managers present at a meeting at which a quorum is present shall be the act of the Managers. A Manager who is present at a meeting of the Managers at which action on any Company matter is taken shall be presumed to have assented to the action unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent to such action with the Person acting as secretary of the meeting before the adjournment thereof or shall deliver such dissent to the Company immediately after the adjournment of the meeting. Such right to dissent shall not apply to a Manager who voted in favor of such action.

6.06.02      Meetings of the Managers may be held at such place or places as shall be determined from time to time by resolution of the Managers. At all meetings of the Managers, business shall be transacted in such order as shall from time to time be determined by resolution of the Managers. Attendance of a Manager at a meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.06.03      In connection with any annual meeting of Members at which Managers were elected, the Managers may, if a quorum is present, hold its first meeting for the transaction of business immediately after and at the same place as such annual meeting of the Members. Notice of such meeting at such time and place shall not be required.

6.06.04      Special meetings of the Managers may be called by any Manager on at least twenty-four (24) hours notice to each other Manager. Such notice need not state the purpose or purposes of, nor the business to be transacted at, such meeting, except as may otherwise be required by law or provided for by the Certificate or this Agreement.

6.07  **Approval or Ratification of Acts or Contracts by Members.** The Managers in their discretion may submit any act or contract for approval or ratification at any annual meeting of the Members, or at any special meeting of the Members called for the purpose of considering any such act or contract, and any act or contract that shall be approved or be ratified by a Required Interest shall be as valid and as binding upon the Company and upon all the Members as if it shall have been approved or ratified by every Member of the Company.

6.08 **Action by Written Consent or Telephone Conference.** Any action permitted or required by the Act, the Certificate, or this Agreement to be taken at a meeting of the Managers or any committee designated by the Managers may be taken without a meeting if a consent in writing, setting forth the action to be taken, is signed by all the Managers or members of such committee, as the case may be. Such consent shall have the same force and effect as a unanimous vote at a meeting and may be stated as such in any document or instrument filed with the Secretary of State of Texas, and the execution of such consent shall constitute attendance or presence in person at a meeting of the Managers or any such committee, as the case may be. Subject to the requirements of the Act, the Certificate, or this Agreement for notice of meetings, unless otherwise restricted by the Certificate, Managers, or members of any committee designated by the Managers, may participate in and hold a meeting of the Managers or any committee of Managers, as the case may be, by means of a conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

6.09 **Compensation.** The Managers must diligently and faithfully devote the time to the Company's management necessary to serve the Company's purposes. They will perform all their duties in accordance with this Agreement and the Act. The Managers shall receive such compensation, if any, for their services rendered to the Company. This compensation will be a guaranteed payment. In addition, the Managers shall be entitled to be reimbursed for out-of-pocket costs and expenses incurred in the course of their service hereunder, including the portion of their overhead reasonably allocable to Company activities. A Required Interest may adjust the compensation based upon performance and dedication of time to the Company's business. If the Company's cash flow is insufficient to pay the compensation, the unpaid portion of the compensation may be deferred and bear interest at the Default Interest Rate. Payments for services rendered to the Company will not be a return on invested capital, but will be paid as compensation for services rendered. Reasonable compensation must comply with Code section 704(e), if applicable, and will be measured by the following: (a) the time required in the Company's administration; (b) the value of property under the Management's administration; and (c) the responsibilities assumed in the discharge of the duties of office.

6.10 **Conflicts of Interest.** For purposes of this section, an "Interested Person" is any Member, Manager, or officer of the Company who acts as an agent on the Company's behalf and who may have a conflict of interest with the Company. If the provisions set forth herein are true, no contract or transaction will be voided or voidable solely because (a) it is between this Company and any Interested Person; (b) it is between this Company and any other limited liability company, corporation, partnership, association, or other organization in which any of its Interested Persons are associated or have a financial interest; (c) the Interested Person associated with the other entity is present at or participates in the meeting or committee that authorizes the contract or transaction; or

*BLACK DUCK PROPERTIES, LLC*
**Company Agreement**
23

(d) the Interested Persons' votes are counted for the purpose of attending or participating in that meeting. The material facts as to the relationship or interest and as to the contract or transaction must be disclosed or known to the Company. The Company must authorize the contract or transaction in good faith by the affirmative vote of the disinterested Management, even though the Persons constituting the disinterested Management is less than a quorum. The material facts as to the relationship or interest and as to the contract or transaction must be disclosed or known to the Persons entitled to vote on the matter. The contract or transaction must be specifically approved in good faith by the Management. The contract or transaction must be fair as to this Company as of the time it is approved by Management.

6.10.01    Interested Persons may be counted in determining the presence of a quorum at a meeting that authorizes the contract or transaction.

6.10.02    This provision may not be construed to invalidate any contract or transaction that would be valid in the absence of this provision.

6.10.03    It is expressly understood that each Member may invest their personal assets for their own account. They may conduct their personal affairs and investments without regard to whether they constitute a Company "opportunity."

