# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| *In re*: | § § | Chapter 11 |
| KrisJenn Ranch, LLC, | § § | |
| *Debtor* | § § § | Case No. 20-50805 |

| | | |
|---|---|---|
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC, | § § § § § § § | |
| *Plaintiffs*, | § § | Adversary No. 20-05027 |
| v. | § § | |
| DMA Properties, Inc. and Longbranch Energy, LP, | § § § § | |
| *Defendants*. | § § | |

| | | |
|---|---|---|
| DMA Properties, Inc. and Frank Daniel Moore, | § § § | |
| *Cross-Plaintiffs/Third-Party Plaintiffs*, | § § § | |
| v. | § § | Adversary No. 20-05027 |
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, Black Duck Properties, LLC, Larry Wright, and John Terrill, | § § § § § § § | |
| *Cross-Defendants/Third-Party Defendants*. | § § | |

1

# FRANK DANIEL MOORE'S RESPONSE IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Frank Daniel Moore opposes the motion for partial summary judgment by KrisJenn Ranch, LLC and its series (collectively, "KrisJenn") on Moore's fraud, breach of contract, and tortious interference claims.

## BACKGROUND

This dispute centers on the attempt of one man (Larry Wright) to steal a deal involving a pipeline right-of-way in East Texas. Daniel Moore and Darin Borders located and secured the right to purchase the right-of-way, without any involvement from Wright. When Wright learned about the deal, he begged to be a part of it and offered to fund the deal if Moore and Borders would include him. Moore and Borders eventually agreed to let Wright participate if he would put up the money to buy the right-of-way. Since that time, Wright has repeatedly schemed to dispose of the right-of-way while disregarding Moore and Borders's interests.

**A.    Moore and Borders secure the option to purchase the right-of-way.**

In the summer of 2015, Darin Borders and Daniel Borders located a potentially lucrative right-of-way in East Texas. Ex. 1 (Moore Decl.) ¶17.[1] Borders's entity (Longbranch) secured the right to purchase the right-of-way, and Moore and Borders paid $25,000 in earnest money to the pipeline's owner, Express Pipeline Connection, LLC. Ex. 1 (Moore Decl.) ¶20; Ex. 2 (Borders Decl.) ¶9. On February 19, 2016, Longbranch and Express memorialized Longbranch's right to purchase the right-of-way in writing. *See* Ex. 7 (Purchase Agreement).

---

[1] In support of this response, Moore cites the declarations previously submitted in response to Wright's state-court motion for summary judgment (which was denied). Although Moore has only attached the exhibits relevant to this motion, all of the exhibits cited in the declarations can be found in the docket as attachments to DMA's prior summary-judgment motion. *See* DMA Mot. Summ. J. [#28].

2

**B.    Wright offers to fund the purchase of the right-of-way, and Longbranch assigns the Purchase Agreement to Black Duck in exchange for a 20% interest.**

When Wright learned about the deal, he begged to be a part of it, and Borders and Moore agreed to include Wright on the deal if he would fund the purchase of the right-of-way. Ex. 1 (Moore Decl.) ¶¶23. Wright reimbursed Moore and Borders for the $25,000 the two men had already paid. Ex. 1 (Moore Decl.) ¶24; Ex. 2 (Borders Decl.) ¶12. Borders, on behalf of Longbranch, agreed to assign the Purchase Agreement to Moore and Wright's jointly owned entity, Black Duck Properties, LLC.[2] Ex. 1 (Moore Decl.) ¶24; Ex. 2 (Borders Decl.) ¶12. In exchange, Wright and Moore, on behalf of Black Duck, agreed that Longbranch would possess a 20% net-profits share that would attach and run with the right-of-way. Ex. 1 (Moore Decl.) ¶24; Ex. 2 (Borders Decl.) ¶12; Ex. 8 (Longbranch Assignment).

**C.    Wright pressures Moore to withdraw from Black Duck, and Moore agrees to withdraw in exchange for a 20% net-profits interest in the right-of-way and other consideration.**

Black Duck closed on the right-of-way on August 14, 2017. Ex. 1 (Moore Decl.) ¶35. Not long afterwards, Wright grew increasingly hostile toward Moore and began to pressure Moore to give up his 50% interest in Black Duck. Ex. 1 (Moore Decl.) ¶40. After several phone conversations, Moore relented to Wright's demands that he resign. *Id.*

On February 3, 2018, Moore drafted an email with the terms of his resignation from Black Duck that he and Wright had orally agreed to. *Id.* ¶41. In exchange for relinquishing his 50% interest in Black Duck—which included 50% interest in all of Black Duck's assets such as the right-of-way—Moore would receive, among other things, "[n]o less than 20% Carried Interest in the P-21 Express Pipeline . . . under the same terms and conditions as the [Longbranch Assignment]" through his entity DMA Properties, Inc. Ex. 18 (Feb. 4, 2018 Email Agreement). On February 4, 2018, Wright agreed to Moore's terms via email. *Id.*

---

[2] Moore owned 50% of Black Duck through SCMED Oilfield Consulting, LLC and Wright owned 50% through KrisJenn Ranch, LLC. Ex. 6 (Black Duck Company Agreement).

