## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: § | | Chapter 11 |
| **KRISJENN RANCH, LLC,** § | | |
| *Debtor* § | | Case No. 20-50805 |
| § | | |

---

| | | |
|---|---|---|
| **KRISJENN RANCH, LLC and** § | | |
| **KRISJENN RANCH, LLC-SERIES** § | | |
| **UVALDE RANCH, and KRISJENN** § | | |
| **RANCH, LLC-SERIES PIPELINE** § | | |
| **ROW as successors in interest to** § | | |
| **BLACKDUCK PROPERTIES, LLC,** § | | |
| *Plaintiffs* § | | |
| § | | |
| v. § | | |
| § | | |
| **DMA PROPERTIES, INC., and** § | | |
| **LONGBRANCH ENERGY, LP,** § | | Adversary No. 20-05027 |
| *Defendants* § | | |

---

| | | |
|---|---|---|
| § | | |
| **DMA PROPERTIES, INC.,** § | | |
| *Cross-Plaintiff/Third Party Plaintiff* § | | |
| § | | |
| v. § | | |
| § | | |
| **KRISJENN RANCH, LLC,** § | | |
| **KRISJENN RANCH, LLC-SERIES** § | | |
| **UVALDE RANCH, and KRISJENN** § | | |
| **RANCH, LLC-SERIES PIPELINE ROW,** § | | Adversary No. 20-05027 |
| **BLACK DUCK PROPERTIES, LLC,** § | | |
| **LARRY WRIGHT, and JOHN TERRILL,** § | | |
| *Cross-Defendants/Third-Party* § | | |
| *Defendants* § | | |

### DEBTORS' RESPONSE TO DMA, MOORE, AND LONGBRANCH'S MOTION TO DISMISS NEW COUNTERCLAIMS UNDER RULE 12(b)(6)

TO THE HONORABLE CHIEF BANKRUPCY JUDGE RONALD B. KING:

COME NOW Debtors, Plaintiffs, and Counter-Defendants KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series Uvalde Ranch, and KrisJenn Ranch, LLC-Series Pipeline Row (collectively the "Debtors"), and file this Response to DMA, Moore, and Longbranch's (collectively the "Defendants") Motion to Dismiss New Counterclaims under Rule 12(b)(6), and would respectfully show as follows:

## BACKGROUND

In February 2016, Darrin Borders, through his entity Longbranch Energy, LP ("Longbranch"), secured the right to purchase the Pipeline and its Right of Way (respectively, the "Pipeline" and "ROW"). Longbranch did not have the monetary resources to close this transaction and, therefore, sold and assigned the right to purchase the Pipeline and ROW to Black Duck Properties, LLC ("Black Duck") in exchange for a promise that Black Duck would pay 20% of its profits from the funds received by Black Duck in relation to the maintenance, sale, use, and operation of the Pipeline to DMA (the "Longbranch Agreement").

Black Duck was owned by SCMED Oilfield Consulting, LLC ("SCMED") and KrisJenn Ranch, LLC ("KrisJenn"). During its formation, Black Duck raised $1,000 in initial capital. Black Duck's Operating Agreement states that no further capital contributions could be compelled, and that all subsequent funding to the company would be a loan from the members. As such, all members of Black Duck knew that its operations would be funded by and through loans from its inception.

KrisJenn provided approximately $5 million in loans to Black Duck in order to fund the purchase of the Pipeline and ROW. Of this amount, KrisJenn secured $4.1 million from another lender on a short-term loan. KrisJenn contributed these funds because SCMED, by and through

Moore, falsely and fraudulently claimed that it could promptly secure a buyer for the Pipeline and ROW.

