IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re:<br>**KRISJENN RANCH, LLC,**<br>*Debtor* | §<br>§<br>§<br>§ | Chapter 11<br><br>Case No. 20-50805 |
| **KRISJENN RANCH, LLC and**<br>**KRISJENN RANCH, LLC-SERIES**<br>**UVALDE RANCH, and KRISJENN**<br>**RANCH, LLC-SERIES PIPELINE**<br>**ROW as successors in interest to**<br>**BLACKDUCK PROPERTIES, LLC,**<br>*Plaintiffs*<br><br>v.<br><br>**DMA PROPERTIES, INC., and**<br>**LONGBRANCH ENERGY, LP,**<br>*Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adversary No. 20-05027 |
| **DMA PROPERTIES, INC.,**<br>*Cross-Plaintiff/Third Party Plaintiff*<br><br>v.<br><br>**KRISJENN RANCH, LLC,**<br>**KRISJENN RANCH, LLC-SERIES**<br>**UVALDE RANCH, and KRISJENN**<br>**RANCH, LLC-SERIES PIPELINE ROW,**<br>**BLACK DUCK PROPERTIES, LLC,**<br>**LARRY WRIGHT, and JOHN TERRILL,**<br>*Cross-Defendants/Third-Party*<br>*Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adversary No. 20-05027 |

**DEBTORS' REPLY TO DMA'S RESPONSE IN OPPOSITION
TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE HONORABLE CHIEF BANKRUPCY JUDGE RONALD B. KING:

*Debtors' Reply to DMA's PMSJ Response*      1

COME NOW Debtors, Plaintiffs, and Counter-Defendants KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series Uvalde Ranch, and KrisJenn Ranch, LLC-Series Pipeline Row (collectively the "Debtors"), and file this Response to DMA's Response in Opposition to Debtors' Motion for Partial Summary Judgment, and would respectfully show as follows:

**LEGAL STANDARD**

"A party is entitled to summary judgment if it can demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law." *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing FED. R. CIV. P. 56(c)). "Once a movant who does not have the burden of proof at trial makes a properly supported motion, the burden shifts to the nonmovant to show that a summary judgment should not be granted." *Ragas*, 136 F.3d at 458 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 321–25 (1986)). "When ruling on a motion for summary judgment, 'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Ragas*, 136 F.3d at 458.

"[I]n the face of the defendant's properly supported motion for summary judgment, the plaintiff c[an] not rest on his allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290 (1968)). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50 (citations omitted).[1]

---

[1] DMA had the burden to raise an issue of material fact supporting its positions. Throughout DMA's response, it either fails to support its contentions with probative evidence or simply states that "DMA has put on evidence" at some previous point in time. However, it was DMA's burden to present evidence *in its response*. The Court should

*Debtors' Reply to DMA's PMSJ Response*      2

# ARGUMENT

## I. DMA'S TORT CLAIMS ARE BARRED BY THE ECONOMIC LOSS RULE

### A. *Conversion can be barred by the economic loss rule if the duty breached is not independent from the underlying contractual undertaking and the harm suffered is merely the economic benefit of the lost contract.*

In *Dixie Carpet Installations, Inc. v. Residences at Riverdale, LP*, 599 S.W.3d 618 (Tex. App.—Dallas 2020, no pet.), the Dallas Court of Appeals held that intentional torts such as conversion can be excluded from the economic loss rule. "Although the rule has been held inapplicable in certain cases involving intentional torts, the emphasis is not on the tort alleged per se, but whether the duty breached is independent from the underlying contractual undertaking and the harm suffered is not merely the lost contract economic benefit." *Id.* at 634. (citing *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014)); *see also Stauffacher v. Coadum Capital Fund 1, LLC*, 344 S.W.3d 584, 591 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (holding the economic loss rule applied to claims against joint venture for contract and fiduciary duty breaches because there was no evidence of how the investment fund was damaged "specifically by" the joint venturer's fiduciary breach separate from his failure to comply with the joint-venture agreement).

The *Dixie* Court held that "Dixie's conversion claim rests on the fact that Riverdale's conduct deprived Dixie from receiving its bargained for consideration" under the contract. *Dixie Carpet Installations, Inc.*, 599 S.W.3d at 636. Here, DMA's conversion claim rests on the fact that the Debtors conduct deprived DMA from receiving its bargained for consideration under the contract. The *Dixie* case is directly on point. Therefore, the Court should grant summary judgment on DMA's conversion claim.

Similarly, DMA's breach of fiduciary duty claim rests on the fact that the Debtors failed to remit payment to DMA as was required by the contract. As such, DMA's breach of fiduciary duty

---

grant summary judgment on every cause of action DMA failed to meet its burden because it did not support its allegations with evidence.

*Debtors' Reply to DMA's PMSJ Response* 3

claim is barred by the economic loss rule because the alleged duty is not independent form the underlying contractual undertaking and the harm suffered is merely the loss of the economic benefit from the contract.[2] *See Dixie Carpet Installations, Inc.*, 599 S.W.3d at 634. Therefore, the Court should grant summary judgment on DMA's breach of fiduciary duty claims regarding the Bigfoot Note Payments.

