# EXHIBIT A

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: § | | Chapter 11 |
| **KRISJENN RANCH, LLC,** § | | |
| *Debtor* § | | Case No. 20-50805 |
| § | | |

_____

| | | |
|---|---|---|
| **KRISJENN RANCH, LLC and** § | | |
| **KRISJENN RANCH, LLC-SERIES** § | | |
| **UVALDE RANCH, and KRISJENN** § | | |
| **RANCH, LLC-SERIES PIPELINE** § | | |
| **ROW as successors in interest to** § | | |
| **BLACKDUCK PROPERTIES, LLC,** § | | |
| *Plaintiffs* § | | |
| § | | |
| v. § | | |
| § | | |
| **DMA PROPERTIES, INC., and** § | | |
| **LONGBRANCH ENERGY, LP,** § | | Adversary No. 20-05027 |
| *Defendants* § | | |

_____

| | | |
|---|---|---|
| **DMA PROPERTIES, INC,** § | | |
| *Cross-Plaintiff/Third Party Plaintiff* § | | |
| § | | |
| v. § | | |
| § | | |
| **KRISJENN RANCH, LLC,** § | | |
| **KRISJENN RANCH, LLC-SERIES** § | | |
| **UVALDE RANCH, and KRISJENN** § | | |
| **RANCH, LLC-SERIES PIPELINE ROW,** § | | Adversary No. 20-05027 |
| **BLACK DUCK PROPERTIES, LLC,** § | | |
| **LARRY WRIGHT, and JOHN TERRILL,** § | | |
| *Cross-Defendants/Third-Party* § | | |
| *Defendants* § | | |

**KRISJENN RANCH, LLC, KRISJENN RANCH, LLC-SERIES UVALDE RANCH, AND KRISJENN RANCH, LLC-SERIES PIPELINE ROW, AS SUCCESSORS IN INTEREST TO <u>BLACK DUCK PROPERTIES, LLC'S THIRD AMENDED ADVERSARY COMPLAINT</u>**

COME NOW KrisJenn Ranch, LLC ("KrisJenn"), KrisJenn Ranch, LLC-Series Uvalde Ranch, and Krisjenn Ranch, LLC-Series Pipeline Row as successors in interest to Black Duck Properties, LLC (collectively the "Debtors") by and through their undersigned attorney, and file this Third Amended

*Debtors' Third Amended Complaint*            1

Adversary Complaint, brought pursuant to Bankruptcy Rule 7001, and would show the Court as follows:

## I.
## SUMMARY

1. Debtors own a pipeline and right of way that is the subject of this dispute (respectively, the "Pipeline" and "ROW"). Pipeline, ROW, and KrisJenn Ranch are each encumbered by a $6 million loan. The Debtor is currently unable to sell the Pipeline and ROW because the Defendants are improperly claiming a perpetual interest in these properties. More specifically, Defendants claim they should receive a share of profits from the operations and sale of the Pipeline and ROW for all time, regardless of whom is buying, selling, or using these properties. This interpretation is so broad that no person will purchase the Pipeline. Failure to monetize the Pipeline has caused Debtor to default on the $6 million secured obligation necessitating its chapter 11 bankruptcy filing.

2. Black Duck Properties, LLC ("Black Duck") was an entity owned by KrisJenn and SCMED Oilfield Consulting, LLC ("SCMED"). SCMED and DMA are wholly owned by Frank Daniel Moore ("Moore").

3. Unbeknownst to KrisJenn or its principals, Moore was actively engaged in a partnership with Longbranch Energy, LP ("Longbranch"). Moore, by and through SCMED, made representations that he was working in the best of interests of Black Duck as he was secretly diverting opportunities to Longbranch at the expense of KrisJenn. After SCMED resigned from Black Duck, Moore continued to divert opportunities from Black Duck and actively sought to unwind any deal KrisJenn attempted to consummate.

