IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| **KRISJENN RANCH, LLC** | § | |
| *Debtor* | § | **Case No. 20-50805** |
| | § | |

_____

| | | |
|---|---|---|
| **KRISJENN RANCH, LLC and** | § | |
| **KRISJENN RANCH, LLC-SERIES** | § | |
| **UVALDE RANCH, and KRISJENN** | § | |
| **RANCH, LLC-SERIES PIPELINE** | § | |
| **ROW as successors in interest to** | § | |
| **BLACKDUCK PROPERTIES, LLC,** | § | |
| *Plaintiffs* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **DMA PROPERTIES, INC., and** | § | |
| **LONGBRANCH ENERGY, LP,** | § | **Adversary No. 20-05027** |
| *Defendants* | § | |

_____

| | | |
|---|---|---|
| **DMA PROPERTIES, INC** | § | |
| *Cross-Plaintiff/Third Party Plaintiff* | § | |
| **v.** | § | |
| **KRISJENN RANCH, LLC,** | § | |
| **KRISJENN RANCH, LLC-SERIES** | § | |
| **UVALDE RANCH, and KRISJENN** | § | |
| **RANCH, LLC-SERIES PIPELINE ROW,** | § | **Adversary No. 20-05027** |
| **BLACK DUCK PROPERTIES, LLC,** | § | |
| **LARRY WRIGHT, and JOHN TERRILL** | § | |
| *Cross-Defendants/Third-Party* | § | |
| *Defendants* | § | |

**KRISJENN RANCH, LLC, KRISJENN RANCH, LLC-SERIES UVALDE RANCH, AND
KRISJENN RANCH, LLC-SERIES PIPELINE ROW, AS SUCCESSORS IN INTEREST
TO BLACK DUCK PROPERTIES, LLC, AND LARRY WRIGHT'S PRETRIAL ORDER**

    COME NOW Debtor Plaintiffs KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series

Pipeline ROW, KrisJenn Ranch, LLC-Series Uvalde Ranch, as successors in interest to Black

Duck Properties, LLC (collectively "KrisJenn") and Third-Party Defendant Larry Wright, pursuant to Local Rule 7016 and submit their proposed pretrial order:

1.      **Concise Description of Dispute**

This case concerns a pipeline right-of-way in East Texas ("the ROW") that was purchased by Black Duck Properties, LLC ("Black Duck") in 2017.    Plaintiff KrisJenn Ranch, LLC ("KrisJenn Ranch") recognizes that Longbranch Energy ("Longbranch") and DMA Properties ("DMA") have a 20% net-profits interest in the proceeds of any profits Black Duck derives from the ROW; however, it denies that this net profits interest would be enforceable against any subsequent purchaser of the ROW.  KrisJenn claims that the imposition of such a perpetual net profits interest is illegal and would prevent the ROW from ever being sold.  Counter-Plaintiffs disagree and, although such a dispute would seem to be between Counter-Plaintiffs and any subsequent purchaser, they assert that Black Duck has breached its contract by refusing to recognize that a net profits interest runs with the land.  Further, they claim this purported breach of contract also constitutes a fraud and other tortious conduct. The parties have asked the Court to declare their respective interests in the ROW and interpret the written agreements conveying those interests—respectively, the Longbranch Assignment and the DMA Agreement.

In addition to claims for declaratory relief, KrisJenn has asserted claims against DMA, Moore, and Longbranch for tortuous interference with a contract, breach of fiduciary duty, fraud, and non-dischargeability.  In short, KrisJenn asserts that the Defendants collectively withheld important facts regarding their business dealings, their relationship with the lawyer who drafted the Longbranch Assignment, and actively worked to place the needs of each other before those of Black Duck.  They further claim that Moore and Borders tortiously interfered with Black Duck's contract to sell the ROW to a subsequent purchaser.  This sale was completed in 2018 and was projected to be very profitable; however, the purchaser demand recession of the sale after Moore

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

and Borders threatened to file a lawsuit. Moore, DMA, and Longbranch deny all of Plaintiffs' claims.

DMA, Moore, and Longbranch have asserted counter-claims and third-party claims against Wright and KrisJenn, including claims for declaratory relief, fraud, breach of fiduciary duty, breach of contract, tortious interference, conspiracy, knowing participation as well as various equitable claims. The gist of these claims is that (a) Wright engaged in wrongful conduct to secure control and ownership over the ROW; and (b) took further wrongful actions (through KrisJenn and Black Duck) in an attempt to disregard Longbranch and DMA's interests in the ROW. Wright and KrisJenn deny those allegations.

DMA also asserts counter-claims based on certain promissory-note payments owed to Black Duck. KrisJenn claims these assets were assigned to it to partially satisfy Black Duck's debts. DMA, Moore, and Longbranch claim this assignment is fraudulent and void. DMA further contends that Wright and his entities attempted to misappropriate DMA's half of the payments. On that basis, DMA asserts claims for breach of contract, conversion, and breach of fiduciary duty, as well as equitable claims. KrisJenn denies those allegations.

## 2. <u>Jurisdictional Statement</u>

This Court has jurisdiction over the parties' claims and defenses under 28 U.S.C. §1334 because this proceeding is a core proceeding under 28 U.S.C. §157(b)(2)(k) concerning the determination of the validity, extent, or priority of liens. Additionally, this proceeding is a core proceeding under §157(b)(2)(I) concerning determination of the dischargeability of particular debts.

Additionally, and in the alternative, this Court has jurisdiction over these proceedings under 28 U.S.C. §157(c) because these proceedings are related to the underlying Chapter 11

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

bankruptcy case and concern the property of the debtor. Those concerns must be resolved before the debtor can effectuate a plan of reorganization.

Bankruptcy courts have jurisdiction over matters that are "related to" the bankruptcy. *See In re Denney*, 171 F.3d 1016, 1022 (5th Cir. 1999). A matter is "related to" a bankruptcy if the outcome of the proceeding may (1) alter the rights, obligations, and choices of action of the debtor; and (2) have an effect on the administration of the estate. *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). An adversary proceeding falls within the Court's "related to" jurisdiction if "the outcome of that proceeding could conceivably have an effect on the estate being administered in bankruptcy." *In re Wood*, 825 F.2d 90, 93 (5th Cir. 1987). Here, the outcome of this proceeding will have a determinative effect on the estate's administration in bankruptcy.

## 3. <u>Consent to Entry of Final Judgment by Bankruptcy Court</u>

The Parties consent to entry of a final order or judgment by the bankruptcy court.

## 4. <u>Summary of Claims and Defenses</u>

### A. KrisJenn's Claims

#### 1. Declaratory Claim

KrisJenn seek judicial declarations that: (1) the Assignment Agreements contain personal covenants, and not real covenants that "run with the land"; (2) KrisJenn is not a successor or assign to Black Duck; and (3) certain funds paid by KrisJenn to Black Duck were loans and not capital contributions.

#### 2. Tortious Interference with a Contract

KrisJenn assert that Defendants DMA Moore, and Longbranch willfully and intentionally interfered with the TCRG contract. Defendants' interference proximately caused injury to KrisJenn who was forced to repurchase the ROW from TCRG, which caused it to incur interest expenses of approximately $22,000 a month. Because these damages resulted from Defendants' malice or actual fraud, KrisJenn is entitled to exemplary damages.

### 3. Fraudulent misrepresentations, concealment, and inducement

KrisJenn assert that Defendants engaged in fraudulent conduct by making material misrepresentations regarding the Assignment Agreements, the role of George Pigg in drafting those agreements, and the meaning of "Net profits interests." Defendants also failed to disclose or concealed material information regarding their existing partnership, exclusive relationship with Pigg, their history of selling unenforceable "net profits interests," and information regarding the existence of potential purchasers for the ROW and their efforts to divert those purchasers away from Black Duck. These representations and concealed facts induced Black Duck to enter into the Assignment Agreements. KrisJenn paid all costs associated with acquiring and maintaining the ROW and is entitled to recover actual, consequential, and exemplary damages. To the extent the Counter-Plaintiffs seek to enforce the Assignment Agreements against Krisjenn, which does not have privity of contract, Krisjenn seeks recission of the Assignment Agreements.

### 4. Breach of Fiduciary Duty

KrisJenn assert that Moore, as the principal of SCMED, a 50% owner and manager of Black Duck owed a fiduciary duty to KrisJenn. Moore breached his fiduciary duty by engaging in self-dealing, failing to deal fairly and honestly, failing to act in good faith and maintain loyalty to KrisJenn, failing to act with strict integrity, failing to make disclosures, and failing to act with full candor. Krisjenn is entitled to recover is actual damages, forfeiture of contractual consideration with respect to the DMA Agreement or, alternatively, recission of the DMA Agreement.

