## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| **KRISJENN RANCH, LLC** | § | |
| *Debtor* | § | **Case No. 20-50805** |
| | § | |

_____

| | | |
|---|---|---|
| **KRISJENN RANCH, LLC and** | § | |
| **KRISJENN RANCH, LLC-SERIES** | § | |
| **UVALDE RANCH, and KRISJENN** | § | |
| **RANCH, LLC-SERIES PIPELINE** | § | |
| **ROW as successors in interest to** | § | |
| **BLACKDUCK PROPERTIES, LLC,** | § | |
| *Plaintiffs* | § | |
| | § | |
| **v.** | § | |
| | § | |
| **DMA PROPERTIES, INC., and** | § | |
| **LONGBRANCH ENERGY, LP,** | § | **Adversary No. 20-05027** |
| *Defendants* | § | |

_____

| | | |
|---|---|---|
| **DMA PROPERTIES, INC** | § | |
| *Cross-Plaintiff/Third Party Plaintiff* | § | |
| **v.** | § | |
| **KRISJENN RANCH, LLC,** | § | |
| **KRISJENN RANCH, LLC-SERIES** | § | |
| **UVALDE RANCH, and KRISJENN** | § | |
| **RANCH, LLC-SERIES PIPELINE ROW,** | § | **Adversary No. 20-05027** |
| **BLACK DUCK PROPERTIES, LLC,** | § | |
| **LARRY WRIGHT, and JOHN TERRILL** | § | |
| *Cross-Defendants/Third-Party* | § | |
| *Defendants* | § | |

## KRISJENN RANCH, LLC, KRISJENN RANCH, LLC-SERIES UVALDE RANCH, AND KRISJENN RANCH, LLC-SERIES PIPELINE ROW, AS SUCCESSORS IN INTEREST TO BLACK DUCK PROPERTIES, LLC, AND LARRY WRIGHT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COME NOW Debtor Plaintiffs KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series

Pipeline ROW, KrisJenn Ranch, LLC-Series Uvalde Ranch, as successors-in-interest to Black

Duck Properties, LLC (collectively "KrisJenn") and Third-Party Defendant Larry Wright, pursuant to Local Rule 7016 and submit their proposed findings of fact and conclusions of law:

## FINDINGS OF FACT

### i. *Background*

1) The right-of-way spans approximately 65 miles and runs from Angelina County through Nacogdoches and Rusk Counties and across Shelby County in East Texas.

2) The Purchase Agreement defines the assets which Longbranch sought to buy (and Express to sell) as "Ownership interest in certain pipe and related facilities (commonly known as the P-21 pipeline) shown on the plat attached hereto as Exhibit 'A'. and described on Exhibit 'B' attached hereto, and the rights-of-way, easements, contracts, permits and leases described in Exhibit 'C' attached hereto (collectively herein referred to as the 'Express Pipeline')".

3) Borders and Moore collectively paid $25,000 to Express to secure the right to purchase the right-of-way.

4) Black Duck Properties was formed in 2015. KrisJenn Ranch, LLC and SCMED Oilfield Consulting, LLC ("SCMED") were its equal members. Larry Wright and Daniel Moore are/were the members of each, respectively.

5) The Black Duck Company Agreement dated 12/28/2015 was signed by Daniel Moore and Larry Wright as corporate representatives for SCMED and KrisJenn, respectively.

6) On January 18, 2016 Daniel Moore signed an acknowledgment advising that the law firm which drafted the Black Duck Company Agreement was not representing its individual members and advising each of its members to secure independent legal counsel in connection with the creation and execution of the Company Agreement and its effect on each of its members.

7) On January 29, 2016 SCMED's charter was involuntarily forfeited for SCMED's failure to comply with the Texas Tax Code.

8) On February 10, 2016, the Black Duck Company Agreement was signed by Daniel Moore.

9) The Black Duck Company Agreement includes a merger clause.

10) The Black Duck Company Agreement does not require capital contributions beyond initial $500 contributions by each member.

11) KrisJenn made an initial capital contribution of $500 and paid another $500 on SCMED's behalf. SCMED has never reimbursed KrisJenn for its $500 capital contribution.

12) Section 4.05 of the Black Duck Company Agreement states that an advance described this section 4.05 constitutes a loan from the Member to the Company, bears interest at the General

Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

13) KrisJenn and/or Wright paid all expenses related to the operations of Black Duck.

14) SCMED never made a capital contribution to Black Duck.

15) SCMED never lent money to Black Duck.

16) SCMED never assumed or paid for any expenses or debts owed by Black Duck.

17) SCMED is not a party to this case.

18) Besides SCMED and KrisJenn, no other person or entity has owned any interest in Black Duck.

19) SCMED and KrisJenn have never assigned their ownership interests in Black Duck to another person or entity.

20) Although SCMED and KrisJenn were 50/50 partners in Black Duck, it was their custom to negotiate different profit splits for certain properties it purchased and sold.

21) Prior to Wright's involvement, Borders and Moore agreed to equally share any financial costs and gains with respect to their option on the right-of-way.

22) Borders and Moore did not disclose this agreement to Wright.

23) Black Duck was not served with process and is not a party to this case.

24) On February 19, 2016, Longbranch and the Express Pipeline Connection, LLC executed a purchase agreement ("Purchase Agreement") under which Longbranch received a contractual right to purchase the right-of-way from Express.

25) Wright learned about the right-of-way through Moore.

26) Black Duck paid or reimbursed Longbranch for all earnest money owed on the Purchase Agreement.

