```
 1              UNITED STATES BANKRUPTCY COURT
           FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION
 3    KRISJENN RANCH, LLC,          )
                                    )
 4         Plaintiff               )
                                    )
 5    VS.                          )        CASE NO. 20-50805
                                    )
 6    DMA PROPERTIES, INC.,        )
      ET AL.,                      )
 7                                 )
           Defendants             )
 8
 9

            -----------------------------------
10                   ORAL DEPOSITION OF
11                     ADAM MCLEOD
12                    OCTOBER 8, 2020
            -----------------------------------
13
14
15         ORAL DEPOSITION OF ADAM MCLEOD, produced as a
16    witness at the instance of the Defendant, and duly
17    sworn, was taken in the above-styled and -numbered
18    cause on October 8, 2020, from 9:22 a.m. to 4:29 p.m.,
19    before Samantha Falcone, CSR in and for the State of
20    Texas, reported by machine shorthand, at Jones, Allen
21    & Fuquay, 8828 Greenville Avenue, Dallas, Texas 75243,
22    pursuant to the Federal Rules of Civil Procedure, the
23    current Emergency Order regarding the COVID-19 State
24    of Disaster, and the provisions stated on the record
25    or attached hereto.
```

Page 1

```
 1                    A P P E A R A N C E S
 2
 3    FOR THE WITNESS:
 4          Ms. Laura Worsham
            JONES, ALLEN & FUQUAY
 5          8828 Greenville Avenue
            Dallas, Texas 75243
 6          (214)343-7400
            laura@jonesallen.com
 7
 8    FOR THE PLAINTIFF:
 9          Mr. Ezekiel Perez (via Zoom)
            MULLER SMEBERG
10          111 West Sunset Road
            San Antonio, Texas 78209
11          (210)695-6684
            zeke@muller-smeberg.com
12
13    FOR THE DEFENDANTS:
14          Mr. Tim Cleveland (via Zoom)
            Mr. Austin Krist (via Zoom)
15          CLEVELAND TERRAZAS PLLC
            4611 Bee Cave Road, Suite 306B
16          Austin, Texas 78746
            (512)689-8698
17          tcleveland@clevelandterrazas.com
18    ALSO PRESENT:
19          Mr. Norm Harris - Videographer
            Mr. John McLeod
20          Mr. Daniel Moore
21
22
23
24
25
                                          Page 2
```

```
1                       I N D E X

2                                                     PAGE

3       Appearances....................................    2

4

5       ADAM MCLEOD
            Examination by Mr. Cleveland..............    6

6

7       Changes and Signature.........................   242

8       Reporter's Certificate........................   244

9                       E X H I B I T S

10      NUMBER          DESCRIPTION                    PAGE

11      EXHIBIT 1       Document Bates Labeled LW364-365...  110

12      EXHIBIT 2       Email Dated November 12, 2019......  124

13      EXHIBIT 3       Document Bates Labeled McLeod
                        1504-1505.........................   127

14

        EXHIBIT 4`      Document Bates Labeled McLeod
15                      1273-1274.........................   145

16      EXHIBIT 5       Document Bates Labeled McLeod
                        714-717...........................   148

17

        EXHIBIT 6       Document Bates Labeled McLeod156...  156

18

        EXHIBIT 7       Email Dated March 17, 2020.........  167

19

        EXHIBIT 8       Document Bates Labeled McLeod
20                      523-525...........................   172

21      EXHIBIT 9       Letter Dated April 23, 2020........  176

22      EXHIBIT 10      Document Bates Labeled McLeod
                        540-542...........................   217

23

        EXHIBIT 11      Document Bates Labeled McLeod
24                      529-530...........................   224

25
```

                                                  Page 3

```
1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:  We are going on the

3    record at 9:19 a.m.  My name is Norm Harris,

4    representing Veritext.  The date today is October the

5    8th, 2020.  This deposition is being held at Jones

6    Allen Fuquay, LLP, located in Dallas, Texas and is

7    being taken by counsel for the defendant.  The caption

8    of the case is KrisJenn Ranch, LLC, et al. versus DMA

9    properties, Inc., et all.  This case is filed in the

10   United States Bankruptcy Court for the Western

11   District of Texas, San Antonio Division.  Case

12   No. 20-50805.  The name of the witness is Adam

13   McCleod.

14              Attorneys, please state your appearance

15   as well as your location.

16              MR. PEREZ:  Morning.  My name is

17   Ezekiel Perez.  I'm here on behalf of Debtors KrisJenn

18   Ranch, LLC, KrisJenn Ranch, LLC, Series Pipeline Road,

19   KrisJenn Ranch, LLC, Series Developing (phonetic)

20   Ranch.  I'm appearing from Muller Smeberg's offices in

21   San Antonio, Texas.

22              THE WITNESS:  Is it possible to turn

23   their volume up a hair?

24              THE REPORTER:  Yeah.  Mr. Perez, we are

25   having a hard time hearing you.
```

                                                    Page  4

1     I'm sorry, what did you say?

2                    THE WITNESS:  Yeah, I see his name on

3     there.

4                    MS. WORSHAM:  Oh, John --

5                    MR. CLEVELAND:  -- have to say anything

6     but just so -- yeah.  Just so the record's clear, John

7     McLeod, I think, is joining by phone as well,

8     somewhere in the Dallas area.

9                    MS. WORSHAM:  Yes.  I don't know where

10    he is.

11                   MR. CLEVELAND:  Okay.

12                   THE WITNESS:  He's at his office in

13    Irving.

14                   MR. CLEVELAND:  Okay.  I think that

15    covers it.

16                         ADAM MCLEOD,

17    having been first duly sworn, testified as follows:

18                         EXAMINATION

19    BY MR. CLEVELAND:

20         Q    Mr. McLeod, good morning.  Can you hear me

21    okay?

22         A    Yes.

23         Q    Okay.  Mr. McLeod, we've met before on the

24    phone in a Zoom and in person; is that correct?

25         A    Yes.

1    Q    And you know that I represent the parties

2  that I just identified in this proceeding, including

3  DMA Properties and the Long Branch entities?

4    A    Yes.

5    Q    Are you aware of that?

6         And do you understand, sir, that DMA

7  Properties is the entity that belongs to Daniel Moore

8  and Long Branch Energy is the entity that belongs to

9  Darin Borders, also my client?

10   A    Yes.

11   Q    And can you state your full name,

12  Mr. McLeod, for the record.

13   A    Adam Wade McLeod.

14   Q    And how old a man are you, sir?

15   A    Thirty-seven years old.

16   Q    Okay.  And you live in Dallas, Texas?

17   A    I do.

18   Q    What's your address?

19   A    6345 Goliad Avenue, Dallas, 75214.

20   Q    Okay.  I'm going to be asking you some

21  questions today about your background and other

22  topics, but I do want to go over some deposition

23  basics with you before we get started.

24        You -- you attended by Zoom the

25  deposition of Larry Wright last week over the course

                                            Page  7

1    of two days; isn't that true, sir?

2         A    Yes, I did.

3         Q    And have you ever been deposed yourself

4    previously, before today?

5         A    Yes.  One time about nine years ago, I

6    believe.

7         Q    Okay.  I'll ask about that in a moment.

8              But do you understand, Mr. McLeod, that

9    you've just taken an oath to tell the truth, which

10   would be the same oath if you were in a courtroom in

11   San Antonio, Texas?

12        A    Yes, I do.

13        Q    And do you understand that one of the

14   penalties for not telling the truth when you've taken

15   the oath like you have can be perjury?

16        A    Yes.

17        Q    And, sir, I'm not suggesting anything about

18   this, but I do need to ask -- and I asked Mr. Wright

19   last week -- are you under the influence of any

20   substance or medication that would in any way affect

21   your ability to truthfully answer my questions here

22   today?

23        A    No.

24        Q    Okay.  And will you agree, sir, to let me

25   know if you don't understand a question that I ask

                                          Page 8

1    because it's very important that you understand my

2    question since you are testifying under oath?

