```
 1                   IN THE UNITED STATES BANKRUPTCY
                    FOR THE WESTERN DISTRICT OF TEXAS
 2                        SAN ANTONIO DIVISION
 3    In re:                       ) CHAPTER 11
                                   )
 4    KRISJENN RANCH, LLC,         )
                                   )
 5        Debtor                   ) CASE NO. 20-50805
      _____
 6
      KRISJENN RANCH, LLC,         )
 7    KRISJENN RANCH, LLC-SERIES   )
      UVALDE RANCH, AND KRISJENN   )
 8    RANCH, LLC-SERIES PIPELINE   )
      ROW, as successors in        )
 9    interest to BLACK DUCK       )
      PROPERTIES, LLC,             )
10                                 )
          Plaintiffs,              )
11                                 )
      V.                           ) ADVERSARY NO. 20-05027
12                                 )
      DMA PROPERTIES, INC., AND    )
13    LONGBRANCH ENERGY, LP,       )
                                   )
14        Defendants.              )
      _____
15
      DMA PROPERTIES, INC.,        ) CHAPTER 11
16                                 )
          Cross-Plaintiff/         )
17    Third-Party Plaintiff,       )
                                   ) ADVERSARY NO. 20-05027
18    V.                           )
                                   )
19    KRISJENN RANCH, LLC,         )
      KRISJENN RANCH, LLC-SERIES   )
20    UVALDE RANCH, AND KRISJENN   )
      RANCH, LLC-SERIES PIPELINE   )
21    ROW, BLACK DUCK              )
      PROPERTIES, LLC, LARRY       )
22    WRIGHT, AND JOHN TERRILL,    )
                                   )
23        Cross-Defendant/         )
      Third-Party Defendants.      )
24
25
                                                    Page 1
```

```
1              ------------------------------------

2            ORAL AND VIDEOTAPED DEPOSITION OF

3                      LARRY WRIGHT

4                  SEPTEMBER 29, 2020

5                    Volume 1 of 2

6              ------------------------------------

7         ORAL AND VIDEOTAPED DEPOSITION OF LARRY WRIGHT,

8     produced as a witness at the instance of DMA PROPERTIES,

9     INC., AND FRANK DANIEL MOORE, and duly sworn, was taken

10    in the above-styled and numbered cause on SEPTEMBER 29,

11    2020, from 9:13 a.m. to 5:23 p.m., via Zoom

12    videoconference, before Kailee Pereida, CSR in and for

13    the State of Texas, reported by machine shorthand

14    pursuant to the Federal Rules of Civil Procedure.

15

16

17

18

19

20

21

22

23

24

25
```

Page 2

```
 1              A P P E A R A N C E S
 2
    FOR PLAINTIFFS, KRISJENN RANCH, LLC, KRISJENN RANCH,
 3  LLC, SERIES-UVALDE RANCH, KRISJENN RANCH, LLC,
    SERIES-PIPELINE ROW:
 4
        MR. JOHN MULLER (Via Videoconference)
 5      MULLER SMEBERG, PLLC
        111 West Sunset Road
 6      San Antonio, Texas 78209
        (210) 664-5000
 7      john@muller-smeberg.com
 8
    FOR FRANK DANIEL MOORE AND DMA PROPERTIES, INC.:
 9
        MR. TIMOTHY CLEVELAND (Via Videoconference)
10      CLEVELAND TERRAZAS PLLC
        4611 Bee Cave Road
11      Suite 306B
        Austin, Texas 78746
12      (512) 689-8698
        tcleveland@clevelandterrazas.com
13
             -AND-
14
        MR. CHRISTOPHER S. JOHNS (Via Videoconference)
15      -AND-
        MS. CHRISTEN MASON HEBERT (Via Videoconference)
16      JOHNS & COUNSEL PLLC
        14101 Highway 290 West
17      Suite 400A
        Austin, Texas 78737
18      (512) 399-3150
        cjohns@johnsandcounsel.com
19      chebert@johnsandcounsel.com
20  FOR LARRY WRIGHT:
21      MR. WILLIAM GERMANY (Via Videoconference)
        THE LAW OFFICES OF BAYNE, SNELL AND KRAUSE
22      1250 NE Interstate 410 Loop
        Suite 725
23      San Antonio, Texas 78209
        (210) 824-3278
24
25
```

