# EXHIBIT A:
# (Opinion and Final Judgment)



Signed March 24, 2021.

**Ronald B. King**
**Chief United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KRISJENN RANCH, LLC, | § | CASE NO. 20-50805-RBK |
| | § | |
| DEBTOR | § | CHAPTER 11 |
| | § | |
| | § | |
| KRISJENN RANCH, LLC, KRISJENN RANCH, | § | |
| LLC-SERIES UVALDE RANCH, AND | § | |
| KRISJENN RANCH, LLC-SERIES PIPELINE | § | |
| ROW, AS SUCCESSORS IN INTEREST TO | § | |
| BLACK DUCK PROPERTIES, LLC, | § | |
| PLAINTIFFS, | § | |
| VS. | § | ADVERSARY NO. 20-05027-RBK |
| | § | |
| DMA PROPERTIES, INC. AND | § | |
| LONGBRANCH ENERGY, LP, | § | |
| DEFENDANTS. | § | |

## OPINION

The subject of this adversary proceeding is a pipeline right-of-way in east Texas owned by

KrisJenn Ranch, LLC-Series Pipeline ROW (together, with KrisJenn Ranch, LLC and KrisJenn

Ranch, LLC-Series Uvalde Ranch, "KrisJenn"). The KrisJenn entities are owned by Larry Wright,

a south Texas rancher, investor, and professional poker player. The pipeline right-of-way (the "ROW") is a 65-mile easement over a strip of land through four counties that could feasibly accommodate three to four pipelines carrying gas or water. The parties valued the ROW between $9.5 million and $10.4 million. The KrisJenn entities filed chapter 11 cases and initiated this adversary proceeding seeking a declaration that the promises to pay a net-profits interest to DMA Properties, Inc. and Longbranch Energy, LP ("DMA" and "Longbranch") do not attach and run with the ROW. DMA and Longbranch seek an opposite declaration and assert claims for various torts against KrisJenn and Wright. DMA's principal, Frank Daniel Moore, intervened and asserted similar counterclaims and cross actions. For a full understanding of the transactions that are the basis for this adversary, a chronology of the facts is helpful.

### BACKGROUND

The story began in 2015, when Wright connected with Moore, an investor from South Carolina, looking for opportunities to invest in oil and gas properties in Texas. Together they agreed that if Moore was willing to find and procure investment opportunities to buy and sell saltwater disposal wells for a profit, then Wright would provide the funding. Together with another investor, Darin Borders, the trio engaged in the business of "flipping" saltwater disposal wells.

After successfully flipping two wells in simultaneous purchase and sale closings and with one more under contract, Wright decided to formalize his business relationship with Moore. In 2015, Black Duck Properties, LLC was formed. The Black Duck Company Agreement (the "Company Agreement") was drafted by Wright's lawyers and was executed on December 28, 2015. Black Duck was owned 50% by Wright through KrisJenn and 50% by Moore through his entity, SCMED Oilfield Consulting, LLC ("SCMED"), as members. Wright and Moore also served as managers of Black Duck with Wright's son-in-law, Hagan Cohle. SCMED is not a party

2

to this adversary proceeding, but has assigned all interests, claims, and causes of action related to the ROW to Moore.

### A. *Longbranch Purchase Agreement*

In February 2016, separate from their investment efforts through Black Duck, Darin Borders and Moore became aware of an opportunity to purchase the ROW in east Texas from its then-owner, Express Pipeline Connection, LLC ("Express Pipeline"). On February 19, 2016, Moore and Borders entered into a purchase agreement with Express Pipeline through Longbranch Energy, LP, Borders's entity. The "Longbranch Purchase Agreement" gave Longbranch a contractual right to purchase the ROW from Express Pipeline for $5 million. Moore and Borders paid $25,000 in earnest money to Express Pipeline to secure the right to purchase the ROW. The Longbranch Purchase Agreement defined the ROW as:

> [O]wnership interest in certain pipe and related facilities (commonly known as the
> P-21 pipeline) shown on the plat attached hereto as Exhibit "A", and described on
> Exhibit "B" attached hereto, and the rights-of-way, easements, contracts, permits
> and leases described on Exhibit "C" attached hereto, (collectively herein referred
> to as the "Express Pipeline").

Moore and Borders began to look for a capital investor for the ROW; preferably an investor that could pay the earnest money, and perhaps the $5 million purchase price, to flip the ROW, or "hold" it for the time needed to find an entity willing to purchase or develop it. When Moore told Wright about the ROW, Wright wanted to be the capital investor. Believing that Wright had access to the cash needed to close on the ROW and hold it, Moore and Borders agreed to deal him in as the "money guy." Wright reimbursed Moore and Borders for the $25,000 earnest money and agreed to participate in the ROW purchase through Black Duck.

3

### B. *The Longbranch Assignment*

In June 2016, Longbranch assigned the Longbranch Purchase Agreement to Black Duck in a short, two-page contract (the "Longbranch Assignment"). As consideration, Black Duck agreed to pay Longbranch "twenty percent . . . of the Net Profits from [Black Duck] or its successors or assigns." "Net Profits" were defined as "gross revenues actually received by [Black Duck], or its successors or assigns directly from the operation, use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline." Black Duck's obligation to pay the net-profits interest was to "attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to the payment of the Net Profits Share." Borders recorded the Longbranch Assignment in Shelby County on October 2, 2017, but not in the other three counties in which it was located. Despite the "attach and run" language, the Longbranch Assignment did not include a legal description of the ROW. It did, however, reference the Longbranch Purchase Agreement as "attached hereto as Exhibit 'A,'" but it was not attached. A full legal description of the ROW was attached as an exhibit to the Longbranch Purchase Agreement.

### C. *Bigfoot Promissory Note*

Separate from their efforts to buy and sell the ROW, Black Duck entered into an agreement to sell a saltwater disposal well (the "Harris SWD") that it owned in Panola County to Bigfoot Energy Services, LLC ("Bigfoot"). The purchase price was $500,000. Black Duck agreed to seller-finance Bigfoot's purchase. In March 2017, Bigfoot made a $50,000 down payment to Black Duck and gave Black Duck a $450,000 promissory note for the remainder of the purchase price (the "Bigfoot Note"), which was secured by the Harris SWD. The Bigfoot Note required quarterly payments to Black Duck in June, September, December, and March until repayment was complete.

