# Exhibit A:
# Adv. Dkt No. 28
# DMA's Motion for Partial Summary Judgment on the Interpretation of the DMA Agreement

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| *In re*: | § | |
| | § | Chapter 11 |
| KrisJenn Ranch, LLC, | § | |
| | § | |
| *Debtor* | § | Case No. 20-50805 |
| | § | |

---

| | | |
|---|---|---|
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC, | § | |
| | § | Adversary No. 20-05027 |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | |
| | § | |
| DMA Properties, Inc. and Longbranch Energy, LP, | § | |
| | § | |
| *Defendants*. | § | |

---

| | | |
|---|---|---|
| DMA Properties, Inc. and Frank Daniel Moore, | § | |
| | § | |
| *Cross-Plaintiffs/Third-Party Plaintiffs,* | § | |
| | § | |
| v. | § | Adversary No. 20-05027 |
| | § | |
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, Black Duck Properties, LLC, Larry Wright, and John Terrill, | § | |
| | § | |
| *Cross-Defendants/Third-Party Defendants.* | § | |

**DMA PROPERTIES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE INTERPRETATION OF DMA'S NET-PROFITS INTEREST AGREEMENT**

In 2018, DMA executed an agreement with Black Duck ("the DMA Agreement"). The plain, unambiguous language of that agreement shows that DMA received a 20% net-profits interest in a pipeline right-of-way and that DMA's interest constitutes a real property interest that "shall attach and run" with the land. Because the DMA Agreement is unambiguous, DMA now moves for partial summary judgment and asks the Court to construe the agreement as a matter of law.

**INTRODUCTION AND SUMMARY**

This dispute centers on the attempt of one man (Larry Wright) to steal a deal involving a pipeline right-of-way in East Texas. Wright was brought into the deal by Daniel Moore and Darin Borders—the two men who had found the right-of-way opportunity and secured the right to purchase it. Moore and Borders agreed to let Wright participate in the deal if he put up the money to buy the right-of-way.

As part of that deal, Borders (through his entity Longbranch) assigned the right to purchase the right-of-way to Black Duck, the company that Moore and Wright owned 50/50. In exchange, Borders received a written assignment of 20% of the net profits from the right-of-way. That written assignment makes clear that Longbranch's interest runs with the land and binds all successors and assigns.

After Black Duck closed on the right-of-way, Wright grew hostile towards Moore and pushed for his resignation from Black Duck. Eventually, Moore agreed give up his 50% interest in Black Duck in exchange for the same deal Borders had received—a 20% net-profits interest for his entity, DMA, that "shall attach and run" with the right-of-way and bind Black Duck's "successors and assigns." *See* Ex. 20 (DMA Agreement).

Since then, Wright has tried on two separate occasions to dispose of the right-of-way while disregarding DMA's net-profits interest—first through a sale to TCRG, and

now through a new deal with the McLeods. In trying to excuse his fraudulent conduct, Wright has argued that DMA's net-profits interest does not run with the land.

The plain language of the DMA Agreement says otherwise. The DMA Agreement states that DMA's net-profits interest "attaches and runs" with the right-of-way and is based on revenues received by Black Duck "or its successors or assigns" from the "operation, use, maintenance or sale" of the right-of-way. It is black letter law that when words used in a contract are only subject to one reasonable interpretation, then the contract is unambiguous and there cannot be a genuine factual dispute concerning the contract's meaning. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004) (applying Texas law).

Indeed, a state court has already rejected Wright's argument that the net-profits interest does not attach and run with the right-of-way, as the DMA Agreement plainly states that it does. Wright responded to the state court's ruling by filing this bankruptcy, where he asks this Court to adopt his meritless position about the DMA Agreement that has already been soundly rejected.

DMA now moves for partial summary judgment and asks the Court to construe the DMA Agreement as a matter of law.

## FACTUAL BACKGROUND

### A. Moore and Borders secure the option to purchase the right-of-way.

In the summer of 2015, Darin Borders told Daniel Moore about a potentially lucrative right-of-way in East Texas. Ex. 1 (Moore Decl.) ¶17.[1] Borders's entity (Longbranch) secured the right to purchase the right-of-way, and Moore and Borders paid $25,000 in earnest money to the pipeline's owner, Express Pipeline Connection, LLC.

[1] In support of this motion, DMA and Moore cite the declarations that Moore and Borders submitted in response to Wright's state motion for summary judgment (which was denied) and include all the exhibits cited therein for completeness. *See* Ex. 1 (Moore Decl.); Ex. 2 (Borders Decl.). For simplicity, DMA and Moore use the same exhibit numbers as the state declarations in this motion.

Ex. 1 (Moore Decl.) ¶20; Ex. 2 (Borders Decl.) ¶9. On February 19, 2016, Longbranch and Express memorialized Longbranch's right to purchase the right-of-way in writing. Ex. 1 (Moore Decl.) ¶20; Ex. 2 (Borders Decl.) ¶9; *see also* Ex. 7 (Purchase Agreement).

