# Exhibit B:
# Adv. Dkt No. 205
# Proposed Findings of Fact and Conclusions of Law for Longbranch, DMA, and Moore

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| *In re*: | § | |
| | § | CHAPTER 11 |
| KrisJenn Ranch, LLC, | § | |
| | § | |
| *Debtor* | § | CASE NO. 20-50805 |
| | § | |
| | § | |

| | | |
|---|---|---|
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC, | § § § § § § | |
| | § | ADVERSARY NO. 20-05027 |
| *Plaintiffs*, | § § | |
| v. | § § | |
| DMA Properties, Inc., Frank Daniel Moore, and Longbranch Energy, LP, | § § § | |
| *Defendants*. | § | |

| | | |
|---|---|---|
| DMA Properties, Inc., Frank Daniel Moore, and Longbranch Energy, LP, | § § § | |
| *Counterplaintiffs,* | § § | |
| v. | § § | |
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, Black Duck Properties, LLC, Larry Wright, | § § § § § | ADVERSARY NO. 20-05027 |
| *Counterdefendants.* | § § § | |

1

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
## FOR LONGBRANCH, DMA, AND MOORE

This case concerns a pipeline right-of-way in East Texas. Longbranch Energy ("Longbranch") and DMA Properties ("DMA") contend that they each have a 20% net-profits interest in the right-of-way and that their interests attach and run with the land. The parties have asked the Court to declare their respective interests in the right-of-way and interpret the written agreements conveying those interests—respectively, the Longbranch Assignment and the DMA Agreement.

In addition to their declaratory claims, DMA, Moore, and Longbranch have also asserted related claims against Wright and KrisJenn for fraud, breach of fiduciary duty, breach of contract, and tortious interference, as well as various equitable claims. These claims are based on DMA, Moore, and Longbranch's allegations that (a) Wright repeatedly engaged in wrongful conduct to secure control and ownership over the right-of-way; and (b) once Wright gained such control, he took further wrongful actions through two entities (KrisJenn[1] and Black Duck) in an attempt to disregard Longbranch and DMA's interests in the right-of-way.

Finally, this case also concerns promissory-note payments made in connection with a saltwater disposal well. DMA contends that it is entitled to 50% of the payments made on a $450,000 promissory note from Bigfoot Energy Services, LLC. DMA further contends that Wright and his entities attempted to misappropriate DMA's half of the payments. On that basis, DMA asserts claims for breach of contract, conversion, and breach of fiduciary duty, as well as equitable claims. On October 21, 2020, the Court granted summary judgment in favor of DMA and recognized DMA's entitlement to 50% of the note payments. However, the Court has not yet ruled on the other elements of DMA's claims for breach of contract, conversion, breach of fiduciary duty, and equitable relief.

Following a bench trial and having considered the evidence and arguments put forward by the parties, the Court now enters the following findings of fact and conclusions of law.

---

[1] KrisJenn and its series are referred to collectively as "KrisJenn."

# FINDINGS OF FACT

### I.   Background

1.  The right-of-way runs from Angelina County through Nacogdoches and Rusk Counties and across Shelby County in East Texas.

2.  The right-of-way is a 65-mile, multiple-line easement that could feasibly fit three to four pipelines.

3.  In its initial bankruptcy schedules, KrisJenn represented, under penalty of perjury, that the value of the right-of-way was $9.5 million.

4.  KrisJenn failed to keep adequate books and records and commingled funds between its series.

5.  On February 19, 2016, Borders and Rod Roberts—the president of Express Pipeline Connection, LLC—executed a purchase agreement ("Purchase Agreement") under which Longbranch received a contractual right to purchase the right-of-way from Express for $5 million.

6.  The Purchase Agreement defines the assets which Longbranch sought to buy (and Express to sell) as "Ownership interest in certain pipe and related facilities (commonly known as the P-21 pipeline) shown on the plat attached hereto as Exhibit 'A'. and described on Exhibit 'B' attached hereto, and the rights-of-way, easements, contracts, permits and leases described in Exhibit 'C' attached hereto (collectively herein referred to as the 'Express Pipeline')".

7.  Borders and Moore collectively paid $25,000 to Express to secure the right to purchase the right-of-way.

8.  Prior to Wright's involvement, Borders and Moore agreed to equally share any financial gains with respect to their option on the right-of-way.

9.  Borders and Moore intended to identify an investor who could either (1) close on the right-of-way and hold it until the right developer was secured or (2) could close on the right-of-way and develop it with the appropriate infrastructure.

10. Borders and Moore viewed the right-of-way as a long-term opportunity that could afford them future royalty payments.

11. Borders and Moore estimated that it could take up to five years to identify the right developer for the right-of-way and that it would take $50-70 million to develop the right-of-way.

12. Longbranch had the resources to close on the right-of-way but did not want to do so because of the high carrying costs necessary to hold the right-of-way until

a developer could be secured.

13. Wright learned about the right-of-way through Moore.

14. Wright represented to Moore and Borders that he had the resources to close on the right-of-way, hold it for time necessary to secure a developer, and even develop the entire right-of-way if he so chose.

15. Wright also represented that his contribution of the money to purchase and hold the right-of-way was to be a capital contribution and his consideration for his interest in the right-of-way.

16. Based on Wright's representations, Borders and Moore agreed to assign the option to purchase the right-of-way to Black Duck.

17. In June 2018, Longbranch and Black Duck executed and entered into the Longbranch Assignment.

18. Under the Longbranch Assignment, Black Duck agreed that Longbranch "shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors or assigns during the period of time beginning on the date first written above (the "Period")."

19. The Longbranch Assignment further states:

    a. Net Profits shall mean gross revenues actually received by [Black Duck], or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

    b. [Black Duck's] obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to the payment of the Net Profits Share.

20. Borders assigned the Purchase Agreement to Black Duck in exchange for the net-profits interest defined above.

21. Longbranch and Black Duck agreed "to execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of this Assignment."

22. Shortly after Longbranch assigned the option to Black Duck, Wright began pressuring Borders and Moore to sell the option for a higher amount than the $5 million purchase price—in what is colloquially known as a "flip."

23. On October 24, 2016, Solaris Midstream Holdings, LLC submitted a letter of interest in acquiring "all of the assets associated with the Express Pipeline" for cash consideration of $7,280,000 ($350/rod) plus an additional royalty payable for the first five years of commercial operation of an "oil and gas flowback and produced water pipeline."

24. Black Duck decided not to accept Solaris's offer, reasoning that it could secure better terms if it closed on the right-of-way before finding a developer.

25. Black Duck closed on the right-of-way on August 14, 2017.

26. Black Duck, through Wright, created meeting minutes for the company which falsely claimed that Moore attended a meeting through a proxy in August 2017 and approved a loan from KrisJenn to Black Duck for $4.1 million, at 18% annual interest, for the acquisition of the right-of-way, before the loan and acquisition occurred. These minutes were false and created after the fact. Moore never attended any such meetings (personally or through proxy) and never voted on or approved the loan from KrisJenn to Black Duck.

27. Borders notarized and recorded the Longbranch Assignment in Shelby County on October 2, 2017.

28. During the fall of 2017 and beginning of 2018, Wright, Borders, and Moore all worked to identify the right developer for the right-of-way. There were several promising leads on potential developers.

29. Borders and Moore made sure to share information on the conversations they had with potential developers with the entire group.

30. On January 18, 2018, Wright executed and a promissory note and deed of trust purporting to evidence a loan from KrisJenn to Black Duck that was allegedly consummated August 14, 2017. The deed of trust listed the right-of-way as collateral.

31. Wright did not disclose any loan from KrisJenn to Black Duck in advance of such loan being made. Nor did Moore authorize Black Duck to borrow money from KrisJenn while he was a member.

32. Black Duck's company agreement required transactions to be approved by disinterested management and, absent a special resolution, also required the agreement of all managers to encumber Black Duck's assets.

33. Disinterested management did not approve a loan from KrisJenn to Black Duck, and Black Duck's managers did not agree to encumber the right-of-way.

34. In late January 2018, Wright grew increasingly hostile toward Moore and

eventually demanded that Moore leave Black Duck. Moore agreed, and Wright and Moore negotiated the terms of Moore's departure.

35.     On February 3, 2018, Moore sent Wright an email stating:

(a)     that Wright and Moore agreed to remove Moore from "all aspects" of Black Duck;

(b)     that Wright would cause Black Duck to transfer "No less than 50% carried interest and 50% entitlement on all terms and conditions and monies owed on the Note to Black Duck Properties and Big Foot regarding the Harris SWD";

(c)     that the "Harris SWD is 100% FREE AND CLEAR OF ANY AND ALL DEBTS."; and

(d)     that Wright would cause Black Duck to transfer "No less than 20% Carried Interest in the P-21 Express Pipeline" under the same terms and conditions as the Longbranch Assignment.

(c)     that Wright could accept Moore's proposed terms by stating that he fully accepts and approves.

36.     On February 4, 2018, Wright replied to Moore's email and stating that "I, Larry Wright hereby fully accept and approve the terms and conditions of this email[,]" forming and entering into the Email Agreement.

37.     Prior to execution of the Email Agreement, Black Duck had two members: SCMED Oilfield Consulting, LLC (which is owned and controlled solely by Moore) and KrisJenn Ranch, LLC (Wright's entity).

38.     At all times prior to execution of the Email Agreement, SCMED owned a 50% membership interest in Black Duck, and KrisJenn likewise owned a 50% membership interest in Black Duck.

39.     At all times prior to execution of the Email Agreement, Moore and Wright were also both managers of Black Duck.

40.     Through the Email Agreement, Moore gave up his 50% membership interest (held through SCMED) in Black Duck and resigned his position as a manager of Black Duck.

41.     On February 7, 2017, DMA and Black Duck executed and entered into the DMA Agreement.

42.     Moore signed the DMA Agreement on behalf of DMA, and Wright signed on behalf of Black Duck.

43.     Under the DMA Agreement, Black Duck agreed that DMA "shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors or assigns during the period of time beginning on the date first written above (the "Period")."

44.     The DMA Agreement further states:

    a.     Net Profits shall mean gross revenues actually received by [Black Duck], or its successors or assigns directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.

    b.     [Black Duck's] obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to the payment of the Net Profits Share.

