# EXHIBIT A

**Page 1**

```
                    IN THE UNITED STATES BANKRUPTCY
                 FOR THE WESTERN DISTRICT OF TEXAS
                        SAN ANTONIO DIVISION
In re:                         )  CHAPTER 11
                               )
KRISJENN RANCH, LLC,           )
                               )
     Debtor                    )  CASE NO. 20-50805
_____)
                               )
KRISJENN RANCH, LLC,           )
KRISJENN RANCH, LLC-SERIES     )
UVALDE RANCH, AND KRISJENN     )
RANCH, LLC-SERIES PIPELINE     )
ROW, as successors in          )
interest to BLACK DUCK         )
PROPERTIES, LLC,               )
                               )
     Plaintiffs,               )
                               )
V.                             )  ADVERSARY NO. 20-05027
                               )
DMA PROPERTIES, INC., AND      )
LONGBRANCH ENERGY, LP,         )
                               )
     Defendants.               )
_____)
                               )
DMA PROPERTIES, INC.,          )  CHAPTER 11
                               )
     Cross-Plaintiff/          )
     Third-Party Plaintiff,    )
                               )  ADVERSARY NO. 20-05027
V.                             )
                               )
KRISJENN RANCH, LLC,           )
KRISJENN RANCH, LLC-SERIES     )
UVALDE RANCH, AND KRISJENN     )
RANCH, LLC-SERIES PIPELINE     )
ROW, BLACK DUCK                )
PROPERTIES, LLC, LARRY         )
WRIGHT, AND JOHN TERRILL,      )
                               )
     Cross-Defendant/          )
     Third-Party Defendants.   )
```

Page 1

**Page 2**

```
            -----------------------------------
                 ORAL AND VIDEOTAPED DEPOSITION OF

                           LARRY WRIGHT

                       SEPTEMBER 29, 2020

                         Volume 1 of 2

            -----------------------------------
```

ORAL AND VIDEOTAPED DEPOSITION OF LARRY WRIGHT,
produced as a witness at the instance of DMA PROPERTIES,
INC., AND FRANK DANIEL MOORE, and duly sworn, was taken
in the above-styled and numbered cause on SEPTEMBER 29,
2020, from 9:13 a.m. to 5:23 p.m., via Zoom
videoconference, before Kailee Pereida, CSR in and for
the State of Texas, reported by machine shorthand
pursuant to the Federal Rules of Civil Procedure.

Page 2

**Page 3**

A P P E A R A N C E S

FOR PLAINTIFFS, KRISJENN RANCH, LLC, KRISJENN RANCH,
LLC, SERIES-UVALDE RANCH, KRISJENN RANCH, LLC,
SERIES-PIPELINE ROW:

     MR. JOHN MULLER (Via Videoconference)
     MULLER SMEBERG, PLLC
     111 West Sunset Road
     San Antonio, Texas 78209
     (210) 664-5000
     john@muller-smeberg.com

FOR FRANK DANIEL MOORE AND DMA PROPERTIES, INC.:

     MR. TIMOTHY CLEVELAND (Via Videoconference)
     CLEVELAND TERRAZAS PLLC
     4611 Bee Cave Road
     Suite 306B
     Austin, Texas 78746
     (512) 689-8698
     tcleveland@clevelandterrazas.com

          -AND-

     MR. CHRISTOPHER S. JOHNS (Via Videoconference)
     -AND-
     MS. CHRISTEN MASON HEBERT (Via Videoconference)
     JOHNS & COUNSEL PLLC
     14101 Highway 290 West
     Suite 400A
     Austin, Texas 78737
     (512) 399-3150
     cjohns@johnsandcounsel.com
     chebert@johnsandcounsel.com
FOR LARRY WRIGHT:
     MR. WILLIAM GERMANY (Via Videoconference)
     THE LAW OFFICES OF BAYNE, SNELL AND KRAUSE
     1250 NE Interstate 410 Loop
     Suite 725
     San Antonio, Texas 78209
     (210) 824-3278

Page 3

**Page 4**

ALSO PRESENT:

     Mr. Darin Borders (Via Videoconference)
     Mr. Adam McLeod (Via Videoconference)
     Mr. John McLeod (Via Videoconference)
     Mr. Daniel Moore (Via Videoconference)
     Ms. Kailee Pereida, The Reporter (Via
Videoconference)
     Mr. Shane Ramirez, The Videographer (Via
Videoconference)
     Ms. Gwynne Wright

Page 4

```
1                    INDEX
                                            PAGE
2   Appearances.......................................  3
3   LARRY WRIGHT
4     EXAMINATION BY MR. CLEVELAND...................  8
5
6   Signature and Changes............................ 271
    Reporter's Certificate........................... 274
7                   EXHIBITS
8   NO.      DESCRIPTION                         PAGE
9   Exhibit 1    Notice of Deposition of KrisJenn
                 Ranch, LLC, and Its Series........... 14
10  Exhibit 2    E-mails, McLeod001507................ 27
    Exhibit 3    E-mails, McLeod002943 and 002944..... 32
11  Exhibit 4    E-mails................................125
    Exhibit 5    E-mails, McLeod0745 through 0747.......139
12  Exhibit 6    E-mails, McLeod000523 through 000525...143
    Exhibit 7    Letter From William D. Kuhlmann, Jr.,
13               Dated April 23, 2020, McLeod002215
                 and 002216..............................146
14  Exhibit 8    Company Agreement of Black Duck
                 Properties, LLC.......................160
15  Exhibit 9    Compromise Settlement Agreement........191
    Exhibit 10   E-mails................................177
16  Exhibit 11   E-mails................................187
    Exhibit 12   Agreement for Assignment and
17               Assumption of Specific Contract.......205
    Exhibit 16   Deed of Trust.........................259
18  Exhibit 17   E-mails................................247
    Exhibit 18   DMA Agreement.........................240
19
20
21
22
23
24
25
                                          Page 5
```

```
1                    THE VIDEOGRAPHER:  Here begins the
2   deposition of Larry Wright.  Today's date is September
3   29th, 2020.  The time is 9:13 a.m.  This deposition is
4   being recorded live via Zoom.
5                    Will the court reporter please do her read
6   on and swear in the witness?
7                    (Witness sworn by court reporter.)
8                    THE REPORTER:  And before we get started,
9   can I get everyone to please state their appearances for
10  the record?
11                   THE WITNESS:  Larry Wright.
12                   MR. MULLER:  This is John Muller on
13  behalf of Mr. Wright and -- I'm sorry -- on behalf of
14  KrisJenn Ranch.  And then Gwynne Wright is also here as
15  a representative of KrisJenn Ranch.
16                   MR. GERMANY:  William Germany on behalf
17  of Larry Wright.
18                   MR. CLEVELAND:  Tim Cleveland, Chris
19  Johns, Christie Hebert on behalf of DMA Properties,
20  Daniel Moore, Longbranch Energy, and Darin Borders;
21  although this deposition has been noticed only by DMA
22  Properties.  And with us as well is Daniel Moore by
23  phone.  And Darin Borders is also with us by phone.
24                   And I think I see -- just so we have a
25  complete record, I think Mr. McLeod is on the phone.
                                          Page 6
```

```
1   He's on mute.  But since the court reporter asked
2   everybody to announce themselves, I think one of them --
3   either John or Adam McLeod is going to be listening in
4   as well.
5                    Is that right, sir?
6                    MR. MULLER:  Mr. McLeod here is a party?
7                    MR. JOHN MCLEOD:  Yeah, I just dialed in
8   because Laura sent this to me.  Should I -- should I not
9   be listening, or is that okay or --
10                   MR. MULLER:  You're certainly allowed to
11  listen if you're a party to the lawsuit.  I don't
12  believe you are at this time.
13                   MR. JOHN MCLEOD:  Well, she --
14                   MR. CLEVELAND:  Well, I think, John,
15  McLeod Oil is one of the creditors, so they are --
16  they're a party to the proceeding.  So I -- I think --
17  that would be my understanding of why he's listening in
18  and why I shared it with Ms. Worsham, McLeod Oil's
19  counsel.
20                   MR. MULLER:  Well, I'll confess to not
21  being an expert in bankruptcy.  I believe this is a
22  regular deposition notice as opposed to a 2004.  Let
23  me -- go ahead and proceed.  I'll make --
24                   MR. CLEVELAND:  Okay.
25                   MR. MULLER:  -- an objection to
                                          Page 7
```

```
1   Mr. McLeod being here right now.  But while I'm doing --
2   while you're doing the initial part of your examination,
3   I'll reach out to Ron and see if we have any real
4   issues.  If not --
5                    MR. CLEVELAND:  Okay.  Great.
6                    MR. MULLER:  Or I'll just stop you if I
7   want to continue on the objection.  We can proceed for
8   now.
9                    MR. JOHN MCLEOD:  That'll -- that'll be
10  fine.  I mean, I can -- I can get off if it upsets
11  anybody too much, so...
12                   MR. MULLER:  No, it doesn't upset
13  anybody.  I just want to make sure we're -- we're doing
14  right.  But let me -- let me check with my -- my smarter
15  half, and I'll get right back to you.
16                   MR. JOHN MCLEOD:  Okay.
17                   MR. CLEVELAND:  Okay.  Kailee, am I good
18  to proceed?
19                   THE REPORTER:  Yes, sir.
20                   MR. CLEVELAND:  Okay.
21                   LARRY WRIGHT,
22  having been first duly sworn, testified as follows:
23                   EXAMINATION
24  BY MR. CLEVELAND:
25      Q.  Mr. Wright, good morning.
                                          Page 8
```

1    A.   Good morning.

2    Q.   Sir, you understand that you just took an oath

3  from our court reporter to tell the truth today, sir?

4    A.   Yes.

5    Q.   Do you understand that that's the same oath

6  that you would take if we were, one, in the same

7  deposition room together physically and also if we were

8  in a courtroom together in San Antonio, Texas?  Do you

9  understand that, sir?

10    A.   Yes.

11    Q.   Okay.  And your full name, as you -- as you

12  stated earlier, is Larry Michael Wright; is that right,

13  sir?

14    A.   Yes.

15    Q.   And what is your residential address,

16  Mr. Wright?

17    A.   410 Spyglass, McQueeney, Texas.

18    Q.   Okay.  And, Mr. Wright, are you, sir, under

19  the influence of any substance or medication this

20  morning that would affect your ability to testify

21  truthfully?

22    A.   No, sir.

23    Q.   Is there any other reason, sir, that you're

24  not able to testify truthfully and give your best

25  answers to my questions today?

1    A.   None.

2    Q.   Okay.  And, Mr. Wright, this is a little

3  unusual because we're taking this deposition by Zoom.

4  And as you've already seen, there is -- there can be

5  some feedback.  There can be slow transmissions of

6  questions and answers.

7       So I think it's very important today that

8  we -- we both agree to slow down and that you let me

9  finish my question before you start your answer.  And,

10  likewise, I will do my best to let you finish your

11  answer before I start my next question.  Is that --

12    A.   Correct.

13    Q.   Does that sound good to you, sir?

14    A.   Yes.

15       Is there a way I can see your video --

16    Q.   Well --

17    A.   -- so I can see --

18    Q.   -- you know --

19    A.   -- who's answering the questions?

20    Q.   Oh, well, Mr. Wright, this is Tim Cleveland.

21  And I am going to be asking the questions today.  I am

22  not on video because I'm going to be sharing my screen

23  shortly to show you exhibits, and so I am not on video.

24       But if you have any -- if you have any

25  question about who's asking the question or what I've

1  asked, please let me know, and I'll clarify it for you,

2  okay?

3    A.   Okay.  Yes.  I was told you would be on video

4  though.  I'd like to -- to see your facial expressions

5  asking the questions.

6    Q.   Well, I tell you what.  We're -- in the -- in

7  the -- in a deposition, if we were in the same room, the

8  video -- you would be the only person being videoed.  So

9  what we're going to do is we're going to get started,

10  okay?

11       Now --

12    A.   Well, I would like to --

13    Q.   -- Mr. Wright -- okay.  You ready, Mr. Wright?

14    A.   Sure.

15    Q.   Okay.  Are you aware, Mr. Wright, that you are

16  appearing today for testimony not only in your

17  individual capacity, but as a corporate representative

18  of the debtors in this proceeding, that being KrisJenn

19  Ranch, KrisJenn Ranch-Series Uvalde, and KrisJenn

20  Ranch-Series Pipeline ROW?  Are you aware of that, sir?

21    A.   That is correct.

22       MR. MULLER:  Hey, Tim, I'm sorry.  Can I

23  interrupt you briefly?

24       MR. CLEVELAND:  Yes, sir.

25       MR. MULLER:  And I'm sorry.  I should

1  have addressed this with you at the beginning of the

2  case.

3       How are we handling this?  Are we taking

4  all three depos at the same time, or are we going to

5  bifurcate the depositions?

6       MR. CLEVELAND:  I -- I am just going to

7  take them all at the same time.  I think -- I doubt his

8  answers would be -- well, we'll just say, I'm -- we're

9  just going to go through it to see how quickly we can

10  get through everything so we don't have to take the

11  first -- the full two days.  So we're just going to

12  do -- do them all.  And if Mr. Wright has any question

13  or if you have any question about capacity in terms of

14  how the question is being asked, let me know.

15       MR. MULLER:  No, I think he understands

16  that when he answers the questions, he's answering

17  for -- you know, the answer might be different.  The

18  problem here is that when he speaks for three different

19  people, he -- the answers might be different for one

20  entity to the next.

21       MR. CLEVELAND:  Well --

22       MR. MULLER:  So --

23       (Unreportable crosstalk.)

24       MR. CLEVELAND:  -- I -- let me -- what

25  I -- what I'd suggest is -- can you put the witness back

1  on the screen --

2          MR. MULLER:  Sure.

3          MR. CLEVELAND:  -- John?

4          MR. MULLER:  Sure.

5      Q.  (BY MR. CLEVELAND) Mr. Wright, if -- if you

6  have any -- if there is any reason that you need to

7  differentiate an answer to a question based upon your

8  testifying as the corporate rep of either KrisJenn Ranch

9  or its two Series, LLC's, will you let me know?

10     A.  Yes.

11         MR. MULLER:  I --

12     Q.  (BY MR. CLEVELAND) Okay.  You --

13         MR. MULLER:  I think -- I think -- I'm

14  just going to note for the record, I think Larry will

15  try to do that as best he can.  I think in some

16  instances, there might be some difficulty with that.

17         And I won't make a speaking objection, but

18  I might object to form on the basis of compound where I

19  think there is confusion.  But I'll just note that for

20  the record.

21         MR. CLEVELAND:  Okay.  And -- okay.

22         Kailee or Shane, I am trying to drag a

23  document into chat, and it's not letting me.  Are you

24  able to -- this is how I'm going to share exhibits.  Are

25  you able to enable that chat so I can share?

1          THE VIDEOGRAPHER:  You -- you can share

2  your screen for exhibits.  You have that option.

3          MR. CLEVELAND:  Well, I understand.  But

4  yesterday I was -- I was dragging PDFs in and --

5  maybe -- let me try it this way.

6          Yeah, it's -- it's not letting me do that.

7  Do you know -- do you have any idea, Shane?

8          THE VIDEOGRAPHER:  I've never had issue

9  with chat sharing of information.  Let me take a look.

10         MR. CLEVELAND:  Wait a second.  Let me

11  try this.  Copy.

12     Q.  (BY MR. CLEVELAND) All right.  While we're

13  working on that, Mr. Wright, I am -- can you see the

14  screen and this document with the case caption on it,

15  sir?

16     A.  Yes, I can.

17     Q.  Okay.  The one that has -- and you can see the

18  little hand that I'm controlling with my mouse up --

19     A.  Yes.

20     Q.  -- by, *In the United States Bankruptcy

21  Court*?  Do you see that, sir?

22     A.  Yes.  Yes, I can.

23     Q.  Okay.

24         (Exhibit 1 marked.)

25     Q.  While we work on the ability to share these

1  exhibits, I am showing you what I have marked as

2  Exhibit 1 to your deposition today.  Do you see

3  Exhibit 1 up here on the tab?

4      A.  Yes, I do.

5      Q.  Okay.  And have -- I am -- I am scrolling

6  down.  This is the Notice of Deposition of KrisJenn

7  Ranch, LLC, and Its Series.

8          Do you see that, sir, here on page 2?

9      A.  Yes, sir.

10     Q.  Okay.  And you'll see that this notices this

11  deposition for today.  I'm highlighting this.  Can you

12  see my highlights on September 29th, 2020?

13     A.  Yes.  Yes, sir.

14     Q.  And I am scrolling down further.  And there's

15  a page of definitions.

16         And, finally, I am -- I am on the page

17  with *Topics.*  Do you see that, sir?

18     A.  Yes, I do.

19     Q.  Have you seen this document before, sir?

20     A.  I was given that on Friday, I think, yes.

21     Q.  Okay.  And do you understand that you are

22  testifying here today on behalf of KrisJenn Ranch and

23  its Series LLC's with respect to the topics in this

24  Exhibit 1?

25     A.  Yes, sir.

1      Q.  And are you prepared to testify as the

2  corporate rep for the Debtors with respect to these

3  topics, sir?

4      A.  To the best of my ability, yes, sir.

5      Q.  Okay.  What did you do to prepare to give

6  testimony on behalf of the Debtors on these topics, sir?

7      A.  I reviewed them over the weekend.

8      Q.  You reviewed the topics themselves that are

9  here in Exhibit 1?

10     A.  Yes.

11     Q.  Did you do anything else?

12     A.  I reviewed them to see what they were relating

13  to.  Some of them -- some of the questions were

14  confusing.  But, yes, I reviewed them.

15     Q.  Okay.  And I appreciate that.  My question is:

16  Did you do anything else to prepare to testify as the

17  Debtor's representative today besides review these

18  topics in Exhibit 1?

19     A.  Well, no.  I mean, each topic, I -- I tried to

20  go into what the -- what the topic related to, yes, sir.

21     Q.  Did you review any documents to prepare

22  to testify today other than this Exhibit 1?

23     A.  You would have to ask me each document if I

24  reviewed it.  But --

25     Q.  Sir --

1    A.   -- I did look --
2    Q.   -- did you --
3    A.   I did look --
4    Q.   -- review any documents --
5    A.   -- at some -- I think I looked at the Harris
6  SWD agreement and --
7    Q.   Okay.
8    A.   -- some of that, yes, sir.  And then I looked
9  at some of the --
10   Q.   Anything else?
11   A.   I looked at some of the agreements on the
12 20 percent, those agreements.
13   Q.   Any -- anything else?
14   A.   I looked at some of the loan documents.
15   Q.   Okay.  Anything else?
16   A.   I -- just in general, I -- I think that was
17 really most of them.  I -- I think I did look at the
18 resignation of Mr. Moore.  I did look at some of the
19 closing documents on the pipeline.  And I did look at
20 the Longbranch agreement.
21   Q.   Okay.  Anything else?
22   A.   I -- I can't remember anything else.
23   Q.   Okay.  I am going to direct you to some of the
24 highlighted topics on this page 5.
25            Can you see these, sir?

1    A.   Yes.  Yes.
2    Q.   Okay.  Let's look at number 26.  You're
3  testifying today on behalf of the Debtors on your
4  communications with McLeod related to the right-of-way,
5  the DMA agreement, and/or the Longbranch assignment.
6            Do you see that, sir?
7    A.   I do.
8    Q.   And did you review your text messages with
9  Adam McLeod and your e-mails with the McLeods to be able
10 to testify on that topic, number 26, here today?
11   A.   I -- I'm not sure I did that.  And I did --
12   Q.   Okay.
13   A.   I don't -- I don't believe I have any text
14 messages.  And I did look at -- basically, with him, it
15 was the -- some e-mails, I believe.
16   Q.   Okay.  Did -- have you ever communicated with
17 Adam McLeod by text message, sir?
18   A.   I'm -- I'm sure I have.  I've known him for
19 ten years.
20   Q.   Okay.  But you did --
21   A.   Eight to --
22   Q.   -- not review any text mes- --
23   A.   Eight to -- eight to ten years, I believe.
24   Q.   But you did not review any text messages with
25 Adam McLeod to prepare for this deposition today?

1    A.   I -- I didn't because -- I did not.
2    Q.   Okay.  You do have text messages with Adam
3  McLeod about the right-of-way, don't you?
4    A.   I am not sure I do.
5    Q.   Okay.  Have you checked your phone to see if
6  you do?
7    A.   I am -- I am retired and not sure -- I never
8  was taught the language of the -- of the -- well,
9  everything just went away.
10   Q.   Okay.  Did -- have you replaced your cell
11 phone at all in the past year, Mr. Wright?
12   A.   No.
13   Q.   Okay.  Do you have your phone with you right
14 now?
15   A.   No.
16   Q.   Okay.  Do you have your phone with you in your
17 lawyer's office there?
18   A.   No.
19   Q.   Where is your phone located?
20   A.   It's in my truck.
21   Q.   Okay.  And is the truck with you at your
22 lawyer's office today?
23   A.   My -- it's at -- it's in Lake McQueeney.
24   Q.   Okay.  Have you deleted any text messages --
25 are you okay, sir?

1    A.   Yes.  I'm in my wife's truck today.  I should
2  have taken mine.  I let her drive.
3    Q.   Okay.  Have you deleted any text messages with
4  Adam McLeod, sir?
5    A.   I am not sure I have or haven't.
6    Q.   Okay.  You said you communicated with the
7  McLeods by e-mail as well?
8    A.   I believe so, yes, sir.
9    Q.   Okay.  How can you be prepared to testify as
10 the corporate representative on Topic 26, your
11 communications with the McLeods related to the
12 right-of-way, if you haven't reviewed your text messages
13 with them or your e-mails with them, Mr. Wright?
14   A.   I'm really not sure what you're trying to ask.
15 Is there anything in particular?
16   Q.   Well --
17   A.   I'm confused.
18   Q.   -- I am asking that question, sir, because
19 you're the corporate representative here today and had a
20 responsibility to prepare to testify on these 30 topics.
21 And --
22   A.   Correct.
23   Q.   -- if you're not ready to testify about your
24 communications with the McLeods, I need to know that.
25   A.   No, I'm prepared.  If there's anything in

1  particular, I would love to -- to answer them.  I'm
2  trying to -- to be open.
3      Q.  Okay.  Have you collected your text messages
4  with the McLeods and your e-mails with the McLeods and
5  provided them to your lawyers?
6      A.  They are being -- they are being collected
7  at -- every single text message and e-mail I have is --
8  is being collected to be presented, yes, sir.  I don't
9  have them --
10     Q.  Okay.
11     A.  I don't have --
12     Q.  Do you have --
13     A.  -- those -- those aren't due until the end of
14  the month.
15     Q.  Okay.  Do you have an auto-delete function on
16  your phone, sir, that would cause text messages to get
17  deleted after a certain period of time?
18     A.  I'm not familiar with that.  But I think that
19  there is a storage on them that says forever that I was
20  told by --
21     Q.  Okay.
22     A.  -- the person -- by the company that's
23  collecting them for me.
24     Q.  Okay.  And are you also collecting your
25  communications with John Terrill relating to the

Page 21

Veritext Legal Solutions
800-336-4000

1  right-of-way, the DMA agreement, and the Longbranch
2  assignment, sir?
3     A.  I've -- every e-mail that I've ever done with
4  him is being turned in, yes, sir.
5     Q.  Okay.  What about text messages?
6     A.  There was only one text message that -- that I
7  remember that he sent me, and it was on the
8  announcement.  And it was also sent to me by e-mail.  I
9  didn't do text messages with John Terrill.
10  Everything --
11     Q.  Okay.
12     A.  -- was by e-mail.
13     Q.  Okay.  All right.  Let's -- let's talk about
14  McLeod Oil.  You know John McLeod and Adam McLeod,
15  correct?
16     A.  I just met John.
17     Q.  When did you meet John?
18     A.  About a year ago, I believe.
19     Q.  Okay.  And you know that their entity that's a
20  creditor in this proceeding is called McLeod Oil, LLC?
21     A.  Yes, I do.
22     Q.  Okay.  I may refer to them collectively today
23  as the McLeods.  Is that okay with you, sir?
24     A.  Sure.
25     Q.  And have the McLeods paid any of your

Page 22

Veritext Legal Solutions
800-336-4000

1  attorney's fees that you've incurred in this bankruptcy
2  or adversary proceeding, sir?
3     A.  No.
4     Q.  Okay.  Have the McLeods ever paid any
5  attorney's fees incurred by you or any of your KrisJenn
6  Ranch entities?
7     A.  No, they have not.
8     Q.  Okay.  You have several agreements with the
9  McLeods, don't you, sir?
10     A.  If you could be specific.
11     Q.  Okay.  Well, you -- there is an option
12  agreement that you have with the McLeods related to the
13  right-of-way, correct?
14     A.  Correct.
15         MR. MULLER:  Objection; form.
16     Q.  (BY MR. CLEVELAND)  And that's the
17  right-of-way that Black Duck acquired back in 2017,
18  correct?
19         MR. MULLER:  Objection; form.
20     Q.  (BY MR. CLEVELAND)  Sir, you can answer.
21     A.  If I could see the document, but, yes, I did
22  sign an option agreement.
23     Q.  Okay.  And that option agreement with the
24  McLeods concerns what we've called in this case the
25  right-of-way, correct?

Page 23

Veritext Legal Solutions
800-336-4000

1         MR. MULLER:  Objection; form.
2     A.  Correct.
3     Q.  (BY MR. CLEVELAND)  And that right-of-way
4  that's the subject of that option agreement is also the
5  right-of-way that was acquired by Black Duck Properties
6  back in 2017 --
7         MR. MULLER:  Objection; form.
8     Q.  (BY MR. CLEVELAND)  -- is that true?
9     A.  Yes.
10     Q.  Okay.  And, Mr. Wright, you also have a loan
11  agreement with the McLeods, don't you?
12         MR. MULLER:  Objection; form.
13     A.  KrisJenn does, yes, sir.
14     Q.  (BY MR. CLEVELAND)  Okay.
15         MR. GERMANY:  Hold on.  Hold on.  I was
16  going --
17     Q.  (BY MR. CLEVELAND)  Mister --
18         MR. GERMANY:  On the questions,
19  Mr. Cleveland --
20         MR. CLEVELAND:  Who's speaking?
21         MR. GERMANY:  -- you're referring to
22  Mr. Wright in his individual capacity.  If you could
23  clarify on the --
24         MR. CLEVELAND:  No.  I'm referring to
25  the -- the witness is -- who is test- -- who is speaking

Page 24

Veritext Legal Solutions
800-336-4000

1  here?
2          MR. GERMANY:  This is William Germany.  I
3  represent Larry Wright in his individual capacity.
4          MR. CLEVELAND:  Right, Counsel.  He's
5  testifying today as the corporate representative, and so
6  he's --
7          MR. GERMANY:  Oh, okay.  But I was
8  just --
9          MR. CLEVELAND:  He has stated that he
10 understands that.
11         MR. GERMANY:  -- hearing you state -- you
12 were saying you.  And he's sitting right there, and
13 you're saying you have an agreement.  I would just
14 appreciate it if you clarified it.
15         MR. CLEVELAND:  Okay.
16     Q.  (BY MR. CLEVELAND)  Sir, do you understand,
17 Mr. Wright, that when I am talking about you, you are
18 the corporate representative of the Debtors for the
19 deposition today?  You understand that, right?
20         MR. MULLER:  Objection; form.  Do you --
21     Q.  (BY MR. CLEVELAND)  Sir?
22         MR. MULLER:  Tim, I'm sorry.  I don't
23 want to interrupt your deposition, but I thought we
24 addressed this a little while ago.  And you said you
25 were taking this deposition on behalf of three different

1  entities at the same time.  So I don't -- can you
2  rephrase the question?  I don't understand what you're
3  trying to ask him to agree to.
4      Q.  (BY MR. CLEVELAND)  All right.  Mr. Wright,
5  the option agreement with the McLeods is with KrisJenn
6  Ranch-Series Pipeline ROW, correct?
7      A.  Correct.
8      Q.  And you have loan agreements with the McLeods
9  on behalf of which KrisJenn entities?
10     A.  KrisJenn Ranch, LLC.
11     Q.  Okay.
12     A.  And --
13     Q.  Do you, Mr. Wright -- oh, I'm sorry, sir.
14 Were you done?
15     A.  Yes.
16     Q.  Do you, Mr. Wright, or the Debtors have any
17 other agreements with the McLeods other than the option
18 agreements and the loan agreement that you just
19 described?
20     A.  None.
21     Q.  Did you say "None"?
22     A.  Repeat the question, please.
23     Q.  Do you, Mr. Wright, or any of the Debtors have
24 any other agreements with the McLeods other than the
25 option agreement and the loan agreement that you just

1  described?
2      A.  I do not.
3      Q.  Okay.  You don't have any agreement that
4  requires the McLeods to provide you or the Debtor
5  entities with a percentage of the right-of-way if the
6  McLeods exercise their option to acquire the
7  right-of-way, do you?
8          MR. MULLER:  Objection; form.
9      A.  No.
10     Q.  (BY MR. CLEVELAND)  Okay.
11         (Exhibit 2 marked.)
12     Q.  All right.  Mr. Wright, I am going to share
13 the screen again and show you what I have marked as
14 Exhibit 2 to your deposition.
15         Can you see this, sir?
16     A.  Yes.
17     Q.  Mr. Wright?
18     A.  Yes.
19     Q.  Okay.  Can you see this -- the arrow that I'm
20 controlling on my screen that says "Exhibit 2" --
21     A.  Yes.
22     Q.  -- "Wright Deposition"?  Do you see that, sir?
23     A.  Yes.
24         MR. CLEVELAND:  And -- and, Counsel, just
25 so you know, I'm going to -- we'll either figure out

1  what to do with the chat, or I will be e-mailing these
2  marked exhibits to you -- and, Kailee, you as well --
3  just so we have a good record of these exhibits.
4      Q.  (BY MR. CLEVELAND)  Now --
5          MR. MULLER:  Okay.  I'm going to scoot
6  the camera over a little bit though just because it's
7  kind of hard for us to see from this distance.  So if
8  you don't mind, we're going to -- we're going to scoot
9  up a bit.
10         MR. CLEVELAND:  I don't mind at all.
11     Q.  (BY MR. CLEVELAND)  Okay.  And -- so
12 Mr. Wright, you can see "Exhibit 2 Wright Deposition" in
13 front of you.  That's, at the top, an e-mail from you to
14 David Strolle on December 13th, 2019.
15     A.  Correct.
16     Q.  And this is a true and correct copy of an
17 e-mail exchange between you and Mr. Strolle on that
18 date, correct, sir?  Sir?
19     A.  Can I read it, please?
20         MR. MULLER:  Yeah, give us just -- just a
21 second.  We're -- we're digesting everything.
22         MR. CLEVELAND:  Sure.
23         (Witness looks at document.)
24     A.  Correct.
25     Q.  (BY MR. CLEVELAND)  Okay.  And what I will --

1   December of 2019 is about the time when the option
2   agreement with the McLeods was -- was executed, correct?
3       A.   Correct.
4       Q.   And your e-mail here, you say to Mr. Strolle,
5   "David, we will be adding an option agreement to the
6   loan modification on Monday.  They are working on that
7   language.  It will entail the McLeods buying the
8   pipeline and right-of-way for $6 million on a one-year
9   option."
10              Did I read that correctly, sir?
11      A.   I believe so.
12      Q.   And you say -- and I'm going to highlight
13  this -- "Also" -- let me OCR this so I can.
14              You also say, "Also, there will be a side
15  agreement guaranteeing KrisJenn a small royalty and a
16  small ownership percentage if they exercise their
17  option."
18              Do you see that, sir?
19      A.   Yes.
20      Q.   Was there ever such an agreement executed or
21  agreed to between KrisJenn and the McLeods?
22      A.   No.
23      Q.   Okay.  So what is that referring to then, that
24  text I highlighted that mentioned the side agreement?
25      A.   That was between my attorney and myself on

1   what I would like -- have liked to have done.  It's
2   pretty apparent we didn't get that part of it into the
3   agreement.
4       Q.   Okay.  Okay.  So is that something that you
5   proposed to the McLeods and they didn't agree to?  Or
6   did it ever get raised with the McLeods?  Help me
7   understand that.
8       A.   That was between myself and my attorney that I
9   wanted to do.
10      Q.   And do you know if any such a side agreement
11  was ever proposed to the McLeods?
12      A.   No, there was not.
13      Q.   Okay.  So KrisJenn has never had any kind of
14  side agreement that is referenced here in Exhibit 2?
15      A.   None.
16      Q.   Okay.  All right.  Do you have any type of
17  agreements where you or any of your entities would
18  obtain a royalty or ownership percentage of the
19  right-of-way if the McLeods exercised their option?
20      A.   I have none.
21      Q.   Okay.  Have you had any kind of a falling out
22  with the McLeods recently, sir?
23      A.   I have not.
24      Q.   Okay.  When was the last time you spoke to
25  either Adam or John McLeod?

1       A.   It was on a settlement agreement.
2       Q.   Well, when -- when was the last time you
3   communicated with Adam or John McLeod?
4       A.   When we had our settlement talk with attorneys
5   on --
6               MR. MULLER:  If I can interrupt.  What
7   your settlement communication --
8       Q.   (BY MR. CLEVELAND)  And when was that?
9       A.   That's --
10      Q.   And when was that?
11      A.   I was on the phone with my attorneys.  And
12  that will -- that is privileged, I think, the settlement
13  agreements.
14      Q.   Sir, my question -- we're going to get to that
15  in a minute.  When was the -- I'm asking when.  When
16  was --
17      A.   I'm not --
18      Q.   -- the last time communicated -- sir, let
19  me --
20      A.   It's been --
21      Q.   -- finish my question.  When --
22      A.   It's been two --
23      Q.   When was the -- sir, hold on.  Just so we have
24  a clean record, Mr. Wright, let -- I'm going to start
25  the question over again, okay?

1               When was the last time you communicated
2   with John or Adam McLeod?
3       A.   I -- I can't remember.
4       Q.   Was it within the last week?
5       A.   I can't remember.  It was not.
6       Q.   Was it within the last month?
7               MR. MULLER:  Objection; form.
8       A.   I can't remember.
9       Q.   (BY MR. CLEVELAND)  Was it within the last six
10  months?
11              MR. MULLER:  Objection; form.
12      A.   I would -- I would -- I would agree that it
13  was probably within the last six months.
14      Q.   (BY MR. CLEVELAND)  Okay.
15              (Exhibit 3 marked.)
16      Q.   All right, Mr. Wright.  I am going to show you
17  what I have marked as Exhibit 3 to your deposition.
18              Can you see the screen I just shared with
19  you, sir?
20              MR. MULLER:  We can see the top half of
21  it.  Can you scroll down so we can read from the bottom
22  up?
23              MR. CLEVELAND:  Yes.  Absolutely.
24      Q.   (BY MR. CLEVELAND)  So I'll tell you,
25  Mr. Wright, this is a -- Exhibit 3 is a two-page

1  exhibit.  And I'll -- it is an e-mail exchange on
2  July 15th of 2020 between yourself and Adam and John
3  McLeod.
4          And I'll happily scroll down and let --
5  this is the -- the second page -- and let you read that
6  first e-mail.  And then I'll scroll up when you tell me
7  you need it.
8          MR. MULLER:  He's going to let you -- you
9  need to read it from the bottom up.  So read this and
10  then -- and then tell him when you need to go up.  And
11  then he'll ask you questions about this, okay?
12          (Witness looks at document.)
13      A.  Okay.
14      Q.  (BY MR. CLEVELAND)  All right.  And now I'm
15  going to scroll up to the first page of this so you can
16  read these e-mails as well before I ask you some
17  questions about this.
18      A.  Yes.
19          (Witness looks at document.)
20      A.  Okay.
21      Q.  All right.  And before I do that, Mr. Wright,
22  let me ask you:  What are you hoping to get out of this
23  bankruptcy, sir?
24          MR. MULLER:  Objection; form.
25      A.  I have no answer to that.

Page 33

1      Q.  (BY MR. CLEVELAND)  Well, sir, you -- you made
2  the decision to have your entities file bankruptcy,
3  right?
4      A.  Correct.
5      Q.  What are you hoping to get out of this
6  bankruptcy?
7          MR. MULLER:  Objection; form.
8      A.  I would have to talk to Mr. Smeberg on that.
9      Q.  (BY MR. CLEVELAND)  So as the corporate
10  representative of the three Debtors, you can't answer
11  the question of what do your entities hope to get out of
12  this bankruptcy that they've filed?
13          MR. MULLER:  Objection; form.
14      A.  I would have to talk to Mr. Smeberg.  I'm sure
15  we have a plan, but that's between Mr. Smeberg and
16  myself or KrisJenn Ranch.
17      Q.  (BY MR. CLEVELAND)  Okay.  Well, you're the
18  cor- -- you're the corporate representative here today.
19  And I'm asking you -- this is my chance to take your
20  deposition as the corporate representative of the
21  Debtors.  And I'm asking you:  What are you hoping to
22  get out of this proceeding, sir, for the three Debtor
23  entities?
24          MR. MULLER:  Objection; form.
25      A.  I would say the ultimate goal would be to

Page 34

1  settle the lawsuit and -- and to sell the pipeline.
2  That would be my side.  But I haven't talked to -- to
3  Mr. Smeberg on that.  He has a full plan that's between
4  KrisJenn Ranch and -- and (inaudible) Mr. Smeberg.
5      Q.  (BY MR. CLEVELAND)  Anything else?
6      A.  Not that I can think of.
7      Q.  Okay.  Before this bankruptcy was filed, you
8  were a party to litigation in Shelby County related to
9  the pipeline right-of-way, correct?
10          MR. MULLER:  Objection; form.
11      A.  I think, yes, that it was improperly moved to
12  Shelby County.  Yes, sir.
13      Q.  (BY MR. CLEVELAND)  You didn't like the venue
14  of Shelby County, did you, sir?
15          MR. MULLER:  Objection; form.
16      A.  I had no problem with Shelby County.
17      Q.  (BY MR. CLEVELAND)  Okay.  But you filed this
18  bankruptcy in part to move this dispute about the
19  right-of-way to a new court --
20          MR. MULLER:  Objection; form.
21      Q.  (BY MR. CLEVELAND)  -- isn't that true?
22          MR. MULLER:  I'm going to instruct you
23  not to answer that.
24          It calls for legal conclusions between me
25  and my client.

Page 35

1          MR. CLEVELAND:  I -- I -- I disagree with
2  that.
3      Q.  (BY MR. CLEVELAND)  Did you --
4      A.  I'm not --
5      Q.  -- coordinate the filing --
6      A.  I'm not going to answer that.
7      Q.  Did you coordinate the filing of this
8  bankruptcy with anybody else that wasn't your attorneys,
9  like Adam or John McLeod?
10      A.  No.
11          MR. MULLER:  Objection; form.
12      Q.  (BY MR. CLEVELAND)  Okay.  Did you talk to the
13  McLeods about filing this bankruptcy before you actually
14  filed it?
15      A.  I can't remember.
16      Q.  Okay.  Did you ever express to Adam McLeod
17  something along the lines of, we can't let this Shelby
18  County judge put the pipeline right-of-way into a trust?
19      A.  I can't remember.  I would doubt that I said
20  that --
21      Q.  Okay.
22      A.  -- but I can't remember.
23      Q.  Okay.  Why did you and the Debtor entities
24  file this bankruptcy?
25          MR. MULLER:  Objection; form.  I'm -- I'm

Page 36

1  going to instruct him not to answer.
2            MR. CLEVELAND:  Well, I think he can
3  answer that, John.  I mean, he's made filings about the
4  debts, and that's what I'm getting at.  I'm not trying
5  to get at privileged information.
6      Q.   (BY MR. CLEVELAND)  But why did KrisJenn
7  Ranch -- I'm not asking for anything privileged,
8  Mr. Wright.
9            Let's start with KrisJenn Ranch.  Why did
10  KrisJenn Ranch determine it was in the best interest of
11  that entity to file bankruptcy?
12      A.   I'm not going to answer that per my attorney's
13  instruction.
14      Q.   Well, he didn't instruct you not to answer
15  that question, so I'll -- I'll state it again.
16            Why did KrisJenn Ranch, LLC, decide that
17  it needed to file this bankruptcy?
18      A.   I'm not going to answer that.
19      Q.   Sir, unless your lawyer tells you not to
20  answer, you have to answer my questions.
21      A.   He told me not to answer.
22      Q.   Can you please answer the question?
23      A.   He told me not to answer.
24      Q.   Sir, not the question I've just asked you.
25            MR. CLEVELAND:  Madame Court Reporter,

Page 37

1  can you read that question back?
2            THE REPORTER:  "Why did KrisJenn Ranch,
3  LLC, decide that it needed to file this bankruptcy?"
4      A.   That's between my attorneys and myself.
5      Q.   (BY MR. CLEVELAND)  Sir, he's not instructing
6  you to answer, so please answer the question.
7      A.   That's my answer though.
8      Q.   Are you refusing to answer my question?
9      A.   I'm just saying, that's between my attorneys
10  and -- and myself.  That -- that is not -- that is one
11  of the few decisions that -- that I believe are --
12  should be kept between attorney-client.
13            MR. MULLER:  Tim -- Tim, I can -- I -- I
14  understand why you're asking the questions.  I don't
15  want to interrupt.  The problem is --
16            MR. CLEVELAND:  Hold on.  Hold on.
17  I'm -- I think he's -- I just -- John, I appreciate
18  that.  Let me --
19            MR. MULLER:  Okay.  Go ahead.
20            MR. CLEVELAND:  If you need to deal with
21  it on a break, so be it, but --
22            MR. MULLER:  Okay.  Got you.
23            MR. CLEVELAND:  -- I want to keep going
24  with this.
25            MR. MULLER:  Okay.  Got you.

Page 38

1      Q.   (BY MR. CLEVELAND)  So can you answer that
2  question, Mr. Wright?
3      A.   I cannot answer that question.
4      Q.   Okay.  Did you confer with your family
5  members, the other members of the KrisJenn Ranch, LLC,
6  before putting KrisJenn Ranch into bankruptcy?
7            MR. MULLER:  Objection; form.
8            I'm going to instruct you not to answer
9  that question.
10            MR. CLEVELAND:  That's -- John, how --
11  what's the basis for that instruction?
12            MR. MULLER:  Because he made a decision
13  about whether to --
14            MR. CLEVELAND:  Hold on.  Hold on.  I'm
15  not -- I -- I'm not asking for -- I'm asking, what's the
16  basis for the instruction, John?  That's not --
17            MR. MULLER:  You're --
18            MR. CLEVELAND:  -- privileged.  I'm
19  asking --
20            MR. MULLER:  Yes, I understand, Tim, your
21  question, and I'm answering.
22            MR. CLEVELAND:  I'm not asking you to
23  answer.  I want the witness to answer.
24            MR. MULLER:  Oh.  Oh, okay.  I'm sorry.
25  I didn't mean to interrupt.  Go ahead.

Page 39

1            MR. CLEVELAND:  All right.
2            MR. MULLER:  Well, can you --
3      Q.   (BY MR. CLEVELAND)  Mr. Wright --
4            MR. MULLER:  -- repeat the -- can you
5  repeat the question?
6            MR. CLEVELAND:  I did --
7            MR. MULLER:  I thought it was directed to
8  me, Tim.
9            MR. CLEVELAND:  Well, let me try this a
10  different way.
11      Q.   (BY MR. CLEVELAND)  You are only one of
12  several members of KrisJenn Ranch, LLC; isn't that
13  right, Mr. Wright?
14      A.   That is correct.
15      Q.   And the other members are your family members
16  that include your wife, Gwynne, and I believe your two
17  daughters; is that right?
18      A.   That is correct.
19      Q.   Okay.  And my question is:  Did you consult
20  with your family members about the decision to put
21  KrisJenn Ranch into bankruptcy?
22            MR. MULLER:  Objection; form.  I'm going
23  to instruct him not to answer.
24            MR. CLEVELAND:  And what's the basis of
25  that instruction, John?

Page 40

1    MR. MULLER:  The basis for that is that
2    he's filed for bankruptcy on the advice of his counsel
3    and his lawyers.
4         MR. CLEVELAND:  Well, that --
5         MR. MULLER:  He's --
6         MR. CLEVELAND:  He's not answering that.
7    I'm --
8         (Unreportable crosstalk.)
9         MR. CLEVELAND:  I understand that.  I'm
10   asking whether -- John, the question of whether he
11   has -- he consulted his family members is not
12   asking about anything that's privileged.  He can answer
13   it yes or no.
14        MR. MULLER:  Okay.  So --
15        MR. CLEVELAND:  But I --
16        MR. MULLER:  -- you've asked me --
17        MR. CLEVELAND:  That question doesn't --
18   that question doesn't invoke anything about his
19   communication with attorneys.
20        MR. MULLER:  Okay.  So you've asked me to
21   state the basis for my objection on the record.  I'm
22   obliged to do this now so -- for the record so that the
23   court can review the basis of my instruction.  I've
24   tried to answer twice.  You've interrupted me.
25        May I please have permission to answer

Page 41

1    your question?
2         MR. CLEVELAND:  Sure.
3         MR. MULLER:  Okay.  The basis of my
4    objection and my instruction is that Mr. Wright's
5    decision, in his capacity as an agent for this company,
6    to file for bankruptcy relief was based on the advice of
7    counsel.  The people he spoke to about whether or not to
8    make the decision was directed by counsel.  It's all
9    privileged information.  You're not allowed to ask about
10   it.
11        MR. CLEVELAND:  Okay.  You just gave an
12   answer, Mr. Muller, about facts that I didn't hear about
13   from the witness.
14        MR. MULLER:  Because --
15        MR. CLEVELAND:  So --
16        MR. MULLER:  -- it's privileged.
17        MR. CLEVELAND:  And I can --
18        MR. MULLER:  You're not going to get
19   those facts.
20        MR. CLEVELAND:  All right.
21   Q.   (BY MR. CLEVELAND)  Well, Mr. Wright, were any
22   of your -- the other members in KrisJenn Ranch -- and
23   I'm not asking about what you talked about with your
24   lawyers, okay?  Do you understand that, sir?
25   A.   I understand.

Page 42

1    Q.   Okay.  My question is simply:  Were -- were
2    your other -- were the other members of KrisJenn
3    Ranch -- your wife, Gwynne, and your two daughters --
4    involved in the decision to put KrisJenn Ranch into
5    bankruptcy?
6         MR. MULLER:  Objection --
7    Q.   (BY MR. CLEVELAND)  -- yes or no?
8         MR. MULLER:  Objection; form.
9         I'm going to instruct you not to answer.
10   A.   I -- I'm not going to answer that per
11   instructions of my attorney.  I have very good legal
12   counsel, and I am not going to go against what they say.
13   Q.   (BY MR. CLEVELAND)  Okay.  Just so we have a
14   record, did you confer with the other members of
15   KrisJenn Ranch, LLC, before putting the Uvalde Ranch
16   Series into bankruptcy?
17        MR. MULLER:  Objection; form.  I'm going
18   to instruct him not to answer the question.
19   A.   That's my answer.
20   Q.   (BY MR. CLEVELAND)  Okay.  Did you consult
21   with the other members of KrisJenn Ranch, LLC, before
22   deciding to put the Series Pipeline ROW entities into
23   this bankruptcy?
24        MR. MULLER:  Objection; form.  I'm going
25   to instruct him not to answer the question.

Page 43

1    Q.   (BY MR. CLEVELAND)  Okay.
2    A.   That's my answer.
3    Q.   Were there debts that any of the Debtors
4    couldn't pay, Mr. Wright?
5    A.   Which debt are you talking about?
6    Q.   Well, let's start with KrisJenn Ranch.  Were
7    there any debts that KrisJenn Ranch, LLC, could not pay?
8    A.   I think that would be in my bankruptcy filing,
9    and -- and it speaks for itself.
10   Q.   Well, I -- I -- this is my chance to take your
11   deposition.  Can you testify to any debts that KrisJenn
12   Ranch, LLC, was unable to pay?
13        MR. MULLER:  Objection; form.
14   A.   Everything is in my filing, and it speaks for
15   itself.  I am not going to go against what -- it speaks
16   for itself.  And I swore -- I swore to that application.
17   And you have a copy of it.  And those were the debts.
18   Q.   (BY MR. CLEVELAND)  Okay.  Is there any
19   partic- -- particular debt, as you sit here today as the
20   corporate representative of KrisJenn Ranch, that you can
21   remember KrisJenn Ranch being unable to pay that led to
22   the filing of this bankruptcy?
23   A.   I'll refer to the documents.  They speak for
24   themselves.  I swore to that -- that testimony when I
25   filed the bankruptcy Chapter 11.

Page 44

1  Q.  Okay.  So I understand that.  But as you sit
2  here today, you can't recall any particular debt that
3  KrisJenn Ranch was unable to pay, is that true, just as
4  you sit here today?
5  A.  My -- the bank account is prepared -- prepared
6  monthly.  It's sworn to and testified.  And you can look
7  at the debts owed and the amount that's in KrisJenn
8  Ranch, and -- and it speaks for itself.
9  Q.  Okay.  But you can't identify any particular
10  debt as you sit here today, true?
11  A.  The monthly filings speak for themselves.
12  Q.  Okay.
13  A.  My accountant --
14  Q.  Is there --
15  A.  Our accountant has the files, the documents on
16  how much money was in the account, how much is spent
17  each month.  100 percent that was in the account when --
18  when KrisJenn Ranch closed the account and moved it to
19  the bankruptcy account is all there and sworn to by
20  testimony, sworn affidavit.
21  Q.  Okay.
22  A.  And I -- that --
23  Q.  Is there any pa- -- that --
24  A.  It speaks for itself.
25  Q.  Okay.  So I hear -- and I'm not hearing you

1  identify any particular debt that you can remember for
2  KrisJenn Ranch.  Let me ask you about the other two
3  Series LLC's.
4        Is there any particular debt that the
5  Uvalde Ranch Series was unable to pay that led to the
6  filing of this bankruptcy, sir?
7  A.  Those documents speak for themselves.  I
8  swore -- I signed affidavits and swore to the accuracy
9  of those documents.  They speak for themselves.
10  Q.  Can you remember anything specific as you sit
11  here today as the corporate representative of the Uvalde
12  Series, sir?  Yes or no?
13  A.  The documents speak for themselves.  It's
14  sworn testimony that I've given.
15  Q.  Okay.  So you're not able to identify them
16  just as you sit here today, correct?
17        MR. MULLER:  Objection; form.
18  A.  Those documents are available and sent out to
19  you each month.  And those are the actual documents.
20  And those are sworn testimonies on how much money is in
21  the account and what they pay each month.  So they
22  speak --
23  Q.  (BY MR. CLEVELAND)  Okay.
24  A.  -- for themselves.
25  Q.  What --

1        (Unreportable crosstalk.)
2  Q.  What were the debt -- were there any debt
3  payments owed to the McLeods which any of the Debtor
4  entities were not able to make which led to this
5  bankruptcy?
6  A.  Those are sworn-to testimony in the bankruptcy
7  filing.  The documents speak for themselves.
8  Q.  Okay.  What were the debts owed to the McLeods
9  at the time this bankruptcy was filed that you or your
10  entities were unable to pay?
11  A.  Those are in the bankruptcy filing.  It shows
12  the amount of money that was in the account.  It shows
13  what was owed.  And those were put on the bankruptcy
14  filing, and they are sworn testimony.  So, therefore,
15  the documents speak for themselves.
16  Q.  Were the McLeods demanding any type of payment
17  that was late from you at the time you filed the
18  bankruptcy?
19  A.  Yes, I did get a document demanding payment,
20  which we could not make.
21  Q.  Okay.  I believe that payment was about
22  108,000; is that right?
23  A.  The letter speaks for itself as it has been
24  put in with the bankruptcy filings, yes, sir.
25  Q.  Okay.  Did you ever send an e-mail to Adam

1  McLeod indicating that it was time for you and your
2  entities to file bankruptcy?
3  A.  I -- I can't remember.  All of those documents
4  are being put together and will be presented within the
5  month, I believe.
6  Q.  Okay.  I am going to direct you, sir, back to
7  Exhibit 3 that you -- you read earlier.  Do you have
8  Exhibit 3 in front of you, sir?
9  A.  Yes, I do.
10  Q.  Okay.  And Exhibit 3 is a true and correct
11  copy of the e-mail string between you and Adam and John
12  McLeod on July 15th, 2020, correct?
13  A.  I believe so, yes.
14  Q.  Okay.  And you see this Bates number that I'm
15  scrolling over here indicates this was produced by the
16  McLeods in response to a subpoena that we served them.
17  Do you understand that, sir?
18  A.  Yes.
19  Q.  Okay.  And I want to first focus on your
20  e-mail at the bottom of page 1 here, sir, this e-mail
21  from you to Adam copying John.  Do you see that, sir?
22  A.  Yes, I do.
23  Q.  Okay.  I want to -- I'm going to highlight
24  something.  This sentence where you say, "The maximum
25  damages Moore and Borders would receive is 20 percent of

1    what I sell the pipeline and ROW for," exclamation
2    points, do you see that, sir?
3       A.   Yes.
4       Q.   What did you mean by that statement?
5       A.   That statement speaks for itself.  It's been
6    the consis- -- consistent language that has been talked
7    about by Daniel Moore and Darin Borders and myself
8    since -- since the week before we sent the 20 percent
9    agreement to the attorney, Pigg.
10       Q.   Okay.  So you're saying that Moore and Borders
11    would receive -- the maximum Moore and Borders would
12    receive is 20 percent of what I sell the pipeline and
13    ROW for, which --
14       A.   Yes.
15       Q.   -- under the option agreement is -- go ahead.
16    Sir, go ahead.
17       A.   No, no, that's fine.
18       Q.   Okay.  And so what -- under the option
19    agreement, what do you -- what's the price that you sell
20    the pipeline and right-of-way for?
21       A.   It will -- it would be the price that I could
22    get for selling it, the --
23       Q.   Well, under the option, isn't the purchase
24    price about 5.9 million?
25       A.   I believe it's 6 million.

Page 49

1       Q.   6 million.
2       So are you saying that the maximum damages
3    Daniel Moore and Darin Borders would receive is
4    20 percent of that 6 million if the McLeods exercise
5    their option?
6       MR. MULLER:  Objection; form.
7       A.   They would get 20 percent of the 100,000.  I
8    would get 60 percent of it.
9       Q.   (BY MR. CLEVELAND)  Okay.  And what's that --
10    what's that statement based on, the 100,000?
11       A.   I have -- I have a minimum of 5.9 million
12    invest into this deal.  And the only definition of net
13    profits is the gross sale less -- less costs.  And that
14    pretty well is 6 million minus 5.9 million, which would
15    be 100,000, which would be 20,000 to Borders and 20,000
16    to Moore.  It would be 60,000 to KrisJenn Ranch, yes,
17    sir.
18       Q.   Okay.  And when you say you've got 5.9 million
19    in this deal, you're talking about the -- the loans that
20    you have taken out, correct?
21       A.   Yes.  Yes, sir.
22       Q.   And -- and that all derives from the -- what
23    you say is a loan that KrisJenn Ranch made to Black Duck
24    back in 2017, right?
25       A.   No, sir.  Those documents speak for

Page 50

1    themselves.
2       Q.   Well, and we're going to get to those over the
3    next couple of days, sir.  But my question is:  Just
4    generally speaking, when you talk about the 5.9 million
5    that you've got in this deal -- do you recall that
6    testimony?
7       A.   Yes, sir.
8       Q.   That is debt that you're saying you have
9    incurred with connecting -- in connection with the
10    pipeline and right-of-way, right?
11       MR. MULLER:  Object -- objection; form.
12       A.   That is the total amount of the loan, which
13    included the buyback from TCRG, yes, sir.
14       Q.   (BY MR. CLEVELAND)  Right.  And the first
15    debt -- excuse me -- that you are claiming relating to
16    the right-of-way is the Asilo loan that you -- that
17    KrisJenn Ranch took out back in 2017, right?
18       A.   That --
19       MR. MULLER:  Objection; form.
20       A.   That would be --
21       Q.   (BY MR. CLEVELAND)  Go ahead.
22       A.   That would be the original loan, yes, sir.
23       Q.   Okay.  And you contributed the amount of the
24    KrisJenn Ranch loan from Asilo to Black Duck to acquire
25    the right-of-way, correct?

Page 51

1       MR. MULLER:  Objection; form.
2       A.   KrisJenn Ranch borrowed the money from Asilo
3    and -- through the ranch, KrisJenn.  Black Duck had no
4    assets that would qualify for a loan.
5       Q.   (BY MR. CLEVELAND)  Right.  So you contributed
6    the Asilo loan to Black Duck to allow Black Duck to
7    acquire the right-of-way and pipeline because, as you
8    say, Black Duck didn't have the assets to make that type
9    of acquisition, right?
10       MR. MULLER:  Objection; form.
11       A.   I guess we could talk about that for a while.
12    But the -- the documents speak for themselves, yes, sir.
13       Q.   (BY MR. CLEVELAND)  Well, sir --
14       MR. CLEVELAND:  Madame Court Reporter,
15    can you read back my question?
16       I'm going to object as nonresponsive,
17    Mr. Wright.
18       Kailee, can you read -- can you read that
19    back?
20       THE REPORTER:  "So you contributed the
21    Asilo loan to Black Duck to allow Black Duck to acquire
22    the right-of-way and pipeline because, as you say, Black
23    Duck didn't have the assets to make that type of
24    acquisition, right?"
25       MR. MULLER:  I reassert my objection to

Page 52

the form of the question.

MR. CLEVELAND:  And -- and, actually, I'm going to withdraw and restate.

Q.  (BY MR. CLEVELAND)  Mr. Wright, the funds from the Asilo loan were used to acquire the pipeline and right-of-way, correct?

A.  A portion of that was, yes, sir.

Q.  Okay.  And the funds were wired from Asilo directly to the seller of the pipeline and right-of-way, correct?

A.  That is correct.

Q.  Okay.  And that was KrisJenn Ranch's contribution to allow Black Duck to take ownership of the pipeline and right-of-way in 2017, right?

MR. MULLER:  Object -- objection; form.

A.  Whether it was contribution or not, that's what, I believe, Adam Moore -- I mean, Daniel Moore is claiming.  There was the loan -- I don't believe our -- I'm trying to remember.  Our partnership agreement said I had to declare where the money came from.

Q.  (BY MR. CLEVELAND)  Okay.  Now, we're going to come back to that.  I'm going to share the screen again.

Back on Exhibit 3 -- do you have Exhibit 3 in front of you, Mr. Wright?

A.  Yes, I do.

---

Q.  Okay.  In your e-mail where -- I made this highlight on the bottom of page 1.  Are you with me, sir?

A.  Yes.

Q.  You make reference to what I am going to highlight here, a resolution with Darin Borders leaving KJ with 7 percent gross, exclamation point.

Do you see that, sir?

A.  Yes.

Q.  And KJ is referring to KrisJenn Ranch?

A.  Yes.

Q.  What is that -- what do you mean by that leaving KJ with 7 percent gross?  What -- what are you referring to?

A.  We were taking on examples.  That was all private settlement negotiations between McLeod and your client, Danny Moore and Darin Borders.  And McLeod did not want to settle.  Darin Borders did.  So all of that was -- was talk back and forth about how to make a settlement that would make everybody happy.  They were not --

Q.  Okay.

A.  -- consummated.  None of that was consummated.

Q.  Okay.  And, in fact, John McLeod says to you in -- in the response e-mail, *Larry, none of this makes

---

sense as we have not settled with Borders.*

Do you see that, sir?

A.  That is correct.

Q.  Okay.  And then I'm going to ask you about your e-mail response immediately -- right after John McLeod's e-mail to you.

A.  Right.

Q.  I highlighted for you your statement, *A handshake backdoor deal with me can no longer be kept silent.*

Do you see that, sir?

A.  Yes, sir.

Q.  And you -- you wrote those words.  What did you mean by that?

A.  That is in reference to the settlement agreement with Borders.

Q.  Well, but you say, *A handshake backdoor deal with me,* meaning you.  So --

A.  I mean, I don't know --

MR. MULLER:  Objection; form.

Q.  (BY MR. CLEVELAND)  -- it wasn't just Borders.

A.  Is that me, or is that KrisJenn Ranch?

Q.  Well, let's -- let's go with if it's KrisJenn Ranch.  What did you mean by *me* means KrisJenn Ranch?

---

A.  I can't make that assumption, sir.

Q.  Well, you wrote the e-mail, Mr. Wright.  So can you tell me what you meant by this e-mail you wrote --

A.  That was --

Q.  -- three months ago?

A.  That was -- that was all in reference to a settlement that never materialized.

Q.  Do you have a handshake backdoor deal with the McLeods --

A.  No.

Q.  -- that you haven't disclosed to the court in this bankruptcy?

A.  No.

Q.  Do you have other backdoor handshake deals with other parties on behalf of --

MR. MULLER:  Objection --

Q.  (BY MR. CLEVELAND)  -- your debtor entities that you haven't -- that you haven't disclosed to the court in this bankruptcy?

MR. MULLER:  Objection; form.

A.  No.

Q.  (BY MR. CLEVELAND)  Okay.  And at the top, you say, *I'm not trying to renegotiate anything with y'all.  I just used the 10 percent gross as an example.*

1    A.   That's --

2    Q.   What did you mean by that?

3    A.   That's exactly right.  It was an example that

4  was part of the -- part of the negotiations with

5  Border -- Borders.

6    Q.   Okay.  Are you in active discussions with the

7  McLeods to try to obtain a gross percentage of this

8  right-of-way, sir?

9    A.   No, I am not.

10    Q.   Okay.  Do you know, Mr. Wright, where the

11  McLeods got the funds for the, you know, nearly

12  $6 million in financing that they've extended to you and

13  your entities?

14         MR. MULLER:  Objection; form.

15    A.   I do not.

16    Q.   (BY MR. CLEVELAND)  Do you know if the McLeods

17  borrowed that money or if it's capital that they may

18  have on their own?

19    A.   I do not know.

20    Q.   Okay.  And have the McLeods shared with you,

21  Mr. Wright, who they are communicating with about

22  potentially developing the right-of-way?

23    A.   No, they have not.

24    Q.   Do you have any knowledge of who the McLeods

25  are -- are communicating with about potentially

1  developing the right-of-way?

2    A.   I do not.

3    Q.   What's your level of confidence that the

4  McLeods have the ability and the resources to build out

5  the right-of-way, sir?

6         MR. MULLER:  Objection; form.

7    A.   I think that -- that -- that's kind of a

8  misleading question because I don't -- I don't have an

9  idea.  My interest is them buying the pipeline and then

10  reducing all of my debt that is against the pipeline,

11  the ranch, and my minerals.

12    Q.   (BY MR. CLEVELAND)  Okay.  But my -- my

13  question was just about your level of confidence.  I

14  mean, we see in this e-mail, you're talking about

15  getting a gross percentage of the right-of-way for

16  KrisJenn Ranch, right?  Do you remember that in this

17  e-mail we just looked at?

18    A.   Yes, I do.

19    Q.   Okay.  And my question was:  What level of

20  confidence do you have, Mr. Wright, if any, that the

21  McLeods have the resources and the ability to actually

22  get this right-of-way built out?

23         MR. MULLER:  Objection; form.

24    A.   It is -- the whole problem is the lawsuit --

25  the malicious lawsuit filed by DMA Properties.  And so

1  what I will say is that there is nobody -- nobody in the

2  world that will buy this pipeline with these claims made

3  by Daniel Moore.

4    Q.   (BY MR. CLEVELAND)  Okay.

5         MR. CLEVELAND:  Objection; nonresponsive.

6    Q.   (BY MR. CLEVELAND)  Do you believe the McLeods

7  can either build out or facilitate the building out of

8  this right-of-way or not, sir?

9         MR. MULLER:  Objection; form.

10    A.   When I made this loan, I was trying to borrow

11  back the money to put the pipeline back into play.  And

12  so that was my objective, to put the pipeline back into

13  play.  If I didn't buy it out, the pipeline would never

14  be in play again.  And that was my --

15    Q.   (BY MR. CLEVELAND)  And --

16    A.   -- objective.

17    Q.   And you're talking about when you bought the

18  pipeline back through one of your entities from TCRG,

19  right?

20    A.   Yes, sir.

21    Q.   That was after they accused you of being a

22  fraud, right?

23         MR. MULLER:  Objection; form.

24    A.   They never accused me of fraud.  They -- it

25  was -- it was all towards Daniel Moore and Darin

1  Borders.

2    Q.   (BY MR. CLEVELAND)  Okay.  There is not a

3  statement in your settlement agreement with TCRG that

4  they accused you of misrepresenting certain facts about

5  this right-of-way?

6         MR. MULLER:  Objection; form.

7    A.   That was used so we could clear each other in

8  case there ever was.

9    Q.   (BY MR. CLEVELAND)  Well, my question is:

10  Isn't there a statement in the agreement that you signed

11  with TCRG which states that TCRG accused you of making

12  misrepresentations with respect to the right-of-way --

13         MR. MULLER:  Objection --

14    Q.   (BY MR. CLEVELAND)  -- yes or no?

15         MR. MULLER:  -- form.  Objection; form.

16    A.   The form -- the form speaks -- speaks to

17  itself.  And my statement will be proved out in court

18  that there never was fraud.  I was not required to make

19  a statement on the net profit situation.  That net

20  profit --

21    Q.   (BY MR. CLEVELAND)  Okay.

22    A.   -- situation was between Black Duck and Daniel

23  Moore and Darin Borders.  It was not required to be

24  given to anybody, much less TC- --

25    Q.   Okay.

1        MR. CLEVELAND:  Objection; non- --
2    objection; nonresponsive.
3        Q.   (BY MR. CLEVELAND)  Mr. Wright, is there a
4    statement in your settlement agreement with TCRG
5    indicating that TCRG accused you of making
6    misrepresentations with respect to the right-of-way, yes
7    or no?
8        MR. MULLER:  Objection; form.
9        A.   The document speaks for itself.
10        Q.   (BY MR. CLEVELAND)  Okay.  We'll get into that
11    document later.
12        Mr. Wright, did you speak with anybody
13    other than your attorneys before you caused this
14    bankruptcy to be filed indicating that your three
15    entities would be going into bankruptcy?
16        MR. MULLER:  Objection; form.  I'm going
17    to instruct the deponent not to answer the question.
18        MR. CLEVELAND:  John, I'd respectfully
19    disagree that that asks for anything that's privileged.
20    It's just simply asking if he talked to anybody other
21    than his attorneys about the filing of this bankruptcy
22    before it was filed.
23        MR. MULLER:  What if he spoke to others
24    on the advice and guidance of counsel?
25        MR. CLEVELAND:  Then he can tell me who

1    he spoke to.  And if you want to instruct him not to
2    explain what the substance of those communications are,
3    we -- you can do that, and we can either agree or
4    disagree.  But the identity --
5        MR. MULLER:  Okay.
6        MR. CLEVELAND:  -- of who he spoke to
7    other than lawyers --
8        Q.   (BY MR. CLEVELAND)  Okay.  So --
9        MR. MULLER:  I --
10        Q.   (BY MR. CLEVELAND)  -- Mr. Wright --
11        MR. MULLER:  I agree -- I agree with you.
12    I'll withdraw --
13        MR. CLEVELAND:  Okay.
14        MR. MULLER:  -- the objection.
15        MR. CLEVELAND:  Okay.  All right.  Thank
16    you, John.
17        Q.   (BY MR. CLEVELAND)  Mr. Wright, let me ask a
18    clean question so we've got a good record, okay?
19        A.   Sure.
20        Q.   Mr. Wright, besides your attorneys, did you
21    communicate with anybody else prior to filing this
22    bankruptcy and indicate that you would be doing so?
23        MR. MULLER:  Objection; form.  I'm going
24    to instruct him not to answer that question.
25        Q.   (BY MR. CLEVELAND)  Let me try it a different

1    way.
2        Did you talk to anybody about this
3    bankruptcy proceeding before it was filed other than
4    your lawyers?
5        A.   Yes.
6        Q.   Who?
7        A.   I talked to the 30 percent owner of KrisJenn
8    Ranch, the 20 percent owner of KrisJenn Ranch, and the
9    other 20 percent owner of KrisJenn Ranch.
10        Q.   And who -- who are they?
11        A.   If you will look on the documents, they speak
12    for themselves.
13        Q.   Well, I believe they're your family members.
14    And you know who they are, don't you?
15        A.   Well, yes.  And you know who they are too.
16    There -- it's --
17        Q.   Yeah.
18        A.   -- Gwynne Wright --
19        Q.   I don't have their names devoted to memory,
20    sir.  So can you -- can you identify who they are?
21        A.   Gwynne Wright, Kristal --
22        Q.   Uh-huh.
23        A.   -- Cohle, and Jennifer Wright.
24        Q.   Anybody else?
25        A.   Not that I can remember.

1        Q.   Okay.  And what were Gwynne, Kristal, and
2    Jennifer's feelings about putting KrisJenn Ranch, LLC,
3    into bankruptcy?
4        MR. MULLER:  Objection; form.  I'm going
5    to instruct the deponent not to answer that question.
6        Q.   (BY MR. CLEVELAND)  Well, let me ask it a
7    different way, Mr. Wright.
8        Did you talk to Gwynne, Kristal, and
9    Jennifer at the direction of counsel, or did you do that
10    because you're their husband and their father?
11        A.   I -- I -- I talk to them about anything and
12    everything we do with the operations of KrisJenn Ranch.
13        Q.   Right.  And so my question is:  Did you talk
14    to them about the filing of this bankruptcy by KrisJenn
15    Ranch at the direction of your lawyers or because -- or
16    for some other reason?
17        A.   I talked to the -- to them at my own advice
18    that KrisJenn Ranch was in a financial situation that
19    they couldn't make the payments.
20        Q.   Okay.  And which payments are you referring to
21    when you told Gwynne, Kristal, and Jennifer that?
22        A.   The interest payments.
23        Q.   On which -- which loan or which obligation?
24        A.   The only one at the time.
25        Q.   Which was what?

```
 1        A.    The $5.9 million loan with McLeod Oil.
 2        Q.    Okay.  And since you went and spoke to Gwynne,
 3  Kristal, and Jennifer on your own advice, as you just
 4  testified, what was their response when you told them
 5  that KrisJenn Ranch needed to file bankruptcy?
 6              MR. MULLER:  Objection; form.  I'm going
 7  to instruct him not to answer.
 8              MR. CLEVELAND:  John, he just said he --
 9  I asked him whether he did that at your advice or on his
10  own personal advice, and he said it was his personal
11  advice.  So I respectfully disagree that that's
12  privileged.
13              MR. GERMANY:  Well, I'm going to have to
14  jump in and object that that wasn't the question asked.
15              MR. CLEVELAND:  Okay.  Thank you,
16  Counsel.
17              John, I --
18              MR. MULLER:  I think your question was a
19  bit confusing.  Would you ask it to him one more time?
20              MR. CLEVELAND:  Sure.
21        Q.    (BY MR. CLEVELAND)  When you went to Gwynne,
22  Kristal, and Jennifer, Mr. Wright, and -- I believe you
23  said told them that KrisJenn Ranch would be filing
24  bankruptcy.  Was that your testimony?
25        A.    My testimony was what was their opinion,
```

```
 1  because if they didn't want me to file bankruptcy, I
 2  could not have filed it.  I am only a 30 percent owner.
 3        Q.    Okay.  And did Gwynne, Kristal, and Jennifer
 4  approve the filing of bankruptcy --
 5              MR. MULLER:  Object --
 6        Q.    (BY MR. CLEVELAND)  -- for KrisJenn Ranch?
 7              MR. MULLER:  Objection; form.  I'm going
 8  to instruct the deponent not to answer.
 9        Q.    (BY MR. CLEVELAND)  Okay.  Let me ask it a
10  different way, Mr. Wright.
11              When you went and told Gwynne, Kristal,
12  and Jennifer about the idea of KrisJenn Ranch filing
13  bankruptcy on your own personal advice, as you've just
14  testified to, what was their response?
15              MR. MULLER:  Objection; form.
16              MR. GERMANY:  Objection; form.
17        A.    I don't tell my daughter and -- two daughters
18  and wife anything.  They tell me.
19        Q.    (BY MR. CLEVELAND)  Well, my question is:
20  What was their response?  So what did they tell you?
21              MR. MULLER:  Objection; form.  I'm going
22  to instruct the deponent not to answer.
23        Q.    (BY MR. CLEVELAND)  Well --
24        A.    I'm taking the -- taking the --
25        Q.    -- Mr. Wright, when you --
```

```
 1        A.    -- advice of my attorney.
 2        Q.    Okay.  When you went to your wife and two
 3  daughters on your own advice, as you've said, did they
 4  have any response to what you told them?
 5              MR. MULLER:  Objection; form.  I'm going
 6  to instruct the deponent not to answer.
 7              MR. CLEVELAND:  What's the basis of that
 8  instruction, John?
 9              MR. MULLER:  The basis of that
10  instruction is that I know he keeps saying what you want
11  to hear, but he did not go to his family on his own
12  advice.  The determination of whether you're going to --
13              MR. CLEVELAND:  That's what he just said.
14              MR. MULLER:  -- file bankruptcy -- the
15  answer is, the determination of whether you're going to
16  file for bankruptcy or not is a legal determination, and
17  it was made upon the advice of counsel.
18              MR. CLEVELAND:  And -- and, John, I
19  appreciate that.  But he said he went to his family
20  members on his own advice.  And I'm just asking what
21  they said.  I am not asking about the final decision to
22  file bankruptcy.  I am just asking what response, if
23  any, they had to what Mr. Wright told them on his own
24  personal advice.
25              MR. GERMANY:  And Mr. Wright didn't
```

```
 1  testify to that.  He said he went as an owner of
 2  KrisJenn and the entities.
 3              MR. CLEVELAND:  Okay.  Is that
 4  Mr. Germany?
 5              MR. GERMANY:  Yes, it is.
 6              MR. CLEVELAND:  Okay.
 7              MR. GERMANY:  You can --
 8              MR. CLEVELAND:  Okay.
 9              MR. GERMANY:  -- clarify your question.
10              MR. MULLER:  It's -- it's confusing, Tim,
11  because he's -- you've got the deponent wearing a lot of
12  different hats.  And he is -- and, of course --
13              MR. CLEVELAND:  Okay.
14              MR. MULLER:  -- you're --
15              (Unreportable crosstalk.)
16              MR. CLEVELAND:  Let me try it again.
17              MR. MULLER:  You're talking about his
18  wife --
19              MR. CLEVELAND:  Let me try it again.
20              MR. MULLER:  -- and his children, and
21  it's confusing him.
22              MR. CLEVELAND:  Okay.
23        Q.    (BY MR. CLEVELAND)  Mr. Wright, you testified
24  about going to your wife and two daughters on your own
25  personal advice.  Do you remember that testimony you
```

1  just gave?

2              MR. MULLER:  Objection; form.

3              MR. GERMANY:  Objection; form.

4      A.   The word advice is -- is what's confusing.  I

5  didn't advise them.  I gave them the parameters of the

6  situation.

7      Q.   (BY MR. CLEVELAND)  And I understand that,

8  sir.  But I am using the phrase that you used about the

9  reasons you went to your wife and two daughters before

10  the bankruptcy.

11          You used the phrase "personal advice."  Do

12  you recall that?

13      A.   Well, it's really not personal advice.  It's

14  just that we have the minutes.  And in the minutes, I

15  like to put everything that we do.  And I can't

16  arbitrarily file bankruptcy without their approval.

17      Q.   So there are minutes for KrisJenn Ranch, LLC,

18  where the -- the decision to file bankruptcy is

19  authorized?

20      A.   I believe so.

21      Q.   Okay.  Have you collected those and produced

22  them to us, sir, to the best of your knowledge?

23      A.   Everything that -- everything that we have,

24  including bank statements, are being collected and will

25  be presented on the due date.

                                           Page 69

1      Q.   Okay.  All right, Mr. Wright.  I'm going to

2  share the screen and --

3              MR. MULLER:  Is -- is now a --

4      Q.   (BY MR. CLEVELAND)  -- mark another --

5              MR. MULLER:  Is now a good time to --

6      Q.   (BY MR. CLEVELAND)  -- exhibit --

7              MR. MULLER:  Is now a good time to take a

8  break, Tim?

9              MR. CLEVELAND:  Sure.

10              MR. MULLER:  You want to say --

11              MR. CLEVELAND:  We've been going awhile.

12              MR. MULLER:  Yeah, yeah.  You want to say

13  ten minutes?

14              MR. CLEVELAND:  Yeah, ten to fifteen is

15  great.

16              MR. MULLER:  Okay.  Sounds good.

17              THE VIDEOGRAPHER:  Going off the record.

18  The time is 10:28 a.m.

19              (Break from 10:28 a.m. to 10:51 a.m.)

20              THE VIDEOGRAPHER:  Back on the record.

21  The time is 10:51 a.m.

22              MR. MULLER:  Tim, before --

23      Q.   (BY MR. CLEVELAND)  All right.

24              MR. MULLER:  Before we proceed, can I

25  just bring a couple of issues to your attention?

                                           Page 70

1              MR. CLEVELAND:  Okay.

2              MR. MULLER:  One, we're having a bit of

3  difficulty following the word "you."  You ask a lot of

4  questions, and you say "you."  And, of course, Larry is

5  wearing three different hats here.  It's confusing to

6  the lawyers because they don't know when to object.  And

7  it's confusing Larry because he doesn't know which

8  entity to answer for.  So I understand you're -- you're

9  doing something that's difficult.  But whenever

10  possible, it'd be best if you said Larry individually or

11  KrisJenn Ranch.

12          And the other thing that's confusing us is

13  the definition of the word ROW that is in your

14  deposition notice which refers to the right-of-way and

15  the pipeline, which are two separate entities.  We

16  probably need to keep those two things clear.  So,

17  anyway, if you can ask questions about the ROW and

18  distinguish between the pipeline whenever necessary, we

19  would greatly appreciate it.

20      Q.   (BY MR. CLEVELAND)  Okay.  Mr. Wright, are you

21  ready to continue?

22      A.   Yes.  Yes.

23              MR. MULLER:  I do think, Tim, he would

24  like --

25      Q.   (BY MR. CLEVELAND)  Okay.

                                           Page 71

1              MR. MULLER:  -- to expand on his

2  testimony from earlier about his preparation for this

3  deposition.

4              MR. CLEVELAND:  Well, and I was going to

5  get back into that.

6      Q.   (BY MR. CLEVELAND)  But -- but let me --

7  first, I want to hear from that -- from you on that,

8  Mr. Wright.

9          But I asked you at the beginning of the

10  deposition, let me know if you need me to clarify --

11  well, let me put it this way.  If you need me to clarify

12  when I ask a question about, you know, which entity am I

13  asking about or if I'm asking in your personal capacity,

14  will you agree to let me know?  If you get confused, let

15  me know, and I will clarify for you, okay?

16      A.   It'd be better if you said this is for

17  KrisJenn Ranch because personal is different than

18  KrisJenn Ranch because the minerals that -- that the

19  McLeods have personal.  The ranch is KrisJenn Ranch.

20  And I -- I spent about at least 40 hours over the last

21  two to three weeks reviewing every document that I have

22  and every e-mail that I have.  I -- I didn't tell you

23  exactly how many hours, but I -- I am very familiar with

24  every document.  I've spent at least 40 hours.  My wife

25  said I've spent more than that because I -- I study

                                           Page 72

them up until one, two in the morning.  So I'm very --

Q.  Okay.

A.  -- familiar.

Q.  So --

A.  And I have studied --

Q.  -- Mister --

A.  -- and I know every -- every document -- I've studied every document that you've put on that list.

Q.  Okay.

MR. CLEVELAND:  Now, Mr. Muller, I have not seen produced the e-mails that he just referred to that he reviewed in preparation for this deposition. Have those been produced?

MR. MULLER:  I don't -- I don't believe so.  The e-mails that I think he is referring to are the ones that have been produced by you.

MR. CLEVELAND:  Hold on.  Hold --

Q.  (MR. CLEVELAND)  Well, Mr. Wright, which e-mails were you referring to that you reviewed in preparation for your deposition?

A.  The ones that -- that are going to be presented on the day that they're required to be turned in.  I think there was some confusion with the attorneys that they were never served.

MR. MULLER:  I --

---

A.  And so those e-mails --

Q.  (BY MR. CLEVELAND)  Okay.

A.  -- I put together, and they have them all.

MR. MULLER:  I think he's right, Tim.

MR. CLEVELAND:  Okay.  Mr. Muller -- hold on.  Well, then we -- Mr. Muller, we're entitled to what he reviewed to prepare for this deposition.  We have not received those e-mails.  When can we expect to receive those?

MR. MULLER:  Yeah, we have them.  They're being processed as quickly as possible.  I don't -- I think it's going to take at least a week or two.

MR. CLEVELAND:  Well, but he just said he reviewed them in prepa- -- preparing for this deposition here today.  I think I'm entitled to have them to ask him about them since he's just clearly testified he reviewed them to prepare to testify today.

MR. MULLER:  You're entitled to have them after we review them.

MR. CLEVELAND:  Well, we can agree to disagree.  He said he reviewed them to prepare to testify as a corporate representative.  That means I'm entitled to them.  If you're not -- if we're not going to get them for today or tomorrow, we can deal with that later.  But --

---

A.  I can --

MR. CLEVELAND:  -- you know, the testimony was clear -- the testimony was clear on that.

MR. MULLER:  Yeah --

Q.  (BY MR. CLEVELAND)  Okay.  Let --

MR. MULLER:  -- the testimony is clear on that.  I'm going to respond to that as well.

To be clear, we instructed you that we received your request on the 22nd and began processing on those days.  We told you we would not be able to turn them around before this deposition.  And we encouraged you to delay this deposition because we wouldn't be able to process them.

Yes, Larry has looked at them.  I have not been able to do my job yet.  You should have delayed this deposition before you proceeded.  We will get them to you as quick as we can.  We are really working as fast as we possibly can on it.

MR. CLEVELAND:  Well, and I -- we'll just agree to disagree because he has just testified he reviewed his own e-mails to prepare to speak today on Topics 26 to 30 that address communications with third parties related to the issues in the case.  And I don't have them for today's deposition or tomorrow's deposition, so --

---

MR. MULLER:  Of course he reviewed them.

MR. CLEVELAND:  -- I think --

MR. MULLER:  He wrote them.

MR. CLEVELAND:  -- it's two different -- it's two -- it's two different things, what he did to prepare for today versus the disagreement about the service of the request for production.  But I think we've made our record.

Q.  (BY MR. CLEVELAND)  Mr. Wright, let's continue.

Mr. Wright, did you meet with your lawyers to prepare for today's deposition?

MR. MULLER:  Objection; form.

I'm going to instruct you not to answer.

MR. CLEVELAND:  That's -- that's not called for, John.  The question of whether he met with his lawyers to prepare is not asking about the substance of the communication.

Q.  (BY MR. CLEVELAND)  Mr. Wright --

MR. MULLER:  I -- I agree.

Q.  (BY MR. CLEVELAND)  -- did you meet with your lawyers --

MR. MULLER:  You can answer.

Q.  (BY MR. CLEVELAND)  Did you meet with your lawyers to prepare for your deposition today?

1      A.   I didn't meet with them today.  I met with
2   them a week ago.
3      Q.   Okay.  Who did you meet with?
4      A.   I met with John Muller.
5      Q.   Anybody else?
6      A.   No.
7      Q.   You met with them a week ago -- or I'm sorry.
8   You met with Mr. Muller a week ago.  For how long?
9      A.   Last week.  Last week.  Not this week.
10     Q.   And which day last week?
11     A.   I can't --
12     Q.   Which day --
13     A.   -- remember.
14     Q.   -- last week?
15     A.   I can't remember because I've been trying to
16  produce documents that they didn't know they were
17  subpoenaed.  And so that's -- I've been jumping through
18  hoops to get every document that's out there.
19     Q.   Okay.
20     A.   So I can't --
21     Q.   About how many hours did you -- about how many
22  hours did you spend with Mr. Muller preparing for this
23  deposition?  And I'm not asking about the substance.
24  I'm --
25               MR. MULLER:  I'm going --

                                        Page 77

---

1      Q.   (BY MR. CLEVELAND)  -- only asking --
2               (Unreportable crosstalk.)
3               MR. MULLER:  -- to instruct him not to
4   answer.  How many hours he spent with -- with me is work
5   product.  We're not going to go into what he discussed
6   with the lawyers, how he did it, or when he did it.
7               I can also correct you and say that I have
8   been conferring with Mr. Wright for way more than a week
9   on preparation for this deposition.  We've been at it
10  for months.
11              MR. CLEVELAND:  Well, Mr. Muller, I'm
12  asking for testimony from the witness, not you.  Thank
13  you for that.
14     Q.   (BY MR. CLEVELAND)  Mr. Wright, do you need to
15  change your testimony in light of what your counsel has
16  just said on the record?
17     A.   I believe ever since the day that you issued
18  my subpoena, I've been going over preparation.
19     Q.   Okay.  So about how many hours have you spent
20  with Mr. Muller or your counsel just to prepare for this
21  deposition here today?
22              MR. MULLER:  Objection; form.
23              I'm going to instruct you not to answer.
24     Q.   (BY MR. CLEVELAND)  Okay.  Are you going to
25  follow your lawyer's instruction?

                                        Page 78

---

1      A.   I always follow my attorney's instruction.
2      Q.   Okay.  So, Mr. Wright, this -- the loan you
3   have with McLeod Oil, it's secured by the right-of-way,
4   correct?
5               MR. MULLER:  Objection; form.
6      A.   That is a -- that is one piece of the
7   collateral.
8      Q.   (BY MR. CLEVELAND)  Okay.  Another piece of
9   the collateral is the KrisJenn Ranch ranch, right?
10     A.   Correct.
11     Q.   And another piece of the collateral are your
12  personal minerals, correct?
13     A.   Yes, sir.  Yes, sir.
14     Q.   Why did you agree to -- or I'm sorry.  Why was
15  it agreed to by the Debtor entities to put -- and
16  yourself to put that much collateral up for a loan with
17  the McLeods?
18     A.   I didn't want to put -- I did not want to put
19  it up.  To be honest with you, I think it's way too much
20  collateral.
21     Q.   But did the McLeods demand that you -- that
22  all of those -- or excuse me.  Did the McLeods demand
23  that those items be put up for collateral?
24     A.   Yes.
25     Q.   Do you know if the McLeods did any kind of

                                        Page 79

---

1   background or credit check on you, sir?
2      A.   I -- I do not know if they did.
3      Q.   Okay.  How did you get connected with the
4   McLeods to lead to the first loan in February of 2019?
5      A.   I did business with the Mc- -- with Adam
6   McLeod on and off for probably five or six years before
7   that.
8      Q.   Okay.  And when did you inform the McLeods
9   about this right-of-way that had been acquired by Black
10  Duck and was subsequently owned by TCRG?
11     A.   I -- I really can't remember.  I'd have to go
12  back and look at documents.  But it was well before
13  the -- the original first loan.
14     Q.   Okay.  And did you first talk about the
15  right-of-way with Adam McLeod or John McLeod?  Do you
16  remember?
17     A.   I -- I only knew Adam.
18     Q.   And what did you tell Adam about the
19  right-of-way when you first disclosed it to him?
20     A.   I talked to Adam about I had a loan with Asilo
21  and they had my minerals on the ranch as collateral and
22  if he would be interested in taking that position.
23     Q.   Okay.  And was that because the Asilo loan was
24  coming due?
25     A.   Correct.

                                        Page 80

1  Q.   And did the other members of KrisJenn Ranch
2  approve the Asilo loan prior to it being made back in
3  2017?
4  A.   I guess they did.
5  Q.   And so that would be -- your wife, Gwynne, she
6  approved it?
7  A.   Yes.
8  Q.   And your two daughters, they also approved it?
9  A.   Yes.
10  Q.   And is that reflected in meeting minutes of
11  KrisJenn Ranch, LLC?
12  A.   Yes, it is.
13  Q.   And that was a 17 percent loan --
14  A.   I believe so.
15  Q.   -- is that right?
16      And why did KrisJenn Ranch, to your
17  knowledge, agree to that kind of a loan with Asilo?
18  A.   We didn't have much of a choice.
19  Q.   And why was that?
20  A.   Because Daniel Moore left Black Duck in a
21  default position.  That's why he moved home because he
22  never thought the loan would be closed.  He didn't think
23  I had the ability to close it.
24  Q.   Well, because part of your responsibilities as
25  the 50 percent member of Black Duck or KrisJenn Ranch's

1  responsibilities was to provide the financing for the
2  acquisition of the right-of-way, correct?
3      MR. MULLER:  Objection; form.
4  A.   That is not correct.
5  Q.   (BY MR. CLEVELAND)  Okay.  When you say Daniel
6  Moore left you in a default position, what do you mean
7  by that?
8  A.   The only reason Daniel Moore was ever part of
9  Black Duck was because he was -- he was acting as the
10  sa- -- a buyer's agent.
11  Q.   He was acting as a what?
12  A.   A buyer's -- the buyer's agent.
13  Q.   Which buyer?
14  A.   Any buyer on any product that we put under --
15  under -- under contract.
16  Q.   Okay.  But you agreed on behalf of KrisJenn
17  Ranch to have a 50/50 split of the ownership interest of
18  Black Duck with Mr. Moore's entity, right?
19  A.   I think -- I think the documents speak for
20  themselves.
21  Q.   Well, did you approve KrisJenn Ranch becoming
22  a 50 percent member of Black Duck, Mr. Wright?
23  A.   That is also in the -- the minutes of KrisJenn
24  Ranch, yes.
25  Q.   Okay.  So you did affirmatively agree to have

1  this 50/50 split with Daniel Moore's entity and Black
2  Duck, right?
3  A.   There is no such thing as a split.  There was
4  a 50 percent ownership.  There was different --
5  Q.   Okay.
6  A.   -- definitions on each -- on each real estate
7  item that we put under contract.
8  Q.   Okay.  But you agree that Daniel Moore's
9  entity was a 50 percent member of Black Duck Properties,
10  LLC, right?
11  A.   What I will say is, per my attorney's advice,
12  his entity was in forfeiture and -- and he was told the
13  day that we did it that he needed to get that entity
14  back in good standings with the State of Texas.  And he
15  was told that many times, and he never did it.
16      MR. CLEVELAND:  Objection; nonresponsive.
17  Q.   (BY MR. CLEVELAND)  Mr. Wright, KrisJenn Ranch
18  was a 50 percent member of Black Duck, right?
19  A.   Yes.  That's a good question.  That's -- that
20  is correct, yes, sir.
21  Q.   Who was -- who was the other 50 percent owner
22  of Black Duck Properties, LLC?
23  A.   It was a forfeited company that was owned by
24  Daniel Moore and another gentleman.
25  Q.   Okay.  And who agreed to this division of

1  ownership of 50 percent between KrisJenn Ranch and
2  Mr. Moore's entity?
3  A.   The documents speak for themselves.  It spells
4  it out exactly --
5  Q.   Did you --
6  A.   -- in the formation documents.
7  Q.   Did you sign the Black Duck company agreement,
8  sir, on behalf of KrisJenn Ranch?
9  A.   The -- it will speak for itself, sir.  The
10  documents will speak for itself.
11  Q.   Okay.  Mr. Wright, can you offer any
12  explanation of why KrisJenn Ranch agreed to a 50 percent
13  ownership stake of Black Duck Properties for Mr. Moore's
14  entity?
15  A.   I'd have to go back and look.  But the
16  documents will speak for themselves.
17  Q.   Do you know one of the topics for your
18  deposition today that you spent 40 hours preparing for
19  is the formation of Black Duck?  Are you aware of that?
20  A.   I spent over 40 hours, a couple of hours here
21  and a couple of hours there, from the day we got the
22  notice on possibly what you could do.  So saying that
23  this 40 hours is not -- you're using that as if I spent
24  40 straight hours.  That would be my estimate over the
25  time period.  We're a small company, and I was active on

1    all of the -- the financial side.  I wasn't active in

2    the sales side (inaudible).

3        Q.   Okay.  I am simply asking, sir -- well, let me

4    start it this way.  You're aware that the formation of

5    Black Duck is one of the topics that you are testifying

6    here today about, correct?

7        A.   I believe I've read that, yes, sir.

8        Q.   Okay.  And you're testifying on behalf of

9    KrisJenn Ranch, LLC, which was a 50 percent member of

10   Black Duck, right?

11       A.   Correct.

12       Q.   And you were around since the beginning of

13   Black Duck in early 2016, right?

14       A.   Yes, sir.

15       Q.   It's an entity that you helped create along

16   with Daniel Moore, correct?

17       A.   Correct.  Correct.

18       Q.   And my question for you is:  Why did you

19   decide to go into this venture, this Black Duck

20   Properties, LLC, with Daniel Moore?

21       A.   Because Daniel Moore bragged of all of the

22   entities -- all of the assets that he could buy and flip

23   without ever having to close any of them.

24       Q.   Okay.  And so did you -- did you find that to

25   be a valuable skill to bring to the table?

1        A.   I'm not sure I thought it was a valuable

2    skill.  I thought it was a way for him to make up for

3    his destroying our family's SWD in -- in one of our

4    ranches in Dilley, Texas.

5        Q.   Okay.  So did you know that when you agreed to

6    go into business with -- in Black Duck with him?

7        A.   He said he would make it up to me, yes, sir.

8        Q.   Okay.  Nobody forced you to enter the Black

9    Duck Properties, LLC, with Daniel Moore, did they?

10       A.   Oh, no.  Daniel Moore is very persuasive.

11   He -- he's very good, very likable person.  In fact, I

12   didn't ever have a problem with liking him.  It's just

13   he confused his facts.  And in selling, he

14   misrepresented to myself bad.

15       Q.   Well, what did Mr. Moore misrepresent to you,

16   sir?

17       A.   He wasn't as qualified in making a sale as he

18   presented.  I think later on in the operation of the

19   company, he realized that he way overstepped his bounds

20   and that something as big as the pipeline needed to be

21   closed.  It couldn't be just flipped.

22       Q.   Okay.  Any other misrepresentations that

23   Daniel Moore made to you, sir?

24       A.   I don't think that was truly a mis- --

25   misrepresentation.  I think that was just being very

1    naive and amateur in representing --

2        Q.   Okay.

3        A.   -- that.  And -- and he just -- he fooled

4    myself and Hagan Cohle.  We --

5        Q.   Well --

6        A.   We -- we -- we always liked Daniel Moore.

7    We've never not liked Daniel.

8        Q.   Okay.  What did you like about Daniel Moore?

9        A.   He knew everybody, and he used to always brag

10   about being connected to the senator from South Carolina

11   and his father-in-law and to a company in Charleston,

12   South Carolina, that had a cable company, about the

13   wealth of friends he had.  It was impressive.  Lindsey

14   Graham, I like a lot, and he bragged about how he was a

15   close personal friend of the family.

16       Q.   And so I -- that sounds to me like Daniel

17   was -- was selling himself to you as a relationship's

18   personal.  Is that -- is that a fair characterization?

19       A.   Yes, it was, because when I first met Daniel

20   Moore, it was a lawsuit.

21       Q.   Well --

22       A.   I wasn't involved in the lawsuit.  He was.

23       Q.   Okay.

24       A.   But he -- he sued the investor in my -- in my

25   ranch, my family's SWD, the KrisJenn Ranch, which is the

1    same members, Gwynne Wright, Jennifer Wright, and

2    Kristal Cohle.

3        Q.   Okay.  Well -- so what value did you think

4    Daniel Moore would bring to the Black Duck Properties

5    entity?

6        A.   He claimed that he had inside knowledge with

7    Steve Kent, Jr.

8        Q.   Is Steve Kent, Jr., a wealthy man who is

9    involved in pipelines to the best of your knowledge?

10       A.   We didn't start KrisJenn -- I mean, we did not

11   start Black Duck to buy a pipeline.

12       Q.   Well, my question is simply:  Who is Steve

13   Kent, Jr.?

14       A.   He was the operator of the SWD on my ranch in

15   Dilley, Texas.  And Daniel Moore's entity sued the

16   operator.  I wasn't involved in that.  I was just the

17   landowner.

18       Q.   Okay.  Well, the fact that Daniel was in a

19   lawsuit, was that the reason you went into business with

20   him or some other reason?

21       A.   Oh, no.  He said he would make it up to me.

22       Q.   Okay.  Did you know Darin Borders before you

23   met Daniel Moore?

24       A.   No.

25       Q.   Did you meet Darin Borders through Daniel

1  Moore?

2      A.    Yes.

3      Q.    And did Darin Borders, through his entity

4  Longbranch, bring the right-of-way to your attention?

5      A.    Again, you've got to be real careful there.

6  The right-of-way was never a term used.  It was always

7  the P-21 pipeline and the equipment.

8      Q.    Okay.  And you're -- you're referring to the

9  P-21 pipeline and the Express Pipeline?

10     A.    Yes, sir.

11     Q.    How -- what's a phrase that you are

12  comfortable using for describing the right-of-way that

13  you have identified as an asset in this bankruptcy?  I

14  want to make sure we're clear on that.

15     A.    It's two different things.  The P-21 Express

16  Pipeline is the pipe in the ground and all of the

17  equipment.

18     Q.    Okay.

19     A.    The ROW is the -- the perpetual interest of

20  the two- or three-hundred owners of the pipeline that I

21  have a perpetual interest in for a lifetime.

22     Q.    Okay.  Okay.  So I'll --

23     A.    Two very --

24     Q.    -- call that --

25     A.    Two very -- two very, very separate entities.

Page 89

---

1      Q.    Okay.  I'm -- I'm going to refer to that

2  second thing, the ROW, as the right-of-way, okay?

3      A.    Yes, that's fine.  Very good.

4      Q.    Okay.  And so the -- the right-of-way, how did

5  you --

6          MR. MULLER:  To be -- to be --

7      Q.    (BY MR. CLEVELAND)  -- become --

8          MR. MULLER:  -- fair --

9          MR. CLEVELAND:  No, John, we're good.

10  We're good -- we're good, John.  We're moving on.

11  You -- you've -- you've made a lot of speaking

12  statements today.  If you want to instruct him not to

13  answer, you can do that, or make an objection, you can

14  do that.  But I -- we need to get moving with this

15  witness.

16          MR. MULLER:  I am so sorry.

17  Unfortunately, I am not a potted plant, and I am going

18  to go ahead and say something now.  Is that okay?

19          MR. CLEVELAND:  Okay.

20          MR. MULLER:  You have a definition in

21  your deposition notice that says the right-of-way is

22  something different than what you just agreed to.  Which

23  are we working under?

24          MR. CLEVELAND:  As I've just said, I'm

25  trying to establish with this witness what he's

Page 90

---

1  comfortable with.  And we're going by what we've just

2  dis-- what I've just discussed with this witness.

3          MR. MULLER:  Okay.  So we can retract the

4  definition that's in your deposition notice?

5          MR. CLEVELAND:  Well, I'm not retracting

6  anything.  But I just want to bring clarity with this

7  witness.  And I think we've done that.  I think he and I

8  are on the same page.  And I am going to proceed.

9      Q.    (BY MR. CLEVELAND)  Mr. Wright --

10          MR. MULLER:  I don't --

11     Q.    (BY MR. CLEVELAND)  -- how did you --

12          MR. MULLER:  For the purposes of the

13  record, I'm going to make it clear that I think and the

14  client now thinks that your prior definition of ROW

15  that's in your deposition notice has been rescinded.

16          I am sorry.  Go ahead and proceed.

17     Q.    (BY MR. CLEVELAND)  All right.  Mr. Wright,

18  how did you become -- first become aware of the

19  right-of-way?

20     A.    Through Daniel Moore.

21     Q.    Okay.  And had you ever been involved in any

22  kind of business deal that involved a pipeline or

23  another right-of-way before --

24     A.    No.

25     Q.    -- this one?

Page 91

---

1      A.    No, sir.

2      Q.    And -- and were you -- when you heard about it

3  from Mr. Moore, were you interested?  Were you excited?

4  Tell me about your reaction.

5      A.    I was not interested in -- in it at all, and I

6  was not excited about it.

7      Q.    Okay.  What was your reaction when -- when

8  Daniel Moore brought it to your attention?

9      A.    He said that he had made a deal and was a

10  partner with Darin Moore -- or Darin Borders on the

11  pipeline and that if Darin Borders could not close it,

12  that he would talk to me about it.  I was not --

13     Q.    Okay.

14     A.    -- the reason they put it under a contract.  I

15  knew nothing about it.

16     Q.    And are you referring to -- excuse me --

17  Longbranch Energy putting it under contract?

18     A.    Correct.  Correct.

19     Q.    Okay.  And Longbranch Energy is -- is an

20  entity owned by Darin Borders; is that your

21  understanding?

22     A.    Yes, sir, a very fine, outstanding gentleman,

23  Darin Borders, who I respect 100 percent.

24     Q.    And why do you -- and why do you say that?  I

25  don't disagree with you, but I'm just -- why do you say

Page 92

that about Mr. Borders?

Q.   All documents speak for themselves that he has done.

Q.   Okay.  Is there any other reason for your -- your kind words about Mr. Borders?

A.   He did Daniel Moore's job in -- in the three SWD's that we bought.  He found the buyer.  Daniel Moore did not.

Q.   Okay.  Any other reason for your kind words about Darin Borders?

A.   He re- -- he treated my son-in-law with utmost respect.

Q.   That's Hagan Cohle?

A.   Yes, sir.

Q.   Any other reason for the kind words you just shared about Darin Borders?

A.   How much time do we have?

Q.   Well, we've got two days for this time around.

A.   Well, I could probably go on for two days about how he's an outstanding gentleman and that how he went into great deal about his family and how his family and some land they had did business with Daniel.  In other words, Daniel spoke highly of him, and we agreed with it.  And my son-in-law was impressed with him.  Basically, we like Dan- -- we like Darin Borders.

Page 93

---

Q.   Are you appreciative that Daniel Moore made that introduction to Darin Borders?

A.   I'm sorry?

Q.   Are you appreciative that Daniel Moore made the introduction to Darin Borders?

A.   Well, at this point, I wish I would have never met Daniel Moore.

Q.   Well, my --

MR. CLEVELAND:  I'll object as nonresponsive.

Q.   (BY MR. CLEVELAND)  Mr. Wright, my question is a little bit different.  You just spoke very highly about Mr. Borders.

A.   Oh --

Q.   And my question is:  Are you -- and so let me ask my question, sir.  Are you appreciative at all to Daniel Moore that he introduced you to Darin Borders?

A.   I'm very appreciative of that.  I just wish that Daniel Moore would have told the truth about everything.

MR. CLEVELAND:  Okay.  I'll -- I'll object as nonresponsive after "that."

Q.   (BY MR. CLEVELAND)  Now, Mr. Wright, I believe I heard you earlier that you said that you weren't interested in the pipe -- in the right-of-way when --

Page 94

---

when Daniel Moore brought it to your attention.

Can you tell me what happened that ultimately led to Black Duck Properties getting the contract to purchase that right-of-way?

A.   I think all of the e-mails that are on file speak to that.  They speak for themselves.

Q.   Well, sir, this is -- this is my chance to get your testimony about that.  And -- and -- so, sir, let me ask again.  What --

A.   My thought -- my thoughts have been relayed in the e-mails.

Q.   Well, sir, I understand that.  We may go through some or -- can you, as -- you know, as a witness under oath in this case, tell me in your own words what -- how you went from not being interested in acquiring -- in the right-of-way to having one of your entities be under contract to buy it for millions of dollars.

A.   Darin Borders found two buyers for two SWD's.  And that's what got me interested in the pipeline in that he found a buyer for the Dillad -- Dillard SWD and for the -- second SWD at -- called the Applebee.  And we made a little bit of a profit on that.  And Darin was very easy on -- on -- we figured out our costs.  And over the costs, we split the profits one-third,

Page 95

---

one-third, one-third.  And my son-in-law thought that that was very -- a very successful business operation.  And, therefore, at that point, Daniel said, "Hey, Darin has a pipeline that I think I can flip and sell for a bunch of money.  And, oh, by the way, Larry, it's only going to cost you 25,000 earnest money."  And I said, "You mean I can put up $25,000 earnest money and we can flip it for a bunch of money?"  "Yes, sir.  Oh, you'll never have to close it."  I said -- I said, "Well, that -- that does interest me."  And that's how it started.

Q.   And so who told you that you -- it would be a flip?

A.   Daniel Moore.

Q.   Okay.  Any other reason that took you from not being interested in the right-of-way to having it under contract?

A.   On the -- the third SWD, Darin Borders said that it wasn't enough profit for three people.  And he said he would back out and let Daniel and I have that deal, or either he would take it all for a small amount of money.  And when Darin backed out, I thought that was really honorable of him because he should have -- he could have and should have stayed in there for one-third of the profit.  And he was an honorable man, and he

Page 96

1  said, "I'd rather y'all concentrate on the -- on the
2  pipeline." And even though we hadn't officially put up
3  any money on the pipeline, Darin says, "You reimburse me
4  the two $25,000 nonrefundables and then put up the
5  75,000 nonrefundable. Then you and Daniel can
6  concentrate on flipping it."
7      And -- and on doing that, my son-in-law
8  convinced me that he -- he believed Darin Moore [sic]
9  and he believed Daniel Moore. So I said, let's go ahead
10  and -- and do that. And I really wasn't that active the
11  first six months to a year. I let my son-in-law -- I
12  wanted him to learn the business because I had been
13  retired for two to three years and was not in business,
14  didn't have any bank line of credit or anything.
15      And so my son-in-law was very excited.
16  And Daniel spent some time with -- with him. And that's
17  where the excitement came from. We were trying to, at
18  that time, get our son-in-law in the business. And he
19  had left a very profitable company in -- in Austin to
20  come down and run our SWD in Dilley, Texas, that Daniel
21  Moore, through his investor, filed a lawsuit and ruined
22  our -- our family plan to retire with my son-in-law
23  running -- running it, the SWD in Dilley, Texas.
24      Q.   And, Mr. Wright, when you're referring to
25  SWD's, that stands for saltwater disposal wells?

1      A.   Yes, sir, it does.
2      Q.   I just wanted to make sure the court reporter
3  had that for clarity sake.
4      Mr. Wright, we're going to go -- we're
5  going to go through some more e-mails. But did you want
6  to acquire the right-of-way from the Rod Roberts group
7  in 2017?
8      A.   I never did want to require [sic] it. All I
9  wanted to do was let Daniel Moore do what he said he
10  could do, and that was flip it.
11      Q.   And so if you had, before the closing in
12  August of 2017, said, "I'm not putting up money to buy
13  this right-of-way," and you let the closing date pass,
14  what -- what would have been the consequence, sir?
15      MR. MULLER:  Objection; form.
16      A.   At that time, I had -- I had 1 million and
17  close to 300,000 dollars in nonrefundable earnest money.
18  So by Daniel Moore packing his bags and moving back to
19  South Carolina and not corresponding at all with -- with
20  the person that he negotiated the contract -- and he
21  even told the seller, "All future communication will be
22  with me;" whereas after that point, Daniel had handled
23  the conversation because he tried an end run on the --
24  on the contract. And that didn't work. He packed his
25  bags, moved his family back to -- to South Carolina.

1  And we didn't even know he was moving.
2      Q.   Okay. And -- so your testimony is, you would
3  have -- you would have lost over a million dollars of
4  earnest money had Black Duck not closed on acquiring the
5  right-of-way in August of 2017?
6      MR. MULLER:  Objection; form.
7      A.   That -- that is correct.
8      Q.   (BY MR. CLEVELAND)  Okay. And -- and that
9  would have been you personally losing that upwards of a
10  million dollars, sir?
11      A.   I personally loaned the money to KrisJenn
12  Ranch, and then KrisJenn Ranch put up the money. In
13  fact, KrisJenn Ranch wired all the money and direct to
14  Mr. Roberts for the benefit --
15      Q.   Okay.
16      A.   -- of Black -- for the benefit of Black Duck.
17  It stated it every time --
18      Q.   And you --
19      A.   -- "for the benefit of Black Duck." He signed
20  it. I signed it. And Darin Borders signed every one of
21  those receipts.
22      Q.   Well, and when you're talking about KrisJenn
23  Ranch wiring the money directly to Mr. Roberts' entity,
24  are you talking -- you're not talking about the Asilo
25  loan. You were referring to the wiring of the -- just

1  over a million dollars of personal loans; is that
2  correct?
3      A.   It's not personal loans. You're -- you're
4  confusing it again. You're making it very hard for me,
5  and it's giving me a headache. I'm trying -- I'm trying
6  my hardest.
7      That money was loaned by KrisJenn Ranch,
8  LLC. KrisJenn Ranch borrowed the money from Larry
9  Wright personally. KrisJenn Ranch wired the money to
10  Rod Roberts' Frost Bank account in Austin, Texas. He
11  receipted every money, and that receipt was signed by
12  Darin Borders and Larry Wright as -- as KrisJenn Ranch
13  and as Black Duck. Every loan said, "for the benefit of
14  Black Duck."
15      Q.   So --
16      A.   Black Duck --
17      Q.   But all I'm -- all I am trying to clarify,
18  Mr. Wright, is that the loan -- the wire you were just
19  talking about that went from KrisJenn Ranch to the Rod
20  Roberts group, that was not the $4.1 million Asilo loan.
21  That was the just over a million dollars that you loaned
22  to KrisJenn Ranch that ultimately got wired to
23  Roberts --
24      A.   That is correct.
25      Q.   -- is that true?

1    A.   That is correct.

2    Q.   Okay.  And when did you -- when did KrisJenn

3  wire that just over a million dollars in earnest money

4  to the Roberts group?

5    A.   It -- it's -- all of the wires speak for

6  themselves.  But they started out 25,000, 25,000, a

7  $75,000 wire, a $400,000 wire, a $400,000 wire, and a

8  $250,000 wire.  And Daniel Moore set up all of those

9  extensions with the exception of the $250,000 wire,

10  which he did sign off on that too.

11    Q.   Mr. Wright, was the Asilo loan ever disclosed

12  to Daniel Moore?

13    A.   He was given a copy of it, yes, sir.

14    Q.   Okay.  And how was Mr. Moore given a copy of

15  the Asilo loan?

16    A.   He was given a copy of the loan before it was

17  done.  It's in an e-mail --

18    Q.   And when you said --

19    A.   -- that (inaudible), yes, sir.

20    Q.   And when you say he was given a copy of the

21  Asilo loan, what -- are -- what -- are you referring to

22  a particular document?

23    A.   I believe it's an e-mail that I would -- we

24  have someone researching those and putting them together

25  for you.  That will be --

Page 101

1    Q.   Okay.

2    A.   -- presented to you at the end of the -- by

3  the last of (inaudible).  I think John is work- -- or my

4  personal attorney is working on that, William Germany.

5    Q.   Okay.  And so was it the note, or was it --

6  what with respect to the Asilo loan was e-mailed to

7  Daniel Moore?

8    A.   A copy of the loan.

9    Q.   Like a copy of the actual note itself?

10    A.   I believe so.

11    Q.   And was that e-mailed to Daniel Moore before

12  Black Duck closed on the right-of-way?

13    A.   Yes, sir, it was.

14    Q.   Okay.  And why did you send the Asilo loan

15  documents to Daniel Moore before closing?

16    A.   I -- I kept Daniel in the loop on everything I

17  did.

18    Q.   Well, but my question -- and I appreciate

19  that.  But more specific to the Asilo loan, why did you

20  e-mail the Asilo loan documents to Daniel Moore before

21  the right-of-way closing?

22    A.   You'll have to look in the Black Duck notes,

23  but it -- it's -- in the Black Duck notes, it spells out

24  that Black Duck was borrowing the money from KrisJenn

25  Ranch to close on the loan.

Page 102

1    Q.   Well, which notes are you talking about?

2    A.   The -- the Asilo notes.

3    Q.   Okay.  So the Asilo -- when you say, "Asilo

4  notes," are you referring to the Asilo loan documents?

5    A.   No.  The actual copy of the note.

6    Q.   Okay.  So the Asilo note, you're saying -- are

7  you saying that that Asilo note states that it is a loan

8  from KrisJenn to Black Duck?

9    A.   No, sir.  The Asilo note had nothing to do

10  with Black Duck.  KrisJenn Ranch borrowed the money

11  from --

12    Q.   Okay.

13    A.   -- Asilo.

14    Q.   Okay.  And so why -- again, why did you send

15  the Asilo loan documents to Daniel Moore before closing?

16    A.   Because the KrisJenn Ranch loaned the money to

17  Black Duck to close it.

18    Q.   Okay.  And so did you disclose to Daniel Moore

19  before closing that KrisJenn Ranch was making a loan to

20  Black Duck?

21         MR. MULLER:  Objection; form.

22    A.   The note speaks for itself.

23    Q.   (BY MR. CLEVELAND)  Which note?

24    A.   The Asilo note to KrisJenn Ranch.  It speaks

25  for itself.  And it speaks for itself on the -- the

Page 103

1  wiring of it and on the e-mail that went to Daniel

2  Moore.

3    Q.   Okay.  Well, let me -- let's -- I want to make

4  sure we're clear about this.

5         Are you saying that the Asilo note

6  somewhere states that it is a really -- really a loan

7  from KrisJenn to Black Duck?

8    A.   It speaks for itself.  You're confusing the

9  issues, Tim.

10    Q.   Well, I'm just trying to understand.  How did

11  you disclose to Daniel Moore that Black Duck was taking

12  a loan out from KrisJenn Ranch?

13         MR. MULLER:  Objection; form.

14    Q.   (BY MR. CLEVELAND)  Was it in an e-mail?  Was

15  it in a text --

16    A.   Yes.

17    Q.   -- message?

18    A.   I -- I e-mailed a copy of the note from Asilo

19  and -- and explained --

20    Q.   Okay.

21    A.   -- the 17 percent, yes, sir.

22    Q.   So you e-mailed a copy of the Asilo note with

23  KrisJenn Ranch to Daniel Moore --

24    A.   Correct.

25    Q.   -- is that correct?

Page 104

1    A.   Yes, sir.

2    Q.   And that happened before -- before closing on

3  the right-of-way --

4    A.   Yes, sir.

5    Q.   -- correct?

6    A.   Yes, sir.

7    Q.   Did you e-mail any other loan documents to

8  Daniel Moore before the closing on the right-of-way

9  other than the Asilo note?

10    A.   I -- I can't remember.  I know that we were

11  left short term to get the -- to get the money wired

12  to -- to Black Duck.  And they had -- I mean, to very --

13  it's hard for me to keep up with this because I'm

14  wearing three hats today.  Let me think about this.

15            They -- KrisJenn wired the money to

16  Express Pipeline for the benefit of Black Duck.  And

17  then once we got it closed, then we had to -- we put it

18  in the Black Duck notes that they borrowed the money to

19  close and that KrisJenn Ranch loaned them -- loaned them

20  the money for the 1.3 million up front.  And then we --

21  we did those notes and then created the notes between

22  Black Duck and KrisJenn Ranch.

23    Q.   And I -- I appreciate that answer.  And I know

24  there's a lot of different documents.

25            But what you were just talking about, the

1  creating of the notes, you were talking -- am I correct

2  that you were talking about the notes between KrisJenn

3  Ranch and Black Duck Properties; is that right?

4    A.   Yeah, you're very confusing where you're going

5  with me.  And the documents speak for themselves.  It

6  just --

7    Q.   Well, I -- and I'm -- and -- and, Mr. Wright,

8  I'm just trying to under- -- unpack what you're saying.

9  You've referred --

10    A.   Okay.

11    Q.   -- to -- there is -- there is -- there is the

12  Asilo loan, which you're -- you've said -- and I

13  understand this -- that you sent the Asilo loan

14  documents to Daniel Moore before the closing on the

15  right-of-way, right?

16    A.   He -- he was e-mailed a copy of them.  And we

17  will furnish that e-mail to show he got a copy of that,

18  whether it be (inaudible) --

19    Q.   Okay.

20    A.   -- or on the date right after that.  He went

21  into shock.

22    Q.   Well, but I --

23    A.   He didn't believe I could close.

24    Q.   Well, but I -- you just -- and I want to --

25  I've got to be very precise with my question.

1  Earlier --

2    A.   Well, you're --

3    Q.   -- you said that --

4    A.   -- confusing me, and I'm trying my hardest.

5  But -- but I've got --

6    Q.   Well --

7    A.   -- three -- three hats here.

8    Q.   Well, you know, back in 2017, though, we're

9  only talking about KrisJenn Ranch, LLC, okay, on this

10  line of questioning about, you know --

11    A.   Well, we're talking about --

12    Q.   -- the Asilo loan, okay?

13    A.   -- me personally too because Asilo took --

14  took my personal minerals as collateral also.

15    Q.   I understand.

16            But, Mr. Wright, earlier you said just now

17  that you sent the Asilo loan documents to Daniel Moore

18  before the closing of the right-of-way, right?

19    A.   I sent a copy of the loan.  He wouldn't be --

20  he wouldn't be -- really from my point of view, it

21  doesn't matter where I got the money.  But I had to

22  borrow the money.  I'm -- I was a retired businessman,

23  and the only money I had was what Daniel Moore knew I

24  had.  That's why he went after me we now know, in that I

25  got a five-hundred settl- -- hundred-thousand-dollar

1  settlement on my SWD.  And I used -- all of that money,

2  I loaned it to KrisJenn as hard earnest money to keep

3  this going while Daniel tried to sell the pipeline,

4  so --

5    Q.   Mr. Wright, when did you send the Asilo

6  loan documents to Daniel?

7    A.   I --

8    Q.   Was it before the closing of the --

9    A.   I --

10    Q.   Excuse me, sir.  Let me finish my question.

11            When did you send the Asilo loan documents

12  to Daniel Moore?  Was it before the closing of the

13  right-of-way?

14    A.   It was right in that exact area.  But it

15  really doesn't matter when -- when I sent them or not

16  because he sent me a document to do whatever I needed to

17  do to close.  And he sent it to -- to Hagan Cohle.  And

18  we presented that to the attorneys.  You might check in

19  with the attorney y'all just hired.  They're the ones

20  that did the loan.

21            A little conflict of interest on your part

22  there, but that's okay to me.  I don't -- because I'm

23  not hiding anything.  It's very easy to remember the

24  truth.

25    Q.   Mr. Wright, did you disclose the Asilo loan to

Daniel Moore before closing on the right-of-way, yes or
no?

    A.   The -- the e-mail will speak for itself and
the date.

    Q.   Was that before -- was that before or after
the closing on the right-of-way, sir?

    A.   I -- when the document is discovered, I will
gladly get you a copy of it.  It was right there on the
date a few days before or after.  You're talking about
someone --

    Q.   Okay.

    A.   -- (inaudible) and had given us 100 percent
right to do whatever it took to close this loan.  And we
now know why he sent that because he couldn't -- he
couldn't -- he didn't believe we could do it.

    Q.   Okay.  So just to close the loop on the Asilo
loan, your best recollection as you sit here today is
that you did send the Asilo loan documents to Daniel
Moore, but --

    A.   I didn't say that.

    Q.   -- you can't remember whether -- did you send
the Asilo loan documents to Daniel Moore, yes or no?

    A.   I've -- I've told you five times.

    THE WITNESS:  Could you go back and
repeat that, please, court reporter, because I -- I'm

trying to be real nice to Mr. Tim Cleveland, but he's
having trouble remembering.  Could you repeat that again
for me?

    Q.   (BY MR. CLEVELAND)  No.

    THE WITNESS:  Repeat what --

    A.   I've answered it five times.

    Q.   (BY MR. CLEVELAND)  Well, I -- I've heard
different things, Mr. Wright.  And I'm trying to tie --

    A.   Well --

    Q.   -- this up so I can move on.

    Did you -- is -- am I correct that your --
your testimony is you -- well, let me ask it again.  Did
you send the Asilo loan document to Daniel Moore or not?

    A.   The documents are two different things.  I
sent a copy of the loan with the --

    Q.   Of the Asilo loan.  Okay.

    A.   Between --

    Q.   To Daniel Moore?

    A.   (Inaudible) -- yes, which he --

    Q.   To Daniel Moore?

    A.   Yes.

    Q.   Okay.  And I understand that you can't
remember whether it was immediately before the
right-of-way, on the day of closing of the right-of-way,
or immediately thereafter when you sent the Asilo loan

to Daniel; is that fair?

    A.   It would be somewhere in that time frame.

    Q.   Okay.  Thank you.

    Now, did you also send any loan documents
between KrisJenn Ranch, LLC, and Black Duck to
Mr. Moore?

    A.   That, I can't remember.

    Q.   Okay.  Did you ever disclose to Mr. Moore that
KrisJenn Ranch would be making a a --
multimillion-dollar loan to Black Duck?

    MR. MULLER:  Objection; form.

    A.   The -- the loans from KrisJenn Ranch to Black
Duck are in the KrisJenn Ranch minutes and --

    Q.   (BY MR. CLEVELAND)  Are you reading from --
are you reading from something, sir?

    A.   And the minutes are in the Black Duck -- Black
Duck -- Black Duck note -- books.  And they speak for
themselves.

    Q.   Okay.  But I'm asking:  Did -- did you,
Mr. Wright, ever tell Daniel Moore about the KrisJenn
loan to Black Duck before it was finalized?

    A.   No, sir.

    MR. MULLER:  Objection; form.

    A.   Those are in the --

    Q.   (BY MR. CLEVELAND)  Okay.  Did you -- next

question.

    MR. CLEVELAND:  I'll object as
nonresponsive after "No, sir."

    Q.   (BY MR. CLEVELAND)  Why didn't you tell Daniel
Moore about this KrisJenn loan to Black Duck before it
was finalized?

    MR. GERMANY:  Objection; form.

    MR. MULLER:  Objection; form.

    A.   Daniel Moore said we could do whatever it took
to get it closed.

    Q.   (BY MR. CLEVELAND)  And was that in an e-mail?

    A.   That was an e-mail and by phone.  He was
distraught because he did not have his driver's license.
And he basically told Mr. Roberts to flip off and that
basically all correspondence would be between Larry
Wright and Hagan Cohle and that he asked him to no
longer have any communications with him.

    Q.   Okay.  And when did Mr. Moore send that
e-mail?

    A.   Before the closing.

    Q.   And your testimony is that that e-mail
constituted authorization from Daniel Moore for Black
Duck to take out a multimillion-dollar loan from
KrisJenn Ranch, LLC?

    MR. MULLER:  Objection; form.

1     A.   I don't think it really mattered where I got
2  the money or how I got the money.
3     Q.   (BY MR. CLEVELAND)  Well, my -- my -- I
4  appreciate that.  My question is a little different.
5          Is your testimony that an e-mail from
6  Daniel Moore gave his approval for Black Duck to take
7  out a loan from KrisJenn Ranch, LLC?
8          MR. MULLER:  Objection; form.
9     A.   I'm going to let his e-mail speak for itself.
10  And it was signed by myself and Hagan Cohle.  You can
11  ask Hagan --
12     Q.   (BY MR. CLEVELAND)  Okay.
13     A.   -- when you take his deposition.  He gave us
14  permission to do whatever it took to get this closed.
15  The reason he gave us permission to do whatever it took
16  to get this closed is because he did not believe we
17  could do it because he had ruined all avenues of
18  flipping the deal.  And he knew that there was never
19  supposed to be a flip.
20     Q.   Okay.  Well, we're -- I think -- we're going
21  to get to that e-mail --
22     A.   It was never supposed to close.  It was only
23  supposed to be a flip.  And he knew that.
24     Q.   Okay.  We're going to get to that e-mail in a
25  little bit, Mr. Wright.  But is your testimony that it

                                              Page 113

1  is a single e-mail from Mr. Moore that -- that gave you
2  that authority to take out the loan by Black Duck from
3  KrisJenn Ranch?
4     A.   The e-mails --
5          MR. MULLER:  Objection; form.
6     A.   The e-mails speak for themselves.
7     Q.   (BY MR. CLEVELAND)  But I'm asking:  Is it a
8  single e-mail from Daniel Moore?  Is it more than one?
9     A.   The e-mails will speak for themselves, and
10  that's my answer.
11     Q.   So you can't tell me whether it was one e-mail
12  or multiple e-mails that you believe constitute Daniel
13  Moore's authority for the Black Duck loan from KrisJenn?
14          MR. MULLER:  Objection; form.
15     A.   The e-mails will speak for themselves.
16     Q.   (BY MR. CLEVELAND)  Do you have anything to
17  answer my question other than what you just said, sir?
18     A.   The e-mails will speak for themselves.
19     Q.   Okay.  Do you agree with me, sir, that a you
20  know, 4.1 million dol- --
21          MR. CLEVELAND:  Well, let me strike that.
22     Q.   (BY MR. CLEVELAND)  Do you agree with me, sir,
23  that a multimillion-dollar loan for a company like Black
24  Duck Properties was a significant event?
25          MR. MULLER:  Objection; form.

                                              Page 114

1     A.   Considering the fact that Daniel Moore said
2  that it was going to be nonrefundable earnest money and
3  each time don't worry about it because I've got it
4  flipped, that was --
5          MR. CLEVELAND:  Objection; nonresponsive.
6     A.   That was -- that was a substantial loan, yes,
7  sir.
8     Q.   (BY MR. CLEVELAND)  Okay.  A
9  multimillion-dollar loan for Black Duck Properties in
10  2017 was pretty substantial, right?
11          MR. MULLER:  Objection; form.
12     A.   That wasn't -- that wasn't -- that was a large
13  loan, yes, sir.
14     Q.   (BY MR. CLEVELAND)  Okay.  And at the time
15  that, according to you, KrisJenn Ranch loaned money to
16  Black Duck Properties, Daniel Moore's entity was a
17  50 percent owner of Black Duck, right?
18     A.   He wasn't a 50 percent owner of the pipeline,
19  but he was a 50 percent owner of Black Duck.  That's
20  correct.
21     Q.   Okay.  And KrisJenn Ranch, LLC, was the other
22  50 percent owner at that time, correct?
23     A.   That is correct.
24     Q.   When did KrisJenn Ranch, LLC, loan money to
25  Black Duck?

                                              Page 115

1          And, actually, let me strike that and ask
2  a more precise question, Mr. Wright.  I'm sorry.
3          When did the loan from KrisJenn Ranch,
4  LLC, to Black Duck Properties close?
5     A.   The documents will speak for themselves.
6     Q.   So the -- the loan from KrisJenn to Black Duck
7  closed on the date of the -- the note?
8     A.   Daniel Moore left us in such bad shape that we
9  had less than four weeks to get a loan.  I went to --
10     Q.   Sir, my -- I'm simply asking about a date.
11  I'm ask- -- I'm trying to get us moving.  I'm asking
12  about a date.
13          Was the -- you -- did the KrisJenn Ranch
14  loan to Black Duck close on the date that Black Duck
15  acquired the right-of-way?
16     A.   I'm not sure about that.  That might have been
17  done after -- after the fact to clean up the paperwork,
18  but I'm not sure.  The documents will speak --
19     Q.   And --
20     A.   -- for themselves.
21     Q.   And when you say, "clean up the paperwork,"
22  what do you mean?
23     A.   The seller accepted the money from KrisJenn
24  Ranch to buy it -- buy the ranch.  And in all the
25  previous wired money, he made sure that it said, "for

                                              Page 116

1  the benefit of Black Duck."

2  Q.  Which -- which wire said "for the benefit of

3  Black Duck"?

4  A.  The 25,000, the 25,000, the 75,000, the

5  $400,000 wire, the second $400,000 wire, and the last

6  $250,000 wire all came from KrisJenn Ranch, and they all

7  said for the benefit of earnest money for the Black Duck

8  purchase of the Express Pipeline.

9  Q.  Okay.  And so my question was:  You said

10  earlier -- you -- you used the phrase "clean up the

11  paperwork."  And my question is:  What did you mean by

12  "clean up the paperwork"?

13  A.  I guess you'll have to ask my attorney because

14  I went by the advice of him on how to -- to straighten

15  it up.  And you can also ask -- y'all hired the law firm

16  that did the loan for Asilo.  I thought that was a very

17  interesting conflict of interest.  But you should ask

18  y'all's bankruptcy attorney because it was her firm that

19  handled it.

20  MR. CLEVELAND:  I'll object as

21  nonresponsive.

22  Q.  (BY MR. CLEVELAND)  You used the phrase "clean

23  up the paperwork," and I'm asking what you meant by that

24  phrase, Mr. Wright.

25  A.  I guess I used the wrong word because when I

                                                    Page 117

1  played softball, I batted cleanup.  So that would be

2  fourth.  So I'm not sure I used the right word.

3  Q.  When -- when were the loan documents between

4  KrisJenn Ranch and Black Duck Properties prepared?

5  A.  I would say after the fact.  We ran out of

6  time on the closing.  And if we didn't get the money

7  wired, we would have lost our earnest money in the

8  contract.

9  Q.  And -- and how long after the fact were

10  they --

11  A.  You would --

12  Q.  -- prepared?

13  A.  -- have to ask my attorney.

14  Q.  Okay.

15  A.  But -- but the loans were listed in the Black

16  Duck notes, and KrisJenn would be loaning the money to

17  Daniel Moore.  And there was an e-mail that specifically

18  stated that KrisJenn would be loaning the money to Black

19  Duck before the closing.  And that document was attached

20  to the loans from Black Duck.

21  It was two separate loans.  One money was

22  clarifying the loans of all of the -- it was clarifying

23  the total amount of earnest money in one loan and then

24  another loan with Asilo to KrisJenn Ranch, and then it

25  clarified that loan as the money was loaned from

                                                    Page 118

1  KrisJenn Ranch to Black Duck.  And that's why that loan

2  was at 17 percent and the other loan was at 4 percent.

3  Q.  Okay.  Let me unpack a lot of what you just

4  said.

5  You said that -- you made reference to

6  something in the Asilo loan making clear that it was a

7  loan from KrisJenn to Black Duck.  What were you

8  referring to?

9  A.  The Asilo loan had nothing to do with Black

10  Duck.

11  Q.  Okay.  But Asilo wired the money straight to

12  the seller of the right-of-way, didn't it?

13  A.  Yes, they did.

14  Q.  Okay.  And my question -- and you also said,

15  "Black Duck notes."  When you say, "Black Duck notes,"

16  what are you referring to?

17  A.  The deeds were issued into Black Duck, and the

18  money came from KrisJenn Ranch.  And so the KrisJenn

19  Ranch money that was wired to -- to Express Pipeline,

20  they issued the deeds to Black Duck.  And that could

21  be -- that -- that's probably where the

22  confusion is coming in.

23  Q.  Well --

24  A.  So I'll --

25  Q.  -- you're talking about the deed --

                                                    Page 119

1  A.  I'll have to -- I'll have to acquiesce to

2  David Strolle on that because everything I did, I asked

3  him to do it and if it was legal, and he said, yes, it

4  was.  Everything I did was legal.  And I used his

5  advice.

6  Q.  And David Strolle was Black Duck's lawyer who

7  prepared these documents, right?

8  A.  Black -- David Strolle was never Black Duck's

9  attorney.  George Pigg was Black Duck's attorney.  And

10  he went through --

11  Q.  Okay.

12  A.  -- the documents before we closed.

13  Q.  Okay.  And just so we're clear, KrisJenn sent

14  wires to the Express Pipeline seller group of just over

15  a million dollars in total, right?

16  A.  KrisJenn did not send the wires.  Asilo sent

17  the wires.

18  Q.  Well, no, I'm -- I'm talking about two

19  different things.  Asilo sent the wires of the -- of the

20  4.1 million to the seller, right?

21  A.  They -- they wired the money direct to the

22  Express Pipeline.

23  Q.  And so did Asilo also wire the -- the

24  million-plus dollars of money that went from you to

25  KrisJenn to the seller of the right-of-way?

                                                    Page 120

1    A.   No.  That was -- that was a separate loan.

2    Q.   And how did those funds from that separate

3  loan get to the seller?  Did they come from KrisJenn's

4  bank account, from your bank account?

5    A.   They came from KrisJenn Ranch bank account.

6  They were money that was held in escrow for over a year

7  and a half by the seller.

8    Q.   And none of those funds passed through the

9  Black Duck Properties' bank account, right?

10    A.   No.

11    Q.   Is that correct?

12    A.   That is correct.

13    Q.   Okay.  So David Strolle prepared the loan

14  documents related to KrisJenn Ranch, LLC; is that true?

15    A.   He did the -- he did loan prep- --

16  repre- -- preparations.  He advised on the loan that

17  Asilo did to KrisJenn Ranch, yes, sir.

18    Q.   Okay.  Why was the deed of trust reflecting

19  the alleged loan from KrisJenn Ranch to Black Duck

20  Properties backdated?

21    MR. MULLER:  Objection; form.

22    A.   Everything was done to show that Black Duck

23  owned the property.  If that wasn't done, then Black

24  Duck would have never owned the property.  It would have

25  been owned by KrisJenn Ranch.

1    Q.   (BY MR. CLEVELAND)  But my question is:  Why

2  was the deed of trust backdated?

3    MR. MULLER:  Objection; form.

4    A.   I'm -- I'm not aware of anything needing to be

5  backdated.  Everything was done per the legal authority

6  of David Strolle.  And he looked -- he looked and

7  created -- and helped create the -- the notes of Black

8  Duck.

9    Q.   (BY MR. CLEVELAND)  Okay.  And -- and after

10  the closing on the right-of-way, as I under- -- and I

11  understand after closing, you're saying Mr. Strolle was

12  preparing these documents to reflect the loans from

13  KrisJenn Ranch to Black Duck.  Is that -- is that right?

14    A.   He had to do that because Black Duck otherwise

15  would have shown paying zero dollars for the loan.  And

16  they were in our -- our corporate notes all the way

17  along; I was putting up the earnest money, said it's

18  nonrefundable, that I would be getting -- on the last

19  days that I was going to have to come up with a loan to

20  protect my million-two-hundred-thousand dollars that

21  Daniel Moore was going to let me -- let default.

22    Q.   Okay.  So my question is just simply:  Did

23  David Strolle prepare these loan documents between

24  KrisJenn Ranch and Black Duck sometime after the closing

25  on the -- on the right-of-way?

1    A.   They were either right around the closing or

2  sometime afterwards is the best of my recollection.  But

3  the documents will --

4    Q.   And after --

5    A.   -- speak for themselves.

6    Q.   And after the closing on the right-of-way, but

7  prior to litigation, did you ever send those loan

8  documents between KrisJenn Ranch and Black Duck

9  Properties to Daniel Moore?

10    MR. MULLER:  Objection; form.

11    A.   I'm not sure what we did there because I

12  wasn't required to send anything to Daniel Moore on how

13  I brought the money.

14    Q.   (BY MR. CLEVELAND)  Dnd why do you say that?

15    A.   There was nothing that required that I had to

16  show him where I got the money.  All it said was that

17  the money -- that I would come up with the money.  And I

18  came up with the money.  There's nothing that says

19  that -- to my knowledge on how or where I got the money.

20    Q.   Well, but my question is simply:  Did you ever

21  disclose the Black Duck/KrisJenn loan documents to

22  Daniel Moore after the right-of-way closed?

23    A.   I'm not sure I did because I wasn't required

24  to.

25    Q.   And you're saying you weren't required to

1  based on what?

2    A.   The organization notes said, I, Daniel Moore,

3  will sell the property, and it says KrisJenn Ranch will

4  provide the earnest moneys for any flip.  And that's

5  what KrisJenn Ranch did.  They provided the earnest

6  moneys.  And then they proceeded to provide -- provide

7  the closing money.  So we -- we did what our part

8  required us to do.  I don't think --

9    Q.   And you said --

10    A.   -- that it's -- I don't think that it's

11  required anywhere on where I got the money.

12    Q.   So you just referred to organizational

13  documents.  What are you referring to?

14    A.   The start-up of Black Duck.  We have

15  organization --

16    Q.   And are you -- when you say, "the start-up" --

17    A.   Yes, that spells out the terms of what Daniel

18  Moore's requirements were.

19    Q.   And are you talking about an e-mail or the

20  Black Duck company agreement when you say that?

21    A.   No.  There was -- in the document, there is

22  the requirements of Daniel Moore.

23    Q.   Which document?  Are you referring to an

24  e-mail?  I think I'm -- I'm about to show it to you.

25  But I'm -- I'm just trying to ask what you're going by,

1   by your memory.
2       A.  Well, I -- from what I studied, it spelled out
3   what his requirements were.  And it was spelled in an
4   e-mail that went to the gentleman -- the attorney that
5   put the document together for Black Duck.
6       Q.  Okay.  So I am -- Mr. Wright, I've shared the
7   screen with you.  Can you see my shared screen?
8       A.  Yes, I do.
9                (Exhibit 4 marked.)
10      Q.  Okay.  And this is Exhibit 4 to your
11  deposition.  Do you see that I've marked it as Exhibit 4
12  at the top tab here?
13      A.  Right.
14              MR. MULLER:  Can you scroll to the
15  bottom, Tim, so he can read from the bottom up?
16              MR. CLEVELAND:  I'm going to.  I'm going
17  to tee it up and then let Mr. Wright have a chance to
18  read it.
19      Q.  (BY MR. CLEVELAND)  I'll represent to you,
20  Mr. Wright -- and I'll give you a chance to read it --
21  excuse me -- that this is an e-mail string between
22  yourself and Daniel Moore and Hagan Cohle in December of
23  2015 --
24      A.  Correct.
25      Q.  -- related to Black -- related to Black Duck.

                                              Page 125

Veritext Legal Solutions
800-336-4000

1   Do you recognize this document, sir?
2       A.  Yes.  Yes, I do.
3       Q.  And is this the e-mail -- I'll let you read
4   it.  But is this the e-mail that you were just referring
5   to about the -- the -- I think you called it an
6   organizational document about duties.  Is this what you
7   were referring to?
8       A.  It's one of many.
9       Q.  Okay.  But why don't you take a chance to read
10  it.  This is the bottom of it.  And then I'm going to
11  ask you some questions.  And I'll scroll up here so you
12  can see the full e-mail that starts it.
13              (Witness looks at document.)
14      A.  Okay.
15      Q.  Okay.  And then I'll scroll up so you can see
16  the -- the final few e-mails leading to the -- the top
17  here.  So there's another e-mail from Hagan Cohle.
18      A.  Okay.
19      Q.  And that -- that's the top.  Let me know when
20  you've read it.
21              (Witness looks at document.)
22      A.  Okay.  I've read it.
23      Q.  Okay.
24              MR. MULLER:  Can you go to the middle
25  again, please, Tim?

                                              Page 126

Veritext Legal Solutions
800-336-4000

1               MR. CLEVELAND:  Sure.  There -- there
2   is -- I guess there's three pages.  There is this
3   e-mail, John, that starts --
4               THE WITNESS:  (Inaudible).
5               MR. CLEVELAND:  The middle one right
6   there.
7               MR. MULLER:  Up a little bit further
8   where it says, "Hi, Mike."
9               THE WITNESS:  I don't see the "Hi, Mike."
10              MR. CLEVELAND:  That may have been at the
11  bottom.  That -- that's the last e-mail, John, on the
12  string right here.
13      A.  Well, just leave up on the screen whatever you
14  want me to answer and -- and that way --
15      Q.  (BY MR. CLEVELAND)  Yeah.
16      A.  -- I can --
17      Q.  Yeah.  I just -- yes, sir.  I just wanted to
18  give you a chance to read it.
19              So Exhibit 4 is a true and correct copy,
20  Mr. Wright, of an e-mail string between yourself, Hagan
21  Cohle, Michael Rodgers, and eventually Daniel Moore --
22      A.  I believe --
23      Q.  -- is that correct, sir?
24      A.  I believe so.
25      Q.  And Michael Rodgers is a lawyer, correct?

                                              Page 127

Veritext Legal Solutions
800-336-4000

1       A.  Yes.
2       Q.  And is he with David Strolle's firm?
3       A.  It's not David Strolle's firm.
4       Q.  Well, but is he at the same law firm as David
5   Strolle?
6       A.  Yes, he was.
7       Q.  Okay.  And this e-mail string starts with
8   Hagan Cole, your son-in-law, e-mailing these lawyers,
9   copying you, subject "Business Formation," right?
10      A.  Correct.  Correct.
11      Q.  And he says, "Hi, Mike.  Larry has requested I
12  contact you to form a new entity (LLC-S Corp) for a new
13  venture.  He wanted me to verify the availability of the
14  below names.  He would like to set it up with the
15  following characteristics."
16              And this is where we have the 50/50
17  ownership between KrisJenn Ranch and Daniel Moore's
18  entity, correct?
19      A.  Correct.
20      Q.  And there is also an e-mail -- a part of this
21  e-mail that talks about duties.  Do you see that?
22      A.  Yes.
23      Q.  And is -- is this description of duties
24  accurate, sir, as Mr. Cohle use -- uses in this e-mail
25  on December 1, 2015?

                                              Page 128

Veritext Legal Solutions
800-336-4000

1      A.    That is very active.

2      Q.    And you said, "active." Is it accurate?

3      A.    The e-mail is accurate.

4      Q.    Okay.  Excuse me.

5            And you also have business name choices

6   here.  The first choice is Wood Duck.  The second choice

7   is Black Duck.  And we obviously know that Black Duck

8   was the one you went with, right?

9      A.    Right.

10     Q.    And you chime in on the first page here in

11  response to your son-in-law's e-mails, and you said,

12  "Black Duck-Approved-Larry," right?  I just highlighted

13  that.

14     A.    Yeah, on the name we picked, I believe.

15     Q.    Okay.  And then Daniel chimes in on

16  December 2nd, and he says, "Duties for me would consist

17  of introducing opportunities that I feel or choose to

18  present to KrisJenn and if KrisJenn chooses to

19  engage...then we run it through Black Duck.  I will also

20  bring buyers but feel we should and will all use

21  whatever resources available to us individually or

22  collectively therefore I think we should all take on

23  that duty."

24            Did I read that correctly, sir?

25     A.    Yeah.  That was an e-mail Daniel threw in

1   there, which I think I would later disagree with.

2      Q.    Right.  But at the time, your response is,

3   "Daniel-I definitely agree;" isn't that true?

4      A.    That the LLC was formed to purchase assets --

5      Q.    Well --

6      A.    -- and resell.

7      Q.    You don't disagree with Daniel's statements

8   that his duties would consist of introducing

9   opportunities, do you?

10     A.    That -- that was something that he just added

11  the fact because here he is again getting into something

12  with no money down.  And we re-- we later figured out

13  his total -- I don't want to call it a scam, but his

14  total way of he did business by never putting money into

15  anything and -- and he is very good at misusing words

16  and putting them into context.  But -- and because there

17  he throws out collectively.  Again, as it turns out, he

18  doesn't bring one buyer to the table on anything we ever

19  closed.

20     Q.    Well, I appreciate that, Mr. Wright.  But

21  Daniel says that his duties would consist of introducing

22  opportunities.  He uses that language.  And you don't

23  disagree with him in your e-mail --

24     A.    Well --

25     Q.    -- at the top of Exhibit 4, do you?

1      A.    Let's go down to the organization agreement.

2   And that was our deal; he would bring buyers, period.

3      Q.    Sir, I --

4      A.    Otherwise --

5      Q.    Sir, I'm asking you about --

6      A.    Otherwise, I wouldn't have needed him in the

7   corporation.  And this would later prove --

8      Q.    All right.

9      A.    -- he had -- he had no use, no benefit to --

10     Q.    Okay.  Well, Mr. Wright, thanks.  I'm just

11  asking you about this document and these e-mails that

12  you wrote and received back before anybody sued anybody,

13  okay?  Do you understand that?

14     A.    The document speaks for itself.

15     Q.    Okay.  Right.  And that document includes

16  Daniel saying, "duties would consist of introducing

17  opportunities." He said --

18     A.    I can't --

19     Q.    -- that, didn't he?

20     A.    -- add or -- or take away because, obviously,

21  you're not going to listen to those.  So the -- the

22  document speaks --

23     Q.    Well, I --

24     A.    -- for itself.

25     Q.    Right.  And you agree that Daniel said his

1   duties would include -- would consist of introducing

2   opportunities right here, right?  Do you see that?

3      A.    The document speaks for itself, Tim.

4      Q.    Right.  And you said, "I definitely agree," to

5   Daniel.  You didn't disagree with anything he said, did

6   you?

7      A.    That was a one -- that was the beginning of a

8   long sentence.

9      Q.    Well, right.  Anywhere else in this long

10  sentence or e-mail do you disagree with Daniel Moore

11  saying duties would consist of introducing opportunities

12  to you?  Do you disagree with that anywhere in this --

13  in your e-mail up here, sir?

14            MR. MULLER:  Well, can you give him time

15  to read it, Tim?  Give him some time to read it.

16            MR. CLEVELAND:  Of course.

17            (Witness looks at document.)

18     A.    It is right there, "specifically formed to

19  purchase assets from Nuverra and resell." So it

20  speaks --

21     Q.    I understand that.

22     A.    -- for itself.  It speaks for itself.  I

23  can't -- I can't say what it says or doesn't say.  It

24  speaks for itself, Tim.  You're -- you're rep-- you're

25  trying to take away what -- what Daniel's true purpose

```
 1   in this corporation was.  And it was --
 2          (Unreportable crosstalk.)
 3      Q.  I'm just asking you about this document.
 4      A.  Yeah, it speaks --
 5      Q.  I'm just asking you about the document.
 6      A.  Yeah.  Yeah, it speaks for itself.
 7      Q.  Okay.
 8      A.  It speaks for itself.  Thank you.
 9      Q.  So Daniel Moore -- after telling you that his
10   duties would consist of introducing opportunities, he
11   did that, didn't he?
12      A.  I disagree.  But that's -- that's all --
13   that's all -- because there is two other documents later
14   that try to respell it.  And he always -- his whole deal
15   was -- getting us to do this is that he had tons of
16   buyers, on and on and on.  And my son-in-law will
17   testify to that too.
18      Q.  Okay.  Well, one of the opportunities Daniel
19   Moore presented to you concerned saltwater disposal
20   wells, right?
21          MR. MULLER:  Tim, if we're going on to
22   something else, I -- and I don't mean to interrupt if
23   we're not.  But it is about fifteen after twelve, and
24   we're all getting a little hungry.  So if you know of a
25   good spot to take a break, please let us know.
```

```
 1          MR. CLEVELAND:  Yeah, absolutely, John.
 2   Let me finish with this exhibit and -- and related
 3   questions, maybe five more minutes, and we'll take our
 4   lunch break.
 5          MR. MULLER:  Yes, sir.
 6      Q.  (BY MR. CLEVELAND)  Okay.  Mr. Wright, one of
 7   the opportunities that Daniel Moore brought to the table
 8   related to saltwater disposal wells; isn't that true?
 9      A.  No, it isn't.
10      Q.  Okay.  Another opportunity that Daniel Moore
11   brought to the table was the right-of-way through Darin
12   Borders; isn't that true.
13      A.  Well, you said that correctly.
14          MR. CLEVELAND:  Okay.  We can take our
15   lunch break.  Thank you.
16          MR. MULLER:  Thank you.
17          THE VIDEOGRAPHER:  Going off the record.
18   The time is 12:13 p.m.
19          (Break from 12:13 p.m. to 1:43 p.m.)
20          THE VIDEOGRAPHER:  We'll mark this as the
21   beginning of file 2.  Back on the record.  The time is
22   1:43 p.m.
23      Q.  (BY MR. CLEVELAND)  Okay.  Mr. Wright, we took
24   a lunch break, and we fixed some audio issues.
25          Can you hear me okay, and are you ready to
```

```
 1   proceed, sir?
 2      A.  Yes, sir.
 3      Q.  Okay.  Mr. Wright, did you or anyone on behalf
 4   of your entities ask the McLeods for an extension on the
 5   debt payment that was overdue prior to filing
 6   bankruptcy?
 7      A.  I'm not sure if I did or not.  The records
 8   will speak for themselves.
 9      Q.  Okay.  And you've said that a lot this morning
10   and just now when you say, "The records will speak for
11   themselves," or, "The documents will speak for
12   themselves."  What do you mean by that?
13      A.  It's what we file in bankruptcy court, sworn
14   testimony that I made.
15      Q.  Okay.  Well, I'll represent to you there is
16   nothing in the bankruptcy filings about whether or not
17   you asked for an extension from the McLeods on any debt
18   payments, okay?  And that's why I'm asking you here in
19   this deposition.  And so my question again is --
20      A.  That --
21      Q.  Sir -- sir --
22      A.  Yes.
23      Q.  -- did you ever ask the McLeods for an
24   extension on the debt payments that were owed by either
25   you or your entities prior to filing bankruptcy?
```

```
 1      A.  The note gave the two dates that the interest
 2   was due.  On the second note -- note payment due date
 3   for the 3.4 million, we did not have funds to make that
 4   payment.  An extension --
 5      Q.  That's not my question.
 6          (Unreportable crosstalk.)
 7      Q.  That's not my question.  My question is:  Did
 8   you or anybody on your behalf ask for an extension on
 9   any debt payments that were owed to the McLeods or not
10   prior to filing bankruptcy?
11      A.  I can't remember.
12      Q.  Okay.
13      A.  The records --
14      Q.  Thank you.
15      A.  -- will speak for themselves.
16      Q.  Okay.  Well, filing bankruptcy is a pretty
17   significant event; wouldn't you agree?
18          MR. MULLER:  Objection; form.
19          MR. GERMANY:  Objection; form.
20      A.  Bankruptcy is -- Chapter 11 is what I did.
21   And the bankruptcy filings represent what I had to do.
22      Q.  (BY MR. CLEVELAND)  Well, do you think you
23   owed it -- do you think you owed it to any of your
24   entities to seek out an extension of debt payments to
25   McLeod before you put all three of your entities into
```

1  bankruptcy, sir?

2           MR. MULLER:  Objection; form.

3           MR. GERMANY:  Objection; form.

4    A.  I put one entity into bankruptcy.  And because

5  of your filings, it became three.

6    Q.  (BY MR. CLEVELAND)  Okay.  Well, my question

7  is -- is different than that, sir.

8          Do you believe that you owed it to your

9  Debtor entities to seek an extension from the McLeods on

10  the debt payments before putting those entities into

11  bankruptcy?

12           MR. MULLER:  Objection; form.

13    A.  Yeah, I'm very confused because you kept

14  saying you, you, you, I, do I, and that's very

15  confusing.

16    Q.  (BY MR. CLEVELAND)  Okay.

17    A.  I really don't know what you're --

18    Q.  Do you believe it would have -- let me ask you

19  this, Mr. Wright.  Do you believe it would have been

20  prudent for either yourself or either of -- any of the

21  three Debtor entities to ask for an extension from the

22  McLeods on those debt payments prior to filing

23  bankruptcy to see if bankruptcy could have been avoided?

24           MR. GERMANY:  Objection; form.

25           MR. MULLER:  Objection; form.

Page 137

---

1    A.  With or without an extension, it wouldn't have

2  given us the funds to make the payment.

3    Q.  (BY MR. CLEVELAND)  It would have bought you

4  some more time, though, wouldn't it?

5    A.  We had no nowhere to go for the funds.

6    Q.  Well, you don't know that though because you

7  could have bought time and tried to figure that out?

8           MR. GERMANY:  Objection; form.  And

9  you're (inaudible).

10           MR. MULLER:  Objection; form.

11    A.  You're asking misleading questions.  So what I

12  could have done and -- I did the best that I could at

13  the time.

14    Q.  (BY MR. CLEVELAND)  Well, wouldn't the best --

15  wouldn't your best efforts involve seeing if you could

16  extend these deadlines from the McLeods, sir?

17           MR. MULLER:  Objection; form.

18           MR. GERMANY:  Objection; form.

19    A.  What I did then was the best of my ability.

20    Q.  (BY MR. CLEVELAND)  Well, you -- you like to

21  text with Mr. Adam McLeod.  You e-mail with the McLeods.

22  You've sent privileged information to the McLeods.  It

23  never occurred to you to call them and ask for an

24  extension on your debt payments to avoid bankruptcy.  Is

25  that your testimony?

Page 138

---

1           MR. MULLER:  Objection; form.

2           MR. GERMANY:  Same objection.

3    A.  My testimony is, the facts speak for

4  themselves.

5    Q.  (BY MR. CLEVELAND)  But it just never occurred

6  to you to ask for an extension.  Is that your testimony?

7    A.  I -- at the time, I couldn't make the payments

8  and -- and so that's -- that's what I thought was the

9  best for the company.

10    Q.  To not ask for an extension?

11    A.  To file bankruptcy.

12    Q.  Okay.

13          (Exhibit 5 marked.)

14    Q.  All right.  Mr. Wright, I am sharing with you

15  my screen so you can see Ex- -- what I've marked as

16  Exhibit 5.

17           MR. CLEVELAND:  And, Counsel, this is

18  Bates-numbered McLeod-0745 to 747.

19    A.  I can't --

20    Q.  (BY MR. CLEVELAND)  Can you see that,

21  Mr. Wright?

22    A.  This is the problem.  We can't see it.  It's

23  so fine print.  That's why I have a headache trying to

24  read your stuff from the first go-round.  There's no way

25  I can see that.  It is so little --

Page 139

---

1    Q.  How about that?  Well, you didn't --

2          (Unreportable crosstalk.)

3    Q.  I didn't hear that complaint from you -- I

4  didn't hear that complaint from you in the morning,

5  Mr. Wright.

6          So now I've zoomed in.  Can you see this

7  document?

8    A.  It's getting better.

9           MR. MULLER:  Can you -- can you blow it

10  up a little bit more, Tim, please?

11           MR. CLEVELAND:  Yes.

12    A.  Okay.

13    Q.  (BY MR. CLEVELAND)  All right.

14           MR. MULLER:  Hang on.  Hang on.

15    Q.  (BY MR. CLEVELAND)  Mr. Wright, can you see

16  that?

17           MR. MULLER:  Part of the problem is that

18  our video screen is up in front of the -- of the e-mail.

19  So if you can bear with us just a moment, Tim.

20           MR. CLEVELAND:  Okay.  Let's go off the

21  record, Shane.

22           MR. MULLER:  Sure.

23           THE VIDEOGRAPHER:  Going off the record.

24  The time is 1:49 p.m.

25          (Break from 1:49 p.m. to 1:58 p.m.)

Page 140

1    THE VIDEOGRAPHER:  Back on the record.
2  The time is 1:58 p.m.
3    Q.   (BY MR. CLEVELAND)  All right.  Mr. Wright,
4  can you hear me okay?
5    A.   Yes.
6    Q.   All right.  I'm going to share my screen again
7  and show you what I have marked as Exhibit 5 to your
8  deposition with the -- with the Bates numbers McLeod-745
9  to 747.  And I understand your counsel has a hard copy
10 of this exhibit as well.
11   Do you have that in front of you?
12   A.   Yes, I do.
13   Q.   Okay.  And this is a true and correct copy of
14 an e-mail that you sent to Adam McLeod on March 17th,
15 2020, correct?  Sir?
16   MR. MULLER:  I've got three -- we've got
17 three pages here, Tim.  And I just want to make sure
18 we've got the right thing.  Two of them are like the
19 bottom part of a -- you know, page --
20   MR. CLEVELAND:  Yes.  Those are --
21   MR. MULLER:  -- 23 and page --
22   MR. CLEVELAND:  -- attachments.  Let
23 me -- I'll -- I'll --
24   Q.   (BY MR. CLEVELAND)  Mr. Wright, there are two
25 pages of attachments -- this is how this was produced to

Page 141

1  us -- that appear to be excerpts of a pleading.  And my
2  question is:  Is this a true and correct copy of an
3  e-mail with attachments that you sent to Adam McLeod in
4  March of this year?
5    A.   I believe so.
6    Q.   Okay.  And by this time, the option agreement
7  with the McLeods had been executed, right?
8    A.   The date would -- would correspond with the
9  date of the option agreement.
10   Q.   Okay.  And you say, "Adam-This guy is living
11 in a bad dream.  We cannot take a chance to have the
12 pipeline moved into a trust by the Shelby County Judge,"
13 exclamation point.
14   Did I read that correctly?
15   A.   I believe so.
16   Q.   Well, what did you mean by, "We can't" -- "We
17 cannot take a chance to have the pipeline moved into a
18 trust by the Shelby County Judge"?
19   A.   That was talked to by -- between my counsel
20 and the counsel for Darin Borders.
21   Q.   Well, I'm asking what you meant when you said
22 that to Adam McLeod on the date of this e-mail.
23   MR. MULLER:  Objection; form.
24   A.   I was just relaying what the attorney told
25 Cedillo at the time.

Page 142

1    Q.   (BY MR. CLEVELAND)  Okay.  But what did you
2  mean by that?  Do you have any understanding of what you
3  meant --
4    A.   I just --
5    Q.   -- when you wrote this in the e-mail?
6    MR. MULLER:  Objection; form.
7    A.   I don't mean anything.  I'm just saying
8  what -- what they told, that they were going to try to
9  move it into a trust.  I'm just repeating what they told
10 Cedillo.
11   Q.   (BY MR. CLEVELAND)  Why were you keeping Adam
12 McLeod informed about happenings in the state court
13 litigation in Shelby County?
14   A.   I don't believe Adam McLeod or the McLeods
15 intend to exercise the option unless -- unless the
16 lawsuit has been handled.
17   Q.   Okay.  Did you tell them about the lawsuit
18 before exercising -- or excuse me -- before executing
19 the option agreement?
20   A.   I -- I believe so.  The e-mails would -- would
21 speak for themselves.  They're all -- 95 percent of all
22 communication, I believe, was by e-mail.
23   (Exhibit 6 marked.)
24   Q.   Okay.  Let's go to Exhibit 6, which is --
25 Exhibit 6, which I'm showing to you, Mr. Wright, which

Page 143

1  you should have in front of you, is an e-mail string
2  dated April 14th, 2020.  This has the Bates numbers
3  McLeod-523 to 525.
4    And do you have that in front of you, sir?
5    A.   On April 14th?
6    Q.   Yes, sir.
7    (Witness looks at document.)
8    A.   Yeah, this looks like --
9    Q.   Do you have it in front of you, sir?  That's
10 my only question.
11   A.   Oh, yes.  Yes.  Yes.
12   Q.   Okay.  When you say to Adam McLeod in the
13 middle of the page that I've highlighted here, "Time to
14 file on the 21st," what did you mean by that?
15   A.   I -- I have no idea.  It must have something
16 to do with -- with the court filings.
17   Q.   Are you referring to filing bankruptcy when
18 you make that statement?
19   A.   I -- I mean, I wouldn't know.  It speaks for
20 itself.  I wouldn't know.
21   Q.   Well, you're the one that wrote it, and I'm
22 asking you what you meant.  What did you mean by, "Time
23 to file on the 21st"?
24   MR. MULLER:  Objection; form.
25   A.   This was April 14th, and I don't remember.

Page 144

**Page 145**

1    Q.   (BY MR. CLEVELAND)  Okay.  You filed
2  bankruptcy in this matter on or about April 27th, 2020.
3  Does that sound correct to you?
4    A.   I -- the dates speak for themselves.
5    Q.   Okay.  Is your testimony that this statement,
6  "Time to file on the 21st," does not relate to the
7  filing of this bankruptcy?
8    A.   I have no idea.  I can't remember.  It speaks
9  for itself.
10    Q.   But you, as you sit here today, have no idea
11  or you can't do anything to help us understand what you
12  meant by "Time to file on the 21st;" is that correct?
13          MR. MULLER:  Objection -- objection;
14  form.
15    A.   You is --
16    Q.   (BY MR. CLEVELAND)  Yes or no?
17    A.   Do you -- I'm sorry?  Do you mean --
18    Q.   Yes or no?
19    A.   -- KrisJenn Ranch?
20    Q.   Yes, sir.
21          MR. MULLER:  Objection; form.
22    A.   I -- I can't remember what it means.
23    Q.   (BY MR. CLEVELAND)  Okay.  You --
24    A.   I have no idea.
25    Q.   Just so we're clear, you can't remember what

**Page 146**

1  you meant by this statement in your e-mail to Adam
2  McLeod on April 14th of this year?  If that's the case,
3  we can --
4          MR. MULLER:  Objection --
5    Q.   (BY MR. CLEVELAND)  -- move on.
6          MR. MULLER:  Objection; form.
7    A.   I guess we can move on because I'd have to see
8  a previous e-mail on what we're talking about.  It's
9  very confusing.  It could be a lot of things because
10  Derick Rodgers is on here and it could have something to
11  do between Derick Rodgers and the settlement talks with
12  Darin Borders and something to do with filing on that
13  case.  I -- I mean, I -- I have no idea.  This is --
14    Q.   (BY MR. CLEVELAND)  Okay.
15    A.   -- April 14th.
16    Q.   That's fine.  Thank you, sir.
17          (Exhibit 7 marked.)
18    Q.   I'm going to -- I'm showing you what I have
19  marked as Exhibit 7 to your deposition, which bears the
20  Bates numbers McLeod-2215 to 2216.
21          Do you have Exhibit 7 in front of you,
22  sir?
23    A.   Is that the Notice of Event of Default?
24    Q.   Yes, sir.
25    A.   Yeah, I have it -- yes, sir, I have it in

**Page 147**

1  front of me.
2    Q.   Okay.  Exhibit 7 is a letter from the McLeod's
3  counsel to -- to you and your three KrisJenn Ranch
4  entities, correct?
5    A.   Let's see.  It's to KrisJenn Ranch, LLC.  It's
6  actually to four of us, not three.  You made a mistake.
7    Q.   Well, you individually and the three KrisJenn
8  Ranch entities, right?
9    A.   And to myself individually.
10    Q.   Okay.
11    A.   Yes, sir.
12    Q.   And did you receive this letter, sir?
13    A.   This went to -- certified, I believe, to
14  myself and to the law firm.
15    Q.   Okay.  But you received it, didn't you?
16    A.   I had it in my possession, so somehow I got
17  it, yes, sir.
18    Q.   Okay.  And this is a notice of default for, as
19  I highlight at the bottom of the first page, a payment
20  that was due on February 8th of 2020.  Do you see that,
21  sir?
22    A.   Yes, I do.
23    Q.   Okay.
24    A.   February 8th of -- now, of 2019 it says.
25    Q.   Sir, look at the paragraph I highlighted at

**Page 148**

1  the bottom of first -- of the first page.  It says --
2    A.   Oh --
3    Q.   "Under the Loan Agreement" --
4    A.   Yes.  Yes.  Oh, okay.
5    Q.   -- "interest on the Note" --
6    A.   I really apologize, Tim.  I was -- I was
7  looking at this, and I forgot to look back up at what
8  you had there.  Yes, you're correct.
9    Q.   Okay.  So this is a -- this is a notice of
10  default for a payment that was owed on February 8th,
11  2020, correct?
12    A.   Correct.
13    Q.   And had you received a notice -- a written
14  Notice of Event of Default for being late on that
15  payment any time prior to April 23rd, 2020, when this
16  letter was sent?
17    A.   On the -- on a notice?  I don't believe so.
18  There might have been a verbal call to the attorney, but
19  not directly to me.
20    Q.   Okay.
21    A.   I -- I just informed my attorney that I wasn't
22  able to make this note.
23    Q.   Okay.  So --
24    A.   And I believe --
25    Q.   -- in the last exhibit --

1   A.  -- that -- I believe that was to Cedillo, if
2   I'm not mistaken.
3   Q.  Okay.  In the last exhibit, you tell Adam
4   McLeod it's time to file.  In this exhibit, you get the
5   notice of default for a payment that was owed almost
6   three months earlier than the date the letter was sent.
7   And then four days after this letter of April 23rd, you
8   put your entities into bankruptcy.
9           Do I have that sequence correct, sir?
10  A.  I -- they speak for themselves.  The
11  documents --
12  Q.  Okay.
13  A.  -- speak for themselves.
14  Q.  Did you -- did you coordinate with the McLeods
15  about the filing of your bankruptcy for your three
16  entities?
17  A.  I did not.
18  Q.  Okay.  So this timing is just a coincidence?
19  A.  The documents speak for themselves because at
20  the time, Cedillo was handling my negotiations.  And I
21  believe they were the ones that advised me that I should
22  go into bankruptcy if I can't make this payment.
23  Q.  But you weren't in default --
24  A.  Then they advised me --
25  Q.  -- until you got this notice.

Page 149

1   A.  I'm sorry?
2   Q.  All right.  Mr. Wright, we're done with that
3   exhibit.
4   A.  Okay.
5   Q.  Mr. Wright, what do you believe is a fair
6   outcome of this lawsuit, sir?
7           MR. MULLER:  Objection; form.
8   A.  The word fair to me is exactly how the
9   agreement was written, which I have never swayed from
10  one bit.  20 percent of the net profits to go to Darin
11  and Daniel and the balance to --
12  Q.  (BY MR. CLEVELAND)  And so --
13  A.  -- KrisJenn Ranch.
14  Q.  And so according to you, how would that play
15  out in where we are right now if the pipeline -- if the
16  right-of-way -- excuse me -- is option to -- I'm sorry.
17  Let me ask a new question.
18          How would what you just said play out if
19  the McLeods acquire the right-of-way that's the subject
20  of the option agreement?
21          MR. MULLER:  Objection; form.
22  A.  The 5.9 million would go back to the McLeods,
23  and the 100,000 would be split fairly between KrisJenn
24  Ranch, Darin Borders, and Daniel Moore.
25  Q.  (BY MR. CLEVELAND)  And you said the

Page 150

1   5.9 million would go back to the McLeods.  Did you
2   mean --
3   A.  Yes, sir.  Yes, sir.
4   Q.  Well, the McLeods wouldn't get the money back.
5   They would get the right-of-way if they exercised their
6   option, right?
7   A.  That -- that is correct.
8   Q.  So when you say the 5.9 million went back to
9   somebody, were you referring to KrisJenn Ranch?
10  A.  Kris- -- the 5.9 million would release the
11  KrisJenn Ranch, and they would then own the pipeline and
12  my minerals would be released.
13  Q.  Meaning the McLeods would own the -- the
14  right-of-way and the pipeline and you would keep your
15  minerals?
16  A.  And the ranch.
17  Q.  Okay.  And the distribution of the 100,000
18  would be what?
19  A.  That would be the net profits.
20  Q.  And so under that, how much would Mr. Borders'
21  and Mr. Moore's entity receive?
22  A.  20,000 apiece.
23  Q.  Okay.  And that's based on the net profit
24  interest agreements?
25  A.  Yes, sir.

Page 151

1   Q.  Okay.  If the loan that you claim was made by
2   KrisJenn Ranch to Black Duck was really a capital
3   contribution from KrisJenn Ranch --
4           MR. MULLER:  Objection; form.
5   Q.  (BY MR. CLEVELAND)  -- what would --
6           MR. CLEVELAND:  I'm not -- I'm not done.
7   Sorry, John.
8   Q.  (BY MR. CLEVELAND)  If the loan from KrisJenn
9   Ranch, LLC, to Black Duck were actually a capital
10  contribution, Mr. Wright, how would the proceeds from
11  the $2.5 million sale to TCRG have been distributed?
12          MR. MULLER:  Objection; form.
13  A.  There -- there would have never been capital
14  contributions made except for the five- -- $500 that I
15  put in and the $500 that I put in for Adam -- I mean,
16  for Daniel Moore.
17  Q.  (BY MR. CLEVELAND)  And, sir, I understand.
18  I'm asking you to engage in a hypothetical with me,
19  okay?
20  A.  I'm not very good at hypothetical.  Today --
21  Q.  Well, let's just give it a try.
22          (Unreportable crosstalk.)
23  Q.  Let's give it a try.
24  A.  I'm willing to try anything.
25  Q.  Okay.  Thank you.

Page 152

1    If the what you claim was a loan from
2    KrisJenn to Black Duck was really a capital
3    contribution -- I'm asking you to assume that with me.
4    I understand you disagree with it, okay?
5         If that was a capital contribution,
6    Mr. Wright, how would the two-and-a-half-million-dollar
7    proceeds from TCRG have been distributed between
8    KrisJenn Ranch, DMA Properties, and Longbranch Energy
9    under the net profits agreement?
10        MR. MULLER:  Objection; form.
11    A.   That was the small part of the deal.  The --
12    Q.   (BY MR. CLEVELAND)  Well, and --
13        (Unreportable crosstalk.)
14    Q.   And, sir, let me just -- I'm just trying to
15    ask you:  In my hypothetical, if -- again, if the
16    KrisJenn Ranch loan to Black Duck were a capital
17    contribution, would DMA Properties and Longbranch have
18    been entitled to 20 percent each of the
19    two-and-a-half-million-dollar sales proceeds from TCRG?
20    A.   No.
21    Q.   Why not?
22    A.   The -- the facts will speak for themselves.
23    Q.   Well, I am here to gain -- gain the facts from
24    you according to you, sir.  Why do you say that?
25    A.   If you'll look at the document that Daniel

Page 153

1    Moore and Darin Borders put together with George Pigg,
2    it -- the only definition in there spells it out if
3    you'll look at that.  And that document will speak for
4    itself.
5    Q.   Which document are you talking about?
6    A.   The net profits document -- document, the
7    only --
8    Q.   Right.  And I'm asking you --
9        (Unreportable crosstalk.)
10    Q.   I'm asking you how the net profits agreement
11    would apply if the -- what you say was the loan from
12    KrisJenn to Black Duck were actually a capital
13    contribution.  In that --
14    A.   Well --
15    Q.   -- scenario, wouldn't -- wouldn't Longbranch
16    be entitled to receive 20 percent of the two-and-a-half
17    million that TCRG paid?
18    A.   I guess maybe I can answer it with a question.
19    Q.   I'm just asking --
20    A.   Would that be --
21    Q.   -- you to answer my question, sir.
22        If that was a capital contribution and not
23    a loan -- stay with me, sir.  If that was a capital
24    contribution and not a loan, would Longbranch, under the
25    net profits agreement, be entitled to 20 percent of the

Page 154

1    two-and-a-half-million dollars that TCRG paid?
2        MR. GERMANY:  Objection; form.
3    A.   Okay.  The answer is no.  And if you don't
4    want me to answer the question -- to -- to answer your
5    question, then I won't.
6    Q.   (BY MR. CLEVELAND)  Well, what's the basis --
7        (Unreportable crosstalk.)
8    A.   -- of your -- I hear your answer is no.  And
9    what is that based on?
10    A.   The answer is no.  The document speaks for
11    itself.  The --
12    Q.   Do you have anything --
13        (Unreportable crosstalk.)
14    Q.   -- to add to that answer?
15    A.   No, not at all.  The document speaks for
16    itself.  The only definition in that document describes
17    what a net profits is.  So my question is:  Why did they
18    put in the definition of a net profits if there was not
19    to be a net profits agreement?  And that's gross costs
20    less -- less net -- less the gross sale.  And so you
21    would subtract the costs versus the sale, and that would
22    equal your net.  And it's pretty obvious that if we sold
23    it for less money than we paid for it, it would be a
24    loss.
25    Q.   And, sir, I hear you.  But that's why I'm

Page 155

1    asking.
2        If the KrisJenn loan to Black Duck were
3    really a capital contribution, there wouldn't be a cost
4    of sale, and Longbranch and DMA would each get
5    20 percent of the sales proceeds under the agreements,
6    right?
7        MR. MULLER:  Objection; form.
8    A.   That would be a -- that would be -- I'll just
9    leave it as interesting.  That would be interesting if
10    someone could make a deal that actually states as you're
11    saying.  That would be --
12    Q.   (BY MR. CLEVELAND)  But isn't that what the
13    net profits interest would provide for, again, if the --
14    what you say was the loan from KrisJenn to Black Duck
15    was actually a capital contribution?
16        MR. MULLER:  Objection; form.
17    A.   Well, I'm -- I am not trying to be anything
18    but humble.  But I know it was before I got out of high
19    school and I know that we definitely studied it in
20    management and in my marketing, which I carried a 4.0 in
21    college, is that --
22    Q.   (BY MR. CLEVELAND)  Sir --
23        (Unreportable crosstalk.)
24    Q.   -- I'm only asking what the net profits
25    interest agreement would -- would do in a scenario I've

Page 156

1  presented to you.  That's what I'm asking about, okay,
2  Mr. Wright?
3      A.   You're -- you're asking me to assume.
4  Assumption is a word that should never be used.  And I
5  learned that in my -- my college classes at Southwest
6  Texas.  So I am going to stay with the facts instead of
7  assumptions.  I guess if you want to watch assumptions,
8  you should tune in to the presidential debate tonight.
9      Q.   Okay.  Well, if the loan that was -- that
10 you -- if what you say was a loan from KrisJenn Ranch to
11 Black Duck is found to be fraudulent by this court,
12 okay, and is ruled to be a capital contribution, would
13 Longbranch and DMA Properties have been entitled to
14 20 percent of the sales proceeds from TCRG?
15          MR. MULLER:  Objection; form.
16     A.   I made loans.  I sent e-mails to both parties.
17 And I'm going to let the facts speak for themselves on
18 that document.  It's the only definition.  It's the only
19 definition that is in that agreement on what net profits
20 are.
21     Q.   (BY MR. CLEVELAND)  I am not asking you to
22 change the definition of net profits in the agreements,
23 Mr. Wright, okay?
24     A.   Okay.
25     Q.   What I am asking is:  If that capital

1  contribution -- I'm sorry.  If that loan was a capital
2  contribution, wouldn't Longbranch and DMA have been
3  entitled to 20 percent of the TCRG sales proceeds, sir?
4          MR. MULLER:  Objection; form.
5      A.   The -- I don't really think there is anybody
6  alive that would put in $100 and do a sale for less than
7  $100 and then split that with their two partners when
8  the $100 came from KrisJenn Ranch.  So you can expand
9  that up or down.  And I'm going to let the document
10 speak for itself because I do not live in a hypothetical
11 world.  That's the world Daniel Moore lives in.  Thank
12 you.
13     Q.   (BY MR. CLEVELAND)  Isn't that why you
14 instructed your lawyer to create a sham deed of trust
15 and backdate it so you could call this a loan and not a
16 capital contribution?
17     A.   You'll have to take that up with my attorney
18 because everything I did was through his legal advice.
19 I don't do anything without my attorneys, and they will
20 not do anything that's not legal.  So you'll have to
21 take it --
22     Q.   We've established --
23     A.   -- (inaudible).
24     Q.   -- that you created those loan -- excuse me.
25 We've established that you created the loan documents

1  reflecting an alleged loan from KrisJenn to Black Duck
2  after the right-of-way sale closed, right?
3          MR. MULLER:  Objection; form.
4      A.   I said that the loan was backed up to make the
5  closing date because Daniel Moore tried every way in the
6  world to see that I defaulted.  Whenever you're ready,
7  I'll tell you why he wanted me to default.
8      Q.   (BY MR. CLEVELAND)  Well, when did Daniel
9  Moore accuse you of defaulting?
10     A.   Well, he didn't.  He --
11     Q.   Okay.  I'll --
12     A.   -- begged me to default.
13     Q.   -- move on to another topic.  I'll move on to
14 another topic.
15     A.   Yeah, because you don't want to know the
16 truth.  Because you don't want to know the truth.
17     Q.   Okay.
18     A.   I struck a nerve with you.
19          MR. CLEVELAND:  John, I'm going to put --
20     Q.   (BY MR. CLEVELAND)  No --
21     A.   I --
22     Q.   -- not at all, sir.
23          MR. CLEVELAND:  All right.  John, do you
24 have the binder of the summary judgment exhibits?
25          MR. MULLER:  I do.  I've got a stack,

1  yes, sir.
2          MR. CLEVELAND:  Okay.
3      Q.   (BY MR. CLEVELAND)  And -- and, Mr. Wright,
4  who's in the room with you that you're -- that you're
5  glancing at?
6      A.   If you'll look down --
7          MR. MULLER:  No, he's -- he's -- he's
8  looking at -- he's just looking off to the side, Tim.
9      A.   The one thing that's --
10     Q.   (BY MR. CLEVELAND)  Can you --
11     A.   -- hurting my eyes --
12     Q.   Can you tell me who's in the room right now?
13          MR. MULLER:  Yeah.  We've already told
14 you.  It's his wife.
15          MR. CLEVELAND:  Okay.  All right.
16          All right.  John, I'm going to look at the
17 Black Duck Company Agreement.  I think it's Exhibit 6 in
18 the -- in our summary judgment evidence.
19          MR. MULLER:  Okay.  Give me one minute.
20 Okay.  We've got it.
21          MR. CLEVELAND:  Okay.  And I'm going
22 to -- give me a second.
23          (Exhibit 8 marked.)
24     Q.   (BY MR. CLEVELAND)  All right.  Mr. Wright, I
25 am sharing my screen with you and directing you to what

1    I have marked as Exhibit 8 to your deposition, which is
2    the Company Agreement of Black Duck Properties.
3              Do you see that, sir?
4         A.   Okay.
5         Q.   Do you have that in front of you, sir?
6         A.   Yes, sir.
7         Q.   And if you turn to the second-to-last page of
8    the exhibit -- maybe it's the third-to-last -- I just
9    want to confirm that you signed the Black Duck
10   Properties Company Agreement.
11        A.   Yes, I did.
12        Q.   Okay.  And you signed this in January of 2016;
13   is that right?
14        A.   Yes, sir.
15        Q.   And when you signed this, you intended to be
16   bind -- bound by the terms of this agreement with
17   respect to Black Duck, correct?
18        A.   Yes, sir.
19        Q.   Okay.  Did you understand that you had any
20   duties or obligations to Daniel Moore by signing this
21   Black Duck Company Agreement?
22        A.   I think it was a mutual.
23        Q.   Well, but I'm understand- -- I'm asking:  What
24   was your understanding of your -- of any duties that you
25   owed to Daniel Moore?

1         A.   I was a manager/member.
2         Q.   Okay.  And what were the --
3         A.   The document --
4         Q.   -- duties as you --
5         A.   The document -- the document speaks for
6    itself.
7         Q.   Okay.  So are you saying this -- this
8    document, the Company Agreement, is accurate then?
9         A.   I'm saying the document speaks for itself.  My
10   attorney prepared it.
11        Q.   Okay.  Okay.  And your attorney, that being
12   Mr. Strolle, he prepared this document?
13        A.   No, he didn't.
14        Q.   Who prepared this for you?
15        A.   Another attorney at the law firm that's no
16   longer there.
17        Q.   Is that Mr. Rodgers?
18        A.   I believe so.
19        Q.   Okay.
20        A.   I didn't know -- I didn't know Mr. Strolle at
21   that time.
22        Q.   Okay.  But you intended to be bound by these
23   terms, sir.  We can agree on that?
24        A.   The terms of the documents speak for
25   themselves.  And that's the only answer you're going to

1    get out of me today, sir.  I'm being very humble --
2         Q.   Can you not tell me under oath whether you
3    intended to be bound by this agreement that you signed?
4         A.   I'm -- I'm -- the documents speak for itself.
5         Q.   That's the only answer I can get out of you on
6    whether you intended to be bound by these terms?
7         A.   The document speaks for itself.  I can say it
8    as many times as you want me to.
9         Q.   Okay.  Is this a valid agreement?
10        A.   The document speaks for itself.  My attorney
11   put it together.
12        Q.   Are you worried about what the terms in this
13   agreement might say when they're applied to your
14   conduct, sir?
15        A.   I -- I am going to stand by the -- by the
16   terms of this document.
17        Q.   And that's not my question.
18             Are you concerned about looking at the
19   terms of this agreement and how they might apply to
20   certain conduct of yours, Mr. Wright?
21        A.   Whatever is in this document, I'm going to
22   abide by the terms.
23        Q.   Okay.  Let me ask you:  Before you executed
24   this loan between KrisJenn Ranch and Black Duck, did you
25   review this agreement to see if there was anything you

1    needed to comply with before that was finalized?
2         A.   I -- I took the advice of my attorney on the
3    loan, and he --
4         Q.   So your attorney advised --
5         A.   -- (inaudible) --
6         Q.   -- you on that loan and your duties under this
7    agreement?
8              MR. MULLER:  Objection; form.  I'm going
9    to instruct him not to answer that.
10        Q.   (BY MR. CLEVELAND)  Okay.  Let's look at this
11   paragraph on page 23 called "Conflicts of Interest."
12             Are you there, Mr. Wright?
13        A.   Okay.  I see it.
14        Q.   All right.  And -- so let's look at paragraph
15   6.1.  It says, "For purposes of this section, an
16   'Interested Person' is any Member, Manager, or officer
17   of the Company who acts as an agent on the Company's
18   behalf and who may have a conflict of interest with the
19   Company."
20             Do you see that, sir?
21        A.   Yes, I do.
22        Q.   It says, "If the provisions set forth herein
23   are true, no contract or transaction will be voided or
24   voidable solely because (a) it is between this Company
25   and any Interested Person; (b) it is between this

1    Company and any other limited liability company,
2    corporation, partnership, association, or other
3    organization in which any of its Interested Persons are
4    associated or have a financial interest."
5            Did I read that correctly, sir?
6    A.   That's what it says, yes, sir.
7    Q.   Okay.  And while we're on (b), let's talk --
8    talking about the loan -- what you say was a loan
9    between KrisJenn Ranch and Black Duck.  You had a
10   financial interest in KrisJenn Ranch, LLC, as of
11   August 2017; isn't that true?
12   A.   The document will speak for itself if that's
13   what it says.
14   Q.   No, that's not my question.  Didn't you --
15   well, you were a member of KrisJenn Ranch, LLC, as of
16   August 2017, right?
17   A.   That I was a member of KrisJenn Ranch?
18   Q.   Yes.
19   A.   I am a 30 percent owner, yes, sir.
20   Q.   Okay.  Did you have a -- did that mean you had
21   a financial interest in Black -- in KrisJenn Ranch, LLC,
22   at the time of this alleged loan with Black Duck?
23   A.   I -- your -- your question is so confusing
24   that I really don't know what you're saying.  The
25   document itself --

Page 165

1    Q.   As a --
2    A.   -- speaks for itself.
3    Q.   Sir, as a member of KrisJenn Ranch, LLC, do
4    you have a financial interest in the affairs of KrisJenn
5    Ranch?  Yes or no?
6    A.   Yes.
7    Q.   Okay.  And was that true in 2017 when you were
8    a member of KrisJenn Ranch, LLC?
9    A.   I'm not sure -- I'm not sure of the relevance,
10   but yes.
11   Q.   Okay.  Let's continue to the next page of this
12   Company Agreement, okay?
13   A.   Okay.  Just tell me where to go to.
14   Q.   Are you there on the top of page 26 of the --
15   of this exhibit?  I'm sorry.
16   A.   Twenty -- page --
17   Q.   Page 24.
18   A.   -- 25 -- okay.  All right.
19   Q.   Do you see it says, "The material facts as to
20   the relationship or interest and as to the contract or
21   transaction must be disclosed or known to the Company,"
22   correct?
23   A.   Yes, sir.  Yes, sir.
24   Q.   It continues, "The Company must authorize the
25   contract or transaction in good faith by the affirmative

Page 166

1    vote of the disinterested Management."
2            Did I read that correctly, sir?
3    A.   I guess, yes.  That's what it says.
4    Q.   Was there an affirmative vote of the
5    disinterested management of Black Duck to approve the
6    loan from KrisJenn Ranch?
7    A.   There -- there was -- the only people that
8    were -- that needed to be authorized, we'd vote on it
9    (inaudible).
10   Q.   Okay.  When was the vote?
11   A.   Before the loan.
12   Q.   Okay.  Who made the vote?
13   A.   The -- only people that were required to.
14   Q.   Okay.  And who was that?
15   A.   The document, it speaks -- it speaks for
16   itself.  The document speaks for itself.
17   Q.   But who made the vote?
18   A.   The -- the people that were required to make
19   the vote.
20   Q.   And who was that?
21   A.   It would be the parties.
22   Q.   And who are the parties?
23   A.   It would be the people that were required by
24   the document.
25   Q.   And who was that?

Page 167

1    A.   It would be the party -- the parties.
2    Q.   And can you identify those parties for me,
3    sir?
4    A.   I'd have to go back and look at it.  If you've
5    got it in front of me, I can identify it.
6    Q.   Well --
7    A.   I'm really confused --
8    Q.   -- Hagan Cohle --
9            (Unreportable crosstalk.)
10   Q.   Well, I'm just asking about this provision in
11   the Black Duck Company Agreement.  And you're --
12   A.   You can --
13   Q.   -- saying there was an affirmative vote.  And
14   you can't tell me who made the vote?
15   A.   Well, you -- if you'd put it in front of me, I
16   would be very glad -- this was all the way back in 2017.
17   And, golly, I'm 66 years old.  I'm trying my hardest,
18   sir.  I'm trying my hardest.
19   Q.   I've heard that --
20   A.   You --
21   Q.   -- before -- I've heard that --
22   A.   You know --
23   Q.   -- before from you.
24   A.   And --
25   Q.   I've heard that before.

Page 168

1          (Unreportable crosstalk.)
2     Q.   I know how it goes.  I know how --
3     A.   Well, then --
4     Q.   -- it goes.
5     A.   -- you should --
6          (Unreportable crosstalk.)
7     Q.   Can you tell me, as the corporate
8  representative, sir, who was required in -- well, let me
9  ask you this.  Who was the disinterested management when
10 it came to the alleged loan from KrisJenn Ranch to Black
11 Duck?
12    A.   I think everybody was interested.
13    Q.   Well, was Daniel Moore a member of KrisJenn
14 Ranch?
15    A.   All -- I think he was, yes.
16    Q.   Oh, so Dan- -- okay.  Was that individually or
17 through an entity?
18    A.   I -- I -- that's a question to be answered, I
19 think.
20    Q.   Okay.  Did -- did you vote affirmatively to
21 approve the loan from KrisJenn Ranch to Black Duck on
22 behalf of Black Duck, sir?
23    A.   My attorney asked under what authority.  And
24 we gave him all the authority that was needed that he --
25 he felt was needed, which was all of the parties --

1     Q.   Okay.  Which attorney -- which attorney was
2  that?  David Strolle?
3     A.   Yes.  He's the one that did the loan.  And
4  he -- and he asked --
5     Q.   Okay.
6     A.   -- for the authority to do that.  And so did
7  Asilo.
8     Q.   Okay.  And what did you provide David Strolle
9  in response to his request for authority on behalf of
10 Black Duck for the loan from KrisJenn Ranch?
11    A.   It's the -- it's the e-mail that was sent to
12 David Strolle operated -- or authorizing myself and
13 Hagan and Mr. Strolle to do what was required, anything
14 and everything that was required to close any
15 transaction to close the pipeline.
16    Q.   And are you referring to an e-mail from Daniel
17 Moore?
18    A.   Yes.
19    Q.   Okay.
20    A.   And that is --
21    Q.   So was there ever --
22         (Unreportable crosstalk.)
23    Q.   -- actually a vote?
24    A.   Yes.
25    Q.   Okay.  And you sent -- you say that Daniel's

1  e-mail constituted a vote by the disinterested
2  management of Black Duck to approve the loan from
3  KrisJenn Ranch for several millions of dollars to Black
4  Duck; is that your testimony?
5     A.   My testimony is that Black Duck took a loan
6  from KrisJenn Ranch.  And the attorney that required
7  that was David Strolle.  And all three members gave
8  permission to do that.
9     Q.   Including Daniel Moore, that's your testimony?
10    A.   Yes, sir, it is.
11    Q.   Okay.  And so according to you, the
12 disinterested management of Black Duck did give an
13 affirmative vote to approve the loan from KrisJenn Ranch
14 to Black Duck of several million dollars, okay?  Is that
15 right?
16    A.   You -- you're putting words in my mouth, and
17 that is not correct.  The -- the documents --
18    Q.   What was --
19    A.   -- and the -- the -- the doc- -- the Black
20 Duck notes and the Black Duck minutes are all in there
21 properly.  And the Black -- and the minutes and the
22 notes in the -- in the KrisJenn Ranch are all in there
23 and properly filed by David Strolle, which --
24    Q.   Okay.
25    A.   -- David -- which Daniel Moore gave

1  100 percent approval and to do anything and everything
2  that was required to close -- to close the purchase of
3  the Express Pipeline.
4     Q.   Okay.  So you're saying Daniel Moore gave
5  approval for you to cause Black Duck to take out the
6  loan even if Daniel Moore didn't actually know about the
7  loan itself?  Is that what you're saying?
8          MR. GERMANY:  Object -- objection; form.
9     A.   You're -- you're -- you're rephrasing what the
10 facts are.  And the facts are, the approvals were made.
11 They're in the -- the -- the minutes of both KrisJenn
12 Ranch and Black Duck.  And those are in the minutes
13 before the actual purchase of the -- of the Express
14 Pipeline.
15    Q.   (BY MR. CLEVELAND)  So there are minutes of
16 Black Duck as a company prior to the closing on the
17 right-of-way that you're saying reflect an affirmative
18 vote by the disinterested management to approve of that
19 loan from KrisJenn Ranch?
20    A.   That's not at all what I said.  If you'll go
21 back and ask the court reporter to repeat what I said,
22 I'll stand by what I said before a court reporter.
23 Thank you.
24    Q.   Are there minutes -- are there minutes of the
25 Black Duck Properties, LLC, prior to closing on the

1  right-of-way that --
2      A.   Yes, there are.
3      Q.   -- reflect any kind of vote -- that reflect
4  any kind of vote approving the loan --
5      A.   No.
6      Q.   -- that KrisJenn Ranch --
7      A.   It just said --
8      Q.   -- provided?
9      A.   -- that -- it just -- not that -- not that I
10  know.  They're being produced and are going to be
11  presented to you, those minutes, but -- and they spell
12  it out.
13      Q.   Okay.  Are those minutes something that you
14  reviewed in preparation for your deposition today?
15      A.   No, I didn't look at those.
16      Q.   Okay.  So as the best you can recall as you
17  sit here today, are there minutes of Black Duck that
18  reflect a vote approving the loan from KrisJenn Ranch?
19      A.   I believe they are.  In fact, the entire book
20  of Black Duck has been copied and is on a drive to be
21  sent to you.
22      Q.   Okay.  But my question is:  Are there minutes
23  of Black Duck where a vote approving the loan from
24  KrisJenn Ranch is addressed?
25      A.   Those will be in the minutes when you get

1  them.
2      Q.   Okay.  So you're saying, yes, there are
3  minutes of Black Duck, the company, that -- sir, don't
4  look at --
5      A.   I --
6      Q.   -- somebody else.  I'm asking you the
7  questions here.  Mr. Wright, please don't look at
8  somebody else for help here, okay?
9          I am trying to understand, are there
10  minutes that you've seen from the Black Duck Properties,
11  LLC, entity that reflect an approval of the loan from
12  KrisJenn Ranch prior to the closing on the right-of-way?
13      A.   I'm sure there are.
14      Q.   Okay.  Have you seen any?
15      A.   But, I mean, I don't know -- I don't know the
16  dates on them exactly.  And we'll have to go and get
17  them.  But I did furnish those.
18      Q.   All I'm asking for is what you know as you sit
19  here today.  Can you state under oath that there are
20  minutes for Black Duck Properties that reflect an
21  approval of the loan from KrisJenn Ranch, yes or no?
22      A.   There are loans.
23      Q.   That's not my question.
24      A.   They --
25      Q.   Are there minutes that reflect the approval by

1  Black Duck of those loans?
2      A.   The minutes speak for themselves.
3      Q.   I am asking if those minutes even exist.  I'm
4  not asking if they speak for themselves.
5          Do the -- are there minutes of Black Duck
6  Properties that reflect an approval of the loan from
7  KrisJenn Ranch, sir?  Do you know?
8      A.   I -- I don't know.  If you want me to bring
9  the minutes tomorrow, I can bring them so we can look
10  through them.
11      Q.   So the answer is, you don't know?
12      A.   Well, I'd have to get them in front of me.
13      Q.   Well, I'm asking if you know as you sit here
14  today.
15      A.   Well, I've told you -- I've told you and told
16  you and told you.  You treat it as a joke; old -- old
17  people not remembering everything.
18      Q.   It's not clear to me, sir.  And I just need to
19  know, and we can move on.
20          Are there any minutes of Black Duck that
21  reflect an approval of the KrisJenn Ranch loan, yes or
22  no?
23      A.   I'm sure there are.  To my belief --
24      Q.   You -- you're shrugging your shoulders like
25  you don't know as you sit here today.

1      A.   That's right.  Let me look at them.  They've
2  copied them and they were sent to the printer for you,
3  every page of that doc- -- of our -- of our deal.  If
4  you would have waited until you got them, you would have
5  been a little more prepared today.  And I'm trying to
6  help you, but it's hard to help you when you weren't
7  prepared in your questioning.
8      Q.   All right.  But you do agree, looking at the
9  Company Agreement, that you testified that the
10  agreement -- this Company Agreement for Black Duck
11  speaks for itself, right?
12      A.   I'm going to testify that the minutes speak
13  for them -- for themselves.
14      Q.   But so does this Black Duck Company Agreement,
15  correct?
16      A.   Black Duck Company Agreement was prepared
17  by -- by my attorney, and it speaks for itself.
18      Q.   Okay.  All right.
19          MR. MULLER:  Tim, quick bathroom break?
20          MR. CLEVELAND:  Sure.
21          MR. MULLER:  Okay.  Ten minutes.
22          THE VIDEOGRAPHER:  Going off the record.
23  The time is 2:42 p.m.
24          (Break from 2:42 p.m. to 2:53 p.m.)
25          THE VIDEOGRAPHER:  Back on the record.

1 The time is 2:53 p.m.
2  Q. (BY MR. CLEVELAND) Okay. Mr. Wright, are you
3 ready to continue after our break?
4  A. Yes, sir.
5  Q. Okay.
6  A. I got me some fresh coffee, so maybe I --
7   MR. CLEVELAND: John, do you have the
8 summary judgment binder with you?
9   MR. MULLER: Yes, sir.
10   (Exhibit 10 marked.)
11   MR. CLEVELAND: Okay. I am going to show
12 the witness what's marked as Exhibit 10 to this
13 deposition.
14   John, for your reference, it's Exhibit 13
15 to the summary -- from our summary judgment evidence,
16 the e-mail on July 17th.
17   MR. MULLER: Okay. I have it, and Larry
18 has it too.
19   MR. CLEVELAND: All right. And I'm going
20 to share my screen.
21  Q. (BY MR. CLEVELAND) Mr. Wright, I've -- I have
22 shared my screen to put up on the screen what's been
23 marked as Exhibit 10 to your deposition. And you also
24 have --
25  A. Okay.

Page 177

1  Q. -- a hard copy of that in front of you. Do
2 you have a hard copy, sir?
3  A. Yes.
4  Q. Okay. And this is a series of e-mails on --
5 in July of 2017. Do you see that, sir?
6  A. Yes, I do.
7  Q. Okay. And this is a couple of weeks or almost
8 a month, I guess, before there was a closing on the
9 right-of-way by Black Duck, right?
10  A. I -- whatever the dates are. They were way
11 back in '17.
12  Q. Okay. But I want to focus you on this e-mail
13 from Daniel Moore that I've highlighted on July 17th,
14 2017. Do you see that, sir?
15  A. Right.
16  Q. And you're receiving this e-mail, as is Hagan
17 Cohle. And Daniel Moore says, "I, Frank Daniel Moore,
18 hereby grant Larry Wright and/or Hagan Cohle full
19 authority to sign on my behalf for Black Duck
20 Properties, LLC, regarding any and all documents that
21 may require my signature to extend or close the
22 transaction between Black Duck Properties and Lancer
23 Resources et al."
24   Do you see that, sir?
25  A. Yes.

Page 178

1  Q. And there was a lot of talk earlier today
2 about what authority you claim you had to agree on
3 behalf of Black Duck to the loan with KrisJenn Ranch.
4 Do you recall a lot of discussion about that topic, sir?
5  A. I do.
6  Q. And you were referring by your memory to an
7 authorization that you claim Mr. Moore gave you to enter
8 that loan on behalf of Black Duck. Do you remember
9 that, sir?
10  A. Correct.
11  Q. And is this -- what's marked as Exhibit 10 in
12 front of you now that I've highlighted on the screen, is
13 this the e-mail you were referring to?
14  A. Yes.
15  Q. Okay. And, similarly, I believe right before
16 our break, we were talking about -- you were talking
17 about -- excuse me -- Mr. Strolle asking you for the
18 authority for Black Duck to enter this loan with
19 KrisJenn Ranch. Do you remember that testimony, sir?
20  A. Yes.
21  Q. And I believe you said that you sent something
22 from Daniel to Mr. Strolle; is that correct?
23  A. He does have this in his file.
24  Q. And that's what I want -- I want to try to tie
25 the loop on that. Is this the e-mail, Exhibit 10, from

Page 179

1 Daniel Moore that you sent to Mr. Strolle to provide
2 what you believe was authorization for Black Duck to
3 enter the loan with KrisJenn Ranch?
4  A. In our -- this was one aspect of it, yes.
5  Q. Okay. Is there any other -- or are there any
6 other approval authorizations that you are claiming in
7 this case by Daniel Moore for the -- the Black Duck loan
8 from KrisJenn other than this e-mail at Exhibit 10?
9  A. It's my signature and Hagan Cohle's signature
10 where he was okay to sign for Daniel Moore.
11  Q. And you're saying you were okay to sign for
12 Daniel Moore on the KrisJenn Ranch loan to Black Duck?
13  A. No, I wasn't.
14  Q. Okay. But are you claiming that this e-mail,
15 Exhibit 10, from Daniel Moore on July 17th, 2017,
16 authorized Black Duck to enter the loan with KrisJenn
17 Ranch, LLC?
18  A. What this document said was any and all
19 documents that may require my signature, period.
20  Q. I understand.
21   And are you -- is -- is that why you're
22 claiming that this is the e-mail that authorized you to
23 execute the loan for Black Duck from KrisJenn Ranch?
24  A. You could -- you can read into it what you
25 want, but it says -- and I'll read it to you --

Page 180

```
 1        Q.   I'm asking -- sir, I'm not trying to read into
 2   it.  I'm asking for your testimony.  Mr. Wright, I'm
 3   asking for your testimony.
 4        A.   So my testimony --
 5        Q.   Is this -- is this the e-mail -- let me ask a
 6   clear question -- let me ask a question, okay?  Just
 7   listen to my question, sir.
 8             Mr. Wright, is this e-mail on Exhibit 10
 9   what you claim is authorization for Black Duck to -- by
10   Mr. Moore to enter the loan with KrisJenn Ranch, LLC?
11        A.   This has nothing to do with the loan.  This
12   has to do with any document which may or may not have
13   included a loan is what Mr. Strolle said in this exhibit
14   and that he would be one part of the three of us
15   authorizing it.
16        Q.   So you're saying that this con- -- this e-mail
17   on Exhibit 10 constitutes Mr. Moore's authorization that
18   gave you the ability to close on the Black Duck/KrisJenn
19   loan; is that true?
20        A.   I'll read it to you again.  It says --
21        Q.   I'm asking if that's what you're saying, sir.
22   I'm not asking you to read it to me.  I'm asking you:
23   Is this what you claim was Daniel Moore's authorization
24   for actions that included Black Duck taking the loan
25   from KrisJenn Ranch?

                                            Page 181
```

```
 1        A.   This -- this e-mail says nothing about a Black
 2   Duck loan KrisJenn Ranch wrote or closed on the
 3   document.  I'm -- I'm agreeing to --
 4        Q.   Right.  So --
 5        A.   -- (inaudible) what this document says.
 6        Q.   Okay.  So are you saying then -- and I
 7   appreciate that.  I'm just trying to understand your
 8   view of this e-mail.
 9             Are you saying that this e-mail was an
10   authorization that was limited to you and/or your
11   son-in-law signing documents to extend the closing date
12   for the -- the right-of-way sale?
13        A.   I don't see anything in there where it says
14   limited.
15        Q.   Well, I'm asking what your position is on it,
16   sir.  This is --
17        A.   My --
18             (Unreportable crosstalk.)
19        A.   My position is this regarded any and all
20   documents as Daniel Moore was fleeing the state of
21   Texas, going back to Louisiana because he had no belief
22   that I could close the loan.  That's what my testimony
23   is today, and that his fraud would --
24        Q.   And so you believe --
25             (Unreportable crosstalk.)

                                            Page 182
```

```
 1        Q.   Do you believe that the scope of this
 2   authorization from Mr. Moore included the Black Duck
 3   loan from KrisJenn Ranch?
 4        A.   It doesn't say that on here.  It says, "any
 5   and all."  And I will say that until it's dark if you
 6   want to keep asking that question.
 7        Q.   And I think I hear what you're saying.  But,
 8   Mr. Wright, are you saying that the breath of this
 9   authorization extended to entering the loan with
10   KrisJenn for Black Duck Properties?
11             MR. MULLER:  Tim, I'm sorry.  I don't
12   mean to make a statement in the middle of your question.
13   I think Larry needs to answer it.  But your -- he's
14   trying not to interrupt you when you ask questions.  If
15   you could let him answer the question fully --
16             MR. CLEVELAND:  Of course.
17             MR. MULLER:  -- before you start your
18   next question, I would appreciate it.
19             MR. CLEVELAND:  Yes, sir.  Thank you for
20   that.  And I appreciate that.
21             MR. MULLER:  Okay.
22        Q.   (BY MR. CLEVELAND)  Mr. Wright, I'm not trying
23   to trap you with this.  I'm just trying to understand.
24   Is your position that the -- the breath of this
25   authorization from Daniel Moore on Exhibit 10 is broad

                                            Page 183
```

```
 1   enough to include authorizing you and Mr. Cohle to carry
 2   out the Black Duck loan from KrisJenn Ranch?
 3        A.   What you're saying is twice as long than what
 4   this agreement says.  I don't see anywhere where it says
 5   the breath of Daniel Moore.  What it says is regarding
 6   any and all documents, period.  Thank you.
 7        Q.   Okay.  And so you --
 8             (Unreportable crosstalk.)
 9        Q.   Are you claiming that --
10        A.   My attorney felt like that was all required
11   because he didn't want to come down personally and be
12   involved in closing because he felt like the scam was
13   over and that he was heading home.
14        Q.   So your attorney -- what -- your attorney felt
15   that this was all that was needed why?
16        A.   You'll have to ask him.
17        Q.   Well, you -- he gave you some explanation.
18   Did he tell you why he thought this was enough for the
19   Black Duck --
20             MR. MULLER:  Objection; form.
21        Q.   (BY MR. CLEVELAND)  -- loan from KrisJenn?
22             MR. MULLER:  I'm going to instruct him
23   not to answer.
24        Q.   (BY MR. CLEVELAND)  Are you going to follow
25   your lawyer's instruction?

                                            Page 184
```

1    A.   I -- I like my attorney.

2    Q.   So you're going to follow his instruction?

3         MR. MULLER:  I'm sorry.  You cut -- and

4  I'm sorry.  I was drifting a little bit there.  But you

5  were asking about his conversations with Strolle, right?

6         MR. CLEVELAND:  Well, after he -- I think

7  he's opened the door on that by saying, my attorney

8  thought this was enough.  And I'm asking what he meant

9  by that.

10        MR. MULLER:  Oh, yeah.

11        MR. CLEVELAND:  So --

12        MR. MULLER:  I'm going to instruct him

13 not to answer that.

14        MR. CLEVELAND:  Okay.

15   Q.   (BY MR. CLEVELAND)  Mr. Wright, is there any

16 e-mail or communication other than Exhibit 10 that you

17 claim gave authorization from Daniel Moore for the Black

18 Duck loan from KrisJenn Ranch?

19   A.   There are other e-mails.  I -- I would have to

20 go back and look at my file.  But if I'm not mistaken,

21 Daniel realized the mistake he made and tried to correct

22 that at a later date.

23   Q.   Okay.  But --

24        MR. CLEVELAND:  Objection; nonresponsive.

25   Q.   (BY MR. CLEVELAND)  Are there any other

Page 185

1  e-mails besides this one that you claim --

2    A.   I would have --

3    Q.   -- hold on.  Let me finish -- are

4  authorization by Daniel Moore for the Black Duck loan

5  from KrisJenn Ranch?

6    A.   I don't remember.  I'll have to look at --

7    Q.   Okay.

8    A.   -- all of my e-mails that we're -- I don't

9  have those e-mails.

10   Q.   Thank you, sir.

11   A.   They pulled all of those --

12   Q.   Thank you.

13        MR. CLEVELAND:  I'll object as

14 nonresponsive after, "I can't remember."

15   Q.   (BY MR. CLEVELAND)  Thank you, sir.

16        All right.  So did you send Exhibit 10 to

17 David Strolle or any of your lawyers back at the time in

18 the summer of 2017?

19   A.   He has those in his -- his copy with --

20 attached to the minutes of -- of Black Duck.

21   Q.   And when you say, "minutes of Black Duck,"

22 what are you referring to?

23   A.   You'd have to ask my attorney and the State of

24 Texas that.

25   Q.   Well, it's a phrase you used, sir.  What do

Page 186

1  you mean by "minutes of Black Duck"?  You've been using

2  them all day.  What do you mean by that?

3    A.   That's something the State requires.  And I've

4  been advised by my attorney that we should keep up the

5  minutes on an annual basis, which we've tried to do.

6    Q.   And are you talking about minutes that reflect

7  the meeting of managers of Black Duck?

8    A.   I can't remember.

9         (Exhibit 11 marked.)

10   Q.   Okay.  I have marked -- I have shared with you

11 Exhibit 11 to your deposition, Mr. Wright.

12        MR. CLEVELAND:  And, John, this is

13 Exhibit 14 to the summary judgment evidence.

14   Q.   (BY MR. CLEVELAND)  But, Mr. Wright, do you

15 see Exhibit 11 on the screen that I've shared with you,

16 a continuation of this e-mail string on July 17th, 2017?

17        MR. MULLER:  However you blew that up,

18 Tim, is good.  That makes it easier for us to see.

19        MR. CLEVELAND:  Okay.  Good to know.

20   Q.   (BY MR. CLEVELAND)  Do you have Exhibit 11 in

21 front of you, Mr. Wright?

22        MR. MULLER:  Exhibit 11 to your -- to

23 your MSJ?

24        MR. CLEVELAND:  No.  It's Exhibit 14 to

25 the MSJ, but that's what I'm using as Exhibit 11 to this

Page 187

1  deposition.

2    A.   I'm looking.  Hang on.  Okay.

3    Q.   (BY MR. CLEVELAND)  All right.  So Exhibit 11

4  is a continuation of what we just looked at in

5  Exhibit 10 where Mr. Moore starts his e-mail "To whom it

6  may concern," right?

7    A.   Okay.

8    Q.   And do you see that about -- well, not long

9  after Mr. Moore sends the e-mail that we just went over,

10 he sends another e-mail to Larry, "To whom it may

11 concern," doesn't he?

12   A.   Okay.

13   Q.   And you received this e-mail back in July of

14 2017, didn't you, sir?

15   A.   I can't remember.  I'm sure I have it

16 somewhere.

17   Q.   Okay.  And Daniel Moore, in this e-mail, at

18 the end says -- excuse me -- "I do not want any

19 documents signed on my behalf (goes without saying) that

20 we have not discussed and agreed prior to one of you

21 signing for me."

22        He said that, didn't he?

23   A.   That's what --

24   Q.   Sir?

25   A.   -- I'm reading, yes, sir.  Yes, that's what

Page 188

1  I'm reading.
2      Q.   And do you still believe, after reading that,
3  that Daniel Moore authorized you to execute the Black
4  Duck/KrisJenn loan on behalf of Black Duck?
5      A.   What this refers to is anything required by
6  signature by notary public.  And if I'm not mistaken,
7  Hagan was in conversation with Daniel and told him that
8  we didn't need anything signed by him to get the loan or
9  to close with the Express Pipeline.  And that's when he
10  had an argument with the seller.  And there is some more
11  e-mails that said all future correspondence will be
12  between Mr. Wright and Mr. Cohle and that I will have no
13  more talkings with you.  There is an e-mail somewhere
14  that says that.  But this strictly --
15      Q.   Okay.
16      A.   -- has to do with him signing by notary
17  public.  And we know we can't sign anything by notary
18  public without his signature.  And that's what that
19  says.
20      Q.   Okay.  So did -- did you and Mr. Moore -- let
21  me ask this.  Did Mr. Moore ever specifically agree to
22  the loan from KrisJenn to Black Duck?
23      A.   He had full notice before it was done of it
24  and --
25              (Unreportable crosstalk.)

Page 189

1      Q.   That's not my question.
2      A.   Yes, he did --
3              (Unreportable crosstalk.)
4      Q.   Did Daniel Moore ever -- did he ever approve
5  that loan for Black Duck from KrisJenn Ranch?
6              MR. GERMANY:  Object -- objection; form.
7      A.   What you're saying is you're -- you're asking
8  the same question ten different ways, and you're making
9  it very hard for a simple answer, Tim.  The second --
10      Q.   (BY MR. CLEVELAND)  No.  This is a simple
11  question, Mr. Wright.  This is a simple question.
12              Did Daniel Moore ever --
13      A.   Okay.
14      Q.   -- approve on behalf of Black Duck the loan
15  from KrisJenn Ranch?
16      A.   He didn't have to approve the loan.
17      Q.   Okay.  So the answer is, no, he didn't approve
18  the loan from Black Duck to -- to --
19      A.   Because he --
20      Q.   -- the loan from KrisJenn to Black Duck?
21      A.   Because he gave full authority in a previous
22  e-mail.
23              MR. GERMANY:  Objection; form.
24      Q.   (BY MR. CLEVELAND)  Okay.  All right.  Thank
25  you.

Page 190

1              Did you ever share this e-mail in
2  Exhibit 11 that includes Mr. Moore's "I don't want
3  documents signed on my behalf" with Mr. Strolle?
4      A.   I can't remember.
5      Q.   Okay.  All right.  We're done with those.
6              (Exhibit 9 marked.)
7      Q.   I'm showing you what I marked as Exhibit 9.
8              MR. CLEVELAND:  And, John, this has been
9  e-mailed to you.  This is the TCRG Compromise Settlement
10  Agreement.
11              MR. MULLER:  Which one is it, Tim?
12              MR. CLEVELAND:  It's the Compromise
13  Settlement Agreement with TCRG and Larry and the
14  KrisJenn entities.  I e-mailed it to you a few minutes
15  ago.
16              MR. MULLER:  Oh, it was -- okay.  Can we
17  go off the record for five minutes while I get that?
18              MR. CLEVELAND:  Yes.
19              MR. MULLER:  All right.  Thanks.
20              (Break from 3:12 p.m. to 3:17 p.m.)
21              MR. CLEVELAND:  All right.  Shane, are we
22  back on?
23              THE VIDEOGRAPHER:  Yes, we are.
24              MR. CLEVELAND:  Are we on the record?
25              THE VIDEOGRAPHER:  Yes, we're on the

Page 191

1  record.
2              MR. CLEVELAND:  Okay.  Great.
3      Q.   (BY MR. CLEVELAND)  Mr. Wright, we've taken a
4  short break.  Are you ready to continue?
5      A.   Yes, I am.
6      Q.   Prior to closing, did anybody, to your
7  knowledge, disclose to Daniel Moore that the loan to
8  Black Duck would be made by KrisJenn Ranch, one of the
9  entities where you were a member?
10      A.   I believe so because he understood that was
11  the only way this thing would get funded would be
12  through KrisJenn Ranch.  And that was told to --
13      Q.   Well, but I'm asking --
14      A.   -- Daniel verbally many times.
15      Q.   Okay.  Was that ever provided --
16      A.   There is an e-mail -- there is an e-mail to
17  him telling him the terms of the loan.
18      Q.   Okay.  What's the date of that e-mail?
19      A.   I -- they'll be presented to you on the date
20  that -- before the deadline.
21      Q.   Okay.  You obviously are remembering that.
22  Did you review that in preparation for your deposition?
23      A.   I can't remember.  I thought you said we were
24  moving on.  You're going back.  Do we need to pull those
25  documents out?  I'm just trying to -- to read what

Page 192

1   you're saying.
2        Q.   But your testimony is there is an e-mail --
3        A.   Do we need to --
4        Q.   There --
5             (Unreportable crosstalk.)
6        Q.   Well, just so we're clear --
7        A.   Do we need --
8        Q.   No.
9        A.   Hang on.  Let me --
10       Q.   You just testified about an e-mail,
11  Mr. Wright.  Is there an e-mail that exists prior to
12  closing where Daniel Moore is informed that -- about the
13  terms of the loan from KrisJenn Ranch to Black Duck, yes
14  or no?
15       A.   I'll have to ask the court to go back and find
16  my previous answer, and I'm going to stick by that
17  answer.
18       Q.   Well, you just referred to an e-mail.  I'm
19  asking you if that e-mail exists or if you were lying
20  about the e-mail -- about the existence of that e-mail.
21       A.   Yeah, it's the same e-mail I referred to about
22  two hours ago.  And if you want to --
23       Q.   Okay.  Which e-mail is that?  What's the date?
24  Who sent it?
25       A.   You'll have to go back and ask your court

1   reporter because it's the same e-mail I was referring to
2   then.  So there is not any new e-mails.  There was only
3   one.
4        Q.   Okay.  Who -- who sent that e-mail?
5        A.   I sent it to Daniel Moore.
6        Q.   And who received it?
7        A.   I'm sorry?
8        Q.   Who did you send it to?
9        A.   And who received it?  I -- who knows.  I mean,
10  he has about four or five e-mails.
11       Q.   Did you e- -- did you send that e-mail to
12  Daniel Moore?
13       A.   I -- I -- I never sent anything to Daniel
14  Moore.  I sent it to all of his -- his scam entities.
15       Q.   Okay.  Well, so that we're clear, your
16  testimony is that there's an e-mail where you disclose
17  to Daniel Moore at one of those e-mail addresses the
18  terms of the loan from KrisJenn to Black Duck?
19       A.   What I told you was, is that I think there
20  might be one.  I'm not for sure.
21       Q.   Oh, okay.  Thank you for that clarification.
22            Did you disclose the interest rate to
23  Daniel Moore for that KrisJenn loan to Black Duck?
24       A.   I can't remember.
25       Q.   Did you disclose the fact that the financing

1   was through a KrisJenn loan and not a capital
2   contribution by KrisJenn Ranch?
3        A.   I can't remember.  He knew.
4        Q.   Okay.
5        A.   He knew where it was from, but I can't
6   remember.
7        Q.   All right.  Let's look at Exhibit 9, the
8   Compromise Settlement Agreement.
9        A.   Okay.
10       Q.   That's in front of you.  Do you have that,
11  sir?
12       A.   Yes, I do.
13       Q.   Okay.  And you -- just going to the bottom
14  page of it, you signed this agreement with TCRG, didn't
15  you?
16       A.   Yes.
17       Q.   All right.  And the date of this settlement
18  agreement with TCRG is November 11th, 2019, correct?
19       A.   Yes, it is.
20       Q.   Okay.  There is a bunch of whereas clauses.
21  It includes the statement that on March 22nd, 2018,
22  Black Duck and TCRG entered into that certain purchase
23  and sale agreement.
24            Do you see that, sir?
25       A.   Yes.

1        Q.   When did you disclose the Black Duck
2   transaction with TCRG to Daniel Moore?
3        A.   I don't remember.
4        Q.   When did you disclose the Black Duck
5   transaction with TCRG to Darin Borders?
6        A.   I don't remember.
7        Q.   Okay.  When did you disclose to TCRG the net
8   profits agreements held by Longbranch Energy and DMA
9   Properties?
10       A.   I don't remember.
11       Q.   Okay.  Did you disclose to TCRG, prior to the
12  sale of the right-of-way by Black Duck, the 20 percent
13  net profits interest of Longbranch and DMA respectively?
14       A.   I don't remember.
15       Q.   Okay.
16       A.   I never had any conversation with --
17       Q.   Did you go back with --
18       A.   -- TCRG.
19       Q.   Did you -- did go back and --
20       A.   Never --
21       Q.   -- review the net profit agreement of
22  Longbranch and DMA prior to closing with TCRG to see if
23  those agreements would have any impact on TCRG?
24       A.   They had no impact.
25       Q.   But that's not my question.  Did you go back

1  specifically to read them --
2      A.  I --
3      Q.  -- to see if they would have any impact --
4      A.  I did read --
5      Q.  Let me finish my question.  Let me finish my
6  question, sir.
7              Did you go back and actually read the net
8  profits agreement of Longbranch or DMA to see if they
9  would have any impact on the TCRG deal?
10     A.  Didn't need to.
11     Q.  Okay.  So the answer is you did not, correct?
12     A.  That is correct.
13     Q.  All right.  And Black Duck retained a
14 16 percent carried interest in the Northern Water
15 Project which was a project on one of the lines of the
16 right-of-way, correct?
17     A.  It was the only line on the right-of-way, yes,
18 sir.
19     Q.  Okay.  But that's -- okay.  And under the net
20 profits agreements, what was, if anything, DMA and
21 Longbranch entitled to from the TCRG deal?
22     A.  They weren't -- they weren't entitled to
23 anything from TCRG.  They were entitled to a net profits
24 interest with Black Duck.
25     Q.  Okay.  But I'm asking:  Just under your

Page 197

1  interpretation of things, what, if anything, was DMA and
2  Longbranch entitled to from the transaction between
3  Black Duck and TCRG, whether it's the money or the
4  16 percent interest?
5      A.  They're not entitled to anything.
6      Q.  Okay.  Not even a percentage of the
7  16 percent?
8      A.  You said entitled from TCRG.  They are
9  entitled to a percentage, 20 percent of the 16 percent
10 carried interest of Black Duck.
11     Q.  Okay.  Black Duck received
12 two-and-a-half-million dollars in cash from TCRG, right?
13              MR. GERMANY:  Objection; form.
14     A.  Never got two-and-a-half million.  They got
15 close to it.
16     Q.  (BY MR. CLEVELAND)  Okay.  Well, how much
17 did -- did Black Duck actually receive?
18     A.  2,425,000.
19     Q.  Okay.  And of that 2,400,000 and -- and
20 some-odd dollars, sir, were DMA and Longbranch entitled
21 to any of that money?
22     A.  No, sir.
23     Q.  Why not?
24     A.  There were -- the only definition in our net
25 profits agreement described the net profits.  It's a

Page 198

1  personal covenant of net profits.  And it gives --
2      Q.  Right.
3              (Unreportable crosstalk.)
4      Q.  But these were -- these were funds received by
5  Black Duck.  Isn't that consistent with your definition
6  of net profits even understanding you believe it's a
7  personal covenant?
8      A.  Those would be a percentage of the -- of the
9  gross -- gross profit.
10     Q.  Okay.
11     A.  And so would --
12     Q.  Are you saying --
13              (Unreportable crosstalk.)
14     Q.  Are you saying that DMA and Longbranch are
15 not -- were not entitled to any of the two --
16 2.4 million and change that Black Duck received from
17 TCRG?
18     A.  None whatsoever.
19              MR. MULLER:  Tim, can I put you over one
20 second?  I'm going to get a supplemental battery to
21 charge my phone up.  Give me one minute.  We don't need
22 to go off the record.
23              MR. CLEVELAND:  Okay.
24              MR. MULLER:  Okay.  Tim, I'm back.  You
25 can go.

Page 199

1              MR. CLEVELAND:  Okay.  Everybody ready to
2  continue?
3              MR. GERMANY:  Yes, sir.
4      Q.  (BY MR. CLEVELAND)  All right.  Mr. Wright,
5  are you ready?
6      A.  Yes.
7      Q.  Okay.  So why would DMA and Longbranch be
8  entitled to their respective 20 percent of the
9  two-and-a-half million that -- or the 2.4-plus million
10 that TCRG paid to Black Duck?
11     A.  Because there was no net profit.  I sold
12 the --
13     Q.  And --
14     A.  -- company at a loss.
15     Q.  Well, and the -- is the reason there was no
16 net profit because of the loan from KrisJenn to Black
17 Duck?
18     A.  It would have to do with the total amounts of
19 funds that KrisJenn put into the deal.
20     Q.  Right.  So --
21     A.  That's called -- that's called the cost.
22     Q.  Understood.  And that cost is -- was the
23 KrisJenn loan to Black Duck that you're saying was the
24 cost to Black Duck which wiped out any
25 two-and-a-half-million-dollar gain, right?

Page 200

```
 1        A.    That's partial right.  The other part was the
 2   1.3 million cash that KrisJenn paid for all of the
 3   deposits that we put on it, nonrefundable deposits.
 4        Q.    Okay.  But if KrisJenn Ranch made those
 5   capital contributions, then the net profits from the
 6   sale to TCRG would have been 2.4-plus-million dollars,
 7   right?
 8        A.    The -- what is that word you're using because
 9   I -- I haven't seen that anywhere in any of my e-mails
10   or correspondence with either of those men from the day
11   we went into business?
12        Q.    Well, what I'm saying is, if the -- the money
13   from KrisJenn as -- Asilo was KrisJenn's capital
14   contribution, then the 2.4-plus million from TCRG would
15   have been nearly all profit.  Do you agree?
16             MR. MULLER:  Objection; form.
17        A.    That's -- that's -- that's so absurd it's
18   crazy.
19        Q.    (BY MR. CLEVELAND)  Well, I'm just asking,
20   sir.  If it was a capital contribution, not a loan, this
21   2.4-plus million from TCRG would have been profit; isn't
22   that true?
23             MR. MULLER:  Objection; form.
24        A.    It's not true.
25        Q.    (BY MR. CLEVELAND)  Okay.  Well, why not?
```

```
 1        A.    At the time I closed this contract, there was
 2   way over $5 million lost.
 3        Q.    And the cost was because of the loans that
 4   Black Duck had with KrisJenn Ranch; isn't that true?
 5        A.    You're putting words into my mouth.  I'll tell
 6   you one more time.
 7        Q.    Okay.  What were the costs if they weren't the
 8   KrisJenn loans?
 9        A.    I gave them -- I sent 25,000 to the Express
10   Pipeline.  I sent another 25,000 to the Express
11   Pipeline.  I sent 75,000 to the Express Pipeline.  I
12   sent 400,000 to the Express Pipeline.  I sent another
13   400,000 to the Express Pipeline.  And I sent a 250,000
14   amount to the Express Pipeline.  All of that amount was
15   put into the minutes of Black Duck, and all of that
16   then -- once I closed, that was converted to one of the
17   loans from KrisJenn Ranch to Black Duck.  And those were
18   authorized in the minutes.  And that was over
19   $1.1 million.
20             The $4.1 million was to close the loan on
21   the Express Pipeline.  That money was used in settlement
22   agreements, for surveys, and for the cost of the line
23   from the Express Pipeline.  You could -- you could put
24   whatever you want on there, but those were the loans
25   from KrisJenn Ranch to Black Duck, which Daniel Moore
```

```
 1   was very aware of the entire time by e-mail and by phone
 2   call.
 3        Q.    Who authorized the conversion of those
 4   payments into a loan as you just said?
 5             MR. MULLER:  Objection; form.
 6             MR. GERMANY:  Objection; form.
 7        Q.    (BY MR. CLEVELAND)  You just said --
 8        A.    Those were --
 9        Q.    -- that they were converted into loans.
10        A.    Those were --
11        Q.    Who authorized that conversion?
12        A.    Those --
13             MR. GERMANY:  Objection; form.
14        A.    Those were authorized by the minutes.  All of
15   those were loans.  Daniel Moore was very aware that the
16   total amount of the loans was the cost and those were
17   loans from KrisJenn Ranch.  He knew those came from
18   KrisJenn Ranch.  He knew exactly where that money came
19   from because he wouldn't have gone and asked me to be
20   part of this deal if he didn't know where the money was.
21   He knew the money was in KrisJenn Ranch because he was
22   part of the scam that beat my family out of the first
23   SWD.
24        Q.    And you said that this authorization is in the
25   minutes of Black Duck company meeting?
```

```
 1        A.    It sure is.
 2        Q.    Okay.  I hear you that you're saying Daniel
 3   Moore knew that money was coming from KrisJenn Ranch.
 4   But you're saying he knew that it was in the form of
 5   loans that were encumbering Black Duck to the tune of
 6   $4.1 million?
 7        A.    He is the expert scammer, and he knew where it
 8   came from.  Exactly, yes, sir.
 9        Q.    But he knew -- I'm asking you:  Did Daniel
10   Moore, according to you, know that they were loans from
11   KrisJenn that were encumbering Black Duck as opposed to
12   capital contributions?
13        A.    I'm not sure what he thought they were because
14   he knew it was coming from KrisJenn Ranch.  And KrisJenn
15   Ranch is not authorized to give any money to Black Duck
16   unless it's done by loan.  And all money that's put into
17   it was added up.  And after it closed, the amount of
18   those moneys, we'll convert it to the loan instead of
19   having six different loans.
20        Q.    Okay.
21             MR. CLEVELAND:  John, we're going to get
22   the Longbranch assignment from the summary judgment
23   exhibits.
24             MR. MULLER:  Okay.
25             THE WITNESS:  Is that part of this
```

**Page 205**

1  deposition?

2  MR. MULLER:  What am I looking for, Tim?

3  MR. CLEVELAND:  It's the Longbranch

4  assignment.  It's in the -- in that summary judgment

5  binder you have.

6  MR. MULLER:  Tell me which one it is.

7  MR. CLEVELAND:  It's Exhibit 8 in that

8  binder, and it's going to be Exhibit 12 to this

9  deposition.

10  MR. MULLER:  Okay.

11  (Exhibit 12 marked.)

12  Q.  (BY MR. CLEVELAND)  All right.  Oh, you know

13  what?  Actually, before we go to Exhibit 12, I need to

14  ask you about Exhibit 9 again Mr. Wright.

15  We talked earlier about whether TCRG

16  accused you of fraud.  Do you remember those questions?

17  A.  (Inaudible).

18  MR. CLEVELAND:  He's on mute.  Hello?

19  A.  You can go back and have the court reporter

20  read that again --

21  Q.  (BY MR. CLEVELAND)  Hold on.  You were --

22  Mr. Wright, you were on mute.  Can you hear me now okay?

23  A.  Yes, I can hear you.

24  Q.  Okay.  I'm going to focus on this highlighted

25  paragraph of Exhibit 9.  It's -- and this is an

**Page 206**

1  agreement you signed as we saw earlier.  This says,

2  "Whereas, as a consequence of Moore's and Borders'

3  claims to any profits generated by use of the Property

4  in perpetuity as well as the Guadalupe County Suit and

5  the Shelby County Suit" --

6  A.  Well, I'm not on the right -- I've got --

7  here's what I have, Exhibit 8, Longbranch Assignment.

8  That's what you're asking me to get?

9  Q.  Yes.  We're going to get to that in a minute.

10  I'm asking you to look back at Exhibit 9.  It should be

11  on your screen.

12  A.  I didn't hear.  What do you need, Tim?

13  MR. MULLER:  He wanted to look at 9

14  again.

15  A.  Oh, you --

16  Q.  (BY MR. CLEVELAND)  9 again.

17  A.  -- were through with it, and now you want to

18  go back to it.  Okay.

19  MR. MULLER:  Back it up.  I made a mess

20  of the exhibits.  Give me a second, Tim.

21  Exhibit 9 from the MSJ or Exhibit 9 from

22  this deposition?

23  MR. CLEVELAND:  Exhibit 9 in this

24  deposition, the TCRG settlement.

25  MR. MULLER:  The TCRG assignment.  Which

**Page 207**

1  is that from the MSJ?

2  THE WITNESS:  Was that 14 or 13?  It must

3  be 14.

4  MR. MULLER:  No.  That's an e-mail chain.

5  A.  It was the settle -- you want the settlement

6  agreement, Tim?

7  Q.  (BY MR. CLEVELAND)  It's right on the screen

8  right now.

9  MR. CLEVELAND:  I e-mailed -- I think I

10  e-mailed it to you, John.

11  A.  Okay.  I have it.  I have it.  I have it.

12  Q.  (BY MR. CLEVELAND)  Okay.  It says, "Whereas,

13  as a consequence of Moore's and Borders' claims to any

14  profits generated by use of the Property in perpetuity

15  as well as the Guadalupe County Suit and the Shelby

16  County Suit, TCRG refused to incur any additional costs

17  to develop the Northern Water Project."

18  Have I read that right so far?

19  A.  I -- I read, "Whereas, as a consequence of

20  Moore" -- "Moore's and Borders' claims" -- okay.

21  Q.  Okay.  And then it says -- referring to TCRG,

22  then it says right here where my marker is, "accused

23  Black Duck and its Manager, Larry M. Wright."  That's

24  you, right?

25  A.  Wait, wait, wait.  "Accused Black Duck" -- so

**Page 208**

1  wait.  TCR- --

2  (Unreportable crosstalk.)

3  Q.  And its Manager, Larry Wright.

4  A.  Okay.  Okay.  Perfect.  Yeah.

5  Q.  Larry Wright is referring to you, right?

6  A.  Yes.  Yes.  Yeah.

7  Q.  You were accused of, quote, misrepresenting

8  the property and failing to disclose Moore's and

9  Borders' alleged interest in the property, weren't you?

10  MR. MULLER:  Objection; form.

11  A.  Was I what?

12  Q.  (BY MR. CLEVELAND)  Does this say that TCRG

13  accused you of --

14  A.  They refused --

15  Q.  -- misrepresenting things?

16  A.  No, they didn't.  They refused to incur any

17  additional costs to develop the Northern --

18  Q.  Right.

19  (Unreportable crosstalk.)

20  Q.  And then do you see right here where it says,

21  "accused Black Duck and its Manager, Larry Wright"?  Do

22  you see that?

23  A.  Yeah.  But it's saying Black -- it's saying

24  that Borders and -- and Moore are accusing Black Duck.

25  That's what that means.

1    Q.   Oh, so your testimony is this highlighted
2  paragraph here refers to Moore and Borders' claim of --
3    A.   Yeah, they're the ones that are claiming it,
4  not TCRG.
5    Q.   Okay.
6    A.   They never --
7    Q.   What's the TC- -- TCRG demand?
8         (Unreportable crosstalk.)
9    A.   Their -- their -- Moore and Borders are
10  claiming that they have a percentage of the project, and
11  TCRG says, well, whether they do or don't, we're not
12  going to incur anymore additional costs.
13    Q.   So you're saying this paragraph is not
14  referring at all to TCRG accusing you of misrepresenting
15  the property and failing to disclose --
16    A.   Oh, no.  They never accused me of
17  misrepresenting.  They --
18    Q.   Okay.
19    A.   They all think it's Moore and Borders that did
20  the claims and that they're wrong.
21    Q.   Okay.  So is this -- and then it says, "made
22  demand against and threatened to sue Black Duck, KJ
23  Ranch, and Wright," calling it the TCRG Demand.
24         Is your testimony --
25    A.   Yes.  That's what --

1    Q.   -- that that does not refer to a demand --
2  hold on.  Let me finish.  Is it your testimony that this
3  does not refer to a demand by TCRG and a threat by TCRG
4  to sue you, sir?
5    A.   Oh, no.  They -- they're -- but they're making
6  claim that Moore and Borders made that claim, and that's
7  what that means.
8    Q.   Okay.  So why is it called the TCRG Demand
9  instead of the Wright and -- well, the Moore and Borders
10  Demand?
11    A.   It's the TCRG demand made upon by Moore and
12  Borders.
13    Q.   Okay.
14    A.   That's what that means.
15    Q.   That's your testimony?
16    A.   We're the ones that put this together.  We're
17  not going to put there that -- we're not going to read
18  that there's any fault between us and TCRG.  There is
19  another meeting from this whole purpose, and that was
20  the settlement purpose so that there wouldn't be any
21  problem.
22    Q.   Okay.  All right, sir.
23         Now we can turn to the Longbranch
24  assignment.  This is Exhibit 12 that I've put in front
25  of you, Mr. Wright, which is the --

1    A.   I have 8 and 9.
2    Q.   I think you're looking at summary judgment 8,
3  which is also Exhibit 12 to your deposition.
4    A.   We don't have an Exhibit 12.  We have
5  Exhibit 8 and Exhibit 9.
6         MR. MULLER:  Let me get there.
7         MR. CLEVELAND:  John, I'm looking for the
8  Longbranch assignment.  It's probably Exhibit 8 to the
9  summary judgment evidence, which may be what he's
10  looking at.
11         MR. MULLER:  Yes.  Give me a second.
12  It's around here somewhere.
13         THE WITNESS:  It is Exhibit 8.
14         MR. MULLER:  Okay.  You've got it right
15  there.
16         THE WITNESS:  Yeah.  Exhibit 8, I have
17  that.
18    Q.   (BY MR. CLEVELAND)  You have the Longbranch
19  assignment in front of you, sir?
20    A.   Yes, I do.
21    Q.   Okay.  And that's -- I'm telling you what I'm
22  mark- -- that is what I'm marking as Exhibit 12 to your
23  deposition, as you can see by the tab on the screen
24  share.
25    A.   Yeah, we don't have that.

1    Q.   Can you see this --
2         THE WITNESS:  Do we have --
3    Q.   (BY MR. CLEVELAND)  -- screen and the document
4  I have up here, sir?
5    A.   I can see that, yes.
6    Q.   Okay.  The Longbranch assignment is
7  Exhibit 12.  Do you have the Longbranch assignment in
8  front of you?
9    A.   I have Exhibit 8, Longbranch assignment.
10    Q.   Okay.
11    A.   See right here?
12    Q.   What was the purpose of the Longbranch
13  assign- -- of the Longbranch Energy/Black Duck
14  Properties agreement that's in front of you, sir?
15    A.   What was the purpose?
16    Q.   Yes, sir.
17    A.   You're asking me what the purpose is.  Is that
18  a joke?
19    Q.   No, it's not.  What was the purpose of it?
20    A.   Well, the purpose of it is that it's a
21  document that spells out the -- what Darin Borders
22  agreed to do with Black Duck.
23    Q.   Okay.  And what did Black Duck get out of this
24  agreement, sir?
25    A.   We got the contract.

```
 1      Q.   To acquire the -- right-of-way?
 2      A.   Right.  We got -- we got the assignment from
 3 the Express Pipeline.  We didn't get anything --
 4      Q.   Okay.
 5      A.   -- from Darin Borders.
 6      Q.   Okay.  And as of the time of this agreement,
 7 you and Mr. Moore's entity -- I'm sorry -- KrisJenn
 8 Ranch and Mr. Moore's entity, you-all were the 50/50
 9 owners of Black Duck, right?
10      A.   He owned 50/50 of Black Duck, yes, sir.
11      Q.   Okay.  And I want to focus on --
12      A.   Well, I don't know if he --
13      Q.   -- paragraph --
14      A.   You know, we -- we're still waiting on
15 discovery.  We're not 100 percent sure of that.  We
16 think that he was 50/50 with Darin Borders when he made
17 this agreement because we do know he played both sides
18 of the game.  That was his scam.
19      Q.   Okay.
20      A.   We do have documents --
21      Q.   So --
22      A.   -- where he -- where he did -- where he was
23 part of the purchase from the Express Pipeline as Darin
24 Borders' partner.  I was nowhere --
25      Q.   Okay.
```

```
 1      A.   -- to be said in that document.
 2      Q.   Okay.  Thank you.
 3           So do you see that that assignee, this
 4 term, is referring to Black Duck in this agreement?  Do
 5 you see that, sir?
 6      A.   I see that, yes.  Yes, that is correct.
 7      Q.   Okay.  And now let's look at paragraph 1 in
 8 Consideration.  Are you there with me, sir?
 9      A.   Paragraph 1.  Okay.  I see it.
10      Q.   It says, *Assignor* -- and that's Longbranch
11 Energy, right?
12      A.   That is correct.
13      Q.   *Shall be paid 20 percent (Net Profits Share)
14 of the Net Profits from Assignee or its successors and
15 assigns during the period of time beginning on the date
16 of first written above (the Period).*
17           Did I read that correctly?
18      A.   You read it correctly.
19      Q.   What does *or its successors and assigns* mean
20 in that paragraph?
21           MR. MULLER:  Objection; form.
22      A.   The document speaks for itself.
23      Q.   (BY MR. CLEVELAND)  Well, I'm asking you:
24 What does *or its successors or assigns* mean in
25 paragraph 1?
```

```
 1      A.   It means what it says.  It speaks for itself.
 2 The document speaks for itself.
 3      Q.   So this agreement is binding on --
 4      A.   It would be -- I don't know who it's binding
 5 on.
 6      Q.   Is it --
 7      A.   It speaks for itself.
 8      Q.   Is this agreement binding --
 9      A.   We can --
10      Q.   -- on the suc- -- is this agreement binding on
11 the successors and assigns of Black Duck?
12      A.   We don't know because it -- it -- we're
13 waiting on the courts to rule on that.  It means what it
14 says.
15      Q.   Okay.  What did you intend when you agreed to
16 this phrase, *or its successors or assigns*?
17      A.   I relied on the attorney that represented
18 Black Duck at that time, Mr. Pigg.
19      Q.   What did you intend when you agreed to this
20 agreement that says, *or its successors and assigns,* in
21 paragraph 1?
22      A.   I agree to what the document says.
23      Q.   Can you tell me anything else about what Black
24 Duck's intent was by including *or its successors or
25 assigns* in paragraph 1?
```

```
 1      A.   We stand by what the document says.
 2      Q.   Can you tell me anything about what Black Duck
 3 intended other than we stand by the document?
 4      A.   That's all I can think of at this moment.
 5      Q.   Okay.  Do you agree that successors and
 6 assigns is pleural; it's not singular?
 7      A.   I don't know.  I'd have to -- my attorney
 8 would have to advise me on that.
 9      Q.   Okay.
10      A.   I guess --
11      Q.   But your -- but your testimony -- but your
12 testimony is that the net profits under this -- I'm
13 sorry.  Is your testimony that Longbranch only got a
14 20 percent share of the net profits of Black Duck by
15 this agreement?
16      A.   My -- my --
17           MR. MULLER:  Objection; form.
18      A.   My -- my testimony is that this document means
19 what it means, the plain language.
20      Q.   (BY MR. CLEVELAND)  Did you intend to grant
21 Longbranch Energy a 20 percent net profit share in
22 anything other than Black Duck the company?
23      A.   It would be hard to grant him anything until
24 we closed on something.  So this -- this was, I guess,
25 looking into the future on what might happen.  And we're
```

1  still -- I think we're waiting on discovery on how
2  Daniel Moore was part of his company here without ever
3  telling me that.  And then somewhere along the line, he
4  went and formed a company with Black Duck.  So we're
5  still waiting for discovery on that.  But I'm going to
6  say that this document stands on its own merit.  It
7  means exactly what it says.
8      Q.  Did you intend to give a net profit share to
9  Longbranch in anything other than Black Duck when you
10  signed this agreement?
11      A.  This agreement was strictly on a contract that
12  he had with Longbranch.
13      Q.  Oh, I understand that.  But you agree that
14  assignee is Black Duck and or its successors and assigns
15  refers successors and assigns of Black Duck, right?
16      A.  I'm having a hard time -- I'm having a hard
17  time following you.  And I'm not going to agree with you
18  because it means what it says, not any more, not any
19  less, and --
20      Q.  Okay.  Was it a mistake that -- to have the
21  phrase "or its successors or assigns" included in
22  paragraph 1?
23          MR. GERMANY:  Objection; form.
24      A.  I think that's standard language on a lot of
25  contracts where the --

1      Q.  (BY MR. CLEVELAND)  But was it a mistake in
2  this contract?  That's what I'm asking you.
3      A.  I don't think so.
4      Q.  Okay.  Did you read this agreement before you
5  signed it?
6      A.  I read all agreements before I sign them.
7      Q.  So you read this one too, right?
8      A.  This was back in 2016.  And, yes, I did read
9  it.
10      Q.  Okay.  And who prepared this document?  Was it
11  Mr. Strolle or somebody from that law firm?
12      A.  No, sir.
13      Q.  Do you know who prepared it?
14      A.  George Pigg prepared it.
15      Q.  Okay.  Now, let's look at paragraph 1(a).
16  Paragraph 1(a) defines what the net profits are.  Do you
17  agree with me, sir?
18      A.  I'm willing to agree that that is the only
19  definition used in this document, yes, sir.
20      Q.  Okay.  And the gross revenues are those
21  received -- actually received by Black Duck or its
22  successors or assigns, correct?
23          MR. GERMANY:  Object -- I'll retract.  Go
24  ahead.
25      A.  It says exactly what it was supposed to say

1  for net profits.  And it gave it --
2      Q.  (BY MR. CLEVELAND)  Which means gross revenues
3  ac -- which means gross revenues actually received by
4  assignee, which is Black Duck, right?
5      A.  It means what it says.  I'm not going to sit
6  here and -- go back and forth what something means
7  because I relied --
8      Q.  Well, this is my chance -- you're a corporate
9  representative today about this agreement, sir.  And
10  so --
11      A.  Okay.  Well, good.
12      Q.  I'm entitled to ask you questions about it.
13      A.  Yeah --
14      Q.  So --
15      A.  -- as the corporate representative --
16      Q.  -- Mr. Wright --
17      A.  -- I relied on my attorneys.
18      Q.  No, I understand.  But, I mean, are you
19  worried about this agreement, Mr. Wright?
20      A.  Not -- not at all.  Not at all.
21      Q.  Okay.  Because it refers to --
22      A.  Are you?
23      Q.  -- revenues actually received by assignee or
24  its successors or assigns, right?  That's what it says
25  there?

1      A.  You can read it, and I will agree with you.
2      Q.  Okay.  That's what it says right there.
3  That's the language you agreed to, isn't it?
4      A.  It says right there, yeah.  I mean, you could
5  ask --
6      Q.  Okay.
7      A.  -- the question 50 times, and the answer is
8  going to be the same.
9      Q.  Where -- where do the --
10          (Unreportable crosstalk.)
11      Q.  Looking at paragraph 1(a) -- Mr. Wright,
12  looking at paragraph 1(a), what are the gross revenues
13  that are the net profits under this paragraph?  Like,
14  where do they come from?
15          MR. MULLER:  Objection; form.
16      A.  The gross revenues before closing would be the
17  nonrefundable earnest money.
18      Q.  (BY MR. CLEVELAND)  Yeah.  But what does it
19  say in this paragraph 1(a) about where the gross
20  revenues come from?  Do you see that word "from"?  Can
21  you answer that question, sir?
22      A.  I'm not seeing where it says come from.
23      Q.  You see "from" --
24      A.  Oh --
25      Q.  -- "the operation, use, maintenance, or sale

1  (including partial sales or conveyances)"?

2     A.  See, you're putting words into it.  There's no

3  way in here where it says come from.

4     Q.  Well, I'm asking you.  Where does the gross

5  revenues come from on this paragraph?

6     A.  I will read it to you again.  It means exactly

7  what it says.  That's the only definition --

8     Q.  And this reflects -- this reflects your intent

9  for this agreement, sir; is that true?

10     A.  This -- this represents the agreement.

11     Q.  Did you intend to bind Black Duck to the words

12  in this agreement, sir?

13     A.  I intended for what net profits (a) says it

14  says, and that was my intent.

15     Q.  Okay.  Okay.  And is there any evidence that

16  can better, you know, show us about what your intent was

17  for this agreement other than this actual agreement

18  you're looking at in this text?

19     A.  I'm not the one trying to prevent evidence on

20  a -- on a scam.  I've told the truth, and it means what

21  it means.  Your client --

22          MR. CLEVELAND:  Objection; nonresponsive.

23     A.  -- is the one -- no, your client --

24          MR. CLEVELAND:  Objection; nonresponsive.

25     A.  -- (inaudible) was very good.  It --

Page 221

---

1     Q.  (BY MR. CLEVELAND)  Okay.

2     A.  It means what it means.  I don't know how else

3  to do it.  I mean, we wouldn't have put it --

4     Q.  Right.

5     A.  -- in here if we didn't --

6          (Unreportable crosstalk.)

7     Q.  Where -- where we would we look -- where would

8  we look to -- where would we look, Mr. Wright, to

9  understand your intent for this agreement other than the

10  actual text of this agreement?

11          MR. MULLER:  Objection; form.

12     A.  I -- you've got to realize, I've never bought

13  a pipeline before, and I didn't know the game that

14  Daniel Moore was planning to scam myself and Darin

15  Borders.  And my intent was a net profits agreement

16  where everybody could make money.  And -- and that net

17  profit is shown by your client, not me.  He shows

18  considerable times that he would like to get

19  nine-and-a-half million for it.  And he admitted way

20  before -- way before that I had over 6 million in it.

21  He was very aware of it.  And he said, that's

22  3.5 million.  And -- and if you'll read your client's

23  e-mail that he sent to both Darin and me, he said we

24  would each get 20 percent of that, and you could shut

25  Black down -- Black Duck down.  And that's where you can

Page 222

---

1  find it with your client.  And we provided a copy of

2  that.  And that's what he -- he wanted to -- he

3  explained it and explained it and explained it.  And

4  that's what it meant is that your client is explaining

5  it without any words you're trying to put in my mouth

6  now would be his scam, and if he can come up with

7  language that I agreed with his scam, please produce it.

8     Q.  (BY MR. CLEVELAND)  Okay.  Well, let me ask it

9  a different way.

10          MR. CLEVELAND:  And I'll object to

11  nonresponsive on that last answer.

12     Q.  (BY MR. CLEVELAND)  Why did you agree to

13  this -- why did you agree to paragraph 1(a) in the

14  Longbranch assignment, Mr. Wright?

15     A.  I was -- I was reading one day, and I read all

16  the way through to where I signed it.  This was a --

17  this was a very good agreement for all parties.  And all

18  parties, all they wanted to do was flip it.  And Daniel

19  Moore, he had five or six buyers and the -- and people

20  talking into doing this.  And he also said all I'd have

21  to put up was $25,000.w  And then I had to put up

22  another 25,000.  Then I had to put up another 75,000 and

23  had to put up another 400, another 400 while he scammed

24  and scammed and scammed.  So I don't know -- you keep

25  asking me whether there might be some language.  That's

Page 223

---

1  my language.

2     Q.  Well, Mr. Wright, if you're -- I hear you that

3  you said that the intent of this was for it to be a

4  flip.  If that's the case, why is this agreement binding

5  on the successors and assigns of Black Duck?

6          MR. MULLER:  Objection; form.

7     A.  This -- this agreement had to be approved by

8  the seller.  The seller would not accept this until

9  Darin Borders signed off on it.  And we have the

10  documents were Derick said he was -- as a team, was

11  going to move forward to sell this.  So you could also

12  ask Darin Borders that question too.  We have the

13  e-mails --

14     Q.  (BY MR. CLEVELAND)  Well --

15     A.  -- where he -- he went to them on this

16  document and said, "Do y'all approve it?"  And the

17  seller approved it too.

18     Q.  Okay.  But if it was only intended, according

19  to you, to be a flip, why is it binding on the

20  successors and the assigns of Black Duck?

21          MR. MULLER:  Objection; form.

22     A.  The document speaks for itself.

23          MR. CLEVELAND:  Objection; nonresponsive.

24     Q.  (BY MR. CLEVELAND)  If this was intended to be

25  a flip, why is it binding on the successors and assigns

Page 224

1  of Black Duck?

2          MR. MULLER:  Objection; form.

3      A.   It's -- the document speaks for itself.

4      Q.   (BY MR. CLEVELAND)  So as the corporate

5  representative here to testify today, you can't answer

6  that question for me other than to say, "The document

7  speaks for itself"?

8          MR. MULLER:  Objection; form.

9      A.   It speaks for itself.

10     Q.   (BY MR. CLEVELAND)  Do you agree with me that

11  what you're describing a flip and something that binds

12  the successors and assigns of Black Duck are two

13  inconsistent things?

14     A.   The document speaks for itself.  Nowhere in

15  here do I see that document talks about a flip.  Talk to

16  your client about --

17     Q.   Okay.

18     A.   -- the flip.  He played both --

19     Q.   Okay.

20     A.   -- sides of the game; your client did.

21     Q.   Okay.

22     A.   Ask him how he was going to flip Darin

23  Borders.

24     Q.   Okay.

25          MR. CLEVELAND:  I'll object as

                                        Page 225

1  nonresponsive after "nowhere in here is there anything

2  about a flip."

3      Q.   (BY MR. CLEVELAND)  Mr. Wright, you said

4  that -- did you say that Darin Borders and Longbranch

5  required for this agreement to binding on the successors

6  and assigns?

7      A.   I did not say that.  I said the document

8  speaks for itself.

9      Q.   Okay.  Why are all three of the -- of yours,

10  Mr. Cohle, and Mr. Moore's signature on this Longbranch

11  assignment that I put up?

12     A.   We were the managers of Black Duck.

13     Q.   Okay.  And so -- and that's why all three of

14  you signed?

15     A.   Well, it -- it says Black Duck Properties,

16  manager, manager, manager, and we were the three

17  managers.  Well, I don't know why --

18     Q.   Okay.

19     A.   -- Frank Moore put manager by his name of --

20     Q.   Why did all three of you sign this

21  agreement -- why did all three of you sign this

22  agreement and you were able to sign the loan documents

23  for the KrisJenn loan to Black Duck?

24     A.   Okay.  You're -- you're jumping back and forth

25  on me, and I'm getting confused.  You'll have to go back

                                        Page 226

1  and look at my previous answers with the court.  And

2  those are the --

3      Q.   Well --

4      A.   -- answers that I stand by.

5      Q.   I have not asked you this question before.

6          Why did all three of you sign this

7  Longbranch assignment and only you were required to sign

8  these alleged loan documents in KrisJenn Ranch to Black

9  Duck that encumbered Black Duck with millions of dollars

10  of debt?

11     A.   I'll have to go back and look at those

12  documents to see.  But I would think that it had

13  something that would be about a year and a half later

14  and Daniel Moore traveling back to South Carolina.

15  Daniel Moore gave up on this deal going through.  That's

16  why he left.  He came up with some excuse, his

17  assignments.  And I was just curious.  Was that a

18  university that assigned him or was that a bank that

19  assigned him to Texas for two years?

20     Q.   Okay.  So you don't know why all three of you

21  signed this and only you signed these loan documents

22  from KrisJenn to Black Duck?

23          MR. MULLER:  Objection; form.

24     A.   The documents stand for themselves.

25     Q.   (BY MR. CLEVELAND)  Anything else?

                                        Page 227

1      A.   All these documents stand for themselves.

2      Q.   Okay.  Why do you keep giving that answer?

3      A.   All documents stand for themselves.

4      Q.   Why do you keep giving that answer, sir?

5          MR. MULLER:  Objection; form.

6      Q.   (BY MR. CLEVELAND)  Sir?

7      A.   I'll -- I'll -- I can keep answering that till

8  dark.  The document stands for itself.

9      Q.   Are you going to show up to the trial of this

10  case and claim that an e-mail you wrote doesn't really

11  mean what you said in the e-mail?

12     A.   Well --

13          MR. MULLER:  Objection; form.

14     A.   -- at the trial -- at the trial, maybe we will

15  have discovered discovery that y'all haven't presented

16  yet and -- and change our minds.  We hold that right for

17  the trial.

18     Q.   (BY MR. CLEVELAND)  Okay.  Well, are you going

19  to keep this position at trial of the documents speak

20  for themselves or are you going to change that position,

21  because I need to know now?

22     A.   Right now, the documents speak for themselves.

23  There's three other people --

24          (Unreportable crosstalk.)

25     Q.   But you might change -- you might change that

                                        Page 228

1   view as we get closer to trial?

2        A.   There's four other people on there.  Why don't

3   you ask them what they think it means.  I think it

4   means --

5        Q.   We will.

6        A.   -- what it says.

7        Q.   We will.

8        A.   Good.  Good.  Good.

9        Q.   Now --

10       A.   Good.

11       Q.   -- Mr. Wright, do you agree that a 20 percent

12  net profit interest is a significant interest as it's

13  defined in this Exhibit 12?

14            MR. GERMANY:  Objection; form.

15       Q.   (BY MR. CLEVELAND)  Sir?

16       A.   Repeat the question.

17       Q.   Well, let me ask a different question.

18            You're aware that there's a DMA -- there's

19  a DMA agreement that grants DMA Properties a 20 percent

20  net profit interest just like the Longbranch assignment?

21  Do you agree?

22       A.   No.

23       Q.   Okay.  What are the differences between the

24  Longbranch assignment and the DMA assignment?

25       A.   That's not up for me to educate you.

---

1        Q.   Well, I -- I'm here to ask you the questions.

2   The answer is either you can explain it to me.  You can

3   say I don't know.  What's your answer?

4        A.   That -- that's going to be something I'm still

5   waiting on the attorneys to explain to me.  But there is

6   a difference I've been told, but I haven't gotten final

7   counsel on that.

8        Q.   Sir --

9        A.   As soon as I get final counsel on that, I'd be

10  glad to tell you.  But I'm sure you already know the

11  answer or you wouldn't be asking.

12       Q.   Well, this is my chance to take your

13  deposition.  What's the difference between --

14       A.   I don't know.

15       Q.   -- the Longbranch assignment and the DMA

16  assignment?

17       A.   I don't know the answer yet.

18       Q.   Okay.

19       A.   My counsel is ready --

20       Q.   Okay.

21       A.   -- for that.  And they'll be ready --

22       Q.   Okay.

23       A.   -- to give me their answer on that in trial,

24  we hope.

25       Q.   Okay.  Has Daniel Moore ever accused you of

---

1   making false representations of facts to third parties?

2        A.   Not that I'm aware of.

3        Q.   Do you remember when he accused you of doing

4   that in negotiations related to the right-of-way?

5        A.   I do -- I don't remember.  I'm sure I -- I'm

6   sure Daniel Moore is going to remember what he remembers

7   because he would never shut up talking.  So I don't know

8   how he remembers anything.

9        Q.   Okay.

10            MR. CLEVELAND:  Let's take a ten-minute

11  break, John.  I'm going to get some new exhibits ready

12  to go.

13            MR. MULLER:  Okay.  Sounds good.

14            MR. CLEVELAND:  Thanks.

15            THE VIDEOGRAPHER:  Going off the record.

16  The time is 4:04 p.m.

17            (Break from 4:04 p.m. to 4:23 p.m.)

18            THE VIDEOGRAPHER:  We'll mark this as the

19  beginning of file 3.  Back on the record.  The time is

20  4:23 p.m.

21       Q.   (BY MR. CLEVELAND)  Mr. Wright, are you ready

22  to continue?

23       A.   Sure.

24       Q.   Who is John Terrill?

25       A.   I think he is a mystery man.

---

1        Q.   Well, but to the best of your knowledge, tell

2   me who he is.

3        A.   He's someone that contacted me through a

4   contact in Oklahoma City about doing some type of

5   purchase, a merger with the Express Pipeline.

6        Q.   And, Mr. Wright, did you disclose to Daniel

7   Moore any of your correspondence with John Terrill with

8   respect to the right-of-way while Mr. Moore was still

9   involved with Black Duck?

10       A.   Yes, sir, I did.

11       Q.   Was -- did you keep Mr. Moore apprised of your

12  negotiations to potentially sell the right-of-way to

13  TCRG?

14       A.   Yes, I did.

15       Q.   And did you do that through e-mail, text

16  message?  How did you do that?

17       A.   E-mail.

18       Q.   Okay.  And so --

19       A.   We provided it.  It will be going out before

20  the --

21       Q.   And so --

22       A.   -- deadlines are due.

23       Q.   And I -- okay.  And so I think the -- the

24  right-of-way was sold to the TCRG entity in, I think,

25  late March 2018.  Does that sound about right to you?

1      A.    The documents speak for themselves.
2      Q.    But does that -- I mean, I'm not trying to
3  trick you.  Does that -- you know, spring of 2018 sound
4  about right when that transaction occurred?
5      A.    Trickery or not, the documents speak for
6  themselves.
7      Q.    Okay.  But is your testimony that you kept
8  Daniel Moore fully informed of your correspondence with
9  John Terrill and TCRG related to the right-of-way?
10           MR. MULLER:  Objection; form.
11     A.    Fully -- fully informed would be a tough
12  question because he didn't care what I had to say.
13     Q.    (BY MR. CLEVELAND)  And what's the basis of
14  that statement?
15     A.    Well, he never shuts up when he talks on the
16  phone.
17     Q.    He never what?
18     A.    He never -- he never shuts up.
19     Q.    Oh, never shuts up.  So you're saying he's --
20  he's talkative.
21           Okay.  But --
22     A.    It was impossible to talk to Daniel Moore
23  because it was a one-sided --
24     Q.    But describe -- describe for me, sir, in your
25  own words how you kept Mr. Moore updated, if at all,

                                           Page 233

1  about your discussions with John Terrill and TCRG
2  related to the right-of-way.
3      A.    I didn't talk to him at all about TCRG.
4      Q.    Okay.  Tell me in your own words how you kept
5  Mr. Moore updated, if at all, about your correspondence
6  with John Terrill related to the right-of-way.
7      A.    I sent him a full e-mail on the full details
8  of the e-mail, and he wasn't interested in hearing it
9  because he had his own entity.  He was in a race to get
10  out of Black Duck so he could make his own deal.  And so
11  he didn't listen --
12     Q.    Okay.
13     A.    -- to it, and even on the e-mails said that's
14  all nonsense.  Of course, Darin Borders, said, "Oh, I
15  like your deal.  Get me more information."
16     Q.    Okay.  Well, let me -- let me back up.  In
17  August of 2017, that's when Black Duck acquired the
18  right-of-way.  And so after that happened, what was your
19  strategy, if any, Mr. Wright, related to that asset?
20     A.    I am not sure really what you're talking to,
21  but I -- I'd have to go back and look at my notes.  But
22  I gave -- I continued to give Daniel an opportunity to
23  sell the right-of-way.  And Darin Borders jumped in.
24  And Daniel tried to keep a coordination on selling it.
25  But at the same time, I explained to them that I have to

                                           Page 234

1  pay 17 percent a month to keep the note going.  And they
2  didn't seem too worried about that because always next
3  month, he'd have it sold; next month, he'd have it sold.
4  And he knew that that was a huge expense running
5  monthly.  But Daniel Moore did try to sell it.  And I
6  gave him a three-month or four-month deadline to come up
7  with some type of offer.
8      Q.    And you're saying -- when you say, "sell it,"
9  you mean sell the right-of-way?
10     A.    Well --
11           MR. MULLER:  Objection; form.
12     A.    You -- you know your definition is -- is
13  definitely wrong, and that's the whole problem --
14     Q.    (BY MR. CLEVELAND)  Okay.  I'm just trying to
15  understand what you said when you said you gave Daniel
16  Moore three months to sell it or something along that
17  line.  What did you mean by that?
18     A.    Sell Express Pipeline and the ROW.
19     Q.    Okay.
20     A.    If it had been up to Daniel Moore --
21     Q.    And --
22     A.    -- he couldn't have sold it in ten years.
23     Q.    Okay.  So --
24     A.    Which I --
25     Q.    Once Black Duck owned the right-of-way --

                                           Page 235

1      A.    I'm sorry?
2      Q.    Once Black Duck owned the right-of-way, was
3  your strategy to develop it or sell it as soon as
4  possible?  What were your plans for it?
5      A.    You'll have to ask your client that.  I gave
6  him permission to sell it.  And he continued working
7  with three or four clients.  We have since found out
8  that he was working them against each other and not
9  involving Darin Borders or myself.
10     Q.    Okay.  Well, when you say Mr. Moore was
11  involved with three or four clients, what are you
12  talking about?
13     A.    Well, you'd have to ask him.
14     Q.    Well --
15     A.    He never told me --
16     Q.    -- you just said the words.  I'm asking what
17  you meant.
18     A.    He never told me who they were.  And then when
19  he would tell me who they were, he absolutely -- you'll
20  see in every e-mail, it says, "Please do not talk to
21  them.  You'll ruin the deal."  E-mail after e-mail
22  says --
23     Q.    Okay.
24     A.    -- "Do not talk to them.  You'll ruin the
25  deal."

                                           Page 236

1    Q.  Do you think Mr. Moore shared your desire to,
2    you know, make the right-of-way a profitable venture for
3    Black Duck?
4    A.  It's hard to say because he offered me a
5    million-and-a-half dollars 30 days before I closed not
6    to close.  And I should have figured out then what the
7    scam was.
8    Q.  Well, what -- what's the scam according to
9    you?
10   A.  He had -- he said that the people will pay you
11   the million-and-a-half.  And I said, "Great.  Let's do
12   it.  Give me my money back and the million-and-a-half,"
13   because I only had a million-two in it.  He said, "Oh,
14   no problem.  I'll get you the money.  But it'll take
15   nine months after they close."  And I said -- and that's
16   when I said, "Here we go again, Mr. Moore.  You've got
17   all these buyers, and now you have a buyer that'll even
18   give me a million-and-a-half dollars.  Tell me who it is
19   and when they'll pay it."  And then he went quiet again
20   and then came up with a new buyer the week afterwards
21   when he figured out that I wasn't going to go for that.
22   Q.  Okay.  What led to the agreement for Daniel
23   and his entity to leave Black Duck?
24   A.  He -- he was involved with a buyer from
25   Dallas/Fort Worth.  And it's to our understanding that

1    he wanted to get out of Black Duck so he could negotiate
2    a better deal for himself to be their manager.
3    Q.  Okay.  And did you negotiate Mr. Moore --
4    Mr. Moore's departure from Black Duck?
5    A.  No, I did not.  He did.  He said that would be
6    the only condition he would leave by.
7    Q.  Okay.  Did you ever take legal action to try
8    to just kick Daniel out of Black Duck?
9    A.  I didn't want him to leave.
10   Q.  Why -- why not?
11   A.  Because if he's going to try to sell it, it
12   would be better him being involved trying to sell it as
13   a partner of Black Duck.
14   Q.  Okay.  And is that why you struck the deal
15   with DMA Properties that you did to try to keep Daniel
16   involved to assist with the sale of the right-of-way?
17   MR. MULLER:  Objection; form.
18   A.  No, that is not.
19   Q.  (BY MR. CLEVELAND)  Why did you grant DMA
20   Properties a 20 percent net profits interest --
21   A.  He said he wanted out and that was the only
22   way he would do it.  He said, "You've already granted
23   that to Darin Borders, and it's the same agreement."  I
24   said, "Will you please tell me one more time what this
25   agreement means?"  And he spelled it out in an e-mail

1    exactly what the agreement meant.  And I said, "If
2    that's what the agreement means and that's only what the
3    agreement means, you can have your wish."  And that --
4    Q.  Okay.
5    A.  -- agreement --
6    Q.  And did --
7    A.  And that agreement is part of the documents.
8    That's -- that's the $9.5 million that -- that you tried
9    to get me on, on the bankruptcy with Ron Smeberg, if
10   you'll remember when you asked me what the value of the
11   pipeline was, and it said 9.5 million.  And that's where
12   I said I never said that.  It had to be corrected -- the
13   only one that ever said it was worth 9.5 million was
14   Daniel Moore.  And he said -- he said, "You have
15   6 million in it.  Let's assume you sell it for
16   9.5 million.  That is a $3.5 million profit for Darin
17   Borders and myself.  We each get 20 percent of
18   three-and-a-half-million dollars."  And I said, "Okay.
19   And what do I have to do after that?"  He said, "Well,
20   after that's done, you can shut Black down -- Duck down
21   because it has no more effect on this transaction."  And
22   I said, "That is the entire transaction?"  And he -- in
23   that e-mail, it spells it out perfect.  That was his
24   language, his statement.  And I said, "If that's what it
25   means, I -- then you can -- I'll grant you your wish."

1    Q.  Okay.
2            (Exhibit 18 marked.)
3    MR. CLEVELAND:  John, I'm going to be
4    referring to what is Exhibit 20 in the summary judgment
5    exhibit.  And it's Exhibit 18 for this deposition.  And
6    that's the DMA agreement, okay?
7    MR. MULLER:  Okay.  Which one is it
8    again?  What number?
9    MR. CLEVELAND:  It's Exhibit 20 in the
10   summary judgment exhibits, but it's going to be
11   Exhibit 18 for this deposition.
12   MR. MULLER:  Hey, I'm sorry.  I moved the
13   exhibits to the other room.  Can I put you on hold for
14   just one minute?
15   MR. CLEVELAND:  Yes.
16   MR. MULLER:  Okay.  Good to go.  20, you
17   say?
18   MR. CLEVELAND:  Yeah, 20 in that binder.
19   And this is Exhibit 18 for the deposition.  And this is
20   the DMA Properties agreement with Black Duck Properties.
21   Q.  (BY MR. CLEVELAND)  Do you have that in front
22   of you, Mr. Wright?
23   A.  Yes, I do.
24   Q.  Okay.  And this is the agreement where DMA
25   Properties received the 20 percent net profit interest,

1    correct?
2         A.    Yes.
3         Q.    And the date of this agreement is
4    February 7th, 2018, as I've highlighted here, correct?
5         A.    Yes.
6         Q.    And why did Black Duck Properties and you, on
7    its behalf, agree to this document with DMA Properties?
8         A.    Because he said that I had approved -- that
9    was the document we approved with Darin Borders and if I
10   would honor the same agreement.  And the agreement still
11   stands by its fact even though he -- he did do an e-mail
12   trying to explain the difference.  But he -- he used
13   presumptions, which are bad for everything.
14        Q.    Okay.  And --
15        A.    He used --
16        Q.    -- Longbranch --
17        A.    Yeah, he used a presumption on the
18   nine-and-a-half million.  I never came up with that or
19   agreed to that --
20        Q.    Okay.
21        A.    -- on any basis, yeah.
22        Q.    Okay.  And, Mr. Wright, did you -- similar to
23   the Longbranch assignment, did you read this document,
24   the agreement, before you signed it on behalf of Black
25   Duck?

                                              Page 241

1         A.    We put it to my attorney, and he looked at it
2    and said it's close to the same agreement, that he's
3    asking for the same thing.
4         Q.    But my question is:  Did you read this before
5    you signed it?
6         A.    I read everything before I sign it, Tim.
7         Q.    So did you read this agreement before you
8    signed it?
9         A.    I read every agreement before I sign it, Tim.
10        Q.    Well, so the answer to my question is yes
11   then; is that right?
12        A.    I read every agreement before I sign it.
13              MR. MULLER:  So the answer to the
14   question is yes?
15        Q.    (BY MR. CLEVELAND)  Including this one?
16        A.    Oh, well -- yes.
17        Q.    Okay.  Thank you.
18              Now, paragraph 1 is Consideration.  Why
19   did you agree to bind Black Duck or its successors and
20   assigns, sir, in paragraph 1?
21        A.    Because it's the same as in the Longbranch
22   agreement.
23        Q.    Any other reason?
24        A.    It's identical.
25        Q.    Is there any other reason?

                                              Page 242

1         A.    It's identical to the Longbranch agreement.
2         Q.    Okay.  Is there any other reason?
3         A.    It's identical to the Longbranch agreement.
4    That's the only reason.
5              MR. CLEVELAND:  Object --
6         Q.    (BY MR. CLEVELAND)  That's the only reason.
7    Okay.
8              Now, did you -- is your testimony that
9    like the Longbranch assignment, that your intent for the
10   DMA agreement was to be a flip?
11        A.    That was done after we closed it.  And the
12   Longbranch agreement was an assignment that listed the
13   net profits.  That -- so the net profits would be --
14   whether it be a flip or whatever it is, it would be the
15   gross -- the gross minus the cost equaled the net.
16        Q.    Okay.  And the gross revenues from what?
17        A.    A sale.
18        Q.    A sale of what?
19        A.    The Express Pipeline and the ROW.
20        Q.    And so did this agreement grant the net
21   profits interest in any gross revenues other than those
22   from a sale of the pipeline or the ROW?
23        A.    This is only in a sale for the Express
24   Pipeline or the P-21.  Nowhere on it does it --
25        Q.    Okay.

                                              Page 243

1         A.    -- describe ROW.
2         Q.    Okay.  But this net profits interest in the
3    DMA agreement only relates to a sale of the P-21 or
4    Express Pipeline.  Is that what you're saying?
5         A.    Yes, sir.
6         Q.    Okay.  And what's that based on?
7         A.    It's what it says.
8         Q.    Okay.  Okay.  And you see paragraph 1(b) here
9    that I just highlighted?
10        A.    Correct.
11        Q.    That's the -- that's the same paragraph 1(b)
12   as from the Longbranch assignment, right?
13        A.    Correct.
14        Q.    Why did you include the phrase "shall attach
15   and run with" in this paragraph 1(b) of the DMA
16   agreement and the Longbranch assignment?
17              MR. MULLER:  Objection; form.
18        A.    Daniel Moore created this agreement, and we
19   looked at it and signed it.
20        Q.    (BY MR. CLEVELAND)  Okay.  But my question is:
21   Why did you include "shall attach and run with" --
22   "shall attach and run with" in paragraph 1(b)?
23        A.    Because it read the same as the Longbranch
24   agreement.
25        Q.    Okay.  Why did you agree on behalf of Black

                                              Page 244

1  Duck to paragraph 1(b) which includes the "shall attach
2  and run with" language?
3      A.    Because -- because Daniel Moore in his
4  e-mails -- I asked him why it reads exactly, and he says
5  because that's something we approve, Black Duck.  And I
6  said, "Okay.  That's fine."
7      Q.    Okay.  Something that attaches and runs with
8  would be inconsistent with simply a net profit on a
9  sale; would you agree?
10         MR. MULLER:  Objection; form.
11      A.    The net profits is describing the pipeline
12  that attaches and runs with it.  That's the way I
13  interpret that to mean.
14      Q.    (BY MR. CLEVELAND)  Okay.  You -- you don't
15  interpret that to mean the obligation to pay the net
16  profit shares shall attach and run?
17      A.    It stands for -- it stands exactly for -- by
18  what it reads.
19      Q.    Which is that Black Duck Properties, LLC's
20  obligation to pay the net profit share shall attach and
21  run with, right?
22      A.    What it says is what it means.
23      Q.    Okay.  And, in fact, you agree that Black Duck
24  would, as it says at the end of 1(b), bind its
25  successors and assigns to the payment of the net profits

                                                    Page 245

1  shared, didn't you?
2      A.    It means exactly what it says.
3      Q.    And what does that mean that -- that binds its
4  successors and assigns to the payment of the net profit
5  share of 1(b)?  What does that mean?
6      A.    It means --
7           MR. MULLER:  Objection; form.
8      A.    It means the words speak for themselves.
9      Q.    (BY MR. CLEVELAND)  Any -- does it mean
10  anything else?
11      A.    They mean what they say in the agreement.
12      Q.    Is there anything else you can help -- you can
13  add to help me understand what that means from your
14  perspective?
15      A.    They mean what they say in the agreement.  The
16  words speak for themselves.
17      Q.    Okay.  Anything else you want to add to
18  elaborate on that?  If the answer is you have nothing
19  else to elaborate on, we can move on.
20      A.    I have nothing else to elaborate on it.  We're
21  still in discovery on that.
22      Q.    Okay.  Thank you.  Let's look at --
23      A.    We don't know what Mr. Black meant -- I mean,
24  Mr. Pigg meant by that.  It would be interesting to see.
25      Q.    (BY MR. CLEVELAND)  Okay.  Well, he didn't

                                                    Page 246

1  sign this agreement; you did.  Isn't that true?
2      A.    The way I see it, I think Daniel signed it and
3  I signed it --
4      Q.    He did -- did you sign it?  Is this your
5  signature on page 2?
6      A.    Yes.
7      Q.    Okay.  And so are you -- are you a
8  businessman, Mr. Wright?  Do you consider yourself a
9  businessman?
10      A.    No.  I'm retired.  I retired --
11      Q.    Okay.
12      A.    -- quite a few years before this.
13      Q.    Okay.  Have you entered a lot of commercial
14  agreements in your life, would you say?
15      A.    No.
16           (Exhibit 17 marked.)
17      Q.    Okay.  All right.  Let's -- let's look at
18  Exhibit 17 to your deposition, which I just pulled up on
19  the screen.
20           MR. CLEVELAND:  And, John, for your
21  information, this is Exhibit 18 in the summary judgment
22  binder.
23           MR. MULLER:  All right.
24      Q.    (BY MR. CLEVELAND)  So, Mr. Wright, Exhibit 17
25  is up on the screen.  This is an e-mail string that

                                                    Page 247

1  involves yourself and Mr. Moore on February 4th, 2018.
2  Do you see that?
3      A.    Yes, I do.
4      Q.    Okay.  And do you see that at -- the final
5  e-mail here is you saying, "I, Larry Wright, hereby
6  fully accept and approve to the terms and conditions of
7  this e-mail," correct?
8      A.    I see that, yes.
9      Q.    Okay.  And did you read this e-mail string
10  before you made this statement that you accept and
11  approve the terms and the conditions?
12           (Witness looks at document.)
13      Q.    Sir?
14           (Witness looks at document.)
15      A.    Yeah, that has to do with the Bigfoot note.
16      Q.    Okay.  But you don't make that clarification
17  in your statement here, do you?
18      A.    All I know is that he's mixing them back and
19  forth because I own 60 percent -- percent of the Black
20  Duck note.  And for some reason, they're hopping back
21  and forth.
22      Q.    Okay.
23      A.    And that's where --
24      Q.    Well, let's go down --
25      A.    -- you'll get the 20 percent, yeah.  Either

                                                    Page 248

1  way you choose --
2      Q.   All right.  Well, let's go --
3              (Unreportable crosstalk.)
4      Q.   Let's go down to Daniel Moore's --
5      A.   This was -- this was a hypothetical thing,
6  yeah.  It's just --
7      Q.   Oh, so the February -- Exhibit 17 is -- is all
8  hypothetical?
9      A.   None of what this says is what we did.  It's
10 all hypothetical.
11     Q.   Okay.  Okay.  Well, let's go down to
12 Mr. Moore's e-mail.  I'm starting on February 3rd at
13 9:24 p.m., okay?
14     A.   On where?  9:24?
15     Q.   Daniel Moore's 9:24 p.m. e-mail at the bottom,
16 okay?
17     A.   Okay.
18     Q.   If this was all hypothetical, Mr. Wright, why
19 at the top did you say, I fully -- you hereby fully
20 accept and approve the terms and conditions of this
21 e-mail?
22     A.   That was talking --
23     Q.   If it's a hypothetical, why did you say that?
24     A.   That was -- that was talking about -- I
25 gave -- I gave him the option for him to pick.

                                          Page 249

1      Q.   What did --
2      A.   He's given lots of options.
3      Q.   What option?
4      A.   He didn't pick them.
5      Q.   Well, but why didn't you -- why didn't you
6  clarify anything here?  You just say, "I fully accept
7  and approve."  How was Mr. Moore supposed to know from
8  this e-mail that you consider this to be hypothetical?
9      A.   Well, I approved whichever one -- way he
10 wanted to go.  And he didn't let me know at that time.
11     Q.   Well --
12     A.   Either he did --
13     Q.   -- he didn't put --
14              (Unreportable crosstalk.)
15     A.   No, later he told Mr. Strolle and communicated
16 with Mr. Strolle.  In fact, he got mad at Mr. Strolle
17 and said that he could have Chris Johns take it over.
18 And Mr. Strolle looked at it later and put it together
19 for him.
20              Yeah, that -- every bit of this is --
21     Q.   Okay.
22     A.   -- hypothetical.  And I agreed with him.  Any
23 way he wanted to do it, I was fine with it.  I didn't
24 want him to leave like that.  I don't know where he came
25 up with the idea I wanted him to leave.

                                          Page 250

1      Q.   Okay.
2      A.   It's all news to me.
3      Q.   Well --
4      A.   It's some -- he must have been on a college
5  two-year exam to move to Texas and then -- because he
6  says his term was up.  But the thing is, he didn't tell
7  us he was here for two years.  And he dadgum sure didn't
8  tell us when he was moving back.  We didn't know he was
9  moving back until he said that he was moving and didn't
10 have a driver's license.  In other words, he drove all
11 the way back to South Carolina without a driver's
12 license.  That ought to tell you what kind of person
13 Mr. Moore is.
14     Q.   All right.  Mr. Wright, let's look at -- let's
15 look at Daniel Moore's 9:24 e-mail in this exhibit,
16 okay?
17     A.   Nine -- nine -- nine -- I don't have a 9/24.
18 I have a February 3rd, February 3rd.  I have a
19 February 4th.  That's all I have.
20     Q.   It's the original e-mail that starts the
21 string, sir.  It starts with, "This e-mail is for Larry
22 Wright and Daniel Moore to agree."
23     A.   I see that.
24     Q.   Are you there?
25     A.   Yeah.  But -- but you're -- you're -- what

                                          Page 251

1  date are you saying?
2      Q.   It says February 3rd, 2018.
3      A.   Yeah, February 3rd.  You -- you were saying a
4  different date.
5      Q.   All right, sir.
6      A.   All of that e-mail was -- had -- all of those
7  e-mails were things that Daniel was firing off to my
8  attorney.  All of these are hypothetical.  The only
9  agreements that work are the agreements -- the final
10 agreements that were signed.
11     Q.   Okay.  So do you believe there's anything
12 enforceable in terms of an agreement from this e-mail
13 exchange in Exhibit 17?
14     A.   Well, he -- he goes back and forth on
15 25 percent and --
16     Q.   Sir --
17     A.   -- 40 percent.  Then he goes 50 percent.  And
18 I told him I didn't care whichever way he wanted to go.
19 And the final agreement --
20     Q.   Okay.
21     A.   -- speaks for itself.  And the final
22 agreement --
23     Q.   The final agreement --
24     A.   In fact, the final agreement says --
25     Q.   What's the final agreement you're referring

                                          Page 252

1  to?  Is that the DMA agreement?
2      A.  Yeah.  The final agreement on the -- on the
3  Harris note says, all other agreements are null and void
4  including the -- on that.  This is the final agreement.
5  The final agreement on the DMA and the Harris note were
6  both done within a few days of each other.  And those
7  e-mails that he was --
8      Q.  Okay.
9      A.  -- firing back and forth were interwoven, and
10  you never knew which one he was talking about.
11      Q.  Okay.
12      A.  You know --
13      Q.  Do you --
14          (Unreportable crosstalk.)
15      Q.  Do you believe that DMA or Daniel Moore is
16  owed anything related to the Harris SWD note?
17      A.  Oh, yes.  We -- we've put together a full
18  accounting.  And we're ready to submit to the court the
19  amount we owe.  Daniel Moore forgot to put a final
20  accounting for the moneys owed.  He also over --
21  overvalued the amount of moneys owed.  And we provided
22  copies of all the checks paid.  And we provided a copy
23  of the -- of the total expenses.  And we put a final
24  accounting that's certified by our accountant.
25      Q.  Okay.  So how much is Daniel Moore or his

1  entity owed related to the Harris SWD note according to
2  you?
3      A.  It will be submitted before October 13th.  I
4  think there's a deadline on that.  They're reviewing it
5  with their -- their other attorneys.
6      Q.  Well, this is my chance to take your
7  deposition.  And you're the corporate rep on that topic
8  here today, sir.  So how much is Daniel Moore or his
9  entity owed related to the Harris SWD note according to
10  you?
11      A.  I don't have -- I wasn't asked to bring that
12  in front of me today, my accounting.  I did not turn
13  that in.  And Ron Smeberg has that.  And I'm sure he'll
14  make copies for everybody.  But I gave a full accounting
15  on every check in and every expense that applies to the
16  cost of -- what Mr. Moore forgot to do was put together
17  the accounting on that.  And we've provided that.
18          MR. MULLER:  Tim, I'm sorry --
19          MR. CLEVELAND:  I don't think you --
20  you -- yeah, I need some help, John.  He's the corporate
21  rep on this --
22          (Unreportable crosstalk.)
23          MR. CLEVELAND:  -- topic and he doesn't
24  know anything --.
25          MR. MULLER:  Yeah.  I think I might be

1  able to help you.  I think he's given us numbers.  I
2  don't think they've been processed and submitted to you
3  yet.
4          Are we going to -- what time are we
5  breaking today and coming back on tomorrow?  Because I
6  don't mind getting that information together for you.
7  And I should be able to roust it for the morning if you
8  need it.
9          MR. CLEVELAND:  Okay.  I imagine we'll go
10  another 30 minutes here, and then we'll pause and resume
11  tomorrow morning.
12          MR. MULLER:  Okay.
13      Q.  (BY MR. CLEVELAND)  All right.  So,
14  Mr. Wright, do you -- am I right you do agree Mr. Moore
15  or his entities are owed something related to the Harris
16  SWD note; you just don't know what the specific amount
17  is?
18      A.  Oh, yes.  I've got a good idea, but I don't
19  want to step out and say that if it's not correct.
20      Q.  Well, tell me what -- I understand that.  Tell
21  me what your good idea is as you are sitting here today.
22  And if you need to tomorrow morning supplement that, you
23  can.
24      A.  I'll tell you in the morning.  And he
25  probably -- you know, we could probably avoid the whole

1  October 13th deal if you want to because we're going to
2  submit to the court the money we believe is owed.  And
3  that -- that -- the -- the moneys owed will be certified
4  by our accountants.  And I don't think Daniel Moore ever
5  cared about what was in the bank or what was paid out.
6  That's not his deal.
7      Q.  Okay.  And --
8      A.  We have that amount --
9      Q.  -- under what agreement --
10      A.  We have that certified.
11      Q.  Sir -- okay.  I will look forward to asking
12  you as the corporate representative tomorrow to answer
13  those questions, okay?
14      A.  Oh, yeah.  No problem.  No problem.
15      Q.  All right.  And under what agreement is Daniel
16  Moore or his entities owed these payments related to the
17  Harris SWD note, sir?
18      A.  That's -- that's confusing.
19      Q.  Well, is it under the DMA agreement we just
20  looked at?  Is it under this e-mail in -- is it some
21  other document?
22      A.  No, no.  After I received all my costs, which
23  is a net profits agreement, then he gets 50/50.  We've
24  never denied that.
25      Q.  Okay.  What are the costs -- what are the

1   costs that you have for the Harris SWD notes?
2        A.   We have the full accounting of the costs.
3        Q.   But what are those costs?
4        A.   Are you -- I -- John just said we'll -- we'll
5   provide them to you in the morning.  They're --
6            MR. MULLER:  Do you know what they are?
7   If you know what they are, tell him.
8        A.   Oh, I mean, the full costs are the -- what I
9   paid for the SWD less -- the costs would be on the
10  accounting reference to --
11       Q.   (BY MR. CLEVELAND)  What are the costs --
12  what's the dollar amount of the costs, sir?
13       A.   I don't have it in front of me.
14       Q.   All right.  Is that information you can get
15  and testify to about in the morning?
16       A.   Oh, yeah.  That's what we're trying to tell
17  you.  I mean, I don't want to tell you something that's
18  wrong.  It's all certified by the accountants of Black
19  Duck.  We have the state tax returns.  We've got all
20  taxes paid.  We've got leases paid.  We've got bonds
21  paid.  We have all the application fees to the State of
22  Texas.  There is quite a few fees on there that Daniel
23  Moore never took into consideration when he start --
24  when he filed this thing.
25       Q.   Okay.  Well, I look forward to asking you

1   questions about that and having you educated and able to
2   answer that tomorrow.  Do I have your promise on that?
3            MR. MULLER:  Let me tell you --
4        A.   Hopefully John can get it from --
5            MR. MULLER:  -- we will have that
6   information for you in the morning.  I do not know that
7   it's going to be certified by anyone, but you will have
8   it.
9            MR. CLEVELAND:  Well, John -- John, let
10  me just say, he's the corporate representative, and he's
11  answered about half the questions with "The documents
12  speak for themselves."  I don't think this witness is
13  prepared to testify as the corporate rep on certain --
14  for -- on behalf of the entities today.  I think the
15  record makes that clear.  So that's why I'm asking can
16  he promise me he's going to be ready tomorrow because
17  he's not really ready on any topic today.
18           MR. MULLER:  He's ready today.  He can't
19  remember all those numbers off the top of his head.  He
20  just doesn't have the capacity to remember that.  If
21  you'd like, I can go get the information for him now for
22  his reference or he can do it in the morning.  But he
23  just can't remember those numbers right off the top of
24  his head.  He needs something to help him.
25           MR. CLEVELAND:  Okay.  We'll do that in

1   the morning.
2            MR. MULLER:  Okay.  Fair enough.
3            (Exhibit 16 marked.)
4        Q.   (BY MR. CLEVELAND)  Mr. Wright, we're going to
5   go to a new exhibit, Exhibit 16, which is in front of
6   you.
7            MR. CLEVELAND:  And, John, this is in the
8   group that I e-mailed to you on our break.
9            MR. MULLER:  Great.  Okay.
10           MR. CLEVELAND:  It's Exhibit 16.  It's
11  the deed of trust.
12           MR. MULLER:  Okay.
13       Q.   (BY MR. CLEVELAND)  Mr. Wright, I am showing
14  you what I have marked as Exhibit 16 to your deposition
15  on the screen share.  Do you see that, sir?
16           THE WITNESS:  This isn't it.  This is a
17  KrisJenn note from Asilo.  He's showing one from Black
18  Duck.
19           MR. MULLER:  Okay.  I've got --
20       A.   You've got -- 16 is the Asilo note.  Is that
21  what you're trying to do?  I don't think it is.
22       Q.   (BY MR. CLEVELAND)  No.
23           MR. CLEVELAND:  Exhibit 16, John, is in
24  the title.  And it's what I sent.
25       Q.   (BY MR. CLEVELAND)  Just look at the document,

1   Mr. Wright.
2            MR. MULLER:  Okay.  I think we've got the
3   wrong Exhibit 16.  Give me a second.  I'm going to have
4   my paralegal --
5            THE WITNESS:  You haven't printed any of
6   those.
7            MR. MULLER:  Okay.  Give me a second.
8   Give me one minute, Tim.
9            MR. CLEVELAND:  All right.  Let's go off
10  the record.
11           MR. MULLER:  Okay.
12           THE VIDEOGRAPHER:  Off the record.  The
13  time is 5:00 p.m.
14           (Break from 5:00 p.m. to 5:11 p.m.)
15           THE VIDEOGRAPHER:  Back on the record.
16  The time is 5:11 p.m.
17       Q.   (BY MR. CLEVELAND)  Mr. Wright, are you ready
18  to continue?  We just have a few more minutes of
19  questions for this evening, and then we will suspend and
20  continue tomorrow morning, okay?
21       A.   Yes.
22       Q.   Mr. Wright, how did you inform the McLeods
23  about the net profit interest agreements of Longbranch
24  and DMA Properties?
25       A.   I don't remember.

1    Q.   Okay.  But you did inform them of the
2    agreement?
3    A.   I have -- I told them there was a lawsuit
4    going on.  And I believe they read the lawsuit and
5    understood it all.
6    Q.   Okay.  Did the McLeods ever tell you that they
7    agreed with any interpretation you had of those
8    agreements with DMA or Longbranch?
9    A.   They never told me whether they agreed or
10   didn't agree.  All they were interested in at the time
11   was collateral.
12   Q.   Okay.  And did -- have the McLeods ever told
13   you anything about their investigation, if any, about
14   the lawsuit?
15   A.   No, they haven't.
16   Q.   Okay.  All right.  Looking at Exhibit 16, the
17   KrisJenn Ranch/Black Duck deed of trust, do you have
18   that in front of you, sir?
19   A.   Yes.
20   Q.   All right.  And on the date of this deed of
21   trust is -- as you can see on page 2 -- and I'll go up
22   there on my screen share -- the date of the deed of
23   trust here is August 14th, 2017, correct?
24   A.   Yes.  Yes.
25   Q.   Okay.  And why is that the date of this deed

                                    Page 261

1    of trust, August 14th, 2017?
2    A.   That was putting together the -- hang on
3    because there were two of them.  This was the -- the
4    total amount of money that KrisJenn Ranch loaned to
5    Black Duck to put up for the earnest money.
6    Q.   Right.  And why is the date August 14th, 2017?
7    That's my question.
8    A.   I'd have to see the date that we closed
9    because we wouldn't -- we didn't know the full amount
10   until after we closed or when we closed that was put up
11   for earnest money.
12   Q.   And you're talking about when we closed --
13   you're -- when you say, "when we closed," you're
14   referring to the sale of the right-of-way?
15   A.   Whenever Black Duck sold to TCRG, yes, sir.
16   No, whenever --
17   Q.   Well, hang on.
18   A.   Whenever Black Duck bought from -- from I'm
19   very tired.  I'm having a hard time.  I'm --
20   Q.   Well, we're almost done.  You're --
21   A.   I think --
22   Q.   You were about to say whenever Black Duck --
23   whenever Black Duck acquired from the Rod Roberts group?
24   A.   Correct.  Yeah.
25            I've made lots of errors in my testimony

                                    Page 262

1    in the last 30 minutes because -- trying to -- trying to
2    read all of this.
3    Q.   Okay.  And on that same page, it says that the
4    trustee is David Strolle.  What's your --
5    A.   Okay.
6    Q.   -- understanding of what it means to be the
7    trustee on a dead of trust?
8    A.   I'm sure --
9    Q.   What's your understanding of the role of the
10   trustee in a deed of trust, Mr. Wright?
11   A.   I -- I -- I think that's for notifications.
12   But it's been so long since I've done any real estate
13   that I'm having trouble recalling.
14   Q.   Okay.  And what's your understanding of what
15   the purpose of this -- this deed of trust document is,
16   sir?
17   A.   I'm not sure.  All I know is that the -- that
18   the 1.175 was the total of all earnest money.  That's
19   what I know.  And that was transferred from our minutes.
20   Q.   Right.  And that's the 1.175 million on the
21   next page that's referred to as -- that was lent by you
22   personally, correct?
23   A.   Yes, that is correct.
24   Q.   And then above that is reference to the
25   $4.1 million from --

                                    Page 263

1    A.   Correct.
2    Q.   -- Asilo, correct?
3    A.   Correct.
4    Q.   But that money was -- the lender on that loan
5    was Asilo to KrisJenn Ranch, right?
6    A.   We just -- that was the same amount, Asilo and
7    KrisJenn Ranch, yes, sir.
8    Q.   Okay.  But Asilo wired that money straight to
9    the seller of the right-of-way, right?
10   A.   Asilo wired some of that money to the
11   right-of-way.
12   Q.   But that money didn't hit Black Duck's
13   account.  It went -- and it didn't hit KrisJenn Ranch's
14   account.  That was wired by Asilo to the seller, right?
15   A.   Some of that was, yes.
16   Q.   Okay.  And so how did that loan from Asilo
17   become a 4.1-million-dollar loan from KrisJenn Ranch to
18   Black Duck?
19   A.   That was -- that plus all the costs was the
20   balance that was going to be owed to the Rod Roberts
21   company.
22   Q.   Right.  And my question is -- my question is:
23   How did the money loaned by Asilo turn into a loan by
24   KrisJenn Ranch, LLC, to Black Duck Properties?
25   A.   We made in the -- the notes or the minutes

                                    Page 264

1    that Black Duck would be borrowing the money from
2    KrisJenn.  And KrisJenn would be borrowing the money
3    from Asilo.  And then Asilo would wire the balance of
4    the -- of the loan.
5        Q.   And those -- those were in minutes of Black
6    Duck --
7        A.   Yes.
8        Q.   -- the company minutes?
9        A.   And --
10       Q.   And those were minutes --
11            (Unreportable crosstalk.)
12       Q.   Those minutes -- sorry.  Let me -- let me ask
13   about that.
14            Those minutes predated the closing on the
15   right-of-way?
16       A.   Yes, they did.
17       Q.   Okay.  Is that --
18       A.   It actually --
19       Q.   Are those documents you can --
20            (Unreportable crosstalk.)
21       Q.   -- bring with you tomorrow -- sir -- sir, let
22   me ask you.  Are those documents -- those minutes you
23   just referred to, documents that you can bring tomorrow
24   so we can talk about them since you're the corporate
25   representative?

                                        Page 265

1        A.   I -- I'm not sure or not.  It's -- you should
2    have waited until the end of the month is what I was
3    advised, that you were waiving all those privileges
4    because those were --
5            MR. CLEVELAND:  Well, Mr. Muller -- let
6    me ask -- let me ask you, Mr. Muller.  There's been a
7    lot of reference to Black Duck company minutes today by
8    this witness.  Do you have those minutes and are you
9    able to produce them to us so I can ask this witness
10   about them tomorrow?
11           MR. MULLER:  Yes, we do have them.
12   They're in a sea of other information, which our group
13   is processing.  No, I can't get them to you before the
14   30 days that's required to process them.  However, I
15   will look tonight.  I don't -- if it, in fact, is not a
16   large volume of information and it's not commingled with
17   a bunch of other stuff and I can just put my hands on
18   it, I don't have any problems doing that.  I will gladly
19   do that.  But I can't make that promise to you for
20   tomorrow.  This is why we encouraged you to give us a
21   little more time.  But I will make my best effort to do
22   it after hours today.
23           MR. CLEVELAND:  Okay.  I appreciate it.
24           MR. MULLER:  Yes.
25       Q.   (BY MR. CLEVELAND)  So, Mr. Wright, I'm still

                                        Page 266

1    not clear on how the Asilo loan turned into a KrisJenn
2    Ranch to Black Duck loan.  Like, who -- who did that
3    paperwork?
4        A.   David Strolle did that.  But you hired the
5    firm that did the loan.  So why don't you ask them.  I
6    figured -- I figured that's why y'all hired them.
7        Q.   Well, they're not -- they're not the witness
8    today.  You are, Mr. Wright --
9        A.   Well, you --
10       Q.   -- okay?
11       A.   You hired them with a conflict of interest.
12   You snuck in backdoor and hired the firm that did it.
13       Q.   Well, how did --
14       A.   That's --
15       Q.   -- the Asilo loan --
16       A.   I'm telling you.
17       Q.   Who decided -- who decided, Mr. Wright, that
18   the Asilo loan where the money was wired by Asilo to the
19   seller of the right-of-way would somehow be a loan by
20   KrisJenn Ranch to Black Duck Properties?
21       A.   That was done in the minutes by -- by the
22   members.  And Daniel Moore --
23       Q.   So who -- who are the members --
24            (Unreportable crosstalk.)
25       A.   Daniel Moore --

                                        Page 267

1        Q.   Okay.
2        A.   -- Hagan Cohle, and myself.
3        Q.   You-all made that decision together?
4        A.   We made that decision that all documents
5    necessary to get this closing done and that -- that
6    is -- we used that -- that e-mail as part of it.  It was
7    an agreement between all three parties to do that.  And
8    nothing was done --
9        Q.   Okay.
10       A.   -- illegal.  We asked Mr. Strolle to file
11   those.  And he filed them accordingly with his advice to
12   us.  And --
13       Q.   And when you're saying asked Mr. Strolle to
14   file those, are you talking about filing the deed of
15   trust?
16       A.   I -- I -- I didn't mean to say file them.  I
17   said to do those.  I meant to say do them.
18       Q.   Okay.  Okay.  I have another question about
19   this deed of trust.  If you can go to page -- I think
20   it's 26.  No.  It's going to be the 27th page of the
21   exhibit with your signature on the deed of trust, sir?
22       A.   It doesn't have my signature on this one.
23            I'm actually very, very tired with a
24   headache, and I'd like to end this today and start
25   again --

                                        Page 268

1    Q.   Let me ask you a couple of more questions
2  about this exhibit and we can --
3    A.   Do you not -- you don't care how I feel?  You
4  don't really care how I feel; it's apparent.  I don't
5  feel good.
6    Q.   I have a few -- I have a few more questions on
7  this exhibit.
8    A.   You apparently don't care how I feel.
9    Q.   Well, that's not true, Mr. Wright.  But I'm
10  trying to wrap up this exhibit so I can start on a new
11  topic tomorrow.
12       MR. MULLER:  Okay.  Twenty seconds.  Tim
13  has the right to keep you on the record until he
14  releases you.  It's his deposition.  If he wants to ask
15  you a few more questions, he has every right to do that.
16       Tim, he really is looking kind of worn
17  out.  And if you'll do us the courtesy of letting him
18  start up tomorrow, that would be great.  But I will
19  defer to you.  It's your deposition.
20    Q.   (BY MR. CLEVELAND)  All right.  Mr. Wright,
21  are you able to answer -- if Mr. Muller can direct you
22  to this page, the 27th page of this exhibit, can I ask
23  you three more questions about it, and then we'll be
24  done?
25    A.   I don't feel good.

Page 269

Veritext Legal Solutions
800-336-4000

---

1    Q.   All right.  Then we'll suspend and resume
2  tomorrow at nine o'clock in the morning.
3       MR. MULLER:  All right.  Thank you, Tim,
4  for that.  I appreciate it.  We will be ready tomorrow.
5  I'll look for these documents for you tonight.
6       MR. CLEVELAND:  Thank you very much.
7       MR. MULLER:  All right.  Bye-bye.
8       THE VIDEOGRAPHER:  This concludes today's
9  deposition of Larry Wright.  Going off the record.  The
10  time is 5:23 p.m.
11       (Deposition recessed at 5:23 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 270

Veritext Legal Solutions
800-336-4000

---

1            CHANGES AND SIGNATURE
2  WITNESS NAME:  LARRY WRIGHT
3  DATE OF DEPOSITION:  SEPTEMBER 29, 2020
4  PAGE LINE      CHANGE          REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 271

Veritext Legal Solutions
800-336-4000

---

1       I, LARRY WRIGHT, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
4
            _____
5              LARRY WRIGHT
6
7  THE STATE OF _____)
   COUNTY OF _____)
8
       Before me, _____, on this day
9  personally appeared LARRY WRIGHT, known to me (or proved
   to me under oath or through _____)
10  (description of identity card or other document)) to be
   the person whose name is subscribed to the foregoing
11  instrument and acknowledged to me that they executed the
   same for the purposes and consideration therein
12  expressed.
       Given under my hand and seal of office this
13  _____ day of _____, _____.
14
15
            _____
16              NOTARY PUBLIC IN AND FOR
               THE STATE OF _____
17              COMMISSION EXPIRES:_____
18
19
20
21
22
23
24
25

Page 272

Veritext Legal Solutions
800-336-4000

**Page 273**

```
 1            IN THE UNITED STATES BANKRUPTCY
            FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION
 3  In re:                    ) CHAPTER 11
                             )
 4  KRISJENN RANCH, LLC,      )
                             )
 5      Debtor              ) CASE NO. 20-50805
    _____)
 6
    KRISJENN RANCH, LLC,      )
 7  KRISJENN RANCH, LLC-SERIES)
    UVALDE RANCH, AND KRISJENN)
 8  RANCH, LLC-SERIES PIPELINE)
    ROW, as successors in     )
 9  interest to BLACK DUCK    )
    PROPERTIES, LLC,          )
10                            )
        Plaintiffs,           )
11                            )
    V.                        ) ADVERSARY NO. 20-05027
12                            )
    DMA PROPERTIES, INC., AND )
13  LONGBRANCH ENERGY, LP,    )
                             )
14      Defendants.           )
    _____)
15
    DMA PROPERTIES, INC.,     ) CHAPTER 11
16                            )
        Cross-Plaintiff/      )
17  Third-Party Plaintiff,    )
                             )
18  V.                        ) ADVERSARY NO. 20-05027
                             )
19  KRISJENN RANCH, LLC,      )
    KRISJENN RANCH, LLC-SERIES)
20  UVALDE RANCH, AND KRISJENN)
    RANCH, LLC-SERIES PIPELINE)
21  ROW, BLACK DUCK           )
    PROPERTIES, LLC, LARRY    )
22  WRIGHT, AND JOHN TERRILL, )
                             )
23      Cross-Defendant/      )
    Third-Party Defendants.   )
24
25                                     Page 273
```

**Page 274**

```
 1                REPORTER'S CERTIFICATION
                DEPOSITION OF LARRY WRIGHT
 2                 SEPTEMBER 29, 2020
 3       I, Kailee Pereida, a Certified Shorthand Reporter
 4  in and for the State of Texas, do hereby certify that
    the foregoing deposition is a full, true and correct
 5  transcript;
 6       That the witness, LARRY WRIGHT, was duly sworn by
    the officer and that the transcript of the oral
 7  deposition is a true record of the testimony given by
    the witness;
 8
         That the deposition transcript was submitted on
 9  _____ to the witness or to the attorney
    for the witness for examination, signature and return to
10  me by _____;
11       That the amount of time used by each party at the
    deposition is as follows:
12
         MR. JOHN MULLER - 00 HOURS:00 MINUTE(S)
13       MR. TIMOTHY CLEVELAND - 05 HOURS:27 MINUTE(S)
         MR. WILLIAM GERMANY - 00 HOURS:00 MINUTE(S)
14
         That pursuant to information given to the
15  deposition officer at the time said testimony was taken,
    the following includes counsel for all parties of
16  record:
17       MR. JOHN MULLER, Attorney for Plaintiffs,
            PLAINTIFFS, KRISJENN RANCH, LLC, KRISJENN
18  RANCH, LLC, SERIES-UVALDE RANCH, KRISJENN RANCH, LLC,
    SERIES-PIPELINE ROW;
19       MR. TIMOTHY CLEVELAND, MR. CHRISTOPHER S. JOHNS,
    and MS. CHRISTEN MASON HEBERT, Attorneys for FRANK
20  DANIEL MOORE AND DMA PROPERTIES, INC.;'
21       MR. WILLIAM GERMANY, Attorney for LARRY WRIGHT;
22       I further certify that I am neither counsel for,
    related to, nor employed by any of the parties or
23  attorneys in the action in which this proceeding was
    taken, and further that I am not financially or
24  otherwise interested in the outcome of the action.
25                                     Page 274
```

**Page 275**

```
 1       Certified to by me this 19th day of October, 2020.
 2
 3
 4
 5                  Kailee Pereida
 6       Kailee Pereida, Texas CSR 8398
         Expiration Date:  September 30, 2022
 7       Veritext Legal Solutions
         Firm Certificate Number:  571
 8       300 Throckmorton Street, Suite 1600
         Fort Worth, Texas 76102
 9       (817) 336-3042
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25                                     Page 275
```

**Page 276**

```
 1                FURTHER CERTIFICATION
 2
 3       The original deposition transcript with corrections
 4  ( ) was ( ) was not returned pursuant to the Federal
    Rules, and the ( ) original transcript ( ) copy of the
 5  nonsignature certificate to be attached to the
    attorney's copy of the deposition was hand-delivered to
 6  the custodial attorney, Mr. Timothy Cleveland, for
    safekeeping and use at trial.
 7       If returned, the attached Changes and Signature
    page contains any changes and the reasons therefor;
 8
         That $_____ is the deposition officer's
 9  charges to Mr. Timothy Cleveland, the Attorney for Frank
    Daniel Moore and DMA Properties, Inc., for preparing the
10  original deposition transcript and any copies of
    exhibits;
11
         That the deposition was delivered in accordance
12  with the Federal Rules of Civil Procedure, and that a
    copy of this certificate was served on all parties shown
13  herein.
14       Certified to by me this _____ day of
    _____, 2020.
15
16
17
18                  Kailee Pereida
19       Kailee Pereida, Texas CSR 8398
         Expiration Date:  September 30, 2022
20
         Veritext Legal Solutions
21       Firm Certificate Number:  571
         300 Throckmorton Street, Suite 1600
22       Fort Worth, Texas 76102
         (817) 336-3042
23
24
25                                     Page 276
```

```
 1   john@muller-smeberg.com

 2                October 19, 2020

 3   RE: Krisjenn Ranch, LLC v. DMA Properties, Inc.

 4   DEPOSITION OF: Larry Wright (# 4272507)

 5        The above-referenced witness transcript is

 6   available for read and sign.

 7        Within the applicable timeframe, the witness

 8   should read the testimony to verify its accuracy. If

 9   there are any changes, the witness should note those

10   on the attached Errata Sheet.

11        The witness should sign and notarize the

12   attached Errata pages and return to Veritext at

13   errata-tx@veritext.com.

14        According to applicable rules or agreements, if

15   the witness fails to do so within the time allotted,

16   a certified copy of the transcript may be used as if

17   signed.

18                Yours,

19                Veritext Legal Solutions

20

21

22

23

24

25

                                    Page 277
```

---

**[& - 23]**

| & | 11 1:3,15 5:16 | 177 5:15 | 2004 7:22 |
|---|---|---|---|
| **& 3:16** | 44:25 136:20 | 17th 141:14 | 2015 125:23 |
| **0** | 187:9,11,15,20,22 | 177:16 178:13 | 128:25 |
| 00 274:12,12,13,13 | 187:25 188:3 | 180:15 187:16 | 2016 85:13 161:12 |
| 000525 5:12 | 191:2 273:3,15 | 18 5:18 240:2,5,11 | 218:8 |
| 002216 5:13 | 111 3:5 | 240:19 247:21 | 2017 23:17 24:6 |
| 002944 5:10 | 11th 195:18 | 187 5:16 | 50:24 51:17 53:14 |
| 05 274:13 | 12 5:16 205:8,11 | 19 277:2 | 81:3 98:7,12 99:5 |
| 0745 139:18 | 205:13 210:24 | 191 5:15 | 107:8 115:10 |
| 0747 5:11 | 211:3,4,22 212:7 | 19th 275:1 | 165:11,16 166:7 |
| **1** | 229:13 | 1:43 134:19,22 | 168:16 178:5,14 |
| 1 2:5 5:9 14:24 | 125 5:11 | 1:49 140:24,25 | 180:8,18 184:18 |
| 15:2,3,24 16:9,18 | 1250 3:22 | 1:58 140:25 141:2 | 187:16 188:14 |
| 16:22 48:20 54:2 | 12:13 134:18,19 | **2** | 234:17 261:23 |
| 98:16 128:25 | 13 177:14 207:2 | 2 2:5 5:10 15:8 | 262:1,6 |
| 214:7,9,25 215:21 | 139 5:11 | 27:11,14,20 28:12 | 2018 195:21 |
| 215:25 217:21 | 13th 28:14 234:3 | 30:14 134:21 | 225:23 233:3 |
| 218:15,16 220:11 | 256:1 | 247:5 261:21 | 241:4 248:1 252:2 |
| 220:12,19 223:13 | 14 5:9 187:13,24 | 2,400,000 198:19 | 2019 24:4 29:1 |
| 242:18,20 244:8 | 207:2,3 | 2,425,000 198:18 | 30:4 147:24 |
| 244:11,15,22 | 14028 275:5 | 2.4 199:16 200:9 | 195:18 |
| 245:1,24 246:5 | 276:18 | 201:6,14,21 | 2020 2:4,11 5:13 |
| 1.1 202:19 | 14101 3:16 | 2.5 152:11 | 6:3 15:12 33:2 |
| 1.175 263:18,20 | 143 5:12 | 20 17:12 48:25 | 48:12 141:15 |
| 1.3 105:20 201:2 | 146 5:13 | 49:8,12 50:4,7 | 144:2 145:2 |
| 10 5:15 56:25 | 14th 144:2,5,25 | 63:8,9 150:10 | 147:20 148:11,15 |
| 177:10,12,23 | 146:2,15 261:23 | 153:18 154:16,25 | 271:3 274:2 275:1 |
| 179:1,25 180:8 | 262:1,6 | 156:5 157:14 | 276:14 277:2 |
| 180:15 181:8,17 | 15th 33:2 48:12 | 158:3 196:12 | 2022 275:6 276:19 |
| 183:25 185:16 | 16 5:17 197:14 | 198:9 200:8 | 205 5:17 |
| 186:16 188:5 | 198:4,7,9 259:3,5 | 214:13 216:14,21 | 21 89:7,9,15 |
| 100 45:17 92:23 | 259:10,14,20,23 | 222:24 229:11,19 | 243:24 244:3 |
| 109:12 158:6,7,8 | 260:3 261:16 | 239:17 | 216 3:6,23 |
| 172:1 213:15 | 160 5:14 | 200,000 50:15,15 | 145:6,12 |
| 100,000 50:7,10,15 | 1600 275:8 276:21 | 151:22 | 2215 146:20 |
| 150:23 151:17 | 17 5:18 81:13 | 20-05027 1:11,17 | 2216 146:20 |
| 108,000 47:22 | 104:21 119:2 | 273:11,17 | 22nd 75:9 195:21 |
| 10:28 70:18,19 | 178:11 235:1 | 20-50805 1:5 | 23 5:13 141:21 |
| 10:51 70:19,21 | 247:16,18,24 | 273:5 | 164:11 |
| | 249:7 252:13 | | |

                                           Page 1

---

**[23rd - able]**

| 23rd 148:15 149:7 | 306b 3:11 | 84:12 85:9 115:17 | 78209 3:6,23 |
|---|---|---|---|
| 24 166:17 | 32 5:10 | 115:18,19,22 | 78737 3:17 |
| 240 5:18 | 336-3042 275:9 | 220:7 252:17 | 78746 3:11 |
| 247 5:18 | 276:22 | 50/50 82:17 83:1 | 7th 241:4 |
| 25 166:18 252:15 | 399-3150 3:18 | 128:16 213:8,10 | **8** |
| 25,000 96:6,7 97:4 | 3:12 191:20 | 213:16 256:23 | 8 5:4,14 160:23 |
| 101:6,6 117:4,4 | 3:17 191:20 | 500 152:14,15 | 161:1 205:7 206:7 |
| 202:9,10 223:22 | 3rd 249:12 251:18 | 512 3:12,18 | 211:1,2,5,8,13,16 |
| 25,000.w 223:21 | 251:18 252:2,3 | 523 144:3 | 212:9 |
| 250,000 101:8,9 | **4** | 525 144:3 | 817 275:9 276:22 |
| 117:6 202:13 | 4 5:11 119:2 125:9 | 571 275:7 276:21 | 824-3278 3:23 |
| 259 5:17 | 125:10,11 127:19 | 5:00 260:13,14 | 8398 275:5 276:19 |
| 26 18:2,10 20:10 | 130:25 | 5:11 260:14,16 | 8th 147:20,24 |
| 75:22 166:14 | 4.0 156:20 | 5:23 2:11 270:10 | 148:10 |
| 268:20 | 4.1 100:20 114:20 | 270:11 | **9** |
| 27 5:10 274:13 | 120:20 202:20 | **6** | 9 5:15 191:6,7 |
| 271 5:5 | 204:6 263:25 | 6 5:12 29:8 49:25 | 195:7 205:14,25 |
| 274 5:6 | 264:17 | 50:1,4,14 57:12 | 206:10,13,16,21 |
| 27th 145:2 268:20 | 40 72:20,24 84:18 | 143:23,24,25 | 206:21,23 211:1,5 |
| 29 2:4,10 271:3 | 84:20,23,24 | 160:17 222:20 | 9.5 239:8,11,13,16 |
| 274:2 | 252:17 | 239:15 | 9/24 251:17 |
| 290 3:16 | 400 223:23,23 | 6.1. 164:15 | 95 143:21 |
| 29th 6:3 15:12 | 400,000 101:7,7 | 60 50:8 248:19 | 9:13 2:11 6:3 |
| 2:42 176:23,24 | 117:5,5 202:12,13 | 60,000 50:16 | 9:24 249:13,14,15 |
| 2:53 176:24 177:1 | 400a 3:17 | 66 168:17 | 251:15 |
| 2nd 129:16 | 410 3:22 9:17 | 664-5000 3:6 | **a** |
| **3** | 4611 3:10 | 689-8698 3:12 | a.m. 2:11 6:3 |
| 3 5:2,10 32:15,17 | 4:04 231:16,17 | **7** | 70:18,19,19,21 |
| 32:25 48:7,8,10 | 4:23 231:17,20 | 7 5:12 54:7,13 | abide 163:22 |
| 53:23,23 231:19 | 4th 248:1 251:19 | 146:17,19,21 | ability 9:20 14:25 |
| 3.4 136:3 | **5** | 147:2 | 16:4 58:4,21 |
| 3.5 222:22 239:16 | 5 5:11 17:24 | 725 3:22 | 81:23 138:19 |
| 30 20:20 63:7 66:2 | 139:13,16 141:7 | 745 141:8 | 181:18 |
| 75:22 165:19 | 202:2 | 747 139:18 141:9 | able 9:24 13:24,25 |
| 237:5 255:10 | 5.9 49:24 50:11,14 | 75,000 97:5 101:7 | 18:9 46:15 47:4 |
| 263:1 266:14 | 50:18 51:4 65:1 | 117:4 202:11 | 75:10,12,15 |
| 275:6 276:19 | 150:22 151:1,8,10 | 223:22 | 148:22 226:22 |
| 300 275:8 276:21 | 50 81:25 82:22 | 76102 275:8 | 255:1,7 258:1 |
| 300,000 98:17 | 83:4,9,18,21 84:1 | 276:22 | 266:9 269:21 |

                                           Page 2

---

**[absolutely - agreement]**

| absolutely 32:23 | acquired 23:17 | addresses 194:17 | 201:15 216:17 |
|---|---|---|---|
| 134:1 236:19 | 24:5 80:9 116:15 | admitted 222:19 | 216:5 217:13,17 |
| absurd 201:17 | 204:20 117:7 | adversary 1:11,17 | 218:17,18 220:1 |
| ac 219:3 | acquiring 95:16 | 23:2 273:11,17 | 223:12,13 225:10 |
| accept 224:8 248:6 | 99:4 | advice 41:2 42:6 | 229:11,21 241:7 |
| 248:10 249:20 | acquisition 52:9 | 61:24 64:17 65:3 | 242:19 244:25 |
| 250:6 | 52:24 82:2 | 65:9,10,11 66:13 | 245:9,23 251:22 |
| accepted 116:23 | acting 82:9,11 | 67:1,3,12,17,20,24 | 251:24 266:13 |
| account 45:5,16 | action 238:7 | 68:25 69:4,11,13 | agreed 29:21 |
| 45:17,18,19 46:21 | 274:22,23 | 83:11 117:14 | 79:15 82:16 83:25 |
| 47:12 100:10 | actions 181:24 | 120:5 158:18 | 84:12 86:5 90:22 |
| 121:4,4,5,9 264:13 | active 57:6 84:25 | 164:2 268:11 | 93:23 188:20 |
| 264:14 | 85:1 97:10 129:1 | advise 46:5 216:8 | 212:23 215:15,19 |
| accountant 45:13 | 129:2 | 216:12 | 220:3 223:7 |
| 45:15 253:24 | acts 164:17 | advised 121:16 | 241:19 250:22 |
| accountants 256:4 | actual 46:19 102:9 | 149:21,24 164:4 | 256:7 |
| 257:18 | 103:5 172:13 | 187:4 266:3 | agreeing 182:3 |
| accounting 253:18 | 221:17 222:10 | affairs 166:4 | agreement 5:14,15 |
| 253:20,24 254:12 | adam 4:2 7:3 18:9 | affect 9:20 | 5:16,18 17:6,20 |
| 254:14,17 257:2 | 18:17,25 19:2 | affidavit 45:20 | 18:5 22:1 23:12 |
| 257:10 | 20:4 22:14 30:25 | affidavits 46:8 | 23:22,23 24:4,11 |
| accuracy 46:8 | 31:3 32:2 33:2 | affirmative 166:25 | 25:13 26:5,18,25 |
| 277:8 | 36:9,16 47:25 | 167:4 168:13 | 26:25 27:3 29:2,5 |
| accurate 128:24 | 48:11,21 53:17 | 171:13 172:17 | 29:15,20,24 30:3 |
| 129:2,3 162:8 | 80:5,15,17,18,20 | affirmatively | 30:10,14 31:1 |
| accuse 159:7 | 138:21 141:14 | 82:25 169:20 | 49:9,15,19 53:19 |
| accused 59:21,24 | 142:3,3,10,22 | affix 272:1 | 55:16 60:3,10 |
| 60:4,11 61:5 | 143:11,14 144:12 | agent 42:5 82:10 | 61:4 84:7 124:20 |
| 205:16 207:22,25 | 146:1 149:3 | 82:12 164:17 | 131:1 142:6,9 |
| 208:7,13,21 | 152:15 | ago 22:18 25:24 | 144:7 146:12 |
| 209:16 230:25 | add 131:20 155:14 | 56:6 77:2,7,8 | 148:4 191:10,13 |
| 231:3 | 246:13,17 | 191:15 193:22 | 156:25 157:19 |
| accusing 208:24 | added 130:10 | agree 10:8 26:3 | 160:17 161:2,10 |
| 209:14 | 204:17 | 30:5 32:12 62:3 | 156:25 157:19 |
| acknowledged | adding 29:5 | 62:11,11 72:14 | 160:17 161:2,10 |
| 272:11 | additional 207:16 | 74:20 75:20 76:20 | 161:16,21 162:8 |
| acquiescence 120:1 | 208:17 209:12 | 79:14 81:17 82:25 | 163:3,9,13,19,25 |
| acquire 27:6 51:24 | address 9:15 | 130:3 131:25 | 164:7 166:12 |
| 52:7,21 53:5 98:6 | 75:22 | 132:4 136:17 | 168:11 176:9,10 |
| 150:19 213:1 | addressed 12:1 | 179:2 189:21 | 176:10,14,16 |
| | 25:24 173:24 | | 184:4 191:10,13 |
| | | | 195:8,14,18,23 |

                                           Page 3

## [agreement - argument]

196:21 197:8
198:25 206:1
207:6 212:14,24
213:6,17 214:4
215:3,8,10,20
216:15 217:10,11
218:4 219:9,19
221:9,10,12,17,17
222:9,10,15
223:17 224:4,7
226:5,21,22
229:19 237:22
238:23,25 239:1,2
239:3,5,7 240:6,20
240:24 241:3,10
241:10,24 242:2,7
242:9,12,22 243:1
243:3,10,12,20
244:3,16,18,24
246:11,15 247:1
252:12,19,22,23
252:24,25 253:1,2
253:4,5 256:9,15
256:19,23 261:2
268:7
**agreements** 17:11
17:12 23:8 26:8
26:17,18,24 30:17
31:1,2,13,14
156:5 157:22
196:8,23 197:20
202:22 218:6
224:14 252:9,9,10
253:3 260:23
261:8 277:14
**ahead** 7:23 38:19
39:25 49:15,16
51:21 90:18 91:16
97:9 218:24
**a1** 178:23

**alive** 158:6
**alleged** 121:19
159:1 165:22
169:10 208:9
227:8
**allotted** 277:15
**allow** 52:6,21
53:13
**allowed** 7:10 42:9
**amateur** 87:1
**amount** 45:7
47:12 51:12,23
96:21 118:23
202:14,14 203:16
204:17 253:19,21
255:16 256:8
257:12 262:4,9
264:6 274:11
**amounts** 200:18
**announce** 7:2
**announcement**
22:8
**annual** 187:5
**answer** 12:17 13:7
21:11
12:17 13:7 21:1
23:20 33:25 34:10
35:23 36:6 37:1,3
37:12,14,18,20,20
37:21,22,23 38:6,6
38:7,8 39:1,3,8,23
39:23 40:23 41:12
41:24,25 42:12
43:9,10,18,19,25
44:2 61:17 62:24
64:5 65:7 66:8,22
67:6,15 71:8
76:14,23 78:4,23
90:13 105:23
114:10,17 127:14
154:18,21 155:3,4
155:4,8,10,14

162:25 163:5
164:9 175:11
183:13,15 184:23
185:13 190:9,17
193:16,17 197:11
220:7,21 223:11
225:5 228:2,4
230:2,3,11,17,23
242:10,13 246:18
256:12 258:2
269:21
**answered** 110:6
**answering** 10:19
12:16 39:21 41:6
228:7
**answers** 9:25 10:6
12:8,16,19 227:1,4
**antonio** 1:2 3:6,23
9:8 273:2
**anybody** 8:11,13
36:8 60:24 61:12
61:20 62:21 63:2
63:24 77:5 131:12
131:12 136:8
158:5 192:6
**anymore** 209:12
**anyway** 71:17
**apiece** 151:22
**apologize** 148:6
**apparent** 30:2
269:4
**apparently** 269:8
**appear** 142:1
**appearances** 5:2
6:9
**appeared** 272:9
**appearing** 11:16
**applicable** 95:22
277:7
277:14

**application** 44:16
257:21
**applied** 163:13
**applies** 254:15
**apply** 154:11
163:19
**appreciate** 16:15
25:14 38:17 67:19
71:19 102:18
105:23 113:4
130:20 182:7
183:18,20 266:23
270:4
**appreciative** 94:1
94:4,16,18
**apprised** 232:11
**approval** 69:16
113:6 172:1,5
174:11,21,25
175:6,21 180:6
**approvals** 172:10
**approve** 64:1 83:2
82:21 167:5
169:21 171:2,13
172:18 190:4,14
190:16,17 224:16
245:5 248:6,11
249:20 250:7
**approved** 81:6,8
129:12 224:7,17
241:8,9 250:9
**approving** 173:4
173:18,23
**april** 5:13 144:2,5
144:25 145:2
146:2,15 148:15
149:7
**arbitrarily** 69:16
**area** 108:14
**argument** 189:10

## [arrow - authorized]

**arrow** 27:19
**asilo** 51:16,24 52:2
52:6,21 53:5,8
80:20,23 81:2,17
99:24 100:20
101:11,15,21
102:6,14,19,20
103:2,3,3,4,6,7,9
103:13,15,24
104:5,18,22 105:9
106:12,13 107:12
107:13,17 108:5
108:11,25 109:16
109:20,22 110:6,13
110:16,25 117:16
118:24 119:6,9,11
120:16,19,23
121:17 170:7
201:13 259:17,20
264:2,5,6,8,10,14
264:16,23 265:3,3
267:1,15,18,18
**asks** 61:19
**aspect** 180:4
**asset** 89:13 234:19
41:20 65:9,14
72:9 112:16 132:9
135:17 169:23
170:4 203:19
227:5 239:10
245:4 254:11
268:10,13
**asking** 10:21,25
11:5 20:18 31:15
34:19,21 37:7
38:14 39:15,15,19
39:22 41:10,12
42:23 61:20 67:20
67:21,22 72:13,13
76:17 77:23 78:1
78:12 85:3 111:19
114:7 116:10,11

117:23 131:5,11
133:3,5 135:18
138:11 142:21
144:22 152:18
153:3 154:8,10,19
156:1,24 157:1,3
157:21,25 161:23
168:10 174:6,18
175:3,4,13 179:17
181:1,2,3,21,22,22
182:15 183:6
185:5,8 190:7
192:13 193:19
197:25 201:19
204:9 206:8,10
212:17 214:23
218:2 221:4
223:25 230:11
236:16 242:3
256:11 257:25
258:15
**assert** 89:13 234:19
**assets** 52:4,8,23
85:22 130:4
132:19
**assign** 212:13
**assigned** 227:18
227:19
**assignee** 241:3,14
217:14 219:4,23
**assignment** 5:16
18:5 22:2 204:22
205:4 206:7,25
210:24 211:8,19
212:6,7,9 213:2
223:14 226:11
227:7 229:20,24
241:23 243:9,12

244:12,16
**assignments**
227:17
**assignor** 214:10
**assigns** 214:15,19
215:19 216:17
214:24 215:11,16
215:20,25 216:6
217:14,15,21
218:17,23 219:7
224:5,20,25
225:12 226:6
242:20 245:25
246:4
**assist** 238:16
**associated** 165:4
**association** 165:2
**assume** 157:8
157:3 239:15
**assuming** 55:25
250:3 254:5
**assumption** 5:17
56:1 157:4
**assumptions** 157:7
157:7
**attach** 244:14,21
244:22 245:1,16
245:20
**attached** 118:19
186:20 276:4,7
277:10,12
**attaches** 245:7,12
**attachments**
141:22,25 142:3
**attention** 70:25
89:4 92:8 95:1
**attorney** 29:25
30:8 38:12 43:11
49:9 67:1 102:4
108:19 117:13,18
118:13 120:9,9
125:4 142:24
148:18,21 158:17

162:10,11,15
163:10 164:2,4
169:23 170:1,1
171:6 176:17
184:10,14,14
185:17 186:23
187:4 215:17
216:7 242:1 252:8
274:9,17,20 276:5
276:9
**attorney's** 23:1,5
37:31 79:1 83:11
276:5
**attorneys** 31:4,11
36:8 38:4,9 41:19
61:13,21 62:20
70:23 117:12
158:19 219:17
220:20 230:5
234:7 274:12,22
279:6
**audio** 134:24
**august** 98:12 99:5
165:11,16 234:17
261:23 262:1,6
**austin** 3:11,17
97:19 100:10
**authority** 114:2,13
125:5 169:11,23,24
170:6,9 178:19
179:2,18 190:21
**authorization**
112:22 179:7
179:8 180:9,17,23
182:10 183:2,9,25
185:17 186:4
203:24
**authorizations**
180:6
**authorize** 166:24
**authorized** 69:19
167:8 180:16,22

## [authorized - believe]

189:3 202:18
203:3,11,14
204:15
**authorizing**
170:12 181:15
184:1
**auto** 21:15
**availability**
128:13
**available** 46:18
129:21 277:6
**avenues** 113:17
**avoid** 138:24
255:25
**avoided** 137:23
**aware** 11:15,20
84:19 85:4 91:18
122:4 203:1,15
222:21 229:18
231:2
**awhile** 70:11

**b**

**b** 164:25 165:7
244:8,11,15,22
245:1,24 246:5
**back** 8:15 12:25
23:17 24:6 38:1
48:6 50:24 51:17
52:15,19 53:22,23
54:19 59:11,11,12
59:18 70:20 72:5
80:12 81:2 83:14
84:15 96:20 98:18
98:25 107:8
109:24 131:12
134:21 141:1
148:7 150:22
151:1,4,8 168:4,16
172:21 176:25
178:11 182:21
185:20 186:17

188:13 191:22
192:24 193:15,25
196:17,19,25
197:7 199:24
205:19 206:10,18
206:19 218:8
219:6 226:24,25
227:11,14 231:19
234:16,21 237:12
248:18,20 251:8,9
251:11 252:14
253:9 255:5
260:15
**backdate** 158:15
**backdated** 121:20
122:2,5
**backdoor** 55:9,17
55:24 56:9,15
267:12
**backed** 96:22
159:4
**background** 80:1
**bad** 86:14 116:8
142:11 241:13
**bags** 98:18,25
**balance** 150:11
264:20 265:3
**bank** 45:5 69:24
97:14 100:10
121:4,4,5,9 227:18
256:5
**bankruptcy** 1:1
7:21 14:20 23:1
33:23 34:2,6,12
35:7,18 36:8,13,24
37:11,17 38:3
39:6 40:21 41:2
42:6 43:5,16,23
44:8,22,25 45:19
46:6 47:5,6,9,11
47:13,18,24 48:2

56:13,20 61:14,15
61:21 62:22 63:3
64:3,14 65:5,24
66:1,4,13 67:14,16
67:22 69:10,16,18
89:13 117:18
135:6,13,16,25
136:10,16,20,21
137:1,4,11,23,23
138:24 139:11
144:17 145:2,7
149:8,15,22 239:9
273:1
**based** 13:7 42:6
50:10 124:1
151:23 155:9
244:6
**basically** 18:14
93:25 112:14,15
144:18 146:2
146:20
**bathroom** 176:19
**batted** 118:1
**battery** 199:20
**bayne** 3:21
**bear** 146:19
**bears** 146:19
**beat** 203:22
**becoming** 82:21
**bee** 3:10
**began** 75:9
**begged** 159:12
**beginning** 1:21
72:9 85:12 132:7

134:21 214:15
231:19
**begins** 6:1
**behalf** 6:13,13,16
6:19 15:22 16:6
18:3 25:25 26:9
56:16 82:16 84:8
85:8 135:3 136:8
164:18 169:22
170:9 178:19
179:3,18 188:19
189:4 190:14
191:3 241:7,24
244:25 258:14
202:15,17
205:25 206:7
258:11
**belief** 175:23
182:21
**believe** 7:12,21
18:13,15,23 20:8
22:18 29:11 38:11
40:16 47:21 48:5
48:13 49:25 53:17
53:18 59:6 63:13
65:22 69:20 73:14
78:17 81:14 85:7
94:23 101:23
102:10 106:23
109:15 113:16
114:12 127:22,24
129:14 137:8,18
137:19 142:5,15
143:14,20,22
147:13 148:17,24
149:1,21 150:5
162:18 173:19
189:2 192:10
196:6 252:11
253:15 256:2
261:4

## [believed - bottom]

**believed** 97:8,9
**benefit** 99:14,16
99:19 100:13
105:16 117:1,2,7
131:9
**best** 9:24 10:10
13:15 16:4 37:10
69:22 71:10 88:9
109:17 123:2
138:12,14,15,19
139:9 173:16
232:1 266:21
**better** 72:16 140:8
221:16 238:2,12
**bifurcate** 12:5
**big** 86:20
**bigfoot** 248:15
**bind** 161:16
221:11 242:19
245:24
**binder** 159:24
177:8 205:5,8
240:18 247:22
**binding** 215:3,4,8
215:10 224:4,19
224:25 226:5
**binds** 225:11
246:3
**bit** 28:6,9 65:19
71:2 94:12 95:23
113:25 127:7
140:10 150:10
184:20 268:1
**black** 1:9,21 5:14
23:17 24:5 50:23
51:24 52:3,6,6,8
52:21,21,22 53:13
173:17,20,23
174:3,10,20 175:3
175:5,20 176:10
176:14,16 178:9
83:1,9,18,22 84:7
84:13,19 85:5,10

85:13,19 86:6,8
88:4,11 95:3 99:4
99:16,16,19
100:13,14,16
102:12,22,23,24
103:8,10,17,20
104:7,11 105:12
105:16,18,22
106:3 111:5,10,12
111:16,16,17,21
112:5,22 113:6
114:2,13,23 115:9
115:16,17,19,25
116:4,6,14,14
117:1,3,7 118:4,15
118:18,20 119:17
119:15,17,20
120:6,8,8,9 121:19
121:19,22,23
122:7,13,14,24
123:8,21 124:14
124:20 125:5,25
125:25 129:7,7,12
132:4,5 225:11
226:12,15,23
226:24 228:8,24
229:24 230:5,15,16
231:8,11,13,16
232:16 235:2
236:2 237:3,23
238:4,6,18 239:9
239:18 240:2,5,8
240:21,25 241:5,9
241:13 242:2,5
242:10,16 243:7,8
244:18,19,24
245:6,9,11 246:11
246:13,16,23 247:1
247:13,18,24 248:2

180:16,23 181:9
181:18,24 182:1
182:2,10 184:2,5
186:21 187:1,7
189:3 193:18
194:18,23 195:22
196:1,5,10,10,12
196:14,21 197:15
197:24 198:3,10
198:11,17 199:5
199:16 200:10,16
200:23,24 202:4
202:15,17 203:25
205:25 206:7
204:15 207:23,25
208:21,23,24
209:22 212:13,22
212:23 213:5,16,20
213:16,24 220:2,10
221:6 222:13,14
223:14 224:11
226:12,15,23
231:4,8,11 232:16
235:2 236:2 237:3
238:4,6,18 239:9
239:18 240:2,5,8
240:21,25 241:5
241:9 259:17 261:7
262:5,15,18,22,23
264:12,18,24
265:1,5 266:7

267:2,20 273:9,21
**blew** 187:17
**blow** 140:9
**blows** 257:20
**bonds** 257:20
**book** 173:19
**books** 111:17
**border** 57:5
**borders** 4:2 6:20
6:23 48:25 49:7
49:10,11 50:3,15
54:6,17,18 55:1,16
55:21 57:5 60:1
89:3 92:10,11,20
92:23 93:1,5,10,16
93:25 94:2,5,13,17
95:1 96:19,19,20
100:12 134:12
142:20 146:12
154:23 160:5
161:3,16,24
163:5,16,24 236:9
**borrow** 59:10
107:22
**borrowed** 52:2
57:17 100:8
103:10 105:18
**borrowing** 102:24
265:1,2
**bottom** 22:21 33:9
48:20 54:2 125:15
125:15 126:10
172:11 141:19

## [bottom - chris]

| | | | |
|---|---|---|---|
| 147:19 148:1 | **businessman** | **caption** 14:14 | **chain** 207:4 |
| 195:13 249:15 | 107:22 247:8,9 | **card** 272:10 | **chance** 34:19 |
| **bought** 59:17 93:7 | **buy** 59:2,13 85:22 | **care** 233:12 | 44:10 95:7 125:17 |
| 138:3,7 222:12 | 88:11 95:17 98:12 | 252:18 269:3,4,8 | 125:20 126:9 |
| 262:18 | 116:24,24 | **cared** 256:5 | 127:18 142:11,17 |
| **bound** 161:16 | **buyback** 51:13 | **careful** 49:5 | 219:8 230:12 |
| 162:22 163:3,6 | **buyer** 82:13,14 | **carolina** 87:10,12 | 254:6 |
| **bounds** 86:19 | 93:7 95:21 130:18 | 98:19,25 227:14 | **change** 78:15 |
| **brag** 87:9 | 237:17,20,24 | 251:11 | 157:22 199:16 |
| **bragged** 85:21 | **buyer's** 82:10,12 | **carried** 156:20 | 228:16,20,25,25 |
| 87:14 | 82:12 | 197:14 198:10 | 271:4 |
| **brak** 38:21 70:8 | **buyers** 95:19 | **carry** 184:1 | **changes** 5:5 271:1 |
| 70:19 133:25 | 129:20 131:2 | **case** 1:5 12:2 | 276:7,7 277:9 |
| 134:4,15,19,24 | 133:16 223:19 | 14:14 23:24 60:8 | **chapter** 1:3,15 |
| 140:25 176:19,24 | 237:17 | 75:23 95:14 146:2 | 44:25 136:20 |
| 177:3 179:16 | **buying** 29:7 58:9 | 146:13 180:7 | 273:3,15 |
| 191:20 192:4 | **bye** 270:7,7 | 224:4 228:10 | **characteristics** |
| 231:1,17 259:8 | | 273:5 | 128:15 |
| 260:14 | **c** | **cash** 198:12 201:2 | **characterization** |
| **breaking** 255:5 | **c** 3:1 | **cause** 2:10 21:16 | 87:18 |
| **breath** 183:8,24 | **cable** 87:12 | 172:5 | **charge** 199:21 |
| 184:5 | **call** 89:24 130:13 | **caused** 61:13 | **charges** 276:9 |
| **briefly** 11:23 | 138:23 148:18 | **cave** 3:10 | **charleston** 87:11 |
| **bring** 70:25 85:25 | 158:15 203:2 | **cedillo** 142:25 | **chat** 13:23,25 14:9 |
| 88:4 89:4 91:6 | **called** 22:20 23:24 | 143:10 149:1,20 | 28:1 |
| 129:20 130:18 | 76:16 95:22 126:5 | **cell** 19:10 | **chebert** 3:19 |
| 131:2 175:8,9 | 164:11 200:21,21 | **certain** 21:17 60:4 | **check** 8:14 80:1 |
| 254:11 265:21,23 | 210:8 | 163:20 195:22 | 108:14 254:15 |
| **broad** 183:25 | **calling** 209:23 | 258:13 | **checked** 19:5 |
| **brought** 92:8 95:1 | **calls** 35:24 | **certainly** 7:10 | **checks** 253:22 |
| 123:13 134:7,11 | **camera** 28:6 | **certificate** 5:6 | **children** 68:20 |
| **build** 58:4 59:7 | **capacity** 11:17 | 275:7 276:4,12,21 | **chime** 129:10 |
| **building** 59:7 | 12:13 24:22 25:3 | **certification** 277:1 | **chimes** 129:15 |
| **built** 58:22 | 42:5 72:13 258:20 | 276:1 | **chips** 129:6 |
| **bunch** 96:5,8 | **capital** 57:17 | **certified** 147:13 | **choice** 81:18 129:6 |
| 195:20 266:17 | 152:2,9,13 153:2,5 | 253:24 256:3,10 | 129:6 |
| **business** 80:5 86:6 | 153:16 154:12,22 | 257:18 258:7 | **choices** 129:5 |
| 88:19 91:22 93:22 | 154:23 156:3,15 | 274:3 275:1 | **choose** 129:17 |
| 96:2 97:12,13,18 | 157:12,25 158:1 | 276:14 277:16 | 249:1 |
| 128:9 129:5 | 158:16 195:1 | **certify** 274:4,21 | **chooses** 129:18 |
| 130:14 201:11 | 201:5,13,20 | | **chris** 6:18 250:17 |
| | 204:12 | | |

## [christen - close]

| | | | |
|---|---|---|---|
| **christen** 3:15 | 258:15 267:1 | 76:2,4,9,15,19,21 | 199:23 200:1,4 |
| 274:19 | **clearly** 74:16 | 76:24 78:1,11,14 | 201:19,25 203:7 |
| **christie** 6:19 | **cleveland** 3:9,10 | 78:24 79:8 82:5 | 204:21 205:3,7,12 |
| **christopher** 3:14 | 5:4 6:18,18 7:14 | 83:16,17 90:7,9,19 | 206:18 207:9,12 |
| 274:19 | 7:24 8:5,17,20,24 | 90:24 91:5,9,11,17 | 206:23 207:7,9,12 |
| **city** 232:4 | 12:21,24 13:3,5,12 | 103:23 104:14 | 212:3 214:23 |
| **civil** 2:14 276:12 | 13:21 14:3,10,12 | 110:1,4,7 111:14 | 216:20 218:1 |
| **cjohns** 3:18 | 23:16,20 24:3,8,14 | 112:15 112:2,4,11 | 219:2 220:18 |
| **claim** 152:1 153:1 | 24:17,19,20,24 | 113:3,12 114:7,16 | 221:22,24 222:1 |
| 179:2,7 181:9,23 | 25:4,9,15,16,21 | 114:21,22 115:5,8 | 223:8,10,12 |
| 185:17 186:1 | 26:4 27:10,24 | 115:14 117:20,22 | 224:14,23,24 |
| 209:2 210:6,6 | 28:4,10,11,22,25 | 122:1,9 123:14 | 224:4,10,25 226:3 |
| 228:10 | 31:8 32:9,14,23,24 | 125:16,19 127:1,5 | 227:25 228:6,18 |
| **claimed** 88:6 | 33:14 34:1,9,17 | 127:10,15 132:16 | 229:15 231:10,14 |
| **claiming** 51:15 | 35:5,13,17,21 36:1 | 134:1,6,14,23 | 231:21 233:13 |
| 184:9 209:3,10 | 36:3,12 37:2,6,25 | 136:22 137:6,16 | 233:4 238:19 |
| **claims** 59:22 200:3 | 38:16,20,23 39:1 | 138:3,14,20 139:5 | 240:3,9,15,18,21 |
| 207:13,20 209:20 | 39:10,14,18,22 | 139:17,20 140:11 | 242:15 243:5,6 |
| **clarification** | 40:1,3,6,9,11,24 | 140:13,15,20 | 244:20 245:14 |
| 194:21 248:16 | 41:4,6,9,15,17 | 141:3,20,22,24 | 246:9,25 247:20 |
| **clarified** 25:14 | 42:2,11,15,17,20 | 143:1,11 145:1,16 | 247:24 254:19,23 |
| 118:25 | 42:21 43:7,13,20 | 145:23 146:5,14 | 255:9,13 257:11 |
| **clarify** 11:14 24:23 | 44:1,18 46:23 | 150:12,25 152:5,6 | 258:9,25 259:4,7 |
| 68:9 72:10,11,15 | 50:9 51:14,21 | 152:8,17 153:12 | 259:10,13,22,23 |
| 100:17 250:6 | 52:5,13,14 53:2,4 | 155:6 156:12,22 | 259:25 260:9,17 |
| **clarifying** 118:22 | 53:21 55:21 56:18 | 157:21 158:1 13 | 266:5,23,25 |
| 118:2 | 56:23 57:16 58:12 | 159:8,19,20,23 | 269:20 270:6 |
| **clarity** 91:6 98:3 | 59:4,5,6,15 60:2,9 | 160:2,3,10,15,25 | 274:13,19 276:5,9 |
| **classes** 157:5 | 60:14,21 61:1,3,10 | 160:24 164:10 | **clevelandterraza...** |
| **clauses** 195:20 | 61:18,25 62:6,8,10 | 172:15 176:20 | 3:12 |
| **clean** 31:24 62:18 | 62:13,15,17,25 | 177:2,7,11,19,21 | **client** 35:25 38:12 |
| 116:17,21 117:10 | 64:6 65:8,15,20,21 | 183:16,19,22 | 54:17 91:14 |
| 117:12,22 | 66:6,9,19,23 67:7 | 184:21,24 185:6 | 221:21,23 222:17 |
| **cleanup** 118:1 | 67:13,18 68:3,6,8 | 185:11,14,15,24 | 223:1,4 225:16,20 |
| **clear** 60:7 71:16 | 68:13,16,19,22,23 | 185:25 186:13,15 | 236:5 |
| 75:3,3,6,8 89:14 | 69:7 70:4,6,9,11 | 187:12,14,19,20 | **client's** 222:22 |
| 91:13 104:4 119:6 | 70:14,23 71:11,20 | 187:24 188:3 | **clients** 236:7,11 |
| 120:13 145:25 | 71:25 72:4,6 | 190:10,24 191:8 | **close** 81:23 85:23 |
| 175:18 181:6 | 73:10,17,18 74:2,5 | 191:12,18,21,24 | 87:15 92:11 96:9 |
| 193:6 194:15 | 74:13,20 75:2,5,19 | 192:2,3 198:16 | 98:17 102:25 |

## [close - consideration]

| | | | |
|---|---|---|---|
| 103:17 105:19 | 168:8 178:17,18 | **communicating** | **conclusions** 35:24 |
| 106:23 108:17 | 184:1 189:12 | 57:21,25 | **condition** 238:6 |
| 109:13,16 113:22 | 226:10 268:2 | **communication** | **conditions** 248:6 |
| 116:4,14 170:14 | **coincidence** | 31:7 41:19 76:18 | 248:11 249:20 |
| 170:15 172:2,2 | 149:18 | 98:21 143:22 | **conduct** 163:14,20 |
| 178:21 181:18 | **cole** 128:8 | 185:16 | **confer** 39:4 43:14 |
| 182:22 189:9 | **collateral** 79:7,9 | **communications** | **conferring** 78:8 |
| 198:15 202:20 | 79:11,16,20,23 | 18:4 20:11,24 | **confess** 7:20 |
| 237:6,15 242:2 | 80:21 107:14 | 21:25 62:2 75:22 | **confidence** 58:3 |
| **closed** 45:18 81:22 | 261:11 | 112:17 | 58:13,20 |
| 86:23 99:4 102:12 | **collected** 21:3,6,8 | **company** 5:14 | **confirm** 161:9 |
| 105:17 112:10 | 69:21,24 | 21:22 42:5 83:23 | **conflict** 108:21 |
| 113:14,16 116:7 | **collecting** 21:23 | 84:7,25 86:19 | 117:17 164:18 |
| 120:12 123:22 | 21:23 | 87:11,12 97:19 | 267:11 |
| 159:5 172:16,25 | **collectively** 22:22 | 104:1 148:23 | **conflicts** 164:11 |
| 174:12 178:8 | 129:22 130:17 | 139:9 160:17 | **confused** 20:17 |
| 182:11 184:12 | **college** 156:21 | 161:2,10,21 162:8 | 72:14 86:13 |
| 196:22 220:16 | 157:5 251:4 | 165:1,1 166:12,21 | 137:13 168:7 |
| 265:14 268:5 | **come** 53:22 97:20 | 166:24 168:11 | 226:25 |
| **coffee** 177:6 | 121:3 122:19 | 172:16 174:3 | **confusing** 16:14 |
| **cohle** 63:23 87:4 | 123:17 184:11 | 176:9,10,14,16 | 65:19 68:10,21 |
| 88:2 93:13 108:17 | 220:14,20,22 | 200:14 203:25 | 69:4 71:5,7,12 |
| 112:16 113:10 | 221:3,5 223:6 | 216:22 217:2,4 | 100:4 104:8 106:4 |
| 125:12 126:19 | 235:6 | 264:21 265:8 | 107:4 137:15 |
| 127:21 128:24 | **comfortable** 89:12 | **company's** 164:17 | 146:9 165:23 |
| | 91:1 | **complaint** 140:3,4 | 256:14 |
| | **coming** 84:21 | **complete** 6:25 | **confusion** 13:19 |
| | 119:22 204:3,14 | **comply** 84:17 | 73:23 119:22 |
| | 255:5 | **compound** 13:18 | **connected** 80:3 |
| | **commercial** | **compromise** 5:15 | 87:10 |
| | 247:13 | 199:12 195:8 | **connecting** 51:9 |
| | **commingled** | **con** 181:16 | **connection** 51:9 |
| | 266:16 | **concentrate** 97:1,6 | **consequence** |
| | **commission** | **concern** 188:6,11 | 98:14 206:2 |
| | 272:17 | **concerns** 23:24 | 207:13,19 |
| | **communicate** | **concludes** 270:8 | **consider** 247:8 |
| | 62:21 | | 250:8 |
| | **communicated** | | **considerable** |
| | 18:16 20:6 31:3 | | 222:18 |
| | 31:18 32:1 250:15 | | **consideration** |
| | | | 214:8 242:18 |

## [consideration - counsel]

| | | | |
|---|---|---|---|
| 257:23 272:11 | **contributed** 51:23 | 109:8 110:15 | 139:18,19 141:13 |
| **considering** 115:1 | 52:5,20 | 127:19 141:9,13 | 141:15 142:2 |
| **consis** 49:6 | **contribution** | 142:2 178:1,2 | 145:3,12 147:4 |
| **consist** 129:16 | 53:13,16 152:3,10 | 186:19 223:1 | 148:8,11,12 149:9 |
| 130:8,21 131:16 | 153:3,5,17 154:13 | 253:22 276:4,5,12 | 151:7 161:17 |
| 132:1,11 133:10 | 154:22,24 156:3 | 277:16 | 166:22 171:17 |
| **consistent** 49:6 | 156:15 157:12 | **copying** 48:21 | 176:15 179:10,22 |
| 199:5 | 158:1,2,16 195:2 | 186:9 | 185:21 195:18 |
| **constitute** 114:12 | 201:14,20 | **cor** 34:18 | 197:11,12,16 |
| **constituted** 112:22 | **contributions** | **corp** 12:12 218:22 | 214:6,12 218:22 |
| 171:1 | 152:14 201:5 | **corporate** 11:17 | 241:1,4 244:10,13 |
| **constitutes** 181:17 | 204:12 | 13:8 16:2 20:10 | 248:7 255:19 |
| **consult** 40:19 | **controlling** 14:18 | 20:19 25:5,18 | 261:3 262:24 |
| 43:20 | 27:20 | 34:9,18,20 44:20 | 263:22,23 264:1,2 |
| **consulted** 41:11 | **conversation** | 46:11 74:22 | 264:2 265:7 |
| **consummated** | 98:23 189:7 | 122:16 169:7 | 266:6,16 267:13 |
| 54:23,23 | 196:16 | 219:8,15 225:4 | 269:5,19,24 |
| **contact** 128:12 | **conversations** | 254:7,20 256:12 | 273:15,20 274:1 |
| 232:4 | 185:5 | 258:10,13 265:24 | 275:1,24 |
| **contacted** 232:3 | **convention** 203:3 | **corporation** 131:7 | 282:12 284:16 |
| **contains** 276:7 | 203:11 | 133:1 165:2 | **counsel** 3:16 7:19 |
| **context** 130:16 | **convert** 204:18 | **correct** 10:12 | 12:9 23:14 24:9 |
| **continuation** | **converted** 202:16 | 11:21 20:22 22:15 | 28:16,18,24 29:2,3 |
| 187:16 188:4 | 203:9 | 23:13,14,18,25 | 112:15 189:11 |
| **continue** 8:7 71:21 | **conveyances** | 24:2 26:6,7 28:15 | 201:10 232:7 |
| 76:10 166:11 | 228:1 | 28:16,18,24 29:2,3 | 233:8 234:5 |
| 177:3 192:4 200:2 | **convinced** 97:8 | 34:4 35:9 40:14 | **corresponding** |
| 231:22 260:18,20 | **coordinate** 36:5,7 | 40:18 46:16 48:10 | 98:19 |
| **continued** 234:22 | 149:14 | 48:12 50:20 51:25 | **cost** 96:4 156:3 |
| 236:6 | **coordination** | 53:6,10,11 55:3 | 200:21,22,24 |
| **continues** 166:2 | 234:24 | 56:12 58:17,24 | 202:3,22 203:16 |
| **contract** 5:17 | **copied** 173:20 | 78:7 79:4,10,12 | 243:15 254:16 |
| 82:15 83:7 92:14 | 176:2 | 83:20 85:6,11,16 | **costs** 50:13 95:24 |
| 92:17 95:4,17 | **copies** 253:22 | 85:17,17 92:18,18 | 95:25 155:19,21 |
| 96:17 98:20,24 | 254:14 276:10 | 99:7 100:2,24 | 202:7 207:16 |
| 118:8 164:23 | **copy** 14:11 28:16 | 101:1 104:24,25 | 208:17 209:12 |
| 166:20,25 202:1 | 44:17 48:11 | 105:5 106:1 | 225:7,25 257:1,2 |
| 212:25 217:11 | 101:13,14,16,20 | 110:11 115:20,22 | 257:3,8,9,11,12 |
| 218:2 | 102:8,9 103:5 | 115:23 121:11,12 | 264:19 |
| **contracts** 217:25 | 104:18,22 106:16 | 121:25 128:10,23 | **counsel** 3:16 7:19 |
| | 106:17 107:19 | 127:25 128:10,10 | 274:24 41:2 |

## Page 12

**[counsel - date]**

| | | | |
|---|---|---|---|
| 42;7,8 43:12 | **creditor** 22:20 | 92:8 93:6,7,22,23 | 230:25 231:6 |
| 61:24 64:9 65:16 | **creditors** 7:15 | 94:1,4,7,17,19 | 232:6 233:8,22 |
| 67:17 78:15,20 | **cross** 1:16,23 | 95:1 96:3,14,20 | 234:22,24 235:5 |
| 139:17 141:9 | 273:16,23 | 97:5,9,16,20 98:9 | 235:15,20 237:22 |
| 142:19,20 147:3 | **crosstalk** 12:23 | 98:18,22 101:8,12 | 238:8,15 239:14 |
| 272:7,9,19 274:15 | 41:8 47:1 68:15 | 102:7,11,15,16,20 | 244:18 245:3 |
| 274:21 | 78:2 133:2 136:6 | 103:15,18 104:1 | 247:2 249:4,15 |
| **county** 35:8,12,14 | 140:2 152:22 | 104:11,23 105:8 | 251:15,22 252:7 |
| 35:16 36:18 | 153:13 154:9 | 106:14 107:17,23 | 253:15,19,25 |
| 142:12,18 143:13 | 155:7,13 156:23 | 108:3,6,12 109:1 | 254:8 256:4,15 |
| 202:7 207:15,16 | 168:9 169:1,6 | 109:18,22 110:13 | 257:22 267:22,25 |
| 256:2 | 170:22 182:18,25 | 110:18,20 111:1 | 270:24 276:9 |
| **couple** 51:3 70:25 | 184:8 189:25 | 111:20 112:4,9,22 | **daniel's** 130:7 |
| 84:20,21 178:7 | 190:3 193:5 199:3 | 113:6 114:8,12 | 132:25 170:25 |
| 269:1 | 199:13 208:2,19 | 115:1,16 116:8 | **danny** 54:17 |
| **course** 68:12 71:4 | 209:8 220:10 | 118:17 122:21 | **darin** 4:2 6:20,23 |
| 76:1 132:16 | 222:6 228:24 | 123:9,12,22 124:2 | 49:7 50:3 54:6,17 |
| 183:16 234:14 | 249:2 250:14 | 124:17,22 125:22 | 54:18 59:25 60:23 |
| **court** 6:5,7 7:1 9:3 | 253:14 254:22 | 127:21 128:17 | 62:8,12,25 89:3 |
| 14:21 35:19 37:25 | 265:11,20 267:24 | 129:15,25 130:3 | 92:10,10,11,20,23 |
| 41:23 52:14 56:12 | **csr** 2:12 275:5 | 130:21 131:16,25 | 93:10,16,25 94:2,5 |
| 56:20 60:17 98:2 | 276:19 | 132:5,10 133:9,18 | 94:17 95:19,23 |
| 109:25 135:13 | **curious** 227:17 | 134:7,10 150:11 | 96:3,18,22 97:3,8 |
| 143:12 144:16 | **custodial** 276:5 | 150:24 152:16 | 134:11 142:20 |
| 157:11 172:21,22 | **cut** 185:3 | 153:25 158:11 | 146:12 150:10,24 |
| 193:15,25 205:19 | | 159:5,8 161:20,25 | 154:1 196:5 |
| 227:1 253:18 | **d** | 169:13 170:16 | 212:21 213:5,16 |
| 256:2 | **d** 5:12 | 171:9,25 172:4,6 | 213:23 224:9,12 |
| **courtesy** 269:17 | **dadgum** 267:14 | 178:13,17,17 | 224:9,12 225:22 |
| **courtroom** 8:17 | **dallas** 237:25 | 179:22 180:1,7,10 | 226:4 234:14,23 |
| **courts** 215:13 | **damages** 48:25 | 180:12,15 181:23 | 236:9 238:23 |
| **covenant** 199:1,7 | 50:2 | 182:20 183:25 | 236:16 241:9 |
| **crazy** 201:18 | **dan** 93:25 169:16 | 184:5 185:17,21 | **dark** 183:5 228:8 |
| **create** 85:15 122:7 | **daniel** 2:9 3:4,3 | 186:4 188:17 | 69:25 98:13 |
| 158:14 | 6:20,22 49:7 50:3 | 189:3,7 190:4,12 | 106:20 109:4,9 |
| **created** 105:21 | 53:17 59:3,25 | 192:7,14 193:12 | 116:7,10,12,14 |
| 122:7 158:24,25 | 60:22 81:30 82:5 | 194:5,12,13,17,23 | 136:2 142:8,9,22 |
| 244:18 | 82:8 83:1,8,24 | 196:2 202:25 | 149:6 159:5 |
| **creating** 106:1 | 85:16,20,21 86:9 | 203:15 204:2,9 | 185:12 185:22 |
| **credit** 80:1 97:14 | 86:10,23 87:6,7,8 | 217:2 222:14 | |
| | 87:16,19 88:4,15 | 223:18 227:14,15 | |
| | 88:18,23,25 91:20 | | |

## Page 13

**[date - derick]**

| | | | |
|---|---|---|---|
| 192:18,19 193:23 | 13:14 153:11 | **declare** 53:20 | 210:3,8,10,11 |
| 195:17 214:15 | 156:10 176:3 | **deed** 5:17 119:25 | **demanding** 47:16 |
| 241:3 252:1,4 | 197:9,21 200:19 | 121:18 122:2 | 47:19 |
| 261:20,22,25 | 203:20 227:15 | 158:14 259:11 | **denied** 256:24 |
| 262:6,8 271:3 | 234:10,15 236:21 | 261:17,20,22,25 | **departure** 238:4 |
| 275:6 276:19 | 236:23 256:16 | 263:10,15 268:14 | **deponent** 61:17 |
| **dated** 5:13 144:2 | 256:1,6 | 268:19,21 | 64:5 66:8,22 67:6 |
| **dates** 136:1 145:4 | **deals** 56:15 | **deeds** 119:17,20 | 68:11 |
| 174:16 178:10 | **debate** 157:8 | **default** 81:21 82:6 | **depos** 12:4 |
| **daughter** 66:17 | **debt** 44:5,19 45:2 | 122:21 146:23 | **deposition** 2:2,7 |
| **daughters** 40:17 | 45:10 46:1,4 47:2 | 147:18 148:10,14 | 7:6 7:14 |
| 43:3 66:17 67:3 | 58:10 135:5,17,24 | 149:5,23 159:7,12 | **deposition** 2:2,7 |
| 68:24 69:9 81:8 | 136:9,24 137:10 | **defaulted** 159:6 | 9:7 10:3 11:7 15:2 |
| **david** 28:14 71:9 | 137:22 138:24 | **defaulting** 159:9 | 15:6,11 18:25 |
| 120:2,6,8 121:13 | 227:23 | **defendant** 1:23 | 23:20,23,25 27:14 |
| 122:6,23 128:2,3,4 | **debtor** 1:5 27:4 | 273:23 | 27:22 28:12 32:17 |
| 170:2,8,12 171:7 | 34:22 36:23 47:3 | **defendants** 1:14 | 34:20 44:11 71:14 |
| 171:23,25 186:17 | 56:18 79:15 137:9 | 1:23 273:14,23 | 72:3,10 73:12,20 |
| 263:4 267:4 | 137:21 273:5 | **defer** 269:19 | 74:7,14 75:11,12 |
| **day** 73:22 77:10 | **debtor's** 16:17 | **defined** 229:13 | 75:16,24,25 76:12 |
| 77:12 78:17 83:13 | **debtors** 11:18 16:2 | **defines** 218:16 | 76:25 77:23 78:9 |
| 84:21 110:24 | 16:6 18:3 25:18 | **definitely** 130:3 | 78:21 84:18 90:21 |
| 187:2 201:10 | 26:16,23 34:10,21 | 132:4 156:19 | 91:4,15 113:13 |
| 223:15 272:8,13 | 44:3 | 235:13 | 125:11 135:19 |
| 275:1 276:14 | **debts** 37:4 44:3,7 | **definition** 50:12 | 141:8 146:19 |
| **days** 12:11 51:3 | 44:11,17 45:7 | 71:13 90:20 91:4 | 161:1 173:14 |
| 75:10 93:18,19 | 47:8 | 91:14 154:2 | 177:13,23 187:11 |
| 109:9 122:19 | **december** 28:14 | 155:16,18 157:18 | 183:1 192:22 |
| 149:7 237:5 253:6 | 29:1 125:22 | 157:19,22 198:24 | 205:9 206:22,24 |
| 266:14 | 128:25 129:16 | 199:5 218:19 | 213:1,23 230:13 |
| **dead** 263:7 | 129:21 135:12 | 221:7 235:12 | 240:5,11,19 |
| **deadline** 192:20 | 199:5 218:19 | **definitions** 17:15 | 247:18 254:7 |
| 235:6 254:4 | **decide** 37:16 38:3 | 83:6 | 259:14 269:14,19 |
| **deadlines** 138:16 | 85:19 | **delay** 75:12 | 270:9,11 271:3 |
| 232:22 | **decided** 267:17,17 | **delayed** 75:15 | 272:1 274:1,4,7,8 |
| **deal** 38:20 50:12 | **deciding** 43:22 | **delete** 21:15 | 274:11,15 276:3,5 |
| 50:19 51:5 55:9 | **decision** 34:2 | **deleted** 19:24 20:3 | 276:8,10,11 277:4 |
| 55:17,24 56:9 | 39:12 40:20 42:5 | 21:17 | **depositions** 12:5 |
| 74:24 91:22 92:9 | 42:8 43:4 67:21 | **delivered** 276:5,11 | **deposits** 201:3,3 |
| 93:21 96:21 | 69:18 268:3,4 | **demand** 79:21,22 | **derby** 248:3 |
| 113:18 131:2 | **decisions** 38:11 | 209:7,22,23 210:1 | **derick** 146:10,11 |
| | | | 224:10 |

## Page 14

**[derives - documents]**

| | | | |
|---|---|---|---|
| **derives** 50:22 | **digesting** 28:21 | **disinterested** | 109:7 110:13 |
| **describe** 233:24 | **dillad** 95:21 | 167:1,5 169:9 | 18:19 124:21,23 |
| 233:24 244:1 | **dillard** 95:21 | 171:1,12 172:18 | 125:5 126:1,6,13 |
| **described** 26:19 | **dilley** 86:4 88:15 | **disposal** 97:25 | 126:21 131:11,14 |
| 27:1 198:25 | 97:20,23 | **dispute** 35:18 | 131:15,22 132:3 |
| **describes** 155:16 | **direct** 17:23 48:6 | **distance** 28:7 | 132:17 133:3,5 |
| **describing** 89:12 | 99:13 120:21 | **distinguish** 71:18 | 140:7 144:7 |
| 225:11 245:11 | 269:21 | **distraught** 112:13 | 153:25 154:3,5,6,6 |
| **description** 5:8 | **directed** 40:7 42:8 | **distributed** 152:11 | 155:10,15,16 |
| 128:23 272:10 | **directing** 160:25 | 153:7 | 157:18 158:9 |
| **desire** 237:1 | **direction** 64:9,15 | **distribution** | 162:3,5,5,8,9,12 |
| **destroying** 86:3 | **directly** 53:9 | 151:17 | 163:7,10,16,21 |
| **details** 234:7 | 99:23 148:19 | **district** 1:1 273:1 | 165:12,25 167:15 |
| **determination** | **disagree** 36:1 | **division** 1:2 83:5 | 167:16,24 180:18 |
| 67:12,15,16 | 61:19 62:4 65:11 | 273:2 | 181:12 182:3,5 |
| **determine** 37:10 | 74:21 75:20 92:25 | **dma** 1:12,15 2:8 | 212:3,21 214:1,22 |
| **develop** 207:17 | 130:1,7,23 132:5 | 3:8 5:18 6:19,21 | 215:2,22 216:1,3 |
| 208:17 236:3 | 132:10,12 133:12 | 18:5 22:1 58:25 | 216:18 217:6 |
| **developing** 57:22 | 153:4 | 153:8,17 156:4 | 218:10,19 224:16 |
| 18:1 | **disagreement** 76:6 | 157:13 158:2 | 224:22 225:3,6,14 |
| **devoted** 63:19 | **disclose** 103:18 | 196:8,13,22 197:8 | 225:15 226:7 |
| **dialed** 7:7 | 104:11 108:25 | 197:20 198:1,20 | 228:8 241:7,9,23 |
| **difference** 230:6 | 111:8 123:21 | 199:14 200:7 | 248:12,14 256:21 |
| 230:13 241:12 | 192:7 194:16,22 | 230:15 238:15,19 | 272:10 |
| **differences** 229:23 | 196:1 208:8 | 240:6,20,24 241:7 | **documents** 16:21 |
| **different** 12:17,18 | 209:15 232:6 | 243:10 244:3,15 | 17:4,14,19 44:23 |
| 12:19 25:25 40:10 | **disclosed** 56:12,19 | 253:1,5,15 256:19 | 45:15 46:7,9,13,18 |
| 62:25 64:7 66:10 | 80:19 101:11 | 256:9 276:9 277:3 | 46:19 47:7,15 |
| 68:12 71:5 72:17 | 166:21 | **dnd** 123:14 | 48:3 50:25 52:12 |
| 76:4,5 83:4 89:15 | **discovered** 109:7 | **doc** 171:19 176:3 | 63:11 77:16 80:12 |
| 90:22 94:12 | 228:15 | **document** 13:23 | 82:19 84:3,6,10,16 |
| 105:24 110:8,14 | **discovery** 213:15 | 14:14 15:19 16:23 | 84:20 125:5 126:3 |
| 113:4 120:19 | 217:1,5 218:15 | 23:21 28:23 33:12 | 225:1,12 226:12 |
| 137:7 190:8 | 246:21 | 33:19 47:19 61:9 | 226:15,23 237:9 |
| 204:19 223:9 | **discussed** 78:5 | 61:11 72:21,24 | 227:22 232:9 |
| 229:17 252:4 | 91:2 188:20 | 73:7,8 77:18 | 234:10,17 235:23 |
| **differentiate** 13:7 | **discussion** 179:4 | 101:22 108:16 | 236:2 237:3,23 |
| **difficult** 71:9 | **discussions** 57:6 | | 234:1,8,13 |
| **difficulty** 13:16 | 234:1 | | 239:20 240:20 |
| 71:3 | | | |

## Page 15

**[documents - e]**

| | | | |
|---|---|---|---|
| 133:13 135:11 | **driver's** 112:13 | 169:22 170:10 | 241:6,25 242:19 |
| 149:11,19 158:25 | 251:10,11 | 170:17 171:2,4,12 | 245:1,5,19,23 |
| 162:24 163:4 | **drove** 251:10 | 172:5,12 173:7,13 | 248:20 257:19 |
| 171:17 178:20 | **duck** 1:9,21 5:14 | 173:20,23 174:3 | 262:5,15,18,22,23 |
| 180:19 182:11,20 | 23:17 24:5 50:23 | 174:10,20 175:1,5 | 263:24 264:5,14 |
| 184:6 188:19 | 51:24 52:3,6,6,8 | 175:20 176:10,14 | 266:7 267:2,20 |
| 191:3 192:25 | 52:21,21,23 53:13 | 176:18 178:9,19 | 273:9,21 |
| 213:20 224:10 | 116:16 118:9,19 | 178:22 179:3,8,18 | **duck's** 120:6,8,9 |
| 226:22 227:8,12 | 60:22 80:10 81:20 | 180:2,7,12,16,23 | 215:24 264:12 |
| 227:21,24 228:1,3 | 81:25 82:9,18,22 | 181:9,12,16,23 | **due** 21:13 69:25 |
| 228:19,22 233:1,5 | 83:2,9,18,22 84:7 | 183:12,10 184:2,19 | 80:24 136:2,2 |
| 239:7 258:11 | 84:13,19 85:5,10 | 185:18 186:4,20 | 147:20 232:22 |
| 265:19,22,23 | 85:13,19 86:6,9 | 186:11 187:1,7 | **duly** 2:9 8:22 |
| 268:4 270:5 | 88:4,11 95:3 99:4 | 189:4,4,22 190:5 | 274:6 |
| **doing** 8:1,2,13 | 99:16,19 100:13 | 190:14,18,20 | **duties** 126:6 |
| 62:22 71:9 97:7 | 100:14,16 102:12 | 192:8 193:13 | 13:23 128:16 |
| 223:20 231:3 | 104:7,11 105:12 | 196:1,4,12 197:10 | 131:11 133:16 |
| 232:4 266:18 | 105:16,18,22 | 197:16 199:24 | 132:1,11 133:10 |
| **dol** 114:20 | 106:3 111:5,10,13 | 202:15,17,25 | 161:20,24 162:4 |
| **dollar** 107:25 | 111:16,17,17,21 | 203:25 204:7,11 | **duty** 129:23 |
| 111:10 112:23 | 112:5,23 113:6 | 205:9 207:4,11 | |
| 114:23 115:9 | 114:2,13,24 115:9 | 208:21,24 209:22 | **e** |
| 153:6,19 200:25 | 115:16,17,19,25 | 212:13,22,23 | **e** 3:1,1 5:10,10,11 |
| 257:12 264:17 | 116:4,6,14,14 | 213:9,10 214:4 | 5:11,12,15,16,18 |
| **dollars** 95:18 | 117:1,3,7 118:4,16 | 215:11,18 216:2 | 18:9,15 20:7,13 |
| 98:17 99:3,10 | 118:19,20 119:1,7 | 216:14,22 217:4,9 | 21:4,7 22:3,8,12 |
| 100:1,21 101:3 | 119:10,15,15,17 | 217:14,15 218:21 | 28:1,13,17 29:4 |
| 120:15,24 122:15 | 119:20 121:9,19 | 219:4 221:11 | 33:1,6,16 47:25 |
| 122:20 155:1 | 121:22,24 122:8 | 222:25 224:5,20 | 48:11,20,20 54:1 |
| 171:3,14 198:12 | 122:13,14,24 | 225:1,12 226:12 | 54:25 55:5,6 56:2 |
| 198:20 201:6 | 123:8,21 124:14 | 226:15,23 237:9 | 56:3 58:14,17 |
| 227:9 237:5,18 | 124:20 125:5,25 | 227:22 232:9 | 72:22 73:11,15,19 |
| 239:11 | 126:7,7,12,19 | 234:10,17 235:23 | 74:1,8 75:21 95:5 |
| **door** 185:7 | 152:2,9 153:2,16 | 236:2 237:3,23 | 95:11 98:5 101:17 |
| **doubt** 12:7 76:8 | 154:12 156:2,14 | 238:20 240:20 | 101:23 102:6,11 |
| **drag** 13:22 | 157:11 159:1 | | 104:18,22 105:7 |
| **dragging** 14:4 | 160:17 161:2,9,17 | | 109:8 110:17 109:3 |
| **dream** 142:11 | 161:21 163:24 | | 112:11,12,19,21 |
| **drifting** 185:4 | 165:9,22 167:5 | | 113:5,9,21,24 |
| **drive** 20:2 173:20 | 168:11 169:11,21 | | 115:9,21,24 |

**[e - exam]**

114:1,4,6,8,9,11
114:12,15,18
118:17 124:19,24
125:4,21 126:3,4
126:12,16,17
127:3,11,20 128:7
128:8,20,21,24
129:3,11,25
130:23 131:11
132:10,13 138:21
140:18 141:14
142:3,22 143:5,20
143:22 144:1
146:1,8 157:16
170:11,16 171:1
177:16 178:4,12
178:16 179:13,25
180:8,14,22 181:5
181:8,16 182:1,8,9
185:16,19 186:1,8
186:9 187:16
188:5,9,10,13,17
189:11,13 190:22
191:1,9,14 192:16
192:16,18 193:2
193:10,11,18,19
193:20,20,21,23
194:1,2,4,10,11,11
194:16,17 201:9
203:1 207:4,9,10
222:23 224:13
228:10,11 232:15
232:17 234:7,8,13
236:20,21,21
238:25 239:23
241:11 245:4
247:25 248:5,7,9
249:12,15,21
250:8,15,16,21
251:21 252:6,7,12
253:7 256:20

259:8 268:6
**earlier** 9:12 48:7
72:2 94:24 107:1
107:16 117:10
149:6 179:1
205:15 206:1
**early** 85:13
**earnest** 96:6,7
98:17 99:4 101:3
108:2 115:2 117:7
118:7,23 122:17
124:5,24 220:17
262:5,11 263:18
**easier** 187:18
**easy** 95:24 108:23
**educate** 229:25
**educated** 258:1
**effect** 239:21
**effort** 266:21
**efforts** 138:15
**eight** 18:21,23,23
**either** 7:3 13:8
27:25 30:25 59:7
62:3 96:21 123:1
135:24 137:20,20
201:10 230:2
248:25 250:12
**elaborate** 246:18
246:19,20
**employed** 274:22
**enable** 13:25
**encouraged** 75:11
266:20
**encumbered** 227:9
**encumbering**
204:5,11
**energy** 1:13 6:20
92:17,19 153:8
196:8 212:13
214:11 216:21
273:13

**enforceable**
252:12
**engage** 129:19
152:18
**entail** 29:7
**enter** 86:8 179:7
179:18 180:3,16
181:10
**entered** 195:22
247:13
**entering** 183:9
**entire** 173:19
230:1 239:22
**entities** 23:6 26:1
26:9 27:5 30:17
34:2,11,23 36:23
43:22 47:4,10
48:2 56:18 57:13
59:18 61:15 68:2
71:15 79:15 85:22
89:25 95:17 135:4
135:25 136:24,25
137:9,10,21 147:4
147:8 149:8,16
191:14 192:9
194:14 255:15
256:16 258:14
**entitled** 74:6,15,18
74:23 153:18
154:16,25 157:13
158:3 197:21,22
197:23 198:2,5,8,9
200:8 199:15
200:9 219:12
**entity** 12:20 22:19
37:11 71:8 72:12
82:18 83:1,9,12,13
84:2,14 85:15
88:5,15 89:3
92:20 99:23
115:16 128:12,18

137:4 151:21
169:17 174:11
213:7,8 232:24
234:9 237:23
254:1,9
**equal** 155:22
**equaled** 243:15
**equipment** 89:7
89:17
**errata** 277:10,12
277:13
**errors** 262:25
**escrow** 121:6
**establish** 90:25
**established** 158:22
158:25
**estate** 83:6 263:12
**estimate** 84:24
**et** 178:23
**evening** 260:19
**event** 114:21
134:17 146:23
148:14
**eventually** 127:21
**everybody** 7:2
54:20 87:9 169:12
200:1 222:16
224:14
**evidence** 160:18
177:15 187:13
211:9 221:15,19
**ex** 139:15
**exact** 108:14
**exactly** 57:3 72:23
84:4 150:8 174:16
203:18 204:8
217:7 218:25
221:6 239:1 245:4
245:17 246:2
**exam** 251:5

**[examination - february]**

**examination** 5:4
8:2,23 274:9
**example** 56:25
57:3
**examples** 54:15
**exception** 101:9
**excerpts** 142:1
**exchange** 28:17
33:1 252:13
**excited** 92:3,6
97:15
**excitement** 97:17
**exclamation** 49:1
54:7 142:13
**excuse** 51:15
79:22 92:16
108:10 125:21
129:4 143:18
150:16 158:24
179:17 188:18
227:16
**execute** 180:23
189:3
**executed** 29:2,20
142:7 163:23
**executing** 143:18
29:16 50:4 143:15
**exercised** 30:19
151:5
**exercising** 143:18
**exhibit** 5:9,10,10
5:11,11,12,12,14
5:15,15,16,16,17
5:18,18 14:24
15:2,3,24 16:9,18
16:22 27:11,14,20
28:12 30:14 32:15
32:17,25 33:1
48:7,8,10 53:23,23

70:6 125:9,10,11
127:19 130:25
134:2 139:13,16
141:7,10 143:23
143:24,25 146:17
146:19,21 147:2
148:25 149:3,4
150:3 160:17,23
161:1,8 166:15
177:10,12,14,23
180:15 181:8,13
181:17 183:25
185:16 186:16
187:9 189:17
189:19 191:2,6,7
196:7 205:7,8,11
205:13,14,25
206:7,10,21,21,23
210:24 211:3,4,5,5
211:8,13,16,22
212:7,9 229:13
240:2,4,5,5,9,11
240:19 247:16,18
247:21,24 249:7
251:15 252:13
259:3,5,5,10,14,23
260:3 261:16
268:21 269:2,7,10
269:22
**exhibits** 5:7 10:23
13:24 14:2 15:1
28:2,3 159:24
304:23 206:20
231:11 240:10,13
276:10
**exist** 15:7
**existence** 193:20
**exists** 193:11,19

**expand** 72:1 158:8
**expect** 74:8
**expense** 235:4
254:15
**expenses** 253:23
**expert** 7:21 204:7
**expiration** 275:6
276:19
**expires** 272:17
**explain** 62:2 230:7
230:5 241:12
**explained** 104:19
223:3,3,3 234:25
**explaining** 223:4
**explanation** 84:12
184:17
**express** 36:16 89:9
89:15 105:16
117:8 119:19
120:14,22 172:3
172:13 189:9
202:9,10,11,12,13
202:14,21,23
213:3,23 232:5
235:18 243:19,23
244:4
**expressed** 272:12
**expressions** 11:4
**extend** 138:16
178:21 182:11
**extended** 57:12
183:9
**extension** 135:4,17
135:24 136:4,8,24
137:9,21 138:1,24
139:6,10
**extensions** 101:9
**eyes** 160:11

**f**

**facial** 11:4
**facilitate** 59:7
**fact** 54:24 86:11
88:18 99:13 115:1
116:17 118:5,9
130:11 173:19
194:25 241:11
245:23 250:16
252:24 266:15
**facts** 42:12,19 60:4
86:13 139:3
153:22,23 157:6
157:17 166:19
172:10,10 231:1
**fail** 277:15
**fails** 208:8
209:15
**fair** 87:18 90:8
111:1 150:5,8
259:2
**fairly** 150:23
**faith** 166:25
**falling** 30:21
**false** 231:1
**familiar** 21:18
72:23 73:3
**family** 39:4 40:15
40:20 41:11 63:13
91:19,21 97:15
93:21,21 97:22
98:25 203:22
**family's** 86:3
87:25
**far** 207:18
**fast** 75:18
**father** 64:10 87:11
**fault** 210:18
**february** 80:4
147:20,24 148:10
241:4 248:1 249:7

**[february - form]**

249:12 251:18,18
251:19 252:2,3
**federal** 2:14 276:3
276:12
**feedback** 10:5
**feel** 129:17,20
269:3,4,5,8,25
**feelings** 64:2
**fees** 23:1,5 257:21
257:22
**felt** 169:25 184:10
184:12,14
**fifteen** 70:14
133:23
**figure** 27:25 138:7
**figured** 95:24
130:12 237:6,21
267:6,6
**file** 34:2 36:24
37:11,17 38:3
42:6 48:2 65:5
66:1 67:14,16,22
69:16,18 95:5
134:21 135:13
139:11 144:14,23
145:6,12 149:4
179:23 185:20
231:19 268:10,14
268:16
**filed** 34:12 35:7,17
36:14 41:2 44:25
47:9,17 58:25
61:14,22 63:3
66:2 97:21 145:1
171:23 257:24
268:11
**files** 45:15
**filing** 36:5,7,13
44:8,14,22 46:6
47:7,11,14 61:21
62:21 64:14 66:23

66:4,12 135:5,25
136:10,16 137:22
144:17 145:7
146:12 149:15
268:14
**filings** 37:3 45:11
47:24 135:16
136:21 137:5
144:16
**final** 67:21 126:16
230:6,9 248:4
252:9,19,21,23,24
252:25 253:2,4,5
253:19,23
**finalized** 111:21
112:6 164:1
**finally** 15:16
**financial** 64:18
85:1 165:4,10,21
166:4
**financially** 274:23
**financing** 57:12
82:1 194:25
**find** 85:24 193:15
223:1
**fine** 8:10 49:17
90:3 92:22 139:23
146:16 245:6
250:23
**finish** 10:9,10
31:21 108:10
134:2 186:3 197:5
197:5 210:2
**firing** 252:7 253:9
**firm** 117:15,18
128:2,3,4 147:14
162:15 181:18
267:5,12 275:7
276:21
**first** 8:22 12:11
33:6,15 48:19

51:14 72:7 80:4
80:13,14,19 87:19
91:18 97:11 129:6
129:10 139:20
147:19 148:1,1
203:22 214:16
**five** 80:6 107:25
109:23 110:6
134:3 152:14
192:19 197:10,14
223:19
**fixed** 134:24
**fleeing** 182:20
**flip** 85:22 96:4,8
96:13 98:10
112:14 113:19,23
124:4 223:18
224:4,19,25
225:11,15,18,22
226:2 243:10,14
**flipped** 115:4
**flipping** 97:6
113:18
**focus** 48:19 178:12
205:24 213:11
**follow** 78:25 79:1
184:24 185:2
**following** 71:3
128:15 217:17
274:15
**follows** 8:22
274:11
**fooled** 87:3
**forced** 86:8
**foregoing** 272:1
**forever** 21:19
**forfeited** 83:23
**forfeiture** 83:12

**forgot** 148:7
253:19 254:16
**form** 13:18 23:15
23:19 24:1,7,12
25:20 27:8 32:7
32:11 33:24 34:7
34:13,24 35:10,15
35:20 36:11,25
39:7 40:22 43:8
43:17,24 44:13
46:17 50:4 51:11
51:19 52:1,10
53:1,15 55:20
56:21 57:14 58:6
58:23 59:9,23
60:6,15,15,16,16
61:8,16 62:23
64:4 65:6 66:7,15
66:16,21 67:5
69:2,3 76:13
78:22 79:5 82:3
98:15 99:6 103:21
104:13 111:11,23
112:7,8,25 113:8
114:5,14,25
115:11 121:21
122:3 123:10
124:25 126:14,19
128:12 136:18,19
137:2,3,12,24,25
138:8,10,17,18
139:1 142:23
143:6 144:24
145:14,21 146:6
150:7,21 152:4,12
153:10 155:2
156:7,16 157:15
158:4 159:3 164:8
172:6 183:4
190:6,23 198:13
201:16,23 203:5,6
203:13 204:4

**[form - goal]**

208:10 214:21
216:17 217:23
220:15 222:11
224:6,21 225:2,8
227:23 228:5,13
229:14 233:10
235:11 238:17
244:17 245:10
246:7
**formation** 84:6,19
85:4 128:9
**formed** 130:4
132:18 217:4
**fort** 237:25 275:8
276:22
**forth** 54:19 164:22
219:6 226:24
248:19,21 252:14
253:9
**forward** 224:11
256:11 257:25
**found** 93:7 95:19
95:21 157:11
236:7
**four** 116:9 147:6
149:7 194:10
229:2 235:6 236:7
236:11
**fourth** 118:2
**frame** 111:2
**frank** 2:9 3:8
178:17 226:19
274:19 276:9
**fraud** 59:22,24
60:18 182:23
205:16
**fraudulent** 157:11
**fresh** 177:6
**friday** 15:20
**friend** 87:15

**friends** 87:13
**front** 28:13 48:8
53:24 105:20
140:18 141:11
144:1,4,9 146:21
147:1 161:5 168:5
168:15 175:12
178:1 179:12
187:21 195:10
210:24 211:19
212:8,14 240:21
254:12 257:13
259:5 261:18
**frost** 100:10
**full** 9:11 12:11
35:3 126:12
178:18 189:3
190:21 234:7,7
253:17 254:14
257:2,8 262:9
274:4
**fully** 183:15 233:8
233:11,11 248:6
249:19,19 250:6
**function** 21:15
**funded** 192:11
**funds** 53:4,8 57:11
121:2,8 136:3
138:2,5 199:4
200:19
**furnish** 106:17
174:17
**further** 15:14
127:7 274:21,23
276:1
**future** 98:21
189:11 216:25

**g**

**gain** 153:23,23
200:25

**game** 213:18
222:13 225:20
**general** 17:16
**generally** 51:4
**generated** 206:3
207:14
**gentleman** 83:9
92:22 93:20 125:4
154:1 218:14
**george** 120:9
154:1 218:14
**germany** 3:21
6:16,16 24:15,18
24:21 25:2,2,7,15
65:13 66:16 67:25
68:4,5,7,9 69:3
102:4 112:7
136:19 137:3,24
138:8,18 139:2
155:2 172:8 190:6
190:23 198:13
**getting** 37:4 58:15
95:3 122:18
131:13 133:15,24
140:8 226:25
255:6
**give** 9:24 16:5
28:20 125:20
127:18 132:14,15
152:21,23 160:19
160:22 171:12
199:21 204:15
206:20 211:11
217:8 230:23
234:22 237:12,18
255:9 258:21
259:9 260:9

138:2 250:2 255:1
272:12 274:7,14
**gives** 199:1
**giving** 100:5 228:2
228:4
**glad** 168:16
230:10
**gladly** 109:8
266:18
**glancing** 160:5
**go** 7:13 22:9 16:20
33:10 38:19 39:25
43:12 44:15 49:15
49:16 51:21 55:23
67:11 78:5 85:11
90:18 91:16 93:19
92:15 97:9 98:4,5
109:24 126:24
131:1 138:5
139:24 140:20
143:24 149:22
150:22 152:1
155:9 206:23
159:9 266:9
261:24 268:19
**goal** 34:25

## Page 20

**[goes - headache]**

goes 169:2,4
188:19 252:14,17
going 7:3 10:21,22
11:9,9 12:4,6,9,11
13:14,24 17:23
24:16 27:12,25
28:5,8,8 29:12
31:14,24 32:16
33:8,15 35:22
36:6 37:1,12,18
38:23 39:8 40:22
42:18 43:9,10,12
43:17,24 44:15
48:6,23 51:2
52:16 53:3,21,22
54:5 55:4 61:15
61:16 62:25 64:4
65:6,13 66:7,21
67:5,12,15 68:24
70:1,11,17 72:4
73:21 74:12,23
75:7 76:14 77:25
78:5,18,23,24 90:1
90:17 91:1,8,13
96:6 98:4,5 106:4
108:3 113:9,20,24
115:2 122:19,21
124:25 125:16,16
126:10 131:21
133:21 134:17
140:23 141:6
143:8 146:18
157:6,17 158:9
159:19 160:16,21
162:25 163:15,21
164:8 173:10
176:12,22 177:11
177:19 182:21
184:22,24 185:2
185:12 192:24
193:16 195:13

199:20 204:21
205:8,24 206:9
209:12 210:17,17
217:5,17 219:5
220:8 224:11
225:22 227:25
228:9,18,20 230:4
231:6,11,15
232:19 235:1
237:21 238:11
240:3,10 255:4
256:1 258:7,16
259:4 260:3 261:4
264:20 268:20
270:9
golly 168:17
good 8:17,25 9:1
10:13 28:3 43:11
62:18 70:5,7,16
83:14,19 86:11
90:3,9,10,10
130:15 133:25
152:20 166:25
187:18,19 219:11
221:25 223:17
229:8,8,8,10
231:13 240:16
235:2,16 261:9,15
269:25
gotten 230:6
graham 87:14
grant 178:18
216:20,23 238:19
239:25 243:20
granted 238:22
grants 229:19
great 8:5 70:15
93:21 192:2
237:11 259:9
269:18

greatly 71:19
gross 50:13 54:7
54:13 56:25 57:7
58:15 155:19,20
199:9,9 218:20
219:13 220:12,16
220:19 221:4
243:15,15,16,21
ground 89:16
group 98:6 100:20
101:4 120:14
259:8 262:23
266:12
guadalupe 206:4
207:15
guaranteeing
29:15
guess 52:11 81:4
117:13,25 127:2
146:7 154:18
157:7 167:3 178:8
216:10,24
guidance 61:24
guy 142:10
gwynne 4:6 6:14
40:16 43:3 63:18
63:21 64:1,8,21
65:2,21 66:3,11
81:5 88:1

**h**

hagan 87:4 93:13
108:17 112:16
113:10,11 125:22
126:17 127:20
128:8 168:8
170:13 178:16,18
180:9 189:7 268:4
half 8:5,21 52:20
121:7 153:6,19
154:16 155:1
198:12,14 200:9

200:25 222:19
227:13 237:5,11
237:12,18 239:18
241:18 258:11
hand 14:18 272:12
276:8
handful 98:22
117:19 143:16
handling 12:3
149:20
hands 266:17
handshake 55:9
55:17,24 56:9,15
hang 140:14,14
188:2 193:9 262:2
262:17
happen 216:25
happened 95:2
105:2 234:18
happenings
143:12
happily 33:4
happy 54:20
hard 28:7 100:4
105:13 108:2
141:9 176:6 178:1
178:2 190:9
215:24 261:17,16
237:4 262:19
hardest 100:6
107:4 168:17,18
harris 17:5 253:3
253:5,16 254:1,9
255:15 256:17
257:1
hats 68:12 71:5
105:14 107:7
he'll 33:11 254:13
head 258:19,24
headache 100:5
139:23 268:24

## Page 21

**[heading - instruct]**

heading 184:13
hear 42:12 45:25
67:11 72:7 134:25
140:3,4 141:4
155:8,25 183:7
204:21 205:23
206:12 224:2
heard 92:2 94:24
110:7 168:19,21
168:25
hearing 25:11
45:25 234:8
hebert 3:15 6:19
honor 79:19
honor 241:10
held 121:6 196:8
hello 205:18
help 30:6 145:11
174:8 176:6,6
246:12,13 254:20
255:1 258:24
helped 85:15
122:7
hey 11:22 96:3
240:12
hi 127:8,9 128:11
hiding 108:23
high 156:18
highlight 29:12
48:23 54:2,6
147:19
highlighted 17:24
29:24 55:8 129:12
144:13 147:25
178:13 179:12
205:24 209:1
241:4 244:9
highlighting 15:11
highlights 15:12
highly 93:23 94:12
highway 3:16

hired 108:19
117:15 267:4,6,11
267:12
hit 264:12,13
hold 24:15,15
204:23 205:2,8
39:14,14 73:17,17
164:23 220:15,21
210:2 228:16
240:13
home 81:21
184:13
honest 79:19
honor 241:10
honorable 96:23
96:25
hoops 77:18
hope 34:11 230:24
hopefully 258:4
hoping 33:22 34:5
34:21
hopping 248:20
hours 72:20,23,24
77:21,22 78:4,19
84:18,20,20,21,23
84:24 193:22
266:22 274:12,13
274:13
huge 235:1,4
huh 63:22
humble 156:18
163:1
hundred 89:20
107:25,25 122:20
hungry 133:24
hurting 160:11
husband 64:10
hypothetical
152:18,20 153:15
158:10 249:5,8,10
249:18,23 250:8

250:7 252:8

**i**

**i**

idea 14:7 58:9
146:7,14,14,15
145:8,10,24
146:13 250:25
255:18,21
identical 242:24
243:1,3
identified 89:13
identify 45:9 46:1
46:15 63:20 168:2
168:5
identity 62:4
272:10
illegal 268:9
imagine 255:9
immediately 5:15
110:23,25
impact 190:23,24
197:3,9
important 10:7
impossible 233:22
impressed 93:24
impressive 87:13
improperly 35:11
inaudible 35:4
85:2 101:19 102:3
106:18 109:12
110:19 127:4
138:9 158:23
164:5 167:9 182:5
205:17 221:25
include 40:16
132:1 184:1
244:14,21
included 51:13
181:13,24 183:2
217:21
includes 131:15
191:2 195:21

245:1 274:15
including 69:24
171:9 215:24
221:1 242:15
253:4
inconsistent
225:13 245:8
incur 207:16
206:18 206:12
index 5:1
indicate 62:22
indicates 48:15
indicating 48:1
61:5,14
individual 11:17
24:22 35:3
individually 71:10
129:21 147:7,9
160:14
influence 9:19
inform 8:8
200:2 261:11
information 14:9
234:15 247:21
255:6 257:14
instead 142:12
233:8,11
initial 8:2
inside 88:6
instance 2:8
instances 13:16
instruct 35:2
37:1,14 39:8
40:23 43:9,18,25
61:17 62:1,24

## Page 22

**[instruct - kept]**

64:5 65:7 66:8,22
67:6 76:14 78:3
78:23 90:12 164:9
184:22 185:12
instructed 75:8
158:14
instructing 38:5
instruction 37:13
39:11,16 40:25
41:23 42:4 67:8
67:10 78:25 79:1
184:25 185:2
instructions 43:11
instrument 272:11
intend 143:15
215:15,19 216:20
217:8 221:11
intended 161:15
162:22 163:3,6
224:18,24
intent 215:24
221:8,14,16 222:9
222:15 224:3
243:9
interest 19:7 31:10
58:9 64:22 82:17
89:19,21 96:10
108:21 117:17
136:1 148:5
151:24 156:13,25
164:11,18 165:4
165:10,21 166:4
166:20 194:22
196:13 197:14,24
196:14,10 208:9
229:12,12,20
238:20 240:25
243:21 244:2
260:23 267:11
273:9

interested 80:22
92:3,5 94:25
95:15,20 96:16
164:16,25 165:3
169:12 234:8
261:10 274:23
interesting 117:17
156:9,9 246:24
interpret 245:13
245:15
interpretation
198:1 261:7
interrupt 11:23
25:23 31:6 38:15
39:25 133:22
183:14
interrupted 41:24
interstate 3:22
interwoven 253:9
introduced 94:17
introducing
129:17 130:8,21
131:16 132:1,11
133:10
introduction 94:2
94:5
invest 50:12
investigation
261:13
investor 87:24
97:21
invoke 41:18
involve 138:15
involved 43:4
87:22 88:9,16
91:21,22 184:12
232:9 236:11
237:24 238:12,16
involves 248:1
involving 236:9

issue 112:17 277:1
issued 78:17
119:17,20
issues 8:4 70:25
75:23 104:9
171:15
it'd 71:10 72:16
it'll 237:14
item 83:7
items 79:23

**j**

january 161:12
jennifer 63:23
64:9,21 65:3,22
66:3,12 88:1
jennifer's 64:2
job 75:15 93:6
john 11:22 3:4,7 4:3
6:12 7:3,7,13,14
8:9,16 13:3 21:25
22:9,14,16,17
30:25 31:3 32:2
33:2 36:9 37:3
38:17 39:10,16
40:25 41:10 48:11
48:21 54:24 55:5
61:18 62:16 65:8
65:17 67:8,18
76:16 77:4 80:15
90:9,10 102:3
127:3,11 134:1
152:7 159:19,23
160:16 177:1,14
187:12 191:8
204:21 207:10
211:7 231:11,24
232:7 233:9 234:1
234:6 240:3
247:20 254:20
257:4 258:4,9,9
259:7,23 273:22

274:12,17 277:1
johns 3:14,16 6:19
250:17 274:19
johnsandcounsel...
3:18,19
joke 175:16
212:18
jr 5:12 88:7,8,13
judge 36:18
142:1,2,18
judgment 159:24
160:18 177:8,15
187:13 204:22
205:4 211:2,9
240:4,10 247:21
177:8 178:5,13
180:15 187:16
188:13
jump 65:14
jumped 234:23
jumping 77:17
226:24

**k**

kailee 2:12 4:4
8:17 13:22 28:2
52:18 274:3 275:5
276:19
keep 38:23 71:16
105:13 108:2
151:14 183:6
187:4 223:24
228:2,4,7,19
232:11 234:14
235:1 238:15
269:13
keeping 143:11
keeps 67:10
kent 88:7,8,13
kept 38:12,15
102:16 137:13

## Page 23

**[kept - language]**

233:7,25 234:4
kick 238:8
kind 28:7 30:13,21
58:7 79:25 81:17
91:22 93:5,9,15
173:3,4 251:12
269:16
kj 54:7,10,13
209:22
knew 80:17 87:9
92:15 107:23
113:18,23 195:3,5
203:17,18,21
204:3,4,7,9,14
204:24 251:18
know 10:18 11:11
12:14,17 13:9
14:7 20:24 22:14
22:19 27:25 30:10
55:19 57:10,11,16
57:19 63:14,15
67:10 71:6,7
72:10,10,14,15
73:7 75:2 77:16
79:25 80:2 84:17
86:5 88:22 95:13
99:1 105:10,23
107:8,10,24
109:14 114:20
126:19 129:7
133:24,25 137:17
138:6 141:19
144:19,20 156:18
156:19 159:15,16
162:20,30 165:24
168:22 169:2,2
170:2 173:10
174:15,15,18
175:5,8,11,13,19
175:25 187:19
189:17 203:20

58:16 63:7,8,9
213:12,14,17
215:4,12 216:7
218:13 221:16
222:2,13 223:24
226:17 227:20
228:21 230:3,10
230:14,17 231:7
233:3 235:12
234:18 250:7,10
250:24 251:8
253:12 254:24
255:16,25 257:6,7
258:6 262:9
263:17,19
knowledge 57:24
69:22 81:17 88:6
88:9 123:19 192:7
232:1
known 18:18
166:21 272:9
knows 194:9
krause 3:21
kris 151:10
krisjenn 1:4,6,7
1:19,19,20 3:2,2,3
121:13,24 123:8
123:21 124:3,5
146:20 165:24
165:15,17,21
146:6,11,20 167:1
169:10,11,13,21
170:10 171:3,6,13
52:2,3 53:12
54:10 55:22,23,25

174:12,21 175:7
175:21 179:3,19
180:3,8,12,16,23
181:10,18,25
182:2 183:3,10
184:2,21 185:18
186:5 189:4,22
190:5,15,20
191:14 192:8,12
193:13 194:18,23
195:1,2 200:16,19
202:4,8,17,25
203:17,18,21
204:3,11,14,14
203:17,18,21
204:13 211,14,14
226:7,13,22 238:6
274:18 277:3
krisjenn's 121:3
201:13
kristal 63:21 64:1
64:8,21 65:3,22
66:3,11 88:2
kuhlmann 5:12

**l**

lake 19:23
lancer 178:22
land 93:22
landowner 88:17
language 19:8
29:7 49:6 130:22
216:19 217:24
220:3 223:7,25
224:1 239:24
245:2

## [large - loan]

large 115:12
266:16
larry 1:21 2;3,7
3:20 5:3 6:2,11,17
8:21 9:12 13:14
25:3 54:25 71:4,7
71:10 75:14 96:5
100:8,12 112:15
128:11 129:12
177:17 178:18
183:13 188:10
191:13 207:23
208:3,5,21 248:5
251:21 270:9
271:2 272:1,5,9
273:21 274:1,6,20
277:4
late 47:17 148:14
232:25
laura 7:8
law 3:21 87:11
93:11,24 96:1
97:7,11,15,18,22
117:15 128:4,8
133:16 147:14
162:15 182:11
218:11
law's 129:11
lawsuit 7:11 35:1
58:24,25 87:20,22
88:19 97:21
143:16,17 150:6
261:3,4,14
lawyer 37:19
120:6 127:25
158:14
lawyer's 19:17,22
78:25 184:25
lawyers 21:5 41:3
42:24 62:7 63:4
64:15 71:6 76:11

76:17,22,25 78:6
128:8 186:17
lead 80:4
leading 126:16
learn 97:12
learned 157:5
leases 257:20
leave 127:13 156:9
237:23 238:6,9
250:24,25
leaving 54:6,13
led 44:21 46:5
47:4 95:3 237:22
left 81:20 82:6
97:19 105:11
116:8 227:16
legal 35:24 43:11
67:16 120:3,4
122:5 158:18,20
238:7 275:7
276:20 277:19
lender 264:4
lent 263:21
letter 5:12 47:23
147:2,12 148:16
149:6,7
letting 13:23 14:6
269:17
level 58:3,13,19
liability 165:1
license 112:13
251:10,12
life 247:14
lifetime 89:17
light 78:15
likable 86:11
liked 30:1 87:6,7
likewise 10:10
liking 86:12
limited 165:1
182:10,14

lindsey 87:13
line 197:14 107:10
197:17 202:22
217:3 235:17
271:4
lines 36:17 197:15
list 73:8
listed 118:15
243:12
listen 7:11 131:21
181:7 234:11
listening 7:3,9,17
litigation 35:8
253:7 117:5
little 10:2 14:18
25:24 28:6 94:12
95:23 108:21
113:4,25 127:7
133:24 139:25
140:10 176:5
185:4 266:21
live 6:4 158:10
lives 158:11
living 112:10
llc 1:4,6,7,8,9,19
1:19,20,21 3:2,3,3
5:9,14 15:7 22:20
26:10 37:16 38:3
39:5 40:12 43:15
43:21 44:7,12
64:2 69:17 81:11
83:10,22 85:9,20
86:9 100:8 107:9
111:5 112:24
113:7 115:21,24
116:4 121:14
128:12 130:4
147:5 152:9
165:10,15,21
166:3,8 172:25
174:11 178:20

100:17 181:10
264:24 273:4,6,7,8
273:9,19,19,20,21
274:17,18,18
277:3
llc's 13:9 15:23
46:3 245:19
loan 17:14 24:10
26:8,18,25 29:6
50:23 51:12,16,22
51:24 52:4,6,21
53:5,18 59:10
60:10,18 68:25
102:6,8,14,19,20
103:19 104:6,12
105:7 106:17
118:2,13,17
108:13,18,20,24
108:14 114:1,8
114:11 118:17
124:19,24 125:4
125:21 126:3,4,12
126:17 127:3,4,11
132:10,13 138:21
140:18 141:14
142:3,6 143:5,22
143:16 153:8,9
134:10,11 136:6
138:9 139:10,13,17
141:20,21,22,25
128:12,24 129:3
128:21,24 129:3
128:12,24 129:3

Page 24

## [loan - mail]

159:1,4 163:24
164:3,6 165:8,8,22
167:6,11 169:10
201:21 170:3,10
171:2,5,13 172:6,7
173:23 174:11,21
175:6,21 179:3,8
179:18 180:7 182:3
180:16,23 181:10
181:11,13,19,24
182:2,22 183:3,9
184:21 185:18
186:4 189:4,5,21
190:5,14,16,18,20
192:7,17 193:13
194:18,23 195:1
200:16,23 201:20
202:20 203:4
204:16,18 226:22
226:23 227:8,21
264:4,16,17,23
265:4 267:1,2,5,15
267:18,19
loaned 99:11
100:7,21 103:16
105:19,19 108:2
115:15 118:25
262:4 264:23
loaning 118:16,18
loans 50:19 100:1
100:3 111:12
112:15,20,21,22
122:12 157:16
174:22 175:1
202:3,8,17,24
203:9,15,16,17
204:5,10,19
located 109:11
long 77:8 118:9
132:8,9 184:3

188:8 263:12
188:12 265:25
259:25 266:15
270:5
looked 17:5,8,11
17:14 58:17 75:14
122:6,6 188:4
242:1 244:19
250:18 256:20
looking 14:07
160:8,8 163:18
176:8 188:2 205:2
211:2,7,10 216:25
220:11,2 221:18
261:16 269:16
looks 28:23 33:12
33:19 126:13,21
132:17 144:7,8
248:12,14
loop 3:22 102:16
109:16 179:25
losing 99:9
loss 155:24 200:14
512 99:3 118:7
202:2
lot 68:11 71:3
87:14 90:11
105:24 119:3
135:9 146:9 179:1
179:4 217:24
247:13 266:7
lots 250:2 262:25
louisiana 182:21
love 21:1
lp 1:13 273:13
lunch 134:4,15,24
lying 193:19

m

m 207:23
machine 2:13
mad 250:16

madame 37:25
52:14
mail 20:7 21:7
22:3,8,12 28:13,17
29:4 33:1,4 47:25
48:11,20,20 54:1
54:25 55:5,6 56:2
56:3 58:14,17
72:22 101:17,23
102:20 104:1,14
105:7 106:17
112:9,10,11 113:6
113:21,24 114:1,8
114:11 118:17
124:19,24 125:3
126:17 127:3,4,11
128:12,24 129:3
128:21,24 129:3
130:4,5 131:16
138:18 189:3,6,8
189:13 190:22
193:11,18,19,20
193:20,21,23
194:1,4,11,16,17
200:1 207:4
222:22 228:10,11
232:15,17 234:7,8

Page 25

## [mail - meant]

236:20,21,21
238:25 239:23
241:11 247:25
248:5,7,9 249:12
249:15,21 250:8
251:15,20,21
252:6,12 256:20
268:6
mailed 102:6,11
104:18,22 106:16
191:9,14 207:9,10
259:8
mailing 28:1 128:8
mails 5:10,10,11
5:11,12,15,16,18
18:9,15 26:13
21:4 33:16 73:11
73:15,19 74:1,8
75:21 95:5,11
98:5 114:4,9,16
114:15,18 126:16
129:11 131:11
143:20 157:16
178:4 185:19
186:1,8,9 189:11
194:2,10 201:9
234:1 234:13
245:4 252:7 253:7
maintenance
220:25
making 60:11 61:5
86:17 100:4
103:19 111:9
119:6 190:8 210:5
231:1
malicious 58:25
man 88:8 96:25
231:25
management
156:20 167:1,5
169:9 171:2,12

172:18
manager 162:1
164:16 207:23
208:3,21 226:16
226:16,16,19
238:2
managers 187:7
226:12,17
march 141:14
142:4 195:21
232:25
mark 70:4 134:20
211:22 231:18
marked 14:24
15:1 27:11,13
28:2 32:15,17
125:9,11 139:13
139:15 141:7
143:23 146:17,19
160:23 161:1
177:10,12,23
179:11 187:9,10
191:6,7 205:11
240:7 247:16
259:3,14
marker 207:22
marketing 156:20
marking 211:22
mason 3:15
274:19
material 166:19
materialized 56:8
matter 107:21
108:15 145:2
mattered 113:1
maximum 48:24
49:11 50:2
mc 80:5
mcleod 4:2,3 6:25
7:3,6,7,13,15,18
8:1,9,16 18:4,9,17

18:25 19:3 20:4
22:14,14,14,20
30:25 31:3 32:2
33:3 36:9,16 48:1
48:12 54:16,17,24
65:1 79:3 80:6,15
80:15 136:25
138:21 139:18
141:8,14 142:3,22
143:12,14 144:3
144:12 146:2,20
149:4
mcleod's 55:6
147:2
mcleod000523
5:12
mcleod001507
5:10
mcleod002215
5:13
mcleod002943
5:10
mcleod0745 5:11
mcleods 18:9 20:7
20:11,24 21:4,4
22:23,25 23:4,9,12
23:24 24:11 26:5
26:8,17,24 27:4,6
29:2,7,21 30:5,6
30:11,19,22 36:13
47:3,8,16 48:16
50:4 56:10 57:7
57:11,16,20,24
58:4,21 59:6
72:19 79:17,21,22
79:25 80:4,8
139:22 138:16
138:21,22 142:7
143:14 149:14
150:19,22 151:1,4

151:13 260:22
261:6,12
mcqueeney 9:17
19:23
mean 8:10 16:19
37:3 39:25 49:4
53:17 54:12 55:14
55:19,24 57:2
58:14 82:6 88:10
96:7 105:12
116:22 117:11
133:22 135:12
143:22 159:25
146:1 185:8 234:7
144:14,19,22
145:17 146:13
151:2 152:15
165:20 174:15
183:12 187:1,2
194:9 214:19,24
219:18 220:4
222:3 228:11
233:2 235:9,17
245:13,15 246:3,5
246:9,11,15,23
257:8,17 268:16
meaning 55:18
252:3
means 55:25 74:22
145:22 208:25
210:7,14 215:1,13
216:18,19 217:7
217:18 219:2,3,5,6
221:6,20,21 222:2
222:2 229:3,4
238:25 239:2,3,25
245:22 246:2,6,8
246:13 263:6
meant 56:3 117:23
142:21 143:3
144:22 145:12
146:1 185:8 223:4

Page 26

## [meant - month]

236:17 239:21
246:23,24 268:17
medication 9:19
meet 22:17 76:11
76:21,24 77:1,3
88:25
meeting 81:10
187:7 203:25
210:19
member 81:25
82:22 83:9,18
85:9 162:1 164:16
165:15,17 166:3,8
169:13 192:9
members 39:5,5,8
40:12,15,15,20
41:11 42:22 43:2
43:14,21 63:13
67:20 81:1 88:1
171:7 267:22,23
memory 63:19
125:1 179:6
men 201:10
mentioned 29:24
merger 32:5
merit 217:6
mes 18:22
mess 286:19
message 18:17
21:7 22:6 104:17
232:16
messages 18:8,14
18:24 19:2,24
20:3,12 21:3,16
22:5,5
met 22:16 76:16
77:1,4,7,8 87:19
88:23 94:7
michael 9:12
127:21,25

middle 126:24
127:5 144:13
183:12
mike 127:8,9
128:11
million 39:8 49:4
49:25 50:1,4,11,14
50:14,18 51:4
57:12 65:1 98:16
99:3,10 100:1,20
100:21 101:3
105:20 114:20
120:15,20,24
122:20 136:3
150:22 151:1,8,10
152:11 153:6,19
154:17 155:1
171:14 198:12,14
199:16 200:9,9,25
201:2,6,14,21
202:2,19,20 204:6
222:19,20,22
237:5,11,12,13,18
239:8,11,13,15,16
239:16,18 241:18
241:23 242:3,4
million 95:17
171:3 227:9
mind 28:8,10
255:6
minds 228:16
mine 20:2
minerals 58:11
72:18 79:12 80:21
107:14 151:12,15
minimum 50:11
miss 50:14
243:15
minute 31:15
160:19 199:21
206:9 231:10

240:14 260:8
274:12,13,13
183:12
minutes 69:14,14
69:17 70:13 81:10
82:23 111:13,16
134:3 171:20,21
172:11,12,15,24
172:24 173:11,13
173:17,22,25
174:3,10,20,25
175:2,3,5,9,20
176:12,21 186:20
186:21 187:1,5,6
191:14,17 202:15
202:18 203:14,25
255:10 260:18
263:1,19 264:25
265:5,8,10,12,14
265:22 266:7,8
267:21
mis 86:24
misleading 58:24
138:11
misrepresent
86:15
misrepresentation
86:25
misrepresentation...
60:12 61:6 86:22
misrepresented
86:14
misrepresenting
60:4 208:7,15
209:14,17
mistake 147:6
185:21 217:20
218:1
mistaken 149:2
185:20 189:6
mister 24:17 73:6

misusing 130:15
mixing 248:18
modification 29:6
moment 140:19
216:4
monday 29:6
money 45:16
46:20 47:12 52:2
52:9 72:16 97:19
98:12,17 99:4,11
99:12,13,23 100:7
100:8,9,11 101:3
102:24 103:10,16
103:18,19 104:4,7
107:21,22,23
108:1,2 113:2,2
118:6,7,16,18,21
118:23,25 119:11
119:18,19 120:21
124:3 121:6
122:17 123:13,16
123:17,17,18,19
124:7,11 130:12
130:14 151:4
151:21,24 153:8,20
256:3 262:5
month 21:14 32:6
45:17 46:19,21

Page 27

**[month - muller]**

| | | | |
|---|---|---|---|
| 48:5 178:8 235:1 | 169:13 170:17 | 226:10 238:4 | 42:16,18 43:6,8,17 |
| 235:3,3,6,6 266:2 | 171:9,25 172:4,6 | 249:4,12,15 | 43:24 44:13 46:17 |
| monthly 45:6,11 | 178:13,17,17 | 251:15 | 50:6 51:11,19 |
| 235:5 | 179:7 180:1,7,10 | morning 8:25 9:1 | 52:1,10,25 53:15 |
| months 32:10,13 | 180:12,15 181:10 | 9:20 73:1 135:9 | 55:20 56:17,21 |
| 56:6 78:10 97:11 | 182:20 183:2,25 | 140:4 255:7,11,22 | 57:14 58:6,23 |
| 149:6 235:16 | 184:5 185:17 | 255:24 257:5,15 | 59:9,23 60:6,13,15 |
| 237:15 | 186:4 188:5,9,17 | 258:6,22 259:1 | 61:8 16,23 62:5,9 |
| moore 2:9 3:8 4:3 | 189:3,20,21 190:6 | 260:20 270:2 | 62:11,14,23 64:4 |
| 6:20,22 17:18 | 190:12 192:7 | mouse 14:18 | 65:6,18 66:5,7,15 |
| 48:25 49:7,10,11 | 193:12 194:5,12 | mouth 171:16 | 66:21 67:5,9,14 |
| 50:3,16 53:17,17 | 194:14,17,23 | 202:5 223:5 | 68:10,14,17,20 |
| 54:17 59:3,25 | 196:2 202:25 | move 35:18 | 69:2 70:3,5,7,10 |
| 60:23 81:20 82:6 | 203:15 204:3,10 | 110:10 143:9 | 70:12,16,22,24 |
| 82:8 83:24 85:16 | 207:20 208:24 | 146:5,7 159:13,13 | 71:2,23 72:1 |
| 85:20,21 86:9,10 | 209:2,9,19 210:6,9 | 175:19 224:11 | 73:10,14,25 74:4,5 |
| 86:15,23 87:6,8,20 | 210:11 217:2 | 246:19 251:5 | 74:6,10,18 75:4,6 |
| 88:4,23 89:1 | 222:14 223:19 | moved 35:11 | 76:1,3,13,20,23 |
| 91:20 92:3,8,10 | 226:19 227:14,15 | 45:18 81:21 98:25 | 77:4,8,22,25 78:3 |
| 93:7 94:1,4,7,17 | 230:25 231:6 | 142:12,17 240:12 | 78:11,20,22 79:5 |
| 94:19 95:1 96:14 | 232:7,8,11 233:8 | moving 90:10,14 | 82:3 90:6,8,16,20 |
| 97:8,9,21 98:9,18 | 233:22,25 234:5 | 98:18 99:1 116:11 | 91:3,10,12 98:15 |
| 101:8,12,14 102:7 | 235:5,16,20 | 99:12 236:3 237:9 | 99:6 103:21 |
| 102:11,15,20 | 236:10 237:1,16 | msj 187:23,25 | 104:13 111:11,23 |
| 103:15,18 104:2 | 238:3 239:14 | 206:21 207:1 | 112:8,25 113:8 |
| 104:11,23 105:8 | 244:18 245:3 | muller 3:4,5,7 | 114:5,14,25 |
| 106:14 107:17,23 | 248:1 250:7 | 6:12,12 7:6,10,20 | 115:11 121:21 |
| 108:12 109:1,19 | 251:13,22 253:15 | 7:25 8:6,12 11:22 | 122:3 123:10 |
| 109:22 110:13,18 | 253:19,25 254:8 | 11:25 12:15,22 | 125:14 126:24 |
| 110:20 111:6,8,20 | 254:16 255:14 | 13:2,4,11,13 23:15 | 127:7 132:14 |
| 112:5,9,18,22 | 256:4,16 257:23 | 23:19 24:1,7,12 | 133:21 134:5,16 |
| 113:6 114:1,8 | 267:22,25 274:20 | 25:20,22 27:8 | 136:18 137:2,12 |
| 115:1 116:8 | 276:9 | 28:5,20 31:6 32:7 | 137:25 138:10,17 |
| 118:17 122:21 | moore's 82:18 | 32:11,20 33:8,24 | 139:1 140:9,14,17 |
| 123:9,12,22 124:2 | 83:1,8 84:2,13 | 34:7,13,24 35:10 | 140:22 141:16,21 |
| 124:22 125:22 | 88:15 93:6 114:13 | 35:15,20,22 36:11 | 142:23 143:6 |
| 127:21 132:10 | 115:16 124:18 | 36:25 38:13,19,22 | 144:24 145:13,21 |
| 133:9,19 134:7,10 | 128:17 131:21 | 38:25 39:7,12,17 | 146:4,6 150:7,21 |
| 150:24 152:16 | 181:17,23 191:2 | 39:20,24 40:2,4,7 | 152:4,12 153:10 |
| 154:1 158:1 | 206:2 207:13,20 | 40:22 41:1,5,14,16 | 156:7,16 157:15 |
| 159:5,9 161:20,25 | 208:8 213:7,8 | 41:20 42:3,12,14 | 158:4 159:3,25 |

**[muller - notes]**

| | | | |
|---|---|---|---|
| 160:7,13,19 164:8 | name 9:11 129:5 | 196:13,21 197:7 | nine 222:19 |
| 176:19,21 177:9 | 129:14 226:19 | 197:19,23 198:24 | 237:15 241:18 |
| 177:17 183:11,17 | 271:2 272:10 | 198:25 199:1,6 | 251:17,17,17 |
| 183:21 184:20,22 | names 63:19 | 200:11,16 201:5 | 270:2 |
| 185:3,10,12 | 128:14 | 214:13,14 216:12 | non 61:1 |
| 187:17,22 191:11 | ne 3:22 | 216:14,21 217:8 | nonrefundable |
| 191:16,19 199:19 | nearly 57:11 | 218:16 219:1 | 97:5 98:17 115:2 |
| 199:24 201:16,23 | 201:15 | 220:13 221:13 | 122:18 201:3 |
| 203:5 204:24 | necessary 71:18 | 222:15,16 229:12 | 220:17 |
| 205:2,6,10 206:13 | 268:5 | 229:20 238:20 | nonrefundables |
| 206:19,25 207:4 | need 13:6 20:24 | 240:25 243:13,13 | 97:4 |
| 208:10 211:6,11 | 27:17 30:6 36:10 | 243:15,20 244:2 | nonresponsive |
| 211:14 214:21 | 71:16 72:10,11 | 245:8,11,15,20,25 | 52:16 59:5 61:2 |
| 216:17 220:15 | 78:14 90:14 | 246:4 256:23 | 83:16 94:10,22 |
| 222:11 224:6,21 | 175:18 189:8 | 260:23 | 112:3 115:5 |
| 225:2,8 227:23 | 192:24 193:3,7 | never 14:8 19:7 | 117:21 185:24 |
| 228:5,13 231:13 | 197:10 199:21 | 30:13 56:8 59:13 | 186:14 221:22,24 |
| 233:10 235:11 | 205:13 206:12 | 59:24 66:18 73:24 | 223:3 225:20 |
| 238:17 240:7,12 | 228:21 254:20 | 81:22 83:15 87:7 | 226:1 |
| 240:16 242:13 | 255:8,22 | 89:6 94:6 96:9 | nonsense 234:14 |
| 244:17 245:10 | needed 37:17 38:3 | 98:8 113:18,22 | nonsignature |
| 246:7 247:23 | 65:5 83:13 86:20 | 120:8 121:24 | 276:4 |
| 254:18,25 255:12 | 108:16 131:6 | 131:19 138:4 | northern 197:14 |
| 257:6 258:3,5,18 | 164:1 167:8 | 139:5 150:9 | 207:17 208:17 |
| 259:2,9,12,19 | 169:24,25 184:15 | 152:13 157:4 | notarize 277:11 |
| 260:2,7,11,16 266:5 | needing 12:24 | 194:13 196:16,20 | notary 189:6,16 |
| 266:11,24 269:12 | needs 183:13 | 198:14 209:6,16 | 189:17 272:16 |
| 269:24 270:3,7 | 258:24 | 222:12 231:7 | note 14:17 |
| 274:12,17 277:1 | negotiate 238:1,3 | 233:15,17,18,18 | 102:5,9 103:5,6,7 |
| multimillion | negotiated 98:10 | 233:19 236:15,18 | 103:9,22,23,24 |
| 111:10 112:23 | negotiations 54:16 | 239:12 241:18 | 104:5,18,22 105:9 |
| 114:23 115:9 | 57:4 149:20 231:4 | 253:10 256:24 | 111:17 116:7 |
| multiple 114:12 | 232:12 | 257:23 261:9 | 136:1,2,2 148:5,22 |
| mute 71:21 205:8 | neither 274:20 | new 35:11,22 | 235:1 248:15,20 |
| 205:22 | nerve 159:18 | 128:12 150:17 | 253:3,5,16 254:1,9 |
| mutual 181:22 | net 50:3 60:19,19 | 194:2 231:11 | 255:16 256:17 |
| mystery 231:25 | 150:10 151:19,23 | 220:21 229:5 | 259:17,20 277:9 |
| | 153:9 154:6,10,25 | 230:25 | noted 272:2 |
| **n** | 155:17,18,19,20 | nice 110:1 | notes 102:22,23 |
| n 3:1 | 156:12 156:13,24 | | 103:1,2,4 105:18 |
| naive 87:1 | 157:19,22 196:7 | news 251:2 | 105:21,21 106:1,2 |

**[notes - okay]**

| | | | |
|---|---|---|---|
| 118:16 119:15,15 | 27:8 32:7,11 | 221:22,24 222:11 | 234:14 237:13 |
| 122:7,16 124:2 | 33:24 34:7,13,24 | 224:6,21,23 225:2 | 242:16 249:7 |
| 171:20,22 234:21 | 35:10,15,20 36:11 | 225:8 227:23 | 253:17 255:18 |
| 257:1 264:25 | 36:25 39:7 40:22 | 228:5,13 229:14 | 256:14 257:8,16 |
| notice 5:9 7:22 | 41:21 42:4 43:6,8 | 233:10 235:11 | 260:2 263:5,6 |
| 15:6 71:14 84:22 | 43:17,24 44:13 | 238:17 244:17 | 65:1 79:3 |
| 90:21 91:4,15 | 46:17 50:6 51:11 | 245:10 246:7 | oil's 7:18 |
| 146:23 147:18 | 51:19 52:1,10,25 | objective 59:12,16 | okay 7:9,24 8:5,16 |
| 148:9,13,14,17 | 53:15 55:20 56:17 | obligation 64:23 | 8:17,20 9:11,18 |
| 149:5,25 189:23 | 56:21 57:14 58:6 | 245:15,20 | 10:2 11:2,3,10,13 |
| noticed 6:21 | 58:23 59:9,23 | obligations 161:20 | 11:15 13:12,21,21 |
| notices 15:10 | 60:6,13,15 61:1,2 | obliged 41:22 | 14:17,23 15:5,10 |
| notifications | 61:8,16 62:14,23 | obtain 30:18 57:7 | 15:21 16:5,15,21 |
| 263:11 | 64:4 65:6 66:7,15 | obvious 155:22 | 17:7,15,21,23 18:2 |
| november 195:18 | 66:16,21 67:5 | obviously 129:7 | 18:12,16,20 19:2,5 |
| null 253:3 | 69:2,3 76:13 | 131:20 192:21 | 19:10,13,16,21,24 |
| number 18:2,10 | 78:22 79:5 82:3 | occurred 138:23 | 19:25 20:3,6,9 |
| 48:14 240:8 275:7 | 83:16 90:13 98:15 | 139:3 234:9 | 21:3,10,15,21,24 |
| 276:21 | 99:6 103:21 | ocr 29:13 | 22:5,11,13,19,22 |
| numbered 2:10 | 104:13 111:11,23 | october 254:3 | 22:23 23:4,8,11,23 |
| 139:18 | 112:7,8,25 113:8 | 256:1 275:1 277:2 | 24:10,14 25:7,15 |
| numbers 141:8 | 114:5,14,25 115:5 | odd 198:20 | 26:11 27:3,10,19 |
| 144:2 146:20 | 115:11 121:21 | offer 84:11 235:7 | 28:5,11,25 29:23 |
| 255:1 258:19,23 | 122:3 123:10 | offered 237:4 | 30:4,4,13,16,21,24 |
| nuverra 132:19 | 136:18,19 137:2,3 | office 91:17,22 | 31:25 32:14 33:11 |
| | 137:12,24,25 | 272:12 | 33:13,20 34:17 |
| **o** | 138:8,10,17,18 | officer 164:16 | 35:7,17 36:12,16 |
| o'clock 270:2 | 139:1,2 142:23 | 271:25 | 36:21,23 38:19,22 |
| 9:2,5 95:14 | 143:6 144:24 | officer's 276:8 | 38:25 39:4,24 |
| 163:2 174:19 | 145:13,13,21 | offices 3:21 | 40:19 41:14,20 |
| 272:9 | 146:4,6 150:7,21 | officially 97:2 | 42:3,11,24 43:1,13 |
| object 13:18 51:11 | 152:4,12 153:10 | oh 10:20 25:7 | 43:20 44:1,18 |
| 52:16 53:15 65:14 | 155:2 156:7,16 | 26:13 39:24,24 | 45:1,9,12,21,25 |
| 66:5 71:6 94:9,22 | 157:15 158:4 | 86:10 88:21 94:14 | 46:15,23 47:8,21 |
| 112:2 117:20 | 159:3 164:8 172:8 | 96:5,8 144:11 | 47:25 48:6,10,14 |
| 172:8 186:13 | 184:20 185:24 | 148:2,4 169:16 | 48:19,23 49:10,18 |
| 190:6 218:23 | 190:6,23 198:13 | 169:18 186:22 | 50:9,18 51:23 |
| 223:10 225:25 | 201:16,23 203:5,6 | 194:21 205:12 | 53:8,12,21 54:1,22 |
| 243:5 | 203:13 208:10 | 206:15 209:1,16 | 54:24 55:4 56:23 |
| objection 7:25 8:7 | 214:21 216:17 | 210:5 217:13 | 57:6,10,20 58:12 |
| 13:17 23:15,19 | 217:23 220:15 | 220:24 233:19 | 58:19 59:4 60:2 |
| 24:1,7,12 25:20 | | | |

**[okay - option]**

| | | | |
|---|---|---|---|
| 60:21,25 61:10 | 136:12,16 137:6 | 195:20 196:7,11 | 249:17 250:21 |
| 62:5,8,13,15,18 | 137:16 139:12 | 196:15 197:11,19 | 251:1,16,24 |
| 64:1,20 65:2,15 | 140:12,20 141:4 | 197:19,25 198:6 | 252:11,20 253:8 |
| 66:3,9 67:2 68:3,6 | 141:13 142:6,10 | 198:11,16,19 | 253:11,25 255:9 |
| 68:8,13,22 69:21 | 143:1,17,24 | 199:10,23,24 | 255:12 256:7,11 |
| 70:1,16 71:1,20,25 | 144:12 145:1,5,23 | 200:1,7 201:4,25 | 256:13,25 257:25 |
| 72:15 73:2,9 74:2 | 146:14 147:2,10 | 202:7 204:2,20,24 | 258:25 259:2,9,12 |
| 74:5 75:5 77:3,19 | 147:15,18,23 | 205:10,22,24 | 259:19 260:2,7,11 |
| 78:19,24 79:2,8 | 148:4,9,20,23 | 206:18 207:11,12 | 260:20 261:1,6,12 |
| 80:3,8,14,23 82:5 | 149:3,12,18 150:4 | 207:20,21 208:4,4 | 261:16,25 263:3,5 |
| 82:16,25 83:5,8,25 | 151:17,23 152:1 | 208:10 209:16,20 | 263:14 264:8,16 |
| 84:11 85:3,8,24 | 152:19,25 153:4 | 210:13,22 211:14 | 265:17 266:23 |
| 86:5,8,22 87:2,4 | 155:3 157:1,9,12 | 211:21 212:6,10 | 267:18 268:1,9,18 |
| 87:23 88:3,18,22 | 157:23,24 159:11 | 212:23 213:4,6,11 | 268:18 269:12 |
| 89:18,23,22 90:1 | 159:17 160:2,15 | 213:19,25 214:2,7 | 269:19 270:4,11 |
| 90:2,4,18,19 91:3 | 160:19,20,21 | 214:9 215:15 | 270:17 271:5,16 |
| 91:21 92:7,13,19 | 161:4,12,19 162:2 | 216:5,9 217:20 | 271:19 272:24 |
| 93:4,9 94:21 | 162:7,11,11,19,22 | 218:4,10,15,20 | 273:4 |
| 96:15 99:2,8,15 | 163:9,23 164:10 | 219:11,21 220:2,6 | 274:19 |
| 101:2,14 102:1,5 | 164:13 165:7,20 | 220:15,15 222:1 | old 168:17 175:16 |
| 103:14,18 104:3 | 167:10,12,14 | 223:8 224:18 | 175:16 |
| 104:20 106:10,19 | 169:16,20 170:1,5 | 225:11,19 227:1 | once 105:17 |
| 107:9,12 108:22 | 170:8,19,25 | 227:20 228:2,18 | 202:16 235:25 |
| 109:11,16 110:16 | 171:11,14,24 | 229:23 230:18,20 | 236:2 |
| 110:22 111:3,8,19 | 172:4 173:13,16 | 230:23 231:2,19 | ones 73:16,21 |
| 111:25 112:18 | 173:22 174:2,8,14 | 231:13 232:18,23 | 78:19 149:21 |
| 113:12,20,24 | 176:18,21 177:2,5 | 233:7,21 234:4,12 | 196:19 197:17 |
| 114:19 115:8,14 | 177:11,17,25 | 234:16 235:14,19 | 200:9 |
| 115:21 117:9 | 178:4,7,12 179:15 | 235:23 236:10,23 | open 21:2 |
| 118:14 119:3,11 | 180:5,10,11,14 | 237:22 238:3,7,14 | opened 185:7 |
| 119:14 120:11,13 | 181:6 182:6 | 238:18 240:1,6,7 | operated 170:12 |
| 121:13,18 122:9 | 183:21 184:7 | 240:16,24 241:14 | operation 86:18 |
| 122:22 125:6,10 | 185:14,23 186:7 | 241:20,22 242:17 | 96:2 220:25 |
| 126:23 128:7 | 187:10,19 188:2,7 | 243:2,7,16,25 | operations 64:12 |
| 129:4,15 131:10 | 188:17 189:7,13 | 244:2,6,8,20,25 | operator 88:14,16 |
| 131:13,15 133:7 | 189:20 190:13,17 | 245:6,7,14,21 | opinion 65:25 |
| 133:18 134:6,10 | 192:2,15,18,21 | 247:7,11,13,17 | 177:13 09:9,22 |
| 135:3,9,15,18 | 193:23 194:4,15 | 249:11,11,13,16 | 131:17 132:2,11 |
| | 194:21 195:4,9,13 | 249:11,11,13,16 | 133:10,18 134:7 |
| | | | opportunity |
| | | | 134:10 234:22 |
| | | | opposed 7:22 |
| | | | 204:11 |
| | | | option 14:2 23:11 |
| | | | 23:22,23 24:4 |

## Page 32

**[option - percent]**

26:5,17,25 27:6
29:1,5,9,17 30:19
49:15,18,23 50:5
142:6,9 143:15,19
150:16,20 151:6
249:25 250:3
**options** 250:2
**oral** 2:2,7 274:6
**organization** 124:2,15 131:1 165:3
**organizational** 124:12 126:6
**original** 51:22 80:13 251:20 276:3,4,10
**ought** 251:12
**outcome** 150:6 274:23
**outstanding** 92:22 93:20
**overdue** 10:5
**overstepped** 86:19
**overvalued** 253:21
**owe** 253:19
**owed** 45:7 47:3,8 47:13 135:24 150:9,23,23 137:8 148:10 149:5 161:25 253:16,20 253:21 254:1,9 255:15 256:2,3,16 264:20
**owner** 63:7,8,9 66:2 68:1 83:21 115:17,18,19,22

165:19
**owners** 89:20 213:9
**ownership** 54:19 30:18 53:13 82:17 83:4 84:1,13 128:17

**p**

**p** 3:1,1 89:7,9,15 243:24 244:3
**p.m.** 2:11 134:18 134:19,19,22 140:24,25,25 141:2 176:23,24 176:24 177:1 191:20,20 231:16 231:17,17,20 249:13,15 260:13 260:14,14,16 270:10,11
**pa** 45:23
**packed** 98:24
**packing** 59:18
**page** 5:18 15:8,15 15:16 17:24 32:25 33:5,15 48:20 54:2 91:8 129:10 141:19,21 144:13 147:19 148:1 161:7 164:11 166:1,1,14,16,17 176:3 195:14 247:5 261:21 263:3,21 268:19 268:20 269:22,22 271:4 276:7
**pages** 127:2 141:17,25 277:12
**paid** 22:25 23:4 154:17 155:1,23 200:10 201:2

214:13 253:22 256:5 257:9,20,20 257:21
**paperwork** 116:17 116:21 117:11,12 117:23 267:3
**paragraph** 147:25 164:11,14 205:25 209:2,13 213:13 214:7,9,20,25 215:21,25 217:22 218:15,16 220:11 220:12,13,19 221:5 223:13 242:18,20 244:8 244:11,15,22
**paying** 122:15
**payment** 47:16,19 47:21 135:5 136:2 136:4 138:2 137:19 148:10,15 149:5,22 245:25 246:4
**payments** 47:3 64:19,20,22 135:18,24 136:9 136:24 137:10,22 138:24 139:7 203:4 256:16
**pdfs** 14:3
**people** 12:19 42:7 96:19 167:7,13,18 167:23 175:17 223:19 228:23 229:2 237:10
**percent** 17:12 45:17 48:25 49:8 49:12 50:4,7,8 63:7,8,9 66:2

**partner** 92:10 213:24 238:13
**partners** 158:7
**partnership** 53:19 165:2
**party** 1:17,23 7:6 7:11,16 35:8 168:1 273:17,23 274:11
**pass** 98:13
**passed** 121:8
**pause** 255:10
**pay** 44:4,7,12,21 45:3 46:5,21 47:10 235:1 237:10,19 245:15 245:20
**paralegal** 260:4
**parameters** 69:5
**part** 8:2 30:2 35:18 57:4,4 81:24 82:8 108:21 124:7 128:20 140:17 141:19 153:11 181:14 201:1 203:20,22 204:25 213:23 217:2 239:7 268:6
**partial** 201:1 221:1
**partic** 44:19
**particular** 20:15 21:1 44:19 45:2,9 46:1,4 101:22
**parties** 56:16 75:23 157:16 167:21,22 168:1,2 169:25 223:17,18 231:1 268:7 274:15,22 276:12

## Page 33

**[percent - prepared]**

81:13,25 82:22
83:4,9,18,21 84:1
84:12 85:9 92:23
104:21 109:12
115:17,18,19,22
134:11 137:13
150:10 153:18
154:16,25 156:5
157:14 158:3
165:19 172:1
196:12 197:14
198:4,7,9,9 200:8
213:15 214:13
216:14,21 222:20
229:11,19 235:1
238:20 239:17
240:25 248:19,19
248:25 252:15,17
252:17
**percentage** 27:5 29:16 30:18 57:7 58:15 198:6,9 199:8 209:10
**pereida** 2:12 4:4 274:3 275:5 276:19
**perfect** 208:4
**period** 21:17 84:25 131:2 180:19 184:6 214:15,16
**permission** 41:25 113:14,15 171:8 236:6
**perpetual** 89:19 89:21
**perpetuity** 206:4 207:14
**person** 11:8 21:22 86:11 98:20

164:16,25 251:12 272:10
**personal** 65:10,10 66:13 67:24 68:25 69:11,13 72:13,17 72:19 79:12 87:15 87:18 100:1,3 102:4 107:14 199:1,7
**personally** 99:9,11 100:9 107:13 202:10,11,11,12 272:9
**persons** 165:3
**perspective** 246:14
**persuasive** 86:10
**perturb** 6:23,23,25 19:5,11,13,16,19 21:16 31:11 112:12 199:21 203:1 233:16
**phrase** 69:8,11 89:11 117:10,22 117:24 186:25 215:16 217:21 244:14
**physically** 9:7
**pick** 249:25 250:4
**picked** 129:14
**piece** 79:6,8,11
**pigg** 49:9 109:24 154:1 215:18 218:14 246:24
**pipe** 89:16 94:25
**pipeline** 1:8,20 3:3 11:20 17:19 26:6 29:8 35:1,9 36:18 43:22 49:1,12,20 51:10 52:7,22 53:5,9,14 58:9,10

59:2,11,12,13,18
71:15,18 86:20
88:11 89:7,9,9,16
89:20 91:22 92:11
95:20 96:4 97:2,3
105:16 108:3
115:18 117:8
119:19 120:14,22
142:12,17 150:15
151:11,14 170:15
172:3,14 189:9
202:10,11,11,12
202:13,14,21,23
213:3,23 222:13
232:5 235:18
239:11 243:19,22
243:23 244:4
245:11 273:8,20
274:18
**pipelines** 88:9
**plain** 216:19
**plaintiff** 1:16,17 273:16,17
**plaintiffs** 1:10,12 273:10 274:17,17
**plan** 34:15 35:3 97:22
**planning** 222:14
**plans** 236:4
**plant** 90:17
**play** 59:11,13,14 150:14,18
**played** 118:1 213:17 225:18
**pleading** 142:1
**please** 6:5,9 11:1 26:22 28:19 37:22 38:6 41:25 109:25 126:25 133:25 140:10 174:7 226:5 236:20

238:24
**pleural** 216:6
**plle** 3:5,10,16
**plus** 120:24 200:9 201:6,14,21 266:14
**point** 54:7 94:6 96:3 98:22 107:20 142:13
**points** 49:2
**portion** 53:7
**position** 80:22 81:21 82:6 182:15 182:19 183:24 228:19,20
**possession** 147:16
**possible** 71:10 74:11 236:4
**possibly** 75:18 84:22
**potentially** 57:22
**pothf** 90:17
**precise** 106:25 116:2
**predated** 265:14
**prep** 121:15
**prepa** 74:14
**preparation** 72:2 73:12,20 78:9,18 173:14 192:22
**preparations** 121:16
**prepare** 16:5,16 16:21 18:25 20:20 74:7,17,21 75:21 76:6,12,17,25 78:20 220:7
**prepared** 16:1 20:9,25 45:5,5 118:4,12 120:7

## Page 34

**[prepared - pull]**

121:13 162:10,12
162:14 176:5,7,16
218:10,13,14
258:13
**preparing** 74:14 77:22 84:18 122:12 276:9
**present** 4:1 129:18
**presented** 2:18 48:4 69:25 72:22 86:18 102:2 108:18 133:19 157:1 173:11 192:19 228:15
**presidential** 157:8
**presumption** 241:17
**presumptions** 241:13
**pretty** 30:2 50:14 115:10 116:10 155:22
**prevent** 221:19
**previous** 116:25 146:8 190:21 193:16 227:1
**price** 49:19,21,24
**print** 139:23
**printed** 260:5
**printer** 176:2
**prior** 62:21 81:2 91:14 123:7 135:5 135:25 136:10 137:22 148:15 172:16,25 174:12 188:20 192:6 193:11 196:11,22
**private** 54:16
**privileged** 31:12 37:5,7 39:18 41:12 42:9,16

61:19 65:12 138:22
**privileges** 266:3
**probably** 32:13 71:16 80:6 93:19 119:21 211:8 255:25,25
**problem** 12:18 35:16 38:15 58:24 86:12 139:22 140:17 210:21 235:13 237:14 256:14,14
**problems** 266:18
**procedure** 2:14 276:12
**proceed** 7:23 8:7 8:18 70:24 91:8 91:16 135:1
**proceeded** 75:16 124:6
**proceeding** 7:16 11:18 22:20 23:2 34:22 63:3 274:22
**proceeds** 152:10 153:7,19 156:5 157:14 158:3
**process** 75:11 266:14
**processed** 74:11 255:2
**processing** 75:9 266:13
**produce** 77:16 223:7 266:9
**produced** 2:8 48:15 69:21 73:11 73:13,16 141:25 173:10
**product** 78:5 82:14

**production** 76:7
**profit** 60:19,20 95:23 96:19,25 151:23 196:21 199:9 200:11,16 201:15,21 216:21 217:8 222:17 229:12,20 239:16 240:25 245:8,16 245:20 246:4 269:23
**profitable** 97:19 237:2
**profits** 50:13 95:25 150:10 151:19 153:9 154:6,10,25 155:17,18,19 156:13,24 157:19 157:22 196:6,13 197:8,20,23 198:6,18,18,23 207:14 214:13,14 216:12,14 218:16 219:1 220:13 221:13 222:15 228:20 243:13,13 243:21 244:2 245:11,25 246:2 247:11,25 255:2 255:2
**project** 197:15,15 207:17 209:10 258:2,16 259:19
**promise** 258:2,16 266:19
**properly** 171:21 171:23
**properties** 1:9,12 1:15,21 2:8 3:8 5:14 6:19,22 24:5 58:25 83:9,22 84:13 85:20 86:9

88:4 95:3 106:3
114:24 115:9,16
116:4 118:4 121:9
121:20 123:9
153:8,17 157:13
161:2,10 172:25
174:10,20 175:6
178:20,22 183:10
196:9 212:14
226:15 229:19
238:15,20 240:20
240:20,25 241:6,7
245:19 260:24
264:24 267:20
272:19
**property** 121:23 124:21 144:3
**proposed** 30:5,11
**protect** 222:10
**prove** 131:7
**proved** 60:17 22:19
**provide** 27:4 82:1 124:4,6,6 156:13 170:8 180:1 257:5
**provided** 21:5 124:5 178:8 192:15 223:1 232:19 253:21,22 254:17
**provision** 168:10
**provisions** 164:22
**prudent** 137:20
**public** 189:6,17,18 272:16
**pull** 192:24

## Page 35

**[pulled - ranch]**

**pulled** 186:11 247:18
**purchase** 49:23 95:4 117:8 130:4 132:19 172:2,13 195:22 213:23 232:5
**purpose** 132:25 210:19,20 212:12 212:15,17,19,20 263:15
**purposes** 91:12 164:15 272:11
**pursuant** 2:14 274:14 276:3
**put** 12:25 36:18 40:20 43:4,22 47:13,24 48:4 59:11,12 69:15 72:11 73:8 74:3 79:15,16,18,18,23 82:14 83:7 92:14 96:7 97:2,4 99:12 105:17 125:5 136:25 137:4 149:8 152:15,15 154:1 155:18 158:6 159:19 163:11 168:15 177:22 199:19 200:19 201:3 202:15,23 204:16 210:16,17,24 222:3 223:5,21,21 223:22,23 226:11 226:19 240:13 242:1 250:13,18 253:17,19,23 254:16 262:5,10 266:17

**putting** 39:6 43:15 64:2 92:17 98:12 101:24 122:17 130:14,16 137:10 170:16 202:5 221:2 262:3

**q**

**qualified** 86:17
**qualify** 52:4
**question** 10:9,11 10:25,25 12:12,13 12:14 13:7 16:15 20:18 26:2,22 31:14,21,25 34:11 37:15,22,24 38:1,6 38:14 71:4,17 40:5,19 41:10,17 41:18 42:1 43:1 43:18,25 51:3 52:15 53:1 58:8 58:13,19 60:9 61:17 62:18,24 64:5,13 65:14,18 66:19 68:9 72:12 76:16 83:19 85:18 88:12 94:11,15,16 102:18 106:25 113:4 114:17 116:2 117:9,11 119:14 122:1,22 123:20 135:19 136:5,7 137:6 142:2 144:10 150:17 154:18,21 155:4,5,17 161:17 165:14,23 169:18 173:22 174:23 181:6,6,7 183:6,12 183:15,18 190:1,8 190:11,11 196:25

197:5,6 220:7,21
224:12 225:6
227:5 229:16,17
233:12 242:4,10
242:14 244:20
262:7 264:2,22
268:18
**questioning** 107:10 176:7
**questions** 9:25 10:6,19,21 11:5 12:16 16:13 24:18 38:14 71:4,17 72:18,19,19 79:9 80:21 81:1,11,16 82:17,21,24 83:17 84:1,8,12 85:9 87:25,25 88:14 99:12,12,13,23 100:7,8,9,16,19,22 102:25 103:10,16 103:19,24 104:22 104:23 105:19,22 111:9,12,13 112:24 113:7 114:3 115:15,21 115:24 116:3,13 116:24 247:17,16 118:4,24 119:1,18 119:19 121:5,14 121:17,19,25 121:24 121:13,24 122:13,24 123:3 123:10,13
**quick** 75:17 176:19
**quickly** 12:9 74:11 111:9,12,13
**quiet** 237:19
**quite** 247:12 257:22
**quote** 269:7

**r**

**r** 3:1
**race** 234:9
**raised** 30:6
**ramirez** 4:5
**ran** 118:5
**ranch** 1:4,6,7,7,8 1:19,19,20,20 3:2 3:2,3,3 5:9 6:4 6:15 11:19,19,20 13:8 15:7,22 23:6 26:6,10 34:16 35:4 37:7,9,10,16 166:3,5,8 167:6

38:2 39:5,6 40:12
40:21 42:22 43:3
43:4,15,15,21 44:6
44:7,12,20,21 45:3
45:8,18 46:2,5
50:16,23 51:17,24
52:2,3 54:10
55:22,24,25 58:11
58:16 63:8,8,9
65:23 66:6,12
69:17 71:11 72:17
72:18,19,19 79:9,8
80:21 81:1,11,16
82:17,24,24 83:17
87:25,25 88:14
99:12,12,13,23
100:7,8,9,16,19,22
103:9,13,13,22,23
103:19,24 104:23
104:24 104:23
105:9,10,16
109:7,8,10 110:2
111:10,12 111:5
112:21 113:7
114:4,24 119:1,18
119:19 121:5,14
121:24 123:19
125:24 116:13,13
116:24,25 244:19
190:11,16

**[ranch - reflected]**

| | |
|---|---|
| 169:10,14,21 | 205:20 207:18,19 |
| 170:10 171:3,6,13 | 210:17 214:17,18 |
| 171:22 172:12,19 | 218:4,6,7,8 220:1 |
| 173:6,18,24 | 221:6 222:22 |
| 174:12,21 175:7 | 223:15 241:23 |
| 175:21 179:3,19 | 242:4,6,7,9,12 |
| 180:3,12,17,23 | 244:23 248:9 |
| 181:10,25 182:2 | 261:4 263:2 272:1 |
| 183:3 184:2 | 277:6,8 |
| 185:18 186:5 | **reading** 111:14,15 |
| 190:5,15 192:8,12 | 188:25 189:1,2 |
| 193:13 195:2 | 223:15 |
| 201:4 202:4,17,25 | **reads** 245:4,18 |
| 203:17,18,21 | **ready** 11:13 20:23 |
| 204:3,14,15 | 71:21 134:25 |
| 209:23 213:8 | 159:6 177:3 192:4 |
| 227:8 261:17 | 200:1,5 230:19,21 |
| 262:4 264:5,7,17 | 231:11,21 253:18 |
| 264:24 267:2,20 | 258:16,17,18 |
| 273:4,6,7,7,8,19 | 260:17 270:4 |
| 273:19,20,20 | **real** 8:3 83:6 89:5 |
| 274:17,18,18,18 | 110:1 263:12 |
| 277:3 | **realize** 222:12 |
| **ranch's** 53:12 | **realized** 86:19 |
| 81:25 264:13 | 185:21 |
| **ranches** 86:4 | **really** 17:17 20:14 |
| **rate** 194:22 | 69:13 75:17 80:11 |
| **reach** 8:3 | 96:23 97:10 104:6 |
| **reaction** 92:4,7 | 104:6 107:20 |
| **read** 6:5 28:19 | 108:15 113:1 |
| 29:10 32:21 33:5 | 137:17 148:6 |
| 33:9,9,16 38:1 | 152:2 153:2 156:3 |
| 48:7 52:15,18,18 | 158:5 165:24 |
| 85:7 125:15,18,20 | 168:7 228:10 |
| 126:3,9,20,22 | 234:20 258:17 |
| 127:18 129:24 | 269:4,16 |
| 132:15,15 139:24 | **reason** 9:23 13:6 |
| 140:24 155:6,15 | 64:16 82:8 88:19 |
| 167:2 180:24,25 | 88:20 92:14 93:4 |
| 181:1,20,22 | 93:9,15 96:15 |
| 192:25 197:1,4,7 | 113:15 200:15 |

| | |
|---|---|
| 242:23,25 243:2,4 | 270:9 274:7,16 |
| 243:6 248:20 | 277:13 |
| 271:4 | **recorded** 6:4 |
| **reasons** 69:9 276:7 | **records** 135:7,10 |
| **reassert** 52:25 | 136:13 |
| **recall** 45:2 51:5 | **reducing** 58:10 |
| 69:12 173:16 | **refer** 22:22 44:23 |
| 179:4 | 90:1 210:1,3 |
| **recalling** 263:13 | **reference** 54:5 |
| **receipt** 100:11 | 55:15 56:7 119:5 |
| **receipted** 100:11 | 177:14 257:10 |
| **receipts** 99:21 | 258:22 263:24 |
| **receive** 48:25 | 266:7 |
| 49:11,12 50:3 | **referenced** 30:14 |
| 74:8 147:12 | 277:5 |
| 151:21 154:16 | **referred** 73:11 |
| 198:17 | 106:9 124:12 |
| **received** 74:8 75:9 | 193:18,21 263:21 |
| 131:12 147:15 | 265:23 |
| 148:13 188:13 | **referring** 24:21,24 |
| 194:6,9 198:11 | 29:23 54:10,14 |
| 199:14,16 218:21 | 64:20 73:15,19 |
| 218:21 219:3,23 | 89:8 92:16 97:24 |
| 240:25 256:22 | 99:25 101:21 |
| **receiving** 178:16 | 103:4 119:8,16 |
| **recessed** 270:11 | 124:13,23 126:4,7 |
| **recognize** 126:1 | 144:17 151:9 |
| **recollection** | 170:16 179:6,13 |
| 109:17 123:2 | 186:22 194:1 |
| **record** 6:10,25 | 207:21 208:5 |
| 13:14,20 28:3 | 209:14 214:4 |
| 31:24 41:21,22 | 240:4 252:25 |
| 43:14 62:18 70:17 | 262:14 |
| 70:20 76:8 78:16 | **refers** 71:14 189:5 |
| 91:13 134:17,21 | 209:2 217:15 |
| 140:21,23 141:1 | 219:21 |
| 176:22,25 191:17 | **reflect** 122:12 |
| 191:24 192:7 | 172:17 173:3,18 |
| 199:2 231:15,15 | 174:11,20,25 |
| 258:15 260:10,12 | 175:6,21 187:6 |
| 260:15 269:13 | **reflected** 81:10 |

**[reflecting - revenues]**

| | |
|---|---|
| **reflecting** 121:18 | 68:25 77:13,15 |
| 159:1 | 80:11,16 105:10 |
| **reflects** 221:8,8 | 108:23 109:21 |
| **refused** 207:16 | 110:23 111:7 |
| 208:14,16 | 136:11 144:25 |
| **refusing** 38:8 | 145:8,22,25 179:8 |
| **regarded** 182:19 | 179:19 186:6,14 |
| **regarding** 178:20 | 187:8 188:15 |
| 184:5 | 191:4 192:23 |
| **regular** 7:22 | 194:24 195:3,6 |
| **reimburse** 97:3 | 196:3,6,10,14 |
| **relate** 145:6 | 205:16 231:3,5,6 |
| **related** 16:20 18:4 | 239:10 258:19,20 |
| 20:11 23:12 35:8 | 262:6 268:10 |
| 75:23 121:14 | **remembering** |
| 125:25,25 134:2,8 | 110:2 175:17 |
| 231:4 233:9 234:2 | **remembers** 231:6 |
| 234:6,19 253:16 | 231:8 |
| 254:1,9 255:15 | **renegotiate** 96:24 |
| 256:16 274:22 | **rep** 13:8 16:2 |
| **relates** 244:3 | 132:24 254:7,21 |
| **relating** 16:12 | 258:13 |
| 21:25 51:15 | **repeat** 26:22 40:4 |
| **relationship** | 40:5 109:25 110:2 |
| 166:20 | 110:5 172:21 |
| **relationship's** | 229:16 |
| 87:17 | **repeating** 143:9 |
| **relayed** 95:10 | **rephrase** 26:2 |
| **relaying** 142:24 | **rephrasing** 172:9 |
| **release** 151:10 | **replaced** 19:10 |
| **released** 151:12 | **reported** 2:13 |
| **releases** 269:14 | **reporter** 4:4 6:5,7 |
| **relevance** 166:9 | 6:8 7:1 8:19 9:3 |
| **relied** 215:17 | 37:25 38:2 52:14 |
| 219:7,17 | 52:20 98:2 109:25 |
| **relief** 42:6 | 172:21,22 194:1 |
| **remember** 17:22 | 205:19 274:3 |
| 22:7 32:3,5,8 | **reporter's** 5:6 |
| 36:15,19,22 44:21 | 274:1 |
| 46:1,10 48:3 | |
| 53:19 58:16 63:25 | |

| | |
|---|---|
| **repre** 121:16 | **residential** 9:15 |
| **represent** 25:3 | **resignation** 17:18 |
| 125:19 135:15 | **resolution** 54:6 |
| 136:21 | **resources** 58:4,21 |
| **representations** | 129:21 178:23 |
| 231:1 | **respect** 15:23 16:2 |
| **representative** | 60:12 61:6 92:23 |
| 6:15 11:17 16:17 | 93:12 102:6 |
| 20:10,19 25:5,18 | 161:23 182:10 |
| 34:10,18,20 44:20 | **respectfully** 61:18 |
| 46:11 74:22 169:8 | 65:11 |
| 219:1 195:15 225:5 | **receptor** 200:8 |
| 256:12 258:10 | **respectively** |
| 265:25 | 196:13 |
| **represented** | **respell** 133:14 |
| 110:2 175:17 | **respond** 48:16 |
| **representing** 87:1 | 54:25 55:5 65:4 |
| **represents** 221:10 | 68:14,20 67:4,22 |
| 231:8 | 129:11 130:2 |
| **request** 75:9 76:7 | 170:9 |
| 170:9 | **responsibilities** |
| **requested** 128:11 | 81:24 82:1 |
| **require** 98:8 | **responsibility** |
| 178:21 180:19 | 20:23 |
| **required** 60:18,23 | **restate** 53:3 |
| 73:22 123:12,15 | **resume** 255:10 |
| 123:23,25 124:8 | 270:7 |
| 124:11 167:13,18 | **retained** 197:13 |
| 167:23 176:16 | **retire** 97:22 |
| 170:13,14 171:6 | **retired** 19:7 97:13 |
| 172:2 184:10 | 107:22 247:10,10 |
| 189:5 226:5 227:7 | **retract** 91:3 |
| 266:14 | 201:23 |
| **requirements** | 218:23 |
| 124:18,22 125:3 | **retracting** 91:5 |
| **requires** 27:4 | **return** 274:9 |
| 187:3 | 277:12 |
| **rescinded** 91:15 | **returned** 276:3,7 |
| **researching** | **returns** 257:19 |
| 101:24 | **revenues** 218:20 |
| **resell** 130:6 | 219:2,3,23 220:12 |
| 132:19 | |

**[revenues - saltwater]**

| | |
|---|---|
| 220:16,20 221:5 | 98:13 99:5 102:12 |
| 243:16,21 | 102:21 105:3,8 |
| **review** 16:17,21 | 106:3,15,15,20 |
| 17:4 18:8,22,24 | 107:18,18 108:13 |
| 41:23 74:19 | 108:14 109:1,6,8 |
| 163:25 192:22 | 109:13 110:24,24 |
| 196:21 | 115:10,17 116:15 |
| **reviewed** 16:7,8 | 118:2 119:12 |
| 16:12,14,24 20:12 | 120:7,15,20,25 |
| 73:12,19 74:7,14 | 121:9 122:10,13 |
| 74:17,21 75:21 | 122:25 123:1,6,22 |
| 76:1 173:14 | 125:13 127:5,12 |
| **reviewing** 72:21 | 128:9 129:8,9,12 |
| 254:4 | 130:2 131:8,15,25 |
| **right** 7:5 8:1,14,15 | 132:2,2,4,9,18 |
| 9:12 14:12 18:4 | 133:20 134:11 |
| 19:3,13 20:12 | 139:14 140:13 |
| 22:1,13 23:13,17 | 141:3,6,18 142:7 |
| 23:25 24:3,5 25:4 | 147:8 150:2,15,16 |
| 25:17 26:18,24 | 150:19 151:5,6,14 |
| 27:5,7,12 29:8 | 154:8 156:6 159:2 |
| 30:16,19 32:16 | 159:2,23 160:12 |
| 33:14,21 34:3 | 160:15,16,24 |
| 35:9,19 36:18 | 161:13 164:14 |
| 40:1,13,17 42:20 | 165:16 166:18 |
| 47:22 49:20 50:24 | 171:15 172:17 |
| 51:10,10,14,16,17 | 173:1 174:12 |
| 51:25 52:5,7,9,22 | 176:1,8,11,18 |
| 52:24 53:6,9,14,14 | 177:19 178:9,9,15 |
| 55:5,7 57:3,8,22 | 179:15 182:4,12 |
| 58:1,5,15,16,22 | 185:18 6:16 |
| 59:8,19,22 60:5,12 | 188:3,6 190:24 |
| 61:6 62:15 64:13 | 191:5,19,21 195:7 |
| 70:1,23 71:14 | 195:17 196:12 |
| 74:4 79:3,9 80:9 | 197:13,16,17 |
| 80:15,19 81:15 | 198:12 199:2 |
| 82:2,18 83:2,10,18 | 200:4,20,25 201:1 |
| 85:10,13 89:4,6,12 | 201:7 205:12 |
| 90:2,4,21 91:17,19 | 206:6 207:7,8,18 |
| 91:23 94:25 95:4 | 207:22,24 208:5 |
| 95:16 96:16 98:6 | 208:18,20 210:22 |

| | |
|---|---|
| 211:14 221:11 | 49:1,13 71:13,17 |
| 213:1,2,9 214:11 | 89:19 90:2 91:14 |
| 217:15 218:7 | 235:18 243:19,22 |
| 219:4,24 220:2,24 | 244:1 273:8,21 |
| 222:4 228:16,22 | 274:18 |
| 231:4 232:8,12,24 | **royalty** 29:15 |
| 232:25 233:4,9 | 30:18 |
| 234:2,6,18,23 | **ruin** 236:21,24 |
| 235:9,25 236:2 | **ruined** 97:13 |
| 237:2 238:16 | 113:17 |
| 242:11 244:10 | **rule** 215:13 |
| 245:21 247:17,23 | **ruled** 157:12 |
| 249:2 251:14 | **rules** 2:14 276:4 |
| 252:5 255:13,14 | 276:12 277:14 |
| 256:15 257:14 | **run** 97:20 98:23 |
| 258:23 260:9 | 129:19 244:15,21 |
| 261:16,20 262:6 | 244:22 245:2,16 |
| 262:14 263:20 | 245:21 |
| 264:5,9,9,11,14,22 | **running** 97:23,23 |
| 265:15 267:19 | 235:4 |
| 269:13,15,20 | **runs** 245:7,12 |
| 270:1,3,7 | |

| | |
|---|---|
| | **s** |
| **road** 3:5,10 | |
| **roberts** 98:6 99:14 | **s** 3:1,14 128:12 |
| 99:23 100:10,20 | 274:12,13,13,19 |
| 100:23 101:4 | **sa** 82:10 |
| 112:14 262:23 | **safekeeping** 276:6 |
| 264:20 | **sake** 98:3 |
| **rod** 98:6 100:10,19 | **sale** 50:13 86:17 |
| 262:23 264:20 | 152:11 155:20,21 |
| **rodgers** 127:21,25 | 156:4 158:6 159:2 |
| 185:18 6:16 | 182:12 195:23 |
| 146:10,11 162:17 | 196:12 201:6 |
| **role** 263:9 | 220:25 238:16 |
| **room** 8:3 239:9 | 243:17,18,22,23 |
| 254:13 | 243:3 245:9 |
| **room** 9:7 11:7 | 262:14 |
| 200:4,20,25 201:1 | **sales** 85:2 153:19 |
| 201:7 205:12 | 155:6 157:14 |
| 206:6 207:7,8,18 | 158:3 221:1 |
| 207:22,24 208:5 | **salt** 139:24 |
| 208:18,20 210:22 | **saltwater** 97:6 |
| **roust** 255:7 | 133:19 134:8 |
| **row** 1:8,21 3:3 | |
| 11:20 26:6 43:22 | |

**[san - sent]**

| | |
|---|---|
| **san** 1:2 3:6,23 9:8 | 217:7,18 218:25 |
| 273:2 | 219:5,24 220:2,4 |
| **saw** 206:1 | 220:22 221:3,7,13 |
| **saying** 25:12,13 | 221:14 226:15 |
| 38:9 49:10 50:2 | 229:6 236:20,22 |
| 51:8 67:10 84:22 | 244:7 245:4,22,24 |
| 103:6,7 104:5 | 246:2 249:9 251:6 |
| 106:8 122:11 | 252:2,24 253:3 |
| 123:25 131:16 | 263:3 |
| 132:11 137:14 | **scam** 130:13 |
| 143:7 156:11 | 184:12 194:14 |
| 162:7,9 165:24 | 203:22 213:18 |
| 168:13 172:4,7,17 | 221:20 222:14 |
| 174:2 180:11 | 223:6,7 237:7,8 |
| 181:16,21 182:6,9 | **scammed** 223:23 |
| 183:7,8 184:3 | 223:24,24 |
| 185:7 188:19 | **scammer** 204:7 |
| 190:7 193:1 | **scenario** 154:15 |
| 199:12,14 200:23 | 156:25 |
| 201:12 204:2,24 | **school** 156:19 |
| 208:23,23 209:13 | **scoot** 28:5,8 |
| 233:19 235:8 | **scope** 183:1 |
| **says** 21:19 27:20 | **screen** 10:22 13:1 |
| 54:24 90:21 97:3 | 14:2,14 27:13,20 |
| 123:18 124:3 | 32:18 53:22 70:2 |
| 127:8 128:11 | 125:7,7 127:13 |
| 129:16 130:21 | 139:15 140:18 |
| 132:23 147:24 | 141:6 160:25 |
| 148:1 164:15,22 | 177:20,22,22 |
| 165:6,13 166:19 | 179:12 187:15 |
| 167:3 178:17 | 206:11 207:7 |
| 180:25 181:20 | 211:23 212:3 |
| 182:1,5,13 183:4 | 247:19,25 259:15 |
| 184:4,4,5 188:18 | 261:22 |
| 189:14,19 206:1 | **scroll** 32:21 33:4,6 |
| 207:12,21,22 | 33:15 125:14 |
| 208:20 209:11,21 | 126:11,15 |
| 214:10 215:1,14 | **scrolling** 15:15 |
| 215:20,22 216:1 | 48:15 |
| | **sea** 266:12 |

| | |
|---|---|
| **seal** 272:12 | 259:15 261:21 |
| **second** 14:10 | 262:8 |
| 28:21 33:5 90:2 | **seeing** 138:15 |
| 95:22 117:5 129:6 | 220:22 |
| 136:2 160:22 | **seek** 136:24 137:9 |
| 161:7 190:9 | **seen** 104:15,19 |
| 199:20 206:20 | 73:11 174:10,14 |
| 211:11 260:3,7 | 201:9 |
| **seconds** 269:12 | **sell** 35:1 49:1,12 |
| **section** 164:15 | 49:19 96:4 108:3 |
| **secured** 79:3 | 124:3 224:11 |
| **see** 6:24 8:3 10:15 | 232:12 234:23 |
| 10:17 11:14 12:9 | 235:5,8,9,16,18 |
| 14:13,17,21 15:2,8 | 236:3,6 238:11,12 |
| 15:10,12,17 16:12 | 239:15 |
| 17:25 18:6 19:5 | **seller** 53:9 98:21 |
| 23:21 27:15,19,22 | 112:3 120:14 |
| 28:7,12 29:18 | 120:14,20,25 |
| 32:18,20 48:14,21 | 121:3,7 189:10 |
| 49:2 54:8 55:2,11 | 224:8,8,17 264:9 |
| 58:14 125:7,11 | 264:14 267:19 |
| 126:12,15 127:9 | **selling** 49:22 86:13 |
| 128:21 132:2 | 87:17 234:24 |
| 137:23 139:15,20 | **senator** 87:10 |
| 139:22,25 140:6 | **send** 47:25 102:14 |
| 140:15 146:7 | 103:14 108:5,11 |
| 147:5,20 159:6 | 109:18,21 110:13 |
| 163:3 165:25 | 111:4 112:18 |
| 164:13,20 166:19 | 120:16 123:7,12 |
| 178:5,14,24 | 186:16 194:8,11 |
| 182:13 184:4 | **sending** 188:9,10 |
| 187:15,18 188:8 | **sends** 188:9,10 |
| 195:24 196:22 | **sense** 55:1 |
| 197:3,8 208:20,22 | **sent** 7:8 22:7,8 |
| 211:23 212:1,5,11 | 46:18 49:8 106:13 |
| 214:3,5,6,9 220:20 | 107:17,19 108:15 |
| 220:23 221:2 | 108:16,17 109:14 |
| 221:12,13 120:23 | 110:15,25 120:13 |
| 236:20 244:8 | 120:16,19 138:23 |
| 246:24 247:2 | 141:14 142:3 |
| 248:2,4,8 251:23 | 146:16 149:6 |
| | 157:16 170:11,25 |

## [sent - sir]

**sent** 173:21 176:2 179:21 180:1 193:24 194:4,5,13 194:14 202:9,10 202:11,12,12,13 222:23 234:7 259:24
**sentence** 48:24 132:8,10
**separate** 71:15 89:25 118:21 121:1,2
**september** 2:4,10 6:2 15:12 271:3 274:2 275:6 276:19
**sequence** 149:9
**series** 1:7,8,19,20 3:3,3 5:9 11:19,20 13:9 15:7,23 26:6 43:16,22 46:3,5,12 178:4 273:7,8,19 273:20 278:18,18
**served** 48:16 73:24 276:12
**service** 76:7
**set** 101:8 128:14 164:22
**settl** 107:25
**settle** 35:1 54:18 207:5
**settled** 55:1
**settlement** 5:15 31:1,4,7,12 54:16 54:20 55:15 56:8 60:3 61:4 108:1 146:11 191:9,13 195:8,17 202:21 206:24 207:5 210:20

**sham** 158:14
**shane** 4:5 13:22 14:7 140:21 191:21
**shape** 116:8
**shapes** 13:24,25 14:1,25 27:12 53:22 70:2 141:6 177:20 191:1 211:24 214:13 216:14,21 217:8 220:25 246:5 259:15 261:22
**shared** 7:18 32:18 57:20 93:16 125:6 125:7 177:22 187:10,15 237:1 246:1
**shares** 245:16
**sharing** 10:22 14:9 139:14 160:25
**sheet** 277:10
**shelby** 35:8,12,14 35:16 36:17 142:12,18 143:13 160:5 207:15
**shock** 106:21
**shoot** 105:11 192:4
**shorthand** 2:13 274:3
**shortly** 10:23
**shoulders** 175:24
**show** 10:23 27:13 32:16 106:17 121:22 123:16 124:24 141:7 177:11 221:16 228:9
**showing** 15:1 143:25 146:18 191:7 259:13,17

**shown** 122:15 222:17 276:12
**shows** 47:11,12 222:17
**shrugging** 175:24
**shut** 222:24 231:7 239:20
**shuts** 233:15,18,19
**sic** 97:8 98:8
**side** 29:14,24 30:10,14 35:2 85:1,2 160:8
**sided** 233:23
**sides** 215:17 225:20
**sign** 23:22 84:7 101:10 178:19 180:10,11 189:17 218:6 226:20,21 226:22 227:6,7 242:6,9,12 247:1,4 277:6,11
**signature** 5:5 178:21 180:9,19 189:6,18 226:10 247:5 268:21,22 271:1 272:1 274:9 275:5 276:7,18
**signed** 46:8 60:10 99:19,20,20 100:11 113:10 161:9,12,15 163:3 188:19 189:8 191:3 195:14 206:1 217:10 218:5 223:16 224:9 226:14 227:21,21 241:24 242:5,8 244:19 247:2,3 252:10 277:17

**significant** 114:24 136:17 229:12
**signing** 161:20 182:11 188:21 189:16
**silent** 55:10
**similar** 241:22
**similarly** 179:15
**simple** 190:9,10,11
**simply** 43:1 61:20 85:3 88:12 116:10 122:22 123:20 245:8
**single** 21:7 114:1,8
**singular** 216:6
**sir** 7:5 8:19 9:2,3,9 9:13,18,22,23 10:13 11:20,24 14:15,21 15:8,9,13 15:17,19,25 16:3,4 16:6,20,25 17:8,25 18:6,17 19:25 20:4,8,18 21:8,16 22:2,4,23 23:2,9 23:20 24:13 25:16 25:21 26:13 27:15 27:22 28:18,18 29:10,18 30:23 31:14,18,23 32:19 33:23 34:1,22 35:12,14 37:19,24 38:5 42:24 46:6 46:12 47:24 48:6 48:8,17,20,21 49:2 49:16 50:17,21,25 51:3,7,13,22 52:12 52:13 53:7 54:3,8 57:8 58:5 59:8,20 63:20 69:8,22 79:13,13 80:1

## [sir - specific]

83:20 84:8,9 85:3 85:7,14 86:7,16,23 89:10 92:1,22 93:14 94:16 95:7 95:8,12 96:8 98:1 98:14 99:10 101:13,19 102:13 103:9 104:21 105:1,4,6 108:10 109:6 111:15,22 112:3 114:17,19 114:22 115:7,13 116:10 121:17 126:1 127:17,23 128:24 129:24 131:3,5 132:13 134:5 135:1,2,21 135:21 137:1,7 138:16 141:15 144:4,6,9 145:20 146:16,22,24,25 147:11,12,17,21 147:25 149:9 150:6 151:3,3,25 152:17 153:14,24 154:21,23 155:25 156:22 158:3 162:21 163:1,14 164:20 165:5,6,19 166:3,23,23 167:2 168:3,18 169:8,22 170:10 174:3 175:7,18 177:4,9 178:2,5,14,24 179:4,9,19 181:1,7 181:21 182:16 183:19 186:10,15 186:25 188:14,24 188:25 195:11,24

197:6,18 198:20 198:22 200:3 201:20 204:8 210:4,22 211:19 212:4,14,16,24 218:8 219:9,21 219:9 220:21 221:9,12 228:4,6 229:15 230:8 232:10 233:24 242:20 244:5 248:13 251:21 252:5,16 254:8 256:11,17 257:12 259:15 261:18 262:15 263:16 264:7 265:21,21 266:8 268:4,5
**sit** 44:19 45:1,4,10 46:10,16 109:17 145:10 173:17 174:18 175:13,25 219:5
**sitting** 25:12 255:21
**situation** 60:19,22 64:18 69:6
**six** 32:9,13 80:6 97:11 204:19 265:12
**skill** 85:25 86:2
**sounds** 70:16
**small** 29:15,16 84:25 96:21 153:11
**smarter** 8:14
**smeberg** 3:5 34:8 34:14,15 35:3,4 239:9 254:13

**smeberg.com** 3:7 277:1
**snell** 3:21
**snuck** 267:12
**softball** 118:1
**sold** 155:22 200:11 222:14,24 235:3,3,22 262:15
**solely** 164:24
**solutions** 275:7 276:20 277:19
**somebody** 151:9 174:6,8 218:11
**son** 93:11,24 96:1 97:7,11,15,18,22 128:8 129:11 133:16 182:11
**soon** 230:9 236:3
**sorry** 6:13 11:22 11:25 25:22 26:13 39:24 77:7 79:14 116:2 145:17 150:1,16 152:7 158:1 166:15 183:11 185:3,4 194:7 213:7 216:13 236:1 240:12 254:18 265:12
**sound** 10:13 145:3 232:25 233:3
**sounds** 70:16 87:16 231:13
**south** 87:10,12 98:19,25 227:14 251:11
**southwest** 157:5
**speak** 44:23 45:11 46:7,9,13,22 47:7 47:15 50:25 52:12

61:12 63:11 75:21 82:19 84:3,9,10,16 93:2 95:6,6 101:5 106:5 109:3 111:17 113:9 114:6,9,15,18 116:5,18 123:5 135:8,10,11 136:15 139:3 143:21 145:4 149:10,13,19 153:22 154:3 157:17 158:10 164:3 165:4 165:12 175:2,4 176:12 228:19,22 233:1,5 246:8,16 253:2
**speaking** 13:17 24:20,25 51:4 90:11
**speaks** 12:18 44:9 34:14,15 45:8,24 47:23 49:5 60:16 60:16 61:9 103:22 103:24,25 104:8 131:14,22 132:3 133:22 144:8,9,19 145:8 155:10,15 162:5 163:7,10 166:2 167:15,15 167:16 176:11,17 214:22 215:1,2,7 224:22 225:3,7,9 225:14 226:8 252:21
**specific** 5:17 23:10 255:16

## [specifically - supposed]

**specifically** 118:17 132:18 189:21 197:1
**spell** 173:11
**spelled** 125:2,3 238:25
**spells** 84:3 102:23 124:17 154:2 212:21 239:23
**spend** 77:22
**spent** 45:16 72:20 72:24,25 78:4,19 84:18,20,23 97:16
**split** 82:17 83:1,3 95:25 150:23 158:7
**spoke** 30:24 42:7 61:23 62:1,6 65:2 93:23 94:12
**spot** 133:25
**spring** 233:3
**spyglass** 9:17
**stack** 159:25
**stake** 84:13
**stand** 163:15 172:22 216:1,3 227:4,24 228:1,3
**standard** 217:24
**standings** 83:14
**stands** 97:25 217:6 228:8 241:11 245:17,17
**start** 10:9,11 31:24 37:9 44:6 85:4 88:10,11 124:14 124:16 183:17 257:23 268:24 269:10,18
**started** 6:8 11:9 96:11 101:6

**starting** 249:12
**starts** 126:12 127:3 128:7 188:5 251:20,21
**state** 2:13 6:9 25:11 37:15 41:21 83:14 143:12 174:19 182:20 186:23 187:3 257:19,21 272:7 272:16 274:4
**stated** 9:12 25:9 99:17 118:18
**statement** 49:4,5 50:10 55:8 60:3 60:10,17,19 61:4 144:18 145:5 146:1 183:12 195:21 233:14 239:24 248:10,17
**statements** 69:24 90:12 130:7
**states** 1:1 14:20 60:11 103:7 104:6 156:10 273:1
**stay** 154:23 157:6
**stayed** 96:24
**step** 255:19
**steve** 88:7,8,12
**stick** 193:16
**stop** 8:6
**storage** 21:19
**straight** 84:24 119:11 264:8
**straighten** 117:14
**strategy** 234:19 236:3
**street** 275:8 276:21
**strictly** 189:14 217:11

**strike** 114:21 116:1
**string** 48:11 125:21 127:12,20 128:7 144:1 187:16 247:25 248:9 251:21
**strolle** 28:14,17 29:4 120:2,6,8 121:13 122:6,11 122:23 128:5 162:12,20 170:2,8 170:12,13 171:7 171:23 179:17,22 180:1 181:13 185:5 186:17 191:3 218:11 250:15,16,16,18 263:4 267:4 268:10,13
**strolle's** 128:2,3 234:8
**studied** 73:5,8 125:2 156:19
**study** 72:25
**stuff** 139:24 266:17
**styled** 2:10
**subject** 44:1 188:0 150:19
**submit** 253:18 256:2
**submitted** 254:3 255:2 274:8
**subpoena** 48:16 276:9
**subpoenaed** 77:17
**subscribed** 272:10
**subsequently** 80:10

**substance** 9:19 62:7 76:17 77:23
**substantial** 115:6 115:10
**subtract** 155:21
**suc** 215:10
**successful** 96:2
**successors** 1:8 214:14,19,24 215:11,16,20,24 216:5 217:14,15 217:21 218:22 219:24 224:5,20 224:25 225:12 226:5 242:19 245:25 246:4 273:8
**sue** 209:22 210:4
**sued** 87:24 88:15 131:12
**suggest** 12:25
**suit** 206:4,5 207:15,16
**suite** 3:11,17,22 275:8 276:21
**summary** 199:24 160:18 177:8,15 177:18 187:13 204:22 205:4 211:2,9 240:4,10 247:21
**summer** 186:18
**sunset** 3:5
**supplement** 255:22
**supplemental** 199:20
**supposed** 113:19 113:22,23 218:25 250:7

## [sure - testified]

**sure** 8:13 11:14 13:2,4 18:11,18 19:4,7 20:5,14 22:24 28:22 34:14 42:22 69:6 70:9 70:9 86:1 89:14 98:2 100:4 116:16 116:18,25 118:2 123:11,23 127:1 135:7 140:22 141:17 166:9,9 174:13 175:23 183:25 194:20 194:20 204:1,13 213:15 230:10 231:5,6,23 234:20 251:7 254:13 263:8,17 266:1
**surveys** 202:22
**suspend** 260:19 270:1
**swayed** 150:9
**swd** 17:6 86:3 87:25 88:14 95:21 95:22 96:18 97:20 97:23 108:1 203:23 253:16 235:7 140:22 256:17 257:1,9
**swd's** 93:7 95:19 97:25
**swear** 6:6
**swore** 44:16,16,24 46:8,8
**sworn** 2:9 6:7 8:22 45:6,19,20 46:14 46:20 47:6,14 135:13 274:6

**t**
**tab** 15:3 125:12 211:23
**table** 85:25 130:18 134:7,11
**take** 9:6 12:7,10 14:9 34:19 44:10 53:13 70:7 74:12 96:21 112:23 113:6,13 114:2 126:9 129:22 174:13 175:23 176:20 188:15 194:20 204:1,13 213:15 230:10 231:5,6,23 234:20 251:7 254:13 263:8,17 266:1
**taken** 2:9 20:2 50:20 192:3 274:15,23
**talk** 22:13 31:4 34:8,14 36:12 51:4 52:11 54:19 63:2 64:8,11,13 80:14 92:12 165:7 179:1 225:15 233:22 234:3 236:20,24 265:24
**talkative** 233:20
**talked** 35:2 42:23 49:6 61:20 63:7 64:17 80:20 142:19 205:15
**talking** 25:17 44:5 50:19 58:14 59:17 68:17 99:22,24,24 100:19 103:1 105:25 106:1,2 107:9,11 109:9 119:25 120:18

124:19 146:8 154:5 165:8 179:16,16 187:6 223:20 231:7 234:20 236:12 249:22,24 253:10 262:12 268:14
**talkings** 189:13
**talks** 128:21 146:11 225:15 233:15
**taught** 19:8
**tax** 257:19
**taxes** 257:20
**tcleveland** 3:12
**tcr** 208:1
**tcrg** 51:13 59:18 60:3,11,11 61:4,5 80:10 152:11 155:1 157:14 195:14,18,22 196:2,5,7,11,18,22 196:23 197:9,21 197:23 198:3,8,12 199:17 200:10 201:6,14,21 205:15 206:24,25 207:16,21 208:12 209:4,7,11,14,23 210:3,3,8,11,18 232:13,24 233:9 234:1,3 262:15
**team** 224:10
**tee** 125:17
**tel** 9:3 11:6 32:24 33:6,10 56:3 65:4 66:14 68:23 72:22 80:18 92:4

95:2,14 111:20 112:4 114:11 143:17 149:3 159:7 160:12 162:21 168:3 168:4 169:7 184:18 202:5 205:6 215:23 216:2 230:10 232:1 234:4 236:19 237:18 238:24 251:6,8,12 255:20,20,24 257:7,16,17 258:3 261:6
**telling** 133:9 192:17 211:21 212:7 212:17
**tells** 37:19
**ten** 18:19,23 70:13 70:14 176:21 190:8 231:10 235:22
**term** 89:6 105:11 214:4 251:6
**terms** 124:7 124:17 161:16 162:3,24 163:6 163:12,16,19,22 192:17 193:13 194:18 248:6,11 249:20 252:12
**terrazas** 3:10
**terrill** 1:22 21:25 22:9 231:24 232:7 233:9 234:1,6
**test** 24:25
**testified** 8:22 45:6 65:4 66:14 68:23 74:16 75:20 176:9

## Page 44

**[testified - time]**

testified 13:8

193:10
testify 9:20,24
16:1,16,22 18:10
20:9,20,23 44:11
68:1 74:17,22
133:7 135:14
225:5 257:15
258:13
testifying 13:8
15:22 18:3 25:5
85:5,8
testimonies 46:20
testimony 11:16
16:6 44:24 45:20
46:14 47:6,14
51:6 65:24,25
68:25 72:25 75:3,5
75:6 78:12,15
95:8 99:2 110:12
112:21 113:5,25
135:14 138:25
139:3,6 145:5
171:4,5,9 179:19
181:2,3,4 182:22
193:2 194:16
209:1,24 210:2,15
216:11,12,13,18
233:7 243:8
262:25 274:7,15
277:8
texas 1:1 2:13 3:6
3:11,17,23 9:8,17
83:14 86:4 88:15
97:20,23 100:10
157:6 182:21
186:24 227:19
251:5 257:22
273:1 274:4 275:5
275:8 276:19,22
277:3

20:3,12 21:3,7,16
22:5,6,9 29:24
104:15 138:21
221:18 222:10
232:15
thank 62:15 65:15
78:12 111:3 133:8
134:15,16 136:14
146:16 152:25
158:11 172:23
183:19 184:6
186:10,12,15
190:24 194:21
214:2 242:17
246:22 270:3,6
thanks 131:10
191:19 231:14
therefor 276:7
thing 71:12 83:3
90:2 141:18 160:9
192:11 242:3
249:5 251:6
257:24
things 71:16 76:5
89:15 110:8,14
120:19 146:9
198:1 208:15
225:13 252:7
think 6:24,25 7:2
7:14,16 10:7 12:7
12:15 13:13,13,14
13:15,19 15:20
17:5,16,17 21:18
31:12 35:6,11
37:2 38:17 44:8
58:7 65:18 71:23
73:15,23 74:4,12
74:15 76:2,7
79:19 81:22 82:19
82:19 86:18,24,25
88:3 91:7,7,13

95:5 96:4 102:3
105:14 113:1,20
124:8,10,24 126:5
129:22 130:1
136:22,23 158:5
160:17 161:22
169:12,15,19
183:7,13 185:6
194:19 207:9
209:19 211:2
213:16 216:4
217:1,24 218:3
227:12 229:3,3
231:25 232:23,24
237:1 247:2 254:4
254:19,25 255:1,2
256:4 258:12,14
259:21 260:2
262:21 263:11
268:19
thinks 91:14
third 1:17,23
75:22 95:25 96:1
96:1,18,24 161:8
231:1 237:17,23
thought 25:3
40:7 81:22 86:1,2
95:10 96:1,22
117:16 139:8
184:18 185:8
192:23 204:13
thoughts 95:10
thousand 107:25
122:20
threat 210:3
threatened 209:22
three 12:4,18
25:25 34:10,22
56:6 61:14 71:5
72:21 80:20 93:6
96:19 97:13

105:14 107:7,7
127:2 136:25
137:5,21 141:16
141:17 147:3,6,7
149:6,15 171:7
181:14 226:9,13
226:16,20,21
227:6,20 228:23
235:6,16 236:7,11
239:18 268:7
269:23
three 129
throckmorton
275:8 276:21
throws 130:17
tie 110:8 179:24
till 228:7
tim 6:18 10:20
11:22 25:22 38:13
38:13 39:20 40:8
68:10 70:8,22
71:23 74:4 104:9
101:1 125:15
126:25 132:3,15
132:24 133:21
140:10,19 141:17
148:6 160:8
176:19 183:18:11
187:18 190:9
191:11 199:19,24
205:2 206:12,20
207:6 242:6,9
254:18 260:8
269:12,16 270:3
time 6:3 7:12 12:4
12:7 21:17 26:1
29:1 30:24 31:2
31:18 32:1 47:9
47:17 48:1 64:24
65:19 70:5,7,18,21
84:25 93:17,18

Page 44
Veritext Legal Solutions
800-336-4000

## Page 45

**[time - try]**

97:16,19 98:16
99:17 111:2 115:3
115:14,22 118:6
130:2 132:14,15
134:18,21 138:4,7
143:18 139:7
140:24 141:2
142:6,25 144:13
144:22 145:6,12
148:15 149:4,20
162:21 165:22
176:23 177:1
186:17 202:1,6
203:1 213:6
214:15 215:18
217:16,17 231:16
231:19 234:23
238:24 250:10
255:4 260:13,16
261:10 262:19
266:21 270:10
274:11,15 277:15

74:24 75:21 76:6
76:25 77:1 78:21
84:18 85:6 90:12
126:16,19 130:25
145:10 152:20
163:1 173:14,17
174:19 175:14,25
176:5 179:1
182:23 219:9
225:5 254:8,12
255:5,21 258:14
258:17,18 266:7
266:22 267:8
268:24
today's 6:2 75:24
76:12 270:8
told 11:3,21 20:2
37:21,23 64:21
65:4,23 66:11
67:4,23 75:10
83:12,15 94:19
96:12 98:21
109:23 112:14
142:24 143:8,9
160:13 175:15,15
175:15,16 189:7
192:12 194:19
221:20 230:6
236:15,18 250:15
252:18 261:3,9,12
tired 262:19
268:23
title 259:24
today 9:3,25 10:7
10:21 11:16 15:2
15:11,22 16:17,22
18:3,10,25 19:22
20:1,19 22:22
25:5,19 34:18
44:19 45:2,4,10
46:11,16 74:15,17

top 28:13 32:20
56:23 125:12
166:14 249:19
258:19,23
topic 16:19,20
18:10 20:10
199:13,14 179:4
254:7,23 258:17
269:11
topics 15:17,23
16:3,6,8,18 17:24
26:20,25 28:4 47:1
85:5
total 51:12 118:23
120:15 130:13,14
200:18 203:16
253:23 262:4
263:18
tough 233:11
transaction
164:23 166:21,25
170:15 178:22
196:2,5 198:2
233:4 239:21,22
transcript 274:5,6
274:8 276:3,4,10
277:5,16
transferred
263:19
transmissions
10:5
trap 183:23
traveling 227:14
treat 175:16
treated 93:11
trial 228:9,14,14
228:17,19 229:1
230:23 276:6
trick 233:3

trickery 233:5
tried 16:19 41:24
98:23 108:3 138:7
159:5 185:21
187:5 234:24
239:18
trouble 110:2
263:13
truck 19:20,21
20:1
true 24:8 28:16
35:21 45:3,10
48:10 100:25
121:14 127:19
133:1 132:25
134:4,12 141:13
142:1 164:23
165:11 166:7
182:19 201:22,24
202:4 221:9 247:1
248:24 272:4 274:4
274:7
truly 86:24
trust 5:17 36:18
121:18 122:2
142:12,18 143:9
158:14 259:11
261:25 263:7,10,15
268:15,19,21
trustee 263:4,7,10
truth 9:3 94:19
168:24 69:16,18,16
221:20
truthfully 9:21,24
try 13:15 14:5,11
40:9 57:7 62:25
68:16,19 133:14
143:8 152:21,23
152:24 179:24
235:5 238:7,11,15

Page 45
Veritext Legal Solutions
800-336-4000

## Page 46

**[trying - view]**

trying 13:22 20:14
21:2 26:3 37:4
53:19 56:24 59:10
77:15 90:25 97:17
100:5,17 104:10
106:8 107:4 110:1
110:8 116:11
124:25 132:25
139:23 153:14
156:17 168:17,18
174:9 176:5 181:1
182:7 183:14,22
183:23 192:25
221:19 223:5
238:12 241:12
257:16 259:21
263:1,1 269:10
tune 157:8 204:5
turn 75:10 161:7
210:23 254:12
264:23
turned 22:4 73:22
267:1
turns 130:17
twelve 133:23
twenty 166:16
269:12
twice 41:24 184:3
two 12:11 13:19
31:22 32:25 40:16
43:3 46:2 66:17
67:2 68:24 69:9
71:15,16 72:21
73:1 74:12 76:4,5
76:5 81:8 89:15
89:20,23,25,25
93:18,19 95:19,19
97:4,13 110:14
118:21 120:18
122:20 133:13

136:1 141:18,24
156:3,19 154:16
155:1 158:7
193:22 198:12,14
199:15 200:9,25
225:12 227:19
237:13 251:5,7
262:3
tx 277:13
type 30:16 47:16
52:8,23 232:4
235:7

**u**

uh 63:22
ultimate 34:25
ultimately 95:3
100:22
unable 44:12,21
45:3 46:5 47:10
understand 9:2,5
9:9 14:3 15:21
25:16,19 26:2
30:7 38:14 39:20
41:9 42:24,25
45:1 48:17 69:7
71:8 95:12 104:10
106:13 107:15
100:22 122:11
131:13 132:21
141:9 145:11
152:17 153:4
161:19,23 174:9
180:20 182:7
183:23 217:13
219:18 222:9
235:15 246:13
255:20
understanding
7:17 92:21 143:2
161:24 199:6
237:25 263:6,9,14

understands 12:15
25:10
understood
192:10 200:22
261:5
unfortunately
90:17
united 1:1 14:20
273:1
university 227:18
unpack 106:8
119:3
unreportable
12:23 41:8 47:1
68:15 78:2 133:2
136:6 140:2
152:22 153:13
154:9 155:7,13
156:23 168:9
169:1,6 170:22
182:18,25 184:8
189:25 190:3
193:5 199:3,13
208:2,19 209:8
220:10 222:6
228:24 249:3
250:14 253:14
254:22 265:11,20
267:24
unusual 10:3
updated 233:25
234:5
upset 8:12
upsets 8:10
upwards 99:7
use 128:24 129:20
276:6
uses 128:24
130:22

utmost 93:11
uvalde 1:7,20 3:3
11:19 43:15 46:5
46:11 273:7,20
274:18

**v**

v 1:11,18 273:11
273:18 277:3
valid 163:9
valuable 85:25
86:1
value 88:3 239:10
venture 85:19
128:13 237:2
venue 35:13
verbal 148:18
verbally 192:14
verify 128:13
277:8
veritext 275:7
276:20 277:12,19
veritext.com.
277:13
versus 76:6 155:21
video 10:15,22,23
11:3,8 140:18
videoconference
2:12 3:4,9,14,15
3:21 4:2,3,3,4,5
videoed 11:8
videographer 4:5
6:1 14:1,8 70:17
70:20 134:17,20
140:23 141:1
145:22 192:4,8
191:25 231:15,18
260:12,15 270:8
videotaped 2:2,7
276:6
view 107:20 182:8
229:1

Page 46
Veritext Legal Solutions
800-336-4000

## Page 47

**[void - wires]**

void 253:3
voidable 164:24
voided 164:23
volume 2:5 266:16
vote 167:1,4,8,10
167:12,17,19
168:13,14 169:20
170:23 171:1,13
172:18 173:3,4,18
173:23

**w**

wait 14:10 207:25
207:25,25 208:1
waited 176:4
266:2
waiting 213:14
215:13 217:1,5
230:5
waiving 266:3
want 8:7,13 25:23
38:15,23 39:23
48:19,23 54:18
62:1 66:1 67:10
70:10,12 72:7
72:11,25 78:8
79:3,19 80:9,15,19
82:2 85:4 86:2,19
89:4,6,12 90:2,24
90:21 91:19,23
94:25 95:4,16
96:5,16 98:6,13
99:5 102:12,21
105:3,8 106:15
107:18 108:13
109:1,6 110:24,24
116:15 119:12
120:25 122:10,16
122:25 123:6,22
127:14 130:14
134:11 138:24
191:2 193:22
202:24 206:17
207:5 213:11
238:9 246:17
250:24 255:19
256:1 257:17

wanted 30:9 97:12
98:2,9 127:17
128:13 159:7
206:13 223:2,18
238:1,21 250:10
250:23,25 252:18
229:22 229:3
223:16 231:4
232:8,12,24 233:9
234:2,6,18,23
235:9,25 236:2
237:2 238:16,22
245:12 247:2
249:1 250:9,23
251:11 252:18
256:24 261:9
265:15 267:19
ways 190:8
we've 23:24 62:18
70:11 76:8 78:9
87:7 91:1,7 93:18
141:16,18 158:22
158:25 160:13,20
187:5 192:3
253:17 254:17
256:23 257:19,20
257:20 260:2
wealth 87:13
wealthy 88:8
wearing 68:11
71:5 105:14
week 32:4 49:8
74:12 77:2,7,8,9,9
77:9,10,14 78:8
237:20
weekend 16:7
weeks 72:21 116:9
178:7
wells 97:25 133:20
134:8
went 19:9 65:2,21
66:11 67:2,19

173:1 174:12
178:9,10 182:12
192:11 196:12
213:1 221:3
221:19 222:3
222:19,20 223:9
223:16 231:4
232:8,12,24 233:9
234:2,6,18,23
235:9,25 236:2
237:2 238:16,22
245:12 247:2
249:1 250:9,23
251:11 252:18
256:24 261:9
265:15 267:19
ways 190:8
we've 23:24 62:18
70:11 76:8 78:9
87:7 91:1,7 93:18
141:16,18 158:22
158:25 160:13,20
187:5 192:3
253:17 254:17
256:23 257:19,20
257:20 260:2
wealth 87:13
wealthy 88:8
wearing 68:11
71:5 105:14
week 32:4 49:8
74:12 77:2,7,8,9,9
77:9,10,14 78:8
237:20
weekend 16:7
weeks 72:21 116:9
178:7
wells 97:25 133:20
134:8
went 19:9 65:2,21
66:11 67:2,19

68:1 69:9 88:19
93:21 95:15
100:19 104:1
106:20 107:24
116:9 117:14
120:10,24 125:4
129:8 147:13
151:8 187:9
201:11 217:4
224:15 237:9
west 3:5,16
western 1:1 273:1
whatsoever
252:18
whichever 250:9
252:18
wife 40:16 43:3
66:18 67:2 68:18
116:9 117:14
120:10,24 125:4
81:5 160:14
wife's 201:1
william 3:21 5:12
6:16 25:2 102:4
274:13,20
willing 152:24
218:18
wiped 200:24
wire 100:18 101:3
101:7,7,7,8,9
117:2,5,5,6 120:23
265:3
wired 53:8 99:13
100:9,22 105:11
105:15 116:25
118:7 119:11,19
122:20 122:16,17
127:14 130:14
138:24
wires 101:5
120:14,16,17,19

Page 47
Veritext Legal Solutions
800-336-4000

**[wiring - zero]**

| | | | |
|---|---|---|---|
| **wiring** 99:23,25 | **worn** 269:16 | 117:24 125:6,17 | **wrote** 55:13 56:2,4 |
| 104:1 | **worried** 163:12 | 125:20 127:20 | 76:3 131:12 143:5 |
| **wish** 94:6,18 239:3 | 219:19 235:2 | 130:20 131:10 | 144:21 182:2 |
| 239:25 | **worry** 115:3 | 134:6,23 135:3 | 228:10 |
| **withdraw** 53:3 | **worsham** 7:18 | 137:19 139:14,21 | **y** |
| 62:12 | **worth** 237:25 | 140:5,15 141:3,24 | **y'all** 56:24 97:1 |
| **witness** 2:8 6:6,7 | 239:13 275:8 | 143:25 150:2,5 | 108:19 117:15 |
| 6:11 12:25 24:25 | 276:22 | 152:10 153:6 | 224:16 228:15 |
| 28:23 33:12,19 | **wrap** 269:10 | 157:2,23 160:3,24 | 267:6 |
| 39:23 42:13 78:12 | **wright** 1:22 2:3,7 | 163:20 164:12 | **y'all's** 117:18 |
| 90:15,25 91:2,7 | 3:20 4:6 5:3 6:2 | 174:7 177:2,21 | **yeah** 7:7 14:6 |
| 95:13 109:24 | 6:11,13,14,17 8:21 | 181:18 182:8 | 28:20 63:17 70:12 |
| 110:5 126:13,21 | 8:25 9:12,16,18 | 183:8,22 185:15 | 70:12,14 74:10 |
| 127:4,9 132:17 | 10:2,20 11:13,13 | 187:11,14,21 | 75:4 106:4 127:15 |
| 144:7 177:12 | 11:15 12:12 13:5 | 189:12 190:11 | 127:17 129:14,25 |
| 204:25 207:2 | 14:13 19:11 20:13 | 192:3 193:11 | 133:4,6,6 134:1 |
| 211:13,16 212:2 | 24:10,22 25:3,17 | 200:4 205:14,22 | 137:13 144:8 |
| 248:12,14 258:12 | 26:4,13,16,23 | 207:23 208:3,5,21 | 146:25 159:15 |
| 259:16 260:5 | 27:12,17,22 28:12 | 209:23 210:9,25 | 160:13 185:10 |
| 266:8,9 267:7 | 28:12 31:24 32:16 | 219:16,19 220:11 | 193:21 208:4,6,23 |
| 271:2 274:6,7,9,9 | 32:25 33:21 37:8 | 222:8 223:14 | 209:3 211:16,25 |
| 277:5,7,9,11,15 | 39:2 40:3,13 | 224:2 226:3 | 219:13 220:4,18 |
| **wood** 129:6 | 42:21 44:4 52:17 | 229:11 231:21 | 240:18 241:17,21 |
| **word** 69:4 71:3,13 | 53:4,24 56:2 | 232:6 234:19 | 248:15,25 249:6 |
| 117:25 118:2 | 57:10,21 58:20 | 240:22 241:22 | 250:20 251:25 |
| 150:8 157:4 201:8 | 61:3,12 62:10,17 | 247:8,24 248:5 | 252:3 253:2 |
| 220:20 | 62:20 63:18,21,23 | 249:18 251:14,22 | 254:20,25 256:14 |
| **words** 55:13 93:5 | 64:7 65:22 66:10 | 255:14 259:4,13 | 257:16 262:24 |
| 93:9,15,23 95:14 | 66:25 67:23,25 | 260:1,17,22 | **year** 19:11 22:18 |
| 130:15 171:16 | 68:23 70:1 71:20 | 263:10 266:25 | 29:8 97:11 121:6 |
| 202:5 221:2,11 | 72:8 73:18 76:9 | 267:8,17 269:9,20 | 142:4 146:2 |
| 223:5 233:25 | 76:11,19 78:8,14 | 270:9 271:2 272:1 | 227:13 251:5 |
| 234:4 236:16 | 79:2 82:22 83:17 | 272:5,9 273:22 | **years** 18:19,23 |
| 246:8,16 251:10 | 84:11 88:1,1 91:9 | 274:1,6,20 277:4 | 80:6 97:13 168:17 |
| **work** 14:25 78:4 | 91:17 94:11,23 | **wright's** 42:4 | 227:19 235:22 |
| 98:24 102:3 252:9 | 97:24 98:4 100:9 | **written** 148:13 | 247:12 251:7 |
| **working** 14:13 | 100:12,18 101:11 | 150:9 214:16 | **yesterday** 14:4 |
| 29:6 75:17 90:23 | 106:7 107:16 | **wrong** 117:25 | **z** |
| 102:4 236:6,8 | 108:5,25 110:8 | 209:20 235:13 | **zero** 122:15 |
| **world** 59:2 158:11 | 111:20 112:16 | 257:18 260:3 | |
| 158:11 159:6 | 113:25 116:2 | | |

Page 48

**[zoom - zoomed]**

| | |
|---|---|
| **zoom** 2:11 6:4 | |
| 10:3 | |
| **zoomed** 140:6 | |

Page 49

---

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

---

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

### Page 1

```
 1        IN THE UNITED STATES BANKRUPTCY COURT
              WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION
 3   IN RE:                    §  CHAPTER 11
                               §
 4   KrisJenn Ranch, LLC,      §  Case No. 20-50805
                               §
 5        Debtor              §
     _____  §  _____
 6                             §
     KrisJenn Ranch, LLC,      §
 7   KrisJenn Ranch, LLC-Series§
     Uvalde Ranch, and KrisJenn§
 8   Ranch, LLC-Series Pipeline§
     ROW, as successors in     §
 9   interest to Black Duck    §
     Properties, LLC,          §
10                             §
          Plaintiffs           §
11                             §
     v.                        §  ADVERSARY NO. 20-05027
12                             §
     DMA Properties, Inc. And  §
13   Longbranch Energy, LP,    §
                               §
14        Defendants           §
     ------------------------- §  -----------------------
15   DMA Properties, Inc.,     §
                               §
16   Cross-Plaintiff/Third-Party§
17   Plaintiff                 §
                               §
18   v.                        §  ADVERSARY NO. 20-05027
                               §
19   KrisJenn Ranch, LLC,      §
     KrisJenn Ranch, LLC-Series§
20   Uvalde Ranch, and KrisJenn§
     Ranch, LLC-Series Pipeline§
21   ROW, Black Duck Properties,§
     LLC, Larry Wright, and John§
22   Terrill,                  §
                               §
23   Cross-Defendants/Third-   §
     Party Defendants          §
24                             §
25   -----------------------------------------------
                                            Page 1
```

### Page 2

```
 1         ORAL AND VIDEO DEPOSITION OF
                  LARRY WRIGHT
 2             (Reported Remotely)
                  Volume 2 of 2
 3             September 30, 2020
     -----------------------------------------------
 4
 5        ORAL AND VIDEO DEPOSITION OF LARRY WRIGHT,
 6   produced as a witness at the instance of DMA
 7   PROPERTIES, INC. AND FRANK DANIEL MOORE, and duly
 8   sworn, was taken in the above-styled and numbered
 9   cause on September 30, 2020 from 9:14 a.m. to 6:01
10   p.m., before Gloria Carlin, CSR No. 498, in and for
11   the State of Texas, reported by stenographic method,
12   at the offices of Muller Smeberg PLLC, 111 W. Sunset,
13   San Antonio, Texas, pursuant to the Federal Rules of
14   Civil Procedure and Federal Bankruptcy Rules and any
15   provisions stated on the record.
16   Job No. 4272514
17        A P P E A R A N C E S
18   FOR THE DEBTOR KRISJENN RANCH:
19        Charles John Muller IV, Esq. (VIA ZOOM)
          MULLER SMEBERG PLLC
20        111 W. Sunset
          San Antonio, Texas 78209
21        210.664.5000
          john@muller-smeberg.com
22
     FOR THE FRANK DANIEL MOORE AND DMA PROPERTIES, INC.:
23
          Timothy Cleveland, Esq. (VIA ZOOM)
24        Austin H. Krist, Esq.  (VIZ ZOOM)
          CLEVELAND | TERRAZAS PLLC
25        4611 Bee Cave Road, Suite 306B
                                            Page 2
```

### Page 3

```
 1        Austin, Texas 78746
          512.689.8698
 2        tcleveland@clevelandterrazas.com
          akrist@clevelandterrazas.com
 3
          Christen Mason Hebert, Esq. (VIA ZOOM)
 4        JOHNS & COUNSEL PLLC
          14101 Highway 290 West, Suite 400A
 5        Austin, Texas 78737
          512.399.3150
 6        chebert@johnsandcounsel.com
 7   FOR LARRY WRIGHT IN HIS INDIVIDUAL CAPACITY:
 8        William Germany, Esq. (VIA ZOOM)
          BSK LAW
 9        1250 NE Loop 410, Suite 725
          San Antonio, Texas 78209
10        210.824.3278
          wgermany@bsklaw.com
11
     ALSO PRESENT:
12
          Daniel Moore (VIA ZOOM)
13        Gwynne Wright (VIA ZOOM)
          Adam McLeod (VIA ZOOM)
14
          Shane Ramirez, Videographer (VIA ZOOM)
15        VERITEXT LEGAL SOLUTIONS
          300 Throckmorton Street
16        Suite 1600
          Fort Worth, Texas 76102
17        800.336.4000
          mince@veritext.com
18
19
20
21
22
23
24
25
                                            Page 3
```

### Page 4

```
 1                   INDEX
 2   Appearances ................................    2
 3   Stipulations ...............................    6
 4   LARRY WRIGHT
 5        EXAMINATION BY MR. CLEVELAND.............   7
 6   Signature and Changes ......................  235
 7   Reporter's Certificate .....................  238
 8                  EXHIBITS
 9   NO.       DESCRIPTION                        PAGE
10   Exhibit 10  Previously marked exhibit         29
11   Exhibit 17  Previously marked exhibit         52
12   Exhibit 17  Previously marked exhibit        136
13   Exhibit 19A Handwritten corrections to        10
                 testimony
14
     Exhibit 20  Real Estate Lien Note dated       11
15               8-14-2017
16   Exhibit 21  Bigfoot Promissory Note          143
17   Exhibit 22  Harris SWD Agreement             147
18   Exhibit 28  WRIGHT-000195 to WRIGHT-000197   193
                 Consent of Members and Managers
19               of Black Duck Properties, LLC
                 dated 7-13-2017
20
     Exhibit 29  Minutes of the Special Meeting of 87
21               the Managers of Black Duck
                 Properties, LLC
22
     Exhibit 31  Real Estate Lien Note dated      128
23               8-14-2017
24   Exhibit 33  Notice of Default dated 9-27-2018 186
25
                                            Page 4
```

| | | |
|---|---|---|
| Exhibit 34 | Minutes of Special Meeting of the Managers of Black Duck Properties, LLC dated 11-14-2018 | 127 |
| Exhibit 35 | Minutes of the Organizational Meeting of The Managers of Black Duck Properties, LLC, from January 18, 2016 | 115 |
| Exhibit 37 | McLeod Option Agreement | 213 |
| Exhibit 38 | Ledger relating to Harris SWD | 222 |

REQUESTED DOCUMENTS/INFORMATION

NO.   DESCRIPTION                    PAGE
              None

CERTIFIED QUESTIONS/INSTRUCTIONS NOT TO ANSWER

NO.                         PAGE/LINE

1   Okay. Well, Mr. Wright, Mr. Muller    179:22
    and Mr. Smeberg are smart lawyers,
    but they'll be the first to tell you
    they were not living these events
    years ago like you were. So they
    don't have personal knowledge of the
    facts. And that's why I'm asking
    you, did you review the pleadings in
    this case that they filed on your
    behalf before they did so?

2   Mr. Wright, have you reviewed any    180:15
    pleadings in this case that were
    filed, not getting into what counsel
    told you. Have you reviewed any
    pleadings in this case before they
    were filed?

Veritext Legal Solutions
800-336-4000

---

THE VIDEOGRAPHER: Here begins the deposition of Larry Wright. Today's date is September 30th, 2020. The time is 9:14 a.m.

This deposition is being recorded live via Zoom. Will the court reporter please do the read-on and swear the witness.

THE REPORTER: This deposition is being conducted remotely in accordance with the Federal Rules and Federal Rules of Bankruptcy Procedure and the 22nd Emergency Order Regarding the COVID-19 State of Disaster.

My name is Gloria Carlin, CSR No. 498. I am administering the oath and reporting the deposition remotely by stenographic means from Mansfield, Texas.

Would counsel please state their appearances and locations for the record and list any other persons who may be present with them.

MR. MULLER: John Mueller for the Debtor KrisJenn Ranch. I'm present in my offices in San Antonio, and present are Larry Wright and Gwynne Wright.

MR. CLEVELAND: This is Tim Cleveland on behalf of DMA Properties, Mr. Moore, Longbranch Energy, and Mr. Borders. My colleague, Austin Krist, is also on the Zoom call. We are at the Cleveland

Veritext Legal Solutions
800-336-4000

---

Terrazas office in Austin, Texas.

Also joining on our side is Christie Hebert, counsel for DMA, Longbranch, et cetera. She is in Austin, Texas. And also joining us is our -- one of our clients, Daniel Moore, who is joining by Zoom from North Carolina.

THE REPORTER: Any other counsel?

All right. If the witness would raise your right hand, please.

Do you solemnly swear or affirm that you are Larry Wright and that your testimony will be the truth, the whole truth and nothing but the truth?

Can't hear you. You're muted.

THE WITNESS: I do.

THE REPORTER: Thank you.

LARRY WRIGHT,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. CLEVELAND:

Q. Mr. Wright, good morning again.

A. Good morning. I have two corrections if I could get those on the record first, please.

Q. Yes, sir, and I just wanted to confirm a couple of housekeeping matters. You understand that you're under oath and this is the continuation of

Veritext Legal Solutions
800-336-4000

---

yesterday's deposition, both in your individual capacity and as the corporate representative of the debtors. Do you understand that, sir?

A. Yes, sir.

Q. Okay. So your counsel advised before we went on the record that, Mr. Wright, you had a couple of corrections wanted to make to your testimony yesterday. What are those corrections that you need to make, sir?

A. On several of the DMA emails I kept referring to them as hypothetical, but what they were were different proposals that Daniel Moore was putting forward. And I used the wrong word, because they were his proposals. And there was several --

THE REPORTER: They were what? I'm sorry. Because they were what?

THE WITNESS: Proposals.

THE REPORTER: Okay.

THE WITNESS: Email proposals.

And then the second correction was that Daniel Moore stated he wanted to use the -- the Longbranch net profits agreement, and they are similar in the framework, but the net interests agreements are actually both -- they are both different, the Longbranch and the DMA agreements. And I wanted to

Veritext Legal Solutions
800-336-4000

1  make that correction.
2     Q.   (BY MR. CLEVELAND)  Okay.  Any other
3  corrections you need to make from yesterday to your
4  testimony, sir?
5     A.   Not that I know of now.  I'm sure we'll
6  review them and see what the court reporter put down
7  to make sure, because the last part of yesterday I got
8  an excruciating headache that came in over -- right at
9  the end of the session before lunch, we were having to
10  squint our eyes and it gave me a headache and it never
11  went away yesterday, so hopefully that won't happen
12  today.
13     Q.   Okay.  And Mr. Wright, it looked like you
14  were just reading from a piece of paper or some notes.
15  Were you doing that when you were talking about your
16  correction?
17     A.   Yes, yes, I was.  It's on the back of your
18  exhibits.  I wrote the two corrections.
19     Q.   Can you --
20        MR. CLEVELAND:  Mr. Mueller, can you
21  put an exhibit sticker on those notes for the
22  deposition and we'll mark it?
23        MR. MULLER:  Yes.
24        MR. CLEVELAND:  Okay.  So let -- let's
25  mark that as Exhibit 19A, John, because we're going to

1  start with 20, but just to make it simple let's mark
2  what Mr. Wright is reading from there as 19A.  Can you
3  do that?
4        MR. MULLER:  I can.  I don't have any
5  exhibit stickers with me.  I'm going to have to go get
6  my associate, just a minute.
7        MR. CLEVELAND:  You can hold -- John,
8  you can just -- let's just write it in and agree that
9  that document will be Exhibit 19A.
10        MR. MULLER:  Okay.  19A.
11        MR. CLEVELAND:  And when we're -- in
12  fact, if you can hand to your assistant so she can --
13  he or she can scan that in and email it to us, that
14  will be great and we will keep going here.
15        MR. MULLER:  Okay.  It's on the way.
16  Give me a moment.
17        MR. CLEVELAND:  Okay.
18        THE REPORTER:  So, Tim, will this be
19  Volume 2?
20        MR. CLEVELAND:  Volume 2 yes, ma'am.
21  Okay.  And let's -- are you ready to go, John?
22        MR. MULLER:  Yes, Tim.  Frankie is
23  emailing the 19A exhibit to you and then you can
24  transfer it to the court reporter.
25        MR. CLEVELAND:  Sounds great.

1     Q.   (BY MR. CLEVELAND)  Okay.  Mr. Wright, thank
2  you for -- for making me aware of those corrections.
3        Now, I want to start, sir, by showing
4  you a new exhibit.  It's been sent to you,
5  Mr. Mueller, this morning, and I'm going to share my
6  screen, Mr. Wright, and show you what I've marked as
7  Exhibit 20 to your deposition.
8        Can you see my screen?  Exhibit 20 is
9  titled Real Estate Lien Note.  Can you see that, sir?
10     A.   I -- yes, yes, I do.
11     Q.   Okay.  And this is a Real Estate Lien Note
12  dated August 14th, 2017, between Black Duck Properties
13  and KrisJenn Ranch LLC and KrisJenn Ranch LLC - Series
14  Uvalde Ranch.  Do you see that, sir?
15     A.   Yes, sir.
16     Q.   And we talked yesterday about this -- at
17  length about this loan from KrisJenn Ranch to Black
18  Duck.  Do you recall we spent some time on that
19  yesterday?
20     A.   Yes.
21     Q.   Okay.  And as we -- as we established
22  yesterday, you are a -- you were a member of KrisJenn
23  Ranch LLC as of August 2017; right?
24     A.   Yes.
25     Q.   And KrisJenn Ranch LLC was a 50 percent

1  member of Black Duck as of this date; right?
2     A.   Yes, sir.
3     Q.   Okay.  I'm going to scroll to the bottom and
4  just confirm, sir, that is that your signature on this
5  note --
6     A.   Yes.
7     Q.   -- signing on behalf of Black Duck
8  Properties?
9     A.   Yes.
10     Q.   Okay.  Is there a reason that only you
11  signed this note and -- as opposed to all three of the
12  managers, you, yourself -- you, Mr. Moore and
13  Mr. Cohle?
14     A.   I was given authority by the other members.
15     Q.   Meaning Mr. Wright [sic] and Mr. Cohle?
16     A.   I need to see the exhibit, because you're
17  just showing me a signature.  Go back to the top for a
18  moment, okay?
19     Q.   Sure, and I'll be happy -- I'm happy to do
20  that.
21     A.   Okay.  Because this is the -- the lender is
22  KrisJenn Ranch and the borrower is Black Duck.  Yes, I
23  was -- I was given authority to sign that note, yes,
24  sir.
25     Q.   And were you given authority by Mr. Moore

and Mr. Cole?

    A.   I was given authority by all members, yes, sir.

    Q.   Okay.  And did David Strolle also give you approval to execute this note on behalf of Black Duck?

    A.   He -- he prepared the note.

    Q.   Did Mr. Strolle give -- approve your signing this note on behalf of Black Duck Properties?

    A.   I'm not sure he was required to give approval.  He prepared the note.

    Q.   Well, and I -- I'm not disagreeing with you, I'm just asking the question.

    A.   I'm confused.  I'm not trying to be --

    Q.   No, that's okay.

    A.   He was -- he prepared the note, because he -- it was a mirror image, the 4.1 of the note that the law firm that y'all hired on the note that was prepared from -- for KrisJenn Ranch.

    Q.   You mean the Asilo note?

    A.   The law firm that y'all hired prepared that note.

    Q.   With Asilo?

    A.   Yes.

    Q.   Okay.

    A.   The same law firm that represented Asilo.

    Q.   So let me -- let me -- so, Mr. Wright, back to my question.  It sounds like the answer may be no, but we got down this path, I was asking you did David Strolle approve your signing this note on behalf of Black Duck, and you answered why would we need his approval or something like that.  And so I'm now looking for --

    A.   I don't know --

    Q.   Hold on, sir, hold on, sir.  I'm just looking for a yes, no, I don't remember, to this simple question.

        Did David Strolle approve your signing this real estate lien note on behalf of Black Duck?

    MR. MULLER:  Objection, form.

    A.   I don't think he -- I don't think he was required to approve anything.  And so --

    Q.   (BY MR. CLEVELAND)  Do you remember what --

    A.   I don't remember.  I mean --

    Q.   Okay, okay.

    A.   Like -- I mean, I really don't know what you're trying to ask there.

    Q.   Okay.  Okay.  That's --

    A.   He -- he prepared the note.

    Q.   I appreciate that, sir.

        Who at Black Duck decided that a

one-year term was appropriate for this note?

    A.   Daniel Moore basically indicated that we had to close the note and that immediately after we closed it he would be able to sell it, so instead of putting six months, I decided to put a year on it.  And the year matches the deal that I have with Asilo.

    Q.   So -- and did you believe that the one-year term was in the best interest of Black Duck?

    A.   Oh, yes, of course.

    Q.   Okay.  Did anybody else besides you approve that one-year term of this note on behalf of Black Duck?

    A.   I was given full authority on that.

    Q.   Okay.  By whom?

    A.   By the other members.

    Q.   And was that -- Mr. Moore gave you authority for this one-year term?

    A.   The other members gave me full authority, yes, sir.

    Q.   And was that authority specific to this agreeing to a one-year term or are you saying it was more of a general grant of authority and you made the decision that a one-year term was appropriate?

    A.   Daniel Moore said we had to close it to sell this, and he said that we can do it within six months

after we closed.  And obviously, I believed it would take longer than that, so I -- I decided one year was in the best interest versus six months.

    Q.   And were you saying that Daniel was -- was saying we, meaning you guys, could sell the right-of-way within six months, or are you saying he was approving a six-month term for this note?

    A.   He was saying that he could not sell it until after it closed.  He changed his tune after the 18 months before that that he could flip it.  And after he failed, then he said he could sell it after it closed.

    Q.   Okay.  And I'm just trying to make sure I get really specific here.  Did Daniel Moore ever give you specific authority or authorization to the one-year term --

    A.   He gave us --

    Q.   So let me finish my question.  Let me finish my question.

        Did Daniel Moore -- did Daniel Moore ever authorize this one-year term for the note specifically or did you just decide that was best based on a general grant of authority from Mr. Moore?

    MR. MULLER:  Objection, form.

    A.   He gave us authority to sign whatever notes

1     to take get this transaction completed to close on the
2     property.
3          Q.   (BY MR. CLEVELAND)  And how did he give you
4     that authority?
5          A.   We have an email where he gave us complete
6     authority, and he gave Hagan Cohle permission to sign
7     the same with authority.
8          Q.   And is that in the email that we looked at
9     yesterday, sir?
10         A.   The verbal authority was between him and
11    Hagan Cohle and that email was that he gave yesterday
12    that we have -- have in the records.
13         Q.   Okay.  And that email was from July 2017; do
14    you recall that, sir?
15         A.   I would have to -- I would have to see if
16    that's true.  I'm sure the -- I'm sure the date is
17    correct.  I'm sure that is correct.
18         Q.   And then the -- you mentioned there was
19    verbal authority from Daniel to Hagan Cohle about this
20    one-year term.  When did Mr. Moore give that -- I'm
21    sorry?
22         A.   I'm going to slow down.
23         Q.   When did Mr. --
24         A.   I didn't mean to interrupt.
25         Q.   Sure.  That's okay.

Page 17

1              When did -- you mentioned that
2     Mr. Moore gave verbal authorization to Hagan Cohle
3     on -- what was that?
4          A.   That was authority for minutes to approve
5     anything and everything that took place to close these
6     transactions, any and all documents.
7          Q.   And you're saying that is reflected in the
8     company minutes of Black Duck?
9          A.   Yes, sir.
10         Q.   So I've got -- and I'm going to try to use
11    this phrasing to speed us along here.  There's an
12    email authorization from Daniel and then there's
13    verbal authorization reflected in the company minutes.
14    Do I have those two things correct?
15         A.   There is a verbal permission for Daniel
16    Moore, and Daniel Moore was not physically here in New
17    Braunfels, Texas, where the records were kept, so he
18    gave permission to Hagan Cohle to sign those and that
19    was -- that was done in front of the attorney, David
20    Strolle.
21         Q.   Okay.  When did Daniel Moore give permission
22    for you to sign this note on behalf of Black Duck?
23         A.   You'll have to ask Hagan Cohle.  I don't --
24    it was before this date.
25         Q.   It was before --

Page 18

1          A.   He gave full authority before this date --
2              THE REPORTER:  I'm sorry?  Excuse me?
3          A.   He gave full authority before this date to
4     sign for us to close any transaction to close the
5     pipeline.
6          Q.   (BY MR. CLEVELAND)  Okay.  And that was
7     before August 14, 2017?
8          A.   Yes.
9          Q.   Okay.  Was there any other authorizations
10    from Daniel Moore other than what you have just
11    testified to, sir?
12         A.   None that I know of.
13         Q.   Okay.  And are the verbal authorization --
14    is the verbal authorization that you're saying Daniel
15    gave to Hagan Cohle, is that reflected in any
16    document, including the company minutes of Black Duck?
17         A.   It is in the company minutes of Black Duck.
18         Q.   And we're going to get to those
19    minutes that your lawyer provided to me in a moment
20    here.  Did you look at those minutes this morning?
21         A.   No, I did not.
22         Q.   Okay.  Look at --
23              MR. MULLER:  Last night.
24         Q.   (BY MR. CLEVELAND)  Okay.  Which -- there
25    is -- in the minutes that were produced to me I see

Page 19

1     there are minutes of an organizational meeting dated
2     January 18, 2016, minutes of a meeting -- a special
3     meeting dated November 14, 2018, and then minutes of a
4     special meeting dated August 14, 2017.  Did you review
5     those sets of minutes?
6          A.   I produced those to my attorney.
7          Q.   Okay.  And which of those dates -- there's
8     January of '16, November of '18, and August of '17,
9     which set of those minutes contains evidence of the
10    authorization of Daniel Moore for this Real Estate
11    Lien Note between Black Duck and KrisJenn?
12         A.   I believe it's the August 14th.
13         Q.   Okay.  And there was a -- a meeting that
14    day; is that your testimony?
15         A.   Yes.
16         Q.   And did Daniel Moore attend that meeting?
17         A.   No.
18         Q.   Who attended that meeting?
19         A.   Myself, Hagan Cohle, and Mr. Strolle.
20         Q.   Okay.  Was Daniel Moore invited to attend
21    that meeting?
22         A.   His email indicated that he was traveling
23    the -- the month before that and did not have a
24    driver's license and could not make it.
25         Q.   Okay.  And I'm familiar with that, that he

Page 20

1  was traveling -- he was traveling at some point in
2  July, but my question is a little more specific.
3          Was Daniel Moore invited to attend this
4  meeting on August 14th that you, Mr. --
5      A.  I --
6      Q.  Hold on -- Mr. -- Mr. Wright, we've got to
7  keep our court reporter happy with us.  Let me finish
8  my question before you answer.  I'll restate it.  I
9  want to be specific.
10         Was Daniel Moore invited to attend this
11 meeting on August 14th, 2017, that was attended by
12 yourself, Mr. Cole and Mr. Strolle?
13     A.  I can't remember.
14     Q.  Okay.  I appreciate that answer.  So my next
15 question, how could Mr. Moore vote in favor of this
16 KrisJenn Ranch loan at this meeting on August 14,
17 2017, if he wasn't even there?
18     A.  He gave permission to Hagan Cohle to sign
19 his name in our minutes.
20     Q.  Okay.  But, again, how could he have given
21 permission at that meeting if he wasn't even there?
22         MR. MULLER:  Objection, form.
23     A.  He gave that permission within the -- within
24 30 days before this meeting, because he said he would
25 not be back -- he was not coming back to Texas.

                                        Page 21

1      Q.  (BY MR. CLEVELAND)  Okay.  Okay.  So when
2  did Daniel Moore give his authorization for this loan
3  to Hagan Cohle prior to this August 14th meeting?
4      A.  You'll have to ask Hagan Cohle.  It was by
5  verbal, phone call.  They talked lots.
6      Q.  Okay.  So there was a phone call where --
7  what you're saying is there was a phone call where
8  Daniel Moore authorized Black Duck to enter into this
9  KrisJenn Ranch loan to Hagan Cohle?
10         MR. MULLER:  Objection, form.
11 Objection, form.
12     A.  That's -- that's a very leading question,
13 because you'll have to ask Hagan Cohle.
14     Q.  (BY MR. CLEVELAND)  Well, let me ask you
15 this.
16         How are you aware of a phone call from
17 Daniel Moore to Hagan Cohle where Daniel approves this
18 loan between Black Duck and KrisJenn?
19     A.  Hagan Cohle said he had authority to sign
20 for him.  And I would like to add to that if you want.
21     Q.  Well, let me -- I'm going to -- let's keep
22 moving on.  You answered the -- you answered the
23 question, and I'm going to ask another question.
24         Hagan Cohle -- you just said Hagan
25 Cohle said he has the authority to sign for Daniel,

                                        Page 22

1  and my question is, is that something that Hagan Cohle
2  told you and Mr. Strolle at this August 14, 2017,
3  meeting?
4      A.  I can't remember.
5      Q.  Okay.  And did -- we got started on this
6  when I was asking who decided the one-year term for
7  this note at Exhibit 20 was appropriate.
8      A.  I did.
9      Q.  Did Daniel Moore -- to your knowledge --
10 right.  And so did Daniel Moore ever specifically
11 approve the terms of this note, or are you saying he
12 gave authority to you guys do what -- to do whatever
13 needed to be done to close and you went by that
14 authorization to agree to these terms?
15     A.  Yes.
16     Q.  So what I said is correct?
17     A.  Yes.
18     Q.  Okay.  And so at this meeting did -- of
19 August 14, 2017, did you and Mr. Cohle and Mr. Strolle
20 decide that a one-year term of this note was in the
21 best interest of Black Duck?
22     A.  I can't remember.
23     Q.  Was there discussion about -- at that
24 meeting about what's in the best interest of Black
25 Duck?

                                        Page 23

1      A.  I believe that decision was up to KrisJenn
2  Ranch.
3      Q.  Well, what decision was up to KrisJenn
4  Ranch?
5      A.  The length of the loan.  Black Duck had no
6  choice in that.
7      Q.  Okay.  Why didn't Black Duck have a choice?
8      A.  Black Duck was a company without any assets.
9      Q.  Any other reason?
10     A.  I can't remember.
11     Q.  Okay.  Did you -- did you have any reason to
12 believe that Black Duck would be able to repay this
13 loan when it was -- when this note was executed?
14     A.  Only the -- the strength of Daniel Moore's
15 contacts with buyers, one being a gentleman named
16 Michael, and I can't remember his last name now.
17 It's -- I produced a copy of a proposal that Daniel
18 gave to us, this -- on his client, and he said he
19 could have closed with them until closed the
20 transaction.
21     Q.  Okay.  But my question was a little
22 different.  Did -- did you have reason to believe when
23 you signed this note for Black Duck that Black Duck
24 would be able to repay?
25         MR. MULLER:  Objection, form.

                                        Page 24

1    A.   I can't remember the exact conversations.
2  The only conversation I remember is Daniel Moore went
3  into his tantrum, said he couldn't sell it until Black
4  Duck closed on the pipeline.
5    Q.   (BY MR. CLEVELAND)  Okay.  But I'm -- Daniel
6  wasn't at the August 14th meeting, so I'm asking you,
7  and maybe the answer is, "I don't remember," but did
8  you have any reason to believe that Black Duck could
9  repay this note when you signed it on behalf of Black
10  Duck?
11        MR. MULLER:  Objection, form.
12    A.   At that time I cannot tell you what I was
13  thinking or wasn't thinking.  But it's been three
14  years ago, and I don't know --
15    Q.   (BY MR. CLEVELAND)  Okay.  Okay.
16    A.   -- I don't remember what my thoughts were at
17  that time.
18    Q.   Okay.  Thank you.  I appreciate that.
19        My next question is the interest rate
20  on this loan is -- in Exhibit 20 -- is 17 percent per
21  annum.  Do you see that, sir?
22    A.   Yes.
23    Q.   Who decided that an interest rate of
24  17 percent was appropriate for Black Duck?
25    A.   Black Duck didn't have a choice.

1    Q.   And why not?
2    A.   Asilo established that rate.
3    Q.   That that's the rate between Asilo and
4  KrisJenn Ranch; right?
5    A.   That was the rate on the KrisJenn Ranch
6  loan.
7    Q.   Okay.  So why -- was that in the best
8  interest of Black Duck to have a 17 percent interest
9  rate on this one-year note?
10    A.   They did not have a choice.
11    Q.   Well, I hear what you're saying there, but
12  just because that's the note that -- or the rate that
13  KrisJenn Ranch had with Asilo doesn't mean it's in the
14  best interest of Black Duck to have that rate; would
15  you agree?
16    A.   No.
17    Q.   Okay.  So is your testimony that 17 percent
18  was in the best interest of Black Duck, sir?
19    A.   They did not have a choice, so it was in
20  their interest.
21    Q.   Well -- well, but my -- I guess I'm looking
22  for either yes, no, I don't know.  Was 17 percent in
23  the best interest of Black Duck?
24        MR. MULLER:  Objection, form.
25    A.   They had no choice, sir, so the answer is

1  yes.
2    Q.   (BY MR. CLEVELAND)  So it was in the best
3  interest of Black Duck, that's -- that's what you're
4  saying?
5        MR. MULLER:  Objection, form.
6    A.   Yes.
7    Q.   (BY MR. CLEVELAND)  Okay.  Now -- now was
8  this note at Exhibit 20 ever authorized by both of the
9  disinterested management of Black Duck Properties,
10  sir?
11        MR. MULLER:  Objection, form.
12    A.   All the parties approved whatever was
13  necessary to close on the pipeline.
14    Q.   (BY MR. CLEVELAND)  And I hear you there.
15  My question is a little more specific.
16        Was this note at Exhibit 20 authorized
17  by both of the disinterested management of Black Duck
18  Properties?
19        MR. MULLER:  Objection, form.
20    Q.   (BY MR. CLEVELAND)  Yes, no, I don't know?
21    Q.   (BY MR. CLEVELAND)  Yes, no, I don't know?
22    A.   There were three managers and it was
23  authorized by the management.
24    Q.   (BY MR. CLEVELAND)  But what about the
25  disinterested management?

1        MR. MULLER:  Objection, form.
2    A.   There was -- there was approval given to
3  close any and all documents.
4    Q.   (BY MR. CLEVELAND)  Okay.  But was there a
5  specific vote by Daniel Moore that authorized Black
6  Duck to enter this loan that's documented by the note
7  Exhibit 20?
8    A.   There -- there was a form where he
9  authorized any documents, and our attorney viewed that
10  as acceptable.  If Mr. Moore was really wanting to
11  close this note he would have made himself available
12  instead of leaving Texas to let this note be -- let
13  Black Duck be foreclosed on.
14    Q.   When you say "our attorney viewed that as
15  acceptable," are you referring to Mr. Strolle?
16    A.   Mr. Strolle was given that authority, and he
17  reviewed it as authority to do whatever was required
18  to close any and all notes to close on the pipeline
19  for the express.
20    Q.   Okay.  And just so we're clear, I pulled up
21  another exhibit on your screen, sir.  This is -- this
22  is the July 2017 email that we looked at yesterday.
23    A.   I can't -- I can't even look at that,
24  because the print is so little that I'm going to get a
25  headache today.

```
 1         Q.   We'll -- we'll -- we can zoom in for you.
 2         MR. MULLER:  Matt, can you give us a
 3   moment please?  Because he'd prefer to see it on
 4   paper.  I'll do it quickly if you'll give us one
 5   second.
 6         MR. CLEVELAND:  Okay.
 7         MR. MULLER:  Which one is this?
 8         MR. CLEVELAND:  This is Exhibit 10 from
 9   yesterday.
10         MR. MULLER:  Okay.
11         MR. MULLER:  Hey, John, since we're
12   on the record, I'd like to not -- I'd like for you
13   guys not to be on mute.  If you need to go get it,
14   that's great, but I'd like to have Mr. Wright stay
15   right there.
16         MR. MULLER:  I have to leave the room
17   and I don't want you to be able to -- my client while
18   you're -- can we go off the record for a second?
19         MR. CLEVELAND:  I'm -- I'm not going to
20   ask him any questions.  I'd just like to stay on the
21   record while you go get the document.  Okay?
22         MR. MULLER:  I'm not going to leave the
23   room while -- while we're on.  Why don't we just go
24   off the record?  Give me one minute.
25         MR. CLEVELAND:  I don't think we should
```
                                              Page 29

```
 1   do that.  Ms. Wright can be there.  She can verify
 2   that I'm not going to ask this witness any questions.
 3         MR. MULLER:  Matt -- Matt --
 4         MR. CLEVELAND:  If you want to get this
 5   document, you can go do that, or you can email your --
 6   if you want to email your assistant to bring a copy,
 7   that's fine.
 8         MR. MULLER:  Okay.
 9         MR. CLEVELAND:  But we just got started
10   and we're not going to do this interruption tactic
11   that y'all did yesterday.
12         MR. MULLER:  Sure.  Sure, I understand.
13         MR. CLEVELAND:  So let's --
14         MR. MULLER:  So -- so --
15         MR. CLEVELAND:  Here's what I'm going
16   to --
17         MR. MULLER:  Yeah.
18         MR. CLEVELAND:  Here's what we're --
19   here's what we're going to do.  We'll go back to --
20   well, tell you what.  Mr. Wright --
21         Did you come in today, John, without
22   hard copy exhibits from yesterday?
23         MR. MULLER:  You sent them five minutes
24   before the deposition.  Frankie has them.  They're in
25   the next room.
```
                                              Page 30

```
 1         MR. CLEVELAND:  This is -- this is an
 2   exhibit that I've got here from yesterday.
 3   Exhibit 10.
 4         Q.   (BY MR. CLEVELAND)  Can you see that
 5   highlight okay, Mr. Wright.
 6         MR. MULLER:  So let me reiterate what
 7   the problem is here.  The deponent is having a hard
 8   time seeing it on the screen.  Part of the problem is
 9   that the laptop I'm using isn't particularly large.
10   The other problem is he doesn't have particularly good
11   eyes.  You're taking a deposition on behalf of three
12   entities at one time.  He can only see about a four
13   inches of the exhibit.
14         MR. CLEVELAND:  Okay.
15         MR. MULLER:  And this is highly
16   confusing to him.  It's causing confusing answers.
17   It's going to cause extensive erratas -- it's not
18   unreasonable --
19         MR. CLEVELAND:  Got it, yeah.
20         MR. MULLER:  -- to go on hold for a
21   minute --
22         MR. CLEVELAND:  Okay.
23         MR. MULLER:  -- while I get a legible
24   copy of your exhibit so that Larry can read it --
25         MR. CLEVELAND:  Okay.  If it's a
```
                                              Page 31

```
 1   minute, we'll stay on the record and you can go get
 2   that document, no problem.
 3         MR. MULLER:  I'm not leaving the room
 4   while -- while we're on the record, Tim.  It's not
 5   practiced.
 6         MR. CLEVELAND:  Okay.
 7         MR. GERMANY:  Tim, and I want to bring
 8   up another point.  This is William -- Tim, hold on --
 9         MR. CLEVELAND:  Let's continue.
10         MR. GERMANY:  No, no, let's not
11   continue.  You've not been emailing me the exhibits
12   either.  So you're kind of playing a shell game with
13   these exhibits.  It's very hard to see through my end
14   and I have a bigger laptop.  All I see are kids there.
15   Okay.  The kids are gone.
16         MR. MULLER:  Two kids, two kids,
17   stipulated on the kids.
18         MR. GERMANY:  So we're not trying to
19   play tricks on you.  We're trying to present the
20   exhibit to the deponent to be able to view, because
21   you'll ask him something and then you'll move it on
22   your screen and it's gone.
23         MR. MULLER:  Yeah.
24         MR. CLEVELAND:  Fine.  John, go ahead.
25   Go ahead.  We'll go off the record for a minute.  Go
```
                                              Page 32

1  get Exhibit 10.  That would be great.
2           MR. MULLER:  Thank you, I will be -- I
3  will be very quick.
4           MR. CLEVELAND:  Thanks.
5           THE VIDEOGRAPHER:  Going off the
6  record.  The time is 9:50 a.m.
7           (Recess from 9:50 a.m. to 9:59 a.m.)
8           THE VIDEOGRAPHER:  Back on the record.
9  The time is 9:59 a.m.
10      Q.  (BY MR. CLEVELAND) All right, Mr. Wright,
11  we've taken a break.  Do you have Exhibit 10 in front
12  of you from your deposition?
13      A.  (Indicating.)
14      Yes.
15           MR. CLEVELAND:  Okay.  Mr. Muller, do
16  you want to say something about this exhibit from
17  yesterday?
18           MR. MULLER:  Yes, this one -- it
19  demonstrates that it's a two-page email.  We only have
20  one page of it, so I won't make -- I won't interrupt
21  your deposition by making continuous objections, but I
22  do object and reserve the right to -- to make
23  objections later if the prior page should show
24  relevant information.
25           MR. CLEVELAND:  Okay.  Thank you.

Page 33

1      Q.  (BY MR. CLEVELAND)  Mr. Wright, the reason
2  we were talking about the KrisJenn/Black Duck note
3  before our break, do you remember that?
4      A.  Yes.
5      Q.  And we were talking about the authority
6  that -- that you said your attorney viewed as
7  acceptable.  Do you remember that testimony?
8      A.  Yes.
9      Q.  Okay.  And that's when I asked -- that's
10  when I moved to this Exhibit 10, which you have in
11  front of you and is up on your screen.  And it's the
12  email from July of 2017 from Mr. Moore in Exhibit 10.
13  Do you have it in front of you and do you see my
14  highlight on your screen?
15      A.  There is no highlight on the screen, but I
16  see the document.
17      Q.  All right.  You know what, I'm going to --
18  I'm going to fix that by sharing the screen.  Thank
19  you for letting me know.  Okay.  Thank you, sir.  Now
20  can you see my screen?
21      A.  Yes.
22      Q.  Okay.  So Exhibit 10, can you see the
23  highlighted email within Exhibit 10 on the screen?
24      A.  Right.
25      Q.  And my question is is this email from

Page 34

1  Mr. Moore what your attorney viewed as acceptable
2  authorization for the Black Duck/KrisJenn note?
3           MR. MULLER:  Object to form.
4           MR. GERMANY:  Objection, form.
5      A.  We presented this to our attorney as Daniel
6  Moore not wanting to be in San Antonio to help close
7  this document.
8      Q.  (BY MR. CLEVELAND)  Okay.
9      A.  To help close --
10      Q.  -- Exhibit 10 --
11      A.  I'm sorry.
12      Q.  When you say you presented this to your
13  attorney, are you referring to this email from
14  Mr. Moore, Exhibit 10?
15      A.  We didn't -- we didn't actually present it.
16  We attached it to the minutes.
17      Q.  Okay.  And is this email what Mr. Strolle
18  told you was acceptable --
19      A.  I'm not --
20      Q.  -- to use as authority?
21      A.  I'm not sure he said -- I'm not sure he said
22  acceptable.  It was the third member.  It says,
23  "Regarding any and all documents."
24      Q.  Okay.
25      A.  That was our --

Page 35

1      Q.  Are you saying -- sir, I'm just trying to
2  ask you a question.  Is this the email in Exhibit 10
3  that you're saying gave you and Mr. Cohle the
4  authority to approve the KrisJenn loan to Black Duck?
5      A.  This email gave us authority regarding any
6  and all documents, any and all documents.
7      Q.  And to you did that -- did that authority
8  include the authority to close on the KrisJenn Ranch
9  loan that we've been looking at this morning?
10      A.  It gave us authority regarding any and all
11  documents, yes.
12      Q.  So is it -- did you say yes?
13      A.  Regarding any and all documents, I said yes
14  to that.
15      Q.  Okay.  And so --
16      A.  And I would --
17      Q.  Yes or no -- yes or no, did this -- this
18  email from Mr. Moore give you authority, in your view,
19  to approve the loan from KrisJenn Ranch to Black Duck?
20      A.  It gave us authority regarding any and all
21  documents and, again, any and all documents covers any
22  loans.
23      Q.  Including the loan that you actually got
24  from KrisJenn Ranch?  Yes or no?
25      A.  The loan from KrisJenn Ranch, the approval

Page 36

1　from KrisJenn Ranch, he had nothing to do with
2　KrisJenn Ranch.  That was --
3　　　　Q.  I understand that.
4　　　　A.  That was my family.
5　　　　Q.  And I understand that --
6　　　　A.  Okay.
7　　　　Q.  -- but I'm just trying to close this off.
8　　　　　Is it your testimony that this email
9　from Mr. Moore, Exhibit 10, granted the authority to
10　execute documents for Black Duck that included the
11　loan from KrisJenn Ranch?
12　　　　A.  I'm going to say yes to your definition.
13　　　　Q.  Okay.
14　　　　A.  It says regarding any and all documents.
15　　　　Q.  Okay.  Okay.  Did anyone else other than
16　Mr. Strolle advise you that the KrisJenn Ranch note to
17　Black Duck was properly authorized pursuant to the
18　Black Duck company agreement?
19　　　　　MR. MULLER:  Objection, form.
20　　　　A.  His job was to prepare the note.
21　　　　Q.  (BY MR. CLEVELAND)  I understand that.
22　My -- my question is different.
23　　　　　Did anybody besides Mr. Strolle advise
24　you that the KrisJenn Ranch note to Black Duck was
25　properly authorized pursuant to the Black Duck company

1　agreement?
2　　　　　MR. MULLER:  Objection, form.
3　　　　A.  We asked Mr. Strolle to prepare the note.
4　　　　Q.  (BY MR. CLEVELAND)  I'm asking --
5　　　　A.  We did not ask -- we did not ask anybody
6　else to prepare the note.
7　　　　Q.  Okay.  And so it sounds like the answer to
8　my question that I'm going to ask again is no, but the
9　question is, did anyone other than Mr. Strolle advise
10　you that the KrisJenn Ranch note was properly
11　authorized pursuant to the Black Duck company
12　agreement?
13　　　　　MR. MULLER:  Objection, form.
14　　　　A.  That question -- that question is -- is
15　misleading and hard to understand, so my answer is
16　going to be that this email from Daniel Moore said
17　regarding any and all documents that may require my
18　signature.  Basically speaks for itself.
19　　　　Q.  (BY MR. CLEVELAND)  Okay.  Let's go back to
20　the note, Exhibit 20.  Do you have that in front of
21　you, sir?
22　　　　A.  No.
23　　　　Q.  Do you see it on the screen that I just
24　showed you?
25　　　　A.  The screen hurts my eyes and gives me a

1　headache.
2　　　　Q.  Okay.  Well, I emailed this to your lawyer
3　this morning.  Do you have a hard copy in front of
4　you?
5　　　　　MR. MULLER:  Not yet.  Give us a
6　minute.
7　　　　　THE WITNESS:  William, are you getting
8　all these emails?
9　　　　　MR. GERMANY:  No, and Tim is not going
10　to email them to me.  I've already asked.
11　　　　　THE WITNESS:  You're my --
12　　　　　MR. CLEVELAND:  William, I'm -- this is
13　the first I've heard about that this morning.  I'm
14　going to email you the depo exhibits I sent to John
15　this morning just to make sure you have them.  They're
16　on -- they're on their way right now.
17　　　　　MR. GERMANY:  Thank you.
18　　　　　MR. MULLER:  That's not it.  That's not
19　it.
20　　　　Q.  (BY MR. CLEVELAND)  Well, let me ask you a
21　different question, Mr. Wright.  Did -- did you
22　believe that you had a conflict of interest with
23　respect to this loan between KrisJenn Ranch and Black
24　Duck Properties?
25　　　　　MR. MULLER:  Objection, form.

1　　　　A.  No.
2　　　　Q.  (BY MR. CLEVELAND)  Okay.  You were on both
3　sides of the transaction, weren't you?
4　　　　　MR. MULLER:  Objection, form.
5　　　　A.  I was on the same side.
6　　　　Q.  (BY MR. CLEVELAND)  Well, you were on the
7　Black Duck side and you were on the KrisJenn Ranch
8　side; right?
9　　　　　MR. MULLER:  Objection, form.
10　　　　A.  KrisJenn Ranch owned 50 percent of the Black
11　Duck, yes.
12　　　　Q.  (BY MR. CLEVELAND)  Okay.  So you were on
13　both sides of the transaction, weren't you?
14　　　　　MR. MULLER:  Objection, form.
15　　　　Q.  (BY MR. CLEVELAND)  Sir?
16　　　　　MR. MULLER:  Objection, form.
17　　　　A.  That's a confusing question.  I answered it.
18　I said I own -- my family owns KrisJenn Ranch, I was
19　30 percent and manager along with my wife and I was
20　manager of Black Duck.
21　　　　Q.  (BY MR. CLEVELAND)  Okay.  And so your
22　testimony is you did not view this as a conflict of
23　interest?
24　　　　A.  That's your words, not my words, so I can't
25　really answer that.

1    Q.   Okay.  Well, do you have an understanding of
2    what "conflict of interest" means?
3    A.   In this case, if KrisJenn Ranch didn't loan
4    the money to Black Duck, then there would be no
5    pipeline closing.
6    Q.   Well, that's not true, because Asilo loaned
7    the money and that money went straight to the seller
8    of the right-of-way; true?
9              MR. MULLER:  Objection, form.
10   A.   So should we have put the deeds in KrisJenn
11   Ranch then, Tim, is that what you're saying?  I'm
12   confused.
13   Q.   (BY MR. CLEVELAND)  Well, no, sir.  I'm just
14   simply asking.  You said this deal wouldn't have
15   happened without the loan from KrisJenn to Black Duck,
16   and I'm pushing back on you, because isn't it true
17   that the Asilo money was wired straight from Asilo to
18   the seller of the right-of-way?
19             MR. MULLER:  Objection, form.
20             MR. GERMANY:  Objection, form.
21   A.   Very confusing question.  In the notes Black
22   Duck was authorized to get funds to close the
23   pipeline.
24   Q.   (BY MR. CLEVELAND)  Okay.  So on this date
25   August 14, 2017, that's when the money would -- well,

                                          Page 41

1    let me strike that.
2              The date of this loan from KrisJenn to
3    Black Duck is August 14, 2017; right?
4    A.   Those dates speak for themselves.  I
5    couldn't -- I cannot change those dates.  The one --
6    they are going to speak for themselves as the actual
7    date of all loans.
8    Q.   Right, and I understand that.  I'm not
9    asking you to change the date.  But as of August 14
10   KrisJenn Ranch had the funds to loan to Black Duck to
11   the tune of 4.1 million.  Is that your testimony?
12   A.   KrisJenn Ranch borrowed the money from Asilo
13   for the benefit of Black Duck.  That is my testimony.
14   Q.   Did KrisJenn Ranch ever send the money from
15   Asilo to Black Duck's bank account?  Yes or no.
16   A.   The answer is no.
17   Q.   Did KrisJenn Ranch ever have the money from
18   the Asilo loan in -- in the KrisJenn Ranch bank
19   account?  Yes or no.
20   A.   No.
21   Q.   Okay.  Do you know when the money was wired
22   from Asilo, this 4.1 million, to the seller of the
23   right-of-way, do you know what date?
24   A.   No.
25   Q.   Do you know whether that wire of funds

                                          Page 42

1    occurred after the date of this loan from KrisJenn to
2    Black Duck of August 14th?
3    A.   We did get an email when they said it came
4    through, but I think it --
5    Q.   Right, would that email -- was that email
6    after the date of this loan of August 14th, sir?  Yes
7    or no.
8    A.   Those dates will speak for themselves.
9    Q.   Well, what's your memory as you sit here as
10   the corporate representative of KrisJenn Ranch, did
11   that money hit the seller's account on August 14th,
12   sir, or was it later?
13   A.   The email will speak for itself from Chase
14   Palmer, who was the representative for the seller
15   Express Pipeline.
16   Q.   Okay.  When did you decide you wanted to
17   reengineer this situation and make it a loan,
18   Mr. Wright?
19             MR. MULLER:  Objection, form.
20   A.   I'm not an engineer, and I didn't try to
21   reengineer anything.
22   Q.   (BY MR. CLEVELAND)  When did you realize,
23   sir, that by -- I'm sorry, go ahead, finish your
24   answer.
25             What are you -- what are you looking

                                          Page 43

1    at, Mr. Wright?
2    A.   You want to look right here?  This is what
3    I'm looking at.
4    Q.   Okay.
5    A.   It's a box.
6    Q.   Okay.
7              MR. MULLER:  He's just looking down.
8    Q.   (BY MR. CLEVELAND)  All right.
9    A.   You know, I'm getting really tired of
10   looking at myself.  It would be nice to -- to see
11   who's asking me these questions.  We looked it up and
12   it says you have to be on the screen too, on Zoom.
13   Q.   Okay.  Mr. Wright --
14   A.   Are you going to put yourself --
15   Q.   -- when did you decide --
16   A.   Are you going to put yourself on the Zoom,
17   please?
18   Q.   When did you decide --
19   A.   Bankruptcy court says you have to put
20   yourself on the Zoom so I can look at my accuser.
21   Q.   Okay.  Mr. Wright, when did you realize that
22   KrisJenn Ranch contributing --
23   A.   No.  You keep interrupting me, asking what
24   I'm looking at.  If you would put your picture up like
25   the Zoom bankruptcy court says you have to.  We can

                                          Page 44

1   get Ron Smeberg to call the judge and it says that you

2   have to put yourself on the screen.

3        Q.   All right.  Mr. Wright --

4        A.   You keep interrupting me asking what I'm

5   looking at.  I'm trying to be helpful here.

6             MR. MULLER:  Tim -- Tim, why can't you

7   put yourself on the screen?

8             THE WITNESS:  The rule says you have

9   to.

10            MR. CLEVELAND:  Look, let's move on,

11  guys.  Okay.  We did this yesterday.  Let's keep

12  going.

13            THE WITNESS:  I don't think so.  I

14  don't think so.  You keep asking what I'm looking at.

15  Put yourself up there.

16        Q.   (BY MR. CLEVELAND) Mr. Wright, when did you

17  first come in contact with John Terrill?

18            MR. MULLER:  Okay.  Tim, we might

19  suspend.  Between the three depositions at one time,

20  the difficulty with the exhibits and your refusal to

21  show yourself on the screen, this deposition is

22  becoming very, very difficult.  I think the deponent's

23  request isn't particularly onerous or inappropriate.

24  Why can't you just hit the video button like everyone

25  else?

Page 45

1             MR. CLEVELAND:  John, I don't believe

2   I'm required to.  This is a complaint that's coming up

3   today, when there was no complaint yesterday about it.

4   Let's just keep moving so we can finish this

5   deposition.

6             MR. MULLER:  Of course, all these Zoom

7   things are new to all of us.  But I sincerely doubt

8   that you are not required to show yourself on the

9   screen so the deponent can see you, just as the

10  deponent -- you can see the deponent.  You want to see

11  the deponent for the reason.  The deponent wants to

12  see you for the same reason.  It is fair, it is equal.

13  Why don't you just hit video?

14            MR. CLEVELAND:  You know what, let me

15  get to a break and we'll -- let me get to a break and

16  we'll talk about that; okay?

17            MR. MULLER:  Okay.

18            MR. CLEVELAND:  When we get to a break

19  we'll talk about that.  Let me get through some things

20  and we'll talk about that.

21            MR. MULLER:  Okay.

22            MR. CLEVELAND:  Fair?

23        Q.   (BY MR. CLEVELAND)  All right.

24  Mr. Wright --

25            MR. GERMANY:  Wait, wait, wait.  Hold

Page 46

1   on.  This is William Germany.  When is the break going

2   to be?  Because all we're asking you to do is show

3   yourself.  I mean, I even appeared on screen yesterday

4   until I was told to get off.  I'm not asking any

5   questions.  So I don't understand, Tim, you want to

6   move on here, and we did raise this issue yesterday.

7             MR. CLEVELAND:  Thank you, thank you,

8   William, very much.  Let's continue to a break.  It's

9   probably another 30 minutes and then we'll address;

10  okay?

11            MR. GERMANY:  Why is it -- why is it

12  when there's always a trust issue with you, you say

13  thank you, dismiss us, and just move on with your

14  deposition?  Why can't you confer with us --

15            MR. CLEVELAND:  I'm not dismissing

16  anything.  Mr. Muller, I've told you I'm going to deal

17  with that at a break.  And Mr. Germany wanted to

18  address it again.  I'm not dismissing it --

19            MR. MULLER:  No, I think you need to do

20  it right now.

21            MR. CLEVELAND:  -- I'm telling you

22  we'll deal with it at a break.

23            MR. MULLER:  Why can't you do it now?

24  Why can't you do it now?

25            MR. CLEVELAND:  Let's get to a break,

Page 47

1   guys, and we'll deal with it.

2             MR. GERMANY:  Tim, you need to deal

3   with this right now.  You know, We've been very

4   patient with you on --

5             MR. CLEVELAND:  William, let me make it

6   a little more clear for you.  Let me make it a little

7   more clear for you.  If we're going to do that I need

8   to talk about getting to a conference room in a place

9   where I can do that, okay?  So --

10            MR. GERMANY:  Please do.  We've given

11  you two days.  You've got two days.  You've got all

12  the time in the world here.

13            MR. CLEVELAND:  Let's get to a break

14  and we'll address it, okay?

15            Mr. Wright, let's continue.

16            MR. GERMANY:  No, no, let's take the

17  break now.

18        Q.   (BY MR. CLEVELAND)  All right.  Mr. Wright,

19  when did you first meet John Terrill?

20            MR. GERMANY:  Mr. Wright, do not answer

21  that question --

22            MR. MULLER:  I'm going to instruct him

23  not to -- yeah.  I'm going to instruct him not to

24  answer and I'll suspend if you won't do it.

25            MR. CLEVELAND:  Okay.  All right.

Page 48

1    Let's take a short break.
2                MR. MULLER:  All right, thank you.
3                MR. GERMANY:  Thank you.
4                THE VIDEOGRAPHER:  That break is now,
5    gentleman?
6                MR. CLEVELAND:  Take a break now.
7                THE VIDEOGRAPHER:  Okay.  Off the
8    record, 10:17 a.m.
9                I'm trying to keep track.
10               (Recess from 10:17 a.m. to 10:55 a.m.)
11               THE VIDEOGRAPHER:  Back on the record.
12   The time is 10:55 a.m.
13        Q.   (BY MR. CLEVELAND)  Mr. Wright, welcome
14   back.  Can you hear me okay?
15        A.   Yes.
16        Q.   Okay.  Are you ready to continue, sir?
17        A.   Yes.
18        Q.   Okay.  You testified this morning and
19   yesterday that Mr. Strolle prepared the -- the real
20   estate note, for example, between Black Duck and
21   KrisJenn.  Do you recall that testimony?
22        A.   Yes.
23        Q.   And did Mr. Strolle also prepare the board
24   minutes of Black Duck?
25        A.   I can't remember that, whether he did that

1    or not.
2         Q.   Okay.  Did Mr. Strolle --
3         A.   It could have been my wife, could have been
4    him.  I'm not sure.
5         Q.   Okay.  What's your best recollection of who
6    prepared the Black Duck company minutes?
7         A.   Good -- there's a good chance that it was
8    Strolle.
9         Q.   Okay.  And did Mr. Strolle also prepare the
10   deeds of trust for -- for the Asilo loan and the
11   KrisJenn loan to Black Duck, as best you can recall?
12        A.   You'd have to ask Mr. Strolle.
13        Q.   Okay.  And did -- did you -- when
14   Mr. Strolle would send you these documents, would he
15   send them to you by email, was that the normal
16   practice?
17        A.   Never.
18        Q.   Then how would you get them from him to
19   review them, approve them, et cetera?
20        A.   I would go to his office.
21        Q.   Okay.  Has Mr. Strolle ever emailed you a
22   Word document attachment to review?
23        A.   I'd have to look and -- I'd have to go
24   through -- we -- I produced everything that he's done.
25   So I can't -- for one thing, I didn't have a computer,

1    so I would go into his office, he'd print them and I
2    would look at it.  You can look at --
3         Q.   Okay.  You had not --
4         A.   You can look at all the billing and it shows
5    that I'm in there in his office for all of that
6    billing, the majority of it.
7         Q.   Okay.  Yeah, have -- have those billing
8    records of Mr. Strolle been produced?
9         A.   I think that's part of the documents that
10   are coming to you before the deadline date.
11        Q.   You're working on those now?
12        A.   Yeah.  Some of those might have been --
13        Q.   Okay.
14        A.   They might have been privileged.  I'm not
15   sure.
16        Q.   Okay.
17        A.   I have no idea on that.
18        Q.   Okay.
19        A.   I'm leaning forward because I'm watching
20   your response.  I like to see who I'm talking to.
21   Even Jesus was able to face his accusers.
22        Q.   Got it.  Well, and as you requested before
23   the break, we may disagree about whether it's
24   required, I did turn my video on.  Can you see me
25   okay?

1         A.   Oh, yeah, I get to see the face.
2         Q.   Great.  Great.
3              Okay.  Let's look at Exhibit 16 from
4    yesterday.  I'm going to share my screen, Mr. Muller.
5    You have this document.  This is the deed of trust
6    where we ended up yesterday's deposition.
7              THE WITNESS:  He's requesting the deed
8    of trust.
9              MR. CLEVELAND:  Okay.  While he's doing
10   that I'll --
11             MR. MULLER:  What exhibit is that to
12   the MSJ?
13             MR. CLEVELAND:  It is Exhibit 16 to the
14   deposition, and I think it is 17 for the MSJ for your
15   reference, John.
16             MR. MULLER:  Here we go.
17             THE WITNESS:  Thank you.
18        Q.   (BY MR. CLEVELAND)  Do you have it?
19        A.   Okay, I have it.
20        Q.   Okay.  So -- great.
21             Mr. Wright, you remember we were
22   looking at this document last evening when we
23   concluded the first day of your deposition?
24        A.   I don't remember a lot from yesterday,
25   because I was -- I was very weak.

1    Q.   Okay.  Well, I -- we're -- I'm showing it to
2  you again.  It's on the screen share, and you have it
3  in front of you -- can you turn to this page, the
4  first page of the deed of trust that --
5    A.   Right.
6    Q.   -- has the date, and the borrower and so
7  forth.  Do you have that in front of you, sir?
8    A.   Right.
9    Q.   And if you can, can you confirm for me that
10  you did, in fact, sign this document on behalf of
11  Black Duck?  I think it's on numbered page 26 of this
12  document, sir.
13    A.   Yes, I did.  I did.
14    Q.   Okay.  And that's your -- that's your
15  signature under Black Duck Property LLC on the page
16  No. 26?
17    A.   Right, right.
18    Q.   Okay.  And if you can turn back to the
19  beginning, that first page of the deed of trust, sir,
20  let me ask you, when was this document, the deed of
21  trust, signed by you, Mr. Wright?
22    A.   You know, I can't remember, because it's
23  showing two different dates, and I -- I don't have an
24  explanation to that -- for that, because we -- we did
25  the document on August 14th.  But I -- you know, I

                                              Page 53

1  think what happened is they didn't file it until a
2  later date.  We did it and then I decided --
3    Q.   Right.  On the first page --
4    A.   -- two different dates.
5    Q.   And the first page of the exhibit showed
6  that it was recorded on January 19, 2018, at about
7  8:44 a.m.  Do you see that, sir?
8    A.   Yeah, I think that's correct.  That's --
9  that's -- that's when we recorded it, but that's not
10  when I signed it.
11    Q.   Yeah.  If you can flip back to your
12  signature page, sir.
13    A.   Yeah.
14    Q.   Actually before we do that, let me ask you
15  this:  One, who prepared this deed of trust?
16    A.   If I'm not mistaken I believe this was
17  Mr. Strolle.
18    Q.   Okay.  And just -- I'm asking about your
19  knowledge.  What's your understanding of -- of what
20  this deed of trust document actually did related to
21  the loan between KrisJenn Ranch and Black Duck?
22    A.   This had nothing -- this -- this has nothing
23  to do with Black Duck.  This was the KrisJenn's
24  protection when we filed it to protect that asset for
25  all parties concerned.

                                              Page 54

1    Q.   And how does the deed of trust, to your
2  understanding, protect KrisJenn Ranch?
3    A.   Because KrisJenn Ranch had made the loan,
4  and KrisJenn Ranch gave up the ranch as collateral,
5  and therefore took the -- the pipeline and ROW as
6  collateral from Black Duck.
7    Q.   And is it your understanding that this, the
8  deed of trust, is the document that -- that would
9  actually allow KrisJenn Ranch to foreclosure on the
10  pipeline right-of-way if there was a default by Black
11  Duck?
12    A.   I'm not -- I'm not sure how that works.  I'd
13  have to -- I left that to my attorney's advice.
14    Q.   Okay.  Okay.
15    A.   -- be an expert on that.
16    Q.   I appreciate that.
17         Can you -- do you have your signature
18  page of this document in front of you?
19    A.   Yes, I do.
20    Q.   Okay.  So the -- do you see the bottom half
21  of the document, there's the notarization by Tracy
22  George?
23    A.   Yes, yes.
24    Q.   And who -- do you know Tracy George?
25    A.   Yes, I do.  She was a --

                                              Page 55

1    Q.   Is she -- I'm sorry, go ahead, sir.
2    A.   I think she's an illegal assistant.
3    Q.   I think you meant a legal -- a legal
4  assistant?
5    A.   I don't know.  She's a secretary in their
6  office.  That's -- that has no --
7    Q.   Got it.  And is that -- she's a secretary in
8  Mr. Strolle's office?
9    A.   Right.
10    Q.   Okay.  Can you read for me, sir, the -- the
11  actual notary that this instrument was?  Can you read
12  that to me?
13    A.   "Instrument acknowledged before me
14  January 18, '18, Larry M. Wright, Manager, Black Duck
15  Properties, Texas Limited Liability Company, on behalf
16  of said limited liability company."
17    Q.   Okay.  And now, Ms. -- Ms. George is stating
18  that, am I correct, that you appeared and signed this
19  document on January 18, 2018?  Is that true?
20    A.   I don't -- I can't remember, but if I'm not
21  mistaken, this document wasn't filed until
22  January 18th or actually January -- January 19th, and
23  that was at the request of -- of KrisJenn Ranch.
24    Q.   Right, and I understand that on January 19th
25  was when it was recorded, but on -- on Ms. George's

                                              Page 56

1    acknowledgement.  That suggests to me, by reading it,
2    that you actually appeared before her to sign this
3    document on the signature page was January 18th, 2018.
4    Do you -- do you disagree with that?
5        A.  I -- I'm not sure when I signed it.  I know
6    it was prepared on the 14th, and I'm not sure why it
7    says the 18th, but as a matter of fact, we may not
8    have signed it till the -- till the 18th.  You'll have
9    to ask her.  That's my signature.
10       Q.  You're saying you may not have signed it --
11   when you say --
12       A.  I signed it.  I don't know what date I
13   signed it on.
14       Q.  When you say it's possible that you may have
15   signed it on the 18th, are you referring to
16   January 18th, 2018, as Ms. George indicates in her
17   acknowledgement?
18       A.  Yeah, that -- that's a good possibility,
19   yes, sir.
20       Q.  Okay.  Do you -- do you have any reason to
21   challenge --
22       A.  And I know the note was prepared -- if I'm
23   not mistaken, we -- we did the note on the 14th, and
24   then I signed it and then we came back and I re-signed
25   it again for her so that we could file it.  We weren't

1    sure we -- we needed to file this, because Daniel
2    Moore said we could sell it within six months, and I
3    think when we realized that it wasn't going to happen,
4    we -- KrisJenn Ranch demanded that it be filed.  I
5    don't think this was ever prepared to be filed, in
6    my -- in my memory, until we realized he wasn't going
7    to perform his duties.
8        Q.  Okay.  Well, let me -- let me clarify a
9    couple of things about that with you.  You said the
10   note -- you believe the note was executed on
11   August 14, 2017.  Is that what I heard you say?
12       A.  It was prepared on August 14th.
13       Q.  But -- and you understand that the note and
14   the deed of trust are two different things?
15       A.  Oh, yeah, yeah.  This -- this --
16       Q.  Okay.
17       A.  This could have -- this could have been
18   prepared on the 14th and not signed on till the 18th
19   when we decided to file it.  That's for sure.
20       Q.  Well -- but when you're referring to the
21   14th and 18th, there -- I think there's quite a bit of
22   time there.  When you say the 14th, you're talking
23   about August 14th, 2017, which is the date on the
24   note.
25       A.  You're exactly right.

1        Q.  Is that right?
2        A.  You're exactly right.
3        Q.  Okay.  And then when you're referring to the
4    18th, you're talking about January 18, 2018, which is
5    several months later; is that correct?
6        A.  You're exactly right.
7        Q.  Okay.  And --
8        A.  If you'll add the difference between
9    those -- let me -- let me do it for you.  September,
10   October, November, December, January.  That's five
11   months, so I think at that point we realized that
12   Daniel Moore was not going to be able to sell the
13   property.  And that's why, if I'm not mistaken,
14   KrisJenn Ranch felt like one year would give them kind
15   of time to do something.  In fact, that one year
16   enabled me to come in and -- it's amazing, the first
17   person I'd talked to, they bought it, whereas he had
18   18 months and so we gave him six more months.  I think
19   there's emails that indicate that I gave him time to
20   do it.
21       Q.  Okay.  So as you're refreshing your memory
22   around this, Mr. Wright, are you saying that it --
23   it's possible that you, in fact, signed this deed of
24   trust on January 18 of 2018, as Ms. George indicates
25   here?

1        A.  And there's a -- it would make sense,
2    because we prepared the note and we weren't prepared
3    to file it yet because there would not be a reason to
4    file it unless it closed to protect -- KrisJenn Ranch,
5    the members of KrisJenn Ranch wanted protection.
6        Q.  Okay.  So if -- if you signed this in
7    January of 2018 why is the -- why is the date of this
8    deed of trust still August 14th, 2017?
9            MR. MULLER:  Objection, form.
10       A.  That's -- that's when the document was made.
11       Q.  (BY MR. CLEVELAND)  But -- but it wasn't
12   signed until January of 2018, so how can the deed of
13   trust be dated August 14, 2017, when Black Duck hadn't
14   even signed until January of 2018, when you signed?
15           MR. MULLER:  Objection, form.
16       A.  As I've stated, it's -- we didn't feel like
17   we needed to file this to protect it because of Daniel
18   Moore's assurances.
19       Q.  (BY MR. CLEVELAND)  Okay.
20       A.  Everything was done on the same date, the
21   14th.
22       Q.  But except you signing this, that happened
23   five months later; right?
24       A.  That -- there's a possibility that's the
25   case.

1      Q.   Okay.  Did -- was this deed of trust that
2   we're looking at ever sent to Daniel Moore?
3      A.   I can't remember.
4      Q.   Was this document the deed of trust
5   authorized by a volt of the disinterested management
6   of Black Duck Properties?
7                MR. MULLER:  Objection, form.
8      A.   It was authorized by the managers.
9      Q.   (BY MR. CLEVELAND)  And was that
10  authorization the same as what you testified to
11  earlier about Daniel's email in July and the
12  August 14th meeting of Black Duck?
13               MR. MULLER:  Objection, form.
14     A.   It's -- the clerk can pull it back, but I
15  think my answer would be the same, that the managers
16  approved the -- the loans.
17     Q.   (BY MR. CLEVELAND)  Okay.  And I just want
18  to make sure that -- I want to make sure this:
19               Is there any additional authorization
20  by Daniel Moore that you're alleging for this deed of
21  trust that is different from the authorizations you
22  alleged for the actual note from KrisJenn, the actual
23  note between KrisJenn and Black Duck?
24               MR. MULLER:  Objection, form.
25     A.   That's -- that's kind of a tongue twister of

Page 61

1   a question.  I really I don't understand what you're
2   trying to say.  I could give you the plain variety if
3   you want.
4      Q.   (BY MR. CLEVELAND)  I just want to make
5   sure, if there is an additional authorization by
6   Daniel Moore for this deed of trust that's different
7   than what you testified to earlier constituted his
8   authority for the actual note between KrisJenn and
9   Black Duck, that I know that.  There may not be, but I
10  just want to make sure I cover that with you.
11     A.   Should I pull that up and look at it to make
12  sure what you're asking?
13     Q.   Yeah, I mean, I have the -- I have the --
14  the note, I can pull it up right here.  We looked at
15  it first thing this morning, it's Exhibit 20.  And --
16  and we had a lengthy discussion about how you say
17  Daniel Moore authorized --
18     A.   Oh, yeah, that's the one we couldn't find --
19  we couldn't find page 3 to it.  Yes, that was the
20  authority given -- that was the authority for all
21  documents that were necessary and required to -- to
22  close the loan between KrisJenn Ranch, Black Duck and
23  the Express Pipeline and Asilo.
24     Q.   And including -- including the deed of trust
25  we just looked at?

Page 62

1      A.   The deed of trust was done on that date.  We
2   didn't -- we were not sure that we needed to file that
3   on that day if I remember right.  You would have to
4   ask Mr. Strolle why we didn't file it on that date and
5   waited.
6      Q.   Okay.  What did Mr. Strolle ever explain to
7   you about why there was a delay between August and
8   January 2018 to file the deed of trust?
9      A.   You'd have to ask him.
10     Q.   Do you remember anything he told you about
11  that?
12     A.   You'd probably have to ask him.
13     Q.   Okay.
14     A.   Now this was back in '17, that was over --
15  over three -- way over three years, and I like to look
16  at documents when I answer questions.  It helps, you
17  know, it helps my memory.
18     Q.   Okay.
19     A.   I'm still looking -- still looking down at
20  the documents that you gave me.
21     Q.   I appreciate that.  I appreciate that.
22               Mr. Wright, as of January of 2018 were
23  you in communication with John Terrill about a
24  potential sale by Black Duck of the right-of-way?
25               MR. MULLER:  Can you repeat it one more

Page 63

1   time?
2      Q.   (BY MR. CLEVELAND)  Sure.  As of
3   January 2018, the date you signed this deed of trust,
4   Mr. Wright, were you already in touch with John
5   Terrill about a potential transaction involving the
6   right-of-way?
7      A.   I think on that date we were looking at
8   quite a few people that were talking to us that were
9   interested in the pipeline.
10     Q.   And were you more involved in those --
11     A.   And John Terrill was -- John Terrill was one
12  of the people.
13     Q.   Okay.  Was Daniel Moore ever involved in any
14  of the communications with John Terrill?
15     A.   No.  He had his contacts, and I told him
16  that I was going to start trying to talk to people.
17  And I think I let Daniel know that back in probably
18  October or November, that I was going to talk to
19  people.
20     Q.   Okay.  But there came a point in time when
21  John Terrill's group, I think it was called Synergy,
22  and Black Duck, executed a letter of intent with
23  respect to a potential acquisition of the
24  right-of-way; is that correct?
25     A.   That is not true, that is not true.

Page 64

1     Q.   Was there a draft letter of intent
2  circulated between Synergy and Black Duck related to
3  the right-of-way?
4     A.   If there is I'd like to see it.
5           MR. MULLER:  Can we bring the exhibit
6  down?
7           MR. CLEVELAND:  I'm sorry?
8           MR. MULLER:  Can we bring the exhibit
9  down?
10          MR. CLEVELAND:  Yeah, we'll get to it
11  in a minute.
12          MR. MULLER:  We can't -- we can't see
13  you because the exhibit is still up.
14          MR. CLEVELAND:  Oh, that one.  I'll
15  stop my screen share for the time being, sure.
16     Q.  (BY MR. CLEVELAND)  So, Mr. Wright, did
17  there come a point in time when you realized that,
18  because Asilo and KrisJenn wired money straight to the
19  seller for the acquisition of the right-of-way, that
20  if the right-of-way, once it was owned by Black Duck,
21  was sold for $2 1/2 million, let's say, that that
22  $2 1/2 million would be split amongst yourself,
23  Mr. Borders, and Mr. Moore on -- without accounting
24  for the contribution to KrisJenn Ranch?
25          MR. MULLER:  Objection, form.

Page 65

Veritext Legal Solutions
800-336-4000

---

1     A.   Your question is definitely not pertinent to
2  any of the conversations that took place.
3     Q.  (BY MR. CLEVELAND)  Well, and I'm just
4  asking did it ever occur to you -- or let me -- when
5  did you ever realize that Daniel Moore and Darin
6  Borders would be able to share in any purchase price
7  for the right-of-way while KrisJenn Ranch would still
8  have the debt to Asilo?
9     A.   It's a misleading question.
10     Q.   I'm just asking, did it ever occur to you?
11     A.   To the -- oh, our Internet connection just
12  went down.  Can you see me?
13     Q.   I got you.
14          Did it -- did that ever occur to you?
15  That's all I'm asking.
16     A.   It was never something that should occur to
17  me, even to this date.
18     Q.   Okay.  When did you and Mr. Strolle come up
19  with the idea of making those KrisJenn contributions
20  loans to Black Duck?
21          MR. MULLER:  Objection, form.
22     A.   The notes -- the minutes will -- that we've
23  sent you will answer those questions.
24     Q.  (BY MR. CLEVELAND)  Okay.  We'll look at
25  those in a minute.  But was it after you started

Page 66

Veritext Legal Solutions
800-336-4000

---

1  talking to John Terrill that you realized that any
2  purchase price for the right-of-way would actually be
3  split between yourself and Mr. Moore and Mr. Borders?
4          MR. MULLER:  Objection, form.
5          MR. GERMANY:  Objection, form.
6     A.   The net profits agreement is what we were
7  working off of.
8     Q.  (BY MR. CLEVELAND)  Right.  At that time
9  there was no DMA net profits agreement; it was just
10  Uvalde Ranch; right?
11     A.   What date was the DMA agreement?  I believe
12  it was --
13     Q.   February of -- February of 2018.
14     A.   February of '17.
15     Q.   February of 2018.
16     A.   2018, right, right.
17     Q.   Is this just a coincidence, sir, that
18  that -- that you got Daniel Moore out of Black Duck
19  just weeks after you filed and recorded -- after you
20  signed and recorded this deed of trust between Black
21  Duck and KrisJenn?
22     A.   Oh, no, not at all.
23     Q.   Okay.  Why did you try to push Daniel Moore
24  out of Black Duck?
25          MR. MULLER:  Objection, form.

Page 67

Veritext Legal Solutions
800-336-4000

---

1          MR. GERMANY:  Objection, form.
2     A.   I never wanted Daniel Moore out.  That was
3  all his idea.
4     Q.  (BY MR. CLEVELAND)  Okay.  Did you think it
5  was fair, as of January 2018, that Daniel Moore's
6  entity had 50 percent ownership of Black Duck?
7     A.   It was fair until -- it was always fair.
8     Q.   Okay.  Because you knew that his carrying a
9  50 percent interest in Black Duck through his entity,
10  Daniel Moore effectively owned half of that
11  right-of-way and pipeline; right?
12          MR. MULLER:  Objection, form.
13          THE WITNESS:  I did not want him to
14  leave.  He was adamant about leaving.
15     Q.  (BY MR. CLEVELAND)  Okay.  Why did you want
16  him to stay?
17     A.   Because he was the original partner in the
18  company and -- and he was the one working with all of
19  the buyers.
20     Q.   Okay.  And that's what -- that's one of the
21  reasons you partnered with him, right, was because of
22  his relationships, isn't that what you said yesterday?
23     A.   Yeah, I liked Daniel Moore.  I just
24  didn't -- I just didn't like the fact that he was
25  having trouble finding a buyer.  He said he could flip

Page 68

Veritext Legal Solutions
800-336-4000

1   it before I closed, and then at the end he said the
2   only way he could sell it is if I closed.  So then I
3   closed and then he realized he couldn't sell it at
4   all.
5            And then during that time frame he
6   tried an end run on my company, on Black Duck, went
7   direct to the seller and made a separate deal with
8   this John Michael.  And then at that point he realized
9   that Black Duck probably could never close the
10  pipeline and -- and at some point he realized that it
11  wasn't going to happen and left town, told nobody,
12  told nobody, just snuck out of town.  That was back in
13  August, if I'm not mistaken, of 2017.
14      Q.  So your -- oh.  So your testimony is that
15  Daniel Moore left Texas and didn't tell anybody he was
16  going to do that?
17      A.  Oh, he never told anybody.  First we read of
18  that was in his -- his lawsuit that he was sent to
19  Texas on some assignment.  We're trying to -- we'd
20  like to know what that assignment was for; maybe a
21  university, maybe his father-in-law sent him on an
22  assignment, we don't know.  Very confusing what his
23  assignment was.
24      Q.  Okay.  But earlier you said that toward the
25  end of '17 you were working with Terrill and Daniel

1   was working with other potential buyers; right?
2       A.  I'm not going to say I was working with
3   anybody.  I was contacted by Terrill.
4       Q.  Okay.  But you -- you said earlier while
5   that -- those communications with Terrill was
6   happening, that Daniel was out trying to work and find
7   other buyers; right?
8       A.  I sent an email to Daniel --
9       Q.  Sir, I'm just asking yes or no.  Was Daniel
10  trying to find other buyers -- real quick, I'm just
11  trying to -- was Daniel trying to find other buyers
12  for the right-of-way at the end of 2017 or not?
13          MR. MULLER:  Objection, form.  If you
14  would allow him to answer the question before you ask
15  your next one.
16          MR. CLEVELAND:  Thank you, counsel.
17      Q.  (BY MR. CLEVELAND) Go ahead, Mr. Wright.
18      A.  I'm not sure what Daniel Moore was doing.
19  He told me he was talking to other buyers, but he
20  wouldn't let myself or Darin talk to the buyers, he
21  wouldn't let us contact them, wouldn't let us email
22  them.  Kept everything private.  We knew nothing of
23  the -- of the other buyers other than he kept the
24  details -- he sent us -- he sent us forms from John
25  Michael, sent us offer forms on Synergy, gave us

1   verbal offer forms for several other companies, and my
2   son-in-law went to one of them, being Al [sic] and
3   another one being a company out of Dallas/Fort Worth.
4       Q.  And was Daniel doing all that in the fall of
5   '17 from North Carolina, to your knowledge?
6       A.  It's hard to say what he was doing from
7   North Carolina, because we were having weekly meetings
8   up to that point so I don't know what he was doing.
9   He claimed he was, but we don't know what he was
10  doing.
11      Q.  Okay.  Mr. Wright, do the net profits
12  interests of DMA Properties and Longbranch Energy
13  attach and run with the land?
14          MR. MULLER:  Objection, form.
15      A.  All I was ever told was that the pipeline
16  itself ran with the land and that's what I thought it
17  meant.  That was never talked about and when I asked
18  the question, it was the pipeline ran with the land.
19  In fact, we had already messed with the seller on
20  where the actual route was before -- before I closed.
21      Q.  (BY MR. CLEVELAND) Okay.  Did you intend
22  the net profits interest to DMA Properties and
23  Longbranch Energy to attach and run with the land?
24          MR. MULLER:  Objection, form.
25      A.  My thought was, it had never changed, was

1   that the pipeline itself ran with the land, and I went
2   and had Darin Borders give me a small tour of where it
3   ran on the left on some of his father's land, if I'm
4   not mistaken.
5       Q.  (BY MR. CLEVELAND) Is there anything else
6   about your intent in that regard, sir, besides what
7   you just said?
8           MR. MULLER:  Objection, form.
9       A.  It was -- it was -- it was my understanding.
10  I'm not going to say there was any intent or not.  It
11  ran with the land.  The pipeline -- ran with the land.
12      Q.  (BY MR. CLEVELAND) Okay.  Anything else?
13      A.  No.
14      Q.  Is the obligation to pay 20 percent net
15  profits share to DMA Properties and Longbranch
16  respectively binding on the successors and assigned to
17  Black Duck?
18      A.  I'd -- I'll have to refer to my attorney on
19  that, because that is a confusing question to me.  And
20  I don't -- I can't answer --
21      Q.  Okay.  Do you -- okay.  Do you have anything
22  else to add to that answer?
23      A.  No.
24      Q.  Okay.  Did you intend for the obligation to
25  pay the 20 percent net profit share to DMA Properties

1   and Longbranch respectively to be binding on the
2   successors and assigned to Black Duck?
3       A.   The same answer I gave before.
4       Q.   You just have to refer to your attorneys and
5   have nothing to tell me on that matter; is that what
6   you're saying?
7       A.   That is -- that is correct.
8       Q.   Okay.  Okay.  Thank you.
9            Mr. Wright, when you signed this deed
10  of trust on behalf of Black Duck in January of 2018
11  did you have reason to believe that Black Duck would
12  be able to repay the KrisJenn loan by August of 2018?
13      A.   Unless Black Duck sold the right-of-way
14  there was no way they could repay it.  That's the
15  reason that that was filed, is to protect KrisJenn
16  Ranch.
17      Q.   Right.  So was the deed of trust that you
18  signed for Black Duck in the best interest of Black
19  Duck?
20      A.   It was in the best interest of KrisJenn
21  Ranch.
22      Q.   And I hear you on that, but was the deed of
23  trust also in the best interest of Black Duck?
24      A.   My answer is it was in the best interest of
25  KrisJenn Ranch.

                                        Page 73

1       Q.   And I understand.  I'm asking you about
2   Black Duck, okay?  Was that deed of trust that you
3   signed on behalf of Black Duck in the best interest of
4   Black Duck?
5       A.   It was in the only interest.
6            MR. CLEVELAND:  Objection,
7   nonresponsive.
8       Q.   (BY MR. CLEVELAND)  Was that deed of trust
9   you signed in the best interest of Black Duck, yes,
10  no, I don't know?
11      A.   It was in the only interest of Black Duck.
12  They had no choice.
13      Q.   So KrisJenn Ranch forced Black Duck to sign
14  and file that deed of trust?
15           MR. GERMANY:  Objection, form.
16           MR. MULLER:  Objection, form.
17      A.   There -- there's not a lot of forcing going
18  on in this entire transaction.
19      Q.   (BY MR. CLEVELAND)  Well, you just said that
20  Black Duck didn't have a choice.  That sounds like
21  forcing to me, sir.  Which is it?
22           MR. GERMANY:  Objection, form,
23  argumentative.
24      A.   It was in the best interest of KrisJenn
25  Ranch.  KrisJenn Ranch --

                                        Page 74

1       Q.   (BY MR. CLEVELAND)  Was it in the best --
2       A.   KrisJenn Ranch is the one that borrowed the
3   money with the 17 percent interest rate that was
4   clicking daily and about $450,000 a month in interest,
5   and that interest payment was coming on and it was
6   obvious that Daniel Moore was conducting himself in
7   the same manner as he was when he was in Texas; not
8   one thing he did was in the best interest of Black
9   Duck.
10           MR. CLEVELAND:  Objection,
11  nonresponsive.
12      Q.   (BY MR. CLEVELAND)  Was this deed of trust
13  in the best interest of Black Duck?
14      A.   It was in the best interest of KrisJenn
15  Ranch.
16           MR. CLEVELAND:  Objection,
17  nonresponsive.
18      Q.   (BY MR. CLEVELAND)  Was this deed of trust
19  in the best interest of Black Duck, sir?
20      A.   It was their only interest, so the answer
21  would be yes.  It was the only interest.
22      Q.   Okay.  Did David Strolle advise you to sign
23  that deed of trust?
24           THE WITNESS:  What time is it?
25           MR. CLEVELAND:  11:30.

                                        Page 75

1            THE WITNESS:  What time?
2            MR. CLEVELAND:  I think it's 11:30 on
3   my clock.
4            THE WITNESS:  Okay.  Well, I'll -- I'll
5   be ready to eat at 12.  I'm getting hungry.  My
6   stomach is going crazy, so --
7            MR. CLEVELAND:  Yes, sir.
8            THE WITNESS:  I was just asking,
9   because I don't -- there's no clock in here.
10           MR. CLEVELAND:  You know what, and
11  I'll -- I'll wrap up before noon so we have plenty of
12  time to eat --
13           THE WITNESS:  Okay, great.
14      Q.   (BY MR. CLEVELAND)  Okay.  Did David Strolle
15  advise you to sign this deed of trust in January of
16  2018?
17      A.   You're going to have to ask David Strolle,
18  because we prepared it on the 14th of August, and we
19  didn't file it till that date because I didn't feel
20  like it was in the best interest of Black Duck to file
21  it until we realized that Mr. Moore's scam was
22  continuing.
23      Q.   Okay.  You know, I shouldn't have tied
24  that -- I shouldn't have tied that to a date.  Let
25  me -- let me restate it, a different question.  Did

                                        Page 76

1    David Strolle advise you to sign the deed of trust on

2    behalf of Black Duck?

3         A.   I advised Mr. Strolle to file it on the

4    benefit of KrisJenn Ranch, because DMA, their scam was

5    continuing, and he -- and he could care less about the

6    money borrowed or if it ever got repaid.

7              MR. CLEVELAND:  Objection,

8    nonresponsive.

9         Q.   (BY MR. CLEVELAND)  My question is did David

10   Strolle advise you to sign the deed of trust on behalf

11   of Black Duck, yes, no, I don't remember?

12        A.   You'd have to ask Mr. Strolle, because I

13   don't remember.

14        Q.   Okay.  Mr. Wright, is -- is it -- was it the

15   right thing to do to date this deed of trust

16   August 14, 2017, when you signed it in January of

17   2018?

18        A.   That's the date we prepared it.  We were

19   hoping we'd never have to file it because Daniel Moore

20   indicated he had a buyer for the pipeline.

21        Q.   But why didn't you date this deed of trust

22   January of 2018, when you signed it and when you filed

23   it?

24              MR. MULLER:  Objection, form.

25        A.   It would -- it remained in the files until

                                        Page 77

1    we decided to file it.

2         Q.   (BY MR. CLEVELAND)  Okay.  Then why didn't

3    you change the date on the first page of the deed of

4    trust, in fact, we can put -- pull that up,

5    Exhibit 20.  I'm sorry, it's Exhibit 16, and I'll

6    share my screen.  Do you have the hard copy in front

7    of you, Mr. Wright?

8              MR. MULLER:  No, but we've seen it

9    before.  He can answer the question.

10        Q.   (BY MR. CLEVELAND)  Okay.  Do you see it on

11   the screen share I just -- I just shared with you?

12        A.   Yes.

13        Q.   This is Exhibit 16, the deed of trust we've

14   been talking about.  My question is, if you signed

15   this document in January of 2018, and you filed this

16   document in January 2018, why does it still have this

17   August 14th, 2017, date on it, sir?

18        A.   You will have to ask David Strolle, because

19   that's the date we prepared it.

20        Q.   So you have nothing to explain to me about

21   that other than whatever David Strolle can say.  Is

22   that your testimony?

23              MR. MULLER:  Objection, form.

24        A.   Yes.

25        Q.   (BY MR. CLEVELAND)  Okay.  Thank you.

                                        Page 78

1              MR. MULLER:  Tim, your outline is up on

2    the screen.  I love your notes.

3              MR. CLEVELAND:  Oh.  We just went right

4    through these, Larry.

5              MR. MULLER:  Thank you.  Thank you.  Is

6    this a good time for a break?  Larry is fizzling and

7    I'm a little hungry too.

8              MR. CLEVELAND:  Yeah, you know what,

9    yeah, let's take a lunch break.  Thanks, John, it is a

10   good time.

11             THE VIDEOGRAPHER:  Going off the

12   record.  The time is 11:37 a.m.

13             (Recess from 11:37 a.m. to 1:18 p.m.)

14             THE VIDEOGRAPHER:  This marks the

15   beginning of file 2.  Back on the record.  The time is

16   1:18 p.m.

17        Q.   (BY MR. CLEVELAND)  Mr. Wright, we've taken

18   our lunch break.  Are you ready to continue?

19        A.   Yes, I am, but now I'm sleepy, because I ate

20   too much.  How long do you plan to go today, because

21   I'd like to have an idea on that.

22        Q.   I expect we'll be here for the rest of the

23   afternoon and -- and possibly longer.  I wish I could

24   tell you we're going to be done sooner than that, but,

25   you know, it's going to take the rest of the day.

                                        Page 79

1              MR. MULLER:  Gloria, where are we on

2    the record in time?

3              THE REPORTER:  I have 1:34.  I have

4    requested the time from the reporter yesterday, but I

5    haven't received it yet.

6              MR. MULLER:  All right.

7         Q.   (BY MR. CLEVELAND)  Okay, Mr. Wright.  Why

8    did Black Duck -- I'm sorry.  Why did KrisJenn Ranch

9    foreclose on the $4.1 million loan that you say was

10   made to Black Duck Properties?

11        A.   To protect the -- the asset.

12        Q.   To protect which asset?

13        A.   The pipeline and ROW.

14        Q.   Well, do you remember, sir, that the

15   foreclosure -- well, let's start here.  The loan that

16   KrisJenn made to Black Duck was for a year, right,

17   through August 14, 2018?

18        A.   Yeah, the document speaks for itself, yes.

19        Q.   Okay.  And by August 14th of 2018 -- sir, by

20   August 14th of 2018, Black Duck had already sold the

21   right-of-way to TCRG; right?

22        A.   Yes.

23        Q.   And the foreclosure by KrisJenn Ranch on

24   Black Duck didn't occur until September of 2018;

25   right?

                                        Page 80

1    A.    Yes.

2    Q.    So it couldn't have been KrisJenn's

3  foreclosure to protect the asset, because the asset

4  had already been sold; right?

5    A.    The documents -- the dates speak for

6  themselves.  I don't have any of them in front of me,

7  so it seems -- seems confusing.  It makes sense.

8    Q.    Okay.  Well, you just said that -- you --

9  well, you just said that KrisJenn foreclosed on Black

10  Duck to protect the asset, and you said the asset was

11  the right-of-way, but the right-of-way had already

12  been sold before August 2018, sir.  So let me ask

13  again, why did KrisJenn Ranch foreclose on its

14  $4.1 million loan with Black Duck?

15    A.    That KrisJenn -- that's KrisJenn's asset,

16  which is 4.1 million, and until Black Duck paid them

17  back, it's their asset.

18    Q.    But -- but the asset had been sold to TCRG,

19  so it wasn't KrisJenn's asset, was it, sir?

20    A.    The note is KrisJenn's asset.

21    Q.    Okay.  So why did KrisJenn Ranch foreclose

22  on Black Duck?

23    A.    To protect its asset, the note.

24    Q.    Okay.  What were you hoping to accomplish by

25  causing KrisJenn Ranch to foreclose, sir?

Page 81

1         MR. MULLER:  Tim, if I may interject,

2  I'm going to object to form, but part of the problem

3  here is you're using the term "you."  And so he

4  doesn't know if he's answering for KrisJenn or Black

5  Duck.

6    Q.    (BY MR. CLEVELAND)  All right.  Mr. Wright,

7  as a member and manager of KrisJenn Ranch, why did

8  KrisJenn Ranch feel it was appropriate and proper to

9  foreclose on Black Duck in September of 2018?

10    A.    To -- to protect their asset.

11    Q.    And which asset was that?

12    A.    The note.

13    Q.    Okay.  Did KrisJenn get anything from Black

14  Duck as the result of that foreclosure?

15    A.    The note that Black Duck owed, 4.1 million

16  plus the 17 percent interest.

17    Q.    Well, did Black Duck have anything to

18  foreclose on?

19    A.    It would be -- it would be the -- it would

20  be the cost and the net profits agreement.  We have to

21  establish the cost.

22    Q.    So you're saying that -- you're saying that

23  KrisJenn Ranch foreclosed on the net profits agreement

24  that Black Duck had with DMA and Longbranch?

25    A.    No.

Page 82

1    Q.    Then what did you mean by the net profit?

2    A.    You asked me a definition, and I gave you

3  the definition.

4    Q.    Well, you have said one of the things that

5  KrisJenn foreclosed on was the net profit.  And I'm

6  trying to ask what you meant when you said net

7  profits.

8    A.    That's not what I said.

9    Q.    Okay.  Well, did KrisJenn foreclose on the

10  net profits of Black Duck?

11    A.    No.

12    Q.    Okay.  So what did KrisJenn get from the

13  foreclosure?

14    A.    The note.

15    Q.    Okay.  Anything else?

16    A.    The note and the interest that would be due

17  to KrisJenn.

18    Q.    Okay.  So as a result of the foreclosure did

19  KrisJenn get any cash that Black Duck had?

20    A.    No.

21    Q.    As a result of the foreclosure did KrisJenn

22  Ranch get any of the assets of Black Duck?

23    A.    No.  Just the -- the note.

24    Q.    And which note are you talking about?

25    A.    I'd have to ask my attorney what you're

Page 83

1  referring to as "note," and "which note."

2         There's -- there's two notes.  So which

3  note are you referring to?

4    Q.    I'm asking which note you are referring to.

5  You -- you used the phrase that KrisJenn got the note

6  from foreclosing on Black Duck.  Which note is it?

7    A.    I don't know, because you're making me

8  assume.  Unless you tell me which note, I don't know.

9    Q.    Well, let me ask you this, did I cause

10  KrisJenn to foreclose on Black Duck or did you cause

11  KrisJenn to foreclose on Black Duck, Mr. Wright?

12         MR. MULLER:  Objection, form.

13    A.    I didn't know then, so I don't think you

14  did.

15    Q.    (BY MR. CLEVELAND)  Okay.  That's why I need

16  to get this information from you, because you did

17  cause KrisJenn to foreclose on Black Duck; right?

18         MR. MULLER:  Objection, form.

19    A.    Who is "you"?

20    Q.    (BY MR. CLEVELAND)  You, Larry Wright, as a

21  member of KrisJenn, caused KrisJenn to foreclose on

22  Black Duck, didn't you?

23    A.    I -- you need to be more specific.

24    Q.    Who made the decision at KrisJenn Ranch to

25  foreclose on Black Duck, sir?

Page 84

1     A.   That would be the managers.

2     Q.   And you are one of the managers; right?

3     A.   One of the managers.

4     Q.   Is Hagan Cohle another manager?

5     A.   I don't know if he became a manager at that

6  time or not.

7     Q.   Okay.  And even in that foreclosure, sir,

8  you were on the both sides of the transaction, because

9  you were a member of KrisJenn Ranch and you were still

10  a member of and a manager of Black Duck; right?

11          MR. MULLER:  Objection, form.

12     A.   I was a manager of the entity.

13     Q.   (BY MR. CLEVELAND)  Okay.  And you had

14  financial interests in each entity, didn't you, sir?

15     A.   Black Duck owed money to KrisJenn Ranch, and

16  my duty was to protect KrisJenn Ranch for the money

17  owed and ...

18     Q.   But didn't you also have a duty to Black

19  Duck?

20          MR. MULLER:  Objection, form.

21     A.   I'm not sure of that answer.

22     Q.   (BY MR. CLEVELAND)  Okay.  You're not sure

23  whether you owed any duties to Black Duck when you

24  were a 50 -- when your entity was a 50 percent member

25  and you were a manager; is that your testimony, sir?

                                        Page 85

1          MR. MULLER:  Objection, form --

2  objection, form.

3     A.   If Black Duck owes money to KrisJenn Ranch

4  and can't pay it, then KrisJenn Ranch has to -- has to

5  repossess it, the note.

6     Q.   (BY MR. CLEVELAND)  Okay.  But your decision

7  to foreclose on Black Duck is what ultimately put

8  Black Duck out of business; right?

9          MR. MULLER:  Objection, form.

10     A.   No, sir.  No, sir.

11          MR. GERMANY:  Objection, form.

12     Q.   (BY MR. CLEVELAND)  Okay.  What caused Black

13  Duck to cease to exist?

14     A.   Had nothing to do with that.

15     Q.   But I'm asking you what caused Black Duck to

16  cease to exist.

17     A.   The decision for Black Duck to cease to

18  exist was because it sold the pipeline.

19     Q.   Okay.  Any other reason?

20     A.   It only had 100 percent entity that owned

21  it, so, therefore, it was no longer going to be a

22  vehicle used to buy and sell properties.

23     Q.   Okay.

24          MR. CLEVELAND:  John, we're going to

25  look at Exhibit 29 which I've shared with you and you

                                        Page 86

1  have a hard copy of.

2     Q.   (BY MR. CLEVELAND)  Mr. Wright, let me know

3  when you have Exhibit 29 in front of you.  It's the

4  minutes of the special meeting of the managers of the

5  Black Duck Properties dated August 14, 2017.

6     A.   Okay.

7     Q.   Do you have that in front of you?  Do you

8  have these minutes in Exhibit 29 in front of you,

9  Mr. Wright?

10     A.   Yes, I do.

11     Q.   Okay.  I'll represent to that these were

12  minutes that were produced by your counsel to us this

13  morning, which I appreciate.  And I have now marked

14  them as Exhibit 29 for your deposition.  Do you

15  recognize these minutes, sir?

16     A.   Yes, I do.

17     Q.   Okay.  And are these, in fact, the minutes

18  of the special meeting of the managers of Black Duck

19  that occurred on August 14, 2017?

20     A.   Correct.

21     Q.   Okay.  And this is a meeting, as we see on

22  the first page, that took place at your house on

23  Spyglass Road in McQueeney; right?

24     A.   Yes, sir.

25     Q.   Who prepared these minutes?

                                        Page 87

1     A.   It could have been Hagan Cohle.  It could

2  have been my wife or it could have been David Strolle.

3     Q.   As you sit here today do you not know?

4     A.   It would be one of those.

5     Q.   Okay.  When were the -- when were the --

6  these minutes prepared?

7     A.   On or before August 14th.

8     Q.   How could these minutes of a meeting that

9  you say happened on August 14th be prepared before

10  August 14th, Mr. Wright?

11     A.   That's not what you asked.

12     Q.   Well, could the -- were these minutes

13  prepared before August 14, 2017?

14     A.   No.  That's impossible.

15     Q.   Okay.

16     A.   They were prepared --

17     Q.   So your testimony is today --

18     A.   Yeah, they --

19     Q.   Okay.  When were they prepared?

20     A.   If I'm not mistaken, the meeting was held on

21  the 14th.  I'm not going to say that the minutes --

22  usually the minutes are typed that -- that day or the

23  next day.

24     Q.   Okay.  Is that what happened here?

25     A.   I don't remember.

                                        Page 88

Q. Okay. Where would we be able to locate the
record of who prepared these minutes and -- and when,
Mr. Wright?

A. The minutes speak for themselves, and so
these would be the minutes.

Q. That's not my question. Where would we look
and be able to find out who prepared these minutes and
when they were prepared, sir?

A. I guess I could call Hagan Cohle and see if
he prepared them, and then --

Q. I would -- I would appreciate you doing that
on a break. I really appreciate you offering to do
that. Anything else we can do?

A. Anything you could do? You can -- let me
give that some thought. It may take me a while on
that one, that question.

Q. Okay. So --

THE WITNESS: Anything else you can do.
See, that's so misleading, William, he keeps saying
you, you, you, Mr. Germany, and I'm just getting tired
of that, because he should have done one -- one for
Larry Wright personally. He should have done one for
Black Duck and he should have done one for KrisJenn
Ranch, and he keeps confusing me and making it very,
very, very hard, Mr. Germany.

Page 89

MR. GERMANY: Yeah, and Larry, when we
object to form, just answer the question. We'll take
that up later. It's -- it's his job to ask the right
question.

THE WITNESS: Oh, okay, okay, okay.

MR. GERMANY: Don't worry about it.

THE WITNESS: He's asking me if there's
anything else more he can do and that's confusing to
me. And I don't know if that's for Black Duck, or if
that's for me or if that's for KrisJenn Ranch. So
I'm -- it's going to take me a while to think about
that, because I -- I can't read his mind on what else
he can do for me. I'm trying. It just seems like a
dumb question. I'm still thinking.

Q. (BY MR. CLEVELAND) Okay. Okay. You have
this meeting -- you have this meeting; right?

A. We definitely had this meeting.

Q. Okay. Let's go down the first page where it
says the following individuals were in attendance at
the special meeting in person or by proxy. Do you see
that, sir?

A. It speaks for itself, yes, sir.

Q. Okay. So you're identified. Were you there
in person or by proxy?

A. Where do you see proxy?

Page 90

Q. Right in the middle of the page. "The
following individuals were in attendance at the
special meeting either in person or by proxy."

Do you see that?

A. Oh, yeah, yeah, I do.

Q. Okay. So you're identified there in the
first bullet point. Did you attend this meeting in
person or by proxy?

A. In person.

Q. Okay. What about your son-in-law, Hagan
Cohle, did he attend in person or by proxy?

A. In person.

Q. And what about Frank Daniel Moore, was he in
person or by proxy?

A. By proxy.

Q. Okay. Who was his proxy?

A. I'm sorry?

Q. Who is Mr. Moore's proxy at this meeting?

A. Hagan Cohle.

Q. Okay. And on what authority did Hagan Cohle
appear at this meeting as Mr. Moore's proxy?

A. By email instructions.

Q. Okay. Is that the email we looked at
earlier today from July 2017?

A. The continuation page, I think, has -- has

Page 91

it, which y'all didn't produce.

Q. Okay. But the proxy specifically states and
authorizes Mr. Cohle to appear at this meeting as the
proxy of Daniel Moore; is that your testimony?

A. No.

Q. Okay.

A. He gave --

Q. So what did that proxy say?

A. It gave him permission for all documents and
meetings to close the loan.

Q. Including encumbering Black Duck with
$5 million of debt, you're saying that was all --

A. Any and all --

MR. MULLER: Objection, form.

A. Any and all documents.

Q. (BY MR. CLEVELAND) Why did Mr. Moore appear
at this meeting by proxy?

A. Because he gave Hagan Cohle the right to
sign his name and vote for him.

Q. Okay. Were these minutes ever sent to
Daniel Moore at any time?

A. I don't remember.

Q. Why not?

MR. MULLER: Objection, form.

A. This happened in 2017, so I can't remember.

Page 92

Q. (BY MR. CLEVELAND) If you were appearing at
a board meeting or a manager meeting by proxy,
wouldn't you want the minutes from that meeting to be
sent to you, Mr. Wright?

A. I have a much -- much better memory than --
than the last person that ran for president of the
United States and 92 percent of the answers he gave
was he couldn't remember. I'm trying to remember and
I'm honest with you. I'm 66 years old, and sometimes
I have to see things. I'm trying -- trying real hard,
Tim. I don't remember.

Q. And I appreciate that.

Okay. The right thing to do would have
been to send these minutes to Daniel Moore; right?

A. Thank you, thank you.

MR. GERMANY: Objection, form.

Q. (BY MR. CLEVELAND) Sir?

A. Thank you.

Q. All right. Let me ask that again. I know
you can't remember, but as you sit here today would
the appropriate thing to have done be to send these
minutes to Daniel Moore?

MR. GERMANY: Objection, form.

MR. MULLER: Objection, form.

A. If he would have liked -- if he would have

---

liked them, we would have gladly sent them to him, but
he wasn't interested.

Q. (BY MR. CLEVELAND) Okay. What -- how do
you know he wasn't interested, what's the basis of
that testimony?

A. He didn't -- he didn't think and actually
called me a liar.

Q. Okay. Well, I'm trying to understand --
sorry, go ahead, sir.

A. I told him we closed and he called me a
liar. He was -- he didn't believe it.

Q. Okay. Well, I'm focused on these minutes.
And I heard you say that you don't -- you don't
remember whether these minutes were sent to Mr. Moore
or not. And my question for you is, wouldn't the
appropriate thing to have done be to send these
minutes to Daniel Moore?

MR. GERMANY: Objection, form.

MR. MULLER: Objection, form.

A. No.

Q. (BY MR. CLEVELAND) Why not?

MR. GERMANY: Objection, form.

A. They weren't required.

Q. (BY MR. CLEVELAND) Okay. So there was no
requirement to send these minutes to Daniel Moore? Is

---

that your testimony?

A. No. My testimony is I can't remember,
because I might have sent them. I don't know. I know
that --

Q. Okay.

A. Mr. Strolle may have sent them. I just
don't know. I don't remember.

Q. Okay. But do you agree with me that that
would have been the appropriate thing to do, sending
these minutes to Mr. Moore?

MR. GERMANY: Objection, form.

MR. MULLER: Objection, form.

A. That's a leading question. That's what you
think should be done.

Q. (BY MR. CLEVELAND) I'm asking if you agree
with me. Do you?

A. I had full authority to -- to run this
company as manager.

Q. Okay. What about when there's a conflict of
interest, did you have full authority then?

MR. MULLER: Objection, form.

A. There is no conflict of interest, because I
produced emails where Daniel Moore told Mr. Roberts
that Hagan Cohle and Larry Wright were the controlling
members.

---

Q. (BY MR. CLEVELAND) Okay. Now, this --
these minutes that were produced to us this morning,
where did they come from in your files, Mr. Wright?

A. They were -- they were all in the -- the
corporate books of Black Duck.

Sorry, I'm cleaning my glasses, because
I -- they were -- I couldn't see.

Q. Okay. And is that a hard copy file that you
keep? Is that a cloud file? I mean, what -- where is
that -- where are those books and records kept?

A. They're kept at 410 Spyglass, hard copy.

Q. Okay. So did you bring these minutes to
your lawyer's office yesterday when you came for your
deposition?

A. I produced those beforehand, the entire
corporate books and they've had them.

Q. Okay. Let's turn to the second page of
these minutes.

A. Sure.

Q. I'll focus on the $1.175 million of payment.
And I've highlighted this text that says "these
payments were made."

Are you with me, sir?

A. Yes.

Q. Referring to the $1.175 million, these

1  minutes state that "These payments were made by Larry
2  M. Wright, individually, with the express agreement
3  that Larry M. Wright would be repaid in full with
4  interest by the company and that this debt would be
5  secured by the ownership interest of the company in
6  the Express Gas Pipeline."
7       Q.   Did I read that correctly, sir?
8       A.   Yes, sir.
9       Q.   Where is the express agreement that's
10 referenced in that sentence, sir?
11      A.   I have an email between Daniel Moore and
12 myself, that same statement.
13      Q.   Okay.
14      A.   Those are -- those are being --
15      Q.   So is it your testimony -- okay.  So is it
16 your testimony that the express agreement here, that
17 effectively your $1.175 million of earnest money with
18 a debt of Black Duck, that's something that you're
19 saying is documented in an email from Daniel Moore?
20      A.   In an email from myself to Daniel Moore,
21 yes, sir.
22      Q.   Okay.
23      A.   Which was dated before this date.
24      Q.   What's the date of that email?
25      A.   I don't know.  I produced those and they've

Page 97

1  sent them out to be copied for you.
2       Q.   Okay.  So you're saying Daniel Moore
3  approved Black Duck taking out a $1.175 million loan
4  from Larry Wright individually?
5       A.   I did -- did not say that.
6       Q.   Okay.  Did Daniel Moore vote in favor of
7  having Black Duck take out over a million dollars in
8  loans from you personally?
9       A.   He did not vote.
10      Q.   Okay.  Moving -- moving on to the next page,
11 this paragraph starting "upon receipt," are you with
12 me, sir?
13      A.   Okay.
14      Q.   There is the third page of Exhibit 29.  The
15 paragraph above refers to the Asilo loan; right?
16      A.   Yes, sir.
17      Q.   The paragraph starting with "thereafter."
18 And then it says, "Upon receipt, all of the proceeds
19 received by KrisJenn Ranch as a result of the above
20 and foregoing loan transaction were immediately loaned
21 by KrisJenn Ranch to the Company which thereafter turn
22 used those loan proceeds to close the Express Gas
23 Pipeline transaction with Seller."
24      Did I read that correctly, sir?
25      A.   Yes, sir.

Page 98

1       Q.   But is that an accurate statement?
2       A.   Of course, it is.
3       Q.   Okay.  Did Black Duck ever receive in its
4  bank account any of the cash that Asilo loaned to
5  KrisJenn Ranch?
6       A.   This has nothing to do with Asilo loan.
7  This has to do with the 1 -- 1.1.
8       Q.   This says it's -- you're -- I'm sorry, sir.
9       A.   Oh, I may be reading that -- I may be
10 reading that wrong.
11      Q.   Right, I believe this is referring to the
12 Asilo loans.
13      A.   Oh, okay, okay, okay.  Yeah, we jumped
14 pages, because the -- the 1.175 was the funds that
15 were on deposit with Asilo, yes.
16      Q.   Okay.  And this statement that "the Company
17 which thereafter turn used those loan proceeds to
18 close the Express Gas Pipeline transaction with
19 Seller," that's not accurate, sir, because Asilo wired
20 money straight to the Express Gas Pipeline seller;
21 correct?
22           MR. MULLER:  Objection, form.
23      A.   The email spells out exactly how the entire
24 procedure went down.  And when you receive that you
25 will see exactly how it was spelled out, and it was

Page 99

1  explained to Daniel Moore and Daniel Moore did not
2  have any disagreements or complaints at the time that
3  this was all spelled out by email.  This -- this
4  entire document is put together after that email was
5  sent to Daniel Moore.
6       Q.   (BY MR. CLEVELAND)  Okay.  So is your
7  testimony that this highlighted sentence starting with
8  "upon receipt all of the proceed," that this is
9  factually accurate?
10      A.   The -- the timing did not allow the monies
11 to go into KrisJenn Ranch, because there was about
12 20 minutes left on the day and we -- we were going to
13 be foreclosed, so we agreed to wire the money direct
14 to the Express Pipeline and that the -- the note
15 transaction between KrisJenn Ranch and the Black Duck
16 would be done after the money got to -- to the Express
17 Pipeline.  If Express Pipeline didn't receive that
18 funds by 5:00 that day, then 20 percent of zero is
19 zero and none of this would have happened.  And
20 then --
21      Q.   Okay.
22      A.   Those loans, the company you hired has a
23 copy of all of those.  I'm sure that's why you hired
24 that company.
25      Q.   All right.

Page 100

1          MR. CLEVELAND:  Objection,
2    nonresponsive.
3          Q.   (BY MR. CLEVELAND)  Mr. Wright, is this
4    sentence that starts with "upon receipt all the
5    proceeds," is it factually -- factually accurate or
6    not?
7          A.   It is a direct copy from the email that was
8    sent to Daniel Moore explaining the transaction.
9          Q.   Not my question.  Is it accurate or not?
10         A.   The document reads as it is stated.
11         Q.   I understand that.
12         A.   I have no reason --
13         Q.   Is this statement --
14         A.   I have no reason to think it's not accurate.
15         Q.   Well, yes, you do, because you just told me
16    that Asilo wired the money straight to the seller.
17         MR. MULLER:  Objection, form.
18         Q.   (BY MR. CLEVELAND)  How could Black Duck have
19    used those loan proceeds to close the Express Pipeline
20    transaction when the money never even went to Black
21    Duck?
22         MR. MULLER:  Objection, form.
23         MR. GERMANY:  Objection, form,
24    argumentative.
25         A.   So should we change the ownership to

1    KrisJenn Ranch, is that what you're asking me?  You're
2    confusing me.
3          Q.   (BY MR. CLEVELAND)  I'm asking how can --
4    how can you say this highlighted sentence is accurate
5    when the money went straight from Asilo to the seller
6    and never passed through Black Duck's --
7          MR. MULLER:  Objection, form.
8          A.   I've seen many corporations -- well, you
9    used hypothetical before.  When you buy a home, the
10   loan doesn't go to you and then to the seller.  The
11   loan goes from the bank that loans the money to the
12   seller, and there has to be a separate agreement where
13   the money is owed by the -- the buyer.  And this is
14   the same transaction.  If you --
15         Q.   (BY MR. CLEVELAND)  Okay.
16         A.   I can get you a book on real estate
17   transactions and that -- that will explain this, Tim.
18         Q.   Okay.  Well, why doesn't this -- why doesn't
19   this highlighted statement just say Asilo wired --
20   wired the funds directly for the benefit of Black Duck
21   rather than indicate Black Duck used the loan proceeds
22   to close the transaction?
23         MR. MULLER:  Objection, form.
24         A.   These words speak for themselves, because
25   I'm not an attorney, nor is Hagan Cohle an attorney.

1          Q.   (BY MR. CLEVELAND)  Okay.  Is the reason --
2          A.   We did -- we put in here -- our minutes
3    relate truthfully to what happened.
4          Q.   Is the reason that because Mr. Strolle is
5    drafting these many months after August of 2017, sir?
6          MR. MULLER:  Objection, form.
7          A.   Give me a break.  Oh, gosh.
8          Q.   (BY MR. CLEVELAND)  Can you answer the
9    question?
10         A.   These -- these were probably drafted the
11   same day.
12         Q.   Okay.  I have another question about this
13   highlighted sentence.  According to this sentence,
14   sir, it says that the loan has been made and the funds
15   were provided to the seller of Express Gas Pipeline.
16   Do you agree?
17         A.   The statement speaks for itself.
18         Q.   But do you agree with me that this
19   highlighted sentence starting with upon receipt
20   indicates that the loan proceeds have been provided to
21   the seller to close the right-of-way transaction?
22         A.   If they were provided, we would have never
23   had a pipeline.  Would have been -- the deed -- the
24   deed says Black Duck.  Maybe we should go back to
25   the -- and put the original deeds in KrisJenn Ranch's

1    name.  That -- that would be better, Tim.  If you
2    would like us to do that, we could check into that and
3    see.  I'd like to point to --
4          Q.   Why would you want to do that?  Why do you
5    want to do that?
6          A.   No, you're making that presentation and
7    wanting to -- and acting like that's what we should
8    do.  I would gladly do that.  We can go back to the
9    seller and see, since he didn't get -- since he didn't
10   get any money from Black Duck, how he could put Black
11   Duck as the buyer.
12         Q.   Okay.  Black Duck was the buyer?
13         A.   No, I'm answering your question.
14         Q.   Okay.
15         A.   Because your question -- it's hard for me to
16   understand your question, that's all.
17         Q.   All right.  These -- these minutes will
18   reflect facts that occurred on August 14, that's your
19   testimony; right?
20         A.   Oh, yes, sir, that's why we have them.
21         Q.   Are you aware that Asilo didn't even
22   disburse the funds until August 15th?
23         A.   I'm not -- I'm not aware of any date that
24   they did it.  This was the approval of the -- what was
25   intended by the email that was sent to Daniel Moore.

**Page 105**

```
 1        Q.   Well, but this highlighted sentence that
 2   starts with "upon receipt" looks like facts in the
 3   past tense, doesn't it?
 4        A.   No, upon receipt would be whatever date they
 5   received them.
 6        Q.   Well, do you agree that "received" is a word
 7   that's in the past tense, sir?
 8             MR. MULLER:  Objection, form.
 9        A.   Once upon a time, once upon, upon.
10        Q.   (BY MR. CLEVELAND)  Right.  And then it
11   says in the second line were -- "were immediately
12   loaned," that's also in the past tense, isn't it?
13        A.   Immediate means now.
14        Q.   Right, but loaned is something that's in the
15   past term -- in the past tense, isn't it?
16        A.   I don't think they would have wired anything
17   until they had my signature, sir.
18        Q.   Right, I'm just asking how did all these
19   things happen in this highlighted sentence when Asilo
20   hadn't even distributed the money until the next day?
21        A.   Well, we weren't getting the loan from Frost
22   Bank.  We were getting the loan from Asilo.  And the
23   date that they did it, I had no control over that.
24   They wired the funds to --
25        Q.   Okay.
```

**Page 106**

```
 1        A.   -- Texas, to Frost Bank, and there was some
 2   confusion that -- that their banking institution had.
 3   I don't know all the results.
 4        Q.   Then why is this highlighted sentence -- why
 5   is this highlighted sentence written as if these funds
 6   have already moved around and the loan has been, you
 7   know, closed and paid to the seller when the money
 8   didn't move until the next day?
 9        A.   Well, it was the projected -- it was the
10   projected time.  And all of this -- all of this was
11   emailed to Daniel Moore long before the actual
12   transaction happened.  I wasn't even for sure a week
13   before that that I was going to get the loan.
14        Q.   Okay.  So you're saying they're going to
15   email --
16             (Counsel and witness speaking
17   simultaneously.)
18        Q.   (BY MR. CLEVELAND)  Are you saying -- okay.
19   Are you saying there's an email to Daniel Moore that
20   informs him that Black Duck is going to take loans out
21   at 17 percent?
22        A.   Yes, I am.
23        Q.   Okay.  When was that email sent?
24        A.   You'll get those because they -- they were
25   just given the -- the correct demand from your company
```

**Page 107**

```
 1   and they're working within their timelines.  And
 2   you'll have that.  Probably one of the reasons --
 3        Q.   Okay.  So --
 4        A.   -- to do one of my testimony later.  I can
 5   look --
 6        Q.   Okay.
 7        A.   I can let William or John answer that for
 8   you.
 9        Q.   Okay.  Well, I can only ask you questions.
10   So is your testimony under oath under penalty of
11   perjury that there is an email prior to August 14,
12   2017, where you disclosed to Daniel Moore that Black
13   Duck is going to take out millions of dollars of loans
14   at 17 percent interest rate?  Is that your testimony,
15   sir?
16        A.   That's very long-winded.  Could you shorten
17   it and I might be able to respond.  Otherwise --
18        Q.   Okay.
19        A.   -- I really don't know the answer.  I'm
20   trying, Tim, but you're -- you're all over the place
21   here and it's like you're -- when I go hunting I go
22   hunting with a deer rifle, because I know what I'm
23   shooting at.  And you're shooting a shotgun, you're
24   firing in all directions.  And it's -- it's very
25   confusing, Tim.
```

**Page 108**

```
 1        Q.   Okay.  Is your testimony, Mr. Wright, that
 2   there is an email that was sent to Daniel Moore before
 3   August 14, 2017, disclosing to him that Black Duck
 4   would be taking out loans with a 17 percent interest
 5   rate?
 6        A.   You know, I just ate lunch.
 7        Q.   Yes -- yes, no or I don't know?
 8        A.   I have to -- I'm going to have to go to the
 9   bathroom, because I drank two glasses of tea and maybe
10   I will figure out that answer by the time I get back.
11   So --
12        Q.   I would respectfully ask that you answer my
13   question.  And we'll take a break, but can you answer
14   my question before you take a break?
15             MR. MULLER:  One second, one second.
16   You really do need to answer the question before you
17   take a break.
18             THE WITNESS:  I do?  Okay.
19             I don't know the answer to that.
20             MR. CLEVELAND:  Okay.  Thank you, we'll
21   take a break.
22             MR. MULLER:  Okay, thank you, Tim.
23             THE VIDEOGRAPHER:  Okay.  Going off the
24   record.  The time is 1:58 p.m.
25             (Recess from 1:58 p.m. to 2:13 p.m.)
```

THE VIDEOGRAPHER: Back on the record.
The time is 2:13 p.m.

Q. (BY MR. CLEVELAND) Mr. Wright, can you hear me, sir?

A. Yes.

Q. All right. Are you ready to continue?

A. Yes.

Q. Okay. We're still looking at Exhibit 29, these minutes from August 14 -- dated August 14, 2017. Do you still have those, sir?

A. Yes.

Q. Okay. And I've turned to the last page on my screen share. Can you turn to the last page of these minutes, sir?

A. Yes.

Q. And is that your signature by your name there, sir?

A. Yes, it is.

Q. Is that Hagan Cohle's signature?

A. He can testify to it, but I believe so.

Q. Okay. I mean the best you know, is that his signature?

A. Yes.

Q. Okay. And then by Frank Daniel Moore, I read that as Hagan Cohle signed for Mr. Moore. Is

Page 109

---

that accurate?

A. That is correct.

Q. Okay. Was Mr. Moore given notice of this special meeting on August 14th in accordance with the Black Duck company agreement?

A. I don't remember.

Q. Okay. Are you aware that there is a 24-hour notice requirement for any special meeting that must be provided to each manager under the Black Duck company agreement?

A. He waived all of that by his email.

Q. Okay. So is it -- so is it correct that there was not 24 hours notice of this special meeting given to Mr. Moore?

A. He was in the middle of moving and waived -- he gave us -- gave Hagan Cohle permission to sign his name for any and all --

Q. I understand that's your -- I've heard you there. My question is, was there 24 hours notice of this special meeting on August 14th given to Daniel Moore, yes or no?

MR. GERMANY: If you remember.

A. I don't know. I don't remember.

Q. (BY MR. CLEVELAND) Okay. Okay. When did you sign these minutes, Mr. Wright?

Page 110

---

A. I wish I'd have dated it. I know that the -- the special meeting was on August 14th.

Q. So you don't remember when you signed these minutes?

A. I don't. I don't remember when it was. I know sometimes the minutes are done and approved and they're typed up and presented to Hagan and I to sign at a later date, but the meeting was held on the 14th.

Q. Okay. And in the normal course of minutes for Black Duck, sir, was -- were these minutes usually typed up by David Strolle or a lawyer at his firm?

A. I don't remember. My wife could have done it too.

Q. Okay.

A. I'm almost -- says one page -- I'm trying to think of who -- who might have done this. It could have been handwritten notes from the meeting that were given to Strolle. I just don't know.

Q. Whoever I --

A. It could have been Strolle that did it. I could ask him, it's just how forever --

Q. Yeah, we're going to ask him.

A. Good, awesome.

Q. Was -- were these -- were the -- how did the minutes -- these minutes, excuse me -- get to you and

Page 111

---

Mr. Cohle for you to approve them and make sure they were accurate and sign them?

A. I don't remember.

Q. You don't remember if it was by email or -- probably not by text. Whether it was by email or carrier pigeon or something like that?

A. I don't remember.

Q. Okay. But Strolle wasn't there at this August 14th meeting according to these minutes. Is that true?

A. The meeting took place at 410 Spyglass, yes, sir.

Q. Okay. So Strolle did not attend, as best you can recall?

A. I don't remember. I don't think he did. I'm not sure he's been out to Spyglass.

Q. Okay. And when David Strolle is doing that work, is he doing that as -- in his capacity as counsel for Black Duck?

A. He was -- he did his work as counsel of KrisJenn Ranch.

Q. So David Strolle prepared these August 14, 2017, minutes in his capacity as a lawyer for KrisJenn Ranch, is that your testimony?

A. I'm not sure he prepared these. I don't

Page 112

1    know.

2         Q.   Okay.  Well --

3         A.   He could have -- he could have just prepared

4    notes per my request for Black Duck so that it -- it

5    could correspond with the KrisJenn Ranch.

6         Q.   Okay.  So did David Strolle, according to

7    you, ever do any legal work for Black Duck Properties

8    LLC?

9         A.   Yes, he did.

10        Q.   And when was that?

11        A.   He prepared the note with -- he prepared the

12   note and then the second note with -- with McLeod Oil

13   Company, and then he reviewed the Asilo note for

14   KrisJenn Ranch that was ultimately for the benefit of

15   Black Duck.

16        Q.   Okay.  I want to make sure I understand

17   that.  I want to make -- my question, I'm asking, did

18   David Strolle do any legal work for you, as you

19   understood it -- I'm sorry, strike that.

20             My question is, did David Strolle ever

21   do any legal work in his capacity as counsel for Black

22   Duck Properties?

23        A.   I don't think he wore that hat, but I'm not

24   sure.

25        Q.   Okay.

1         A.   He made it -- he made it --

2         Q.   What about his law firm, did his law --

3         A.   I'm sorry?

4         Q.   You go ahead, and then I'll ask my next

5    question.

6         A.   No.  I don't have anything.

7         Q.   Okay.  Was Mr. Strolle's law firm, Granstaff

8    Gaedke & Edgmon, to your knowledge, did that firm ever

9    do any legal work as counsel for Black Duck

10   Properties?

11        A.   Most of the work they did, they considered

12   it work for Larry M. Wright, and the original attorney

13   that did the work there did it for the family and for

14   KrisJenn Wright, which was Mr. --

15             THE REPORTER:  I'm sorry, which was

16   what?

17        A.   It was Mark Edgmon, he did the original work

18   for KrisJenn Ranch.  He prepared our trust, our

19   corporate books for KrisJenn Ranch.

20             When I'm looking down, I'm scanning the

21   document, Tim.

22        Q.   (BY MR. CLEVELAND)  Okay.  Let's -- let's

23   pull up Exhibit 35.

24             MR. CLEVELAND:  Which, John, I just

25   sent.  That is the January 18, 2016, minutes that you

1    produced this morning.

2             MR. MULLER:  January minutes.

3             MR. CLEVELAND:  And I'm going to pull

4    it up on the screen as well.

5             MR. MULLER:  Which exhibit again?

6             MR. CLEVELAND:  It's Exhibit 35 which

7    is -- and I just pulled it up, it's the January

8    2016 -- I'll share the screen.  The January 2016 Black

9    Duck minutes.  So it's up.  Yeah, it's shared.

10             MR. MULLER:  Okay.  I'm horribly

11   disorganized.  We're going to try to do this one on

12   the screen.  Is that okay, Larry?

13             THE WITNESS:  I -- I can --

14        A.   This is good as long as you don't put it in

15   yellow.  The yellow is what I can't read, Tim, when

16   you do that.

17        Q.   (BY MR. CLEVELAND)  Oh.

18        A.   When you put it in yellow it strains my

19   eyes.

20             MR. MULLER:  Okay.  I'm sorry, Tim, I

21   lost it, but let's just try it on the screen.

22        A.   We can try.

23        Q.   (BY MR. CLEVELAND)  Okay.  There's not going

24   to be a lot of questions.

25             So, Mr. Wright, this is Exhibit 35 to

1    your deposition, which is minutes from a meeting of

2    January 2016 for Black Duck that was produced by your

3    lawyers to me this morning.  And do you see that, the

4    title of this document on the first page, minutes, et

5    cetera?

6         A.   Yes.

7         Q.   Okay.  And these are minutes of a meeting of

8    Black Duck Properties; right?

9         A.   Correct.

10        Q.   And like the meeting on August 14th, this is

11   a meeting that took place at your -- at your home,

12   410 Spyglass in McQueeney; right?

13        A.   Okay.

14        Q.   Do you see that where the little hand is?

15        A.   Yes.

16        Q.   Okay.  And this indicates that the three

17   managers were present, that being you, Mr. Cohle, and

18   Mr. Moore.  Do you see that in the next 1b?

19        A.   Yes.  Would you go to the very end of this

20   where we signed it?

21        Q.   Yeah, I'm going to just -- I'm going to jump

22   down to the end.  That's the last page of what you

23   produced this morning.

24             And actually that's the document that

25   actually might be -- hang on.  I think that was the

1    second -- actually, that's the second set of minutes.
2    Let me get to the page where you signed for the
3    January meetings, Mr. Wright.
4            I'm going to scroll up.  That's the
5    July meeting.  There you go.  No.  No, no, no.  There
6    we are.
7            Okay.  This is the signature page.  Can
8    you see that, Mr. Wright, for the January 2016
9    meeting?
10   A.  Yes.
11   Q.  And can you see your signature along with
12   Mr. Cohle's and Mr. Moore's?
13   A.  Yes.
14   Q.  All right.  And is that your signature?
15   A.  That is my signature.
16   Q.  Okay.  I'm going to go back to the first
17   page.  I'm going to scroll down to this paragraph
18   No. 3.
19           Okay.  Mr. Wright, can you see that?
20   A.  Yes.
21   Q.  And this says Regulations.  "The Secretary
22   presented a proposed form of the Company Agreement for
23   the company's management prepared by Granstaff, Gaedke
24   & Edgmon, PC, counsel to the company."
25           Did I read that correctly, sir?

                                          Page 117

1    A.  I believe so.
2    Q.  And does that indicate that the Black Duck
3    company agreement was prepared by Granstaff Gaedke &
4    Edgmon?
5    A.  What had become the agreement was prepared
6    by Mr. Edgmon.
7    Q.  Okay.  And it refers to Granstaff -- these
8    minutes refer to Granstaff Gaedke & Edgmon as counsel
9    to the company.  Do you see that, sir?
10   A.  I don't see where it says minutes anywhere.
11   Q.  Well, I'm referring to these minutes.  This
12   sentence that I just read refers to Granstaff Gaedke &
13   Edgmon PC.  Do you -- do you see that?
14   A.  Yes, sir.
15   Q.  As counsel to the company.  Do you see that?
16   A.  Yes, sir, I see that.
17   Q.  Is that indicating that Granstaff Gaedke &
18   Edgmon was counsel to Black Duck Properties?
19   A.  Not necessarily.  They were counsel to the
20   company agreement.
21   Q.  That's -- that's how you interpret that
22   sentence?
23   A.  Yes, sir.
24   Q.  So did Granstaff Gaedke & Edgmon ever serve
25   as counsel to Black Duck according to you?

                                          Page 118

1    A.  For the company agreement, yes, sir.
2    Q.  For any other reason?
3    A.  For the formation of Black Duck.
4    Q.  For anything else?
5    A.  I'm trying to remember.  Mr. Strolle worked
6    on the Daniel Moore leaving the company and Daniel
7    Moore on the Harris note, but he represented me.  He
8    did not represent -- he represented me in my capacity
9    as a manager, but he represented me personally on
10   that.
11   Q.  So when it came to Mr. Moore's departure
12   from Black Duck, your testimony is that Mr. Strolle
13   was involved, but he was representing you personally
14   on that transaction; is that --
15   A.  For the -- for the benefit of -- for the
16   benefit of Black Duck, yes, sir.
17   Q.  Okay.  And then --
18   A.  That was -- that was part of -- that was
19   part of the wind-down.  It's my understanding --
20   Q.  Right.  When Mr. Strolle --
21   A.  Yeah.
22   Q.  So you -- were you done?  I didn't mean to
23   interrupt you.
24           MR. MULLER:  Tim, are we centered on
25   the screen right now?  I can't really tell with the --

                                          Page 119

1            MR. CLEVELAND:  There's like a sliver
2    of you, John, but it's -- it's fine by me.
3    Q.  (BY MR. CLEVELAND)  Mr. Wright, I
4    interrupted you inadvertently.  Did you want to finish
5    your answer or have anything else to add to that?
6    A.  No.
7    Q.  Okay.  And you -- you testified that
8    Mr. Strolle prepared both the Asilo note and the note
9    from KrisJenn Ranch to Black Duck; is that right?
10   A.  He did not prepare it.  The company that
11   y'all hired -- the company that y'all hired to
12   represent in the bankruptcy case is the company that
13   prepared the note.  I'm sure that's why you hired that
14   company.
15   Q.  Well -- so, okay.  Who prepared the note
16   from KrisJenn to Black Duck?
17   A.  KrisJenn/Black Duck was Mr. Strolle for the
18   benefit of -- of KrisJenn, yes.
19   Q.  Okay.  Okay.  And my -- that was my
20   question.  Which hat was Mr. Strolle wearing when he
21   prepared the -- the note between KrisJenn Ranch and
22   Black Duck?
23   A.  You'll have to ask him.
24   Q.  Well, what's the best -- what's the answer
25   according to you as best you understand it?

                                          Page 120

MR. MULLER: Objection, form.

A. I -- you'd have to ask him. I wanted him to prepare the note so that KrisJenn Ranch, the money they loaned the company would be protected. So if -- if I had to answer, I would say KrisJenn, because I hired him to protect the money.

Q. (BY MR. CLEVELAND) Okay. And then when Mr. Strolle prepared the deed of trust that we saw earlier that you signed in January of 2018, which hat was Mr. Strolle wearing then?

A. He was protecting the funds. He was trying to protect the ranch, KrisJenn Ranch, so he protected the interest of KrisJenn Ranch.

Q. Okay. When Mr. Strolle prepared the letter of intent between Black Duck and TCRG -- I'm sorry, the letter of intent between Black Duck and Synergy, which hat did Mr. Strolle have on then?

A. He didn't prepare it. He had nothing to do with it.

Q. Mr. Strolle had nothing to do with the letter of intent between Synergy and Black Duck; did I hear you correctly?

A. That was a -- that was a proposal that Synergy prepared.

Q. Okay. But was Mr. Strolle involved at all,

Page 121

even if he didn't prepare the LOI?

A. No.

Q. He wasn't on any emails pertaining to that LOI; that's your testimony?

A. I didn't -- he said -- he represented Larry Wright. He was protecting the interest of KrisJenn Ranch, and he was protecting the interest of the money, and he was protecting the interest of the KrisJenn Ranch real property.

Q. Okay. When David Strolle had his Black Duck hat on him, according to you, was that his responsibility?

A. I never saw him -- I never saw him wear a Black Duck hat.

Q. Well, when Mr. Strolle was acting as counsel for Black Duck do you think he owed any obligations to Daniel Moore as a manager of Black Duck?

MR. MULLER: Objection, form.

A. He represented Larry Wright. The articles of organization was created by Mr. Edgmon and another attorney that was representing Black Duck who left the firm.

Q. (BY MR. CLEVELAND) Okay.

A. Mr. Rogers, Mr. Rogers, I believe was his name.

Page 122

Q. Okay. When Mr. Strolle is acting -- are you okay, Mr. Wright?

MR. MULLER: He's just tired. Do you want to take a break?

THE WITNESS: No, I'm good, I'm good for a little bit.

MR. MULLER: Okay.

THE WITNESS: It's just -- it's just --

MR. CLEVELAND: If you need to take a break, we can take one.

THE WITNESS: No, I'm good. No, I'm good. I'm good. It's just -- it's hard.

MR. CLEVELAND: Okay. Let me know if you need to take a break.

THE WITNESS: No. In fact, if you don't mind, Tim, do you remember the first time you ever questioned me?

MR. CLEVELAND: There have been a lot of those, Larry, so --

THE WITNESS: No, the first time, do you remember?

MR. CLEVELAND: No. Tell you what, can we have that conversation off the record at the next break, just so we're not burning tape? I want to hear what you have to say, but we probably should keep it

Page 123

off the record.

MR. MULLER: Let's do it off the record. Tim, can you take down the exhibit? It's a little -- we'd like to be able to see you.

MR. CLEVELAND: Oh, yeah.

MR. MULLER: Just -- you're just here to answer his questions today. We'll chat -- we'll chat later.

THE WITNESS: It was a compliment, Tim, if you remember the first time.

MR. CLEVELAND: Okay? We'll chat about -- we'll chat about that -- we can chat about that later.

Q. (BY MR. CLEVELAND) Okay. All right. You can see me now, I'm actually going to shove another exhibit up. Well, actually, let me ask this question:

Mr. Wright, with respect to the Harris SWD dispute, you said yesterday that it's your position that any monies owed to DMA Properties with respect to Harris SWD would be net of costs and expenses that -- that you have incurred. Did I state that accurately in terms of your position?

MR. MULLER: Objection, form.

A. That is -- that is correct.

Q. (BY MR. CLEVELAND) Okay. And is there a

Page 124

1  written agreement, sir, that provides that any Harris
2  SWD payments owed to DMA will be net of costs for
3  expenses?
4      A.  Yes.
5      Q.  And what agreement is that?
6      A.  The company agreement.
7      Q.  The Black Duck company agreement?
8      A.  Yes.
9      Q.  Okay.  What provision in the Black Duck
10  company agreement provides that, with respect to
11  Harris SWD, DMA is only entitled to funds that are net
12  of costs and expenses?
13      A.  14.01.
14      Q.  All right.  Now, is there anything else --
15  you had that devoted to memory.
16      A.  Some things I'm good at, because I'm
17  trying -- I'm trying to protect the money of KrisJenn
18  Ranch.
19      Q.  Right.  And --
20      A.  Thank you, Tim.  That was a good catch.
21  That was a good catch.
22      Q.  This -- this relates to the -- you're
23  talking about the Black Duck company agreement and
24  I've got 14.01 here and it's titled Offset, which I'll
25  read it to you, which says, "When the company is going

1  to pay any sum to any member, any amount" --
2      Q.  Can you put that up on the screen?  I just
3  remembered it was 14.01.
4      Q.  Yeah, I -- I tell you what, I can --
5          MR. MULLER:  Let me just get it for
6  him.  Tim, hang on.  Hang on.
7          MR. CLEVELAND:  Yeah, it's just -- I'll
8  have you read the -- look at the hard copy with me,
9  Larry.  Just adding another exhibit on here is --
10          MR. MULLER:  He's got a copy in front
11  of him, Tim.
12      Q.  (BY MR. CLEVELAND)  Okay.  Can you turn to
13  14.01, Mr. Wright?
14      A.  Okay.  Yes.
15      Q.  Are you there?
16      A.  Yes.
17      Q.  And that is the paragraph called Offsets;
18  right?
19      A.  Yes.
20      Q.  So is there anything other than this
21  paragraph 14.01 in the Black Duck company agreement
22  that supports your contention in this case that any
23  Harris SWD money owed to DMA Properties must be net of
24  any costs or expenses?
25      A.  That's -- that's one of them.  I'd have to

1  go back and read the rest of the agreement.  There
2  might be a couple more.
3      Q.  Okay.  And we'll -- we're going to look at
4  some of those agreements, but as you sit here right
5  now, is there anything you can think of, and maybe you
6  can't, other than 14.01 that supports your --  your
7  contention about offset of Harris SWD money owed to
8  DMA?
9      A.  I would have to look at those, but I can't
10  recall those.  This -- this is the main one.
11      Q.  Okay.  All right.  Let's --
12          MR. CLEVELAND:  John, we're going to
13  pull up Exhibit 34, which is the final set of minutes
14  that you sent this morning from November 14, 2018, and
15  I've emailed that to you as well at our last break.
16          MR. MULLER:  I lost it as well, but I
17  think you should be able to handle one exhibit on the
18  screen; right?
19          THE WITNESS:  Yes.
20          MR. MULLER:  Okay.
21      A.  As long as you don't put the yellow, it
22  makes it where I can't read it.  I think that's what
23  strained my eyes yesterday and gave me the headache,
24  Tim.
25          MR. CLEVELAND:  Got it.  You know,

1  before we go there, you know, do you have 31 with you,
2  John?  What I -- 31 is Larry's note.
3          MR. MULLER:  Last one I have is 28 --
4  last one I have is 28.
5          Frankie, can you help me?  I also have
6  29.  Can you tell Frankie I need the exhibits up to
7  29.
8          MR. CLEVELAND:  All right.  Let me
9  share it and see --
10          MR. MULLER:  Yeah.  Put it on the --
11  put it on the screen for now.  She'll walk it in to me
12  here.
13      Q.  (BY MR. CLEVELAND)  Okay.  But this is --
14  this is -- so before we get to the minutes, I want to
15  show you Exhibit 31, Mr. Wright, which is a six-page
16  document that this is the Real Estate Lien Note
17  between yourself and Black Duck Properties for that
18  1.175 million.  Do you see that?
19      A.  Yes, sir.
20      Q.  Okay.  And we -- earlier I asked you a lot
21  of questions about the note between KrisJenn and Black
22  Duck and so I want to go through some of the same
23  questions about this note Exhibit 31.  And was this
24  note disclosed to Daniel Moore?
25      A.  Okay.  Yes.

1    Q.   Okay.  Did you send the actual note to
2    Mr. Moore?
3    A.   Oh, I -- I don't remember that.
4    Q.   Okay.  Who signed this note?  I'm going to
5    scroll down and show you.  Who signed this note on
6    behalf of Black Duck?
7    A.   I did.
8    Q.   Okay.  And when did you sign this note?
9    A.   Go back up to the date.
10   Q.   Yes, sir.  I'll go back up to the top.  Here
11   you go.
12   A.   Yeah, August 14th.
13   Q.   Of 2017?  Is that -- you signed it on
14   August 14th of 2017; is that correct?
15   A.   That's what it looks like, yes, sir.
16   Q.   Okay.  And how did you and Black Duck decide
17   on a 4 percent interest rate for this loan?
18   A.   That was the rate that my bank was giving me
19   a line of credit.
20   Q.   Okay.  So were the funds that made up the
21   1.175 million that's the subject of this note, did you
22   obtain those yourself, Mr. Wright, through a bank
23   financing?
24   A.   No.
25   Q.   How did you obtain these funds to loan to --

1    to Black Duck under this note?
2    A.   Those were funds that I received in the
3    other transaction that Daniel -- where I first met
4    Daniel Moore, and that SWD note that KrisJenn Ranch
5    owned in LaSalle County.
6    Q.   Okay.  So if you had over a million dollars
7    from that transaction, it sounds like -- do you
8    consider that a positive outcome from that transaction
9    that involved Mr. Moore?
10   A.   Oh, it was terrible.
11   Q.   But you still -- but this million plus
12   dollars came from that deal?
13   A.   No, part of that did.  The other part was in
14   my investment account at the bank.
15   Q.   Okay.  Are you -- stock to --
16   A.   500,000 -- 500,000 came from the -- the --
17   the KrisJenn Ranch/SWD that Daniel Moore brought in a
18   buyer with -- the investment group with the Steve Kent
19   Trucking, which was the operator of the -- of the SWD,
20   and that's how I first met Edgar Moore.
21   Q.   Okay.
22   A.   He was present the day before the lawsuit
23   was filed because of him?
24   Q.   Okay.  Was -- was this note Exhibit 31
25   authorized by a vote of the disinterested management

1    of Black Duck Properties?
2    A.   It -- yes, it was.
3    Q.   Okay.  When was that vote taken?
4    A.   That was the email to Hagan Cohle, by phone
5    and email.
6    Q.   So you're say Daniel Moore gave his vote
7    authorizing this note for Black Duck by phone and by
8    email?
9    A.   Yes, for all documents.
10   Q.   Okay.  But was it -- was that authorization
11   specifically for this note or was there a general
12   authorization that you think this note falls under?
13   A.   It's a general.  It's a general that was
14   specific for all notes.
15   Q.   Okay.  Okay.  And is that the July email we
16   looked at earlier?
17   A.   Yes.
18   Q.   Okay.  And did David Strolle advise you that
19   this note was authorized pursuant to the Black Duck
20   company agreement?
21   A.   He was representing myself on that and was
22   trying to get back to protect the earnest money that I
23   had in this deal.
24   Q.   Okay.  Did David Strolle advise you that
25   this note was authorized pursuant to the Black Duck

1    company agreement?
2    A.   You -- you'll have to ask him.  I don't
3    remember.
4    Q.   But -- okay.  You don't remember.  That's
5    fine.
6         Okay.  And why was there a one-year
7    term on this note, Mr. Wright?
8    A.   Again, that goes back to Daniel Moore saying
9    that he could sell it within six months.
10   Q.   Sell the right-of-way?
11   A.   Yes, sir.
12   Q.   Okay.  All right.  We're done with that
13   exhibit.
14   A.   Good.
15   Q.   Now we'll go to Exhibit 34.
16   MR. CLEVELAND:  Exhibit 34, John, is
17   the -- is the November 2018 minutes of the Black Duck
18   special meeting.
19   MR. MULLER:  Okay.
20   Q.   (BY MR. CLEVELAND)  I'll blow this up for
21   you, sir.  Do you have Exhibit 34 in front of you,
22   Mr. Wright?
23   A.   Yes, yes, I'm looking at it.
24   Q.   And -- and these are the meetings -- the
25   meeting minutes from November 14, 2018?

**Page 133**

```
 1        A.   Yes, let me -- let me go over to the -- yes,
 2   they are.
 3        Q.   Okay.  And let me point to you in the first
 4   page, see, these note -- these minutes have that same
 5   page numbering that the August 14, 2017, minutes do
 6   that you noticed.  Do you see that?
 7        A.   Yeah.  That makes me think it's my wife that
 8   did it.
 9        Q.   Okay.
10        A.   She was the manager.
11        Q.   Okay.  Now, this meeting took place in
12   November of 2018.  Do you see that, sir?
13        A.   Yes.
14        Q.   I'm going to direct you to the paragraph at
15   the bottom of page 1 that's called Recent Development,
16   Changes in Ownership and Development of the Company.
17   Do you see that?
18        A.   Sure.
19        Q.   And this paragraph, I'll just try to
20   summarize, refers to the departure of your 50 percent
21   partner, SCMED Consulting, which was Daniel Moore's
22   entity; is that accurate?
23        A.   Right.  Right.
24        Q.   And I'm going to -- it's attached -- I
25   believe attached to these minutes, because this is how
```

**Page 134**

```
 1   it was produced to us, is an email, this is -- this is
 2   going to be a few pages into the exhibit, Mr. Wright,
 3   is an email from February -- two emails from February
 4   of 2018 right here.  And this is what I want to ask
 5   you about.  Do you have that in front of you, sir?
 6             MR. MULLER:  Hold on.  Yeah, I'm
 7   looking at it real quick.  Hold on.
 8             MR. CLEVELAND:  Sure.
 9             MR. MULLER:  He's got it.
10        Q.   (BY MR. CLEVELAND)  Okay.  And your -- the
11   top email here is you telling Mr. Strolle,
12   "David-Daniel is completely removed from BlackDuck
13   with this agreement.  Please review and see what you
14   think about the next agreement in the next email."
15             Did I read that correctly?
16        A.   Okay.
17        Q.   And are you referring to -- when you say,
18   "Daniel is completely removed from BlackDuck with this
19   agreement," are you referring to the email immediately
20   below from Mr. Moore with the subject line Agreement
21   Terms on Black Duck Properties/Final Version?
22        A.   I think these were, when I corrected my deal
23   this morning, all of these were proposals by
24   Mr. Moore.
25        Q.   So when you -- when you -- when you say
```

**Page 135**

```
 1   "this agreement" in your first email, is your
 2   testimony that you're not referring to Mr. Moore's
 3   email immediately below?
 4        A.   Oh, I have no idea.
 5        Q.   Okay.  Why did you forward this email from
 6   Mr. Moore to Mr. Strolle?
 7        A.   For one thing, I believe this was a
 8   confidential email that shouldn't have been produced.
 9        Q.   Well, your lawyer produced it this morning
10   and it's attached to these minutes, so --
11        A.   I -- I gave -- everything I have I gave to
12   my attorney to go through to see what needed to be
13   produced and not produced.  And if he felt like it
14   needed to be produced then it's fine with me, but that
15   is a confidential -- it's confidential email.
16        Q.   Okay.  Well, my question -- my question is
17   why did you forward Mr. Moore's email to Mr. Strolle?
18        A.   I have no idea.  Mr. Moore --
19        Q.   Okay.  Is this because you wanted --
20        A.   Mr. Moore sent probably 20 pages of
21   proposals.
22        Q.   But you chose to send this one to
23   Mr. Strolle and say, "Daniel is completely removed
24   from BlackDuck with this agreement"?
25        A.   I'm sure I sent every single one of them.
```

**Page 136**

```
 1   These --
 2        Q.   Okay.
 3        A.   These were emails -- these were the emails
 4   that were kept in the Black Duck minutes.
 5        Q.   Okay.  So let's look at Mr. Moore's email.
 6        A.   That was a proposal.
 7        Q.   Oh, it was a proposal?
 8        A.   That's all it was, yeah.
 9        Q.   Let me -- okay.  I'm going to -- I'm going
10   to pull up from yesterday real quickly --
11        A.   And Mr. Strolle made it very clear that he
12   represented Larry Wright on this, because Daniel asked
13   him, and he said he couldn't represent Daniel on this,
14   and that's when Daniel got in touch with Chris Johns
15   and so --
16        Q.   Okay.
17        A.   -- there were a lot of proposals he was
18   throwing out there.  And I told him whatever he felt
19   comfortable with.  I didn't want him to leave the
20   company.  It was him that wanted to leave Black Duck.
21        Q.   Okay.  So Mr. Wright, I've pulled up on the
22   screen Exhibit 17 from yesterday and I'll see if I can
23   delete that yellow text that you don't like.  It helps
24   me, but I'm glad you told me it doesn't help you --
25        A.   Yeah, it strains my eyes.
```

1          Yeah, that was another proposal.

2     Q.  -- let me know --

3     A.  Yeah, that's another proposal.

4     Q.  Okay.  But what I want us to try to

5 establish with you is at the bottom of Exhibit 17,

6 this document, is -- is a lengthy email from Daniel

7 Moore to you dated February 3rd, 2018.  Do you see

8 that?

9     A.  Yes.  Yes.

10    Q.  And I want to -- I want to ask you, is this

11 email that -- at the bottom of Exhibit 17, right here,

12 the same email that's what you forwarded to your

13 lawyer in Exhibit 34 right here.

14       So let's -- let's look at Exhibit 17.

15 The time and date of this email from Mr. Moore on

16 Exhibit 17 is February 3rd, 2018, at 9:24 p.m.  Can

17 you see that, sir?

18    A.  Okay.  Okay.

19    Q.  And then the email at the bottom of

20 Exhibit 34 is from Daniel Moore dated February 3rd,

21 2018, at 9:24 p.m.  Do you see that?

22    A.  Was the other one a.m.?

23    Q.  The other one, I believe, was p.m.; see?

24    A.  9:24, and what's the next one?

25    Q.  9:24.

Page 137

1    A.  .31.  I wonder what CST, different time --

2    Q.  -- 31 seconds --

3    A.  -- yeah, those were all proposals.

4       MR. MULLER:  Tim, if you could --

5    Q.  (BY MR. CLEVELAND)  My question -- sorry.

6       MR. MULLER:  Could you put us in line

7 for a break with your next opportunity?

8       MR. CLEVELAND:  Yeah.  Why don't -- let

9 me -- we can do a break.  Let me just tee -- tee it up

10 this way with this question.  What I want to do is to

11 streamline it.

12    Q.  (BY MR. CLEVELAND)  What I want to know,

13 Mr. Wright, can you confirm for me the content -- that

14 the email Mr. Moore sent on February 3rd, 2018, in

15 Exhibit 34 right here is the same email that started

16 Exhibit 17.  I just want to make sure we're on the

17 same page, that these are the same --

18    A.  I -- I really can't, because it's -- it's in

19 different format, which is weird.

20    Q.  Well, that's why I'm going to ask Mr. -- if

21 Mr. Muller can print them out.

22    A.  I'm sure I sent those -- yeah, I'm sure I

23 sent those to David, because he was trying to work up

24 an agreement to remove Daniel Moore from Black Duck,

25 and Daniel was in a hurry to get that done.  He was in

Page 138

1 a hurry to get out of Black Duck, and that's -- we

2 couldn't figure out --

3    Q.  Okay.

4    A.  And so he sent lots of options to me.

5       MR. CLEVELAND:  One last question,

6 John, and we'll take a break.

7    Q.  (BY MR. CLEVELAND)  You testified earlier

8 today and just now, Mr. Moore, that -- I mean,

9 Mr. Wright, that -- that everything here from Daniel

10 Moore was just proposals, and yesterday you said

11 that --

12    A.  There is -- there is -- all of these emails

13 were used to come up with an agreement which was the

14 final agreement that -- that spelled out his leaving

15 Black Duck, yes, sir.

16    Q.  Okay.  If -- if these are all proposals, why

17 did you say at the top of Exhibit 17, "I, Larry

18 Wright, hereby fully accept and approve to the terms

19 and conditions of this email"?

20    A.  I believe there's one where we both

21 approved, and then I printed it and signed it and

22 mailed it to him, and then he printed and signed it

23 and mailed it to me.  And I'm sure those have been

24 produced.  Yeah.

25       MR. CLEVELAND:  Well, I have to object

Page 139

1 as nonresponsive.  And I want to get us to the break.

2    Q.  (BY MR. CLEVELAND)  Why, if these were only

3 proposals in Exhibit 17, did you, Mr. Wright, say

4 at -- in the final email that you hereby fully accept

5 and approve to the terms and conditions of this email?

6    A.  I don't know.

7       MR. CLEVELAND:  Okay.  We can take our

8 break.

9       MR. MULLER:  Thank you.

10      THE VIDEOGRAPHER:  Going off the

11 record.  The time is 2:55 p.m.

12      (Recess from 2:55 p.m. to 3:15 p.m.)

13      THE VIDEOGRAPHER:  We'll mark this as

14 the beginning of File 3.  Back on the record.  The

15 time is 3:16 p.m.

16    Q.  (BY MR. CLEVELAND)  Okay.  We're back on the

17 record.  Mr. Wright, are you ready to continue?

18    A.  Yes, sir.

19       MR. CLEVELAND:  Okay.  And, John,

20 just -- I'll put on the record what we talked about

21 before we came back on, which is -- and I do

22 appreciate that your -- your office is trying to track

23 down information that would give Mr. Wright

24 information to answer who prepared the Black Duck

25 minutes that were produced earlier today.  And so I

Page 140

1  know you're -- y'all are doing your best effort with
2  that and I appreciate that.  I just wanted to put that
3  on the record.
4           MR. MULLER:  Yeah, that's correct, and
5  I can also say on the record that I think there were
6  three choices:  Gwynne, Mr. Strolle, and Hagan.  It
7  was none -- none of them were prepared by Gwynne,
8  though, we have confirmed that.  So we're reaching out
9  to figure out who prepared the others.  It may be a
10 mixture of both of those other gentlemen, but we'll
11 let you know at the next break to the best of our
12 ability.
13          MR. CLEVELAND:  Got it.
14      Q.  (BY MR. CLEVELAND)  And Mr. Wright, just so
15 we have that from you on the record as the witness, on
16 this question of who prepared the Black Duck minutes
17 that we've looked at today, is it -- have you
18 determined that it was not your wife Gwynne Wright who
19 prepared these?
20      A.  Yes, we've -- we've determined that.
21      Q.  Okay.  Is it true it would either be
22 Mr. Cohle or Mr. Strolle who prepared those minutes
23 for Black Duck?
24      A.  Yes, that's what it looks like, yes, sir.
25      Q.  Okay.  And when your counsel and your team,

                                        Page 141

1  when they have more information to share with you,
2  I'll ask you about that before we conclude the
3  deposition.
4      A.  All right.
5      Q.  Mr. Wright, do you have any kind of
6  agreement or understanding with the McLeods that the
7  McLeods will not seek to foreclose on your -- on the
8  KrisJenn Ranch?
9      A.  I have no agreement.
10     Q.  Okay.
11     A.  I have --
12     Q.  Do you have --
13     A.  We have -- I have that entire file that they
14 have copied and is sending it to you, includes every
15 aspect of the file.  It states --
16     Q.  Right.
17     A.  -- the end, it states the options, it states
18 when the note, the second note is due, which was
19 definitely before that time.
20     Q.  Right, and I -- yes, sir, and I -- I -- I
21 know what the loan agreement requires and says.  I
22 know what the option agreement says, and those are the
23 two agreements between you and your entities and
24 McLeod.  We established that yesterday; right?
25     A.  Right.

                                        Page 142

1      Q.  And similar, you know, I asked you yesterday
2  about whether you have any kind of handshake deal with
3  them to get a gross percentage on the right-of-way if
4  they exercise their option.  And you said no to that;
5  right?
6      A.  Right.
7      Q.  And so the question is, is there any type of
8  handshake deal, side deal, any deal at all where the
9  McLeods have agreed not to foreclose on your ranch?
10     A.  Oh, there's no agreement on foreclosing on
11 my ranch, no side agreement whatsoever.  If --
12     Q.  Okay.
13     A.  If... all right.
14     Q.  I appreciate that.
15          MR. CLEVELAND:  I'm going to share,
16 John, Exhibit 21.  This was sent probably before
17 lunch.  It's the -- it's the Bigfoot note.
18     A.  We don't have it, but as long as you don't
19 put the yellow up there, I can see it.  He went to
20 find it, but I'm good.  I can see it, Tim.
21     Q.  (BY MR. CLEVELAND)  Okay.  Okay.  So can you
22 see this Exhibit 21, Mr. Wright?
23     A.  Yes.
24     Q.  And is this the -- the promissory note
25 between Bigfoot Energy Services and Black Duck?

                                        Page 143

1      A.  I believe so.
2      Q.  Can you in your own words just tell me
3  briefly, what is the promissory note between Bigfoot
4  and Black Duck from a business perspective?
5      A.  I've never found that "in your own words"
6  means anything when you're looking at the note.  The
7  note stands for itself, in my -- my opinion.
8      Q.  And I appreciate -- I appreciate that.
9  Could you just -- could you just tell me what the
10 Bigfoot business deal was in your own words, what the
11 deal behind this note is?
12     A.  It's the SWD on -- on the Harris property.
13     Q.  And -- and what are SWDs?
14     A.  An SWD, saltwater disposal well.  Saltwater
15 disposal.
16     Q.  And what is a salt -- what does a saltwater
17 disposal well do?
18     A.  It disposes of saltwater.
19     Q.  And is that something that is necessary,
20 based upon your knowledge, or that can become
21 necessary in the drilling and extraction of oil and
22 gas from the ground?
23     A.  I'm not an expert on that.
24     Q.  But you have an understanding of where
25 the -- where the saltwater comes from that needs to be

                                        Page 144

1   disposed of by these wells?

2      A.  Yes, I do.  I mean it's -- it's from vacuum

3   trucks.

4      Q.  Okay.  And Black Duck lent Bigfoot $450,000;

5   is that right?

6      A.  No.

7      Q.  Okay.  How did I get that wrong?

8      A.  We didn't loan them any money.

9      Q.  Okay.  Well, explain this note to me, then.

10     A.  They owe Black Duck 450,000.  They're --

11  they're purchasing the SWD.

12     Q.  Okay.  And so how much money from this note

13  has been received by Black Duck to date?

14     A.  We -- we presented that in a ledger.

15           MR. MULLER:  Tim -- the ledger is

16  actually the -- is actually my attorney notes, and I

17  do want to claw it back, but -- anyway, I just thought

18  I'd --

19           MR. CLEVELAND:  I appreciate that.  I'm

20  just trying to get -- trying to avoid using those or

21  having to deal with retract notes.

22           MR. MULLER:  Yeah.

23     Q.  (BY MR. MULLER)  So, Mr. Wright, what's

24  your best understanding as you sit here today on what

25  the amount that's been paid by Bigfoot to Black Duck

                        Page 145

---

1   under this note?

2      A.  Are you aware that the money is going to a

3  trustee?

4      Q.  I am, but I'm asking how much money has been

5  received under this note, whether it's with a trustee

6  or somewhere else, how much has been received.

7      A.  All the money that's been received, except

8  the money that's gone to the trustee.

9      Q.  How much has been received and how much is

10  with the trustee?

11     A.  I would need the -- a copy of that ledger.

12     Q.  You -- otherwise, you can't tell me as you

13  sit here today?

14           MR. MULLER:  I'm sorry, Tim, I don't

15  mean to interrupt.  He can't use it as -- I just asked

16  him not to because I want to keep it as my attorney

17  notes.  Would you like for me to -- we can just go

18  ahead and agree to let him use it as an exhibit.

19           THE WITNESS:  That's fine.  We're still

20  working on it.

21           MR. MULLER:  Tim, I don't have any

22  objection to you using it as an exhibit.

23           MR. CLEVELAND:  All right.

24           MR. MULLER:  As long as you don't call

25  me as a witness.

                        Page 146

---

1           MR. CLEVELAND:  I won't.  All right.

2  I'm going to share a different exhibit, Exhibit 22.

3     Q.  (BY MR. CLEVELAND)  And I'm going to blow

4  that up for you, Mr. Wright.  Do you have Exhibit 22

5  in front of you?

6      A.  No, but go ahead.  I'm good.

7      Q.  Okay.  And the Harris SWD issue was the

8  subject of an agreement between Black Duck and

9  yourself and Daniel Moore and DMA Properties when

10  Daniel exited Black Duck; is that correct?

11     A.  Correct.

12     Q.  And is this the agreement -- or is this --

13  is this an agreement that you signed, Exhibit 22,

14  Mr. Wright?

15     A.  Yes.

16     Q.  And did you sign it on behalf of Black Duck?

17     A.  Yes.

18     Q.  That's your signature right there dated

19  February 21, 2018?

20     A.  Yes, sir.

21     Q.  And is that Daniel Moore's signature as

22  well?

23     A.  If he signed it and sent it to me, I would

24  accept it as his, but he didn't sign it in front of

25  me.  I think he signed it in Minnesott Beach, North

                        Page 147

---

1   Carolina, and mailed it to me.

2      Q.  Okay.  Best you know, is that his signature?

3      A.  It's Frank D. Moore, I believe, yes, sir.

4      Q.  All right.  And are these initials on the

5  second page --

6      A.  I did not sign his name.

7      Q.  Okay.  Is -- are these your initials by LMW

8  on the second page of this exhibit on Exhibit A?

9      A.  Yes.  Yes, sir.

10     Q.  Okay.  And FDM, that stands for Frank Daniel

11  Moore?

12     A.  That's good with me.

13     Q.  Okay.  And by initialing Exhibit A were you

14  agreeing to the email agreement dated February 3rd,

15  2018, that was accepted by you on February 4?

16           MR. MULLER:  Objection, form.

17     A.  I'd have to see that email, but I know there

18  were quite a few emails, and they were put together in

19  the top document that is what we finalized on.  And I

20  think most of the emails we agreed on.  I gave him the

21  option, Daniel, yes, sir.

22     Q.  (BY MR. CLEVELAND)  Okay.  What -- what

23  option did Daniel have, according to you?

24     A.  Well, he just -- he didn't know whether he

25  wanted to stay at 40 percent or not.  And he decided

                        Page 148

1    he would rather stay a -- he would rather be a
2    50 percent partner, and then say 20 percent on the net
3    profits.
4        Q.  And when you say he would rather be
5    50 percent and have a 20 percent net profits, are you
6    saying he was telling you he wanted a 50 percent --
7        A.  I just -- I just --
8        Q.  Hold on, let me finish, hold on.  We're
9    doing okay.  Let me finish my question first.
10            When you say 20 percent net profits and
11    50 percent as something that Daniel wanted.  Is that
12    50 percent referring to the Harris SWD split?
13        A.  I believe so.
14        Q.  Okay.  And did you read and sign this
15    agreement, sir, that's in front of you back in 2018?
16        A.  Yes.  Yes, I did.
17        Q.  Who -- who prepared this agreement, if you
18    know?
19        A.  Daniel Moore.
20        Q.  Okay.  Are you challenging this agreement in
21    this lawsuit?
22        A.  Not at all.
23        Q.  Okay.  Is it a valid agreement?
24        A.  Yes, sir.
25        Q.  From your perspective?

1        A.  Yes, sir.
2        Q.  And was this something -- was this a
3    material agreement that was part of Daniel's exit from
4    Black Duck?
5            MR. MULLER:  Objection, form.
6        A.  Yes, sir.
7        Q.  (BY MR. CLEVELAND)  All right.  And let's
8    focus on the second paragraph here, and that highlight
9    is not from me on the PDF display.  That's just the
10    way this -- I have this exhibit hard-copied with the
11    highlight.
12            But this says, "DMA Properties, Inc.,
13    is entitled to receive 50% of all Gross Monies
14    received by Black Duck Properties, LLC including its
15    successors and assigns for the remainder of all
16    payments due to Black Duck Properties from Bigfoot per
17    the terms and conditions of the Note payments as
18    originally negotiated and accepted by and between
19    Bigfoot and Black Duck Properties, LLC."
20            Did I read that correctly?
21        A.  Yes, you read that properly.
22        Q.  Okay.  All right.  And it further goes on to
23    say, starting down here, last paragraph before the
24    signatures, "DMA Properties will be paid 50% of all
25    Gross monies received on the 'Note' payments starting

1    on February 7, 2018, and for the remainder of all
2    payments received."
3            Did I read that correctly?
4        A.  Yes.
5        Q.  Okay.  Now, this agreement refers to gross
6    monies a couple of times.  Do you see that?
7        A.  Yes.
8        Q.  Is it your contention that you're allowed to
9    deduct from 50 percent of the gross payments received
10    under the Bigfoot note and that's all that Daniel's
11    entitled to?
12            MR. MULLER:  Objection, form.
13        A.  He would get 50 percent of the monies after
14    KrisJenn Ranch received the costs and any monies owed
15    by Daniel Moore.
16        Q.  (BY MR. CLEVELAND)  Why -- why is Daniel's
17    50 percent reduced by anything owed to KrisJenn Ranch?
18        A.  Because he -- he was a partner in the
19    purchase where he provided zero money.
20        Q.  Okay.  Where in this agreement, in
21    Exhibit 22, does it say that you can take out cost of
22    KrisJenn Ranch from the payments that are made to DMA
23    Properties from the Bigfoot note?
24        A.  There are -- I'm sure there is some -- some
25    emails showing out the cost of the well.

1        Q.  Okay.  Well, let's start with this
2    document -- let's start with this document that's two
3    pages long.
4        A.  Okay.
5        Q.  Is there anything in this document,
6    Exhibit 22, that you can point me to, that allows a
7    reduction of the monies owed to DMA Properties under
8    the Bigfoot note of any costs or expenses?
9        A.  I'm not an attorney.  I'll have to let my
10    attorney decide that.
11        Q.  Well, I'm not -- this is my chance to take
12    your deposition.  Can you point me to anything that
13    supports that contention in this agreement that's
14    before you in Exhibit 22?  You can say "Yes," "No," or
15    "I don't know."
16            MR. MULLER:  Objection, form.
17        A.  I don't know.
18        Q.  (BY MR. CLEVELAND)  All right.  What does
19    gross monies as it's used in this agreement mean to
20    you?
21        A.  It says gross monies.  That's -- that's --
22    that's been the problem all along, gross money and net
23    monies have been interchanged throughout this.
24        Q.  Okay.
25        A.  And nowhere does this say that this

1    agreement wipes out any previous agreement.

2       Q.  Okay.  Right.

3       A.  This -- this whole agreement is subject to

4    the amount of money that was spent by Black Duck to

5    buy the well and the cost of buying the well.

6       Q.  Okay.  And where does it say that in this

7    agreement Exhibit 22?

8       A.  It doesn't say that in this agreement,

9    because this agreement doesn't say that all previous

10   agreements are void.  This agreement --

11      Q.  So how -- how can this agreement --

12      A.  I don't know.

13      Q.  How can -- how can this agreement really be

14   for 50 percent of all gross money if what you're

15   saying is there are prior agreements that are

16   incorporated that make it a net instead of a gross?

17          MR. MULLER:  Objection, form.

18      A.  You gave me this document a while ago and it

19   says 14.01, it's called offset.  Because the note is

20   owned by Black Duck.  In 14.01, offset.

21      Q.  (BY MR. CLEVELAND)  Right.  Right.  And this

22   agreement that we're looking at, Exhibit 22, was the

23   way that you got DMA -- that you got Daniel Moore and

24   his entities out of Black Duck; right?

25      A.  I didn't get him out of Black Duck.  He --

                                                    Page 153

1    he wanted out of Black Duck.

2      Q.  Well, is this another situation where you're

3   saying that an agreement doesn't mean what it really

4   says, Mr. Wright?

5          MR. MULLER:  Objection -- objection,

6   form.

7          THE WITNESS:  The agreement means what

8   it says.

9      Q.  (BY MR. CLEVELAND)  Okay.

10      A.  Only thing is it's not the only agreement.

11      Q.  Okay.  So you're saying -- your testimony is

12   that this agreement, Exhibit 22, is also subject to

13   the Black Duck company agreement?

14      A.  Yes, because Black Duck owned the note.

15      Q.  Okay.  Even though it doesn't say anything

16   in here about incorporating the Black Duck company

17   agreement?

18      A.  No, it does not, and he understood that.

19      Q.  Okay.  So let's look at 14.01 since you have

20   that in front of you.

21      A.  Yes, I still do, yeah.

22      Q.  Okay.  That says whenever the company has to

23   pay any sum to any member any amount that the member

24   owes the company may be deducted from that sum before

25   payment.

                                                    Page 154

1      A.  That's correct.

2      Q.  After -- after this agreement in Exhibit 22

3   was Daniel Moore and his entities still a member of

4   Black Duck?

5      A.  This agreement doesn't relieve him of any

6   debt to Black Duck, including the other notes.

7          MR. CLEVELAND:  Objection,

8   nonresponsive.  Mr. Wright, my question was -- was

9   different than that.

10      A.  Okay.

11      Q.  (BY MR. CLEVELAND)  My question is, after

12   this agreement in Exhibit 22 in February of 2018, was

13   Daniel Moore or his entity still a member of Black

14   Duck; yes or no?

15      A.  He was not a member of Black --

16          MR. MULLER:  Objection, form.

17      A.  He was not a member of Black Duck after --

18   after -- there were two different agreements that --

19   as they both had to be signed, and I don't know which

20   one was signed first.

21      Q.  (BY MR. CLEVELAND)  Sir, you started the

22   answer and I just want to get a clean answer.  After

23   this agreement, Exhibit 22, in February 2018, was

24   Daniel Moore or any of his entities a member in Black

25   Duck, yes or no?

                                                   Page 155

1      A.  I don't know.

2      Q.  Okay.  Let's -- we're done with the company

3   agreement now, sir.

4          Looking back at Exhibit 22, and this

5   exhibit that refers to the email agreement dated

6   February 3rd, 2018, and accepted by Larry Wright on

7   February 4th, 2018.  Do you see that?

8      A.  I see that.

9      Q.  Now, is that referring to this agreement at

10   Exhibit 17 where you say at the top, "I hereby fully

11   accept and approve to the terms and conditions of this

12   email"?

13      A.  I don't know.

14      Q.  Okay.  Can you under oath say anything

15   about -- or let me ask you this way.  What email

16   agreement are you referring to here on Exhibit A to

17   the Harris SWD agreement, sir?

18      A.  I really don't know.  It's confusing.

19      Q.  Okay.  Well, you signed it, didn't you?

20      A.  I signed any -- I signed an email agreement.

21      Q.  Right.  Are you aware of any other email

22   agreement that was prepared on February 3rd and -- and

23   accepted by you on February 4th, other than what we've

24   marked as Exhibit 17, sir?

25      A.  I really don't know.

                                                   Page 156

Q.   Okay.  Because --

A.   For some reason I --

Q.   Let's look at --

A.   For some reason, I don't know why Daniel didn't attach that to it if he meant for it to be excluded.  And I agreed to it.

Q.   Okay.  And if we look at Exhibit 17, which is now in front of you -- well, look down at Mr. Moore's email.  He says -- let me get rid of this highlight for you.  This first bullet point of his email says, "No less than 50% carried interest and 50% entitlement on all terms and conditions and monies owed on the Note to Black Duck Properties and Bigfoot regarding the Harris SWD.  Harris SWD is 100% FREE AND CLEAR OF ANY AND ALL DEBTS."

          Did I read that correctly?

A.   Yes, you did.

Q.   Is it still your testimony that what DMA Properties is entitled to for Harris SWD is a net and not a -- and not a gross?

          MR. MULLER:  Objection, form.

A.   It's always been a net.

Q.   (BY MR. CLEVELAND)  Okay.  Are you saying that this email agreement in Exhibit 17 is also subject to the Black Duck company agreement?

A.   I don't know.  It looks like it is to me.

Q.   Okay.  Does it say that anywhere in here?

A.   It says it here on 14.01, offset.

Q.   I understand that.  You're looking at the company agreement, which is a separate document.  Is there anything in Exhibit 17 that incorporates the Black Duck company agreement, sir?

A.   I don't see it.

Q.   Okay.  Now, let's look at this third bullet point of Mr. Moore's email.  And I'll take the highlighting away for this one as well.

A.   Okay, thank you.

Q.   Now, let's just -- the premise for these bullet points, according to Mr. Moore's email is, No. 1, do you see it's to remove Daniel Moore from all aspects that involve Black Duck.  Do you see that?

A.   Yeah, he was agreeing to be removed.  I didn't remove him, which he has continuously said.  And I agree.

Q.   But -- well, I understand, but -- but this is part of y'all's agreement that you reached for Daniel to exit Black Duck; right?

          MR. MULLER:  Objection, form.

A.   Yes.

Q.   (BY MR. CLEVELAND)  Okay.  And No. 2 says,

Larry Wright, you hereby agree that you have the authority and will be responsible to have any members -- I'll paraphrase -- execute the proper forms to approve the complete removal of Daniel Moore from Black Duck.  That's what No. 2 says; right?

          MR. MULLER:  Objection, form.

A.   That's what it says, yes.

Q.   (BY MR. CLEVELAND)  Okay.  And this tees up the bullet points.  And so the first bullet point we just went over, does that address the 50 percent of the Harris SWD payments that DMA Properties would be getting in connection with this business divorce?

A.   He would have been getting 50 percent of the net.

Q.   Right, but that's -- he's getting -- he's getting that in connection with his agreement to depart from Black Duck; right?

A.   Yes.

Q.   Okay.  And Daniel Moore or his entities get these items in these bullet points in exchange for you getting the 50 percent interest in Black Duck back under your control; correct?

A.   I'm not sure I got anything.  I owned 60 percent of it, he owned 40 percent of it.  And I really didn't want him to leave the company.  If --

all of this you're going through is confusing.

Q.   Okay.  Well, when you say 60/40, where did that come from?

A.   I owned 60 percent of this before this agreement.  What did I get in exchange for it?

Q.   Well, my understanding is that you were a 50 percent owner through KrisJenn Ranch -- let me finish my question.  You were a 50 percent owner of Black Duck through your entity KrisJenn Ranch; right?

A.   That is correct.

Q.   Okay.  Not a 60 percent owner; right?

A.   I was 50 percent owner of Black Duck and Daniel was 50 percent owner of Black Duck.

Q.   Right.

A.   But the assets -- the assets owned by Black Duck were different than the -- there's a capital account.

Q.   Okay.  But did you see any value, sir, in -- well, let me ask it this way.

          Did you have control over Black Duck while KrisJenn Ranch had a 50 percent interest and Daniel through his entity had the other 50 percent interest?

          MR. MULLER:  Objection, form.

          MR. GERMANY:  Objection, form.

1   THE WITNESS: He's the 50 percent stock
2   owner, but he is not a 50 percent owner of anything.
3   MR. CLEVELAND: Okay. Objection,
4   nonresponsive.
5   THE WITNESS: He's a 50 percent stock
6   owner and we had a capital account.
7   Q. (BY MR. CLEVELAND) Okay. Before he
8   exited --
9   A. Not what the agreement says, I don't
10  believe.
11  Q. Okay. Before Daniel and his entity withdrew
12  from Black Duck who had control over Black Duck,
13  KrisJenn Ranch or Daniel's -- Daniel's entity?
14  MR. MULLER: Objection, form.
15  MR. GERMANY: Same objection.
16  A. We each owned 50 percent of the stock when
17  the -- when the company was formed, that is correct.
18  The capital account changed immediately after monies
19  was put into it.
20  Q. (BY MR. CLEVELAND) But when it's
21  50 percent -- when it's 50/50 ownership, did you do
22  any -- I'm sorry, could you have caused Black Duck to
23  do something without getting Daniel's approval?
24  MR. MULLER: Objection, form.
25  A. No, of course not, but the capital account

Page 161

1   started even, so the only time he was ever a
2   50 percent owner was the day we started the company.
3   Q. (BY MR. CLEVELAND) Okay. Okay. And so
4   after this what I call a business divorce, KrisJenn
5   Ranch didn't have to go ask Daniel then for permission
6   to do anything with respect to Black Duck, did it?
7   A. There were two managers at that point, so
8   Daniel was removing himself from Black Duck, yes, sir.
9   What I'm trying to figure out is I
10  can't figure out did he want to stay in or did he want
11  out, because on the pipeline it looks like he wanted
12  to stay in, and on the Harris he wanted to stay out.
13  So -- we did not want him to get out.
14  Q. Okay. Let's go down to -- back to
15  Exhibit 17, the third bullet point. This says, "No
16  less than 20% Carried Interest in the P-21 Express
17  Pipeline."
18  Do you see that, sir?
19  A. Yes.
20  Q. What's that referring to?
21  MR. MULLER: Objection, form.
22  A. See, that's the problem I have with all of
23  this is these are just proposed emails that he puts
24  through. The documents stood for themselves and he's
25  trying to -- he's trying to put one document to go

Page 162

1   with both, and it's very confusing.
2   MR. CLEVELAND: Okay. Objection,
3   nonresponsive.
4   Q. (BY MR. CLEVELAND) What did you understand
5   this sentence to mean, "No less than 20% Carried
6   Interest in the P-21 Express Pipeline," sir?
7   A. Exactly what it says, the P-21 Pipeline.
8   Q. Okay. Is this referring to the -- the net
9   profits interest that DMA was getting in connection
10  with this business divorce?
11  A. I'm not sure. It looks like it.
12  Q. What else could it be referring to,
13  Mr. Wright?
14  A. But this -- but this email was never signed
15  by myself or Daniel. We -- we signed something
16  referring to some email that was never attached, so --
17  so I'm going to have to say that it's -- it's all just
18  proposals, because Daniel emailed quite a few
19  proposals. I think there's eight or -- eight or ten
20  others too, that came through.
21  Q. Okay. In those other proposals did you
22  respond by saying that you hereby fully accept and
23  approve the term and conditions of the email?
24  A. But it doesn't say which email.
25  Q. Well, I'm asking about these other

Page 163

1   proposals. In those -- in response to those other
2   proposals did you respond by saying that you agree --
3   you hereby fully accept and approve to the terms and
4   conditions of this email? Did you?
5   A. I think -- I think there is an email that
6   attaches to one of the documents, but I'm really
7   confused today which one that is.
8   Q. Okay. Well, back to this bullet point about
9   a carried interest. Did you have an understanding of
10  what a carried interest means?
11  MR. MULLER: Objection, form.
12  A. I have no idea what a carried interest is.
13  Q. (BY MR. CLEVELAND) Okay. When you received
14  this email what was your understanding or how did you
15  understand this term "20% Carried Interest in the P-21
16  Express Pipeline"?
17  A. I don't remember.
18  Q. Okay. This bullet point continues, says,
19  "The document will be under the exact same terms and
20  conditions as the 'Agreement for Assignment and
21  Assumption of Specific Contract' that was and is still
22  binding for Longbranch Energy (Darin Borders) and
23  Black Duck Properties."
24  Do you see that, sir?
25  A. Yes, sir.

Page 164

1    Q.   Is it still your testimony that you had no
2  idea what Mr. Moore was referring to with this bullet
3  point?
4            MR. MULLER:  Objection, form.
5       A.   I don't remember at that time.
6       Q.   (BY MR. CLEVELAND)  Okay.  If you look at it
7  now --
8       A.   I mean, I don't remember.
9       Q.   If you look at it now --
10      A.   I don't remember.
11      Q.   Look at it now.
12      A.   If I look at it now, it's -- it's very
13  confusing.  I'm wondering how --
14      Q.   Okay.  So your testimony -- all right.  It's
15  your testimony that when you look at this bullet point
16  that starts with no less than 20 percent carried
17  interest, as you sit here today that you don't know
18  what Mr. Moore is talking about in this email?
19      A.   Mr. Moore talked about a lot.
20      Q.   I understand, but I'm asking as you sit here
21  today is it your testimony that looking at this bullet
22  point that you don't know what he's talking about?
23      A.   For one thing I really need to have this in
24  my hand, because you're jumping back and forth and my
25  eyes are going crazy, and you -- yeah, I -- because

Page 165

---

1  you're jumping back and forth on what this bullet
2  point says, what it doesn't say, and if I'm not
3  mistaken, he mailed an email attachment to these and
4  when that thing came in I -- I signed it, kept copies
5  of it, emailed it back.  So we need to find the email
6  that he mailed to me, because all this is very
7  confusing.
8       Q.   Well -- okay.  Well, we've established that
9  what we're looking at --
10      A.   You're going way too fast.  You're going way
11  too fast.
12      Q.   All right.  Well, let's have Mr. Muller --
13  Mr. Muller can get you a hard copy of Exhibit 17.
14            MR. MULLER:  Do you have a --
15            MR. CLEVELAND:  Do you have that handy,
16  John?
17            MR. MULLER:  Yeah, give me two minutes.
18  Can we go off?
19            MR. CLEVELAND:  Yeah.  Are you -- is
20  somebody going to have to leave the room --
21            MR. MULLER:  I'll get it here, Tim.
22  Hang on.
23            MR. CLEVELAND:  It's Exhibit 17 for the
24  deposition, John, and it was, just for your reference,
25  marked as Exhibit 18 for the Motion For Summary

Page 166

---

1  Judgment.
2            MR. MULLER:  Okay, that's easier.  I
3  have a better chance of finding that.  All right.
4            THE WITNESS:  This will be a lot
5  easier, Tim, because I was trying to follow it and it
6  was making me dizzy what you were trying to do.  Okay.
7       Q.   (BY MR. CLEVELAND)  Well, I appreciate you
8  speaking out.  You have the exhibit, and do you see,
9  sir, the -- you know, at the top you say, "I hereby
10  fully accept and approve," you see that.  And what
11  we've been talking about is the bullet points from
12  Daniel Moore's original email in this exhibit.
13      A.   Yeah, something -- something is wrong on
14  this, because before that you have a February 3rd,
15  2018, at 10:58 p.m., and then you go up, which should
16  be the next email and it says February 3rd, 2018, at
17  10:25.  So that email is before the other email and
18  then up at the top it says Sunday, February 4th at
19  12:26 p.m.  So these -- so these documents have been
20  placed out of order.  So it can't say -- I have no
21  idea what I'm approving and accepting here.  It's
22  impossible to tell and there's no way you can prove
23  that, what it means.  So it could be any document.
24            And it says you pick -- you pick.  So I
25  didn't know what he picked until he picked.  So all of

Page 167

---

1  this is jumbled.
2            See, here's another one on February --
3  Saturday, February 3rd.  So you're --
4       Q.   All right.  All right.
5       A.   -- you're picking and choosing, so there's
6  no way this makes sense.  It doesn't make sense.  So I
7  can't answer any questions about this.
8       Q.   Well, I'm asking simply because you make a
9  pretty definitive statement at the top about accepting
10  and approving the terms and conditions of this email.
11  Would you agree with me there?
12      A.   We don't -- we don't have any idea what I'm
13  agreeing to.  I'm probably agreeing to his email on
14  the terms is what I'm probably agreeing to, because
15  Daniel prepared --
16      Q.   What, the bullet -- the bullet point?
17      A.   No.  The terms of the agreement is probably
18  what I'm agreeing to that he emailed to me, because
19  Daniel Moore prepared --
20      Q.   Of which agreement?
21      A.   The Black -- of the Bigfoot.  That's what
22  I'm probably agreeing to that he sent, because he
23  would have wanted that --
24      Q.   Which one?
25      A.   -- he would have mailed that too.

Page 168

Daniel Moore did this.

Q.   Okay.  So just so I have this straight.
Just so I have this straight, your testimony is when
you say, "I, Larry Wright, hereby fully accept and
approve to the terms and conditions of this email,"
you are actually accepting the terms and conditions of
a -- of a separate agreement that was sent to you by
Daniel Moore.  Is that your testimony?

A.   It's to some email which -- which in no way
describes what's below it, because these are out of
order, so which one could it be?

Q.   Well, I'm -- you -- you made the statement,
so you tell me, sir.

A.   Yeah, it's none of these.  It's none of
these that I believe.

Q.   Okay.  So when -- when you say that you
fully accept and approve the terms and conditions of
this email --

A.   This --

Q.   -- you're accepting and approving terms and
conditions of some other email, but not the emails
immediately below in Exhibit 17, is that what you're
saying?

A.   Exhibit 18 is all out of order.  There's no
way we know what it approves and -- and what I accept.

Page 169

There's no way to know that.

Q.   Okay.  You don't like these bullet points
that Mr. Moore put together, do you?

A.   It's impossible to know.  He put together --
he put together emails after emails after
emails.  That's why it's taken us so long --

Q.   Okay.

A.   -- to get all of our correspondences
together, Tim.

Q.   Then, Mr. Wright, why didn't you tell him,
Daniel, I'm confused about what you're proposing,
instead of saying that you accept and approve the
conditions of this email?

A.   I'm approving it, I'm fully accepting and
approving the terms and conditions of this email.  The
only problem is this email, you can't jump to a day
before, on a February 3rd at 9:24 p.m. and say that
that is what I'm approving.  There's no way to know
that.  There's no way to know that.

Q.   Okay.  Let me ask you this, Mr. Wright.
What were you agreeing to, if anything, when you said
in Exhibit 17 that you hereby fully accept and approve
to the terms and conditions of this email?

A.   I would bet there's an email that is the
agreement that I signed.

Page 170

Q.   What -- okay.  Your testimony is it's not
referring to any emails that are below your acceptance
statement in Exhibit 17?

A.   What I'm saying is that this is out of
order.  This was put together in some order that is
wrong.

MR. MULLER:  Tim, you can't have --
Tim --

Q.   (BY MR. CLEVELAND)  You can answer my
question.

A.   You go from the bottom up.  How can you have
an email at 10:58 p.m. and the next email is at
10:25 p.m.?  It's out of order.

Q.   What time zone -- what time zone was Daniel
Moore in when he was in North Carolina, sir?

A.   It doesn't matter.  It states right here,
10:25 p.m.  That is after 10:58 p.m.

MR. MULLER:  Tim, I don't mean to
interrupt, but I think you can see here what his
problem is.  It's the time.  I think if we were to go
off the record --

MR. CLEVELAND:  I understand what he's
trying to say.

MR. MULLER:  If we can go off the
record I think I can --

Page 171

MR. CLEVELAND:  Let me -- I'm just
trying to -- hold on.  I'm just trying to understand
what -- let me ask this way.

Q.   (BY MR. CLEVELAND)  Mr. Wright, are you
saying this email was doctored?

A.   No.  I'm saying it's out of order.

Q.   Okay.

A.   It doesn't --

Q.   What -- let me ask again, let me ask again.
When you said, Mr. Wright, at the top of this email
that you hereby fully accept and approve to the terms
and conditions of this email, is your testimony that
you were not agreeing to any email that is beneath
that statement in this exhibit, yes or no?

A.   I have no idea.  I don't know.  I don't
know.

Q.   So is the reason that you make this
statement so clearly that you accept and approve the
terms and conditions, simply because you were
confused?

A.   No.  I fully accepted and approved the terms
and conditions of this email.  That's what I said, but
what email, where -- where is the email?

Q.   Did you -- did you read this email in
Exhibit 17 before saying that you accepted and

Page 172

```
 1   approved the terms?  Yes or no.
 2        A.   I read this email and said that, yes, sir --
 3        Q.   All right.  Thank you.  We'll move on.
 4        A.   -- but you're trying to say the email I said
 5   is something that is out of order.  It's out of order.
 6             MR. CLEVELAND:  Objection as
 7   nonresponsive -- I'll object as nonresponsive after
 8   "yes, sir."  You can put that exhibit to the side.
 9             MR. MULLER:  So Tim, how about my
10   proposal that we go off the record for a moment?
11             MR. CLEVELAND:  Yeah, we are moving on,
12   so -- I mean, unless -- we're moving on from the
13   exhibit, John, so I think we can -- we can stay on,
14   but if you think it's important, then, sure, we can go
15   off.
16             MR. MULLER:  Well, whatever you want.
17   It's either we can go off and I can help my client
18   understand your question better so he can testify or
19   we can do this in erratas later.  I think it would be
20   better if you went off the record and get a clean
21   record.
22             MR. CLEVELAND:  Okay, let's go off for
23   a couple minutes.
24             MR. MULLER:  Okay.  Thanks.
25             THE VIDEOGRAPHER:  Going off the
                                               Page 173
```

```
 1   record.  The time is 4 p.m.
 2             (Recess from 4:00 p.m. to 4:03 p.m.)
 3             THE VIDEOGRAPHER:  Back on.  The time
 4   is 4:03 p.m.
 5             MR. MULLER:  Okay.  I think Larry would
 6   like to clarify some of his prior testimony.
 7        Q.   (BY MR. CLEVELAND)  Okay, Larry -- I mean
 8   Mr. Wright.  Excuse me.
 9        A.   Tim, because what you showed me, that's why
10   I was having trouble reading it.  I'm still thinking
11   Daniel Moore is in Texas.  This is 10:58 p.m. Central
12   Standard.  And then I go up here and it is 10:25 p.m.
13   Eastern Standard.  And that's why I was saying they're
14   out of order.  I did not realize the time zones, so,
15   yes, I did say fully accept and approve the terms and
16   conditions of this email.  That's what was confusing
17   me was the time zone.
18        Q.   Okay.  And so were you, in fact, accepting
19   and approving the terms and conditions of the emails
20   that are below your acceptance, Mr. Wright --
21        A.   Yes.  Yes, I was.  You bet.
22        Q.   Okay.  And were you also agreeing to --
23        A.   Yeah.
24        Q.   Were you -- so you were also agreeing to
25   these bullet points that Mr. Moore originally set out
                                               Page 174
```

```
 1   in his original email on this string; is that true?
 2        A.   Correct.
 3        Q.   Okay.  And so when you agreed -- when you
 4   agreed to no less than a 20 percent carried interest
 5   in the P-21 Express Pipeline, what did you understand
 6   you were agreeing to?
 7        A.   That it was what he was referring to in the
 8   second part of that, the agreement that was similar to
 9   the Longbranch agreement.
10        Q.   Okay.  He said exact same terms and
11   conditions; right?
12        A.   That's what -- that's what I understood him
13   saying, yes, sir.
14        Q.   Okay.
15             All right.  Different topic,
16   Mr. Wright.  Have you collected your text messages
17   with Adam McLeod and provided them to your lawyer?
18        A.   We have -- we have someone that's putting
19   those together.
20        Q.   When was the last time that you texted with
21   Adam McLeod?
22        A.   It's been probably over a month or two,
23   probably a month.
24        Q.   I've seen that you and Mr. McLeod,
25   Mr. Adam McLeod texted pretty regularly.  Is there a
                                               Page 175
```

```
 1   reason that you have not texted with him in the last
 2   at least month, according to you?
 3        A.   We share hunting and fishing texts all the
 4   time and we haven't talked about that lately.  And
 5   he's been -- he was interested in buying some ranches,
 6   and I think he texted to let me know about that and
 7   vice versa, and then hunting, doing some hunting
 8   trips.
 9        Q.   Okay.  But --
10        A.   We just haven't talked about that.
11        Q.   Okay.  Okay.  Mr. Wright, I've seen some
12   emails where there was -- where you and TCRG were
13   getting the Railroad Commission involved with respect
14   to some permitting on the pipeline in the ground with
15   this right-of-way.  Are you familiar with what I'm
16   talking about?
17        A.   That was some clarification, I believe.  I
18   think I was on those emails.  Would those be emails
19   with Derick Rodgers on it?  That was part of the --
20        Q.   I think Mr. Rodgers -- I think Mr. Derick
21   Rodgers was on some of the emails --
22        A.   Yeah.
23        Q.   -- this was in March of this year --
24        A.   Yes.
25        Q.   -- when there was some confusion about
                                               Page 176
```

```
 1    whether there was an expiration of any rights related
 2    to the right of way or the pipeline.  Are you familiar
 3    with that?
 4         A.   Correct, correct.  Correct.
 5         Q.   How was that resolved, as you understand it?
 6         A.   We requested that the -- the permits be
 7    turned over and back to KrisJenn Ranch ROW, but it was
 8    determined by Mr. Crockett and the Railroad Commission
 9    that the pipeline has not been active since before
10    1960.  And it was not an active gas pipeline or would
11    ever be used as an active gas pipeline.
12         Q.   And when you're using pipe -- the word
13    "pipeline" in that answer, are you referring to the,
14    what I understand is a broken-up pipe that's in the
15    ground along this right-of-way?
16         A.   Yes, sir.  Yes, sir.
17         Q.   And is it your understanding that the
18    expiration of that pipeline that's in the ground, like
19    the broken-up pipe, has any impact on the easements
20    that make up the right-of-way?
21              MR. MULLER:  Objection, form.
22         A.   Those are two separate items.
23         Q.   (BY MR. CLEVELAND)  Okay.  So are you aware
24    of anything expiring with respect to the right-of-way?
25         A.   No.  The right-of-way is perpetual.

                                            Page 177
```

```
 1         Q.   Okay.  And have you investigated, sir, since
 2    your entity controls the right-of-way to make sure
 3    that this issue with the Railroad Commission about the
 4    pipe in the ground has not had any adverse on the
 5    right-of-way itself?
 6         A.   I was -- I was told by the Railroad
 7    Commission and by TCRG that the pipe in the ground
 8    related to the gas line that was last operated in 1960
 9    and that any future water line or gas pipeline would
10    have to have a new permit on the ROW.
11         Q.   Okay.  But that -- your testimony is that
12    does not impact the Express Pipeline which is the name
13    that's used to describe the right-of-way zone?
14              MR. MULLER:  Objection, form.
15         A.   The -- the Express Pipeline, the P-21
16    relates only to that pipe that's in the ground and
17    that permit that last moved gas in 1960 is the way it
18    was explained to me.
19         Q.   (BY MR. CLEVELAND)  Have you ever used the
20    term "Express Pipeline" to describe the right-of-way?
21         A.   Never.  It's two different things.
22         Q.   Okay.  Have you used the term "Express
23    Pipeline" to describe the right-of-way in your filings
24    in this lawsuit?
25         A.   I don't know, because I don't have that

                                            Page 178
```

```
 1    counsel anymore.
 2         Q.   Well, I'll represent to you that there are
 3    filings in this lawsuit that you made -- or I should
 4    say you directed your current counsel, Muller Smeberg
 5    to file that used the term "Express Pipeline" to
 6    describe the right-of-way.
 7              MR. MULLER:  Objection, form.
 8         Q.   (BY MR. CLEVELAND)  Would that be a mistake?
 9              MR. MULLER:  Objection, form.
10         A.   I would have to ask my attorneys that, Tim.
11         Q.   (BY MR. CLEVELAND)  Okay.  Did you -- have
12    you approved the filings in this case before they get
13    filed, Mr. Wright?
14         A.   I understand that there will be some
15    corrected pleadings, and I will wait for the advice of
16    my attorney, new attorney.
17         Q.   Well, my question is different, Mr. Wright.
18    My question is, have you read the pleadings in this
19    case and approved them before they get filed?
20         A.   I'll have to refer to my attorneys on that
21    deal.
22         Q.   Okay.  Well, Mr. Wright, Mr. Muller and
23    Mr. Smeberg are smart lawyers, but they'll be the
24    first to tell you they were not living these events
25    years ago like you were.  So they don't have personal

                                            Page 179
```

```
 1    knowledge of the facts.  And that's why I'm asking
 2    you, did you review the pleadings in this case that
 3    they filed on your behalf before they did so?
 4              MR. MULLER:  Objection, form.  Larry,
 5    I'm going to instruct you not to answer to the extent
 6    it requires you to convey your conversations with me
 7    or lawyers in the firm.
 8              MR. GERMANY:  Same objection from me,
 9    and same instruction, Larry.
10              THE WITNESS:  Okay.
11              MR. GERMANY:  Also, Tim, you're trying
12    to get him to swear to pleadings.  That's improper.
13              MR. MULLER:  Which is true.  Those are
14    my pleadings and my words.
15         Q.   (BY MR. CLEVELAND)  All right.  Mr. Wright,
16    have you reviewed any pleadings in this case that were
17    filed, not getting into what counsel told you.  Have
18    you reviewed any pleadings in this case before they
19    were filed?
20              MR. MULLER:  Again, I'm going to
21    instruct you can answer.  But to the extent you
22    need to answer and refer to your conversations with
23    your lawyers, I'm going to instruct you not to answer.
24         A.   Those are confidential between myself and my
25    attorney.  I refuse to answer.

                                            Page 180
```

1  Q. (BY MR. CLEVELAND) Well, and that's why I'm
2  simply asking if you reviewed. I'm not asking what
3  any lawyers told you, sir.
4  A. I'm simply -- said simply, I'm simply going
5  to refer to my attorney's advice on that.
6  Q. Okay. Sir, is there -- the option agreement
7  with the McLeods, did that option exist on both the
8  right-of-way and the pipe in the ground?
9  A. I would have to refer to my attorneys on
10  that, but I would not have a problem with either, I
11  don't believe.
12  Q. Okay. The McLeods weren't paying $6 million
13  in an option agreement to acquire a broken-up pipe in
14  the ground, were they?
15       MR. MULLER: Objection, form.
16  A. Their option is to buy the pipeline to put
17  in new pipe in the ground, I believe, sir. They
18  haven't told me their plans.
19  Q. (BY MR. CLEVELAND) Does the option
20  agreement with the McLeods include an option on the
21  right-of-way, sir?
22  A. I believe so.
23  Q. Okay. And what's that belief based on?
24  A. The way the option agreement is written.
25  Q. Okay. Do you have any knowledge of what oil

Page 181

1  and gas or pipeline experience John or Adam McLeod
2  have?
3  A. I do not.
4  Q. Okay. Have you had any past or current
5  business relationships with Adam McLeod concerning any
6  minerals that you own, Mr. Wright?
7  A. Yes.
8  Q. And what is that business relationship?
9  A. He bought minerals that I used to own.
10  Q. And when did he do that?
11  A. I would say at the early part of 2011 or
12  '12.
13  Q. And how many minerals -- how much mineral
14  acreage did he buy from you, sir?
15  A. I would have to go back and get the
16  documents. That was quite a few years ago.
17  Q. Do you have any agreement with Mr. McLeod at
18  present for him to get any commission or compensation
19  related to your minerals?
20  A. In the first agreement we had -- he had an
21  option if he sold the minerals that he would get
22  15 percent of the minerals and that was on the first
23  loan for 3.4 million.
24  Q. And that's the loan agreement that was from
25  early 2019?

Page 182

1  A. Yes, sir.
2  Q. Okay. So --
3  A. February of 2019, yes, sir.
4  Q. And -- and did you go get that loan from the
5  McLeods in February 2019 because the Asilo loan was
6  coming due?
7  A. The Asilo loan had already been extended and
8  the reason I went and got that loan was because Daniel
9  Moore was not -- did not -- was not able to sell the
10  right-of-way and the 17 percent was eating up -- was
11  the costs factor of the gross, the cost of daily each
12  day going up 17 percent.
13  Q. Okay. Mr. Wright, you had your eyes closed.
14  Are you okay? Do we need to take a break?
15  A. I'm very -- I'm very weak and very tired. I
16  have a sugar low.
17       MR. MULLER: Tim, why don't you --
18       MR. CLEVELAND: Why don't we take a
19  break, John.
20       MR. MULLER: Yeah, yeah, thank you.
21       THE WITNESS: Because I made a lot of
22  mistakes at this time yesterday.
23       MR. CLEVELAND: I just noticed you had
24  your eyes closed and so I spoke up. And so do you
25  want to take a break, John?

Page 183

1       THE WITNESS: Yes, thank you, Tim.
2       MR. MULLER: Thank you, Tim.
3       THE VIDEOGRAPHER: Off the record at
4  4:17 p.m.
5       (Recess from 4:18 p.m. to 4:36 p.m.)
6       THE VIDEOGRAPHER: Back on the record.
7  The time is 4:36 p.m.
8  Q. (BY MR. CLEVELAND) Okay. Mr. Wright, your
9  counsel told us when we were off the record that you
10  wanted to correct some testimony, and also I think you
11  have information about who prepared the Black Duck
12  minutes; is that correct?
13  A. Yes. My wife did not prepare any of them.
14  It looks like most of the early minutes were prepared
15  by Mr. Strolle. There were two that Hagan Cohle could
16  have performed. He changed computers and printers, so
17  he's trying to figure out if he did do it or not. So
18  when his testimony -- when y'all depose him he will
19  know whether he did it or not, prepared them.
20  Q. Okay. So did -- did you learn whether
21  Mr. Strolle prepared any of the minutes or are you
22  still uncertain?
23  A. Oh yeah, he did. He prepared all of the
24  early ones for Black Duck.
25  Q. And was --

Page 184

1    A.   The early notes for Black Duck, some of them
2    were prepared -- it was his law firm.
3    Q.   Okay.  What about the notes for the
4    August 14th, 2017, meeting, did you learn whether
5    those were prepared by Mr. Strolle or his firm?
6    A.   I -- we're trying to figure that out,
7    because that could have been Hagan Cohle's old
8    computer and printer.  He's -- he's trying to confirm
9    that now.  And he should have that information for you
10   by the time you dispose -- you depo him.
11   Q.   Okay.  So as of today with respect to the
12   minutes for the August 14, 2017, meeting, your
13   testimony is you -- you don't know who prepared those
14   minutes?
15   A.   I'm not sure whether it was Hagan or
16   Mr. Strolle.  It would have been one of the two.
17   Q.   Okay.  Okay.  I appreciate that.
18   A.   But nobody knows.
19   Q.   Now -- okay.  And I believe your counsel
20   said you needed to correct some testimony as well?
21        MR. MULLER:  It was just on that point,
22   Tim.
23        MR. CLEVELAND:  Is that -- oh, just on
24   that point, okay, great.
25        MR. MULLER:  Is that right, is there

1    anything else you've testified to before that you want
2    to correct right now?
3         THE WITNESS:  I don't think so.
4         MR. MULLER:  Okay.
5         MR. CLEVELAND:  All right, thank you
6    for that, John.
7    Q.   (BY MR. CLEVELAND)  And, Mr. Wright,
8    let's -- let's continue.
9         I'm going to show -- share the screen
10   and show you Exhibit 33.
11        MR. CLEVELAND:  John, this was -- this
12   was shared earlier today.  It's two pages.  I think
13   it's -- if you don't have a hard copy we can deal with
14   it pretty quickly.
15   Q.   (BY MR. CLEVELAND)  Can you see that
16   Exhibit 33, Notice of Default, Mr. Wright?
17   A.   Yes.
18   Q.   Okay.  And is this a notice of default from
19   KrisJenn Ranch to Black Duck dated September 27, 2018?
20   A.   Yes.
21   Q.   And this notice of default is sent to Black
22   Duck at your home address, 410 Spyglass Road; is that
23   right?
24   A.   Yes, sir.
25   Q.   And it was sent -- or signed by you on

1    behalf of KrisJenn Ranch; is that right?
2    A.   Yeah.  I don't think it was mailed.  It was
3    prepared and delivered.
4    Q.   And is that your signature?
5    A.   Yes.
6    Q.   And who prepared this notice of default?
7    A.   Mr. Strolle.
8    Q.   Did you deliver it to yourself or how did
9    that work?
10   A.   I'm sure, yes, sir, because I had it in my
11   minutes -- or I had it in my --
12   Q.   You had it in your minutes?
13   A.   No.  I had that in my note -- my binder.
14   Q.   Okay.  And is this the notice of default for
15   the -- the loan of 4.1 million that you're saying
16   KrisJenn made to Black Duck in August of 2017?
17   A.   That was the balance on the -- on the note.
18   Q.   Okay.  Okay.  And what were the payments
19   that Black Duck did make on the note, like how much
20   before you foreclosed?
21   A.   They made approximately $600,000 on the
22   note.
23   Q.   Okay.
24   A.   $800,000 in interest.
25   Q.   So -- so all told, Black Duck paid to

1    KrisJenn Ranch, oh, help me with the math, what's the
2    ballpark total for principal and interest that -- that
3    Black Duck was able to pay on this loan before you
4    foreclosed?
5    A.   The entire amount that came from the sale
6    reduced -- reduced the two notes and paid interest on
7    the bigger note.
8    Q.   Okay.  But my question is between -- between
9    combining principal and interest together of the
10   payments made by Black Duck on this KrisJenn note
11   that's the subject of this default, what's the total
12   amount of that payment?
13   A.   It would be the difference between the
14   liens -- liens -- there was another payment paid in
15   there somewhere.  There were some more payments paid
16   on that after the fact.  But it's -- it would be the
17   difference between that and the 4.1 million.
18   Q.   Okay.  And that would be the principal paid,
19   but you said, I think, did you say 800,000 in interest
20   was paid?
21   A.   There was -- there was some -- somewhere in
22   that neighborhood.  We produced those on the full --
23   Q.   Okay.
24   A.   -- on the full folder that have been sent
25   off to printing, so I don't have it.  I would not have

it in front of me.

Q.  Okay.  But the 600,000 --

A.  The entire Asilo folder is being printed for you, Tim.

Q.  Okay.  But in terms of what Black Duck paid, I believe you said, and I understand this was an approximation, sir, but you believe that there was about $600,000 in principal paid and about $800,000 interest paid by Black Duck on this KrisJenn note before foreclosure; is that accurate?

A.  I believe -- I believe so.  We'd have to look at the note.

Q.  Okay.

A.  It speaks for itself --

Q.  Okay.

A.  -- I mean the checks speak for themselves.

Q.  Okay.  Okay.  And then is it true that Black Duck paid off the personal loan of about 1.175 million?

A.  Yes, sir.  Yes, sir.

Q.  And what was the -- they -- did they pay the full principal and then some interest on that?

A.  I would have to look at the checks, but they paid off the full note.  I'm not sure they paid any interest.

Page 189

Q.  Okay.  So the --

A.  But the checks -- but the checks are coming to you, and they'll -- they'll be --

Q.  Okay.

A.  -- they'll speak for -- they'll speak for themselves.

Q.  And I'll -- I appreciate that --

A.  -- I didn't take any of the money.  A hundred percent of the money went to the notes and interest.

Q.  Okay.  You're saying that the money that came to KrisJenn from this foreclosure went to pay down the Asilo note; is that what you're saying?

A.  All the money from the TCRG sale went to pay the two notes.

Q.  Okay.  And I want to make sure --

A.  The check came -- the check -- 2 million came from TCRG and 425,000 came from TCRG and John Carroll.  I -- I don't know who put up the money.

Q.  But of that approximate $2.4 million that Black Duck received from selling the right-of-way, you're saying all those funds either went to KrisJenn Ranch or to you personally; is that correct?

A.  The first -- those payments came in two payments.  One was 425,000 and that -- that amount

Page 190

went to Asilo.  All of that went to Asilo, because there was an interest payment that was either due or past due.

The reason I'm shutting my eyes is I have to think.  I don't like looking at myself.

Q.  Okay.

A.  So it's not that I'm tired.  I'm -- that's just how I concentrate.

Q.  Yes, sir.

A.  And then the -- then the 2 million when it came in, all of that went to Asilo on the -- the 4.1 million, and I believe that total after the next six months was reduced to 3.4 million, I believe, from --

Q.  Okay.

A.  -- from different payments that came in, and I believe those -- some of those payments came from the -- the Harris note that went to them.

Q.  Okay.  How did Black Duck -- of this 2.4 million that came through TCRG, how did Black Duck determine that you and KrisJenn Ranch were going to get paid, but Longbranch and DMA Properties would not get paid anything under their Net Profit Agreement?

MR. MULLER:  Objection, form.

A.  It -- it was always public knowledge between

Page 191

Daniel Moore and Darin Borders that the full amount that I'd spent, which was close to 6 million, would go back to KrisJenn Ranch first and then they would get 20 percent of anything over that.

Q.  (BY MR. CLEVELAND)  Okay.  But who made the decision at Black Duck to direct the funds to KrisJenn and yourself instead of Longbranch or DMA?  You --

A.  Larry Wright.

Q.  Okay.  Anybody else?

A.  No.

Q.  And when, Mr. Wright, did you decide to direct the Black Duck payments to yourself and KrisJenn Ranch instead of Longbranch and DMA?  How long after the TCRG deal closed?

MR. MULLER:  Objection, form.

A.  Black -- Black Duck was not required to send any of that money to Darin Borders or to Daniel Moore. That is a new position that they have taken up in the lawsuit, which was all news to me when they filed the countersuit.

Q.  (BY MR. CLEVELAND)  Okay.  But how long after the TCRG money come in at Black Duck did you direct that to yourself and KrisJenn Ranch?

MR. MULLER:  Objection, form.

A.  The funds were paid when they were due, to

Page 192

1    keep it -- the note from going -- from the -- I'm
2    trying to think out loud -- to keep the note paid,
3    because Asilo was very firm that they would move
4    immediately to foreclose if -- if I was one day late.
5    They were a tough act.  I didn't like it at all.
6       Q.   How did you get -- how did you get in touch
7    with Asilo in the first place, Mr. Wright?
8       A.   A broker who charged me for the note, for
9    the --
10      Q.   Who was the broker?
11      A.   It was a gentleman in Uvalde.
12      Q.   Okay.  And let's move on to this -- this
13   exhibit that's in front of you, Exhibit 28,
14   Mr. Wright.  I'll take care of the highlighting.
15              MR. CLEVELAND:  John, this was -- this
16   was sent earlier today.  Actually, it will help me
17   direct you, and then I'll take the highlighting off,
18   Mr. Wright.
19      Q.   (BY MR. CLEVELAND)  So Exhibit 28 is a -- a
20   three-page document that, Mr. Wright, you -- your
21   lawyers produced for you.  It's got the Bates numbers
22   that says Wright 0195.  Do you see that down here
23   (indicating)?
24      A.   Yes, sir.
25      Q.   That means that this -- this was produced by

1    your lawyers as -- as your production or part of your
2    production.  And this is a -- the title of this, can
3    you see this, it's the Consent of Members and Managers
4    of Black Duck Properties, LLC?
5       A.   Yes, sir.
6       Q.   And the date is July 13, 2017, of this
7    document.  Do you see that?
8       A.   Yes, sir.
9       Q.   And I'm scrolling down, because really what
10   I just want to ask you about here, is this document
11   signed by yourself and Hagan Cohle, but not Daniel
12   Moore?
13      A.   Yes, sir.
14      Q.   Okay.  And similarly on the second page, is
15   that your signature, sir --
16      A.   Yes.
17      Q.   -- with an area for SCMED Oilfield
18   Consulting?
19      A.   Yes.
20      Q.   And then -- okay.  And who prepared this
21   draft consent, sir?
22      A.   I'm sure it was -- I need to look at the
23   full document.
24      Q.   Oh.
25      A.   Go down to the bottom.  I believe it's -- it

1    was Mr. Strolle.
2       Q.   Yes, sir.  That's the end of page 1.  Page 2
3    is just the signature block where you signed and the
4    blank for SCMED, and then --
5       A.   Yeah, that -- and what is the --
6               MR. MULLER:  Go to the very bottom of
7    Exhibit A, there's a footer he's looking for, Tim.
8       A.   Yeah.  And now go to the top for the date
9    for me, please.
10      Q.   (BY MR. CLEVELAND)  Sure.
11      A.   Date is July 13 of 2017.  And, okay, now let
12   me read what it says.
13      Q.   Yes, sir.
14      A.   Okay.  Go to No. 2.  You have to go up a
15   little bit.
16      Q.   Oh.
17              MR. MULLER:  Numbered paragraph 2.
18      Q.   (BY MR. CLEVELAND)  Okay.  I've got it.
19      A.   Okay, okay.  Yes, David Strolle prepared
20   that.
21      Q.   Okay.  And was this ever sent to Daniel
22   Moore, to your knowledge, sir?
23      A.   I don't know.  I know that he was --
24      Q.   What was --
25      A.   -- he was in contact with Mr. Strolle, I

1    know, on several occasions.
2       Q.   Okay.
3       A.   But I wasn't privy to those.
4       Q.   Is -- are you aware of Daniel Moore ever
5    signing this consent?
6       A.   I don't -- I don't think he ever signed it.
7       Q.   Okay.  Did you ask Mr. Strolle to prepare
8    this on behalf of Black Duck, for -- for the members'
9    signature?
10      A.   I -- it's back on July 13th, I'd have to
11   confer with Mr. Strolle on that.
12      Q.   Okay.  Okay.  Are you contending that this
13   consent of members and managers is effective even
14   though it doesn't have Daniel Moore's signature?
15      A.   There's probably a good reason why this was
16   put together and I don't see any emails that dictate
17   why it was put together or effective.  I do know that
18   I remember there's an email where Mr. Moore got into a
19   heated discussion with the seller, and he told the
20   seller that the controlling parties were Mr. Wright
21   and Mr. Cohle and that he wasn't going to sign
22   anything else from that day forward.  And I'm not sure
23   if that was at this exact time or not.
24      Q.   Okay.  And my question is a little -- little
25   more simpler than that.  I'm just asking are you

1  claiming -- and it's okay, I'm not fussing at you.
2  Are -- are you claiming that this consent is somehow
3  effective without Mr. Moore's signature or is your
4  position that to be effective he would have had to
5  sign it?
6        A.   I -- I can't tell you.  I'd have to ask
7  Mr. Strolle.
8        Q.   Okay.  That's all on that exhibit.
9        A.   Just everything we -- everything we did, all
10  documents I retained in the black folder and I
11  provided everything that's requested, a hundred
12  percent of it.
13        Q.   Okay.  Thank you.  We're done with that
14  exhibit.
15        A.   Thank you.
16        Q.   Mr. Wright, you said several times or used
17  the word "scam" to describe something that Daniel
18  Moore was doing.  Do you recall that?
19        A.   I -- I'd have to go back to testimony.
20        Q.   Okay.  Well, we'll try to make it a little
21  clearer.  Are you contending that Daniel Moore was
22  running any kind of scam as it related to you or Black
23  Duck or anybody else?
24        A.   I always had suspicions, no proof.
25        Q.   Okay.  So are you claiming in this case that

Page 197

1  Daniel Moore was leading some kind of a scam?
2              MR. MULLER:  Objection, form, and I'm
3  going to note for the record that the pleadings
4  deadline in this case is not yet passed.  We reserve
5  the right to --
6              MR. CLEVELAND:  Yeah.  Got it.  Right.
7  I understand.
8        Q.   (BY MR. CLEVELAND)  Mr. Wright, are you
9  contending in this case that Daniel Moore was involved
10  in any kind of scam?
11        A.   I don't know of any scams that he provided.
12  I just don't like that it was -- that's probably the
13  wrong word.  I'll have to think about it and make a
14  correction on the right word, because he -- he always
15  was able to remember his truths.  He had trouble
16  remembering his lies.  And so I don't want to call it
17  a scam.
18              If you remember at the beginning of the
19  day I made a -- I made a correction on -- that I
20  changed it to proposals.  And let me think about it
21  and I'll make a correction on this when my attorney
22  gets it.  Because a scam would have had to be
23  something that was done and completed.  And he really
24  didn't do a scam.  He just left me in bad shape is
25  all.  And --

Page 198

1        Q.   Okay.
2        A.   Yeah, I honestly believe that he -- he tried
3  to sell it, just -- I think he -- in my case, I felt
4  like he had plenty of time to sell it and his excuse
5  was he -- finally afterwards, the only way he could
6  sell it was closing it.  So "scam" is probably not the
7  right word.  There's -- there's a word I can think of
8  and I will correct that, because --
9        Q.   Well --
10        A.   -- I don't think he intentionally tried to
11  scam.  I think it just looked like a scam.
12        Q.   Got it.  And, Mr. Wright, let me say I know
13  these have been two long days and I really appreciate
14  you hanging in there, and I -- you've corrected that
15  by that explanation.  And I do appreciate that answer.
16        A.   Yeah, because Daniel, you know, he's a nice
17  guy, I mean, very likeable guy.  He owns -- he owns a
18  $10,000 rifle that I gave him as a gift.  I put him in
19  tournaments, introduced him to all my family and
20  friends.  And I felt like he was a friend.  It just
21  upsets me that he's -- he's doing what he's doing.
22        Q.   And I understand that you -- you had Daniel
23  to your ranch, the KrisJenn Ranch; is that right?
24        A.   I let him in as part of my family, yes, sir.
25        Q.   And did you go -- did I hear that you and

Page 199

1  Mr. Moore played golf in North Carolina or South
2  Carolina or somewhere like that?
3        A.   Oh, he invited me.  I didn't get to go yet.
4  I think he invited me to go golfing and surfing, but
5  I've had two shoulder surgeries and I'm not a good
6  surfer, so --
7        Q.   Did you ever get an invite to the Key West
8  fishing trips?
9        A.   I wish I did.  I would have loved to have
10  gone.  I --
11        Q.   I heard he had one of those.
12        A.   -- it's a shame he doesn't want to try to
13  settle this, because I've always tried to ...
14        Q.   Mr. Wright, I heard you -- I think you used
15  the word "frustration" or that you were put in a bad
16  spot because of something Daniel did, and just -- I
17  haven't asked you this.  Can you just tell me, what
18  was the bad spot that you think Daniel left you in?
19        A.   That was our part of my emails that are
20  being produced, and maybe in the amended pleadings
21  they will be able to pull them together.  I don't
22  think my counsel has sufficiently gone through those
23  yet.
24              You've got something up on the screen
25  that we're not familiar with or have never seen.

Page 200

Page 201

1    Q.   Oh, well, you know what, I'm going there
2    next, but since you -- I'm okay -- I will stop that
3    screen share, but we're going there next.  I didn't
4    mean to distract you.
5    A.   There's no way to read it because it was --
6    Q.   Yeah, that's a really -- that's a real tough
7    one.
8    A.   -- this -- this big.
9    Q.   Right.  Right.  I'll blow it up when we show
10   it to you.
11        But in terms of -- as best you can
12   today, can you in your own words -- actually, let me
13   ask you this way.
14        Can you in your own words just describe
15   Daniel Moore based on your -- your dealings with him?
16   A.   I really can't.  It would take hours to do
17   it.
18   Q.   Okay.  You've already done it a little bit.
19   Is there anything you'd -- you'd add to that?
20   A.   That was -- that was the good side of him.
21   There were lots of sides of Daniel.
22   Q.   Okay.  And in your own words can you
23   describe Darin Borders?
24   A.   I only met Darin -- I met him, I was with
25   him -- let me think about this.  I met him at a

Page 202

1    closing on one -- two deals that he sold for us.  It
2    was all business, short and not much there.  Then I
3    met him at an agreement on a contract that Daniel and
4    Darin put together for Black Duck with Solares, and he
5    took charge as -- as if he had never sold a contract,
6    so I thought he was a little forward there.
7        And then after the TCRG deal John
8    Terrill wanted to meet him, I went and met him there.
9    Found him at that point very congenial, very open,
10   ready to participate in the project.  And I learned a
11   little bit about his business at that time.  That it
12   was very successful in Shelby County and it could be
13   an asset to this project.
14   Q.   Okay.  And just so I get this from you
15   today, can you in your own words just tell me what the
16   tough spot that -- that you think Daniel put you in?
17   A.   I'll have to -- to refer to my attorney,
18   because we possibly could be amending our pleadings
19   and could possibly be working on some of that in the
20   future.  The hearing dates, I think one of them is
21   October 13 with some deadlines and then there's some
22   deadlines on when the rest of the documents you
23   requested, so I'll leave that.  I'll leave that.
24   Q.   Okay.  But -- but I -- but I do -- I do
25   think I'm entitled to the answer today.  I hear what

Page 203

1    you're saying about what may come in the future,
2    but -- and I'm not asking you for, you know, to commit
3    to doing or not doing anything in the future.  But as
4    we sit here today, can you in your own words just
5    describe the tough spot that you feel that Daniel put
6    you in?
7    A.   No.
8    Q.   Is that no?
9    A.   No.
10   Q.   Okay.  Is that because you can't think of
11   anything or is that because you don't want to answer
12   the question?
13        MR. MULLER:  Objection, form.
14   A.   Yes.
15   Q.   (BY MR. CLEVELAND)  Which one is it both?
16   A.   Yes, I don't want to answer.  Well, you know
17   the answer so --
18        MR. MULLER:  Wait, wait --
19   A.   I said no, and then you asked another
20   question before I answered the first question, so your
21   first question is no, your second question is yes.
22   Q.   (BY MR. CLEVELAND)  Which means that you
23   just don't want to answer the question about the tough
24   spot that Daniel put you in?
25   A.   We're going to reserve those for a later

Page 204

1    time, because of new pleadings -- may have to do with
2    confidential pleadings with -- between my attorney and
3    myself and also between Mr. Germany on some pleadings
4    that we may be doing there too.
5        MR. MULLER:  Tim, may I interrupt?
6    Q.   (BY MR. CLEVELAND)  Okay.  Are you saying I
7    need to depose you again on that?  I'm -- I'm just
8    trying to get what your -- what you know today, sir.
9        MR. MULLER:  Yeah, let me -- let me --
10   I'll instruct him on the record.  He has a right, if
11   you know of anything that -- it's a tough spot that
12   you've been in, he has a right to talk about that --
13        THE WITNESS:  I want to --
14        MR. MULLER:  -- tell him -- words we'll
15   determine things later, but what's the tough spot, if
16   you know of something.
17   A.   My tough spot is that Daniel Moore spent
18   four months, he said every morning at 6:00 he would
19   get on the phone with this gentleman named John
20   Michael and talk four to five hours every day for four
21   to five months.  And I don't know if Daniel was making
22   a deal with John or John was trying to make a deal
23   with Daniel, but he told me for four months he needed
24   to make this deal.  He kept presenting offers, and
25   then he finally said if you close it I can sell it to

1   this guy, and then when I said that I could close it,

2   then he says -- John Michael says to Daniel, I'll give

3   you a million and a half dollars if you don't close

4   it.  So then I'm going, how is that going to work?

5   And then he said, well, John Michael said, nine months

6   after you default we'll give you the million and a

7   half.

8         So it put me in a tough spot with the

9   seller because the seller had already said it's not

10  going to work with Daniel Moore anymore, and that's

11  when Daniel Moore moved, after that really tough spot

12  that he put me in.  He moved to South Carolina, and

13  then he bought a home in North Carolina, and so

14  that's -- that's the tough spot.

15        And then apparently -- and I don't know

16  what happened, Daniel and John Michael made some

17  agreement over a Labor Day weekend, and they went to

18  the seller, who was Mr. Roberts, and without my

19  permission changed the whole contract, without Darin

20  Borders' permission, and agreed to give Mr. Roberts

21  3- to $400,000 more for a six-month closing, and --

22  and Mr. Roberts sent him an email back and said that

23  I'm in -- out of service, I can come back.  And

24  then the attorney with him said this is the terms you

25  agreed to, and -- and Daniel Moore said, yes, I agree

Page 205

1   to these terms.  And so he said, all right, this is

2   the new terms of the deal, and then on Tuesday or

3   Wednesday after that Mr. Roberts called and said

4   where's the money.  I said I don't know what you're

5   talking about, and he said the new deal that Adam

6   proposed.  And I said I have no idea what that deal

7   is.

8         And then I got ahold of Adam -- I mean

9   John.  I got -- Daniel Moore, I got ahold of Daniel

10  Moore after that, and I said well, what's this new

11  deal.  He said, well, it was a proposal for a

12  six-month extension to give him 3- or 400,000 more

13  dollars.  I said where's the money.  He said, well,

14  I'm waiting on this John Michael.  And apparently John

15  Michael defaulted that or played Daniel, I don't know

16  exactly how that went down, but Chase Palmer and the

17  seller, Mr. Roberts, then moved to try to put Black

18  Duck in default.  And by trying to put Black Duck in

19  default, I had to step in and save it, and by not --

20  by not putting any money into it.  That was the tough

21  spot.

22        MR. MULLER:  Tim, I'm sorry, I don't

23  mean to interrupt.  Larry is fading here.  How much

24  longer do we have, do you think?

25        MR. CLEVELAND:  We've got quite a bit.

Page 206

1        MR. MULLER:  We're getting there

2   though?

3        MR. CLEVELAND:  Yeah, I know, I did see

4   that.  I think because of the -- the tech and this

5   being a Zoom and everything else, I think there's --

6   we can check the record, I think there's still quite a

7   bit of time that I'm allowed under the record to

8   continue with him.  And I have a lot to get through.

9        As you can probably see from some of

10  the exhibits I forwarded, that being, you know, TCRG,

11  that whole negotiation deal, more McLeod questions

12  about different agreements we haven't even -- we

13  haven't gotten to yet, so -- and I need to keep going

14  on this subject as well.  So there's -- that was a

15  long way of saying quite a bit, John.

16        MR. MULLER:  Okay.  Well, let's see if

17  we can figure something out here.  You know, you've

18  deposed Mr. Wright on several occasions prior to this.

19  We've saved you two days today.  It's 5:00.  I'll stay

20  on the record, but I don't think this witness is --

21  you can see him on the video, he's on video.  You can

22  see that this witness is physically having difficulty

23  continuing on right now.

24        And what's more is we've covered a lot

25  of ground.  It seems like the things you just

Page 207

1   mentioned we're just repeating stuff that's been

2   covered over and over again.  What can we do here?

3        MR. CLEVELAND:  Well, I don't agree

4   with that, and I -- if he's tired, I'm not going to

5   make him stay, if he's tired and doesn't want to

6   continue.  Obviously, I'm not going to do that.  If we

7   need to suspend and resume and finish this out, we can

8   do that.  If you want to go a little bit longer.

9   Really, it will depend on the witness and how

10  Mr. Wright is doing, how he's feeling.  If he wants to

11  go a little bit longer and then we suspend, we can do

12  that.  If he wants to suspend now, okay, but I

13  really would -- I really would defer to him.

14        MR. MULLER:  All right.  Well, I

15  appreciate your concerns.  We reserved two days for

16  this deposition, which I think is more than adequate

17  given the fact that you've had many prior occasions to

18  depose him.  I think Larry can make it for another

19  hour.

20        We're -- we're going to object to any

21  further deposition time.  We're -- you know, we can go

22  to the court and the court may order me to tender him

23  again in the future, and if so, I'll defer to the

24  court, but I will probably resist those efforts.  So

25  do you think we can wrap it up in an hour?

Page 208

MR. CLEVELAND: No, but do we have a record time, Gloria, that we've been on the record today?

THE REPORTER: Yes, I have four hours and 31 minutes for today, and five hours and 27 minutes yesterday.

MR. MULLER: So you've had how many hours total, nine?

MR. CLEVELAND: Right. And that's really nowhere near what I'm entitled to for the two days given that, as we've said, to try to streamline this, this is a corporate rep depo and it's a personal rep.

THE VIDEOGRAPHER: I have closer to five hours today and we had five hours 27 minutes yesterday.

MR. MULLER: Yeah, your time limit is six per deponent.

MR. CLEVELAND: Yeah, so we're not --

MR. MULLER: You elected to take -- you elected to take all three at the same time.

MR. CLEVELAND: Right, so we're not -- we're not near the expiration of the time I'm entitled to. I've been doing it as expeditiously as possible. Why don't we --

Page 209

MR. MULLER: Do you think you get 18 -- do you think you get 18 on the record?

MR. CLEVELAND: If it takes that long, I don't think I'm -- it's unreasonable to expect that given the complexity here. But why don't we -- we're burning tape now. Why don't I keep going with Mr. -- Mr. Wright if he's able, and I'll get as far as I can.

MR. MULLER: Well, sure, it's unreasonable. The rules only allow you to have six.

MR. CLEVELAND: Okay. Again, do we need to go off the record and have more conversation or do you want to keep going with him if he's able?

MR. MULLER: Okay, yeah, let's go off the record. We'll confer off the record.

THE VIDEOGRAPHER: Going off the record, the time is 5:15 p.m.

(Recess from 5:15 p.m. to 5:28 p.m.)

THE VIDEOGRAPHER: Back on the record. The time is 5:28 p.m.

Q. (BY MR. CLEVELAND) All right, Mr. Wright, we have taken a break. Are you ready to continue?

A. Ready as I can be.

Q. Okay. I want to follow up on a couple of things in a narrative answer you gave, and then I'm going to move on.

Page 210

It sounded to me -- well, let me ask this. The John Michael you referred to in your previous answer, is that his full name, is Michael his last name or is that a --

A. I'm not sure what his full name is, but I believe that's close.

Q. Okay.

A. We presented in the original bankruptcy hearings that you questioned me on before that he was one of the potential buyers, and we -- we presented copies of that that Daniel Moore presented to Darin and myself.

Q. Okay. And so was John Michael another potential buyer of the -- the right-of-way?

A. Yes.

Q. Okay. And were these interactions that Mr. Moore had with John Michael that put you in a tough spot, were those dealings before Black Duck closed on the right-of-way in August of 2018?

A. They were right at the time of the closing, and that's -- that was the tough spot. When Daniel wasn't able to make the deal with John Michael, that really became the tough spot, and then Daniel just loaded up and went back to South Carolina without telling me, left me by myself on this.

Page 211

Q. And do you think -- I'm sorry, do you think Mr. Moore set this situation up intentionally or do you think it's some -- a tough spot that came about despite his best intentions? I mean what's your view about it?

A. I don't know, I don't know. We haven't -- my attorneys haven't disposed him yet, but I felt like that he -- he fell into a big trap with this.

Q. Okay.

A. And that was -- and that was a really, really tough spot there.

Q. But was your earnest money already -- was your earnest money from KrisJenn Ranch already with the seller at the time that Daniel was talking with John Michael?

A. We put up a continual time up until one month when we closed on the earnest money. The last earnest money I put up was $250,000 which was exactly 30 days before I closed and I did not have a loan at that time. And Daniel Moore left and -- without a buyer that we thought we had. And I had 30 days to find money.

I don't care who you are, to go and sign a loan in 30 days is pretty tough. Pretty tough.

Q. Okay.

Page 212

1    A.  For someone that's retired.

2    Q.  All right.  I'm going to share the screen

3  and show you a new exhibit, it's No. 37.

4         MR. CLEVELAND:  John, it's the McLeod

5  option agreement.

6         MR. MULLER:  Sure.

7    Q.  (BY MR. CLEVELAND)  All right.  Mr. Wright,

8  do you see this Exhibit 37 which is the option

9  agreement between two of your entities and McLeod Oil?

10   A.  So you're jumping from 30 days before the

11  closing till -- you're jumping all the way to December

12  of 2019.

13        Okay.  See, that's what -- if you could

14  keep things in chronological order my mind can handle

15  it, but by jumping, I just can't handle this.  You can

16  try, but I had my mind all set on tough spots in 2017,

17  '18, now you're jumping to '19.  And so I'll try, but

18  I'm only going to be good for a few minutes if you're

19  going to do this.

20   Q.  Okay.  Yes, we're -- we're moving forward to

21  2019 and this option agreement in front of you.  And

22  I'm -- I'm going to scroll down and -- to a highlight

23  that I have, and I'm going to take it out because I

24  know you don't like the highlights.

25        We're looking at paragraph 7-A of the

                                          Page 213

1  option agreement.  Do you see that on the screen

2  share, sir?

3    A.  Yes.

4    Q.  And 7-A is a paragraph called Optionor's

5  Representation.  Do you see that, sir?

6    A.  Yes, who -- who is the optionor?

7    Q.  Well, I believe the optionor here would be

8  the group granting the option, which would be your --

9  your side of this, because you guys granted the option

10  to the McLeods.

11   A.  Okay.

12   Q.  Does that sound right to you?

13   A.  I didn't look at the definition --

14   Q.  Okay.

15   A.  -- because I've never been involved -- this

16  is the first option I've ever been involved in, so

17  it's -- it's all new to me.  I know assignor and a

18  signee, but if you could go back to the -- the

19  definition at the very top, I can -- I can make sure I

20  understand it.  And then --

21   Q.  Absolutely.

22   A.  Okay.  If you're jumping it back and forth,

23  it really hurts my eyes.  Don't move it, because if

24  you do it really --

25   Q.  I won't move it.  So we're back at the

                                          Page 214

1  first page --

2    A.  KrisJenn Ranch is the optionor and they're

3  the optionee, yes.  Okay.  That -- that makes sense,

4  the 'or' or the 'ee,' yes, okay.

5    Q.  Right.  It -- it took me a little time as

6  well, but --

7         I'm going to -- sorry for the headache.

8  I'm going to scroll back down --

9    A.  I'm good.

10   Q.  Now that --

11   A.  I'm good.

12   Q.  Okay, okay.

13        And optionor's representation.  This

14  says, "Subject to the Litigation, each of the entities

15  and individuals comprise" -- are you following me,

16  sir?

17   A.  Yes.

18   Q.  "Comprising Optionor Group hereby represents

19  to Optionee the following, which representations are

20  true and correct on the Effective Date of this

21  Agreement" --

22   A.  Okay.

23   Q.  -- "and which representations will be deemed

24  to have been re-made at the Closing as still being

25  true and correct."

                                          Page 215

1         Did I read that correctly, sir?

2    A.  Yes.

3    Q.  And what did you mean by "subject to the

4  Litigation"?

5    A.  That was their requirement, so I don't know

6  what they meant by it.

7    Q.  So the McLeods added this phrase, "Subject

8  to the Litigation," is that what you're saying?

9    A.  Yes.  Everything in there they prepared it,

10  Strolle reviewed it and I signed it.

11   Q.  Okay.  Did -- did you disclose the net

12  profit interest of Longbranch and DMA Properties to

13  the McLeods?

14   A.  They were given the entire lawsuit and they

15  saw the position of the net profits claim.

16   Q.  Okay.  Okay.  Did you tell them anything

17  about -- I understand you provided them the lawsuit,

18  as you say.  Did you tell them, the McLeods, anything

19  about the litigation and the positions taken by DMA

20  Properties and Longbranch?

21   A.  They -- they were given the full case and

22  they went in and reviewed it, but I don't even think

23  that was their interest at the time.  Their interest

24  was in having collateral to back up the loan, full

25  collateral.  And they --

                                          Page 216

Q. That was the loan -- I'm sorry.

A. They said when the time was correct then they would do their investigation.

Q. Okay. But did you believe that, as you represent -- you understand that optionor's representations, this was your representations in this agreement; right?

A. It -- it speaks for itself, plain language, you'll see.

Q. Okay. So was it true, sir, as you represent in 7-A(1) here, that "Optionor Group own(s) the Property free and clear of all liens, claims, and encumbrances (other than same related to the Loan Agreement or this Agreement)"?

A. The optionor group did own the property free and clear. But that became untrue when this was all signed. Before this was signed the optionor group owned the property free and clear because Asilo only had a loan against the ranch and the minerals, and then their first loan agreement only had -- had a lien against the ranch, and then they had an option to buy some points, some of those 16 percentage points.

Q. Well, once --

A. Once we did the -- once we did the -- the lien agreement, they had a lien against the land, so

Page 217

---

it would not be free and clear of all encumbrance.

Q. Okay. Was this statement at 7-A(1) true with respect to the right-of-way from your perspective?

A. It -- they had a contract on the -- on the -- the pipe and the right-of-way.

Q. But was this representation that that was free and clear of all liens, claims, and encumbrances true when there were claims existing by DMA and Longbranch with respect to the right-of-way and the net profits interest as well?

MR. MULLER: Objection, form.

A. Those were claims that are -- that are being proven invalid and are invalid.

Q. (BY MR. CLEVELAND) But they were still claims that were in existence at the time that you signed this agreement and made these representations; right, sir?

MR. MULLER: Objection, form.

THE WITNESS: They're still claims today.

Q. (BY MR. CLEVELAND) So this representation at 7-A(1) is not entirely accurate then; is that true?

MR. MULLER: Objection, form.

MR. GERMANY: Objection, form.

Page 218

---

A. Yeah, I give up on what you're trying to get me to say. If you want to move on to something else, otherwise, I'm going to have to shut her down. You're wearing me out, Tim, and I'm trying hard. I'm 66 years old. That's why I asked how old you are. You're 39. At 39 I could run circles around you. At 66 I'm having a hard time and I'm being honest. I'm being honest.

MR. MULLER: Tim, how close are we?

THE WITNESS: This -- it's ridiculous. He's just --

MR. CLEVELAND: Well, there's still plenty more to do, John, but if the witness can't continue, then, I mean, he can't continue today. So --

THE WITNESS: You're just wearing me out. Because everything in here speaks for itself, Tim.

MR. MULLER: Okay. We're going to have to --

THE WITNESS: I can't tell you what it doesn't say.

MR. MULLER: The lawyers are going to confer. We'll work it out.

William, what do you think?

Page 219

---

MR. GERMANY: Here's my problem, Tim, you've asked the same question five times. And it's confusing everybody. You know, you're trying to make him define something that he just -- you've just got to be happy with his answer, Tim. If you could move it along, I think Larry could answer your questions.

THE WITNESS: That's right. Over and over.

MR. MULLER: Tim, I kind of agree with that. We've kind of just hit the same stuff over and over again.

MR. CLEVELAND: Well, this is the first time I've -- we've asked him any questions about this agreement, and, you know, I'm entitled to examine him about it.

MR. GERMANY: Well, you keep asking him whether or not -- you know, about the claim and then it says subject to the litigation right there. And he said, well, yeah, there's claims ongoing right now in litigation. I don't know what other answer you want from him.

MR. MULLER: I mean he can't tell you what the legal claims are. He's not a lawyer.

MR. CLEVELAND: Okay. I mean, can he -- can he continue or not? I mean, if he can't,

Page 220

```
 1    then he can't.
 2            I'm not asking you, Mr. Wright, to
 3    continue if -- if you -- if you can't continue, so
 4    it's really entirely Mr. Wright's call.
 5            MR. MULLER:  He said -- he said --
 6            THE WITNESS:  I will clarify a few of
 7    the tough spots you put me in a while ago, but other
 8    than that, I'm going to call it a day.  You've just --
 9    you've worn me out, I mean literally worn me out.
10            MR. MULLER:  He was willing and ready
11    to testify on the issues of what the tough spots were
12    and the -- and the offset issue which I've given you
13    this ledger on.  But you kind of went somewhere else,
14    and he -- if you want -- if you want to touch on those
15    issues, he's ready today, but if we're going to go
16    back --
17            MR. CLEVELAND:  If he's ready and able
18    to do that now, then let's -- I'm all for covering
19    what we can today, understanding it's getting later
20    and understanding Mr. Wright is tired.  So I am --
21            MR. MULLER:  Great.
22       Q.   (BY MR. CLEVELAND)  Okay.  Mr. Wright, are
23    you ready -- are you to continue, sir?
24       A.   I will --
25       Q.   Okay.

                                              Page 221
```

```
 1       A.   I will -- I will try to continue.  Not on
 2    this, though.
 3       Q.   Okay.  Well, let me --
 4       A.   If you want to hear --
 5       Q.   All right.
 6       A.   -- some more of my tough spots, I can do
 7    that.  And if you want to talk about the Harris SWD
 8    note, Bigfoot offsets, I'll do that, just because I
 9    understand --
10       Q.   All right.  All right.  I have put up here,
11    Mr. -- what's that, sir?
12       A.   Anything on that I can answer for you.
13       Q.   Okay.  So I have put on the screen
14    Exhibit 38, which is the -- some notes on a ledger
15    related to Harris SWD notes.
16       A.   Right.
17       Q.   And I understand that the -- the Post-it
18    notes that are copied on the right-hand side are notes
19    of your counsel and he's -- I don't think there's
20    anything too secret about those.  And to expedite,
21    he's just agreed to let us use that, which I
22    appreciate, to use this with those notes on there.
23            But, Mr. Wright, did you -- who made
24    these handwritten entries on the left-hand side of
25    this page?

                                              Page 222
```

```
 1       A.   I did.
 2       Q.   And when did you run these numbers here,
 3    sir?
 4       A.   I put these together after Daniel Moore
 5    wanted to know the status, and I told him that we
 6    missed quite a bit and that I was going to put it
 7    together and get it to him, but he wasn't -- he wasn't
 8    interested in that.  I tried to ask him about stuff,
 9    and he ignored it.  And so I put it together, because
10    I knew at some point we would need to know what was
11    going on here.
12       Q.   Okay.  And so I asked you yesterday, and you
13    said -- and your counsel helped you -- helped with
14    your position that you needed to look at some notes to
15    be able to answer my question about what, if anything,
16    are you admitting that is owed to DMA Properties or
17    Mr. Moore related to the Harris SWD situation.  Do you
18    remember that?
19       A.   And -- and I said that we were working on
20    that and present it this morning, but you never
21    brought it up, and -- so it's here in front of us now.
22       Q.   Great.  And I want to cover that with you.
23    Can you explain to me, sir, what amount, if any, that
24    you agree are owed to DMA Properties or Mr. Moore
25    related to the Harris SWD issue?

                                              Page 223
```

```
 1       A.   Okay.  Where would you like to start?
 2       Q.   Let's go to the bottom and go backwards.
 3       A.   Yeah.  Go to the bottom and go backwards.
 4            The 12-20 payment and the 3-20-21
 5    payment would be the final two payments that Bigfoot
 6    owes to -- owes on the notes, and so that amount is
 7    $63,588, I believe.
 8       Q.   Okay.
 9       A.   And then 10 through 14 would be monies that
10    were paid to the -- to the bank by the court order.
11       Q.   Okay.
12       A.   Because they're not due till 12-20 and 3-20
13    is the last note.  And then 10 through 14 are in the
14    registry of the court, and -- has anybody checked to
15    see if they've all been paid?  Because it was your
16    order that put it there, yeah, and -- okay.  So that's
17    what's owed.
18            Now --
19       Q.   Mr. Wright, can I try to -- just to remind
20    you, what I want to know is what amount you agree or
21    admit is owed to DMA Properties or Mr. Moore or his
22    entities related to this Harris SWD issue.
23       A.   Okay.  To date -- to date, KrisJenn Ranch
24    owes DMA $26,588.50, but there are two other items
25    we're trying to see if they're offset.  That would be

                                              Page 224
```

1    the taxes on the real estate and the -- and damage
2    claims on the -- on the ROW.
3        Q.   And the off -- offset of whose claims in the
4    ROW?
5        A.   The damage claims that are -- that were paid
6    by KrisJenn Ranch.  Those are offsets of Black Duck.
7        Q.   Wait.  Can you explain that to me?  What
8    payments by KrisJenn Ranch are offsetting what's owed
9    to DMA Properties?
10       A.   Offsets are DMA had to pay the taxes on the
11   real estate which was close to 20,000.  That's not in
12   here.  And DMA -- and the Black -- Black Duck has paid
13   about $5500 in damage claims on the ROW line.
14       Q.   Okay.  And so is the -- I think you said
15   approximately $28,000 that you believe is owed to DMA
16   Properties.  Is that -- that is a total net of this
17   $182,000 of costs that are on this exhibit --
18       A.   Yeah, 182,000 in cost --
19            MR. MULLER:  Objection, form.
20       Q.   (BY MR. CLEVELAND)  Okay.  And so --
21       A.   Yeah, because I don't -- it's covered up
22   with some of my stuff.  We've been looking at this.
23   The total cost -- and there's some other costs that we
24   have on there, and one of those was the taxes, another
25   was the claims, so it's probably going to be closer to

1    a hundred and -- $205,000, which --
2        Q.   Of cost?
3        A.   -- which will be the offset.
4        Q.   Okay.  If -- if there's no offset of costs
5    required, assume that with me, Mr. Wright, how much
6    would DMA Properties be entitled to related to Harris
7    SWD?
8            MR. MULLER:  Objection, form.
9        A.   If there were no offsets at all, there was a
10   huge mistake.  There were -- the first three payments
11   went to offset.  The fourth and fifth payment,
12   50 percent was sent to Daniel Moore and then that's
13   when we realized that there was a lot more offset.
14            The sixth, seventh, eighth, and ninth,
15   if there was no offset to be owed to Danny Moore.
16   That -- if there was no offset at all, $63,000 would
17   be owed, $63,588 would be owed.  That's the total
18   total.
19            In your -- in your pleadings you put
20   that I owed five payments, but it's only four.  It's
21   the 9-20 payment, the 1-15 payment, the -- that's --
22   payment 6, 7, 8, and 9 would be the payments.  That's
23   the dates we were paid on.
24            Including all the bounced checks and
25   the late fees, they averaged between 45 and 60 days

1    late on every payment.  That's why it would be good to
2    check with the registry, to see if 10, 11, 12, 13 or
3    14 are there, since y'all are the one that forced them
4    into the registry.
5        Q.   Okay.  I appreciate that explanation.
6            Mr. Wright, you told me that you're
7    not -- you don't want to testify any further about the
8    option agreement and the McLeods; is that right, or
9    that you're not able to?
10       A.   I can tell you a few more tough spots,
11   because you said tell me what the tough spots were.
12   And there was actually five.  I told you one.  And
13   I'll do that.
14       Q.   Are you -- are you able to do any -- to
15   testify on any other subjects today?
16       A.   I'm -- I'm telling you, you're like I used
17   to be.  You have a lot of energy, Tim, and I
18   appreciate that.  I think my compliment six months ago
19   was that I wouldn't want -- I would love to hire you,
20   but nowadays I have some --
21            MR. MULLER:  Mr. Wright, can you
22   testify as to the final tough spots?
23       A.   There's four more tough spots.
24            MR. MULLER:  To let you know.
25       Q.   (BY MR. CLEVELAND)  I appreciate the kind --

1    I appreciate the kind words, Mr. Wright, but while --
2    let's -- cover some that we can while you've got the
3    energy to talk about it.
4            So you told me about one tough spot
5    that you think Mr. Moore put you in.  What -- did you
6    suffer any financial harm from that tough spot?
7        A.   I would -- I would say I suffered a ton, a
8    ton of financial damage.
9        Q.   And I'm just talking about financial harm
10   that resulted from Mr. Moore's dealings with the
11   potential buyer John Michael?  Like, can you identify
12   any financial harm that specifically resulted from
13   that?
14       A.   Yes.  We had to get a loan for 17 percent,
15   and we wouldn't have had to get a loan for 17 percent
16   if he would have let me know way before that that John
17   Michael's flip was not going to happen.
18       Q.   So what's the -- what's the financial harm
19   that you're saying you would have had to get a loan,
20   but --
21       A.   We could have took a loan for a lot less
22   price.  We could have got better loan terms.
23       Q.   How so?
24       A.   He left town.  He let me on such a short
25   fuse.  Basically, he left town -- and that was the

```
 1   other tough spot that I was going to be without the
 2   $1.2 million.  I was going to lose it all.  And he put
 3   up no money and made no capital contribution to Black
 4   Duck.  So it was going to be a hundred percent loss
 5   to -- to KrisJenn Ranch and my family.
 6        Q.   What was your contribution to Black Duck --
 7   or actually what was KrisJenn Ranch's capital
 8   contribution to Black Duck?
 9        A.   Up to that point the loan to Black Duck was
10   1.2 million.
11        Q.   That was KrisJenn's capital contribution?
12             MR. MULLER:  What was your capital
13   contribution, that's what he's asking.
14        A.   I put in the $500 to start the company, and
15   I put in the $500 that Daniel Moore never put in.
16        Q.   (BY MR. CLEVELAND)  Okay.  Wasn't it one of
17   your duties --
18        A.   Yeah.
19        Q.   Sir, wasn't it one of KrisJenn Ranch's
20   duties to contribute earnest money for Black Duck?
21        A.   I would say that the duties in the -- I
22   would say the partnership agreement stands superior to
23   the duties that were agreed upon.  And so Daniel Moore
24   need -- needed to abide by the partnership agreement.
25        Q.   You mean the Black Duck company agreement?
```

Page 229

```
 1        A.   Yes.
 2        Q.   Okay.  And if the McLeods exercised their
 3   option --
 4        A.   I'm not talk -- I'm not going to talk about
 5   that today.  You're switching me -- switching gears.
 6        Q.   Well --
 7        A.   I'm through -- I'm through now, Tim.  You
 8   did what we all three said you wouldn't do --
 9        Q.   No.  This relates to what you -- you were
10   talking about your harm, sir.
11             MR. MULLER:  You jumped ship.
12             THE WITNESS:  You're jumping -- you
13   jumped ship again, Tim.  I can't handle it.  I can't
14   handle it.  You're just too much.  It's too much.
15             MR. MULLER:  All right --
16             MR. CLEVELAND:  Does he want to hear --
17   does he want to hear -- does he want to hear the end
18   of my question?  Because he interrupted me and sort of
19   assumed I was jumping back.  The question related to
20   his -- what he was talking about for the harm from the
21   kind of loan he had to get, so --
22             MR. MULLER:  Tim, I hear you.  It's 6,
23   he's beat.  You've just -- you've done a good job for
24   two days.  You're a very good lawyer.  He's given you
25   all he's got.  I just can't -- can't imagine we're --
```

Page 230

```
 1   we've got anything left at this point.
 2             THE WITNESS:  I could take a two-hour
 3   nap.
 4             MR. CLEVELAND:  If he -- I can't -- I'm
 5   not going to force Mr. Wright to stay if he's not --
 6   if he's not able.  So I'm obviously not going to nor
 7   could I.
 8             MR. MULLER:  He's telling me he's not
 9   ill.  He really had the energy to end these last two
10   points.  I think he's covered them pretty well.  I
11   think -- I think you've got everything you need.
12             William, thoughts?
13             MR. GERMANY:  Yeah, that's it.
14   Obviously, he can't even answer a simple question
15   right now.
16             MR. CLEVELAND:  Okay.  I'm not -- we're
17   not forcing him to stay.  We can -- we'll -- I --
18   again, we're not going to agree on this.  I'm going to
19   say my position is the deposition is suspended.  I
20   understand, Mr. Muller, you're going to say no, the
21   deposition is over.  We can agree to disagree on that,
22   and with that, I want to thank you, Mr. Wright, for
23   your time.
24             MR. MULLER:  Thank you for that, Tim.
25   I think the rules require you to state the basis of
```

Page 231

```
 1   suspension before we go off.
 2             MR. CLEVELAND:  All right.  The basis
 3   is that I still have time afforded to me under the
 4   rules that we have not exhausted.  And I would use
 5   that time to cover topics that I have not been able to
 6   get to.
 7             I also have an objection to the fact
 8   that yesterday Mr. Wright's testimony that he reviewed
 9   emails to prepare for his testimony as corporate rep
10   that weren't provided to us before this deposition --
11   which has nothing to do with the discovery request.
12   It's just he said he reviewed them and prepared to
13   testify as a corporate rep and they -- they weren't
14   provided to us.
15             And so the other -- the reason for the
16   suspension would be I don't think Mr. Wright, try as
17   he may, answered a lot of my questions.  I think he
18   got into a rhythm certainly yesterday afternoon saying
19   the documents speak for themselves and he wasn't
20   answering my questions.  And so, you know, reserving
21   my right to go back and add to that based on the
22   transcript and two days of testimony.  That is --
23   that's our position of why this is a suspension of the
24   deposition.
25             MR. MULLER:  All right.  I'll make my
```

Page 232

**Page 233**

1 objection for the record. I'll also note there's

2 correspondence between us urging you to please

3 postpone and reschedule your deposition and then you

4 elected not to.

5          MR. CLEVELAND: Right. And, you know,

6 with trial -- with trial in December we weren't going

7 to postpone, we -- we're not able to postpone, and so

8 we didn't. And we can agree -- I understand your

9 correspondence. We couldn't do that given the

10 schedule we're on, so --

11          MR. MULLER: You could have -- for the

12 record, just for the record. With trial -- with trial

13 in December, with us having one dec action and you 34

14 counterclaims, we were also compelled to -- to

15 postpone. And you could have very well done the same.

16          MR. CLEVELAND: Okay. Well, we -- we

17 decided against it. I think everyone's position on

18 the record is clear, and --

19          MR. MULLER: I think William would like

20 to --

21          MR. CLEVELAND: Any other -- anything

22 else we need to take up?

23          MR. GERMANY: Yeah. I don't remember

24 us doing this, but this is federal so we need to agree

25 or state that we're going to read and sign on the

---

**Page 234**

1 record.

2          THE REPORTER: All right.

3          MR. MULLER: Yes, we want to read and

4 sign.

5          THE REPORTER: All right.

6          MR. CLEVELAND: Okay. Anything else?

7          THE VIDEOGRAPHER: Is that everyone?

8          MR. MULLER: That's it.

9          THE VIDEOGRAPHER: This concludes

10 today's deposition of Larry Wright. Going off the

11 record. The time is 6:01 p.m.

12          (Deposition adjourned at 6:01 p.m.)

---

**Page 235**

           CHANGES AND SIGNATURE

         TO THE ORAL DEPOSITION OF

2             LARRY WRIGHT

            Volume 2 of 2

3          September 30, 2020

4 Page    Line    Change        Reason

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

---

**Page 236**

1 I, LARRY WRIGHT, have read the foregoing deposition
and hereby affix my signature that same is true and

2 correct, except as noted above.
Signed under penalty of perjury this ___ day of

3 _____, 20__.

4

5

6         _____

7             LARRY WRIGHT

8 (If notary is requested use the following.)

9

10 STATE OF _____)
COUNTY OF _____)

11

12     Before me _____ on this day
personally appeared LARRY WRIGHT, known to me (or
proved to me under oath or through _____

13 (description of identity card or other document) to be
the person whose name is subscribed to the foregoing

14 instrument and acknowledged to me that he executed the
same for the purposes and consideration therein

15 expressed.
    (Seal) Given under my hand and seal of office

16 this _____ day of _____, _____.

17

18         _____

19            Notary Public in and for the
           State of _____

IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

IN RE:                                § CHAPTER 11
                                      §
KrisJenn Ranch, LLC,                  § Case No. 20-50805
                                      §
        Debtor                        §
_____             § _____
                                      §
KrisJenn Ranch, LLC,                  §
KrisJenn Ranch, LLC-Series            §
Uvalde Ranch, and KrisJenn            §
Ranch, LLC-Series Pipeline            §
ROW, as successors in                 §
interest to Black Duck                §
Properties, LLC,                      §
                                      §
        Plaintiffs                    §
                                      §
v.                                    § ADVERSARY NO. 20-05027
                                      §
DMA Properties, Inc. And              §
Longbranch Energy, LP,                §
                                      §
        Defendants                    §
------------------------              § -----------------------
                                      §
DMA Properties, Inc.,                 §
                                      §
Cross-Plaintiff/Third-Party           §
Plaintiff                             §
                                      §
v.                                    § ADVERSARY NO. 20-05027
                                      §
KrisJenn Ranch, LLC,                  §
KrisJenn Ranch, LLC-Series            §
Uvalde Ranch, and KrisJenn            §
Ranch, LLC-Series Pipeline            §
ROW, Black Duck Properties,           §
LLC, Larry Wright, and John           §
Terrill,                              §
                                      §
Cross-Defendants/Third-               §
Party Defendants                      §
------------------------------------------------------

                                                        Page 237

Veritext Legal Solutions
800-336-4000

---

REPORTER'S CERTIFICATION
DEPOSITION OF LARRY WRIGHT
(Reported Remotely)
Volume 2 of 2
September 30, 2020

-------------------------------------------------------

    I, Gloria Carlin, Certified Shorthand Reporter in
and for the State of Texas, hereby certify to the
following:
    That the witness, LARRY WRIGHT, was duly sworn by
the officer and that the transcript of the oral
deposition is a true record of the testimony given by
the witness;
    I further certify that pursuant to FRCP Rule
30(e)(1) that the signature of the deponent was
requested by the deponent or a party before the
completion of the deposition; that the deposition
transcript was submitted on October 12, 2020 to the
witness or to the attorney for witness for
examination, signature and return to Veritext Legal
Solutions by _____;
    That the amount of time used by each party at the
deposition is as follows:
    Charles John Muller IV - 00:00:00
    Timothy Cleveland - (05:06:09)
    William Germany - 00:00:00
    That pursuant to information given to the

                                                        Page 238

Veritext Legal Solutions
800-336-4000

---

deposition officer at the time said testimony was
taken, the following includes all parties of record:
FOR THE DEBTOR KRISJENN RANCH:
    Charles John Muller IV, Esq.
    MULLER SMEBERG PLLC
    111 W. Sunset
    San Antonio, Texas 78209
    210.664.5000
    john@muller-smeberg.com

FOR THE FRANK DANIEL MOORE AND DMA PROPERTIES, INC.:

    Timothy Cleveland, Esq.
    Austin H. Krist, Esq.
    CLEVELAND | TERRAZAS PLLC
    4611 Bee Cave Road, Suite 306B
    Austin, Texas  78746
    512.689.8698
    tcleveland@clevelandterrazas.com
    akrist@clevelandterrazas.com
    Christen Mason Hebert, Esq.
    JOHNS & COUNSEL PLLC
    14101 Highway 290 West, Suite 400A
    Austin, Texas  78737
    512.399.3150
    chebert@johnsandcounsel.com

FOR LARRY WRIGHT IN HIS INDIVIDUAL CAPACITY:

    William Germany, Esq.
    BSK LAW
    1250 NE Loop 410, Suite 725
    San Antonio, Texas  78209
    210.824.3278
    wgermany@bsklaw.com

    I further certify that I am neither counsel for,
related to, nor employed by any of the parties or
attorneys in the action in which this proceeding was
taken, and further that I am not financially or

                                                        Page 239

Veritext Legal Solutions
800-336-4000

---

otherwise interested in the outcome of the action.
    Certified to by me October 12, 2020.


                    Gloria Carlin
                    _____
                    Gloria Carlin, CSR No. 498
                    Expiration Date:  04/30/21
                    VERITEXT LEGAL SOLUTIONS
                    Veritext Registration No. 571
                    300 Throckmorton Street
                    Suite 1600
                    Fort Worth, Texas  76102
                    (817) 336-3042 (800) 336-4000
Job No. 4272514

                                                        Page 240

Veritext Legal Solutions
800-336-4000

```
 1        ***NOTIFICATION RE RETURN OF ORIGINAL***
 2     ------------------------------------------------
          DEPOSITION OF LARRY WRIGHT
 3                  Volume 2 of 2
                  September 30, 2020
 4     ------------------------------------------------
 5        The original deposition was/was not returned to
 6     the deposition officer on _ _ _ _ _ _ _ _ _ _;
 7        If returned, the attached Changes and Signature
 8     page contains any changes and the reasons therefor;
 9        If returned, the original deposition was sent to
10     Timothy Cleveland, Custodial Attorney;
11        That $_____ is the deposition officer's charges
12     to the DMA PROPERTIES, INC. AND FRANK DANIEL MOORE for
13     preparing the original deposition transcript and any
14     copies of exhibits.
15        That a copy of this notification was sent to all
16     parties shown herein this _____ day of _____,
17     2020.
18
19
                     Gloria Carlin
20             Gloria Carlin, CSR No. 498
               Expiration Date:  04/30/21
21             VERITEXT LEGAL SOLUTIONS
               Veritext Registration No. 571
22             300 Throckmorton Street
               Suite 1600
23             Fort Worth, Texas  76102
               (817) 336-3042 (800) 336-4000
24     Job No. 4272514
25
                                          Page 241
```

```
 1     john@muller-smeberg.com
 2                    October 12, 2020
 3     RE: Krisjenn Ranch, LLC v. DMA Properties, Inc.
 4     DEPOSITION OF: Larry Wright , Vol 2 (# 4272514)
 5        The above-referenced witness transcript is
       available for read and sign.
 6
 7        Within the applicable timeframe, the witness
 8     should read the testimony to verify its accuracy. If
       there are any changes, the witness should note those
 9
10     on the attached Errata Sheet.
11        The witness should sign and notarize the
12     attached Errata pages and return to Veritext at
13     errata-tx@veritext.com.
14        According to applicable rules or agreements, if
15     the witness fails to do so within the time allotted,
16     a certified copy of the transcript may be used as if
17     signed.
18                Yours,
19                Veritext Legal Solutions
20
21
22
23
24
25
                                          Page 242
```

**[& - 2016]**

&
& 3:4 114:8
  117:24 118:3,8,12
  118:17,24 239:13
0
000195 4:18
000197 4:18
0195 193:22
04/30/21 240:5
05:06:09 238:23
1
1 5:15 99:7 133:15
  158:15 195:2
  217:11 218:2,23
  238:14
1-15 226:21
1.1. 99:7
1.175 96:20,25
  97:17 98:3 99:14
  128:18 129:21
  189:19
1.2 229:2,10
1/2 65:21,22
10 4:10,13 29:8
  31:3 33:1,11
  34:10,12,22,23
  35:10,14 36:2
  37:9 224:9,13
  227:2
10,000 199:18
100 36:20 157:14
10:17 49:8,10
10:25 167:17
  171:13,17 174:12
10:55 49:10,12
10:58 167:15
  171:12,17 174:11
11 1:3 4:14 227:2
  237:3

11-14-2018 5:2
111 2:12,20 239:5
115 5:3
11:30 75:25 76:2
11:37 79:12,13
12 76:5 182:12
  227:2 238:17
  240:2 242:1
12-20 224:4,12
1250 3:9 239:18
12549 240:4
  241:19
127 5:1
128 4:22
12:26 167:19
13 194:6 195:11
  202:21 227:2
136 4:12
13th 196:10
14 19:7 20:3,4
  21:16 23:2,19
  41:25 42:3,9
  58:11 60:13 77:6
  80:17 87:5,19
  88:13 104:18
  107:11 108:3
  109:9 112:22
  127:14 132:25
  133:5 185:12
  224:9,13 227:3
14101 3:4 239:14
143 4:16
147 4:17
14th 11:12 20:12
  21:4,11 22:3 25:6

43:2,6,11 53:25
  57:6,23 58:12,18
  58:21,22,23 60:8
  60:21 61:12 76:18
  78:17 80:19,20
  88:7,9,10,21 110:4
  110:20 111:2,8
  112:9 116:10
  129:12,14 185:4
15 182:22
15th 104:21
16 4:11 20:8 52:3
  52:13 78:5,13
  217:22
1600 240:7
17 4:12 20:8 25:20
  25:24 26:8,17,22
  52:14 63:14 67:14
  69:25 71:5 75:3
  82:16 106:21
  107:14 108:4
  136:22 137:5,11
  137:14,16 138:16
  139:17 140:3
  156:10,24 157:7
  157:24 158:6
  162:15 166:13,23
  169:22 170:22
  171:3 172:25
  183:10,12 228:14
  228:15
18 5:4 16:10 20:2
  20:8 56:14,14,19
  59:4,18,24 114:25
  166:25 169:24
  210:1,2 213:17
182,000 225:17,18
186 4:24
18th 56:22 57:3,7
  78:8,15,16 58:18

58:21 59:4
19 6:10 54:6
  213:17
193 4:18
1960 177:10 178:8
  178:17
19a 4:13 9:25 10:2
  10:9,10,23
19b 56:22,24
19th 79:13,16
1:34 80:3
1:58 108:24,25
1b 116:18
2
2 2:2,2 4:2 5:21
  10:19,20 65:21,22
  79:15 158:25
  159:5 190:17
  191:10 195:2,14
  195:17 235:2
  238:3,3 241:3,3
  242:4
2.4 190:20 191:20
20 4:14 10:1 11:7
  11:8 23:7 25:20
  27:8,16 28:7
  38:20 62:15 72:14
  72:17 73:5 100:12
  100:18 135:20
  149:2,5,10 162:16
  163:5 164:15
  165:16 175:4
  192:4 236:4
20,000 225:11
20-05027 1:11,18
  237:11,18
20-50805 1:4
  237:4
2011 182:11
2016 5:4 20:2
  114:25 115:8,8

                              Page 1

**[2016 - 512.689.8698]**

116:2 117:8
2017 11:12,23
  17:13 19:7 20:4
  21:11,17 23:2,19
  28:22 34:12 41:25
  58:23 61:11,23
  60:8,13 69:13
  70:12 77:16 78:17
  87:5,19 88:13
  91:24 92:25 103:5
  107:12 108:3
  109:9 112:23
  129:13,14 133:5
  185:4,12 187:16
  194:6 195:11
  213:16
2018 20:3 54:6
  56:19 57:3,16
  59:4,24 60:7,12,14
  63:8,22 64:3
  67:13,15,16 68:5
  73:10,12 76:16
  77:17,22 78:15,16
  80:17,19,20,24
  81:12 82:9 121:9
  127:14 132:17,25
  133:12 134:4
  137:7,16,21
  138:14 147:19
  148:15 149:15
  151:1 155:12,23
  156:6,7 167:15,16
  186:19 211:19
2019 182:25 183:3
  183:5 213:12,21
2020 2:3,9 6:3
  3-20-21 224:4
  240:2 241:3,17
  242:2
205,000 226:1

21 4:16 143:16,22
  147:19 162:16
  163:6,7 164:15
  175:5 178:15
210.664.5000 2:21
  239:6
210.824.3278 3:10
  239:19
213 5:5
214 4:17 147:2,4,13
  151:21 152:6,14
  153:7,22 154:12
  155:2,12,23 156:4
222 5:6
224 6:10
235 4:6
238 4:7
24 110:7,13,19
250,000 212:18
26 53:11,16
26,588.50 224:24
27 186:19 209:5,15
28 4:18 128:3,4
  193:13,19
28,000 225:15
29 4:10,20 86:25
  87:3,8,14 98:14
  109:8 128:6,7
290 3:4 239:14
2:13 108:25 109:2
2:55 140:11,12
3
3 42:17 147:8,15
  174:1
4.1 13:16 42:11,22
  80:9 81:14,16
  82:15 187:15
  138:17 191:12
40 148:25 159:24
400,000 205:21
  206:12

235:3 238:3,14
  241:3
300 3:15 240:7
  241:22
306b 2:25 239:10
30th 6:3
31 4:22 128:1,2,15
  128:23 130:24
  138:1,2 209:5
33 4:24 186:10,16
336-3042 240:8
  241:23
336-4000 240:8
  241:23
34 5:11 127:13
  132:15,16,21
  137:13,20 138:15
  233:13
35 5:3 114:23
  156:22 14
36 5:6 222:14
39 2:19 6:2
3:15 140:12
3:16 140:15
3rd 137:7,16,20
  138:14 148:14
  156:6,22 167:14
  167:16 168:3
  170:17
4
4 129:17 148:15
  174:1
41 3:6 99:24 209:1
  226:16

400a 3:4 239:14
410 3:9 96:11
  112:11 116:12
  186:22 239:18
425,000 190:18,25
4272514 2:16
  240:9 241:24
  242:4
45 226:25
450,000 75:4 145:4
  145:10
4611 2:25 239:10
498 2:10 6:12
  240:5 241:20
4:00 174:2
4:03 174:2,4
4:17 184:4
4:18 184:5
4:36 184:5,7
4th 156:7,23
  167:18
5
5 92:12
50 11:25 40:10
  68:6,9 85:24,24
  133:20 149:2,5,6
  149:11,12 150:13
  150:24 151:9,13
  151:17 153:14
  157:11,11 159:10
  159:13,21 160:7,8
  160:12,13,21,22
  162:2 226:12
50/50 161:21
500 229:14,15
500,000 130:16,24
512,399,3150 3:5
  239:11
512.689.8698 3:1
  239:11

                              Page 2

## [52 - ago]

52 4:11
5500 225:13
571 240:6 241:21
5:00 100:18
207:19
5:15 210:16,17
5:28 210:17,19

**6**

6 4:3 181:12 192:2
226:22 230:22
60 159:24 160:4,11
226:25
60/40 160:2
600,000 187:21
189:2,8
63,000 226:16
63,588 224:7
226:17
66 93:19 219:4,7
6:30 204:18

**7**

7 4:5 151:1 213:25
214:4 217:11
218:2,23 226:22
7-13-2017 4:19
725 3:9 239:18
76102 3:16 240:8
241:23
78209 2:20 3:9
239:5,19
78737 3:5 239:14
78746 3:17 239:14

**8**

8 226:22
8-14-2017 4:15,23
800 240:8 241:23
800,000 187:24
188:19 189:8
800.336.4000 3:17

817 240:8 241:23
87 4:20
8:44 54:7

**9**

9 226:22
9-20 226:21
9-27-2018 4:24
92 93:7
9:14 2:9 6:3
9:24 137:16,21,24
137:25 170:17
9:50 33:6,7
9:59 33:7,9

**a**

a.m. 2:9 6:3 33:6,7
33:7,9 49:8,10,10
49:12 54:7 79:12
79:13 137:22
abide 229:24
ability 141:12
able 15:4 24:12,24
29:17 32:20 51:21
59:12 66:6 73:12
89:1,7 107:17
124:4 127:17
183:9 188:3
198:15 200:21
210:7,12 211:22
221:17 223:15
227:9,14 231:6
232:5 233:7
absolutely 214:21
accept 139:18
140:4 147:24
156:11 163:22
164:3 167:10
169:4,17,25
170:12,22 172:11
172:18 174:15

acceptable 28:10
28:15 34:7 35:1
35:18,22
acceptance 171:2
174:20
accepted 148:15
150:18 156:6,23
172:21,25
accepting 167:21
168:9 169:6,20
170:14 174:18
accomplish 81:24
account 42:15,19
43:11 99:4 130:14
160:17 161:6,18
161:25
accounting 15:21
accuracy 242:8
accurate 99:1,19
100:9 101:5,9,14
102:4 110:1 112:2
133:22 189:10
218:23
accurately 124:22
accuser 44:20
accusers 51:21
acknowledged
56:13 236:14
acknowledgement
57:1,17
acquire 181:13
acquisition 64:23
65:19
acreage 182:14
act 193:5
acting 104:7
122:15 123:1
action 233:13
239:24 240:1
active 177:9,10,11

actual 42:6 56:11
61:22,22 62:8
71:20 106:11
129:1
adam 3:13 175:17
175:21,25 182:1,5
206:5,8
adamant 68:14
add 22:20 59:8
72:22 120:5
201:19 232:21
added 216:7
adding 126:9
additional 61:19
62:5
address 47:9,18
48:14 159:10
186:22
adequate 208:16
adjourned 242:12
administering
6:13
admit 224:21
admitting 223:16
adversary 1:11,18
237:11,18
adverse 178:4
advice 55:13
179:15 181:5
advise 37:16,23
38:9 75:22 76:15
77:1,10 131:18,24
advised 8:5 77:3
affirm 7:10
affix 236:1
afforded 232:3
afternoon 77:9
232:18
ago 5:17 25:14
182:16 221:7

## [ago - approve]

227:18
agree 6:10 8:23:14
26:15 95:8,15
103:16,18 105:6
146:18 158:19
159:1 164:2
168:11 205:25
208:3 220:9
223:24 224:20
231:18,21 233:8
233:24
agreed 100:13
143:9 148:20
157:6 175:3,4
205:20,25 222:21
229:23
agreeing 15:21
148:14 158:17
168:13,13,14,18
168:22 170:21
172:13 174:22,23
175:6
agreement 4:17
5:5 8:22 37:18
38:1,12 67:6,9,11
82:20,23 97:2,9,16
102:12 110:5,10
117:22 118:3,5,20
119:1 125:1,5,6,7
125:10,23 126:21
131:2 134:13,14
134:19,20 135:1
135:24 138:24
139:13,14 142:6,9
142:21,22 143:10
143:11 147:8,12
147:13 148:14
149:15,17,20,23
150:3 151:5,20
152:13,19 153:1,1

153:3,7,8,9,10,11
153:13,22 154:3,7
154:10,12,13,17
155:2,5,12,23
156:3,5,9,16,17,20
156:22 157:24,25
158:5,7,21 159:16
160:5 161:9
164:20 168:17,20
169:7 170:25
175:8,9 181:6,13
182:20,24 182:17
202:3 205:17
213:5,9,21 214:1
215:21 217:7,14
217:14,20,25
218:17 220:14
227:8 229:22,24
229:25
agreements 8:23
8:25 127:4 142:23
153:10,15 155:18
207:12 242:14
ahead 32:24,25
43:23 56:1 70:17
94:9 114:4 146:18
147:6
ahold 206:8,9
akrist 3:2 239:12
al 71:2
alleged 61:22
122:22 40:17
alleged 61:22
121:2,22 40:17
allotted 242:15
allow 55:9 70:14
100:10 210:9
allowed 151:8
207:7
allows 152:6
150:3 151:5,20
152:13,19 153:1,1

amended 200:20
amending 202:18
amount 126:1
145:25 153:4
154:23 188:5,12
190:25 192:1
223:23 224:6,20
238:21
annum 25:21
answer 5:13 14:2
21:8,14 25:7
26:25 38:7,15
40:25 42:16 43:24
63:16 66:23 70:14
72:20,22 73:3,24
75:20 78:9 85:21
90:2 103:8 107:7
107:19 108:10,12
108:13,16,19
120:5,24 121:5
124:7 140:24
155:22,22 168:7
171:9 177:1,3
180:5,21,22,23,25
199:15 202:25
203:11,16,17,23,24
220:5,6,20 222:12
223:15 231:14
answered 14:5
22:22,22 40:17
203:20 232:17
answering 82:4
104:13 232:20
answers 31:16
93:7
antonio 1:2 2:13
2:20 3:9 6:20 35:6
237:2 239:5,19
amazing 59:16

anybody 15:10
37:23 38:5 69:15
69:17 70:3 192:9
197:23 224:14
anymore 179:1
205:15
anyone 205:10
206:14
anyway 145:17
apparently 205:15
206:14
appear 91:21 92:3
92:16
appearances 4:2
6:15
appeared 47:3
56:18 57:2 236:12
appearing 93:1
applicable 242:7
242:14
appreciate 14:20
21:14 25:18 55:16
63:21,21 87:13
89:11,12 93:12
140:22 141:2
143:14 144:8,8
145:19 167:7
185:17 190:7
199:13,15 208:15
222:22 227:5,18
227:25 228:1
appropriate 15:1
15:23 23:7 25:24
82:8 93:21 94:16
95:9
approval 13:5,10
14:6 28:2 36:25
104:24 161:23
approve 13:7 14:4
14:12,16 15:10
18:4 23:11 16:4
36:19 50:19 112:1
139:18 140:5

## [approve - authorize]

156:11 159:4
163:23 164:3
167:10 169:5,17
170:12,22 172:11
172:18 174:15
approved 27:12
61:16 98:3 111:6
139:21 172:21
173:1 179:12,19
approves 22:17
169:25
approving 16:7
167:21 168:10
169:20 170:14,15
170:18 174:19
approximate
190:20
approximately
187:21 225:15
approximation
189:7
area 194:17
argumentative
74:23 101:24
articles 122:19
asile 13:19,22,25
15:6 26:2,3,13
41:6,17,17 42:12
42:15,18,22 50:10
62:23 65:18 66:8
98:15 99:4,6,12,15
99:19 101:16
102:5,19 104:21
105:19,22 113:13
120:8 183:5,7
189:3 190:13
191:1,1,11 193:3,7
217:18
asked 34:9 38:3
39:10 71:17 83:2
88:11 128:20

136:12 143:1
146:15 200:17
203:19 219:5
220:2,13 223:12
asking 5:18 13:12
14:3 23:6 25:6
38:4 41:14 42:9
44:11,23 45:4,14
47:2,4 54:18
62:12 66:4,10,15
70:9 74:1 76:8
84:7 86:15 90:7
95:15 102:1,3
105:18 113:17
146:4 163:25
165:20 168:8
180:1 181:2,2
196:25 203:2
229:13
aspect 142:15
aspects 158:16
asset 54:20 128:15
80:12 81:3,3,10,10
81:15,17,18,19,20
81:23 82:10,11
202:13
assets 24:8 83:22
160:15,15
assigned 72:16
73:2
assignment 69:19
69:20,22,23
164:20
assignor 217:14
assigns 150:15
assistant 10:12
30:6 56:2,4
associate 10:6
assume 84:8 226:5

assumed 230:19
assumption
164:21
ate 79:19 108:6
attach 71:13,23
157:5
attached 35:16
133:24,25 135:10
163:16 241:3
242:10,12
attaches 164:6
attachment 50:22
166:3
attend 20:16,20
21:3,10 91:7,11
112:13
attendance 90:19
91:2
attended 20:18
21:11
attorney 18:19
20:6 28:9,14 34:6
35:1,5,13 72:18
83:25 102:25,25
114:12 122:21
135:12 145:16
146:16 152:9,10
179:16,16 180:25
198:21 202:17
204:2 205:24
238:18 241:10
attorney's 55:13
181:5
attorneys 73:4
179:10,20 181:9
181:11 184:20
authorization
16:15 18:2,12,13
19:13,14 20:10
22:2 23:14 35:2
61:10,19 62:5
131:10,12
authorizations
19:9 61:21
authorize 16:21

41:25 42:3,9 43:2
43:6,11 53:25
58:11,12,23 60:8
60:13 61:12 63:7
69:13 73:12 76:18
77:16 78:17 80:17
80:19,20 81:12
87:5,19 88:7,9,10
88:13 103:5
104:18,22 107:11
108:3 109:9,9
110:4,20 111:2
112:9,22 116:10
129:12,14 133:5
185:4,12 187:16
210:4 211:8
auslin 2:14 3:1,5
6:24 7:1,4 239:9
239:10,14
authority 12:14,23
12:25 13:2 15:13
15:16,18,20,22
16:15,23,25 17:4,6
17:7,10,19 18:4
19:1,3 22:19,25
34:5 35:20 36:4,5
36:7,8,10,18,20
37:10 39:23 40:7
40:10,20 41:4,15
41:21 42:3,10,13
42:15 43:2 49:20
49:24 50:6,11
53:11,15 54:21,23
54:25 61:1 64:14
64:22 65:2,20

## [authorized - black]

authorized 22:8
27:8,16,23 28:9
37:17,25 38:11
41:22 61:5,8
62:17 130:25
131:19,25
authorizes 92:3
authorizing 131:7
available 28:11
242:6
averaged 226:25
avoid 145:20
aware 11:22:16
104:21,23 110:7
146:21 156:21
177:23 196:4
awesome 111:23

**b**

back 9:17 12:17
14:1 21:25,25
30:19 33:8 38:19
41:16 49:11,14
53:18 54:11 57:24
61:14 63:14 64:17
69:12 79:15 81:17
103:24 104:8
108:10 109:1
117:16 127:1
129:9,10 131:22
132:8 140:14,16
140:21 145:17
149:15 156:4
159:21 162:14
164:8 165:24
177:7 182:15
184:6 192:3
196:10 197:19
205:22,23 210:18
211:2,4 214:18,22
214:25 215:8

216:24 221:16
230:19 232:21
backwards 224:2
224:3
bad 198:24 200:15
200:18
balance 187:17
ballpark 188:2
bank 42:15,18
99:4 102:11
105:22 106:1
129:18,22 130:14
224:10
banking 106:2
bankruptcy 1:1
2:14 6:9 44:19,25
120:12 211:8
237:1
based 16:23
144:20 181:23
201:15 232:21
224:7 225:15
basically 15:2
38:18 228:25
basis 94:4 231:25
232:2
bates 193:21
bathroom 108:9
beach 147:20
beat 230:23
becoming 45:22
bee 2:25 239:10
beginning 53:19
79:15 140:14
198:18
begins 6:1
behalf 5:20 6:23
12:7 13:5,8 14:4
14:13 15:11 18:22
25:9 31:11 53:10
56:15 73:10 97:8
77:2,10 129:6

147:16 180:3
187:1 196:8
belief 181:23
believe 15:7 20:12
24:1,12,22 25:8
39:22 46:1 54:16
58:10 67:11 73:11
94:11 99:11
109:20 118:1
122:24 133:25
135:7 137:23
139:20 144:1
176:17 181:1,17
181:22 185:19
189:6,7,11,11
191:12,13,17
194:25 199:2
211:6 214:7 217:4
224:7 225:15
believed 16:1
beneath 172:13
benefit 42:13 77:4
102:20 113:14
119:15,16 120:18
121:20 122:22
123:25 216:18
217:10 218:13
best 153:8 16:3,22
26:8,14,18,23 27:3
26:18,23 27:2
30:5,11 73:18,20
73:23,24 74:3,9,24
75:1,8,13,14,19
76:20 109:21
112:13 120:24,25
141:1,11 145:24
148:21 211:2
212:4
bet 170:24 174:21
better 93:5 104:1
167:3 173:18,20
228:22

big 201:8 212:8
bigfoot 4:16
bargaining 143:1
144:10 145:4,25
150:16,19 151:10
151:23 152:8
157:13 168:21
222:8 224:5
bigger 32:14 188:7
billing 51:4,6,7
binder 187:13
binding 72:16
73:1 164:22
bit 58:21 123:6
199:15 201:18
202:11 206:25
207:7,15 208:8,11
223:6
black 1:9,21 4:19
42:5 51:3 111:12
11:17 12:1,7,22
13:5,8 14:5,13,25
26:18,23 28:5,17
28:18,23 29:21
24:5,7,8,12,23,23
25:8,9,24,25
28:18,23 29:23
37:10,17,18,24,25
38:11 39:23 40:7
40:10,20 41:4,15
41:21 42:3,10,13
42:15 43:2 49:20
49:24 50:6,11
53:11,15 54:21,23
54:25 61:1 64:14
60:13 61:6,12,23
62:9 22 65:20,24
64:22 65:2,20

**[black - care]**

| | | | |
|---|---|---|---|
| 66:20 67:18,20,24 | 147:16 150:4,14 | **borrower** 12:22 | 170:2 174:25 |
| 68:6,9 69:6,9 | 150:16,19 153:4 | 53:6 | **burning** 123:24 |
| 72:17 73:2,10,11 | 153:20,24,25 | **bottom** 12:3 55:20 | 210:6 |
| 73:13,18,18,23 | 154:1,13,14,16 | 133:15 137:5,11 | **business** 86:8 |
| 74:2,3,4,9,11,13 | 155:4,6,13,15,17 | 137:19 171:11 | 144:4,10 159:12 |
| 74:20 75:8,13,19 | 155:24 157:13,25 | 194:25 195:6 | 162:3,8 163:10 |
| 76:20 77:2,11 | 158:7,16,22 159:5 | 224:2,3 | 182:5,8 202:2,11 |
| 80:8,10,16,20,24 | 159:17,21 160:9 | **bought** 59:17 | **button** 45:24 |
| 81:9,14,16,22 82:4 | 160:12,13,15,20 | 182:9 205:13 | **buy** 86:22 102:9 |
| 82:9,13,15,17,24 | 161:12,12,22 | **bounced** 226:24 | 153:5 181:16 |
| 83:10,19,22 84:6 | 162:6,8 164:23 | **box** 44:5 | 182:14 217:21 |
| 84:10,11,17,22,25 | 168:21 184:11,24 | **braunfels** 18:17 | **buyer** 68:25 77:20 |
| 85:10,15,18,23 | 185:1 186:19,21 | **break** 33:11 34:3 | 102:13 104:11,12 |
| 86:3,7,8,12,15,17 | 187:16,19,25 | 46:15,15,18 47:1,8 | 130:18 211:14 |
| 87:5,18 89:23 | 188:3,10 189:5,9 | 47:17,22,25 48:13 | 212:21 228:11 |
| 90:9 92:11 96:5 | 189:17 190:21 | 48:17 49:1,4,6 | **buyers** 21:5 |
| 97:18 98:3,7 99:3 | 191:19,20 192:6 | 51:23 79:6,9,18 | 68:19 70:1,7,10,11 |
| 100:15 101:18,20 | 192:12,16,16,22 | 89:12 103:7 | 70:19,20,23 |
| 102:6,20,21 | 194:4 196:8 | 108:13,14,17,21 | 211:10 |
| 103:24 104:10,10 | 197:10,22 202:4 | 123:4,10,14,24 | **buying** 153:5 |
| 104:12 106:20 | 206:17,18 211:18 | 127:15 138:7,9 | 176:5 |
| 107:12 108:3 | 225:6,12,12 229:3 | 139:6 140:1,8 | |
| 110:5,9 111:10 | 229:6,8,9,20,25 | 141:11 183:14,19 | **c** |
| 112:19 113:4,7,15 | 237:9,21 | 183:25 210:21 | **c** 2:17 |
| 113:21 114:9 | **blackduck** 134:12 | **briefly** 144:3 | **call** 6:25 22:5,6,7 |
| 115:8 116:2,8 | 134:18 135:24 | **bring** 30:6 32:7 | 22:16 45:1 89:9 |
| 118:2,18,25 119:3 | **blank** 195:4 | 65:5,8 96:12 | 146:24 162:4 |
| 119:12,20 120:8 | **block** 195:3 | **broken** 171:14 | 198:16 221:4,8 |
| 120:16,17,22 | **blow** 132:20 147:3 | 181:13 | **called** 64:21 94:7 |
| 121:15,16,21 | 201:9 | **broker** 193:8,10 | 94:10 126:17 |
| 122:10,14,16,17 | **board** 49:23 93:2 | **brought** 130:17 | 133:15 153:19 |
| 122:21 125:7,9,23 | **book** 102:16 | 223:21 | 206:3 214:4 |
| 126:21 128:17,21 | **books** 96:5,10,16 | **bsklaw.com** 3:10 | **capacity** 3:7 8:2 |
| 129:6,16 130:1 | 114:19 | 239:20 | 112:18,23 113:21 |
| 131:1,7,19,25 | **borders** 6:24 | **bullet** 191:5 107:10 | 119:8 239:16 |
| 132:17 134:21 | 65:23 66:6 67:3 | 158:9,14 159:9,9 | **capital** 160:16 |
| 136:4,20 138:24 | 72:2 164:22 192:1 | 159:20 162:15 | 161:6,18,25 229:3 |
| 141:6,22 143:23 | 192:17 201:23 | 164:8,18 165:2,15 | 229:7,11,12 |
| 144:4 145:4,10,13 | 205:20 | 165:21 166:1 | **card** 236:13 |
| 145:25 147:8,10 | **borrowed** 42:12 | 167:11 168:16,16 | **care** 77:5 193:14 |
| | 75:2 77:6 | | 212:23 |

**[carlin - cleveland]**

| | | | |
|---|---|---|---|
| **carlin** 2:10 6:12 | **cetera** 7:3 50:19 | **christen** 3:3 | 30:4,9,13,15,18 |
| 238:6 240:5 | 116:5 | 239:13 | 31:1,4,14,19,22,25 |
| 241:20 | **challenge** 57:21 | **christie** 7:2 | 32:6,9,24 33:4,10 |
| **carolina** 7:6 71:5,7 | **challenging** 149:20 | **chronological** 213:14 | 33:15,25 34:1 |
| 148:1 171:15 | **chance** 50:7 | **circles** 219:6 | 35:8 37:21 38:4 |
| 200:1,2 205:12,13 | 152:11 167:3 | **circulated** 65:2 | 38:19 39:12,20 |
| 211:24 | **change** 42:5,9 78:3 | **civil** 2:14 | 40:2,6,12,15,21 |
| **carried** 157:11 | 101:25 235:4 | **claim** 216:15 | 41:13,24 43:22 |
| 162:16 163:5 | **changed** 16:9 | 220:17 | 44:8 45:10,16 |
| 164:9,10,12,15 | 71:25 161:18 | **claimed** 71:9 | 46:1,14,18,22,23 |
| 165:16 175:4 | **change** 184:16 198:20 | **claiming** 197:1,2 | 47:7,15,21,25 48:5 |
| **carrier** 12:6 | 205:19 | 197:25 | 48:13,18,25 49:6 |
| **carroll** 190:19 | **changes** 4:6 | **claims** 217:12 | 49:13 52:9,13,18 |
| **carrying** 68:8 | 133:16 235:1 | 218:8,9,13,16,20 | 60:11,19 61:9,17 |
| **case** 1:4 5:19,21 | 5:23 41:3 60:25 | 220:19,23 225:2,3 | 62:4 64:2 65:7,10 |
| 52:23 134:18 | 120:12 126:22 | 225:5,13,25 | 65:14,16 66:3,24 |
| 129:11 161:23 | 179:12,19 180:2 | **clarification** | 67:8 68:4,15 |
| 179:22 180:6 | 180:16,18 197:25 | 176:17 | 70:16,17 71:21 |
| 182:16,18 197:25 | 198:4,9 199:3 | **clarify** 58:8 174:6 | 72:5,12 74:6,8,19 |
| 198:4,9 199:3 | 216:21 237:4 | 221:6 | 75:1,10,12,16,18 |
| 216:21 237:4 | **charge** 202:5 | **claw** 145:17 | 75:25 76:2,7,10,14 |
| **cash** 83:19 99:4 | **charged** 193:8 | **clean** 15:22 | 77:7,9 78:2,10,25 |
| **catch** 125:20,21 | **charges** 241:11 | **clean** 43:13 | 79:3,8,17 80:7 |
| **cause** 2:9 31:17 | **charles** 2:19 | 206:16 | 82:6 84:15,20 |
| 84:9,10,17 | 238:23 239:4 | 173:20 | 85:13,22 86:6,12 |
| **caused** 84:21 | **chase** 43:13 | **cleaning** 96:6 | 86:24 87:2 90:15 |
| 86:12,15 161:22 | 206:16 | **clear** 28:20 48:6,7 | 92:12 93:6 96:1,19 |
| **causing** 31:16 | **chat** 124:7,8,11,12 | 136:11 157:15 | 94:3,21,24 95:15 |
| 81:25 | 124:12 | 217:12,16,18 | 96:1 100:6 101:1 |
| **cave** 2:25 239:10 | **chebert** 3:6 239:15 | 218:1,8 223:18 | 101:3,18 102:3,15 |
| **cease** 86:13,16,17 | 227:2 | **clearer** 197:21 | 102:3,18 105:10 |
| **centered** 119:24 | **checked** 224:19 | **clearly** 172:18 | 106:18 108:20 |
| **central** 174:11 | **checks** 189:16,23 | **clerk** 61:14 | 109:3 110:24 |
| **certainly** 232:18 | **cleveland** 2:23,24 | **cleveland** 2:3,24 | 114:22,24 115:3,6 |
| **certificate** 4:7 | 4:5 6:22,22,25 | 4:5 6:22,22,25 | 115:17,23 120:1,3 |
| **certification** 238:1 | 7:19 9:2,20,24 | 7:19 9:2,20,24 | 123:9,13,18,22 |
| 242:16 | 10:7,11,17,20,25 | 10:7,11,17,20,25 | 124:5,11,14,25 |
| **certified** 5:13 | 11:1 14:17 17:3 | 11:1 14:17 17:3 | 126:7,12 127:12 |
| 238:6 240:2 | 19:6,24 22:1,14 | 19:6,24 22:1,14 | 127:25 128:8,13 |
| 242:16 | 25:5,15 27:2,7,14 | 25:5,15 27:2,7,14 | 129:3,13,18,22 |
| **certify** 238:7,13 | 27:20,24 28:4 | 27:20,24 28:4 | 127:25 128:8,13 |
| 239:22 | 29:6,8,11,19,25 | 29:6,8,11,19,25 | 132:16,20 134:8 |

**[cleveland - conditions]**

| | | | |
|---|---|---|---|
| 134:10 138:5,8,12 | **clicking** 75:4 | 184:15 194:11 | 118:15,20 119:1,6 |
| 139:5,7,25 140:2,7 | **client** 24:18 29:17 | 196:21 | 120:10,11,12,14 |
| 140:16,19 141:13 | 173:17 | **cohle's** 109:19 | 121:4 125:6,7,10 |
| 141:14 143:15,21 | **clients** 7:5 | 117:12 185:7 | 125:23,25 126:21 |
| 145:19,23 146:23 | **clock** 76:3,9 | **coincidence** 67:17 | 131:20 132:1 |
| 147:1,3 148:22 | **close** 15:3,24 17:1 | **cole** 13:1 21:12 | 133:16 136:20 |
| 150:7 151:16 | 18:5 19:4,4 23:13 | **collateral** 55:4,6 | 154:13,16,22,24 |
| 152:18 153:21 | 27:13 28:3,11,18 | 216:24,25 | 156:2 157:25 |
| 154:9 155:7,11,21 | 28:18 35:6,9 36:8 | **colleague** 6:24 | 158:5,7 159:25 |
| 157:23 158:25 | 37:7 41:22 62:22 | **collected** 175:16 | 161:17 162:2 |
| 159:8 161:3,7,20 | 69:9 92:10 98:22 | **combining** 188:9 | 162:22 166:16 |
| 162:3 163:2,4 | 99:18 101:19 | **come** 30:21 45:17 | 229:14,25 |
| 164:13 165:6 | 102:22 103:21 | 59:16 65:17 66:18 | **company's** 117:23 |
| 166:15,19,23 | 192:2 204:25 | 96:3 139:13 160:3 | **compelled** 233:14 |
| 167:7 171:6,22 | 205:1,3 211:6 | 192:12 203:1 | **compensation** |
| 172:1,4 173:6,11 | 219:9 225:11 | 205:23 | 182:18 |
| 173:22 174:7 | **closed** 15:3 16:1,9 | **comfortable** | **complaint** 46:2,3 |
| 177:23 178:19 | 16:12 24:19,19 | 136:19 | **complaints** 100:2 |
| 179:8,11 180:15 | 25:4 60:4 69:1,2,3 | **coming** 21:25 46:2 | **complete** 17:5 |
| 181:1,19 183:18 | 71:20 94:10 106:7 | 51:10 75:5 183:6 | 159:4 |
| 183:23 184:8 | 183:13,24 192:14 | 190:2 | **completed** 17:1 |
| 185:21 186:5,7,11 | 211:19 212:17,19 | **commission** | 198:23 |
| 186:15 192:5,21 | **closer** 209:14 | 176:13 177:8 | **completely** 134:12 |
| 193:15,19 195:10 | 225:25 | 178:3,7 182:18 | 134:18 135:23 |
| 195:18 198:6,8 | **closing** 41:5 199:6 | 180:6 | **completion** 238:16 |
| 203:15,22 204:6 | 202:1 205:21 | **commit** 203:2 | **complexity** 210:5 |
| 206:25 207:3 | 211:20 213:11 | **commitment** | **complaint** 124:9 |
| 208:3 209:11,9,19 | 215:24 | 121:18 | 227:18 |
| 209:22 210:3,10 | **cloud** 96:9 | **comprise** 215:15 | **complete** 50:25 |
| 210:20 213:4,7 | **cohle** 12:13,15 | **comprising** 215:18 | 185:8 |
| 218:15,22 219:12 | 17:6,11,19 18:2,18 | **computer** 50:25 | **computers** 184:16 |
| 220:1,24 221:2,17 | 18:23 19:15 20:19 | 185:8 | 184:19 189:20 |
| 221:22 225:20 | 21:18 22:3,4,9,13 | **concentrate** 191:8 | 191:18 211:20 |
| 227:25 229:16 | 22:17,19,24,25 | **concerned** 54:25 | 50:6 56:15,16 |
| 230:16 231:4,16 | 23:1,19 36:3 85:4 | **concerning** 182:5 | 68:18 69:6 71:3 |
| 232:2 233:5,16,21 | 88:1 89:9 91:11 | **concerns** 208:15 | 194:25 199:21 |
| 234:8 239:10 | 91:19,20 92:3,18 | **concluded** 142:2 | 200:16 209:19 |
| 239:8,9 241:10 | 95:24 102:25 | **concluded** 52:23 | 209:23 211:25 |
| **clevelandterraza...** | 109:25 110:16 | **concludes** 234:9 | |
| 3:2,3 239:11,12 | 112:1 116:17 | 110:5,10 113:13 | **conditions** 139:19 |
| | 131:4 141:22 | 117:22,24 118:3,9 | 140:5 150:17 |

**[conditions - counsel]**

| | | | |
|---|---|---|---|
| 156:11 157:12 | **consider** 130:8 | **contribute** 229:20 | 73:7 87:20 99:21 |
| 163:23 164:4,20 | **consideration** | **contributing** | 106:25 110:2,12 |
| 168:10 169:5,6,17 | 236:14 | 229:22 | 114:9 144:14 |
| 169:21 170:13,15 | **considered** 114:11 | **contribution** | 147:10,11 155:1 |
| 170:23 172:12,19 | **constituted** 62:7 | 65:24 229:3,6,8,11 | 159:22 160:10 |
| 172:22 174:16,19 | **consulting** 133:21 | 229:13 | 161:17 175:2 |
| 175:11 | 194:18 | **contributions** | 177:4,4,4 184:10 |
| **conducted** 6:8 | **contact** 45:17 | 66:19 | 184:12 185:20 |
| **conducting** 75:6 | 70:21 195:25 | **control** 105:23 | 186:2 190:22 |
| **confer** 47:14 | **contacted** 70:3 | 159:22 160:20 | 199:8 213:20,25 |
| 196:11 210:14 | **contacts** 24:15 | 161:12 | 217:2 236:2 |
| 219:24 | 64:15 | **controlling** 95:20 | **corrected** 134:22 |
| **conference** 48:8 | **contains** 20:9 | 196:20 | 179:15 199:14 |
| **confidential** 135:8 | 241:8 | **controls** 178:2 | **correction** 8:20 |
| 135:15,15 180:24 | **contending** 196:12 | **conversation** 25:2 | 9:1,16 198:14,19 |
| 204:2 | 197:21 198:9 | 123:23 210:11 | 198:21 |
| **confirm** 7:23 12:4 | **content** 138:13 | **conversations** | **corrections** 4:13 |
| 53:9 138:13 185:8 | 139:18 159:24 | 25:1 66:2 180:6 | 7:21 8:7,8 9:3,18 |
| **confirmed** 141:8 | **contention** 126:22 | 180:22 | 134:22 |
| **conflict** 39:22 | 127:7 151:8 | **convey** 180:6 | **correctly** 97:7 |
| 40:22 41:2 95:19 | 152:13 | **cool** 112:10 | 98:24 117:25 |
| 95:22 | **continual** 212:16 | **copied** 98:1 | 121:22 134:15 |
| **confused** 13:13 | **continuation** 7:25 | 142:14 150:10 | 150:20 151:3 |
| 41:12 164:7 | 91:25 | 222:18 | 157:16 216:1 |
| 170:11 172:20 | **continue** 32:9,11 | **copies** 166:4 | **corrected** 113:5 |
| **confusing** 31:16 | 47:8 48:15 49:16 | 211:11 241:14 | 220:9 |
| 31:16 40:17 41:21 | 79:18 109:6 | **copy** 24:17 30:6 | **correspondence** |
| 69:22 72:19 81:7 | 140:17 186:8 | 30:22 31:24 39:3 | 23:20 |
| 89:24 90:8 102:2 | 207:8 208:6 | 78:6 87:1 96:8,11 | **correspondences** |
| 107:25 156:18 | 210:21 219:14,14 | 100:23 101:7 | 170:8 |
| 160:1 163:1 | 220:25 221:1,3,3,23 | 126:8,10 146:11 | **cost** 82:20,21 |
| 165:13 166:7 | 234:10 | 241:15 242:16 | 121:25,25 153:5 |
| 174:16 220:3 | **continues** 164:18 | 241:15 242:16 | 183:11 225:18,23 |
| **confusion** 106:2 | **continuing** 76:22 | **corporate** 8:12 | 226:2 |
| 176:25 | 77:5 207:23 | 43:10 96:5,16 | **costs** 124:20 125:2 |
| **congenial** 202:9 | **continuous** 33:21 | 114:19 209:12 | 125:12 126:24 |
| **connection** 61:11 | **continuously** | 232:9,13 | 151:14 152:8 |
| 159:12,16 163:9 | 158:18 | **corporations** | 183:11 225:17,23 |
| **consent** 4:18 194:3 | **contract** 164:21 | 102:8 | 226:4 |
| 194:21 196:5,13 | 202:3,5 205:19 | **correct** 17:17,17 | **counsel** 3:4 5:22 |
| 197:2 | 218:5 | 18:14,23 16:54 | 6:15 7:3,7 8:7 |

## [counsel - day]

70:16 87:12
106:16 112:19,20
113:21 114:9
117:24 118:8,15
118:18,19,25
122:15 141:25
179:1,4 180:17
184:9 185:19
200:22 222:19
223:13 239:13,22
**counterclaims**
233:14
**countersuit**
192:20
**county** 130:5
202:12 236:10
**couple** 72:3 8:6
58:9 127:2 151:6
173:23 210:23
**course** 15:9 46:6
99:2 111:9 161:25
**court** 1:6 6:5 9:6
10:24 21:7 44:19
44:25 208:22,22
208:24 224:10,14
237:1
**cover** 62:10
223:22 228:2
232:5
**covered** 207:24
208:2 225:21
231:10
**covering** 221:18
**covers** 36:21
**covid** 6:10
**crazy** 76:6 165:25
**created** 122:20
**credit** 129:19
**crockett** 177:8
**cross** 1:12,15
237:16,23

**csr** 2:10 6:12
240:5 241:20
**cst** 138:1
**current** 179:4
182:4
**custodial** 241:10

**d**
**d** 148:3
**daily** 75:4 183:11
**dallas** 71:3
**damage** 225:1,5
225:13 228:8
**daniel** 2:7,22 3:12
7:5 8:12,21 15:2
15:24 16:4,14,20
16:20 17:19 18:12
18:15,16,21 19:10
19:14 20:10,16,20
21:3,10 22:2,8,17
22:17,25 23:9,10
24:14,17 25:2,5
25:8 35:5 38:16
58:1 59:12 60:17
61:2,20 62:6,17
64:13,17 66:5
67:18,23 68:2,5,10
68:23 69:15,25
70:6,8,9,11,18
71:4 75:6 77:19
91:3 92:4,21
93:14,22 94:17,25
95:23 97:11,19,20
98:2,6 100:1,1,5
101:8 104:25
106:11,19 107:12
108:2 109:24
110:20 119:6,6
122:17 128:24
130:3,4,17 131:6
132:8 133:21
134:12,18 135:23

136:12,13,14
137:6,20 138:24
138:25 139:9
147:9,10,21
148:10,21,23
149:11,19 151:15
153:23 155:3,13
155:24 157:4
158:15,22 159:4
159:19 160:13,22
161:11 162:5,8
163:15,18 167:12
168:15,19 169:1,8
170:11 171:14
174:11 183:8
192:1,17 194:11
195:21 196:4,14
197:17,21 198:1,9
199:16,22 200:16
200:18 201:15,21
202:3,16 203:5,24
204:17,21,23
205:7,11,16,25
206:9,9,15 211:11
211:21,23 212:14
212:20 223:4
226:12 229:15,23
239:7 241:12
**daniel's** 61:11
150:3 151:10,16
161:13,13,23
**danny** 226:15
**darin** 66:5 70:20
72:2 164:22 192:1
192:17 201:23,24
202:4 205:19
211:11
**date** 6:2 12:1
17:6 18:24 19:1
19:3 41:24 42:2,7
42:9,23 43:1,6

51:10 53:6 54:2
57:12 58:23 60:7
60:20 63:1,4 64:3
64:7 66:17 67:11
76:19,24 77:15,18
77:21 78:3,17,19
97:23,24 104:23
105:4,23 111:8
129:9 137:15
145:13 194:6
195:8,11 215:20
224:23,23 240:5
241:20
**dated** 4:14,19,22
4:24 5:2 11:12
20:1,3,4 60:13
87:5 97:23 109:9
111:1 137:7,20
147:18 148:14
156:5 186:19
**dates** 20:7 42:4,5
43:8 53:23 54:14
81:5 202:20
226:23
**david** 13:4 14:3,12
18:19 75:22 76:14
76:17 77:1,9
78:18,21 88:2
111:11 112:1,17
113:6,18,20
122:10 131:18,24
134:12 138:23
195:19
**day** 20:14 52:23
63:3 79:25 88:22
88:23 100:12,18
103:11 105:20
106:8 130:22
162:2 170:16
183:12 193:4
196:22 198:19

## [day - disagree]

204:20 205:17
221:8 236:3,11,16
241:16
**days** 21:24 48:11
48:11 199:13
207:19 208:15
209:11 212:19,21
212:24 213:10
222:24 223:10
232:22
**deadline** 51:10
198:4
**deadlines** 202:21
202:22
**deal** 15:6 41:14
47:16,22 48:1,2
69:7 130:12
131:23 134:22
143:2,8,8,8 144:10
144:11 145:21
179:21 186:13
192:14 202:7
204:22,22,24
206:2,5,6,11
207:11 211:22
**dealings** 201:15
211:18 228:10
**deals** 202:1
**debt** 66:9 92:12
97:4,18 155:6
**debtor** 1:5 2:18
6:19 237:5 239:3
**debtors** 8:3
**debts** 157:15
**dec** 233:13
**december** 59:10
213:11 233:6,13
236:16 16:22 23:20
43:16 44:15,18
129:16 152:10
192:11

**decided** 14:25
15:5 16:2 23:6
25:23 54:2 58:9
78:1 148:25
233:17
**decision** 15:23
24:1,3 84:24 86:6
86:17 192:6
**deduct** 151:9
**deducted** 154:24
**deed** 52:5,7 53:4
53:19,20 54:15,20
55:1,8 58:14
59:23 60:8,12
61:1,4,20 62:6,24
63:1,8 64:3 67:20
73:9,17,22 74:2,8
74:14 75:12,18,23
76:15 77:1,10,15
77:21 78:3,13
103:23,24 121:8
**deeds** 41:10 50:10
103:25
**deemed** 215:23
**deer** 107:22
**default** 4:24 55:10
186:16,18,21
187:6,14 188:11
205:6 206:18,19
**defaulted** 206:15
**defendants** 1:14
1:23,23 237:14,23
237:23
**defer** 208:13,23
**define** 220:4
**definitely** 86:1
90:17 142:19
**definition** 37:12
83:2,3 214:13,19
**definitive** 168:9

**delay** 63:7
**delete** 136:23
**deliver** 187:8
**delivered** 187:3
**demand** 106:25
**demanded** 58:4
**demonstrates**
33:19
**depart** 199:17
**departure** 119:11
133:20
**depend** 208:9
**depo** 39:14 185:10
209:12
**deponent** 31:7
32:20 46:9,10,10
46:11,11 209:18
238:14,15
**deponent's** 45:22
**depose** 184:18
204:7 208:18
**deposed** 207:18
**deposit** 99:15
205:8
**deposition** 2:1,5
6:2,4,7,13 8:1
9:22 11:7 30:24
31:11 33:12,21
45:21 46:5 47:14
52:6,14,23 87:14
96:14 116:1 142:3
152:12 166:24
208:16,21 231:19
231:21 232:10,24
233:3 234:10,12
235:1 236:1 238:2
238:11,16,16,22
239:1 241:2,5,6,9
241:11,13 242:4
**depositions** 45:19
**derick** 176:19,20

**describe** 178:13
178:20,23 179:6
197:17 201:14,23
203:5
**describes** 169:10
**description** 4:9
5:10 236:13,9
**despite** 212:4
**details** 70:24
**determine** 191:21
201:1
**determined**
141:18,20 177:8
**development**
133:15,16
**devoted** 125:15
**dictate** 196:16
**difference** 59:8
188:13,17
**different** 8:12,24
24:22 37:22 39:21
53:23 54:4 58:14
61:21 62:6 76:25
138:1,19 147:2
155:9,18 160:16
175:15 178:21
179:17 191:16
207:12
**difficult** 45:22
**difficulty** 45:20
207:22
**direct** 69:7 100:13
101:7 133:14
192:6,12,23
193:17
**directed** 179:4
**directions** 107:24
**directly** 102:20
**disagree** 57:1
57:4 231:21

## [disagreeing - duck]

**disagreeing** 13:11
**disagreements**
100:2
**disaster** 6:11
**disburse** 104:22
**disclose** 216:11
**disclosed** 107:12
128:24
**disclosing** 108:3
**discovery** 232:11
**discussion** 33:23
62:16 196:19
**disinterested** 27:9
27:17,25 61:5
215:9
**dismiss** 47:13
**dismissing** 47:15
47:18
**disorganized**
**display** 150:9
**dispose** 144:14,15
144:17
**dispose** 185:10
**disposed** 145:1
212:7
**disposes** 144:18
**dispute** 124:18
**distract** 201:4
**distributed** 105:11
**district** 1:1 237:1
**division** 1:2 237:2
**divorce** 159:12
162:4 163:10
**dizzy** 167:6
**dma** 1:12,15 2:6
2:22 6:23 7:3 8:10
8:25 67:9,11
71:12,22 72:15,25
77:4 82:24 124:19
125:2,11 126:23

127:8 147:9
150:12,24 151:22
152:7 153:23
157:18 159:11
163:9 191:22
192:7,13 216:12
216:19 218:9
223:16,24 224:23
225:12,15 226:6
237:12,15 239:7
241:12 242:3
**doctored** 172:5
**document** 10:9
19:16 29:21 30:5
32:2 34:16 35:7
50:22 52:5,22
54:20 55:8,18,21
56:19,21 57:3
60:10 61:4 78:15
78:16 80:18 100:4
101:10 114:21
116:4,24 128:16
137:6 148:19
152:2,2,5 153:18
158:5 162:25
163:16,20 164:19
167:19 182:16

197:10 202:22
232:19
**doing** 9:15 52:9
70:18 71:4,6,8,10
89:11 112:17,18
141:1 149:9 176:7
197:18 199:21,21
203:3,3 204:1
208:10 209:24
233:24
**dollars** 98:7
107:13 130:6,12
205:3 206:13
**doubt** 46:7
**draft** 65:1 194:21
**drafted** 103:10
**drafting** 103:5
**drank** 108:9
**drilling** 144:21
**driver's** 20:2
**duck** 1:9,21 4:19
4:21 5:1,4 11:12
11:18 12:1,7,22
13:5,8 14:5,13,25
15:8,12 18:6,22
19:16,17 20:11
22:8,18 23:21,25
24:5,7,8,12,23 25:3
25:4,8,10,24,25
26:8,14,18,23 27:3
27:9,17 28:6,13
34:2 35:2 36:4,19
37:10,14,17,24,25
38:11 39:24 40:7
40:11,20 41:4,15
41:22 42:3,10,13
43:2 49:20,24
50:6,11 53:11,15
54:21,23 55:6,11
56:14 60:13 61:6
61:12,23 62:9 92:2

63:24 64:22 65:2
65:20 66:20 67:18
67:21,24 68:6,9
69:6,9 72:17 73:2
73:10,11,13,18,19
73:23 74:2,3,4,9
74:11,13,20 75:9
75:13,19 76:20
77:2,11 80:8,10,16
80:20,24 81:10,14
81:16,22 82:5,9,14
82:15,17,24 83:10
83:19,22 84:6,10
84:11,17,22,25
85:10,15,19,23
86:3,7,8,13,15,17
87:5,18 89:23
90:9 92:11 96:5
97:18 98:3,7 99:3
99:16,23,24
100:3,4 101:7
106:3 107:11
108:2 110:11
112:4,5 131:4,5,8
131:15 134:1,3,11
134:14,19 135:1,3
135:5,8,15,17
136:5 137:6,11,12
137:15,19 138:14
140:4,5 148:14,17
156:5,12,15,20,21
157:9,11,24
158:10,14 163:14
163:16,23,24
164:4,5,14 165:18
166:3,5 167:12,16
167:17,17 168:10
168:13 169:5,9,18
169:24 170:7,9
170:16,23,24
172:12,12 173:4,7

## [duck - entitled]

145:25 147:6,10
147:16 150:4,14
150:16,19 153:4
153:20,24,25
154:1,13,14,16
155:4,6,14,17,25
157:13,25 158:7
158:16,22 159:5
159:17,21 160:9
160:12,13,16,20
161:12,12,22
162:6,8 164:23
164:11,24 185:1
186:19,22 187:16
187:25 188:3
188:10 189:5,9,18
190:21 191:19,20
192:6,12,16,22
194:4 196:8
197:23 202:4
206:18,18 211:18
225:6,12 229:4,6,8
229:9,20,25 237:9
237:21
**duck's** 42:15
102:6
**due** 83:6 142:18
150:16 163:6
191:2,3 192:25
224:12
**duly** 2:7 7:17
238:9
**dumb** 90:14
**duties** 58:7 85:23
229:17,20,21,23
**duty** 85:16,18

**e**
**e** 2:17,17 238:14
**earlier** 61:11 62:7
69:24 70:4 91:24
121:9 128:20

131:16 139:7
140:25 186:12
193:16
**early** 142:11,25
143:1,14,16
146:14,17,25
157:13,25 158:7
212:1,13 229:20
**earnest** 97:17
131:22 212:1,21
212:17,18 215:19
215:20
**easements** 177:19
**east** 76:5,12
**eating** 183:10
**edgar** 130:20
**edmon** 114:8,17
117:24 118:4,6,8
118:13,18,24
122:20
**ee** 215:4
**effective** 196:13
196:17 197:3,4
215:20
**effectively** 68:10
97:17
**effort** 141:1
**efforts** 163:19,19
170:16,23,24
171:12,12 172:5
173:23,24 174:16
173:2 174:16
175:1 196:18
205:22
**either** 26:22 32:12
91:3 141:21
173:17 181:10
190:22 191:2
**elected** 209:20,21
233:4
**email** 8:19 10:13
17:5,8,11,13 18:12
163:15 166:5 168:18
**emailing** 10:23
32:11
**emails** 8:10 39:8
59:19 95:23 123:2
134:3 136:3,3

43:3,5,5,13 50:15
61:11 70:8,21
91:22,23 97:11,19
97:20,24 99:23
100:3,4 101:7
104:25 106:15,19
106:23 107:11
108:2 110:11
112:4,5 131:4,5
131:15 134:1,3
134:14,19 135:1,3
135:5,8,15,17
136:5 137:6,11,12
137:15,19 138:14
140:4,5 148:14,17
156:5,12,15,20
157:9,11,24
158:10,14 163:14
163:16,23,24
164:4,5,14 165:18
166:3,5 167:12,16
167:17,17 168:10
168:13 169:5,9,18
**emailed** 39:2
**emergency** 6:10
**employed** 239:23
**enabled** 59:16
**encumbering**
92:11
**encumbrances**
218:1
**encumbrances**
218:23
**ended** 52:6
**energy** 1:13 6:24
71:12,23 143:25
144:6,8 168:5,18
166:3,5 167:18
168:13 169:5,9,18
**engineer** 22:8 28:6
**enter** 22:8 28:6
**entire** 74:18 96:15
99:23 100:4
142:13 188:5
189:3 216:14
**entirely** 218:23
221:4
**entities** 31:12
142:23 153:24
155:3,24 159:19
213:9 215:14
224:22
**entitled** 125:11
150:5 151:15
157:19 202:25
209:10,23 220:14
226:6

**[entitlement - fact]**

entitlement 157:12
entity 68:6,9 85:12 85:14,24 86:20 133:22 155:13 160:9,22 161:11 161:13 178:2
entries 222:24
equal 46:12
errata 242:10,12 242:13
erratas 31:17 173:19
esq 2:19,23,24 3:3 3:8 239:4,8,9,13 239:17
establish 82:21 137:5
established 11:21 26:2 142:24 166:8
estate 4:14,22 11:9 11:11 14:13 20:10 49:20 102:16 128:16 225:1,11
et 7:3 50:19 116:4
evening 52:22
events 5:17 179:24
everybody 220:3
everyone's 233:17
evidence 20:9
exact 25:1 164:19 175:10 196:23
exactly 58:25 59:2 59:6 99:23,25 163:7 206:16 212:18
examination 4:5 7:18 238:19
examine 220:14
example 49:20
exchange 159:20 160:5
excluded 157:6
excruciating 9:8
excuse 172:11 111:25 174:8 199:4
execute 13:5 37:10 159:3
executed 24:13 58:10 64:22 236:14
exercise 143:4
exercised 230:2
exhausted 232:4
exhibit 4:10,10,11 4:11,12,12,13,14 4:16,17,18,20,22 4:24 5:1,3,5,6 9:21,25 10:5,9,23 11:4,7,8 12:16 23:7 25:20 27:8 27:16 28:7,21 29:8 31:2,3,13,24 32:20 33:1,11,16 34:10,12,22,23 35:10,14 36:2 37:9 38:20 52:3 52:11,13 54:5 62:15 65:5,8,13 78:5,5,13 86:25 87:3,8,14 98:14 108:9 114:23 115:5,6,25 124:3 124:16 126:9 127:13,17 128:15 128:23 130:24 132:13,15,16,21 134:2 136:22 137:5,11,13,14,16 137:20 138:15,16 139:17 140:3 143:16,22 146:18 146:22 147:2,2,4 147:13 148:8,8,13 150:10 151:21 152:6,14 153:7,22 154:12 155:2,12 155:23 156:4,5,10 156:16,24 157:7 157:24 158:6 162:15 166:13,23 167:5,8,17,18,24 169:22,24 170:22 171:3 172:14,25 173:8,13 186:10 186:16 193:13,13 193:19 195:7 197:8,14 213:3,8 222:14 225:17
exhibits 4:8 9:18 30:22 32:11,13 39:14 45:20 128:6 180:21 181:7
existence 218:16
existing 218:9
exit 193:19 198:22
exited 147:10 161:8
expect 79:22 210:4
expedite 222:20
expeditiously 209:24
expenses 124:21 125:3,12 126:24 152:8
experience 182:1
expert 55:15 144:23
expiration 177:1 177:18 209:23 240:5 241:20
expiring 177:24
explain 63:6 78:20 102:17 145:9 223:23 225:7
explained 100:1 178:18
explaining 101:8
explanation 53:24 199:15 227:5
express 28:19 43:15 62:23 97:2 97:6,9,16 98:22 99:18,20 100:14 100:16,17 101:19 103:15 162:16 163:6 164:16 175:5 178:12,15 178:20,22 179:5
expressed 236:15
extended 183:7
extension 26:17
extensive 31:17
extent 180:5,21
extraction 144:21
extreme 31:11

**f**

face 51:21 52:1 52:10 53:10 57:7 59:15,23 68:24 71:19 78:4 87:17 123:15 127:23 136:25 165:25 183:15 208:17 232:7

**[factor - form]**

factor 183:11
facts 5:18 104:18 105:2 180:1
factually 100:9 101:5,5
fading 206:23
failed 16:11
fails 242:15
fair 46:12,22 68:5 68:7,7
fall 71:4
falls 13:12
familiar 20:25 176:15 177:2 200:25
family 37:4 40:18 114:13 199:19,24 229:5
far 220:17
fast 166:10,11
father 69:21
father's 72:3
favor 21:15 98:6
fdm 148:10
february 67:13,13 67:14,15 134:3,3 137:7,16,20 138:14 147:19 148:14,15 151:1 155:12,23 156:6,7 156:22,23 167:14 167:16,18 168:2,3 170:17 183:3,5
federal 2:13,14 6:8 6:9 233:24
feel 60:16 76:19 82:8 203:5
feeling 208:10
fees 226:25
fell 212:8
felt 59:14 135:13 136:18 199:3,20 212:7
fifth 226:11
figure 108:10 139:2 141:9 162:9 162:10 184:17 185:6 207:17
file 54:1 57:25 58:1,19 60:3,4,17 63:2,4,8 74:14 76:19,20 77:3,19 78:1 79:15 96:8,9 140:14 142:13,15 179:5
filed 5:19,22,23 54:24 56:21 58:4 58:5 67:19 73:15 77:22 78:15 130:23 179:13,19
filings 178:23 179:3,12
final 127:13 134:21 139:14 140:4 224:5 227:22
finalized 148:19
finally 199:5 204:25
financial 85:14 228:6,8,9,12,18
financially 239:25
financing 129:23
find 62:18,19 70:6 70:10,11 89:7 143:20 166:5
fine 30:7 32:24 120:2 132:5 135:14 146:19
finish 16:18,18 21:7 43:23 46:4 120:4 149:8,9 160:8 208:7
finding 68:25 167:3
firing 107:24
firm 13:17,20,25 76:19,20 77:3,19 122:22 180:7 185:2,5 193:3
first 5:16 7:17,22 39:13 45:17 48:19 52:23 53:4,19 54:3,5 59:16 62:15 69:17 78:3 87:22 90:18 91:7 116:4 117:16 123:16,20 124:10 130:3,20 133:3 135:1 149:9 155:20 157:10 159:9 179:24 180:20,22 190:24 192:9 193:2 203:20,21 214:16 215:1 217:20 220:12 226:10 228:17 236:1
fishing 176:3 200:8
five 30:23 59:10 60:23 204:20,21 209:5,15,15 220:2 226:20 227:12
fix 34:18
fizzling 79:6
flip 61:6 116:4 68:25 228:17
focus 96:20 150:8
focused 94:12
folder 188:24 189:3 197:10
follow 167:5 210:23
following 90:19 91:2 215:15,19 236:8 238:8 239:2
follows 7:17 238:22
foot 195:7
force 231:5
forced 74:13 227:3
forcing 74:17,21 231:17
foreclose 80:9 81:13,21,25 82:9 82:18 83:9 84:10 84:11,17,21,25 86:7 142:7 143:9 193:4
foreclosed 28:13 79:12 82:3 83:5 100:13 187:20 188:4
foreclosing 84:6 143:10
foreclosure 55:9 80:15,23 81:3 82:14 83:13,18,21 85:7 189:10 190:12
foregoing 98:20 236:1,13
forever 111:21
form 14:14 16:24 21:22 22:10,11 24:25 25:11 26:24 27:5,11,19,21 28:1 28:8 35:3,4 37:19

**[form - given]**

38:2,13 39:25 40:4,9,14,16 41:9 41:19,20 43:19 60:9,15 61:7,13,24 65:25 66:21 67:4 67:5,25 68:1,12 70:13 71:14,24 72:8 74:15,16,22 77:24 78:23 82:2 84:12,18 85:11,20 86:1,2,9,11 90:2 92:14,24 93:16,23 93:24 94:18,19,22 95:11,12,21 99:22 101:7,22,23 102:7,23 103:6 105:8 117:22 121:1 122:18 124:23 148:16 150:5 151:12 152:16 153:17 154:6 155:16 157:21 158:23 159:6 160:24,25 161:14,24 162:21 164:11 165:4 177:21 178:14 179:7,9 180:4 181:15 191:24 192:15,24 198:2 203:13 218:12,19 218:24,25 225:19 226:8
format 138:19
formation 119:3
formed 161:17
forms 70:24,25 71:1 159:3
fort 3:16 71:3 240:8 241:23
forth 53:7 165:24 166:1 214:22
forward 8:13 51:19 135:5,17 196:22 202:6 213:20
forwarded 137:12 207:10
found 144:5 202:9
four 31:12 204:18 204:20,20,23 209:4 226:20
fourth 226:11
frame 69:5
framework 8:23
frank 2:7,22 91:13 109:24 148:3,10 239:7 241:12
frankie 10:22
frcp 238:13
free 157:14 217:12 217:15,18 218:1,8
friend 199:20
friends 199:20
front 18:19 33:11 34:11,13 38:20 39:3 53:3,7 55:18 78:6 81:6 87:3,7,8 126:10 132:21 134:5 147:5,24 149:15 154:20 157:18 189:1 193:13 213:21 223:21
frost 105:21 106:1
frustration 200:15
full 15:13,18 19:1 19:3 95:17,20 97:3 188:22,24
fully 139:18 140:4 156:10 163:22 163:3 167:10 169:4,17 170:14 170:22 172:11,21 174:15
funds 41:22 42:10 42:25 99:14 100:18 102:20 103:14 104:22 105:24 106:5 121:11 125:11 129:20,25 130:2 190:22 192:6,25
further 150:2 208:21 227:7 238:13 239:22,23
fuse 228:25
fussing 197:1
future 178:9 202:20 203:1,3 208:23

**g**

gaedke 114:8 117:23 118:3,8,12 118:17,24
game 32:12
gas 97:6 98:22 99:18,20 103:15 144:22 177:10,11 178:8,9,17 182:1
gears 230:5
general 15:22 16:23 131:11,13 131:13
gentleman 24:15 49:5 193:11 204:19
gentlemen 141:10
george 55:22,24 56:17 57:16 59:24
george's 56:25
germany 3:8 32:7 32:10,18 35:4 39:9,17 41:20 46:25 47:1,11,17 48:2,10,16,20 49:3 67:5 68:1 74:15 74:22 86:11 89:20 89:25 90:1,6 93:16,23 94:18,22 95:11 101:23 110:22 160:25 161:15 180:8,11 204:3 218:25 220:1,16 231:13 233:23 238:24 239:17
getting 5:22 39:7 44:9 48:8 76:5 89:20 105:21,22 159:12,13,15,16 159:21 161:23 163:9 176:13 180:17 207:1 221:19
gift 199:18
give 10:16 13:4,7,9 16:14 17:3,20 18:21 22:2 29:2,4 29:24 36:18 39:5 59:14 62:2 72:2 89:15 103:7 140:23 166:17 205:2,6,20 206:12 219:1
given 12:14,23,25 13:2 15:13 21:20 28:2,16 48:10

**[given - hand]**

62:20 106:25 103:5,14,20 111:18 208:17 209:11 210:5 216:14,21 221:12 230:24 233:9 236:15 238:11,25
gives 38:25
giving 129:18
glad 136:24
gladly 94:1 104:8
glasses 96:6 108:9
gloria 2:10 6:12 80:1 209:2 238:6
go 3:25 12:17 29:13,18,21,23 30:5,19 31:20 32:1,24,25,25,25 38:19 43:23 50:20 50:23 51:1 52:16 56:1 70:17 79:20 90:18 94:9 100:1 102:10 103:24 104:8 107:21,21 108:8 114:4 116:19 117:5,16 127:1 128:1,22 129:9,10,11 135:13 146:17 146:18 167:15 167:11,20,24 173:10,14,17,22 174:12 182:15 183:4 192:2 194:25 195:6,8,14 195:14 197:19 199:25 200:3,4 208:8,11,21 210:11,13 212:23 214:18 221:15 224:2,2,3,3 232:1 232:21
goes 102:11 132:8 150:22
going 9:25 10:5,14 11:5 12:3 17:22 18:10 19:18 22:21 22:23 28:24 29:19 29:22 30:2,10,15 30:19 31:17 33:5 34:17,18 37:12 38:8,16 39:9,14 42:6 44:14,16 45:12 47:1,16 48:7,22,23 52:4 58:3,6 59:12 61:18,20,24 125:3,5,11,12,22 125:16,20,21 132:14 143:20 147:6 148:12 196:21 198:3 201:1,3 203:25 205:4,4,10 207:13 208:4,6,20 210:6 210:12,15,25 213:2,18,19,22,23 215:7,8 219:3,19 219:23 221:8,15 228:17 229:1,2,4 230:4 231:5,6,18 232:23 234:10 235:23 236:4
golf 200:1
golfing 200:4
good 7:20,21 48:7,22,23 52:4 53:8 58:3,6 59:12 64:16,18 69:11,16 70:2 72:10 74:17 76:6,17 79:11,24 79:25 82:2 86:21 111:23 115:14 123:5,5,11,12,22 125:16,20,21 132:14 132:24 143:15 146:6 147:2,3 160:1 163:17 165:25 183:23 188:5 191:7 194:15 195:9,13 196:5 200:3 201:20 213:18 214:18,22 221:15 223:22
gosh 103:7
gotten 207:13
granstaff 114:7 117:23 118:3,7,8 118:12,17,24
grant 15:22 16:23 117:23 118:3,7,8 118:12,17,24
granted 37:9 214:9
granting 214:8
great 10:14,25 29:14 33:1 52:2 52:20 76:13 223:22
gross 143:3 150:13 150:25 151:5,9 152:19,21,22 153:14,16 157:20 183:11
ground 144:22 176:14 177:15,18 178:4,7,16 181:8 181:14,17 207:25
group 64:21 130:18 214:8 215:18 217:11,15 217:17
guess 26:21 89:9
guy 199:17,17 205:1
guys 16:5 23:12 29:13 45:11 48:1 214:9
gwynne 3:13 6:20 141:6,7,18

**h**

h 2:24 239:9
hagan 17:6,11,19 18:2,18,23 19:15 20:19 21:18 22:3 22:4,9,13,17,19,24 22:24 23:1 85:4 88:1 89:9 91:10 91:19,20 92:18 95:24 102:25 109:19,25 110:16 110:11 113:1 141:6 184:15 185:7,15 194:11
half 55:20 68:10 205:3,7
hand 7:9 10:12 116:14 165:24 222:18,24 236:15

**[handle - includes]**

handle 127:17
213:14,15 230:13
230:14
handshake 143:2
143:8
handwritten 4:13
111:17 222:24
handy 166:15
hang 116:25 126:6
126:6 166:22
hanging 199:14
happen 9:11 58:3
69:11 105:19
228:17
happened 41:15
54:1 60:22 88:9
88:24 92:25
100:19 103:3
106:12 205:16
happening 70:6
happy 12:19,19
21:7 220:5
hard 30:22 31:7
32:13 38:15 39:3
71:6 78:6 87:1
89:25 93:10 96:8
96:11 104:15
123:12 126:8
150:10 166:13
186:13 219:4,7
harm 228:6,9,12
228:18 230:10,20
harris 4:17 5:6
119:7 124:17,20
125:1,11 126:23
127:7 144:12
147:7 149:12
157:17 157:14,14
157:19 159:11
162:12 191:18
222:7,15 223:17

223:25 224:22
226:6
hat 113:23 120:20
121:9,17 122:11
122:14
headache 9:8,10
28:25 39:1 127:23
215:7
hear 7:13 26:11
27:14 49:14 73:22
109:3 121:22
123:24 199:25
202:25 222:4
230:16,17,17,22
heard 39:13 58:11
94:13 110:18
200:11,14
hearing 202:20
hearings 211:9
heated 196:19
hebert 3:3 7:3
239:13
held 88:20 111:8
help 35:6,9 128:5
136:24 173:17
188:1 193:16
helped 223:13,13
helpful 45:5
helps 63:16,17
136:23
hey 29:11
highlight 31:5
34:14,15 150:8,11
157:10 213:22
highlighted 34:23
96:21 100:7 102:4
102:19 103:13,19
105:1,19 106:4,5
highlighting
158:11 193:14,17

highlights 213:24
highly 31:15
highway 3:4
239:14
hire 227:19
hired 115:17
100:22,23 120:11
120:11,13 121:16
hit 43:15,45
46:13 220:10
hold 107:14 9,9
21:6 31:20 32:8
34:16 134:6,7
149:8,8 172:2
home 102:9
116:11 186:22
205:13
honest 93:9 219:7
219:8
honestly 199:2
hopefully 9:11
hoping 77:19
81:24
horribly 115:10
hour 110:7 208:19
208:25 231:2
hours 110:13,19
201:16 204:20
209:4,5,8,15,15
house 87:22
housekeeping 7:24
huge 226:10
hundred 190:9
197:11 226:1
229:4
hungry 76:5 79:7
hunting 107:21,22
176:3,7,7
hurry 138:25
139:1

hurts 38:25
214:23
hypothetical 8:11
102:9

**i**

idea 51:17 66:19
68:3 79:21 135:4
73:18 134:6
165:2 167:21
168:12 172:15
206:6
identified 90:23
91:6
identify 28:11
identity 236:13
ignored 233:9
illegal 56:2
image 13:16
imagine 230:25
immediate 105:13
immediately 15:3
98:20 105:11
134:19 135:3
161:18 169:22
193:4
impact 177:19
178:12
important 173:14
impossible 88:14
167:22 170:4
improper 180:12
inadvertently
120:4
inappropriate
45:23
inches 31:13
include 36:8
181:20
included 37:10
includes 142:14
239:2

**[including - john]**

including 19:16
36:23 62:24,24
92:11 150:14
155:6 226:24
incorporated
153:16
incorporates
158:6
incorporating
154:16
incurred 124:21
index 41:1
indicate 59:19
102:21 118:2
indicated 15:2
20:22 77:20
indicates 57:16
59:24 103:20
116:16
indicating 33:13
118:17 193:23
individual 3:7 8:1
239:16
individually 97:2
98:4
individuals 90:19
91:2 215:15
informs 5:9
33:24 84:16
140:23,24 142:1
184:11 185:9
238:25
informs 106:20
initialing 148:13
initials 148:4,7
instance 2:6
institution 106:2
instruct 48:22,23
180:5,21,23
204:10

instruction 180:9
instructions 5:13
91:22
instrument 56:11
56:13 236:14
intend 71:21 72:24
intended 104:25
incidental 64:22 65:11
72:6,10 121:15,16
121:21
intentionally
190:19 212:2
intentions 152:2
interactions
211:16
interchanged
152:23
interest 1:9 15:8
16:3 23:21,24
25:19,23 26:8,8,14
26:18,20,23 27:3
39:22 40:23 41:2
68:9 71:22 73:18
73:20,23,24 74:3,5
74:9,11,24 75:3,4
75:5,8,13,14,19,20
75:21 76:20 82:16
83:16 95:20,22
97:4,5 107:14
108:4 121:13
122:6,7,8 129:17
157:11 159:21
160:21,23 162:16
163:6,9 164:9,10
164:12,15 165:17
175:4 187:24
188:2,6,9,19 189:9
189:22,25 190:10
191:2 216:12,23
216:23 218:11
237:9

interested 64:9
94:2,4 176:5
223:8 240:1
interests 8:23
71:12 85:14
interject 82:1
internet 66:11
interpret 118:21
interrupt 17:24
33:20 119:23
146:15 171:19
204:5 206:23
interrupted 120:4
230:18
interrupting 44:23
45:4
interruption 30:10
introduce 199:19
introduced 199:19
invalid 218:14,14
investigated 178:1
investigation
217:3
investment 130:14
invite 200:7
invited 20:20 21:3
21:10 200:3,4
involve 158:16
involved 64:10,13
119:13 121:25
130:9 176:13
198:9 214:15,16
involving 64:5
issue 47:6,12
147:7 178:3
221:12 223:25
224:22
issues 221:11,15
items 159:20
177:22 224:24

iv 2:19 238:23
239:4

**j**

january 5:4 20:2,8
54:6 56:14,19,22
56:22,22,24 57:3
57:16 59:4,10,24
60:7,12,14 63:8,22
64:3 68:5 73:10
76:15 77:16,22
76:25 77:6 114:25
115:2,7,8 116:2
117:3,8 121:9
jesus 51:21
job 2:16 37:20
90:23 109:24 90:9
241:24
john 1:21 2:19,21
6:18 9:25 107:21
29:11 30:21 32:24
39:14 45:17 46:1
48:19 52:15 63:23
64:4,11,11,14,21
67:6,8 69:4 70:24
79:9 86:24 107:7
114:24 120:2
127:12 128:2
132:16 139:6
140:19 143:16
166:16,24 173:13
182:1 183:19,25
186:6,11 190:18
193:15 202:7
204:19,22,22
206:14,14 207:15
211:2,13,17,22
212:15 213:4
219:13 228:11,16
239:4,6 242:1

**[johns - language]**

johns 3:4 136:14
239:13
johnsandcounsel...
3:6 239:15
joining 7:2,4,5
judge 45:1
judgment 167:1
july 17:13 21:2
28:22 34:12 61:11
112:14,17
131:15 194:6
195:11 196:10
jumbled 168:1
jump 116:21
170:16
jumped 99:13
230:11,13
jumping 155:24
166:1 213:10,11
213:15,17 214:22
230:12,19

**k**

keep 14:14 21:7
22:21 44:23 45:4
45:11,14 46:4
49:9 96:9 123:25
146:16 193:1,2
207:13 210:6,12
213:14 220:16
keeps 89:19,24
kent 130:18
kept 8:10 18:17
72:20 85:2 96:10,11
136:4 164:4
204:24
key 200:7
kids 32:14,15,16
32:16,17
kind 32:12 59:14
62:25 142:5 143:2
197:22 198:1,10

220:9,10 221:13
227:25 228:1
230:21
knew 68:8 70:22
223:10
know 9:5 14:8,20
19:12 25:14 26:22
27:20 34:17,19
42:21,23,25 44:9
46:14 48:3 53:22
53:25 55:24 56:5
57:5,12,22 62:9
63:17 64:17 69:20
69:22 71:8,9
74:10 76:10,23
79:8,25 82:4 84:7
84:8,13 85:5 87:2
88:3 90:9 93:19
94:4 95:3,3,7
97:25 106:3,7
107:19,22 108:6,7
108:19 109:21
110:23 111:1,6,18
113:1 123:13
127:25 128:1
137:2 138:12
140:6 141:1,11
142:21,22 143:1
148:2,17,24
149:18 152:15,17
153:12 155:19
156:1,13,18,25
157:4 158:1
165:17,22 167:9
167:25 169:25
170:1,4,18,19
172:15,16 176:6
178:25 184:19
185:13 190:19
196:17 198:11

199:12,16 201:1
203:12,16 204:8,11
204:16,21 205:15
206:4,15 207:3,10
207:17 208:21
212:6,6 213:24
214:17 216:5
220:3,14,17,20
223:5,10 224:20
227:24 228:16
232:20 233:5
knowledge 5:18
23:9 54:19 71:5
114:8 144:20
180:1 181:25
191:25 195:22
known 236:12
knows 185:18
krisjenn 1:4,6,7,7
1:19,19,20 2:18
6:19 11:13,17
11:22,25 12:22
13:18 20:11 21:16
22:9,18 24:1,3
26:4,5,13 34:2
35:2 36:4,8,19,24
36:25 37:1,2,11,16
37:24 38:10 39:23
40:7,10,18 41:3,10
41:15 42:2,10,12
42:14,17,18 43:11
43:10 44:22 49:21
50:11 54:21 55:2
55:3,4,9 56:23
58:4 59:14 60:4,5
61:22,23 62:8,22
67:21 73:12,15,20
73:25 74:13,24,25
75:2,14 77:4 80:8
80:16,23 81:9,13

81:15,21,25 82:4,7
82:8,13,23 83:5,9
83:12,17,19,21
84:5,10,11,17,21
84:21,24 85:9,15
85:16 86:3,4
89:23 90:10 98:19
98:21 99:5 100:11
100:15 102:1
103:25 112:21,23
113:5,14 114:14
114:18,19 120:9
120:16,17,18,21
121:3,5,12,13
122:6,9 125:17
126:21 130:4,17
142:8 151:14,17
151:22 160:7,9,21
161:13 162:4
177:7 186:19
187:18 188:1,10
189:9 190:12,22
191:3,6 193:23,24
239:3 242:3
krisjenn's 54:23
81:2,15,19,20
229:11
krist 2:24 6:24
239:9

**l**

labor 205:17
land 71:13,16,18
71:23 72:1,3,11,11
217:25
language 217:8

**[laptop - long]**

laptop 31:9 32:14
large 31:9
larry 1:21 2:1,5
3:7 4:4 6:2,20
7:11,16 31:24
56:14 79:4,6
84:20 89:22 90:1
95:24 97:1,3 98:4
114:12 115:12
126:9 129:1,19
130:9 159:1 169:4
174:7 180:4,9
192:8 206:23
208:18 220:6
234:10 235:2
236:1,6,12 237:21
238:2,9 239:16
241:2 242:4
harry's 228:2
lasalle 130:5
late 193:4 226:25
227:1
lately 176:4
law 3:8 13:17,20
13:25 69:21 71:2
91:10 114:2,2,7
185:2 239:18
lawsuit 69:18
130:22 149:21
178:24 179:3
192:19 216:14,17
lawyer 19:19 39:2
111:11 112:23
135:9 137:13
175:17 220:23
230:24
lawyer's 96:13
lawyers 5:16
116:3 179:23

180:7,23 181:3
193:21 194:1
219:23
leading 22:12
95:13 198:1
leaning 51:19
learn 184:20 185:4
learned 202:10
leave 29:16,22
68:14 136:19,20
159:25 166:20
202:23,23
leaving 28:12 32:3
68:14 119:6
ledger 5:6 145:10
145:15 146:11
145:19 146:17
238:23 239:16
left 55:13 69:11,15
72:3 100:12
122:12 198:16
216:4,8,19 220:18
220:20
legal 3:15 56:3,3
113:7,18,21 114:9
220:23 238:19
240:6 241:21
242:19
legible 31:23
length 11:17 24:5
lengthy 62:16
137:6
lent 145:4
letter 64:22 65:1
175:17 220:23
230:24
lawyer's 96:13
letting 34:19
liability 56:15,16
liar 94:7,11

license 20:24
lien 4:14,22 11:9
11:11 14:13 20:21
128:16 217:20,25
217:25
liens 188:14,14
217:12 218:8
lies 198:16
likeable 199:17
liked 68:23 93:25
94:1
limit 209:17
limited 56:15,16
line 5:14 105:11
129:19 134:20
138:6 178:8,9
225:13 235:4
list 6:16
literally 221:9
litigation 215:14
216:4,8,19 220:18
220:20
little 21:2 24:21
27:15 28:24 48:6
48:6 79:7 116:14
123:6 124:4
195:15 196:24,24
197:20 201:18
202:6,11 208:8,11
live 6:4
lived 5:17 179:24
lk 1:4,6,7,8,9,19
1:19,20,21 4:19,21
5:2,4 11:13,13,23
11:25 53:15 113:8
150:14,19 194:4
237:4,6,7,8,9,19
237:19,20,21
242:3

lmw 148:7
loaded 211:24
loan 11:17 21:16
22:2,9,18 24:5,13
25:20 26:6 28:6
36:4,9,19,23,25
37:11 39:23 41:3
41:15 42:2,10,18
43:1,6,17 50:10,11
54:21 55:3 62:22
73:12 80:9,15
81:14 92:10 98:3
98:15,20,22 99:4
99:17 101:19
102:10,11,21
105:22 106:6,13
129:17,25 142:21
145:8 182:23,24
183:4,5,7,8 187:15
188:5,17,18 189:9
212:19,24 216:24
217:1,13,19,20
228:14,15,19,21
228:22 229:9
230:21
loaned 41:6 98:20
99:4 105:12,14
121:4
loans 36:22 42:7
61:16 66:20 98:8
99:12 100:22
100:11 106:20
107:13 108:4
locate 89:1
locations 6:16
loi 112:14
long 79:20 106:11
111:13,13,14,18
146:24 152:3

## Page 23

**[long - meeting]**

170:6 192:14,21
199:13 207:15
210:3
**longbranch** 1:13
6:23 7:3 8:22,25
7:12 21:22 72:15
73:1 82:24 164:22
175:9 191:22
192:7,13 216:12
216:20 218:10
237:13
**longer** 16:2 79:23
86:21 206:24
208:8,11
**look** 19:20,22
28:23 44:2,20
45:10 50:23 51:2
51:2,4 52:3 62:11
63:15 66:24 86:25
89:6 107:5 126:8
127:3,9 136:5
137:14 134:19
157:3,7,8 158:9
165:6,9,11,12,15
189:12,23 194:22
214:13 223:14
**looked** 9:13 17:8
28:22 44:11 62:14
62:25 91:23
131:16 141:17
199:11
**looking** 14:7,10
26:21 36:9 43:25
44:3,7,10,24 45:5
45:14 52:22 61:2
63:19,19 64:7
109:8 114:20
122:23 134:7
144:6 153:22
156:4 158:4
165:21 166:9

191:5 195:7
213:25 225:22
**looks** 105:2 129:15
141:24 158:1
162:11 163:11
184:14
**loop** 39:9 239:18
**lose** 229:2
**loss** 229:4
**lost** 115:21 127:16
**lot** 52:24 74:17
115:24 123:18
128:20 136:17
165:19 167:4
183:21 207:8,24
226:13 227:17
228:13 232:17
**lots** 22:5 139:4
201:21
**loud** 193:2
**love** 79:2 227:19
**loved** 200:9
**low** 183:16
**lp** 1:13 237:13
**lunch** 9:9 79:9,18
108:6 143:17

**m**

**m** 56:14 97:2,3
114:12
**ma'am** 10:20
**mailed** 139:22,23
148:1 166:3,6
168:25 187:2
**main** 127:10
**majority** 51:6
**making** 11:2 33:21
66:19 84:7 89:24
104:6 167:6
204:21
**management** 27:9
27:17,23,25 61:5

117:23 130:25
**manager** 40:19,20
56:14 82:7 85:4,5
85:10,12,25 93:2
95:18 110:9 119:9
122:17 133:10
**managers** 4:18,21
5:1,3 12:12 27:22
61:8,15 85:1,2,3
87:4,18 116:17
162:7 194:3
196:13
**manner** 75:7
**mansfield** 6:14
**march** 176:23
**mark** 9:22,25 10:1
114:17 140:13
**marked** 4:10,11
4:12 11:6 87:13
156:24 166:25
**marks** 79:14
**mason** 3:3 239:13
**matches** 15:6
**material** 130:1
**math** 188:1
**matt** 29:2 30:3,3
**matter** 57:7 73:5
171:16
**matters** 7:24
**mcleod** 3:13 5:5
113:12 142:24
175:17,21,24,25
182:1,5,17 207:11
213:4,9
**mcleods** 142:6,7
143:9 181:7,12,20
183:5 214:10
216:7,13,18 227:8
230:2
**mcqueeney** 87:23
116:12

**mean** 13:19 14:18
14:20 17:24 26:13
47:3 62:13 83:1
96:9 109:21
119:22 139:8
145:2 146:15
152:19 154:3
163:5 165:8
166:14 171:18
173:12 174:7
189:16 199:17
201:4 206:8,23
212:4 216:3
219:14 220:22,24
220:25 221:9
229:25
**meaning** 12:15
165:5
**means** 6:14 41:2
105:13 144:6
154:7 164:10
167:23 193:25
203:22
**meant** 56:3 71:17
83:6 157:5 216:6
**meet** 48:19 202:8
**meeting** 4:20 5:1,3
20:1,2,3,4,13,16
20:18,21 21:4,11
21:16,21,24 22:3
23:3,18,24 25:6
61:12 87:4,18,21
88:8,20 90:16,16
90:17,20 91:3,7,18
91:21 92:3,17
93:2,2,3 110:4,8
110:13,20 111:2,8
111:17 112:9,11
116:1,7,10,11
117:5,9 132:18,25
133:11 185:4,12

## Page 24

**[meetings - moore]**

**meetings** 71:7
92:10 117:3
132:24
**member** 11:22
12:1 35:22 82:7
84:21 85:9,10,24
126:1 154:23,23
155:3,13,15,17,24
**members** 4:18
12:14 13:2 15:15
15:18 60:5 95:25
199:3 194:3 196:8
196:13
**memory** 43:9 58:6
59:21 63:17 93:5
125:15
**mentioned** 17:18
18:1 208:1
**messages** 175:16
**messed** 71:19
**met** 130:3,20
201:24,24,25
202:3,8
**method** 2:11
**michael** 24:16
69:8 70:25 204:20
205:2,5,16 206:14
211:17,22 212:15
228:11
**michael's** 228:17
**middle** 91:1
10:15
**million** 42:11,22
65:21,22 80:9
81:14,16 82:15
92:12 96:20,25
97:17 98:3,7
128:18 129:21
130:6,11 181:12
182:23 187:15

188:17 189:19
190:17,20 191:19
191:12,13,20
192:2 205:3,6
229:2,10
**millions** 107:13
**mince** 3:17
**mind** 90:12 123:16
213:14,16
**mineral** 182:13
**minerals** 182:6,9
183:12,19,21,22
217:19
**minnesott** 147:25
**minute** 10:6 29:24
31:21 32:1,25
**minutes** 4:20 5:1,3
18:4,8,13 19:16,17
19:19,20,25 20:1,2
20:3,5,9 21:19
29:24 90:6 66:22
75:3 77:6 85:15
216:2
**mirror** 13:16
**misleading** 58:15
66:9 89:19
**missed** 223:6
**mistake** 179:8
226:10
**mistaken** 54:16
56:21 57:23 59:13
69:13 72:4 88:20
161:3
**mistakes** 183:22
**mixture** 141:10
**moment** 116:18
12:18 19:19:3
**money** 41:4,7,7,17
41:25 42:12,14,17
42:21 43:11 65:18
75:3 77:6 85:15
85:16 86:3 97:17
99:20 100:13,16
100:16,20 102:5
102:11,13 104:10
105:20 106:7
121:3,6 122:8
125:17 126:23
145:8,12 146:2,4,7
146:8 151:19
152:22 153:4,14
190:8,9,11,14,19
192:17,22 206:4
206:13,20 212:12
212:13,17,18,22
229:3,20
**monies** 100:10
124:19 150:13,25

173:23 184:12,14
184:21 185:12,14
187:11,12 209:5,6
209:15 213:18
224:9
**month** 16:7 20:23
75:4 175:22,23
176:2 205:21
206:12 222:17
**months** 15:5,25
16:3,6,10 58:2
59:5,11,18,18
60:23 103:5 132:9
191:13 204:18,21
204:23 205:5
227:18
**moore** 2:7,22 3:12
6:23 7:5 8:11,22,1
12:12,25 15:2,16
15:24 16:14,20,20
16:23 17:20 18:2
18:16,16,21 19:10
20:10,16,20 21:3
21:10,15 22:2,8,17
23:9,10 25:2 28:5
35:6,14 36:18
37:9 38:16 58:2
59:12 61:2,20
62:6,17 64:13
65:23 66:5 67:3
67:18,23 68:2,10
68:23 69:15 70:18
75:6 77:19 91:13
92:4,16,21 93:14
93:22 94:14,17,25
95:10,23 97:11,19
97:20 98:2,6
100:1,1,5 101:8
104:25 106:11,19
107:12 108:2
109:24,25 110:3

151:6,13,14 152:7
152:19,21,23
157:12 161:18
224:9

## Page 25

**[moore - need]**

110:14,21 116:18
119:6,7 122:17
128:24 129:2
130:4,9,17,20
135:18,20 137:7
137:15,20 138:14
138:24 139:8,10
147:9 148:3,11
149:19 151:15
153:23 155:3,13
155:24 158:15
159:4,19 165:2,18
166:19 168:9
169:1,8 170:3
171:15 174:11,25
183:9 192:1,17
194:12 195:22
196:4,18 197:18
197:21 198:1,9
200:1 201:15
204:17 205:10,11
205:25 206:9,10
211:11,17 212:2
212:20 223:4,17
223:24 224:21
226:12,15 228:5
229:15,23 239:7
241:12
**moore's** 24:14
60:18 68:5 76:21
91:18,21 117:12
119:11 133:21
135:2,17 136:5
147:21 157:9
158:10,14 167:12
196:14 197:3
228:10
**morning** 7:20,21
11:5 19:20 36:9

39:3,13,15 49:18
62:15 87:13 96:2
115:1 116:3,23
127:14 134:23
135:9 204:18
223:20
**motion** 166:25
**move** 32:21 45:10
47:6,13 106:8
173:3 193:3,12
210:25 214:23,25
219:2 220:5
**moved** 34:10
106:6 178:17
205:11,12 206:17
**moving** 22:22 46:4
98:10,10 110:15
173:11,12 213:20
**msj** 52:12,14
**mueller** 6:18 9:20
11:5
**muller** 2:12,19,19
2:21 5:15 6:18
9:23 10:4,10,15,22
14:14 16:24 19:23
21:22 22:10 24:25
25:11 26:24 27:5
27:11,19,21 28:1
29:2,7,10,16,22
30:3,8,12,14,17,23
31:6,15,20,23 32:3
32:16,23 33:2,15
33:18 35:3 37:19
38:2,13 39:5,18,25
40:4,9,14,16 41:9
41:19 43:19 44:7
45:6,18 46:6,17,21
47:16,19,23 48:22
49:2 52:4,11,16
60:9,15 61:7,13,24
63:25 65:5,8,12,25

66:21 67:4,25
68:12 70:13 71:14
71:24 72:8 74:16
77:24 78:8,23
79:1,5 80:1,6 82:1
84:12,18 85:11,20
86:1,9 92:14,24
93:24 94:19 95:12
95:21 99:22
101:17,22 102:7
102:23 103:6
105:8 108:15,22
115:2,5,10,20
119:24 121:1
123:6 123:13,3
124:2,6,23 126:5
126:10 127:16,20
128:3,10 132:19
134:6,9 138:4,6,21
140:9 141:4
145:15,22 146:14
146:21,24 148:16
150:5 151:12
152:16 153:17
154:5 155:16
157:21 158:23
159:6 160:24
161:14,24 162:1
164:11 165:4
166:12,13,14,17
166:21 167:2
171:7,18,24 173:9
173:16,24 174:5
177:21 178:14
179:4,7,9,22 180:4
183:17,20 184:2
185:21,25 186:4
191:24 192:15,24
195:6,17 198:2
203:13,18 204:5,9

204:14 206:22
207:1,16 208:14
209:7,17,20 210:1
210:8,13 213:6
218:12,19,24
219:9,19,23 220:9
220:22 221:5,10
221:21 225:19
226:8 227:21,24
229:12 230:11,15
230:22 231:8,20
231:24 232:25
233:11,19 234:3,8
238:23 239:4,4,6
242:1
**mute** 29:13
**muted** 7:13

**n**

**n** 2:17
**name** 1:21 22:16
24:16 92:19 104:1
109:16 110:17
122:25 148:6
178:12 211:3,4,5
236:13
**named** 24:15
204:19
**nap** 231:3
**narrative** 210:24
**ne** 3:9 239:18
**near** 209:10,23
**necessarily** 118:19
**necessary** 27:13
62:21 144:19,21
**need** 8:8 9:3 12:16
14:5 29:13 47:19
48:2,7 84:15,23
108:16 123:9,14
128:6 146:11
165:23 166:5
180:22 183:14

## Page 26

**[need - objection]**

194:22 204:7
207:13 208:7
210:11 223:10
229:24 231:11
233:22,24
**needed** 5:11 58:1
60:17 63:2 135:12
135:14 185:20
204:23 223:14
**needs** 144:25
**negotiated** 150:18
**negotiation** 207:11
**neighborhood**
188:22
**net** 8:22,23 67:6,9
71:11,22 72:14,25
82:20,23 83:1,5,6
83:10 124:20
125:2,11 126:23
149:2,5,10 152:22
153:16 157:19,22
159:14 163:8
191:23 216:11,15
218:11 225:16
**never** 9:10 60:17
66:16 68:2 69:9
69:17 71:17,25
77:19 101:20
102:6 103:22
122:13,13 144:5
163:14,16 178:17
200:25 202:5
214:15 223:20
229:15

214:17
**news** 192:19
**nice** 44:10 199:16
**night** 19:23
**nine** 205:5 209:8
**ninth** 226:14
**nonresponsive**
74:7 75:11,17
77:8 101:2 140:1
155:9 161:4 163:3
173:7,7
**noon** 76:11
**normal** 50:15
111:9
**north** 7:6 71:5,7
147:25 171:15
200:1 205:13
**notarization** 55:21
**notarize** 242:11
**notary** 56:11
236:8,19
**note** 4:14,16,22
11:9,11 12:5,11,23
13:5,6,8,10,15,16
13:17,19,21 14:4
14:13,23 15:1,3,11
16:7,21 18:22
20:11 23:7,11,20
24:13,23 25:9
26:9,12 27:8,16
28:6,11,12 34:2
35:2 37:16,20,24
38:3,6,10,20 49:20
59:24 60:4,24
61:22,23 62:8,14
62:17 63:1,19 64:8
65:4,16,20 67:4
68:3,14,16,23,24
74:5,19,24 75:14
79:19 79:22 80:8
80:16,17 81:1,7
83:14,16,23,24
84:1,1,3,4,5,6,8
86:5 100:14
113:11,12,12,13

119:7 120:8,8,13
120:15,21 121:3
128:2,16,21,23,24
129:1,4,5,8,21
130:1,4,24 131:7
131:11,12,19,25
132:7 133:4
142:18,18 143:17
143:24 144:3,6,7
144:11 145:9,12
151:10,23 152:8
153:19 154:14
157:13 163:11,25
172:5 208:20
223:2

**o**

**oath** 6:13 7:25
107:10 156:14
236:12
**object** 33:22 35:3
82:2 90:2 139:25
173:7 208:20
**objection** 14:14
16:24 21:22 22:10
22:11 24:25 25:11
26:24 27:5,11,19
27:19,21 28:1
39:25 40:4,9,14,16
41:9,19,20 43:19
60:9,15 61:7,13,24
65:25 66:21 67:4
67:5,25 68:4,12
70:13 71:14,24
72:8 74:16,15,16
75:10,16 77:7,24
78:23 84:12,18
85:11,20 86:1,1,2,9
86:11 92:14,24
93:16,23,24 94:18
94:19,22 95:11,12
95:10,23 97:11,1
101:17,22,23
122:1 122:18
122:18 124:23

**[objection - okay]**

146:22 148:16
150:5 151:12
152:16 153:17
154:5,5 155:7,16
157:21 158:23
159:6 160:24,25
161:3,14,15,24
162:21 163:2
164:11 165:4
173:6 177:21
178:14 179:7,9
180:4,8 181:15
191:24 192:15,24
198:2 203:13
218:12,19,24,25
225:19 226:8
232:7 233:1

**objections** 33:21
33:23

**obligation** 72:14
72:24

**obligations** 122:16

**obtain** 129:22,25

**obvious** 75:6

**obviously** 16:1
208:6 231:6,14

**occasions** 196:1

**occur** 66:4,10,14
66:16 80:24

**occurred** 43:1
87:19 104:18

**october** 59:10
64:18 202:21
238:17 240:2
242:2

**offer** 70:25 71:1

**offering** 89:12

**office** 7:1 50:20
51:1,5 56:6,8

96:13 140:22
236:15

**officer** 238:10

239:1 241:6

**officer's** 241:11

**offices** 2:12 6:19

**offset** 125:24
127:7 153:19,20
158:3 221:12
224:25 225:3
226:3,4,11,13,15
226:16

**offsets** 126:17
222:8 225:6,10
226:9

**offsetting** 225:8

**oh** 15:9 52:1 58:15
62:18 65:14 66:11
67:22 69:14,17
79:3 90:5 91:5
99:9,13 103:7
104:20 115:17
124:5 129:3
130:10 135:4
136:7 143:10
184:23 185:23
188:1 194:24
195:16 200:3
201:1

**oil** 113:12 144:21
181:25 213:9

**oilfield** 194:17

**okay** 5:15 8:5,18
9:2,13,24 10:10,15
10:17,21 11:1,11
11:21 12:3,10,18
12:21 13:4,14,24
14:19,19,22,22
15:10,14 16:13
17:13,25 18:21
19:6,9,13,18,22,24

20:7,13,20,25
21:14,20 22:1,1,6
23:5,18 24:7,11,21
25:5,15,15,18 26:7
26:17 27:7 28:4
28:20 29:6,10,21
30:8 31:5,14,22,25
32:6,15 33:15,25
34:9,19,22 35:8,17
35:24 36:15 37:6
37:13,15,15 38:7
38:19 39:2 40:2
40:12,21 41:1,14
42:21 43:16 44:4
44:6,13,21 45:11
45:18 46:16,17,21
47:10 48:9,14,25
49:7,14,16,18 50:2
50:5,9,13,21 51:3
51:7,13,16,18,25
52:3,9,19,20 53:1
53:14,18 54:18
55:14,14,20 56:10
56:17 57:20 58:8
58:16 59:3,7,21
60:6,19 61:1,17
63:6,13,18 64:13
64:20 66:18,24
67:23 68:4,8,15,20
69:24 70:4 71:11
71:21 72:12,21,21
72:24 73:8,8 74:2
75:22 76:4,13,14
76:23 77:14 78:2
78:10,25 80:7,19
81:8,21,24 82:13
83:9,12,15,18
84:15 85:7,13,22
86:6,12,19,23 87:6
87:11,17,21 88:5
88:15,19,24 89:1

89:17 90:5,5,5,15
90:15,18,23 91:6
91:10,16,20,23
92:2,6,20 93:13
94:3,8,12,24 95:5
95:8,19 96:1,8,12
96:17 97:13,15,22
98:2,6,10,13 99:3
99:13,13,13,16
100:6,21 102:15
102:18 103:1,12
104:12,14,21
105:23 106:14,18
106:23 107:3,6,9
107:18 108:1,18
108:20,22,23
109:8,12,21,24
110:3,7,12,24,24
111:9,14 112:8,13
112:17 113:2,6,16
113:25 114:7,22
115:10,12,20,23
116:7,13,16 117:7
117:16,19 118:7
119:17 120:7,11
120:19,19 121:7
121:14,25 122:10
122:23 123:1,2,7
123:13 124:11,14
124:25 125:9
126:12,14 127:3
127:11,20 128:13
128:20,25 129:1,4
129:8,16,20 130:6
130:15,21,24
131:3,10,15,15,18
131:24 132:4,6,12
132:19 133:3,9,11
134:10,16 135:5
135:16,19 136:2,5
136:9,16,21 137:4

**owes** 86:3 154:24
224:6,6,24

**owned** 40:10
65:20 68:10 86:20
130:5 153:20
162:6 164:4
164:20
164:4,15 161:16
217:18

**owner** 160:7,8,11
160:12,13 161:2,2
161:6 162:2

**ownership** 68:6
97:5 101:25

**owns** 40:18 199:17
199:17

**p**

**p** 2:17,17 162:16
163:6,7 164:15
175:5 178:15

**p.m.** 2:10 79:13,16
108:24,25,25
109:2 137:16,21
137:23 140:11,12
140:12,15 167:15
167:19 170:17
171:12,13,17,17
174:1,2,2,4,11,12
184:4,5,5,7 210:16
210:17,17,19
234:11,12

**page** 4:9 5:10,14
33:19,20,23 53:3,4
53:11,15,19 54:3,5
54:14 55:18 57:3
62:19 78:3 87:22
90:18 91:1,25
96:17 98:10,14
116:4,22 117:2,7
117:17 128:15

137:18,18 139:3
139:16 140:19 141:9
140:19 141:21,25
142:10 143:12,21
143:21 145:4,7,9
145:12 147:7
148:2,7,10,13,22
149:9,14,20,23
150:22 151:5,20
152:1,4,24 153:2,6
154:9,11,15,19,22
155:10 156:2,14
156:19 157:1,7,23
158:2,9,12,25
159:8,19 160:2,11
160:18 161:3,7,11
162:3,3,14 163:2,8
163:21 164:8,13
164:18 165:6,14
166:8 167:2,6
169:2,16 170:2,7
170:20 171:1
172:7 173:22,24
174:5,7,18,22
175:3,10,14,24
176:9,11,11
177:23 178:1,11
178:22 179:11,22
180:10 181:6,12
181:23,25 182:4
183:2,13,14 184:8
184:20 185:3,11
185:17,17,19,24
186:4,18 187:14
187:18,18,23
188:8,18,23 189:2
189:5,13,15,17,17
190:1,4,11,16
191:6,15,19 192:5
192:9,21 193:12
194:14,20 195:11

195:14,18,19,19
195:21 196:2,7,12
196:12,24 197:1,8
197:13,20,25
199:1 201:2,18,22
202:1,4,24 203:10
204:6 207:16
208:12 210:10,13
210:23 211:7,13
211:16 212:19,25
213:13,20 214:11
214:14,22 215:3,4
215:12,12,22
216:11,16,16
217:4,20,24 218:2
219:19 220:24
221:22,25 222:3
222:13 223:12
224:1,8,11,16,23
225:14,20 226:4
227:5 229:16
230:2 231:16
233:16 234:6

**old** 93:9 185:7
219:5,5

**once** 65:20 105:9,9
217:23,24,24

**onerous** 45:23

**ones** 184:24

**ongoing** 220:19

**open** 202:9

**operated** 178:8

**operator** 130:19

**opinion** 144:7

**opportunity** 138:7

**opposed** 12:11

**option** 5:5 142:22
143:4 148:22,23
181:6,7,13,16,19
181:20,24 182:21
213:5,8,21 214:1,8

214:9,16 217:21
227:8 230:3
**optionee** 215:3,19
**optionor** 214:6,7
215:2,18 217:11
217:15,17
**optionor's** 214:4
215:13 217:5
**options** 139:4
142:17
**oral** 2:1,5 235:1
238:10
**order** 6:10 167:20
169:11,24 171:5,5
171:13 172:6
173:5,5 174:14
208:22 213:14
224:10,16
**organization**
122:20
**organizational** 5:3
20:1
**original** 68:17
103:25 114:12,17
167:12 175:1
211:8 241:1,5,9,13
**originally** 150:18
174:25
**outcome** 130:8
240:1
**outline** 79:1
**owe** 145:10
**owed** 82:15 85:15
85:17,23 102:13
122:16 124:19
125:2 126:23
127:7 151:14,17
152:7 157:13
223:16,24 224:17
224:21 225:8,15
226:15,17,17,20

**[page - place]**

133:4,5,15 138:17
148:5,8 193:20
194:14 195:2,2
215:1 222:25
235:4 241:8

**pages** 99:14 134:2
135:20 152:3
186:12 242:12

**paid** 81:16 106:7
145:25 150:24
187:25 188:6,14
188:15,18,20
189:5,8,9,18,24,24
191:22,23 192:25
193:22 204:10,15
225:5,12 226:23

**palmer** 43:14
206:16

**paper** 9:14 29:4

**paragraph** 98:11
98:15,17 117:17
126:17,21 133:14
133:19 150:8,23
195:17 213:25
214:4

**paraphrase** 193:7

**part** 9:7 31:8 51:9
82:2 119:18,19
130:13,13 150:3
158:21 175:8
176:19 182:11
194:1 199:24
200:19

**participate** 202:10

**particularly** 31:9
31:10 45:23

**partly** 27:12
54:25 196:20
239:2,23 241:16

**partner** 68:17
133:21 149:2

151:18
**partnered** 68:21
**partnership**
229:22,24
**party** 1:16,23
237:16,23 238:15
238:21
**passed** 102:6
198:4
**path** 14:3
**patient** 48:4
**pay** 72:14,25 86:4
126:1 154:23
188:3 189:21
190:12,14 225:10
190:9 192:4
197:12 226:12
228:14,15 229:4
**percentage** 143:3
217:22
**perform** 58:7
**performed** 184:16
**perjury** 107:11
236:3
**permission** 17:6
18:15,18,21 21:18
21:21,23 92:9
110:16 162:5
205:19,20
**permit** 178:10,17
**permits** 177:6
**perpetual** 177:25
**person** 90:17
90:20,24 91:3,8,9
91:11,12,14 93:6
236:13
**percent** 11:25
25:20,24 26:8,17
26:22 40:10,19
68:6,9 72:14,25
75:3 82:16 85:24

86:20 93:7 100:18
106:21 107:14
108:4 129:17
149:2,5,5,6,10
149:11,12 151:9
151:13,17 153:14
159:10,13,21,24
159:24 160:4,7,8
160:11,11,13,21
165:16 175:4
182:22 183:10,12
190:9 192:4
197:12 226:12
228:14,15 229:4
217:22

**pipe** 177:12,14,19
178:4,7,16 181:8
181:11,17 218:6

**pipeline** 18:20
236:1

**perjury** 107:11
236:3

**pertaining** 122:3

**pertinent** 66:1

**phone** 22:5,6,7,16

**phrase** 84:5 216:7

**phrasing** 18:11

**physically** 18:16
207:22

**pick** 167:24,24

**picked** 167:25,25

**picking** 168:5

**picture** 44:24

**piece** 9:14

**pigeon** 112:6

**pipe** 177:12,14,19
178:4,7,16 181:8
181:11,17 218:6

**pipeline** 18:20
236:1

190:23 236:12
**persons** 6:17
**perspective** 144:4
149:25 218:4
**pertaining** 122:3
**pertinent** 66:1
**phone** 22:5,6,7,16
**phrase** 84:5 216:7
**phrasing** 18:11
**physically** 18:16
207:22
**pick** 167:24,24
**picked** 167:25,25
**picking** 168:5
**picture** 44:24
**piece** 9:14
**pigeon** 112:6
**pipe** 177:12,14,19
178:4,7,16 181:8
181:11,17 218:6
**pipeline** 18:20
236:1
**place** 18:5 48:8
66:2 87:22 107:20

**[place - produced]**

112:11 114:18
133:11 193:7

**placed** 167:10

**plain** 62:2 217:8

**plaintiff** 1:16,17
237:16,17

**plaintiffs** 1:10

**plan** 79:20

**plans** 181:18

**play** 32:19

**played** 200:1

**playing** 32:12

**pleadings** 5:19,21
5:23 179:15,18
180:2,12,14,16,18

**please** 6:5,15 7:9
7:22 29:3 44:17
48:10 134:13
195:9 233:2

**plenty** 76:11 199:4

**plic** 2:12,19,24 3:4
239:4,9,13

**plus** 82:16 130:11

**point** 21:1 32:8
59:11 64:20 65:17
69:8,10 71:8 91:7
104:3 133:3 152:6
152:12 157:10
153:10 159:9
162:7,15 164:8,18
165:3,15,22 166:2
168:16 185:21,24
202:9 223:10
229:9 231:1

points 158:14
159:9,20 167:11
170:2 174:25
217:22,22 231:10
220:8,13,15,21
192:18 197:4
216:15 223:14
231:19 232:23
233:17
positions 216:19
positive 130:8
possibility 57:18
60:24
possible 57:14
59:23 209:24
possibly 79:23
202:18,19
post 222:17
postpone 233:3,7
233:7,15
potential 63:24
645,5 23 70:1
211:10,14 228:11
211:11
practiced 32:5
prefer 29:3
premise 158:13
prepare 37:20
38:3,6 49:23 50:9
43:21,24 123:18
122:1 184:13
196:7 232:9
prepared 13:6,10
13:15,18,20 14:23
49:19 50:6 54:15
57:6,22 58:5,12,18
60:2,2 76:18
77:18 78:19 87:25
88:6,9,13,16,19
89:2,7,8,10 112:22
112:25 113:3,11

113:11 114:18
117:23 118:3,5
120:8,13,15,21
121:8,14,24
140:24 141:7,9,16
141:19,22 149:17
156:22 168:15,19
184:11,14,19,21
184:23 185:2,5,13
187:3,6 194:20
195:19 216:9
232:12
preparing 241:13
present 3:11 6:17
6:19,20 32:19
35:15 116:17
130:22 182:18
presentation
104:6
presented 35:5,12
111:7 117:22
145:14 211:8,10
211:11
presenting 204:24
president 9:16
pretty 168:9
175:25 186:14
212:24,24 231:10
previous 153:11
211:3
previously 4:10,11
4:12
price 66:6 67:2
228:22
principal 188:2,9
188:18 189:8,22
print 28:24 51:1
138:21
printed 139:21,22
112:25 113:3,11

printer 185:8
printers 184:16
printing 188:25
prior 22:3 33:23
107:11 153:15
174:6 207:18
208:17
private 70:22
privileged 51:14
privy 196:3
probably 47:9
63:12 64:17 69:9
102:10 107:2
112:5 123:25
133:20 143:16
168:13,14,17,22
175:22,23 196:15
198:12 199:6
207:9 208:24
225:25
problem 31:7,8,10
32:2 83:2 152:22
162:22 170:16
171:20 181:10
procedure 2:14
6:9 99:24
proceed 100:8
proceeding 239:24
proceeds 98:18,22
produce 92:1
produced 2:6
19:25 20:6 24:17
50:24 51:8 87:12
95:23 96:2,15
97:25 115:1 116:2
116:23 134:1
139:24 140:25

**[produced - question]**

188:22 193:21,25
200:20
production 194:1
194:2
profit 72:25 83:1,5
191:23 216:12
profits 8:22 67:6,9
71:11,22 72:15
82:20,23 83:7,10
149:3,5,10 163:9
216:15 218:11
project 202:10,13
projected 106:9
106:10
promissory 4:16
143:24 144:3
proof 197:24
proper 82:8 159:3
properly 37:17,25
38:10 150:21
properties 1:9,12
1:15,21 2:7,22
4:19,21 5:2,4 6:23
11:12 12:8 13:8
27:9,18 39:24
56:15 61:6 71:12
71:22 72:15,25
82:10 86:22 87:5
113:7,22 114:10
116:8 118:18
124:19 126:23
128:17 131:1
130:12,14,16,19
150:24 151:23
152:7 157:13,19
159:11 164:23
192:22 194:4
216:12,20 223:16
223:24 224:21
225:9,16 226:6

237:9,12,15,21
239:7 241:12
242:3
property 17:2
53:15 59:13 122:9
144:12 217:12,15
217:18
proposal 24:17
121:23 136:6,7
137:1,3 173:10
206:11
proposals 8:12,14
8:17,19 134:23
135:21 136:17
138:3 139:10,16
140:3 163:18,19
163:21 164:1,2
198:20
proposed 117:22
162:23 206:6
proposing 170:11
protect 54:24 55:2
60:4,17 73:15
80:11,12 81:3,10
81:23 82:10 85:16
121:6,12 125:17
131:22
protected 121:4
121:12
protecting 121:11
122:6,7,8
protection 54:24
60:5
prove 167:22
proved 236:12
proven 218:14
provided 19:19
103:15,20,22
110:9 151:19
175:17 197:11
198:11 216:17

232:10,14
provides 125:1,10
provision 125:9
provisions 2:15
proxy 90:20,24,25
91:3,8,11,14,15,16
92:17 93:2
public 191:25
236:19
pull 61:14 62:11
62:14 78:4 114:23
115:3 127:13
136:10 200:21
pulled 28:20 115:7
136:21
purchase 66:6
67:2 151:19
purchasing 145:11
purposes 236:14
pursuant 2:13
37:17,25 38:11
131:19,25 238:13
238:25
push 67:23
pushing 41:16
put 9:6,21 15:5
41:10 44:14,16,19
44:24 45:2,7,15
78:4 86:7 100:4
103:2,25 104:10
115:14,18 126:2
127:21 128:10,11
138:6 140:20
141:2 143:19
148:18 161:19
162:25 170:3,4,5
171:5 173:8
181:16 190:19
196:16,17 199:18
200:15 202:4,16

203:5,24 205:8,12
206:17,18 211:17
212:16,18 221:7
222:10,13 223:4,6
223:9 224:16
226:19 228:5
229:2,14,15,15
236:19
putting 8:12 15:4
175:18 206:20

**q**

question 13:12
14:2,11 16:18,19
21:2,8,15 22:12,23
22:23 23:1 24:21
25:19 27:15 34:25
36:2 37:22 38:8,9
38:14,14 39:21
40:17 41:21 48:21
62:1 66:1,9 70:14
71:18 72:19 76:25
77:9 78:9,14 89:6
89:16 90:2,4,14
94:15 95:13 101:9
103:9,12 104:13
104:15,16 108:13
108:14,16 110:19
113:17,20 114:5
120:20 124:16
130:5,16 138:5
138:10 139:5
141:16 143:7
149:9 155:8,11
160:8 171:10
173:9 177:18,18
188:8 196:24
203:12,20,20,21
203:21,23 220:2
223:15 230:18,19
231:14

**[questioned - recognize]**

questioned 123:17
211:9
questions 5:13
29:20 30:2 44:11
47:5 63:16 66:23
107:9 115:24
124:7 128:21,23
168:7 207:11
quick 33:3 70:10
134:7
quickly 29:4
136:10 186:14
quite 58:21 64:8
148:18 163:18
182:16 206:25
207:6,15 223:6

**r**

r 2:17
railroad 176:13
177:8 178:3,6
raise 7:8 47:6
ramirez 3:14
ran 71:16,18 72:1
72:3,11,11 93:6
ranch 1:4,6,7,7,8
1:19,19,20,20 2:18
6:19 11:13,13,14
11:17,23,25 12:22
13:18 21:16 22:9
24:2,4 26:4,5,13
36:8,19,24,25 37:1
37:2,11,16,24
38:10 39:23 40:7
40:10,18 41:3,11
42:10,12,14,17,18
43:10 44:22 54:21
55:2,3,4,4,9 56:23
58:4 59:14 60:4,5
62:22 65:24 66:7

67:10 73:16,21,25
74:13,25,25 75:2
75:15 77:4 80:8
80:23 81:13,21,25
82:7,8,23 83:22
84:24 85:9,15,16
86:3,4 89:24
90:10 98:19,21
99:5 100:11,15
102:1 112:21,24
113:5,14 114:18
114:19 120:9,21
121:3,12,12,13
122:7,9 125:18
130:4,17 142:8
143:9,11 151:14
151:17,22 160:7,9
160:21 161:13
162:5 177:7
186:19 187:1
188:1 190:23
191:21 192:3,13
192:23 199:23,23
212:13 215:2
217:19,21 224:23
225:6,8 229:5
237:4,6,7,7,8,19
237:19,20,20
239:3 242:3
ranch's 103:25
229:7,19
ranches 176:5
26:3,5,9,12,14
75:3 107:14 108:5
129:17,18
reached 158:21
reaching 141:8
read 6:6 31:24
58:4 59:14 60:4,5
90:12 97:7 98:24
62:22 65:24 66:7

109:25 115:15
117:25 118:12
125:25 126:8
127:1,22 134:15
149:14 150:20,21
151:3 157:16
172:24 173:2
179:18 195:12
201:5 216:1
233:25 234:3
236:1 242:6,8
reading 9:14 10:2
174:10
reads 101:10
ready 10:21 49:16
76:5 79:18 109:6
140:17 202:10
210:21,22 221:10
221:15,17,23
real 4:14,22 11:9
11:11 14:13 20:10
49:19 70:10 93:10
102:16 122:9
128:16 134:7
136:10 201:6
225:11 227:12
realize 43:22
44:21 66:5 174:14
realized 58:3,6
59:11 65:17 67:1
69:3,8,10 76:21
226:13
really 41:20 16:14
38:10 40:25 44:9
129:17,18
reached 158:21
154:3 156:18,25
159:25 164:6
165:23 194:9

198:23 199:13
201:6,16 205:11
208:9,13,13
209:10 211:23
212:10,11 214:23
214:24 221:4
231:9
reason 12:10 24:9
24:11,22 25:8
34:1 46:11,12
57:20 60:3 73:11
73:15 86:19
101:12,14 103:1,4
103:18 172:17
172:17 176:1
183:8 191:4
196:15 232:15
235:4
reasons 68:21
107:2 241:8
recall 11:18 17:14
49:21 50:11
112:14 127:10
197:18
receipt 98:11,18
100:8 101:4
103:19 105:2,4
receive 99:3,24
100:7 150:13
received 80:5
98:19 105:5,6
130:2 145:13
146:5,6,7,9 150:14
150:25 151:2,9,14
164:13 190:21
recess 33:7 49:10
79:13 108:21
142:4 172:2
184:5 210:17
recognize 87:15

**[recollection - requested]**

recollection 50:5
record 2:15 6:16
7:22 8:6 29:12,18
29:21,24 32:1,4,25
32:19 79:12,15 80:2
89:2 108:24 109:1
123:23 124:1,3
140:11,14,17,20
141:3,5,15 171:21
171:25 173:10,21
173:21 174:1
184:3,6,9 198:3
204:10 207:6,7,20
209:2,2 210:2,11
210:14,14,16,18
233:1,12,12,18
234:1,11 238:11
239:2
recorded 6:4 54:6
54:9 56:25 67:19
67:20
records 17:12
18:17 51:8 96:10
reduced 151:17
180:6,6 191:13
reduction 15:2,7
reengineer 43:17
43:21
refer 72:18 73:4
118:8 179:20
180:22 181:5,9
202:17
reference 52:15
166:24
referenced 97:10
242:5
referred 211:2
referring 8:11
28:15 35:13 57:15
58:20 59:3 84:1,3

84:4 96:25 99:11
118:11 134:17,19
135:2 149:12
156:9,16 162:20
163:8,12,16 165:2
171:2 175:7
177:13
refers 98:15 118:7
118:12 133:20
151:15 156:5
reflect 104:18
reflected 18:7,13
19:15
refreshing 59:21
refusal 45:20
refuse 180:25
regard 72:6
regarding 6:10
35:23 36:5,10,13
36:20 37:14 38:17
157:14
registration 240:6
241:21
registry 224:14
227:2,4
regularly 175:25
regulations 117:21
reiterate 31:6
relate 103:3
related 54:20 65:2
177:1 178:8
182:19 197:22
217:13 222:15
223:17,25 224:22
226:6 230:19
239:23
relates 125:22
178:16 230:9
relating 5:6
relationship 182:8

relationships
68:22 182:5
relevant 33:2
relieve 155:5
remainder 150:15
151:1
remained 77:25
remember 14:10
14:17,18 21:13
234:22 240:16
25:1,2,7,16 34:3,7
49:25 52:21,24
53:22 56:20 61:3
63:3,10 77:11,13
80:14 88:25 92:22
92:25 93:8,8,11,20
94:14 95:2,7
110:6,22,23 111:3
111:5,12 112:3,4,7
112:15 119:5
123:16,21 124:10
129:3 132:3,4
164:17 165:5,8,10
196:18 198:15,18
223:18 233:23
remembered
126:3
remembering
198:16
remind 224:19
remotely 2:2 6:8
6:14 238:2
removal 159:4
remove 138:24
158:15,18
removed 134:12
158:16,17 159:6
removing 162:8
rep 209:12,13
232:9,13

repaid 77:6 97:3
repay 24:12,24
25:9 73:12,14
repeat 63:25
regulating 208:1
reported 2:2,11
238:2
reporter 6:5,7 7:7
7:15 8:15,18 9:6
10:18,24 19:2
21:7 80:3,4
114:15 209:4
234:2,5 238:6
reporter's 4:7
238:1
reporting 6:13
repossess 86:5
represent 87:11
119:8 120:12
136:13 179:2
217:5,10
representation
214:5 215:13
218:7,22
representations
215:19,23 217:6,6
218:17
representative 8:2
43:10,14
represented 3:25
123:9 178:9
136:12
representing
119:13 122:21
131:21
represents 215:18
45:23
56:23 113:4
232:11
requested 5:9
51:22 80:4 177:6

**[requested - sale]**

197:11 202:23
236:8 238:15
requesting 52:7
require 38:17
231:25
required 13:9
14:16 28:17 46:2
46:8 51:24 62:21
94:23 192:16
requirement
94:25 110:8 216:5
requires 142:21
180:6
reschedule 233:3
reserve 33:22
198:4 203:25
reserved 208:15
reserving 232:20
resist 208:24
resolve 159:9
respect 39:23
64:23 124:17,20
125:10 162:6
176:13 177:24
185:11 218:3,10
respectfully
108:12
respectively 72:16
73:1
respond 107:17
163:22 164:2
response 51:20
164:1
responsibility
122:12
responsible 159:2
rest 79:22,25
127:1 202:22
restate 21:8 76:25

result 82:14 83:18
83:21 98:19
resulted 228:10,12
results 106:3
resume 208:7
retained 197:10
retired 213:1
retract 145:21
return 238:19
241:1 242:12
returned 241:5,7,8
review 5:19 9:6
66:23 106:1 161:3
reviewed 5:21,22
28:17 113:13
180:16,18 181:2
216:10,22 232:8
232:12
rhythm 232:18
rid 157:9
ridiculous 219:10
rifle 107:22
199:18
right 7:8,9 9:8
11:23 12:1 16:6
23:10 26:4 29:15
33:10,22 34:17,24
35:16 40:8 41:8
41:18 42:3,8,23
43:5 44:23 46:5
46:23 47:20 48:3
48:18,25 49:2
53:5,8,17,17 54:3
55:10 56:9,24
58:25 59:1,2,6
60:23 62:14 63:3
63:24 64:6,24
65:3,19,20 66:7
67:2,8,10,16,16
68:11,11,21 70:1,7

70:12 73:13,17
77:15 79:3 80:6
80:16,21,21,25
81:4,11,11 82:6
84:17 85:2,10
86:8 87:23 90:3
90:16 91:1 92:18
93:13,14,19 98:15
99:11 100:25
103:21 104:17,19
105:10,14,18
109:6 116:8,12
117:14 119:20,23
120:9 124:14
125:14,19 126:18
127:4,11,18 128:8
130:10,12 133:23
133:23 134:4
137:11,13 138:15
142:4,16,20,24,25
143:3,5,6,13 145:5
146:23 147:1,18
148:4 150:7,22
152:18 153:2,21
153:21,24 156:21
158:22 159:5,15
160:9,11 166:19
167:4,15 169:1,18
170:16 171:4,17
173:3 175:11,15
176:15 177:21,25
178:10 225:2,4,13
237:8,21
rise 21:5
road 2:25 87:23
rob 45:1
room 29:16,23
30:25 32:3 48:8
166:20
route 71:20

207:23 208:14
209:9,22 210:20
211:14,19,20
213:2,7 214:12
215:5 217:7 218:3
218:6,10,18 220:7
220:18,19 222:5
222:10,10,16,18
223:5 230:15
231:15 232:2,21
234:2,5
rights 177:1
road 2:25 87:23
roberts 95:23
205:18,20,22
206:3,17
rodgers 176:19,20
176:21
rogers 122:24,24
ros 45:1
room 29:16,23
30:25 32:3 48:8
166:20
route 71:20
rule 2:13,14 6:9,9
233:1 177:7
rules 2:15 232:4
232:4 242:14
run 69:6 71:13,23
95:17 219:6 223:2
running 197:22

**s**

s 2:17 217:11
sale 63:24 188:5
190:14

## [salt - sent]

salt 144:16
saltwater 144:14
  144:14,16,18,25
san 1:2 2:13,20 3:9
  6:20 35:6 237:2
  231:9,15
saturday 168:3
save 206:19
saved 207:19
saw 121:8 122:13
  122:13 216:15
saying 15:21 16:4
  16:5,6,8 18:7
  19:14 22:7 23:11
  26:11 27:4 36:1,3
  41:11 57:10 59:22
  73:6 82:22,22
  89:19 92:12 97:19
  98:2 106:14,18,19
  132:8 149:6
  153:15 154:3,11
  157:23 163:22
  164:2 169:23
  170:12 171:4
  172:5,6,25 174:13
  175:13 187:15
  190:11,13,22
  200:1 204:6
  207:15 216:8
  228:19 232:18
says 35:22 37:14
  44:12,19,25 45:1,8
  57:7 90:19 96:21
  98:18 99:8 103:14
  103:24 105:11
  111:15 117:21
  118:10 125:25
  152:21 153:19
  154:4,8,22 157:9
  157:11 158:3,25

159:5,7 161:9
162:15 163:7
164:18 166:2
167:16,18,24
193:22 195:12
205:2,2 215:14
202:18
scam 76:21 77:4
  197:17,22 198:1
  198:10,17,22,24
  199:6,11,11
scams 198:11
scan 10:13
scanning 114:20
schedule 233:10
scmed 133:21
  194:17 195:4
screen 28:21 31:8 32:22
  34:11,14,15,18,20
  44:12 45:2,7,21
  46:9 47:3 52:4
  53:2,6,25 174:13
  78:11 79:2 109:13
  115:4,8,12,21
  119:25 126:2
  127:18 128:11
  136:22 137:1,17
  137:21,23 143:19
  143:20,22 148:17
  151:6 156:7,8
  158:8,15,16
  160:18 162:18,22
  164:24 167:8,10
  168:2 171:19
  186:15 193:22
  194:3,7 196:16
  207:3,9,16,21,22
  213:8,18 214:1,5
  217:9 224:15,25
  227:2

142:18 148:5,8
150:8 175:8
194:14 203:21
167:16,18,24
seconds 138:2
secret 222:20
secretary 56:5,7
  117:21
secured 97:5
see 9:6 11:9,19
  16:12 17:15 19:25
  25:21 29:3 31:4
  31:12 32:13,14
  34:13,16,20,22
  38:23 44:10 46:9
  46:10,10,12 51:20
  51:24 52:1 54:7
  55:20 65:4,12
  66:12 78:10 87:21
  89:9,19 90:20,25
  91:4 93:10 96:7
  99:25 104:3,9
  116:3,14,18 117:8
  117:11,19 118:9
  118:10,13,15,16
  124:4,15 128:9,18
  133:4,6,12,17
  134:13 135:12
  136:22 137:1,17
  137:21,23 143:19
  143:20,22 148:17
  151:6 156:7,8
  158:8,15,16
  160:18 162:18,22
  164:24 167:8,10
  168:2 171:19
  186:15 193:22
  194:3,7 196:16
  207:3,9,16,21,22
  213:8,18 214:1,5
  217:9 224:15,25
  227:2

seeing 31:8
seek 142:7
seen 78:8 102:8
  175:24 176:11
  200:25
seg 154:24 16:5,8
  59:12 69:2,3
  86:22 132:9,10
  183:9 199:3,4,6
  204:25
seller 41:7,18
  42:22 43:14 65:19
  69:7 71:19 98:23
  99:19,20 101:16
  102:5,10,12
  103:15,21 104:9
  106:7 196:19,20
  205:9,9,18 206:17
  212:14
seller's 43:11
selling 190:21
  190:24 192:14
  94:16,25 129:1
  135:22 192:16
  142:14
sense 60:1 81:7
  168:6,6 215:3
sent 11:4 30:23
  39:14 61:2 66:23
  67:20 73:9,18
  70:24,25 92:20
  93:4 94:1,14 95:3
  95:6 98:1 100:5
  101:8 104:25
  106:23 108:2
  114:25 127:14
  135:20,25 138:14
  138:22,23 139:4

## [sent - sir]

143:16 147:23
162:22 169:7
186:21,25 188:24
193:16 195:21
205:22 226:12
231:9,15
sentence 97:10
  100:7 101:4 102:4
  103:13,13,19
  105:1,19 106:4,5
  118:12,22 163:5
separate 69:7
  102:12 158:5
september 2:3,9
  6:3 59:9 80:24
  82:9 186:19 235:3
  238:3 241:3
series 1:7,8,19,20
  1:23 237:7,8,19
  237:20
serve 118:24
service 205:23
services 143:25
session 9:9
set 20:9 117:1
  127:13 174:25
  212:2 213:16
sets 26:5 200:13
settle 200:13
seventh 226:14
shame 200:12
shape 3:14
shape 11:5 52:4
  53:2 65:15 66:6
  72:15,25 78:6,11
  109:13 115:8
  128:9 142:1
  143:15 147:2
  176:3 186:9 201:3

213:2 214:2
shared 78:11
  86:25 115:9
  186:12
sharing 34:18
she'll 18:1
sheet 242:10
shelby 202:12
shell 32:12
ship 230:11,13
shooting 107:23
  107:23
short 49:1 202:2
  228:24
shorten 107:16
shorthand 238:6
shotgun 107:23
shoulder 200:5
shove 124:15
show 11:6 33:23
  45:21 46:8 47:2
  128:15 129:5
  186:9,10 201:9
  213:3
showed 38:24 54:5
  174:9
showing 11:3
  12:17 53:1,23
  151:25
shown 241:16
shows 51:4
shut 123:19
shutting 191:4
sic 12:15 71:2
side 7:2 40:5,7,8
  143:8,11 173:8
  201:20 214:9
  222:18,24
sides 40:3,13 85:8
  201:21

sign 12:23 16:25
  17:6 18:18,22
  19:4 21:18 22:19
  22:25 53:10 57:5
  74:13 75:22 76:15
  77:1,10 92:19
  110:16,25 111:7
  112:1 129:8
  147:16,24 148:6
  149:14 196:21
  197:5 212:24
  233:25 234:4
  242:6,11
signature 4:6 12:4
  12:17 38:18 53:15
  54:12 55:17 57:3
  57:9 105:17
  109:16,19,22
  117:7,11,14,15
  147:18,21 148:2
  187:4 194:15
  195:3 196:9,14
  197:3 235:1 236:1
  238:14,19 240:4
  241:7,19
signatures 150:24
signed 12:11 24:23
  25:9 53:21 54:10
  56:18 57:5,8,10,12
  57:13,15,24,24
  58:18 59:23 60:6
  60:12,14,14 64:3
  67:20 73:9,18
  74:3,9 77:16,22
  78:14 109:25
  111:3 116:20
  117:2 121:9 129:4
  130:23 138:19,20
  156:19,20,20

163:14,15 164:4
  170:25 186:25
  194:11 195:3
  196:6 216:10
  217:17,17 218:17
  236:3 242:17
signee 214:18
signing 12:7 13:7
  14:4,12 60:22
  196:5
similar 8:22 143:1
similarly 194:14
simple 10:1 14:11
  231:14
simpler 196:25
simply 41:14
  168:8 172:19
  181:2,4,4,4
simultaneously
  106:17
sincerely 46:7
single 135:25
sir 7:23 8:3,4,9 9:4
  11:3,9,14,15 12:2
  12:4,24 13:3 14:9
  14:9,24 15:19
  16:2 17:24 18:3
  19:11 25:21 26:18
  26:25 27:10 28:21
  34:19 36:1 38:21
  40:15 41:13 43:6
  43:12,23 49:16
  53:7,12,19 54:7,12
  56:1,10 57:19
  67:17 70:9 72:6
  74:21 75:19 76:7
  78:17 80:14,19
  81:12,19,25 84:25
  85:7,14,25 86:10
  86:10 87:15,24

## [sir - statement]

89:8 90:21,22
93:17 94:9 96:23
97:7,8,10,21 98:8
98:16,24,25 99:8
100:3,5 104:25
104:20 105:7,17
107:15 109:4,10
109:14,17 111:10
112:12 117:25
118:9,14,16,23
119:1,16 125:1
128:19 129:10,15
132:11,21 133:12
134:5 137:17
139:15 140:18
141:24 142:20
147:20 148:3,9,21
149:15,24 150:1,6
155:21 156:3,17
157:23 161:6
160:18 162:8,18
163:6 164:24,25
167:9 169:13
171:15 173:2,8
175:13 177:16,16
178:1 181:3,6,17
181:21 182:14
183:1,3 186:24
187:10 189:7,20
189:20 191:9
193:24 194:5,8,13
194:15,21 195:2
195:13,22 199:24
204:8 214:2,5
215:16 216:1
217:10 218:18
221:23 222:11
223:3,23 229:19
230:10
sit 43:9 88:3 93:20
127:4 145:24

146:13 165:17,20
203:4
situation 43:17
154:2 212:2
six 15:5,25 16:3,6
16:7 58:2 59:18
128:15 132:9
191:13 205:21
216:9 227:18
sixth 226:14
sleepy 79:19
sliver 120:1
slow 17:22
small 72:2
smart 5:16 179:23
smeberg 2:12,19
5:16 45:1 179:4
179:23 239:4
smeberg.com 2:21
239:6 242:1
snuck 69:13
solares 202:4
sold 65:21 73:13
80:9 81:4,12,18
86:18 182:21
202:1,5
solemnly 7:10
solutions 3:15
238:20 240:6
241:21 242:19
son 71:2 91:10
sooner 79:24
sorry 8:16 17:21
19:2 35:11 43:23
56:1 65:7 78:5
80:9 81:17 94:9
96:6 99:8 113:10
114:3,15 115:20

121:15 138:5
146:14 161:22
206:22 212:1
215:7 217:1
sort 230:18
sound 214:12
sounded 211:1
sounds 10:25 14:2
38:7 74:20 130:7
south 200:1
205:12 211:24
speak 42:4,6 43:8
43:13 81:5 89:4
102:24 189:16
190:5,5 232:19
speaking 106:16
167:8
speaks 38:18
80:18 90:22
103:17 189:14
217:8 219:17
special 4:20 5:1
20:2,4 87:4,18
90:20 91:3 110:4
110:8,13,20 111:2
132:18
specific 15:20
16:14,15 21:2,9
27:15 28:5 84:23
131:14 164:21
specifically 16:22
23:10 92:2 131:11
228:12
speed 18:11
spelled 99:25
100:3 139:14
spell 11:18 153:4
192:1 204:17
split 62:5 67:3
149:12

spoke 183:24
spot 200:16,18
202:16 203:5,24
204:11,15,17
205:8,11,14
206:21 211:18,21
211:23 212:3,11
228:4,6 229:1
spots 213:16 221:7
221:11 222:6
227:10,11,22,23
spyglass 87:23
96:11 112:11,16
116:12 186:22
spyware 9:10
standard 174:12
174:13
stands 144:7
148:10 229:22
start 10:1 11:3
64:16 80:15 152:1
152:2 224:1
229:14
started 23:5 30:9
66:25 138:15
155:21 162:1,2
starting 98:11,17
111:18,20 112:8
100:7 103:19
150:23,25
state 2:11 6:11,15
58:19 61:18,18
228:12
97:1 124:21
231:25 233:25
236:10,19 238:7
stated 2:15 8:21
66:14 161:10
statement 97:12
99:1,16 101:13
102:19 103:17
168:9 169:12

## [statement - take]

171:3 172:14,18
218:2
states 1:1 92:2
93:7 142:15,17,17
144:11 146:9
145:23,25
stating 56:17
status 223:5
stay 29:14,20 32:1
68:16 148:25
149:1 162:10,12
162:12 173:13
207:19 208:5
stenographic 2:11
6:14
step 206:19
steve 130:18
sticker 9:21
stickers 10:5
stipulated 32:17
stipulations 4:3
stock 130:15 161:1
161:5,16
stomach 76:6
stood 162:24
stop 65:15 201:2
straight 41:7,17
65:18 99:20
101:16 102:5
169:2,3
strained 127:23
strains 115:18
136:25
streamline 138:11
209:11
street 3:15 240:7
241:22
strength 24:14
strike 42:1 113:19
string 175:1

strolle 13:4,7 14:4
14:12 18:20 20:19
21:12 23:2,19
28:15,16 35:17
37:16,23 38:3,19
49:19,23 50:2,8,9
50:12,14,21 51:8
54:17 63:4,6
66:18 75:22 76:14
76:17 77:1,3,10,12
78:18,21 88:2
95:6 103:4 111:11
111:18,20 112:18
112:13,17,22
113:6,18,20 119:5
119:12,20 120:8
120:17,20 121:8
121:10,14,17,20
121:25 122:10,15
123:1 131:18,24
134:11 135:6,17
135:23 136:11
141:6,22 184:15
184:21 185:5,16
187:7 195:1,19,25
196:7,11 197:7
216:10
strolle's 56:8
114:7
stuff 208:1 220:10
223:8 225:22
styled 2:8
subject 129:1
134:20 147:8
153:3 154:12
157:25 188:11
207:14 215:14
216:3,7 220:18
subjects 227:15
submitted 238:17

subscribed 236:13
successful 202:12
successors 1:8
72:16 73:2 150:15
237:8
suffer 228:6
suffered 228:7
sufficiently 200:22
sugar 183:16
suggests 57:1
suite 2:3 5:3,4,9,16
239:10,14,18
240:7 241:22
sum 126:1 154:23
154:24
summarize 133:20
summary 166:25
sunday 167:18
sunset 2:12,20
239:5
superior 229:22
supports 126:22
127:6 152:13
sure 9:5,7 12:19
13:9 16:13 17:16
17:16,17,25 30:12
30:12 35:21,21
39:15 50:4 51:15
55:12 57:5,6 58:1
163:11 173:14

178:2 185:15
187:10 189:24
190:16 194:22
195:10 196:22
217:17,17 218:16
236:3 242:17
surfer 200:6
surfing 200:4
surgeries 200:5
surgery 45:19
48:24 208:7,11,12
suspended 231:19
suspension 232:1
232:16,23
suspicions 197:24
swa 4:17 5:6
124:18,20 125:2
125:11 126:23
127:7 130:4,17,19
147:2 149:12
156:17 157:14,14
157:19 159:11
222:7,15 223:17
223:25 224:22
226:7
swds 144:13
swear 6:6 7:10
180:12
switching 230:5,5
sworn 2:8 7:17
238:9
synergy 64:21
65:2 70:25 121:16
121:21,24

### t

tactic 30:10
take 16:2 17:1
48:16 49:1,6 79:9
79:25 89:15 90:2
90:11 98:7 106:20

**[take - things]**

```
take                   192:14,22 202:7       170:15,23 172:11       232:8,9,22 238:11
  107:13 108:13,14       207:10                172:19,21 173:1        239:1 242:8
  108:17,21 123:4,9    tea 108:9             174:15,19 175:10      texas 1:1 2:11,13
  123:10,14 124:3      team 141:25           189:5 201:11           2:20 3:1,5,9,16
  139:6 140:7          tech 207:4            205:24 206:1,2         6:14 7:1,4 18:17
  151:21 152:11        tee 138:9:9           228:22                 21:25 28:12 56:15
  183:25 190:8         tees 159:8          terrazas 2:24 7:1        69:15,19 75:7
  193:14,17 201:16     tell 5:16 25:12        239:9                  106:1 174:11
  209:20,21 213:23     terrible 130:10     testified 7:17          237:1 238:7 239:5
  231:2 233:22         terrill 1:22 45:17  text 96:21 112:5        239:10,14,19
taken 2:8 33:11          48:19 63:23 64:5     136:23 175:16         240:8 241:23
  79:17 131:3 170:6    text 64:11,11,14      texted 175:20,25      test 96:21 112:5
  192:18 210:21        69:25 70:3,5        texts 176:3             136:23 175:16
  216:19 239:2,25      202:8 237:22        thank 7:15 11:1         176:1,6
takes 210:3           terrill's 64:21      thanks 33:4 79:9       tested 7:17
talk 46:16,19,20      testified 7:17       197:13,15 231:22       19:11 49:18 61:10
  48:8 64:16,18       19:11 49:18 61:10    231:24                 62:7 120:7 139:7
  70:20 204:12,20     62:7 120:7 139:7     therefor 241:8         186:1
  222:7 228:3 230:4   186:1                thing 50:25 62:15      testify 109:20
  230:4               testify 109:20       75:8 77:15 93:13       173:18 221:11
talked 11:16 22:5     173:18 221:11        93:21 94:16 95:9       227:7,15,22
  59:17 71:17         227:7,15,22          135:7 154:10           232:13
  140:20 165:19       231:8                165:23 166:4           testimony 4:13
  176:4,10            ten 163:19           things 18:14 46:7      108:20,22 125:20
talking 9:15 34:2,5   tender 208:22        46:19 58:9,14          140:9 158:12
  51:20 58:22 59:4    tense 105:3,7,12     83:4 93:10 105:19      173:3 183:20
  64:8 67:1 70:19     105:15               95:12,15,18 231:22     184:1,2 186:5
  78:14 83:24         term 15:1,8,11,17    231:24                 197:13,15 231:22
  125:23 165:18,22    15:21,23 16:7,16                            231:24
  167:11 176:16       16:21 17:20 23:6     thanks 33:4 79:9
  206:5 212:14        23:20 82:3 105:15    173:24
  228:9 230:10,20     132:7 163:23         therefor 241:8
tantrum 25:3          164:15 178:20,22     thing 50:25 62:15
tape 123:24 210:6     179:5                75:8 77:15 93:13
taxes 225:11,10,24    terms 23:11,14       93:21 94:16 95:9
tcleveland 3:2        124:22 134:21        135:7 154:10
  239:11              139:18 140:5         165:23 166:4
tcrg 80:21 81:18      150:17 156:11        things 18:14 46:7
  171:15 176:12       157:12 164:3,19      46:19 58:9,14
  178:7 190:14,18     168:10,14,17         83:4 93:10 105:19
  190:18 191:20       169:5,6,17,20        95:12,15,18
```

**[things - tongue]**

```
  204:15 207:25        233:19                184:1,2 185:22        times 151:6
  210:24 213:14      thinking 25:13,13     189:4 195:7 204:5      197:16 220:2
think 14:15,15         90:14 174:10        206:22 219:4,9,18      timing 100:10
  29:25 43:4 45:13   third 1:16,23         222:9,13,22,23         timothy 2:23
  45:14,22 47:19       35:22 98:14 158:9   230:7,13,22            238:23 239:8
  51:9 52:14 53:11   162:15 237:16,23      231:24                 241:10
  54:1,8 56:2,3 58:3 thought 71:16,25    time 6:3 11:18          tired 44:9 89:20
  58:5,21 59:11,18     89:15 145:17        25:12,17 31:8,12       123:1 183:15
  61:15 64:7,17,21   202:6 212:21          33:6,9 45:19           191:7 208:4,5
  68:4 76:2 84:13    thoughts 25:16        48:12 49:12 58:22      221:20
  90:11 91:25 94:6   231:12                59:15,19 64:1,20      title 116:4 194:2
  95:14 101:14       three 12:11 25:13     65:15,17 67:8         titled 119:12,25
  105:16 111:16      27:22 31:11 45:19     69:5 75:24 76:1       today 9:12 28:25
  112:13 113:3       63:15,15 116:16       76:12 79:6,10,12       30:21 46:3 79:20
  116:25 122:16      141:6 193:20          79:15 80:2,4 85:9      88:3,17 91:24
  127:5,17,22        209:21 226:10         92:21 100:2 105:9      93:20 124:7 139:8
  131:12 133:7       throckmorton         104:10 137:15          142:6 145:21 147:7
  134:14,22 141:5    3:15 240:7 241:22     124:10 137:15         145:24 146:13
  147:25 148:20      throwing 136:18       138:1 140:11,15       164:7 165:17,21
  163:19 164:5,5     tied 76:23,24         142:19 162:1          185:11 186:12
  171:19,20,25       till 57:9,8 58:18     165:5 171:14,14       193:16 201:12
  174:5 176:6,18,20  76:19 213:11          171:20 174:1,3,14     204:8 207:19
  176:20 184:10      tim 62:10 18:22       174:17 175:20         209:3,5,15 218:21
  186:3,12 187:2     32:4,7,8 39:9         176:4 183:22          219:14 221:15,19
  188:19 191:5       41:11 45:6,6,18       196:23 199:4          227:15 230:5
  193:2 196:6        47:5 48:2 79:1        202:11 204:1          today's 6:2 234:10
  198:13,20 199:3,7  99:10,11 200:4        207:7 208:21          told 10:23 24:23
  199:10,11,20:4     104:1 107:20,25       209:2,17,21,23        60:13 64:15 69:11
  200:14,18,22       108:22 114:21         210:16,19 211:20      69:12,17 70:19
  202:25 203:10      115:15,20 119:24      212:14,16,20          71:15 74:10 95:23
  204:24 207:4,5,6   116:24 124:7          213:16 124:3,9        91:15,18 170:13
  207:20 208:16,18   125:20 126:6,11       217:2 218:16          178:6 180:17
  208:25 210:1,2,4   127:24 138:4          219:7 220:13          181:3,18 184:9
  212:1,1,3 216:22   143:20 145:15         231:23 232:3,5        187:25 196:19
  227:18 228:5       146:14,21 166:21      234:11 238:21         204:23 223:5
  231:10,11,11,25    167:5 170:9 171:7     timeframe 242:7       ton 228:7,8
  232:16,17 233:17   171:8,18 173:9        179:9 179:10          tongue 61:25
                     232:16,17 233:17      180:11 183:17
```

**[top - understanding]**

```
top 12:17 129:10     transactions 18:6    truth 7:12,12,12       53:23 54:4 58:14
  134:11 139:17       102:17               truthfully 103:3      84:2 108:9 134:3
  148:19 156:10      transcript 232:22     truths 198:15         142:23 152:2
  167:9,18 168:9      238:10,17 241:13     try 18:10 43:20       155:18 162:7
  172:10 195:8        242:5,16             67:23 115:11,21       166:17 175:22
  214:19             transfer 10:24        115:22 133:19         177:22 178:21
topic 175:15         transom 10:22         137:4 197:20          184:15 185:16
topics 232:5         traveling 20:22       200:12 206:17         186:12 188:6
total 188:2,11        21:1,1               209:11 213:16,17      190:15,24 199:13
  191:12 209:8       trial 233:6,6,12,12   222:1 224:19          200:5 202:1
  225:16,23 226:17    tricks 32:19         232:16                207:19 208:15
  226:18             tried 69:6 199:2      trying 13:13 14:21    209:10 213:9
touch 64:4 136:14     199:10 200:13        16:13 32:18,19        224:5,24 230:24
  193:6 221:14        223:8                36:1 37:7 45:5        231:2,9 232:22
tough 193:5 201:6    trips 176:8 200:8     49:9 62:2 64:16       236:8
  202:16 203:5,23     223:6                69:19 70:6,10,11     type 143:17
  204:11,15,17       trouble 68:25         70:11 83:6 90:13     typed 88:22 111:7
  205:8,11,14        trucking 130:19       93:8,10,10 94:8       111:11
  206:20 211:18,21   trucks 145:13         107:20 111:15
  211:23 212:3,11    true 17:16 41:6,8     119:5 121:11                  u
  212:24,24 213:16    41:16 56:19 64:25    125:17,17 131:22
  221:7,11 222:6      64:25 112:10         138:23 140:22       ultimately 86:7
  227:10,11,22,23     141:21 175:1         145:20,20 162:9       113:14
  228:4,6 229:1       180:13 189:17        162:25,25 167:5,6   uncertain 184:22
tour 72:2             215:20,25 217:10     171:23 172:2,2      understand 7:24
tournaments           218:23,23 236:1      173:4 180:11         8:3 30:12 37:3,5
  199:19              238:11               184:17 185:6,8       37:21 38:15 42:8
town 69:11,12        trust 47:12 50:10     193:2 204:8,22       47:5 56:24 58:13
  228:24,25           52:5,8 53:4,19,21    206:18 219:1,4       62:1 74:1 94:8
track 49:9 140:22     54:15,20 55:1,8      220:3 224:25         100:11 104:16
tracy 55:21,24        58:14 59:24 60:8     tuesday 26:2         101:18 113:16
transaction 17:1      60:13 61:1,4,21     tune 16:9 42:11       120:25 158:4,20
  19:4 24:20 40:3     62:6,24 63:1,8      turn 52:14 53:3,18    163:4 164:15
  40:13 64:5 74:18    64:3 67:20 73:10     96:17 98:21 99:17    165:20 171:22
  85:8 98:20,23       73:17,23 74:2,8,14   109:13 126:12       172:2 173:18
  99:18 100:15        75:12,18,23 76:15    177:7                175:5 177:5,14
  101:8,20 102:14     77:1,10,15,21 78:4   turned 109:12        179:14 189:6
  102:22 103:21       78:13 114:18         177:7                198:7 199:22
  106:12 119:14       121:8                two 7:21 9:18        214:20 216:17
  130:3,7,8          trustee 146:3,5,8     18:14 32:16,16       217:5 222:9,17
                      146:10               33:19 48:11,11       231:20 233:8
                                          understanding
                                           41:1 54:19 55:2,7
```

**[understanding - wearing]**

```
  72:9 119:19 142:6  veritext.com 3:17   walk 127:6,16         watching 51:19
  144:24 145:24       veritext.com.        want 11:3 21:9       water 178:9
  160:6 160:9,14       242:13              22:20 29:17 30:4     way 10:15 16:6
  177:17 221:19,20   versa 176:7           30:6 32:7 33:16      39:16 41:8,18
understood           version 134:17        34:2,3 46:19 47:5    42:23 55:10 63:15
  113:19 154:18      versus 16:3          61:17,18 62:3,4,10    63:24 64:6,24
  175:12             vice 176:7            68:13,15 93:3        65:3,19,20 66:7
united 1:1 93:7      video 2:1,5 45:24    104:4,5 113:16,17     67:2 68:11 69:2
  237:1               46:13 51:24          120:4 123:4,24      70:12 73:13,14
university 69:21      207:21,21            128:14,22 134:4      80:21 87:5 121:4
unreasonable         videographer 3:4     136:19 137:4,10      103:21 132:10
  31:18 210:4,9       6:1 33:5,8 49:4,7    137:10 138:10,12     138:10 143:3
untrue 217:16         49:11 79:11,14       138:16 140:1         150:10 153:23
upsets 199:21         108:23 109:1         145:17 146:16       156:15 160:19
urging 233:2          140:10,13 173:25     155:22 159:25       160:10,10 167:22
use 8:21 181:10       174:3 184:3,6        162:10,10,13         168:6 169:9,25
  35:20 146:15,18     209:14 210:15,18     173:16 183:25       170:1,18,19 172:3
  222:21,22 232:4     234:7,9              174:16 175:17,25     176:15 177:2,15
  236:8              view 32:20 36:18     175:18 177:7,20      177:22 178:2,5,13,17,20
usually 88:22         40:22 212:4          194:10 198:16       178:2,5,13,17,20
  111:10             viewed 28:9,14       200:12 203:11,16     182:5,13,17,20
uvalde 1:7,20         34:6 35:1            203:23 204:13       183:10 190:21
  242:9              viz 2:24              208:5,8 210:12,23    199:5 201:5,13
                     void 153:10          219:2 220:20        207:15 211:14,19
         v           vol 242:4            227:19 230:16       213:11 218:3,6,10
v 1:11,18 237:11      237:18 242:3        231:23 234:2         228:16
  237:18 242:3       vacuum 145:2         234:3                we've 21:6 33:11
vacuum 145:2         valid 149:23         wanted 7:23 8:7      36:9 48:3,10
valid 149:23         value 160:18         8:21,25 43:16        66:22 78:8,13
value 160:18         variety 62:2         47:17 60:5 68:2      79:17 141:17,20
variety 62:2         vehicle 86:22        121:2 135:19         141:20 156:23
vehicle 86:22        verbal 17:10,19      136:20 141:2         166:8 167:11
verbal 17:10,19       18:2,13,15 19:13    148:25 149:6,11      206:25 207:19,24
  18:2,13,15 19:13    19:14 22:5 71:1     154:1 162:11,12      209:2,11 220:10
  19:14 22:5 71:1    verify 30:1 242:8    168:23 184:10        213:25 225:22
verify 30:1 242:8    veritext 3:15        202:8 223:5          230:17
veritext 3:15         238:19 240:6,6     wanting 28:10        weak 52:25 183:15
  238:19 240:6,6      241:21,21 242:12     35:6 104:7          wear 122:13
  241:21,21 242:12   242:19               wants 46:11         wearing 21:20
                                           208:10,12           121:10 219:4,16
```

[wednesday - written]

| | | | |
|---|---|---|---|
| **wednesday** 206:3 | **wipes** 153:1 | 228:1 | 101:3 108:1 109:3 |
| **week** 106:12 | **wire** 42:25 100:13 | **wore** 113:23 | 110:25 114:12,14 |
| **weekend** 205:17 | **wired** 41:17 42:21 | **work** 70:6 112:18 | 115:25 117:3,8,19 |
| **weekly** 71:7 | 65:18 99:19 | 112:20 113:7,18 | 120:3 122:6,19 |
| **weeks** 67:19 | 101:16 102:19,20 | 113:21 114:9,11 | 123:2 124:17 |
| **weird** 138:19 | 105:16,24 | 114:12,13,17 | 126:13 128:15 |
| **welcome** 49:13 | **wish** 79:23 111:1 | 138:23 187:9 | 129:22 132:7,22 |
| **wells** 145:1 | 200:9 | 205:4,10 219:24 | 134:2 136:12,21 |
| **went** 8:6 9:11 | **withdrew** 161:11 | **worked** 119:5 | 138:13 139:9,18 |
| 23:13 25:2 41:7 | **witness** 2:6 6:6 7:8 | **working** 51:11 | 140:3,17,23 |
| 66:12 69:6 71:2 | 7:14 8:17,19 30:2 | 67:7 68:18 69:25 | 141:14,18 142:5 |
| 72:1 79:3 99:24 | 39:7,11 45:8,13 | 70:1,2 107:1 | 143:22 145:23 |
| 101:20 102:5 | 52:7,17 68:13 | 146:20 202:19 | 147:4,14 154:4 |
| 143:19 159:10 | 75:24 76:1,4,8,13 | 223:19 | 155:8 156:6 159:1 |
| 173:20 183:8 | 89:18 90:5,7 | **works** 55:12 | 163:13 169:4 |
| 190:9,12,14,22 | 106:16 108:18 | **world** 48:12 | 170:10,20 172:4 |
| 191:1,1,11,18 | 115:13 123:5,8,11 | **worn** 221:9,9 | 172:10 174:8,20 |
| 202:8 205:17 | 123:15,20 124:9 | **worry** 90:6 | 175:16 176:11 |
| 206:16 211:24 | 127:19 141:15 | **worth** 3:16 71:3 | 179:13,17,22 |
| 216:22 221:13 | 146:19,25 154:7 | 240:8 241:23 | 180:15 182:6 |
| 226:11 | 161:1,5 167:4 | **wrap** 76:11 208:25 | 183:13 184:8 |
| **west** 3:4 200:7 | 180:10 183:21 | **wright** 1:21 2:1,5 | 186:7,16 192:8,11 |
| 239:14 | 184:1 186:3 | 3:7,13 4,4,18,18 | 193:7,14,18,20,22 |
| **western** 1:1 237:1 | 204:13 207:20,22 | 5:15,21 6:2,20,21 | 196:20 197:16 |
| **wgermany** 3:10 | 208:9 218:20 | 7:11,16,20 8:6 | 198:8 199:12 |
| 239:20 | 219:10,13,16,21 | 9:13 10:2 11:1,6 | 200:14 207:18 |
| **whatsoever** | 220:7 221:6 | 12:15 14:1 21:6 | 208:10 210:7,20 |
| 143:11 | 222:12 231:2 | 29:14 30:1,20 | 211:22 221:20,22 |
| **wife** 40:19 50:3 | 238:9,12,18,18 | 31:5 33:10 34:1 | 222:23 224:19 |
| 88:2 111:12 133:7 | 242:5,7,9,11,15 | 39:21 43:18 44:1 | 226:5 227:6,21 |
| 141:18 184:13 | **wonder** 138:1 | 44:13,21 45:3,16 | 228:1 231:5,22 |
| **william** 3:8 32:8 | **wondering** 165:13 | 46:24 48:15,18,20 | 232:16 234:10 |
| 39:7,12 47:1,8 | **word** 8:13 50:22 | 49:13 52:21 53:21 | 235:2 236:1,6,12 |
| 48:5 89:19 107:7 | 105:6 177:12 | 56:14 59:22 63:22 | 237:21 238:2,9 |
| 219:25 231:12 | 197:17 198:13,14 | 64:4 65:16 70:17 | 239:16 241:2 |
| 233:19 238:24 | 199:7,7 200:15 | 71:11 73:9 77:14 | 242:4 |
| 239:17 | **words** 40:24,24 | 78:7 79:17 80:7 | **wright's** 221:4 |
| **willing** 221:10 | 102:24 144:2,5,10 | 82:6 84:11,20 | 232:8 |
| **wind** 119:19 | 180:14 201:12,14 | 87:2,9 88:10 89:3 | **write** 10:8 |
| **winded** 107:16 | 201:22 202:15 | 89:22 93:4 95:24 | **written** 106:5 |
| | 203:4 204:14 | 96:3 97:2,3 98:4 | 125:1 181:24 |

[wrong - zoom]

| | | | |
|---|---|---|---|
| **wrong** 8:13 99:10 | **year** 15:1,5,6,7,11 | | |
| 145:7 167:13 | 15:17,21,23 16:2 | | |
| 171:6 198:13 | 16:16,21 17:20 | | |
| **wrote** 9:18 | 23:6,20 26:9 | | |
| | 59:14,15 80:16 | | |
| **y** | 132:6 176:21 | | |
| **y'all** 13:17,20 | **years** 5:17 25:14 | | |
| 30:11 92:1 120:11 | 63:15 93:9 179:25 | | |
| 120:11 141:1 | 182:16 219:5 | | |
| 184:18 227:3 | **yellow** 115:15,15 | | |
| **y'all's** 158:21 | 115:18 127:21 | | |
| **yeah** 30:17 31:19 | 131:6 169:5 | | |
| 32:23 48:23 51:7 | **yesterday** 8:8 9:3 | | |
| 51:12 52:1 54:8 | 9:7,11 11:16,19,22 | | |
| 54:11,13 57:18 | 17:9,11 28:22 | | |
| 58:15,15 62:13,18 | 29:9 30:11,22 | | |
| 65:10 68:23 79:8 | 31:2 33:17 45:11 | | |
| 79:9 80:18 88:18 | 46:3 47:3,6 49:19 | | |
| 90:1 91:5,5 99:13 | 52:4,24 68:22 | | |
| 111:22 115:9 | 80:4 96:13 124:18 | | |
| 116:21 119:21 | 127:23 136:10,22 | | |
| 124:5 126:4,7 | 137:9 140:24 | | |
| 128:10 129:12 | 143:1 183:22 | | |
| 133:7 134:6 136:8 | 209:6,16 223:12 | | |
| 136:25 137:1,3 | 232:8,18 | | |
| 138:3,8,22 139:24 | **yesterday's** 8:1 | | |
| 141:4 145:22 | 52:6 | | |
| 154:21 158:17 | **z** | | |
| 165:25 166:17,19 | | | |
| 167:13 169:14 | **zero** 100:18,19 | | |
| 173:11 174:23 | 151:19 | | |
| 176:22 183:20,20 | **zone** 171:14,14 | | |
| 184:23 187:2 | 174:17 178:13 | | |
| 195:5,8 198:6 | **zones** 174:14 | | |
| 199:2,16 201:6 | **zoom** 2:19,23,24 | | |
| 200:7 200:9 | 3:3,8,12,13,13,14 | | |
| 209:17,19 210:13 | 6:5,25 7:6 29:1 | | |
| 219:1 220:19 | 44:12,16,20,25 | | |
| 224:3,16 225:18 | 46:6 207:5 | | |
| 225:21 229:18 | | | |
| 231:13 233:23 | | | |

---

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

---

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.