# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

**IN RE:**

| | |
|---|---|
| **KRISJENN, RANCH, LLC, DBA as**<br>    **KRISJENN RANCH, LLC-SERIES**<br>**UVALDE RANCH; and**<br>**KRISJENN RANCH, LLC SERIES**<br>**PIPELINE ROW,** | **Bankruptcy Case No. 20-50805-RBK**<br>**(CHAPTER 11)** |

      *Debtors,*

_____

**DMA PROPERTIES, INC., et al.,**

      *Appellees,*

**v.**                                            **Adversary No. 20-5027-RBK**

**KRISJENN RANCH, LLC,**
**et al.,**

      *Appellants.*

## <u>NOTICE OF APPEAL</u>

TO THE HONORABLE BANKRUPTCY JUDGE RONALD B. KING:

Pursuant to 28 U.S.C. §158(a) and Rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure, Plaintiffs, and Counter-Defendants KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series Uvalde Ranch, and KrisJenn Ranch, LLC-Series Pipeline Row (collectively the "Debtors") hereby appeal to the United States District Court for the Western District of Texas from the following:

    a. Order (I) Granting DMA Properties Inc.'s Motion for Partial Summary Judgment on DMA's Ownership Interest in the Bigfoot Note Payments, and (II) Overruling KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series Uvalde

1

Ranch, KrisJenn Ranch, LLC Series Pipeline Row's Objections to DMA's Evidence entered in the above-referenced adversary proceeding [relates to Dkt. Nos. 41 and 95] on October 21, 2020 (Dkt. No. 110);

b. *Final Judgment* entered by Judge Ronald B. King in the above-referenced adversary proceeding (Dkt No. 237) and its accompanying *Opinion* (Dkt. No. 236) entered on March 24, 2021;

c. *Final Judgment* entered by Judge Jason Pulliam in Case No. SA-21-CV-0358-JKP on March 14, 2023 (Dkt. No. 285); and its accompanying *Opinion* (Dkt. No. 284).

d. *Final Judgment After Remand* entered by Judge Ronald B. King (Dkt. No. 329) and its accompanying *Opinion After Remand* (Dkt. No. 330) entered in the above-referenced adversary proceeding on March 26, 2024;

The Parties to the judgment appealed from and the names and addresses of their respective attorneys are as follows:

Appellants/Plaintiffs/Third-Party Defendants: KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series Uvalde Ranch, and KrisJenn Ranch, LLC-Series Pipeline Row:

C. John Muller IV
john.muller@cjma.law
CJ MULLER & ASSOCIATES, PLLC
111 W. Sunset Rd.
San Antonio, Texas 78209
(210)664-5000

Appellee/Defendant/Third-Party Plaintiffs: DMA Properties, Inc., and Frank Daniel Moore:

Natalie F. Wilson
nwilson@langleybanack.com
LANGLEY & BANACK, INC.
745 E. Mulberry, Suite 700 San
Antonio, Texas 78212
(210) 736-6600

Appellee/Defendant/Third-Party Plaintiffs: Long Branch Energy:

Michael Black
mblack@burnsandblack.com
BURNS & BLACK PLLC
750 Rittiman Road
San Antonio, Texas 78209

Jeffrey Duke
jeff@jfduke.com
JF DUKE AND ASSOCIATES
11819 Great Oaks Drive
College Station, Texas 77494

Appellee/Defendant/Third-Party Plaintiffs: Long Branch Energy, DMA Properties, Inc., and Frank Daniel Moore:

Timothy Cleveland
tcleveland@clevelandkrist.com
Austin Krist
akrist@clevelandkrist.com
CLEVELAND KRIST PLLC
303 Camp Craft Road, Suite 325
Austin, Texas 78746
(512) 689-8698

Christopher S. Johns
cjohns@cobbjohns.com
COBB & JOHNS PLLC
14101 Hwy 290 West, Suite 400A
Austin, Texas 78737
(512) 399-3150

Appellee/Third-Party Defendant: Larry Wright

William P. Germany
william@germanlaw.com
GERMANY LAW, PLLC
1250 N.E. Loop 410, Suite 725
San Antonio, Texas 78209
(210) 824-3278

Appellee/Third-Party Defendant: John Terrill, *pro se*

12712 Arrowhead Lane
Oklahoma City, Oklahoma 73120

Debtors appeal the Summary Judgment, Final Judgment and Opinion entered by

Judge Ronald B. King, Final Judgment and Opinion entered by Judge Jason Pulliam, and

Final Judgment After Remand and Opinion After Remand entered by Judge Ronald King as

outline above and attached hereto as Exhibits A, B, C, and D.

Respectfully submitted,

CJ MULLER & ASSOCIATES, PLLC

By: /s/ *John Muller*
  C. John Muller IV
  State Bar No. 24070306
  john.muller@cjma.law
  111 W. Sunset Rd.
  San Antonio, TX 78209
  Telephone: 210-664-5000
  Facsimile: 210-899-1933

ATTORNEYS FOR KRISJENN RANCH,
LLC, KRISJENN RANCH, LLC-SERIES
UVALDE RANCH, AND KRISJENN
RANCH, LLC-SERIES PIPELINE ROW

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on all counsel of record by way of e-service through the CM/ECF system by notice of electronic filing or via email on the 5th day of April 2024:

Christopher S. Johns
cjohns@cobbjohns.com
COBB AND JOHNS
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
Telephone: (512) 399-3150
Facsimile: (512 572-8005

Timothy Cleveland
tcleveland@clevelandkrist.com
Austin Krist
akrist@clevelandkrist.com
CLEVELAND KRIST PLLC
303 Camp Croft Road, Suite 325
Austin, Texas 78746
Telephone: (512) 689-8698

Attorneys for Longbranch Energy
DMA Properties, Inc., and
Frank Daniel Moore

Natalie Wilson
nwilson@langleybanack.com
LANGLEY & BANACK, INC.
745 East Mulberry Avenue, Suite 700
San Antonio, TX 78212
Telephone: 210-736-6600
Facsimile: (210) 735-6889

Attorneys for DMA Properties, Inc. and
Frank Daniel Moore

Jeffery Duke
jeff@jfduke.com
JF DUKE AND ASSOCIATES
11818 Great Oaks Drive
College Station, Texas 77494

Michael Black
BURNS & BLACK PLLC
mblack@burnsandblack.com
750 Rittiman Road
San Antonio, Texas 78209
Telephone: 210-829-2022
Facsimile: 210-829-2021 fax

Attorneys for Longbranch Energy, LP

William Germany
william@germanylaw.com
GERMANY LAW, PLLC
1250 NE Loop 410, Ste. 725
San Antonio, Texas 78209
Telephone: (210) 824-3278

Attorneys for Larry Wright

OFFICE OF THE UNITED STATES
TRUSTEE
James.roase@usdog.gov
903 San Jacinto Blvd, Room 230
Austin, Texas 78701
United States Trustee

 /s/ *John Muller*
C. John Muller IV

# EXHIBIT A



**The relief described hereinbelow is SO ORDERED.**

**Signed October 21, 2020.**

_____
**Ronald B. King**
**Chief United States Bankruptcy Judge**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| _In re_: | § | |
| | § | Chapter 11 |
| KrisJenn Ranch, LLC, | § | |
| | § | |
| _Debtor_ | § | Case No. 20-50805 |
| | § | |

| | | |
|---|---|---|
| KrisJenn Ranch, LLC, KrisJenn Ranch, LLC–Series Uvalde Ranch, and KrisJenn Ranch, LLC–Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC, | § § § § § | |
| | § | Adversary No. 20-05027 |
| _Plaintiffs_, | § | |
| | § | |
| v. | § | |
| | § | |
| DMA Properties, Inc. and Longbranch Energy, LP, | § § | |
| | § | |
| _Defendants_. | § | |

DMA Properties, Inc. and Frank Daniel  §
Moore,                                  §
                                        §
*Cross-Plaintiffs/Third-Party Plaintiffs,*  §
                                        §
v.                                      §      Adversary No. 20-05027
                                        §
KrisJenn Ranch, LLC, KrisJenn Ranch,    §
LLC–Series Uvalde Ranch, and KrisJenn   §
Ranch, LLC–Series Pipeline ROW, Black   §
Duck Properties, LLC, Larry Wright, and §
John Terrill,                           §
                                        §
*Cross-Defendants/Third-Party Defendants.*  §

### ORDER (I) GRANTING DMA PROPERTIES, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON DMA'S OWNERSHIP INTEREST IN THE BIGFOOT NOTE PAYMENTS, AND (II) OVERRULING KRISJENN RANCH, LLC, KRISJENN RANCH, LLC SERIES UVALDE RANCH, KRISJENN RANCH, LLC SERIES PIPELINE ROW'S OBJECTIONS TO DMA'S EVIDENCE [RELATES TO ADV. DKT. NOS. 41 & 95]

On this day, the Court considered (I) DMA Properties, Inc.'s Motion for Partial Summary Judgment on DMA's Ownership Interest in the Bigfoot Note Payments [Adv. Dkt. No. 41] (the "Motion for Summary Judgment") and (II) Krisjenn Ranch, LLC, Krisjenn Ranch, LLC, Series Uvalde Ranch, Krisjenn Ranch, LLC, Series Pipeline Row's Objections to DMA's Evidence [Adv. Dkt. No. 95] ("Evidentiary Objections"). Having reviewed the parties' briefing, the governing law, and the case file as a whole and having heard the parties' arguments as presented by counsel, the Court finds (I) the Motion is meritorious and should be granted, and (II) the Evidentiary Objections are not well-taken and should be overruled.

It is therefore ORDERED that for the reasons stated on the record, DMA Properties, Inc.'s Motion for Partial Summary Judgment on DMA's Ownership Interest in the Bigfoot Note Payments [Adv. Dkt. No. 41] is GRANTED.

It is further ORDERED that for the reasons stated on the record, Krisjenn Ranch, LLC, Krisjenn Ranch, LLC, Series Uvalde Ranch, Krisjenn Ranch, LLC, Series Pipeline Row's Objections to DMA's Evidence [Adv. Dkt. No. 95] are OVERRULED.

IT IS SO ORDERED.

# # #

Order Prepared By:

/s/ Christopher S. Johns
Christopher S. Johns
State Bar No. 24044849
Christen Mason Hebert
State Bar No. 24099898
JOHNS & COUNSEL PLLC
14101 Highway 290 West, Suite 400A
Austin, Texas 78737
512-399-3150
512-572-8005 fax
cjohns@johnsandcounsel.com
chebert@johnsandcounsel.com

/s/ Timothy Cleveland
Timothy Cleveland
State Bar No. 24055318
Austin H. Krist
State Bar No. 24106170
CLEVELAND | TERRAZAS PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandterrazas.com
akrist@clevelandterrazas.com

/s/ Natalie F. Wilson
Natalie F. Wilson
State Bar No. 24076779
LANGLEY & BANACK, INC.
745 East Mulberry Avenue, Suite 700
San Antonio, Texas 78212
210-736-6600
210-735-6889 fax
nwilson@langleybanack.com

*Counsel for Frank Daniel Moore and DMA Properties, Inc.*

Approved as to Form:

/s/ Charles John Muller, IV
Ronald Smeberg
Charles John Muller, IV
THE SMEBERG LAW FIRM, PLLC
2010 W Kings Hwy
San Antonio, TX 78201-4926
ron@smeberg.com
john@muller-smeberg.com

*Counsel for Plaintiffs KrisJenn Ranch, LLC, KrisJenn Ranch, LLC, Series Uvalde Ranch, KrisJenn Ranch, LLC, Series Pipeline Row*

# EXHIBIT B

**The relief described hereinbelow is SO ORDERED.**

**Signed March 24, 2021.**

_____
**Ronald B. King**
**Chief United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KRISJENN RANCH, LLC, | § | CASE NO. 20-50805-RBK |
| | § | |
| DEBTOR | § | CHAPTER 11 |
| | § | |
| _____ | § | |
| | § | |
| KRISJENN RANCH, LLC, KRISJENN RANCH, | § | |
| LLC-SERIES UVALDE RANCH, AND | § | |
| KRISJENN RANCH, LLC-SERIES PIPELINE | § | |
| ROW, AS SUCCESSORS IN INTEREST TO | § | |
| BLACK DUCK PROPERTIES, LLC, | § | |
| PLAINTIFFS, | § | |
| VS. | § | ADVERSARY NO. 20-05027-RBK |
| | § | |
| DMA PROPERTIES, INC. AND | § | |
| LONGBRANCH ENERGY, LP, | § | |
| DEFENDANTS. | § | |

**FINAL JUDGMENT**

On the 11th day of January 2021, came on to be heard this adversary proceeding for trial on the

merits. Plaintiffs, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series Uvalde Ranch, and KrisJenn Ranch,

LLC-Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC (collectively,

"KrisJenn"), appeared by and through counsel of record and announced ready for trial. Defendants, DMA Properties, Inc. ("DMA") and Longbranch Energy, LP ("Longbranch"), appeared by and through counsel of record and announced ready for trial.  Third-party plaintiff, Frank Daniel Moore ("Moore"), and Third-party defendant, Larry Wright ("Wright"), appeared in person and by and through counsel of record and announced ready for trial.

The Court heard the testimony of witnesses, received documentary evidence, and heard arguments of counsel over the course of approximately six days. This Final Judgment is based on the record and all applicable legal and equitable principles.

For the reasons stated in the Opinion rendered contemporaneously herewith, pursuant to FED. R. BANKR. P. 7052, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. Declaratory judgment is rendered in favor of Plaintiffs that the net-profits interests in the Assignment Agreements owned by Longbranch Energy, LP and DMA Properties, Inc. are personal covenants.

2. As to Moore's claim for breach of fiduciary duty against Wright regarding the unauthorized Black Duck Loan, the Court renders judgment that Moore take nothing because no actual damages were proven.

3. Declaratory judgment is rendered in favor of DMA that, under the terms of the Email Agreement and Harris SWD Agreement, DMA has an ownership interest in 50% of the Bigfoot Note payments. Further, the Court will award DMA $175,143.60 from the funds held in the Panola County court registry, plus attorney's fees from the court registry if DMA requests attorney's fees in accordance with FED. R. BANKR. P. 7054 and Local Bankruptcy Rule 7054.

4. All relief not granted herein is denied.

# # #

2



Signed March 24, 2021.

_____
**Ronald B. King**
**Chief United States Bankruptcy Judge**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KRISJENN RANCH, LLC, | § | CASE NO. 20-50805-RBK |
| | § | |
| DEBTOR | § | CHAPTER 11 |
| | § | |
| | § | |
| KRISJENN RANCH, LLC, KRISJENN RANCH, | § | |
| LLC-SERIES UVALDE RANCH, AND | § | |
| KRISJENN RANCH, LLC-SERIES PIPELINE | § | |
| ROW, AS SUCCESSORS IN INTEREST TO | § | |
| BLACK DUCK PROPERTIES, LLC, | § | |
| PLAINTIFFS, | § | |
| VS. | § | ADVERSARY NO. 20-05027-RBK |
| | § | |
| DMA PROPERTIES, INC. AND | § | |
| LONGBRANCH ENERGY, LP, | § | |
| DEFENDANTS. | § | |

**OPINION**

The subject of this adversary proceeding is a pipeline right-of-way in east Texas owned by

KrisJenn Ranch, LLC-Series Pipeline ROW (together, with KrisJenn Ranch, LLC and KrisJenn

Ranch, LLC-Series Uvalde Ranch, "KrisJenn"). The KrisJenn entities are owned by Larry Wright,

a south Texas rancher, investor, and professional poker player. The pipeline right-of-way (the "ROW") is a 65-mile easement over a strip of land through four counties that could feasibly accommodate three to four pipelines carrying gas or water. The parties valued the ROW between $9.5 million and $10.4 million. The KrisJenn entities filed chapter 11 cases and initiated this adversary proceeding seeking a declaration that the promises to pay a net-profits interest to DMA Properties, Inc. and Longbranch Energy, LP ("DMA" and "Longbranch") do not attach and run with the ROW. DMA and Longbranch seek an opposite declaration and assert claims for various torts against KrisJenn and Wright. DMA's principal, Frank Daniel Moore, intervened and asserted similar counterclaims and cross actions. For a full understanding of the transactions that are the basis for this adversary, a chronology of the facts is helpful.

## BACKGROUND

The story began in 2015, when Wright connected with Moore, an investor from South Carolina, looking for opportunities to invest in oil and gas properties in Texas. Together they agreed that if Moore was willing to find and procure investment opportunities to buy and sell saltwater disposal wells for a profit, then Wright would provide the funding. Together with another investor, Darin Borders, the trio engaged in the business of "flipping" saltwater disposal wells.

After successfully flipping two wells in simultaneous purchase and sale closings and with one more under contract, Wright decided to formalize his business relationship with Moore. In 2015, Black Duck Properties, LLC was formed. The Black Duck Company Agreement (the "Company Agreement") was drafted by Wright's lawyers and was executed on December 28, 2015. Black Duck was owned 50% by Wright through KrisJenn and 50% by Moore through his entity, SCMED Oilfield Consulting, LLC ("SCMED"), as members. Wright and Moore also served as managers of Black Duck with Wright's son-in-law, Hagan Cohle. SCMED is not a party

2

to this adversary proceeding, but has assigned all interests, claims, and causes of action related to the ROW to Moore.

### A. *Longbranch Purchase Agreement*

In February 2016, separate from their investment efforts through Black Duck, Darin Borders and Moore became aware of an opportunity to purchase the ROW in east Texas from its then-owner, Express Pipeline Connection, LLC ("Express Pipeline"). On February 19, 2016, Moore and Borders entered into a purchase agreement with Express Pipeline through Longbranch Energy, LP, Borders's entity. The "Longbranch Purchase Agreement" gave Longbranch a contractual right to purchase the ROW from Express Pipeline for $5 million. Moore and Borders paid $25,000 in earnest money to Express Pipeline to secure the right to purchase the ROW. The Longbranch Purchase Agreement defined the ROW as:

> [O]wnership interest in certain pipe and related facilities (commonly known as the P-21 pipeline) shown on the plat attached hereto as Exhibit "A", and described on Exhibit "B" attached hereto, and the rights-of-way, easements, contracts, permits and leases described on Exhibit "C" attached hereto, (collectively herein referred to as the "Express Pipeline").

