UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


| | | |
|---|---|---|
| KRISJENN RANCH, LLC, | ) | CASE NO: 20-ap-05027-rbk |
| KRISJENN RANCH, LLC, SERIES | ) | ADVERSARY |
| UVALDE RANCH, KRISJENN RANCH, | ) | |
| LLC, SERIES PIPELINE ROW, | ) | San Antonio, Texas |
| | ) | |
| Plaintiffs, | ) | Tuesday, January 30, 2024 |
| | ) | |
| vs. | ) | 10:01 a.m. to 10:53 a.m. |
| | ) | |
| DMA PROPERTIES, INC, ET AL, | ) | |
| | ) | |
| Defendants. | ) | |

LEAD CASE: 20-50805-rbk
KrisJenn Ranch, LLC


HEARING RE:


DISTRICT COURT MEMORANDUM OPINION AND ORDER
BY JUDGE JASON PULLIAM, CIVIL ACTION NUMBER: SA-21-CV-0358,
AFFIRMS IN PART, REVERSES IN PART, AND REMANDS [DKT.NO.284];

MOTION FOR PRELIMINARY INJUNCTION TO PRESERVE ASSETS
[DKT.NO.292]


BEFORE THE HONORABLE RONALD B. KING,
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:              See page 2

Court Reporter [ECRO]:    Recorded; Digital

Transcribed by:           Exceptional Reporting Services, Inc.
                          P.O. Box 18668
                          Corpus Christi, TX 78480-8668
                          361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**APPEARANCES**:


For Plaintiff:                CHARLES J. MULLER, IV, ESQ.
                                      CJ Muller & Associates
                                      111 W. Sunset Rd.
                                      78209
                                      San Antonio, TX 78201
                                      210 664-5000

For Defendants:              CHRISTOPHER S. JOHNS, ESQ.
                                        Johns & Counsel
                                      14101 Highway 290 West
                                      Suite 400A
                                      Austin, TX 78737
                                      512-399-3150

3

| | |
|---|---|
| 1 | **San Antonio, Texas; Tuesday, January 30, 2024; 10:01 a.m.** |
| 2 | **(Call to Order)** |
| 3 | **THE COURT:**  Good morning, ladies and gentlemen.  This |
| 4 | is Judge King in San Antonio.  Our 10 O'clock case is Krisjenn |
| 5 | Ranch, LLC versus DMA Properties. |
| 6 | Let's get announcements from those who intend to |
| 7 | speak this morning. |
| 8 | **MR. MULLER:**  Good morning, Your Honor, John Muller on |
| 9 | behalf of the debtor, Larry White and -- Krisjenn entities, I'm |
| 10 | sorry, Your Honor. |
| 11 | **THE COURT:**  Okay. |
| 12 | **MR. JOHNS:**  Your Honor, it's Chris Johns.  I |
| 13 | represent DMA Properties, Longbranch Energy, and Daniel Moore. |
| 14 | **THE COURT:**  Okay.  So we've got the motion for |
| 15 | preliminary injunction and then the remand order.  So what do |
| 16 | y'all envision for us to do this morning? |
| 17 | I'll ask -- |
| 18 | **MR. MULLER:**  Your Honor? |
| 19 | **THE COURT:** -- you first, Mr. -- okay, go ahead Mr. -- |
| 20 | Go ahead, Mr. Muller. |
| 21 | **MR. MULLER:**  Your Honor, we -- in the original motion |
| 22 | for injunction and relief related to an argument that the Row |
| 23 | needed to be registered with the Texas Railroad Commission.  We |
| 24 | broke from that motion and went in protracted settlement |
| 25 | negotiations which ultimately failed.  But at the end of that |

4

1   it's my understanding that that motion has been withdrawn or

2   that they no longer seek to pursue that claim in my

3   (inaudible) --

4            **THE COURT:**  Okay.

5            **MR. MULLER:**  -- it wasn't meritorious.

6            **THE COURT:**  Mr. Johns, is it going forward or no?

7            **MR. JOHNS:**  Your Honor, I think if we address the

8   issues in the -- in the remand order and talk about remedies, I

9   think the remedies that we would seek would basically take the

10  place of the -- of the injunctive relief we were seeking.

11  Because we're seeking a constructive trust and/or a

12  disgorgement of the right of way interests.

13           **THE COURT:**  Okay.

14           **MR. MULLER:**  If I may, Your Honor, if we are going to

15  proceed, I don't know -- I think what I heard there is we're

16  not proceeding on that issue.

17           If we are proceeding on that issue, I want to

18  announce not ready.  As the TCR (inaudible) went to the

19  wayside, some new briefing and they had a pretrial hearing.

20  You asked for briefing.  And during that period of time, I

21  indicated that that issue of the injunction wasn't before us on

22  remand.  And the Court agreed and asked for the parties to not

23  brief on that issue.

24           **THE COURT:**  Mm-hmm.

25           **MR. MULLER:**  The DMA Properties did so anyway, and I

5

1  did not respond to that.  But I don't -- I don't believe we're

2  here on the remand on those issues.

3          **THE COURT:**  Okay.

4          **MR. MULLER:**  If we are doing that, I'm not ready.

5          **THE COURT:**  All right.  Well let's talk about the

6  remedies, Mr. Johns.

7          **MR. JOHNS:**  Yes, Your Honor.  May I share -- may I

8  share my screen?

9          **THE COURT:**  Certainly.

10          **MR. JOHNS:**  Okay.  I'd like to just walk the Court

11  through some handouts that I think hopefully will help us focus

12  this morning.

13          Just a moment.

14      **(Pause)**

15          **MR. JOHNS:**  Okay.  Let's see.  I'm having (inaudible)

16  issues here.

17          Well, Your Honor, let me -- let me just walk

18  through -- I wish I could -- and I'm happy to forward these to

19  the Court after the hearing.  But I'll just -- I'll just walk

20  through my handouts.

21          **THE COURT:**  That's fine.

22          **MR. JOHNS:**  You know, is the -- is -- it was already

23  adjudicated.  Mr. Wright got ownership and control of the right

24  of way by breaching fiduciary duties.  He used an unauthorized

25  undisclosed self-interested loan transaction including through

6

```
 1    a secret wrap around deed of trust to obtain ownership interest

 2    and control over the right of way in the first place.  That's

 3    how he came up with the money --

 4           THE COURT:  Mm-hmm.

 5           MR. JOHNS:  -- to purchase the right of way on behalf

 6    of Black Duck, which is how he has his interest.

 7           He later used this -- these illegal loan documents

 8    and illegal loans to perform some sham foreclosures on

 9    Longbranch's and DMA's right of way interests as the Court may

10    remember.

11           And this Court and the District Court already

12    recognized that Mr. Wright's conduct by which he obtained his

13    right of way interest breached fiduciary duties that were owed

14    to Mr. Moore, who was his partner at Black Duck at the time.

15           I just note that there's no dispute about this.  DMA

16    and Moore pleaded and at trial proved entitlement to

17    disgorgement, constructive trust, and damages, both for breach

18    of fiduciary duty and knowing participation by Mr. Wright's

19    entities, which were solely controlled and owned by him in

20    order to -- in order to get his right of way -- in order to get

21    the right of way interest.

22           In our -- in our pleadings it's at pages 23, 25, 36

23    of our original counter-claims and third party claims.  It's in

24    DMA's amended counter-claims at 26, 27, 28, 40.  It's in

25    Moore's amended counter-claims and third party claims at 25,
```

7

1    28, and 30.  It was in our proposed trial order at pages 20 and

2    27.  It was in our proposed findings of fact and conclusions of

3    law at page 14 and 15, 31 through 33, 29, and 30.  We also

4    argued about joint liability there for Mr. Wright.  We argued

5    non-dischargeability and then again disgorgement and

6    constructive trust at 40 and 41.

