

No. 5:24-cv-00365-XR

# In the United States District Court
# for the Western District of Texas

———— ♦ ————

DMA Properties, Inc., et al.,
*Appellant*

v.

KrisJenn Ranch, LLC, et al.,
*Appellee.*

———— ♦ ————

Consolidated Appeal from the United States Bankruptcy Court
for the Western District of Texas Adversary Proceeding 20-05027-RBK

———— ♦ ————

## APPELLANTS' BRIEF

———— ♦ ————

Timothy Cleveland
Texas Bar No. 24055318
Austin H. Krist
Texas Bar No. 24106170
CLEVELAND KRIST PLLC
303 Camp Craft Road, Suite 325
Austin, Texas 78746
512-689-8698
tcleveland@clevelandkrist.com
akrist@clevelandkrist.com

Christopher S. Johns
Texas Bar No. 24044849
 *Counsel of Record*
Bill Cobb
Texas Bar No. 00796372
Michael C. Cotton
Texas Bar No. 24116229
COBB & JOHNS PLLC
13341 W. US-290, Building 2
Austin, Texas 78737
512-399-3150
512-572-8005 fax
chris@cobbjohns.com
bill@cobbjohns.com
michael@cobbjohns.com

*Counsel for DMA Properties, Inc.,
Longbranch Energy, LP, and
Frank Daniel Moore*

**P9-0001**

CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1(a), Appellants DMA Properties, Inc., Longbranch Energy, LP, and Frank Daniel Moore, through their undersigned attorneys, represents that they do not have a parent company and are not owned by a publicly held corporation.

P9-0002

# TABLE OF CONTENTS

Corporate Disclosure Statement ................................................................ ii

Table of Contents ...................................................................................... iii

Table of Authorities .................................................................................. v

Statement Regarding Oral Argument ....................................................... vii

Jurisdictional Statement .......................................................................... viii

Statement of Issues Presented ................................................................. ix

Statement of the Case .............................................................................. x

Introduction ............................................................................................. 1

Statement of Facts ................................................................................... 5

Summary of the Argument ....................................................................... 13

Argument ................................................................................................. 16

    I.    Moore and DMA are entitled to disgorgement of
        Wright's ill-gotten gains—a constructive trust
        requiring transfer of title of the ROW from
        Wright's entities to Moore and DMA ..................................... 16

        A.    It is undisputed that Wright breached his
               fiduciary duty and acquired ownership of the
               ROW *through* his breach ................................................. 18

        B.    Wright cannot lawfully retain the property
               he acquired by breaching his fiduciary duty ................... 20

        C.    The Bankruptcy Court confused Wright's
               breach of fiduciary duty with his later
               violation of the Chapter 11 bankruptcy plan .................. 26

P9-0003

II.    This Court should render judgment that Wright's entities knowingly participated in Wright's breaches of fiduciary duty .......................................................... 28

III.    In the alternative, Moore and DMA are entitled to actual damages resulting from Wright's breaches of fiduciary duty ................................................................ 30

Conclusion and Prayer ..................................................................... 34

Certificate of Compliance .............................................................. 36

Certificate of Service....................................................................... 37

P9-0004

# TABLE OF AUTHORITIES

## Cases

*Baker Botts, L.L.P. v. Cailloux*,
224 S.W.3d 723 (Tex. App.—San Antonio 2007, pet. denied) ...................................................................21, 23

*D'Onofrio v. Vacation Publ'ns, Inc.*,
888 F.3d 197 (5th Cir. 2018) ............................................. 18

*ERI Consulting Engineers, Inc. v. Swinnea*,
318 S.W.3d 867 (Tex. 2010).....................................16, 20-21

*Hsin-Chi-Su v. Vantage Drilling Co.*,
474 S.W.3d 284 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ...........................................................21, 22, 23

*In re Estate of Preston*,
346 S.W.3d 137 (Tex. App.—Fort Worth 2011, no pet.) ..............21, 23

*In re Estate of Wallis*,
No. 12-07-00022-CV, 2010 WL 1987514 (Tex. App.—Tyler May 19, 2010, no pet.)............................................. 23

*In re National Gypsum Co.*,
208 F.3d 498 (5th Cir. 2000) ........................................... 18

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*,
160 S.W.2d 509 (Tex. 1942) .............................14, 20, 29, 30

*Leach v. Conner*,
No. 13-01-468-CV, 2003 WL 22860911 (Tex. App.—Corpus Christi–Edinburg Dec. 4, 2003, no pet.) ..........................21, 23

*Matter of Mornig's Dep't Stores, Inc.*,
929 F.2d 197 (5th Cir. 1991) ........................................... 21

*Nat. Gas Pipeline Co. of Am. v. Justiss*,
397 S.W.3d 150, 155 (Tex. 2012).......................................31

P9-0005

*Omohundro v. Matthews,*
    341 S.W.2d 401 (Tex. 1960) ..................................................... 20, 21, 23

*Talley v. Howsley,*
    176 S.W.2d 158 (Tex. 1943) ............................................................. 23

*Wolf v. Ramirez,*
    622 S.W.3d 126 (Tex. App.—El Paso 2020, no pet.) ........................ 18

## Other Authorities

BLACK'S LAW DICTIONARY (Bryan A. Garner, 10th ed. 2014) ..................... 22

RESTATEMENT (FIRST) OF RESTITUTION AND UNJUST
ENRICHMENT (1937) .................................................................................. 23

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST
ENRICHMENT (2011) ......................................................................... 14, 22, 34

P9-0006

## STATEMENT REGARDING ORAL ARGUMENT

Given the nature and importance of the issues involved in this appeal, the Appellants/Cross-Appellees believe oral argument would assist the Court in resolving the case and therefore request oral argument.

P9-0007

## JURISDICTIONAL STATEMENT

The Bankruptcy Court had jurisdiction over this case under 28 U.S.C. §§ 1334(a) and 157(a). The District Court has jurisdiction over this appeal of the Bankruptcy Court's final orders under 28 U.S.C. § 158(a).

The Appellants/Cross-Appellees' opening brief is timely under this Court's order granting Appellants until October 7, 2024 to file their principal brief.

**P9-0008**

## STATEMENT OF ISSUES PRESENTED

1. Whether, applying *de novo* review, the Bankruptcy Court committed reversible error in leaving the property in question (a pipeline easement or right of way) in the hands of the wrongdoer who acquired his interests in the easement by breaching his fiduciary duty.

2. Whether, applying *de novo* review, the Bankruptcy Court erred in refusing to grant final judgment that Wright's entities knowingly participated in Wright's breaches of fiduciary duty, when Wright directly controlled those entities and used them to effectuate his breaches of fiduciary duty.

3. Whether, applying *de novo* review, the Bankruptcy Court erred in concluding that Moore and DMA are not entitled to actual damages.