6.10.04    A Member may engage in or possess an interest in any other business or venture of any nature and description. They may act independently or with others, including ones in competition with the Company, with no obligation to offer to the Company or any other Member the right to participate. Neither the Company nor its Members have by virtue of this Agreement any right in the independent venture or its income or profits.

6.11    **Powers of Vested Managers.** Every Manager is an agent of this Company for the purpose of conducting its business. The act of a Manager, including executing in the Company's name any instrument for apparently conducting the Company's business in the usual manner, binds the Company. The Company is not, however, bound by a Manager's act if: (a) the Manager acting lacks the authority to act for the company; and (b) the person with whom the Manager is dealing has knowledge of the fact that the Manager does not have the authority to act.

## ARTICLE VII
## MEETING OF MEMBERS

7.01    **Meetings.**

7.01.01    A quorum shall be present at a meeting of Members if the holders of a Required Interest are represented at the meeting in person or by proxy. With respect to any matter, other than a matter for which the affirmative vote of the holders of a specified portion

of the Sharing Ratios of all Members entitled to vote is required by the Act, the affirmative vote of a Required Interest at a meeting of Members at which a quorum is present shall be the act of the Members.

7.01.02        All meetings of the Members shall be held at the principal place of business of the Company or at such other place within or without the State of Texas as shall be specified or fixed in the notices or waivers of notice thereof; provided that any or all Members may participate in any such meetings by means of conference telephone or similar communications equipment pursuant to Section 7.05.

7.01.03        Notwithstanding the other provisions of the Certificate or this Agreement, the chairman of the meeting or the holders of a Required Interest shall have the power to adjourn such meeting from time to time, without any notice other than announcement at the meeting of the time and place of the holding of the adjourned meeting. If such meeting is adjourned by the Members, such time and place shall be determined by a vote of the holders of a Required Interest. Upon the resumption of such adjourned meeting, any business may be transacted that might have been transacted at the meeting as originally called.

7.01.04        An annual meeting of the Members, for the election of the Managers and for the transaction of such other business as may properly come before the meeting, may be held at such place, within or without the State of Texas, on such date and at such time as the Managers shall fix and set forth in the notice of the meeting.

7.01.05        Special meetings of the Members for any proper purpose or purposes may be called at any time by the Managers or the holders of at least ten percent of the Sharing Ratios of all Members. If not otherwise stated in or fixed in accordance with the remaining provisions hereof, the record date for determining Members entitled to call a special meeting is the date any Member first signs the notice of that meeting. Only business within the purpose or purposes described in the notice (or waiver thereof) required by this Agreement may be conducted at a special meeting of the Members.

7.01.06        Written or printed notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be delivered not less than ten nor more than 60 days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or Person calling the meeting, to each Member entitled to vote at such meeting. If mailed, any such notice shall be deemed to be delivered when deposited in the United States mail, addressed to the Member at his address provided for in Section 14.02, with postage thereon prepaid.

7.01.07    The date on which notice of a meeting of Members is mailed or the date on which the resolution of the Managers declaring a distribution is adopted, as the case may be, shall be the record date for the determination of the Members entitled to notice of or to vote at such meeting, including any adjournment thereof, or the Members entitled to receive such distribution.

7.01.08    The right of Members to cumulative voting in the election of Managers is expressly prohibited.

7.02    **Voting List**. The Managers shall make, at least ten days before each meeting of Members, a complete list of the Members entitled to vote at such meeting or any adjournment thereof, arranged in alphabetical order, with the address of and the Sharing Ratios held by each, which list, for a period of ten days prior to such meeting, shall be kept on file at the registered office or principal place of business of the Company and shall be subject to inspection by any Member at any time during usual business hours. Such list shall also be produced and kept open at the time and place of the meeting and shall be subject to the inspection of any Member during the whole time of the meeting. The original membership records shall be prima-facie evidence as to who are the Members entitled to examine such list or transfer records or to vote at any meeting of Members. Failure to comply with the requirements of this Section shall not affect the validity of any action taken at the meeting.

7.03    **Proxies**. A Member may vote either in person or by proxy executed in writing by the Member. A telegram, telex, cablegram or similar transmission by the Member, or a photographic, photostatic, facsimile or similar reproduction of a writing executed by the Member shall be treated as an execution in writing for purposes of this Section. Proxies for use at any meeting of Members or in connection with the taking of any action by written consent shall be filed with the Managers, before or at the time of the meeting or execution of the written consent, as the case may be. All proxies shall be received and taken charge of and all ballots shall be received and canvassed by the Managers, who shall decide all questions touching upon the qualification of voters, the validity of the proxies, and the acceptance or rejection of votes, unless an inspector or inspectors shall have been appointed by the chairman of the meeting, in which event such inspector or inspectors shall decide all such questions. No proxy shall be valid after 11 months from the date of its execution unless otherwise provided in the proxy. A proxy shall be revocable unless the proxy form conspicuously states that the proxy is irrevocable and the proxy is coupled with an interest. Should a proxy designate two or more Persons to act as proxies, unless that instrument shall provide to the contrary, a majority of such Persons present at any meeting at which their powers thereunder are to be exercised shall have and may exercise all the powers of voting  or giving consents thereby conferred, or if only one be present, then such powers may be exercised by that one; or, if an even number attend and a majority do not agree on any particular issue, the Company shall not be required to recognize such proxy with respect to such issue if such proxy does not specify how the Sharing Ratios that are the subject of such proxy are to be voted with respect to such issue.