3

Formal documents, dated February 7, 2018, memorialize the terms of Moore's email resignation. Ex. 1 (Moore Decl.) ¶42. One of those documents was the DMA Agreement. In relevant part, the DMA Agreement states:

> DMA Properties shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from Black Duck Properties, LLC or its successors or assigns . . .
>
> a. Net Profits shall mean gross revenues actually received by Black Duck Properties, LLC., or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.
>
> b. Black Duck Properties, LLC.'s obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and Black Duck Properties binds its successors and assigns to the payment of the Net Profits Share.

Ex. 20 (DMA Agreement).

Moore entered the February 4 Email Agreement in his personal capacity (as well as on behalf of SCMED) and entered the DMA Agreement in his capacity as a principal of DMA. And the DMA Agreement expressly states that it was intended to "satisf[y] the duties ( in the Email Agreement ) regarding only the P-21 Express Pipeline[,]" thereby directly incorporating the February 4 Email Agreement. Ex. 20 (DMA Agreement). The two agreements—the February 4 Email Agreement and the DMA Agreement—therefore form one contract: the contract between Moore and Wright (and all the relevant entities) that Moore would withdraw from Black Duck in exchange for, among other things, a 20% net-profits interest in the right-of-way. Moore is thus a party in privity with respect to both agreements. DMA, the entity that Moore choose to hold the assets that he received per the terms of the business divorce, is the third-party beneficiary.

4

**D.    Wright immediately sells the right-of-way.**

Two days after the documents memorializing Moore's resignation were drawn up, Wright executed plans to sell the right-of-way to John Terrill through an entity that Terrill planned to form (TCRG). Terrill's commitment to buy "the East Texas right-of-way (also known as the Express Gas Pipeline)" is dated February 9, 2018. Ex. 21 (Letter of Intent). According to the Letter of Intent, Terrill agreed to purchase Black Duck's right-of-way for $2.5 million, with Black Duck retaining a 16% carried interest in a future waterline. *Id*. As Terrill later declared under oath, he and Wright had been working on this deal since December 2017—well before Wright pushed Moore out of Black Duck. Ex. 22 (Terrill Aff.).

**E.    Moore and Borders begin to uncover Wright's schemes.**

Moore eventually learned about the deal, but only after he had already relinquished his interest in Black Duck. When Moore and Borders asked Wright about the potential sale, Wright said that Terrill knew all about Longbranch's and DMA's interests and even had copies of their agreements. Ex. 1 (Moore Decl.) ¶48; Ex. 2 (Borders Decl.) ¶31. But when Moore and Borders reached out to Terrill, Terrill told a different story: Wright had not disclosed the previously assigned interests, and Terrill did not intend to honor them. Ex. 1 (Moore Decl.) ¶49; Ex. 2 (Borders Decl.) ¶32.

If Moore had known or suspected that Wright had crafted a scheme to sell the right-of-way and then claim that Moore only had an interest in Black Duck's profits, Moore would not have agreed to resign from Black Duck. Ex. 1 (Moore Decl.) ¶53. Nor would Moore have given up his right to 50% of Black Duck's assets for 20% of its profits from the sale of the right-of-way. *Id.*

**F.    Wright threatens to "kill the 20% each of you own."**

Though Moore and Borders continued to seek an amicable solution with TCRG, Wright, and Wright's entities, Wright was not so inclined. In the spring of 2019, Wright emailed Moore and Borders that if Moore did not stop his settlement conversations with TCRG, then Wright would "end the 20% and file [m]alicious charges against you and all your forfeited

5

Companies in the State of Texas." Ex. 31 (Apr. 16, 2019 Email). Likewise, Wright threatened "to kill the 20% each of you own." *Id.*

Eventually, TCRG forced Wright to rescind the sale because of misrepresentations made by Wright. Ex. 35 (Compromise Settlement Agreement). But instead of rescinding the sale through Black Duck, Wright shut down Black Duck and used the transaction as an excuse to shuffle the right-of-way to one of his KrisJenn entities. Ex. 36 (TCRG Repurchase Agreement). Wright and KrisJenn now claim that Moore and Borders's net-profits interests were merely interests in Black Duck's profits—a position which makes no sense given that both interests attach and run with the right-of-way. Ex. 8 (Longbranch Assignment); Ex. 20 (DMA Agreement).