SCMED was unable to locate a buyer for the Pipeline and ROW, and thereafter failed to actively participate in Black Duck. SCMED subsequently surrendered its ownership in Black Duck in return for a promise that Black Duck would pay 20% of its profits from the funds received by Black Duck in relation to the maintenance, sale, use, and operation of the Pipeline to DMA (the "DMA Agreement"). The Longbranch Agreement and the DMA Agreement are collectively referred to as the Pipeline Agreements. At all relevant times, and continuing to the present date, Black Duck has honored the Pipeline Agreements. Eventually, Black Duck did find a purchaser for the Pipeline—TCRG. Black Duck did, in fact, include DMA and Longbranch's net profits interest in the transaction. In particular, Black Duck agreed that 20% of the estimated daily profits from the TCRG deal would be paid to DMA and 20% of the estimated daily profits would be paid to Longbranch. The daily payments were estimated to be $48,000 and, as a result, DMA and Longbranch were each estimated to receive $10,000 a day after Black Duck's acquisition costs had been satisfied.

DMA, Moore, and Longbranch were not satisfied with this result. They contacted TCRG directly and demanded to receive 20% of TCRG's net profits, rather than 20% of the net profits received by Black Duck. This position was not supported by any law and, moreover, was directly contrary to the clear language of the Pipeline Agreements. DMA and Longbranch each have a 20% net profits interest in Black Duck's profits from the sale, maintenance, operation, or use of the Pipeline—not a subsequent purchaser's profits. Nevertheless, DMA, Moore, and Longbranch repeatedly threatened TCRG with litigation and convinced its principals that Wright had lied about DMA and Longbranch's interests under the Pipeline Agreements. These representations were

categorically false, and all parties to the transaction were well aware that they would receive the net profits interest that were promised by Black Duck. In fact, an email dated September 20, 2016 directly demonstrates that Moore and Borders—as principals of SCMED and Longbranch, respectively—understood and agreed with the Debtors' interpretation of the Pipeline Agreements. *See* Ex. A.

In the September 20, 2016 email, Moore and Borders agree that DMA and Longbranch would receive 20% net profits of only certain revenues received by Black Duck. *See* Ex. A (admitting in an email from Moore to Borders that the DMA and Longbranch agreements would entitle DMA and Longbranch to a 20% interest after expenses and then Longbranch and DMA "would have no further participation if Larry walked away" from the Pipeline).[1]

---

[1] The September 20, 2016 email at 9:45 AM from Daniel Moore to Darin Borders states:

Darin,

> Per our conversation over the past few weeks I wanted to make sure we are on the same page prior to my meeting with Larry and Hagan. As you know[,] Larry has been speaking with a few potential investors/buyers that seem to be willing to buy him/all of us out. As you and I discussed, it was clear to me that we are on the same page. Can I speak for you when I say that we are not wanting Larry to sell the option on the pipeline for $1,000,000.00. That would (*per our agreement*) leave us with approximately $100,000.00 each and we would have no further participation if Larry walked away? Furthermore, even if Larry does get us 2 cents that only leaves us with 0.04 cents per/bbl that will run with the land. While that is better than nothing, is it fair to say that we gave up our control and took a risk on getting 20% (each) of what Larry *actually receives* so that we could have the TIME to put together a solid deal.
>
> I am going to let Larry know that we sincerely understand and agree that it is his right to make the deal he sees fit and *we accept that what we end up with is ultimately in his hands*, however, we would like a first right of refusal on any deals he is willing to take.
>
> Please confirm you agree with the terms of this email.
>
> Thanks,
> Daniel Moore

Ex. A (emphasis added). It is clear from this email that both Moore and Borders understood that they would only get 20% of what Black Duck actually received less expenses. In the scenario *drafted by Moore*, Moore acknowledges that the Longbranch and DMA agreements would entitle each of them only $100,000—$1,000,000 minus $500,000 in expenses multiplied by their 20% interests each. Further, Moore acknowledged that if Black Duck were to receive 2 cents per/bbl as a carried interest, Longbranch and DMA would only be entitled to 20% of 2 cents—0.4 cents per/bbl each.