## II. DMA DOES NOT HAVE STANDING TO BRING A BREACH OF CONTRACT CLAIM AGAINST DEBTORS

### A. *Debtors are not the proper parties to be sued.*

First, DMA argues that it has to standing to sue under the DMA Agreement. That may be true, but Debtors are not arguing that DMA does not have standing to sue the parties to the DMA Agreement. Instead Debtors argue they are the wrong parties to be sued because the Debtors were not parties to the DMA Agreement. Therefore, DMA's arguments regarding its standing to sue under the DMA Agreement is irrelevant.

Second, DMA claims—for the first time—that he is entitled to sue the Debtors because they *may* be liable for Black Duck's obligations under the fraud exception in section 21.223(b) of the Texas Business Organizations Code. As argued at length in Debtors' reply to Moore's response, DMA cannot show that Debtors committed any fraudulent acts against it.

---

[2] DMA attempts to impose duties on Debtors that belong to Black Duck. This is premised on DMA's misunderstanding of the difference between a successor and a successor-in-interest. KrisJenn is not a successor to Black Duck, but rather is a successor-in-interest to Black Duck. Black's Law Dictionary defines the two terms as follows:

> **successor.** A corporation that, through amalgamation, consolidation, or other assumption of interest is vested with the rights and duties of an earlier corporation.
>
> **successor in interest.** One who follows another in ownership or control of property.

*Successor*, Black's Law Dictionary (9th ed. 2009); *Successor in Interest*, Black's Law Dictionary (9th ed. 2009). Here, KrisJenn is a "successor-in-interest" to Black Duck's ownership or control of certain property. It is not a "successor" to Black Duck as a matter of law. Thus, KrisJenn does not assume the duties of Black Duck because the foreclosure between the two companies only transferred the assets of Black Duck to KrisJenn.

*Debtors' Reply to DMA's PMSJ Response* 4

DMA asserts through its incorporation of Moore's response that Debtors committed acts of fraud against DMA. However, DMA's allegations again seem to be only against Wright and Wright's "use" of the KrisJenn entities to perpetrate a fraud. Should the Court find DMA's fraud claims implicate the Debtors, Debtors respond without conceding this position.

Specifically, DMA alleges that Wright used the Debtors to secretly indebt Black Duck without authorization from Moore. However, several emails to and from Moore show that he knew and operated under the assumption that Black Duck had taken a loan from Debtors in order to purchase the Pipeline. *See* Ex. A (disclosing the need for Black Duck to take out a $5 million loan in order to fund the purchase of the Pipeline); Ex. B (Moore explaining net profits would not be obtained until after the Debtors were reimbursed for the initial $5 million loan plus interest).

Next, DMA alleges the Debtors orchestrated a fraudulent foreclosure on Black Duck's assets to obtain the Pipeline. This is just simply not true. While Debtors did foreclose on whatever assets Black Duck had at the time, Debtors obtained the Pipeline because they were forced to purchase it back from TCRG after Moore, DMA, and Longbranch threatened to sue TCRG and compromised that business relationship. The foreclosure had no effect on Debtors acquisition of the Pipeline.

Finally, DMA argues that Wright purchased the Pipeline from TCRG through KrisJenn Ranch, LLC-Series Pipeline Row "in an attempt to erase Moore's 20% net-profits interest." Dkt 175 (Moore's Response to PMSJ). Again, this is untrue. The Pipeline was sold to TCRG and Wright had every intention to pay DMA and Longbranch 20% each of the net profits, i.e. profits after the initial purchase price had been reimbursed. However, before any net profits were realized, Moore, DMA, and Longbranch scuttled the deal with TCRG and TCRG demanded that Wright purchase the Pipeline to preserve that business relationship. Black Duck was no longer a going

concern at this point, so Wright used another entity he owned to purchase the Pipeline from TCRG. There was nothing fraudulent about these transactions, and the transition of the Pipeline from TCRG to Series Pipeline ROW was due to Moore, DMA, and Longbranch's conduct—not the conduct of Wright or the Debtors.

In this portion of his response, DMA fails to connect the dots or explain how any of these legal and reasonable actions amount to fraud. DMA's pleadings and summary judgment response fail to present any probative evidence or legal argument implicating Debtors in its fraud claims. As such, the Court should grant summary judgment on DMA's breach of contract claims because section 21.223(b) of the Texas Business Organizations Code is inapplicable.

### III. DMA'S CLAIM FOR MONEY HAD AND RECEIVED REGARDING THE PIPELINE DOES NOT PRESENT AN ISSUE OF FACT BECAUSE MOORE ACKNOWLEDGED THAT KRISJENN LOANED THE PURCHASE MONEY FOR THE PIPELINE TO BLACK DUCK

DMA claims that the money Black Duck used to purchase the Pipeline was a capital contribution from KrisJenn rather than a loan. However, that position is nonsensical and without merit.