4. Black Duck held title to the Pipeline and ROW before the disputes in this case arose. Black Duck sold the Pipeline to TCRG East Texas Pipeline 1, LLC ("TCRG") for $2.5 million and a 16% gross interest in the revenues generated by the Pipeline. After the deal was closed, Defendants

contacted TCRG and informed them that Defendants had a 20% perpetual interest in the Pipeline and ROW that "ran with the land." They stated that TCRG would continue to owe each Defendant 20% net profits from the Pipeline and ROW in addition to the 16% gross revenues owed to KrisJenn. These efforts effectively scuttled the deal with TCRG.

5. Before Defendants interference with the TCRG deal, all of Black Duck's assets were transferred to KrisJenn because Black Duck could not honor its debts to KrisJenn. Black Duck subsequently wound-up its operations pursuant to the Texas Business Organizations Code.

6. After TCRG sought to undue the purchase of the Pipeline due to Defendants interference. KrisJenn repurchased the Pipeline from TCRG using one of its series, KrisJenn Ranch, LLC-Series Pipeline ROW. KrisJenn had to take a loan from Mcleod Oil ("Mcleod") in order to make this repurchase.

7. This case seeks to interpret Debtors' and Defendants' rights in the subject contracts so that Debtor can sell the Pipeline and ROW, and pay the secured lender.

## II.
## JURISDICTION AND VENUE

8. Debtors filed a Chapter 11 Bankruptcy Petition in this Court on April 27, 2020—Case No. 20-5080.

9. Jurisdiction is conferred on this Court pursuant to the provisions of Section 1334 of Title 28 of the United States Code in that this proceeding is a core proceeding under 157(b)(2)(k) of Title 28. Jurisdiction is also conferred as this proceeding is related to the above-captioned Chapter 11 case under Title 11 and concerns property of the Debtor in that case. Therefore, the Court has both personal and subject matter jurisdiction to hear this case pursuant to Section 1334 of Title 28 of the United States Code and Sections 157(b)(2)(k) and 157(c) of Title 28 of the United States Code.

10. This proceeding is a core proceeding because it involves resolving third-party interests that encumber Debtors' property pursuant to 157(b)(2)(k) of Title 28.

11. This proceeding is also a non-core proceeding that is related to the Chapter 11 case because it concerns the property of the Debtor and those concerns must be resolved for the Debtor to effect its plan of reorganization.

12. Bankruptcy courts have jurisdiction over matters that are "related to" the bankruptcy. *In re Denney*, 171 F.3d 1016, 1022 (5th Cir. 1999). A matter is "related to" a case under title 11 if the adversary proceeding's outcome may both: (1) alter the rights, obligations, and choices of action of the debtor, and (2) have an effect on the administration of the estate." *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). An adversary proceeding falls within the court's "related to" jurisdiction if "the outcome of that proceeding could conceivably have an effect on the estate being administered in bankruptcy." *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987).

13. Resolution of the issues alleged in the Summary of this Adversary Complaint are critical to Debtor's ability to reorganize, making jurisdiction over this action clearly appropriate pursuant to Section 157(c).

## III.
## PARTIES

14. KrisJenn Ranch, LLC is a Texas limited liability company that has appeared in this case.

15. KrisJenn Ranch, LLC – Series Uvalde Ranch is a Texas limited liability company that has appeared in this case.

16. KrisJenn Ranch, LLC – Series Pipeline ROW is a Texas limited liability company that has appeared in this case.

17. Larry Wright is an individual who has appeared in this case.

18. DMA Properties, Inc. ("DMA") is a South Carolina corporation that has appeared in this case.

19. Longbranch Energy, LP ("Longbranch") is a Louisiana limited partnership that has appeared in this case.

20. Frank Daniel Moore is an individual who has appeared in this case.

## IV.
## BACKGROUND

21. Daniel Moore is a real estate broker who brokers and facilitates the purchase and sale of real estate assets, including but not limited to saltwater disposal wells.

22. Borders is in the business of buying and selling saltwater disposal wells, and primarily operates through his business Longbranch Energy, LP ("Borders"). When Borders sells his saltwater disposal wells he generally retains certain interests in them. These ongoing interests are dubbed "net profits interests"; however, they intended to mimic overriding royalties interests in oil and gas interests. These fabricated overriding royalty interests are enforceable against those persons who are in privity of contract with Borders, and not subsequent purchasers.