## B. Longbranch, Moore, and DMA's Affirmative Defenses to KrisJenn's Claims

### 1. Justification

DMA, Moore, and Longbranch contend that they were justified in providing TCRG with the agreements that created DMA and Longbranch's 20% net-profits interests in the right-of-way. DMA, Moore, and Longbranch also contend that they had, at a minimum, a good-faith claim to a colorable legal right when they informed TCRG of their interests.

### 2. Privilege

DMA, Moore, and Longbranch contend that they were privileged to provide TCRG with the agreements that created DMA and Longbranch's 20% net-profits interests in the right-of-way. DMA, Moore, and Longbranch also contend that they had, at a minimum, a good-faith claim to a colorable legal right when they informed TCRG of their interests.

### 3. Unclean Hands

DMA, Moore, and Longbranch contend that equity and good conscience do not allow KrisJenn to recover on its claim for tortious interference given Wright's inequitable conduct and fraudulent actions.

## C. Longbranch's Claims

### 1. Declaratory Claim

Longbranch seeks a declaration construing the Longbranch Assignment and declaring Longbranch's rights and interest with respect to the right-of-way.

### 2. Breach of Contract

Longbranch claims that Black Duck and KrisJenn breached their obligations under the Longbranch Assignment, which includes the duty to pay Longbranch 20% of net profits earned through the sale and operation of the right-of-way and the duty to execute any additional instruments required to effectuate the intent of the Longbranch Assignment. Longbranch also seeks attorneys' fees under state law in connection with this claim.

### 3. Fraud/Fraudulent Inducement

Longbranch contends that Wright fraudulently wormed his way into the deal by representing that he had the financial wherewithal to hold the right-of-way for an extended period of time (measured in years, not weeks or months), including until a suitable buyer or investment partner could be located. If Wright had told the truth about his actual financial resources, Longbranch never would have assigned the right-of-way to Black Duck.

### 4. Fraud (in the alternative)

Longbranch contends that Wright never intended to honor his obligation to pay Longbranch 20% of the net profits earned

through the right-of-way and that Wright orchestrated a sham foreclosure in an attempt to erase part or all of Longbranch's interest in the right-of-way.

**5. Tortious Interference with Contract**

Longbranch contends that Wright (through Black Duck and KrisJenn) repeatedly took actions to interfere with and avoid the obligation to recognize and pay Longbranch's 20% net-profits interest.

**6. Money Had and Received**

Longbranch claims that Wright and KrisJenn received proceeds from the sale of the right-of-way—and that 20% of the net profits from the sale of the right-of-way belongs to Longbranch in equity and good conscience.

**7. Unjust Enrichment**

Longbranch contends that Wright and his entities have been unjustly enriched by their unfair and inequitable actions.

**D.     DMA's Claims**

<u>Claims Related to the Right-of-Way</u>

**1. Declaratory Claim**

DMA seeks a declaration construing the DMA Agreement and the Email Agreement and declaring DMA's rights and interest with respect to the right-of-way.

**2. Breach of Contract**

DMA claims that Wright and his entities breached their obligations under the DMA Agreement, which includes the duty to pay DMA 20% of net profits earned through the sale and operation of the right-of-way and the duty to execute any additional instruments required to effectuate the intent of the DMA Agreement. DMA also seeks attorneys' fees under state law in connection with this claim.

**3. Fraud/Fraudulent Inducement**

DMA and Moore contend that Wright fraudulently wormed his way into the deal by representing that he had the financial wherewithal to hold the right-of-way for an extended period of time (measured in years, not weeks or months), including until a

suitable buyer or investment partner could be located. If Wright had told the truth about his actual financial situation, Moore never would have agreed to include Wright in the deal.

### 4. Fraud (in the alternative)

DMA contends that Wright never intended to honor his obligation to pay DMA 20% of the net profits earned through the right-of-way and that Wright orchestrated a sham foreclosure and transferred the right-of-way to KrisJenn in an attempt to erase part or all of DMA's interest in the right-of-way.

### 5. Tortious Interference with Contract

DMA contends that Wright (through Black Duck and KrisJenn) repeatedly took actions to interfere with and avoid the obligation to pay DMA's 20% net-profits interest.

### 6. Breach of Fiduciary Duty

DMA claims that Wright breached fiduciary duties owed to DMA as custodian and agent for payment of DMA's net-profits interest, by failing to convey 20% of the net profits resulting from the sale of the right-of-way to TCRG.

### 7. Knowing Participation in Breach of Fiduciary Duty

DMA claims that Wright used his control over Black Duck and KrisJenn to cause his entities to carry out and effectuate his breaches of fiduciary duty.

### 8. Money Had and Received

DMA claims that Wright and KrisJenn received proceeds from the sale of the right-of-way, and that 20% of the net profits from the sale of the right-of-way belong to DMA in equity and good conscience.

### 9. Unjust Enrichment

To the extent that Wright and his entities do not have to pay DMA its 20% net-profits interest, DMA contends that Wright and his entities have been unjustly enriched by their unfair and inequitable actions.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

**10. Civil Conspiracy**

DMA contends that Wright, Black Duck, and KrisJenn reached a meeting of the minds and conspired to defraud DMA of its net-profits interest in the right-of-way.

<u>Claims Related to the Bigfoot Note Payments</u>

**1. Declaratory Claim**

DMA seeks a declaration construing the Email Agreement and the Harris SWD Agreement and declaring DMA's rights and interest with respect to the payments.

**2. Conversion**

DMA claims that it owns a property interest in the Bigfoot note and that Wright and his entities converted DMA's half of the Bigfoot note payments.

**3. Breach of Contract**

DMA claims that Wright and his entities breached the obligation to transfer to DMA 50% of the Bigfoot note payments. DMA also seeks attorneys' fees under state law in connection with this claim.

**4. Money Had and Received**

DMA claims that Wright and his entities received 100% of the Bigfoot note payments, and that 50% of those payments belong to DMA in equity and good conscience.

**5. Breach of Fiduciary Duty**

DMA claims that Wright and his entities incurred and breached fiduciary duties owed as custodians and agents of payment with respect to the Bigfoot note payments.

**6. Unjust Enrichment**

DMA claims that Wright and his entities were unjustly enriched through their retention of DMA's half of the Bigfoot note payments.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

### E. Moore's Claims

#### 1. Declaratory Claim

Moore seeks a declaration construing the Email Agreement and the DMA Agreement and declaring the parties' rights and interests with respect to the right-of-way.

#### 2. Breach of Contract

Moore claims that Wright and his entities breached the Email Agreement and the DMA Agreement by failing or refusing to recognize and pay the 20% net-profits interest contemplated by both agreements. Moore also seeks to pierce the veil between Black Duck and KrisJenn (and between KrisJenn and Wright) because Wright has repeatedly used his entities to commit actual fraud. Moore also seeks attorneys' fees under state law in connection with this claim.

#### 3. Fraud/Fraudulent Inducement

Moore contends that Wright fraudulently wormed his way into the deal by representing that he had the financial wherewithal to hold the right-of-way until a suitable buyer could be located. If they had known the truth, Moore never would have agreed to include Wright in the deal. Moore contends that Wright fraudulently wormed his way into the deal by representing that he had the financial wherewithal to hold the right-of-way for an extended period of time (measured in years, not weeks or months), including until a suitable buyer or investment partner could be located. If Wright had told the truth, Moore never would have agreed to include Wright in the deal.

#### 4. Fraud (in the alternative)

DMA contends that Wright and his entities never intended to honor the obligation to pay DMA 20% of the net profits earned through the right-of-way and that Wright orchestrated a sham foreclosure and transferred the right-of-way to KrisJenn in an attempt to erase part of DMA's interest in the right-of-way. Wright also committed fraud by nondisclosure when he failed to disclose the possible sale to TCRG and/or another buyer prior to Moore's exit from Black Duck.

#### 5. Breach of Fiduciary Duty

Moore claims that Wright breached fiduciary duties owed to Moore and Black Duck by failing disclose a contemplated sale of

the right-of-way to TCRG and by engaging in other numerous acts of self-dealing when Wright and Moore were 50/50 members in Black Duck.

6. **Knowing Participation in Breach of Fiduciary Duty**

Moore claims that Black Duck and KrisJenn knowingly participated in and facilitated Wright's fiduciary breaches.