27) Longbranch assigned the Purchase Agreement to Black Duck (the "Longbranch Assignment").

28) George Pigg represented Longbranch Energy, LP in connection with the drafting of the Longbranch Assignment, not Black Duck.

29) Moore informed Wright that Pigg would represent both Longbranch and Black Duck in drafting the Longbranch Assignment.

30) George Pigg did not disclose any conflicts of interest to Black Duck when he agreed to draft the Longbranch Assignment.

31) George Pigg did not advise Black Duck to retain independent counsel when he drafted the Longbranch Assignment.

32) When conferring with Pigg about drafting instructions, Moore claimed that he was aware of Wright's wishes and could "speak for the group."

33) Under the Longbranch Assignment, Black Duck agreed that Longbranch "shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from Assignee or its successors or assigns during the period of time beginning on the date first written above (the "Period")."

34) The Longbranch Assignment further states:

    a. Net Profits shall mean gross revenues actually received by Assignee, or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

    b. Assignee's obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to the payment of the Net Profits Share.

35) Moore convinced Wright to purchase the ROW, by and through Black Duck, by claiming that he could promptly find a subsequent purchaser for the ROW.

36) Moore agreed to receive 20% of the profits earned from the ROW.

37) Beginning on or about May 25, 2017, Moore and Borders negotiated with a prospective purchaser of the ROW and attempted to negotiate "additional services" contracts that would have potentially provided Moore and Borders with salaries and equity ownership.

38) Wright was not informed of Moore's efforts to negotiate additional service contracts.

39) Moore and Borders proposed to be 50/50 owners/partners in a new entity that would be named Longbranch Services, LLC.

40) Moore told the prospective purchaser that he felt "100% that [Borders] was a must and would have to be part of the deal" but the "only continency is that Larry Wright CANNOT be involved in any participation beyond the terms of the closing contract of the ROW purchase."

41) During this period of time, Moore was corresponding with prospective purchasers of the ROW.

42) Some of these prospective purchasers were not disclosed by Moore in his verified answers to interrogatories in this case.

43) Moore lost all of his text messages with prospective purchasers of the ROW that existed prior to June 2019.

44) If these text messages had not been lost, they would have shown that Moore intentionally refused to negotiate with prospective purchasers of the ROW unless they were willing to offer additional service contracts to Longbranch Services, LLC.

45) Moore failed to inform Wright of his attempts to secure additional service contracts for Longbranch Services, LLC

46) On or about August 14, 2017, Asilo Investment loaned $4,100,000 to KrisJenn Ranch at 17% APR.

47) On or about August 14, 2017, KrisJenn Ranch loaned Black Duck $4,100,000 at 17% APR.

48) On or about August 14, 2017, Wright loaned $1,175,000 to Black Duck at 4% APR.

49) On or about August 14, 2017, Wright informed Moore that KrisJenn had borrowed $5,270,000 in order to purchase the ROW.

50) Moore knew that KrisJenn had only raised $1,000 in capital at the time the ROW was purchased.

51) On or about August 17, 2017, Black Duck purchased the ROW for $5,000,000.

52) Borders recorded the Longbranch Assignment in Shelby County on October 2, 2017.

53) SCMED agreed to transfer is ownership to KrisJenn after Wright complained about Moore's inability to sell the ROW.

54) On February 7, 2018, in return for transferring SCMED's ownership interest to KrisJenn, DMA and Black Duck executed and entered into the DMA Agreement.

55) Under the DMA Agreement, Black Duck agreed that DMA "shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from Assignee or its successors or assigns during the period of time beginning on the date first written above (the "Period")."

56) The DMA Agreement further states:

   a. Net Profits shall mean gross revenues actually received by Assignee, or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

   b. Assignee's obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and Assignee binds its successors and assigns to the payment of the Net Profits Share.

57) After SCMED transferred its ownership interest to KrisJenn, KrisJenn owned 100% of Black Duck's outstanding membership interests.

58) Wright met Terrill for the first time after SCMED transferred its ownership interest.

59) On February 9, 2018, John Terrill ("Terrill") sent Wright a letter of intent to purchase the right-of-way for $2.5 million, with Black Duck retaining a 16% carried interest in the completed Northern Water Project joint venture.

60) Terrill, by and through Synergy Midstream, LLC ("Synergy"), formed a Texas Limited Liability Company named TCRG East Texas Pipeline 1, LLC ("TCRG") to purchase the ROW.

61) Synergy owned 25% and One Industries Group, LP owned 75% of TCRG.

62) All of Wright's direct communications to TCRG were by and through Terrill.

63) On March 22, 2018, Wright, by and through his legal counsel, informed TCRG that it was better to wait until TCRG was satisfied with the title work for the ROW than sign a purchase and sale agreement for the ROW.

64) On March 22, 2018, TCRG East Texas Pipeline 1, LLC purchased the ROW in exchange for $2.5 million and a retaining a 16% carried interest in TCRG's profits from the ROW.

65) TCRG had sufficient assets to develop the ROW and make it productive within 20 months of closing.

66) On April 3, 2018, the Longbranch Assignment was recorded in the public record of Shelby County.

67) TCRG did due diligence on the ROW before closing.

68) On April 3, 2018, Wright executed a deed transferring the right-of-way from Black Duck to TCRG East Texas Pipeline 1, LLC.

69) John Terrill's entity, Synergy Midstream, LLC, is (or, before the initiation of this lawsuit, was) a member of TCRG East Texas Pipeline 1, LLC with 25% ownership in TCRG East Texas Pipeline 1, LLC.