3         A    Yes.

4         Q    And we've done well so far, but especially

5    in this odd Zoom setting, it's important that we slow

6    down and that you'll let me finish my question before

7    you answer; and likewise, I will endeavor to let you

8    finish your answer before I start my next question.

9              Does that sound good?

10        A    Yes.

11        Q    Because you understand that the court

12   reporter is taking down what we say today and there

13   will be a transcript of this deposition?

14        A    Yes.

15        Q    Okay.  Mr. McLeod, where are you presently

16   employed?

17        A    I currently manage a couple of LLCs.

18        Q    Okay.  And which ones are those?

19        A    McLeod Oil, Cape Energy, Bordeaux Mineral

20   Holdings, VCG Energy, ECB Energy.  I think that's it.

21        Q    Okay.  I need you to hit me with those

22   again.  I'm writing them down.

23              McLeod Oil, LLC?

24        A    Yes.

25              Cape Energy, C-a-p-e, one word; second

                                          Page  9

1      A      That's correct, just one of the owners of

2   those.  I'm not a W2.

3      Q      Okay.  Let's -- let's start with McLeod Oil.

4   I'm going to go through and ask you some questions

5   about these different entities.

6      A      Okay.

7      Q      What does McLeod Oil do?

8      A      It's a oil-and-gas and investment vehicle.

9   We've -- we've operated in a variety of sectors, I

10  believe, almost all in the energy field.  And it's a

11  company that's owned by my father and I, John McLeod

12  fifty-fifty.  And I -- I believe that's about all I

13  can think of.

14     Q      Okay.  And what is the approximate value of

15  the assets that are currently under management by

16  McLeod Oil, LLC?

17     A      Well, that's a moving target.  I -- I really

18  do not know.  They vary with commodities and they vary

19  with Coronavirus and I mean, I really do not know.

20  We've never done a full audit or anything like that.

21     Q      And I understand that especially with oil

22  and gas it's on a day-to-day basis, that can be a

23  difficult number to pin down.  And I -- I'm truly

24  asking for just your best approximation.

25                    If you would like to answer with a

1    range, that's fine, too.  But as you -- just as best

2    you can, understanding all the caveats you gave me,

3    can you give me a ballpark of the value of assets

4    under management by McLeod Oil?

5         A    Maybe -- maybe as high as 12 to 15 million.

6         Q    Okay.  And is that -- how is the -- do you

7    include anything from the option agreement that you

8    have with some of the KrisJenn Ranch entities in that

9    amount of assets under management?

10        A    I was just including the $5.9 million loan

11   as being the asset there.

12        Q    Okay.  So, I appreciate that.

13             So when you say 12 to 15 million as

14   your best approximation as we sit here today, were you

15   including the $5.9 million loan to Mr. Wright and his

16   entities within that amount?

17        A    Yes.

18        Q    And so if we removed -- just to be clear --

19   that loan from the situation and I asked you what's

20   the ballpark amount of assets under management of

21   McLeod Oil sitting here today, you'd be, what,

22   between, about 5 and 8 million; is that fair?

23        A    Yes.  Yes.

24        Q    Okay.  Other than the -- and I'm glad you

25   brought that up.  On McLeod Oil's books is -- how is

Page 12

1    does McLeod Oil have any business dealings with Larry

2    Wright or any of his entities other than the loan for

3    5.9 million and the option agreement that concerns the

4    right-of-way that's at the center of this case?

5        A    I -- I don't know if you consider this an

6    active loan, but we -- we purchased minerals from him

7    in probably 2012.  But that's not an active fluid

8    deal, but we -- that -- that would be the only thing.

9        Q    Okay.  Is there anything that -- that is

10   ongoing in the relationship with Mr. Wright related to

11   that purchase of minerals in 2012?

12       A    No.

13       Q    Okay.  Do you have any agreements with

14   Mr. Wright or his entities at present other than the

15   loan agreement for 5.9 million and the option

16   agreement?

17       A    No.

18       Q    How much was the purchase of minerals from

19   Mr. Wright in 2012?

20       A    Somewhere in the neighborhood of $800,000, I

21   think.  Off the top of my head, it -- there were some

22   title --

23       Q    Okay.

24       A    -- issues, but yes, somewhere 750, 800,

25   around there.

Page 16

```
 1          Q     Okay.  You said there was title issues.

 2                      What were those?

 3          A     I -- I think we had some issues with what --

 4     when we ran title and did due diligence, the actual

 5     number of acres we were able to prove, because it was

 6     an undivided interest situation, and there was an --

 7     there was a tracker, too, that we were not comfortable

 8     with the title on.  And so we pulled back and actually

 9     ended up buying a little bit less.  It was just a

10     little bit cloudy title, typical for South Texas.

11          Q     Okay.  You -- you attended the deposition

12     last week of -- of Mr. Wright, and you -- you probably

13     heard me ask him this question.  I asked if he had any

14     side agreements or, you know, handshake deals with

15     McLeod Oil about McLeod not pursuing his ranch in this

16     proceeding.

17                      Do you remember me asking him questions

18     to that effect?

19          A     I -- I -- I was in and out during the --

20     during that.  I do remember some cause of it.  I don't

21     specifically remember what you said, but I remember

22     some generalities.

23          Q     Okay.  Let me just -- I'll just ask you this

24     question.

25                      Do you have any side agreement,
```

Page 17

1    handshake deal, or anything like that with Mr. Wright

2    or any of his entities to promise him any gross points

3    in any transaction involving the right-of-way?

4         A    No, I do not.

5         Q    Does McLeod Oil have any of those kind of

6    agreements with Mr. Wright or his entities?

7         A    No, we do not.

8         Q    Do you -- or excuse me.

9              Does McLeod Oil have any agreements

10   with Larry Wright or his entities to refrain from

11   pursuing either Mr. Wright's ranch or his minerals,

12   which are both identified as assets in this

13   bankruptcy?

14        A    No, we do not.

15        Q    Are you working or coordinating in any way

16   with Mr. Wright related to this bankruptcy proceeds?

17        A    The only coordination I had was we tried to

18   do a settlement over the summer, and that is all.  We

19   tried to do a settlement with Mr. Borders, which he

20   was involved.

21        Q    Okay.  Are you happy to have been involved

22   in this bankruptcy, Mr. McLeod?

23        A    In -- in the -- in the bankruptcy or the

24   entire thing?

25        Q    We'll start with the bankruptcy and then

Page 18

```
 1    who -- who did that.  I don't -- I don't recall.
 2          Q    Okay.  Have you ever seen the net profit
 3    interest agreements between Black Duck and DMA
 4    Properties as Black Duck and Longbranch Energy?
 5          A    Speaking here now today?
 6          Q    Yes, sir.
 7          A    Yes.
 8          Q    Okay.  And when did you first see the net
 9    profits agreements with DMA Properties and Longbranch
10    Energy?
11          A    To my best recollection, it was at the
12    summary judgments in January in Center, Texas.
13          Q    You're talking about a hearing in a
14    courthouse on the summary judgment motion?
15          A    Yes, sir.
16          Q    Okay.  And that was a hearing in Shelby
17    County in January of 2020?
18          A    I believe that's correct, yes.
19          Q    And you physically attended that hearing; is
20    that right, sir?
21          A    Yes, I did.
22          Q    And you were sitting in the gallery while
23    the lawyers were up doing defense, arguing with the
24    Court?
25          A    Yes.
```

Page 38

```
 1    with Larry Wright and his entities, but they also

 2    exercised -- excuse me, signed an option agreement at

 3    that time?

 4         A    Yes.

 5         Q    Okay.  And my question is:  Prior to McLeod

 6    Oil signing that amended loan agreement and that

 7    option agreement in December of 2019, did you or

 8    McLeod Oil -- or had you or McLeod Oil ever seen the

 9    net profit interest agreements of DMA Properties or

10    Longbranch Energy?

11         A    I do not recall if I saw it.  I did not read

12    it and take -- and do any -- any kind of a thorough

13    analysis.  It's possible it came through on an e-mail,

14    but I did not read it.  And I'm not even sure if I had

15    it.  I -- but like I said, it's possible.  I would

16    have to go back and look at my e-mails to see when --

17    when that did or did not come to me.  So I -- I really

18    do not know.

19         Q    Okay.  I'll represent to you that McLeod

20    Oil, in response to a subpoena from my office,

21    produced, I want to say, 3,000 pages of -- of

22    documents.  And I'll represent to you that nowhere in

23    there is there an e-mail where anybody sends McLeod,

24    you or your dad, my clients' net profits interest

25    agreements prior to the option agreement and the loan
```

Page 41

1    agreement in December of 2019.