Page 3

1   ALSO PRESENT:

2       Mr. Darin Borders (Via Videoconference)

        Mr. Adam McLeod (Via Videoconference)

3       Mr. John McLeod (Via Videoconference)

        Mr. Daniel Moore (Via Videoconference)

4       Ms. Kailee Pereida, The Reporter (Via

    Videoconference)

5       Mr. Shane Ramirez, The Videographer (Via

    Videoconference)

6       Ms. Gwynne Wright

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 4

```
 1                         INDEX
                                              PAGE
 2   Appearances...........................................  3
 3   LARRY WRIGHT
 4        EXAMINATION BY MR. CLEVELAND...................  8
 5
     Signature and Changes............................. 271
 6   Reporter's Certificate............................ 274
 7                        EXHIBITS
 8   NO.             DESCRIPTION                      PAGE
 9   Exhibit 1    Notice of Deposition of KrisJenn
                  Ranch, LLC, and Its Series............ 14
10   Exhibit 2    E-mails, McLeod001507.................. 27
     Exhibit 3    E-mails, McLeod002943 and 002944....... 32
11   Exhibit 4    E-mails...............................125
     Exhibit 5    E-mails, McLeod0745 through 0747.......139
12   Exhibit 6    E-mails, McLeod000523 through 000525...143
     Exhibit 7    Letter From William D. Kuhlmann, Jr.,
13                Dated April 23, 2020, McLeod002215
                  and 002216............................146
14   Exhibit 8    Company Agreement of Black Duck
                  Properties, LLC.......................160
15   Exhibit 9    Compromise Settlement Agreement.......191
     Exhibit 10   E-mails...............................177
16   Exhibit 11   E-mails...............................187
     Exhibit 12   Agreement for Assignment and
17                Assumption of Specific Contract.......205
     Exhibit 16   Deed of Trust.........................259
18   Exhibit 17   E-mails...............................247
     Exhibit 18   DMA Agreement.........................240
19
20
21
22
23
24
25
                                              Page 5
```

```
1              THE VIDEOGRAPHER:  Here begins the
2    deposition of Larry Wright.  Today's date is September
3    29th, 2020.  The time is 9:13 a.m.  This deposition is
4    being recorded live via Zoom.
5              Will the court reporter please do her read
6    on and swear in the witness?
7              (Witness sworn by court reporter.)
8              THE REPORTER:  And before we get started,
9    can I get everyone to please state their appearances for
10   the record?
11             THE WITNESS:  Larry Wright.
12             MR. MULLER:  This is John Muller on
13   behalf of Mr. Wright and -- I'm sorry -- on behalf of
14   KrisJenn Ranch.  And then Gwynne Wright is also here as
15   a representative of KrisJenn Ranch.
16             MR. GERMANY:  William Germany on behalf
17   of Larry Wright.
18             MR. CLEVELAND:  Tim Cleveland, Chris
19   Johns, Christie Hebert on behalf of DMA Properties,
20   Daniel Moore, Longbranch Energy, and Darin Borders;
21   although this deposition has been noticed only by DMA
22   Properties.  And with us as well is Daniel Moore by
23   phone.  And Darin Borders is also with us by phone.
24             And I think I see -- just so we have a
25   complete record, I think Mr. McLeod is on the phone.
```

Page 6

1   Mr. McLeod being here right now.  But while I'm doing --

2   while you're doing the initial part of your examination,

3   I'll reach out to Ron and see if we have any real

4   issues.  If not --

5                    MR. CLEVELAND:  Okay.  Great.

6                    MR. MULLER:  Or I'll just stop you if I

7   want to continue on the objection.  We can proceed for

8   now.