4

### D. *Black Duck Purchase of the ROW*

The process to find a buyer or developer for the ROW was long and convoluted. The communications between Wright, Moore, and Borders reflected that the parties did not appear to be on the same page, and their efforts were ever changing and often contradicted one another. During parts of the summer and fall of 2016, Wright pushed to flip the ROW. At one point, the parties were seriously negotiating with a potential buyer, Solaris. Through spring 2017, believing that Wright had the capital to purchase the ROW and hold it, Moore and Borders engaged in a concerted effort to find and negotiate with developers for the ROW. Moore testified that his efforts were continuously stymied by developers' concerns that Black Duck did not yet own the ROW. In one discussion, Moore expressed concern over Wright overplaying his hand and exaggerating his financial position, worried that they were negotiating from a "false position of strength."

After Wright funded various additional earnest money payments to extend the closing date, Black Duck finally closed on the ROW on August 14, 2017. To fund the $5 million purchase price, Wright made a personal loan of $1.25 million to Black Duck to pay a nonrefundable partial payment to extend the contract. Wright also took a loan from Asilo Investments to KrisJenn for $4.1 million at a 17% interest rate. Wright put up his family ranch as collateral for this hard money loan. Wright then lent the $4.1 million to Black Duck from KrisJenn to complete the ROW purchase (the "Black Duck Loan"). The Black Duck Loan was executed and notarized much later on January 18, 2018, and Wright recorded the deed of trust in Nacogdoches County the next day.

Wright was on both sides of the Black Duck Loan. The Black Duck Loan was secured by the ROW pursuant to a deed of trust recorded on January 19, 2018. Because KrisJenn could foreclose on the ROW if Black Duck defaulted on the loan, Wright was essentially able to put Black Duck on the hook for the 17% interest rate that KrisJenn was paying on KrisJenn's loan

5

from Asilo Investments. Playing his cards this way, Wright could secure repayment on the hard money loan and protect his family ranch by foreclosing on the ROW.

Much later, Moore became aware of the Black Duck Loan. Even though the Company Agreement required loan transactions to be authorized by the managers, Moore testified that he was never informed of this "secret loan" and never authorized it as a then-manager of Black Duck.

### E.   *The DMA Agreement & Harris SWD Agreement*

Following the closing of the purchase of the ROW, Wright allegedly pressured Moore to relinquish his 50% interest in Black Duck through SCMED and resign from his position as manager. In an email exchange spanning February 3–4, 2018, Moore and Wright agreed on the terms of Moore's resignation (the "Email Agreement"). In exchange for withdrawing from the company, Moore (through his entity, DMA) would receive "[n]o less than 20% Carried Interest in the P-21 Express Pipeline . . . . [u]nder the exact same terms and conditions as the [Longbranch Assignment]." The Email Agreement also provided that DMA would receive "[n]o less than 50% carried interest and 50% entitlement on all terms and conditions and monies owed on the [Bigfoot Note] regarding the Harris SWD. Harris SWD is 100% FREE AND CLEAR OF ANY AND ALL DEBTS." Wright agreed to Moore's terms via email on February 4, 2018.

On February 7, 2018, DMA and Black Duck executed a formal agreement incorporating the terms of the Email Agreement (the "DMA Agreement"). The DMA Agreement expressly states that DMA shall be paid 20% of the net profits from Black Duck "or its successors or assigns" received from the "operation, use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline." This language is identical to the language in the Longbranch Assignment, but no legal description of the ROW was

attached. The DMA Agreement was recorded in the four counties spanning the ROW months later on December 4, 2018.

On the same day, Wright and Moore executed a second formal agreement (the "Harris SWD Agreement"). This document "address[es] the obligations regarding the Harris SWD" from "the binding 'Email Agreement' . . . dated Feb. 3, 2018." The Harris SWD Agreement provides that "DMA Properties, Inc. is entitled to receive 50% of all Gross Monies" paid on the Bigfoot Note to "Black Duck Properties, LLC including its successors and assigns." The agreement further states that Black Duck would continue to collect the note payments and mail DMA its portion "within three business days of the funds being available."

### F.  *The TCRG Sale*

Shortly after the DMA Agreement was executed, Wright entered into an agreement with John Terrill to sell the ROW to Terrill's entity, TCRG East Texas Pipeline 1, LLC ("TCRG") for $2.5 million, with a 16% profits interest retained. On February 9, 2018, a few days after the business divorce with Moore, Wright caused Black Duck to execute a letter of intent with TCRG. A purchase agreement was later executed by Black Duck and TCRG on March 22, 2018 (the "TCRG Purchase Agreement"). Under the terms of the TCRG Purchase Agreement, Black Duck retained a 16% carried interest in the gross profit of the ROW. TCRG made a $500,000 down payment on the purchase price and the deed transferring the ROW to TCRG was executed on April 3, 2018. TCRG had a wealthy investor backing it who intended to spend tens of millions of dollars to develop the ROW by constructing one or more pipelines.

On or about April 4, 2018, Borders learned of the TCRG sale during a meeting with Wright and Terrill. During the meeting, Borders informed Terrill of his 20% net-profits interest. Terrill was not aware of the interest. Borders informed Moore of these developments. Believing that

Wright intentionally concealed their net-profits interests from Terrill, Moore and Borders confronted Wright and shared copies of the Longbranch Assignment and DMA Agreement with TCRG. Wright testified that he did not disclose the net-profits interests to TCRG because, as he understood it, DMA and Longbranch were only entitled to 20% of the net-profits received by *Black Duck* through its 16% carried interest in the ROW. In turn, Wright was entitled to the remaining 60% of Black Duck's 16% carried interest. DMA and Longbranch vehemently disagreed, arguing that the Longbranch Assignment and DMA Agreement entitled each to a 20% net-profits interest in the *entire* ROW because the net-profits interests run with the land and are binding on the successors and assigns to the ROW, including TCRG. Borders and Moore both admitted at trial that the 20% net-profits interest that each reserved would probably diminish the chances of obtaining a sale; they had reserved it to give themselves negotiating leverage. Like Wright, they too may have overplayed their hands and negotiated from a false position of strength.

Wright asked Borders and Moore to stop interfering with the TCRG sale. On April 16, 2018, Wright emailed Moore and Borders threatening to "kill" their 20% if they continued to communicate with Terrill about their net-profits interests. Ultimately, TCRG funded the final $2 million of the purchase price. After the TCRG sale closed in April 2018, Black Duck was owned 100% by KrisJenn and TCRG owned the ROW. Despite a seemingly successful sale with a valuable retained income interest, the deal ultimately collapsed like a house of cards.