The Purchase Agreement defined the assets Longbranch sought to buy and Express sought to sell:

> Ownership interest in certain pipe and related facilities (commonly known as the P-21 pipeline) shown on the plat attached hereto as Exhibit "A". and described on Exhibit "B" attached hereto, and the rights-of-way, easements, contracts, permits and leases described in Exhibit "C" attached hereto (*collectively herein referred to as the "Express Pipeline"*).

Ex. 7 (Purchase Agreement) at 1 (emphasis added).

## B. Wright offers to fund the purchase of the right-of-way, and Longbranch assigns the Purchase Agreement to Black Duck in exchange for a 20% interest.

Borders and Moore agreed to include Wright on the deal, and Wright reimbursed Moore and Borders for the $25,000 the two men had already paid. Ex. 1 (Moore Decl.) ¶24; Ex. 2 (Borders Decl.) ¶12. Borders, on behalf of Longbranch, agreed to assign the Purchase Agreement to Moore and Wright's jointly owned entity, Black Duck Properties, LLC.[2] Ex. 1 (Moore Decl.) ¶24; Ex. 2 (Borders Decl.) ¶12. In exchange, Wright and Moore, on behalf of Black Duck, agreed that Longbranch would possess a 20% net-profits share that would attach and run with the right-of-way. Ex. 1 (Moore Decl.) ¶24; Ex. 2 (Borders Decl.) ¶12.

Longbranch and Black Duck confirmed their agreement in writing. Ex. 8 (Longbranch Assignment). Moore, Borders, and Wright all understood that Longbranch was conveying its option to purchase the right-of-way to Black Duck for a 20% net-profits share in the right-of-way that attached and ran with the land—and bound Black Duck's successors and assigns. Ex. 1 (Moore Decl.) ¶¶25-26; Ex. 2 (Borders Decl.) ¶¶13-14.

---

[2] Moore owned 50% of Black Duck through SCMED Oilfield Consulting, LLC and Wright owned 50% through KrisJenn Ranch, LLC. Ex. 6 (Black Duck Company Agreement); Ex. 3 (Dec. 2, 2015 Email Chain).

**C. Moore agrees to withdraw from Black Duck in exchange for a 20% net-profits interest in the right-of-way.**

Black Duck closed on the right-of-way on August 14, 2017. Ex. 1 (Moore Decl.) ¶35. Not long afterwards, Wright grew increasingly hostile toward Moore and began to pressure Moore to give up his 50% interest in Black Duck. Ex. 1 (Moore Decl.) ¶40. After several phone conversations, Moore relented to Wright's demands that he resign. *Id.*

On February 3, 2018, Moore drafted an email with the terms of his resignation from Black Duck that he and Wright had orally agreed to. *Id.* ¶41. In exchange for relinquishing his 50% interest in Black Duck—which included 50% interest in all of Black Duck's assets such as the right-of-way—Moore would receive, among other things, "[n]o less than 20% Carried Interest in the P-21 Express Pipeline . . . under the same terms and conditions as the [Longbranch Assignment]" through his entity DMA Properties, Inc. Ex. 18 (February 4, 2018 Email Chain). Moore requested the same terms and conditions as the Longbranch Assignment because he knew that those terms gave Borders a 20% net-profits share in the right-of-way, binding not only Black Duck but also its successors and assigns. Ex. 1 (Moore Decl.) ¶41. On February 4, 2018, Wright agreed to Moore's terms via email. Ex. 18 (Feb. 4, 2018 Email Chain).

Formal documents, dated February 7, 2018, memorialize the terms of Moore's email resignation. Ex. 1 (Moore Decl.) ¶42. One of those documents was the DMA Agreement. In relevant part, the DMA Agreement states:

> DMA Properties shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from Black Duck Properties, LLC or its successors or assigns . . .
>
> a. Net Profits shall mean gross revenues actually received by Black Duck Properties, LLC., or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

b. Black Duck Properties, LLC.'s obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and Black Duck Properties binds its successors and assigns to the payment of the Net Profits Share.

Ex. 20 (DMA Agreement). The DMA Agreement specifically states that Black Duck and DMA "agree to execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of this Agreement." *Id.*

The same date on the documents confirming Moore's resignation terms—February 7, 2018—Moore and Wright confirmed that Wright would owe Moore 20% and Borders 20% (through their entities) of any net profits from a cash payment that Black Duck received from a sale of the right-of-way. Ex. 19 (Feb. 7, 2018 Email Chain). In that email, Wright and Moore did not discuss how Longbranch's and DMA's interests would affect a carried interest held by Black Duck in the right-of-way, nor did they discuss the obligations that a buyer would have to Longbranch and DMA according to their net-profits interests. *Id.*

**D. Wright immediately sells the right-of-way.**

Two days after the documents memorializing Moore's resignation were drawn up, Wright executed plans to sell the right-of-way to John Terrill through an entity that Terrill planned to form (TCRG). Terrill's commitment to buy "the East Texas right-of-way (also known as the Express Gas Pipeline)" is dated February 9, 2018. Ex. 21 (Letter of Intent). According to the Letter of Intent, Terrill agreed to purchase Black Duck's right-of-way for $2.5 million, with Black Duck retaining a 16% carried interest in a future waterline. *Id.* As Terrill later declared under oath, he and Wright had been working on this deal since December 2017—well before Wright pushed Moore out of Black Duck. Ex. 22 (Terrill Aff.).