45.     The DMA Agreement incorporates the February 4th Email Agreement by reference.

46.     The DMA Agreement further states "this agreement satisfies the duties ( in the Email Agreement ) regarding ONLY the P-21 Express Pipeline."

47.     DMA and Black Duck agreed "to execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of this Assignment."

48.     Wright and Moore simultaneously executed and entered into the Harris SWD Agreement.

49.     Wright signed the Harris SWD Agreement "on behalf of himself and Black Duck" and Moore signed the Agreement "on behalf of himself and DMA."

50.     The Harris SWD Agreement states that it is "on behalf of the binding 'Email Agreement' . . . dated February 3, 2018" and that it is meant to address "the obligations regarding the Harris SWD mentioned in the 'Email Agreement.'"

51.     The Harris SWD Agreement further states that DMA is "entitled to receive 50% of all Gross Monies received by Black Duck Properties, LLC including its successors and assigns for the remainder of all payments due to Black Duck Properties, LLC" from Bigfoot.

52.     As stated in the Harris SWD Agreement, "Black Duck Properties, LLC its successors and assigns" had the obligation to "mail the payment to DMA Properties, Inc. ( ADDRESS: 88 Wild Swan Lane, Minnesott Beach, N.C

7

28510 ) within three business days of the funds being available."

53. After Moore's exit from Black Duck, KrisJenn owned 100% of Black Duck's outstanding membership interests.

54. On February 9, 2018, two days after Wright and Moore executed the DMA Agreement, John Terrill sent Wright a letter of intent to purchase the right-of-way for $2.5 million, with Black Duck retaining a 16% carried interest in a future waterline.

55. On March 22, 2018, Wright executed an agreement on behalf of Black Duck to sell the right-of-way to TCRG East Texas Pipeline 1, LLC in exchange for $2.5 million and a limited assignment of 16% carried interest in a water pipeline.

56. Wright and Terrill began discussing the sale of the right-of-way in December 2017, yet Wright did not disclose such negotiations or the existence of Terrill or TCRG as a potential buyer until after February 4, 2018.

57. On April 3, 2018, Wright executed a deed transferring the right-of-way from Black Duck to TCRG East Texas Pipeline 1, LLC.

58. John Terrill's entity, Synergy Midstream, LLC, is (or, before the initiation of this lawsuit, was) a member of TCRG East Texas Pipeline 1, LLC with 25% ownership in TCRG East Texas Pipeline 1, LLC.

59. On April 4, 2018, Wright, Terrill, Borders, and Terrill's father met for lunch. Wright introduced Terrill to Borders as the new owner of the right-of-way.

60. After visiting the right-of-way, Wright, Terrill, Borders, and Terrill's father drove to Longbranch's office. There, Borders gave Terrill the easement documents for the right-of-way.

61. During the drive to Longbranch's office, Borders informed Terrill about Longbranch's and DMA's 20% net-profits interest in the right-of-way.

62. After the April 4, 2018 meeting was completed, Borders called Moore and informed Moore that it appeared the right-of-way had been sold to a man named John Terrill.

63. Seeking more information, Borders and Moore called Wright via a three-way call to inquire about the terms of the purchase of the right-of-way.

64. Wright reacted to the call with anger, voicing frustration that Borders had told Moore about the deal with Terrill. Wright, however, assured Moore and Borders that (1) Terrill had copies of both the Longbranch Assignment and the DMA Agreement; (2) the sale of the right-of-way had not closed; and (3) Wright would

send Borders and Moore copies of the deal documents.

65.    Days passed and Wright did not send Borders or Moore copies of any documents contemplating the sale of the right-of-way.

66.    On April 9, 2018, Moore emailed Terrill a copy of the DMA Agreement. Borders also subsequently emailed Terrill a copy of the Longbranch Assignment on April 9, 2018.

67.    DMA received half of the payments made by Bigfoot in March 2018 and June 2018, a total of $31,844.30. DMA never received its portion of Bigfoot's September 2018 payment or any payment made thereafter.

68.    On October 12, 2018, David Strolle—an attorney for Wright and KrisJenn—sent a letter to Bigfoot providing "formal notice" of an assignment that purportedly transferred 100% of Black Duck's interest in the Bigfoot promissory note to KrisJenn.

69.    The purported assignment (attached to the letter) states that the assignment is partial payment on a note dated August 14, 2017 for $4.1 million between KrisJenn as lender and Black Duck as borrower.

70.    The Assignment further states KrisJenn had "foreclosed" on the note "and the collateral which includes [Black Duck's] interest in the Express Gas Pipeline."

71.    Wright executed the assignment on behalf of KrisJenn and on behalf of Black Duck as "Sole Member/Manager."

72.    Wright did not provide Moore or DMA with notice of the assignment.

73.    On December 4, 2018, Moore recorded the DMA Agreement in Angelina, Nacogdoches, Shelby, and Rusk Counties.

74.    In December 2018, Wright terminated Black Duck and filed a certificate of termination with the Texas Secretary of State.

75.    In an email sent to Borders and Moore on April 16, 2019, Wright stated "I can arbitrarily end yall's 20%." Wright also stated that if Borders and Moore did not reply to the email, "I will proceed to kill the 20% each of you own."

76.    In July 2019, Wright and KrisJenn claimed that any loan secured by the right-of-way was paid; they filed a release of lien in Rusk County that "acknowledge[d] it payment and release[d] the property from the lien."

77.    On November 11, 2019, Wright, KrisJenn, and KrisJenn's series executed a Compromise Settlement Agreement with TCRG East Texas Pipeline 1, LLC.

78. The Compromise Settlement Agreement states that TCRG accused Black Duck and Wright of "misrepresenting the [right-of-way] and failing to disclose Moore's and Borders' alleged interests in the [right-of-way]."

79. After executing the TCRG Compromise Settlement Agreement, Wright and KrisJenn borrowed $5.9 million from McLeod Oil, LLC.

80. In December 2019, KrisJenn Ranch, LLC–Pipeline ROW purchased the right-of-way from TCRG for $2.5 million.

81. The right-of-way is currently listed as additional collateral and "Mortgaged Property" under the McLeod loan agreement.

82. McLeod also currently holds an option to purchase the right-of-way for $6 million.

83. On September 24, 2019, Bigfoot Energy Services LLC (Bigfoot) filed an interpleader action in Panola County, Texas asserting that Black Duck, KrisJenn, and DMA were making competing claims to payments that Bigfoot owed under a promissory note.

84. On September 30, 2019, the Panola Court granted Bigfoot's request to tender payments into the court registry.

85. All payments made by Bigfoot on the promissory note since September 2019 have been deposited into the Panola County court registry.

86. On December 10, 2020, Bigfoot paid off the promissory note.

87. Bigfoot has paid a total of $222,910.16 into the Panola County court registry since September 2019.

88. On October 13, 2020, this Court heard and granted DMA's motion for partial summary judgment, which asked the Court to recognize DMA's right to 50% of the payments Bigfoot made on the promissory note. DMA is entitled to at least $175,143.60 of the money in the court registry because that amount is the total of the payments that DMA would have received from the Bigfoot note payments from September 2018 to present.

89. SCMED has assigned all interests, claims, and causes of action related to the right-of-way to Moore.

90. The right-of-way, at the time of the Longbranch Assignment, was worth between $9.5 million (KrisJenn's legal admission of market value) and $10.4 million (market value based on offer from a prospective purchaser and other market-value evidence from Longbranch and Darin Borders (who was a property owner

on the ROW) about the per-rod value of pipeline easements in the area in 2016).

91.     Further, McLeod Oil LLC currently holds an option to acquire the right-of-way for an effective purchase price of $6 million, demonstrating that the actual value of the right-of-way is at least $6 million.

92.     Longbranch's and Moore's equitable interests in the option to purchase the right-of-way were each worth between $2.25 million and $2.7 million after accounting for the cost to close on the right-of-way (($9.5 million to $10.4 minus $5 million option price, divided by two), and Longbranch's legal interest was worth between $4.5 million and $5.5 million.

## II.    Claims Related to the Right-of-Way

### A.    Interpretation of the Longbranch Assignment

93.     Longbranch's net-profits interest was intended by Black Duck and Longbranch to run with the land and to bind Black Duck and Longbranch's successors and assigns.

94.     KrisJenn, as successor to the right-of-way and member of Black Duck, had notice of Longbranch's net-profits interest. Additionally and alternatively, KrisJenn is an assignee of the right-of-way.

95.     The phrase "pipe and related facilities commonly known as the P-21 or Express pipeline" encompasses the pipeline as well as the associated right-of-way.

96.     The phrase "[Longbranch] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors and assigns" means that Black Duck and any subsequent owners of the right-of-way are required to pay Longbranch 20% of net-profits generated through operation, use, maintenance, or sale—including partial sales or conveyances—of the right-of-way.

97.     "Net Profits" means the means the gross revenues that Black Duck and any subsequent owners of the right-of-way receive directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the right-of-way less the actual costs of goods and expenses associated with operation or sale of the same. The cost of purchasing the right-way is not a cost that is included in the net-profits calculation.

### B.    Interpretation of the Email Agreement and DMA Agreement

98.     DMA's net-profits interest was intended by Black Duck and Longbranch to run with the land.

99.     KrisJenn, as successor to the right-of-way and member of Black Duck, had notice

of Longbranch's net-profits interest. Additionally and alternatively, KrisJenn is an assignee of the right-of-way.

100. The terms "P-21" and "Express pipeline" mean the pipeline and the right-of-way that Longbranch had the option to purchase and that Black Duck ultimately purchased.

101. The phrase "No less than 20% Carried Interest in the P-21 Express Pipeline" means a 20% interest in the net-profits generated from use and sale of the pipeline and the related right-of-way.

102. The phrase "[DMA] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors and assigns" means that Black Duck and any subsequent owners of the right-of-way are required to pay DMA 20% of net-profits generated through operation, use, maintenance, or sale—including partial sales or conveyances—of the right-of-way.

103. "Net Profits" means the means the gross revenues that Black Duck and any subsequent owners of the right-of-way receive directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the right-of-way less the actual costs of goods and expenses associated with operation or sale of the same. The cost of purchasing the right-way is not a cost that is included in the net-profits calculation.