Moore and Borders began to look for a capital investor for the ROW; preferably an investor that could pay the earnest money, and perhaps the $5 million purchase price, to flip the ROW, or "hold" it for the time needed to find an entity willing to purchase or develop it. When Moore told Wright about the ROW, Wright wanted to be the capital investor. Believing that Wright had access to the cash needed to close on the ROW and hold it, Moore and Borders agreed to deal him in as the "money guy." Wright reimbursed Moore and Borders for the $25,000 earnest money and agreed to participate in the ROW purchase through Black Duck.

3

### B. *The Longbranch Assignment*

In June 2016, Longbranch assigned the Longbranch Purchase Agreement to Black Duck in a short, two-page contract (the "Longbranch Assignment"). As consideration, Black Duck agreed to pay Longbranch "twenty percent . . . of the Net Profits from [Black Duck] or its successors or assigns." "Net Profits" were defined as "gross revenues actually received by [Black Duck], or its successors or assigns directly from the operation, use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline." Black Duck's obligation to pay the net-profits interest was to "attach and run with the P-21 or Express pipeline and [Black Duck] binds its successors and assigns to the payment of the Net Profits Share." Borders recorded the Longbranch Assignment in Shelby County on October 2, 2017, but not in the other three counties in which it was located. Despite the "attach and run" language, the Longbranch Assignment did not include a legal description of the ROW. It did, however, reference the Longbranch Purchase Agreement as "attached hereto as Exhibit 'A,'" but it was not attached. A full legal description of the ROW was attached as an exhibit to the Longbranch Purchase Agreement.

### C. *Bigfoot Promissory Note*

Separate from their efforts to buy and sell the ROW, Black Duck entered into an agreement to sell a saltwater disposal well (the "Harris SWD") that it owned in Panola County to Bigfoot Energy Services, LLC ("Bigfoot"). The purchase price was $500,000. Black Duck agreed to seller-finance Bigfoot's purchase. In March 2017, Bigfoot made a $50,000 down payment to Black Duck and gave Black Duck a $450,000 promissory note for the remainder of the purchase price (the "Bigfoot Note"), which was secured by the Harris SWD. The Bigfoot Note required quarterly payments to Black Duck in June, September, December, and March until repayment was complete.

4

### D. *Black Duck Purchase of the ROW*

The process to find a buyer or developer for the ROW was long and convoluted. The communications between Wright, Moore, and Borders reflected that the parties did not appear to be on the same page, and their efforts were ever changing and often contradicted one another. During parts of the summer and fall of 2016, Wright pushed to flip the ROW. At one point, the parties were seriously negotiating with a potential buyer, Solaris. Through spring 2017, believing that Wright had the capital to purchase the ROW and hold it, Moore and Borders engaged in a concerted effort to find and negotiate with developers for the ROW. Moore testified that his efforts were continuously stymied by developers' concerns that Black Duck did not yet own the ROW. In one discussion, Moore expressed concern over Wright overplaying his hand and exaggerating his financial position, worried that they were negotiating from a "false position of strength."

After Wright funded various additional earnest money payments to extend the closing date, Black Duck finally closed on the ROW on August 14, 2017. To fund the $5 million purchase price, Wright made a personal loan of $1.25 million to Black Duck to pay a nonrefundable partial payment to extend the contract. Wright also took a loan from Asilo Investments to KrisJenn for $4.1 million at a 17% interest rate. Wright put up his family ranch as collateral for this hard money loan. Wright then lent the $4.1 million to Black Duck from KrisJenn to complete the ROW purchase (the "Black Duck Loan"). The Black Duck Loan was executed and notarized much later on January 18, 2018, and Wright recorded the deed of trust in Nacogdoches County the next day.

Wright was on both sides of the Black Duck Loan. The Black Duck Loan was secured by the ROW pursuant to a deed of trust recorded on January 19, 2018. Because KrisJenn could foreclose on the ROW if Black Duck defaulted on the loan, Wright was essentially able to put Black Duck on the hook for the 17% interest rate that KrisJenn was paying on KrisJenn's loan

5

from Asilo Investments. Playing his cards this way, Wright could secure repayment on the hard money loan and protect his family ranch by foreclosing on the ROW.

Much later, Moore became aware of the Black Duck Loan. Even though the Company Agreement required loan transactions to be authorized by the managers, Moore testified that he was never informed of this "secret loan" and never authorized it as a then-manager of Black Duck.

### E. *The DMA Agreement & Harris SWD Agreement*

Following the closing of the purchase of the ROW, Wright allegedly pressured Moore to relinquish his 50% interest in Black Duck through SCMED and resign from his position as manager. In an email exchange spanning February 3–4, 2018, Moore and Wright agreed on the terms of Moore's resignation (the "Email Agreement"). In exchange for withdrawing from the company, Moore (through his entity, DMA) would receive "[n]o less than 20% Carried Interest in the P-21 Express Pipeline . . . . [u]nder the exact same terms and conditions as the [Longbranch Assignment]." The Email Agreement also provided that DMA would receive "[n]o less than 50% carried interest and 50% entitlement on all terms and conditions and monies owed on the [Bigfoot Note] regarding the Harris SWD. Harris SWD is 100% FREE AND CLEAR OF ANY AND ALL DEBTS." Wright agreed to Moore's terms via email on February 4, 2018.

On February 7, 2018, DMA and Black Duck executed a formal agreement incorporating the terms of the Email Agreement (the "DMA Agreement"). The DMA Agreement expressly states that DMA shall be paid 20% of the net profits from Black Duck "or its successors or assigns" received from the "operation, use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline." This language is identical to the language in the Longbranch Assignment, but no legal description of the ROW was

6

attached. The DMA Agreement was recorded in the four counties spanning the ROW months later on December 4, 2018.

On the same day, Wright and Moore executed a second formal agreement (the "Harris SWD Agreement"). This document "address[es] the obligations regarding the Harris SWD" from "the binding 'Email Agreement' . . . dated Feb. 3, 2018." The Harris SWD Agreement provides that "DMA Properties, Inc. is entitled to receive 50% of all Gross Monies" paid on the Bigfoot Note to "Black Duck Properties, LLC including its successors and assigns." The agreement further states that Black Duck would continue to collect the note payments and mail DMA its portion "within three business days of the funds being available."

### F. *The TCRG Sale*

Shortly after the DMA Agreement was executed, Wright entered into an agreement with John Terrill to sell the ROW to Terrill's entity, TCRG East Texas Pipeline 1, LLC ("TCRG") for $2.5 million, with a 16% profits interest retained. On February 9, 2018, a few days after the business divorce with Moore, Wright caused Black Duck to execute a letter of intent with TCRG. A purchase agreement was later executed by Black Duck and TCRG on March 22, 2018 (the "TCRG Purchase Agreement"). Under the terms of the TCRG Purchase Agreement, Black Duck retained a 16% carried interest in the gross profit of the ROW. TCRG made a $500,000 down payment on the purchase price and the deed transferring the ROW to TCRG was executed on April 3, 2018. TCRG had a wealthy investor backing it who intended to spend tens of millions of dollars to develop the ROW by constructing one or more pipelines.

On or about April 4, 2018, Borders learned of the TCRG sale during a meeting with Wright and Terrill. During the meeting, Borders informed Terrill of his 20% net-profits interest. Terrill was not aware of the interest. Borders informed Moore of these developments. Believing that

7

Wright intentionally concealed their net-profits interests from Terrill, Moore and Borders confronted Wright and shared copies of the Longbranch Assignment and DMA Agreement with TCRG. Wright testified that he did not disclose the net-profits interests to TCRG because, as he understood it, DMA and Longbranch were only entitled to 20% of the net-profits received by *Black Duck* through its 16% carried interest in the ROW. In turn, Wright was entitled to the remaining 60% of Black Duck's 16% carried interest. DMA and Longbranch vehemently disagreed, arguing that the Longbranch Assignment and DMA Agreement entitled each to a 20% net-profits interest in the *entire* ROW because the net-profits interests run with the land and are binding on the successors and assigns to the ROW, including TCRG. Borders and Moore both admitted at trial that the 20% net-profits interest that each reserved would probably diminish the chances of obtaining a sale; they had reserved it to give themselves negotiating leverage. Like Wright, they too may have overplayed their hands and negotiated from a false position of strength.

Wright asked Borders and Moore to stop interfering with the TCRG sale. On April 16, 2018, Wright emailed Moore and Borders threatening to "kill" their 20% if they continued to communicate with Terrill about their net-profits interests. Ultimately, TCRG funded the final $2 million of the purchase price. After the TCRG sale closed in April 2018, Black Duck was owned 100% by KrisJenn and TCRG owned the ROW. Despite a seemingly successful sale with a valuable retained income interest, the deal ultimately collapsed like a house of cards.

Because of Moore's and Borders's continued contact with TCRG regarding their net-profits interests, the entire sale fell apart. With threats of litigation, TCRG forced Wright to rescind the TCRG Purchase Agreement and repurchase the ROW. KrisJenn purchased the ROW back from TCRG in December 2019. To pay the $2.5 million repurchase price, KrisJenn obtained additional financing from an existing lender, the McLeod family (the "McLeod Option

8

Agreement"). The McLeod Option Agreement, effective December 19, 2019, pledged Wright's family ranch, mineral interests, and the ROW as collateral. It also conveyed to the McLeods the option to purchase the ROW for $6 million.

### G. *KrisJenn Foreclosed on the Bigfoot Note*

Black Duck was unable to pay its debt to KrisJenn under the Black Duck Loan, so KrisJenn "foreclosed" and became a successor-in-interest to Black Duck's assets. On October 12, 2018, KrisJenn's attorney, David Strolle, sent a letter to Bigfoot Energy as "formal notice" of an assignment and transfer of 100% of Black Duck's interest in the Bigfoot Note to KrisJenn in lieu of the foreclosure. At that point, Black Duck had already remitted 50% of the Bigfoot Note payments to DMA pursuant to the Harris SWD Agreement for the March and June 2018 quarterly payments, a total of $31,844.30. DMA never received its portion of the September 2018 payment or any payment made thereafter.

Moore protested that this was a "sham foreclosure" and KrisJenn was just looking to the Bigfoot Note in order to repay its own hard money loan from Asilo Investments. Moore asserted that the Bigfoot Note was not listed as collateral for the Black Duck Loan. The loan documents expressly stated that the "Note is secured by the following Deeds of Trust . . . [a] The Express Gas Pipeline and related facilities . . . ." Neither the Black Duck Loan nor the accompanying deed of trust referred to or mentioned the Bigfoot Note or the Harris SWD. Wright dissolved Black Duck in December 2018 and KrisJenn became its successor-in-interest. The Bigfoot Note was paid off on December 10, 2020 and the remaining payments are currently held in the registry of the court in Panola County, Texas.

9

## PROCEDURAL HISTORY

Three separate lawsuits were filed in Texas state courts in 2019 to interpret the terms of the Longbranch Assignment and DMA Agreement (the "Assignment Agreements"). Before these lawsuits were resolved, Wright caused KrisJenn to file chapter 11 and initiated this adversary proceeding. KrisJenn's *Second Amended Complaint* includes only two counts, one for declaratory judgment and a claim against DMA and Longbranch asserting tortious interference with the TCRG Purchase Agreement. KrisJenn seeks a declaration that: (1) the net-profits interests in the Assignment Agreements are personal covenants, and not real covenants that attach and run with the ROW, (2) KrisJenn is not a "successor or assign" of Black Duck, and (3) the Black Duck Loan was an authorized loan and not a capital contribution.

DMA and Longbranch answered and filed their own counterclaims and cross actions. They seek a judicial declaration that the net-profits interests in the Assignment Agreements attach and run with the ROW and are enforceable against the subsequent owners, TCRG and KrisJenn. Together with Moore's third-party claims, the counterclaims total over 30 counts seeking relief based on fraud, breach of contract, breach of fiduciary duty, tortious interference with contract, promissory estoppel, civil conspiracy, unjust enrichment, money had and received, conversion, and nondischargeability of debts against Wright, Black Duck, KrisJenn, and Terrill. All parties seek attorney's fees and costs.

DMA also asserts separate counterclaims related to the Bigfoot Note and Harris SWD Agreement. The Court granted partial summary judgment to DMA recognizing its ownership interest in 50% of the Bigfoot Note payments. Now, DMA seeks payment on its 50% portion of the funds currently held in the Panola County district court registry and exemplary damages against KrisJenn.

10

The Court held a six-day evidentiary trial on these issues. All parties consented to entry of a final order or judgment.

### JURISDICTION AND VENUE

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(k). The Court also has jurisdiction over these proceedings pursuant to 28 U.S.C. § 157(c). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### DISCUSSION

The Court has broad discretion to decide declaratory judgment actions. Declaratory claims are governed by 28 U.S.C. § 2201. The Declaratory Judgment Act provides that, in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." *Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 293–94 (5th Cir. 2019) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007)); *see also* 28 U.S.C. § 2201(a). The primary issue in this case is whether the net-profits interests in the Assignment Agreements constitute real covenants running with the land under Texas law. Resolution of this key issue goes a long way to resolving the parties' remaining claims and counterclaims.

#### A. *Real Covenant Running with the Land*

In Texas, a covenant runs with the land and is enforceable if: (1) the obligation touches and concerns the land; (2) the obligation relates to a thing in existence or specifically binds the parties and their assigns; (3) the obligation is intended by the original parties to run with the land; (4) the successor to the burden has notice of the obligation; and (5) "[t]here must also be privity of estate

11

between the parties when the covenant was made." *In re Energytec, Inc.*, 739 F.3d 215, 221 (5th Cir. 2013) (quoting *Ehler v. B.T. Suppenas Ltd.*, 74 S.W.3d 515, 521 (Tex. App.—Amarillo 2002, pet. denied)); *see also Fort Worth 4th St. Partners, L.P. v. Chesapeake Energy Corp.*, 882 F.3d 574, 577 (5th Cir. 2018); *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987).[1] A covenant that "runs with the land" binds parties and their successors and assigns. *See Inwood*, 736 S.W.2d at 635. The party that seeks to enforce a restrictive covenant bears the burden of proof "to establish that the covenant was imposed." *Davis v. Skipper*, 83 S.W.2d 318, 321–22 (Tex. 1935).

There is no genuine dispute that the Assignment Agreements "relate to a thing in existence" and that that the agreements contain express language that purported to bind the parties and their assigns. The parties primarily focus their arguments on the intent element, the touch and concern element, and privity. Limited time was spent on whether the successor to the burden had notice. The Court finds that multiple elements are lacking, and the net-profits interests in the Assignment Agreements are personal covenants that do not attach and run with the land. The Court analyzes each element in turn.

### a.   Intent that the Obligation Run with the Land

"When a contract's meaning is disputed, [the Court's] primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018). Courts determine intent by looking first to the "text of the instrument

---

[1] The concept of real covenants that bind remote successors in interest (i.e., runs with the land) is often associated with a famous English case. In *Spencer's Case*, the English court established an early test for real covenants: (1) the covenant must "touch and concern the thing demised;" (2) must relate to something in existence, alternatively, it must expressly bind the assigns of the parties; and (3) the covenanting parties must have a common interest in the burdened land (i.e., privity of estate). Michael P. Pearson, *Covenants Running with the Land*, 48 ST. MARY'S L.J. 727, 734 (2017) (citing *Spencer's Case* (1583), 77 Eng. Rep. 72, 72, 74).

itself to determine if there is language expressly stating that the covenant binds successors." *Fort Worth 4th St. Partners*, 882 F.3d at 578. A contract will not be ambiguous "merely because the parties disagree about its meaning." *URI, Inc.*, 543 S.W.3d at 763. Instead, ambiguity exists when contract language is "susceptible to more than one reasonable interpretation." *Id.* at 765. A term is unambiguous if it "is so worded that it can be given a definite or certain legal meaning." *Id.*

The parties had different understandings of the Assignment Agreements. They disagree whether the net-profits interests flow from revenue generated from the ROW itself, or from Black Duck's revenue received from the operation, use, or sale of the ROW. This is highlighted by the parties' dispute over the meaning of "its successors and assigns." The Assignment Agreements each clearly state that Black Duck's "obligation to pay the Net Profits Share shall attach and run with the [ROW] and [Black Duck] binds *its successors and assigns* to the payment of the Net Profits Share." (emphasis added).

KrisJenn argues that "its successors and assigns" was clearly meant to refer to the successors and assigns of Black Duck, not the ROW. DMA and Longbranch assert that "its" means the successors and assigns of the ROW, and that is the only reasonable interpretation of this language because phrases like "run with the land" and "binding upon . . . successors and assigns" are the classic words used to create a covenant that runs with the land. *See MPH Prod. Co. v. Smith*, 06-11-00085-CV, 2012 WL 1813467, at *5 (Tex. App.—Texarkana 2012, no pet.) (mem. op.).

Because the agreements include express language that the obligation shall attach and run with the ROW, "[g]enerally speaking, such an acknowledgement, without more, would establish the requisite intent." *In re Chesapeake Energy Corp.*, 622 B.R. 274, 282 (Bankr. S.D. Tex. 2020). But the analysis does not end there. In Texas, a covenant running with the land is not created

13

simply because contractual language purports to create one. ***MJR Oil & Gas 2001 LLC v. AriesOne, LP***, 558 S.W.3d 692, 701 (Tex. App.—Texarkana May 18, 2018, no pet.); ***Musgrave v. Brookhaven Lake Prop. Owners Ass'n***, 990 S.W.2d 386, 395 (Tex. App.—Texarkana 1999, pet. denied). Even if language purporting to run with the land is unambiguous, courts will consider a contract in its entirety to determine whether an obligation runs with the land. *In re Chesapeake*, 622 B.R. at 282 (citing Texas cases analyzing contracts in their entirety to determine the intent of the parties despite unambiguous language).

The words "its successors and assigns" are unambiguous and not subject to more than one reasonable construction. The Assignment Agreements use "successors and assigns" a total of three times. First, "Net Profits shall mean gross revenues actually received by [Black Duck], or *its successors or assigns* directly from the operation, use, maintenance or sale (including partial sales or conveyances) of the [ROW]." The second occurrence, the subject of the parties' dispute, states that "[Black Duck's] obligation to pay the Net Profits Share shall attach and run with the [ROW] and [Black Duck] binds *its successors and assigns*." Third, "The terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their respective legal representatives, *successors and assigns*." In each instance, the phrase is used to refer to the successors or assigns of the parties.