7         And I'll just walk through some of the trial exhibits

8    which were accompanied by trial testimony that showed how

9    Mr. Wright got the control and interest in the right of way.

10        It -- we talked about the Black Duck company

11   agreement, which was defendant's Exhibit 5.  We talked about

12   false meeting minutes at defendant's Exhibit 46.  We talked

13   about falsified -- how Mr. Wright falsified Black Duck -- a

14   Black Duck written consent to the loans at plaintiff's Exhibit

15   33 and defendant's Exhibit 57.  We put in the evidence about

16   the unauthorized ultra vires secret loan documents including

17   the back dated deed of trust at defendant's Exhibit 10, 11, 26,

18   27.

19        We then showed in defendant's Exhibit 9 that that's

20   how Mr. Wright's entity thereby obtained the right of way

21   interests was by him getting that money and then paying the

22   money to Express which then transferred the right of way

23   interests to Mr. Wright's entity.  We then at defendant's

24   Exhibit 58 there was Mr. Wright's notice of default to himself.

25   Defendant's 8 an assignment of the right of way to Wright's

1    solely owned entity Krisjenn.  At defendant's Exhibit 31,

2    plaintiff's Exhibit 21, defendant's Exhibit 32, Mr. Wright

3    apologized for those lies.  And then at, you know, in our

4    motion at 4 through 9, 18 through 19 we talk about it more.

5         So our third point is that Texas law forbids a

6    fiduciary from keeping what he obtained by breaching his

7    fiduciary duty and as just explained, you know, what did

8    Mr. Wright obtain by the breach?  He got ownership interest and

9    control of the right of way through Black Duck.  And then

10   without disclosing those illegal, you know, ultra vires loans

11   then convinced Mr. Moore to leave Black Duck and obtain his

12   interests, you know, with the 20 percent nets profits interests

13   that's been upheld by the District Court.

14        So at every -- at every stage both in getting it, the

15   right of way interests and in having Mr. Moore, you know, agree

16   to leave.  You know, if he had known that Mr. Wright had done

17   what he'd done, he wouldn't have left.  He would have

18   maintained his control.

19        So you know, Texas law doesn't allow a fiduciary to

20   do those kind of things.  And it's not just -- I note that

21   Mr. Muller argued that on page two of his response, "Hey,

22   Mr. Wright gained nothing."  Well that's just not true.  He got

23   property interest obtained in breach of fiduciary duty.  He got

24   control of the right of way in breach of fiduciary duty.  And

25   Texas law just doesn't allow a fiduciary to keep property

9

1   interests.

2          It's not just money that they can't keep.  If they

3   obtain property interests in breach of fiduciary duty, they're

4   just not allowed to keep it.  And we've cited a ton of cases to

5   Your Honor at pages 12 through 17 and 20 to 22 of our motion.

6          And the purpose of the rule is not just the

7   protection of the person that was owed the duty, it's the

8   protection of the fiduciary relationship itself.  It's to

9   prevent fiduciaries from gaining from their breaches.  And we

10  cite, again, that those same page ranges in our motion, 12

11  through 17, 20 through 22.

12         You know, my fourth point is that Krisjenn and

13  Wright's other entities are likewise liable for knowing

14  participation in Wright's breaches of fiduciary duty.  There's

15  no dispute that Mr. Wright controlled all those entities and

16  was just moving, you know, pieces around the chessboard.  He

17  was the one that was pulling all the strings, setting up the

18  things without letting people know about them.  He controlled

19  all the entities that, you know, that ultimately held the right

20  of way interests, and that includes Krisjenn.

21         He's now in violation of the Court's order,

22  transferred it to another entity.  We were supposed to get

23  notice of that.  The Court was supposed to get notice of that.

24  And he's tried to transfer away presumably to try to evade

25  whatever judgment this Court might have about disgorgement or

10

1    constrictive trust.

2          But anyway the District Court remanded the case for

3    consideration of knowing participation in the fiduciary

4    breaches by Wright's entities.  And again, Mr. Wright had sole

5    control over all those entities as this Court and the District

6    Court have already recognized.

7          So --

8          **THE COURT:**  Can you summarize what you're asking for

9    as far as remedies?  I know damages, attorney's fees, and then

10   was is the injunctive relief or equitable relief that you're

11   seeking?

12         **MR. JOHNS:**  Yes, Your Honor, that's our -- that's our

13   fifth point that I'd love to explain.  Is that, you know, DMA

14   and Moore have an election of remedies for breach of fiduciary

15   duties and knowing participation.

16         One is a set of gain-based remedies.  We've asked for

17   constructive trusts.  We've asked for disgorgement of

18   Mr. Wright's interests.  Our position is that we -- that

19   Mr. Wright got the right of way and his interests in it and

20   control over it through the breach of fiduciary duty.  That

21   should be taken away.  But the law doesn't -- it -- the law

22   isn't inequitable.  Ms. Wright paid, I believe the evidence at

23   trial was $4.7 million for the right of way interest.  And our

24   position is that he should be -- there should be a

25   constructive -- either a constructive trust imposed on the

1   right of way in my client's favor or it should be disgorged.

2          And I think at our last -- our last status conference

3   we -- Mr. Muller had -- and we'll have to go back and get the

4   reporter's record on this, but it represented on the record

5   that Express H20 that now owns it, in order to avoid more

6   litigation would be willing to bring it back here.  And I know

7   that Mr. Muller takes exception to that.  But we just need

8   the -- to roll the tape on that.  I think that was the

9   representation.

10         But as far as constructive trust, we think the right

11  of way interest is at issue here, and there could be a

12  constructive trust imposed on it that's subject to a $4.7

13  million first monies obligation that if our clients ever obtain

14  any profits, any, you know, any them -- any revenue on it,

15  it's -- it would be subject to Mr. Wright's $4.7 million

16  initial payment.  And that's what Texas law that we've cited

17  says would be appropriate.

18         We'd say the $4.7 million first payment obligation we

19  think would be subsidiary to Mr. -- whatever attorney's fees

20  were awarded.  But you know, once we net out attorney's fees

21  whatever is left of the $4.7 million, that should go to

22  Mr. Wright.

23         Our other -- we have an election of remedies.  The

24  other calculation that we provided is at page 23 of our motion.

25  It's $1.92 million, and I could, you know, basically walk the

12

1    Court through that if you would like, Your Honor?

2            **THE COURT:**  Well is that the breach of contract or

3    what?

4            **MR. JOHNS:**  That's the amount for breach of fiduciary

5    duty.

6            **THE COURT:**  Okay.