P9-0009

## STATEMENT OF THE CASE

This Court has previously affirmed the Bankruptcy Court's finding that Appellee/Cross-Appellant Larry Wright breached his fiduciary duty to Appellant/Cross-Appellee Daniel Moore. This Court remanded to the Bankruptcy Court to consider, among other things, Moore's gains-based remedies, including disgorgement and constructive trust. The Bankruptcy Court nominally ordered a constructive trust, but one that left the property in the hands of Wright—the wrongdoer—who acquired it by breaching his fiduciary duties to his business partner. The Bankruptcy Court also rejected Moore's claim to actual damages, and the Bankruptcy Court failed to follow this Court's instruction to consider Moore's claim that Wright's entities knowingly participated in his breach of fiduciary duty.

**P9-0010**

## INTRODUCTION

This case is about a professional poker player's attempts to con two of his business partners out of a 65-mile pipeline right-of-way ("ROW") in East Texas worth millions of dollars. But this appeal is about two things only—the proper remedy for the poker player's breach of fiduciary duty, and whether his wholly controlled entities are liable for knowing participation in that breach. The Bankruptcy Court—and this Court—have already found that Larry Wright breached his fiduciary duty to his business partner Daniel Moore, attempting to swindle Moore and their other partner, Darin Borders (and his entity Longbranch Energy, L.P. ("Longbranch")), out of their interests in the ROW. The record is clear that Wright did this through lying, secret back-door deals, and unauthorized wrap-around loans—all in an attempt to completely wipe out the interests of his business partners in the ROW and obtain a windfall for himself.

In short, Wright (1) was invited into the ROW deal only because he lied about his wealth and ability to fund the purchase; (2) obtained his ROW interests by taking out an undisclosed hard-money loan for his capital contribution; (3) hedged the hard-money loan with an unauthorized loan from his entity KrisJenn Ranch LLC ("KrisJenn") to Black Duck Properties, LLC ("Black Duck")—his jointly owned entity with Moore—using the ROW as collateral; (4) thereby secretly set himself up

1

P9-0011

as creditor and debtor behind Moore's back; (5) pushed Moore out of Black Duck; and (6) then "foreclosed" on the undisclosed "loan" to Black Duck and transferred the ROW to his wholly-controlled entity, KrisJenn. His game plan was simple: erase his business partners' interests entirely and take the ROW for himself.

Multiple lawsuits were filed in Texas state court, where Wright moved for summary judgment and asked the court to declare that the interests of Longbranch and Moore's entity, DMA Properties, Inc. ("DMA") in the ROW were merely personal covenants from Black Duck—a then-defunct entity—that did not attach and run with the land. When the Texas court ruled against him, his wholly-controlled entity that now owned the ROW through a sham "foreclosure," KrisJenn, declared bankruptcy—attempting to find a different answer in a different court.

The Bankruptcy Court, after a six-day trial, found that Wright breached his fiduciary duties to Moore, in part by "enter[ing] into an ultra vires and conflicted loan transaction without Moore's consent." 1.ROA.4467.[1] But despite finding that Wright breached his fiduciary duties to Moore, the Bankruptcy Court held that DMA and Longbranch's interests in the ROW were merely personal covenants from Black Duck that did not run with the land. The Bankruptcy Court then concluded

---

[1] Appellants/Cross-Appellees Moore, DMA, and Longbranch submitted a five-volume record on appeal. Record citations note the volume number, page number, and (where applicable) line number. For example, 1.ROA.1:1 would refer to volume 1, page 1, line 1.

P9-0012

that DMA and Longbranch had no interest in the ROW and thus suffered no damages, despite the clear breach of fiduciary duty that allowed Wright to obtain ownership of the ROW.

DMA and Longbranch appealed, and this Court reversed. This Court affirmed the Bankruptcy Court's finding of a breach of fiduciary duty but held that DMA's and Longbranch's interests in the ROW *did* attach and run with the land. Moreover, this Court explained that Moore did not need to prove actual damages, because he pleaded and requested gain-based remedies—disgorgement, unjust enrichment, restitution, and constructive trust—which are different from loss-based damages. This Court also remanded for the Bankruptcy Court to consider the damages model presented to it, as well as Moore and DMA's claims against the Wright entities for knowing participation in his breach of fiduciary duty.

On remand, Moore and DMA asked for disgorgement of the ROW—the creation of a constructive trust that would place the ROW in *their* hands, subject to a first-monies obligation for Wright to recover the $4.7 million he invested. Moore and DMA emphasized that black-letter law does not allow fiduciaries to profit from their breaches of fiduciary duty. DMA and Moore's proposed remedies would allow them to sell or develop the ROW—and for Wright to receive his initial investment but nothing else.

3

P9-0013

The Bankruptcy Court ordered a constructive trust, *of sorts*, but it was a remedy in name only. The Bankruptcy Court left the asset in the hands of Wright and his entities, merely requiring that if any profits were ever realized from the ROW, DMA and Longbranch would each receive 20% of the net profits. But this was no remedy at all; it was the status quo. Under this Court's decision, DMA and Longbranch already owned 20% net-profits interests in the ROW. Moreover, the Bankruptcy Court's "remedy" left the ROW in the hands of the wrongdoer who acquired it through deception and breaches of fiduciary duty, who had gone to great lengths to shuffle the asset between multiple entities—even in defiance of the Bankruptcy Court's order—all to rob DMA and Longbranch of their interests.

And, as the Bankruptcy Court noted, Wright has never been able to develop or sell the ROW—despite multiple (secret) attempts. Left in his hands, for reasons explained below, it's a dead asset. As even the Bankruptcy Court conceded, DMA and Longbranch will likely never see a dollar of profit if the parties are forced to work together to develop or sell the ROW.

DMA, Longbranch, and Moore are the only remaining creditors here. So the only parties affected by the Bankruptcy Court's order, or this Court's order, are the parties to this lawsuit. The real remedy is the one More and DMA requested and the one that Texas law requires—imposition of a constructive trust placing the ROW in

**P9-0014**

*their* hands—so they can develop or sell it, subject to a first-monies obligation of Wright's $4.7 million investment. This Court should reverse and render judgment to that effect.

<div align="center">STATEMENT OF FACTS</div>

**A.    Borders and Moore negotiate and secure the option to purchase the ROW.**

In 2015, Darin Borders learned of a potentially lucrative pipeline easement running through four counties in East Texas—that if developed could be worth tens of millions of dollars. In the summer of 2015, Borders told his friend Daniel Moore about the ROW, and the two made plans to buy it. Borders and Moore spent countless hours negotiating with the owner, Express Pipeline Connection, LLC, over the right to purchase the ROW. And Moore and Borders's efforts paid off. In February 2016, Borders's entity Longbranch, executed an agreement with Express Pipeline Connection to purchase the ROW for $5,000,000. 5.ROA.13-14; 1.ROA.96-139. Longbranch paid Express Pipeline Connection $25,000 in earnest money for the right to purchase the ROW. 5.ROA.13-14; 1.ROA.96-139.