7.04  **Conduct of Meetings.** All meetings of the Members shall be presided over by the chairman of the meeting, who shall be a Manager (or representative thereof) designated by a majority of the Managers. The chairman of any meeting of Members shall determine the order of business and the procedure at the meeting, including such regulation of the manner of voting and the conduct of discussion as seem to him in order.

7.05  **Action by Written Consent or Telephone Conference.**

7.05.01      Any action required or permitted to be taken at any annual or special meeting of Members may be taken without a meeting, without prior notice, and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holder or holders of not less than the minimum Sharing Ratios that would be necessary to take such action at a meeting at which the holders of all Sharing Ratios entitled to vote on the action were present and voted. Every written consent shall bear the date of signature of each Member who signs the consent. No written consent shall be effective to take the action that is the subject to the consent unless, within 60 days after the date of the earliest dated consent delivered to the Company in the manner required by this Section, a consent or consents signed by the holder or holders of not less than the minimum Sharing Ratios that would be necessary to take the action that is the subject of the consent are delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers. A telegram, telex, cablegram or similar transmission by a Member, or a photographic, photostatic, facsimile or similar reproduction of a writing signed by a Member, shall be regarded as signed by the Member for purposes of this Section. Prompt notice of the taking of any action by Members without a meeting by less than unanimous written consent shall be given to those Members who did not consent in writing to the action.

7.05.02      The record date for determining Members entitled to consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company by delivery to its registered office, its principal place of business, or the Managers. Delivery shall be by hand or by certified or registered mail, return receipt requested. Delivery to the Company's principal place of business shall be addressed to the Managers.

7.05.03      If any action by Members is taken by written consent, any Certificate or documents filed with the Secretary of State of Texas as a result of the taking of the action shall state, in lieu of any statement required by the Act or the TBOC concerning any vote of Members, that written consent has been given in accordance with the provisions of the Act and the TBOC and that any written notice required by the Act and the TBOC has been given.

7.05.04    Members may participate in and hold a meeting by means of conference telephone or similar communications equipment by means of which all Persons participating in the meeting can hear each other, and participation in such meeting shall constitute attendance and presence in person at such meeting, except where a Person participates in the meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

## ARTICLE VIII
## INDEMNIFICATION

8.01    **Parties Indemnified.** The Company agrees to indemnify, defend, and hold harmless each of the following:

8.01.01    The Members, Managers, and officers of the Company, as well as their officers, managers, members, partners, owners, employees, and agents (the "Indemnified Person"), if any, from and against all Claims they may incur as a result of having been, being, or threatened to be made a named defendant or respondent in a proceeding because the Indemnified Person is or was a Member, Manager, or officer in the Company or is performing or had performed the obligations of the Member, Manager, or officer with respect to the Company, specifically including claims based on or arising from the Indemnified Person's sole, partial, or concurrent negligence, but excluding any items incurred as a result of acts of gross negligence or willful or intentional acts against the Company.

8.01.02    Each Indemnified Person from and against all Claims the Person may incur as a result of appearing as a witness or other participation in a proceeding that involves or affects the Company.

8.01.03    Each Indemnified Person from and against all Claims the Person may incur as a result of having performed or performing services for the Company, specifically including claims based on or arising from the Indemnified Person's sole, partial, or concurrent negligence.

8.02    **Right to be Reimbursed.** The right to indemnification conferred in this Article VIII shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred in defending any proceeding in advance of its final disposition.

8.03    **If Claim for Indemnification Is Not Paid In Full.** If a claim for indemnification or advancement or expenses under this Article VIII is not paid in full by the Company within 90 days after a written claim has been received by the Company, the Person seeking a remedy under this Article VIII may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim, and if successful in whole or in part, the Person seeking a remedy under this Article

*BLACK DUCK  PROPERTIES, LLC*
**Company Agreement**
28

VIII will also be entitled to be paid the expenses of prosecuting the claim.

8.04    **Rights Survive Termination of Status as an Indemnified Person.** The right of any Indemnified Person under this Article VIII will survive the termination of that Person's status as an Indemnified Person, the termination of this Agreement, an the winding up and termination of the Company. In the event of the death of a Person seeking a remedy under this Article VIII, the right under this Article VIII will inure to the benefit of the Person's heirs, executors, administrators, and personal representatives.

8.05    **Rights Not Exclusive.** The right to indemnification and the advancement and payment of expenses conferred in this Article VIII shall not be exclusive of any other right that a Person seeking a remedy under this Article VIII may have or later acquire under any statute or resolution of Members or Managers' agreement or otherwise.