## LEGAL STANDARD

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

6

# ARGUMENT

## I. The Court should deny summary judgment with respect to Moore's fraud claims.

Moore has asserted two sets of fraud claims. The first set of fraud claims is for fraudulent inducement and concerns material misrepresentations made by Wright to convince Moore and Borders to let him participate in the right-of-way deal in the first place. *See* Moore Am. 3P Claims [#173] ¶¶151–58. The second set of fraud claims, asserted in the alternative, centers on Wright's subsequent conduct. *Id.* ¶¶159–170. KrisJenn only seeks summary judgment on the latter set of fraud claims. Mot. Summ. J. [#117] at 5-8. Moore's fraudulent-inducement claims therefore undisputedly survive summary judgment, as KrisJenn has not challenged them.

### A. KrisJenn is liable for Wright's fraudulent misstatements and omissions.

As an initial matter, KrisJenn claims that "[n]early all of Moore's assertions of fraud are directed at Wright or Black Duck, rather than Debtors." Mot. Summ. J. [#117] at 5.

That is incorrect: Moore's fraud claims squarely implicate both Wright *and* the KrisJenn entities, because Wright repeatedly used the KrisJenn entities to facilitate his fraudulent conduct. *See* Moore Am. 3P Claims [#173] ¶¶151–70. For example, Wright used his KrisJenn entities to secretly indebt Black Duck without authorization from Moore (who had a 50% interest in Black Duck at that time). Ex. 1 (Moore Decl.) ¶¶35–39. Later, Wright used his control over Black Duck and KrisJenn to orchestrate a "foreclosure" on Black Duck's asserts, including its interest in the right-of-way. *See* Ex. 37 (Assignment of Note). And after TCRG forced Wright to rescind the sale of the right-of-way in 2019, Wright shuffled the right-of-way to KrisJenn Ranch, LLC–Series Pipeline ROW in an attempt to erase Moore's 20% net-profits interest. *See* Ex. 36 (TCRG Repurchase Agreement).

In short, Wright acted with dishonesty of purpose and intent to deceive and repeatedly used his control over KrisJenn to further his fraud on Moore. Part and parcel of Wright's schemes from the beginning, KrisJenn cannot now escape liability for his fraud.

7

**B.   The economic-loss rule does not apply to fraud claims based on intentional misrepresentations and omissions.**

The economic-loss rule precludes recovery in tort when (1) the tort claim is premised on breach of a duty created by the contract rather than a duty imposed by law; and (2) the injury is only the economic loss to the subject of the contract. *Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*, 2009 WL 150942, at *19–20 (S.D. Tex. Jan. 21, 2009). When a tort claim is premised on a duty imposed by law, the economic-loss rule does not apply.

Here, the economic-loss rule does not apply because Moore's fraud claims are based on Wright's breach of a duty imposed by law—the duty not to commit fraud through intentional misrepresentations and omissions. *See Eastman Chem. Co. v. Niro, Inc.*, 80 F. Supp.2d 712, 717 (S. D. Tex. 2000) ("[The defendant] had an independent legal duty not to commit the *intentional* tort of fraud" (emphasis original)); *Experian Info Sols, Inc. v. Lexington Allen LP*, No. 4:10-CV-144, 2011 WL 1627115, at *12 (E.D. Tex. April 7, 2011) ("The economic loss rule does not apply to fraud claims, including claims for fraud in the performance and fraudulent omission."); *Alcan Aluminum Corp. v. BASF Corp.*, 133 F. Supp.2d 482, 503 n. 19 (N.D. Tex. 2001) (concluding the Texas Supreme Court has "specifically rejected the application of this doctrine to fraud claims"); *cf. WC 1899 McKinney Ave., LLC v. STK Dallas, LLC*, 380 F. Supp. 3d 595, (W.D. Tex. 2019) ("Economic loss rules operate to bar parties from recovering purely economic losses based on negligence or strict liability.").[3]

Moore's fraud claims are premised on multiple, intentional misrepresentations and omissions made by Wright.