*Debtors' Response to DMA, Moore,* 4
*And Longbranch's Motion to Dismiss*

**LEGAL STANDARD**

The Court "must construe [the non-movant's] complaint in the light most favorable to them and take all the allegations contained therein as true." *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "A case should not be dismissed pursuant to Rule 12(b)(6) 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Clark*, 794 F.2d at 970 (quoting *Conley v. Gibson*, 355 U.S. 41, 45 (1957)).

"Although Rule 12(b)(6) is a powerful tool to use in expediting the judicial process and exercising court calendars of cases in which there are no judicially cognizable claims, it is a disfavored motion and is rarely granted." *Clark*, 794 F.2d at 970. "Rule 12(b)(6) should not be used as a substitute for a request of a more definite pleading . . .[,] [n]or is a Rule 12(b)(6) dismissal warranted because the district court believes the plaintiff is unlikely to prevail on the merits." *Id.* "Even if it seems 'almost a certainty to the court that the facts alleged cannot be proved to support the legal claim,' the claim may not be dismissed so long as the complaint states a claim." *Id.* (quoting *Boudeloche v. Grow Chemical Coatings Corp.*, 728 F.2d 759, 762 (5th Cir. 1984)) ("To qualify for dismissal under Rule (12)(b)(6), a complaint must on its face show a bar to relief.").

**ARGUMENT**

**I. DEBTORS' TORTIOUS INTERFERENCE CLAIMS SHOULD NOT BE DISMISSED BECAUSE THEY ARE CLAIMS UPON WHICH RELIEF CAN BE GRANTED**

The Texas Supreme Court has "identified the elements of tortious interference with an existing contract as: (1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss." *Prudential Ins. Co. of Am. v. Financial Review Serv., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000).

"Justification is an affirmative defense to tortious interference with [a] contract . . . ." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 80. "[A]s an affirmative defense, a defendant may negate liability on the ground that its conduct was privileged or justified." *Id.* at 77–78. "The justification defense can be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right, even though that claim ultimately proves to be mistaken." *Id.* at 80. "[I]f a trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, the defendant has conclusively established the justification defense, and the motive is irrelevant." *Id.* "Alternatively, if the defendant cannot prove justification as a matter of law, it can still establish the defense if the trial court determines that the defendant interfered while exercising a colorable right, and the jury finds that, although mistaken, the defendant exercised that colorable right in good faith." *Id.*

### A. The Court should not dismiss Debtors' tortious interference claim simply because the Defendants may have an affirmative defense to the claim.

The very fact that the Defendants try to use an affirmative defense to dismiss the Debtors' tortious interference is a concession that the Debtors' have in fact stated a claim upon which relief can be granted. As such, the Court may only dismiss the Debtors' tortious interference claims if a successful affirmative defense appears on the face of the pleadings. *Miller v. BAC Home Loans Serv., L.P.*, 726 F.3d 717, 726 (5th Cir. 2013).

Here, the Debtors' pleadings support the Debtors' interpretation of the Pipeline Agreements—that the Defendants are entitled to 20% of the net profits received by *Black Duck* from the operation, maintenance, use, or sale of the Pipeline—and any interference with a subsequent contract with TCRG under that interpretation should be adjudicated at a trial on the merits. The Defendants' try to construe the Debtors' pleadings to mean the Defendants are entitled

to 20% of the net profits received by any subsequent owner of the Pipeline in order to dismiss the Debtors' tortious interference claims before it ever reaches a trial on the merits. However, under the 12(b)(6) standard, the Court is to construe the Debtors' complaint in the light most favorable to the Debtors rather than the Defendants. *See Clark*, 794 F.2d at 970 (citing *Scheuer*, 416 U.S. at 236) (holding the Court "must construe [the non-movant's] complaint in the light most favorable to them and take all the allegations contained therein as true"). Therefore, the Court should deny the Defendants motion to dismiss Debtors' tortious interference claim.