Here, DMA could not have reasonably believed that Wright or the Debtors were going to simply pay over $5 million, take all of the risk in purchasing the Pipeline, and give the Pipeline to Black Duck without some sort of security. This would be tantamount to simply giving SCMED 50% of a $5 million asset in exchange for nothing. The only reasonable view of the facts is that Black Duck borrowed the funds to purchase the Pipeline from KrisJenn. Then, when Black Duck sold the Pipeline, it would repay the loan to KrisJenn and disburse the profits among Black Duck's members and any person that may hold a net profits interest in those profits obtained by Black Duck. In fact, Moore admits this was his understanding of the facts in an email he sent to Wright on February 7, 2018. *See* Ex. B (calculating Moore's interest in profits generated by the Pipeline

*after* KrisJenn was reimbursed for the loan Black Duck took from KrisJenn to purchase the Pipeline). Moore was required to exercise ordinary care for the protection of his own interests. Further, Moore was aware of the loan and recognized its existence in several emails. *See* Ex. A; Ex. B. Moore cannot now claim the loan was a capital contribution in order to claim a percentage of the money received by Black Duck in the TCRG deal.

DMA only cites Moore's self-serving declaration to support its position that the money used to purchase the Pipeline was a capital contribution. The Court should grant summary judgment on DMA's money had and received claim against the Debtors because DMA has failed to present sufficient evidence showing Debtors ever received money that belonged to DMA from the sale of the Pipeline.

## IV. DMA FAILS TO SUPPORT ITS TORTIOUS INTERFERENCE CLAIM WITH EVIDENCE

### A. *DMA fails to meet its burden on tortious interference.*

DMA fails to explain how the various actions Debtors took regarding the sale of the Pipeline amount to tortious interference with the DMA contract. DMA does not cite any law linking the facts to the elements of the cause of action and fails to analyze the facts that are presented under the applicable law for tortious interference. DMA has wholly failed to meet its burden under the summary judgment standard in his response.

### B. *DMA does not cite any law or evidence supporting the causation element of its tortious interference claim.*

Debtors claimed DMA was unable to show that the Debtors purported tortious interference caused DMA damages. In response, DMA cites no law and cites no evidence at all supporting the causation element of its tortious interference claim. The Court should grant summary judgment on DMA's tortious interference claim because DMA failed to produce any evidence—much less probative evidence—creating a material issue of fact on the causation element.

      ***C. DMA's tortious interference claim fails because Debtors were justified in their actions when they operated under the mutual understanding of the DMA Agreement.***

As mentioned above, the Debtors did not interfere with the DMA Agreement through misrepresentation or fraud. Black Duck simply sold the Pipeline to TCRG and planned on paying DMA and Longbranch 20% of the net profits after the KrisJenn loan was repaid. Then, when Moore, DMA, and Longbranch scuttled the deal with TCRG, Series Pipeline Row bought the Pipeline from TCRG. It is unclear how DMA can claim tortious interference under these facts. Even if DMA was able to state a proper claim for tortious interference, the Debtors' actions were proper under the circumstances. Because the Debtors were enforcing their legal rights and complying with their interpretation of the contract, they were justified in any purported interference with the DMA Agreement.

      WHEREFORE PREMISES CONSIDERED Debtors pray that this Court issue an order granting Debtors' Motion for Partial Summary Judgment on DMA's Claims, and for such further relief as the Court may deem them justly entitled.

      Dated: December 4, 2020.

Respectfully submitted,

MULLER SMEBERG, PLLC

By:   /s/ *John Muller*
     C. John Muller IV
     State Bar No. 24070306
     john@muller-smeberg.com
     Ronald J. Smeberg
     State Bar No. 24033967
     ron@smeberg.com
     Ezekiel J. Perez
     State Bar No. 24096782
     zeke@muller-smeberg.com
     111 W. Sunset Rd.
     San Antonio, TX 78209
     Telephone: 210-664-5000
     Facsimile: 210-598-7357

     ATTORNEYS FOR DEBTORS

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system by notice of electronic filing or via email on the 4th day of December 2020:

Michael Black
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, Texas 78209
210-829-2022
210-829-2021 fax
mblack@burnsandblack.com
Attorneys for Longbranch Energy, LP
and DMA Properties, Inc.

Christopher S. Johns
Christen Mason Hebert
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

Timothy Cleveland
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
Attorneys for DMA Properties, Inc.

Natalie Wilson
LANGLEY & BANACK, INC.
745 East Mulberry Avenue | Suite 700
San Antonio, TX 78212
210-736-6600
lwilson@langleybanack.com
Attorneys for DMA Properties, Inc.

Jeffery Duke
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, Texas 77494
jduke@dbmmlaw.com
Counsel for Longbranch Energy, LP

William Germany
BAYNE, SNELL, & KRAUSE
1250 NE Loop 410, Ste. 725
San Antonio, Texas 78209
T- (210) 824-3278
F- (210) 824-3937
wgermany@bskaw.net
Attorney for Larry Wright

OFFICE OF THE UNITED STATES TRUSTEE
903 San Jacinto Blvd, Room 230
Austin, Texas 78701
shane.p.tobin@usdoj.gov
United States Trustee

        /s/ *John Muller*
        C. John Muller IV