23. To facilitate an illicit scheme, Borders entered into a partnership with Moore whereby Moore agreed to find purchasers of Borders' "net profits interests" in return for 50% of the profits from those sales.

24. Without disclosing the aforementioned relationship, Moore approached Wright. Wright is an investor who often purchases and sells real estate interests, including ranches, saltwater disposal wells, and mineral interests. He has an excellent reputation as a businessman and, based on his successful track record, has access to extensive credit facilities.

25. Moore induced Wright to enter into a partnership that was similar to the one he had with Borders. As a result, Moore and Wright formed Black Duck Properties, LLC ("Black Duck"). Black

Duck initially had two equal members: KrisJenn and SCMED. Black Duck's initial operations involved purchasing certain saltwater disposal wells and selling them for a profit.

26. Borders next door neighbor is Rod Roberts. Rod Roberts was aware of a certain right of way that spanned approximately 65 miles of East Texas and ran through Borders' and his property (the "ROW"). The ROW had been idle and abandoned for many decades. Rod suggested that revival of the ROW could be potentially lucrative because of recent fracking operations located nearby.

27. Falsely claiming to be the person who discovered the ROW, Moore convinced Wright to purchase the ROW. Moore claimed that he knew several potential purchasers for the ROW, and that he could quickly sell it for a profit.

28. Wright agreed to fund the acquisition of the ROW with the understanding that Borders would receive 20% of the net profits of Black Duck that related to its ownership of the ROW. The purchase price for the ROW was approximately $5.3 million. To facilitate this transaction, KrisJenn loaned $4.1 million to Black Duck, and Larry Wright loaned Black Duck an additional $1.2 million.

29. Subsequently, Moore, although he was a partner with Wright in Black Duck, hired Borders' long-term attorney, George Pigg, to draft documents assigning Longbranch's right to purchase the ROW to Black Duck (the "Longbranch Assignment"). Pigg had a track record of drafting one-sided and unenforceable "net profits agreements" for Borders. Moore was fully aware of these illicit agreements as he had profited from them on many occasions.

30. At all times concealing his partnership with Borders, Moore handled the communications and negotiations with Pigg relating to the Longbranch Assignment. Moore falsely and fraudulently told Wright that Pigg would represent both Black Duck and Longbranch in drafting the Longbranch Assignment. However, Moore fraudulently concealed that the Longbranch Assignment was actually being drafted in a way that created an illegal and unenforceable windfall for Longbranch while placing Black Duck at tremendous risk.

31. The Longbranch Assignment states:

1. Consideration: [LONGBRANCH] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [BLACK DUCK] or its successors or assigns during the period of time beginning on the date . . . above.

    a. Net profits shall mean gross revenues actually received by [BLACK DUCK], or its successors or assigns directly from the operation, use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.
    b. [BLACK DUCK'S] obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [BLACK DUCK] binds its successors and assigns to the payment of the Net Profits Share.

32. On August 11, 2017, the Pipeline and ROW was purchased by Black Duck.

33. On February 7, 2018, SCMED sold its 50% interest in Black Duck in exchange for a "net profits" interest that was loosely based upon the Longbranch Assignment (the "DMA Assignment"). The DMA Assignment states as follows:

1. Consideration: DMA Properties, Inc. shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from Black Duck Properties, LLC or its successors or assigns during the period of time beginning on the date . . . above.

    a. Net profits shall mean gross revenues actually received by Black Duck Properties, LLC., or its successors or assigns directly from the operation, use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

    b. Black Duck Properties, LLC.'s obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and Black Duck Properties, LLC. binds its successors and assigns to the payment of the Net Profits Share.

Collectively the Longbranch Assignment and the DMA Assignment are referred to as the "Assignment Agreements."

34. In 2018, Black Duck sold the Pipeline and ROW to TCRG for $2.5 million, and—as part of the deal—Black Duck retained 16% of the gross profits from the Pipeline and ROW. The aggregate, projected profit to Black Duck and other interested parties was estimated to be $48,000 per day.