7. **Tortious Interference with Contract**

Moore contends that Wright (through Black Duck and KrisJenn) repeatedly took actions to interfere with and avoid the obligation to pay the 20% net-profits interest owed under the Email Agreement and DMA Agreement.

8. **Promissory Estoppel (in the alternative)**

Moore contends that Wright and his entities promised that Moore that he would receive (through DMA) a 20% net-profits interest in the right-of-way and that the interest would attach and run with the land. Moore contends that to avoid injustice, Wright and his entities must be estopped to deny their promises.

9. **Unjust Enrichment (in the alternative)**

To the extent that Wright and his entities do not have to pay the 20% net-profits interest, Moore contends that Wright and his entities have been unjustly enriched by their unfair and inequitable actions.

10. **Civil Conspiracy**

Moore contends that Wright, Black Duck, and KrisJenn reached a meeting of the minds and conspired to defraud Moore and DMA of their 20% net-profits interest in the right-of-way.

11. **Nondischargeability**

Moore contends that KrisJenn's debts (with respect to the Email Agreement, the DMA Agreement, and Moore's claims in this case) are nondischargeable because KrisJenn and Wright have obtained property from Moore through false pretenses, false representations, and actual fraud. KrisJenn and Wright have also committed fraud and defalcation while acting in a fiduciary capacity.

F.    **Affirmative Defenses (KrisJenn and Wright)**

**KrisJenn's Affirmative Defenses**

1. **Standing**

    KrisJenn assert that DMA, Moore, and Longbranch lack standing to sue because they were not members of Black Duck.

2. **Unilateral or Mutual Mistake**

    Plaintiffs, DMA, Moore, and Longbranch were mistaken as to the terms of the Assignment Agreements. Specifically, whether the covenants contained therein were personal or real in nature.

3. **Modification**

    The parties subsequently modified the Assignment Agreements and acknowledged that the covenants were personal in nature.

4. **Impossibility**

    Enforcement of the portions of the Assignment Agreements that purport to "run with the land" are impossible to enforce against subsequent purchasers.

5. **Illegality**

    Enforcement of the covenants against subsequent purchasers is barred by illegality.

6. **Third-party beneficiary limitations**

    Moore and DMA are subject to the limitations of a donee beneficiary.

7. **Waiver**

    DMA Moore, and Longbranch have waived their claims to collect net profits from subsequent purchasers.

8. **Unclean Hands**

    DMA, Moore, and Longbranch cannot collect because they have unclean hands. Specifically, their fraud and breaches of fiduciary duty bar their recovery.

9. **Economic Loss Rule**

    DMA, Moore, and Longbranch's tort claims are limited by the economic loss rule.

**10. Justification**

Wright's communications that are at the heart of the Counter-Plaintiff's tortious interference claims were justified because Wright was the principal of Black Duck.

**11. Proportionate Responsibility**

DMA, Moore, and Longbranch's recovery, if any, is subject to adjustment for their respective percentage of responsibility.

**12. Indemnification**

Moore has a duty to indemnify KrisJenn, per the Black Duck Company Agreement.

**13. Offset**

DMA, Moore, and Longbranch's claims are subject to offset for debts paid by KrisJenn.

**<u>Wright's Affirmative Defenses</u>**

**1. Illegality**

Enforcement of the covenants against subsequent purchasers is barred by illegality.

**2. Statute of Limitations**

Moore and DMA are subject to the limitations of a donee beneficiary.

**3. Estoppel**

Moore, Longbranch, and DMA failed to disclose they had a general partnership in their dealings with Wright inducing him to enter into agreements that where drafted by Moore, Longbranch, and Wright. These parties now want the court to construe ambiguous contract language in their favor after Wright took affirmative actions based upon Moore's representation that he was looking out for Wright's best interest. These parties should be estopped from claiming favorable contract construction to avoid injustice.

**4. Comparative Negligence**

Moore, Longbranch, and DMA are at fault for misconstruing the contract language drafted by their attorney and at minimum, negligently interfering with debtor's contracts and relationships which they claim caused them harm.

5. **Indemnification**
   Moore has a duty to indemnify KrisJenn, per the Black Duck Company Agreement.

6. **Offset**
   DMA, Moore, and Longbranch's claims are subject to offset for debts paid by KrisJenn and Wright is entitled to these offset in his individual capacity as well.

7. **Moore, DMA, and Longbranch lack capacity to sue Wright**
   Moore lacks capacity to sue Wright for all claims made by Moore. Moore was only a member of Black Duck through an entity, SCMED Oilfield Consulting, LLC ("SCMED"). SCMED lost is privileges to bring or defend suits in Texas in or about January of 2016.

   DMA and Longbranch lack capacity to bring claims against Wright in his individual capacity because all act or omissions were performed in Wright's capacity as a member of respective entities. Further, none of these entities owed any fiduciary duties to Longbranch, DMA or Moore.

8. **Limitation and Waiver in Black Duck Company Agreement**
   Moore's claims, if he can prove his capacity to bring suit against Wright, are limited by the limitations and waiver provisions of the Black Duck Company Agreement.

5. <u>**Stipulated Facts**</u>

1) The Purchase Agreement defines the assets which Longbranch sought to buy (and Express to sell) as "Ownership interest in certain pipe and related facilities (commonly known as the P-21 pipeline) shown on the plat attached hereto as Exhibit 'A'. and described on Exhibit 'B' attached hereto, and the rights-of-way, easements, contracts, permits and leases described in Exhibit 'C' attached hereto (collectively herein referred to as the 'Express Pipeline')".

2) Borders and Moore collectively paid $25,000 to Express to secure the right to purchase the right-of-way.

3) Prior to Wright's involvement, Borders and Moore agreed to equally share any financial gains with respect to their option on the right-of-way.

4) Wright learned about the right-of-way through Moore.

5) Longbranch and Black Duck agreed "to execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in

14

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

order to effectuate the intent of this Assignment."

6) Borders notarized and recorded the Longbranch Assignment in Shelby County on October 2, 2017.

7) On February 3, 2018, Moore sent Wright an email stating, among other things:

  (a) that Wright and Moore agreed to remove Moore from "all aspects" of Black Duck;

  (b) that Wright would cause Black Duck to transfer "No less than 50% carried interest and 50% entitlement on all terms and conditions and monies owed on the Note to Black Duck Properties and Big Foot regarding the Harris SWD";

  (c) that the "Harris SWD is 100% FREE AND CLEAR OF ANY AND ALL DEBTS."; and

  (d) that Wright would cause Black Duck to transfer "No less than 20% Carried Interest in the P-21 Express Pipeline" under the same terms and conditions as the Longbranch Assignment.

  (c) that Wright could accept Moore's proposed terms by stating that he fully accepts and approves.

8) At all times prior to execution of the Email Agreement, Moore and Wright were also both managers of Black Duck.

9) On February 7, 2017, DMA and Black Duck executed and entered into the DMA Agreement.

10) Moore signed the DMA Agreement on behalf of DMA, and Wright signed on behalf of Black Duck.

11) Under the DMA Agreement, Black Duck agreed that DMA "shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors or assigns during the period of time beginning on the date first written above (the "Period")."

12) The DMA Agreement further states:

  a. Net Profits shall mean gross revenues actually received by Assignee, or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

15

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

    b. Assignee's obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and Assignee binds its successors and assigns to the payment of the Net Profits Share.

13) The DMA Agreement incorporates the February 4 Email Agreement by reference.

14) The DMA Agreement further states "this agreement satisfies the duties (in the Email Agreement) regarding ONLY the P-21 Express Pipeline."

15) DMA and Black Duck agreed "to execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of this Assignment."

16) The Harris SWD Agreement states that it is "on behalf of the binding 'Email Agreement' . . . dated February 3, 2018" and that it is meant to address "the obligations regarding the Harris SWD mentioned in the 'Email Agreement.'"

17) The Harris SWD Agreement further states that DMA is "entitled to receive 50% of all Gross Monies received by Black Duck Properties, LLC including its successors and assigns for the remainder of all payments due to Black Duck Properties, LLC" from Bigfoot.

18) After Moore's exit from Black Duck, KrisJenn owned 100% of Black Duck's outstanding membership interests.

19) On February 9, 2018, John Terrill sent Wright a letter of intent to purchase the right-of-way for $2.5 million, with Black Duck retaining a 16% carried interest in the completed Northern Water Project joint venture.

20) On March 22, 2018, Wright executed an agreement on behalf of Black Duck to sell the right-of-way to TCRG East Texas Pipeline 1, LLC in exchange for $2.5 million and a limited assignment of 16% carried interest in a water pipeline.