70) Wright informed Terrill that both DMA and Longbranch would receive 20% of the profits Black Duck received from the sale of the ROW.

71) On April 4, 2018, Wright introduced Terrill to Borders. After visiting the right-of-way, Wright, Terrill, Borders, and Terrill's father drove to Longbranch's office. There, Borders gave Terrill the easement documents for the right-of-way.

72) Borders had no right to review or approve the terms of the sale of the ROW.

73) Moore had no right to review or approve the terms of the sale of the ROW.

74) Wright agreed that Longbranch and DMA would receive 20% of the profits received from the sale of the ROW.

75) On April 9, 2018, Moore emailed Terrill a copy of the DMA Agreement. Borders also subsequently emailed Terrill a copy of the Longbranch Assignment on April 9, 2018.

76) On October 12, 2018, David Strolle—an attorney for KrisJenn—sent a letter to Bigfoot providing "formal notice" of an assignment that transferred 100% of Black Duck's interest in the Bigfoot promissory note to KrisJenn.

77) Wright provided Moore or DMA with notice of the assignment.

78) The assignment (attached to the letter) states that the assignment is partial payment on a note dated August 14, 2017 for $4.1 million between KrisJenn as lender and Black Duck as borrower.

79) On December 4, 2018, Moore recorded the DMA Agreement in Angelina, Nacogdoches, Shelby, and Rusk Counties.

80) In December 2018, Wright terminated Black Duck and filed a certificate of termination with the Texas Secretary of State.

81) Black Duck assigned its claims to KrisJenn Ranch, LLC.

82) KrisJenn Ranch, LLC-Series Pipeline Row and KrisJenn Ranch, LLC are legally distinct entities.

83) On or before March 5, 2019, DMA and Longbranch, by and through their legal counsel, submitted a demand letter to TCRG claiming that: (1) their net profits interests "ran with the land," (2) their net profits interests entitled them to collectively receive 40% of all profits earned by TCRG, (3) Wright committed fraud by not informing TCRG that their net profits interests "ran with the land," and (4) they would sue TCRG if they did not acquiesce to such demands.

84) On or after April 3, 2019, TCRG informed Borders that they would not recognize his claims to a net profits interest because there were a number of legal problems with the Longbranch Assignment.

85) On November 11, 2019, Wright, KrisJenn, and KrisJenn's series executed a Compromise Settlement Agreement with TCRG to avoid the costs and hazards of litigation with TCRG.

86) After executing the TCRG Compromise Settlement Agreement, Wright and KrisJenn borrowed the funds required to repurchase the ROW from McLeod Oil, LLC.

87) In December 2019, KrisJenn Ranch, LLC–Pipeline ROW purchased the ROW from TCRG for $2.5 million.

88) McLeod currently holds an option to purchase the right-of-way for $6 million.

89) On December 10, 2020, Bigfoot paid off the promissory note.

90) After litigation was reasonably anticipated, Moore lost several cell phones by dropping them into the ocean during fishing trips.

91) Black Duck never earned profits from the ROW.

92) KrisJenn never earned profits from the ROW.

93) Moore did not disclose multiple prospective purchasers of the ROW in his verified answers to interrogatories.

94) Moore communicated with multiple prospective purchasers of the ROW prior to June 2019.

95) Moore's text communications prior to June 2019 included conversations about additional services relating to the ROW.

96) Moore attempted to negotiate additional services on behalf of Longbranch, with the condition that Black Duck, KrisJenn, and Wright would be excluded from participating in such additional services.

97) Moore and DMA acted with intent to conceal discoverable evidence or acted negligently when he lost multiple phones in the ocean while fishing after the time that litigation became reasonably foreseeable.

98) June 2019 was the most recent time that Moore dropped his phone in the ocean.

99) After dropping his phone in the ocean, Moore could have searched for backup information and/or contacted the prospective purchasers of the ROW to recover his text messages.

100) Moore failed to take appropriate action in order to recover the data that was contained on his phone that was lost in June 2019.

101) Pursuant to Rule 9 of the Federal Rules of Civil Procedure, DMA, Moore, and Longbranch were required to plead the basis of fraud with particularity.

102) The facts which DMA pled with particularity are:

   a. Wright represented to Moore and Borders that he was a wealthy man. Wright further represented to Moore and Borders that he had cash on hand to fully fund building the first line in the right-of-way and/or acquisition and maintenance of the right-of-way until Wright, Moore, and Borders (including through their entities) identified a suitable developer to build the first pipeline in the right-of-way. Wright also represented that his capital contribution would be consideration for his inclusion in the right-of-way deal.

   b. Black Duck and Wright represented to Moore and DMA that DMA would receive, among other things, a 20% net-profits interest in the P-21/Express right-of-way that attached and ran with the right-of-way, that Black Duck would bind its successors

and assigns of the right-of-way to this obligation, and that DMA's 20% net-profits interest would be binding on subsequent owners of the right-of-way.

103) The facts which Moore pled with particularity are:

a. Wright represented to Moore and Borders that he was a wealthy man. Wright further represented to Moore and Borders that he had cash on hand to fully fund building the first line in the right-of-way and/or the acquisition and maintenance of the right-of-way until Wright, Moore, and Borders (including through their entities) identified a suitable developer to build the first pipeline in the right-of-way. Wright also represented that his capital contribution would be consideration for his inclusion in the right-of-way deal.

b. Black Duck and Wright represented to Moore and DMA that DMA would receive, among other things, a 20% net-profits interest in the P-21/Express right-of-way that attached and ran with the right-of-way, that Black Duck would bind its successors and assigns of the right-of-way to this obligation, and that DMA's 20% net-profits interest would be binding on subsequent owners of the right-of-way.