2                    And if you had such an agreement, would

3    you have produced it in response to -- I'm sorry.

4                    If you had such an e-mail, would you

5    have produced it in response to the subpoena, sir?

6         A    Yes.

7         Q    Okay.  And you, with your counsel,

8    Ms. Worsham, and her office, you did -- did you do a

9    pretty exhaustive search of your e-mails and text

10   messages to find responsive information to our

11   subpoena, sir?

12        A    Yes.

13        Q    Okay.  Prior to the amended loan agreement

14   and the option agreement in December of 2019, sir, did

15   you ever discuss the net profits interest of DMA

16   Properties or Longbranch Energy with Larry Wright?

17        A    Not that I recall.

18        Q    Okay.  Did you, prior to signing the loan

19   agreement -- the amended loan agreement and the option

20   agreement in December of 2019, do any record searches

21   on this right-of-way to determine if there were any

22   net profit interests or other encumbrances on the

23   right-of-way?

24                    MS. WORSHAM:  Tim, did -- did Mr. Adam

25   McLeod sign those documents?  We don't have any

                                           Page 42

```
 1    exhibits in front of us, but my understanding is --
 2                MR. CLEVELAND:  Oh, I mean --
 3                MS. WORSHAM:  -- John signed them on
 4    behalf of McLeod Oil.
 5                MR. CLEVELAND:  Yeah.  Okay.  Well, I
 6    appreciate it.  Let me -- let me modify the question a
 7    little bit.
 8        Q    (BY MR. CLEVELAND) Prior -- Mr. McLeod,
 9    prior to McLeod Oil signing the amended loan agreement
10    and the option agreement in December of 2019, did you
11    or anyone at McLeod Oil do any diligence into the
12    records related to the right-of-way to see if there
13    were any encumbrances on the right-of-way, like a net
14    profit interest?
15        A    No, we did not.
16        Q    Okay.  When you -- when you first saw the
17    net profits interest agreements at this hearing in
18    January of 2020, what was your reaction?
19        A    Probably just confusion.  Just -- you know,
20    I need to spend a little more time understanding this.
21    Like you said, I didn't have it in front of me.  It
22    was on the teleprompter, and I -- or not a
23    teleprompter, excuse me, a screen on like a
24    PowerPoint.  And so I -- I was just confused and
25    realized there was a -- you know, there was some more
```

Page 43

1    hair on this thing.

2         Q    Okay.  And why are you confused?

3         A    It was a lot of information.  And both sides

4    were telling a story, and I didn't know what to think,

5    really.

6         Q    Okay.  Have you ever heard of the phrase in

7    business or in your life, Mr. McLeod, that "a deal is

8    a deal"?

9         A    Maybe.  I don't recall a specific time.

10        Q    Okay.  When -- when you and McLeod Oil gave

11   your word in agreement, do you intend to honor the

12   text of the agreements that you're signing?

13        A    Yes, we do.

14        Q    Okay.  Did you, after seeing the net profits

15   interest agreements, ever go to Larry Wright and say,

16   "What's going on?  I didn't know about these two

17   encumbrances."

18        A    I -- I believe -- I don't know the exact

19   words I used, but I believe something along those

20   lines.

21        Q    Okay.  What do you specifically recall going

22   back to Larry with after you saw these net profits

23   interest agreements at the hearing in January of 2020?

24        A    I think I was just -- you know, "Is" -- "is

25   this serious?  Is this going to a problem?"  You know,

1    completely forthcoming with you about this litigation

2    and the net profits interests agreement with DMA and

3    Longbranch prior to McLeod signing the option

4    agreement in December of 2019?

5                    MR. PEREZ:  Objection; form.

6                    MS. WORSHAM:  I'm sorry, did somebody

7    else speak besides Tim there?

8                    MR. PEREZ:  Sorry, Ezekiel Perez.

9    Objection; form.

10                   MR. CLEVELAND:  Yes.  That was just

11   counsel for Mr. -- for KrisJenn making an objection to

12   form.

13                   THE REPORTER:  Oh, okay.  I'm sorry, we

14   couldn't hear that.

15        A    Will you repeat the question, please?

16        Q    (BY MR. CLEVELAND) Sure.

17                   Looking back -- looking back, do you

18   believe that Larry Wright was forthcoming with McLeod

19   Oil about this right-of-way and any encumbrances on

20   the right-of-way before McLeod Oil signed the option

21   agreement in December of 2019?

22        A    I believe Mr. Wright told us there was some

23   hair on the deal that would be taken care of.  I don't

24   believe he went into as much detail as he probably

25   could have, but, you know, I -- I was told that there

Page 46

1    was -- was some hair on the deal.  I just -- I guess I

2    didn't know how much.

3         Q    Okay.  So again, my question is:  Do you

4    believe that Mr. Wright was entirely forthcoming with

5    you before the option agreement in December of 2019,

6    given where we are today?

7                    MR. PEREZ:  Objection; form.

8         A    No.

9         Q    (BY MR. CLEVELAND) Okay.  What do you wish

10   he would have told you that he didn't?

11        A    I guess I just wish I knew a little bit more

12   about the -- the history between Mr. Moore and

13   Mr. Borders and Mr. Wright and the documents.

14        Q    Okay.  Looking back, who do you consider to

15   be responsible for providing that information to you

16   before you signed -- McLeod Oil signed this option

17   agreement?

18        A    Please repeat the question.

19        Q    Sure.

20                    Looking back, who do you believe should

21   have been responsible for -- for providing you more

22   information about the hair on this deal before you

23   signed -- before McLeod signed the option agreement?

24        A    There's probably fault on both McLeod Oil

25   and Larry for not exploring the hair on the deal

Page 47

1    further.  That -- that's probably my answer there.

2         Q    Okay.  But who -- who knew more about the

3    hair on the deal?  Larry or yourself?

4         A    Larry.

5         Q    Okay.  He kept things from you, didn't he?

6              MR. PEREZ:  Objection; form.

7         A    He probably could have told me more.

8         Q    (BY MR. CLEVELAND) Okay.  If you had seen

9    the net profit interest agreements with DMA Properties

10   for Longbranch before you signed the option agreement,

11   would you -- would McLeod Oil sign that deal?

12        A    I don't know for sure.

13        Q    Okay.  At the time that McLeod Oil signed

14   the option agreement with Larry Wright in December of

15   2019, is it fair to say that you had a fair amount of

16   trust in Mr. Wright?

17        A    Yes.

18        Q    Okay.  As you sit here today, do you have

19   the same amount of trust in Larry Wright that you did

20   before you signed -- before McLeod signed the option

21   agreement?

22        A    I'm not sure.  I don't know.

23        Q    Okay.

24        A    Still have more -- still have more stuff to

25   find out.

Page 48

1    table with him or anything, but I was in the 200 or

2    250-man tournament that he was in.  But it was hardly

3    a poker tournament.  It was much more of a handshaking

4    and networking deal.

5        Q    Okay.  And, I guess, other than that event,

6    which I -- I wouldn't categorize as playing poker with

7    Larry, let me ask you, have you ever played poker with

8    Larry Wright?

9        A    One time, he and I played at his ranch when

10   I was down there proving a pipeline easement.  He and

11   I played heads up for probably an hour.  That's about

12   it.

13       Q    And this was at the KrisJenn Ranch?

14       A    Yes.

15       Q    How many times have you been to the KrisJenn

16   Ranch?

17       A    I would guess maybe four.

18       Q    Okay.  And -- and what were -- what were

19   those occasions?