9                    MR. JOHN MCLEOD:  That'll -- that'll be

10  fine.  I mean, I can -- I can get off if it upsets

11  anybody too much, so...

12                   MR. MULLER:  No, it doesn't upset

13  anybody.  I just want to make sure we're -- we're doing

14  right.  But let me -- let me check with my -- my smarter

15  half, and I'll get right back to you.

16                   MR. JOHN MCLEOD:  Okay.

17                   MR. CLEVELAND:  Okay.  Kailee, am I good

18  to proceed?

19                   THE REPORTER:  Yes, sir.

20                   MR. CLEVELAND:  Okay.

21                        LARRY WRIGHT,

22  having been first duly sworn, testified as follows:

23                       EXAMINATION

24  BY MR. CLEVELAND:

25       Q.   Mr. Wright, good morning.

                                            Page 8

1           A.    Good morning.

2           Q.    Sir, you understand that you just took an oath

3     from our court reporter to tell the truth today, sir?

4           A.    Yes.

5           Q.    Do you understand that that's the same oath

6     that you would take if we were, one, in the same

7     deposition room together physically and also if we were

8     in a courtroom together in San Antonio, Texas?  Do you

9     understand that, sir?

10          A.    Yes.

11          Q.    Okay.  And your full name, as you -- as you

12    stated earlier, is Larry Michael Wright; is that right,

13    sir?

14          A.    Yes.

15          Q.    And what is your residential address,

16    Mr. Wright?

17          A.    410 Spyglass, McQueeney, Texas.

18          Q.    Okay.  And, Mr. Wright, are you, sir, under

19    the influence of any substance or medication this

20    morning that would affect your ability to testify

21    truthfully?

22          A.    No, sir.

23          Q.    Is there any other reason, sir, that you're

24    not able to testify truthfully and give your best

25    answers to my questions today?

```
 1    exhibits, I am showing you what I have marked as

 2    Exhibit 1 to your deposition today.  Do you see

 3    Exhibit 1 up here on the tab?

 4         A.   Yes, I do.

 5         Q.   Okay.  And have -- I am -- I am scrolling

 6    down.  This is the Notice of Deposition of KrisJenn

 7    Ranch, LLC, and Its Series.

 8                   Do you see that, sir, here on page 2?

 9         A.   Yes, sir.

10         Q.   Okay.  And you'll see that this notices this

11    deposition for today.  I'm highlighting this.  Can you

12    see my highlights on September 29th, 2020?

13         A.   Yes.  Yes, sir.

14         Q.   And I am scrolling down further.  And there's

15    a page of definitions.

16                   And, finally, I am -- I am on the page

17    with "Topics."  Do you see that, sir?

18         A.   Yes, I do.

19         Q.   Have you seen this document before, sir?

20         A.   I was given that on Friday, I think, yes.

21         Q.   Okay.  And do you understand that you are

22    testifying here today on behalf of KrisJenn Ranch and

23    its Series LLC's with respect to the topics in this

24    Exhibit 1?

25         A.   Yes, sir.
```

Veritext Legal Solutions
800-336-4000

1       Q.    And are you prepared to testify as the

2   corporate rep for the Debtors with respect to these

3   topics, sir?

4       A.    To the best of my ability, yes, sir.

5       Q.    Okay.  What did you do to prepare to give

6   testimony on behalf of the Debtors on these topics, sir?

7       A.    I reviewed them over the weekend.

8       Q.    You reviewed the topics themselves that are

9   here in Exhibit 1?

10      A.    Yes.

11      Q.    Did you do anything else?

12      A.    I reviewed them to see what they were relating

13  to.  Some of them -- some of the questions were

14  confusing.  But, yes, I reviewed them.