Because of Moore's and Borders's continued contact with TCRG regarding their net-profits interests, the entire sale fell apart. With threats of litigation, TCRG forced Wright to rescind the TCRG Purchase Agreement and repurchase the ROW. KrisJenn purchased the ROW back from TCRG in December 2019. To pay the $2.5 million repurchase price, KrisJenn obtained additional financing from an existing lender, the McLeod family (the "McLeod Option

8

Agreement"). The McLeod Option Agreement, effective December 19, 2019, pledged Wright's family ranch, mineral interests, and the ROW as collateral. It also conveyed to the McLeods the option to purchase the ROW for $6 million.

### G. *KrisJenn Foreclosed on the Bigfoot Note*

Black Duck was unable to pay its debt to KrisJenn under the Black Duck Loan, so KrisJenn "foreclosed" and became a successor-in-interest to Black Duck's assets. On October 12, 2018, KrisJenn's attorney, David Strolle, sent a letter to Bigfoot Energy as "formal notice" of an assignment and transfer of 100% of Black Duck's interest in the Bigfoot Note to KrisJenn in lieu of the foreclosure. At that point, Black Duck had already remitted 50% of the Bigfoot Note payments to DMA pursuant to the Harris SWD Agreement for the March and June 2018 quarterly payments, a total of $31,844.30. DMA never received its portion of the September 2018 payment or any payment made thereafter.

Moore protested that this was a "sham foreclosure" and KrisJenn was just looking to the Bigfoot Note in order to repay its own hard money loan from Asilo Investments. Moore asserted that the Bigfoot Note was not listed as collateral for the Black Duck Loan. The loan documents expressly stated that the "Note is secured by the following Deeds of Trust . . . [a] The Express Gas Pipeline and related facilities . . . ." Neither the Black Duck Loan nor the accompanying deed of trust referred to or mentioned the Bigfoot Note or the Harris SWD. Wright dissolved Black Duck in December 2018 and KrisJenn became its successor-in-interest. The Bigfoot Note was paid off on December 10, 2020 and the remaining payments are currently held in the registry of the court in Panola County, Texas.

9

### PROCEDURAL HISTORY

Three separate lawsuits were filed in Texas state courts in 2019 to interpret the terms of the Longbranch Assignment and DMA Agreement (the "Assignment Agreements"). Before these lawsuits were resolved, Wright caused KrisJenn to file chapter 11 and initiated this adversary proceeding. KrisJenn's *Second Amended Complaint* includes only two counts, one for declaratory judgment and a claim against DMA and Longbranch asserting tortious interference with the TCRG Purchase Agreement. KrisJenn seeks a declaration that: (1) the net-profits interests in the Assignment Agreements are personal covenants, and not real covenants that attach and run with the ROW, (2) KrisJenn is not a "successor or assign" of Black Duck, and (3) the Black Duck Loan was an authorized loan and not a capital contribution.

DMA and Longbranch answered and filed their own counterclaims and cross actions. They seek a judicial declaration that the net-profits interests in the Assignment Agreements attach and run with the ROW and are enforceable against the subsequent owners, TCRG and KrisJenn. Together with Moore's third-party claims, the counterclaims total over 30 counts seeking relief based on fraud, breach of contract, breach of fiduciary duty, tortious interference with contract, promissory estoppel, civil conspiracy, unjust enrichment, money had and received, conversion, and nondischargeability of debts against Wright, Black Duck, KrisJenn, and Terrill. All parties seek attorney's fees and costs.

DMA also asserts separate counterclaims related to the Bigfoot Note and Harris SWD Agreement. The Court granted partial summary judgment to DMA recognizing its ownership interest in 50% of the Bigfoot Note payments. Now, DMA seeks payment on its 50% portion of the funds currently held in the Panola County district court registry and exemplary damages against KrisJenn.

10

The Court held a six-day evidentiary trial on these issues. All parties consented to entry of a final order or judgment.

### JURISDICTION AND VENUE

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(k). The Court also has jurisdiction over these proceedings pursuant to 28 U.S.C. § 157(c). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### DISCUSSION

The Court has broad discretion to decide declaratory judgment actions. Declaratory claims are governed by 28 U.S.C. § 2201. The Declaratory Judgment Act provides that, in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 293–94 (5th Cir. 2019) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007)); *see also* 28 U.S.C. § 2201(a). The primary issue in this case is whether the net-profits interests in the Assignment Agreements constitute real covenants running with the land under Texas law. Resolution of this key issue goes a long way to resolving the parties' remaining claims and counterclaims.

### A. *Real Covenant Running with the Land*

In Texas, a covenant runs with the land and is enforceable if: (1) the obligation touches and concerns the land; (2) the obligation relates to a thing in existence or specifically binds the parties and their assigns; (3) the obligation is intended by the original parties to run with the land; (4) the successor to the burden has notice of the obligation; and (5) "[t]here must also be privity of estate

11

between the parties when the covenant was made." *In re Energytec, Inc.*, 739 F.3d 215, 221 (5th Cir. 2013) (quoting *Ehler v. B.T. Suppenas Ltd.*, 74 S.W.3d 515, 521 (Tex. App.—Amarillo 2002, pet. denied)); *see also* *Fort Worth 4th St. Partners, L.P. v. Chesapeake Energy Corp.*, 882 F.3d 574, 577 (5th Cir. 2018); *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987).[1] A covenant that "runs with the land" binds parties and their successors and assigns. *See Inwood*, 736 S.W.2d at 635. The party that seeks to enforce a restrictive covenant bears the burden of proof "to establish that the covenant was imposed." *Davis v. Skipper*, 83 S.W.2d 318, 321–22 (Tex. 1935).

There is no genuine dispute that the Assignment Agreements "relate to a thing in existence" and that that the agreements contain express language that purported to bind the parties and their assigns. The parties primarily focus their arguments on the intent element, the touch and concern element, and privity. Limited time was spent on whether the successor to the burden had notice. The Court finds that multiple elements are lacking, and the net-profits interests in the Assignment Agreements are personal covenants that do not attach and run with the land. The Court analyzes each element in turn.