**E. Moore and Borders begin to uncover Wright's schemes.**

When Moore and Borders learned about the deal with TCRG and asked Wright what was going on, Wright said that Terrill knew all about Longbranch's and DMA's interests and even had copies of their agreements. Ex. 1 (Moore Decl.) ¶48; Ex. 2 (Borders Decl.) ¶31. But when Moore and Borders reached out to Terrill, Terrill told a different story: Wright had not disclosed the previously assigned interests, and Terrill did not intend to honor them. Ex. 1 (Moore Decl.) ¶49; Ex. 2 (Borders Decl.) ¶32.

If Moore had known or suspected that Wright had crafted a scheme to sell the right-of-way and claim Moore only had an interest in Black Duck's profits, Moore would not have agreed to resign from Black Duck. Ex. 1 (Moore Decl.) ¶53. Nor would Moore have given up his right to 50% of Black Duck's assets for 20% of its profits from the sale of the right-of-way. *Id.*

**F. Wright threatens to "kill the 20% each of you own."**

Despite what looked like a scheme, but Moore and Borders continued to seek an amicable solution with TCRG, Wright, and Wright's entities. Ex. 1 (Moore Decl.) ¶52; Ex. 2 (Borders) Decl. ¶35. Wright was not so inclined. In the spring of 2019, Wright emailed Moore and Borders that if Moore did not stop his conversations with TCRG, then Wright would "end the 20% and file [m]alicious charges against you and all your forfeited Companies in the State of Texas." Ex. 31 (Apr. 16, 2019 Email). Likewise, Wright threatened "to kill the 20% each of you own." *Id.*

**G. TCRG forces Wright to rescind the sale, so Wright arranges a new deal with the McLeods.**

TCRG forced Wright to rescind the sale of the right-of-way because of misrepresentations made by Wright. Ex. 32 (Compromise Settlement Agreement). Wright responded by borrowing $5.9 million from the McLeod family to pay back the $2.5 million he owed TCRG. *See* Ex. 33 (Option Agreement). As collateral for the loan, Wright pledged his ranch, some mineral interests, and the pipeline right-of-way, while also

conveying an option for the McLeods to step in as owner of the right-of-way. (The McLeods have not yet exercised their option.) The Option Agreement expressly incorporates the settlement agreement with TCRG and refers to the "Litigation"— which includes the lawsuit in which Wright sought to rewrite the DMA Agreement. *See id.* at 1. The McLeods had both (1) actual knowledge of the DMA Agreement and (2) constructive knowledge of the DMA Agreement, which was recorded in county land records before the loan was made. It is unclear what Wright did with the difference between the $5.9-million loan and the $2.5 million he returned to TCRG.

**H. DMA now moves for partial summary judgment and asks this Court to interpret the DMA Agreement as a matter of law.**

Under the plain language of the DMA Agreement, DMA's net-profits interest "attaches and runs" with the right-of-way and is based on revenues received by Black Duck "or its successors or assigns" from the "operation, use, maintenance or sale" of the right-of-way. In spite of that unambiguous language, Wright has now tried on two separate occasions to dispose of the right-of-way—first with TCRG and now with the McLeods—while disregarding DMA's net-profits interest. On both occasions, Wright argued that DMA's net-profits interest is merely a personal covenant that was erased through Wright's machinations.

But Wright's "interpretation" is flatly contradicted by the plain language of the DMA Agreement. Wright has already tried—and failed—to get a court to adopt his view of the agreement in the underlying state court litigation. When the state court rejected his reading, Wright responded by filing for bankruptcy and urging this Court to declare that the agreement does not mean what it says in plain language

DMA now moves for partial summary judgment and asks the Court to construe the DMA Agreement as a matter of law.

## ARGUMENT AND AUTHORITY

Summary judgment is appropriate when there is no genuine dispute of material fact concerning a claim. FED. R. CIV. P. 56(a) (made applicable to this proceeding by FED. R. BANKR. P. 7056); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When reviewing the evidence on a motion for summary judgment, the Court must view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). But only disputes over facts that might affect the outcome of the suit can preclude entry of summary judgment. *Anderson*, 477 U.S. at 248.

### I. The DMA Agreement unambiguously conveys a net-profits interest in the right-of-way that attaches and runs with the land.