## C. Valuation of the Right-of-Way

104. Debtors' unamended schedules are admissions as to value. *In re Rollings*, 451 Fed. App'x 340, 348 (5th Cir. 2011) ("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions." (quotation omitted)). KrisJenn's unamended schedules admit the value of the right-of-way is at least $9.5 million.

105. In light of the factual findings above, the value of the right-of-way is $10.4 million.

## D. Breach of Contract for the Longbranch Assignment

106. A valid contract, the Longbranch Assignment, whereby Longbranch agreed to assign Black Duck the right to purchase the right-of-way in exchange for a 20% net-profits interest in the right-of-way that attached and ran with the land.

107. Longbranch performed its obligations under the Longbranch assignment.

108. Wright, Black Duck, and KrisJenn breached the Longbranch Assignment by failing to pay or recognize Longbranch's 20% net-profits interest.

109. Wright and Black Duck also breached the Longbranch Assignment by failing to

disclose the Longbranch Assignment to successors and assigns of Black Duck's interest in the right-of-way and by claiming the Longbranch Assignment did not bind successors and assigns.

110.   Wright, Black Duck, and KrisJenn breached the Longbranch Assignment by failing to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the Longbranch Assignment]."

111.   Longbranch incurred $2.08 million in damages because of Wright's, Black Duck's, and KrisJenn's breach of contract, calculated as the value of Longbranch's 20% net-profits interest in the right-of-way, which is worth $10.4 million.

112.   Longbranch incurred costs and attorneys' fees in litigating of Wright's, Black Duck's, and KrisJenn's breach of contract.

**E.     Breach of Contract for the Email Agreement and DMA Agreement**

113.   Moore and DMA are parties in privity with respect to the Email Agreement and the DMA Agreement.

114.   Additionally and alternatively, Moore and Wright intended DMA to benefit from the Email Agreement and the DMA Agreement.

115.   Moore performed under the Email Agreement.

116.   Wright signed the Email Agreement in his personal capacity, on behalf of Black Duck, and on behalf of KrisJenn.

117.   Wright and his entities breached the Email Agreement by failing to grant DMA "[n]o less than 20% Carried Interest in the P-21 Express Pipeline" under the same terms and conditions as the Longbranch Assignment.

118.   Wright and his entities breached the DMA Agreement by failing to pay or recognize DMA's 20% net-profits interest.

119.   Wright and Black Duck also breached the DMA Agreement by failing to disclose the DMA Agreement to successors and assigns of Black Duck's interest in the right-of-way and by claiming the DMA Agreement did not bind successors and assigns.

120.   Wright and his entities breached the DMA Agreement by failing to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the DMA Agreement]."

121. Moore and DMA incurred $2.08 million in damages because of Wright's, Black Duck's, and KrisJenn's breach of contract, calculated as the value of DMA's 20% net-profits interest in a right-of-way worth $10.4 million.

122. Moore and DMA incurred costs and attorneys' fees in litigating of Wright's, Black Duck's, and KrisJenn's breach of contract.

**F.  Breach of Fiduciary Duty**

123. Wright owed fiduciary duties to Black Duck, including a duty of care, a duty of loyalty, a duty of disclosure, and a duty to refrain from self-dealing.

124. Wright owed fiduciary duties to DMA in connection with its role as custodian and agent for payment of DMA's net-profits interests.

125. Wright owed fiduciary duties to Moore and/or SCMED, including a duty of care, a duty of loyalty, a duty of disclosure, and a duty to refrain from self-dealing in connection with Black Duck.

126. Wright breached fiduciary duties owed to DMA by failing to convey to DMA 20% of the net profits resulting from the sale of the right-of-way to TCRG and by using one of his entities (KrisJenn) to conduct a sham foreclosure on Black Duck's remaining interest in the right-of-way.

127. Wright took out an unauthorized loan on behalf of Black Duck without informing Moore.

128. Wright failed to disclose the potential deal with Terrill prior to Moore's exit from Black Duck.

129. Wright made false promises to Moore to convince Moore to withdraw from Black Duck.

130. Wright breached fiduciary duties owed to Black Duck and Moore/SCMED through the conduct outlined above.

131. Wright and KrisJenn benefited from the breaches of fiduciary duty described above.

132. DMA's damages were proximately caused by the breaches of fiduciary duty described above.

133. Moore's damages were proximately caused by the breaches of fiduciary duty described above.

134. Moore and DMA incurred $2.28 million in damages because of Black Duck's breaches of fiduciary duty. These damages are calculated as the value of Moore's

50% interest in the right-of-way held by Black Duck. Black Duck held an 80% interest in the right-of-way (after accounting for Longbranch's 20% net-profits interest), and the value of that interest is calculated from the market value of the right-of-way at the time of the breach ($10.4m) less the value of the capital contribution used to purchase the right-of-way ($4.7 m).

135. Wright, Black Duck, and KrisJenn received a wrongful gain consisting of Moore and DMA's interest in the right-of-way resulting from Wright's breaches of fiduciary duty. DMA and Moore seek to disgorge Wright's interest in the right-of-way and/or impose a constructive trust on that interest.

## G. Knowing Participation in Breach of Fiduciary Duty

136. KrisJenn knew that Wright owed fiduciary duties to Black Duck.

137. KrisJenn knew that Wright owed fiduciary duties to DMA.

138. KrisJenn knew that Wright owed fiduciary duties to Moore.

139. Black Duck was controlled by Wright.

140. KrisJenn is controlled by Wright.

141. Wright used his entities to carry out his breaches of fiduciary duty.

142. Wright's entities were knowing participants in his breaches of fiduciary duty.

143. Moore and DMA incurred $$2.28 million in damages because of KrisJenn's participation in Wright's breaches of fiduciary duty. These damages are calculated as the value of Moore's 50% interest in the right-of-way held by Black Duck. Black Duck only held an 80% interest in the right-of-way (after accounting for Longbranch's 20% net-profits interest), and the value of that interest is equal to the market value of the right-of-way at the time of the breach ($10.4m) less the value of the capital contributions ($4.7m) used to acquire the right-of-way.

144. Wright, Black Duck, and KrisJenn received a wrongful gain consisting of Moore and DMA's interest in the right-of-way resulting from Wright's breaches of fiduciary duty. DMA and Moore seek to disgorge Wright's interest in the right-of-way and/or impose a constructive trust on that interest.

## H. Fraud/Fraudulent Inducement

145. Wright made material misrepresentations to Moore and Longbranch to convince them to include him on the right-of-way deal.

146. Wright represented he had the financial wherewithal to purchase and hold the right-of-way until a suitable buyer came along.

147.   Wright represented his contributions would take the form of a capital contribution to Black Duck.

148.   Wright represented that his funding for acquisition of the right-of-way would be consideration for his inclusion in the deal.

149.   Wright's representations were false.

150.   Wright's representations were material.

151.   Moore and Longbranch would not have included Wright in the deal except for Wright's misrepresentations.

152.   Longbranch would not have transferred the Purchase Agreement to Black Duck except for Wright's misrepresentations.

153.   Wright knew the representations were false.

154.   Wright made the misrepresentations recklessly as a positive assertion and without knowledge or regard for their truth or falsity.

155.   Wright made the misrepresentations with the intent that Moore and Longbranch act and rely upon them.

156.   Moore and Longbranch acted and relied on Wright's misrepresentations when they agreed to have Longbranch assign the Purchase Agreement to Black Duck.

157.   Moore and Longbranch suffered injury because of their reliance, including loss of their right to purchase the right-of-way and loss of control over the right-of-way project.

158.   Longbranch incurred $2.7 million in damages because of Wright's fraud, representing the value of Longbranch's 50% interest in the right-of-way prior to Wright's involvement and calculated as 50% of: the market value of the right-of-way ($10.4m) less the cost ($5m) of initially acquiring the right-of-way.

159.   Moore incurred $2.7 million in damages because of Wright's fraud, representing the value of Moore's 50% interest in the right-of-way prior to Wright's involvement and calculated as 50% of: the market value of the right-of-way ($10.4m) less the cost ($5m) of initially acquiring the right-of-way.

160.   Wright, Black Duck, and KrisJenn received a wrongful gain consisting of Longbranch, Moore, and DMA's interests in the right-of-way resulting from Wright's breaches of fiduciary duty. Longbranch, DMA, and Moore seek to disgorge Wright's interest in the right-of-way and/or impose a constructive trust on that interest.

## I.  Fraud (in the alternative)

161.  Black Duck represented to Longbranch that Longbranch would receive a 20% net-profits interest in the right-of-way, that the interest attaches and runs with the land, that the interest is binding on Black Duck's successors and assigns, and that Black Duck would bind its successors and assigns to this interest.

162.  Wright represented to Longbranch that Longbranch would receive a 20% net-profits interest in the right-of-way, that the interest attaches and runs with the land, that the interest is binding on Black Duck's successors and assigns, and that Black Duck would bind its successors and assigns to this interest.

163.  Wright and Black Duck's representations to Longbranch were material and false statements of fact.

164.  Wright and Black Duck's representations to Longbranch were false promises of future performance.

165.  Wright and Black Duck knew the representations were false and intended Longbranch to rely on those representations and omissions.

166.  Longbranch justifiably relied on Wright and Black Duck's representations.

167.  Longbranch's reliance was reasonable and substantial.

168.  Wright knew or reasonably should have known that Longbranch would rely on his promises.

169.  Black Duck represented to Moore and DMA that DMA would receive a 20% net-profits interest in the right-of-way, that the interest attaches and runs with the land, that the interest is binding on Black Duck's successors and assigns, and that Black Duck would bind its successors and assigns to such interest.

170.  Wright represented to Moore and DMA that DMA would receive a 20% net-profits interest in the right-of-way, that the interest attaches and runs with the land, that the interest is binding on Black Duck's successors and assigns, and that Black Duck would bind its successors and assigns to such interest.

171.  Wright and Black Duck's representations to Moore/SCMED and DMA were material and false statements of fact.

172.  Wright and Black Duck's representations to Moore/SCMED and DMA were false promises of future performance.

173.  Wright indebted Black Duck and encumbered the right-of-way without consulting with Moore.

174. Wright failed to disclose the terms of the alleged loan from KrisJenn to Black Duck to Moore.

175. Wright failed to obtain proper authorization for the alleged loan in accordance with Black Duck's governing documents.