Analyzing the Assignment Agreements in their entirety, the Court finds that the phrase "its successors and assigns" qualifies Black Duck. It is difficult, however, to reconcile this interpretation with the express language that the obligation "shall attach and run" with the ROW. This "classic" language is the only evidence to indicate that the parties intended to create anything more than a personal covenant. The use of classic language that the net-profits obligation "shall attach and run" with the ROW is not enough to establish a covenant running with the land under

14

Texas law, and is merely an "attempt to portray the [Assignment Agreements] as a horse of a different color." *Id.* The Court finds that the requisite intent is lacking.

### b.  Touch and Concern

A covenant touches and concerns land when the underlying obligations affect the "nature, quality or value of the thing demised, independently of collateral circumstances, or if it affect[s] the mode of enjoying it." *In re El Paso Refinery, LP*, 302 F.3d 343, 356 (5th Cir. 2002) (quoting *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982)). Some courts also apply a "burden on the promisor's land" test, which states that an obligation touches or concerns land if "the promisor's legal relations in respect to the land in question are lessened—his legal interest as owner rendered less valuable by the promise." *Westland Oil*, 637 S.W.2d at 911. To prove the touch and concern element, DMA and Longbranch must show that the obligation to pay the net-profits burdens the owner of the ROW's real property interests.

There is no dispute that the ROW itself is an interest in real property. The parties dispute whether a net-profits interest is an interest in real property, or a mere personal covenant that cannot attach and run with the land. DMA and Longbranch correctly point out that, in the context of oil and gas leases, Texas courts sometimes recognize net-profits interests as interests in real property. *See In re Hous. Bluebonnet, L.L.C.*, No. 16-34850, 2020 WL 930111, at *11 (Bankr. S.D. Tex. Feb. 21, 2020) ("A net profits interest in oil and gas properties is a real property interest."). KrisJenn counters that the net-profits interests here are "inherently and obviously" personal covenants that do not touch and concern the land.

The Court finds that an interest in the net-profits of Black Duck is an interest in personal property. DMA and Longbranch conflate an interest in the net-profits of Black Duck with a net-profits interests in an oil and gas lease. As previously discussed, the terms of the Assignment

15

Agreements create net-profits interests in the cash flow or sales proceeds received by Black Duck from the ROW. Generally, promissory notes, net-profit agreements, and cash are personal property, not real property. *San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 640 (Tex. 2000).

The Texas Supreme Court in *San Antonio Area Foundation v. Lang* considered whether net-profit agreements associated with the development of a tract of land, along with promissory notes and cash, were included in a devise of real property. *Id.* at 638. The court defined personal property as "everything that is subject to ownership not falling under the definition of real estate," and determined that the disputed property was personal property. *Id.* at 640. Here, the Assignment Agreements do not convey an interest in the ROW *itself*. The Court finds that the net-profits interests are personal covenants.

Next, DMA and Longbranch point to the Fifth Circuit's analysis of the touch and concern element in *In re Energytec, Inc.*, 739 F.3d 215 (5th Cir. 2013). *Energytec* involved the sale of a gas pipeline that included an obligation to pay a transportation fee that "ran with the land." Energytec's predecessor, Mescalaro, sold a gas pipeline pursuant to a letter agreement, assignment, and bill of sale. Pursuant to the letter agreement, the buyer promised to pay Newco Energy (Mescalaro's affiliate) a transportation fee based on the volume of gas transported through the pipeline. To secure payment of the fee, Newco was granted a security interest and lien on the entire pipeline. The buyer was also required to obtain Newco's consent before assigning its interest in the pipeline. Energytec purchased the pipeline from the original buyer and later filed bankruptcy.

In bankruptcy court, Energytec moved to sell the pipeline free and clear of liens. Newco objected, arguing that the transportation fee and right to consent to assignment ran with the land. The Fifth Circuit held that the transportation fee touched and concerned the land because the fee

16

was a clear restriction on the owner's use and enjoyment of the pipeline. Every time the owner wanted to transport gas through the pipeline, it was required to pay a transportation fee to Newco.

Recent bankruptcy cases have analyzed whether covenants in midstream gathering agreements in oil and gas transactions meet the touch and concern element under Texas law. The analyses of the touch and concern element in these cases are persuasive. The cases focus on the relationship between the covenant and the promisor's mineral interest. *In re Sabine Oil & Gas Corp.*, 567 B.R. 869, 877 (S.D.N.Y. 2017), *aff'd*, 734 F. App'x 64 (2d Cir. 2018) (distinguishing *Energytec* and holding that a gathering fee covenant based on "produced gas" did not touch and concern the land under Texas law because the fee did not reduce the landowner's ability to "make use of or alienate its real property interests"); *In re Chesapeake Energy Corp.*, 622 B.R. 274 (Bankr. S.D. Tex. 2020).

The Bankruptcy Court for the Southern District of Texas recently considered whether a natural gas purchase agreement between the debtor and a pipeline company could be rejected under bankruptcy law. *In re Chesapeake*, 622 B.R. 274 (Bankr. S.D. Tex. 2020). The court held that the agreement did not contain covenants running with the land under Texas law and could be rejected in bankruptcy. The gas purchase agreement required the debtor to sell all gas it produced from its leases to ETC Texas Pipeline Ltd.[2] The court concluded that this "dedication covenant" did not satisfy the touch and concern element because "produced gas" is personal property. ETC had "no right of access to or control over [the debtor's] use of its real property interests. [The debtor's] ability to use and enjoy its property rights is unaffected. Only after gas is produced and becomes personal property does an obligation regarding the disposition of that gas arise." *Id.* at 283. The

---

[2] *Id.* at 278. The covenant reads, "Seller dedicates for sale and delivery hereunder of all of the Gas owned or controlled by Seller . . . that is produced from the oil and gas leases described in Exhibit 'C.'" *Id.*

debtor "did not assign a specific interest in the oil and gas leases themselves," but only assigned an interest in the "produced gas" severed from the mineral estate. *Id.* Without more, the covenant did not touch and concern the land.

The test and analysis for the touch and concern element are the same in both *Energytec* and *Chesapeake Energy*, but each court reaches a different conclusion on the facts. In *Energytec*, the transportation fee affected the use of real property, i.e., the traveling of natural gas along the pipeline before it was severed from the mineral estate. In contrast, the dedication covenant in *Chesapeake Energy* to sell all "produced gas" only impacted Chesapeake *after* the gas was severed from the mineral estate and became personal property. Chesapeake's ability to use and enjoy the land was not impacted.

The Court finds that the net-profits interests here are analogous to the dedication covenant from *Chesapeake Energy*. Like "produced gas," Black Duck's net profits are personal property. Black Duck's profits from the ROW are an interest in the cash flow received by Black Duck, which "is not so closely linked to the land itself that it constitutes an interest in the land." **Wayne Harwell Props. v. Pan Am. Logistics Ctr., Inc.**, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997, writ denied). The net-profits interests in Black Duck do not reduce the ROW owner's ability to use, enjoy, or alienate its real property interests. The Court finds that the net-profits interests do not touch and concern the ROW.

### c. *Privity of Estate*

For a covenant to run with the land in Texas, "[t]here must also be privity of estate between the parties when the covenant was made." **In re Energytec, Inc.**, 739 F.3d 215, 221 (5th Cir. 2013) (quoting **Ehler v. B.T. Suppenas Ltd.**, 74 S.W.3d 515, 521 (Tex. App.—Amarillo 2002, pet. denied)). There are two traditional components to the privity requirement, vertical privity and

18

horizontal privity. Vertical privity requires a successor-in-interest relationship as to each owner of the burdened property. *Id.* at 222; *see also In re Chesapeake*, 622 B.R. at 283 ("An easy example of vertical privity is the transfer of a person's fee estate to another."). Here, Black Duck purchased the ROW and sold it to TCRG, which then sold it to KrisJenn. The Court finds that vertical privity exists between the successive owners of the ROW.

It is unclear whether horizontal privity is still required. Recent cases, including *Energytec* and *Chesapeake Energy*, have criticized the doctrine while still analyzing the element. Until the Texas Supreme Court weighs in, an analysis of this element is prudent. To establish horizontal privity, the covenant "must be contained in a grant of land or in a grant of some property interest in the land." ***Wasson Interests, Ltd. v. Adams***, 405 S.W.3d 971, 973 (Tex. App.—Tyler 2013, no pet.) (citing *Wayne Harwell*, 945 S.W.2d at 218)). "Since privity of estate is a precondition for a covenant running with the land at law, whether the parties conveyed an interest in the land by their agreement will be dispositive . . . ." *Wayne Harwell*, 945 S.W.2d at 218.

Though horizontal privity is potentially inapplicable, the Court finds that it is missing here. The Assignment Agreements granted "no simultaneous interest" in real property between the original parties as grantor or grantee. *In re Chesapeake*, 622 B.R. at 284. Horizontal privity existed in *Energytec* because the transportation fee was granted to Newco in the same transaction as the sale of the pipeline by bill of sale. There is no corollary conveyance of real property in the Assignment Agreements.

### d.  *Notice of Successor to the Burden*

A subsequent purchaser is bound only by those restrictive covenants attaching to property of which it has actual or constructive notice, and a purchaser for value without notice takes land free from restriction. ***Jennings v. Bindseil***, 258 S.W.3d 190, 197–98 (Tex. App.—Austin 2008,

19

no pet.) (citing *Davis v. Huey*, 620 S.W.2d 561, 565–66 (Tex. 1981)). "[I]t is essential that the party seeking to enforce the restrictions on the use of land establish that the purchaser had notice of the limitations on his title." *Davis*, 620 S.W.2d at 567. To establish notice, the agreement containing a covenant running with the land should be recorded in the county where the real property is located, with a legal description of the affected property. TEX. PROP. CODE ANN. § 13.002 ("An instrument that is properly recorded in the proper county is . . . notice to all persons of the existence of the instrument.").

There is no question that KrisJenn, the current owner of the ROW, had actual notice of the net-profits interests. An issue arose at trial, however, over whether the recorded Assignment Agreements contained a sufficient legal description of the ROW. The sufficiency of land descriptions typically arises in the context of whether a contract to sell land satisfies the statute of frauds. *See AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008). Even though the Assignment Agreements are not contracts to convey real property, a brief discussion of this issue is helpful.

A conveyance of real property must contain a sufficient description of the property to be conveyed. *Id.* at 644–45. A land description is sufficient if "the writing furnishes within itself, or by reference to some other existing writing, the means or data by which the particular land . . . may be identified with reasonable certainty." *Id.* at 645 (citing *Broaddus v. Grout*, 258 S.W.2d 308, 309 (Tex. 1953)); *see also Morrow v. Shotwell*, 477 S.W.2d 538, 539 (Tex. 1972). If the description of the land is insufficient, the requirements of the statute of frauds have not been met and the contract is void. *Reiland v. Patrick Thomas Props., Inc.*, 213 S.W.3d 431, 437 (Tex. App.—Houston [1st Dist.] 2006, pet. denied) (citing *Pick v. Bartel*, 659 S.W.2d 636, 637 (Tex. 1983)). Extrinsic evidence may be used "not for the purpose of supplying the location or

20

description of land, but only for the purpose of identifying it with reasonable certainty from the data *in the memorandum*." *Id.* at 438 (quoting *Morrow*, 477 S.W.2d at 541) (emphasis in original).

Only the Longbranch Purchase Agreement includes a detailed legal description of the ROW. The Assignment Agreements do not include the same detailed legal description. Instead, they describe the property as "the pipe and related facilities commonly known as the P-21 or Express pipeline." The Longbranch Assignment refers generally to the Longbranch Purchase Agreement in the recitals. The DMA Agreement, however, does not reference the Longbranch Purchase Agreement. The Assignment Agreements would not satisfy the requirement of a sufficient legal description.

The Court finds that the Assignment Agreements do not contain valid enforceable covenants running with the land, and the obligation to pay net-profits interests are personal covenants of Black Duck and its successor or assigns. At its core, this adversary is an action for declaratory judgment. The Court's interpretation of the Assignment Agreements goes a long way to resolving the remaining claims and counterclaims in this case.

## B. *Additional Claims Related to the ROW*

DMA, Longbranch, and Moore assert a litany of additional third-party claims and counterclaims in tort relating to the transactions surrounding the ROW. First, DMA, Moore, and Longbranch assert claims for breach of contract and money had and received related to the Assignment Agreements. They claim that Wright, KrisJenn, and Black Duck breached the Assignment Agreements in multiple respects, including the failure to pay or recognize the 20% net-profits interests. Because the Assignment Agreements are personal covenants of Black Duck that do not contain real covenants running with the land, the Court will deny DMA's, Moore's, and Longbranch's claims for breach of contract and money had and received.

21

Moore also asserts a counterclaim for nondischargeability of debts against KrisJenn under 11. U.S.C. § 523(a). This counterclaim is not well founded because § 523 specifically applies to "individual debtor[s]." 11 U.S.C. § 523(a). The only debtors in these bankruptcy cases are the KrisJenn entities. This counterclaim will be denied.

Next, the Court finds that there is insufficient evidence in the record to prove DMA's, Longbranch's, and Moore's remaining third-party claims and counterclaims related to the ROW, including knowing participation in breach of fiduciary duty, tortious interference with contract, fraud, fraud in the alternative, civil conspiracy, unjust enrichment, conversion, and promissory estoppel. Evidence in the record and the testimony of the parties show that Wright, Moore, and Borders were engaged in a vigorous effort to make the ROW a success. They often misunderstood each other and engaged in puffery and other common tools of negotiation in business deals. Forceful negotiation, puffery, and exaggeration, however, do not amount to a tort. These claims will be denied. The Court next addresses KrisJenn's claim for tortious interference with contract and DMA's and Moore's claims for breach of fiduciary duty.

### a. KrisJenn's Claim for Tortious Interference with Contract

KrisJenn asserts a claim against DMA and Longbranch for tortious interference with the TCRG Purchase Agreement. To prevail on a claim for tortious interference with contract, KrisJenn must show (1) the existence of a contract subject to interference; (2) willful and intentional interference (3) interference that proximately caused damage and (4) actual damage or loss. ***Powell Indus., Inc. v. Allen***, 985 S.W.2d 455, 456 (Tex. 1998) (per curiam). KrisJenn asserts that the TCRG Purchase Agreement was a valid and enforceable contract, and that DMA and Longbranch committed acts of interference that were willful and intentional through their communications with John Terrill and TCRG.

22

DMA and Longbranch assert the affirmative defense of justification. DMA and Longbranch argue that they provided copies of the Assignment Agreements and contacted TCRG based on their good faith belief that they had a claim to a colorable legal right to 20% of all net profits of the ROW. The Court agrees, and KrisJenn's claim of tortious interference with contract will be denied.

Although KrisJenn did not assert a claim for breach of fiduciary duty, KrisJenn argued at trial that Moore and Borders engaged in an undisclosed partnership by which Moore stymied any attempt to sell the ROW to prospective purchasers unless they entered into additional service contracts with Moore and Borders. This alleged partnership, according to KrisJenn, would ensure that Moore and Borders could continue to profit from the ROW after a sale was complete, all while excluding Wright from future profits. KrisJenn argues that Moore, as a co-participant in Black Duck, owed a fiduciary duty to Wright that required Moore to disclose his partnership with Borders. Because these arguments relate only to a claim for breach of fiduciary duty and KrisJenn did not assert such a claim, the Court will not address these arguments.

### b. DMA's and Moore's Claims for Breach of Fiduciary Duty

To prevail on a claim for breach of fiduciary duty, the claimant must establish that "(1) a fiduciary relationship [existed] between the plaintiff and defendant; (2) the defendant [breached] his fiduciary duty to the plaintiff; and (3) the defendant's breach [resulted] in injury to the plaintiff or benefit to the defendant." *D'Onofrio v. Vacations Publ'ns, Inc.*, 888 F.3d 197, 215–16 (5th Cir. 2018) (quoting *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 581 (5th Cir. 2015)). A third party who knowingly participates in the breach of a fiduciary duty "becomes a joint tortfeasor with the fiduciary and is liable as such." *Id.* (quoting *Hunn*, 789 F.3d at 581).

23

Moore and DMA each assert a claim for breach of fiduciary duty against Wright for numerous acts of self-dealing when Moore (through SCMED) and Wright (through KrisJenn) were equal members of Black Duck. First, DMA argues that Wright breached fiduciary duties owed to DMA as custodian and agent for payment by failing to convey to DMA its 20% of the net-profits resulting from the sale to TCRG. Because the Assignment Agreements do not create real covenants running with the land, DMA's claim for breach of fiduciary duty against Wright and Black Duck will be denied.

Next, Moore argues that Wright, in his capacity as manager of Black Duck, owed fiduciary duties to SCMED and Moore prior to Moore's resignation from Black Duck. Moore argues that Wright breached those fiduciary duties by scheming to steal Moore's interest in the ROW through numerous acts of self-dealing. The acts of self-dealing included: Wright's failure to disclose his plan to sell the ROW to TCRG, Wright's false promises to Moore to convince Moore to resign from Black Duck, and using KrisJenn to carry out a sham foreclosure on the Black Duck Loan. Primarily, Moore argues that the Black Duck Loan, extended by KrisJenn to Black Duck to fund the purchase of the ROW, was an unauthorized loan under the Company Agreement because it was executed without Moore's consent. According to Moore, Wright's conduct was for his own benefit and in violation of his fiduciary duties to Moore and SCMED.

The Texas Business Organizations Code does not define or specify whether manager or member fiduciary duties exist in the context of limited liability companies. *See* TEX. BUS. ORGS. CODE ANN. §§ 1.001–402.015. Moore asserts that Wright, as a manager of Black Duck, owed fiduciary duties to Moore and SCMED, including duties of care, loyalty, disclosure, and a duty to refrain from self-dealing. Texas courts recognize formal and informal fiduciary relationships. ***Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.***, 823 S.W.2d 591, 594 (Tex. 1992). In the

24

absence of a formal fiduciary duty, members and managers of an entity may owe informal fiduciary duties to one another. *See **Bazan v. Muñoz***, 444 S.W.3d 110, 118 (Tex. App.—San Antonio 2014, no pet.). For example, Texas courts have held that "the nature of the relationships between shareholders in a limited liability company sometimes gives rise to an informal fiduciary relationship between them." *Id.* Wright does not dispute that he owed fiduciary duties to SCMED and Moore as co-participants in Black Duck, and the Court finds that at least an informal fiduciary relationship existed between Wright, SCMED, and Moore based on their past dealings and the personal relationship of trust and confidence between Wright and Moore.