7            **MR. JOHNS:**  That -- our preference is the gain-based

8    remedy where we get control back of what our client -- my

9    clients had originally held subject to a first monies

10   obligation.

11           But you know, barring that I think our second remedy

12   would be the -- for breach of fiduciary duty what Mr., you

13   know, what Mr. Wright took away from the client.  He said you

14   know, in some of his schedules that the (glitch in audio) was

15   worth $9.5 million at least.  And we did a calculation that I

16   believe is at page -- let's see, page 23 of our brief that kind

17   of runs through how we get to $1.92 million.

18           So those are the -- those are the remedies we're

19   asking the Court to award.  You know, kind of a last point on

20   the -- before we get to attorney's fees is that there are some

21   other really important (indisc.) concerns that prevent

22   Mr. Wright from keeping the right of way interests.

23           One is the bad faith exhibited in transferring the

24   entity -- transferring the right of way to a new entity without

25   complying with the Court's order to give us at least 30 days'

13

1   notice of that, giving the Court notice of that.

2           **MR. MULLER:**  I object.

3           **THE COURT:**  Mr. Muller is objecting.  What

4   Mr. Muller?

5           **MR. MULLER:**  About the injunction.  He just said he

6   wasn't going to argue this.  And he just started doing it.

7   (inaudible) the injunction, this is not part of the remand.  He

8   (inaudible) to tell you that Larry has transferred the Row into

9   another entity in violation of the bankruptcy plan, which is

10  true, which he has recognized and which he's offered to remedy.

11  But now he's going to say since these subsequent acts were not

12  tried, you should consider them in your opinion on remand.

13  That is not part of this proceeding and I'm not ready, Your

14  Honor.

15          **THE COURT:**  Who's the current title holder of the

16  right of way?

17          **MR. MULLER:**  The entity is called H2 Express, LLC.

18          **THE COURT:**  Okay.  And so that -- is that part of the

19  preliminary injunction, Mr. Johns, or is that part of the

20  remand and remedies or what?

21          **MR. JOHNS:**  Well this is -- this is part of our --

22  this is just -- Your Honor, I think it's important to note

23  things that have happened since the remand.

24          **THE COURT:**  Mm-hmm.

25          **MR. JOHNS:**  That you know, there's been a -- there's

14

1   been a transfer.  Well that's one thing, but more concerning we

2   put this in our reply brief which is that we just got a new

3   demand letter from a new law firm who -- that claims that the

4   right of way either doesn't exist or is worthless and is about

5   to sue my clients and presumably the original person who

6   transferred the right of way to Black Duck Express and is going

7   out there -- he's -- this right of way is worth nothing.

8   That's burning down the house.  I mean we've got a 20 percent

9   interest in it.  Mr. Wright's presumably going to be going out

10  with the demand letter that we attached to our reply brief

11  telling people that this right of way is worth nothing.  I

12  mean, that's --

13          **THE COURT:**  Who do they represent?  You said there

14  were some attorneys that send demand letter, who do they

15  represent?

16          **MR. JOHNS:**  Mr. Wright and the new entity that holds

17  the right of way that didn't -- where the transfer of that

18  right of way didn't comply with the Court's order -- the

19  Court's plan.

20          **THE COURT:**  The H20 entity?

21          **MR. JOHNS:**  Yes, Your Honor.

22          **THE COURT:**  Okay.  Who represents them?

23          **MR. JOHNS:**  It's Norton Rose Fulbright --

24          **THE COURT:**  Okay.

25          **MR. JOHNS:**  -- in Houston.

1          **THE COURT:**  Okay.

2          **MR. JOHNS:**  And so you know, Mr. Wright just is not

3  an appropriate steward for the right of way.  You know -- you

4  know, our position is having lost on the -- on the appeal about

5  the interpretation of the net profits interests, he's now, you

6  know, in our opinion, trying to burn down the house.  And we

7  think that's another factor for the Court to consider in

8  whether to award the equitable remedies of disgorgement or

9  constructive trusts.

10          And so we just --

11          **THE COURT:**  Let me ask one question, Mr. Johns, real

12  quick.  Now it was appealed by your side to the District Court

13  and the District Court issued an order.

14          Mr. Muller, you didn't appeal it to the Fifth

15  Circuit, correct?

16          **MR. MULLER:**  Your Honor, we did in an abundance of

17  caution but the Fifth Circuit has dismissed our (inaudible) for

18  want to jurisdiction.  Their ruling is that I don't have --

19  that I should not file my notice of appeal until after you've

20  ruled on remand.  And then the issue with the right of way --

21          **THE COURT:**  Okay.  Well okay.  Of course my question

22  is -- and I'm going to follow whatever the District Court tells

23  me or the Court of Appeals tells me to do.  But if I follow the

24  District Court mandate and then it goes up to District

25  presumably it gets affirmed, it's consistent with the District

16

1   Court mandate, then it goes to the Fifth Circuit, and they

2   could reverse it and start the whole thing over again, right?

3           **MR. MULLER:**  Yes, Your Honor.

4           **MR. JOHNS:**  That's right, Your Honor.  If -- I would

5   just point out that if it's, you know, if the Fifth Circuit

6   reverses the District Court's ruling on whether my clients have

7   real property interests, those 20 percent --

8           **THE COURT:**  Right.

9           **MR. JOHNS:**  -- net profits interests --

10          **THE COURT:**  Right.

11          **MR. JOHNS:**  I mean, effectively that -- I would be

12  surprised if it were not a reverse in render at that point.

13          **THE COURT:**  Okay.

14          **MR. JOHNS:**  I -- of course, we're -- I'm speculating.

15  But --

16          **THE COURT:**  Yeah.

17          **MR. JOHNS:**  I think that's how --

18          **THE COURT:**  Well we have always favored render, we

19  just don't want it remanded.  We don't care if they affirm or

20  reverse, just don't remand.  And the District Courts say the

21  same thing about their judgments.  They -- you know, they say,

22  "We don't care if the Fifth Circuit reverses but just don't

23  remand."  So.

24          All right.  Did you finish up, Mr. Johns?

25          **MR. JOHNS:**  Well I've finished on the -- on the

17

1  substantive claims.

2         We'd also, you know, we point the Court to our motion

3  at 23 through 26 about attorney's fees.  You know, the reason

4  that (glitch in audio) there was only one attorney's fees

5  issued that went up to the District Court, you know, before.

6  And that was on the issue of whether we could get attorney's

7  fees from Mr. Wright personally based on the SWD, the Harris

8  SWD agreement.  But because this Court had ruled that we lost

9  on the declaratory judgment on the interpretation of the net

10 profits interest, then that -- we had to get that reversed

11 first.

12        And so our, you know, our argument to attorney's fees

13 is that now that the District Court has upheld that interest,

14 we should get, you know, our attorney's fees that are equitable

15 and just.  And you know, there were breaches to our net profits

16 interest agreement that were committed there.  And I don't

17 believe Mr. Muller addressed that in his response.  And so I

18 don't really know what the argument is on the other side.

19        But the other -- another argument --

20        **THE COURT:**  Is it based on breach of contract or

21 based on Texas Declaratory Judgments Act or what?