**B.    Wright, through a series of lies, inserts himself into deal.**

When Moore and Borders secured the right to purchase the ROW, Moore had already been working with his business partner, Larry Wright, in their jointly owned entity, Black Duck Properties, LLC ("Black Duck"). Wright learned of the ROW through Borders and Moore, and he asked them if he could join the deal as the

<div align="center">5</div>

<div align="right">**P9-0015**</div>

"money guy." 1.ROA.3333:22-3334:10, 3439:3, 3879. Wright proposed that he would fund the initial purchase price through his own capital and then use that capital to maintain the ROW while Borders, Moore, and Wright attempted to develop it.

Borders and Moore pressed Wright on whether he actually had the capital to fund the purchase price and maintain the ROW while the partners jointly developed the opportunity. 1.ROA.3723. Wright claimed that "he had all the cash to be king," 1.ROA.3620:4-5, and that the $5,000,000 needed to close on the ROW was "chump change." 1.ROA.3386:24-3387:4. He said he had "cash on hand to fully fund the first line in the right-of-way," which would have cost between $50,000,000 and $75,000,000. 1.ROA.3372:10-3373-7. Wright claimed to have "a bunch of trusts"— "some of them" worth "50 to 100 million." 1.ROA.3384:11-14, 3622:2-11.

When Borders and More emphasized the need for ample funds required to purchase and hold the ROW, Wright repeatedly ensured his partners that he had "eaten [his] Wheaties," 1.ROA.3620:4-5—that he had what it took to keep the ROW afloat before the parties could monetize it. As it turned out, regardless of whether Wright ate his Wheaties, he did not have $50,000,000, or anything close to it. This was simply a lie that Wright told so that he could get a seat at the table.

**P9-0016**

Relying on Wright's representations (1.ROA.3453:14-3454:10), Borders and Moore agreed to include Wright in the deal, and Wright reimbursed Moore and Borders for the $25,000 the two men had already paid. 5.ROA.14. Borders, on behalf of Longbranch, agreed to assign the Purchase Agreement to Black Duck (Moore and Wright's jointly owned entity).[2] 5.ROA.13-14. In exchange, Wright and Moore, on behalf of Black Duck, agreed that Longbranch would possess a 20% net-profits share that would attach and run with the ROW. 5.ROA.14.

## C. Wright buys the ROW for Black Duck through a secret, unauthorized loan from one of his own entities, encumbering the ROW as collateral.

In August 2017, over a year after Black Duck had assumed Longbranch's Purchase Agreement, Black Duck closed on the ROW. 1.ROA.704-766; 5.ROA.15. But unbeknown to Borders and Moore, Wright had been lying the whole time about his wealth. He didn't have the funds to purchase and maintain the ROW. *See* 1.ROA.3381:21-24. He needed a loan, and he would need collateral to secure that loan. Wright contributed $1.25 million of his own money. 5.ROA.15-16. He then secretly used his ranch and certain minerals in Webb County as collateral to secure a hard-money loan of $4.1 million at 17% interest. 1.ROA.4445-4446; 5.ROA.16.

---

[2] Moore owned 50% of Black Duck through SCMED Oilfield Consulting, LLC and Wright owned 50% through KrisJenn. 1.ROA.4442.

P9-0017

Wright had said all along that his funding of the ROW purchase price was to be his capital contribution to the parties' joint venture. 1.ROA.338, 3570:5-7, 3602:14-21. Instead, without Moore's or Borders's knowledge, Wright used his entity KrisJenn to "loan" $4.1 million to Black Duck (at 17% interest)—now wrongfully using the ROW itself as collateral. 1.ROA.1213, 4445-46. As the Bankruptcy Court found, "Wright was on both sides of the Black Duck loan." 1.ROA.445. "Playing his cards this way, Wright could secure repayment on the hard money loan and protect his family ranch by foreclosing on the ROW." 1.ROA.4446. Wright would never have been able to fund the purchase of the ROW without this convoluted "ultra vires and conflicted loan transaction." *See* 1.ROA.1781, 4467. And, as this Court found, "[a]lthough Moore was a manager of Black Duck . . . and although the company agreement required loan transactions to be authorized by the managers, no one informed Moore of this 'secret loan,' and he did not authorize it." 5.ROA.16.

What's more, Wright secretly executed these sham "loan documents" well after Black Duck closed on the ROW. Those documents—which used the ROW as collateral—purport to evidence a transaction that was consummated on August 14, 2017—when Black Duck closed on the ROW. 1.ROA.697-702, 704-766, 1213-18;

**P9-0018**

5.ROA.15. Yet, as this Court found, those loan documents were not executed or notarized until January 18, 2018. 5.ROA.16.

The upshot of Wright's undisclosed, wrap-around loan was that Black Duck allegedly owed Wright's entity, KrisJenn, the $4.1 million (at 17% interest) that Wright used to purchase the ROW, and KrisJenn could take possession of the ROW if Black Duck did not repay the loan. But Moore—who, at the time, was a manager of Black Duck and whose entity owned 50% of Black Duck—knew none of this. 1.ROA.4467; 5.ROA.15. In short, Wright breached his fiduciary duties to obtain his interests in the ROW.

**D.     Wright pressures Moore to withdraw from Black Duck in exchange for a 20% net-profits interest running with the ROW and 50% of a promissory note.**

Shortly after Black Duck closed on the ROW, Wright grew hostile to Moore and began pressuring him to resign and give up his 50% interest in Black Duck. 1.ROA.3517:2-3518:15, 515. Moore didn't understand Wright's sudden hostility but eventually relented after several phone conversations with Wright. Moore resigned, giving up his 50% interest in Black Duck and all of Black Duck's assets, including the ROW. 5.ROA.16. In exchange, among other things, Moore's entity DMA received a 20% carried interest that ran with the ROW, on the same terms as what Borders received through Longbranch. 5.ROA.16.

P9-0019

But Moore would never have withdrawn as manager of Black Duck or given up his 50% ownership interest in the ROW if he had known half of what Wright had been up to behind his back. As this Court found, Moore didn't know that Wright had set himself up as a creditor to Black Duck, who could foreclose on the ROW at any time. 5.ROA.16. Nor did Moore know that Wright had been negotiating in secret for months—well before Wright forced Moore out of Black Duck—to sell the ROW to a landman named John Terrill and a company called TCRG that was owned by a Dallas billionaire. 1.ROA.2929, 2939. Two days after Moore's resignation documents were drawn up, Wright executed plans to sell the ROW to TCRG for $2.5 million, with Black Duck retaining a 16% carried interest in a future waterline. 5.ROA.18.