## ARTICLE IX
## TAXES

As provided above, initially the Company shall be a domestic eligible entity with a single owner electing to be disregarded as a separate entity pursuant to Federal Treasury Regulation 301.7701-3 and Rev. Proc. 2002-69, and this Article IX shall not apply. At such time as the Company has multiple Members, this Article IX shall become effective.

9.01    **Tax Returns.** The Managers shall cause to be prepared and filed all necessary federal and state income tax returns for the Company, including making the elections described in Section 9.02. Each Member shall furnish to the Managers all pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed.

9.02    **Tax Elections.** The Company shall make the following elections on the appropriate tax returns:

9.02.01    To adopt the calendar year as the Company's fiscal year;

9.02.02    To adopt the cash method of accounting and to keep the Company's books and records on the income-tax method;

9.02.03    If a distribution of Company property as described in section 734 of the Code occurs or if a transfer of a Membership Interest as described in section 743 of the Code occurs, on written request of any Member, to elect, pursuant to section 754 of the Code, to adjust the basis of Company properties; and

9.02.04      Any other election the Managers may deem appropriate and in the best interest of the Members.

9.03    **Subchapter K.**  Neither the Company nor any Manager or Member may make an election for the Company to be excluded from the application of the provisions of subchapter K of chapter 1 subtitle A of the Code or any similar provisions of applicable state law, and no provision of these Regulation (including, without limitation, Section 2.08) shall be construed to sanction or approve such an election.

9.04    **State, Local, or Foreign Income or Franchise Taxes**.  If state or foreign income or foreign taxes become applicable to the Company, the principals and procedures of this Article IX will apply to those taxes.  References to the Code or Treasury Regulations will be deemed to refer to corresponding provisions that may become applicable under state, local, or foreign income or franchise tax statutes and regulations.

9.05    **"Tax-Matters Partner."**  A Required Interest must designate one Member to be the "tax-matters partner" of the Company pursuant to section 6231(a)(7) of the Code. The tax-matters partner must take the necessary action to cause each other Member to become a "notice partner" within the meaning of section 6223 of the Code.  The tax-matters partner must give prompt notice to all Members of all significant matters that may come to its attention in its capacity as tax-matters partner. The tax-matters partner may not take any action contemplated by section 6222 through 6232 of the Code without the consent of a Required Interest but this sentence does not authorize such Manager (or any other Manager) to take any action left to the determination of an individual Member under sections 6222 through 6232 of the Code.  As provided above, initially the Company shall be a domestic eligible entity with a single owner electing to be disregarded as a separate entity pursuant to Federal Treasury Regulation 301.7701-3 and Rev. Proc. 2002-69, and this Article IX shall not apply.  At such time as the Company has multiple Members, this Article IX shall become effective.

## ARTICLE X
## BOOKS, RECORDS, REPORTS, AND BANK ACCOUNTS

10.01    **Maintenance of Books.**  The Company shall keep books and records of accounts and shall keep minutes of the proceedings of its Members, its Managers and each committee of the Managers. The books of account for the Company shall be maintained on a cash basis in accordance with the terms of this Agreement, except that the capital accounts of the Members shall be maintained in accordance with Section 4.06.  The calendar year shall be the accounting year of the Company.

10.02    **Reports**.  On or before the 120th day following the end of each fiscal year during the term of the Company, the Managers shall cause each Member to be furnished with a balance sheet, an income statement, and a statement of changes in Members' capital of the Company for, or as of

the end of, that year certified by a recognized firm of certified public accountants. These financial statements must be prepared in accordance with accounting principles generally employed for cash-basis records consistently applied (except as therein noted) and must be accompanied by a report of the certified public accountants certifying the statements and stating that (a) their examination was made in accordance with generally accepted auditing standards and, in their opinion, the financial statements fairly present the financial position, financial results of operations, and changes in Members' capital in accordance with accounting principles generally employed for cash-basis records consistently applied (except as therein noted) and (b) in making the examination and reporting on the financial statements described above, nothing came to their attention that caused them to believe that (i) the income and revenues were not paid or credited in accordance with the financial and accounting provisions of this Agreement, (ii) the costs and expenses were not charged in accordance with the financial and accounting provisions of this Agreement, or (iii) the Managers or any Member failed to comply in any material respect with the financial and accounting provisions of this Agreement, or if they do conclude that the Managers or a Member so failed, specifying the nature and period of existence of the failure. The Managers also may cause to be prepared or delivered such other reports as they may deem appropriate. The Company shall bear the costs of all these reports. Notwithstanding the above, a copy of the income tax return, IRS Form 1065, which was filed with the Internal Revenue Service and made available to each Member, will be an acceptable substitute for the above defined financial statements and reports.

10.03 **Accounts.** The Managers shall establish and maintain one or more separate bank and investment accounts and arrangements for Company funds in the Company name with financial institutions and firms that the Managers determine. The Managers may not commingle the Company's funds with the funds of any Member; however, Company funds may be invested in a manner the same as or similar to the Managers' investment of their own funds or investments by their Affiliates.