For example, Wright intentionally (and repeatedly) misrepresented how he was funding the purchase of the right-of-way. Initially, Wright told Moore that he was a wealthy man who

---

[3] *See also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex. 1998) (noting that parties can maintain fraud claims, independent of contract claims, when one party enters into a contract with no intention of performing); *Kajima Int'l, Inc. v. Formosa Plastics Corp., USA*, 15 S.W.3d 289, 294 (Tex. App.—Corpus Christi-Edinburg, pet. denied) (explaining that negligent misrepresentation claims may be barred under the economic-loss rule but that fraud involving intentional or reckless conduct is not barred).

could hold the right-of-way until a suitable buyer could be located. Ex. 1 (Moore Decl.) ¶¶23–24. Then, after Moore later learned that Wright had taken out a loan to close on the right-of-way, Wright changed his story and told Moore that he took out that loan in his personal capacity. *See* Ex. 38 (Jan. 31, 2018 Email) (stating that Moore understood Wright wanted to close as soon as possible "in order to satisfy your loan"). Later, Wright changed his story again, claiming that his capital contribution was actually a loan *to Black Duck* that KrisJenn foreclosed on after Moore exited Black Duck. *See* Mot. Summ. J. [#117] at 4. Prior to Moore's departure from Black Duck, Wright never disclosed that he was indebting Black Duck, nor is there any evidence that Moore approved such a transaction. Ex. 1 (Moore Decl.) ¶¶36–38. Because these intentional misrepresentations violated Wright's duty not to commit intentional fraud (and his fiduciary duties owed to Moore), the economic-loss rule does not apply.

Moore has also put forward evidence that Wright intentionally failed to disclose the pending deal with TCRG prior to execution of the DMA Agreement. Ex. 1 (Moore Decl.) ¶¶46–49; Ex. 22 (Terrill Aff.). Wright's failure to disclose the TCRG deal violated not one but at least two independent legal duties: the duty not to commit intentional fraud *and* fiduciary duties that Wright owed to Moore in his capacity as a manager and member of Black Duck.

Finally, Moore's fraud claims are also based on Wright's misrepresentations that Moore and DMA would receive 20% of all net profits earned through the right-of-way and that Black Duck would bind successors, assigns, and subsequent owners to this obligation. *See* Ex. 18 (Feb. 4, 2018 Email Agreement). These misrepresentations were false promises of future performance because Wright had no intention of paying 20% of net profits to Moore and DMA. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46–47 (Tex. 1998) (noting that parties can maintain fraud claims, independent of contract claims, when one party enters a contract with no intention of performing). Indeed, Wright did not even disclose the TCRG deal to Moore or Borders, nor did he disclose Moore or Borders's interest to TCRG. Ex. 1 (Moore Decl.) ¶¶46–49; Ex. 22 (Terrill Aff.). Instead, Wright never intended to honor the 20% net-profit interests. When Moore and Borders attempted to work out a solution with

TCRG, Wright threatened that he would "kill the 20% each of you own" and if Moore and Borders continued their conversations with TCRG. Ex. 31 (Apr. 16, 2019 Email).

At a minimum, Wright's failure to disclose Moore and Borders's interests raises a genuine issue of material fact as to whether he intended to perform under the parties' agreements. To the extent Moore's fraud claims are based on Wright's intentional false promises of future performance, those claims are not barred by the economic-loss rule.

### C. In any event, Moore's fraud claims are independent of the contract.

In any event, Moore's fraud claims seek damages independent of Moore's expectancy under the contract. If Wright fraudulently failed to disclose the deal with TCRG, then Moore would be entitled to recover the value of the 50% interest in Black Duck and its assets—including the right-of-way—that Moore gave up based on Wright's intentional misrepresentations and omissions. Moore would also be entitled to recover the value of that interest if Wright misrepresented the indebtedness of Black Duck, failed to disclose the status of the loan to KrisJenn prior to execution of the DMA Agreement, or misrepresented his intentions of performing under the February Email Agreement or the DMA Agreement.

Further, the forms of relief Moore seeks with respect to these fraud claims are not merely benefit-of-the bargain damages: Based on his fraud claims, Moore seeks to disgorge or impose a constructive trust on proceeds Wright has received or will receive from the right-of-way.[4] *See* Moore Am. 3P Claims [#173] ¶¶170. All of these remedies are separate and apart from

---

[4] *Cf. WC 1899 McKinney*, 380 F. Supp. at 607 ("While an economic loss rule does apply to bar STK from recovering purely contractual economic losses, . . . in this case, STK has sought reliance damages distinguishable from its claimed contractual damages."). Disgorgement and constructive trusts are both available as remedies for fraud. *See Matter of Monnig's Dep't Stores*, 929 F.2d 197, 201 (5th Cir. 1991) (noting constructive trusts may be imposed to remedy both actual and constructive fraud); *Saden v. Smith*, 415 S.W.3d 450, 475 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (upholding disgorgement of profits where defendant committed "fraud, defalcation, and embezzlement while acting and serving in a fiduciary capacity" (quotation marks omitted)).