> **B. The Defendants actions could not have been justified as a matter of law because the Defendants knew they were trying to enforce rights greater than those they were entitled to under the Agreements.**

The Court should also deny the Defendants motion to dismiss the Debtors' tortious interference claims because they are valid claims upon which relief can be granted. The affirmative defense of justification is not successful on the face of the pleadings and should be adjudicated at a trial on the merits.

"The justification defense can [only] be based on the exercise of either (1) one's own legal rights or (2) a good-faith claim to a colorable legal right . . . ." *Prudential Ins. Co. of Am.*, 29 S.W.3d at 80.

First, the Defendants are not entitled to have the Debtors' tortious interference claims dismissed because the Defendants have not conclusively established the justification defense. Simply stating the Defendants were exercising their own legal rights in a motion to dismiss is not sufficient to establish the defense as a matter of law. This Court has not held, as a matter of law, that the Defendants had a legal right to interfere with the TCRG deal. *See id.* ("[I]f a trial court finds as a matter of law that the defendant had a legal right to interfere with a contract, the defendant has conclusively established the justification defense."). Therefore, the Defendants are not entitled to have the Debtors' claims dismissed under the first prong of the justification defense.

Second, the Defendants are not entitled to have the Debtors' tortious interference claims dismissed because the Defendants were not exercising colorable legal rights in good faith. The Defendants would have to actually have believed their own position in order to interfere with the TCRG deal by exercising colorable legal rights in good faith. However, the September 20, 2016 email makes clear that the Defendants knew their rights only extended to a claim in 20% of the profits actually received by Black Duck in the maintenance, sale, operation, or use of the Pipeline. *See* Ex. A. The Defendants were no longer satisfied with the deals they struck under the Pipeline Agreements, and proactively tried to scuttle the deal with TCRG in order to force better terms on the Debtors and Wright. These are hardly the type of actions the "justification" defense was meant to protect.

Moreover, the inquiry on whether the Defendants exercised a colorable legal right in good faith is a question of fact. *See id.* ("Alternatively, if the defendant cannot prove justification as a matter of law, it can still establish the defense if the trial court determines that the defendant interfered while exercising a colorable right, and the jury finds that, although mistaken, the defendant exercised that colorable right in good faith."). Thus, it is for the fact finder to decide whether the defendants exercised their colorable right in good faith at a trial on the merits.

Here, Black Duck sold the Pipeline to TCRG in exchange for $2.5 million and a 16% gross interest in the funds generated by the Pipeline. Black Duck would have been obligated to pay DMA and Longbranch 20% of whatever net profits were generated from the Pipeline after the KrisJenn loan was paid off. Black Duck affirmatively made plans to pay DMA and Longbranch 20% of its net profits on the sale to TCRG; however, DMA, Moore, and Longbranch were not satisfied with the Agreements and demanded to receive 20% of TCRG's net profits. DMA, Moore,

and Longbranch subsequently threatened a lawsuit against TCRG claiming to have a 20% interest in the Pipeline that "ran with the land."

Now the Defendants claim that the Debtors' tortious interference claims should be dismissed for failure to state a claim upon which relief can be granted because the Defendants were justified when they tortiously interfered with the TCRG deal. However, the Defendants could not have been justified in their actions because they were trying to enforce rights that were greater than those conferred by the Pipeline Agreements. The September 20, 2016 email makes it clear that the Defendants knew their rights only entitled them to claim a 20% net profits interest in what Black Duck received from the sale, maintenance, operation, or use of the Pipeline. *See* Ex. A. Moore and Borders spelled out a scenario exactly like the TCRG deal and stated they understood that DMA and Longbranch were only entitled to "20% (each) of what Larry *actually receives*" from the deal. *See* Ex. A. Following these representations, the Defendants cannot now take an inconsistent position by claiming they were exercising their legal rights or making a good-faith claim to a colorable legal right in order to fit into the definition of an affirmative defense. The Defendants ask the Court to accept their inconsistent position as a basis to dismiss the Debtors' claims for tortious interference under "the rigid 12(b)(6) standard." *See Clark*, 794 F.2d at 970.