35. The initial $2.5 million received from the TCRG sale was allocated to pay the debts encumbering the Pipeline and ROW. No profits were anticipated on the sale to TCRG until the $48,000 daily payments had satisfied the outstanding principal balance and interest owed on the loan made from KrisJenn to Black Duck used to purchase the Pipeline and ROW.

36. Later in 2018, KrisJenn became a successor-in-interest to Black Duck. Black Duck was unable to pay its debts to KrisJenn Ranch, LLC. Therefore, KrisJenn foreclosed on its note with Black Duck. Shortly thereafter, Black Duck ceased being a going concern and was eventually wound-up, with KrisJenn being the successor-in-interest to many of Black Duck's remaining assets.

37. In 2019, shortly after the TCRG purchase, Longbranch and DMA threatened TCRG with litigation. Contrary to all prior communications with the Debtor, Defendants DMA and Longbranch, by and through their agents Moore and Borders, claimed they were entitled to receive a share of *any* income generated by the Pipeline and ROW in perpetuity, regardless of who owns the Pipeline and ROW or how many subsequent sales of the Pipeline and ROW take place. DMA and Longbranch knew these representations were false and made these representations to TCRG because they did not like the terms of the proposed deal.

38. DMA and Longbranch actively worked to unwind the deal and threatened to sue TCRG, its employees, and representatives.

39. Ultimately, to avoid litigation with TCRG, KrisJenn Ranch, LLC-Series Pipeline ROW ("Series Pipeline") purchased the ROW.

40. KrisJenn is presently unable to sell the Pipeline and ROW because Defendants claim to have perpetual interests in them. Consequently, no purchasers are willing to purchase or operate the Pipeline or ROW for fear that DMA and Longbranch will file lawsuits asserting the same claims they alleged in the TCRG matter. The basis of the Defendants' claims are a latent or patent ambiguity in the Assignment Agreements.

## V.
## DECLARATORY JUDGMENT

41. Debtors incorporate by reference the factual allegations contained in the preceding paragraphs.

42. Pursuant to 28 U.S.C. § 2201, Debtors request that this Court construe and interpret the Longbranch Assignment, the DMA Assignment, and the Company Agreement of Black Duck, LLC to ascertain and declare the respective rights, obligations, and liabilities of the Debtor, Longbranch, and DMA, as follows:

### A. *That the Assignment Agreements Do Not "Run With the Land."*

43. Debtors seek a judicial declaration that the Assignment Agreements contain personal covenants, and not real covenants that "run with the land."

44. Debtors seek a judicial declaration that Longbranch and DMA have no contractual or property rights in the Pipeline and ROW except for those borne from the net profits received by Black Duck from its operation and sale of the Pipeline and ROW.

### B. *That KrisJenn is not a successor or assign to Black Duck.*

45. Debtors ask this Court to declare that KrisJenn is not a successor to Black Duck, nor is it an assign to any ownership interest in Black Duck. KrisJenn is merely a successor-in-interest to certain property that was previously owned by Black Duck.

### C. *That certain funds paid by KrisJenn to Black Duck were loans and not capital contributions.*

46. Debtors ask this Court to declare that certain funds paid by KrisJenn to Black Duck were loans by KrisJenn and not capital contributions.

47. Plaintiffs are entitled to recover their reasonable and necessary attorney's fees and court costs pursuant to Section 37.009 of the Texas Uniform Declaratory Judgments Act.

## VI.
## TORTIOUS INTERFERENCE WITH A CONTRACT

48. Debtors incorporate by reference the factual allegations contained in the preceding paragraphs.

49. KrisJenn had a valid contract with TCRG for the sale of the Pipeline and ROW.

50. Defendants DMA, Moore, and Longbranch knew or had reason to know of KrisJenn's contract with TCRG and KrisJenn's interest in the contract.