21) On April 3, 2018, Wright executed a deed transferring the right-of-way from Black Duck to TCRG East Texas Pipeline 1, LLC.

22) John Terrill's entity, Synergy Midstream, LLC, is (or, before the initiation of this lawsuit, was) a member of TCRG East Texas Pipeline 1, LLC with 25% ownership in TCRG East Texas Pipeline 1, LLC.

23) On April 4, 2018, Wright, Terrill, Borders, and Terrill's father met for lunch. Wright introduced Terrill to Borders.

24) After visiting the right-of-way, Wright, Terrill, Borders, and Terrill's father drove to Longbranch's office. There, Borders gave Terrill the easement documents for the right-of-way.

16

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

25) On April 9, 2018, Moore emailed Terrill a copy of the DMA Agreement. Borders also subsequently emailed Terrill a copy of the Longbranch Assignment on April 9, 2018.

26) DMA received half of the payments made by Bigfoot in March 2018 and June 2018, a total of $31,844.30. DMA never received its portion of Bigfoot's September 2018 payment or any payment made thereafter.

27) The Assignment further states KrisJenn had "foreclosed" on the note "and the collateral which includes [Black Duck's] interest in the Express Gas Pipeline."

28) Wright executed the assignment on behalf of KrisJenn and on behalf of Black Duck as "Sole Member/Manager."

29) On December 4, 2018, Moore recorded the DMA Agreement in Angelina, Nacogdoches, Shelby, and Rusk Counties.

30) In December 2018, Wright terminated Black Duck and filed a certificate of termination with the Texas Secretary of State.

31) On November 11, 2019, Wright, KrisJenn, and KrisJenn's series executed a Compromise Settlement Agreement with TCRG East Texas Pipeline 1, LLC.

32) After executing the TCRG Compromise Settlement Agreement, Wright and KrisJenn borrowed $5.9 million from McLeod Oil, LLC.

33) In December 2019, KrisJenn Ranch, LLC–Pipeline ROW purchased the right-of-way from TCRG for $2.5 million.

34) The right-of-way is currently listed as additional collateral and "Mortgaged Property" under the McLeod loan agreement.

35) McLeod also currently holds an option to purchase the right-of-way for $6 million.

36) On September 24, 2019, Bigfoot Energy Services LLC (Bigfoot) filed an interpleader action in Panola County, Texas asserting that Black Duck, KrisJenn, and DMA were making competing claims to payments that Bigfoot owed under a promissory note.

37) On September 30, 2019, the Panola Court granted Bigfoot's request to tender payments into the court registry.

38) All payments made by Bigfoot on the promissory note since September 2019 have been deposited into the Panola County court registry.

39) On December 10, 2020, Bigfoot paid off the promissory note.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

40) Bigfoot has paid a total of $222,910.16 into the Panola County court registry since September 2019.

41) SCMED has assigned all interests, claims, and causes of action related to the right-of-way to Moore.

42) After litigation was reasonably anticipated, Moore lost several cell phones by dropping them into the ocean during fishing trips.

**6.**     **Disputed Factual Issues**

1)     The right-of-way spans approximately 65 miles and runs from Angelina County through Nacogdoches and Rusk Counties and across Shelby County in East Texas.

2)     In its initial bankruptcy schedules, KrisJenn estimated the value of the right-of-way to be approximately $9.5 million if it were unencumbered by the alleged net profits interests.

3)     On February 19, 2016, Longbranch and the Express Pipeline Connection, LLC executed a purchase agreement ("Purchase Agreement") under which Longbranch received a contractual right to purchase the right-of-way from Express.

4)     Black Duck Properties was formed in 2015. KrisJenn Ranch, LLC and SCMED Oilfield Consulting were its equal members. Larry Wright and Daniel Moore are/were the principals of each, respectively.

5)     Although Moore and Wright were 50/50 partners in Black Duck, it was their custom to negotiate different profit splits for certain properties it purchased and sold.

6)     Black Duck was not served with process and is not a party to this case.

7)     SCMED Oilfield Consulting Services, LLC is not in good standing with the Texas Secretary of State and has not been in good standing since its involuntary forfeiture as of January 29, 2016.

8)     SCMED was not served with process and is not a party to this case.

9)     The Black Duck Company Agreement dated 12/28/2015 was signed by Daniel Moore and Larry Wright as corporate representatives for SCMED and KrisJenn, respectively.

10)     The Black Duck Company Agreement includes a merger clause.

11)     The Black Duck Company Agreement does not require capital contributions beyond initial $500 contributions by each member.

18

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

12) The Black Duck Company Agreement states that subsequent payments by its members may be treated as a loan.

13) SCMED never made a capital contribution to Black Duck.

14) SCMED never lent money to Black Duck.

15) SCMED never assumed or paid for any debts owed by Black Duck.

16) Longbranch and Black Duck signed the Longbranch Assignment

17) George Pigg represented Longbranch Energy, LP in connection with the Longbranch Assignment, not Black Duck.

18) George Pigg did not disclose conflicts of interest to Black Duck when he agreed to draft the Longbranch Assignment.

19) George Pigg did not advise Black Duck to retain independent counsel when he drafted the Longbranch Assignment.

20) When conferring with Pigg about drafting instructions, Moore claimed that he was aware of Wright's wishes and could "speak for the group."

21) Under the Longbranch Assignment, Black Duck agreed that Longbranch "shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from Assignee or its successors or assigns during the period of time beginning on the date first written above (the "Period")."

22) The Longbranch Assignment further states:

   a. Net Profits shall mean gross revenues actually received by Assignee, or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

   b. Assignee's obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to the payment of the Net Profits Share.

23) Besides SCMED and KrisJenn, no other person or entity has owned any interest in Black Duck.

24) SCMED and KrisJenn have never assigned their ownership interests in Black Duck to another person or entity.

19

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

25) Longbranch assigned the Purchase Agreement to Black Duck in exchange for $25,000 and the net-profits interest defined above.

26) Moore initially agreed to receive 20% of the profits earned from the ROW.

27) Wright and Terrill began discussing the sale of the right-of-way in December 2017, yet Wright did not disclose such negotiations or the existence of Terrill or TCRG as a potential buyer until after February 4, 2018.

28) Moore convinced Wright to purchase the ROW based upon claims that he could promptly find a subsequent purchaser for the ROW.

29) On or about August 14, 2017, Wright loaned $1,175,000 to Black Duck at 4% APR.

30) Black Duck purchased the right-of-way on August 14, 2017.

31) Asilo Investment loaned $4,100,000 to KrisJenn Ranch at 17% APR.

32) On or about August 14, 2017, KrisJenn Ranch loaned Black Duck $4,100,000 at 17% APR.

33) On February 4, Wright replied to Moore's email and stated that he fully accepted and approved the terms and conditions of the email.

34) Through the Email Agreement, Moore gave up his 50% membership interest (held through SCMED) in Black Duck and resigned his position as a manager of Black Duck.

35) At all times prior to execution of the Email Agreement, SCMED owned a 50% membership interest in Black Duck, and KrisJenn likewise owned a 50% membership interest in Black Duck. However, the parties agreed that SCMED's interest in the ROW would be limited to 20% of profits.

36) Black Duck and DMA simultaneously executed and entered into the Harris SWD Agreement.

37) Wright signed the Harris SWD Agreement "on behalf of himself and Black Duck" and Moore signed the Agreement "on behalf of himself and DMA."

38) Wright informed Terrill that both DMA and Longbranch would receive 20% of the profits received from the sale of the ROW.

39) Borders had no right to review or approve the terms of the sale of the ROW.

40) Moore had no right to review or approve the terms of the sale of the ROW.

41) Wright agreed that Longbranch and DMA would receive 20% of the profits received

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

from the sale of the ROW.

42) On April 3, 2018, the Longbranch Assignment has been recorded in the public record.

43) On October 12, 2018, David Strolle—an attorney for Wright and KrisJenn—sent a letter to Bigfoot providing "formal notice" of an assignment that transferred 100% of Black Duck's interest in the Bigfoot promissory note to KrisJenn.

44) Wright provided Moore or DMA with notice of the assignment.

45) The assignment (attached to the letter) states that the assignment is partial payment on a note dated August 14, 2017 for $4.1 million between KrisJenn as lender and Black Duck as borrower.