104) The facts which Longbranch pled with particularity are:

a. Wright represented to Moore and Borders that he was a wealthy man. Wright further represented to Moore and Borders that he had cash on hand to fully fund building the first line in the right-of-way and/or the acquisition and maintenance of the right-of-way until Wright, Moore, and Borders (including through their entities) identified a suitable developer to build the first pipeline in the right-of-way. Wright also represented that his capital contribution would be consideration for his inclusion in the right-of-way deal.

b. Black Duck and Wright represented to Longbranch that it would retain a 20% net-profits interest in the P-21/Express right-of-way that attached and ran with the right-of-way, that Black Duck would bind its successors and assigns of the right-of-way to this obligation, and that Longbranch's 20% net-profits interest would be binding on subsequent owners of the right-of-way

### ii.   *KrisJenn's claims*

## 1.   **Declaratory Claims**

1) The Assignment Agreements expressly state that DMA and Longbranch shall be paid twenty percent (20%) of the Net Profits from Assignee or its successors or assigns.

2) TCRG is not a successor to Black Duck.

3) TCRG is an assign to Black Duck.

4) TCRG was merely assigned one of Black Duck's assets, the ROW, by and through an asset purchase and sale agreement.

5) Successor is a corporation that, through amalgamation, consolidation, or other assumption of interest is vested with the rights and duties of an earlier corporation.

6) Successor-in-interest is on who follows another in ownership or control of property.

7) The Black Duck Company Agreement is a valid contract, which is binding and enforceable against SCMED and its officer Moore.

8) Moore executed the Black Duck Company Agreement after being advised to seek independent legal counsel.

9) The Black Duck Company Agreement includes a merger clause.

10) The Black Duck Company Agreement states that its members are not required to make any further capital contributions beyond their initial $500 contribution.

11) The Black Duck Company Agreement states that additional funds provided to the company by its members shall be treated as a loan.

12) Black Duck only raised $1000 in capital contributions at its formation.

13) KrisJenn lent Black Duck $5,275,000 so that it could purchase and maintain the ROW.

14) SCMED never contributed or lent funds to Black Duck.

15) Moore never contributed or lent fund to Black Duck.

**2.    Tortious Interference**

16) KrisJenn was the sole member of Black Duck at the time of the TCRG sale.

17) Black Duck had a valid contract with TCRG.

18) DMA, Moore, and Longbranch knew or had reason to know of KrisJenn's contract with TCRG and KrisJenns' interest in the contract.

19) DMA, Moore, and Longbranch willfully and intentionally interfered with KrisJenn's contract with TCRG.

20) DMA, Moore, and Longbranch's interference proximately caused injury to KrisJenn.

21) KrisJenn's damages include the interest paid on the loans taken by KrisJenn.


# CONCLUSIONS OF LAW

### i.    *Spoliation*

1) A "trial court may submit an instruction only if it finds that (1) the spoliating party acted with intent to conceal discoverable evidence, or (2) the spoliating party acted negligently and caused the nonspoliating party to be irreparably deprived of any meaningful ability to present a claim or defense." *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 921 (Tex. 2015).

2) Moore and DMA acted with intent to conceal discoverable evidence or acted negligently when he lost multiple phones in the ocean while fishing after the time that litigation became reasonably foreseeable, and by failing to take appropriate measures to recover lost data. As the party who initiated legal threats, Moore knew or should have known that it was imperative that he preserve all evidence relevant to this matter.

3) The loss of DMA and Moore's phones caused KrisJenn to be irreparably deprived of any meaningful ability to present a claim or defense because the text messages in the phone would have shown: that Moore was in a secret partnership with Longbranch, that Moore and Borders attempted to conceal this partnership from Wright, that Moore and Borders did not attempt to sell the ROW to prospective purchasers unless such purchasers agreed to enter into additional service contracts with Longbranch, and that Moore and Borders attempted to prevent the ROW from being sold so that they could acquire the ROW by other means.

4) Moore intentionally spoliated evidence that was essential to this case or, alternatively negligently spoliated evidence and caused KrisJenn to be irreparably deprived of any meaningful ability to present a claim or defense. The Court is entitled to make an adverse inference about the contents of those communications. *Id.*

5) DMA intentionally spoliated evidence that was essential to this case or, alternatively negligently spoliated evidence and caused KrisJenn to be irreparably deprived of any meaningful ability to present a claim or defense. The Court is entitled to make an adverse inference about the contents of those communications. *Id.*

## ii. *Background*

1) "Factors indicating that persons have created a partnership include the persons': (1) receipt or right to receive a share of profits of the business; (2) expression of an intent to be partners in the busines; (3) participation or right participation in control of the business; (4) agreement to share or sharing: (A) losses of the business; or (B) liability for claims by third parties against the business; and (5) agreement to contribute or contributing money or property to the business." TEX. BUS. ORG COE §152.052(a).

2) To find the existence of a General Partnership under Texas law, a court need not find "direct proof of the parties' intent to form a partnership," proof of all factors, or sharing of profits in order to prove the existence of a partnership. "Still, ... the traditional import of sharing profits as well as control over the business will probably continue to be the most important factors. *Eagle TX I SPE, L.L.C. v. Sharif & Munir Enterprises, Inc.*, 602 Fed. Appx. 576, 580 (5th Cir. 2015).

3) Borders and Moore agreed to share profits related to the purchase and sale of SWDs and the ROW.

4) Borders and Moore expressed an intent to be partners.