20       A    The first time I went there when I was

21   buying those minerals in Zavalla in 2012.  Another

22   time, I was there because Larry was -- was -- or

23   want -- needed my signature to execute an easement

24   that he was giving on the ranch.  And since we were

25   the main creditors, he needed me to look at it and

Page 63

1    then sign paperwork down there.  And then another

2    time, I -- I went down there to -- to fish and hunt,

3    and then the same thing the other time.

4                    So two times to fish and hunt, then one

5    time to -- to do the easement, and another time to do

6    the minerals.

7         Q    And when you -- on those two occasions when

8    you went there to fish and hunt, were you doing those

9    things with Larry, or did you bring other people on

10   the ranch to -- to do that with you?

11        A    I brought my -- my wife and one of our other

12   friends and her husband with us.  It was a -- it was a

13   social deal where we were going to, you know, all fish

14   and hunt.  And then the other time was --

15        Q    And was --

16        A    Sorry.  Go ahead.

17        Q    You -- you can finish what you were saying,

18   "the other time" and then I'll ask.

19        A    The -- the other time I -- I was there --

20   I -- I was there just to fish and hunt.

21        Q    Okay.  And when you brought your wife and

22   the other couple, were you socializing with Larry and

23   his family on that occasion, or were they there?

24        A    I think just Larry was there.

25        Q    Okay.  Was he hunting and fishing with you

Page 64

1       and -- and the other couple?

2           A    No.  He -- he -- well, he put me in a stand

3       to hunt, and then we -- we all kind of went down to

4       like a river/pond area.  I mean, he -- he was kind of

5       there around, but he kind of more -- more let us kind

6       of have run of the place, you know, because we -- it

7       was quarantine, and we all wanted something to do, and

8       he was all -- he was nice enough to offer up his ranch

9       as a place for us to get out of town.

10          Q    Oh, so that was -- that's this year, then;

11      is that right?

12          A    Yes.  Like, last spring.

13          Q    Okay.  And that was the occasion with your

14      wife and the other couple that came down?

15          A    Yeah.

16          Q    And then this other hunting and fishing trip

17      where you went, was that also this calendar year?

18          A    I think it was the end -- no.  It was

19      either -- I -- I know it was during deer season.  I --

20      I can't really remember if it was -- it was somewhere

21      between the -- the first and last part -- I -- I'm

22      going to say probably the early part of 2020.

23          Q    Okay.  Do you consider Larry Wright to be a

24      personal friend of yours?

25          A    Probably more business acquaintance.

                                              Page 65

1    Q    Okay.  Did you and your wife and the other

2    couple, did you pay Larry or the KrisJenn Ranch for

3    this hunting and fishing trip during the quarantine?

4    A    We brought down some -- some food, you know,

5    and -- and some crawfish, but I -- there was no

6    monetary exchange.

7    Q    Okay.  Mr. McLeod, were you aware that Larry

8    Wright was going to cause his entity to file

9    bankruptcy before they actually did it in April of

10   this year?

11   A    I do not recall.  I don't believe so.  I do

12   not believe so.  I don't -- I -- I don't recall

13   100 percent, but I don't believe so.

14   Q    Did Larry Wright ever share with you why he

15   decided to put his three entities into bankruptcy?

16   A    No, I don't think he did.  I mean, I -- I

17   think I connected the dots on my own.

18   Q    And what -- what were those?

19   A    That he was out of money.

20   Q    Okay.  Did -- did Larry or his entities miss

21   any payments on their loan with McLeod Oil?

22   A    Yes.

23   Q    What payments did he miss?

24   A    Interest payment.

25   Q    And that was an interest payment that was

Page 66

1    owed -- I believe the deadline was early February of

2    2020; is that right?

3         A    Yes.

4         Q    What was the amount of the interest payment

5    that he missed?

6         A    Off the top of my head -- don't hold me to

7    it -- around 108,000.

8         Q    Okay.  And so he missed that deadline early

9    February, right?

10        A    Yes.

11        Q    And then he filed bankruptcy in late

12   April 2020, right?

13             MS. WORSHAM:  If you know.

14        A    Yes.  I -- I -- I -- I think that's -- I

15   believe that's accurate.  I -- I don't know for sure.

16        Q    (BY MR. CLEVELAND) Okay.  Okay.  When did

17   McLeod Oil first send a notice of default to

18   Mr. Wright and his entities?

19        A    I'd have -- you'd have to ask my dad or my

20   attorney, but I know we started talking about it, you

21   know, for a while, but I don't know when the actual

22   notice came in.

23        Q    Okay.  Was this trip, this hunting trip,

24   your wife and the other couple, if that was in

25   quarantine, that would have been after early

Page 67

1      February 2020, right?

2          A    I believe so.

3          Q    Okay.  Was there any tension on that trip

4      with Mr. Wright seeing as he had missed the

5      108,000-dollar interest payment to McLeod Oil?

6          A    Little -- little bit.  Little bit.

7          Q    Okay.  Did -- did you say, you know, in your

8      mind, before going, "Wait, maybe I shouldn't go to

9      this trip since this is" -- "this is one of our

10     debtors that owes us," you know, "a lot of money, and

11     he's missed the payment"?

12         A   He -- he acted like it was fine, and, you

13     know, we -- I -- it's a -- it's a nice place to go,

14     and we'd been locked up and, you know, we -- we took

15     advantage of his offer.

16              MS. WORSHAM:  Hey, Tim, when you get to

17     a stopping point, we need to take a restroom break, or

18     I do, at your -- at your next stopping point.

19              MR. CLEVELAND:  You -- you read the

20     pause well, Laura.

21              Why -- why don't we do that now.

22              MS. WORSHAM:  I was waiting for you to

23     pause and then I was going say, "I got to go."

24              MR. CLEVELAND:  That was a pause for a

25     mental block, too, so that means it's time for a

Page 68

```
 1    would listen to parts of it through the Zoom, and
 2    other times, you were doing other things; is that --
 3        A    Yeah.  Yes.
 4        Q    -- accurate?
 5        A    That's correct, yeah.
 6             I was logged in, but I was up and out
 7    and moving around and taking other calls and stuff
 8    like that, so it would -- yes.
 9        Q    Understood.
10             MR. CLEVELAND:  Laura, are we -- are we
11    good on that, Laura?
12             MS. WORSHAM:  Yes.  Thank you.
13             MR. CLEVELAND:  Okay.  Great.
14        Q    (BY MR. CLEVELAND) All right.  Mr. McLeod,
15    we have taken a break.
16             Are you ready to continue, sir?
17        A    Yes.
18        Q    So prior to the -- the option agreement that
19    McLeod Oil has related to the right-of-way in this
20    case, do you have any experience developing
21    right-of-ways or pipelines, sir?
22        A    No, I do not.
23        Q    Okay.  And what attracted you to -- to a
24    potential pipeline business project, given your
25    background -- your significant background and
```

Page 70

1    experience in oil and gas?

2         A    I know that midstreams are a big commodity

3    these days in the industry.  People are -- people are,

4    you know -- are clamoring for them.  I know a lot of

5    the local municipalities and -- and counties and

6    parishes want those water hauling trucks off the road.

7    Being in the saltwater disposal business, I can attest

8    that the people that drive those trucks are not who

9    you want driving near your child's school, just to put

10   it that way, but they -- I -- I just -- I -- I know

11   enough, given my background, that water is a huge

12   deal.  And if you can't dispose of it in the

13   Haynesville, which what I consider to be one of the

14   biggest plays right now in the entire world, that, you

15   know -- that you're going to have to get rid of that

16   water if that play is going to move forward and with

17   the issue in Shelby County.  And having a solution to

18   that, to me, seems like -- like an attractive -- an

19   attractive venture.

20        Q    Got it.

21             And you used the word "midstream."

22             And not an oil and gas person here, I

23   need that -- what is -- what do you mean by

24   "midstream"?