15      Q.    Okay.  And I appreciate that.  My question is:

16  Did you do anything else to prepare to testify as the

17  Debtor's representative today besides review these

18  topics in Exhibit 1?

19      A.    Well, no.  I mean, each topic, I -- I tried to

20  go into what the -- what the topic related to, yes, sir.

21      Q.    Okay.  Did you review any documents to prepare

22  to testify today other than this Exhibit 1?

23      A.    You would have to ask me each document if I

24  reviewed it.  But --

25      Q.    Sir --

Page 16

1          A.    -- I did look --

2          Q.    -- did you --

3          A.    I did look --

4          Q.    -- review any documents --

5          A.    -- at some -- I think I looked at the Harris

6     SWD agreement and --

7          Q.    Okay.

8          A.    -- some of that, yes, sir.  And then I looked

9     at some of the --

10         Q.    Anything else?

11         A.    I looked at some of the agreements on the

12    20 percent, those agreements.

13         Q.    Any -- anything else?

14         A.    I looked at some of the loan documents.

15         Q.    Okay.  Anything else?

16         A.    I -- just in general, I -- I think that was

17    really most of them.  I -- I think I did look at the

18    resignation of Mr. Moore.  I did look at some of the

19    closing documents on the pipeline.  And I did look at

20    the Longbranch agreement.

21         Q.    Okay.  Anything else?

22         A.    I -- I can't remember anything else.

23         Q.    Okay.  I am going to direct you to some of the

24    highlighted topics on this page 5.

25                Can you see these, sir?

                                              Page 17

1          A.   I'm sorry?

2          Q.   All right.  Mr. Wright, we're done with that

3     exhibit.

4          A.   Okay.

5          Q.   Mr. Wright, what do you believe is a fair

6     outcome of this lawsuit, sir?

7               MR. MULLER:  Objection; form.

8          A.   The word fair to me is exactly how the

9     agreement was written, which I have never swayed from

10    one bit.  20 percent of the net profits to go to Darin

11    and Daniel and the balance to --

12         Q.   (BY MR. CLEVELAND)  And so --

13         A.   -- KrisJenn Ranch.

14         Q.   And so according to you, how would that play

15    out in where we are right now if the pipeline -- if the

16    right-of-way -- excuse me -- is option to -- I'm sorry.

17    Let me ask a new question.

18              How would what you just said play out if

19    the McLeods acquire the right-of-way that's the subject

20    of the option agreement?

21              MR. MULLER:  Objection; form.

22         A.   The 5.9 million would go back to the McLeods,

23    and the 100,000 would be split fairly between KrisJenn

24    Ranch, Darin Borders, and Daniel Moore.

25         Q.   (BY MR. CLEVELAND)  And you said the

Page 150

1    5.9 million would go back to the McLeods.  Did you

2    mean --

3         A.   Yes, sir.  Yes, sir.

4         Q.   Well, the McLeods wouldn't get the money back.

5    They would get the right-of-way if they exercised their

6    option, right?

7         A.   That -- that is correct.

8         Q.   So when you say the 5.9 million went back to

9    somebody, were you referring to KrisJenn Ranch?

10        A.   Kris- -- the 5.9 million would release the

11   KrisJenn Ranch, and they would then own the pipeline and

12   my minerals would be released.

13        Q.   Meaning the McLeods would own the -- the

14   right-of-way and the pipeline and you would keep your

15   minerals?

16        A.   And the ranch.

17        Q.   Okay.  And the distribution of the 100,000

18   would be what?

19        A.   That would be the net profits.

20        Q.   And so under that, how much would Mr. Borders'

21   and Mr. Moore's entity receive?

22        A.   20,000 apiece.

23        Q.   Okay.  And that's based on the net profit

24   interest agreements?

25        A.   Yes, sir.

Page 151

1          Q.    When did you disclose the Black Duck

2     transaction with TCRG to Daniel Moore?