### a. Intent that the Obligation Run with the Land

"When a contract's meaning is disputed, [the Court's] primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018). Courts determine intent by looking first to the "text of the instrument

---

[1] The concept of real covenants that bind remote successors in interest (i.e., runs with the land) is often associated with a famous English case. In *Spencer's Case*, the English court established an early test for real covenants: (1) the covenant must "touch and concern the thing demised;" (2) must relate to something in existence, alternatively, it must expressly bind the assigns of the parties; and (3) the covenanting parties must have a common interest in the burdened land (i.e., privity of estate). Michael P. Pearson, *Covenants Running with the Land*, 48 St. Mary's L.J. 727, 734 (2017) (citing *Spencer's Case* (1583), 77 Eng. Rep. 72, 72, 74).

itself to determine if there is language expressly stating that the covenant binds successors." *Fort Worth 4th St. Partners*, 882 F.3d at 578. A contract will not be ambiguous "merely because the parties disagree about its meaning." *URI, Inc.*, 543 S.W.3d at 763. Instead, ambiguity exists when contract language is "susceptible to more than one reasonable interpretation." *Id.* at 765. A term is unambiguous if it "is so worded that it can be given a definite or certain legal meaning." *Id.*

The parties had different understandings of the Assignment Agreements. They disagree whether the net-profits interests flow from revenue generated from the ROW itself, or from Black Duck's revenue received from the operation, use, or sale of the ROW. This is highlighted by the parties' dispute over the meaning of "its successors and assigns." The Assignment Agreements each clearly state that Black Duck's "obligation to pay the Net Profits Share shall attach and run with the [ROW] and [Black Duck] binds *its successors and assigns* to the payment of the Net Profits Share." (emphasis added).

KrisJenn argues that "its successors and assigns" was clearly meant to refer to the successors and assigns of Black Duck, not the ROW. DMA and Longbranch assert that "its" means the successors and assigns of the ROW, and that is the only reasonable interpretation of this language because phrases like "run with the land" and "binding upon . . . successors and assigns" are the classic words used to create a covenant that runs with the land. *See MPH Prod. Co. v. Smith*, 06-11-00085-CV, 2012 WL 1813467, at *5 (Tex. App.—Texarkana 2012, no pet.) (mem. op.).

Because the agreements include express language that the obligation shall attach and run with the ROW, "[g]enerally speaking, such an acknowledgement, without more, would establish the requisite intent." *In re Chesapeake Energy Corp.*, 622 B.R. 274, 282 (Bankr. S.D. Tex. 2020). But the analysis does not end there. In Texas, a covenant running with the land is not created

13

simply because contractual language purports to create one. ***MJR Oil & Gas 2001 LLC v. AriesOne, LP***, 558 S.W.3d 692, 701 (Tex. App.—Texarkana May 18, 2018, no pet.); ***Musgrave v. Brookhaven Lake Prop. Owners Ass'n***, 990 S.W.2d 386, 395 (Tex. App.—Texarkana 1999, pet. denied). Even if language purporting to run with the land is unambiguous, courts will consider a contract in its entirety to determine whether an obligation runs with the land. *In re Chesapeake*, 622 B.R. at 282 (citing Texas cases analyzing contracts in their entirety to determine the intent of the parties despite unambiguous language).

The words "its successors and assigns" are unambiguous and not subject to more than one reasonable construction. The Assignment Agreements use "successors and assigns" a total of three times. First, "Net Profits shall mean gross revenues actually received by [Black Duck], or *its successors or assigns* directly from the operation, use, maintenance or sale (including partial sales or conveyances) of the [ROW]." The second occurrence, the subject of the parties' dispute, states that "[Black Duck's] obligation to pay the Net Profits Share shall attach and run with the [ROW] and [Black Duck] binds *its successors and assigns*." Third, "The terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, *successors and assigns*." In each instance, the phrase is used to refer to the successors or assigns of the parties.

Analyzing the Assignment Agreements in their entirety, the Court finds that the phrase "its successors and assigns" qualifies Black Duck. It is difficult, however, to reconcile this interpretation with the express language that the obligation "shall attach and run" with the ROW. This "classic" language is the only evidence to indicate that the parties intended to create anything more than a personal covenant. The use of classic language that the net-profits obligation "shall attach and run" with the ROW is not enough to establish a covenant running with the land under

14

Texas law, and is merely an "attempt to portray the [Assignment Agreements] as a horse of a different color." *Id.* The Court finds that the requisite intent is lacking.

### b. Touch and Concern

A covenant touches and concerns land when the underlying obligations affect the "nature, quality or value of the thing demised, independently of collateral circumstances, or if it affect[s] the mode of enjoying it." ***In re El Paso Refinery, LP***, 302 F.3d 343, 356 (5th Cir. 2002) (quoting ***Westland Oil Dev. Corp. v. Gulf Oil Corp.***, 637 S.W.2d 903, 911 (Tex. 1982)). Some courts also apply a "burden on the promisor's land" test, which states that an obligation touches or concerns land if "the promisor's legal relations in respect to the land in question are lessened—his legal interest as owner rendered less valuable by the promise." *Westland Oil*, 637 S.W.2d at 911. To prove the touch and concern element, DMA and Longbranch must show that the obligation to pay the net-profits burdens the owner of the ROW's real property interests.

There is no dispute that the ROW itself is an interest in real property. The parties dispute whether a net-profits interest is an interest in real property, or a mere personal covenant that cannot attach and run with the land. DMA and Longbranch correctly point out that, in the context of oil and gas leases, Texas courts sometimes recognize net-profits interests as interests in real property. *See **In re Hous. Bluebonnet, L.L.C.***, No. 16-34850, 2020 WL 930111, at *11 (Bankr. S.D. Tex. Feb. 21, 2020) ("A net profits interest in oil and gas properties is a real property interest."). KrisJenn counters that the net-profits interests here are "inherently and obviously" personal covenants that do not touch and concern the land.

The Court finds that an interest in the net-profits of Black Duck is an interest in personal property. DMA and Longbranch conflate an interest in the net-profits of Black Duck with a net-profits interests in an oil and gas lease. As previously discussed, the terms of the Assignment

15

Agreements create net-profits interests in the cash flow or sales proceeds received by Black Duck from the ROW. Generally, promissory notes, net-profit agreements, and cash are personal property, not real property. ***San Antonio Area Found. v. Lang***, 35 S.W.3d 636, 640 (Tex. 2000).

The Texas Supreme Court in *San Antonio Area Foundation v. Lang* considered whether net-profit agreements associated with the development of a tract of land, along with promissory notes and cash, were included in a devise of real property. *Id.* at 638. The court defined personal property as "everything that is subject to ownership not falling under the definition of real estate," and determined that the disputed property was personal property. *Id.* at 640. Here, the Assignment Agreements do not convey an interest in the ROW *itself*. The Court finds that the net-profits interests are personal covenants.