Under Texas law,[3] courts must interpret unambiguous contracts as a matter of law. *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 490 (5th Cir. 2007) (applying Texas law). When words used in a contract are only subject to one reasonable interpretation, then the contract is unambiguous and there cannot be a genuine factual dispute concerning the contract's meaning. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004). Because the DMA Agreement unambiguously grants DMA a 20% net-profits interest (which attaches and runs with the right-of-way and is binding on Black Duck, its successors, and its assigns), summary judgment should be granted here.

#### A. The plain language of the DMA Agreement grants DMA a property interest in the Express Pipeline.

The goal of contract interpretation is "to ascertain the parties' true intent as expressed by the plain language they used." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017); *see also Gonzalez*, 394 F.3d 392. The DMA Agreement's plain language

[3] Texas law governs the interpretation of the DMA Agreement. The parties previously argued the DMA Agreement should be interpreted under Texas law in state court.

establishes that DMA has a right to "twenty percent (20%)" of the "Net Profits" of "Black Duck Properties, LLC., its successors or assigns" from the "use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline," a right that "attach[es] and run[s] with the P-21 or Express pipeline." Ex. 20 (DMA Agreement).

The terms "P-21" and "Express pipeline" mean the pipeline and the right-of-way that Longbranch had the option to purchase and that Black Duck ultimately purchased. [4] Indeed, Wright himself continues to use the term "Express Pipeline" to "collectively" refer to the pipeline and the right-of-way. Am. Compl. ¶1 (ECF No. 3).

Rather than include the full legal description of the pipeline and the associated right-of-way, the DMA Agreement refers to what is "commonly known" as "the P-21 or Express pipeline" and incorporates by reference the chain of documents through which the terms were defined and understood. *See In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) ("Documents incorporated into a contract by reference become part of that contract.").

Tracing that chain from the beginning, the original Purchase Agreement defines "P-21" and "Express pipeline" as follows: "certain pipe and related facilities (commonly known as the P-21 pipeline) . . . and the rights-of-way, easements, contracts, permits and leases . . . (collectively herein referred to as the 'Express Pipeline')." Ex. 7 (Purchase Agreement). The Longbranch Assignment specifically refers to the Purchase Agreement in its text and incorporates that definition. *See* Ex. 8 (Longbranch Assignment) (attaching Purchase Agreement as "Exhibit A"). Further, the February 4, 2018 Email Chain between Wright and Moore expressly requires "the same terms and conditions as the [Longbranch Assignment.]" Ex. 18 (February 4, 2018 Email Chain). Finally, the DMA

[4] For all intents and purposes, the Express pipeline is the right-of-way. The pipeline currently in the right-of-way is an old pipe in disrepair that does not run continuously through the right-of-way. Ex. 2 (Borders Decl.) ¶8.

Agreement expressly incorporates "the binding 'EMAIL AGREEMENT[.]'" Ex. 20 (DMA Agreement).

By its terms, the DMA Agreement therefore grants DMA a net-profits interest in both the pipeline and the associated right-of-way.

And phrase after phrase confirms that DMA's interest runs with the land:

- DMA's interest "shall attach and run with" both the pipeline and right-of-way.
- Black Duck "binds its successors and assigns" to recognize and honor DMA's interest.
- DMA has the right to receive a share of net profits "from *the operation, use, maintenance* or sale (including partial sales or conveyances)" of the pipeline and right-of-way.
- The obligation to pay net profits encompasses not only "gross revenues actually received" by Black Duck but also "gross revenues actually received by . . . its successors or assigns."
- The agreement states that its "terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, successors and assigns."

Ex. 20 (DMA Agreement).

The words of the DMA Agreement are only subject to one reasonable interpretation: DMA has a net-profits interest in the right-of-way that attaches and runs with the land.

**B. Wright's position is contradicted by the DMA Agreement's language.**

In spite of the plain language of the DMA Agreement, Wright and his entities assert that the real intent was to give DMA a net-profits interest only in Black Duck's profits from a buy-and-flip transaction. Am. Compl. ¶30 (ECF No. 3).

But that assertion ignores what the DMA Agreement actually says. The agreement says that DMA's net-profits interest applied not only to any "sale (including partial sales and conveyances)" but also to net profits "from the operation, use, [or]

maintenance" of pipeline facilities in the right-of-way. It also provides that DMA's interest "shall attach and run" with the right-of-way—and the obligation to honor that interest is "binding" on Black Duck's "successors and assigns." Ex. 20 (DMA Agreement). These words have a certain and definite legal meaning, and the Court must interpret them accordingly. *See Gonzalez*, 394 F.3d at 392 (summarizing Texas law on contract interpretation).

Wright has already tried to convince the state court to adopt his baseless interpretation of the DMA Agreement. The state court rejected it. And when confronted with the plain language of the DMA Agreement while testifying before this Court, Wright floundered. First, he confirmed under oath that "the original intent" was that the "[DMA] agreement does grow with the land." Ex. 34 (Excerpt of May 21, 2020 Hearing Tr.) at 68:6-8. Then, when Wright's attorney asked Wright to clarify what he meant by "runs with the land," Wright answered, "That's a very ambiguous statement, 'runs with the land,' and I'll just—I'll just leave it at that, because that's the whole reason we're in bankruptcy, your Honor." *Id.* at 70:5-7.