176. Wright fraudulently executed the alleged loan documents more than five months after the purported loan transaction.

177. Wright and Black Duck committed fraud by nondisclosure by failing to inform Moore of the potential deal with Terrill, prior to Moore's exit from Black Duck.

178. Wright and Black Duck knew the representations identified above were false and intended Moore/SCMED and DMA to rely on those representations and omissions.

179. Moore and DMA justifiably relied on Wright and Black Duck's false representations when Moore resigned from Black Duck and relinquished his membership stake in Black Duck.

180. Moore and DMA's reliance was reasonable and substantial.

181. Wright and Black Duck knew or reasonably should have known that Moore and DMA would rely on their promises and representations.

182. Wright committed fraud by using his control over Black Duck and KrisJenn to effect a sham foreclosure on Black Duck's remaining assets, including Black Duck's 16% carried interest under the TCRG deal.

183. Longbranch incurred $2.08 million in damages because of Wright's fraud, calculated as the value of Longbranch's 20% net-profits interest in the right-of-way, which is worth $10.4 million.

184. DMA and Moore incurred $2.28 million in damages because of Wright's fraud, representing the value of Moore's 50% interest in Black Duck's ownership of the right-of-way and calculated as 40% of the market value of the right-of-way ($10.4m) less the value of the capital contribution used to purchase the right-of-way ($4.7 m).

185. Wright, Black Duck, and KrisJenn received a wrongful gain consisting of Longbranch, Moore, and DMA's interests in the right-of-way from Wright's breaches of fiduciary duty. Longbranch, DMA, and Moore seek to disgorge Wright's interest in the right-of-way and/or impose a constructive trust on that interest.

**J.**     **Joint Liability of Wright and KrisJenn**

186.    Wright used Black Duck and KrisJenn to perpetrate an actual fraud on Moore, DMA, and Longbranch, for Wright's direct personal benefit.

187.    Wright took actions through Black Duck and KrisJenn with dishonesty of purpose and intent to deceive:

- Wright used Black Duck to make a fraudulent transfer to KrisJenn.

- KrisJenn is an insider with respect to Black Duck.

- Wright concealed the transfer.

- Wright was threatened with a suit before the transfer.

- Wright effectively transferred substantially all the assets of Black Duck to KrisJenn.

- Black Duck became insolvent after the transfer.

- Wright retained possession or control of the right-of-way (or other property) after the transfer.

- Black Duck transferred its essential assets to a lienor (KrisJenn) that is an insider of the debtor.

188.    KrisJenn failed to keep adequate books and records and commingled funds between its series. *See* Resp. Mot. Sever [#28] at 4 (stating that KrisJenn and its series "have not maintained records for each particular series account" and "[a]ll of the KrisJenn money has been commingled).

189.    KrisJenn and Black Duck are the alter egos of Wright, and holding only Black Duck or KrisJenn liable would result in injustice because:

- Wright exercised substantial control over Black Duck and KrisJenn.

- Black Duck and KrisJenn disregarded multiple, substantial corporate formalities and failed to keep adequate books and records.

- Wright exercised control over KrisJenn and Black Duck for his own personal benefit.

## K.    Tortious Interference with Contract

190.    Wright intentionally interfered with the DMA Agreement.

191.    Wright intentionally interfered with the Email Agreement.

192.    Wright intentionally interfered with the Longbranch Assignment.

193.    Black Duck intentionally interfered with the Email Agreement.

194.    KrisJenn intentionally interfered with the DMA Agreement.

195.    KrisJenn intentionally interfered with the Email Agreement.

196.    KrisJenn intentionally interfered with the Longbranch Assignment.

197.    DMA was proximately injured because of Wright's interference.

198.    Moore was proximately injured because of Wright's interference.

199.    Moore was proximately injured because of Black Duck's interference.

200.    Longbranch was proximately injured because of Wright's interference.

201.    DMA was proximately injured because of KrisJenn's interference.

202.    Moore was proximately injured because of KrisJenn's interference.

203.    Longbranch was proximately injured because of KrisJenn's interference.

204.    Longbranch incurred $2.08 million in damages because of Wright's, Black Duck's, and KrisJenn's breach of contract, calculated as the value of Longbranch's 20% net-profits interest in the right-of-way, which is worth $10.4 million.

205.    DMA and Moore incurred $2.08 million in damages because of Wright's, Black Duck's, and KrisJenn's breach of contract, calculated as the value of DMA's 20% net-profits interest in the right-of-way, which is worth $10.4 million.

## L.    Promissory Estoppel

206.    Wright promised (on behalf of himself and Black Duck) that Moore's entity would receive a 20% net-profits interest in the right-of-way that would attach and run with the land and bind Black Duck's successors and assigns.

207.    Moore relied on Wright's promises by resigning from Black Duck and relinquishing his stake in Black Duck.

208.    Moore's reliance was reasonable and substantial.

209. Injustice to Moore can be avoided only if Wright's promises are enforced.

210. Moore's reliance resulted in injury to Moore, including the loss of his 50% ownership stake in Black Duck and its assets.

**M.    Money Had and Received**

211. Wright and/or KrisJenn received net profits—as defined in the Longbranch Assignment and DMA Agreement—of $2.5 million from the sale of the right-of-way to TCRG.

212. 20% of the net profits received by Wright and/or KrisJenn ($500,000) belong in equity and good conscience to Longbranch.

213. 20% of the net profits received by Wright and/or KrisJenn ($500,000) belong in equity and good conscience to DMA.

**N.    Unjust Enrichment**

214. Wright, Black Duck, and KrisJenn were unjustly enriched at Moore, DMA, and Longbranch's expense.

215. Wright's, Black Duck's, and KrisJenn's enrichment consists of their wrongful gain of the value of DMA and Moore's interests in the right-of-way as well as KrisJenn's receipt of up to $6,000,000 from McLeod in connection with the right-of-way.

**O.    Civil Conspiracy**

216. Black Duck, KrisJenn, and Wright reached a meeting of minds and intentionally conspired to defraud Moore and DMA.

217. Moore and DMA incurred $2.7 million in damages proximately caused by Black Duck, KrisJenn, and Wright's unlawful acts, representing the value of Moore's 50% interest in the right-of-way prior to Wright's involvement and calculated as 50% of: the market value of the right-of-way ($10.4m) less the cost ($5m) of initially acquiring the right-of-way

**P.    Nondischargeability**

218. Wright used KrisJenn to defraud Moore and DMA of their net-profits interest and to sell the right-of-way in disregard of that interest.

219. KrisJenn (via Wright) used false presentations, false representations, and actual fraud to obtain Moore/SCMED's membership interest in Black Duck and obtain or ignore DMA's 20% net-profits interest.

220. KrisJenn (via Wright) committed fraud or defalcation while acting in a fiduciary capacity.

**Q.    Exemplary Damages**

221.    DMA, Moore, and Longbranch's injuries resulted from Wright's gross negligence, malice, or actual fraud.

**III.    Claims Related to the Bigfoot Note Payments**

**A.    Interpretation of the Harris SWD Agreement**

222.    On August 14, 2020, DMA filed a Motion for Partial Summary Judgment in adversary proceeding number 20-05027, asking this Court to recognize DMA's right to 50% of the payments Bigfoot made on the promissory note.

223.    On October 13, 2020, this Court heard and granted DMA's Motion for Partial Summary Judgment. The Court found that DMA had a "right to payments of 50% under the note."

**B.    Breach of Contract**

224.    Wright executed the Email Agreement in his personal capacity, on behalf of Black Duck and on behalf of KrisJenn.

225.    Moore performed under the Email Agreement by resigning from Black Duck and relinquishing his 50% membership interest in Black Duck held through SCMED.

226.    Wright, Black Duck, and KrisJenn breached the Harris SWD Agreement by failing to pay DMA 50% of the Bigfoot note payments within three business days of the funds becoming available.

227.    KrisJenn was an assignee of the obligation to pay DMA its portion of the Bigfoot note payments and Black Duck's 50% interest in the Bigfoot note.

228.    DMA incurred $175,143.60 in damages because of Wright's, Black Duck's, and KrisJenn's breaches.

229.    DMA incurred attorneys' fees and costs in litigating Wright's, Black Duck's, and KrisJenn's breaches.

**C.    Conversion**

230.    DMA had a right to immediate possession of 50% of the Bigfoot note payments under the Email Agreement and Harris SWD Agreement.

231.    Half of the proceeds from the note payments are DMA's property.

232.    Wright wrongfully exercised dominion and control over DMA's half of Bigfoot's September 2018, December 2018, March 2019, and June 2019 note payments—

a total of $63,688.58—in a manner inconsistent with DMA's rights.

233. Black Duck wrongfully exercised dominion and control over DMA's half of the note payments, in a manner inconsistent with DMA's rights.

234. KrisJenn wrongfully exercised dominion and control over DMA's half of the note payments, in a manner inconsistent with DMA's rights.

235. Wright, Black Duck, and KrisJenn refused to return DMA's property on demand, amounting to a clear repudiation of DMA's rights.

236. And, in any case, a demand would have been useless.

237. DMA was injured by Wright, Black Duck, and KrisJenn's refusal to return the converted property.

238. DMA incurred $70,000 in damages because of the conversion, an amount which includes compensation for loss of use of the converted property and loss of profits.

**D.    Money Had and Received**

239. Wright or KrisJenn hold $63,688.58 in proceeds from the Bigfoot note which in equity and good conscience belong to DMA.

**E.    Breach of Fiduciary Duty**

240. Black Duck and Wright had a fiduciary relationship with DMA, as custodians and agents for payments of DMA's portion of the Bigfoot note payments.

241. Black Duck and Wright breached fiduciary duties owed to DMA by failing to convey the 50% of the Bigfoot note payments to DMA or explain the failure to convey.

242. Wright and KrisJenn benefited through these breaches of fiduciary duty.

243. DMA was damaged by these breaches of fiduciary duty.

244. DMA incurred $63,688.58 in damages because of the breach.

**F.    Unjust Enrichment**

245. Wright and KrisJenn were unjustly enriched by $63,688.58 at DMA's expense through their retention of the Bigfoot note payments.

## IV. Affirmative Defenses to KrisJenn's Tortious-Interference Claim

246. DMA, Moore, and Longbranch were justified in informing TCRG that their net-profits interests attach and run with the land, because their net-profits interests attach and run with the Land.