Next, whether Wright breached his fiduciary duty depends on whether the Black Duck Loan was authorized under the terms of the Company Agreement. The Company Agreement explains the requirements for loan authorization. Section 4.05 of the Company Agreement states,

> If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so *with the Managers' consent* may advance all or part of the needed funds to or on behalf of the Company. An advance described in this Section 4.05 constitutes a *loan* from the Member to the Company . . . and is not a Capital Contribution."

Pls.' Ex. 5 (emphasis added). Additionally, Section 6.10 requires transactions between the Company and an "Interested Person," including KrisJenn, to be authorized "in good faith by the affirmative vote of the disinterested Management, even though the Persons constituting the disinterested Management is less than a quorum." *Id.* "The contract or transaction must be specifically approved in good faith by the Management." *Id.* As a member of Black Duck, KrisJenn

25

had authority under the Company Agreement to make a loan to Black Duck, but only with Moore's consent in his capacity as a manager.

Wright argues that Moore's consent was either not necessary to execute the Black Duck Loan, or it was obtained through an email from Moore in which Moore gave Wright and Cohle full authority to sign on his behalf.[3] Moore sent this email because he was not available in-person to sign one specific agreement, which was an agreement to extend the ROW closing date.[4] At the time, Moore was in the process of moving his family to North Carolina, so Cohle signed the closing extension agreement on Moore's behalf. Aiming to use Moore's email consent "to remove Daniel Moore as a required signer for any legal documents,"[5] Wright and Cohle signed a broadly-worded Consent of Members and Managers of Black Duck in lieu of a meeting. This Consent, which was not signed by Moore, authorized "two of the three managers of [Black Duck] . . . to execute certain agreements and documents relating to the matter or matters described on Exhibit A . . . without the joinder of FRANK D. (Daniel) MOORE."[6] Moore argues that he never intended his email consent, which was limited in scope to the closing extension agreement, to allow the other managers, Wright and Cohle, to approve the Black Duck Loan on his behalf. Moore also argues that he was not given notice of this "fake board meeting" and was never asked to provide written authorization of proxy to approve the Black Duck Loan.

Even though Moore was likely aware that the purchase of the ROW would be accomplished through borrowed funds, rather than through Wright's own cash injected into Black Duck as a

---

[3] Pls.' Ex. 33 ("I Frank Daniel Moore, hereby grant Larry Wright and/or Hagan Cohle full authority to sign on my behalf for [Black Duck] regarding any and all documents that may require my signature to extend or close the transaction between [Black Duck] and Lancer Resources et al.").
[4] Pls.' Ex. 32.
[5] Pls.' Ex. 33.
[6] Pls.' Ex. 31. Exhibit A is blank.

26

capital contribution, the Company Agreement treats all advances from its members as loans. Loans to Black Duck and conflict of interest transactions required the affirmative vote and consent of Moore. Wright did not obtain Moore's consent or specific approval to approve the Black Duck Loan, so the Black Duck Loan was not authorized under the terms of the Company Agreement. The Court finds that Moore's email allowing his consent by proxy to approve a closing-date extension does not establish Moore's specific approval of the Black Duck Loan.

Because the Black Duck Loan was not properly authorized, Wright breached his informal fiduciary duty owed to Moore. Wright entered into an ultra vires and conflicted loan transaction without Moore's required consent. While Moore is entitled to assert his legal rights, as he did here, he must prove that he is entitled to an award of damages. Moore seeks actual damages of $2.28 million for these alleged breaches. The damages model assumes that the Assignment Agreements contain covenants running with the land.[7] Because the Assignment Agreements do not contain valid covenants running with the land, this model for damages is inapposite. Moore did not prove any other calculation for damages resulting from Wright's breach of fiduciary duty. As such, the Court finds that Moore is not entitled to an award of actual damages.

### C. *Claims Related to the Bigfoot Note*

The Court previously granted partial summary judgment to DMA establishing that DMA has a property interest in 50% of the Bigfoot Note payments under terms of the Email Agreement and Harris SWD Agreement. In the summary judgment order, the Court did not indicate how much DMA was entitled to receive. DMA was paid a total of $31,844.30 for its half of the March and

---

[7] The *Proposed Findings of Fact and Conclusions of Law for Longbranch, DMA, and Moore* provides that $2.28 million in damages "are calculated as the value of Moore's 50% interest in the [ROW] held by Black Duck." Further, "Black Duck held an 80% interest in the [ROW] (after accounting for Longbranch's 20% net-profits interest), and the value of that interest is calculated from the market value of the [ROW] at the time of the breach ($10.4m) less the value of the capital contribution used to purchase the [ROW] ($4.7m)."

June 2018 quarterly payments. DMA claims that Wright or KrisJenn wrongfully hold $63,688.58 in proceeds that represent DMA's half of the payments for September 2018, December 2018, March 2019, and June 2019. Since September 2019, Bigfoot has paid a total of $222,910.16 into the Panola County court registry. DMA argues that it is entitled to at least $175,143.60 of the money in the court registry, which is the total of the payments that DMA would have received from the Bigfoot Note payments from September 2018 to present.

At trial, KrisJenn moved to reconsider the partial summary judgment order, arguing that KrisJenn properly foreclosed on the Bigfoot Note in partial satisfaction of the debt owned by Black Duck to KrisJenn. The Court is not persuaded by KrisJenn's argument because the Bigfoot Note was not collateral for the Black Duck Loan. The Court again declares that DMA has a carried interest in and a right to 50% of the payments made on the Bigfoot Note. The Court finds that Black Duck breached the Harris SWD Agreement by failing to pay DMA 50% of the Bigfoot Note payments. The Court finds that DMA is entitled to $175,143.60 plus attorney's fees from the funds held in the Panola County court registry in satisfaction of its portion of the Bigfoot Note payments. Declaratory judgment will be granted in favor of DMA and all other counterclaims related to the Bigfoot Note will be denied.

### CONCLUSION

The net-profits interests in the Assignment Agreements are personal covenants that fail to meet the requirements of a covenant running with the land under Texas law. For the foregoing reasons, KrisJenn is entitled to a declaratory judgment that the Assignment Agreements are personal covenants. Further, Wright breached his fiduciary duty related to the unauthorized Black Duck Loan, but no actual damages were proven.

28

The Court further declares that DMA is entitled to 50% of the payments on the Bigfoot Note and that Black Duck breached the Harris SWD Agreement when it failed to pay DMA its portion of the payments. DMA is awarded $175,143.60 from the funds held in the Panola County court registry and is entitled to reasonable attorney's fees related to this claim. DMA may seek attorney's fees post-judgment under Local Bankruptcy Rule 7054. All other relief not specifically granted herein is denied.

This Opinion shall constitute the findings of fact and conclusions of law of the Court pursuant to FED. R. BANKR. P. 7052. A separate judgment will be rendered.

### #

# EXHIBIT C

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

IN RE:

KRISJENN, RANCH, LLC, dba as           Bankruptcy Case No. 20-50805-RBK
KrisJenn Ranch, LLC-Series Uvalde Ranch;      (Chapter 11)
Ranch and KrisJenn Ranch, LLC Series
Pipeline ROW,

     *Debtor*.

_____

DMA PROPERTIES, INC., et al.,

     *Appellants*,

v.                            Case No. SA-21-CV-0358-JKP

KRISJENN RANCH, LLC,          (Consolidated Appeal from Final
et al.,                     Judgment and Opinion in Adversary
                         Proceeding No. 20-05027-RBK)

     *Appellees*.

## FINAL JUDGMENT

The Court has considered the issues presented in this appeal and rendered its decision. For

the reasons stated in the Memorandum Opinion and Order issued contemporaneously with this

Final Judgment, the Court **AFFIRMS IN PART, REVERSES IN PART, AND REMANDS** this

matter to the Bankruptcy Court for further consideration consistent with the Memorandum Opinion

and Order of the Court. The appeal is now **TERMINATED** on the active docket of this Court.

     **IT IS SO ORDERED this 14th day of March 2023.**

_____
JASON PULLIAM
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

IN RE:

KRISJENN, RANCH, LLC, dba as      Bankruptcy Case No. 20-50805-RBK
KrisJenn Ranch, LLC-Series Uvalde Ranch;          (Chapter 11)
Ranch and KrisJenn Ranch, LLC Series
Pipeline ROW,

       *Debtor*.

_____

DMA PROPERTIES, INC., et al.,

       *Appellants*,

v.                                     Case No. SA-21-CV-0358-JKP

KRISJENN RANCH, LLC,           (Consolidated Appeal from Final
et al.,                            Judgment and Opinion in Adversary
                                     Proceeding No. 20-05027-RBK)

       *Appellees*.

## MEMORANDUM OPINION AND ORDER

This consolidated bankruptcy action concerns appeals from a final judgment entered in a single adversary proceeding following a bench trial. Three entities owned by Larry Wright (Kris-Jenn Ranch, LLC; KrisJenn Ranch, LLC-Series Uvalde Ranch; and KrisJenn Ranch, LLC Series Pipeline ROW (collectively "KrisJenn" or "Appellees")) filed for Chapter 11 bankruptcy and commenced an adversary proceeding to obtain a declaration that two promises to pay a percentage interest in a pipeline right-of-way ("ROW") to Appellants DMA Properties, Inc. ("DMA") and Longbranch Energy, LP ("Longbranch") (collectively "Appellants") do not attach and run with the ROW. Appellants counterclaimed for a contrary declaration and asserted various torts against Appellees and Wright. Frank Daniel Moore, DMA's principal, intervened to assert similar counterclaims and cross actions. The Bankruptcy Court ruled that Appellants' interests are personal

covenants that do not attach and run with the ROW rather than real property interests that do attach and run with the ROW.

Pursuant to 28 U.S.C. § 158(a) and Fed. R. Bankr. P. 8001 and 8002, Appellants appeal the Bankruptcy Court's Final Judgment (Bankr. ECF No. 237) and the accompanying findings of fact and conclusions of law set out in the Bankruptcy Court's opinion (Bankr. ECF No. 236) issued on March 24, 2021, in Adversary Proceeding No. 20-05027.[1] Having considered the issues raised in this consolidated appeal, the arguments of the parties, the relevant portions of the record, and the applicable principles of law, the Court finds no need for oral argument and, for the reasons that follow, it **AFFIRMS IN PART and REVERSES IN PART** the Bankruptcy Court's final judgment and **REMANDS** this matter for further consideration and entry of judgment consistent with this Memorandum Opinion and Order.

## I. BACKGROUND

On March 24, 2021, Chief United States Bankruptcy Judge Ronald B. King entered an opinion, R. 3719-47 (*KrisJenn Ranch, LLC v. DMA Props., Inc. (In re KrisJenn Ranch, LLC)*, 629 B.R. 589 (Bankr. W.D. Tex. 2021)), and final judgment, R. 3748-49, in Adversary Proceeding No. 20-05027-RBK. The opinion constitutes the Bankruptcy Court's findings of fact and conclusions of law under Fed. R. Bankr. P. 7052. *See* R. 3747. As the Bankruptcy Court stated, "a chronology of the facts is helpful" to fully understand the transactions forming the basis for the Adversary

---

[1] The consolidated Bankruptcy Record on Appeal (ECF No. 28) ("ROA") contains three attachments: (1) a Joint Designation of Items for Appellate Record (ECF No. 28-1) listing the designations; (2) Designated Documents (ECF No. 28-2); and (3) Docket Sheet (ECF No. 28-3) of the Bankruptcy Court. This Court will cite to the Designated Documents, which comprise the 4,271-page record on appeal as "R." It will cite to the other documents filed in this appeal by the ECF docket number. The Court may also include the document number for filings in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary Proceeding No. 20-05027-RBK. Both Appellants and Appellees cite to various exhibits without referencing the ROA. *See*, *e.g.*, ECF No. 34 at 3-10 (using DX and PX to refer to exhibits); ECF No. 35 at 19 (using "Pl.'s Ex."). Believing ECF No. 28 to be the complete record on appeal for all matters in this consolidated appeal, the Court initially found the parties' citations unhelpful. When a court has an expansive ROA, use of an imprecise citation format is particularly unhelpful. Nevertheless, the Court located the appellate documents crucial to this consolidated appeal within the electronic ROA. Only after such efforts did the Court notice a docketing remark that the Bankruptcy Court had forwarded four large volumes of exhibits. This remark related to the original ROA that the Court had received four months prior to consolidated ROA. Thus, this Court may cite to the parties' exhibits as they do or by reference to the ROA or both.

Proceeding. R. 3720. The Bankruptcy Court then thoroughly set out relevant background facts from 2015 through 2020. *See* R. 3720-27. The parties know the relevant transactional history and assert no disagreement with it factually unless otherwise noted. Because the factual chronology is crucial to understanding the various transactions at play, the Court will repeat much of the Bankruptcy Court's efforts. This Court will include appropriate citations to the record as it reviews the record. But unless a party disputes a relevant background fact, the Court sees no need to provide a citation for each background fact, especially when neither the Bankruptcy Court nor the parties provide a specific citation to the record. The following timeline provides the needed transactional detail.

In 2015, Wright, Moore, and a third individual (Darin Borders) were "flipping" saltwater disposal wells. With two successful flips and a third under contract, Wright and Moore formalized their business relationship by forming Black Duck Properties, LLC, ("Black Duck"). Attorneys drafted a Black Duck Company Agreement (the "Company Agreement") that Moore and Wright executed on December 28, 2015. *See* Bankr. ECF No. 28-6 (found at R. 546-87). Black Duck's members (Wright, Moore, and Hagan Cohle) witnessed and adopted this agreement in January and February 2016. *See* R. 587. According to the agreement, Wright owned half of Black Duck through KrisJenn Ranch, LLC, and Moore owned half through his entity, SCMED Oilfield Consulting, LLC ("SCMED"). *See* R. 588. SCMED has assigned all interests, claims, and causes of action related to the ROW to Moore and that entity is not a party to this consolidated bankruptcy appeal.

The next year, separate from any Black Duck investment, Moore and Borders learned of an opportunity to purchase the relevant ROW from its then-owner Express Pipeline Connection, LLC ("Express"). So, on February 19, 2016, through Borders's company ("Longbranch), Moore and Borders agreed to purchase the ROW from Express. *See* ECF No. 28-7 (found at R. 590-634); DX6. The resulting "Longbranch Purchase Agreement" gave Longbranch a contractual right to purchase the ROW for $5 million. R. 593. Moore and Borders paid $25,000 in earnest money to

3

secure the purchasing right. R. 592-93. Exhibit A of that agreement is a map of the ROW. *See* R. 603. Exhibit B provides the legal description of the ROW. *See* R. 604. The agreement also includes additional information for each county through which the ROW runs, including dates, grantors, grantees, and the specific book with page number. *See* R. 605-24 (Exs. C-1 through C-4). Exhibit D is a proposed "Deed, Conveyance and Assignment" between Express and Longbranch. *See* R. 629-33.

After securing that Purchase Agreement, Moore and Borders set out to find another investor. When Wright indicated he wanted to be the capital investor, they added him as the "money guy." He reimbursed the earnest deposit and agreed to participate in the ROW purchase through Black Duck. R. 3601.

In June 2016, Longbranch assigned its rights to purchase the ROW to Black Duck through a two-page contract (the "Longbranch Assignment"). *See* Bankr. ECF No. 28-8 (found at R. 636-37); DX1. Interpretation of this assignment is a primary issue in this consolidated bankruptcy appeal. The assignment agreement includes the following language:

> Consideration: ASSIGNOR [(Longbranch)] shall be paid twenty percent (20%) ("Net Profits Share") of the Net Profits from ASSIGNEE [(Black Duck)] or its successors or assigns during the period of time beginning on the date of first written above (the "Period").
>
> a.    Net Profits shall mean gross revenues actually received by ASSIGNEE, or its successors or assigns directly from the operation, use, maintenance or sale (including partial sales or conveyances) of the pipe and related facilities commonly known as the P-21 or Express pipeline less actual cost of goods and costs and expenses associated with the operation or sale of the same.
>
> b.    ASSIGNEE's obligation to pay the Net Profits Share shall attach and run with the P-21 or Express pipeline and ASSIGNEE binds its successors and assigns to the payment of the Net Profits Share.

R. 636. The Assignment Agreement also states:

> The parties agree to execute such other and additional legal instruments, consents, ratifications and other matters that may be reasonably required in order to effectuate the intent of this Assignment and Assumption Agreement. The terms and provisions hereof shall inure to the benefit of and be binding upon the parties hereto and their

4

respective legal representatives, successors and assigns.

R. 636-37.

Borders recorded the Longbranch Assignment in Shelby County on October 2, 2017, but not in the other three counties in which it was located. Despite the "attach and run" language, the Longbranch Assignment did not include a legal description of the ROW. Furthermore, although the two-page assignment referenced the Longbranch Purchase Agreement as "attached hereto as Exhibit 'A,'" *see* R. 636, the assignment lacked any attachment. Nevertheless, a full legal description of the ROW was attached as Exhibit B to the Longbranch Purchase Agreement.

Separate from its efforts concerning the ROW, Black Duck agreed to sell a saltwater disposal well (the "Harris SWD") to Bigfoot Energy Services, LLC ("Bigfoot") for $500,000. Black Duck agreed to seller-finance the purchase. In March 2017, Bigfoot paid $50,000 as a down payment to Black Duck and gave Black Duck a $450,000 promissory note for the remainder of the purchase price (the "Bigfoot Note"), which was secured by the Harris SWD. The Bigfoot Note required quarterly payments to Black Duck in June, September, December, and March until repayment was complete.

After Wright funded various additional earnest money payments to extend the closing date, Express ultimately transferred ownership of the ROW to Black Duck on August 14, 2017. *See* R. 662-67 (Deed, Conveyance and Assignment ("Deed")), 705 (Deed of Trust Security Agreement); 2627. Similar to an attachment to the Longbranch Purchase Agreement, Exhibit A of the Deed is a map of the ROW showing how it meanders through four Texas counties (Shelby, Rusk, Nacogdoches, and Angelina). *See* R. 668. Part of Exhibit B to the Deed also includes additional information for each county through which the ROW runs, including dates, grantors, grantees, and the specific book with page number. *See* R. 669-89 (Exs. B-1 through B-4). On August 15, 2017, this Deed was filed in Shelby and Rusk counties. *See* R. 694-95.