22        **MR. JOHNS:**  It's the latter, Your Honor, it's the

23 Declaratory Judgments Act.

24        **THE COURT:**  Declaratory Judgment.  Okay.

25        **MR. JOHNS:**  That's right.

18

1          And the other -- the other thing that we raise in our

2   motion that I also was -- responded to is that because the

3   breaches of fiduciary duty were integrately you know,

4   interlaced with the violations of the Black Duck company

5   agreement, then Mr., you know, Mr. Moore should get attorney's

6   fees related to the breach of that agreement in the -- in the

7   kind of the corresponding simultaneous breach of fiduciary duty

8   claims against Mr. Wright personally.

9          So that, you know, we briefed all that, Your Honor,

10  and with that I think that's everything that we've asked for --

11          **THE COURT:**  Okay.

12          **MR. JOHNS:**  -- on remedies on remand.

13          **THE COURT:**  Okay.

14          Mr. Muller?

15          **MR. MULLER:**  Thank you, Your Honor.  I'm anxious to

16  respond on the merits.  I think Mr. Johns made a number of

17  assertations about what I do and I don't argue.  I don't agree

18  with the characterization arguments on brief.  The issues are

19  not in the briefing either.

20          But the Court asked for us to proceed on remedies and

21  we were not going to be able to do the injunction issues.  But

22  Mr. Johns raised those anyway.  And so I feel it's important to

23  give you some background here on what's presently happening.

24          (inaudible) is here.  You'll remember that the

25  bankruptcy plan that has agreed -- was agreed between the

19

1   parties allows for Mr. Wright to sell the entity, sell the Row

2   free and clear.  And then DMA and Longbranch's only recourse

3   then is to the proceeds of the sale for which they would

4   receive 40 (inaudible) have no problem with that.

5        The only concern there was that the sale would be for

6   too little and so we are obliged under the bankruptcy plan to

7   tell them when we have a purchaser and what it's for so that

8   they can come back and ensure that they're getting a good price

9   and they're not being diminished in any way.  That's the spirit

10  of the agreement.

11       Mr. Wright has in fact moved the entity -- the Row

12  out of the -- it -- it's no longer held in the name of Krisjenn

13  but into H20.  And the purpose for that being of course is that

14  that Krisjenn name was very much tainted within the community,

15  it's a small community of possible purchasers.  In large part

16  because DMA and Mr. Moore (inaudible) call them and say

17  disparaging things.

18       But the hope was to clean up the name and the title

19  and put it in a position where it could really be sold.  And

20  that's really the remedy to all this frankly.  It, you know,

21  kind of notwithstanding this deal if it's sold then everybody

22  gets their money and we're done.

23       The problem is is that since we've taken control

24  we've been doing a considerable amount of diligence on title,

25  and as it turns out this Row is in fact worthless.  It's

20

1   worthless, Your Honor.  There are numerous breaks in title.

2   It's non-ambiguous.  Most of the pipeline is missing.  And

3   there's a warranty deed on this.

4          So at some point in time we now realize we had been

5   given a piece of property that is not as represented.  Norton

6   (inaudible) Fulbright has that claim and intends to prosecute

7   it.  I don't know really who the defendants are.  They may not

8   necessarily be DMA and Longbranch.

9          But in the latest round of briefing that was filed,

10  there was a claim that we couldn't seek here because things

11  were (inaudible) res judicata but counsel in fact called

12  opposing and said that their strategy was to file an injunction

13  motion so as to pollute the issues before the Court.  And so I

14  just wanted you to be aware that this idea that we're out

15  representing and telling people that the Row is worthless to

16  somehow harm DMA and Longbranch is not true.

17         Think about how damaging that is to us.  We're out $7

18  million right now, so we are not telling people it's worthless.

19  Rather we've come to the conclusion that we just can't sell it.

20  And that's why we're recording it here today.

21         And so I wanted --

22         **THE COURT:**  What happened to the involvement of

23  McCloud that came in and lent money and so forth?

24         **MR. MULLER:**  We settled it, settled out.

25         **THE COURT:**  And so they don't have any further

21

1  ownership or claim to the right of way?

2      **MR. MULLER:**  What we really had -- well they're real

3  security for the loan I think under the loan (inaudible) the

4  amount was Larry Wright's ranch out in the hill country.

5      And if you'll remember that ranch was sold off in the

6  bankruptcy proceeding.  It netted about $9.7 million.  And that

7  went back to reimburse the Ascilla loan, the McClouds as a

8  subsequent lender, and then of course, you know, all the other

9  expenses of the case.  Of the $9.7 million that was paid out

10 from the estate, almost nothing went to Larry.

11     And I really want to point that out to you the fact

12 is Larry lost, literally lost the ranch, $10 million ranch,

13 family ranch which was heartbreaking to him and his family.

14 And yet we're here suggesting that Larry has done something

15 wrongful to these people by losing $10 million who put nary any

16 into this right of way.

17     So if this really very, in my opinion, very

18 vindictive, very insidious type of (inaudible).  This poor man

19 is out $10 million.

20     But anyway the end of closing of the ranch the

21 McClouds were fully reimbursed for their principal.  They gave

22 us a break on interest, but anyway that made everyone happy and

23 the McClouds are now paid.

24     **THE COURT:**  So are there any security interests

25 currently asserted against the right of way?

22

1          **MR. MULLER:**  Just the -- just the only claim against

2     the right of way are the net profits interest, which according

3     to Court, now based on Justice Pulliam's Opinion, continue to

4     run with the land.

5          **THE COURT:**  So it can be sold for a million or two

6     million?  I mean, I realize that everybody thought it was worth

7     a lot more, but there's not somebody that would buy it for

8     bargain basement price?

9          **MR. MULLER:**  I -- I'm really not handling this, but

10    there are -- what we have learned is that there are a number of

11    breaks (inaudible) title.  And they go back to a number of law

12    suits that have been pending in the past that the title

13    research on this, Your Honor, is considerable.  It -- Larry

14    spent hundreds of thousands already.  They have a program that

15    allows them to go in and look at all the title.  But you have

16    to take 276 parcels of land back to origin, and then there a

17    number of law suits that are in place.  And so we're really --

18    we would not finish the title research but what we can --

19          **THE COURT:**  Are the law suits still pending or are

20    they dismissed or final judgments or what?

21          **MR. MULLER:**  The law suits that would potentially

22    cause some of the breaks in between title are final, they're

23    final, they're old too.  They've been on record for a long

24    period of time.

25          And frankly (inaudible) again that there was some

23

1 representation at Row I think Mr. Johns said, you know, he took

2 from us this Row that was ours. And you got to -- and that's

3 not true. Neither Longbranch nor DMA ever owned this Row. A

4 guy named Rob Roberts has owned it. A lovely man that -- from

5 East Texas and they just had a contracts to purchase it for

6 which they put down $25,000 towards an earnest money. And then

7 they came to Larry and told him, hey this is a really great Row

8 and a great investment opportunity.

9         **THE COURT:** Mm-hmm.

10        **MR. MULLER:** And he put the money forward. But title

11 transfer from Mr. Roberts through his entity to Black Duck

12 which was come on by Morrey Borders. But these gentlemen had

13 never owned this Row. They were just sales men intermediaries

14 who have pitched Larry on the purchase. They'd never been out.