When Moore and Borders learned of the deal with TCRG and approached Wright, Wright said that Terrill and TCRG knew about Longbranch's and DMA's interests and even had copies of their agreements. 1.ROA.3552. But this was another lie. Moore and Borders contacted the buyers, who said that Wright had not disclosed their previously assigned interests. 5.ROA.18. Terrill and TCRG claimed that they would not honor Longbranch's and DMA's interests. 1.ROA.3350:1-10; 5.ROA.18. Despite realizing that Wright had gotten control of the ROW through lies and breaches of fiduciary duties, Moore and Borders sought an amicable solution with

**P9-0020**

TCRG, Wright, and Wright's entities. 1.ROA.3357-58. But Wright was not interested. 1.ROA.518-19. Wright threatened that if Moore and Borders did not end all communications with TCRG, Wright would "proceed to kill the 20% each of you own." 1.ROA.295; 5.ROA.18-19.

**E.**   **After attempting to arrange a new deal with another unsuspecting buyer, Wright uses the undisclosed loan to foreclose on the ROW and declares bankruptcy.**

TCRG forced Wright to rescind the ROW sale because of Wright's misrepresentations. 5.ROA.19. To repay TCRG, Wright borrowed $5.9 million from the Dallas–based McLeod family. 5.ROA.19. As collateral for the loan, Wright pledged the ROW, in addition to his ranch and some mineral interests, while also conveying an option for the McLeods to purchase the ROW for $6,000,000. 5.ROA.19. Just as he had done with TCRG, Wright chose not to disclose Longbranch's and Moore's interests to the McLeods. 1.ROA.3392:19-3393:13.

Later, as this Court found, when "Black Duck was unable to pay its debt under the [undisclosed] Black Duck Loan, KrisJenn 'foreclosed' and became a successor-in-interest to Black Duck's assets." 5.ROA.19. Wright later dissolved Black Duck in December 2018. 5.ROA.20. After Wright's undisclosed "loan" and sham foreclosure, multiple lawsuits ensued in Texas state court. 5.ROA.20. Wright and his entities moved for summary judgment, arguing that DMA's and Longbranch's

net-profits interests were merely personal covenants from Black Duck (a then-defunct entity) rather than real covenants that ran with the land. But the Texas court rejected Wright's theory. 1.ROA.2140-41.

In the wake of that ruling, Wright threw KrisJenn into bankruptcy, hoping to get a different answer from a different court.

And Wright's plan almost worked. The Bankruptcy Court held a six-day evidentiary trial, after which it held that "Wright breached his fiduciary duty related to the unauthorized Black Duck loan." 1.ROA.4468. But the Bankruptcy Court concluded that the DMA's and Longbranch's interests in the ROW created only personal covenants that did not attach and run with the land under Texas law. 1.ROA.4468. The Bankruptcy Court further concluded that "no actual damages were proven." 1.ROA.4468.

This Court reversed, holding that DMA's and Longbranch's interests in the ROW attached and ran with the land. This Court also instructed the Bankruptcy Court to consider the gains-based remedies that Moore and DMA presented, their damages claim, and their claims against Wright's entities for knowing participation in the breach of fiduciary duty. 5.ROA.48.

On remand, the Bankruptcy Court rejected Moore's and DMA's claims of actual damages and declined to rule at all on Moore's and DMA's knowing-

P9-0022

participation claims against Wright's entities. 5.ROA.306-07, 311-12. The Bankruptcy Court nominally ordered the imposition of a constructive trust on the ROW, but the Court left the ROW in the hands of Wright and his entities—ordering only that DMA and Longbranch should receive 20% of net profits from any sale or development, which is only what the parties had already agreed to through the respective assignment agreements. 5.ROA.306, 312.

### SUMMARY OF THE ARGUMENT

The Bankruptcy Court and this Court have already held that Wright was a fiduciary and that Wright breached his fiduciary duties to Moore. 1.ROA.4353, 4354, 4465-67; 5.ROA.43-44. Wright and his entities never contested the Bankruptcy Court's holding that Wright was a fiduciary and that he breached his fiduciary duty. 5.ROA.25, 43. The only things left to decide were the proper remedy for Wright's breach and whether Wright's entities knowingly participated in that breach. Here, the Bankruptcy Court ordered a constructive trust—but a constructive trust in name only. *See* 5.ROA.306, 312.

Under the Bankruptcy Court's holding, Wright is left holding the ROW, which he acquired by—and could not have acquired without—breaching his fiduciary duties. *See* 5.ROA.306, 312. If the Bankruptcy Court's order stands, Wright will keep the ROW, keep his initial investment, and keep any profits realized off the

P9-0023

ROW—subject only to DMA's and Longbranch's net-profits interests, which they already owned under this Court's previous ruling. *See* 5.ROA.306, 312. This decision cannot stand.

Texas law does not allow fiduciaries to breach their duties and then keep the fruits of their breach. *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942). The proper remedy, and the one Moore and DMA asked for below, is the imposition of a constructive trust requiring the ROW to be transferred to Moore and DMA, with Wright retaining a first-monies obligation of his $4.7 million on any profits realized by the sale or development of the ROW.[3]

Further, this Court should hold that Wright's entities knowingly participated in Wright's breach of fiduciary duty. This Court previously remanded for the Bankruptcy Court to consider this issue, but the Bankruptcy Court did not, despite Moore's and DMA's requests for such a ruling. 5.ROA.48, 95, 306-07. The record is clear, and this Court can and should hold Wright's entities liable for knowing participation. There is no dispute that Wright used KrisJenn to set up the unauthorized, undisclosed "loan" to Black Duck to purchase the ROW and then to

---

[3] Moore and DMA suggested to the Bankruptcy Court that Wright should receive the $4.7 million first-monies obligation because breaching fiduciaries are generally entitled to reimbursement of the costs of acquisition—but must disgorge everything else. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 55 cmts. c, l (2011).

14

**P9-0024**

"foreclose" on that wrongful loan to gain full ownership of the ROW. 1.ROA.4445-46. Nor is there any dispute that KrisJenn was wholly controlled by Wright. For all the reasons that Wright breached his fiduciary duty—because he was directly controlling his other entities to carry out his plans—KrisJenn and Wright's other entities knowingly participated in that breach as well.

Finally, Moore and DMA are entitled to actual damages and should be allowed to choose between a disgorgement remedy and a damages remedy. The Bankruptcy Court rejected their claim for actual damages, reasoning that the value of the ROW is uncertain, so it could not quantify damages—largely because of Wright's two failed attempts to sell the ROW in secret, without acknowledging DMA's and Longbranch's interests. 5.ROA.310-11. But as interest holders in the ROW, Moore and Borders offered competent trial testimony on the value of Moore's ROW interests. 1.ROA.3667. And this evidence was supported by third-party offers and other market data. 1.ROA. 2783:1-17. Such value evidence was never refuted, and the trial court had no basis to second-guess the damages evidence—or to deny damages based on uncertainty caused by Wright's own actions.