## ARTICLE XI
## BANKRUPTCY OF A MEMBER

Subject to Section 12.01.03, if any Member becomes a Bankrupt Member, the Company shall have the option, exercisable by notice from the Managers to the Bankrupt Member (or its representative) at any time prior to the 180th day after receipt of notice of the occurrence of the event causing it to become a Bankrupt Member, to buy, and on the exercise of this option the Bankrupt Member or its representative shall sell, its Membership Interest. The purchase price shall be an amount equal to the fair market value thereof determined by agreement by the Bankrupt Member (or its representative) and the Managers; however, if those Persons do not agree on the fair market value on or before the 30th day following the exercise of the option, either such Person, by notice to the other, may require the determination of fair market value to be made by an independent appraiser specified in that notice. If the Person receiving that notice objects on or before the tenth day following receipt to the independent appraiser designated in that notice, and those Persons otherwise

fail to agree on an independent appraiser, either such Person may petition the United States District Judge for the Western District of Texas (San Antonio Division) then senior in service to designate an independent appraiser. The determination of the independent appraiser, however designated, is final and binding on all parties. The Bankrupt Member and the Company each shall pay one-half of the costs of the appraisal. The purchaser shall pay the fair market value as so determined in four equal cash installments, the first due on closing and the remainder (together with accumulated interest on the amount unpaid at the General Interest Rate) due on each of the first three anniversaries thereof. The payment to be made to the Bankrupt Member or its representative pursuant to this Article XI is in complete liquidation and satisfaction of all the rights and interest of the Bankrupt Member and its representative (and of all Persons claiming by, through, or under the Bankrupt Member and its representative) in and in respect of the Company, including, without limitation, any Membership Interest, any rights in specific Company property, and any rights against the Company and (insofar as the affairs of the Company are concerned) against the Members, and constitutes a compromise to which all Members have agreed pursuant to Section 101.154 of the Act.

## ARTICLE XII
## DISSOLUTION, LIQUIDATION, AND TERMINATION

12.01 **Dissolution**. The Company shall dissolve and its affairs shall be wound up on the first to occur of the following:

      12.01.01      The written consent of a Super Majority,

      12.01.02      The expiration of the period fixed for the duration of the Company set forth in the Certificate;

      12.01.03      Any Manager who is a Member (or, if there is no Manager who is a Member, any Member) shall become a Bankrupt Member (with or without the consent of a Required Interest); provided, however, that if the event described in this Section 12.01.03 shall occur and there shall be at least one other Member remaining, the Company shall not be dissolved, and the business of the Company shall be continued, if all Members so agree, and

      12.01.04      Entry of a decree of judicial dissolution of the Company under article 6.02 of the Act.

12.02 **Continuation**. Except as provided in Section 12.01.03, the death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member, or the occurrence of any other event that terminates the continued membership of a Member in the Company, shall not cause a dissolution of the Company.

12.03  **Liquidation and Termination**.  Upon an event requiring the winding up of the Company, the Management must act as Liquidating Agent or may appoint one or more Members as Liquidating Agent. The Liquidating Agent must proceed diligently to wind up the Company's affairs and make final distributions as provided in this Agreement and the Act. Liquidation costs will be borne by the Company. Until final distribution, the Liquidating Agent must continue to operate the Company properties with all of the Management's power and authority. The steps to be accomplished by the Liquidating Agent are as follows:

12.03.01    As promptly as possible after an event requiring the winding up of the Company and again after final liquidation, the Liquidating Agent must have a proper accounting prepared of the Company's assets, liabilities, and operations. The accounting must be prepared by a recognized firm of certified public accountants. It must be through the last day of the calendar month in which the date of the event requiring the winding up of the Company occurs or the final liquidation is completed, as applicable.

12.03.02    The Liquidating Agent must mail notice to each known creditor of an claimant against the Company in the manner described in Section 11.052 of the Act.

12.03.03    The Liquidating Agent must pay, satisfy or discharge from Company funds all of the debts, liabilities and obligations of the Company. The Company's obligations the Liquidating Agent must pay include all expenses incurred in liquidation and any advances. If a debt, liability, or obligation is not paid, the Liquidating Agent must make adequate provisions to pay and discharge it. Adequate provision includes establishing a cash escrow fund for contingent liabilities in the amount and for the term the Liquidating Agent reasonably determines.

12.03.04    All remaining assets of the Company shall be distributed to the Members as follows:

12.03.04.01    The Liquidating Agent may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the capital accounts of the Members;

12.03.04.02    With respect to all Company property that has not been sold, the fair market value of that property shall be determined and the capital accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the capital accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution; and

12.03.04.03    Company property shall be distributed among the Members in accordance with the positive capital account balances of the Members, as determined after taking into account all capital account adjustments for the taxable year of the Company during which the liquidation of the partnership occurs (other than those made by reason of this clause 12.03.04.03; and those distributions shall be made by the end of the taxable year of the Company during which the liquidation of the Company occurs (or, if later, 90 days after the date of liquidation).