10

Moore's expectancy under the contract, which was a 20% net-profits interest that attaches and runs with the right-of-way.[5]

Because Moore's fraud claims seek to recover for injuries apart from the expectancy of the contract, the economic-loss rule does not apply.

### D. There are genuine issues of material fact as to whether Moore justifiably relied on Wright's misrepresentations and omissions.

Next, KrisJenn argues that Moore cannot show he justifiably relied on Wright's failure to disclose the KrisJenn loan. Mot. Summ. J. [#117] at 7. "Justifiable reliance usually presents a question of fact for the jury to decide." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 497 (Tex. 2019). Here, multiple factual disputes exist.

For example, KrisJenn asserts that Moore must have known about the KrisJenn loan because Black Duck "only raised $1,000 in capital contributions." Mot. Summ. J. [#117] at 7. Yet the only evidence KrisJenn cites is the *initial* contribution chart in the Black Duck Company Agreement. Ex. 1 (Moore Decl.) ¶¶37–38. Wright represented that he would provide the additional funds to purchase the right-of-way following Black Duck's formation and that those funds would be a capital contribution to Black Duck, not a loan. *Id.*

KrisJenn also claims that Moore must have known that KrisJenn had loaned the money to Black Duck because of an email that Wright supposedly sent to Moore in June 2017. Mot. Summ. J. [#117] at 7. In that email, Wright states KrisJenn "will be owed $5,000,000 plus interest" after Black Duck closes on the right-of-way. *Id.* [#117-2] Ex. B. Wright also states that he will "need a letter from you understanding and agreeing to this to put into the Corporate Minutes of Blackduck." *Id.*

---

[5] Moore may pursue remedies for both fraud and breach of contract through the verdict. If the jury finds in favor of Moore on both sets of claims, Moore can then elect which remedy to receive. *See, e.g.*, *Gonzalez v. Atenea Capital Markets Fund, LP*, No. 04-14-00614-CV, 2015 WL 6509750, at *4 (Tex. App.—San Antonio Oct. 28, 2015, no pet.) (reiterating that a party may elect between remedies after a verdict but "before a judgment is entered").

11

Of course, Moore never wrote a letter "understanding and agreeing" that KrisJenn would be owed $5 million, because Moore did not agree to it. Nor has KrisJenn put forward any evidence that the terms of the loan were disclosed to or approved by Moore as required by Black Duck's Company Agreement. *See* Ex. 6 (Black Duck Company Agreement) ¶4.05 (requiring approval of all managers to indebt company). Instead, Moore understood that Wright's funding would be a capital contribution, as Moore and Wright had previously agreed. Ex. 1 (Moore Decl.) ¶¶37–38.

This is a fundamental point: Wright was only included in the deal in the first place because he represented he had the wherewithal to purchase the right-of-way and hold it until an appropriate buyer came along. Ex. 1 (Moore Decl.) ¶¶23–24, 52–53. While it is true that Wright continually tried to renegotiate the terms of the parties' bargain,[6] the fact remains that Moore rejected those proposals and continued to abide by the parties' original deal.

In short, KrisJenn has not pointed to any evidence that Moore agreed to indebt Black Duck, and the Company Agreement shows that Black Duck could not indebt itself without Moore's approval. Since Moore never approved a loan—and continued to abide by the parties' agreement that Wright's funding would be a capital contribution—Moore justifiably believed that no such loan existed.

Thus, there are reasonable factual disputes as to (1) whether Wright's funding was a capital contribution or a loan; and (2) whether Moore justifiably believed that Black Duck was not indebted to KrisJenn. These factual disputes preclude summary judgment.

---

[6] For example, in the same email, Wright proposes that KrisJenn should get 50% of a potential sale, Moore should get 35%, and Borders should get 15%. *See* Mot. Summ. J. [#117-2] Ex. B. That is a bafflingly proposal with no basis in the parties' agreements, because at that time, Wright and Moore were 50/50 owners of Black Duck, while Borders (a nonmember in Black Duck) held a 20% net-profits interest. Wright then goes on try to renegotiate "the fair ownership of KrisJenn Ranch in this project." *Id.*

> **E. Fact issues exist as to whether Wright tried to defraud Moore through a sham foreclosure on the right-of-way.**

Next, KrisJenn suggests that Wright could not have perpetrated a fraud through a sham foreclosure, because "Debtors never foreclosed on the Pipeline." Mot. Summ. J. [#117] at 7. Yet the evidence says otherwise. On October 12, 2018, Wright executed an "assignment" stating that KrisJenn had "foreclosed" on the undisclosed note to Black Duck "and the collateral which includes [Black Duck's] interest in the Express Gas Pipeline." Ex. 37 (Assignment of Note). Wright executed the assignment on behalf of both Black Duck and KrisJenn, and he signed for both entities. *Id.*

## II. Moore properly asserts a breach of contract claim against KrisJenn.

Because Moore is a proper party to sue for breach of the February 4 Email Agreement and the DMA Agreement and KrisJenn is liable for obligations under both agreements, Moore has established breach-of-contract claims.