A Rule 12(b)(6) is not the proper motion to adjudicate these issues of fact, and the Debtors' should not be deprived of their day in court because of the Defendants' improper and untimely motion.

**II. THE COURT SHOULD DENY THE DEFENDANTS' MOTION TO DISMISS DEBTORS' BREACH OF CONTRACT CLAIM AS MOOT BECAUSE THE DEBTORS DO NOT HAVE A BREACH OF CONTRACT CLAIM IN ITS LIVE COMPLAINT.**

"An amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the

earlier pleading." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (per curiam). When a motion to dismiss has been filed against a superseded complaint, the proper course is to deny the motion to dismiss as moot." *Michael v. Boutwell*, No. 3:24-CV-00116-DMB-SAA, 2015 WL 728516, at *4 (N.D. Miss. Feb. 19, 2015) (citing cases holding and denying as moot a motion to dismiss a superseded complaint).

Here, the Defendants move to dismiss the Debtors Breach of Contract claim contained in a second amended complaint filed on November 2, 2020 at Docket number 138. *See* Dkt. 138. This complaint incorrectly included a breach of contract claim due to clerical error. However, Debtors superseded that complaint with the correct filing on November 3, 2020 at Docket number 141. *See* Dkt. 141. The most recent and live complaint filed by Debtors does not contain a breach of contract claim. *See id.* Therefore, the Court should deny the Defendants motion to dismiss Debtors breach of contract claim as moot because no such claim exists in the Debtors' live pleadings.

WHEREFORE PREMISES CONSIDERED Debtors pray that this Court issue an order denying DMA, Moore, and Longbranch's Motion to Dismiss New Counterclaims under Rule 12(b)(6), and for such further relief as the Court may deem them justly entitled.

Dated: December 4, 2020.

Respectfully submitted,

MULLER SMEBERG, PLLC

By:   /s/ *John Muller*
     C. John Muller IV
     State Bar No. 24070306
     john@muller-smeberg.com
     Ronald J. Smeberg
     State Bar No. 24033967
     ron@smeberg.com
     Ezekiel J. Perez
     State Bar No. 24096782
     zeke@muller-smeberg.com
     MULLER SMEBERG, PLLC
     111 W. Sunset Rd.
     San Antonio, TX 78209
     Telephone: 210-664-5000
     Facsimile: 210-598-7357

     ATTORNEYS FOR DEBTORS

**CERTIFICATE OF SERVICE**

   I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system by notice of electronic filing or via email on the 4th day of December 2020:

Michael Black
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, Texas 78209
210-829-2022
210-829-2021 fax
mblack@burnsandblack.com
Attorneys for Longbranch Energy, LP
and DMA Properties, Inc.

Christopher S. Johns
Christen Mason Hebert
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

Timothy Cleveland
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
Attorneys for DMA Properties, Inc.

Natalie Wilson
LANGLEY & BANACK, INC.
745 East Mulberry Avenue | Suite 700
San Antonio, TX 78212
210-736-6600
lwilson@langleybanack.com
Attorneys for DMA Properties, Inc.

Jeffery Duke
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, Texas 77494
jduke@dbmmlaw.com
Counsel for Longbranch Energy, LP

William Germany
BAYNE, SNELL, & KRAUSE
1250 NE Loop 410, Ste. 725
San Antonio, Texas 78209
T- (210) 824-3278
F- (210) 824-3937
wgermany@bskaw.net
Attorney for Larry Wright

OFFICE OF THE UNITED STATES TRUSTEE
903 San Jacinto Blvd, Room 230
Austin, Texas 78701
shane.p.tobin@usdoj.gov
United States Trustee

          /s/ *John Muller*
          C. John Muller IV