51. Defendants DMA, Moore, and Longbranch willfully and intentionally interfered with KrisJenn's contract with TCRG when they harassed TCRG claiming to have a perpetual 20% interest in TCRG's ownership of the Pipeline and ROW that ran with the land.

52. Defendants' interference proximately cause injury to KrisJenn, which resulted in the following actual damage or loss:

   a. The loss of the TCRG deal, which would have resulted in KrisJenn earning profits of approximately $48,000 a day for as long as the Pipeline and ROW were in use, subject to DMA and Longbranch's respective 20% interest in these daily payments;

   b. Interest and fees paid for loans to purchase and repurchase the Pipeline and ROW.

53. Debtors are entitled to recover their pre- and post-judgment interest and court costs.

54. Debtors injury resulted from Defendants' malice or actual fraud, which entitles Debtors to exemplary damages under Section 41.003.

## VII.
## FRAUDULENT MISREPRESENTATION, CONCEALMENT, AND INDUCEMENT
(against Moore and Longbranch)

55. Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs.

56. Defendants Moore and Longbranch made material representations to Plaintiffs regarding the Assignment Agreements, the role of George Pigg in drafting those agreements, and the meaning of "net profits interests". These representations were false. At the time they were made, Defendants knew the representations were false or that they were made recklessly, as positive assertions, without knowledge of their truth. Defendants made these representations with the intent that the Plaintiffs would act on them. The Plaintiffs have been injured as a direct and proximate result.

57. Defendants Moore and Longbranch failed to disclose—and concealed—material information relating to their existing partnership, exclusive relationship with Pigg, and history of selling unenforceable "net profits interests". Further, Defendants concealed the existence of potential purchasers for the ROW, as well as their efforts to divert those purchasers away from Black Duck. Defendants had a duty to disclose this material information to Plaintiffs. Defendants knew the Plaintiffs were ignorant of this information and that they did not have an equal opportunity to discover this information but deliberately chose to stay silent when they had a duty to speak. The Plaintiffs relied on Defendants' nondisclosures and were injured as a result of acting without knowledge of the undisclosed facts.

58. Plaintiffs reasonably relied on Defendants' misrepresentations as well as their failure to disclose material information and were thereby induced to enter into and remain parties to the Assignment Agreements.

59. Plaintiffs' damages include their actual, consequential, and exemplary damages as well as pre- and post-judgment interest as allowed by law.

60. Defendants' fraudulent acts and omissions were committed to secure execution of documents by deception and constitute a violation of the Texas Penal Code. As a result, the treble damages cap that would otherwise apply should be disregarded.

61. Plaintiffs are entitled to rescind or invalidate all or part of the Assignment Agreements because they were fraudulently induced.

## VIII.
## BREACH OF FIDUCIARY DUTY
(against Moore)

62. Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs.

63. Moore was the sole owners of SCMED. He therefore owed KrisJenn a fiduciary duty because SCMED a member and manager of Black Duck.

64. Moore breached his fiduciary duty to KrisJenn by engaging in self-dealing, failing to deal fairly and honestly, failing to act in good faith and maintain loyalty to KrisJenn, failing to act with strict integrity, failing to make disclosures, and failing to act with full candor.

65. At all times, Moore acted in the best interests of himself and/or Longbranch. Moore did not disclose his general partnership with Borders to KrisJenn. Moore also failed to refrain from competition with Black Duck by consistently working to exclude KrisJenn from dealings regarding the ROW and engaging in "side deals" with Longbranch.

66. Moreover, Moore actively directed business opportunities away from Black Duck, divulged confidential Black Duck information to Longbranch, and conspired to enter into agreements that precluded Wright or KrisJenn's further participation in the ROW.

67. Defendant's breach of fiduciary duty resulted in injury to KrisJenn—and its members—as well as a benefit to Defendant.

68. Plaintiffs are entitled to recover their actual damages, which include out-of-pocket

losses and lost profits.

69. Moore's breach of fiduciary duty was intentional, caused actual harm to Plaintiffs, and amounted to fraudulent inducement. Accordingly, Plaintiffs are entitled to the forfeiture of the contractual consideration with respect to the DMA Agreement, or, alternatively, the recission of the DMA Agreement.