46) The Compromise Settlement Agreement states that after the TCRG Agreement and the sale of the Property to TCRG, DMA, Moore, and Borders made demand on TCRG claiming that each retained and owned twenty percent (20%) of all profits generated by use of the Property in perpetuity by any party, including TCRG and that as a consequence of Moore's and Borders' claims to profits TCRG refused to incur any additional costs to develop the Norther Water Project, accused Black Duck and Wright of "misrepresenting the [right-of-way] and failing to disclose Moore's and Borders' alleged interests in the [right-of-way], and made demand against and threatened to sue Black Duck, K[ris]J[enn] Ranch, and Wright."

47) SCMED has assigned all interests, claims, and causes of action related to the right-of-way to Moore.

48) On October 13, 2020, this Court heard and partially granted DMA's motion for partial summary judgment, which asked the Court to recognize DMA's right to a portion of the payments Bigfoot made on the promissory note.

**Disputed Issues – KrisJenn's claims**

1. **Declaratory Claims**

    1) Whether the Assignment Agreements "run with the land."

    2) Whether KrisJenn is a successor or assign to Black Duck.

    3) Whether certain funds paid by KrisJenn were loans and not capital contributions.

2. **Tortious Interference**

    4) Whether KrisJenn had a valid contract with TCRG.

    5) Whether DMA, Moore, and Longbranch knew or had reason to know of KrisJenn's contract with TCRG and KrisJenn's interest in the contract.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

6) Whether DMA, Moore, and Longbranch willfully and intentionally interfered with KrisJenn's contract with TCRG.

7) Whether that interference proximately caused injury to KrisJenn.

8) The amount of damages caused to KrisJenn.

**3.    Fraud**

9) Whether DMA, Moore, and Longbranch made material representations to KrisJenn regarding the Assignment Agreements, the role of George Pigg in drafting those agreements, and the meaning of "net profits interests."

10) Whether at the time those representations were made DMA, Moore, and Longbranch knew they were false or that they were made recklessly, as positive assertions, without knowledge of their truth.

11) Whether those representations were made with the intent that KrisJenn would act on them.

12) Whether KrisJenn was injured as a direct and proximate result.

13) Whether DMA, Moore, and Longbranch failed to disclose-and concealed- material information relating to their existing partnership, exclusive relationship with Pigg, and history of selling "net profits interests," the existence of potential purchasers for the ROW, as well as their efforts to divert those purchasers away from Black Duck.

14) Whether Defendants had a duty to disclose this material information to KrisJenn.

15) Whether Defendants knew that KrisJenn was ignorant of this information and that they did not have an equal opportunity to discover this information but deliberately chose to stay silent when they had a duty to speak.

16) Whether KrisJenn relied on Defendants' nondisclosures.

17) Whether KrisJenn were injured as a result of acting without knowledge of the undisclosed facts.

18) Whether KrisJenn reasonably relied on Defendants' misrepresentations as well as their failure to disclose material information.

19) Whether KrisJenn were induced to enter into and remain parties to the Assignment Agreements.

20) The amount of Plaintiffs' damages.

21) Whether Defendants' fraudulent acts were committed to secure the execution of documents by deception.

**4.    Breach of Fiduciary Duty**

22) Whether Moore as the sole owner of SCMED owed KrisJenn a fiduciary duty.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

23) Whether Moore breached that duty by:

    a.    Engaging in self-dealing;

    b.    Failing to deal fairly and honestly;

    c.    Failing to act in good faith and maintain loyalty to KrisJenn;

    d.    Failing to act with strict integrity;

    e.    Failing to make disclosures; and

    f.    Failing to act with full candor.

24) Whether Moore disclosed his general partnership with Borders to KrisJenn.

25) Whether Moore improperly competed with Black Duck by working to exclude KrisJenn from dealings regarding the ROW and engaging in "side deals" with Longbranch.

26) Whether Moore's breach of his fiduciary duty resulted in injury to KrisJenn and/or benefit to Moore.

27) The amount of KrisJenn's damages.

28) Whether KrisJenn is entitled to the forfeiture of the contractual consideration with respect to the DMA Agreement, or alternatively, the recission of the DMA Agreement.

**5.**    **Nondischargability of Debts and Claims**

29) Whether DMA, Moore and Longbranch intended to defraud KrisJenn and Wright.

30) Whether DMA, Moore and Longbranch committed defalcation while acting in a fiduciary capacity.

**Disputed Issues – DMA, Moore, and Longbranch's Claims**

Claims Related to the Right-of-Way

**1. Declaratory Claim**

Longbranch Assignment

1)    How to interpret the phrase "[Longbranch] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors and assigns."

2)    How to interpret the phrase "[Black Duck's] obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to payment of the Net Profits Share."

3)    How to interpret the phrase "Net profits shall mean gross revenues actually received by [Black Duck], or its successors and assigns directly from the operation, use,

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same."

<u>Email Agreement and DMA Agreement</u>

4) How to interpret the phrase "No less than 20% Carried Interest in the P-21 Express Pipeline."

5) How to interpret the phrase "[DMA] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors and assigns."

6) How to interpret the phrase "[Black Duck's] obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to payment of the Net Profits Share."

7) How to interpret the phrase "Net profits shall mean gross revenues actually received by [Black Duck], or its successors and assigns directly from the operation, use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same."

## 2. Breach of Contract

8) Whether Moore and DMA are parties in privity with respect to the Email Agreement.

9) Whether Moore and DMA are parties in privity with respect to the DMA Agreement.

10) Whether Moore performed under the Email Agreement.

11) Whether Wright signed the Email Agreement in his personal capacity, on behalf of Black Duck, and/or on behalf of KrisJenn.

12) Whether Wright and his entities breached the Longbranch Assignment by failing to pay or recognize Longbranch's 20% net-profits interest.

13) Whether Wright and his entities breached the Longbranch Assignment by failing to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the Longbranch Assignment]."

14) Whether Wright and his entities breached the Email Agreement by failing to pay "[n]o less than 20% Carried Interest in the P-21 Express Pipeline" under the same terms and conditions as the Longbranch Assignment.

24

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

15) Whether Wright and his entities breached the DMA Agreement by failing to pay or recognize DMA's 20% net-profits interest.

16) Whether Wright and his entities breached the DMA Agreement by failing to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the DMA Agreement]."

17) Whether Wright used Black Duck and KrisJenn to perpetrate an actual fraud on Moore, DMA, and Longbranch, for Wright's direct personal benefit.

18) Whether Wright took actions through Black Duck and KrisJenn with "dishonesty of purpose and intent to deceive," considering such factors as:

- whether Wright used Black Duck to make a fraudulent transfer to KrisJenn;

- whether KrisJenn is an insider with respect to Black Duck;

- whether Wright concealed the transfer;

- whether Wright was threatened with a suit before the transfer;

- whether Wright effectively transferred substantially all of the assets of Black Duck to KrisJenn;

- whether Black Duck became insolvent after the transfer;

- whether Wright retained possession or control of the right-of-way (or other property) after the transfer;

- whether Black Duck transferred its essential assets to a lienor (KrisJenn) that is an insider of the debtor.

19) Whether such unity existed between KrisJenn/Wright and Black Duck following Moore's exit that holding only Black Duck liable would result in injustice, considering such factors as:

- The degree to which KrisJenn and Wright exercised control over Black Duck.

- The degree to which Wright exercised control over KrisJenn.

- The degree to which Black Duck observed corporate formalities.

- The degree to which KrisJenn observed corporate formalities.

25

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

- ▪ Whether KrisJenn and Wright used Black Duck for personal purposes.
- ▪ Whether Wright used KrisJenn for personal purposes.

20) The amount of damages incurred by Moore as a result of the breach.

21) The amount of attorneys' fees incurred by Moore, DMA, and Longbranch in connection with their claims for breach of contract.

## 3. Breach of Fiduciary Duty

22) Whether Wright owed fiduciary duties to Black Duck, including a duty of care, a duty of loyalty, a duty of disclosure, and a duty to refrain from self-dealing.

23) Whether Wright owed fiduciary duties to DMA and Longbranch in connection with its role as custodian and agent for payment of Longbranch and DMA's net-profits interests.

24) Whether Wright owed fiduciary duties to Moore and/or SCMED, including a duty of care, a duty of loyalty, a duty of disclosure, and a duty to refrain from self-dealing in connection with Black Duck.

25) Whether Wright breached fiduciary duties owed to DMA and Longbranch by failing to convey to each DMA and Longbranch 20% of the net profits resulting from the sale of the right-of-way to TCRG and by using one of his entities (KrisJenn) to conduct a sham foreclosure on Black Duck's remaining interest in the right-of-way.