5) Borders and Moore each participated in their partnership's business.

6) Borders and Moore would have shared in the losses of their investments.

7) Borders and Moore jointly contributed $25,000 in earnest money to acquire the right to purchase the ROW.

8) Borders and Moore's arrangement to share profits constitutes a General Partnership under Texas law.

9) An informal fiduciary duty may arise from certain relationships of trust and confidence. *Meyer v. Cathey*, 167 S.W. 327, 330-31 (Tex. 2005).

10) Managers of a Texas Limited Liability Company owe fiduciary duties to one another. *Smith*

*v. Gartley, et. al.*, No. SA-10-CA-350-XR, 2011 WL 13269541 (W.D. Tex. 2011).

11) Moore as an officer of SCMED, through its ownership in Black Duck owed KrisJenn a formal fiduciary duty.

12) Moore owed Wright a fiduciary duty that, among other things, required they disclose their partnership to Wright.

13) Moore had a duty to inform Wright of his attempts to secure additional service contracts for Longbranch Services, LLC

14) A duty to disclose may arise in three situations: (1) when one voluntarily discloses information, he has a duty to disclose the whole truth; (2) when one makes a representation, he has a duty to disclose new information when he is aware the new information makes the earlier representation misleading or untrue; and (3) when one makes a partial disclosure and conveys a false impression, he has a duty to speak. *Four Bros. Boat Works, Inc. v. Tesoro Petroleum Companies, Inc.*, 217 S.W.3d 653, 670–71 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

15) After SCMED transferred its ownership interest to KrisJenn it ceased being a member or manager of Black Duck. Moreover, KrisJenn did not fail to disclose the whole truth or convey a false impression. Therefore, KrisJenn had no duty to inform SCMED of its operations or seek its approval to conduct business.

16) SCMED is not in good standing with the Texas Secretary of State and has not been in good standing since its involuntary forfeiture as of January 29, 2016. Any assignment of SCMED's claims has the same rights and privileges of SCMED and, as a result, SCMED lacks capacity to sue in Texas.

17) Contractual rights may be assigned orally unless the contract giving rise to the claim, or statute pertaining to the claim, requires a written transfer. *Sanders Oil & Gas, Ltd. V. Big Lake Construction, Inc.*, 554 S.W.3d 79, 92 (Tex. App.—El Paso 2018, no pet.).

18) Black Duck assigned its claims to KrisJenn Ranch, LLC.

19) KrisJenn Ranch, LLC-Series Pipeline Row and KrisJenn Ranch, LLC are legally distinct entities.

### iii. *KrisJenn's Claims*

#### 1. Declaratory Claims

1) "The Declaratory Judgment Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 293-94 (5th Cir. 2019) (citing *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118 (2007)); *see also* 28 U.S.C. §2201.

2) "When considering a declaratory judgment action, a district court must engage in a three-step inquiry." The court must ask (1) "whether an 'actual controversy' exists between the parties" in the case; (2) whether it has authority to grant declaratory relief; and (3) whether

"to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Id.* (internal citations omitted).

3) A controversy exists as to: (1) whether the Assignment Agreements run with the land; (2) whether KrisJenn is a successor or successor-in-interest to Black Duck; and (3) whether funds paid by KrisJenn to purchase and maintain the ROW were loans to Black Duck or capital contributions.

4) This Court has authority to grant declaratory relief pursuant to 28 U.S.C. §2201.

5) This Court will exercise its broad discretion to decide these declaratory judgment actions.

## Whether the Assignment Agreements Run with the Land

6) "When a contract's meaning is disputed, [the Court's] primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg Cty*, 543 S.W.3d 755, 763 (Tex. 2018). "Objective manifestations of intent control, not 'what one side or the other alleges they intended to say but did not.'" *Id*. At 763-64.

7) Under Texas law, [the Court is] required to interpret contract provisions... so as to avoid meanings that produce unreasonable, oppressive, or absurd results." *Mid-Continent Cas. Co. v. Bay Rock Operating Co*., 614 F.3d 105, 114 (5th Cir.2010).

8) Courts will not enforce an illegal contract. *Morrison v. City of Ft. Worth*, 155 S.W.2d 908, 909 (Tex. 1941).

9) The Assignment Agreements clearly convey the parties' intent that the Net Profits Interests shall come from—or flow through—Black Duck, or Black Duck's successors or assigns.

10) Enforcing the Assignment Agreements in such a way that a net profits interest in the Pipeline lasts in perpetuity, regardless of the owner, would make the Pipeline inalienable. If it were true that the Net Profits Interest runs with the land, and is a real covenant rather than a personal covenant, then it would affect every downstream sale of the Pipeline. There would not be any purchaser willing to purchase the Pipeline under these conditions. Binding subsequent purchasers of the ROW to the Assignment Agreements would produce unreasonable, oppressive, or absurd results.

11) Moreover, under Texas law, a covenant running with the land is not created simply by being named as such in a contract. *See Musgrave v. Brookhaven Lake Prop. Owners Ass'n*, 990 S.W.2d 386, 395 (Tex. App.—Texarkana 1999, pet. denied) ("Such terminology… is not dispositive [as to] an obligation intended to run with the land...."); *see also In re Jenkins*, 74 B.R. 440, 445 (N.D. Ga.1987) ("[L]anguage in an instrument of conveyance or contract cannot create a covenant running with the land merely be stating that the interest conveyed is such...."). Rather, in Texas, "a covenant runs with the land when it: (1) touches and concerns the land; (2) relates to a thing in existence or specifically binds the parties and their assigns; (3) is intended by the original parties to run with the land; [] (4) when the successor to the burden has notice[;]" and (5) "[t]here must also be privity of estate between the parties when the covenant was made." *In re Energytec, Inc*., 739F.3d 215, 221 (5th Cir.2013).