25        A    Well, you've got what's considered to be

Page 71

```
 1    very, very big business.  You know, they're a --
 2    they're a billion- if not multibillion-dollar company
 3    within a very short amount of time, and I've -- I've
 4    studied them quite a bit.
 5         Q    And so once the -- let -- let's stick with
 6    the one pipeline example on this right-of-way.
 7                        Once one line is built on this
 8    right-of-way, and there's a -- there's a group that
 9    owns it, how does that line cash flow?
10         A    Well, there -- from -- from my
11    understanding, you know, there's quite a few different
12    ways to do it.  You know, you -- you can take a -- a
13    royalty per barrel, you can take -- you know, like
14    every single barrel is X, you know, like you get
15    eight cents for every barrel you move, or you can
16    charge them, you know, the -- the full process of --
17    of -- you know, some people want to recycle water and
18    then send it back and try and resell it.  You know,
19    I -- the -- this is stuff I'm still learning about,
20    but -- you know, like from what I understand, there's
21    quite a few different ways to skin a cat, if you will,
22    on how you make money, and I think everyone's got
23    their own -- their own recipe.
24         Q    Okay.  And I'll give you another example or
25    potential example and ask you questions about it.
```

Page 80

```
 1        Q     We'll look at it later.

 2        A     Yeah, I do not remember.

 3        Q     One second.  Let me get another exhibit up

 4    here.

 5                    (Exhibit 1 marked.)

 6        Q     (BY MR. CLEVELAND) All right.  Mr. McLeod,

 7    I'm going to show you what I'm marking -- what I've

 8    marked as Exhibit 1 to your deposition.

 9                    MR. CLEVELAND:  And Exhibit 1, Counsel,

10    is Bates number --

11                    We'll come back to this, Adam.

12                    -- is Bates number LW364 to 365.

13                    These were the documents produced by

14    David Strolle last week.

15        Q     (BY MR. CLEVELAND) All right.  Mr. McLeod,

16    do you have this document in front of you on your

17    screen, sir?

18        A     Yes, I do.

19        Q     And this is an e-mail string, you know,

20    around the time frame where we've been discussing, you

21    know, the first half or so of 2019.

22                    Do you see that this is a string that

23    involves Mr. Crockett, Larry Wright, David Strolle,

24    and others?

25        A     I do.
```

Page 110

1      Q    And do you know who Craig Crockett is?

2      A    I -- I believe he is the attorney for TCRG.

3      Q    All right.  And do you remember the last

4   week in the deposition, were you listening when --

5   when Larry Wright testified that TCRG never accused

6   him of fraud?  Did you hear that part?

7      A    I don't recall that.  I -- I think -- I -- I

8   kind of tuned out whenever I didn't hear McLeod.

9      Q    Okay.  Fair enough.

10            Well, I want to direct you to -- this

11   is just the bottom of the e-mail that starts with

12   Mr. Strolle and Mr. Crockett about the northern water

13   protect.

14            Do you see that, sir, on LW365?

15      A    Uh-huh.  Yes.

16      Q    The northern water project, was that the

17   title of the -- the water line that TCRG was going to

18   build where you had 4 percent carried interest?

19      A    I have no idea.

20      Q    Okay.  I'm going focus you on the next

21   e-mail from Mr. Crockett to Mr. Strolle.  It's

22   highlighted.

23            Do you see that, sir?

24      A    Uh-huh.  Yes.

25      Q    And do you see at the very top Larry

Page 111

1    Wright's e-mail included in this string?

2         A    Yes.

3         Q    All right.  I'll read Mr. Crockett's e-mail.

4              "David, as I see it, your client

5    fraudulently failed to disclose the existence of the

6    encumbrances created by the DMA for assignment, the

7    Borders, Longbranch assignment, and the August 14,

8    2017 deed of trust filed in volume 42888568 (phonetic)

9    in the real property of Zavalla County.  And in doing

10   so, your client violated sections 5.2, 5.3, 5.5, 5.7,

11   and so on of the purchase and sale agreement."

12             Do you see that paragraph, sir?

13        A    Yes.

14        Q    Continues.  "When a lawsuit is filed against

15   your client and Mr. Terrill for fraud, I would

16   anticipate that DMA, Moore, Borders, Longbranch and/or

17   my client will seek the remedy of this disgorgement of

18   the ill-gotten gain.  That is total disgorgement of

19   your clients' interest" -- excuse me -- "and

20   Mr. Terrill's/Synergy's interest.  I think your client

21   would do well to recognize this and resolve these

22   claims immediately, commensurate with the risk of

23   total disgorgement to damage."

24             Do you see that, sir?

25        A    Yes.

Page 112

1        Q     Now, were you ever made aware by Mr. Terrill

2     or anybody at TCRG that they were accusing Larry

3     Wright of fraud for failing to disclose encumbrances

4     created by the DMA and Longbranch assignment?

5        A     I do not recall ever hearing those words.

6        Q     Okay.  And, sir -- I mean -- let me ask you:

7     You've been in business for a long time -- I mean, do

8     you think you would remember if somebody said, "Hey,

9     this guy you're in business with were" -- "is accused

10    of fraud"?

11       A     I think I would remember that.

12       Q     Okay.  And this was the same thing we talked

13    about this morning, Mr. McLeod, when I asked you, did

14    Larry disclose these assignments to you and your dad

15    before the option agreement, and you can't remember

16    them doing that, can you?

17       A     I -- correct.  I do not recall.

18       Q     Okay.  Do you have any reason to believe

19    that Craig Crockett was lying here when he was

20    accusing Larry Wright and John Terrill of fraud?

21       A     I don't know the guy.  I have no idea.  I

22    mean, I can't speak to a guy who I don't know.  I

23    mean, people -- as I -- that's all I can say.

24       Q     Okay.  All right.  We're done -- we're done

25    with that one.

Page 113

1      A     That is -- I -- I -- I don't recall exactly

2    when that payment was due.  I'm -- I'm sure my dad

3    will know tomorrow.  I -- I can't remember exactly

4    when the first one was due.

5      Q     Okay.  Did -- did Mr. Wright ever ask McLeod

6    Oil for an extension or a grace period on this

7    interest payment that was owed in February of 2020?

8      A     Not that I know of.

9      Q     Not even before they filed bankruptcy, you

10   don't recall them asking for an extension or a grace

11   period?

12     A     I do not recall that request, no.

13     Q     If Mr. Wright had asked you for a -- a

14   six-month extension on the deadline for that interest

15   payment, would you have agreed to it?

16     A     I have -- I have no idea.  That's -- that's

17   a -- another question for my dad, and I'm -- you know,

18   I -- I have no idea.

19     Q     Okay.  Well, let me ask -- based on your

20   dealings with Mr. Wright, Mr. McLeod, if you were

21   making the decisions, if Mr. Wright had asked for an

22   extension on that interest payment, would you have

23   agreed to give it to him?

24          MR. PEREZ:  Objection; form.

25     A     I have no idea.

Page 166

```
 1        Q    (BY MR. CLEVELAND) Okay.  All right.  All
 2   right.  Another exhibit upcoming.
 3                   THE WITNESS:  Oh, my neck.
 4                   MS. WORSHAM:  Not the most comfortable
 5   chair.
 6                   THE WITNESS:  Well, I'm leaning
 7   forward.  I'm trying to -- squinting in this thing.
 8                   MS. WORSHAM:  And, you know, if --
 9                   MR. CLEVELAND:  Oh --
10                   MR. PEREZ:  Tim, if you want to take a
11   five-minute, ten-minute bathroom break quickly?  We've
12   been on for about an hour.
13                   MR. CLEVELAND:  Yeah, we can do that.
14   We can do that.
15                   Let's take a short bathroom break.
16                   THE WITNESS:  Okay.
17                   THE VIDEOGRAPHER:  We are going off the
18   record at 2:17 p.m.
19                   (Break from 2:17 p.m. to 2:31 p.m.)
20                   THE VIDEOGRAPHER:  We are going back on
21   the record at 2:31 p.m.
22                   (Exhibit 7 marked.)
23        Q    (BY MR. CLEVELAND) All right.  Mr. McLeod,
24   we've taken a break.  Back on the record.
25                   Are you ready to continue?
```

                                                    Page 167

1     A   Well, that was the -- so that was what I

2  thought the Shelby County litigation was.