3          A.    I don't remember.

4          Q.    When did you disclose the Black Duck

5     transaction with TCRG to Darin Borders?

6          A.    I don't remember.

7          Q.    Okay.  When did you disclose to TCRG the net

8     profits agreements held by Longbranch Energy and DMA

9     Properties?

10         A.    I don't remember.

11         Q.    Okay.  Did you disclose to TCRG, prior to the

12    sale of the right-of-way by Black Duck, the 20 percent

13    net profits interest of Longbranch and DMA respectively?

14         A.    I don't remember.

15         Q.    Okay.

16         A.    I never had any conversation with --

17         Q.    Did you go back with --

18         A.    -- TCRG.

19         Q.    Did you -- did go back and --

20         A.    Never --

21         Q.    -- review the net profit agreement of

22    Longbranch and DMA prior to closing with TCRG to see if

23    those agreements would have any impact on TCRG?

24         A.    They had no impact.

25         Q.    But that's not my question.  Did you go back

Page 196

```
 1          Q.   Can you see this --
 2               THE WITNESS:  Do we have --
 3          Q.   (BY MR. CLEVELAND)  -- screen and the document
 4    I have up here, sir?
 5          A.   I can see that, yes.
 6          Q.   Okay.  The Longbranch assignment is
 7    Exhibit 12.  Do you have the Longbranch assignment in
 8    front of you?
 9          A.   I have Exhibit 8, Longbranch assignment.
10          Q.   Okay.
11          A.   See right here?
12          Q.   What was the purpose of the Longbranch
13    assign- -- of the Longbranch Energy/Black Duck
14    Properties agreement that's in front of you, sir?
15          A.   What was the purpose?
16          Q.   Yes, sir.
17          A.   You're asking me what the purpose is.  Is that
18    a joke?
19          Q.   No, it's not.  What was the purpose of it?
20          A.   Well, the purpose of it is that it's a
21    document that spells out the -- what Darin Borders
22    agreed to do with Black Duck.
23          Q.   Okay.  And what did Black Duck get out of this
24    agreement, sir?
25          A.   We got the contract.
```

Page 212

1      A.    -- to be said in that document.

2      Q.    Okay.  Thank you.

3            So do you see that that assignee, this

4   term, is referring to Black Duck in this agreement?  Do

5   you see that, sir?

6      A.    I see that, yes.  Yes, that is correct.

7      Q.    Okay.  And now let's look at paragraph 1 in

8   Consideration.  Are you there with me, sir?

9      A.    Paragraph 1.  Okay.  I see it.

10     Q.    It says, "Assignor" -- and that's Longbranch

11  Energy, right?

12     A.    That is correct.

13     Q.    "Shall be paid 20 percent (Net Profits Share)

14  of the Net Profits from Assignee or its successors or

15  assigns during the period of time beginning on the date

16  of first written above (the Period)."

17            Did I read that correctly?

18     A.    You read it correctly.

19     Q.    What does "or its successors and assigns" mean

20  in that paragraph?

21            MR. MULLER:  Objection; form.

22     A.    The document speaks for itself.

23     Q.    (BY MR. CLEVELAND)  Well, I'm asking you:

24  What does "or its successors or assigns" mean in

25  paragraph 1?

Page  214

1        A.   It means what it says.  It speaks for itself.

2    The document speaks for itself.

3        Q.   So this agreement is binding on --

4        A.   It would be -- I don't know who it's binding

5    on.

6        Q.   Is it --

7        A.   It speaks for itself.

8        Q.   Is this agreement binding --

9        A.   We can --

10       Q.   -- on the suc- -- is this agreement binding on

11   the successors and assigns of Black Duck?

12       A.   We don't know because it -- it -- we're

13   waiting on the courts to rule on that.  It means what it

14   says.

15       Q.   Okay.  What did you intend when you agreed to

16   this phrase, "or its successors or assigns"?