Next, DMA and Longbranch point to the Fifth Circuit's analysis of the touch and concern element in ***In re Energytec, Inc.***, 739 F.3d 215 (5th Cir. 2013). *Energytec* involved the sale of a gas pipeline that included an obligation to pay a transportation fee that "ran with the land." Energytec's predecessor, Mescalaro, sold a gas pipeline pursuant to a letter agreement, assignment, and bill of sale. Pursuant to the letter agreement, the buyer promised to pay Newco Energy (Mescalaro's affiliate) a transportation fee based on the volume of gas transported through the pipeline. To secure payment of the fee, Newco was granted a security interest and lien on the entire pipeline. The buyer was also required to obtain Newco's consent before assigning its interest in the pipeline. Energytec purchased the pipeline from the original buyer and later filed bankruptcy.

In bankruptcy court, Energytec moved to sell the pipeline free and clear of liens. Newco objected, arguing that the transportation fee and right to consent to assignment ran with the land. The Fifth Circuit held that the transportation fee touched and concerned the land because the fee

16

was a clear restriction on the owner's use and enjoyment of the pipeline. Every time the owner wanted to transport gas through the pipeline, it was required to pay a transportation fee to Newco.

Recent bankruptcy cases have analyzed whether covenants in midstream gathering agreements in oil and gas transactions meet the touch and concern element under Texas law. The analyses of the touch and concern element in these cases are persuasive. The cases focus on the relationship between the covenant and the promisor's mineral interest. *In re Sabine Oil & Gas Corp.*, 567 B.R. 869, 877 (S.D.N.Y. 2017), *aff'd*, 734 F. App'x 64 (2d Cir. 2018) (distinguishing *Energytec* and holding that a gathering fee covenant based on "produced gas" did not touch and concern the land under Texas law because the fee did not reduce the landowner's ability to "make use of or alienate its real property interests"); *In re Chesapeake Energy Corp.*, 622 B.R. 274 (Bankr. S.D. Tex. 2020).

The Bankruptcy Court for the Southern District of Texas recently considered whether a natural gas purchase agreement between the debtor and a pipeline company could be rejected under bankruptcy law. *In re Chesapeake*, 622 B.R. 274 (Bankr. S.D. Tex. 2020). The court held that the agreement did not contain covenants running with the land under Texas law and could be rejected in bankruptcy. The gas purchase agreement required the debtor to sell all gas it produced from its leases to ETC Texas Pipeline Ltd.[2] The court concluded that this "dedication covenant" did not satisfy the touch and concern element because "produced gas" is personal property. ETC had "no right of access to or control over [the debtor's] use of its real property interests. [The debtor's] ability to use and enjoy its property rights is unaffected. Only after gas is produced and becomes personal property does an obligation regarding the disposition of that gas arise." *Id.* at 283. The

---

[2] *Id.* at 278. The covenant reads, "Seller dedicates for sale and delivery hereunder of all of the Gas owned or controlled by Seller . . . that is produced from the oil and gas leases described in Exhibit 'C.'" *Id.*

debtor "did not assign a specific interest in the oil and gas leases themselves," but only assigned an interest in the "produced gas" severed from the mineral estate. *Id.* Without more, the covenant did not touch and concern the land.

The test and analysis for the touch and concern element are the same in both *Energytec* and *Chesapeake Energy*, but each court reaches a different conclusion on the facts. In *Energytec*, the transportation fee affected the use of real property, i.e., the traveling of natural gas along the pipeline before it was severed from the mineral estate. In contrast, the dedication covenant in *Chesapeake Energy* to sell all "produced gas" only impacted Chesapeake *after* the gas was severed from the mineral estate and became personal property. Chesapeake's ability to use and enjoy the land was not impacted.

The Court finds that the net-profits interests here are analogous to the dedication covenant from *Chesapeake Energy*. Like "produced gas," Black Duck's net profits are personal property. Black Duck's profits from the ROW are an interest in the cash flow received by Black Duck, which "is not so closely linked to the land itself that it constitutes an interest in the land." **Wayne Harwell Props. v. Pan Am. Logistics Ctr., Inc.**, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997, writ denied). The net-profits interests in Black Duck do not reduce the ROW owner's ability to use, enjoy, or alienate its real property interests. The Court finds that the net-profits interests do not touch and concern the ROW.

### c. Privity of Estate

For a covenant to run with the land in Texas, "[t]here must also be privity of estate between the parties when the covenant was made." **In re Energytec, Inc.**, 739 F.3d 215, 221 (5th Cir. 2013) (quoting **Ehler v. B.T. Suppenas Ltd.**, 74 S.W.3d 515, 521 (Tex. App.—Amarillo 2002, pet. denied)). There are two traditional components to the privity requirement, vertical privity and

18

horizontal privity. Vertical privity requires a successor-in-interest relationship as to each owner of the burdened property. *Id.* at 222; *see also In re Chesapeake*, 622 B.R. at 283 ("An easy example of vertical privity is the transfer of a person's fee estate to another."). Here, Black Duck purchased the ROW and sold it to TCRG, which then sold it to KrisJenn. The Court finds that vertical privity exists between the successive owners of the ROW.

It is unclear whether horizontal privity is still required. Recent cases, including *Energytec* and *Chesapeake Energy*, have criticized the doctrine while still analyzing the element. Until the Texas Supreme Court weighs in, an analysis of this element is prudent. To establish horizontal privity, the covenant "must be contained in a grant of land or in a grant of some property interest in the land." **Wasson Interests, Ltd. v. Adams**, 405 S.W.3d 971, 973 (Tex. App.—Tyler 2013, no pet.) (citing *Wayne Harwell*, 945 S.W.2d at 218)). "Since privity of estate is a precondition for a covenant running with the land at law, whether the parties conveyed an interest in the land by their agreement will be dispositive . . . ." *Wayne Harwell*, 945 S.W.2d at 218.

Though horizontal privity is potentially inapplicable, the Court finds that it is missing here. The Assignment Agreements granted "no simultaneous interest" in real property between the original parties as grantor or grantee. *In re Chesapeake*, 622 B.R. at 284. Horizontal privity existed in *Energytec* because the transportation fee was granted to Newco in the same transaction as the sale of the pipeline by bill of sale. There is no corollary conveyance of real property in the Assignment Agreements.