The phrase "runs with the land" is not ambiguous, though. To the contrary, it has a well-established legal meaning: A covenant that "runs with the land" binds the parties as well as their successors and assigns. *See*, *e.g.*, *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987) (stating that where a contact "evidences the intent of the original parties that the covenant run with the land" then the covenant "specifically binds the parties, their successors and assigns"); *Montfort v. Trek Res., Inc.*, 198 S.W.3d 344, 355 (Tex. App.—Eastland 2006, no pet.) ("Covenants that run with the land bind the heirs and assigns of the covenanting parties[.]"); *see also* Howard R. Williams, *Restrictions on the Use of Land: Covenants Running with the Land at Law*, 27 TEX. L. REV. 419, 423 (1949) (discussing the development of the doctrine of covenants "running with land" to bind both assignees of lessors and lessees in the Tudor period).

In state court, Wright tried to avoid this unambiguous language by pointing to parol evidence. Wright is now recycling those same arguments and again suggests that "post contract writings" show what the parties intended as opposed to what they actually wrote in the DMA Agreement. Am. Comp. ¶32 (ECF No. 3). But Wright and his entities "may not rely on extrinsic evidence to create an ambiguity or to give the contract a meaning different from that which its language imports," and "extrinsic evidence cannot be used to show that the parties probably meant, or could have meant, something other than what their agreement stated." *First Bank v. Brumitt*, 519 S.W.3d 95, 109–10 (Tex. 2017). Nor can the Court simply ignore the phrases "attach and "run" and "binding on successors." *Kern v. Sitel Corp.*, 517 F.3d 306, 309 (5th Cir. 2008) (reiterating that courts must "give effect to *all the provisions* of the contract so that none will be rendered meaningless" (emphasis in original)).

Besides, even if Wright and his entities could rely on parol evidence—and they cannot—the "post contract writings" do not actually contradict DMA's textual interpretation. For example, Wright points to a February 7, 2018 email exchange between Wright and Moore to suggest the parties intended the agreements to convey only an interest in Black Duck's profits. But that email chain does no such thing. Wright's email asked, "What would I owe you and Darin" if Black Duck "accepted say 9,500,000 all cash with no royalty." Ex. 19 (Feb. 7, 2018 Email Chain). Moore answered only the question that Wright asked, giving a dollar amount that would be owed to him under the hypothetical Wright posed. *Id.* Wright and Moore did not discuss in that email what would happen if Black Duck received a carried interest in the right-of-way. *Id.* Nor did they discuss what a successor or assignee would owe Moore's and Borders's entities. *Id.* That parol evidence shows that Wright and Moore discussed only what *Black Duck*—in contrast with Black Duck's successors—would owe Moore's and Borders's entities out of any cash it received for the right-of-way. That email exchange does not contradict the

plain language of the DMA Agreement, which makes clear that DMA's 20% net-profits interest attaches and runs with the land and is binding on successors and assigns.[5]

The plain language of the DMA Agreement shows that DMA's net-profits interest is much more than a one-time commission. Because there is only one reasonable way to interpret the disputed language in the DMA Agreement, the Court must construe that language as a matter of law, and summary judgment is appropriate. *See Gonzalez*, 394 F.3d at 392–95 (affirming summary judgment where there was only one reasonable interpretation of the contract).

## II. DMA's net-profits interest is a property interest that attaches and runs with the land under Texas law.

Texas courts recognize that net-profits interests in real property are property interests running with the land, not merely personal covenants. *In re Houston Bluebonnet, L.L.C.*, No. 16-34850, 2020 WL 930111, at *11 (Bankr. S.D. Tex. Feb. 21, 2020) ("A net profits interest in oil and gas properties is a real property interest."); *T-Vestco Litt-Vada v. Lu-Cal One Oil Co.*, 651 S.W.2d 284, 292 (Tex. App.—Austin 1983, writ ref'd n.r.e.) (concluding that a net-profits interest was an interest in land); *Parker v. Petro-Lewis Corp.*, 663 S.W.2d 905 (Tex. App.—San Antonio 1983, no writ) (treating net-profits interest as an interest in land); *see also* 2 Williams & Meyers, OIL AND GAS LAW §424 (2018)

---

[5] But if the Court decides to go beyond the text of the DMA Agreement and consider extrinsic evidence, the entire email chain and the circumstances surrounding the execution of the DMA Agreement confirm DMA's interpretation. Moore's 11:34 A.M. email on February 7, 2018 explains that the parties' written agreement—not Wright's "Hypothetical terms" by phone and email—is what would define the parties' obligations "regarding the ROW." Ex. 19 (Feb. 7, 2018 Email Chain). More fundamental, Wright's interpretation—that Moore agreed to just 20% of *Black Duck's* net profits from a flip sale, with no rights running with the land—makes no sense given Moore's position. Moore owned 50% of Black Duck, which in turn owned 80% of the right-of-way. It would not have made any sense for Moore to give up his 50% stake in Black Duck in exchange for 20% of Black Duck's profits from a flip. Instead, Moore was willing to give up his position in Black Duck for a 20% share of the net profits from the right-of-way, which (as the DMA Agreement states) would attach and run with the right-of-way and be binding on Black Duck's successors and assigns. Ex. 1 (Moore Decl.) ¶¶41, 53.