247. DMA, Moore, and Longbranch had, at a minimum, a good-faith claim to a colorable legal right when they informed TCRG that the Longbranch Assignment and DMA Agreement created net-profits interests that attach and run with the land.

248. DMA, Moore, and Longbranch were privileged to provide TCRG with copies of the Longbranch Assignment and DMA Agreement.

249. Because TCRG received copies of the Longbranch Assignment and DMA Agreement, TCRG was able to form its own assessment of whether the net-profits interests created by those agreements attach and run with the land, and in that context, any related discussions with Moore and/or Borders cannot constitute a proximate cause of KrisJenn's alleged damages.

250. Equity and good conscience do not allow KrisJenn to recover on its claim for tortious interference given Wright and KrisJenn's inequitable conduct and fraudulent actions.

## CONCLUSIONS OF LAW

## I. Claims Related to the Right-of-Way

### A. Declaration Interpreting the Parties' Agreements

1. 28 U.S.C. §2201 allows federal courts to declare the rights and legal relations of any interested party seeking such declaration, regardless of whether further relief is sought.

2. Under Texas law, courts must interpret unambiguous contracts as a matter of law. *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 490 (5th Cir. 2007).

3. When words used in a contract are only subject to one reasonable interpretation, then the contract is unambiguous and there cannot be a genuine factual dispute concerning the contract's meaning. *Gonzalez v. Denning*, 394 F.3d 388, 392 (5th Cir. 2004).

4. The goal of contract interpretation is "to ascertain the parties' true intent as expressed by the plain language they used." *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017); *see also Gonzalez*, 394 F.3d 392.

5. Courts must "give effect to *all the provisions* of the contract so that none will be rendered meaningless." *Kern v. Sitel Corp.*, 517 F.3d 306, 309 (5th Cir. 2008) (emphasis in original).

6. The Email Agreement and DMA Agreement incorporate each other by reference and form one contract. *See In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) ("Documents incorporated into a contract by reference become part of that contract.").

7. The Longbranch Assignment, Email Agreement and DMA Agreement incorporate the Purchase Agreement's definition of "P-21" and "Express pipeline", which encompasses the pipeline as well as the related right-of-way.

8. The phrase "[Black Duck's] obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to payment of the Net Profits Share" is unambiguous and requires all subsequent owners and purchasers of the right-of-way to recognize and pay Longbranch and DMA's net-profits interest.

9. Longbranch's 20% net-profits attaches and runs with the land and binds Black Duck's successors and assigns.

10. DMA's 20% net-profits interest attaches and runs with the land and binds Black Duck's successors and assigns.

11. A covenant that "runs with the land" binds the parties as well as their successors and assigns. *See, e.g.*, *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987) (stating that where a contact "evidences the intent of the original parties that the covenant run with the land" then the covenant "specifically binds the parties, their successors and assigns"); *Montfort v. Trek Res., Inc.*, 198 S.W.3d 344, 355 (Tex. App.—Eastland 2006, no pet.) ("Covenants that run with the land bind the heirs and assigns of the covenanting parties[.]"); *see also* Howard R. Williams, *Restrictions on the Use of Land: Covenants Running with the Land at Law*, 27 TEX. L. REV. 419, 423 (1949) (discussing the development of the doctrine of covenants "running with land" to bind both assignees of lessors and lessees in the Tudor period).

12. Net-profits interests in real property are property interests running with the land, not merely personal covenants. *In re Houston Bluebonnet, L.L.C.*, No. 16-34850, 2020 WL 930111, at *11 (Bankr. S.D. Tex. Feb. 21, 2020) ("A net profits interest in oil and gas properties is a real property interest."); *T-Vestco Litt-Vada v. Lu-Cal One Oil Co.*, 651 S.W.2d 284, 292 (Tex. App.—Austin 1983, writ ref'd n.r.e.) (concluding that a net-profits interest was an interest in land); *Parker v. Petro–Lewis Corp.*, 663 S.W.2d 905 (Tex. App.—San Antonio 1983, no writ) (treating net-profits interest as an interest in land); *see also* 2 Williams & Meyers, OIL AND GAS LAW §424 (2018) (explaining that net-profits interests are

"fractional interests in oil and gas property");[2] Lowe, John, OIL AND GAS LAW IN A NUTSHELL 51 (6th ed. 2014) ("A net-profits interest is another oil and gas interest closely related to a royalty interest," which is a nonpossessory interest in real property).

13.    Because a pipeline right-of-way is itself a property interest under Texas law,[3] net-profits interests in the right-of-way are "fractional interests" in real property that run with the land and are binding on successive owners of the right-of-way.

14.    Longbranch and DMA's net-profits interests constitute real covenants because they (1) touch and concern the land; (2) relate to a thing in existence or specifically binds the parties and their assigns; (3) were intended by the original parties to run with the land; and (4) the successor to the burden had notice of the interests. *Fort Worth 4th St. Partners, L.P. v. Chesapeake Energy Corp.*, 882 F.3d 574, 577 (5th Cir. 2018).

<u>Touch and Concern the Land</u>

15.    Longbranch and DMA's net-profits interests affect the value of the right-of-way and render the right-of-way owner's interest in the land less valuable. *See In re Energytec, Inc.*, 739 F.3d 215, 224 (5th Cir. 2013) (holding that interest in transportation fees from the use of a pipeline touches and concerns land).

16.    Longbranch and DMA's net-profits interests also increase Longbranch and DMA's legal relation to the land and correspondingly lessen Black Duck's legal relations to it, rendering Black Duck's interest less valuable by the promises made to Longbranch and DMA. *Westland*, 637 S.W.2d at 911.

<u>Relate to a Thing in Existence, or Specifically Bind the Parties and Assigns</u>

17.    The right-of-way was in existence when the Longbranch Assignment, Email Agreement, and DMA Agreement were executed.

18.    The Longbranch Assignment and DMA Agreement expressly bind Black Duck

---

[2] 2 Williams & Meyers, Oil and Gas Law §424.1 (2014) also provides: "There is some indication in early cases, at least by way of dictum, that the [net profits] interest is a mere contract interest. We believe, however, that a net profits interest should be treated in much the same manner as an overriding royalty and that it should be classified as an interest in land." (footnotes omitted).

[3] *See, e.g., Ohio Dev., LLC v. Tapatio Springs Homeowners Ass'n*, 04-18-00523-CV, 2019 WL 6333474, at *2 (Tex. App.—San Antonio Nov. 27, 2019, no pet. h.) ("[A]n easement is a nonpossessory interest that authorizes its holder to use the property for only particular purposes."); *Keown v. Meriwether*, 371 S.W.2d 56, 57 (Tex. Civ. App.—Beaumont 1963, writ ref'd n.r.e.) (finding the statute of limitations for actions affecting real property applied to action to enjoin landowner from obstructing right-of-way); *Big Sandy Lumber Co. v. Kuteman*, 41 S.W. 172, 172 (Tex. Civ. App. 1897, no writ) (holding that "the right of way was real property").

and its assigns.

<u>Intended to Run with the Land</u>

19. Courts judge intent by first looking to "the text of the instrument itself to determine if there is language expressly stating that the covenant binds successors." *Chesapeake Energy Corp.*, 882 F.3d at 578.

20. The plain language of the Longbranch Assignment, Email Agreement, and the DMA Agreement makes clear that the parties intended the net-profits interests to attach and run with the land.

21. The terms used— "attach and run" and "binding upon . . . successors and assigns"—are the paradigmatic way to create a covenant that runs with the land. *See MPH Prod. Co., Inc. v. Smith*, 06-11-00085-CV, 2012 WL 1813467, at *5 (Tex. App.—Texarkana May 18, 2012, no pet.) (collecting cases and examining first whether a contract used terminology such as "run with the land" or bound "successors and assigns").

<u>Successor to the Burden Had Notice</u>

22. KrisJenn had notice of the net-profits interests, because (1) Wright (the manager of KrisJenn) was personally involved in executing the Longbranch Assignment, Email Agreement, and DMA Agreement; (2) KrisJenn was a member of Black Duck when the Longbranch Assignment, Email Agreement, and DMA Agreement were executed; and (3) KrisJenn purchased the right-of-way from TCRG after lawsuits seeking to interpret the Longbranch Assignment, Email Agreement, and DMA Agreement had been filed.

23. McLeod also had actual or constructive notice of the interests because (1) DMA and Longbranch recorded their interests prior to any loan from McLeod to Wright or KrisJenn; and (2) the Option Agreement between KrisJenn and McLeod expressly references the settlement agreement with TCRG and the litigation between the parties in state court.

<u>Other Matters</u>

24. To the extent privity of estate is required, vertical privity exists between Black Duck and KrisJenn, and Longbranch and DMA are the original parties to the Longbranch Assignment, Email Agreement, and DMA Agreement.

25. To the extent privity of estate is required, vertical privity is sufficient to establish privity of estate. *See Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d

632, 635 (Tex. 1987) (only looking to whether vertical privity was established).[4]

26.    To the extent horizontal privity is required, both the Longbranch Assignment and DMA Agreement were recorded before KrisJenn and the McLeods took their interests in the right-of-way, eliminating the need for the horizontal privity requirement altogether. *See Energytec*, 739 F.3d at 223 (concluding that recording satisfies "the Restatement's perception of the rational for the privity requirement").]

27.    Further, horizontal privity existed between Longbranch and Black Duck when the Longbranch Assignment was executed. Longbranch's option to purchase the right-of-way was a property interest. *Hitchcock Properties, Inc. v. Levering*, 776 S.W.2d 236, 238 (Tex. App.—Houston [1st Dist.] 1989, writ denied) ("Given the nature of an option's relation to and limitation over the land optioned, it is no less logically included in the definition of an 'interest' in land, than is, for example, an easement, or royalty interest, or a contingent future interest."). In assigning Black Duck the option to purchase the right-of-way, Longbranch reserved a 20% net-profit interest in that right-of-way. Black Duck subsequently purchased the right-of-way, and Borders recorded Longbranch's interest.