To fund the purchase price, Wright made a personal loan of $1.25 million to Black Duck

to pay a nonrefundable partial payment to extend the contract. Wright also took a loan from Asilo Investments ("Asilo") to KrisJenn for $4.1 million. *See* R. 696-702 (Renewal and Modification of Real Estate Note). Wright's family ranch was collateral for this hard money loan. *See* R. 698. Wright then lent the $4.1 million to Black Duck from KrisJenn to complete the ROW purchase (the "Black Duck Loan"). *See* R. 705-30. The Black Duck Loan was executed and notarized on January 18, 2018, *see* R. 730, and Wright recorded the deed of trust in Nacogdoches County the next day, *see* R. 704.

As a loan between two of his entities, Wright was on both sides of the loan. According to a security agreement for the ROW deed of trust, the ROW secured the Black Duck Loan. *See* R. 705. Structuring the loan in this manner enabled Wright to secure repayment on the hard money loan and protect his family ranch by foreclosing on the ROW. Although Moore was a manager of Black Duck when this loan was completed, and although the Company Agreement required loan transactions to be authorized by the managers, no one informed Moore of this "secret loan," and he did not authorize it. Moore became aware of the loan much later.

After Black Duck closed the ROW purchase, Wright allegedly pressured Moore to relinquish his 50% interest in Black Duck through SCMED and resign from his position as manager. In an email exchange on February 3 and 4, 2018, the two business partners agreed on the terms of Moore's resignation (the "Email Agreement"). *See* R. 767-71. Moore (through his entity, DMA) would receive "[n]o less than 20% Carried Interest in the P-21 Express Pipeline . . . . [u]nder the exact same terms and conditions as the [Longbranch Assignment]." R. 770. DMA would also receive "[n]o less than 50% carried interest and 50% entitlement on all terms and conditions and monies owed on the [Bigfoot Note] regarding the Harris SWD. Harris SWD is 100% FREE AND CLEAR OF ANY AND ALL DEBTS." *Id*. Wright agreed to these terms via email on February 4, 2018. R. 768.

On February 7, 2018, DMA and Black Duck executed a formal agreement incorporating

6

the terms of the Email Agreement (the "DMA Agreement"). *See* Bankr. ECF No. 28-20 (found at R. 776-80); DX2. The DMA Agreement contains essentially the same terms previously set out when Longbranch assigned the ROW purchase agreement to Black Duck. *Compare* R. 779 *with* R. 636-37. This agreement lacks any reference to any legal description and has no attachments. *See* R. 779-80. But it contains the following provision:

> Each party agrees that upon this agreement being fully executed that this will become the ONLY valid agreement between the parties AND this agreement as mentioned in the binding "EMAIL AGREEMENT" ONLY IN REGARDS to the P-21 Express Pipeline that, both parties agree that this agreement satisfies the duties (in the Email Agreement ) regarding ONLY the P-21 Express Pipeline and that all other prior agreements or duties of any kind that relate to the P-21 Express Pipeline are NULL AND VOID.

R. 880. The DMA Agreement was recorded in the four counties spanning the ROW months later on December 4, 2018. *See, e.g.,* R. 777 (Nacogdoches County), 780 (Rusk County).

Wright and Moore also executed a second formal agreement (the "Harris SWD Agreement") in late February and early March 2018, "to address the obligations regarding the Harris SWD" that had been mentioned in "the binding 'Email Agreement' . . . dated Feb. 3, 2018." R. 1150; DX4. Although Moore signed this agreement as "Principle" of DMA and Wright signed as "President" of Black Duck, the body of the agreement begins with language that might suggest that they both execute the document on their individual behalf as well as for their respective entity. *See* R. 1150. The agreement begins with, "Larry M. Wright on behalf of himself and Black Duck Properties, LLC and Frank D. Moore on behalf of himself and DMA Properties, Inc." *Id.* The Harris SWD Agreement provides that DMA "is entitled to receive 50% of all Gross Monies" paid on the Bigfoot Note to Black Duck "including its successors and assigns." *Id.* The agreement further states that Black Duck would continue to collect the note payments and mail DMA its portion "within three business days of the funds being available." *Id.*

Shortly after executing the DMA Agreement, Wright agreed with John Terrill and others to sell the ROW for $2.5 million, with a 16% profits interest retained. *See* R. 782 (letter

7

memorializing agreement). On February 9, 2018, a few days after Moore left the company, Wright caused Black Duck to execute a letter of intent regarding that agreement with Terrill. *See* R. at 781-83 (letter of intent); DX22. On March 22, 2018, Terrill's entity, TCRG East Texas Pipeline 1, LLC ("TCRG"), and Black Duck executed a purchase agreement (the "TCRG Purchase Agreement"). *See* Bankr. ECF No. 28-24 (found at R. 852-68). Under the terms of that agreement, Black Duck would receive a cash purchase price of $2.5 million and retain a 16% carried interest in the gross profit of the ROW. R. 855, 891-93. TCRG made a $500,000 down payment on the purchase price, R. 855, and the deed transferring the ROW to TCRG was executed on April 3, 2018, *see* R. 927-33. TCRG had a wealthy investor backing it who intended to spend tens of millions of dollars to develop the ROW by constructing one or more pipelines.

On or about April 4, 2018, Borders learned of the TCRG sale during a meeting with Wright and Terrill. During the meeting, Borders informed Terrill of his 20% net-profits interest. Terrill was not aware of the interest. Borders informed Moore of these developments. Believing that Wright intentionally concealed their net-profits interests from Terrill, Moore and Borders confronted Wright and shared copies of the Longbranch Assignment and DMA Agreement with TCRG. Wright testified that he did not disclose the net-profits interests to TCRG because, as he understood it, DMA and Longbranch were only entitled to 20% of the net-profits received by Black Duck through its 16% carried interest in the ROW. In turn, Wright was entitled to the remaining 60% of Black Duck's 16% carried interest. DMA and Longbranch vehemently disagreed, arguing that the Longbranch Assignment and DMA Agreement entitled each to a 20% net-profits interest in the entire ROW because the net-profits interests run with the land and are binding on the successors and assigns to the ROW, including TCRG. Borders and Moore both testified at trial that the 20% net-profits interest that each reserved would probably diminish the chances of obtaining a sale; they had reserved it to give themselves negotiating leverage.

Wright asked Borders and Moore to stop interfering with the TCRG sale. On April 16,

2018, Wright emailed Moore and Borders threatening to "kill" their 20% if they continued to communicate with Terrill about their net-profits interests. Ultimately, TCRG funded the final $2 million of the purchase price. After the TCRG sale closed in April 2018, Black Duck was owned 100% by KrisJenn and TCRG owned the ROW. Despite a seemingly successful sale with a valuable retained income interest, the deal ultimately collapsed.

Because of the continued contact of Moore and Borders with TCRG regarding their net-profits interests, the entire sale fell apart. With threats of litigation, TCRG forced Wright to rescind the TCRG Purchase Agreement and repurchase the ROW. KrisJenn purchased the ROW back from TCRG in December 2019. To pay the $2.5 million repurchase price, KrisJenn obtained additional financing from an existing lender, the McLeod family (the "McLeod Option Agreement"). This agreement became effective on December 19, 2019, pledged Wright's family ranch, mineral interests, and the ROW as collateral. It also conveyed an option to purchase the ROW for $6 million.

When Black Duck was unable to pay its debt under the Black Duck Loan, KrisJenn "foreclosed" and became a successor-in-interest to Black Duck's assets. On October 12, 2018, KrisJenn's attorney, David Strolle, sent a letter to Bigfoot Energy as "formal notice" of an assignment and transfer of 100% of Black Duck's interest in the Bigfoot Note to KrisJenn in lieu of the foreclosure. At that point, Black Duck had already remitted 50% of the Bigfoot Note payments to DMA pursuant to the Harris SWD Agreement for the March and June 2018 quarterly payments, a total of $31,844.30. DMA never received its portion of the September 2018 payment, or any payment made thereafter.

Moore protested that this was a "sham foreclosure" and KrisJenn was just looking to the Bigfoot Note in order to repay its own hard money loan from Asilo. He asserted that the Bigfoot Note was not listed as collateral for the Black Duck Loan. The loan documents expressly stated that the "Note is secured by the following Deeds of Trust . . . [a] The Express Gas Pipeline and related facilities . . . ." Neither the Black Duck Loan nor the accompanying deed of trust referred

9

to or mentioned the Bigfoot Note or the Harris SWD. Wright dissolved Black Duck in December 2018 and KrisJenn became its successor-in-interest. The Bigfoot Note was paid off on December 10, 2020 and the remaining payments are currently held in the registry of the court in Panola County, Texas.

In 2019, these business transactions resulted in three state lawsuits to interpret the terms of the Longbranch Assignment and DMA Agreement (the "Assignment Agreements"). But before these lawsuits were resolved, KrisJenn filed for bankruptcy under Chapter 11 and initiated the bankruptcy adversary proceeding leading to the instant consolidated bankruptcy appeal. Through the adversary proceeding, KrisJenn claimed that DMA and Longbranch tortiously interfered with the TCRG Purchase Agreement. KrisJenn also sought a declaration that: (1) the net-profits interests in the Assignment Agreements are personal covenants, and not real covenants that attach and run with the ROW, (2) KrisJenn is not a "successor or assign" of Black Duck, and (3) the Black Duck Loan was an authorized loan and not a capital contribution.

DMA and Longbranch answered and filed their own counterclaims and cross actions. They sought a declaration that the net-profits interests in the Assignment Agreements attach and run with the ROW and are enforceable against the subsequent owners, TCRG and KrisJenn. Together with Moore's third-party claims, the counterclaims total over thirty counts seeking relief based on fraud, breach of contract, breach of fiduciary duty, tortious interference with contract, promissory estoppel, civil conspiracy, unjust enrichment, money had and received, conversion, and nondischargeability of debts against Wright, Black Duck, KrisJenn, and Terrill. All parties sought attorney's fees and costs. DMA further asserted separate counterclaims related to the Bigfoot Note and Harris SWD Agreement. After the Bankruptcy Court granted partial summary judgment to DMA recognizing its ownership interest in 50% of the Bigfoot Note payments, DMA sought payment on its 50% portion of the funds currently held in the Panola County district court registry and exemplary damages against KrisJenn.

10

The Bankruptcy Court conducted a six-day evidentiary trial on all issues with the consent of all parties for entry of a final order or judgment. On March 24, 2021, it issued a detailed opinion, R. 3719-47, and ultimately concluded that "[t]he net-profits interests in the Assignment Agreements are personal covenants that fail to meet the requirements of a covenant running with the land under Texas law," R. 3746. It thus found KrisJenn "entitled to a declaratory judgment that the Assignment Agreements are personal covenants." *Id*. Although the Bankruptcy Court also found that "Wright breached his fiduciary duty related to the unauthorized Black Duck Loan," it further found that "no actual damages were proven." *Id*. In addition, the Bankruptcy Court "declare[d] that DMA is entitled to 50% of the payments on the Bigfoot Note and that Black Duck breached the Harris SWD Agreement when it failed to pay DMA its portion of the payments." R. 3747. It awarded DMA "$175,143.60 from the funds held in the Panola County court registry and is entitled to reasonable attorney's fees related to this claim." *Id*.

The Bankruptcy Court entered a Final Judgment, R. 3748-49, memorializing its conclusions. More particularly, it rendered a declaratory judgment in favor of KrisJenn that the net-profits interests in the Assignment Agreements owned by Longbranch and DMA are personal covenants. R. 3749. And "[a]s to Moore's claim for breach of fiduciary duty against Wright regarding the unauthorized Black Duck Loan, the Court render[ed] judgment that Moore take nothing because no actual damages were proven." *Id*. Further, the Bankruptcy Court rendered a declaratory judgment in favor of DMA that, under the terms of the Email Agreement and Harris SWD Agreement, DMA has an ownership interest in 50% of the Bigfoot Note payments." *Id*. The Bankruptcy Court further "awarded DMA $175,143.60 from the funds held in the Panola County court registry, plus attorney's fees from the court registry if DMA requests attorney's fees in accordance with [applicable procedures]." *Id*.

On April 7, 2021, DMA moved for attorneys' fees and to amend the judgment. *See* R. 3750-60. It moved to amend the judgment to reflect that Wright is also liable in his individual

11

capacity on DMA's claim for breach of the Harris SWD Agreement. R. 3760. That same date, both DMA and Longbranch filed notices of appeal, R. 3832-35, 3870-73, resulting in separate bankruptcy appeals before this Court – Cause Nos. 5:21-CV-00358-JKP and 5:21-CV-00359-JKP.

On August 5, 2021, the Bankruptcy Court partially granted the motion for fees and for amendment of the judgment. R. 4270-71. It granted fees in the amount of $100,000, but otherwise denied the motions without significant analysis. R. 4271.

A third appeal (Cause No. 5:32-CV-00775-JKP).was later opened based upon a notice of appeal by KrisJenn. This Court consolidated the three bankruptcy appeals and set various deadlines, including a briefing schedule. *See* ECF Nos. 19, 22, 29. The Court received statements of issues from Appellants Longbranch and DMA and from Cross-Appellants KrisJenn. *See* ECF Nos. 23, 26. However, prior to the filing of any appellate brief, KrisJenn voluntarily dismissed their cross-appeal by agreement. *See* ECF No. 33. Consequently, this consolidated case concerns only the appeals commenced by Appellants. With the filing of Appellants' Brief (ECF No. 34), Appellees' Brief (ECF No. 35), and a Reply Brief (ECF No. 38), this consolidated bankruptcy appeal is ready for ruling.

## II. JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a), which provides district courts with the authority to hear appeals from final judgments and orders of bankruptcy judges. "When reviewing a bankruptcy court's decision in a 'core proceeding,' a district court functions as a[n] appellate court and applies the standard of review generally applied in federal court appeals." *First Nat'l Bank v. Crescent Elec. Supply Co.*, 713 F.3d 285, 293 (5th Cir. 2013) (quoting *Webb v. Reserve Life Ins. Co.*, 954 F.2d 1102, 1103-04 (5th Cir. 1992)). The same is true when the district court sits as an appellate court to review adversary proceedings completed to finality by consent of the parties. *See Monge v. Rojas (In re Monge)*, 826 F.3d 250, 254 (5th Cir. 2016) (recognizing the difference in the appeal then before the circuit as proceeding to the

district court on proposed findings of fact and conclusions of law). At issue in this consolidated bankruptcy appeal are challenged matters within the opinion of the Bankruptcy Court and resulting final judgment entered by the consent of all parties.

Courts review a bankruptcy court's findings of fact under the clearly erroneous standard, but review questions of law de novo. *Saenz v. Gomez*, 899 F.3d 384, 390 (5th Cir. 2018); *Wiggains v. Reed*, 848 F.3d 655, 660 (5th Cir. 2017); *Thaw v. Moser*, 769 F.3d 366, 368 (5th Cir. 2014); *Whitley v. Cage*, 737 F.3d 980, 985 (5th Cir. 2013). Both "legal conclusions and mixed questions of fact and law" are reviewed de novo. *Credit v. Schott (In re Jackson)*, 850 F.3d 816, 818 (5th Cir. 2017). Furthermore, when an "appeal is based on the bankruptcy court's application of law to undisputed facts, the de novo standard of review applies." *Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 218 (5th Cir. 2013). "A finding of fact is clearly erroneous only if on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed." *Robertson v. Dennis*, 330 F.3d 696, 701 (5th Cir. 2003) (citation and internal quotation marks omitted).

"Interpretation of a contract is a matter of law, as is the determination that a contract is ambiguous, and both are reviewed de novo." *Hurt v. Fed. Nat'l Mortg. Assoc & Home Securitization Trust 1 (In re Homeowners Mortg. & Equity, Inc.)*, 354 F.3d 372, 375 (5th Cir. 2003) (quoting *Camden Iron & Metal, Inc. v. Krafsur (In re Newell Indus., Inc.)*, 336 F.3d 446, 448 (5th Cir. 2003)). "The interpretation of ambiguous contracts implicates questions of fact," which are "review[ed] for clear error." *Stinnett v. Colo. Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000). No one disputes that Texas law applies to the contract disputes at issue in this case. "To determine the parties' intent, Texas law requires us to harmonize the complete document and give effect to all its provisions." *Hurt*, 354 F.3d at 375.

### III. ISSUES RAISED ON APPEAL

Appellants raise five specific issues that they contend cover all reasonably related subsidi-

ary issues:

> 1. Whether the Bankruptcy Court erred in granting final judgment thus rendering a declaration in favor of KrisJenn and finding that the net-profits-interest assignment agreements owned by Appellants were personal covenants rather than real covenants running with the land.

> 2. Whether the Bankruptcy Court erred in granting final judgment that denied enforcing the reasonable-assurances clause in the net-profits-interest assignment agreements owned by Appellants through either (a) ordering production of documents or authorizations as would be required to effectuate the parties' intent to make the assignment agreement enforceable as real covenants running with the land or (b) reforming the assignment agreement to make it enforceable as a real covenant running with the land.

> 3. Whether the Bankruptcy Court erred in granting final judgment that rejected DMA's claims for breach of fiduciary duty against Wright.

> 4. Whether the Bankruptcy Court erred in granting final judgment that rejected the Appellants' claims for knowing participation in breach of fiduciary duty against KrisJenn and Black Duck.

> 5. Whether, in failing to hold Wright personally liable for the breach, damages, and attorneys' fees related to the Harris SWD Agreement, the Bankruptcy Court erred in granting final judgment and denying in part DMA's motion to amend the final judgment.

*See* ECF No. 23.

While originally listing those five issues, Appellants identify only three issues within their

appellate brief:

> 1. Whether the Bankruptcy Court committed reversible error in granting final judgment that rendered declaratory judgment in favor of the Appellees, and denying declaratory judgment sought by Appellants, and holding that the net-profits-interest assignment agreements owned by Appellants were personal covenants rather than real covenants running with the land.

> 2. Whether through its conclusions of law, the Bankruptcy Court committed reversible error in granting final judgment that rejected DMA's claims for breach of fiduciary duty against Larry Wright and DMA's claims for knowing participation in breach of fiduciary duty against KrisJenn and Black Duck.