15 They were out $25,000 for a couple of months and then that was

16 fully reimbursed. That's their only investment in the Row.

17        **THE COURT:** They were reimbursed the $25,000?

18        **MR. MULLER:** Yes, Your Honor.

19        And so if I can proceed onto my argument if I would

20 I'd like to address a number of issues. I guess I'll start

21 with that is these -- remember Mr. Moore and Mr. Borders were

22 intermediaries only. During the case it became very clear.

23 They never paid anything for expensable.

24        They never paid -- there was some things about well

25 the Ascilla loans, the pardon money loan, I think it's 17

24

1   percent interest loan.  All of that interest was paid by Larry

2   Wright directly.  Mr. Wright -- that assertion was well Larry

3   had said that he's wealthy.  But there's nothing in the record

4   that ever indicated how he would pay -- provide the resources

5   in order to purchase the Row.  He was wealthy.  He had a ranch.

6   He had a $10 million ranch that was (inaudible) which he used

7   as collateral to secure an Ascilla loan which was a short term

8   loan, a high interest rate under the pretense that this was

9   going to be a quick flip as all their prior ventures had been

10  as the emails and evidence will show (inaudible).

11          So he did provide the $5 million.  He absolutely did

12  and he never said he would do it through equity rather than

13  debt.  The DMA and Moore would never have the opportunity to be

14  here or to be -- have a profits interest in the Row without

15  this original investment by Mr. Wright.

16          **THE COURT:**  Well if he wasn't going to have equity,

17  how would he make anything on the flip?

18          **MR. MULLER:**  I'm sorry.  I --

19          **THE COURT:**  If Mr. Wright wasn't going to receive

20  equity, how would he receive any profits on a flip?

21          **MR. MULLER:**  No, he has a 50 percent equity interest

22  by and through --

23          **THE COURT:**  Okay.

24          **MR. MULLER:**  -- and in the Black Duck.  Black Duck

25  is --

1          **THE COURT:**  Okay.

2          **MR. MULLER:**  -- was owned 50/50.  But through --

3    Larry through an entity named Krisjenn and Mr. Moore through an

4    entity named DMA, hence the problems --

5          **THE COURT:**  Mm-hmm.

6          **MR. MULLER:**  -- that it faced.  And so that was

7    50/50.  That -- there's a -- there's some arguments being

8    made -- at one point in time Mr. -- the third interest of

9    course is Mr. Moore who had a 20 percent net profits interest

10   from the beginning.  Not an ownership interest, a silent

11   profits interest.  And midway through their relationship

12   (inaudible) recall Mr. Moore wanted out.  And he did get out by

13   converting his 50 percent equity interest into a 20 percent net

14   profits interest like (inaudible) Mr. Moore.  And the

15   argument --

16         **THE COURT:**  Borders.

17         **MR. MULLER:**  Border.  Border.  Yes.  And you hear the

18   argument being made here today, "Why would you do that?"  Don't

19   you know that 50 is a bigger number than 20?  And so the net

20   profits interest must be worth less.

21         But of course that ignores the fact that the 50

22   percent interest -- and there were the, you know, 23 page

23   operating agreement which produced the rules that you would

24   know, which says that he's 50 percent in for the good and 50

25   percent in for the bad.  So if Mr. Moore had not converted to

26

1   the 20 like them, there would be a capital call and he would be

2   in for the, what is now roughly a $10 million loss.  He would

3   be required to make a $5 million contribution otherwise he

4   would be (inaudible) zero and not have any interest whatsoever.

5           And so the 20 percent net profits interest was really

6   an improvement for him and that he shares no responsibility for

7   losses.  He only gets upside.  He only gets 20 percent of

8   profit as does Mr. Borders.  But -- which it really makes it a

9   40/60 split.  So I just wanted to remind the Court of those

10  facts --

11          **THE COURT:**  Mm-hmm.

12          **MR. MULLER:**  -- because they were indicated in some

13  of the arguments that were made here.

14          I'd like to address the merits of the case of why

15  we're here on remand.  And I'd like to point out really

16  primarily one of the things we've heard was talking about the

17  exhibits and what you've heard at trial.  And it would appear

18  there's some assumption that we're here to re-litigate the

19  case.

20          As you know the factual issues went up on appeal to

21  the -- to the District Court.  But there -- reviewed there on a

22  (inaudible) clearly erroneous standard.  Only illegal issues

23  were heard de novo and sent back on remand.

24          The Opinion of the judgment of Judge Pulliam

25  affirmatively states that there's no dispute on the factual

27

1    issues and that the parties agreed to it.  And so we're back

2    here to discuss the facts of the case.  And the only thing

3    that's important then in that regard is this Court's findings

4    of facts and conclusions of law, which were recited in its

5    lengthy and incredibly well written opinion, which includes by

6    stating that any factual findings or (inaudible) not stated

7    therein are thereby denied.

8          And so we -- you're talking about exhibits and such

9    as the like, that's -- all of that was denied, Your Honor.  All

10   of that -- those facts are not before the Court.  And so what

11   do we know here on remand.

12         First of all, we have to define what we're here on

13   remand for.  I'm still not clear that we're here on damages to

14   re-litigate damages.  There's some confusion in the Opinion

15   that's -- that suggests that some of the analysis stop because

16   the Court had found -- this Court had found that there was a

17   real covenant (inaudible) the land as opposed to our personal

18   covenant (inaudible) a real covenant.

19         But notwithstanding that language, this Court did not

20   affirmatively find damages nor could it.  There was just

21   extensive evidence in the record.  There was -- that these

22   parties, DMA and Longbranch, they never paid out of pocket.

23   Never.  They never -- they never paid for principal.  They

24   never paid for insurance.  They never paid the taxes.  They

25   never paid anything whatsoever.

28

1          And so it's not an issue of the ruling on (inaudible)

2    real or personal covenant.  The damages issue comes down to one

3    thing and one thing only, which is that you did not receive

4    evidence of damages nor could you have.

5          You will remember in -- during the trial at some

6    point Mr. Borders tried to take the stand as an expert to

7    provide some type of nebulous undisclosed opinion about how

8    this thing is actually worth millions of dollars.  But the

9    Court disallowed that testimony because he wasn't disclosed as

10   an expert (inaudible) a report as an expert.

11         So after you read the Court's well-reasoned opinion,

12   there is simply no evidence of damages.  I don't believe we're

13   here on damages.

14         **THE COURT:**  Well I mean that's why it was remanded by

15   Judge Pulliam.  It says this Court's role being the District

16   Court is not to determine the proper measure of damages.  The

17   Bankruptcy Court should consider the damage model presented to

18   it in the first instance.

19         So I mean that's what we're here to determine.  He

20   disagreed on the real covenants whether they're running with

21   the land.  That's fine.  I'm supposed to consider the damage

22   model which was presented and rule accordingly.  So --

23         **MR. MULLER:**  (inaudible)

24         **THE COURT:**  And then on the third issue he found no

25   error on the salt water disposal well.