P9-0025

**ARGUMENT**

I.    **Moore and DMA are entitled to disgorgement of Wright's ill-gotten gains—a constructive trust requiring transfer of title of the ROW from Wright's entities to Moore and DMA.**

After holding that DMA's and Longbranch's interests attached and ran with the land, this Court emphasized that "Texas permits courts to 'fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty.'" 5.ROA.44 (quoting *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010)). This Court remanded the case to the Bankruptcy Court, instructing it to consider both "the damage model presented to it" and "gains-based remedies, such as disgorgement of wrongful gains, restitution, constructive trust, and reformation." 5.ROA.44, 48.

On remand, the Bankruptcy Court considered Moore's and DMA's damages model and even stated that it was giving the remedy they "elected in their proposed judgment." 5.ROA.311. But, in reality, the Bankruptcy Court gave them no remedy at all—and certainly not one that they elected.

In their remedies briefing before the Bankruptcy Court, Moore and DMA asked the Bankruptcy Court to order disgorgement of the ROW and for the Court to "impose a constructive trust upon the ROW (and any proceeds or [re]venues generated by the same) for the benefit of Moore and DMA. Moore and DMA will

**P9-0026**

*receive control over the ROW* and work to monetize it." 5.ROA.103 (emphasis added). Moore and DMA suggested that pursuant to the constructive trust, "Wright will be entitled to the first $4.7 million in proceeds—representing the amounts contributed by Wright," but that "all subsequent gains, revenues, and proceeds will be distributed to Moore, subject to Longbranch's net profits interest." 5.ROA.103. The Bankruptcy Court suggested that it was adopting this remedy, but its actual order was a constructive trust in name only, leaving Wright with all the fruits of his wrongful acts and leaving Moore and DMA with nothing except what they already owned. *See* 5.ROA.311-12.

The Bankruptcy Court "render[ed] judgment that a constructive trust be imposed on the ROW in the hands of Express H2O, unless Larry Wright and Express H20 transfer ownership of the ROW back to KrisJenn." 5.ROA.312. Under the trial court's judgment, Moore and DMA do not get legal or equitable title to the ROW. They don't get control over the ROW. The trial court ordered that DMA and Longbranch are entitled only to their "20% net profits interests," 5.ROA.312, which is precisely what this Court ruled that they already had. And with the ROW in the hands of Wright, for reasons explained below, they will likely never see a dollar for their net-profits interests.

P9-0027

**A.     It is undisputed that Wright breached his fiduciary duty and acquired ownership of the ROW *through* his breach.**

On appeal from an order of a bankruptcy court, a district court reviews the bankruptcy court's finding of facts for clear error and its conclusions of law *de novo*. *In re National Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000). Mixed questions of fact and law are reviewed *de novo*. *Id.*

Here, both the Bankruptcy Court and this Court have held that Wright breached his fiduciary duty to Moore. A party claiming breach of fiduciary duty must prove that (1) a fiduciary relationship existed, (2) the defendant breached his fiduciary duty, and (3) the breach resulted in injury to the claimant or benefit to the defendant. *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 215 (5th Cir. 2018). Wright's fiduciary duties to Moore in connection with the ROW and Black Duck included "the duty of loyalty and utmost good faith; duty of candor; duty to refrain from self-dealing; duty to act with integrity; duty of fair, honest dealing; and the duty of full disclosure." *Wolf v. Ramirez*, 622 S.W.3d 126, 142 (Tex. App.—El Paso 2020, no pet.) (citations removed). Wright breached these duties in myriad ways.

First, Wright was only able to enter the ROW deal because of his repeated lies that he personally had the necessary cash to purchase the ROW and maintain it while the parties sought to develop it. 1.ROA.3372:10-3373:7 (Wright claimed to have

**P9-0028**

"cash on hand to fully fund the first line in in the right of way," which would have cost approximately $50-75 million).

More important, because Wright did not have that cash, he "entered into an ultra vires and conflicted loan transaction without Moore's required consent," which secretly set the ROW up as collateral for Wright's unauthorized loan that allowed him to purchase the ROW. *See* 1.ROA.4467. As the Bankruptcy Court held, "[b]ecause the Black Duck Loan was not properly authorized, Wright breached his informal fiduciary duty owed to Moore." 1.ROA.4467. Wright would never have had the money to fund Black Duck's purchase of the ROW—and encumber the ROW as collateral—without this "ultra vires" wrap-around loan from his own entity, ultimately funded by a hard-money loan he took out on his ranch and other assets. *See* 1.ROA.294, 697-702, 1213-18, 4445-46.

As the Bankruptcy Court found, Wright hid this loan from Moore. 1.ROA.4446. Then Wright attempted to sell the ROW in secret to a third party without acknowledging DMA's or Longbranch's interests—cutting them out of what was properly theirs. 1.ROA.4446, 4448. And Wright negotiated this back-door deal while pressuring Moore (who was still unaware of the conflicted loan) to resign and relinquish his ownership in Black Duck. 1.ROA.515, 3517:2-3518:15, 4446.

19

**P9-0029**

Moore would *never* have done so—diminishing his ownership interest in the ROW—if he had known any of this.

Finally, Wright wrongfully "foreclosed" on the ROW, 1.ROA.4449, in an effort to extinguish DMA's and Longbranch's interests, which he could never have accomplished but for his "ultra vires and conflicted loan transaction." *See* 1.ROA.4467.

In sum, it was only through Wright's lies and breaches of fiduciary duty that he was able to obtain the ROW. But despite these breaches of fiduciary duty, the Bankruptcy Court left the ROW in the hands of the wrongdoer who obtained the ROW through those very breaches.

### B. Wright cannot lawfully retain the property he acquired by breaching his fiduciary duty.

Under Texas law, a fiduciary cannot be permitted to keep what he has acquired through his breaches of fiduciary duty. *Omohundro v. Matthews*, 341 S.W.2d 401, 409 (Tex. 1960); *ERI Consulting*, 318 S.W.3d at 874; *Kinzbach Tool*, 160 S.W.2d at 514. When a fiduciary receives any "benefit in violation of his duty, or acquires any interest adverse to his principle, without a full disclosure, it is a betrayal of his trust and a breach of confidence, *and he must account to his principle for all he has received.*" *Id.* (emphasis added). This is true even if the victim suffers no actual damages from the breach. *ERI Consulting*, 318 S.W.3d at 874. That's because the

P9-0030

purpose of these gains-based remedies is "not to compensate an injured principle" but rather "to protect relationships of trust by discouraging agents' disloyalty." *Id.* at 872; *see also Omohundro*, 341 S.W.2d at 409 (explaining that the purpose of a constructive trust is to "prevent unjust enrichment obtained through the violation of the fiduciary relationship"); *In re Estate of Preston*, 346 S.W.3d 137, 165 (Tex. App.—Fort Worth 2011, no pet.) (same).