12.03.05    All distributions in kind to the Members shall be made subject to the liability of each distributee for costs, expenses, and liabilities theretofore incurred or for which the Company has committed prior to the date of termination and those costs, expenses, and liabilities shall be allocated to the distributee pursuant to this Section 12.02 constitutes a complete return to the Member of its Capital Contributions and a complete distribution to the Member of its Membership Interest and all the Company's property and constitutes a compromise to which all Members have consented within the meaning of Section 101.154 of the Act.  To the extent that a Member returns funds to the Company, it has no claim against any other Member for those funds.

12.04    **Deficit Capital Accounts.**  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the capital account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Sharing Ratios, upon dissolution of the Company such deficit shall not be an asset of the Company and such Members shall not be obligated to contribute such amount to the Company to bring the balance of such Member's capital account to zero.

12.05    **Certificate of Termination.**  On completion of the distribution of Company assets as provided herein, the company is terminated, and the Managers (or such other Person or Persons as the Act may require or permit) shall file Certificate of Termination with the Secretary of State of Texas, cancel any other filings made pursuant to Section 2.05 of this Agreement, and take such other actions as may be necessary to terminate the Company.

## ARTICLE XIII
## ALTERNATIVE DISPUTE RESOLUTION ("ADR"); BINDING ARBITRATION

13.01    **Agreement to Use Procedure.**  The Members have executed this Agreement in good faith and in the belief that they are mutually advantageous to them.  It is with that same spirit of cooperation that they pledge to resolve any dispute amicably without litigation.  Accordingly, they agree if any dispute arises between them relating to the Company or this Agreement ("Dispute"), they will first utilize the procedures specified in this article ("Procedure") before any Additional

*BLACK DUCK  PROPERTIES, LLC*
**Company Agreement**
34

Proceedings.

13.02  **Initiation of Procedure**.  The Member seeking to initiate the Procedure ("Initiating Member") must give written notice to the other Members. The notice must describe in general terms the nature of the Dispute, the Initiating Member's claim for relief, and identify one or more individuals with authority to settle the Dispute on the Initiating Member's behalf. The Members receiving the notice ("Responding Member", whether one or more) have five business days within which to designate by written notice to the Initiating Member, one or more individuals with authority to settle the Dispute on their behalf. The individuals so designated will be known as the "Authorizing Individuals". The Responding Member may designate himself or herself as an Authorized Individual. The Initiating Member and the Responding Member will be collectively referred to as the "Disputing Members" or individually "Disputing Member".

13.03  **Direct Negotiations**. The Authorized Individuals may investigate the Dispute as they deem appropriate. But they agree to promptly, and in no event later than 30 days from the date of the Initiating Partner's written notice, meet to discuss the Dispute's resolution. The Authorized Individuals will meet at the times and places and with the frequency as they may agree. If the Dispute has not been resolved within 30 days from the date of their initial meeting, the Disputing Partners must cease direct negotiations and must submit the Dispute to mediation in accordance with the following procedure.

13.04  **Selection of Mediator**. The Authorized Individuals will have five business days from the date they cease direct negotiations to submit to each other a written list of acceptable, qualified attorney-mediators not affiliated with any of the Members. Within five days from receiving the list, the Authorized Individuals must rank the mediators in numerical order of preference and exchange the rankings. If one or more names are on both lists, the highest ranking person will be designated as the mediator. If no mediator has been selected under this procedure, the Disputing Members agree jointly to request a State or Federal District Judge of their choosing to supply within ten business days a list of potential qualified attorney-mediators. If they cannot agree upon a State or Federal District Judge, the Local Administrative Judge for the county in which the principal office of the Company is located will supply the list. Within five business days after receiving the list, the Authorized Individuals must again rank the proposed mediators in numerical order of preference and simultaneously exchange the list. They will select as the mediator the individual receiving the highest combined ranking. If the mediator is not available to serve, they must proceed to contact the mediator who was next highest in ranking until they are able to select a mediator.

13.05  **Time and Place of Mediation**. In consultation with the mediator selected, the Authorized Individuals must promptly designate a mutually convenient time and place for the mediation. Unless circumstances require otherwise, the time may not be later than 45 days after the mediator is selected.

13.06 **Exchange of Information**. If any Disputing Member has substantial need for information in another Disputing Member's possession in order to prepare for the mediation, all Disputing Members must attempt in good faith to agree to procedures for expeditiously exchanging the information. They may use the mediator's help to expedite information exchange if necessary.

13.07 **Summary of Views**. Each Disputing Member must deliver to the mediator and to the other Disputing Members a concise written summary of its views on the matter in Dispute and other matters required by the mediator. The summary must be submitted at least seven days before the first scheduled session of mediation. The mediator may also request that a confidential issue paper be submitted to the mediator by each Disputing Member.

13.08 **Parties to be Represented**. In the mediation, each Disputing Member must be represented by an Authorized Individual and may be represented by counsel. With the mediator's permission, each Disputing Member may bring any additional Persons needed to respond to questions, contribute information, and participate in the negotiations.