### A. Moore has standing to sue for breach of contract.

"[T]o establish standing to maintain a breach of contract action, a plaintiff must show either third-party beneficiary status or privity." *OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.*, 234 S.W.3d 726, 738 (Tex. App.—Dallas 2007, pet. denied).

Because Moore—in his individual capacity and through SCMED[7]—was a party to the February 4, 2018 Email Agreement, privity of contract is established. *See id.* (reiterating that privity is established where plaintiff was a party to the contract). In the February 4, 2018 Email Agreement, Wright and Moore agreed to "remove Daniel Moore from all aspects that involve BLACK DUCK PROPERTIES, LLC"— including Moore's role as manager and his ownership through SCMED. Ex. 18 (Feb. 4, 2018 Email Agreement). The final sentence of the February

---

[7] In 2019, SCMED assigned to Moore all of its causes of action related to the DMA Agreement. Ex. 39 (Assignment of Claims). *See generally State Farm Fire and Cas. Co. v. Gandy*, 925 S.W.2d 696, 707 (Tex. 1996) ("Practicalities of the modern world have made free alienation of choses in action the general rule[.]").

13

4, 201,8 Email Agreement confirms Moore was a party: "I, Daniel Moore her[e]by fully accept and approve[ ]the terms and conditions of this email." *Id.* And it undisputed that Moore performed his contractual obligations when he resigned from his position as manager and relinquished SCMED's 50% stake in Black Duck.

In exchange for that performance, Wright—on behalf of Black Duck—promised "to legally transfer" from Black Duck "to DMA Properties, INC or any other [e]ntity owned by Daniel Moore of Daniel[']s choice" by a certain date "[n]o less than 20% Carried Interest" in the right-of-way. Moore therefore also intended to benefit from the February 4, 2018 Email Agreement, through his entity DMA Properties.

Black Duck, in performing its obligation to transfer no less than 20% carried interest, executed the DMA Agreement. The DMA Agreement is therefore merely part of the performance of the February 4, 2018 Email Agreement—the mechanism through which Black Duck conveyed the 20% net-profits interest to Moore's chosen entity per the terms of the February 4, 2018 Email Agreement.

Indeed, the DMA Agreement even expressly states that it is intended to "satisf[y] the duties ( in the Email Agreement ) regarding only the P-21 Express Pipeline"— the parties' term for the right-of-way. Ex. 20 (DMA Agreement).

### B. KrisJenn is liable for breach of contract.

In yet another attempt to escape liability, KrisJenn argues that Moore cannot bring his breach-of-contract claim against KrisJenn because "DMA entered into a contract with Black Duck, not Debtors." Mot. Summ. J. [#117] at 8–9. KrisJenn is liable on both contracts, however, for multiple, independent reasons.

First, when Moore previously moved for summary judgment, this Court held there was a fact issue as to whether DMA's 20% net-profits interest constitutes a real covenant or a personal covenant. If the DMA Agreement is a real covenant, then KrisJenn is bound to recognize DMA's ownership of a 20% net-profits interest in the right-of-way, "notwithstanding

the absence of contractual privity." *Excel Willowbrook, LLC v. JP Morgan Chase Bank, N.A.*, 758 F.3d 592, 599 (5th Cir. 2014).

Second, KrisJenn is liable for breach of the DMA Agreement because Wright used the KrisJenn entities and Black Duck to commit actual fraud to escape the DMA Agreement's obligations. Under Texas law, members of a limited liability company may be liable for the company's contractual obligations when the company is used to perpetrate an "actual fraud" on the plaintiff for the direct benefit of the defendant." TEX. BUS. ORG. CODE § 21.223.[8] In the veil-piercing context, actual fraud is defined as conduct "'involv[ing] dishonesty of purpose or intent to deceive.'" *Spring Street Partners–IV, LP v. Lam*, 730 F.3d 427, 442–43 (5th Cir. 2013) (alteration in original) (citing *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd)); *see also Matter of Ritz*, 832 F.3d 560, 567 (5th Cir. 2016).