70. Plaintiff is entitled to pre- and post-judgment interest as well as costs of court.

71. Plaintiffs' injury resulted from Moore's malice or actual fraud, as pled with particularity in paragraphs 23, 24, 25, 27, 29, 30, 37, 38, 56, 57, and 58 which entitles Plaintiffs to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a).

## IX.
## NONDISCHARGABILITY OF DEBTS AND CLAIMS
(against Moore and Longbranch)

72. Plaintiffs incorporate by reference the factual allegations contained in the preceding paragraphs.

73. As described above, Moore and Longbranch intended to defraud KrisJenn and Wright.

74. Defendants made multiple misrepresentations and omissions to KrisJenn and Wright before and after entering into the Assignment Agreements.

75. In light of Moore and Longbranch's attempts to defraud KrisJenn and Wright the claims and debts owed to KrisJenn are non-dischargeable under 11 U.S.C. §523(a)(2).

76. Additionally, and in the alternative, Moore and Longbranch committed fraud or defalcation while acting in a fiduciary capacity.

77. In his capacity as a member of Black Duck, Moore owed fiduciary duties to Wright.

78. Moore breached those duties through his dealings with Longbranch.

79. Moore's conduct was self-dealing to his benefit and to the detriment of his fiduciaries KrisJenn and Wright. Moore's conduct violated every component of his fiduciary obligation, including his duty of care, duty of loyalty, duty of disclosure, and duty to refrain from self-dealing.

80. Because Moore committed fraud while acting in a fiduciary capacity, the claims and debts owed by Moore and Longbranch are non-dischargeable under 11 U.S.C. §523(a)(4).

81. Finally, because Moore and Longbranch intended to inflict willful and malicious injury on Wright and KrisJenn, the claims and debts owed by Defendants are non-dischargeable under 11 U.S.C. §523(a)(6).

WHEREFORE PREMISES CONSIDERED Debtors asks for declaratory relief, their actual, consequential, and exemplary damages, recission of the Assignment Agreements, a finding of non-dischargeability with respect to Moore and Longbranch's conduct, recovery of reasonable and necessary attorney's fees, pre- and post-judgment interest, court costs, and such other and further relief to which they may be justly entitled.

Dated: December 30, 2020

Respectfully submitted,

MULLER SMEBERG, PLLC

By: /s/ *John Muller*
C. John Muller IV
State Bar No. 24070306
john@muller-smeberg.com
Ezekiel J. Perez
State Bar No. 24096782
zeke@muller-smeberg.com
MULLER SMEBERG, PLLC
111 W. Sunset Rd.
San Antonio, TX 78209
Telephone: 210-664-5000
Facsimile: 210-598-7357

ATTORNEYS FOR DEBTORS

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system by notice of electronic filing or via email on the 30th day of December 2020:

Michael Black
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, Texas 78209
210-829-2022
210-829-2021 fax
mblack@burnsandblack.com
Attorneys for Longbranch Energy, LP
and DMA Properties, Inc.

Christopher S. Johns
Christen Mason Hebert
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

Timothy Cleveland
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
Attorneys for DMA Properties, Inc.

Natalie Wilson
LANGLEY & BANACK, INC.
745 East Mulberry Avenue | Suite 700
San Antonio, TX 78212
210-736-6600
lwilson@langleybanack.com
Attorneys for DMA Properties, Inc.

Jeffery Duke
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, Texas 77494
jduke@dbmmlaw.com
Counsel for Longbranch Energy, LP

William Germany
BAYNE, SNELL, & KRAUSE
1250 NE Loop 410, Ste. 725
San Antonio, Texas 78209
T- (210) 824-3278
F- (210) 824-3937
wgermany@bskaw.net
Attorney for Larry Wright

OFFICE OF THE UNITED STATES TRUSTEE
903 San Jacinto Blvd, Room 230
Austin, Texas 78701
shane.p.tobin@usdoj.gov
United States Trustee

                                          /s/ John Muller
                                        C. John Muller