26) Whether Wright took out an unauthorized loan on behalf of Black Duck without informing Moore.

27) Whether Wright failed to disclose the potential deal with Terrill prior to Moore's exit from Black Duck.

28) Whether Wright made false promises to Moore in order to convince Moore to withdraw from Black Duck.

29) Whether Wright breached fiduciary duties owed to Black Duck and Moore/SCMED through the conduct outlined above.

30) Whether Wright and KrisJenn benefited from the breaches of fiduciary duty described above.

31) Whether Longbranch were proximately caused by the breaches of fiduciary duty described above.

26

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

32) Whether DMA's damages were proximately caused by the breaches of fiduciary duty described above.

33) Whether Moore's damages were proximately caused by the breaches of fiduciary duty described above.

34) Damages incurred by Longbranch as a result of Wright's breaches of fiduciary duty.

35) Damages incurred by DMA as a result of Wright's breaches of fiduciary duty.

36) Damages incurred by Moore as a result of Wright's breaches of fiduciary duty.

37) The amount of Wright, Black Duck, and KrisJenn's wrongful gain resulting from Wright's breaches of fiduciary duty, which DMA, Moore, and Longbranch seek to disgorge.

**4. Knowing Participation in Breach of Fiduciary Duty**

38) Whether KrisJenn knew that Wright owed fiduciary duties to Black Duck.

39) Whether KrisJenn knew that Wright owed fiduciary duties to DMA.

40) Whether KrisJenn knew that Wright owed fiduciary duties to Moore.

41) Whether Black Duck was controlled by Wright.

42) Whether KrisJenn is controlled by Wright.

43) Whether Wright used his entities to carry out his breaches of fiduciary duty.

44) Whether Wright's entities were knowing participants in his breaches of fiduciary duty.

45) Damages incurred by Moore as a result of KrisJenn's participation in Wright's fiduciary breaches.

46) Damages incurred by DMA as a result of KrisJenn's participation in Wright's fiduciary breaches.

47) The amount of Wright, Black Duck, and KrisJenn's wrongful gain resulting from Wright's breaches of fiduciary duty, which DMA, Moore, and Longbranch seek to disgorge.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

## 5. Fraud/Fraudulent Inducement

48) Whether Wright made material misrepresentations to Moore and Longbranch to convince them to allow him to include him on the right-of-way deal.

49) Whether Wright represented he had the financial wherewithal to purchase and hold the right-of-way until a suitable buyer came along.

50) Whether Wright represented his contributions would take the form of a capital contribution to Black Duck.

51) Whether Wright represented his contributions would take the form of a loan to Black Duck.

52) Whether Wright represented that his funding for acquisition of the right-of-way would be consideration for his inclusion in the deal.

53) Whether Wright's representations were false.

54) Whether Wright's representations were material.

55) Whether Moore and Longbranch would have included Wright in the deal except for Wright's misrepresentations.

56) Whether Longbranch would have transferred the Purchase Agreement to Black Duck except for Wright's misrepresentations.

57) Whether Wright knew the representations were false.

58) Whether Wright made the misrepresentations recklessly as a positive assertion and without knowledge or regard for their truth or falsity.

59) Whether Wright made the misrepresentations with the intent that Moore and Longbranch act and rely upon them.

60) Whether Moore and Longbranch acted and relied on Wright's misrepresentations when they agreed to have Longbranch assign the Purchase Agreement to Black Duck.

61) Whether Moore and Longbranch suffered injury as a result of their reliance, including loss of their right to purchase the right-of-way and loss of control over the right-of-way project.

62) The amount of damages incurred by Moore and Longbranch as a result of Wright's fraud.

28

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

6. **Fraud (in the alternative)**

63) Whether Black Duck represented to Longbranch that Longbranch would receive a 20% net-profits interest in the right-of-way, that the interest attaches and runs with the land, that the interest is binding on Black Duck's successors and assigns, and that Black Duck would bind its successors and assigns to this interest.

64) Whether Wright represented to Longbranch that Longbranch would receive a 20% net-profits interest in the right-of-way, that the interest attaches and runs with the land, that the interest is binding on Black Duck's successors and assigns, and that Black Duck would bind its successors and assigns to this interest.

65) Whether Wright/Black Duck's representations to Longbranch were material and false statements of fact.

66) Whether Wright/Black Duck's representations to Longbranch were false promises of future performance.

67) Whether Wright/Black Duck knew the representations were false and intended Longbranch to rely on those representations and omissions.

68) Whether Longbranch justifiably relied on Wright/Black Duck's representations.

69) Whether Longbranch's reliance was reasonable and substantial.

70) Whether Wright knew or reasonably should have known that Longbranch would rely on his promises.

71) Whether Black Duck represented to Moore and DMA that DMA would receive a 20% net-profits interest in the right-of-way, that the interest attaches and runs with the land, that the interest is binding on Black Duck's successors and assigns, and that Black Duck would bind its successors and assigns to such interest.

72) Whether Wright represented to Moore and DMA that DMA would receive a 20% net-profits interest in the right-of-way, that the interest attaches and runs with the land, that the interest is binding on Black Duck's successors and assigns, and that Black Duck would bind its successors and assigns to such interest.

73) Whether Wright and/or Black Duck's representations to Moore/SCMED and DMA were material and false statements of fact.

74) Whether Wright and/or Black Duck's representations to Moore/SCMED and DMA were false promises of future performance.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

75) Whether Wright indebted Black Duck without consulting with Moore.

76) Whether Wright failed to disclose the terms of the loan to Moore.

77) Whether Wright failed to obtain proper authorization for the loan in accordance with Black Duck's governing documents.

78) Whether Wright and/or Black Duck committed fraud by nondisclosure by failing to inform Moore of the potential deal with Terrill, prior to Moore's exit from Black Duck.

79) Whether Wright/Black Duck knew the representations identified above were false and intended Moore/SCMED and DMA to rely on those representations and omissions.

80) Whether Moore and DMA justifiably relied on Wright and/or Black Duck's false representations when Moore resigned from Black Duck and relinquished his membership stake in Black Duck.

81) Whether Moore and DMA's reliance was reasonable and substantial.

82) Whether Wright/Black Duck knew or reasonably should have known that Moore and DMA would rely on their promises and representations.

83) Whether Wright committed fraud by using his control over Black Duck and KrisJenn to effect a sham foreclosure on Black Duck's remaining assets, including Black Duck's 16% carried interest under the TCRG deal.

84) Damages incurred by Longbranch, Moore/SCMED, and DMA as a result of Wright's fraud.

## 7. Tortious Interference with Contract

85) Whether Wright intentionally interfered with the DMA Agreement.

86) Whether Wright intentionally interfered with the Email Agreement.

87) Whether Wright intentionally interfered with the Longbranch Assignment.

88) Whether Black Duck intentionally interfered with the Email Agreement.

89) Whether KrisJenn intentionally interfered with the DMA Agreement.

90) Whether KrisJenn intentionally interfered with the Email Agreement.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

91) Whether KrisJenn intentionally interfered with the Longbranch Assignment.

92) Whether DMA was proximately injured as a result of Wright's interference.

93) Whether Moore was proximately injured as a result of Wright's interference.

94) Whether Moore was proximately injured as a result of Black Duck's interference.

95) Whether Longbranch was proximately injured as a result of Wright's interference.

96) Whether DMA was proximately injured as a result of KrisJenn's interference.

97) Whether Moore was proximately injured as a result of KrisJenn's interference.

98) Whether Longbranch was proximately injured as a result of KrisJenn's interference.

99) Damages incurred by DMA as a result of Wright's interference.

100) Damages incurred by DMA as a result of KrisJenn's interference.

101) Damages incurred by Moore as a result of Wright's interference.

102) Damages incurred by Moore as a result of Black Duck's interference.

103) Damages incurred by Moore as a result of KrisJenn's interference.

104) Damages incurred by Longbranch as a result of Wright's interference.

105) Damages incurred by Longbranch as a result of KrisJenn's interference.

## 8. Promissory Estoppel (in the alternative)

106) Whether Wright promised (on behalf of himself and Black Duck) that Moore's entity would receive a 20% net-profits interest in the right-of-way that would attach and run with the land and bind Black Duck's successors and assigns.

107) Whether Moore relied on Wright's promises by resigning from Black Duck and relinquishing his stake in Black Duck.

108) Whether Moore's reliance was reasonable and substantial.

109) Whether injustice to Moore can be avoided only if Wright's promises are enforced.