12) "A covenant touches and concerns when it affects the "nature, quality or value of the thing demised, independently of collateral circumstances, or if it affect[s] the mode of enjoying

it." *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex.1982). The Assignment Agreements provided for a net profits interest in Black Duck, not the ROW; and, therefore, do not touch and concern the land.

13) The language of the Assignment Agreements is ambiguous as to what it purports to bind "assignee" and its successors or assigns to because the terms successors or assigns could refer to the successors or assigns of Black Duck and could refer to successors or assigns of Black Duck's assets. These persons or entities could be mutually exclusive.

14) Promissory notes, net-profit agreements, and cash are personal property, not real property." *San Antonio Area Found. v. Lang*, 35S.W.3d 636, 640 (Tex.2000). Moreover, even in the context of oil and gas leases, a party who agrees to receive part of net profits of oil and gas lease operations and lease resale in exchange for acting as agent in lease negotiation, has no title to or ownership of lease or license to explore and produce minerals. *See LeBus v. LeBus*, 269 S.W.2d 50, 508, 510-11 (Tex. App.—Ft. Worth 1954, writ ref'd n.r.e.). As such, KrisJenn, DMA, or Longbranch did not intend for the Assignment Agreements to run with the land, because they contracted for a personal covenant rather than a real covenant.

15) The Assignment Agreements were not filed at the time Black Duck first conveyed the ROW.

16) The Assignment Agreements: (1) do not touch and concern the land; (2) do not specifically bind the parties and their assigns; (3) were not intended by the original parties to run with the land; (4) were not filed of record at the time of the TCRG sale and thus any successor to the burden did not have notice; and (5) do not create privity of estate between the parties when the covenant was made. Because the Assignment Agreements do not meet all elements, they cannot be a covenant that runs with the land.

17) Longbranch did not have privity of estate with respect to the ROW.

18) Moore did not have privity of estate with respect to the ROW.

19) DMA did not have privity of estate with respect to the ROW.

20) The profits interest contained in the Assignment Agreements do not touch and concern the ROW.

21) The terms contained in the Assignment Agreements were personal covenants.

22) The terms contained in the Assignment Agreements were not real covenants.

23) The terms contained in the Assignment Agreements do not run with the land.

Whether KrisJenn is a Successor or a successor-in-interest to Black Duck.

24) The phrase "its successors or assigns", as contained in the Assignment Agreements, refers to successors or assigns of Black Duck, not Black Duck's assets.

25) The phrase "its successors or assigns", as contained in the Assignment Agreements, does not refer to any person or entity who subsequently owns the ROW.

26) If "successors or assigns" is subject to two reasonable interpretations, it is ambiguous.

27) Any ambiguity in the Assignment Agreements must be construed against Longbranch and DMA because they drafted such documents. Further, "[w]hen two constructions of a

contract are possible, preference will be given to that which does not result in violation of law." *In re OCA, Inc*., 552F.3d at 422 (quoting *Lewis v. Davis*, 199S.W.2d 146, 149 (1947)).

28) Longbranch and DMA have no contractual or property rights in the Pipeline and ROW except those borne from the Net Profits generated from the operation and sale of the Pipeline and ROW by Black Duck.

29) The term "successor" does not ordinarily mean an assignee; rather, it is normally used in respect to corporate entities to describe the status of a corporation which has become vested with the rights and has assumed the burdens of another corporation by amalgamation, consolidation, or duly authorized legal succession, and does not contemplate acquisition by ordinary purchase from another corporation. *Sitaram v. Aetna U.S. Healthcare of N. Tex., Inc.*, 152 S.W.3d 817, 825 (Tex. App.—Texarkana 2004, no pet.)

30) KrisJenn was never assigned ownership in Black Duck.

31) KrisJenn is not a successor to Black Duck.

32) A successor-in-interest is one who follows another in ownership or control of property. *See e.g. id*. at 828.

33) KrisJenn followed TCRG in ownership of the ROW and followed Black Duck in ownership of the Bigfoot note.

34) KrisJenn is a successor-in-interest to Black Duck.

<u>Whether funds paid by KrisJenn into Black Duck are capital contributions or loans to Black Duck.</u>

35) Moore, on behalf of SCMED, signed the Black Duck Company Agreement.

36) Moore was advised to seek independent legal counsel before signing the Black Duck Company Agreement.

37) Section 4.05 of the Black Duck Company Agreement states that an advance described this section 4.05 constitutes a loan from the Member to the Company, bears interest at the General Interest Rate from the date of the advance until the date of payment, and is not a Capital Contribution.

38) The Black Duck Company Agreement includes a merger clause.

39) All monies paid into Black Duck by KrisJenn, after making its initial $500 capital contribution, were loans to Black Duck.

40) This Court has broad discretion to decide this declaratory judgment action. *Frye v. Anadarko Petroleum Corp.*, 953 F.3d at 294.

41) Pursuant to 28 U.S.C. § 2201 the Black Duck Operating Agreement provides that those funds paid by KrisJenn for the benefit of Black Duck constituted loans to Black Duck.

42) KrisJenn is entitled to the recovery of its attorney's fees incurred in the prosecution of these claims.