3     Q   Like the actual summary judgment hearing

4  itself?

5     A   Yes.

6     Q   So let's look at the atta- -- but let me --

7  sorry.  Sorry.  Starting over.

8           Other than the discussion about the

9  summary judgment hearing, after that, did Larry Wright

10  ever have a phone call or more with you to discuss the

11  litigation in Shelby County or even this bankruptcy?

12           MR. PEREZ:  Objection; form.

13     A   Not -- not that I can recall.  I mean,

14  the -- the only thing I recall was he said that that

15  judge was taking a long time because I asked, "Did she

16  ever make a ruling?"  But I don't remember anything

17  beyond that.

18     Q   (BY MR. CLEVELAND) Okay.  And what -- let's

19  look at in Exhibit 7.  I'll scroll down to the

20  attachments.  Now -- and -- and just remember the

21  statement, "We cannot take a chance to have the

22  pipeline moved into a trust by the Shelby County

23  judge."

24           Now, what Larry attached was this, and

25  I'm going to rotate this around.  This is how it

Page 170

1  was -- we'll -- so there you go.

2       All right.  So I've rotated that.  This

3  is one of the attachments, and this is what Mr. Wright

4  attached.  The statement, it says that, "As equitable

5  relief, Moore seeks the disgorgement of all

6  ill-begotten profits and funds procured by Wright and

7  his entities as the result of his breach of fiduciary

8  duty.  Moore further requests the constructive trust

9  be placed on all proceeds, property, and/or interests

10  obtained by Wright and his entities, including but not

11  limited to KrisJenn Ranch, LLC, series pipeline ROW as

12  a result of this breach of fiduciary duty."

13       Do you see that?

14  A Yeah.

15  Q Did you read this when -- when Mr. Wright

16  sent it as an attachment to his email?

17  A I don't recall, probably, but I -- I

18  don't -- I don't recall it.

19  Q Do -- do you recall, you know, ever being

20  alarmed that -- at the idea that there could be a

21  constructive trust with the right-of-way placed in it

22  in connection with litigation?

23  A I still didn't have -- really didn't even

24  know what was going on, so I -- I didn't -- I don't

25  even know the downside of being in a trust at that

Page 171

```
 1   time, so I -- no, I -- it -- it -- it did not resonate
 2   with me, really.
 3        Q    Okay.  So you do -- do you recall having
 4   a -- a discussion after Larry sent the email about its
 5   contents and, you know, his -- his discussion about
 6   the litigation in Shelby County?
 7        A    I do not.
 8        Q    All right.  It -- did -- were there --
 9   sometimes Larry would email you the -- I mean, I -- I
10   guess it says that sometimes you tuned him out a
11   little bit from the way you're answering this, I mean;
12   is that true?
13        A    Probably, yeah.  Yeah.  And sometimes he's a
14   little hard to follow.
15        Q    Okay.  All right.  I'm going to mark another
16   exhibit, Exhibit 18 -- and I'm sorry -- Exhibit 8 to
17   your deposition, Mr. McLeod.
18              (Exhibit 8 marked.)
19        Q    (BY MR. CLEVELAND) We're now in April of
20   2020, and Exhibit 8 has the Bates numbers McLeod 523
21   through 525.  So these are -- this is another email
22   that came from your -- your production in response to
23   subpoena.
24        A    Uh-huh.
25        Q    And I -- I'll -- I'll go to the bottom,
```

Page 172

```
 1      third page and work our way up, Mr. McLeod.
 2                      Do you see that on the bottom of the
 3      string is an email with a bunch of lawyers on it on
 4      April 14th, 2020?  And it says Judge Rafferty has
 5      invited you -- invited you to a scheduled Zoom
 6      meeting.
 7                      Do you see that?
 8           A     Yup.  Yes.
 9           Q     And do you understand -- you see these --
10      these italicized te- -- pieces of texts here that say,
11      at Long Branch versus TCRG and Larry Wright, et
12      cetera, versus Frank Daniel Moore, do you see those?
13           A     Yes.
14           Q     Do you understand that those two pieces of
15      italicized texts are referring to two different
16      lawsuits?
17           A     Okay.  I mean, I -- I'm not an attorney, no.
18      I -- I've -- to -- to me, that means --
19           Q     That's fine.
20           A     -- they're all somehow interconnected.
21           Q     Got it.
22                      Okay.  And looking up with the next
23      email, do you see an email from Judge Rafferty, the
24      judge in Shelby County, to all of us lawyers on
25      April 14th, 2020?
```

Page 173

1          A    Yes.

2          Q    All right.  Do you see she says, "Counsel,

3     I'd like to reconsider the motion to consolidate

4     during this hearing as well"?  Do you see that?

5          A    Yes.

6          Q    Did you have any understanding of what the

7     motion to consolidate was in the Shelby County

8     litigation?

9          A    No.

10         Q    All right.  And then scrolling up, there's

11    Derick Rodgers.

12              Did you understand that he was counsel

13    for Mr. Wright or his entities?

14         A    Yes.

15         Q    He's sending an email here about the notice

16    of hearing to Judge Rafferty's email.

17              Do you see that?

18         A    Yes.

19         Q    And then you see in the next email above,

20    Mr. Rodgers emails Larry Wright copying Ricardo

21    Cedillo.  It says, "Larry, see the notice below."

22              Do you see that?

23         A    Yes.

24         Q    And I'm going to remind you again that

25    the -- the hearing that's being referred to is an

                                        Page 174

```
 1    April 22nd hearing.
 2                    Do you see that in Judge Rafferty's
 3    email?
 4         A    Yes.
 5         Q    Okay.  So now, we're at the top of this
 6    exhibit, and Larry Wright emails you on April 14th at
 7    3:12 p.m. Central.  And he says, "Time to file on the
 8    21st.  Thank you, Larry."
 9                    Do you see that?
10         A    I do.
11         Q    Okay.  Can you hear me okay, Mr. McLeod?
12         A    Yes.  Yes.  Yes, I can.
13         Q    And then you forwarded Mr. Wright's email to
14    your dad later that afternoon.
15                    Do you see that?
16         A    Yes, I do.
17         Q    Do you have any knowledge of what Mr. Wright
18    is referring to when he says, "Time to file on the
19    21st"?
20                    MR. PEREZ:  Objection; form.
21         A    No, I do not.  I believe that's why I sent
22    it to my dad because I was confused.
23         Q    (BY MR. CLEVELAND) Okay.  Did Mr. Wright
24    ever give you any indication that he was talking about
25    filing this bankruptcy the day before --
```

Page 175

```
 1          A    Oh.

 2          Q    -- a hearing in the Shelby court litigation?

 3          A    No.

 4          Q    Did you ever call Larry and say or ask him,

 5     "What" -- "what do you mean time to file on the 21st"?

 6          A    Not that I recall.  I -- I don't believe so.

 7     I --

 8          Q    Did -- did you and -- I'm sorry.  Go ahead.

 9          A    Oh, nothing.  No, I -- I don't believe I

10     ever got clarification on what he was talking about.

11          Q    And did you and your dad discuss this email

12     after you sent the -- the forward at 4:52 p.m.?

13          A    I do not recall.

14          Q    Was -- was your dad or anybody else ever

15     able to help you understand what Mr. Wright was

16     referring to when he says, "Time to file on the 21st"?

17          A    No.

18          Q    Okay.  All right.  All right.  Mr. McLeod,

19     I'm -- I've marked and I'm showing you Exhibit 9 to

20     your deposition, which has the Bates numbers

21     McLeod 2215 to 2216.

22               Do you have this document in front of

23     you, sir?

24               (Exhibit 9 marked.)

25          A    Yes, I do.
```

Page 176

1           Q       (BY MR. CLEVELAND)  Okay.   And do you see
2      that Exhibit 9 is a letter from Bill Kuhlmann dated
3      April 23rd, 2020?
4           A       Yes.
5           Q       And I'll -- I'll go down to the second page
6      just so you can see Mr. Kuhlmann's signature.
7                   Do you see it there?
8           A       Yes, I do.
9           Q       All right.  And -- and have you seen this
10     letter before?
11          A       Yes.
12          Q       Okay.  And what -- can you tell me in your
13     own words what -- what is this letter?
14          A       I believe that that was a letter we sent as
15     the result of Larry missing his loan payment to us.
16          Q       Okay.  And I'm highlighting in the document
17     mine just to -- to help move us along, but the payment
18     that was missed is -- is --
19          A       Sorry, say it again.
20          Q       Is that the payment -- yeah, I'm going to
21     take you back.
22                  Can you hear me okay?
23                  MS. WORSHAM:  No.  We're getting
24     that --
25          A       No.