17       A.   I relied on the attorney that represented

18   Black Duck at that time, Mr. Pigg.

19       Q.   What did you intend when you agreed to this

20   agreement that says, "or its successors and assigns," in

21   paragraph 1?

22       A.   I agree to what the document says.

23       Q.   Can you tell me anything else about what Black

24   Duck's intent was by including "or its successors or

25   assigns" in paragraph 1?

Page  215

1        A.   We stand by what the document says.

2        Q.   Can you tell me anything about what Black Duck

3   intended other than we stand by the document?

4        A.   That's all I can think of at this moment.

5        Q.   Okay.  Do you agree that successors and

6   assigns is pleural; it's not singular?

7        A.   I don't know.  I'd have to -- my attorney

8   would have to advise me on that.

9        Q.   Okay.

10       A.   I guess --

11       Q.   But your -- but your testimony -- but your

12  testimony is that the net profits under this -- I'm

13  sorry.  Is your testimony that Longbranch only got a

14  20 percent share of the net profits of Black Duck by

15  this agreement?

16       A.   My -- my --

17            MR. MULLER:  Objection; form.

18       A.   My -- my testimony is that this document means

19  what it means, the plain language.

20       Q.   (BY MR. CLEVELAND)  Did you intend to grant

21  Longbranch Energy a 20 percent net profit share in

22  anything other than Black Duck the company?

23       A.   It would be hard to grant him anything until

24  we closed on something.  So this -- this was, I guess,

25  looking into the future on what might happen.  And we're

                                        Page 216

1   my language.

2       Q.   Well, Mr. Wright, if you're -- I hear you that

3   you said that the intent of this was for it to be a

4   flip.  If that's the case, why is this agreement binding

5   on the successors and assigns of Black Duck?

6           MR. MULLER:  Objection; form.

7       A.   This -- this agreement had to be approved by

8   the seller.  The seller would not accept this until

9   Darin Borders signed off on it.  And we have the

10  documents were Derick said he was -- as a team, was

11  going to move forward to sell this.  So you could also

12  ask Darin Borders that question too.  We have the

13  e-mails --

14      Q.   (BY MR. CLEVELAND)  Well --

15      A.   -- where he -- he went to them on this

16  document and said, "Do y'all approve it?"  And the

17  seller approved it too.

18      Q.   Okay.  But if it was only intended, according

19  to you, to be a flip, why is it binding on the

20  successors and the assigns of Black Duck?

21          MR. MULLER:  Objection; form.

22      A.   The document speaks for itself.

23          MR. CLEVELAND:  Objection; nonresponsive.

24      Q.   (BY MR. CLEVELAND)  If this was intended to be

25  a flip, why is it binding on the successors and assigns

Page  224

1  of Black Duck?

2      MR. MULLER:  Objection; form.

3    A.  It's -- the document speaks for itself.

4    Q.  (BY MR. CLEVELAND)  So as the corporate

5  representative here to testify today, you can't answer

6  that question for me other than to say, "The document

7  speaks for itself"?

8      MR. MULLER:  Objection; form.

9    A.  It speaks for itself.

10    Q.  (BY MR. CLEVELAND)  Do you agree with me that

11  what you're describing a flip and something that binds

12  the successors and assigns of Black Duck are two

13  inconsistent things?