### d. Notice of Successor to the Burden

A subsequent purchaser is bound only by those restrictive covenants attaching to property of which it has actual or constructive notice, and a purchaser for value without notice takes land free from restriction. **Jennings v. Bindseil**, 258 S.W.3d 190, 197–98 (Tex. App.—Austin 2008,

no pet.) (citing *Davis v. Huey*, 620 S.W.2d 561, 565–66 (Tex. 1981)). "[I]t is essential that the party seeking to enforce the restrictions on the use of land establish that the purchaser had notice of the limitations on his title." *Davis*, 620 S.W.2d at 567. To establish notice, the agreement containing a covenant running with the land should be recorded in the county where the real property is located, with a legal description of the affected property. TEX. PROP. CODE ANN. § 13.002 ("An instrument that is properly recorded in the proper county is . . . notice to all persons of the existence of the instrument.").

There is no question that KrisJenn, the current owner of the ROW, had actual notice of the net-profits interests. An issue arose at trial, however, over whether the recorded Assignment Agreements contained a sufficient legal description of the ROW. The sufficiency of land descriptions typically arises in the context of whether a contract to sell land satisfies the statute of frauds. *See AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008). Even though the Assignment Agreements are not contracts to convey real property, a brief discussion of this issue is helpful.

A conveyance of real property must contain a sufficient description of the property to be conveyed. *Id.* at 644–45. A land description is sufficient if "the writing furnishes within itself, or by reference to some other existing writing, the means or data by which the particular land . . . may be identified with reasonable certainty." *Id.* at 645 (citing *Broaddus v. Grout*, 258 S.W.2d 308, 309 (Tex. 1953)); *see also Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972). If the description of the land is insufficient, the requirements of the statute of frauds have not been met and the contract is void. *Reiland v. Patrick Thomas Props., Inc.*, 213 S.W.3d 431, 437 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983)). Extrinsic evidence may be used "not for the purpose of supplying the location or

20

description of land, but only for the purpose of identifying it with reasonable certainty from the data *in the memorandum*." *Id.* at 438 (quoting *Morrow*, 477 S.W.2d at 541) (emphasis in original).

Only the Longbranch Purchase Agreement includes a detailed legal description of the ROW. The Assignment Agreements do not include the same detailed legal description. Instead, they describe the property as "the pipe and related facilities commonly known as the P-21 or Express pipeline." The Longbranch Assignment refers generally to the Longbranch Purchase Agreement in the recitals. The DMA Agreement, however, does not reference the Longbranch Purchase Agreement. The Assignment Agreements would not satisfy the requirement of a sufficient legal description.

The Court finds that the Assignment Agreements do not contain valid enforceable covenants running with the land, and the obligation to pay net-profits interests are personal covenants of Black Duck and its successor or assigns. At its core, this adversary is an action for declaratory judgment. The Court's interpretation of the Assignment Agreements goes a long way to resolving the remaining claims and counterclaims in this case.

### B. *Additional Claims Related to the ROW*

DMA, Longbranch, and Moore assert a litany of additional third-party claims and counterclaims in tort relating to the transactions surrounding the ROW. First, DMA, Moore, and Longbranch assert claims for breach of contract and money had and received related to the Assignment Agreements. They claim that Wright, KrisJenn, and Black Duck breached the Assignment Agreements in multiple respects, including the failure to pay or recognize the 20% net-profits interests. Because the Assignment Agreements are personal covenants of Black Duck that do not contain real covenants running with the land, the Court will deny DMA's, Moore's, and Longbranch's claims for breach of contract and money had and received.

21

Moore also asserts a counterclaim for nondischargeability of debts against KrisJenn under 11. U.S.C. § 523(a). This counterclaim is not well founded because § 523 specifically applies to "individual debtor[s]." 11 U.S.C. § 523(a). The only debtors in these bankruptcy cases are the KrisJenn entities. This counterclaim will be denied.

Next, the Court finds that there is insufficient evidence in the record to prove DMA's, Longbranch's, and Moore's remaining third-party claims and counterclaims related to the ROW, including knowing participation in breach of fiduciary duty, tortious interference with contract, fraud, fraud in the alternative, civil conspiracy, unjust enrichment, conversion, and promissory estoppel. Evidence in the record and the testimony of the parties show that Wright, Moore, and Borders were engaged in a vigorous effort to make the ROW a success. They often misunderstood each other and engaged in puffery and other common tools of negotiation in business deals. Forceful negotiation, puffery, and exaggeration, however, do not amount to a tort. These claims will be denied. The Court next addresses KrisJenn's claim for tortious interference with contract and DMA's and Moore's claims for breach of fiduciary duty.

### a. KrisJenn's Claim for Tortious Interference with Contract

KrisJenn asserts a claim against DMA and Longbranch for tortious interference with the TCRG Purchase Agreement. To prevail on a claim for tortious interference with contract, KrisJenn must show (1) the existence of a contract subject to interference; (2) willful and intentional interference (3) interference that proximately caused damage and (4) actual damage or loss. ***Powell Indus., Inc. v. Allen***, 985 S.W.2d 455, 456 (Tex. 1998) (per curiam). KrisJenn asserts that the TCRG Purchase Agreement was a valid and enforceable contract, and that DMA and Longbranch committed acts of interference that were willful and intentional through their communications with John Terrill and TCRG.

22

DMA and Longbranch assert the affirmative defense of justification. DMA and Longbranch argue that they provided copies of the Assignment Agreements and contacted TCRG based on their good faith belief that they had a claim to a colorable legal right to 20% of all net profits of the ROW. The Court agrees, and KrisJenn's claim of tortious interference with contract will be denied.

Although KrisJenn did not assert a claim for breach of fiduciary duty, KrisJenn argued at trial that Moore and Borders engaged in an undisclosed partnership by which Moore stymied any attempt to sell the ROW to prospective purchasers unless they entered into additional service contracts with Moore and Borders. This alleged partnership, according to KrisJenn, would ensure that Moore and Borders could continue to profit from the ROW after a sale was complete, all while excluding Wright from future profits. KrisJenn argues that Moore, as a co-participant in Black Duck, owed a fiduciary duty to Wright that required Moore to disclose his partnership with Borders. Because these arguments relate only to a claim for breach of fiduciary duty and KrisJenn did not assert such a claim, the Court will not address these arguments.