(explaining that net-profits interests are "fractional interests in oil and gas property");[6] Lowe, John, OIL AND GAS LAW IN A NUTSHELL 51 (6th ed. 2014) ("A net-profits interest is another oil and gas interest closely related to a royalty interest," which is a nonpossessory interest in real property).

Here, the DMA Agreement creates a net-profits interest in the pipeline and right-of-way. Ex. 20 (DMA Agreement). Specifically, the agreement entitles DMA to the gross revenues from the "operation, use, maintenance or sale" of the pipeline and right-of-way less "the costs and expenses associated." *Id.* Because a pipeline right-of-way is itself a property interest under Texas law,[7] net-profits interests in the right-of-way are "fractional interests" in real property that run with the land and are binding on successive owners of the right-of-way. They are not merely personal covenants.

### A. DMA's net-profits interest satisfies the traditional test for covenants running with the land.

DMA's net-profits interest easily satisfies the four traditional requirements for property covenants: (1) it touches and concerns the land; (2) it relates to a thing in existence or specifically binds the parties and their assigns; (3) it was intended by the original parties to run with the land; and (4) the successor to the burdens had notice of

---

[6] 2 Williams & Meyers, Oil and Gas Law §424.1 (2014) also provides: "There is some indication in early cases, at least by way of dictum, that the [net profits] interest is a mere contract interest. We believe, however, that a net profits interest should be treated in much the same manner as an overriding royalty and that it should be classified as an interest in land." (footnotes omitted).

[7] *See, e.g.*, *Ohio Dev., LLC v. Tapatio Springs Homeowners Ass'n*, 04-18-00523-CV, 2019 WL 6333474, at *2 (Tex. App.—San Antonio Nov. 27, 2019, no pet. h.) ("[A]n easement is a nonpossessory interest that authorizes its holder to use the property for only particular purposes."); *Keown v. Meriwether*, 371 S.W.2d 56, 57 (Tex. Civ. App.—Beaumont 1963, writ ref'd n.r.e.) (finding the statute of limitations for actions affecting real property applied to action to enjoin landowner from obstructing right-of-way); *Big Sandy Lumber Co. v. Kuteman*, 41 S.W. 172, 172 (Tex. Civ. App. 1897, no writ) (holding that "the right of way was real property").

the property interest. *Fort Worth 4th St. Partners, L.P. v. Chesapeake Energy Corp.*, 882 F.3d 574, 577 (5th Cir. 2018) (applying Texas law).

**1. The DMA Agreement touches and concerns the land.**

While the tests governing when a covenant touches and concerns land under Texas law "are far from absolute,"[8] DMA wins on this element no matter what test the Court applies. Some Texas courts have said that the benefit of a covenant runs with the land when it "affected the nature, quality or value of the thing demised, independently of collateral circumstances, or if it affected the mode of enjoying it." *Id.* at 578. Other courts have stated that "if the promisor's legal relations in respect to that land are lessened—his legal interest as owner rendered less value by the promise—the burden of the covenant touches or concerns that land." *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982).

DMA prevails under either test. Under the effects test, the DMA Agreement affects the value of the right-of-way and renders the right-of-way owner's interest in the land less valuable. *See In re Energytec, Inc.*, 739 F.3d 215, 224 (5th Cir. 2013) (holding that interest in transportation fees from the use of a pipeline touches and concerns land). After all, the right-of-way owner will have to pay DMA 20% of the net profits made from the right-of-way for perpetuity. And under the legal-relations test, the DMA Agreement increased DMA's legal relations to the land and correspondingly lessened Black Duck's legal relations to it, rending Black Duck's interest less valuable by the promise made to DMA. *Westland*, 637 S.W.2d at 911. By granting DMA a 20% net-profits interest in the right-of-way, the agreement gave DMA an interest in the profits from the use of the land.

---

[8] *Chesapeake Energy Corp.*, 882 F.3d at 578 (quoting *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982)).

**2. DMA's interest relates to a thing in existence or specifically binds the parties and their assigns.**

The second requirement can be satisfied in one of two ways: an agreement can either "relate[] to a thing in existence or specifically bind[] the parties and their assigns[.]" *Inwood*, 736 S.W.2d at 635. The DMA Agreement satisfies the requirement both ways. The right-of-way was a thing in existence when the DMA Agreement was executed. *See, e.g.*, Ex. 7 (Purchase Agreement). Further, the DMA agreement expressly "binds [Black Duck] and [Black Duck's] assigns." Ex. 20 (DMA Agreement).