28.    Black Duck's conveyance of a 20% interest to Longbranch is valid even though Black Duck acquired title to the right-of-way after it purported to convey the 20% interest. *See Burns v. Goodrich*, 392 S.W.2d 689, 691 (Tex. 1965) ("When one assumes, by his deed, to convey a title, and by any form of assurance obligates himself to protect the grantee in the enjoyment of that which the deed purports to give him, he will not be suffered afterwards to acquire or assert a title, and turn his grantee over to a suit upon his covenants. . . . [R]edress is to deny [the grantee] the liberty of setting up his after-acquired title as against his previous conveyance." (quoting *Duhig v. Peavy-Moore Lumber Co.*, 144 S.W.2d 878, 508

---

[4] The principle of horizontal privity has been "explicitly rejected" by the Restatement of the Law of Property and only a minority of cases require horizontal privity. *Energytec*, 739 F.3d at 222. In its most recent case on the requirements for real covenants, the Texas Supreme Court found a covenant to run with land based on vertical privity even through horizontal privity was not established. *See Inwood*, 736 S.W.2d at 633-635 (finding privity was satisfied even though the covenant was created in a declaration and not as part of any transfer of interest). Subsequent Texas cases have likewise recognized covenants can run with the land even when they are created without any conveyance. *See, e.g., Harris County Flood Control Dist. v. Glenbrook Patiohome Owners Ass'n*, 933 S.W.2d 570, 574 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (covenants in declaration); *Fallis v. River Mountain Ranch Prop. Owners Ass'n, Inc.*, 04-09-00256-CV, 2010 WL 2679997, at *9 (Tex. App.—San Antonio July 7, 2010, no pet.) (covenants in declaration); *see also* Jason S. Brookner, Philip B. Jordan, Lydia R. Webb, Ethan M. Wood, *This Land Is Your Land, This Land Is My Land: Farmout Agreements in Bankruptcy*, 13 TEX. J. OIL GAS & ENERGY L. 23, 43 (2018) (opining that horizontal privity is not a requirement under Texas law for a covenant to run with land because "the Texas Supreme Court has never addressed horizontal privity and has found covenants that fail the horizontal privity test to be covenants running with the land").

(1940)).

29. Horizontal privity existed between Black Duck and Moore/SCMED when the DMA Agreement was executed. Black Duck owned the right-of-way (minus the 20% net-profit interest it had granted to Longbranch) when it agreed DMA would have a 20% net-profits interest in the right-of-way going forward. Moore—as a 50% owner of Black Duck through SCMED—owned 50% of Black Duck's interest in the right-of-way. In exchange for SCMED transferring ownership of both Black Duck and its assets to KrisJenn Ranch, Moore retained (through DMA) a 20% net-profits interest in the right-of-way.

30. Longbranch, DMA, and Moore are entitled to recover attorneys' fees and costs incurred in pursuing this claim because state law provides for such fees and costs in connection with their related claim for breach of contract. *See* TEX. CIV. PRAC. & REM. CODE §38.001.

## B. Joint Liability of Wright and KrisJenn

31. Under Texas law, members of a limited liability company may be liable for the company's contractual obligations when the company is used to perpetrate an "actual fraud" on the plaintiff for the direct benefit of the defendant." TEX. BUS. ORG. CODE §21.223; *see also Spring Street Partners–IV, LP v. Lam*, 730 F.3d 427, 442–43 (5th Cir. 2013) (alteration in original) (citing *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd)); *Matter of Ritz*, 832 F.3d 560, 567 (5th Cir. 2016).

32. Section 21.223 applies to domestic corporations as well as limited liability companies and foreign companies. *See* TEX. BUS. ORG. CODE §101.002(a); *id.* §9.203.

33. For purposes of piercing the veil of a company or corporation to hold a member or shareholder liable, actual fraud is defined as conduct "'involv[ing] dishonesty of purpose or intent to deceive.'" *Spring Street Partners–IV, LP v. Lam*, 730 F.3d 427, 442–43 (5th Cir. 2013) (alteration in original) (citing *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd)); *see also Matter of Ritz*, 832 F.3d 560, 567 (5th Cir. 2016).

34. Wright used Black Duck as an alter ego of KrisJenn after Moore withdrew from Black Duck.

35. KrisJenn is liable for fraudulent actions taken by Black Duck at Wright's direction.

36. Because KrisJenn failed to keep adequate books and records and commingled funds between its series, KrisJenn has failed to meet the prerequisites for the series form. *See* TEX. BUS. ORG. CODE §101.602(b); *see also* Resp. Mot. Sever

[#328] at 4 (conceding that KrisJenn and its series have not met the series requirements imposed by §101.602).

37.    KrisJenn Ranch, LLC and its series are jointly liable for all debts incurred by KrisJenn Ranch, LLC or any of its series.

38.    Wright is personally liable for fraudulent actions taken by Black Duck.

39.    KrisJenn is an alter ego of Wright such that the corporate veil between Wright and KrisJenn should be disregarded.

40.    KrisJenn is liable for fraudulent actions taken by Wright.

## C.    Breach of Contract

41.    To prevail on a breach-of-contract claim, a plaintiff must establish (1) a valid contract existed; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff sustained damages because of the breach. *WC 1899 McKinney Ave., LLC v. STK Dallas, LLC*, 380 F. Supp. 3d 595, 601 (W.D. Tex. 2019).

42.    In light of the factual findings above, Longbranch prevails on its claim for breach of the Longbranch Assignment and is entitled to recover $2.080 million in damages from Wright and/or KrisJenn.

43.    In light of the factual findings above, DMA and Moore prevail on their claim for breach of the Email Agreement and the corresponding DMA Agreement and are entitled to recover $2.08 million in damages from Wright and/or KrisJenn.

44.    In light of the factual findings above, Longbranch and DMA are entitled to an injunctive order that Wright and KrisJenn specifically perform the Email Agreement and DMA Agreement, including the obligation to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the DMA] Agreement[;]"

45.    DMA, Moore, and Longbranch are also entitled to recover attorneys' fees and costs incurred in pursuing this claim. *See* TEX. CIV. PRAC. & REM. CODE §38.001.

## D.    Fraud/Fraudulent Inducement

46.    To prevail on a claim of fraud, a plaintiff must establish (1) the defendant made a material misrepresentation; (2) the defendant knew the misrepresentation was false or made the misrepresentation without knowledge of its truth; (3) the defendant intended the plaintiff to act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the misrepresentation caused injury to

the plaintiff. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990); *see also Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001).

47. In light of the factual findings above, Longbranch prevails on its claim for fraud/fraudulent inducement and is entitled to recover $2.7 million in damages from Wright and/or KrisJenn.

48. In light of the factual findings above, DMA and Moore prevail on their claim for fraud/fraudulent inducement and are entitled to recover $2.7 million in damages from Wright and/or KrisJenn.

49. In light of the factual findings above, Longbranch, DMA, and Moore are entitled to disgorgement of KrisJenn and Wright's interest in the right-of-way.

50. In light of the factual findings above, Longbranch, DMA, and Moore are entitled to a constructive trust with respect to KrisJenn and Wright's interest in the right-of-way.

**E.    Fraud (in the alternative)**

51. To prevail on a claim of fraud, a plaintiff must establish (1) the defendant made a material misrepresentation; (2) the defendant knew the misrepresentation was false or made the misrepresentation without knowledge of its truth; (3) the defendant intended the plaintiff to act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the misrepresentation caused injury to the plaintiff. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990); *see also Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001).

52. In light of the factual findings above, Longbranch prevails on its claim for fraud and is entitled to recover $2,080,000 in damages from Wright and/or KrisJenn.

53. In light of the factual findings above, DMA and Moore prevail on their claim for fraud and are entitled to recover $2.8 million in damages from Wright and/or KrisJenn.

54. Wright, Black Duck, and KrisJenn received a wrongful gain consisting of Longbranch, Moore, and DMA's interests in the right-of-way resulting from Wright's breaches of fiduciary duty. Longbranch, DMA, and Moore are entitled to disgorgement Wright's interest in the right-of-way and imposition of a constructive trust on that interest.

**F.    Breach of Fiduciary Duty**

55. To prevail on a breach-of-fiduciary-duty claim, a plaintiff must establish (1) a fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached the fiduciary duty; and (3) the breach resulted in jury to the

plaintiff or benefit to the defendant. *D'Onofrio v. Vacations Publ'ns, Inc.*, 888 F.3d 197, 215–16 (5th Cir. 2018).

56. Wright, Black Duck, and/or KrisJenn owed fiduciary duties to DMA as custodians and agents for payment with respect to DMA's net-profits interest.

57. Wright owed a duty of care to Black Duck.

58. Wright owed a duty of disclosure to Black Duck.

59. Wright owed a duty of loyalty to Black Duck.

60. Wright a duty of care to Moore/SCMED.

61. Wright owed a duty of disclosure to Moore/SCMED.

62. Wright owed a duty of loyalty to Moore/SCMED.

63. Wright's fiduciary duties to Black Duck required him to refrain from self-dealing at the expense of Black Duck and its members.

64. Wright is personally liable for breaches of fiduciary duty committed by Wright through Black Duck.

65. Wright is personally liable for breaches of fiduciary duty committed by Wright through KrisJenn.

66. KrisJenn is liable for fiduciary breaches committed by Wright through KrisJenn.

67. In light of the factual findings above, DMA and Moore prevail on their claims for breach of fiduciary duty and are entitled to recover $2,28 million in damages from Wright and/or KrisJenn.

68. In light of the factual findings above, DMA and Moore are entitled to disgorgement of KrisJenn and Wright's interest in the right-of-way.

69. In light of the factual findings above, DMA and Moore are entitled to a constructive trust with respect to KrisJenn and Wright's interest in the right-of-way.

**G.    Knowing Participation in Breach of Fiduciary Duty**

70. To prevail on a claim for knowing participation in breach of fiduciary duty, a plaintiff must establish (1) the existence of a fiduciary relationship; (2) the third party knew of the fiduciary relationship; and (3) the third party was aware that it was participating in a breach of the fiduciary relationship. *D'Onofrio v. Vacations Publ'ns, Inc.*, 888 F.3d 197, 215–16 (5th Cir. 2018).

71.     In light of the factual findings above, DMA and Moore prevail on their claims for knowing participation in breach of fiduciary duty and are entitled to recover $2,28 million in damages from Wright and/or KrisJenn.

72.     In light of the factual findings above, DMA and Moore are entitled to disgorgement of KrisJenn and Wright's interest in the right-of-way.

73.     In light of the factual findings above, DMA and Moore are entitled to a constructive trust with respect to KrisJenn and Wright's interest in the right-of-way.