> 3. Whether, in not holding Wright personally liable for the breach, damages, and attorneys' fees related to the Harris SWD Agreement, the Bankruptcy Court committed reversible error in granting final judgment and denying in part DMA's motion to amend the final judgment.

*See* ECF No. 34 (Statement of Issues). Despite the numerical reduction of identified issues,

Appellants continue to argue other aspects of the original five issues within the context of the three

identified issues.

Because Appellees cross-appealed, they initially raised three specific appellate issues of

their own:

> 1. Whether the Bankruptcy Court erred in granting summary judgment that DMA
> has a direct ownership interest in the Bigfoot Note Payments. (Bankr. ECF No.
> 110).
>
> 2. Whether the Bankruptcy Court erred in granting final judgment that rejected
> KrisJenn's claim for tortious interference with a contract against DMA. (Bankr.
> ECF Nos. 236-37).
>
> 3. Whether the Bankruptcy Court erred in awarding DMA attorney's fees in the
> amount of $100,000.00. (Bankr. ECF No. 267).

*See* ECF No. 26. But the voluntary dismissal of the cross-appeal, *see* ECF No. 33, eliminated these

appellate issues.

Appellees identify the core question in this case as whether two profit sharing agreements

(often collectively referred to as the "Agreements" or "Assignment Agreements") are personal or

real covenants. *See* ECF No. 35 at 13. Furthermore, consistent with the voluntary dismissal of their

cross-appeal, Appellees make no arguments regarding their three raised appellate issues while re-

sponding to the specific appellate issues raised in Appellants' brief, they. *See*, *generally*, *id*.

## IV. PRESERVATION OF ISSUES, WAIVER, AND ABANDONMENT

The issues included in Appellants' original statement of issues properly preserve the issues

for appeal. *See Highland Cap. Mgmt. Fund Advisors, LP v. Highland Cap. Mgmt., LP (In re High-*

*land Cap. Mgmt., LP)*, 57 F.4th 494, 499-500 (5th Cir. 2023).

> Bankruptcy Rule 8009—previously Rule 8006—requires that, in an appeal to a dis-
> trict court or bankruptcy appellate panel, "[t]he appellant must file with the bank-
> ruptcy clerk and serve on the appellee a designation of the items to be included in
> the record on appeal and a statement of the issues to be presented."

*Id*. at 499 (quoting Fed. R. Bankr. P. 8009(a)(1)(A)). An issue is not preserved for appeal, "even

if [it] is argued in the bankruptcy court and ruled on by that court . . . unless the appellant includes

the issue in its statement of issues on appeal." *Id.* (quoting *Smith ex rel. McCombs v. H.D. Smith Wholesale Drug Co. (In re McCombs)*, 659 F.3d 503, 510 (5th Cir. 2011)). Furthermore, even if an unpreserved issue is "argued before the district court," it "is waived on subsequent appeal to the Fifth Circuit." *Id.* at 500 (same). As the Fifth Circuit has

> previously held, "the rules regarding preservation of issues on appeal in bankruptcy cases apply with equal force regardless of whether the appeal is from the bankruptcy court to the district court ... from the district court to the court of appeals ... or from the bankruptcy court to the court of appeals"—in other words, Appellants' "statement of issues must be considered to determine whether [they] properly preserved for appeal the issues and arguments contained in [their] brief."

*Id.* (quoting *In re McCombs*, 659 F.3d at 511).

Additionally, a party may abandon an issue preserved for appeal by failing to brief it adequately in the appellate brief. *See Assadi v. Osherow (In re Assadi)*, No. 22-50452, 2022 WL 17819599, at *2 (5th Cir. Dec. 20, 2022) (per curiam) ("Assadi abandoned this issue by inadequately briefing it before the district court.); *Ramirez v. Escajeda*, 921 F.3d 497, 500 (5th Cir. 2019) (recognizing that parties abandon issues "[b]y presenting but failing to brief" the issues); *United States v. Arizpe*, 371 F. App'x 521, 522 (5th Cir. 2010) (per curiam) ("We will not raise and discuss legal issues that Arizpe has failed to assert; those issues are deemed abandoned."); *Saddler v. Quitman Cnty. Sch. Dist.*, 278 F. App'x 412, 416 (5th Cir. 2008) (per curiam) (deeming an issue abandoned when the appellant "failed to raise the issue in her opening brief"); *Davis v. Maggio*, 706 F.2d 568, 571 (5th Cir. 1983) ("Claims not pressed on appeal are deemed abandoned."). Briefing schedules arising from applicable bankruptcy rules of procedure create an expectation that "issues in bankruptcy appeals [are] to be raised and argued in appellant's brief." *MortgageAmerica Corp. v. Bache Halsey Stuart Shields Inc.*, 789 F.2d 1146, 1150 (5th Cir. 1986). "An original brief abandons all points not mentioned therein, and also those points assigned as error but not argued in the brief." *Id.* (quoting parenthetically *Martin v. Atl. Coast Line R.R. Co.*, 289 F.2d 414, 417 n.4 (5th Cir. 1961)).

# V. APPLICABLE LAW

"Under the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996); *accord Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In the context of a bankruptcy appeal, reviewing courts likewise apply state substantive law. *See Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 221 (5th Cir. 2013) (applying Texas law). As mentioned previously, the parties do not dispute the applicability of Texas law to issues in this case. Texas law provides the "substantive law governing construction of contracts," *Nat'l Car Rental Sys., Inc. v. Better Monkey Grip Co.*, 511 F.2d 724, 729 (5th Cir. 1975); *accord AXO Staff Leasing, LLC v. Zurich Am. Ins. Co.*, No. A-19-CV-00002-LY, 2019 WL 4418539, at *4 (W.D. Tex. Sept. 16, 2019) (applying Texas law regarding the construction of contracts), including applicability of "the parole evidence rule, which is not really a rule of evidence but rather a substantive rule from the law of contracts," *Harville Rose Serv. v. Kellogg Co.*, 448 F.2d 1346, 1349 (5th Cir. 1971).

"When reviewing issues of state law, federal courts look to the law of that state's highest court." *City of Alexandria v. Brown*, 740 F.3d 339, 351 (5th Cir. 2014). Absent a final decision by the Texas Supreme Court that "'precisely' resolves the legal issue, federal courts "must make an *Erie* guess and determine as best [they] can what the Supreme Court of Texas would decide." *Martinez v. Walgreen Co.*, 935 F.3d 396, 398 (5th Cir. 2019) (citation omitted). When compelled to make an *Erie* guess, federal courts "defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008) (citations and internal quotation marks omitted). The federal courts not only look to the intermediate state appellate decisions, but also to "the general rule on the issue, decisions from other jurisdictions, and general policy concerns." *Martinez*, 935 F.3d at 398 (citation omitted).

17

# VI. ANALYSIS

Appellants argue that the Bankruptcy Court erred in three respects: (A) ruling that the relevant agreements are personal covenants rather than real property interests that attach and run with the ROW; (B) rejecting their claims for breach of fiduciary duty and knowing participation in that breach; and (C) denying request to hold Wright personally liable for damages and attorneys' fees for breaching an agreement related to note payments. *See* ECF No. 34 (statement of the case).

## A. <u>Personal Versus Real Covenants</u>

The first appellate issue requires the Court to interpret two agreements involving Black Duck – the Longbranch Assignment and the DMA Agreement – which the Bankruptcy Court addressed jointly as the Assignment Agreements. As the Bankruptcy Court recognized, "[t]he primary issue in this case is whether the net-profits interests in the Assignment Agreements constitute real covenants running with the land under Texas law" and resolving "this key issue goes a long way to resolving the parties' remaining claims and counterclaims." R. 3729. In large part, the parties do not contest the applicable legal principles. They instead differ in how those principles are applied in the context of the adversarial proceeding.

"Texas caselaw contains some variations on the requirements for a covenant that runs with the land." *Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 221 (5th Cir. 2013). But for a decade, the Fifth Circuit has accepted the following variation as controlling:

> a covenant runs with the land when it [1] touches and concerns the land; [2] relates to a thing in existence or specifically binds the parties and their assigns; [3] is intended by the original parties to run with the land; and [4] when the successor to the burden has notice.

*Id*. (quoting *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987)). Because *Inwood* "referred to a requirement of privity but did not detail it," the Fifth Circuit also accepted the following privity element: "There must also be privity of estate between the parties when the covenant was made." *Id*. (attributing second quote to *Ehler v. B.T. Suppoenas Ltd.*, 74

S.W.3d 515, 521 (Tex. App.– Amarillo 2002, pet. denied)).

If a required element is lacking, "the agreement is a personal covenant that remains with the original parties to the contract and does not run to successors." *Fort Worth 4th St. Partners, LP v. Chesapeake Energy Corp.*, 882 F.3d 574, 577 (5th Cir. 2018) (noting only the first four listed elements). Long ago, the Texas Supreme Court held that when "parties seek to enforce a restrictive covenant the burden of proof is upon them to establish that the covenant was imposed." *Davis v. Skipper*, 83 S.W.2d 318, 321-22 (Tex. 1935). The Court has no reason to question that *Davis* accurately states the burden as quoted. Both the Bankruptcy Court and Appellees apply the quoted language. *See* R. 3730; ECF No. 14, 19, 24.

Appellees argue that Appellants have not proven "four of the five elements necessary to establish a real covenant." ECF No. 35 at 14. Appellees concede the second element. *See id*. at 13-16 (presenting arguments only concerning the other elements). Both sides agree that the parties stipulated at trial that the second element was satisfied. *See* ECF No. 35 at 29; ECF No. 38 at 10 n.4. And the Bankruptcy Court recognized that there was "no genuine dispute" as to the second element. *See* R. 3730. This Court will limit its discussion to the elements placed in dispute by the briefing. Because intent is such an important element in this case, the Court starts with that element.

### 1. <u>Intent that the Obligation Run with the Land</u>

"When a contract's meaning is disputed, [a court's] primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 763 (Tex. 2018). In the context of a contractual covenant, "[c]ourts judge intent by first looking to the text of the instrument itself to determine if there is language expressly stating that the covenant binds successors." *Fort Worth 4th St. Partners, LP v. Chesapeake Energy Corp.*, 882 F.3d 574, 578 (5th Cir. 2018). Whether the parties agree or disagree as to the ambiguity or clearness of a contract is not determinative. *URI*, 543 S.W.3d at 763.

Courts conduct de novo review of matters of law, including contract interpretation and whether a contract is ambiguous. *Hurt v. Fed. Nat'l Mortg. Assoc & Home Securitization Trust 1 (In re Homeowners Mortg. & Equity, Inc.)*, 354 F.3d 372, 375 (5th Cir. 2003). The Texas Supreme Court has recognized the following "well-settled contract-construction principles":

> Objective manifestations of intent control, not what one side or the other alleges they intended to say but did not. [Courts] therefore presume parties intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise.
>
> [Courts] are also cognizant that words are simply implements of communication, and imperfect ones at that. Oftentimes they cannot be assigned a rigid meaning, inherent in themselves. Rather, their meaning turns upon use, adaptation and context as they are employed to fit various and varying situations. Even a single word can carry subtle—and significant—differences in meaning when applied to different situations.
>
> Accordingly, to home in on the meaning the parties intended, [courts] have long allowed that words must be construed in the context in which they are used. Context is not, however, confined to the two-dimensional contractual environs in which the words exist but may also encompass the circumstances present when the contract was entered. This is so because words are the skin of a living thought, and our quest is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean.

*URI*, 543 S.W.3d at 763-64 (footnotes, citations, and internal quotation marks omitted).

Furthermore, whether courts may consider evidence "of surrounding circumstances is limited by the parole evidence rule, which prohibits a party to an integrated written contract from presenting extrinsic evidence for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *Id*. at 764 (same). However, as the Texas Supreme Court has recognized, this prohibition does not prevent "courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution as an aid in the construction of the contract's language." *Id*. at 765 (same). However, such extrinsic "evidence may only give the words of a contract a meaning consistent with that to which they are reasonably susceptible, i.e., to interpret contractual terms." *Id*. (same). In short, "whether a court is considering if an ambiguity exists or construing the terms of an unambiguous contract, surrounding facts and

circumstances can only provide context that elucidates the meaning of the words employed, and nothing else." *Id.*

Under Texas law, a written contract is not ambiguous when it "is so worded that it can be given a definite or certain legal meaning . . . as applied to the matter in dispute." *Id.* On the other hand, ambiguity exists under Texas law when "contract language is susceptible to more than one reasonable interpretation." *Id.* With these principles in mind, the Court's task is to interpret the relevant contracts between the parties and determine whether they are unambiguous.

The parties have different understandings of the relevant agreements. As noted by the Bankruptcy Court, they "disagree whether the net-profits interests flow from revenue generated from the ROW itself, or from Black Duck's revenue received from the operation, use, or sale of the ROW." R. 3731. And this disagreement stems from "the parties' dispute over the meaning of "its successors and assigns." *Id.*

For the most part, the agreements at issue contain identical terms. The text of both contracts expressly binds successors and assigns while also expressly stating that the "obligation to pay the Net Profits Share shall attach and run with the [ROW]." *See* R. 636, 779.

In general, this latter text "without more, would establish the requisite intent." *In re Chesapeake Energy Corp.*, 622 B.R. 274, 282 (Bankr. S.D. Tex. 2020). But courts must examine the entirety of the contract to determine whether that intent is unambiguous. *See id.* (relying on *ABS Sherman Props., Ltd. v. Sarris*, 626 S.W.2d 538, 540 (Tex. App. – Texarkana 1981, writ ref'd n.r.e.), while noting parenthetically that "determining an unambiguous lease provision ran with the land based on an examination of the entire lease"). Absent such clarity, the courts may rely on matters beyond the four-corners of the contract to determine intent. *See id.* (citing cases).

The Court has no disagreement with the Bankruptcy Court's legal finding that the phrase, "its successors and assigns," unambiguously refers to the successors and assigns of Black Duck or other party to the specific contract, i.e., Longbranch or DMA. As the Bankruptcy Court points out,

the relevant agreements use the phrase three times – each time to refer to the successors or assigns of the parties to the agreements, i.e., either Black Duck or one of the Appellants. R. 3732. Still, the Bankruptcy Court expressed difficulty in "reconcil[ing] this interpretation with the express language that the obligation 'shall attach and run' with the ROW." *Id*. Despite that expressed difficulty, the Bankruptcy Court found as a matter of law that the terms of the agreements are "not enough to establish a covenant running with the land under Texas law" and are merely an attempt to portray the agreements as containing such a covenant. R. 3732-33. Without further analysis, the Bankruptcy Court found "that the requisite intent is lacking." R. 3733.

Upon de novo review, this Court interprets the relevant contracts differently than the Bankruptcy Court. That both agreements bind Black Duck's successors and assigns does not, without more, make either agreement a personal covenant. First, a contractual covenant is personal when a required element for a covenant running with the land is missing. *Fort Worth 4th St. Partners, LP v. Chesapeake Energy Corp.*, 882 F.3d 574, 577 (5th Cir. 2018). Interpreting the meaning of the phrase, "its successors and assigns," does not of itself resolve any element required for a covenant running with the land.

That the relevant contracts unambiguously refer to the successors and assigns of Black Duck does not resolve the question of intent. It is clear that the parties intended Black Duck, or its successors or assigns, to pay Appellants the Net Profit Share. But that share is calculated from "revenues actually received . . . directly from the operation, use, maintenance or sale" of the ROW. *See* R. 636, 779. It thus appears that the parties intended to connect the covenant to the land, i.e., the ROW. In addition to the definition of "Net Profits," two other contractual provisions further bolster this interpretation: (1) the "obligation to pay the Net Profits Share shall attach and run with [the ROW]" and (2) Black Duck "binds its successors and assigns to payment of the Net Profits Share."

As Appellants argued and the Bankruptcy Court recognized, "phrases like 'run with the

land' and 'binding upon . . . successors and assigns' are the classic words used to create a covenant that runs with the land." *See* R. 3731 (citing *MPH Prod. Co. v. Smith*, No. 06-11-00085-CV, 2012 WL 1813467, at \*5 (Tex. App. – Texarkana 2012, no pet.) (mem. op.)). "Such terminology, although helpful in determining intent, is not dispositive, and an obligation intended to run with the land can be created without such language." *Musgrave v. Brookhaven Lake Prop. Owners Ass'n*, 990 S.W.2d 386, 395 (Tex. App. – Texarkana 1999, pet. denied); *accord MPH Prod. Co.*, 2012 WL 1813467, at \*5. The Bankruptcy Court properly recognized that " a covenant running with the land is not created simply because contractual language purports to create one." R. 3731-31 (citing *MJR Oil & Gas 2001 LLC v. AriesOne, LP*, 558 S.W.3d 692, 701 (Tex. App. – Texarkana May 18, 2018, no pet.); *Musgrave*, 990 S.W.2d at 395).

Texas law requires courts to "consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Kern v. Sitel Corp.*, 517 F.3d 306, 309 (5th Cir. 2008) (omitting emphasis and quoting *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). Additionally, "[n]o single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.* (quoting Coker, 650 S.W.2d at 393). By not reconciling its interpretation with the attach-and-run language, the Bankruptcy Court rendered such language meaningless.

Considering only the four-corners of each relevant contract, the Court finds that the Bankruptcy Court erred in finding the intent element lacking. The Court finds that the contracts in question unambiguously state an intent for the covenant to run with the land. Although the Bankruptcy Court relied on *In re Chesapeake* to find otherwise, this Court does not find that case as dictating the Bankruptcy Court's result. The Southern District of Texas found the requisite intent missing in *In re Chesapeake* because that case dealt specifically with an "obligation to sell certain quantities of gas" that was purported to run with the land, and the remedy for a breach of such obligation was limited to "a formulaic monetary payment." 622 B.R. at 282. The circumstances of this case

23

differ materially, and the Court does not find *In re Chesapeake* to be dispositive of the intent element. As Appellants point out, *In re Chesapeake* departed from the recognized general rule that express language of an intent to run an obligation with the land is sufficient. *See* ECF No. 38 at 5 n.2. And it departed because contractual remedy provisions were irreconcilable with a real covenant. *See In re Chesapeake*, 622 B.R. at 282.