29

1          **MR. MULLER:**  Okay.  Well Your Honor, I mean if that's

2    the Court's reason, I don't disagree with it.  I still would

3    say to you though.  You have no evidence of damages.  Just like

4    you did in the --

5          **THE COURT:**  Okay.

6          **MR. MULLER:**  -- (inaudible).

7          **THE COURT:**  You can certainly argue that.

8          **MR. MULLER:**  Yeah.  Yeah.  I really thought -- I

9    thought and then I think the trial briefing kind of fleshes

10   this out.  That the real issue before the Court now is the

11   equitable remedy of disgorgement and constructive trust.  And I

12   think Mr. Johns spoke to that issue.

13         And I think there was some representation that

14   there's an election of remedies as to can you get damages as

15   well as disgorgement.  And I'm going to disagree with Mr. Johns

16   on that.  I'm going to disagree with him in his favor.  I don't

17   think that's the law.  I think the law is that you can have

18   both.

19         The rule about disgorgement is -- and first of all

20   it's a purely equitable remedy that only this Court can decide

21   if we had a jury, the jury wouldn't make that decision.  And

22   you can have the -- you can have the remedy of disgorgement

23   notwithstanding damages.  You can have it if you don't have

24   damages.  And you will see Justice Pulliam's Opinion does refer

25   to that at some point in time.  That was my impression the real

30

1   issue on appeal.  And to that end --

2           **THE COURT:**  Get me some water.

3           **MR. MULLER:**  -- to that end I'd like to address the

4   issue of disgorgement because the Court -- remember, Judge,

5   that there were two issues we really litigated.  One was the

6   issue of the Row and whether it was (inaudible) or personal.

7   And the other was this Big Foot note.  I don't know if you'll

8   recall, but there was a foreclosure which they -- they claimed

9   to be (inaudible) foreclosure.  And the Court agreed that that

10  foreclosure was improper and that -- because of that Mr. Wright

11  had received funds that were held in the registry (inaudible)

12  County Court and that those funds should be released to --

13  (inaudible) Your Honor, I got kind of a (inaudible).

14          **THE COURT:**  Did those funds get released or are they

15  still sitting in the State Court registry?

16          **MR. MULLER:**  They did.  They got -- they probably got

17  all their money and they got $100,000 in attorney's fees like

18  on 12 pages of briefing and summary judgment.

19          So that was really the issue of fiduciary duty to

20  Court.  Now Mr. Johns is telling me this Court has already

21  found a breach in fiduciary duty.

22          **THE COURT:**  Well that's a separate issue from the

23  right of way isn't it?  I mean, the salt water disposal well,

24  Big Foot --

25          **MR. MULLER:**  It is.

1          THE COURT: -- Note, whatever.

2          MR. MULLER: It is. It is, and in fact, in Justice

3    Pulliam's Opinion, he actually refers to it as a matter that is

4    separate and apart from the right --

5          THE COURT: Right.

6          MR. MULLER: -- of way. And so I think one --

7          THE COURT: Right.

8          MR. MULLER: -- of the things you heard Mr. Johns

9    saying was the Court found a breach of fiduciary duty in

10   connection with the acquisition of the right of way. And

11   that's not true. They -- you found a breach of fiduciary with

12   regards to the sham foreclosure that caused the Big Foot funds

13   to be lost. But there are absolutely no findings whatsoever

14   that Mr. Wright did anything wrongful in --

15         THE COURT: Mm-hmm.

16         MR. MULLER: -- the acquisition of the Row. In fact,

17   the Courts say it's likely that Mr. Borders likely knew about

18   these loans. The problem was --

19         THE COURT: Okay.

20         MR. MULLER: -- that the loan -- that the company

21   agreement didn't allow those loans to be authorized unless both

22   parties agreed.

23         THE COURT: Okay. So the District Court remanded to

24   consider the damage model. That's the exact language in the

25   Opinion. What do you propose for the judgment from me to

32

1    provide so that -- it'll probably go back up on appeal I

2    understand, by one side or the other, but what do you propose

3    that the judgment should say?

4         **MR. MULLER:**  I propose that the judgment should say

5    that there's no relief available to DMA and Mr. -- and

6    Longbranch based on the factual findings of the Court.

7         Again, if we're back here on damages, that's fine.

8    But there's not -- there are no findings of damages.  It's just

9    that simple --

10        **THE COURT:**  Okay.

11        **MR. MULLER:**  -- Your Honor.

12        **THE COURT:**  So basically a take nothing judgment

13   other than what was granted previously on the Big Foot note,

14   right?

15        **MR. MULLER:**  I think that's right.

16        **THE COURT:**  Okay.

17        **MR. MULLER:**  I think that's right. (inaudible).

18        **THE COURT:**  I'm just wanting to understand what both

19   sides are asking for.

20        **MR. MULLER:**  Yeah.  No.  I -- there is confusion on

21   that front, Your Honor.  I -- again, I don't -- if we're back

22   here on damages, I don't disagree with that.  That is what the

23   Court -- what his Opinion says.  It just seemed odd to me --

24   but it really seems very obvious to me that there is no --

25        **THE COURT:**  Well he doesn't say there are damages.

33

1   He said just consider --

2           **MR. MULLER:**  Yeah.

3           **THE COURT:**  -- the damage model.  So it wasn't a pre-

4   ordaining what should be found.

5           **MR. MULLER:**  I agree.  I just -- my only point would

6   be, Your Honor, is that it seems that there's some suggestion

7   that we're here to retry the issues.  It's --

8           **THE COURT:**  No, we're not retrying the case or the

9   issues.  We're taking the evidence that came in at the trial

10  and making a conclusion that would be consistent with Judge

11  Pulliam's conclusion on the real covenant.

12          **MR. MULLER:**  I think though that when you look to the

13  Court's findings, you go to your opinion which it -- DMA and

14  Longbranch disagreed with the Court's --

15          **THE COURT:**  Mm-hmm.

16          **MR. MULLER:**  -- findings and conclusions.  And they

17  had a -- they had 40 or 50 pages of requested findings.

18          For instance, the disgorgement claim, Your Honor.  If

19  they want to get disgorgement, they have to show untoward

20  (inaudible) the law, illicit gain, wrongful gain.  Well

21  Mr. Wright didn't gain anything from any kind of inappropriate

22  contact.  He has a 60 percent, he has -- had a 50 percent

23  interest originally and then a 60 percent interest that's off

24  set by their 40 interest in the profits.  And that's all he's

25  ever had.

34

1      The only thing he did in this case was litigate the

2 issue of whether there are profits interest attached to the

3 next guy.  Because he couldn't sell the Row to anyone if they

4 believed the property came attached to Mr. Moore, who sues

5 everyone all the time.  And --

6      **THE COURT:**  Okay.  So the plan was that it should be

7 sold, correct?

8      **MR. MULLER:**  The plan was -- it was sold.  It was in

9 fact sold to TCRD.  And then --

10      **THE COURT:**  Okay.  But then that was undone.  That

11 was -- that was taken apart and rescinded.

12      **MR. MULLER:**  Right.

13      **THE COURT:**  So where are we now?  I mean, the Row is

14 free and clear.  It may not have as much value as everybody

15 thought.  But I mean, do we need to convert -- this isn't an

16 issue, but do we need to convert the case to Chapter 7 and let

17 a Trustee sell it?