Thus, when a fiduciary "acquires legal title to property in violation of a fiduciary relationship," a court will impose a constructive trust on the property—subjecting the wrongdoer "to an equitable duty to convey it to another." *Id.*; *Hsin-Chi-Su v. Vantage Drilling Co.*, 474 S.W.3d 284, 299 (Tex. App.—Houston [14th Dist.] 2015, pet. denied); *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied); *Leach v. Conner*, No. 13-01-468-CV, 2003 WL 22860911, at *8 (Tex. App.—Corpus Christi–Edinburg Dec. 4, 2003, no pet.).

As explained above, the Bankruptcy Court correctly found and this Court agreed (1) that Wright and Moore had a fiduciary relationship; (2) that he breached his fiduciary duties when he entered into the conflicted loan transaction; and (3) that he used the conflicted loan to acquire the ROW. The elements required for a constructive trust under Texas law are thus easily satisfied. *See Matter of Mornig's Dep't Stores, Inc.*, 929 F.2d 197, 201 (5th Cir. 1991) (holding that a constructive trust

21

**P9-0031**

requires (1) the breach of a fiduciary relationship or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res). Here, because a constructive trust was the right remedy, Wright and his entities should have been ordered to transfer the ROW to DMA and Moore. *See Hsin-Chi-Su*, 474 S.W.3d at 299.

The whole purpose of the constructive-trust remedy is to put the wrongfully acquired property in the hands of the victim. RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 55 (2011). Courts will impose a constructive trust when "a defendant is unjustly enriched by the acquisition of title to identifiable property at the expense of the claimant or in violation of the claimant's rights." *Id*. Then, "the defendant may be declared a constructive trustee, for the benefit of the claimant, of the property in question and its traceable product." *Id*. At that point, the "obligation of a constructive trustee is to surrender the constructive trust property to the claimant, on such conditions as the court may direct." *Id*.; *see also Constructive Trust*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The court declares a constructive trust in favor of the victim of the wrong, who is given the right to the property rather than a claim for damages.").

The breaching fiduciary—the constructive "trustee"—does not get to keep the property. *Id*. His "obligation . . . is simply to turn the property over to the

P9-0032


constructive beneficiary; the device does not create a 'trust' in any usual sense of that word." *Id.*

Texas law recognizes the remedy in the same way. *Talley v. Howsley*, 176 S.W.2d 158, 160 (Tex. 1943) ("A constructive trust is a relationship with respect to property, subjecting the person by whom the title to the property is held to an equitable duty *to convey it* to another.") (emphasis added); *Omohundro*, 341 S.W.2d at 405 (permitting imposition of a constructive trust "because the person holding the title to property would profit by a wrong or would be unjustly enriched if *he were permitted to keep the property*") (emphasis added).[4]

Following Texas law, Moore and DMA argued for the imposition of a constructive trust and disgorgement or forfeiture of Wright and his entities' interests

---

[4] *See also Hsin-Chi-Su*, 474 S.W.3d at 299 ("A constructive trust subjects the person holding title to property to an equitable duty to convey it to another on the ground the person's acquisition or retention of the property is wrongful and he would be unjustly enriched if permitted to retain it."); *Baker Botts*, 224 S.W.3d at 736 ("The constructive trust may be defined as a device used by chancery to compel one who unfairly holds a property interest to convey that interest to another to whom it justly belongs."); *Leach*, 2003 WL 22860911, at *8 ("Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.") (quoting RESTATEMENT (FIRST) OF RESTITUTION § 160 (1937)); *In re Estate of Wallis*, No. 12-07-00022-CV, 2010 WL 1987514, at *3 (Tex. App.—Tyler May 19, 2010, no pet.) ("A court of equity has jurisdiction to reach the property in the hands of a wrongdoer whenever legal title to property has been obtained through fraud, misrepresentations, concealments, or under similar circumstances that render it unconscionable for the holder of legal title to retain the interest."); *Estate of Preston*, 346 S.W.3d at 165 (explaining that a constructive trust imposes an "equitable duty to convey" "title to the property" to another).

P9-0033

in the ROW. 5.R.R.103. And the Bankruptcy Court said it was imposing a constructive trust. But it was a constructive trust in name only because the court left the wrongfully acquired property entirely in the hands of the unfaithful fiduciary. 5.ROA.306, 312. The Bankruptcy Court let Wright keep everything—his investment, any returns (subject only to DMA's and Longbranch's net 20% profits interests), and, most important, direct *control* over and *ownership* of the ROW. 5.ROA.306, 312. This was no remedy at all, and it certainly did not "punish[]" Wright for breaching his fiduciary duty, or serve to "protect the relationship of trust." *ERI*, 318 S.W.3d at 872-73. The Bankruptcy Court ordered the status quo, in practical effect ignoring the breaches of fiduciary duty it had already identified and which this Court ordered be addressed through disgorgement, constructive trust, and other potential gain-based remedies.

If there are ever circumstances where it would be permissible for a court to impose a constructive trust but leave the property entirely in the hands of the unfaithful fiduciary, this case is not it. Wright has engaged in a years-long campaign to eliminate DMA's and Longbranch's interests entirely, creating elaborate shell games with the ROW for that very purpose. Consider the following:

- Wright lied about his wealth to get an invitation to join the ROW. 1.ROA.3453:11-3454:18.

**P9-0034**

- He then acquired funding for the ROW through the "ultra vires and conflicted loan transaction," whereby he secretly set himself up as a creditor with the ROW itself as collateral. 1.ROA.4467.

- He *twice* attempted to sell the ROW in secret without disclosing DMA's and Longbranch's net-profits interests to the respective buyers. 1.ROA.2893:1-15, 3392:19-3393:13; 5.ROA.18.

- He pushed Moore out of Black Duck, defaulted on the undisclosed Black Duck "loan," and thereby transferred the ROW to his wholly owned entity KrisJenn. 1.ROA.16-19.

- He has argued in multiple forums that DMA's and Longbranch's interests in the ROW are worth nothing because they were merely promises of Black Duck (which Wright dissolved), even though Wright himself made those promises.

- And he defied the Bankruptcy Court's order by transferring the ROW to a new entity, Express H20, that he created after trial to shield the ROW from judgment. *See* 5.ROA.311.

Wright simply cannot be trusted to comply with the Bankruptcy Court's order and ensure that DMA and Longbranch ever see anything from their 20% net-profits interests.

Moreover, practically speaking, the ROW is a dead asset in Wright's hands— as the Bankruptcy Court realized. 5.ROA.311. Wright has never demonstrated that he has the capital, ability, or interest in developing the ROW himself. *See* 1.ROA.3289:12-3291:2. And Wright's potential purchasers have backed out upon learning that the ROW is encumbered by DMA's and Longbranch's 20% interests. 5.ROA.310. Moore testified that he and Borders negotiated those terms in the first

**P9-0035**

place to prevent Wright from cutting them out of a deal, *see, e.g.*, 1.ROA.3363-64, which Wright tried to do anyway. 5.ROA.18. If the goal is to sell the ROW, Moore's and Longbranch's net-profits interests give them leverage with a buyer because they can negotiate those interests down to reach a favorable purchase price. 1.ROA.3363-3364. But if they don't have a seat at the table, a sale of the ROW is unlikely.