13.09 **Conduct of Mediation**. The mediator must determine the format for the meetings. The format must be designed to assure that both the mediator and the Authorized Individuals have an opportunity to hear an oral presentation of each Disputing Member's views on the matter in dispute. The format must be designed so that the authorized parties attempt to negotiate a resolution of the matter in dispute, with or without counsel or assistance, but with the mediator's assistance. To this end, the mediator is authorized to conduct both joint meetings and separate private caucuses with the Disputing Members. The mediation session will be private. The mediator will keep confidential all information learned in private caucus with any Disputing Members unless specifically authorized by the Disputing Member to disclose the information to the other Disputing Member. The Disputing Members agree to sign a document agreeing that the mediator is to be governed by the provisions of Chapter 154 of the Tex. Civ. Prac. & Rem. Code and any other rules the mediator may prescribe. The Disputing Members commit to participate in the proceedings in good faith with the intention of resolving the Dispute if at all possible.

13.10 **Termination of Procedure**.

13.10.01 The Disputing Members agree to participate in the mediation procedure to its conclusion. The mediation may be terminated: (a) by the Disputing Members signing a settlement agreement; (b) by the mediator's declaration that the mediation is terminated; or (c) by a Disputing Member's written declaration to the effect that the mediation process is terminated at the conclusion of one full day's mediation session.

13.10.02 Even if the mediation is terminated without resolving the Dispute, the Disputing Members agree not to terminate negotiations and not to commence any Additional Proceedings until five days after the mediation expires. Any Disputing Partner may,

however, commence Additional Proceedings within the five-day period if the Dispute may be barred by an applicable statute of limitations.

**13.11 Arbitration. The parties agree to participate in good faith in the ADR to its conclusion. If the Disputing Members are not successful in resolving the dispute through the ADR, the Disputing Members may agree to submit the matter to binding arbitration or a private adjudicator, or either Disputing Member may seek an adjudicated resolution through the appropriate court.**

**13.12 Fees of Mediation; Disqualification**. The mediator's fees and expenses will be shared equally by the Disputing Members. The mediator will be disqualified as a witness, consultant, expert, or counsel for any Disputing Member with respect to the Dispute and any related matters.

**13.13 Confidentiality**. Mediation is a compromise negotiation for purposes of Federal and State Rules of Evidence. It constitutes privileged communication under Texas law. The entire mediation process is confidential. No stenographic, visual, or audio record may be made. All conduct, statements, promises, offers, views, and opinions, whether oral or written, made during mediation by any Disputing Member, their agents, employees, representatives or other invitees and by the mediator are confidential and will, in addition and where appropriate, be deemed privileged. The conduct, statements, promises, offers, views, and opinions may not be discoverable or admissible for any purpose, including impeachment, in any litigation or other proceeding involving the parties. It may not be disclosed to anyone not an agent, employee, expert, witness, or representative of any of the Members. Evidence otherwise discoverable or admissible, however, is not excluded from discovery or admission because of its use in the mediation.

**13.14 Waiver of Exemplary or Punitive Damages**. To the maximum extent permitted by law, except for fraud or gross negligence, each of the Members knowingly, voluntarily, and intentionally waives any right to consequential exemplary or punitive damages with respect to any Dispute, regardless of the forum for the proceedings.

**ARTICLE XIV**
**GENERAL PROVISIONS**

**14.01 Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

**14.02 Notices.** Except as expressly set forth to the contrary in this Agreement, all notices, requests, or consents provided for or permitted to be given under this Agreement must be in writing and must be given either by depositing that writing in the United States mail, addressed to the recipient, postage paid, and registered or certified with return receipt requested or by delivering that

writing to the recipient in person, by courier, or by facsimile transmission; and a notice, request, or consent given under this Agreement is effective on receipt by the Person to receive it. All notices, requests, and consents to be sent to a Member must be sent to or made at the addresses given for that Member on Exhibit A or in the instrument described in Section 3.03.04 or 3.04, or such other address as that Member may specify by notice to the other Members. Any notice, request, or consent to the Company or the Managers must be given to the Managers at the following address: 410 Spyglass, McQueeney, Texas 78123. Whenever any notice is required to be given by law, the Certificate or this Agreement, a written waiver thereof, signed by the Person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

14.03  **Entire Agreement; Supersedure.** This Agreement include the entire agreement of the Members and their Affiliates relating to the Company and supersedes all prior contracts or agreements with respect to the Company, whether oral or written.

14.04  **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

14.05  **Amendment or Modification.** This Agreement may be amended or modified from time to time only by a written instrument adopted by the Managers and executed and agreed to by a Required Interest; provided, however, that (a) an amendment or modification reducing a Member's Sharing Ratio or increasing its Commitment (other than to reflect changes otherwise provided by this Agreement) is effective only with that Member's consent, (b) an amendment or modification reducing the required Sharing Ratio or other measure for any consent or vote in this Agreement is effective only with the consent or vote of Members having the Sharing Ratio or other measure theretofore required, and (c) amendments of the type described in Section 3.04 may be adopted as herein provided.