As stated above, Wright has repeatedly used Black Duck and KrisJenn in his efforts to defraud Moore and Borders of their interests in the right-of-way. After Moore left Black Duck, Wright—through KrisJenn—owned 100% of Black Duck's membership interests. *See* Ex. ___ (Black Duck Company Agreement) at 6; Ex. 18 (Feb. 4, 2018 Email Agreement). Wright used his control over both entities to execute an "assignment" in October 2018 that represented KrisJenn has "foreclosed" on a note to Black Duck as well as "collateral which includes [Black Duck's] interest in the Express Gas Pipeline." Ex. 37 (Assignment of Note). And later, when TCRG accused Wright of fraud and forced Wright to rescind the sale, Wright used his control over both entities to redirect the right-of-way to one of the KrisJenn series, instead of to Black Duck. Wright has subsequently argued that this transfer wiped out DMA's interest in the right-of-way. What's more, there is little dispute that Wright ignored the required corporate formalities when transferring assets and liabilities between his entities. Indeed, KrisJenn previously argued that its series could not even be recognized as separate entities because

---

[8] Section 21.223 applies to domestic corporations as well as limited liability companies and foreign companies. *See* TEX. BUS. ORG. CODE § 101.002(a); *id.* § 9.203.

Wright had failed to keep adequate books and records and commingled funds between the series. *See* Resp. Mot. Sever [#28] at 4.

Third, fact issues exist as to whether KrisJenn was actually a party to the February 4 Email Agreement because it is unclear whether Wright approved that agreement: (a) on behalf of KrisJenn, the sole remaining member of Black Duck; (b) as a manager of Black Duck; (c) in his personal capacity; or (d) all of the above.

### III.  The Court should deny summary judgment with respect to Moore's tortious-interference claims.

#### A.  Moore is a proper party to sue for tortious interference.

Again arguing that Moore is not a "party or beneficiary to an existing contract," KrisJenn asserts that Moore's tortious-interference claim fails. Mot. Summ. J. [#117] at 9. But, as discussed in Part II(A), Moore has standing to bring his tortious-interference claim because he was both a party to the contract—as expressed in the February 4, 2018 Email Agreement and DMA Agreement—and an intended beneficiary of contract, through the entity of his choice.

#### B.  Fact issues exist as to whether KrisJenn tortiously interfered.

KrisJenn also argues that Moore "can provide no evidence" that KrisJenn interfered with the DMA Agreement or the February 4 Email Agreement. Mot. Summ. J. [#117] at 10. Yet Moore has identified multiple pieces of evidence raising fact issues as to whether KrisJenn tortiously interfered with those agreements. For example, Moore has put forward evidence that Wright caused KrisJenn to make an unauthorized loan to Black Duck and to place an invalid lien on the right-of-way. Ex. 1 (Moore Decl. ¶¶37–38). Wright and KrisJenn later claimed that they foreclosed on that unauthorized loan and the collateral, including Black Duck's interest in the right-of-way. Ex. 37 (Assignment of Note).

More fundamentally, Wright used his control over both Black Duck and KrisJenn to try and wipe out DMA's 20% net-profits interest in the right-of-way. To avoid Black Duck's obligations, Wright used his joint control over Black Duck and KrisJenn to orchestrate a transfer

16

of the right-of-way to KrisJenn. Ex. 36 (TCRG Repurchase Agreement); Ex. 35 (Compromise Settlement Agreement). Wright then terminated Black Duck, and Wright now claims that he is no longer obligated to honor the net-profits interests because he has transferred the right-of-way to KrisJenn. Ex. 40 (Certificate of Termination). And when TRCG demanded that Black Duck rescind its purchase of the right-of-way, Wright used KrisJenn Ranch, LLC–Series Pipeline ROW to reacquire the right-of-way to add another layer of corporate identity to avoid Black Duck's promises.

In short, Wright has repeatedly used his control over Black Duck and KrisJenn to play shell games with the right-of-way to escape DMA's 20% net-profits interest under the DMA Agreement. Genuine fact issues thus preclude summary judgment on Moore's claims that KrisJenn tortiously interfered with that agreement.

### C. Fact issues exist as to whether Debtors' interference proximately caused injury to Moore/SCMED and DMA.

KrisJenn next argues that even if it tortiously interfered, Moore cannot show that KrisJenn's conduct proximately caused any damages to Moore. Mot. Summ. J. [#117].

Yet Moore has already put forward evidence of both proximate causation and damages. Wright claims that he does not have to honor DMA's 20% net-profits interest because the right-of-way has been shuffled from Black Duck to KrisJenn. *See id.* at 9–10. If the Court adopts Wright's position, then Moore has been damaged by Wright and KrisJenn's shell game: he was deprived of his 20% net-profits interest. KrisJenn has admitted that the right-of-way was expected to generate exorbitant profits for Black Duck. *See* Mot. Financing [#4] ¶5 (estimating an "aggregate, projected profit to Black Duck and other interested parties" of "$48,000 per day"). Through its interference, KrisJenn deprived Moore of his portion of those profits.