110) Whether Moore's reliance resulted in injury to Moore, including the loss of his 50% ownership stake in Black Duck and its assets.

31

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

**9. Money Had and Received**

111) Whether Wright received net profits from the sale of the right-of-way to TCRG.

112) Whether KrisJenn received net profits from the sale of the right-of-way to TCRG.

113) Whether 20% of the net profits received by Wright belong in equity and good conscience to Longbranch.

114) Whether 20% of the net profits received by KrisJenn belong in equity and good conscience to Longbranch.

115) Whether 20% of the net profits received by Wright belong in equity and good conscience to DMA.

116) Whether 20% of the net profits received by KrisJenn belong in equity and good conscience to DMA.

**10. Unjust Enrichment (in the alternative)**

117) Whether Wright was unjustly enriched at Moore's expense.

118) Whether Wright was unjustly enriched at DMA's expense.

119) Whether Wright was unjustly enriched at Longbranch's expense.

120) Whether Black Duck was unjustly enriched at Moore's expense.

121) Whether Black Duck was unjustly enriched at DMA's expense.

122) Whether Black Duck was unjustly enriched at Longbranch's expense.

123) Whether KrisJenn was unjustly enriched at Moore's expense.

124) Whether KrisJenn was unjustly enriched at DMA's expense.

125) Whether KrisJenn was unjustly enriched at Longbranch's expense.

126) Whether the enrichment of Wright/Black Duck/KrisJenn was unjust.

**11. Civil Conspiracy**

127) Whether Black Duck, KrisJenn, and Wright reached a meeting of minds and intentionally conspired to defraud Moore and DMA.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

128) Whether Moore and DMA suffered damages proximately caused by Black Duck, KrisJenn, and Wright's unlawful acts.

## 12. Nondischargeability

129) Whether Wright used KrisJenn to defraud Moore and DMA of their net-profits interest and to sell the right-of-way in disregard of that interest.

130) Whether, through the conduct outlined above, KrisJenn (via Wright) used false presentations, false representations, and actual fraud to obtain Moore/SCMED's membership interest in Black Duck and obtain or ignore DMA's 20% net-profits interest.

131) Whether, through the conduct outlined above, KrisJenn (via Wright) committed fraud or defalcation while acting in a fiduciary capacity.

## 13. Exemplary Damages

132) Whether DMA's injuries resulted from Wright's gross negligence, malice, or actual fraud.

133) Whether Moore's injuries resulted from Wright's gross negligence, malice, or actual fraud.

134) Whether Longbranch's injuries resulted from Wright's gross negligence, malice, or actual fraud.

Claims Related to the Bigfoot Note Payments

## 1. Breach of Contract

135) Whether Wright executed the Email Agreement in his personal capacity, on behalf of Black Duck, and/or on behalf of KrisJenn.

136) Whether DMA is an intended third-party beneficiary under the Email Agreement.

137) Whether DMA is an intended third-party beneficiary under the Harris SWD Agreement.

138) Whether Moore performed under the Email Agreement by resigning from Black Duck and relinquishing his 50% membership interest in Black Duck held through SCMED.

33

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

139) Whether Wright, Black Duck, and/or KrisJenn breached the Email Agreement by failing to convey to pay DMA 50% of the Bigfoot note payments within three business days of the funds becoming available.

140) Whether Wright, Black Duck, and/or KrisJenn breached the Harris SWD Agreement by failing to pay DMA 50% of the Bigfoot note payments within three business days of the funds becoming available.

141) Whether KrisJenn was an assignee of the obligation to pay DMA its portion of the Bigfoot note payments and Black Duck's 50% interest in the Bigfoot note.

142) The amount of damages incurred by DMA as a result of Wright, Black Duck, and KrisJenn's breaches.

143) The amount of attorneys' fees incurred by DMA in connection with its claim for breach of contract with respect to the Bigfoot note payments.

## 2. Conversion

144) Whether DMA had a right to immediate possession of 50% of the Bigfoot note payments under the Email Agreement and/or Harris SWD Agreement.

145) Whether half of the proceeds from the note payments are DMA's property.

146) Whether Wright wrongfully exercised dominion and control over DMA's half of the note payments, in a manner inconsistent with DMA's rights.

147) Whether Black Duck wrongfully exercised dominion and control over DMA's half of the note payments, in a manner inconsistent with DMA's rights.

148) Whether KrisJenn wrongfully exercised dominion and control over DMA's half of the note payments, in a manner inconsistent with DMA's rights.

149) Whether Wright, Black Duck, and/or KrisJenn refused to return DMA's property on demand, amounting to a clear repudiation of DMA's rights, or whether a demand would have been useless.

150) When DMA was injured by Wright, Black Duck, and/or KrisJenn's refusal to return the converted property.

151) The damages incurred by DMA as a result of Wright, Black Duck, and/or KrisJenn's conversion, including compensation for loss of use of the converted property and loss of profits.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

152) Whether DMA's injury resulted from Wright, Black Duck, and/or KrisJenn's malice, entitling DMA to exemplary damages.

### 3. Money Had and Received

153) Whether Wright or KrisJenn hold proceeds from the Bigfoot note which in equity and good conscience belong to DMA.

154) The amount of proceeds that in equity and good conscience belong to DMA.

### 4. Breach of Fiduciary Duty

155) Whether Black Duck and Wright had a fiduciary relationship with DMA, as custodians and agents for payments of DMA's net-profits interest.

156) Whether Black Duck and Wright breached fiduciary duties owed to DMA by failing to process and pay 20% of net-profits to DMA.

157) Whether Wright and KrisJenn benefited through these breaches of fiduciary duty.

158) Whether DMA was damaged by these breaches of fiduciary duty.

159) Damages incurred by DMA as a result of the breach.

### 5. Unjust Enrichment

160) Whether Wright and/or KrisJenn were enriched at DMA's expense through their retention of the Bigfoot note payments.

161) Whether the enrichment was unjust.

### 6. Declaratory Claim

162) How to interpret the phrase "[DMA] is entitled to receive 50% of all Gross Monies received by [Black Duck] including its successors and assigns for the remainder of all payments due to [Black Duck] from Big foot."

163) How to interpret the phrase "[DMA] is a 50% carried interest party."

### 7. <u>Agreed Applicable Law</u>

- The parties' declaratory claims are governed by 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57.

- Moore's nondischargeability claims are governed by 11 U.S.C. §§ 523(a)(2), 523(a)(4), and 523(a)(6).

35

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

- All of the parties' other claims and defenses are governed by Texas statutory and common law.

## 8. **Contested Issues of Law**

KrisJenn's Claims

### 1. **Declaratory Claims**

1) Whether the Assignment Agreements run with the land.

2) Whether KrisJenn is entitled to the recovery of attorney's fees.

3) The amount of attorney's fees to be recovered.

### 2. **Tortious Interference**

4) Whether KrisJenn is entitled to pre- and post-judgment interest.

5) Whether the injury resulted from Defendants' malice or actual fraud, entitled KrisJenn to exemplary damages.

6) Whether KrisJenn is entitled to recover exemplary damages under section 41.003 of the Texas Civil Practice and Remedies Code.

### 3. **Fraud**

7) Whether their deception constitutes a violation of the Texas Penal Code.

8) Whether the treble damages cap should be disregarded.

9) Whether Plaintiffs are entitled to rescind or invalidate all or part of the Assignment Agreements.

### 4. **Breach of Fiduciary Duty**

10) Whether Moore owed KrisJenn a fiduciary duty.

### 5. **Non-dischargability of Debts and Claims**

11) Whether claims against Moore and Longbranch and debts owed to KrisJenn by Moore and Longbranch are non-dischargeable under 11 U.S.C. §523(a)(2).

12) Whether Moore and Longbranch committed fraud or defalcation while acting in a fiduciary capacity.

13) Whether claims and debts based on Moore and Longbranch's fraud are non-dischargable under 11 U.S.C. §523(a)(4).

14) Whether claims against Moore and Longbranch and debts owed by them are non-dischargable under 11 U.S.C. §523(a)(6).

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

DMA/Moore/Longbranch's Claims Related to the Right-of-Way

1. **Declaratory Claim**

1) Whether Longbranch's net-profits interest touches and concerns the land.

2) Whether Longbranch's net-profits interest specifically binds the parties and their assigns.

3) Whether Longbranch's net-profits interest was intended by Black Duck and Longbranch to run with the land.

4) Whether KrisJenn (as successor to the right-of-way) had notice of Longbranch's net-profits interest.

5) Whether privity of estate is required for a covenant to attach and run with the land.