**2. Tortious Interference**

1) The "elements of tortious interference with contract are: (1) existence of contract subject to interference; (2) occurrence of act of interference that was willful and intentional; (3) act was proximate cause of claimant's damage; and (4) actual damage or loss occurred." *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 856 (Tex. App.—Houston [14th Dist.] 2001).

2) Black Duck had a valid enforceable purchase and sale contract with TCRG, which was subject to interference.

3) DMA, Moore, and Longbranch committed acts of interference that were willful and intentional.

4) DMA, Moore, and Longbranch's communications were the proximate cause of KrisJenns' damage.

5) KrisJenn incurred actual damage or loss by way of its loss of Black Duck's 16% carried interest in the Northern Water Project.

6) KrisJenn is entitled to pre- and post-judgment interest.

7) KrisJenns' injury resulted from Defendants' malice or actual fraud.

8) KrisJenn is entitled to recover exemplary damages under section 41.003 of the Texas Civil Practice and Remedies Code.

### iii.    Affirmative Defenses (KrisJenn and Wright)

**<u>KrisJenn's Affirmative Defenses</u>**

### 1.    Standing

Standing to sue on a contract requires privity of contract. *Barrett Computer Svcs., Inc. v. PDA, Inc.*, 884 F.2d 214 (1989). DMA, Moore, and Longbranch lack standing to sue for any breach of the Black Duck Company Agreement because they lack privity of contract, and have not been assigned any rights to enforce the Black Duck Company Agreement.

### 2.    Illegality

Courts will not enforce an illegal contract. *Morrison v. City of Ft. Worth*, 155 S.W.2d 908, 909 (Tex. 1941). It would be illegal to construe the net profits interests contained in the Assignment Agreements to be real covenants, rather than personal covenants. As a result, any enforcement of the Assignment Agreements against subsequent purchasers is barred.

### 3.    Third-party beneficiary limitations

Limitations of liability clauses in management agreements may preclude exemplary or punitive damages. *Bombadier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 230-31 (Tex. 2019). DMA is a third-party beneficiary to the Black Duck Company Agreement. As a result, the terms and conditions of the Black Duck Company Agreement are enforceable against DMA. Black Duck's Company Agreement prohibits the imposition of punitive damages and, as such, Moore and DMA are not entitled to claim punitive damages in this case.

4. **Waiver**

"Waiver" is the intentional relinquishment of a known right or intentional conduct inconsistent with claiming the right. *Medical Imaging Solutions Group, Inc. of Texas v. Westlake Surgical, LP*, 554 S.W.3d 152, 162 (Tex. App.—San Antonio, 2018, no pet.). DMA Moore, and Longbranch have acknowledged that they were not entitled to gross profits and, additionally, waived their claims to collect net profits from subsequent purchasers.

5. **Unclean Hands**

Asserting unclean hands as a defense requires the party seeking relief to show that they have been seriously harmed and the wrong claimed cannot be correct without applying the doctrine. *Cantu v. Guerra & Moore, LLP*, 448 S.W.3d 485, 495 (Tex. App.—San Antonio, 2014, no pet.). DMA, Moore, and Longbranch have unclean hands because: they failed to disclose their partnership, they told Wright that Pigg was representing Black Duck's interests, they actively prevented the ROW from being sold to any prospective purchaser who would not offer Longbranch additional service contracts, they tortiously interfered with the TCRG contract, and by failing to preserve evidence that was essential to this case.

6. **Economic Loss Rule**

"The economic loss rule generally precludes recovery in tort for economic losses resulting from a party's failure to perform under a contract when the harm consists only of the economic loss of a contractual expectancy." *Chapman Custom Homes, Inc. v. Dall. Plumbing Co.*, 445S.W.3d 716, 718 (Tex.2014).

"The contractual relationship of the parties may create duties under both contract and tort law." Id.at 618. "The acts of a party may breach duties in tort or contract alone or simultaneously in both." *Southwestern Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex.1991) (quoting *Reed*, 711S.W.2d at 618). "The nature of the injury most often determines which duty or duties are breached." *Sharyland Water Supply Co. v. City of Alton*, 354S.W.3d 407, 417 (Tex.2011) (quoting *DeLanney*, 809S.W.2d at 495). "When the injury is only the economic loss to the subject of a contract itself the action sounds in contract alone." *Id.*

All damages, if any, arising from DMA, Moore, and Longbranch's asserted tort claims consist only of the economic loss of a contractual expectancy and are barred by the economic loss rule.

7. **Justification**

Justification can be established through either (a) exercise of one's own legal rights; or (b) "a good-faith claim to a colorable legal right," even if the claim "ultimately proves to be mistaken." *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 80 (Tex. 2000)

KrisJenn had an absolute right to purchase the Pipeline from TCRG after DMA and Moore scuttled that deal. Debtors are free to purchase any asset they desire in furtherance of their business.

8. **Proportionate Responsibility**

In an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent. TEX. CIV. PRAC. & REM. CODE §33.001. DMA, Moore, and Longbranch are more than fifty percent liable for all claims relating to negligence, and their recovery for all tort claims, if any, is barred.

**9. Indemnification**

Texas Law recognizes the right to contract for indemnity. *Travelers Lloyds Inc. Co. v. Pacific Employers Ins. Co.*, 602 F.3d 667, 682 (5th Cir. 2010). As a signatory to the Black Duck Company Agreement, Moore, as an agent for SCMED, has a duty to indemnify KrisJenn.

**10. Offset**

Pursuant to article 4 of the Black Duck Company Agreement, DMA and Moore's, and claims are subject to offset for debts paid by KrisJenn. Moreover, Longbranch's net profits interest, if any, is subject to offset for amounts paid to acquire and maintain the ROW.