                                    Page 177

```
 1              MS. WORSHAM:  -- feedback again.
 2              THE WITNESS:  Yeah.
 3         Q    (BY MR. CLEVELAND) Yeah.
 4              What about now?
 5         A    Yes.
 6         Q    All right.  Okay.  Back to this letter in
 7    Exhibit 9.  You said this letter was -- was written
 8    because of a missed payment on a loan between McLeod
 9    Oil and Mr. Wright and his entities; is that right?
10         A    Yes.
11         Q    Okay.  And is that the payment that
12    Mr. Kuhlmann refers to in the second paragraph that
13    I've highlighted that says, "Under loan agreement,
14    interest on the note is due and payable semiannually
15    and an interest payment was due and payable on
16    February 8th, 2020."
17              Do you see that?
18         A    Yes.
19         Q    He continues.  He says, "Payment was not
20    made and failure to make that payment constituted in
21    events of default under section 10.1 of the loan
22    agreement.  The amount that should have been paid on
23    February 8th, 2020 was $109,367.21."
24              Did I read that correctly?
25         A    Yes.
```

Page 178

```
 1        Q     Okay.  Do you know why -- well, actually,
 2   let me ask it this way.
 3               Are you aware of any notice of -- of
 4   default that was sent by McLeod Oil to Mr. Wright
 5   before April 23rd, 2020?
 6        A     Since like this -- like within a letter?
 7        Q     Yeah.  Let's start there, an e-mail or a
 8   letter.
 9        A     I do not -- I do not recall either of those
10   being sent.
11        Q     Okay.  Do you know why -- why the first
12   written notice of default to Mr. Wright and his
13   entities came about 2 1/2 months after he missed the
14   deadline?
15               MR. PEREZ:  Objection, form.
16        A     You'll need to -- to ask my dad.  I believe
17   he dealt with Mr. Kuhlmann on this.  He'll be able to
18   give you a better understanding.
19        Q     (BY MR. CLEVELAND) Well, what -- and I will.
20               But as you sit here today, do you have
21   any understanding or knowledge of why the first
22   written notice of default from McLeod Oil to
23   Mr. Wright for a payment that was due in early
24   February came in late April?
25               MR. PEREZ:  Objection; form.
```

Page 179

1     A     I do not.

2     Q     (BY MR. CLEVELAND) All right.  Did it have

3   anything do with the bankruptcy Larry Wright was about

4   to file?

5               MR. PEREZ:  Objection; form.

6     A     I -- I have no idea.

7     Q     (BY MR. CLEVELAND) Okay.  Mr. Kuhlmann says

8   on the second page here, let me highlight this.  It

9   says, "Lenders representatives have been engaged in

10  discussions with you regarding the delinquent

11  installment of interest but those discussions have

12  been frequent.  Accordingly, you have left Lender no

13  choice but to take this action."

14              Do you see that, sir?

15    A     Yes, I do.

16    Q     Were you involved in any discussions with

17  Mr. Wright about this delinquent interest payment?

18    A     I believe we may have asked about it, but I

19  don't recall much more than that.  My dad may have --

20  you may want to ask him if he said something.

21    Q     Okay.  Did -- did this loan between McLeod

22  Oil and Mr. Wright and his entities have anything to

23  do with Black Duck Properties, LLC?

24              MR. PEREZ:  Objection; form.

25    A     I'll need you to -- to rephrase or explain

                                        Page 180

```
 1    that further.
 2         Q    (BY MR. CLEVELAND) Sure.
 3                   Well, have you been -- have you learned
 4    of an entity called Black Duck Properties, LLC --
 5         A    Yes.
 6         Q    -- in connection with this case as -- as
 7    being an entity that, you know, you suggest and
 8    consisted of two members, one was an entity controlled
 9    by Mr. Wright and the other was an entity controlled
10    by Mr. Moore?
11         A    Yes.  I'm -- I'm familiar with -- with Black
12    Duck.
13         Q    Okay.  Black Duck was not a party to the
14    loans between McLeod Oil and KrisJenn Ranch and
15    Mr. Wright, was it?
16         A    Not to my knowledge.
17         Q    Okay.  Do you see this footer down here in
18    the letter?
19         A    Yes, I do.
20         Q    Do you see this -- in this letter, Black
21    Duck, where the words "Black Duck" appear?
22         A    Uh-huh.  Yes.
23         Q    Do you -- do you know if David Strolle wrote
24    this letter?
25                   MR. PEREZ:  Objection; form.
```

Page 181

```
 1                    MS. WORSHAM:  He --

 2        A    No.  But to my knowledge, Bill Kuhlmann --

 3                    MS. WORSHAM:  The letter speaks for

 4   itself.

 5                    THE WITNESS:  Okay.  Yeah.

 6        Q    (BY MR. CLEVELAND) Well -- and what I meant

 7   is that, do you know if David Strolle, like, created

 8   the first draft to this letter and then sent it to

 9   McLeod Oil to finalize and send it back?

10                    MR. PEREZ:  Objection; form.

11                    MS. WORSHAM:  No idea.

12        A    I have absolutely no idea.

13        Q    (BY MR. CLEVELAND) Okay.  So I guess you

14   can't help me understand why -- why there's some sort

15   of a footer with a Black Duck -- with the Black Duck

16   name in there.

17                    Do you know why Black Duck appears in

18   this letter that has nothing to do with Black Duck?

19                    MR. PEREZ:  Objection --

20        A    You probably -- you probably need to ask the

21   author.  I have no idea.

22        Q    (BY MR. CLEVELAND) Okay.  Okay.  And are --

23   are you aware that approximately four days after this

24   letter was sent, Mr. Wright's -- KrisJenn entities all

25   filed bankruptcy?
```

Page 182

```
 1        A    I -- I was not aware of the exact day when

 2    that happened.

 3        Q    Did you -- did Mr. Wright ever tell you

 4    before he did it that he was going to cause those

 5    entities to file bankruptcy?

 6        A    I believe -- I believe he mentioned it at

 7    one point.

 8        Q    And when was that?

 9        A    I -- I don't recall.

10        Q    What did he say?

11        A    I think it was something to the effect that

12    he was out of money, and I think we've kind of asked

13    what the deal was on the interest.  He said he was out

14    of money, and that was about it.

15        Q    Okay.  Did he say anything else?

16        A    That -- that's all I remember.

17        Q    Okay.  So in this time frame, Mr. McLeod, so

18    end of April 2020, this is about two months after

19    the -- the Trace -- the Trace Midstream call --

20        A    Yes.

21        Q    -- that we discussed earlier; is that right?

22        A    Yes.

23        Q    In this -- and after that Trace Midstream

24    call between then and, like, end of April 2020, which

25    is when Mr. Wright caused his entities to file
```

Page 183

```
 1        that is just speculation.
 2             Q     (BY MR. CLEVELAND) Okay.  Do you have any --
 3        any further answer to that question, Mr. McLeod?
 4             A     I do not.
 5             Q     All right.  Looking down at 1B, sir, it
 6        says, "Black Duck Properties, LLC's obligation to pay
 7        the Net Profit Share shall attach and run with the P21
 8        or Express pipeline and Black Duck Properties, LLC
 9        binds its successors and assigns to the payment of the
10        Net Profits Share."
11                   Do you see that, sir?
12             A     I do see it.
13             Q     Okay.  And have you been involved in
14        agreements where obligations attached and ran with the
15        land in your --
16             A     Not that I -- not to my knowledge.
17             Q     Okay.  From your lawyer's comment,
18        Mr. McLeod, I take it that you don't have any position
19        on what this agreement means; is that correct?
20             A     That's correct.  I -- I'm not armed with
21        enough information --
22             Q     Okay.
23             A     -- to -- to say.
24             Q     Well -- well, let me ask.
25                        Are you taking a position on what this
```

Page 203

1    agreement -- DMA agreement means, Mr. McLeod?