14    A.  The document speaks for itself.  Nowhere in

15  here do I see that document talks about a flip.  Talk to

16  your client about --

17    Q.  Okay.

18    A.  -- the flip.  He played both --

19    Q.  Okay.

20    A.  -- sides of the game; your client did.

21    Q.  Okay.

22    A.  Ask him how he was going to flip Darin

23  Borders.

24    Q.  Okay.

25      MR. CLEVELAND:  I'll object as

Page 225

```
 1              Q.   Okay.

 2                        (Exhibit 18 marked.)

 3                   MR. CLEVELAND:  John, I'm going to be

 4       referring to what is Exhibit 20 in the summary judgment

 5       exhibit.  And it's Exhibit 18 for this deposition.  And

 6       that's the DMA agreement, okay?

 7                   MR. MULLER:  Okay.  Which one is it

 8       again?  What number?

 9                   MR. CLEVELAND:  It's Exhibit 20 in the

10       summary judgment exhibits, but it's going to be

11       Exhibit 18 for this deposition.

12                   MR. MULLER:  Hey, I'm sorry.  I moved the

13       exhibits to the other room.  Can I put you on hold for

14       just one minute?

15                   MR. CLEVELAND:  Yes.

16                   MR. MULLER:  Okay.  Good to go.  20, you

17       say?

18                   MR. CLEVELAND:  Yeah, 20 in that binder.

19       And this is Exhibit 18 for the deposition.  And this is

20       the DMA Properties agreement with Black Duck Properties.

21              Q.   (BY MR. CLEVELAND)  Do you have that in front

22       of you, Mr. Wright?

23              A.   Yes, I do.

24              Q.   Okay.  And this is the agreement where DMA

25       Properties received the 20 percent net profit interest,
```

Page 240

1     correct?

2          A.    Yes.

3          Q.    And the date of this agreement is

4     February 7th, 2018, as I've highlighted here, correct?

5          A.    Yes.

6          Q.    And why did Black Duck Properties and you, on

7     its behalf, agree to this document with DMA Properties?

8          A.    Because he said that I had approved -- that

9     was the document we approved with Darin Borders and if I

10    would honor the same agreement.  And the agreement still

11    stands by its fact even though he -- he did do an e-mail

12    trying to explain the difference.  But he -- he used

13    presumptions, which are bad for everything.

14         Q.    Okay.  And --

15         A.    He used --

16         Q.    -- Longbranch --

17         A.    Yeah, he used a presumption on the

18    nine-and-a-half million.  I never came up with that or

19    agreed to that --

20         Q.    Okay.

21         A.    -- on any basis, yeah.

22         Q.    Okay.  And, Mr. Wright, did you -- similar to

23    the Longbranch assignment, did you read this document,

24    the agreement, before you signed it on behalf of Black

25    Duck?

Page 241

1    A.    We put it to my attorney, and he looked at it

2    and said it's close to the same agreement, that he's

3    asking for the same thing.

4    Q.    But my question is:  Did you read this before

5    you signed it?

6    A.    I read everything before I sign it, Tim.

7    Q.    So did you read this agreement before you

8    signed it?

9    A.    I read every agreement before I sign it, Tim.

10   Q.    Well, so the answer to my question is yes

11   then; is that right?

12   A.    I read every agreement before I sign it.

13   MR. MULLER:  So the answer to the

14   question is yes?

15   Q.    (BY MR. CLEVELAND)  Including this one?

16   A.    Oh, well -- yes.

17   Q.    Okay.  Thank you.

18   Now, paragraph 1 is Consideration.  Why

19   did you agree to bind Black Duck or its successors and

20   assigns, sir, in paragraph 1?

21   A.    Because it's the same as in the Longbranch

22   agreement.

23   Q.    Any other reason?

24   A.    It's identical.

25   Q.    Is there any other reason?

Page 242

1      A.    It's identical to the Longbranch agreement.

2      Q.    Okay.  Is there any other reason?

3      A.    It's identical to the Longbranch agreement.

4  That's the only reason.

5                MR. CLEVELAND:  Object --

6      Q.    (BY MR. CLEVELAND)  That's the only reason.

7  Okay.

8                Now, did you -- is your testimony that

9  like the Longbranch assignment, that your intent for the

10  DMA agreement was to be a flip?

11      A.    That was done after we closed it.  And the

12  Longbranch agreement was an assignment that listed the

13  net profits.  That -- so the net profits would be --

14  whether it be a flip or whatever it is, it would be the

15  gross -- the gross minus the cost equaled the net.