### *b. DMA's and Moore's Claims for Breach of Fiduciary Duty*

To prevail on a claim for breach of fiduciary duty, the claimant must establish that "(1) a fiduciary relationship [existed] between the plaintiff and defendant; (2) the defendant [breached] his fiduciary duty to the plaintiff; and (3) the defendant's breach [resulted] in injury to the plaintiff or benefit to the defendant." *D'Onofrio v. Vacations Publ'ns, Inc.*, 888 F.3d 197, 215–16 (5th Cir. 2018) (quoting *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 581 (5th Cir. 2015)). A third party who knowingly participates in the breach of a fiduciary duty "becomes a joint tortfeasor with the fiduciary and is liable as such." *Id.* (quoting *Hunn*, 789 F.3d at 581).

23

Moore and DMA each assert a claim for breach of fiduciary duty against Wright for
numerous acts of self-dealing when Moore (through SCMED) and Wright (through KrisJenn) were
equal members of Black Duck. First, DMA argues that Wright breached fiduciary duties owed to
DMA as custodian and agent for payment by failing to convey to DMA its 20% of the net-profits
resulting from the sale to TCRG. Because the Assignment Agreements do not create real covenants
running with the land, DMA's claim for breach of fiduciary duty against Wright and Black Duck
will be denied.

Next, Moore argues that Wright, in his capacity as manager of Black Duck, owed fiduciary
duties to SCMED and Moore prior to Moore's resignation from Black Duck. Moore argues that
Wright breached those fiduciary duties by scheming to steal Moore's interest in the ROW through
numerous acts of self-dealing. The acts of self-dealing included: Wright's failure to disclose his
plan to sell the ROW to TCRG, Wright's false promises to Moore to convince Moore to resign
from Black Duck, and using KrisJenn to carry out a sham foreclosure on the Black Duck Loan.
Primarily, Moore argues that the Black Duck Loan, extended by KrisJenn to Black Duck to fund
the purchase of the ROW, was an unauthorized loan under the Company Agreement because it
was executed without Moore's consent. According to Moore, Wright's conduct was for his own
benefit and in violation of his fiduciary duties to Moore and SCMED.

The Texas Business Organizations Code does not define or specify whether manager or
member fiduciary duties exist in the context of limited liability companies. *See* TEX. BUS. ORGS.
CODE ANN. §§ 1.001–402.015. Moore asserts that Wright, as a manager of Black Duck, owed
fiduciary duties to Moore and SCMED, including duties of care, loyalty, disclosure, and a duty to
refrain from self-dealing. Texas courts recognize formal and informal fiduciary relationships. ***Crim
Truck & Tractor Co. v. Navistar Int'l Transp. Corp.***, 823 S.W.2d 591, 594 (Tex. 1992). In the

24

absence of a formal fiduciary duty, members and managers of an entity may owe informal fiduciary duties to one another. *See Bazan v. Muñoz*, 444 S.W.3d 110, 118 (Tex. App.—San Antonio 2014, no pet.). For example, Texas courts have held that "the nature of the relationships between shareholders in a limited liability company sometimes gives rise to an informal fiduciary relationship between them." *Id.* Wright does not dispute that he owed fiduciary duties to SCMED and Moore as co-participants in Black Duck, and the Court finds that at least an informal fiduciary relationship existed between Wright, SCMED, and Moore based on their past dealings and the personal relationship of trust and confidence between Wright and Moore.

Next, whether Wright breached his fiduciary duty depends on whether the Black Duck Loan was authorized under the terms of the Company Agreement. The Company Agreement explains the requirements for loan authorization. Section 4.05 of the Company Agreement states,

> If the Company does not have sufficient cash to pay its obligations,
> any Member(s) that may agree to do so *with the Managers' consent*
> may advance all or part of the needed funds to or on behalf of the
> Company. An advance described in this Section 4.05 constitutes a
> *loan* from the Member to the Company . . . and is not a Capital
> Contribution."

Pls.' Ex. 5 (emphasis added). Additionally, Section 6.10 requires transactions between the Company and an "Interested Person," including KrisJenn, to be authorized "in good faith by the affirmative vote of the disinterested Management, even though the Persons constituting the disinterested Management is less than a quorum." *Id.* "The contract or transaction must be specifically approved in good faith by the Management." *Id.* As a member of Black Duck, KrisJenn

25

had authority under the Company Agreement to make a loan to Black Duck, but only with Moore's

consent in his capacity as a manager.

Wright argues that Moore's consent was either not necessary to execute the Black Duck

Loan, or it was obtained through an email from Moore in which Moore gave Wright and Cohle

full authority to sign on his behalf.[3] Moore sent this email because he was not available in-person

to sign one specific agreement, which was an agreement to extend the ROW closing date.[4] At the

time, Moore was in the process of moving his family to North Carolina, so Cohle signed the closing

extension agreement on Moore's behalf. Aiming to use Moore's email consent "to remove Daniel

Moore as a required signer for any legal documents,"[5] Wright and Cohle signed a broadly-worded

Consent of Members and Managers of Black Duck in lieu of a meeting. This Consent, which was

not signed by Moore, authorized "two of the three managers of [Black Duck] . . . to execute certain

agreements and documents relating to the matter or matters described on Exhibit A . . . without the

joinder of FRANK D. (Daniel) MOORE."[6] Moore argues that he never intended his email consent,

which was limited in scope to the closing extension agreement, to allow the other managers,

Wright and Cohle, to approve the Black Duck Loan on his behalf. Moore also argues that he was

not given notice of this "fake board meeting" and was never asked to provide written authorization

of proxy to approve the Black Duck Loan.

Even though Moore was likely aware that the purchase of the ROW would be accomplished

through borrowed funds, rather than through Wright's own cash injected into Black Duck as a

---

[3] Pls.' Ex. 33 ("I Frank Daniel Moore, hereby grant Larry Wright and/or Hagan Cohle full authority to sign on my behalf for [Black Duck] regarding any and all documents that may require my signature to extend or close the transaction between [Black Duck] and Lancer Resources et al.").
[4] Pls.' Ex. 32.
[5] Pls.' Ex. 33.
[6] Pls.' Ex. 31. Exhibit A is blank.

capital contribution, the Company Agreement treats all advances from its members as loans. Loans

to Black Duck and conflict of interest transactions required the affirmative vote and consent of

Moore. Wright did not obtain Moore's consent or specific approval to approve the Black Duck

Loan, so the Black Duck Loan was not authorized under the terms of the Company Agreement.

The Court finds that Moore's email allowing his consent by proxy to approve a closing-date

extension does not establish Moore's specific approval of the Black Duck Loan.