**3. The original parties intended DMA's interest to run with the land.**

Courts judge intent by first looking to "the text of the instrument itself to determine if there is language expressly stating that the covenant binds successors." *Chesapeake Energy Corp.*, 882 F.3d at 578. The plain language of the DMA Agreement makes clear that DMA has a property right in the right-of-way, not merely a personal interest in Black Duck's profits from its sale of the right-of-way to TCRG. *See* Part I above.

The DMA Agreement's language—the terms "attach and run" and "binding upon . . successors and assigns"—is the paradigmatic way to create a covenant that runs with the land. *See MPH Prod. Co., Inc. v. Smith*, 06-11-00085-CV, 2012 WL 1813467, at *5 (Tex. App.—Texarkana May 18, 2012, no pet.) (collecting cases and examining first whether a contract used terminology such as "run with the land" or bound "successors and assigns").

**4. The successor to the burdens had notice of the DMA Agreement.**

KrisJenn Ranch, LLC–Series Pipeline ROW had notice of the DMA Agreement and DMA's interest in the pipeline and right-of-way through its manager, Larry Wright.

*See* 20-51084-rbk [#6] at 5. Indeed, Wright was personally involved in the creation and execution of the DMA Agreement in his capacity as a 50% owner of Black Duck.[9]

**B. Privity of estate is also established.**

To the extent that privity of estate is required in addition to the four requirements for a covenant to run with land,[10] privity of estate—both vertical and horizontal—is established here. Privity of estate "means there must be a mutual or successive relationship to the same rights of property." *Westland*, 637 S.W.2d at 911.

Vertical privity is satisfied. This kind of privity is categorized as a "successive relationship[]" to a property right. *Energytec*, 739 F.3d at 222. Black Duck sold its interest in the right-of-way to TCRG. TCRG then sold its interest to KrisJenn Ranch, LLC–Series Pipeline ROW, which is therefore the successor to Black Duck's same rights in the right-of-way. DMA is the original beneficiary of the DMA Agreement. Further, Moore (through his entity SCMED) gave up his 50% ownership in Black Duck at a time when

---

[9] Although the McLeods have not exercised their option, the McLeods also had notice of the DMA Agreement and DMA's interest. The Option Agreement expressly incorporates the settlement agreement with TCRG and refers to the "Litigation"—the lawsuits between Moore, Borders, Wright and their entities over the interests in the right-of-way. Ex. 33 (Option Agreement). Further, the McLeods executed the Option Agreement well after the DMA Agreement was recorded in county land records. *Compare* Ex. 20 (DMA Agreement), *with* Ex. 33 (Option Agreement).

[10] In *Inwood*, the Texas Supreme Court did not expressly require privity in addition to the four elements for a covenant to run with land. 736 S.W.2d at 635. But the Court found privity to be satisfied "because the property in question was conveyed in a succession of fee simple estates." *Id.* The covenant in *Inwood* was created in a declaration, not as part of any transfer of a property interest, suggesting that if privity of estate is a requirement under Texas law, then only vertical and not horizontal privity is needed. *Id.* at 633–35; *see also* Jason S. Brookner, Philip B. Jordan, Lydia R. Webb, Ethan M. Wood, *This Land Is Your Land, This Land Is My Land: Farmout Agreements in Bankruptcy*, 13 TEX. J. OIL GAS & ENERGY L. 23, 43 (2018) (noting that Texas law is unsettled on whether privity is an additional requirement for a covenant to run with land and opining that horizontal privity is not a requirement because "the Texas Supreme Court has never addressed horizontal privity and has found covenants that fail the horizontal privity test to be covenants running with the land").

Black Duck owned the right-of-way, and he did so in exchange for Black Duck's transfer of the 20% net-profits interest to DMA. Vertical privity is thus satisfied.

Horizontal privity is likewise present. Horizontal privity exists when there is a mutual relationship between the original covenanting parties, like a grant of some property interest in land. *See In re Sabine Oil & Gas Corp.*, 734 F. App'x 64, 67 (2d Cir. 2018) (applying Texas and finding no horizontal privity because the contracts at issue did not convey a property interest). Here, the covenant was made as part of a grant of property interests. Black Duck owned the right-of-way (minus the 20% net-profits interest it had granted to Longbranch) when it agreed DMA would have a 20% net-profits interest in the right-of-way going forward. Moore—as a 50% owner of Black Duck[11]—owned 50% of Black Duck's interest in the right-of-way. In exchange for Moore's transferring ownership of Black Duck and its assets to KrisJenn Ranch, Black Duck granted DMA a 20% net-profits interest in the right-of-way. DMA's 20% net-profits interest was thus conferred as part of a conveyance.

Privity and every other potential factor for covenants running with land are therefore satisfied here.

### C. The DMA Agreement does not violate the rule against perpetuities.

Wright's final challenge to the DMA Agreement, that it violates the rule of perpetuities, is a nonstarter. Am. Compl. ¶34.