## H.     Tortious Interference with Contract

74.     To prevail on a claim for tortious interference with contract, the plaintiff must establish (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage; and (4) actual damage or loss. *Powell Indus., Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998) (per curiam).

75.     In light of the factual findings above, Longbranch prevails on its claim for tortious interference and is entitled to recover $2.08 million in damages from Wright and/or KrisJenn.

76.     In light of the factual findings above, DMA and Moore prevail on their claims for tortious interference and are entitled to recover $2.08 million in damages from Wright and/or KrisJenn.

77.     In light of the factual findings above, Longbranch, DMA, and Moore are entitled to disgorgement of KrisJenn and Wright's interest in the right-of-way.

78.     In light of the factual findings above, Longbranch, DMA, and Moore are entitled to a constructive trust with respect to KrisJenn and Wright's interest in the right-of-way.

79.     Because Wright and KrisJenn's interference was fraudulent and otherwise tortious, Wright and KrisJenn cannot rely on the affirmative defenses of justification or privilege.

## I.     Promissory Estoppel

80.     To prevail on a promissory-estoppel claim, the plaintiff must establish that (1) the defendant made a promise to induce substantial action or forbearance by the plaintiff; and (2) injustice can be avoided only by enforcement of the promise. *Martin-Janson v. JP Morgan Chase Bank, NA*, 536 F. App'x 394, 398 (5th Cir. 2013) (per curiam) (unpublished) (citing *In re Weekley Homes, LP*, 180 S.W.3d 127 (Tex. 2005)).

81.     In light of the factual findings above, injustice can only be avoided by enforcing the DMA Agreement against KrisJenn.

## J.     Money Had and Received

82.     To prevail on a claim for money had and receive, the plaintiff must establish that the defendant held money which in equity and good conscience belongs to the plaintiff. *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004); *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015).

83.     Because 20% of the net profits received by Wright and KrisJenn belong in equity and good conscience to Longbranch, Longbranch prevails on its claim for money had and received and is entitled to recover $500,000 from Wright and/or KrisJenn.

84.     Because 20% of the net profits received by Wright and KrisJenn belong in equity and good conscience to DMA, DMA and Moore prevail on their claims for money had and received and are entitled to recover $500,000 from Wright and/or KrisJenn.

## K.     Unjust Enrichment

85.     To prevail on a claim for unjust enrichment, the plaintiff must show that the defendant obtained a benefit from another by fraud, duress, or the taking of undue advantage. *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

86.     Because Wright, Black Duck, and KrisJenn were unjustly enriched at DMA, Moore, and Longbranch's expense, Longbranch prevails on its unjust enrichment claim and is entitled to recover Wright and KrisJenn's wrongful gain, consisting of the value of DMA and Longbranch's interests in the right of way as well as KrisJenn's receipt of up to $6,000,000 from McLeod in connection with the right-of-way.

87.     Because Wright, Black Duck, and KrisJenn were unjustly enriched at Moore and DMA's expense, Moore and DMA prevail on their unjust enrichment claims and are entitled to recover Wright and KrisJenn's wrongful gain, consisting of the value of DMA and Longbranch's interests in the right of way as well as KrisJenn's receipt of up to $6,000,000 from McLeod in connection with the right-of-way.

## L.     Civil Conspiracy

88.     To prevail on a civil-conspiracy claim, the plaintiff must establish (1) a combination of two or more persons; (2) the persons sought to accomplish an

object or course of action; (3) the persons reached a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts taken in pursuance of the object or course of action; and (5) damages proximately caused by the act or acts. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017).

89. In light of the factual findings above, the Court concludes that Black Duck, Wright, and KrisJenn were part of a civil conspiracy to defraud Moore and DMA, and that Moore and DMA are entitled to recover $2.7 million in damages from Wright and KrisJenn.

## M. Nondischargeability

90. Because Wright and KrisJenn committed actual fraud and used false pretenses and false representations to obtain Moore's interest in Black Duck and to avoid paying DMA's net-profits interest, debts owed by KrisJenn in connection with the Email Agreement, the DMA Agreement, and the Harris SWD Agreement are nondischargeable. 11 U.S.C. §523(a)(2)(A).

91. Because Wright and KrisJenn committed fraud or defalcation while acting in a fiduciary capacity, debts owed by KrisJenn in connection with the Email Agreement, the DMA Agreement, and the Harris SWD Agreement are nondischargeable. 11 U.S.C. §523(a)(4).

92. Because Wright and KrisJenn inflicted willful and malicious injury on Longbranch, DMA, Moore, and their property, debts owed by KrisJenn in connection with Longbranch, Moore, and DMA's claims in this lawsuit are nondischargeable. 11 U.S.C. §523(a)(6).

93. The nondischargeable debts include the amounts owed to Moore on claims related to the Email Agreement, the DMA Agreement, and the Harris SWD Agreement, as well as attorneys' fees incurred by Moore in seeking to recover for breach of those agreements, because Moore is entitled to such fees under state law, and those fees arise from or on account of the conduct resulting in the nondischargeable debt. *See In re Kirk*, 525 B.R. 325, 330–32 (Bankr. W.D. Tex. 2015); Tex. Civ. Prac. & Rem. Code §38.001.

## N. Exemplary Damages

94. Because Moore, Longbranch, and DMA's injuries resulted from Wright's gross negligence, malice, and actual fraud, Moore, Longbranch, and DMA are entitled to exemplary damages under Texas Civil Practice and Remedies Code §41.003(a).

95. Moore and DMA are entitled to recover exemplary damages of $4 million.

96.     Longbranch is entitled to recover exemplary damages of $4 million.

## II.     Claims Related to the Bigfoot Note Payments

### A.     Breach of Contract

97.     To prevail on a breach-of-contract claim, a plaintiff must establish (1) a valid contract existed; (2) the plaintiff performed or tendered performance; (3) the defendant breached the contract; and (4) the plaintiff sustained damages because of the breach. *WC 1899 McKinney Ave., LLC v. STK Dallas, LLC*, 380 F. Supp. 3d 595, 601 (W.D. Tex. 2019).

98.     In light of the factual findings above, DMA prevails on its breach of contract claim and is entitled to recover $175,143.60 for breach of the Email Agreement and Harris SWD Agreement.

99.     DMA is also entitled to recover attorneys' fees and costs incurred in pursuing this claim. *See* TEX. CIV. PRAC. & REM. CODE §38.001.

### B.     Conversion

100.     To prevail on a conversion claim, a plaintiff must establish that (1) the plaintiff owned or had legal possession of the property or an entitlement to possession; (2) the defendant unlawfully and without authorization assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; (3) the plaintiff demanded return of the property; and (4) the defendant refused to return the property. *Smith v. Maximum Racing, Inc.*, 136 S.W.3d 337, 341 (Tex. App—Austin 2004, no pet.)

101.     In light of the factual findings above, DMA prevails on its conversion claim and is entitled to recover $70,000 in damages from Wright and/or KrisJenn.

### C.     Money Had and Received

102.     To prevail on a claim for money had and receive, the plaintiff must establish that the defendant held money which in equity and good conscience belongs to the plaintiff. *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 840 (5th Cir. 2004); *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 302 n.4 (Tex. 2015).

103.     In light of the factual findings above, DMA prevails on its money-had-and-received claim and is entitled to recover $63,688.58 from Wright and/or KrisJenn.

### D.     Breach of Fiduciary Duty

104.     To prevail on a breach-of-fiduciary-duty claim, a plaintiff must establish (1) a

fiduciary relationship existed between the plaintiff and defendant; (2) the defendant breached the fiduciary duty; and (3) the breach resulted in jury to the plaintiff or benefit to the defendant. *D'Onofrio v. Vacations Publ'ns, Inc.*, 888 F.3d 197, 215–16 (5th Cir. 2018).

105. Wright, Black Duck, and/or KrisJenn owed fiduciary duties to DMA as custodians and agents for payment with respect to the Bigfoot promissory note.

106. In light of these findings and conclusions, DMA prevails on its fiduciary breach claim with respect to the Harris SWD Agreement and is entitled to recover $175,143.60 in damages from Wright and/or KrisJenn.

### E. Joint Liability of Wright and KrisJenn

107. Under Texas law, members of a limited liability company may be liable for the company's contractual obligations when the company is used to perpetrate an "actual fraud" on the plaintiff for the direct benefit of the defendant." TEX. BUS. ORG. CODE §21.223; *see also Spring Street Partners–IV, LP v. Lam*, 730 F.3d 427, 442–43 (5th Cir. 2013) (alteration in original) (citing *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd)); *Matter of Ritz*, 832 F.3d 560, 567 (5th Cir. 2016).

108. Section 21.223 applies to domestic corporations as well as limited liability companies and foreign companies. *See* TEX. BUS. ORG. CODE §101.002(a); *id.* §9.203.

109. For purposes of piercing the veil of a company or corporation to hold a member or shareholder liable, actual fraud is defined as conduct "'involv[ing] dishonesty of purpose or intent to deceive.'" *Spring Street Partners–IV, LP v. Lam*, 730 F.3d 427, 442–43 (5th Cir. 2013) (alteration in original) (citing *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd)); *see also Matter of Ritz*, 832 F.3d 560, 567 (5th Cir. 2016).

110. Wright used Black Duck as an alter ego of KrisJenn after Moore withdrew from Black Duck.

111. KrisJenn is liable for fraudulent actions taken by Black Duck at Wright's direction.

112. Wright is personally liable for fraudulent actions taken by Black Duck.

113. KrisJenn is an alter ego of Wright such that the corporate veil between Wright and KrisJenn should be disregarded.

114. KrisJenn is liable for fraudulent actions taken by Wright.

**F.    Unjust Enrichment**

115.    To prevail on a claim for unjust enrichment, the plaintiff must show that the defendant obtained a benefit from another by fraud, duress, or the taking of undue advantage. *Heldenfels Bros. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

116.    Because Wright, Black Duck, and KrisJenn were unjustly enriched at DMA's expense, DMA prevails on its unjust enrichment claims with respect to the Bigfoot note payments and is entitled to recover $63,688.58 from Wright and/or KrisJenn.

**G.    Declaratory Claim**

117.    28 U.S.C. §2201 allows federal courts to declare the rights and legal relations of any interested party seeking such declaration, regardless of whether or not further relief is sought.