Appellees argue that Appellants' "interpretation of the Agreement[s] would lead to absurd and illegal results." ECF No. 35 at 32. As part of this argument, they contend that the Appellants' interpretation "would make the ROW inalienable." *Id*. They further contend that such interpretation creates an illegal contract in violation of Texas law. *See id*. at 33. But, although Appellees provide precedent to support the general legal principles that they espouse, they make no effort to tie such precedent to the facts and circumstances relevant to their dispute with Appellants. Such conclusory arguments make no difference to the outcome in this consolidated appeal.

### 2. <u>Touch and Concern</u>

As the Fifth Circuit has noted, Texas has two "tests governing when a covenant touches and concerns land" and both "are far from absolute." *Fort Worth 4th St. Partners, LP v. Chesapeake Energy Corp.*, 882 F.3d 574, 578 (5th Cir. 2018) (attributing second quote to *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982)). Under the first test, a "benefit of a covenant runs with the land when it 'affected the nature, quality or value of the thing demised, independently of collateral circumstances, or if it affected the mode of enjoying it.'" *Id*. (quoting *Westland*, 637 S.W.2d at 911). The second test is stated in terms of "if the promisee's legal relations in respect to that land are increased—his legal interest as owner rendered more value by the promise—the benefit of the covenant touches or concerns the land." *Id*. (quoting *Westland*, 637 S.W.2d at 911). Appellants aptly refer to the first test as "the effects test" and the second test as "the legal-relations test." *See* ECF No. 34 at 20-21.

Appellants contend that they satisfy this element under either test set out by the Fifth

24

Circuit. ECF No. 34 at 20; ECF No. 38 at 8. They submit that their interests both (1) make the value of the ROW less valuable to the owner and (2) increase Appellants' legal relations to the ROW at the expense of Black Duck. ECF No. 34 at 20-21; ECF No. 38 at 8. To succeed under that theory for the first test, the diminished value of the ROW to the owner must be independent of collateral circumstances. And that is precisely the situation resulting from the Appellants' interests should they run with the land as intended. Because both Black Duck and any successor or assignee are obligated to pay the twenty percent share to Appellants, the value of the ROW is that much less valuable to Black Duck and any successor or assignee. With respect to the second test, both Appellants have increased legal relations with respect to the ROW and thus their legal interest as owners of the twenty percent interest has more value based upon the promises within the respective agreements.

As the Bankruptcy Court stated, to satisfy this element, Appellants "must show that the obligation to pay the net-profits burdens the owner of the ROW's real property interests." R. 3733. But the Bankruptcy Court found that Appellants failed to make the requisite showing because "an interest in the net profits of Black Duck is an interest in personal property." *Id*. The Bankruptcy Court viewed the contracts as creating "net-profits interests in the cash flow or sales proceeds received by Black Duck." R. 3734. But the contracts unambiguously bind any successor or assignee of Black Duck the same as Black Duck itself.

Appellants concede that, had the contracts merely imposed the payment obligation on Black Duck and its successors, one might reasonably limit the obligation to the corporate successors of Black Duck. *See* ECF No. 34 at 17. Both contracts, however, go beyond obligating Black Duck and its successors – they also obligate its assigns. This term is broader than the corporate successors. An "assignee" is defined as "someone to whom property rights or powers are transferred by another." Assignee, Black's Law Dictionary (11th ed. 2019) (referring readers to definition of assignee for assign). That definition can encompass an assignee of the ownership of Black

25

Duck. It can encompass assignees of Black Duck's obligation to pay the net-profits share – such as assigning its debts. But the term goes beyond those types of assignees and can also encompass assignees of Black Duck's ownership interests in the ROW.

Neither contract at issue here limits the term "assigns" in any way that forecloses including the latter type of assignee. And reading each contract as a whole, the Court finds the "shall attach and run" provision particularly supportive of interpreting the term "assigns" to include future owners of the ROW. On de novo review, this Court finds that Appellants have shown that their interests touch and concern land – specifically, the ROW. The contracts unambiguously bind Black Duck and any successor or assignee that owns the ROW's real property interests.

Appellees argue that, because "net profit agreements are personal property, not real property," any covenants within the agreements at issue in this case "do not touch and concern the land." ECF No. 35 at 15 (citing *San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 639 (Tex. 2000)). Although *Lang* states that "net-profit agreements . . . are personal property, not real property," *see* 35 S.W.3d at 639, that statement does not dispose of the issue in this case. As the Bankruptcy Court recognized, *Lang* supports a proposition that net-profit agreements are generally personal property rather than real property. *See* R. 3734. But the Bankruptcy Court also agreed that "Texas courts sometimes recognize net-profits interests as interests in real property." R. 3733 (citing *In re Hous. Bluebonnet, LLC*, No. 16-34850, 2020 WL 930111, at *11 (Bankr. S.D. Tex. Feb. 21, 2020)). Nevertheless, unlike the Bankruptcy Court, this Court does not view Appellants as "conflat[ing] an interest in the net-profits of Black Duck with a net-profits interests in an oil and gas lease." *See id*. The circumstances of this case are simply different than the net profits interest at issue in *Lang*. A label used by contracting parties does not control whether an interest is personal or real property.

Although Appellees boldly proclaim that "oil and gas law" is simply inapplicable to the circumstances of this case, they make no attempt to explain such proclamation other than their

reliance on *Lang*. *See* ECF No. 14-15. Notably, Appellees themselves later note that the Bankruptcy Court relied on an oil and gas case (*MJR Oil & Gas*) in addressing the intent element. *See* ECF No. 21 (citing R. 3731). *Lang* does support the broad proclamation of Appellees. It did not address the touch-and-concern element or any other element for determining whether a covenant runs with the land. *See* 35 S.W.3d at 640-41 (addressing a will that devised an interest in real property and finding that the phrase, "real property" does not include "her interest in the real estate lien and promissory notes, net-profit agreements, and cash in the reserve account"). The mere fact that *Lang* labeled the net-profit agreements at issue in that case as personal property does not dictate the same outcome in distinctly different circumstances. Appellees place too much reliance on the label, "net-profit agreements," and too little reliance on determining whether the twenty percent interests at issue here touch and concern the land.

### 3. <u>Notice to Successor to the Burden</u>

The Bankruptcy Court recognized that the current owner of the ROW had notice of the Appellants' twenty percent interests. R. 3738 ("There is no question that KrisJenn, the current owner of the ROW, had actual notice of the net-profits interests."). The notice requirement is satisfied "when the successor to the burden has notice." *Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 221 (5th Cir. 2013). Subsequent purchasers have notice of the burden when they have "actual or constructive notice," and when they make a purchase "without notice," then they "take[] the land free from the restriction." *Davis v. Huey*, 620 S.W.2d 561, 565–66 (Tex. 1981).

As the Bankruptcy Court noted, "[t]o establish notice, the agreement containing a covenant running with the land should be recorded in the county where the real property is located, with a legal description of the affected property." R. 3738 (citing Tex. Prop. Code Ann. § 13.002 ("An instrument that is properly recorded in the proper county is . . . notice to all persons of the existence of the instrument.")). But just because there should be such a recording does not mean that its

absence defeats the notice element. Such a recording merely provides one way to establish notice. Recorded instruments provide constructive notice to future purchasers, *Musgrave v. Brookhaven Lake Prop. Owners Ass'n*, 990 S.W.2d 386, 396 (Tex. App. – Texarkana 1999, pet. denied), but the notice element is not limited to such constructive notice.

While there may be some issues with how the contracts identified the ROW being burdened with the twenty percent interests, both contracts identify the ROW as "commonly known as the P-21 or Express pipeline." R. 636, 779. Such identification does not affect the notice in this instance because the current owner has actual knowledge of the burden caused by the twenty percent interests. Furthermore, for essentially the reasons stated by Appellants, both contracts appear to refer to and incorporate by reference a chain of documents through which a successor may understand the specific encumbered land. *See* ECF No. 34 at 14-15; ECF No. 38 at 9-10. "Documents incorporated into a contract by reference become part of that contract." *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010).

### 4. **Privity of Estate**

Privity of estate "means there must be a mutual or successive relationship to the same rights of property." *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 911 (Tex. 1982) (citing *Blasser v. Cass*, 314 S.W.2d 807 (1958)). Under Texas law, privity has two potential aspects – vertical and horizontal. *See Newco Energy v. Energytec, Inc. (In re Energytec, Inc.)*, 739 F.3d 215, 221-23 (5th Cir. 2013).

The Bankruptcy Court found that vertical privity exists because "Black Duck purchased the ROW and sold it to TCRG, which then sold it to KrisJenn." R. 3736. This does satisfy vertical privity "as to the succession of ownership of the burdened property." *See In re Energytec, Inc.*, 739 F.3d at 222. Although that aspect of vertical privity does not require either Appellant to have privity as an owner of the land, it does appear that there also must be vertical privity as to "original owner of the benefit of the covenant." *See id.* (finding such privity). That aspect, however, is easily

met here because both Appellants are the original owner of the benefit of the covenants, i.e., the twenty percent interests. In addition, while Black Duck owned the ROW, Moore gave up his fifty percent ownership interest in Black Duck (through his entity SCMED) in exchange for the twenty percent net-profits interest to DMA. On de novo review, the Court finds all aspects of vertical privity to be satisfied.

When the Texas Supreme Court set out the four requirements for when "a covenant runs with the land," it briefly mentioned that "the requirement of privity [wa]s satisfied" because "the property in question was conveyed in a succession of fee simple estates." *Inwood N. Homeowners' Ass'n, Inc. v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987). Of course, "[a]n easy example of vertical privity is the transfer of a person's fee estate to another." *In re Chesapeake Energy Corp.*, 622 B.R. 274, 283 (Bankr. S.D. Tex. 2020). Based on *Inwood*, there appears to be only one privity requirement. And it has been satisfied in this case. If vertical privity alone satisfies the privity requirement, then under this Court's de novo review of the legal issues, the Court finds all elements satisfied for finding the twenty percent interests to be real covenants that run with the land.

However, *In re Energytec, Inc.* did not limit the privity requirement to vertical privity. *See* 739 F.3d at 222-23. It also discussed the concept of "'horizontal privity,' which is the relationship between the original parties to the covenant," because a party had alleged this type of privity was missing. *Id*. at 222. It stated, that for "jurisdictions requiring horizontal privity, there must be simultaneous existing interests or mutual privity between the original parties as either landlord and tenant or grantor and grantee." *Id*. (citation and internal quotation marks omitted). Through the concept of horizontal privity, "some Texas courts also require that the covenant 'must be contained in a grant of land or in a grant of some property interest in the land.'" *In re Chesapeake Energy Corp.*, 622 B.R. at 281 (quoting *Wasson Interests, Ltd. v. Adams*, 405 S.W.3d 971, 973 (Tex. App. – Tyler 2013, no pet.), which in turn quoted *Wayne Harwell Props. V. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex. App. – San Antonio 1997, writ denied)).

Horizontal privity "is a much-criticized doctrine that has been explicitly rejected by th[e] Restatement [of Property]." *In re Energytec, Inc.*, 739 F.3d at 222. Indeed, the "Restatement describes *Wayne Harwell* as one of the minority of modern cases requiring horizontal privity." *Id.* After noting that (1) "[t]he principal rationale for the doctrine was so that most covenants intended to run with the land will be created in conveyances," (2) federal courts "must also be wary because the cited decision is not one from the Texas Supreme Court," and (3) federal courts "are guided but not controlled by that decision when interpreting Texas law," the Fifth Circuit merely concluded that, in the case then before it, horizontal privity was satisfied, "if horizontal privity is a requirement of Texas law." *Id.* at 222-23 (citations and internal quotation marks omitted).

While the Bankruptcy Court noted that "[i]t is unclear whether horizontal privity is still required," it found it prudent to address the issue in the absence of a definitive Texas Supreme Court decision. R. 3737. It found horizontal privity missing because the relevant contracts "granted 'no simultaneous interest in real property between original parties as grantor or grantee." *Id.* (quoting *In re Chesapeake Energy Corp.*, 622 B.R. at 284).

Appellants argue that horizontal privity exits because "the covenants were made as part of successive grants of property interests." ECF No. 34 at 24. Notably, Longbranch's option to purchase the ROW constitutes an interest in land. *See Madera Prod. Co. v. Atl. Richfield Co.*, 107 S.W.3d 652, 660 (Tex. App. – Texarkana 2003, pet. denied) (citing *Hitchcock Props. v. Levering*, 776 S.W.2d 236, 238-39 (Tex. App. – Houston [1st Dist.] 1976); 1 Arthur Linton Corbin, Corbin on Contracts § 272). Longbranch thus gave a property interest to Black Duck in exchange for the net profits interest. When Black Duck exercised the received purchase option, the Longbranch interest attached to the property. As to Appellant Longbranch, the horizontal privity requirement appears satisfied to the extent Texas requires it.

Further, with respect to DMA, Wright and Moore (through his separate SCMED entity) owned Black Duck as fifty-fifty owners when Black Duck as owner of the ROW agreed to convey

a twenty percent net profits interest in the ROW to DMA, a separate entity of Moore. DMA received its twenty percent property interest in the ROW through this series of conveyances. Moore as sole owner of DMA and fifty percent owner of Black Duck at the time of the transaction had a sufficient mutual interest in the ROW to satisfy horizontal privity, if Texas requires it.

To the extent Texas requires horizontal privity, these successive grants of property interests satisfy the requirement. But, if the Court were forced to make an *Erie* guess as to whether the Texas Supreme Court would agree that horizontal privity is a necessary element before finding that a real property interest runs with the land, it finds the omission of such privity requirement by the Texas Supreme Court in *Inwood* to be the most persuasive indication that horizontal privity is simply not required. The fact that the Restatement of Property has rejected such requirement and the Fifth Circuit has criticized it while finding it satisfied to the extent required provide further support for making an *Erie* guess that horizontal privity is not required.

### 5. Conclusion Regarding Personal Versus Real Covenant

On de novo review of the legal issues concerning whether the interests owned by Appellants constitute real or personal covenants, the Court finds that all required elements for a real covenant that runs with the land are satisfied. Accordingly, the Bankruptcy Court erred in granting final judgment that rendered a declaration in favor of KrisJenn and finding that the net-profits-interest assignment agreements owned by Appellants were personal covenants rather than real covenants running with the land. Appellate Issue 1 is resolved in favor of Appellants. On this issue, the Court reverses and remands for entry of judgment in favor of Appellants.

Because this Court finds that the relevant contracts unambiguously include real covenants that run with the land, there is no need to address Appellants' submission of extrinsic evidence on this issue. *See* ECF No. 34 at 25-27. Nevertheless, were this Court to find the contracts ambiguous as to whether they create real covenants that run with the land, it agrees that the extrinsic evidence persuasively supports reversal. The Court disagrees that Appellants have waived any arguments

as to using parole evidence. *See* ECF No. 35 at 20-21. Of course, even if the Court were to find the contracts ambiguous, the Court would remand for resolution of any factual issues concerning the extrinsic evidence.

Similarly, the Court agrees with Appellants that, to the extent that additional documents may be necessary to effectuate the intent of the contracts to create real covenants that run with the land, the reasonable assurance clause of each contract provide a means to effectuate such intent. *See* ECF No. 34 at 27; ECF No. 38 at 12.

Appellees argue that Appellants have waived their arguments concerning ambiguity and reasonable assurances by not presenting them to this Court in their statement of issues. ECF No. 35 at 37. But Appellants adequately identified these matters in their original statement of issues. *See* ECF No. 23 at 1-2. And while the matters may not be specifically identified in the statement of issues within their appellate brief, *see* ECF No. 34 (statement of issues), both matters are inherently within whether the Bankruptcy Court erred in holding that the relevant agreements were personal covenants rather than real covenants running with the land and Appellants brief both matters, *see* ECF No. 34 at 25-27. The Court will not find waiver in these circumstances.

Appellees next argue that any ambiguity should be construed in their favor because they did not draft either contract at issue. *See* ECF No. 35 at 37 (citing Pl. Ex. 12 at 4; Pl. Ex. 94.) But Appellants point to the undisputed record which indicates that both twenty percent interest agreements were drafted by an attorney acting for Black Duck, an entity that, at the time, was controlled equally by Wright and Moore. *See* ECF No. 38 (citing to R. 2472:17-18, 3653:15-3654:5, 2776:23-2779:9). The cited deposition transcripts show that an attorney for Black Duck drafted the Longbranch Assignment, R. 2472:17-2473:19; Moore did not engage an attorney when he left Black Duck but did seek help from David Strolle, R. 3653:15-3654:5; and Mr. Strolle reviewed the DMA Agreement for Wright, R. 2776:23-2779:9. There is no basis to construe ambiguity in favor of Appellees who are all entities of Wright.

Finally, Appellees argue that Appellants are not entitled to the equitable remedy of reformation because Appellants have not pled mutual mistake. ECF No. 35 at 16, 37-38. But, as Appellants point out, Appellants are merely seeking to enforce the reasonable assurances clauses contained within the relevant agreements. *See* ECF No. 38 at 13.

## B. **Breach of Fiduciary Duty**

Through Issue 2, Appellants seek de novo review of the Bankruptcy Court's legal conclusions in rejecting DMA's claims for breach of fiduciary duty against Larry Wright and DMA's claims for knowing participation in breach of fiduciary duty against KrisJenn and Black Duck. *See* ECF No. 34 (statement of issues). They argue generally that the Bankruptcy Court improperly denied claims of Moore and DMA for breach of fiduciary duty and knowing participation in that breach. *See id.* at 28-29. But more particularly, they argue that the Bankruptcy Court erred in denying the breach of fiduciary claim for lack of proof of damages. *Id.* at 28. And they argue that this Court should either render judgment on or remand for further consideration the knowing participation claims because the Bankruptcy Court wrongly denied that predicate claim. *Id.* at 29.

The Bankruptcy Court found "that at least an informal fiduciary relationship existed between Wright, SCMED, and Moore based on their past dealings and the personal relationship of trust and confidence between Wright and Moore." R. 3743. No one challenges that finding. And this Court has no reason to disturb it.