18      **MR. MULLER:**  I don't (inaudible) to answer that

19 question.  It's my understanding that once we adjudicated a

20 plan that that's the plan and you can't go back and convert it

21 at this point.  But I -- you would know better than me.

22      **THE COURT:**  Well that's the plan for sure.  But 11,

23 12 says if the plan fails, we can convert it to Chapter 7.  If

24 it's not --

25      **MR. MULLER:**  You know --

35

1          **THE COURT:**  -- being implemented according to its

2    terms.

3          **MR. MULLER:**  To be honest, Your Honor, I'm a little

4    surprised here because I mean again, our settlement

5    conversations have been private and confidential.  But I would

6    have never --

7          **THE COURT:**  No, I don't want to get into settlement

8    negotiations.  They're all privileged.

9          **MR. MULLER:**  But to the extent Mr. Johns was saying

10   we would -- we would like to have constructive trusts put in

11   place that says if it's sold by -- you know, they don't have a

12   problem with Mr. Wright getting back his $4.7 million for the

13   acquisition.  I appreciate him saying that.  I really do.  He's

14   got more in it than $4.7.  All right.  He's had to pay the

15   taxes.  He's had to pay (inaudible) development (inaudible).

16         **THE COURT:**  Okay.  Well I don't want to hear what

17   people are willing to take or unwilling to take.  That's

18   settlement --

19         **MR. MULLER:**  Right.

20         **THE COURT:**  -- negotiations.  So I don't need to hear

21   that.  But I mean, my attitude is -- and this is not something

22   that you were prepared for today.  I understand.  And so I'm

23   not going to take any action.  It's just a question.  We've got

24   a confirmed plan.  The property's been transferred.  Nobody's

25   getting paid because the property hasn't been sold other than

36

1    this transfer to a Wright owned entity, Larry Wright owned

2    entity.

3            So I mean, how is this benefiting the creditors in

4    the case?  I assume they're still creditors that are unpaid,

5    right?

6            **MR. MULLER:**  I think there -- no, there was only one

7    creditor, there was DMA and Longbranch, and they agreed to a

8    plan that affords them to be paid in a particular way.  And we

9    are still -- we are going to honor that agreement, Your Honor.

10   I understand --

11           **THE COURT:**  Are you saying all the creditors have

12   been paid other than DMA and Borders and Moore?

13           **MR. MULLER:**  (inaudible).

14           **THE COURT:**  That right, Mr. Johns?

15           **MR. JOHNS:**  Your Honor, I take exception to a lot of

16   what Mr. Muller said, but I --

17           **THE COURT:**  No, of course.

18           **MR. JOHNS:**  (inaudible)

19           **THE COURT:**  I understand that.  I don't --

20           **MR. JOHNS:**  (inaudible)

21           **THE COURT:**  I don't think that you're -- I don't

22   think you're agreeing with it just because you're politely

23   listening.

24           **MR. JOHNS:**  Thank you, Your Honor.  I think it's

25   correct that we -- we're the ones -- the only ones left that

37

1   are owed anything.

2          **THE COURT:**  And the question is, are you owed

3   anything and if so, how much?

4          **MR. JOHNS:**  That's right, Your Honor.

5          **MR. MULLER:**  They're owed 40 percent of the proceeds

6   from sale.

7          **MR. SPEAKER:**  Net proceeds.

8          **THE COURT:**  Okay.

9          **MR. MULLER:**  Net proceeds from sale.  And then we

10  are -- and we are attempting to sell the property for as much

11  as possible.  It does not hurt to help us sell it for a little

12  bit amount of money.  And the problem is is that we can't get

13  it sold right now because there's these problems with title.  I

14  can't speak to that issue of whether that issue is fully

15  resolved or not.  They have --

16         **THE COURT:**  Okay.

17         **MR. MULLER:**  -- (inaudible).

18         **THE COURT:**  Okay.

19         **MR. MULLER:**  -- bright lawyers, you know, very smart

20  working on that.  If we can sell it.  Look at it this way, if

21  we could sell it for $10 million or $100 million, we would be

22  more than happy --

23         **THE COURT:**  Of course.  Of course.

24         **MR. MULLER:**  -- (inaudible). 40 percent.  We don't

25  contest that.

38

1        **THE COURT:**  So --

2        **MR. MULLER:**  -- that.

3        **THE COURT:**  I'm not trying to pull the rug out from

4   under the debtor or the creditors who could get paid with a

5   good sale.  But I mean, this case was filed in 2020.  You know,

6   we were hearing things during the pandemic by Webex because

7   actually some of y'all actually got sick some during the trial.

8   And we had to postpone it.

9        But I mean, this thing has been hanging around for

10  quite a long time.  And I'm not trying to rush into anything

11  here, but I think it's well past the time where we're rushing

12  into anything.  So you know, maybe we need to sell it as is to

13  someone who's willing to go in and do the title work to make

14  a -- to make a profit on it.  Because the debtor has not been

15  able to do it so far.  Now that's just a broad question on

16  the -- on the case itself not on this adversary.

17        **MR. JOHNS:**  May I --

18        **MR. MULLER:**  (inaudible).

19        **MR. JOHNS:**  -- respond, Your Honor?

20        **MR. MULLER:**  Well let me say one thing (inaudible).

21        **THE COURT:**  Yeah, let's let Mr. Johns go for a

22  minute.  Mr. Johns?

23        **MR. JOHNS:**  Well I just point out that the -- there

24  has been a wrongful gain here.  The wrongful gain was using

25  proceeds of an undisclosed secret loan that was in breach of

39

1 fiduciary duty to get the right to have the money to buy the

2 right of way in the first place.

3      So that's what we're seeking to disgorge. We'd be

4 happy to be the ones to take, you know, whether it's a

5 constructive trust or disgorgement, we'd be happy to be the

6 ones to go market this and we'd be happy to report back to the

7 Court on it.

8      **THE COURT:** Mm-hmm.

9      **MR. JOHNS:** We'd be happy to give Mr. Wright the $4.7

10 that came (inaudible) If he -- if he wants to -- if Your Honor

11 wants to have something else that he's entitled to more than

12 $4.7, which is what it was at trial, we're happy to have Your

13 Honor determine --

14      **THE COURT:** Now wait a minute. How are you going

15 to -- you're going to give him the $4.7? Where does that come

16 from?

17      **MR. JOHNS:** That -- that's -- that was the purchase

18 price that came in at trial that Mr. Wright paid.

19      **THE COURT:** Okay.

20      **MR. JOHNS:** And we just point out, Your Honor, too

21 that Mr. Muller has said that --

22      **MR. MULLER:** That's wrong.

23      **MR. JOHNS:** -- this right of way to them is

24 worthless. And that burdened by our interest --

25      **MR. MULLER:** (inaudible).

40

1          **MR. JOHNS:** -- our 40 percent interest --

2          **THE COURT:** Not worth as much as they hope it is

3    because of the title work that's necessary and the litigation

4    that's clouding it.

5          **MR. JOHNS:** Yes, Your Honor. But I did hear

6    Mr. Muller say that, you know, their position is that given all

7    those things it's not worth very much. And I actually heard

8    the word --

9          **THE COURT:** I heard that.