In sum, a constructive trust requiring Wright to transfer the ROW to DMA and Moore is the legally correct remedy and is the only practical solution for protecting DMA's and Longbranch's interests from Wright's bad conduct.

### C. The Bankruptcy Court confused Wright's breach of fiduciary duty with his later violation of the Chapter 11 bankruptcy plan.

As explained above, the Bankruptcy Court ordered the correct remedy—but in name only. This may be because the Bankruptcy Court was confused by which breach required the remedy. Rather than trace the constructive trust to Wright's breaches of fiduciary duty to Moore, the Bankruptcy Court's judgment stated that it was imposing the constructive trust because Wright defied the Court's chapter 11 plan. 5.ROA.306 (rendering judgment that "DMA and Moore recover a constructive trust on the ROW in the hands of Express H20, LLC, *because of the unauthorized transfer* by KrisJenn of the ROW *to Express H2O, LLC*") (emphasis added).

P9-0036

Several passages in the Bankruptcy Court's opinion reveal this same error. *See* 5.ROA.311 (explaining that the ROW was transferred to another Wright entity "in violation of the terms of the confirmed chapter 11 plan" and that "[t]he Court will impose a constructive trust on the ROW *in the event* that Larry Wright and Express H20 fail to transfer the ROW back to KrisJenn, the reorganized debtor") (emphasis added); *see* 5.ROA.311 (explaining that the "better remedy" for DMA and Moore is that "Larry Wright would restore ownership of the ROW to KrisJenn, *or* this Court would impose a constructive trust on the ROW in the hands of Express H20") (emphasis added); 5.ROA.312 ("The Court will render judgment that a constructive trust be imposed on the ROW in the hands of Express H20, *unless* Larry Wright and H20 transfer ownership of the ROW back to KrissJenn.") (emphasis added).

In short, the Bankruptcy Court seems to have been more concerned with Wright's defiance of the Chapter 11 plan—and which *Wright entity* controlled the ROW—than with Wright's breaches of fiduciary duty to Moore. Wright's unlawful transfer is certainly another reason that the ROW should be in the hands of DMA and Moore rather than Wright, but violation of the Chapter 11 plan wasn't the breach

P9-0037

of fiduciary duty requiring imposition of the constructive trust.[5] The Bankruptcy Court may have imposed the right remedy for the wrong bad conduct, which may explain why the remedy lacked any teeth—neither punishing Wright nor providing any relief whatsoever to Moore and DMA. Simply put, the Bankruptcy Court did not follow this Court's remand orders to consider Moore's and DMA's gain-based remedies for Wright's breach of fiduciary duty.

This dispute has dragged on for six years. Moore and DMA requested an appropriate remedy, and likely the only remedy that prevents Wright from being unjustly enriched as a breaching fiduciary while allowing him to recoup what he invested. This Court should reverse and render judgment, ordering the imposition of a constructive trust that requires Wright and his entities to transfer title to the ROW to DMA and Moore, subject to a first-monies obligation whereby Wright receives the first $4.7 million of any return from a sale or other profit from the ROW.

## II. This Court should render judgment that Wright's entities knowingly participated in Wright's breaches of fiduciary duty.

This Court should also hold that Wrights' entities, KrisJenn and Black Duck, knowingly participated in Wright's breaches of fiduciary duty—making those

---

[5] Moreover, the Bankruptcy Court ordered that Wright and Express H20 transfer the ROW back to KrisJenn, which was the reorganized debtor. 5.ROA.311. But by this time, KrisJenn was a defunct entity that no longer existed. It was dissolved by Larry Wright the day after Moore, DMA, and Longbranch filed their motion to dismiss the Wright entities' appeal in the Fifth Circuit.

**P9-0038**

entities liable as well. "It is settled as the law of this State that where a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Kinzbach Tool*, 160 S.W.2d at 574.

The Bankruptcy Court originally rejected this claim because of its holding that Moore and DMA cannot prove damages. In appealing that ruling, Moore and DMA argued that because the predicate fiduciary claim against Wright was wrongfully denied, this Court should address their knowing participation claims against Wright's entities, or at least remand the case for the Bankruptcy to consider those claims. 5.ROA.299. In reversing and remanding to the Bankruptcy Court, this Court instructed the Bankruptcy Court to consider "the knowing participation claims against Wright's various entities"—with the benefit of this Court's finding of "a valid covenant running with the land in each interest agreement at issue." 5.ROA.300, 303.

On remand, the Bankruptcy Court did not address these claims, despite DMA and Moore's "ask[ing] that the Court conclude that KrisJenn is liable for knowing participation in Wright's breaches of fiduciary duty." *See* 5.ROA.95-96. There is no reason to send this case back to the Bankruptcy Court. It is the settled law of the case and the finding of the Bankruptcy Court—and this Court—that Wright breached his

**P9-0039**

fiduciary duty. And there is no dispute that Wright's entities knowingly participated in that breach of fiduciary duty. Wright used KrisJenn to carry out his plan from day one. KrisJenn is Wright's entity that "loaned" Black Duck money and then "foreclosed" on that loan, even though Moore never knew about or approved the loan. 1.ROA.4446, 4449.

Black Duck participated in that sham too, to the extent it (solely at the direction of Wright) agreed to the loan and allegedly failed to make payments under the loan. KrisJenn is wholly controlled by Wright, and Black Duck was wholly controlled by Wright at the time that it allowed the ROW to be "foreclosed" by KrisJenn. 5.ROA.19. In fact, when Wright, on behalf of KrisJenn, sent the letter of notice of default to Black Duck, Wright simply printed out the letter and handed it to himself. 1.ROA.2844:24-2845:9. Wright should not be permitted to play a shell game in which he evades liability simply by hiding the asset in a series of new entities—hoping eventually that the courts (and Moore) will tire and move on. This Court should hold liable his wholly controlled entities, which he used to carry out his breaches of fiduciary duty. *See Kinzbach Tool Co.*, 160 S.W.2d at 574.

## III. In the alternative, Moore and DMA are entitled to actual damages resulting from Wright's breaches of fiduciary duty.

DMA and Moore are likewise entitled to actual damages. At trial, Moore and Borders, as interest holders in the ROW, offered competent trial testimony on the

**P9-0040**

value of Moore's ROW interests. And under the property owner rule, an "owner of the property can testify to its market value, even if he could not qualify to testify about the value of like property belonging to someone else." *Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 155 (Tex. 2012) (quoting *Porras v. Craig*, 675 S.W.2d 503, 504 (Tex. 1984)). This evidence was supported by third-party offers and other market data, and the evidence was never refuted.