14.06  **Binding Effect.** Subject to the restrictions on Dispositions set forth in this Agreement, this Agreement is binding on and inures to the benefit of the Members and their respective heirs, legal representatives, successors, and assigns.

14.07  **Governing Law; Severability.** THIS AGREEMENT IS GOVERNED BY AND SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF TEXAS, EXCLUDING ANY CONFLICT-OF-LAWS RULE OR PRINCIPLE THAT MIGHT REFER THE

GOVERNANCE OR THE CONSTRUCTION OF THIS AGREEMENT TO THE LAW OF ANOTHER JURISDICTION. In the event of a direct conflict between the provisions of this Agreement and (a) any provision of the Certificate, or (b) any mandatory provision of the Act or (to the extent such statutes are incorporated into the Act) the TBOC or the Texas Miscellaneous Corporation Laws Act, the application provision of the Certificate, the Act, the TBOC or the Texas Miscellaneous Corporation Laws Act shall control. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances is not affected thereby and that provision shall be enforced to the greatest extent permitted by law.

14.08  **Further Assurances.**  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions.

14.09  **Waiver of Certain Rights.**  Each Member irrevocably waives any right it may have to maintain any action for dissolution of the Company or for partition of the property of the Company.

14.10  **Indemnification.**  To the fullest extent permitted by law, each Member shall indemnify the Company, each Manager and each other Member and hold them harmless from and against all losses, costs, liabilities, damages, and expenses (including, without limitation, costs of suit and attorney's fees) they may incur on account of any breach by that Member of this Agreement.

14.11  **Notice to Members of Provisions of this Agreement.**  By executing this Agreement, each Member acknowledges that it has actual notice of (a) all of the provisions of this agreement, including, without limitation, the restrictions on the transfer of Membership Interests set forth in Article III, and (b) all of the provisions of the Certificate, [including, without limitation, the fact that the Certificate provide that no Member shall have the preemptive right to acquire any Membership Interests or securities of any class that may at any time be issued, sold or offered for sale by the Company]. Each Member hereby agrees that this Agreement constitute adequate notice of all such provisions, including, without limitation, any notice requirement under article 101.352 of the Act and Chapter 8 of the Texas Uniform Commercial Code, and each Member hereby waives any requirement that any further notice thereunder be given.

14.12  **Counterparts.**  This Agreement may be executed in any number of counterparts with the same effect as if all signing parties had signed the same instrument.

14.13  **Series LLCs.**  Pursuant to the applicable provisions of the TBOC, including without limitation Sections 101.601 and 101.602 of the TBOC, the Managers shall be authorized to establish one or more designated series of members, managers, membership interests, or assets that (1) has

*BLACK DUCK  PROPERTIES, LLC*
**Company Agreement**
39

separate rights, powers, or duties with respect to specified property or obligations of the Company or profits and losses associated with specified property or obligations or (2) has a separate business purpose or investment objective. Any such series shall be described on **Exhibit B** attached to this Company Agreement. Notice is hereby provided that the debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to any such particular series shall be enforceable against the assets of that series only, and shall not be enforceable against the assets of the Company generally or any other series; and, none of the debts, liabilities, obligations, and expenses incurred, contracted for, or otherwise existing with respect to the Company generally or any other series shall be enforceable against the assets of a particular series. Consistent with the requirements of the TBOC, the Company shall maintain records for any particular series account established for the assets associated with that series separately from the other assets of the company or any other series.

      **IN WITNESS HEREOF**, following adoption of this Agreement by the Managers, the Members have executed this Agreement as of the date first set forth above.

**MEMBERS**:

Name: LARRY M. WRIGHT
Title: Manager/Member
Date of Execution: 1-18-16

Name: HAGAN COHLE
Title: Manager/Member
Date of Execution: 1-19-16

Name: FRANK D. MOORE
Title: Manager/Member
Date of Execution: 2/10/16

*BLACK DUCK  PROPERTIES, LLC*
**Company Agreement**
40

# EXHIBIT A

| Name, Address and Initial Capital Contribution of Each Member | Commitment | Initial Sharing Ratio |
|---|---|---|
| KrisJenn Ranch, LLC 410 Spyglass McQueeney, Texas 78123 | $500 | 500% |
| SCMED Oilfield Consulting, LLC 2718 Bobby Lane Austin, Texas 78745 | $500 | 500% |

*BLACK DUCK  PROPERTIES, LLC*
**Company Agreement**
**41**

## EXHIBIT B - SERIES LLC'S

No series have been established by the Mangers at the time of the adoption of this Company Agreement; provided, however, a revised Exhibit B shall be attached to this Company Agreement at the time any series are established as provided in Section 101.601 et. seq. of the Texas Business Organizations Code and section 14.13 of the Company Agreement.

P:\WP2\Clients T-Z\Wright, Larry & Gwynne\Entities\Black Duck Properties, LLC\Regulations of LLC.wpd