At a minimum, these actions by Wright and KrisJenn raise fact issues as to proximate causation and damages, making summary judgment inappropriate.

### D. Fact issues preclude summary judgment on Debtors' affirmative defense of justification.

Finally, KrisJenn argues it is entitled to summary judgment on its affirmative defense of justification because all its actions were privileged or justified as a matter of law. Mot. Summ. J. [#117] at 11–12. The only evidence that KrisJenn cites is an affidavit from Wright. *See id.* [#117-1] Ex. A (Wright Aff.).

The affirmative defenses of justification and privilege do not apply when "there is interference by illegal or tortious means, such as misrepresentation or fraud." *Lamont v. Vaquillas Energy Lopeno Ltd.,* 421 S.W. 3d 198 (Tex. App.—San Antonio 2013, pet. denied). As outlined above, fact issues exist as to whether Wright used KrisJenn to defraud Moore and Borders's of their interests in the right-of-way. These fact issues preclude judgment on KrisJenn's affirmative defenses of justification and privilege. To rehash:

(1) Wright promised to transfer a 20% net-profits interest in the right-of-way to DMA in exchange for Moore's resignation as manager and relinquishment of his ownership interest.

(2) Once Moore withdrew from Black Duck, Wright then used his control over KrisJenn and Black Duck to sell the right-of-way to TCRG (while not disclosing the net-profits interest) and allegedly foreclosed on Black Duck's assets.

(3) After TCRG learned about the net-profits interests and demanded that Black Duck rescind the sale, Wright terminated Black Duck as an entity and then shuffled the right-of-way to KrisJenn.

(4) Wright now claims this shuffle eliminated DMA's net-profits interest, because only Black Duck was obligated to pay that interest—and Wright shut down Black Duck when he transferred the right-of-way to KrisJenn.

Wright should not be allowed to use KrisJenn as a puppet to cover for his attempts to breach the DMA Agreement and the February 4 Email Agreement. Since fact issues exist regarding whether Wright was justified in using KrisJenn to disregard DMA's net-profits interest, the Court should deny summary judgment on KrisJenn's affirmative defense of justification.

## CONCLUSION

For these reasons, Moore respectfully asks that the Court deny KrisJenn's motion for summary judgment in its entirety.

## CERTIFICATE OF SERVICE

I hereby certify that on November 30, 2020, a true and correct copy of the above and foregoing instrument was served via the Court's electronic transmission facilities on those parties registered for such notice and served via first class mail, postage prepaid on the parties below.

| | |
|---|---|
| Charles John Muller, IV<br>Email: john@muller-smeberg.com<br>Muller Smeberg, PLLC<br>111 W. Sunset<br>San Antonio, TX 78209<br><br>Ronald J. Smeberg<br>Email: ron@smeberg.com<br>The Smeberg Law Firm, PLLC<br>2010 W Kings Hwy<br>San Antonio, TX 78201-4926<br><br>*Counsel to Plaintiffs Krisjenn Ranch, LLC and its Series* | Michael Black<br>Email: mblack@burnsandblack.com<br>Burns and Black PLLC<br>750 Rittiman Road<br>San Antonio, TX 78209<br><br>Jeffery Duke<br>Email: jduke@dbmmlaw.com<br>Duke Banister Miller & Miller<br>22310 Grand Corner Drive, Suite 110<br>Katy, TX 77494<br><br>*Counsel to Defendant Longbranch Energy, LP* |
| Ronald J. Smeberg<br>Email: ron@smeberg.com<br>The Smeberg Law Firm, PLLC<br>2010 W Kings Hwy<br>San Antonio, TX 78201-4926<br><br>*Counsel to Third-Party Defendant Black Duck Properties, LLC* | Shane P. Tobin<br>Email: shane.p.tobin@usdoj.gov<br>Office of the U.S. Trustee<br>903 San Jacinto Blvd, Room 230<br>Austin, Texas 78701<br><br>*United States Trustee* |
| William P. Germany<br>Email: wgermany@bsklaw.com<br>BAYNE, SNELL & KRAUSE<br>1250 N.E. Loop 410, Suite 725<br>San Antonio, Texas 78209<br><br>*Counsel to Third-Party Defendant Larry Wright* | John Terrill<br>12712 Arrowhead Lane<br>Oklahoma City, OK 73120<br><br>*Third Party Defendant, pro se* |

                                                            */s/ Christopher Johns*
                                                            Christopher Johns