6) To the extent privity of estate is required, whether vertical privity exists between Black Duck and KrisJenn.

7) To the extent privity of estate is required, whether vertical privity is sufficient to establish privity of estate.

8) To the extent horizontal privity is required to establish privity of estate, whether horizontal privity existed between Longbranch and Black Duck when the Longbranch Assignment was executed.

9) Whether DMA's net-profits interest touches and concerns the land.

10) Whether DMA's net-profits interest specifically binds the parties and their assigns.

11) Whether DMA's net-profits interest was intended by Black Duck and Longbranch to run with the land.

12) Whether KrisJenn (as successor to the right-of-way) had notice of DMA's net-profits interest.

13) To the extent horizontal privity is required to establish privity of estate, whether horizontal privity existed between Black Duck and Moore/SCMED when the DMA Agreement was executed.

14) To the extent horizontal privity is required to establish privity of estate, whether horizontal privity existed between Black Duck and DMA when the DMA Agreement was executed.

15) Whether Longbranch's net-profits interest constitutes a real covenant that attaches

and runs with the land and binds successors and assigns.

16) Whether DMA's net-profits interest constitutes a real covenant that attaches and runs with the land and binds successors and assigns.

17) How to interpret the phrase "pipe and related facilities commonly known as the P-21 or Express pipeline."

## 2. Breach of Contract

18) Whether Longbranch's 20% net-profits interest attaches and runs with the land and binds Black Duck's successors and assigns.

19) Whether DMA's 20% net-profits interest attaches and runs with the land and binds Black Duck's successors and assigns.

20) Whether the Email Agreement incorporates the DMA Agreement by reference.

21) Whether the DMA Agreement incorporates the Email Agreement by reference.

22) Whether the Email Agreement and the DMA Agreement form one contract.

23) Whether the Longbranch Assignment and DMA Agreement incorporate the Purchase Agreement's definition of "P-21" and "Express pipeline."

24) Whether Wright used Black Duck as an alter ego of KrisJenn after Moore withdrew from Black Duck.

25) Whether KrisJenn is liable for fraudulent actions taken by Black Duck at Wright's direction.

26) Whether Wright is personally liable for fraudulent actions taken by Black Duck.

27) Whether KrisJenn is an alter ego of Wright such that the corporate veil between Wright and KrisJenn should be disregarded.

28) Whether KrisJenn is liable for fraudulent actions taken by Wright.

29) Whether DMA, Moore, and Longbranch are entitled to specific performance with respect to Wright, Black Duck, and KrisJenn's obligation to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent" of the Longbranch Assignment and the DMA Agreement.

30) Whether DMA, Moore, and Longbranch are entitled to recover attorneys' fees under Texas Civil Practice and Remedies Code § 38.001.

38

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

### 3. Fraud/Fraudulent Inducement

31) The parties are not aware of any contested issues of law with respect to this claim.

### 4. Fraud (in the alternative)

32) The parties are not aware of any contested issues of law with respect to this claim.

### 5. Breach of Fiduciary Duty

33) Whether Wright, Black Duck, and/or KrisJenn owed fiduciary duties to DMA as custodians and agents for payment with respect to DMA's net-profits interest.

34) Whether Wright a duty of care to Black Duck.

35) Whether Wright owed a duty of disclosure to Black Duck.

36) Whether Wright owed a duty of loyalty to Black Duck.

37) Whether Wright a duty of care to Moore/SCMED.

38) Whether Wright owed a duty of disclosure to Moore/SCMED.

39) Whether Wright owed a duty of loyalty to Moore/SCMED.

40) Whether Wright's fiduciary duties to Black Duck required him to refrain from self-dealing at the expense of Black Duck and its other members.

41) Whether Wright is personally liable for breaches of fiduciary duty committed by Wright through Black Duck.

42) Whether Wright is personally liable for breaches of fiduciary duty committed by Wright through KrisJenn.

43) Whether KrisJenn is liable for fiduciary breaches committed by Wright through KrisJenn.

### 6. Knowing Participation in Breach of Fiduciary Duty

44) The parties are not aware of any contested issues of law with respect to this claim.

### 7. Tortious Interference with Contract

45) The parties are not aware of any contested issues of law with respect to this claim.

### 8. Promissory Estoppel

46) The parties are not aware of any contested issues of law with respect to this claim.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

### 9. Money Had and Received

47) The parties are not aware of any contested issues of law with respect to this claim.

### 10. Unjust Enrichment

48) The parties are not aware of any contested issues of law with respect to this claim.

### 11. Civil Conspiracy

49) The parties are not aware of any contested issues of law with respect to this claim.

### 12. Nondischargeability

50) Whether KrisJenn's debts owed to Longbranch, DMA, and Moore in connection with the claims asserted in this adversary proceeding are nondischargeable under 11 U.S.C. § 523.

Claims Related to the Bigfoot Note Payments

### 1. Breach of Contract

51) The parties are not aware of any contested issues of law with respect to this claim.

### 2. Conversion

52) The parties are not aware of any contested issues of law with respect to this claim.

### 3. Money Had and Received

53) The parties are not aware of any contested issues of law with respect to this claim.

### 4. Breach of Fiduciary Duty

54) The parties are not aware of any contested issues of law with respect to this claim.

55) Whether Wright, Black Duck, and/or KrisJenn owed fiduciary duties to DMA as custodians and agents for payment with respect to the Bigfoot promissory note.

### 5. Unjust Enrichment

56) The parties are not aware of any contested issues of law with respect to this claim.

### 6. Declaratory Claim

57) The parties are not aware of any contested issues of law with respect to this claim.

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

**9.**     **List of Potential Witnesses**

1. Frank Daniel Moore
2. Darin Borders
3. Larry Wright
4. David Strolle
5. Hagan Chole
6. George Pigg
7. Craig Crockett
8. John Terrill
9. Adam McCleod
10. John Muller

**10.**     **Estimated Length of Trial**

The parties estimate that trial will take approximately 24 hours.

**11.**     **Additional Matters**

The parties are not aware of any additional matters at this time.

**12.**     **Trial Exhibits**

The parties will separately file their respective exhibit lists.  However, Plaintiff reserves the right to supplement this list based upon the Court's Order allowing it to conduct additional discovery.

Dated: January 4, 2021

*Signature on following page.*

41

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

Respectfully submitted,

MULLER SMEBERG, PLLC

By: _/s/ *John Muller*_____
    C. John Muller IV
    State Bar No. 24070306
    john@muller-smeberg.com
    Ezekiel J. Perez
    State Bar No. 24096782
    zeke@muller-smeberg.com
    111 W. Sunset Rd.
    San Antonio, TX 78209
    Telephone: 210-664-5000
    Facsimile: 210-598-7357

    ATTORNEYS FOR DEBTORS

BAYNE, SNELL & KRAUSE

By: _/s/ *William P. Germany*_____
    WILLIAM P. GERMANY
    State Bar No. 24069777
    1250 N.E. Loop 410, Suite 725
    San Antonio, Texas 78209
    Telephone: (210) 824-3278
    Facsimile: (210) 824-3937
    Email: wgermany@bsklaw.com

    ATTORNEY FOR THIRD-PARTY
    DEFENDANT LARRY WRIGHT

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system by notice of electronic filing or via email on the 4th day of January 2021:

Michael Black
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, Texas 78209
210-829-2022
210-829-2021 fax
mblack@burnsandblack.com
Attorneys for Longbranch Energy, LP
and DMA Properties, Inc.

Christopher S. Johns
Christen Mason Hebert
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

Timothy Cleveland
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
Attorneys for DMA Properties, Inc.

Natalie Wilson
LANGLEY & BANACK, INC.
745 East Mulberry Avenue | Suite 700
San Antonio, TX 78212
210-736-6600
lwilson@langleybanack.com
Attorneys for DMA Properties, Inc.

Jeffery Duke
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, Texas 77494
jduke@dbmmlaw.com
Counsel for Longbranch Energy, LP

William Germany
BAYNE, SNELL, & KRAUSE
1250 NE Loop 410, Ste. 725
San Antonio, Texas 78209
T- (210) 824-3278
F- (210) 824-3937
wgermany@bskaw.net
Attorney for Larry Wright

OFFICE OF THE UNITED STATES TRUSTEE
903 San Jacinto Blvd, Room 230
Austin, Texas 78701
shane.p.tobin@usdoj.gov
United States Trustee

_/s/ John Muller_____
C. John Muller IV

*KrisJenn Ranch, LLC and its Series and Larry Wright's Proposed Pretrial Order*