**<u>Wright's Affirmative Defenses</u>**

**1. Illegality**

Courts will not enforce an illegal contract. *Morrison v. City of Ft. Worth*, 155 S.W.2d 908, 909 (Tex. 1941). Enforcement of the covenants against subsequent purchasers is barred by illegality.

**2. Unclean Hands**

Asserting unclean hands as a defense requires the party seeking relief to show that they have been seriously harmed and the wrong claimed cannot be correct without applying the doctrine. *Cantu v. Guerra & Moore, LLP*, 448 S.W.3d 485, 495 (Tex. App.—San Antonio, 2014, no pet.) DMA, Moore, and Longbranch have unclean hands because: they failed to disclose their partnership, they told Wright that Pigg was representing Black Duck's interests, they actively prevented the ROW from being sold to any prospective purchaser who would not offer Longbranch additional service contracts, they tortiously interfered with the TCRG contract, and by failing to preserve evidence that was essential to this case.

**3. Estoppel**

Moore, Longbranch, and DMA failed to disclose they had a general partnership in their dealings with Wright inducing him to enter into agreements that where drafted by Moore, Longbranch, and Wright. These parties now want the court to construe ambiguous contract language in their favor after Wright took affirmative actions based upon Moore's representation that he was looking out for Wright's best interest. These parties should be estopped from claiming favorable contract construction to avoid injustice.

**4. Proportionate Responsibility**

In an action to which this chapter applies, a claimant may not recover damages if his percentage of responsibility is greater than 50 percent. TEX. CIV. PRAC. & REM. CODE §33.001. DMA, Moore, and Longbranch are more than fifty percent liable for all claims relating to negligence, and their recover for all tort claims, if any, is barred. Moore, Longbranch, and DMA are at fault for misconstruing the contract language drafted by their

attorney and at minimum, negligently interfering with debtor's contracts and relationships which they claim caused them harm.

**5. Indemnification**

Texas Law recognizes the right to contract for indemnity. *Travelers Lloyds Inc. Co. v. Pacific Employers Ins. Co.*, 602 F.3d 667, 682 (5th Cir. 2010). Moore has a duty to indemnify Wright, per the Black Duck Company Agreement.

**6. Offset**

Pursuant to article 4 of the Black Duck Company Agreement, DMA and Moore's claims are subject to offset for debts paid by KrisJenn and Wright and is entitled to these offset in his individual capacity as well. Moreover, Longbranch's net profits interest, if any, is subject to offset for amounts paid to acquire and maintain the ROW.

**7. Moore, DMA, and Longbranch lack capacity to sue Wright**

Moore lacks capacity to sue Wright for all claims made by Moore pursuant to Section 171.251 of the Texas Tax Code. Moore was only a member of Black Duck through an SCMED. On January 29, 2016, SCMED lost is privileges to bring or defend suits in Texas and has not been revived since.

DMA and Longbranch lack capacity to bring claims against Wright in his individual capacity because all act or omissions were performed in Wright's capacity as a member of respective entities. Further, none of these entities owed any fiduciary duties to Longbranch, DMA or Moore. *See Smith v. Gartley, et. al.*, No. SA-10-CA-350-XR, 2011 WL 13269541 (W.D. Tex. 2011).

**8. Limitation and Waiver in Black Duck Company Agreement**

Moore's claims are limited by the limitations and waiver provisions of the Black Duck Company Agreement.

Dated: January 8, 2021

Respectfully submitted,

MULLER SMEBERG, PLLC

By: /s/ *John Muller*
C. John Muller IV
State Bar No. 24070306
john@muller-smeberg.com
Ezekiel J. Perez
State Bar No. 24096782
zeke@muller-smeberg.com
111 W. Sunset Rd.
San Antonio, TX 78209
Telephone: 210-664-5000
Facsimile: 210-598-7357

ATTORNEYS FOR DEBTORS

BAYNE, SNELL & KRAUSE

By:  /s/ William P. Germany
WILLIAM P. GERMANY
State Bar No. 24069777
1250 N.E. Loop 410, Suite 725
San Antonio, Texas 78209
Telephone: (210) 824-3278
Facsimile: (210) 824-3937
Email: wgermany@bsklaw.com

ATTORNEY FOR THIRD-PARTY
DEFENDANT LARRY WRIGHT

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system by notice of electronic filing or via email on the 8th day of January 2021:

Michael Black
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, Texas 78209
210-829-2022
210-829-2021 fax
mblack@burnsandblack.com
Attorneys for Longbranch Energy, LP
and DMA Properties, Inc.

Christopher S. Johns
Christen Mason Hebert
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

Timothy Cleveland
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
Attorneys for DMA Properties, Inc.

Natalie Wilson
LANGLEY & BANACK, INC.
745 East Mulberry Avenue | Suite 700
San Antonio, TX 78212
210-736-6600
lwilson@langleybanack.com
Attorneys for DMA Properties, Inc.

Jeffery Duke
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, Texas 77494
jduke@dbmmlaw.com
Counsel for Longbranch Energy, LP

William Germany
BAYNE, SNELL, & KRAUSE
1250 NE Loop 410, Ste. 725
San Antonio, Texas 78209
T- (210) 824-3278
F- (210) 824-3937
wgermany@bskaw.net
Attorney for Larry Wright

OFFICE OF THE UNITED STATES TRUSTEE
903 San Jacinto Blvd, Room 230
Austin, Texas 78701
shane.p.tobin@usdoj.gov
United States Trustee

_/s/ John Muller_____
C. John Muller IV