2         A    No.

3         Q    All right.  Do you have any opinion,

4    Mr. McLeod, on what this DMA agreement means?

5         A    No.

6         Q    All right.  And similarly, are you aware --

7    strike that.

8                   Are you aware that there's a -- a

9    similar agreement to this one that's been referred to

10   as the Longbranch assignment?

11                  MR. PEREZ:  Objection; form.

12        A    Yes.

13        Q    (BY MR. CLEVELAND) And are you aware that --

14   in fact, why don't we just pull it up so we can close

15   this loop.

16                  Speaking of that, let me -- on the DMA

17   agreement, one more question.

18                  Do you have any knowledge or opinions

19   or testimony to tell me, sir, about the impact of the

20   DMA agreement on McLeod Oil and its potential

21   ownership of the right-of-way?

22                  MR. PEREZ:  Objection; form.

23        A    No.

24        Q    (BY MR. CLEVELAND) Okay.  So we're -- we're

25   done with that one.  And, sir, what I've pulled up in

                                        Page 204

```
 1    have any opinion or testimony about what this
 2    Longbranch assignment means?
 3         A    I really just -- Tim, I really don't have
 4    the -- the legal wherewithal or the history to -- to
 5    say.
 6         Q    I understand that, and I'm not being
 7    critical of that.  I just need to make sure I
 8    establish this, and I can move on.
 9              So are you offering a position in any
10    way about what this Longbranch assignment means in
11    this case?
12         A    I am not.
13         Q    Okay.  Are you offering any testimony or a
14    position, sir, about what this -- the impact of this
15    Longbranch assignment would have on any ownership by
16    McLeod Oil of the right-of-way?
17                   MR. PEREZ:  Objection; form.
18         A    No.
19         Q    (BY MR. CLEVELAND) Are you offering -- do
20    you have any position about whether the Longbranch
21    assignment or DMA agreement attaches and runs with the
22    right-of-way?
23         A    I am not.
24         Q    All right.
25         A    Or I do not.
```

Page 206

1       Q     Are you offering any position or testimony

2    on whether the Longbranch assignment or the DMA

3    agreement and the interest therein binds the

4    successors and assigns Black Duck?

5       A     I am not.

6                    MR. CLEVELAND:  Okay.  We can take a

7    break.

8                    THE WITNESS:  Okay.

9                    THE VIDEOGRAPHER:  We are going off the

10   record at 3:23 p.m.

11                   (Break from 3:23 p.m. to 3:35 p.m.)

12                   THE VIDEOGRAPHER:  We are going back on

13   the record at 3:35 p.m.

14      Q     (BY MR. CLEVELAND) Okay.  Mr. McLeod, just

15   to tie a couple of things up.

16                   Sir, are you taking a position on

17   whether or not DMA Properties has a 20 percent net

18   profit interest that attaches and runs with the

19   right-of-way?  Yes or no?

20      A     No.

21      Q     Are you taking a position, sir, that the

22   20 percent net profit interest of Longbranch Energy

23   attaches and runs with the right-of-way?  Yes or no?

24      A     No.

25      Q     Okay.  Mr. McLeod, switching topics again.

                                        Page 207

1    physical line for them.  I don't know if they used a

2    third-party contract or if they have in-house guys.

3    That's -- that's going to be something I still have

4    yet to learn.

5        Q    Okay.

6                MR. CLEVELAND:  And, Laura, just so we

7    have a clean record, I'm going to ask this question,

8    and you can give any instruction that you feel is

9    appropriate.  Okay?

10               MS. WORSHAM:  Okay.

11       Q    (BY MR. CLEVELAND) Just so it's clean,

12   Mr. McLeod, who are the potential capital partners

13   that you have met with in connection with the

14   potential project on this right-of-way?

15               MS. WORSHAM:  I'm going to object as to

16   proprietary confidential information not relevant to

17   the matters at hand, and I am instructing Mr. McLeod

18   not to answer.

19               MR. CLEVELAND:  Got it.

20       Q    (BY MR. CLEVELAND) Are you going to follow

21   your lawyer's instruction?

22       A    Yes.

23       Q    Okay.  Mr. McLeod, last topic, your cell

24   phone.

25               I was made aware that we -- we received

Page 235

1    several text messages in the McLeod Oil Production

2    from you, messages between you and Larry Wright,

3    messages between you and Darin Borders.

4              But I understand that some of your text

5    messages with Larry Wright were lost; is that correct,

6    sir?

7         A    Yes.  My -- my entire phone kind of

8    collapsed, and I recovered what I could, what was on

9    the cloud, and I produced that phone.  I don't know

10   what happened.  I had it for -- for a good while.  And

11   it just -- it just stopped working, and I took it to

12   AT&T, bought a new phone, recovered what I could from

13   the Cloud, and, you know, that's -- that's as much as

14   I could tell you about it.

15        Q    Okay.  And when you say "the phone

16   collapsed," first of all, when did this happen?

17        A    Somewhere in the la- -- the latter part of

18   July, I believe.

19        Q    Okay.  And when you say it "collapsed,"

20   what -- what do you mean?

21        A    When I tried to turn it on, it would only

22   show the -- the white Apple screen.  And I tried all

23   the tricks of, you know, the rice, I tried resetting

24   it, everything I knew to troubleshoot it.  And

25   eventually, I went to Apple.  They told me that these

Page 236

1    phones, you know, sometimes just do that.  You know,

2    very noncommittal and Apple -- the stores

3    unfortunately are closed down because of COVID, so I

4    just purchased a new phone at that time.

5        Q    What kind of phone -- what kind of iPhone

6    was it that just stopped working?

7        A    Like an i- -- like seven, maybe.  I -- I

8    don't know the exact -- it's on the back of the phone.

9    I think Laura has it.

10       Q    Okay.  And have you ever taken affirmative

11   steps to actually delete any text messages with Larry

12   Wright?

13       A    No.

14       Q    Have you ever done that to delete a text

15   messages with Darin Borders?

16       A    I -- I don't believe so.

17       Q    Okay.  And so what -- you were able to

18   recover some text messages with Mr. Wright from the

19   Cloud; is that right?

20       A    Yes.

21       Q    And from what I've seen, there's some text

22   messages with Mr. McLeod -- with Mr. Wright from, you

23   know, early part of 2019.  And then there's a gap to

24   midsummer of 2020.

25                   Is that consistent with your

Page 237

1    recollection of -- of the missing group of texts?

2        A    Yeah.   That -- it was not just Mr. Wright.

3    It was for anybody and everybody.  That was the last

4    time the cloud had updated or uploaded that

5    information.  So I lost con- -- contacts, music,

6    everything.  And so when I turned on my new phone and

7    connected it to the Cloud, everything reverted back to

8    that September area and so I lost -- I -- I lost

9    everything.  Every conversation with everybody as well

10   as music and apps and everything.

11       Q    But when you say "the new phone," everything

12   reverted back to when?

13       A    Around that September '19 time.  Like, that

14   all just popped up on my phone when I synched it with

15   the cloud.

16       Q    Okay.  Have you checked your new phone and

17   new cloud to see if any of these text messages between

18   September of '19 and middle of summer 2020 are --

19   are -- have been recovered or -- or restored?

20       A    Yes, I have, actually.

21       Q    And have they -- have you found any?

22       A    No, I didn't -- I -- I did not see them.

23       Q    Okay.  And so do you know why we're able to

24   have some text messages starting in July of 2020 to

25   present?  Were those on the new phone or --

                                        Page 238