16      Q.    Okay.  And the gross revenues from what?

17      A.    A sale.

18      Q.    A sale of what?

19      A.    The Express Pipeline and the ROW.

20      Q.    And so did this agreement grant the net

21  profits interest in any gross revenues other than those

22  from a sale of the pipeline or the ROW?

23      A.    This is only in a sale for the Express

24  Pipeline or the P-21.  Nowhere on it does it --

25      Q.    Okay.

Page 243

```
 1            A.   -- describe ROW.
 2            Q.   Okay.  But this net profits interest in the
 3    DMA agreement only relates to a sale of the P-21 or
 4    Express Pipeline.  Is that what you're saying?
 5            A.   Yes, sir.
 6            Q.   Okay.  And what's that based on?
 7            A.   It's what it says.
 8            Q.   Okay.  Okay.  And you see paragraph 1(b) here
 9    that I just highlighted?
10            A.   Correct.
11            Q.   That's the -- that's the same paragraph 1(b)
12    as from the Longbranch assignment, right?
13            A.   Correct.
14            Q.   Why did you include the phrase "shall attach
15    and run with" in this paragraph 1(b) of the DMA
16    agreement and the Longbranch assignment?
17                      MR. MULLER:  Objection; form.
18            A.   Daniel Moore created this agreement, and we
19    looked at it and signed it.
20            Q.   (BY MR. CLEVELAND)  Okay.  But my question is:
21    Why did you include "shall attach and run with" --
22    "shall attach and run with" in paragraph 1(b)?
23            A.   Because it read the same as the Longbranch
24    agreement.
25            Q.   Okay.  Why did you agree on behalf of Black
```

Page 244

1    Duck to paragraph 1(b) which includes the "shall attach

2    and run with" language?

3        A.   Because -- because Daniel Moore in his

4    e-mails -- I asked him why it reads exactly, and he says

5    because that's something we approve, Black Duck.  And I

6    said, "Okay.  That's fine."

7        Q.   Okay.  Something that attaches and runs with

8    would be inconsistent with simply a net profit on a

9    sale; would you agree?

10                   MR. MULLER:  Objection; form.

11       A.   The net profits is describing the pipeline

12   that attaches and runs with it.  That's the way I

13   interpret that to mean.

14       Q.   (BY MR. CLEVELAND)  Okay.  You -- you don't

15   interpret that to mean the obligation to pay the net

16   profit shares shall attach and run?

17       A.   It stands for -- it stands exactly for -- by

18   what it reads.

19       Q.   Which is that Black Duck Properties, LLC's

20   obligation to pay the net profit share shall attach and

21   run with, right?

22       A.   What it says is what it means.

23       Q.   Okay.  And, in fact, you agree that Black Duck

24   would, as it says at the end of 1(b), bind its

25   successors and assigns to the payment of the net profits

Page  245

1    shared, didn't you?

2         A.   It means exactly what it says.

3         Q.   And what does that mean that -- that binds its

4    successors and assigns to the payment of the net profit

5    share of 1(b)?  What does that mean?

6         A.   It means --

7                   MR. MULLER:  Objection; form.

8         A.   It means the words speak for themselves.

9         Q.   (BY MR. CLEVELAND)  Any -- does it mean

10   anything else?

11        A.   They mean what they say in the agreement.

12        Q.   Is there anything else you can help -- you can

13   add to help me understand what that means from your

14   perspective?

15        A.   They mean what they say in the agreement.  The

16   words speak for themselves.

17        Q.   Okay.  Anything else you want to add to

18   elaborate on that?  If the answer is you have nothing

19   else to elaborate on, we can move on.

20        A.   I have nothing else to elaborate on it.  We're

21   still in discovery on that.

22        Q.   Okay.  Thank you.  Let's look at --

23        A.   We don't know what Mr. Black meant -- I mean,

24   Mr. Pigg meant by that.  It would be interesting to see.

25        Q.   (BY MR. CLEVELAND)  Okay.  Well, he didn't

                                        Page 246