Because the Black Duck Loan was not properly authorized, Wright breached his informal

fiduciary duty owed to Moore. Wright entered into an ultra vires and conflicted loan transaction

without Moore's required consent. While Moore is entitled to assert his legal rights, as he did here,

he must prove that he is entitled to an award of damages. Moore seeks actual damages of $2.28

million for these alleged breaches. The damages model assumes that the Assignment Agreements

contain covenants running with the land.[7] Because the Assignment Agreements do not contain

valid covenants running with the land, this model for damages is inapposite. Moore did not prove

any other calculation for damages resulting from Wright's breach of fiduciary duty. As such, the

Court finds that Moore is not entitled to an award of actual damages.

### C. *Claims Related to the Bigfoot Note*

The Court previously granted partial summary judgment to DMA establishing that DMA

has a property interest in 50% of the Bigfoot Note payments under terms of the Email Agreement

and Harris SWD Agreement. In the summary judgment order, the Court did not indicate how much

DMA was entitled to receive. DMA was paid a total of $31,844.30 for its half of the March and

---

[7] The *Proposed Findings of Fact and Conclusions of Law for Longbranch, DMA, and Moore* provides that $2.28 million in damages "are calculated as the value of Moore's 50% interest in the [ROW] held by Black Duck." Further, "Black Duck held an 80% interest in the [ROW] (after accounting for Longbranch's 20% net-profits interest), and the value of that interest is calculated from the market value of the [ROW] at the time of the breach ($10.4m) less the value of the capital contribution used to purchase the [ROW] ($4.7m)."

June 2018 quarterly payments. DMA claims that Wright or KrisJenn wrongfully hold $63,688.58 in proceeds that represent DMA's half of the payments for September 2018, December 2018, March 2019, and June 2019. Since September 2019, Bigfoot has paid a total of $222,910.16 into the Panola County court registry. DMA argues that it is entitled to at least $175,143.60 of the money in the court registry, which is the total of the payments that DMA would have received from the Bigfoot Note payments from September 2018 to present.

At trial, KrisJenn moved to reconsider the partial summary judgment order, arguing that KrisJenn properly foreclosed on the Bigfoot Note in partial satisfaction of the debt owned by Black Duck to KrisJenn. The Court is not persuaded by KrisJenn's argument because the Bigfoot Note was not collateral for the Black Duck Loan. The Court again declares that DMA has a carried interest in and a right to 50% of the payments made on the Bigfoot Note. The Court finds that Black Duck breached the Harris SWD Agreement by failing to pay DMA 50% of the Bigfoot Note payments. The Court finds that DMA is entitled to $175,143.60 plus attorney's fees from the funds held in the Panola County court registry in satisfaction of its portion of the Bigfoot Note payments. Declaratory judgment will be granted in favor of DMA and all other counterclaims related to the Bigfoot Note will be denied.

## CONCLUSION

The net-profits interests in the Assignment Agreements are personal covenants that fail to meet the requirements of a covenant running with the land under Texas law. For the foregoing reasons, KrisJenn is entitled to a declaratory judgment that the Assignment Agreements are personal covenants. Further, Wright breached his fiduciary duty related to the unauthorized Black Duck Loan, but no actual damages were proven.

The Court further declares that DMA is entitled to 50% of the payments on the Bigfoot Note and that Black Duck breached the Harris SWD Agreement when it failed to pay DMA its portion of the payments. DMA is awarded $175,143.60 from the funds held in the Panola County court registry and is entitled to reasonable attorney's fees related to this claim. DMA may seek attorney's fees post-judgment under Local Bankruptcy Rule 7054. All other relief not specifically granted herein is denied.

This Opinion shall constitute the findings of fact and conclusions of law of the Court pursuant to FED. R. BANKR. P. 7052. A separate judgment will be rendered.

### # #



**The relief described hereinbelow is SO ORDERED.**

**Signed March 24, 2021.**

_____
**Ronald B. King**
**Chief United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KRISJENN RANCH, LLC, | § | CASE NO. 20-50805-RBK |
| | § | |
| DEBTOR | § | CHAPTER 11 |
| | § | |
| | § | |
| KRISJENN RANCH, LLC, KRISJENN RANCH, | § | |
| LLC-SERIES UVALDE RANCH, AND | § | |
| KRISJENN RANCH, LLC-SERIES PIPELINE | § | |
| ROW, AS SUCCESSORS IN INTEREST TO | § | |
| BLACK DUCK PROPERTIES, LLC, | § | |
| PLAINTIFFS, | § | |
| VS. | § | ADVERSARY NO. 20-05027-RBK |
| | § | |
| DMA PROPERTIES, INC. AND | § | |
| LONGBRANCH ENERGY, LP, | § | |
| DEFENDANTS. | § | |

FINAL JUDGMENT

On the 11th day of January 2021, came on to be heard this adversary proceeding for trial on the

merits. Plaintiffs, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series Uvalde Ranch, and KrisJenn Ranch,

LLC-Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC (collectively,

"KrisJenn"), appeared by and through counsel of record and announced ready for trial. Defendants, DMA Properties, Inc. ("DMA") and Longbranch Energy, LP ("Longbranch"), appeared by and through counsel of record and announced ready for trial.  Third-party plaintiff, Frank Daniel Moore ("Moore"), and Third-party defendant, Larry Wright ("Wright"), appeared in person and by and through counsel of record and announced ready for trial.

The Court heard the testimony of witnesses, received documentary evidence, and heard arguments of counsel over the course of approximately six days. This Final Judgment is based on the record and all applicable legal and equitable principles.

For the reasons stated in the Opinion rendered contemporaneously herewith, pursuant to FED. R. BANKR. P. 7052, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1.   Declaratory judgment is rendered in favor of Plaintiffs that the net-profits interests in the Assignment Agreements owned by Longbranch Energy, LP and DMA Properties, Inc. are personal covenants.

2.   As to Moore's claim for breach of fiduciary duty against Wright regarding the unauthorized Black Duck Loan, the Court renders judgment that Moore take nothing because no actual damages were proven.

3.   Declaratory judgment is rendered in favor of DMA that, under the terms of the Email Agreement and Harris SWD Agreement, DMA has an ownership interest in 50% of the Bigfoot Note payments. Further, the Court will award DMA $175,143.60 from the funds held in the Panola County court registry, plus attorney's fees from the court registry if DMA requests attorney's fees in accordance with FED. R. BANKR. P. 7054 and Local Bankruptcy Rule 7054.

4.   All relief not granted herein is denied.

# # #