The rule against perpetuities means that "no interest is valid unless it must vest, if at all, within twenty-one years after the death of some life or lives in being at the time of the conveyance." *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 867 (Tex. 2018).

[11] Moore owned the 50% interest in Black Duck either through SCMED or personally. SCMED has not paid state taxes and is a forfeited entity, but SCMED's forfeited status did not preclude SCMED—or, alternatively, Moore individually as the sole member of SCMED—from owning a 50% stake in Black Duck.

Like any other interest, net-profits interests are subject to the rule against perpetuities. *See Verde Minerals, LLC v. Burlington Res. Oil & Gas Co., LP*, 360 F. Supp. 3d 600, 619 (S.D. Tex. 2019) (finding a royalty interest does not violate the rule against perpetuities). But, here, the DMA agreement vested upon the execution of the DMA Agreement and does not violate the rule. DMA has a present, vested interest in 20% of the net profits from the right-of-way.

The fact that DMA might have to wait many years to see any profit from the pipeline right-of-way does not cause the DMA Agreement to fail. *Id.* (relying on *Luecke v. Wallace*, 951 S.W.2d 267, 273 (Tex. App.—Austin 1997, no writ)). That is because, like a royalty interest, a net-profits interest is a present interest—a current interest in the profit from the use of real property. *See id.* Neither the existence of any profits nor actual use of the right-of-way are necessary for the net-profits interest to be a vested, present interest. *See id.* (finding a royalty interest did not violate the rule even through no lease and no oil or gas production existed); *see also Haywood WI Units, Ltd. v. B&S Dunagan Investments, Ltd.*, No. 13-15-00454-CV, 2017 WL 6379737, at *4 (Tex. App.—Corpus Christi Dec. 14, 2017, pet. denied) (interest in a share of future mineral production was a "vested, present interest").

## CONCLUSION AND PRAYER

For these reasons, DMA respectfully asks the Court to grant it partial summary on the interpretation of the DMA Agreement.

Respectfully submitted,

/s/ Christopher S. Johns
Christopher S. Johns
State Bar No. 24044849
Christen Mason Hebert
State Bar No. 24099898
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

/s/ Timothy Cleveland
Timothy Cleveland
State Bar No. 24055318
Austin H. Krist
State Bar No. 24106170
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
akrist@clevelandterrazas.com

/s/ Natalie F. Wilson
Natalie F. Wilson
State Bar No. 24076779
LANGLEY & BANACK
745 East Mulberry Avenue, Suite 700
San Antonio, Texas 78212
210-736-6600
210-735-6889 fax
nwilson@langleybanack.com

Andrew R. Seger
State Bar No. 24046815
KEY TERRELL & SEGER
4825 50th Street, Suite A
Lubbock, Texas 79414
806-793-1906
806-792-2135 fax
aseger@thesegerfirm.com

*Attorneys for Frank Daniel Moore and DMA Properties, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 24, 2020, a true and correct copy of the foregoing document was transmitted to each of the parties via the Court's electronic transmission facilities and/or via electronic mail as noted below. For those parties not registered to receive electronic service, a true and correct copy of the foregoing document was served by United States Mail, first class, postage prepaid, at the address noted below.

| | |
|---|---|
| Ronald J. Smeberg<br>Charles John Muller, IV<br>MULLER SMEBERG, PLLC<br>111 W. Sunset<br>San Antonio, TX 78209<br>ron@smeberg.com<br>john@muller-smeberg.com<br><br>*Counsel for Plaintiffs Krisjenn Ranch, LLC, Krisjenn Ranch, LLC, Series Uvalde Ranch, Krisjenn Ranch, LLC, Series Pipeline Row* | Michael Black<br>BURNS & BLACK PLLC<br>750 Rittiman Road<br>San Antonio, TX 78209<br>mblack@burnsandblack.com<br><br>Jeffery Duke<br>DUKE BANISTER MILLER & MILLER<br>22310 Grand Corner Drive, Suite 110<br>Katy, TX 77494<br>jduke@dbmmlaw.com<br><br>*Counsel for Defendant Longbranch Energy, LP* |
| Ronald J. Smeberg<br>THE SMEBERG LAW FIRM, PLLC<br>2010 W Kings Hwy<br>San Antonio, TX 78201-4926<br>ron@smeberg.com<br><br>*Counsel for Third-Party Defendant Black Duck Properties, LLC* | Shane P. Tobin<br>OFFICE OF THE U.S. TRUSTEE<br>903 San Jacinto Blvd, Room 230<br>Austin, Texas 78701<br>shane.p.tobin@usdoj.gov<br><br>*United States Trustee* |
| Larry Wright<br>410 Spyglass Road<br>McQueeney, TX 78123<br><br>*Third-Party Defendant, pro se* | John Terrill<br>12712 Arrowhead Lane<br>Oklahoma City, OK 73120<br><br>*Third Party-Defendant, pro se* |

/s/ Christopher S. Johns
Christopher S. Johns