118.    On August 14, 2020, DMA filed a Motion for Partial Summary Judgment in adversary proceeding number 20-05027, asking this Court to recognize DMA's right to 50% of the payments Bigfoot made on the promissory note.

119.    On October 13, 2020, this Court heard and granted DMA's Motion for Partial Summary Judgment. The Court found that DMA had a "right to payments of 50% under the note."

120.    The phrases "[DMA] is entitled to receive 50% of all Gross Monies received by [Black Duck] including its successors and assigns for the remainder of all payments due to [Black Duck] from Big foot" and "[DMA] is a 50% carried interest party" mean that DMA has a carried interest in and right to 50% of the Bigfoot note payments.

**III.    Affirmative Defenses to KrisJenn's Tortious-Interference Claim**

**A.    Justification and Privilege**

121.    DMA, Moore, and Longbranch were justified in informing TCRG of their interests created by the Longbranch Assignment and DMA Agreement.

122.    DMA, Moore, and Longbranch were privileged to provide the Longbranch Assignment and DMA Agreement to TCRG.

123.    Because DMA, Moore, and Longbranch have established their affirmative defenses of justification and privilege, KrisJenn is not entitled to recover on its tortious-interference claim.

**B.     Unclean Hands**

124.    Because Wright and KrisJenn have unclean hands with respect to the sale to
TCRG, KrisJenn is not entitled to recover on its tortious-interference claim.

## PRAYER FOR RELIEF

<u>DMA and Moore respectfully request:</u>

a.      A judicial declaration that

i.      DMA received a 20% net-profits share that attaches and runs with the P-21/Express right-of-way and that such interest was received in exchange for Moore's resignation from Black Duck and agreement to surrender of his 50% ownership stake in Black Duck and its assets;

ii.     KrisJenn, as successor to the right-of-way and member of Black Duck, had notice of DMA's net-profits interest and is bound to honor the DMA Agreement. Additionally and alternatively, KrisJenn is an assignee of the right-of-way and is bound to honor the DMA Agreement;

iii.    The phrase "pipe and related facilities commonly known as the P-21 or Express pipeline" encompasses the pipeline as well as the associated right-of-way;

iv.     The phrase DMA "shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors and assigns" means that Black Duck and any subsequent owners of the right-of-way are required to pay DMA 20% of net-profits generated through operation, use, maintenance, or sale—including partial sales or conveyances—of the right-of-way; and

v.      "Net Profits" means the means the gross revenues that Black Duck, KrisJenn, and any subsequent owners of the right-of-way receive directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the right-of-way less the actual costs of goods and expenses associated with operation or sale of the same. The cost of purchasing the right-way is not a cost that is included in the net-profits calculation.

b.      an injunctive order that Wright and KrisJenn specifically perform the Email Agreement and DMA Agreement, including the obligation to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the DMA] Agreement[;]"

c.      a judicial declaration that

      i.     DMA has a carried interest in and a right to 50% of Bigfoot Energy's note payments; and

      ii.    DMA is entitled to at least $175,143.60 of the money in the Panola court registry.

d.     an order directing the clerk of the Panola County Court to release at least $175,143.60 in the court's registry to Johns and Counsel PLLC in Trust for DMA Properties, Inc;

e.     an award of $2.08 million in money damages for the loss of, or damage to the value of, the 20% net-profits share under the Email Agreement and DMA Agreement;

f.     an award of $2.7 million in money damages for harm resulting from the torts of Wright and KrisJenn;

g.     an award of reasonable and necessary attorneys' fees incurred in this action, to be determined following trial;

h.     an award of $4 million in exemplary damages;

i.     the disgorgement of and/or imposition of a constructive trust on any interests (including but not limited to property interests and contractual interests in or related to the right-of-way), proceeds, profits, or ill-begotten funds received by Wright and KrisJenn as a remedy for fraud, breach of fiduciary duty, and/or unjust enrichment;

j.     an accounting to determine the amount of funds improperly withheld from DMA in connection with profits earned through the right-of-way;

k.     pre- and postjudgment interest and costs of suit; and/or

l.     any other legal or equitable relief to which DMA or Moore may show themselves to be justly entitled.

<u>Longbranch respectfully requests:</u>

a.     A judicial declaration that

      i.     Longbranch received a 20% net-profits share that attaches and runs with the P-21/Express right-of-way and that such interest was received in exchange for Longbranch's assignment of the right to purchase the P-21/Express right-of-way;

    ii.    KrisJenn, as successor to the right-of-way and member of Black Duck, had notice of Longbranch's net-profits interest and is bound to honor the Longbranch Assignment. Additionally and alternatively, KrisJenn is an assignee of the right-of-way and is bound to honor the Longbranch Assignment;

    iii.    The phrase "pipe and related facilities commonly known as the P-21 or Express pipeline" encompasses the pipeline as well as the associated right-of-way;

    iv.    The phrase "[Longbranch] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from [Black Duck] or its successors and assigns" means that Black Duck and any subsequent owners of the right-of-way are required to pay Longbranch 20% of net-profits generated through operation, use, maintenance, or sale—including partial sales or conveyances—of the right-of-way; and

    v.    "Net Profits" means the means the gross revenues that Black Duck, KrisJenn, and any subsequent owners of the right-of-way receive directly from the operation, use, maintenance, or sale (including partial sales or conveyances) of the right-of-way less the actual costs of goods and expenses associated with operation or sale of the same. The cost of purchasing the right-way is not a cost that is included in the net-profits calculation;

b.    an injunctive order that Wright and KrisJenn specifically perform the Email Agreement and DMA Agreement, including the obligation to "execute such other and additional legal instruments, consents, ratifications and other matters as may be reasonably required in order to effectuate the intent of [the DMA] Agreement[;]"

c.    an award of $2.08 million in money damages for the loss of, or damage to the value of, the 20% net-profits share under the Longbranch Assignment;

d.    an award of $2.7 million in money damages for harm resulting from the torts of Wright and KrisJenn;

e.    an award of reasonable and necessary attorneys' fees incurred in this action, to be determined following trial;

f.    an award of $4 million in exemplary damages;

g.    the disgorgement of and/or imposition of a constructive trust on any interests (including but not limited to property interests and contractual interests in or related to the right-of-way), proceeds, profits, or ill-begotten funds received by Wright and KrisJenn as a remedy for fraud and/or unjust enrichment;

h.  an accounting to determine the amount of funds improperly withheld from Longbranch in connection with profits earned through the right-of-way;

i.  pre- and postjudgment interest and costs of suit; and/or

j.  any other legal or equitable relief to which Longbranch may show itself to be justly entitled.

Respectfully submitted,

*/s/ Christopher S. Johns*
Christopher S. Johns
State Bar No. 24044849
Christen Mason Hebert
State Bar No. 24099898
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

*/s/ Timothy Cleveland*
Timothy Cleveland
State Bar No. 24055318
Austin Krist
State Bar No. 24106170
CLEVELAND | TERRAZAS PLLC
303 Camp Craft Road, Suite 325
Austin, Texas 78746
(512) 689-8698
tcleveland@clevelandterrazas.com
akrist@clevelandterrazas.com

*Attorneys for Longbranch Energy, DMA
Properties, and Frank Daniel Moore*

Andrew R. Seger
State Bar No. 24046815
KEY TERRELL & SEGER
4825 50th Street, Suite A
Lubbock, Texas 79414
806-793-1906
806-792-2135 fax
aseger@thesegerfirm.com

Natalie F. Wilson
State Bar No. 24076779
LANGLEY & BANACK
745 East Mulberry Avenue, Suite 700
San Antonio, Texas 78212
210-736-6600
210-735-6889 fax
nwilson@langleybanack.com

*Attorneys for DMA Properties and Frank
Daniel Moore*

Michael Black
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, TX 78209
mblack@burnsandblack.com

Jeffery Duke
DUKE BANISTER MILLER & MILLER
22310 Grand Corner Drive, Suite 110
Katy, TX 77494
jduke@dbmmlaw.com

*Counsel for Longbranch Energy*

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2021 a true and correct copy of the foregoing document was transmitted to each of the parties via the Court's electronic transmission facilities and/or via electronic mail as noted below. For those parties not registered to receive electronic service, a true and correct copy of the foregoing document was served by United States Mail, first class, postage prepaid, at the address noted below.

| | |
|---|---|
| Ronald J. Smeberg<br>Charles John Muller, IV<br>MULLER SMEBERG, PLLC<br>111 W. Sunset<br>San Antonio, TX 78209<br>ron@smeberg.com<br>john@muller-smeberg.com<br><br>*Counsel for KrisJenn Ranch, LLC,*<br>*Krisjenn Ranch, LLC, Series Uvalde*<br>*Ranch, KrisJenn Ranch, LLC, Series*<br>*Pipeline Row* | Michael Black<br>BURNS & BLACK PLLC<br>750 Rittiman Road<br>San Antonio, TX 78209<br>mblack@burnsandblack.com<br><br>Jeffery Duke<br>DUKE BANISTER MILLER & MILLER<br>22310 Grand Corner Drive, Suite 110<br>Katy, TX 77494<br>jduke@dbmmlaw.com<br><br>*Counsel for Longbranch Energy, LP* |
| Ronald J. Smeberg<br>THE SMEBERG LAW FIRM, PLLC<br>2010 W Kings Hwy<br>San Antonio, TX 78201-4926<br>ron@smeberg.com<br><br>*Counsel for Black Duck Properties, LLC* | Shane P. Tobin<br>OFFICE OF THE U.S. TRUSTEE<br>903 San Jacinto Blvd, Room 230<br>Austin, Texas 78701<br>shane.p.tobin@usdoj.gov<br><br>*United States Trustee* |
| William P Germany<br>BAYNE, SNELL & KRAUSE<br>1250 N.E. Loop 410, Suite 725<br>San Antonio, TX 78209<br>wgermany@bsklaw.com<br><br>*Counsel for Larry Wright* | John Terrill<br>12712 Arrowhead Lane<br>Oklahoma City, OK 73120<br><br>*Third Party-Defendant, pro se* |
| Laura L. Worsham<br>JONES, ALLEN & FUQUAY, L.L.P.<br>8828 Greenville Avenue<br>Dallas, TX 75243<br>lworsham@jonesallen.com<br><br>*Counsel for McLeod Oil, LLC* | |

/s/ Christopher S. Johns
Christopher S. Johns