The Bankruptcy Court next stated that "whether Wright breached his fiduciary duty depends on whether the Black Duck Loan was authorized under the terms of the Company Agreement." *Id.* After finding that "Wright did not obtain Moore's consent or specific approval to approve the Black Duck Loan, so the Black Duck Loan was not authorized under the terms of the Company Agreement," the Bankruptcy Court found that "Wright breached his informal fiduciary duty owed to Moore." R. 3745. The Bankruptcy Court further found that "Wright entered into an ultra vires and conflicted loan transaction without Moore's required consent." *Id.* Despite these

33

findings, the Bankruptcy Court denied the breach of fiduciary duty claim – but only because Moore did not prove damages. *See id.* Moore failed in that respect purely because the submitted damage model assumed that the assignments "contain covenants running with the land" and the Bankruptcy Court had found no such valid covenant. *Id.* Accordingly, the Bankruptcy Court found the "model for damages . . . inapposite." *Id.*

The Bankruptcy Court denied all claims of knowing participation in the breach of fiduciary duty because it found "insufficient evidence in the record to prove" any such claim. R. 3740. Appellants challenge that denial only to the extent the Bankruptcy Court denied the predicate fiduciary claim for lack of evidence of damages. *See* ECF No. 34 at 29. But Appellants also urge reversal for judgment, or at least reversal and remand for further consideration, on their claims of knowing participation against Wright's entities. *See id.*

Appellants present two reasons for reversing the Bankruptcy Court on Issue 2. ECF No. 34 at 28. They first contend that Moore had no need to prove damages because he had also pled other gain-based remedies, such as disgorgement of wrongful gains, restitution, constructive trust, and reformation. *Id.* Second, if the DMA interest agreement was an enforceable real covenant, then this Court should reverse and render damages based on the unrebutted damage model presented to the Bankruptcy Court. *Id.* at 28-29. In the latter scenario, Appellants also argue alternatively that this Court reverse and remand for the Bankruptcy Court to consider the proper measure of damages. *Id.* at 29.

Although Moore did plead alternative remedies against Wright, *see* R. 416-17; Texas recognizes that a claim for breach of fiduciary does not necessarily require a showing of an affirmative loss, *see Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942); and Texas permits courts to "fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty," *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010), it is not the role of this Court on appellate review to determine the proper measure

of damages. Merely pleading these alternate remedies does not mean that Moore continued to pursue them through trial. And now that this Court has found a valid covenant running with the land in each interest agreement at issue, it is apparent that the Bankruptcy Court should consider the damage model presented to it. But given the various measures of damages that are arguably within the Bankruptcy Court's consideration, this Court will reverse and remand this issue for further consideration. Such further consideration shall also include the knowing participation claims against Wright's various entities. This resolves Issue 2 presented in this appeal.

Appellees argue that the Bankruptcy Court properly applied the economic loss rule to find that Appellants had not proven any damages. ECF No. 35 at 39. But the Bankruptcy Court never mentions the economic loss rule. "Because a fiduciary duty may arise as a matter of law independent of the contract," the economic loss rule does not necessarily foreclose a claim for breach of fiduciary duty. *Bates Energy Oil & Gas v. Complete Oilfield Servs.*, 361 F. Supp. 3d 633, 659 (W.D. Tex. 2019). Under Texas law, "the economic loss doctrine is a 'court-adopted rule for interpreting whether a party is barred from seeking damages in an action alleging tort injuries resulting from a contract between the parties." *Gehan Homes, Ltd. v. NIBCO Inc.*, No. 5:19-CV-1478-JKP, 2020 WL 5110707, at *5 (W.D. Tex. Aug. 31, 2020) (quoting *Golden Spread Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 360 F. Supp. 3d 494, 517 n.21 (N.D. Tex. 2019), *aff'd sub nom. Golden Spread Elec. Coop., Inc. v. Emerson Process Mgmt. Power & Water Sols., Inc.*, 954 F.3d 804 (5th Cir. 2020)). The Bankruptcy Court did not find that Appellants were barred from seeking damages. It instead found that they had not proven their damages.

## C. Personal Liability of Wright

The third identified appellate issue concerns the Bankruptcy Court's partial denial of Appellants' motion to amend the final judgment. Appellants argue that the Bankruptcy Court erred in not holding Wright personally liable for the breach, damages, and attorneys' fees related to the Harris SWD Agreement.

Appellants premise this challenge on Wright executing the Harris SWD Agreement "on behalf of himself and Black Duck Properties, LLC." ECF No. 34 at 29 (quoting DX4). And as Appellants portray it, that agreement specifically binds Wright in his individual capacity. *See id.* at 29-30.

Undoubtedly, it is "[a] bedrock principle of corporate law . . . that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations." *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006). But it is equally clear that such principle is merely the general rule with known exceptions. *See id.* at 271-72. One such exception is when "the shareholder expressly agrees to be personally liable to the obligee for the obligation." *Id.* (omitting citation, internal quotation marks, and ellipses).

The first few words of the one-page Harris SWD Agreement provides the premise for Appellants' challenge, but, while brief, the agreement does not stop there. Indeed, pared of its identification of other interested parties, the first sentence states: "Larry M. Wright on behalf of himself and Black Duck Properties, LLC . . . acknowledge that this 'Harris SWD Agreement' is ONLY to address the obligations regarding the Harris SWD mentioned in the 'Email Agreement' and all parties herby [sic] agree as follows . . . ." R. 1150. At no point in the paragraphs that follow does Wright expressly agree to be personally liable to DMA. *See id.* Wright then signs the agreement as "President" of Black Duck. *Id.* The signature block does not indicate any intent to be personally liable. The exception to the general rule requires more than what is shown by the Harris SWD Agreement itself.

The Harris SWD Agreement references and attaches an Email Agreement. *See* R. 1150-51. Nothing in that Email Agreement constitutes an express agreement by Wright to be personally liable to DMA. *See* R. 767-71. The Court finds that the Harris SWD Agreement is unambiguous as to this issue, and Wright does not expressly agree to be personally liable to DMA.

Even if the Court were to view that agreement as ambiguous and look to other evidence of

36

intent, Appellants have pointed to nothing beyond the initial words of the Harris SWD Agreement. And interpreting an ambiguous contract involves questions of fact, which are reviewed for clear error. *Stinnett v. Colo. Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000). The Court finds no clear error on this issue. Viewing the entire evidence of record, this Court is not left with any definite or firm conviction that the Bankruptcy Court committed any error on this issue. *See Robertson v. Dennis*, 330 F.3d 696, 701 (5th Cir. 2003).

As a last-ditch effort, Appellants argue that, even if Wright signed only in his corporate capacity, "he would remain personally liable because he knowingly abused the corporate form 'for injustice or inequity.'" ECF No. 38 at 18 n.6 (quoting *Endsley Elec., Inc. v. Altech, Inc.*, 378 S.W.3d 15, 23 (Tex. App. – Texarkana 2012, no pet.) and citing *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008)). They contend that he "caused one of his wholly owned entities, Black Duck, to assign the Bigfoot Note to another of his wholly owned entities, KrisJenn, all in an effort to deprive DMA of the payments to which it is contractually entitled." *Id.* To the extent this argument was preserved for appeal through the statement of issues, Appellants abandoned it by not arguing it in their initial brief.

For the foregoing reasons, this Court finds no error as to Appellate Issue 3.

### D. General Summation

After reviewing the bankruptcy record, the orders of the Bankruptcy Court, the arguments of the parties, and the applicable law, the Court resolves Appellate Issue 1 in favor of Appellants. This Court finds that the Bankruptcy Court erred in granting final judgment that rendered a declaration in favor of KrisJenn and finding that the net-profits-interest assignment agreements owned by Appellants were personal covenants rather than real covenants running with the land. Accordingly, on this issue, the Court reverses and remands for entry of judgment in favor of Appellants.

As to Appellate Issue 2, this Court reverses and remands the issue for further consideration because this Court's role is not to determine the proper measure of damages. Because this Court

has found a valid covenant running with the land in each interest agreement at issue, the Bankruptcy Court should consider the damage model presented to it in the first instance. Such further consideration shall also include the other gains-based remedies pursued at trial and the knowing participation claims against Wright's various entities.

As to Appellate Issue 3, the Court finds no error. Therefore, there is no reason for the Bankruptcy Court to revisit the issue on remand.

## VII. CONCLUSION

For the foregoing reasons, the Court **AFFIRMS IN PART, REVERSES IN PART, AND REMANDS** this matter to the Bankruptcy Court for further consideration consistent with this Memorandum Opinion and Order. Contemporaneously, the Court will issue a final judgment consistent with this Memorandum Opinion and Order.

**SIGNED this 14th day of March 2023.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT D



**The relief described hereinbelow is SO ORDERED.**

**Signed March 26, 2024.**

_____
**Ronald B. King**
**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KRISJENN RANCH, LLC, ET AL, | § | CASE NO. 20-50805-RBK |
| | § | |
| DEBTOR | § | CHAPTER 11 |
| ——————————————— | § | |
| | § | |
| KRISJENN RANCH, LLC, ET AL, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | ADVERSARY NO. NO. 20-5027-RBK |
| V. | § | |
| | § | |
| DMA PROPERTIES, INC., ET AL, | § | |
| | § | |
| DEFENDANTS. | § | |

---

### FINAL JUDGMENT AFTER REMAND

On January 11, 2021, came on to be heard this adversary proceeding for trial on the merits.

Plaintiffs, KrisJenn Ranch, LLC, KrisJenn Ranch, LLC-Series Uvalde Ranch, and KrisJenn Ranch,

LLC-Series Pipeline ROW, as successors in interest to Black Duck Properties, LLC ("**KrisJenn**"),

appeared by and through counsel of record and announced ready for trial. Defendants, DMA Properties, Inc. ("**DMA**") and Longbranch Energy, LP ("**Longbranch**"), appeared by and through counsel of record and announced ready for trial. Third-party plaintiff, Frank Daniel Moore ("**Moore**"), and Third-party defendant, Larry Wright ("**Wright**"), appeared in person and by and through counsel of record and announced ready for trial. After a six-day trial and an appeal to United States District Court, this Court renders judgment for the reasons stated by the District Court and in this Court's Opinion After Remand, pursuant to FED. R. BANKR. P. 7052.

It is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1. Declaratory Judgment is rendered for Defendants, DMA and Longbranch, that the net-profits interests owned by Longbranch Energy, LP and DMA Properties, Inc. are valid and subsisting covenants running with the land in the right of way ("**ROW**") which is called the Express Pipeline.

2. As to DMA's and Moore's claim for breach of fiduciary duty against Wright regarding the unauthorized Black Duck loan, the Court renders judgment that DMA and Moore recover a constructive trust on the ROW in the hands of Express H2O, LLC, because of the unauthorized transfer by KrisJenn of the ROW to Express H2O, LLC.

3. As to the claims of DMA and Moore for damages for breach of fiduciary duty, Larry Wright may recover the $4,700,000 purchase price that he paid for the ROW, prior to the breaches of fiduciary duty, out of income from the ROW or the sales proceeds. After that, DMA and Longbranch will each receive 20% out of the net profits from a sale or future development income of the ROW.  Other requested damages are denied.

4. DMA, Moore, and Longbranch are entitled to recover reasonable and necessary attorney's fees under the Texas Declaratory Judgment Act for the issues relating to the

covenant running with the land. The parties may submit a request for attorney's fees within 14 days after the judgment is entered pursuant to FED. R. BANKR. P. 7054 and Bankruptcy Local Rule 7054.

5. Declaratory judgment is rendered in favor of DMA that, under the terms of the Email Agreement and Harris SWD Agreement, DMA has an ownership interest in 50% of the Bigfoot Note payments. Further, the Court awards DMA $175,143.60 from the funds held in the Panola County court registry plus $100,000 in attorney's fees, if not previously paid.

6. All costs of court are taxed to Plaintiff, KrisJenn Ranch, LLC.

7. All relief not specially granted herein is hereby **DENIED**.

# # #

The relief described hereinbelow is SO ORDERED.

Signed March 26, 2024.

_____
**Ronald B. King**
**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| KRISJENN RANCH, LLC, ET AL, | § | CASE NO. 20-50805-RBK |
| | § | |
| DEBTOR | § | CHAPTER 11 |
| _____ | § | |
| | § | |
| KRISJENN RANCH, LLC, ET AL, | § | |
| | § | |
| PLAINTIFFS, | § | |
| | § | ADVERSARY NO. 20-5027-RBK |
| V. | § | |
| | § | |
| DMA PROPERTIES, INC., ET AL, | § | |
| | § | |
| DEFENDANTS | § | |

---

**OPINION AFTER REMAND**

After a six-day trial, this Court rendered judgment that the assignments of the right of way

("**ROW**") owned by KrisJenn Ranch, LLC and its affiliated entities (collectively, "**KrisJenn**"),

1

contained net profits interests that were personal covenants rather than covenants that run with the land.  The judgment also determined the rights of the parties with respect to the Harris Saltwater Disposal ("**SWD**") well agreement and denied relief on other claims and counterclaims between the parties.

On appeal, the United States District Court reviewed the factual issues under a clear error standard and the legal issues on a *de novo* basis.  The purpose of this Opinion After Remand is to make additional findings and conclusions pursuant to FED. R. BANKR. P. 7052 and to conform the findings, conclusions, and the judgment to that directed by the District Court. This Court reaffirms the findings and conclusions in its original Opinion to the extent that they are not inconsistent with the District Court Opinion.  The District Court stated that there were three issues on appeal, two of which should be addressed by this Court on remand.

## I.

On the first issue, the District Court disagreed with this Court's determination regarding covenants running with the land.  The District Court found that the net profits interests of DMA Properties, Inc. ("**DMA**") and Longbranch Energy, LP ("**Longbranch**") are covenants that run with the land and it remanded to this Court to render judgment accordingly.[1]

Because the net profits interests have been determined on appeal to be covenants that run with the land, DMA and Longbranch are entitled to a judgment to that effect.  This Court will

---

[1] As stated by Judge Edith Jones in a dissenting opinion on a different bankruptcy issue: "I would hope to stand with Galileo, who, rebuffed by a higher temporal authority, muttered under his breath, 'Eppur si muove.' ('And yet it moves.')."  *In re Greystone III Joint Venture*, 995 F.2d 1274, 1285 (5th Cir. 1992) (Jones, J., dissenting).

2

render judgment that the net profits interests of DMA and Longbranch are valid covenants that run with the land.

## II.

The second issue considered on appeal by the District Court was this Court's determination of the proper measure of damages for breach of fiduciary duty by Larry Wright, the principal of KrisJenn. After reviewing the transcripts of the six-day trial, this Court is unable to find any evidence of quantification of damages suffered by DMA and Moore other than their claim to recover the original purchase price of approximately $4,700,000 prior to the breaches of fiduciary duty. All of the parties to the ROW transaction were well aware that it was a speculative venture that could make a profit or could generate economic loss. Larry Wright, Daniel Moore, and Darin Borders all attempted to sell or develop the ROW, without success for various reasons. One reason was that, in the early stages, Black Duck Properties, LLC ("**Black Duck**"), did not own the ROW and buyers were hesitant to deal with people who had only a contract to *acquire* the ROW but did not actually *own* it. When Black Duck later acquired title to the ROW, the individuals who owned Black Duck or the net profits interests often disagreed about whether they should "flip" the ROW or attempt to develop it on a long-term basis in which they stayed involved and which could potentially be much more lucrative. The TCRG sale that occurred and was ultimately rescinded was a painful episode in the attempt by the parties to make a profit by selling the ROW and retaining net profits interests. Because of the dispute over whether the two 20% net profits interests were enforceable against future buyers, the parties could not agree on the proper split of sales proceeds or future income. Not one of the entities or individual parties—KrisJenn, Larry Wright, DMA, Longbranch, Daniel Moore, or Darin Borders—has made money on the purchase of the

3

ROW.  Larry Wright and KrisJenn have paid millions of dollars and have little to show for it. Daniel Moore, Darin Borders, DMA, and Longbranch spent many hours working on the deal but have paid little.

The ROW was revested in KrisJenn at confirmation of the chapter 11 plan.  It was subsequently transferred by KrisJenn to another Larry Wright-controlled entity, Express H2O Pipeline & ROW, LLC. ("**Express H2O**"), in violation of the terms of the confirmed chapter 11 plan of reorganization.[2]  The Court will impose a constructive trust on the ROW in the event that Larry Wright and Express H2O fail to transfer the ROW back to KrisJenn, the reorganized debtor.

It is impossible to quantify damages as a result of Larry Wright's breach of fiduciary duty. In addition, the speculative value of the ROW and the net profits interests owned by DMA and Longbranch make the amount of damages uncertain.  The Court could use offers to purchase the ROW from years ago, but values may have changed and none of the offers resulted in an actual sale.  The better remedy for DMA and Moore, and the one they have elected in their proposed judgment, would be an equitable remedy: Larry Wright would restore ownership of the ROW to KrisJenn, or this Court would impose a constructive trust on the ROW in the hands of Express H2O, and allow Larry Wright to recover his investment for the $4,700,000 purchase price, prior to the breaches of fiduciary duty, from a sale or development of the ROW.  After Wright is able to recover $4,700,000, the two 20% net profits interests would begin receiving income from a sale or development of the ROW.  The Court is not optimistic that the parties will be able to work together for their common good and suggests that the parties agree to go to arbitration or mediation.

---

[2] "Wright's new entity, Express H2O, LLC, intends to comply with all obligations of the Fourth Amended Chapter 11 Plan."  ECF No. 322, p. 5 (KrisJenn response to briefing on remedies).

4

Nonetheless, the Court will impose this equitable remedy against Larry Wright for breach of fiduciary duty.

The Texas Declaratory Judgment Act provides for attorney's fees if such fees are equitable and just. TEX. CIV. PRAC. & REM. CODE § 37.009. DMA, Moore, and Longbranch were forced to seek legal remedies and equitable relief to defend their net profits interests in the ROW and they are entitled to recover reasonable and necessary attorney's fees for their efforts. DMA, Moore, and Longbranch may file a post-judgment motion for attorney's fees.

## III.

The third issue considered by the District Court related to the Harris SWD well. The District Court was satisfied that this Court's disposition of the SWD well issues were appropriate and found no issue to revisit on remand.

## IV.

In conclusion, as directed by the District Court, the Court will render judgment that the net profits interests of DMA and Longbranch are valid covenants running with the land. The Court will render judgment that a constructive trust be imposed on the ROW in the hands of Express H2O, unless Larry Wright and Express H2O transfer ownership of the ROW back to KrisJenn. Larry Wright may recover the $4,700,000 purchase price that he paid for the ROW, prior to the breaches of fiduciary duty, out of income from the ROW or the sales proceeds. After that, DMA and Longbranch will each receive 20% out of the net profits from a sale or future development income of the ROW. The Court will separately enter a Final Judgment consistent with this Opinion.

# # #