10         **MR. JOHNS:** -- worthless. And if that's -- if that's

11   true, then give the worthless thing to us and let us go try to

12   make money for Mr. Wright off of it.

13         **THE COURT:** And how --

14         **MR. JOHNS:** (inaudible).

15         **THE COURT:** -- would you make money for Mr. Wright

16   off of it?

17         **MR. JOHNS:** Because we would -- we would have an

18   obligation to go and market the right of way and sell it and

19   work with somebody to clean up whatever needs to be cleaned up

20   in title and we'd have a first monies obligation to pay

21   Mr. Wright any money before we pay it ourselves.

22         **THE COURT:** And your people would get 40 percent of

23   the net and he would get 60 percent?

24         **MR. JOHNS:** Well our position there, Your Honor,

25   would be that it -- if that's -- that might be something to

41

1   talk about and work out, but I think the legally right thing to

2   do here is since Mr. Wright got it, he got the right of way

3   interest in the first place and got control of it through

4   breaches of fiduciary duty, then the right thing to do is to --

5   is to take away that gain that he got while also protecting the

6   actual money that he put up which at trial was the $4.7.

7           If Your Honor wants to have a hearing and determine

8   the right amount of first monies obligation, we're happy to

9   have that conversation.  But we think, you know, contrary to

10  what Mr. Muller said, our people had a -- had a property

11  interest and the District Court recognized --

12          **THE COURT:**  Yeah, I --

13          **MR. JOHNS:**  -- that it --

14          **THE COURT:**  -- understand.

15          **MR. JOHNS:**  -- was a property interest in this --

16          **THE COURT:**  I don't think we're going to reopen the

17  evidence.  I'll just put it that way.

18          **MR. JOHNS:**  I --

19          **THE COURT:**  We're going to just (inaudible) --

20          **MR. JOHNS:**  I certainly hope --

21          **THE COURT:**  -- on the record.

22          **MR. JOHNS:**  I certainly hope we don't because I think

23  that evidence and the rulings have gone our way on that issue.

24  So I mean, that's what --

25          **THE COURT:**  Some of them.

42

1        **MR. JOHNS:** -- you think the appropriate thing is is

2  to -- is to say, hey, you know, whatever the fiduciary got as a

3  result of breaching fiduciary duties --

4        **THE COURT:** Mm-hmm.

5        **MR. JOHNS:** -- there should be a constrictive trust

6  or a disgorgement of that interest which is the right of way

7  interest.  But he did put up some money.  Let's figure out

8  how -- exactly how much that is and we have a first monies

9  obligation to Mr. Wright.

10       **THE COURT:** Okay.

11       Mr. Muller, go ahead.  Let's finish it up.

12       **MR. MULLER:** (inaudible).

13       **THE COURT:** We have other people waiting on another

14  case.

15       **MR. MULLER:** Yeah, I think on the issues that are on

16  remand, Your Honor, I think that it's sufficient to say that

17  when it comes to damages, you would have to look in your -- at

18  your opinion is very well written.  It's very clear.  There

19  were no --

20       **THE COURT:** It's so well -- it's so well written he

21  reversed it.

22    **(Laughter)**

23       **MR. MULLER:** I like your version much better, Judge.

24  It's true.  But I don't think they found that you need those

25  findings in order to rule.  And you don't have any findings on

43

1    damages.

2           I would say this, and Judge Pulliam's Opinion also

3    recognizes this exclusively.  You did not find any knowing

4    participation.  You found a breach of fiduciary duty.  It was

5    an informal fiduciary duty.  I will -- I will say they did not

6    plead that.  They pled only a formal fiduciary duty.

7           But you did not find -- there are no findings of

8    knowing participation, and Judge Pulliam's addressed that and

9    there are also no findings of illicit gain.  But Mr. Johns

10   still arguing all day long.

11          But you didn't find that Mr. Moore -- or that

12   Mr. Wright gained anything.  (inaudible) anybody gained

13   anything wrongfully or not wrongfully.  He only got what he

14   paid for.  He never took anything from them.  He only seeked to

15   adjudicate whether it ran with the land.  Judge Pulliam says it

16   does.  And so they still have exactly what they bargained for

17   as of today.  So there's no gain.  But there are no findings of

18   gain.  And I think that's the core issues on remand.  I think

19   that's the net of my argument, Your Honor.

20          **THE COURT:**  Okay.

21          **MR. MULLER:**  (inaudible)

22          **THE COURT:**  Why don't -- why don't you do this,

23   gentlemen.  Why don't you, Mr. Johns, just do a proposed

24   judgment based upon what you believe that the damage model is

25   or should be.  And we don't need further findings of fact and

44

1  conclusions of law at this point.  Just what you think the

2  judgment should say based upon the Opinion that was done either

3  by me or by Judge Pulliam and then you can do the same.

4          **MR. MULLER:**  Your Honor, I'll be happy to do that.

5  And I think to the extent that, you know, Mr. Johns is seeking

6  a judgment from facts that are not on the record, I would

7  appreciate the opportunity to point that out.

8          **THE COURT:**  Yeah, that's fine.  Just file --

9  Mr. Muller, just file a proposed judgment, and I'm not

10  suggesting what it should say.  You just tell me what you think

11  the evidence proves and should lead to the judgment.

12          I mean, there -- you know, we're at -- we're all

13  about trying to get to final judgment here so that one party or

14  the other can appeal it.  Which is what I expect to happen.  No

15  matter what I do I think it's going to get appealed.  And

16  that's fine.  I don't have any problem with that.  I used to

17  appeal judgments myself.  So it's part of the process.  So

18  whoever wins, great, and whoever doesn't win gets to file an

19  appeal most likely.  But we just need a proposed judgment from

20  each side reflecting what should be done in the Opinion of that

21  side.

22          Okay?  If you -- if you -- can you do that within 10

23  days maybe?

24          **MR. JOHNS:**  Yes, Your Honor.

25          **MR. MULLER:**  Yeah, okay.

45

1           THE COURT:  Okay.

2           All right.  We have another case waiting and I think

3    I'm going to wrap it up on this case.

4           Did y'all have anything else to say?

5           MR. MULLER:  No, Your Honor.  It's good seeing you

6    again.

7           THE COURT:  Okay.  All right.

8           MR. JOHNS:  Thank you so much.

9           THE COURT:  Nice to see you gentlemen.

10          MR. JOHNS:  Thank you, Judge King.

11          THE COURT:  Let's get this case wrapped up.  And if

12   it has to go up on appeal, then it has to go up on appeal.

13          MR. JOHNS:  Thank you, Your Honor.

14          MR. MULLER:  Okay.

15          THE COURT:  Mr. Johns, Mr. Muller, feel free to drop

16   off, and we'll go to the next case.

17          MR. JOHNS:  Thanks so much.

18          MR. MULLER:  Thank you, Your Honor.

19          MR. JOHNS:  Bye.  Bye.

20      **(Proceeding adjourned at 10:53 a.m.)**

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                          June 11, 2024
         Signed                                        Dated


                    *TONI HUDSON, TRANSCRIBER*