For example, Moore testified that the ROW had approximately 20,800 rods (a rod is a unite of measure—16.5 feet) and that rods were worth about $500 each at the time of the breach. 1.ROA.3667. This would value the ROW at $10,400,000. 1.ROA.3667. Black Duck held an 80% interest in the ROW (after accounting for Longbranch's 20% net-profits interest), and Moore owned 50% of Black Duck's assets. Even after first subtracting Wright's $4.7 million capital contribution from the ROW's value, Moore's ownership interest in the ROW was worth $2,280,000. And the court had other evidence to draw from as well.

In KrisJenn's original bankruptcy schedules, Wright swore under oath that the ROW was worth $9.5 million. 1.ROA.2163, 2262.[6] This, along with Moore's testimony, is why the Bankruptcy Court itself stated the "parties valued the ROW

---

[6] Wright later claimed in his amended schedule that the ROW was worth at least $6.5 million. 1.ROA.105.

P9-0041

between \$9.5 million and \$10.4 million." 1.ROA.3720. Based on Wright's own sworn testimony, Moore's ownership interest in the ROW would have been worth between \$720,000 and \$1,900,000. Moore also testified at trial that a third party called Solaris offered to buy the ROW in October 2016 for \$7.2 million, plus royalties. 1.ROA.2783:1-2783:17. Using this third-party offer, Moore would be entitled to at least \$1,000,000 plus royalties that would have been worth millions. 1.ROA.2781:19-25, 2783:10-17. This was more than enough evidence to place a market value on the ROW with reasonable certainty.

But the Bankruptcy Court rejected Moore and DMA's claim of actual damages, reasoning that "[i]t is impossible to quantify damages as a result of Larry Wright's breach of fiduciary duty." 5.ROA.311. The Bankruptcy Court refused to make a determination about the ROW's value, mostly because the parties have thus far been unable to sell or monetize the ROW. 5.ROA.310 ("Larry Wright, Daniel More, and Darin Borders all attempted to sell or develop the ROW, without success for various reasons."). But the "reasons" the court gave for the parties' lack of success in selling the ROW are either (1) no longer applicable or (2) due directly to Wright's lies, contorted back-door deals, and breaches of fiduciary duty.

The Bankruptcy Court noted that "in the early stages," Black Duck was unable to sell the ROW because Black Duck "did not actually *own* it." 5.ROA.310. It

P9-0042

is unsurprising that buyers were hesitant to buy an asset from an entity that did not own the asset. But Black Duck eventually purchased the ROW. Now that the ROW is in the hands of an actual owner (though currently the wrong hands and wrong owner), this concern about marketability is irrelevant.

Second, the Bankruptcy Court noted that the parties have never realized a profit from the ROW, implying that the problem was in the asset itself, rather than in Wright's misconduct. 5.ROA.310 ("The TCRG sale that occurred and was ultimately rescinded was a painful episode in the attempt by the parties to make a profit by selling the ROW and retaining net profits interests."); 5.ROA.310-11 ("Not one of the entities or individual parties—KrisJenn, Larry Wright, DMA, Longbranch, Daniel Moore, or Darin Borders—has made money on the purchase of the ROW."). But the very reason the TCRG sale was rescinded was that Wright attempted to sell the asset behind the backs of his partners and hide their interests in the ROW from the buyer. 1.ROA.2893:1-15.

This "painful episode" was painful only because of Wright's deception. It makes no sense to penalize Moore and DMA—finding that they have no claim to actual damages—*precisely because* of Wright's breaches of fiduciary duty. It was Wright who secretly encumbered the asset as collateral for an undisclosed loan so he could pay off his own hard-money loan. It was Wright who attempted to sell the asset

**P9-0043**

behind the backs of his partners without disclosing their interests to buyers, and it was Wright's conduct that has embroiled the ROW in years of litigation. In reality, if the ROW had no discernable value, the parties would not have been fighting over it for years. The record shows three attempts to buy the ROW, and in two of those transactions, Wright chose not to disclose DMA's and Longbranch's interests to the buyers. 1.ROA.2893:1-15; 3392:19-3393:13. To the extent there is any uncertainty in the ROW's value, that uncertainty was created by Wright and should be construed against him—the breaching fiduciary—not against his victims.[7]

In sum, the record demonstrates substantial actual damages. If this Court does not order the imposition of a constructive trust transferring the ROW to DMA and Moore, it should award Moore and DMA damages of at least $2,280,000.

## CONCLUSION AND PRAYER

For these reasons, Moore, DMA, and Longbranch respectfully ask the Court to reverse and render judgment in their favor—ordering that legal title to the ROW be transferred to Moore and DMA, subject to a first-monies obligation to Wright for his $4.7 million investment. In addition, or in the alternative, Moore, DMA, and

---

[7] Moreover, if the value of the ROW was truly too uncertain to establish damages, that is all the more reason that the Bankruptcy Court should have imposed a constructive trust requiring Wright to transfer the ROW to Moore and DMA. *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT §55 cmt. c (2011) (explaining that a constructive trust is useful when the "value" of the property in question "might be difficult to establish").

P9-0044

Longbranch request that the Court render judgment that Moore and DMA are entitled to actual damages of $2,280,000 or more.

In the alternative, Moore, DMA, and Longbranch ask this Court to reverse the Bankruptcy Court's decision and remand the case with instructions to impose a constructive trust or other disgorgement remedy over the ROW in their favor, award actual damages, and, to the extent necessary to avoid inconsistent remedies, allow them an election of remedies.

Dated: October 7, 2024

Respectfully submitted,

*Christopher S. Johns*

Christopher S. Johns
Texas Bar No. 24044849
Michael C. Cotton
Texas Bar No. 24116229
COBB & JOHNS PLLC
13341 W. US-290, Building 2
Austin, Texas 78737
512-399-3150
512-572-8005 fax
chris@cobbjohns.com
michael@cobbjohns.com

Timothy Cleveland
Austin H. Krist
CLEVELAND | KRIST PLLC
4611 Bee Cave Road, Suite 306B
Austin, Texas 78746
512-689-8698
tcleveland@clevelandkrist.com
akrist@clevelandkrist.com

*Counsel for Appellants*

P9-0045

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(B) and Fed. R. Bankr. P. 8015, I certify that this brief complies with the type-volume limitation of Fed. R. Bankr. P. 8015(a)(7)(B) and Fed. R. Bankr. P. 8015(h) because this brief contains 8,316 words, excluding the parts of the brief exempted by Fed. R. Bankr. P. 8015(g).

This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5)-(6) and Fed. R. Bankr. P. 8015(a)(5)-(6) because this brief has been prepared in a proportionately spaced typeface using Equity Text A font in Microsoft Word version 16.16.4.

Date: October 7, 2024

Christopher S. Johns

P9-0046

### CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2024, I caused a copy of the foregoing to be

filed by this Court's CM/ECF system, which will serve a copy on all registered users.

Christopher S. Johns

**P9-0047**