# Exhibit 1

```
 1                    UNITED STATES BANKRUPTCY COURT
                       SOUTHERN DISTRICT OF TEXAS
 2                        SAN ANTONIO DIVISION

 3                                    )  CASE NO: 20-50805-rbk
        KRISJENN RANCH LLC            )
 4                                    )  Houston, Texas
                                      )
 5               Debtor.              )  August 6, 2025
                                      )
 6      ------------------------------)  10:00 to 11:20 a.m.
                                      )
 7      KRISJENN RANCH LLC            )  CASE NO: 20-5027
                                      )  ADVERSARY
 8                      Plaintiffs,   )
                                      )
 9          Vs.                       )
                                      )
10      DMA PROPERTIES INC.           )
                                      )
11                      Defendants.   )
        ------------------------------)
12

13                          MOTION HEARING

14            BEFORE THE HONORABLE RONALD B. KING
                  UNITED STATES BANKRUPTCY JUDGE
15

16      APPEARANCES:

17      For Larry Wright:         HERBERT C. SHELTON, II
                                  Hayward PLLC
18                                7600 Burnet Road, Ste 530
                                  Austin, TX 78757
19
                                  CHRISTOPHER SACHITANO
20                                Christopher Sachitano Law
                                  5760 Walden Road, Ste 230
21                                Beaumont, TX 77707

22      For DMA Properties and    AUSTIN HAMMER KRIST
        Frank Daniel Moore:       Cleveland Krist PLLC
23                                303 Camp Craft Road, Ste 325
                                  Austin, TX 78746
24

25
```

```
1    Court Reporter:         Unknown

2    Courtroom Deputy:       Unknown

3    Transcribed by:         Veritext Legal Solutions
                             330 Old Country Road, Suite 300
4                            Mineola, NY 11501
                             Tel: 800-727-6396
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   Transcript produced by transcription service.
```

```
 1        SAN ANTONIO, TEXAS; FRIDAY, AUGUST 8, 2025; 10:00 AM

 2                        (Call to Order)

 3        THE COURT:  Good morning, everyone this is Judge

 4   King in San Antonio, our case at 10:00 is KrisJenn Ranch LLC

 5   versus DMA Properties.  Let's get the announcements from the

 6   attorneys who intend to speak.  I see Mr. Krist.

 7        MR. KRIST:  Yes, Your Honor, Austin Krist here on

 8   behalf of DMA Properties, Frank Daniel Moore, and Longbranch

 9   Energy.

10        THE COURT:  Okay.  I don't see Mr. Shelton on.

11        MR. SACHITANO:  Yeah, Judge King, this is Chris

12   Sachitano.  Charlie had sent an email about having a prior

13   hearing.  He got called to an emergency hearing, let me pull

14   it up.

15        THE COURT:  Okay.  Do you know anything about the

16   case?

17        MR. SACHITANO:  I do, but Charlie's the lead on

18   it, Judge, and he'd been preparing for the hearing himself.

19        THE COURT:  Mm hmm.  So, what do you suggest?

20        MR. SACHITANO:  I would ask if we could wait for

21   him.  He says he had emailed Diana Castleberry and Austin

22   noting that there's another case he's involved in at a

23   hearing at 9:30 before Judge Parker and one of his

24   colleagues was going to cover.  But about 10 minutes ago, so

25   this is 9:32 --
```

20-05027-rbk  Doc#515-1  Filed 10/24/25  Entered 10/24/25 13:43:46  Exhibit 1 (Hearing on
Motion for Satisfaction of Attorneys Fees) Pg 5 of 65

Page 4

1          THE COURT:  So, he's in San Antonio in Judge

2     Parker's courtroom?

3          MR. SACHITANO:  I don't know if he's in the

4     courtroom or not.  I think it's Zoom honestly because he was

5     going to appear on this by Zoom.

6          THE COURT:  Okay.  Do you know what case it is?

7          MR. KRIST:  He did indicate -- he -- I believe he

8     indicated the case, Judge, was Water Energy Services and he

9     did get the case number, it's 25-50539.  He emailed a couple

10    of minutes ago and indicated the hearing will be over in

11    less than 10 minutes.

12         THE COURT:  Oh, okay.  Well, the reason I'm asking

13    is because I heard that Judge Parker has an all-day hearing

14    today, but it's not the only case he's got set today.  He

15    has other cases set.  I'm just looking at his docket right

16    now.  So, he expects to get out in a little while, Mr.

17    Sachitano?

18         MR. SACHITANO:  That's what it appears, I think

19    Mr. Krist has more information than I have right now.

20         THE COURT:  Okay.  Mr. Krist, what else do you

21    know about it?  This is Water Energy Services; it looks like

22    cash collateral and motion to sell property.

23         MR. KRIST:  That's correct, Your Honor.  That's

24    the extent of my knowledge but it sounds like Mr. Shelton

25    thinks he'll be here by 10:10 or 10:15.

1          THE COURT:  Okay.

2          MR. KRIST:  And he did email Ms. Castleberry, who

3     in fairness said she had informed you, but I take that she

4     was just planning to inform you as soon as she could.

5          THE COURT:  Well, let's see, maybe I missed the

6     email.  Oh yeah, there it is.  She sent an email at one

7     minute until 10:00.  Yeah, she said she would let us know

8     when he's finished, he has a 10:00 a.m. with me.  So, okay.

9     Let's just take about a 15-minute break and we'll check back

10    with you.  So, start billing a different client, Mr. Krist,

11    for 15 minutes and then we'll get back with you.

12         MR. KRIST:  Yes, Your Honor.

13         THE COURT:  All right?  We'll be in recess for 15

14    minutes.

15         (Recess)

16         MR. SHELTON:  It went fine, I apologize for the

17    delay but it -- you know, fortunately, I was going to have

18    Mr. Norway cover it and I -- I'm assuming you know Bach, and

19    I was going to have him cover it.  So, I had to prep him up

20    quite a bit --

21         THE COURT:  Mm hmm.

22         MR. SHELTON:  -- I assume this is off the record -

23    - I had to prep him up quite a bit on the --

24         THE COURT:  Oh, it's all on the record.

25         MR. SHELTON:  Well, then it's on the record.

```
 1    That's fine.  But I had to prep him up quite a bit because

 2    he's fairly young associate, he hasn't been super -- he's

 3    not young, he's my age, but he's a fairly young lawyer I

 4    should say.

 5            THE COURT:  Mm hmm.

 6            MR. SHELTON:  And he's been kind of tangentially

 7    involved with the case, but I was like hey, it's not -- it's

 8    no big deal, all the objections have been resolved.  So, I

 9    had already prepped everything, I had prepped all the

10    proffers, I had prepped all the exhibits, and then he called

11    me at 9:20 and told me about this emergency and I said you

12    know, there's nothing really more important than time with

13    loved ones and so do that.

14            THE COURT:  Oh, not -- an emergency not relating

15    to law practice.

16            MR. SHELTON:  It had nothing to do with the law.

17    It was just his --

18            THE COURT:  Oh, okay.

19            MR. SHELTON:  -- it was a family emergency of his

20    own --

21            THE COURT:  Yeah.

22            MR. SHELTON:  And he kept saying he could do it,

23    but you know, I'm like well so can I and --

24            THE COURT:  That's fine.

25            MR. SHELTON:  -- you know, I was worried about
```

1    where his head would be but then also like I said, the

2    practice of law is demanding enough you know, that surely,

3    we can take time out to deal with --

4            THE COURT:  Yeah.

5            MR. SHELTON:  -- real life when it comes up.  So -

6    - no, it went great, and I apologize to the Court and Mr.

7    Krist for the very, very late notice.

8            THE COURT:  That's fine.  Okay, so just for the

9    record, Mr. Krist, obviously you're on.  Can you hear us

10   okay, Mr. Krist?

11           MR. KRIST:  Yes, I can Your Honor.

12           THE COURT:  Okay.  So, our case again for the

13   record is KrisJenn Ranch, LLC versus DMA Properties and we

14   have a couple of motions this morning.  Let me look at the

15   calendar.  Motion for Satisfaction of Attorney's Fees by

16   Recoupment etc., and objections.  And these are both yours,

17   Mr. Shelton, so why don't you tell us what's going on and

18   what's happened since the last hearing?

19           MR. SHELTON:  Will do.  As Your Honor will recall,

20   at the last hearing, the -- Your Honor entered an interim

21   order granting in part, denying in part Wright's motion for

22   satisfaction of attorney's fees judgment --

23           THE COURT:  Mm hmm.

24           MR. SHELTON:  -- and that's Docket Number 473.

25   And there were a few salient terms in there that I think are

1    the most pertinent for today's hearing.

2          The first was that on or before July 15th, that

3    Wright needed to provide a personal financial statement to

4    DMA and Longbranch detailing the items that Your Honor

5    listed in the order.  Wright has done that, I believe it was

6    done on July 15th, it may have been on July 14th, but I

7    think it was July 15th --

8          THE COURT:  All right.

9          MR. SHELTON:  -- that has been done.  Second, the

10   Court ordered that Wright take steps to -- immediate,

11   affirmative steps to market and sell the mineral interest

12   disclosed in reference at the hearing.

13         I submitted to the Court a binder, I don't know if

14   Your Honor's received it yet, if not I can publish it on --

15   by sharing my screen.  But Exhibit P3 is an engagement

16   letter from an entity called Vaquero Energy Holdings where

17   they were engaged to market the exact mineral interests that

18   were at issue.  And they --

19         THE COURT:  Is this on file in CMECF?

20         MR. SHELTON:  I don't know that we docketed it.  I

21   think --

22         THE COURT:  Okay.  I saw an exhibit list, but it

23   just listed the names of exhibits by number, it didn't

24   attach the actual exhibits.

25         MR. SHELTON:  Yeah, my apologies, and this is

20-05027-rbk  Doc#515-1  Filed 10/24/25  Entered 10/24/25 13:43:46  Exhibit 1 (Hearing on
Motion for Satisfaction of Attorneys Fees)  Pg 10 of 65

Page 9

1    partially just a practice habit.  We -- as a matter of

2    course don't usually do that and I have been trying to

3    remember that before Your Honor it's helpful for the Court

4    to do it in this particular court.

5            THE COURT:  Well, that's up to you, I don't

6    require the exhibits to be filed in advance but if you want

7    to it's fine.  A lot of times people don't want them on the

8    public record, they'd rather just offer them during the

9    hearing and have them as exhibits during the hearing, so.

10           MR. SHELTON:  Yeah, that's --

11           THE COURT:  For you, I'm flexible.

12           MR. SHELTON:  That's typically the way I like to

13   do it Your Honor, because if there's -- I don't think it's

14   going to happen in this case, but when there's an appeal,

15   people tend to designate the entire docket --

16           THE COURT:  Yeah.

17           MR. SHELTON:  -- and then it implies that exhibits

18   that were never actually offered or admitted are somehow

19   part of the evidence.  And that's the reason I don't like to

20   do that.  But --

21           THE COURT:  That's fine.

22           MR. SHELTON:  -- if the Court doesn't have it, I

23   can certainly share my screen and show you the engagement

24   letter.

25           THE COURT:  Okay, I don't think I have it.

1          MR. SHELTON:  Okay, one moment.  So, Your Honor,

2    what's before the Court is Exhibit P3 it's -- again, it's

3    from Vaquero Energy Holdings.  One thing I do want to note,

4    Your Honor, is that this is dated July the 2nd, which I

5    believe was after the hearing, but it was before the order

6    itself came out.  The order itself came out on July the 8th

7    of 2025, so even before the order came out, we had already

8    started the process.  An update on --

9          THE COURT:  I think the hearing was on July 2nd.

10         MR. SHELTON:  Yeah, we start -- it was pretty

11   fast, I thought it was the next day, but maybe it was even

12   the same day.  I remember getting this pretty quick.  I

13   understand from the client that they are currently

14   anticipating offers from three separate oil funds, oil and

15   gas funds with respect to those mineral interests --

16         THE COURT:  Mm hmm.

17         MR. SHELTON:  -- and that we expect those to be in

18   excess -- well in excess of the $750,000 that would be

19   needed to satisfy DMA and Longbranch's attorneys' fees.  The

20   Debtor has no intention to stop -- I say the Debtor, strike

21   that.  Mr. Wright --

22         THE COURT:  Mr. Wright.

23         MR. SHELTON:  -- but I'm using a habitual term of

24   the Debtor because that's usually who I represent.  Mr.

25   Wright has no intention of stopping that process, he's going

1    to continue to go forward with it and if -- you know, we'll

2    see how those offers are and if they're in excess I

3    anticipate that that'll be sold and the attorneys' fees will

4    be paid out of that and DMA and Longbranch's attorneys' fees

5    award will be satisfied.

6          THE COURT:  Mm hmm.

7          MR. SHELTON:  We've also provided Your Honor the

8    personal financial statement.  And I'm -- with -- unless

9    Your Honor absolutely requires it, I'm not going to publish

10   the personal financial statement because we've marked as

11   confidential pursuant to the post --

12         THE COURT:  No, I don't want it on the public

13   record.

14         MR. SHELTON:  So -- I would also add that --

15         THE COURT:  Does Mr. Krist have it?

16         MR. SHELTON:  My apologies, Your Honor, go ahead.

17         THE COURT:  Does Mr. Krist have it?

18         MR. SHELTON:  Yes, he does.

19         MR. KRIST:  Yes, Your Honor.

20         THE COURT:  Okay.

21         MR. SHELTON:  With respect to the personal

22   financial -- sorry, with respect to the mineral interest, I

23   do want to add Your Honor that we're expecting those sales

24   to be over $1.5 to $2 million dollars.  So, again, and even

25   with that we're getting a lot of interest pretty quickly.

1      So, this shouldn't be -- I think as Your Honor hinted at at

2      the last hearing, should not be a long, difficult, arduous

3      process.  This is a --

4              THE COURT:  Can you tell me what county the

5      property is in?

6              MR. SHELTON:  I don't --

7              THE COURT:  There is a specific number of

8      notifications --

9              MR. SHELTON:  -- know, Your Honor -- I don't know,

10     Your Honor.  It's possible that --

11             THE COURT:  Okay.

12             MR. SHELTON:  -- I don't know if --

13             THE COURT:  Presumably shale property in the Eagle

14     Formations?  Presumably.

15             MR. KRIST:  That's correct.

16             MR. SHELTON:  Okay.  It sounds like Mr. Krist --

17     Mr. Krist probably knows more about it than I do.

18             THE COURT:  Yeah, Mr. Krist, do you know what

19     county?

20             MR. KRIST:  Your Honor, I don't know what county.

21     I'm just looking at the letter and it does note that the

22     mineral interests are within the Eagle Ford Shale.

23             THE COURT:  Okay.  I had a case about 13, 14 years

24     ago where we went very much in-depth on the history of the

25     Eagle Ford Shale, which was at that time just beginning to

1    see all the very deep drilling and the horizontal drilling

2    and the multiple completions and so forth.

3           So, I have some background in it and so that's why

4    I was asking what county it's in.  Some counties have a

5    bigger slice of the Eagle Ford than others.

6           MR. SHELTON:  Yeah, I don't know, Your Honor.

7    I'll probably, if we have a subsequent hearing, I'll

8    probably have that information for you at that time.

9           THE COURT:  Okay.

10          MR. SHELTON:  One of the things I've noticed, I

11   noticed it from the last hearing, is that you seem very

12   skilled at asking me questions I don't know the answer to.

13   So, I need to be more skilled at --

14          THE COURT:  Well, I do my best.  I'm kind of like

15   Judge Robinson, you know, I have a million questions and

16   most of them you have no idea what the answer is.

17          MR. SHELTON:  Well, I'll always -- I will try to

18   have them known in advance.  I don't know if Your Honor

19   remembers the movie Heartbreak Ridge where the troops were

20   finally able to start getting their commanders' shirts match

21   so they could avoid extra work duty, it kind of has that

22   vibe to it a little bit.

23          THE COURT:  Okay.  So, where are we with the trial

24   in state court?

25          MR. SHELTON:  Your Honor, there are a significant

1    number of procedural updates with that.  And I -- I'll try

2    to go through it to the best of my ability.  I will say --

3              THE COURT:  Is the trial date still a trial date?

4              MR. SHELTON:  No, but for good -- which is good

5    news, what I'm about to get into.

6              THE COURT:  Okay.

7              MR. SHELTON:  Ms. Pryor-Baze, I might need to lean

8    on her for a little bit of the procedural posture but on

9    July 21st, this was after our last hearing, the Court -- the

10   state court -- entered summary judgment on Express's dec

11   action.  And essentially held and I can share this with the

12   Court as well --

13             THE COURT:  In favor of the plaintiff?

14             MR. SHELTON:  In favor of Express H2O, yes, Your

15   Honor.  And --

16             THE COURT:  You got a summary judgment in state

17   court?  That's a miracle.

18             MR. SHELTON:  I think it speaks to the strength of

19   the case.

20             THE COURT:  I mean, it's very unusual for state

21   courts to grant summary judgment from my personal experience

22   because they figure they can get reversed for granting it,

23   but they can't get reversed for denying it.

24             MR. SHELTON:  I have similar experiences, if may I

25   publish Exhibit P4 Your Honor, to the Court?

1          THE COURT:  Sure.

2          MR. SHELTON:  Your Honor, Exhibit P4, this is --

3     it's dated July 22nd, 2025, and I'll just state for the

4     record it's in Case Number CV-00461-24-08 in the District

5     Court of Angelina County.

6          This is the order, it's signed by the judge and

7     the Defendant's motion is denied, Plaintiff's motion is

8     granted, and in particular this is the important part, the

9     Court finds and declares that the Gulf easements were first

10    filed and are superior to the Westlake easements -- that's

11    the Defendant in the state court case.

12         The Westlake easements irreconcilably conflict

13    with the Gulf easements.  Third, the Westlake easements must

14    yield to the Gulf easements.  And four, therefore, the

15    Westlake easements are invalid and ineffective.

16         Which is -- again, Ms. Pryor-Baze knows more about

17    it than I do but the way I read that is effectively an

18    unequivocal and essentially a total victory.  There are

19    still some outstanding issues, I'm not going to say there's

20    not --

21         THE COURT:  So, is this a summary judgment on all

22    issues and all parties?  Or is it a partial summary

23    judgment?

24         MR. SHELTON:  It's a partial summary judgment,

25    Your Honor.  There's still the Quiet Title cause of action

1    as well as a request for a permanent injunction.

2           THE COURT:  So, is the trial date going forward on

3    the other issues that are not covered by this partial

4    summary judgment?

5           MR. SHELTON:  The trial date has been reset.  In

6    response to the summary judgment being granted, the

7    Defendants for Westlake, I'm just being clear, I actually

8    don't know who's labeled as Plaintiff or Defendant, so I'll

9    just be clear.  Westlake filed a motion to reset the trial

10   date, and I understand that it has been reset to December

11   the 1st, 2025.  And Ms. Pryor-Baze, if I'm misspeaking,

12   please correct me, but it's been reset to December the 1st,

13   2025.

14          THE COURT:  Mm hmm.

15          MR. SHELTON:  And in the interim, the Court has

16   ordered the parties to go to mediation to resolve any

17   remaining issues and that that mediation must take place by

18   September 26th, 2025.  And further, the Court is allowing

19   the deposition of -- it sounds like two depositions, for

20   Westlake to take two depositions and we're expecting one to

21   be Larry Wright.

22          We don't know that, I don't think it's been

23   noticed yet, but it -- I mean, it's a standup reason that it

24   would be Mr. Wright.  And it sounds like that's with respect

25   to the request for permanent injunction and perhaps with

1    respect to the Quiet Title issue.  So, those were the

2    remaining issues.

3         So, the Debtor, we were anticipating a trial date

4    of September 8th the last time I was in here, I think I

5    indicated that there weren't likely to be anymore

6    continuances.  I was partially wrong, partially right.  The

7    Debtor has been -- or sorry, Express H2O has been successful

8    on the merits, at least as to that issue.

9         If the permanent injunction is entered, that would

10   permanently remove Westlake's ability to access the

11   property.  And the likely outcome of all this, Your Honor,

12   is -- I think it's pretty clear, I don't know whether or not

13   there will be settlement discussions, I have -- not privy to

14   any of that.

15        But the monetary -- the expected monetary value of

16   the right-of-way has undoubtedly increased due to the July

17   21st order.  No matter what ends up happening with it in the

18   long run, it automatically adds a significant amount of

19   value.

20        THE COURT:  For sale or for development or both?

21        MR. SHELTON:  Either.  I mean, either or both.  I

22   think it --

23        THE COURT:  Okay.

24        MR. SHELTON:  -- because if a negotiation is had

25   with Westlake, I mean they currently have their pipeline on

1    the property, so that might be low hanging fruit for a

2    negotiation.  If it's sold, then somebody is selling it with

3    the ability to effectively add to enter into agreements with

4    somebody that wants to run a pipeline.  And if it's

5    developed, it's the exact same analysis I think applies.

6    So, I think the values of --

7              THE COURT:  What is the Westlake pipeline?  Is it

8    a gas, oil, or something else?  Or water?

9              MR. SHELTON:  I'm going to defer to Ms. Pryor-Baze

10   on that if she knows, but it is gas to my knowledge.

11             THE COURT:  Okay.

12             MR. SHELTON:  I see she's --

13             MS. PRYOR-BAZE:  Mm hmm, it's ethane.  The juice

14   for the production of ethylene in Longview.

15             THE COURT:  Okay.  Is it one county, multiple

16   counties or what?  This pipeline.

17             MS. PRYOR-BAZE:  The pipeline is I think 120

18   miles.  Our lawsuit covers Angelina and Nacogdoches

19   counties.  So, it's only a small -- it's a smaller section

20   of the overall pipeline.

21             THE COURT:  Right.  It's not the entire right-of-

22   way, it's a section of the right-of-way.

23             MS. PRYOR-BAZE:  It is a -- the Westlake pipeline

24   interferes with the -- with this right-of-way that the

25   Court's concerned with only on a small portion.  That's

1   correct.

2           THE COURT:  Does it cross it?  Or does it cover it

3   linearly?

4           MS. PRYOR-BAZE:  It covers a good portion of it.

5   They actually removed some of the old Gulf pipeline that was

6   in -- that's on these Gulf easements that the Court's

7   concerned with.

8           THE COURT:  Okay.

9           MS. PRYOR-BAZE:  Westlake came in, removed our

10  pipeline, and put its pipeline right in the place of ours.

11  Of Express's, Your Honor.

12          THE COURT:  Okay.  So, the trial date is now

13  December 1st in state court in Angelina County?

14          MS. PRYOR-BAZE:  That's correct, Your Honor, if we

15  even need a trial.

16          THE COURT:  Okay.

17          MS. PRYOR-BAZE:  The declaratory judgment action

18  disposed in our position of all the legal and factual

19  issues, so we have two remaining summary judgment motions

20  and our permanent injunction.  We don't believe there are

21  any fact issues, and we think the case will be resolved by

22  the Court pretty quickly after mediation.

23          THE COURT:  Okay.  Do you have more summary

24  judgment motions you said?  Partial --

25          MS. PRYOR-BAZE:  We have two --

1          THE COURT:  -- summary judgment motions?

2          MS. PRYOR-BAZE:  Yes, Your Honor.  We have a

3    summary judgment on Plaintiff's claim, just on the suit's

4    Quiet Title, we filed that in July and we expect that to be

5    heard at the end of September right after mediation.  We

6    also have a summary judgment filed on Westlake's declaratory

7    judgment.  And Westlake's declaratory judgment has

8    effectively been decided --

9          THE COURT:  Mm hmm.

10         MS. PRYOR-BAZE:  -- by the Court's order on our

11   declaratory judgment.  And so --

12         THE COURT:  Right.

13         MS. PRYOR-BAZE:  -- that really is just a -- just

14   granting our summary judgment will dispose of that cause of

15   action.  After that, there are no more causes of action in

16   the case and we can move towards final judgment and our

17   preliminary -- excuse me, our permanent injunction.

18         Of which there aren't any fact issues, the Court's

19   declaratory judgment has decided all -- almost all the

20   issues for even the permanent injunction plus some testimony

21   the Court will consider.

22         THE COURT:  Do you have a mediator as of yet?

23         MS. PRYOR-BAZE:  Well, Your Honor, we had a -- we

24   mediated once before and now we're in the process of

25   selecting another mediator.  But the Court, Judge Capshaw

1    here in Angelina County, has given us a very short deadline.

2    If we do not agree on a mediator and a mediation date by I

3    believe next Wednesday, the Court will decide for us.

4            THE COURT:  Okay.

5            MS. PRYOR-BAZE:  So, the parties are exchanging

6    dates now and mediators now.  We have dates through the end

7    of August that we hope Westlake will agree --

8            THE COURT:  Mm hmm.

9            MS. PRYOR-BAZE:  -- if not, the Judge will pick

10   that date and the mediator for us.

11           THE COURT:  Do the parties split the cost of the

12   mediator?

13           MS. PRYOR-BAZE:  Yes, Your Honor.

14           THE COURT:  Okay.  And both parties are able to

15   afford that cost?

16           MS. PRYOR-BAZE:  Yes, Your Honor.

17           THE COURT:  Okay.  And is it usually a retired

18   judge or a local lawyer or someone from out of town?  Or

19   what do they usually use for mediation?

20           MS. PRYOR-BAZE:  We have a number of good

21   mediators here in East Texas that we've suggested out of

22   Tyler and then also in the Longview area.  Our last mediator

23   was a very well respected, experienced, commercial

24   litigation mediator and he came from Tyler.

25           THE COURT:  Okay.  All right.  So, you don't

1    expect it to have undue delay as far as getting the

2    mediation scheduled, getting it consummated, and then

3    getting final judgments perhaps by December 1st?

4              MS. PRYOR-BAZE:  No, Your Honor, that's a -- that

5    is our expected path.

6              THE COURT:  Okay.

7              MS. PRYOR-BAZE:  Hopefully, the final judgment

8    will be sooner than that in October, that's our goal, so

9    that's what we're working towards.

10             THE COURT:  Was this set for jury trial in

11   September originally?

12             MS. PRYOR-BAZE:  Yes, it was.

13             THE COURT:  Okay.  Were there any real jury issues

14   in your opinion?

15             MS. PRYOR-BAZE:  In our opinion, there are not

16   jury issues --

17             THE COURT:  Yeah.

18             MS. PRYOR-BAZE:  -- Westlake have a different

19   idea, and they've raised -- they raised a number of

20   affirmative defenses in their response to our summary --

21             THE COURT:  Right.

22             MS. PRYOR-BAZE:  -- judgment motion for the dec

23   action.

24             THE COURT:  Right.

25             MS. PRYOR-BAZE:  And the judge denied their motion

1    for summary judgment, asserting those affirmative defenses -

2    -

3           THE COURT:  Mm hmm.

4           MS. PRYOR-BAZE:  -- and granting our motion for

5    our declaratory relief --

6           THE COURT:  Yeah.

7           MS. PRYOR-BAZE:  -- that our title is superior and

8    Westlake's easements are void.

9           THE COURT:  Okay.  And if title were cleared in

10   favor of Mr. Shelton's client, you don't know what's going

11   to happen with respect to the right-of-way, whether it would

12   be developed, or sold, or whatever, that's just not

13   something you're involved in, is that correct?

14          MS. PRYOR-BAZE:  I can't speak to details, those

15   negotiations certainly are confidential, but right now,

16   Express is actively looking for buyers --

17          THE COURT:  Okay.

18          MS. PRYOR-BAZE:  -- or development opportunities,

19   that is ongoing --

20          THE COURT:  Okay.

21          MS. PRYOR-BAZE:  -- but we're hampered by this

22   cloud on the title.  Once the title is unclouded, I think

23   that the opportunities, especially in East Texas right now

24   with the water fights we're having and with different oil

25   and gas pipelines trying to make their way through East

1   Texas, the market is ripe to develop and sell -- or sell

2   this right-of-way.

3           THE COURT:  So, you're saying right now is a good

4   time to be marketing or developing because there's a lot of

5   demand out there for this?

6           MS. PRYOR-BAZE:  Yes, Your Honor, we're having

7   huge fights in East Texas right now over water rights and

8   how to get water from East Texas to DFW in Houston.  And so,

9   the market is right now exploding with requests to build

10  additional pipelines and companies looking for right-of-ways

11  for pipelines.

12          THE COURT:  Is it possible that multiple pipelines

13  could be run through this right-of-way?  We've heard that in

14  the past.

15          MS. PRYOR-BAZE:  Yes, Your Honor, these are

16  blanket easements for multiple pipelines.  So, the -- at

17  least I can speak to the right-of-way sections that we're

18  dealing with here in the Angelina County lawsuit --

19          THE COURT:  Mm hmm.

20          MS. PRYOR-BAZE:  -- Mr. Sachitano can speak maybe

21  to the rest of the right-of-way.  But certainly, in the area

22  of the right-of-way that's concerned in our lawsuit, the

23  easements are multi pipeline and they're blanket.  They

24  cover the entire real property that the easements are on.

25          THE COURT:  How big are the -- is the right-of-way

1    in one particular location?  I mean, is it 20 feet wide or

2    500 feet wide or how big are these rights-of-way?

3         MS. PRYOR-BAZE:  Chris, you might be able to speak

4    better on this.  They cover the entire plot that the

5    landowner granted, so, Chris?

6         MR. SACHITANO:  Yeah, Judge, I'll pipe-in here.

7    What we're talking about --

8         THE COURT:  It's Mr. Sachitano for the record.  Go

9    ahead.

10        MR. SACHITANO:  Oh, sorry, excuse me, Judge, yes.

11   Chris Sachitano.  What we're talking about here are like for

12   example the parcel itself is covered by the easement

13   document, okay?  So, it covers the entire parcel and then it

14   says off of the original pipe that's laid down, we have

15   unlimited land rights to be able to go parallel across the

16   whole property.

17        And so, there's not really -- you know, there are

18   older easements that are incorporated into the file

19   easements and these are 19 -- these are pre-1930s easements

20   and so, they're much more broader in scope, they're blanket

21   style, which you don't see this much anymore.

22        THE COURT:  So, the right-of-way is not a fee

23   interest -- fee simple interest, it's an easement over

24   someone else's land who owns the surface?

25        MR. SACHITANO:  That is correct, Your Honor, it's

1    a --

2              THE COURT:  Okay, and --

3              MR. SACHITANO:  -- (indiscernible).

4              THE COURT:  Right, and so, what is the width of

5    these rights-of-way?  Maybe it varies from location to

6    location, but I mean, is it 20-feet-wide or 100-feet-wide or

7    what's the approximate width of these rights-of-way?

8              MR. SACHITANO:  In the original, like there's a --

9    historically, there are multiple Gulf easements that you've

10   kind of got to look at all of it -- look at all of them at

11   one time.  But your -- the original width that was set down

12   was a 16-foot-width on many of the easements (indiscernible)

13   it varied across.

14             You know, because we're talking about 67 miles of

15   line.  But then most of these easements have a 1925 easement

16   that's going to say we can put as many on -- there's no

17   width, like across the property we can run anything we want.

18   Like, to kind of follow up on Holly's comment, we can run

19   water through it, we can take it out --

20             THE COURT:  But 16 feet is what you're saying?  In

21   width?

22             MS. PRYOR-BAZE:  Your Honor, that's the original

23   easement, is what Mr. Sachitano's saying, that there's multi

24   lines, and so -- Chris, do you know how big like the Texas

25   Parks and Wildlife land is?  So, for example, through

1    Nacogdoches County, we have an easement under Texas Parks

2    and Wildlife land.

3            THE COURT:  Okay.

4            MS. PRYOR-BAZE:  And it is very large acreage

5    that's all timber and right across the Angelina River we

6    have multipipeline rights on Texas Parks and Wildlife land.

7    But --

8            THE COURT:  Okay.

9            MS. PRYOR-BAZE:  -- it's -- and the acreage is --

10   I can't give you the exact acreage, but it is a huge piece

11   of property.

12           THE COURT:  Okay.

13           MR. SACHITANO:  It's significant, Judge, so just

14   to put it in perspective, it could be multiple lines get

15   developed out well beyond that 16-foot original --

16           THE COURT:  So, you could have a water line, a gas

17   line, an oil line, all in the same easement area?

18           MR. SACHITANO:  That -- yes, Your Honor.  But when

19   we say easement area, we're not talking about a necessarily

20   width, we're talking about as I put a -- as Express -- hence

21   the name Express H2O, which is originally their idea to move

22   water kind of follow from Holly's comment.

23           THE COURT:  Okay.

24           MR. SACHITANO:  But you know, effectively -- this

25   is a very popular case, Mr. Krist might be familiar with it

1    but we kind of throw this around quite a bit called the

2    Atmos case in the state of Texas where we're basically --

3    you know, you can effectively tie-up a piece of property --

4    and of course, they're a little bit more different in that

5    case.  They can spiderweb; ours run parallel, but still,

6    that's a pretty valuable easement.

7           You know, when we say easement we're not talking

8    about the actual width of the possessory interest, we're

9    talking about the right to continue to put lines -- I kind

10   of equate it to like a box of straws you get back in the

11   day.  You pop them open and they're all just kind of lined

12   up against each other.

13          And so, you know, we can continue to place those

14   lines and/or you know, sell those rights.  Those rights

15   actually say, those easement documents or the original

16   easement documents say we can do whatever we really want to

17   with the rights.  That we could legit sell off one line but

18   then develop another line --

19          THE COURT:  Mm hmm.

20          MR. SACHITANO:  -- right next to it.  Or release a

21   line to a party, things along those lines.  And so, the gist

22   of our easement rights is they're so broad, how could

23   Westlake have a pipe there when I can put as many pipes as I

24   want across that property and I could go, you know, in-depth

25   and everything else?

1          But that's -- that was the crux of part of the

2     argument and rationale for the judge to finally

3     (indiscernible) reconcile the differences and for us to

4     prevail in the summary judgment motion.

5          THE COURT:  Okay.  I could foresee there might be

6     litigation with landowners who object to the easement being

7     over their land.  I mean, they may be aware of it, but they

8     may disagree with the usage by the easement owner.  So, I

9     mean, do you expect litigation to come out of it once it

10    starts being developed?

11         MR. SACHITANO:  That's always a possibility,

12    Judge.  I think with these particular easements, the ones

13    that I've seen, they account for actual compensation even

14    though it's a small amount per rod --

15         THE COURT:  Right.

16         MR. SACHITANO:  -- you know, it still does account

17    for compensation and that is the utmost rationale that that

18    case (indiscernible) not (indiscernible) fall on that

19    straight out but --

20         THE COURT:  So, the --

21         MR. SACHITANO:  -- that is correct.

22         THE COURT:  -- the owner of the fee is subject to

23    the easement may be claiming damages basically against the

24    people that are developing putting in a pipeline?

25         MR. SACHITANO:  They may, but you're -- even if

1    that's the case, your easements are the dominant stake.

2              THE COURT:  Right, and I understand that.

3              MS. PRYOR-BAZE:  And also, Your Honor, that --

4    those -- the easements come up in title searches --

5              THE COURT:  Right.

6              MS. PRYOR-BAZE:  -- and so, they've taken their

7    property with notice of --

8              THE COURT:  Right.

9              MS. PRYOR-BAZE:  -- Gulf's easement.

10             THE COURT:  Right.  It's in the chain of title; I

11   understand.

12             MS. PRYOR-BAZE:  Yes.

13             THE COURT:  It's kind of -- but to me, it's kind

14   of like the surface owner that doesn't own the minerals

15   being irritated and annoyed --

16             MS. PRYOR-BAZE:  Yes.

17             THE COURT:  -- by people drilling oil wells on

18   their land when they don't own the minerals, they just own

19   the surface and so there's a tension there between the two

20   interests basically.

21             MS. PRYOR-BAZE:  Absolutely.

22             THE COURT:  I can foresee that that would be a

23   problem when you're developing an easement by putting in a

24   pipeline and the surface owners are not happy about that.

25             MS. PRYOR-BAZE:  Yes, Your Honor, and in

1    Nacogdoches County we deal with Texas Parks and Wildlife and

2    that actually -- they've solved that problem because you

3    can't actually do anything on their land, you have to do it

4    all under, through the river, down under through their land,

5    you're -- so, there are ways to work around some of those

6    issues that landowners bring up.

7         THE COURT:  Okay.  All right, Mr. Shelton, what

8    else today?

9         MR. SHELTON:  Your Honor, from my point of view,

10   that's pretty much it.  I think the -- what I would request,

11   Your Honor, again, I would request essentially a

12   continuation of some of the relief granted under the interim

13   order and I do want to bring one other issue in the interim

14   order to the Court's attention in a moment.

15        But the Court's third, fourth, fifth, and sixth

16   ordering provision, so there's -- well, I guess I'll have to

17   actually request the fifth and sixth, I -- but I think it's

18   natural that they would go with it.  So, the third ordering

19   paragraph says that post-judgment discovery in the case is

20   stayed until August the 6th, and the fourth one says that

21   the order execution is stayed until August the 6th.

22        We would request, Your Honor, that those dates be

23   extended to December the 6th.  So, effectively four months

24   until after the supposed trial.  I do have something that --

25   I do want to add that even if the Court, or if the Court

1    grants it until December the 6th, that's not going to stop

2    Mr. Wright from marketing the mineral interest that we

3    discussed earlier and he still fully intends to market,

4    sell, and pay DMA and Longbranch their attorneys' fees.

5         So, my request to push those out is simply a

6    request to provide enough time and space again for Mr.

7    Wright.  As we indicated, he's likely going to be still a

8    deponent, he's definitely going to be needed for the

9    mediation, so he still has an active role, and we want to

10   avoid anything that could derail that.  But there has been

11   success in that case.  So, I think there's good reason to

12   move those dates out.

13        THE COURT:  The order you're talking about is the

14   one from July 8th which is Document 473, and they're not

15   numbered paragraphs, but is that the one you're talking

16   about?

17        MR. SHELTON:  Correct, and I'm -- yeah --

18        THE COURT:  Okay.

19        MR. SHELTON:  -- that's correct, Your Honor, and

20   the two ordering provisions I'm calling them the third

21   ordering provision and fourth ordering provision.  They're

22   from that -- specifically the ones that talk about August

23   the 6th --

24        THE COURT:  Yeah.

25        MR. SHELTON:  -- of the --

1          THE COURT:  Right.

2          MR. SHELTON:  -- and we'd like to move those out.

3     I do think, although like I said it's probably technically

4     Mr. Krist's request, I do think the fifth ordering provision

5     that limits Mr. Wright's ability to transfer I think is

6     appropriate to also continue on --

7          THE COURT:  Mm hmm.

8          MR. SHELTON:  -- in light of the request I just

9     made and then I think third, fourth, fifth, and then sixth,

10    the requirement to take immediate steps to sell the mineral

11    interest is also -- I mean, maybe it could be rephrased as

12    to continue the process, but I think --

13         THE COURT:  But you'd rather sell the mineral

14    interests and pay the judgment rather than have them

15    execute, correct?

16         MR. SHELTON:  What would I prefer?  Yeah,

17    absolutely.

18         THE COURT:  I mean, Mr. Wright would prefer that

19    too I assume, correct?

20         MR. SHELTON:  Absolutely.  I understand --

21         THE COURT:  Yeah.

22         MR. SHELTON:  -- the client prefers it, I think

23    DMA and Longbranch prefers it, I think this Court prefers it

24    and I think -- so, that's still the preference.  So,

25    nonetheless, so that would be the request, Your Honor, to

1    move those out.

2          I do have one thing I do want to raise to the

3    Court and that -- the penultimate ordering provision.

4    Again, this is an interim order so I didn't see any reason

5    to raise it prior to today, but it basically says that DMA,

6    Frank Daniel Moore, and Longbranch shall recover and be

7    entitled to receive any outstanding amounts in the event

8    that the right-of-way is sold or developed, that they

9    receive money first from the sale.

10          THE COURT:  Mm hmm.

11          MR. SHELTON:  I recall that that was discussed at

12   the prior hearing, Your Honor.  I went back and I re-read

13   the transcript and the way that I read the Court's comments,

14   there were -- that was brought up and the Court seemed

15   pretty unequivocal and I do have the transcript that I could

16   also publish to the Court if you'd like for me to pull it

17   up.

18          THE COURT:  I can pull it up.

19          MR. SHELTON:  Of course, yeah, actually you get

20   access to all the transcripts that are ordered.  The way

21   that I read that the Court's comments -- I'm looking at Page

22   48 of the transcript.  It seemed -- Your Honor seems pretty

23   unequivocal in that your thoughts are that in the event of a

24   sale that DMA and Longbranch should get paid off the top.

25          And I'm not saying that Your Honor doesn't --

1  didn't believe that or doesn't say that or that you're

2  wrong, I'm not even really arguing the point.  It just -- I

3  think that that was effectively dicta, it wasn't really

4  before the Court.  And so, when we got down to the ordering

5  provisions of the interim order, I don't recall that

6  language being incorporated into the actual ordering

7  provisions.

8          So, on a second interim order, Your Honor, I would

9  request that that penultimate paragraph be stricken.  Not

10  that it's a determination as to the rightness or wrongness

11  of that paragraph, I just don't think it was germane to what

12  was before the Court at that time.

13          So, the summary of my request, Your Honor, is move

14  those dates out from August 6th, today, for four months, so

15  approximately December the 6th and then secondly to strike

16  that second to last ordering provision.

17          THE COURT:  Okay, so I'm looking at Page 49, 50,

18  51 of the transcript of the hearing, is that what you're

19  talking about, those pages?

20          MR. SHELTON:  Correct, Your Honor, and I think --

21  I'll get you the exact page number, one moment.

22          MR. KRIST:  And then, Your Honor, whenever you're

23  ready, I do have a response --

24          THE COURT:  Yeah, I'm --

25          MR. KRIST:  -- on behalf of my clients on the

1    relief.

2          THE COURT:  You do get to talk, Mr. Krist.  Don't

3    worry.

4          MR. KRIST:  Thank you, Your Honor.

5          MR. SHELTON:  It should be Page 48 of the

6    transcript, Your Honor.

7          THE COURT:  Okay.

8          MR. SHELTON:  It actually begins on -- sorry -- it

9    begins on Page --

10         THE COURT:  47.

11         MR. SHELTON:  -- 47.  Yeah, and Your Honor said, I

12   think that if --

13         THE COURT:  If the property in the pipeline right-

14   of-way, if it were ever sold obviously and Mr. Wright had

15   not paid the $750,000 in attorneys' fees, he doesn't get all

16   the money from the sale of the right-of-way unless that

17   $750,000 is paid or deducted.  So, in that sense, I think a

18   set off would be appropriate only if the judgment had not

19   been paid.  How is that inconsistent with what's in the

20   order?

21         MR. SHELTON:  It's not that it's inconsistent,

22   it's that the way that I read the order, Your Honor, was

23   that when the ordering provisions themselves did not

24   incorporate that language and that the -- there was no issue

25   before the Court as to the order of payment regarding the

```
1    sale of the right-of-way or anything --

2             THE COURT:  Okay --

3             MR. SHELTON:  -- that's --

4             THE COURT:  -- well, I mean, you know, this is a

5    grant of mercy by the Court in my opinion, this order.  This

6    is like, I'm not going to let them execute because we've got

7    these potentialities to pay not only the judgment for the

8    attorneys' fees but also to sell or develop the property

9    which has been going on for -- I don't know, ten years

10   maybe?

11            Certainly, this case has been going on for five

12   and a half years.  I mean, I remember it well back during

13   the pandemic when we tried this thing.  So, everybody got

14   sick, by the way, not me, but everybody had COVID and --

15            MR. SHELTON:  There was a lot of that.

16            THE COURT:  -- yeah, I mean I -- this case needs

17   to go away but I don't want to close it prematurely and

18   cause damage.  In other words, I want everybody to get paid,

19   I want the attorneys' fees to get paid, I want the property

20   to be sold or developed, I want Borders and Moore to make

21   money on this, I want Mr. Wright to get his money back, the

22   $4.7 million or whatever it is under the judgment.

23            I want everybody to get what they're entitled to

24   and I don't want to just collapse this thing and send out

25   people to execute on the judgment against Mr. Wright and
```

1    sort of kill the whole deal.  So, I'm trying to be patient

2    in order for the -- this to be an excellent result for

3    everyone at least based on what the judgment provides.

4           So, I'm hoping that Borders and Moore can be a

5    little bit patient with what I'm doing in this and

6    understand why I'm doing it the way I'm doing it.  Normally,

7    I would just say, yeah, go ahead and execute.  You've got a

8    judgment, there's no appeal of the judgment, go out and send

9    the marshals out and execute.

10          But I'm trying to be a little more patient and

11   manage this process where we don't just blow the whole thing

12   up, which it's been blown up several times already, and I'm

13   trying to get everybody what they're entitled to.  So, I'm

14   going to stick with the order the way it is, I mean, I'm

15   sure Mr. Krist doesn't want to change that order.

16          I mean, if there's money that comes in, it's going

17   to go to Mr. Krist's client first to pay that judgment.

18   There's not even an appeal of the judgment.  I mean, like I

19   said, this is total mercy on my part to not let Mr. Krist's

20   clients execute on this immediately.

21          So, the first money that comes in goes to them.  I

22   don't care about anything else.  And then we're going to try

23   to be patient to let the property get sold or developed

24   through the lawsuit in Angelina County, etc.  So, Mr. Krist,

25   do you have anything to add?

1           MR. KRIST:  I --

2           MR. SHELTON:  Your Honor, I --

3           THE COURT:  I know you haven't been able to talk

4    yet but go ahead.

5           MR. KRIST:  Thank you, Your Honor.  I do have a

6    little bit that I'd like to add.  In general, we oppose the

7    continued stay on discovery in this case and stay on

8    execution.  I have heard everything that Your Honor has just

9    said and --

10          THE COURT:  And I don't blame you a bit.  I don't

11   blame you for taking that position.

12          MR. KRIST:  And for context, Your Honor, when we

13   previously came before the Court at this prior hearing, the

14   argument that I heard from Mr. Wright's counsel were that

15   Mr. Wright simply didn't have time to deal with us because

16   he had this trial coming up in September and --

17          THE COURT:  Yeah.

18          MR. KRIST:  -- executing on the judgment and

19   conducting post-judgment discovery was going to interfere

20   with that.  And we were told at that time that there

21   wouldn't be any continuation and that it was going forward.

22          And then four hours after the hearing, the other

23   side predictably moved for a continuance.  I know that

24   wasn't in Mr. Wright's control, but the end result is that

25   now the trial is going forward in December, and apparently a

1   lot of the issues are resolved.  And so, the initial reason

2   for the abatement or pause or the stay, has fallen away.

3          And so, the situation we're in now is we're faced

4   with asking whether discovery should continue to be stayed

5   and whether the enforcement of the judgment should continue

6   to be stayed given the fact that Mr. Wright has not

7   satisfied this judgment.

8          He could have satisfied it before, he had these

9   mineral interests he could have sold a long time ago to

10  satisfy the judgment, and he didn't do so.  And given this

11  context, there is simply not a basis, respectfully, for

12  continuing to stay post-judgment discovery --

13          THE COURT:  Mm hmm.

14          MR. KRIST:  -- or execution on the judgment

15  because Mr. Wright has not satisfied the procedural

16  prerequisites for abatement or a stay.  The procedural rules

17  in the federal court and in federal bankruptcy court require

18  him to post a bond in a substantial amount equal to the

19  amount he would owe under the order in order to stay an

20  execution on that order and he hasn't done so.

21          And he hasn't been able to show that he's entitled

22  to that relief.  And so, for those reasons --

23          THE COURT:  How can he post a bond when he doesn't

24  have an appeal?

25          MR. KRIST:  Well, that's true, Your Honor, I mean

1    this was one of the arguments we made at the prior hearing

2    was that --

3         THE COURT:  Well, you're 100 percent right.

4         MR. KRIST:  -- under normal circumstances a

5    litigant would have to do both of those things, and he's

6    done neither and so he has no basis for staying post-

7    judgment discovery or enforcement of the judgment.

8         And you know, Your Honor mentioned that you know,

9    your order was an act of mercy toward Mr. Wright because he

10   said well, maybe I'll be able to satisfy it through this

11   lawsuit or through sale of this mineral interest.

12        But I have a couple issues that I want to talk

13   about with respect to that, Your Honor, if you'll allow me.

14        THE COURT:  Let's hear them.

15        MR. KRIST:  Which is, Mr. Wright in his previous

16   motion to abate, and I'm happy to share my screen if that

17   would be helpful, represented to the Court and I think he's

18   continuing to represent here today, that he's going to

19   receive a bunch of money from this Express H2O litigation.

20        He said in his motion to abate that Express H2O is

21   holding the right-of-way from which Mr. Wright will recover

22   the $4.7 million purchase price.  And then he says Mr.

23   Wright is going to be benefited when the value of the right-

24   of-way rises in light of the Express H2O suit.

25        And then they also explicitly say, the

1    monetization of the right-of-way is what will be used to pay

2    the attorneys' fees awarded by the Court.  But the problem

3    is, the financial statement that we got from Mr. Wright that

4    was referenced by Mr. Shelton a minute ago, doesn't actually

5    identify that Mr. Wright has any interest in Express H2O.

6         Your Honor, at the previous hearing, said that Mr.

7    Wright, I want you to go in and identify all of the assets

8    that you hold, including any assets in Express H2O, any

9    assets on the right-of-way, and any assets in any business

10   entities.  And we got back a financial statement from Mr.

11   Wright that -- all it says in business interests is that he

12   is manager of Express H2O, listed as president.

13        And when we received this, since this is the most

14   important asset, we contact Mr. Shelton and said what does

15   this mean?  It doesn't say that he has an interest, it

16   doesn't say that he's a member, it doesn't say the

17   percentage of his ownership interest, it doesn't value his

18   interest.  And I can share my screen if Your Honor would

19   like so that you can see what exactly I'm looking at here.

20        THE COURT:  So, who do you believe owns Express

21   H2O, Mr. Krist?

22        MR. KRIST:  Well, Your Honor, I think --

23        MR. SHELTON:  Your Honor, hold on -

24        MR. KRIST:  -- we have always --

25        MR. SHELTON:  Hold on, if I may, I just want to

 1   make sure.  I do see that Mr. Krist is sharing a screen, I

 2   don't know if that screenshare is going to hit the record or

 3   not, I assume -- well, I don't want to assume.  There is a

 4   confidentiality order and if we start putting that up and

 5   it's in the record, we're going to have to seal that part of

 6   the transcript.

 7          So, I just want to make sure that we're all aware

 8   of that in advance of that type of publication, that's all.

 9          THE COURT:  I don't think we have video record on

10   CMECF, we might have audio record on CMECF which is

11   available.

12          MR. KRIST:  And --

13          THE COURT:  I could order --

14          MR. KRIST:  Your Honor, I --

15          THE COURT:  -- a new hearing to be put on audio or

16   you can get a transcript.  Go ahead, Mr. Krist.

17          MR. KRIST:  Your Honor, I won't share my screen

18   because I think it's pretty straightforward.  It doesn't

19   disclose what interest Mr. Wright owns in Express H2O or the

20   right-of-way.  And Your Honor asked, what do I think that

21   Mr. Wright owns?  Candidly, I think that Mr. Wright owns you

22   know, nearly 100 percent of Express H2O or this right-of-way

23   --

24          THE COURT:  Mm hmm.

25          MR. KRIST:  -- but the problem is that he keeps

1    claiming to own or not own it depending on whether the

2    circumstances inure to his benefit.  So, we received this

3    financial statement that claims he doesn't own it --

4              THE COURT:  So --

5              MR. KRIST:  -- but then he comes before the Court

6    --

7              THE COURT:  Mr. Shelton, who owns Express H2O?

8              MR. SHELTON:  I don't know who owns it, I have

9    been told consistently that it is not Mr. Wright.  As

10   indicated to Mr. Krist, Mr. Wright has a managerial position

11   with respect to Express H2O.

12             THE COURT:  Does he --

13             MR. SHELTON:  The reason --

14             THE COURT:  -- have investors that own it?

15             MR. SHELTON:  Sorry, my -- sorry, apologies Your

16   Honor --

17             THE COURT:  Does he have investors that own it?

18   Did he recruit someone to put money in to own Express H2O?

19             MR. SHELTON:  I see Ms. Pryor-Baze has spoken up

20   but --

21             THE COURT:  Ms. Pryor-Baze, do you know?

22             MS. PRYOR-BAZE:  Yes, I believe that it's a

23   family-owned business but Mr. Wright does not -- is not a

24   member, but I would have to look at the latest --

25             THE COURT:  Oh, like a family --

```
 1              MS. PRYOR-BAZE:  -- membership article.

 2              THE COURT:  -- trust or a family LLC or something

 3      like that?

 4              MS. PRYOR-BAZE:  It is an LLC, Your Honor, which

 5      Mr. Wright is not a member, but I'm not -- I don't believe

 6      it's investors that own -- I can't speak to that.

 7              I would say that Mr. Krist's point is why does Mr.

 8      Wright get money from the sale of the ROW is because Your

 9      Honor ordered it.  That's why.  He's not getting it because

10      he's the manager of Express, he would receive money from the

11      sale or development of the ROW because of Your Honor's order

12      that he gets is purchase price back.  He is not a member of

13      Express and will benefit because of his membership in

14      Express.  That's --

15              THE COURT:  But his family --

16              MS. PRYOR-BAZE:  -- why the financial statement is

17      done that way.

18              THE COURT:  -- is the owner of the LLC, Express

19      H2O, LLC?

20              MS. PRYOR-BAZE:  I believe that his wife is one of

21      the members but I'd have to look to see --

22              THE COURT:  Okay.

23              MS. PRYOR-BAZE:  -- the other memberships.

24              THE COURT:  Okay, but he's a manager but not an

25      equity holder --
```

1          MS. PRYOR-BAZE:  Yes.

2          THE COURT:  -- in effect.

3          MS. PRYOR-BAZE:  That's correct, Your Honor.

4          THE COURT:  Okay, Mr. Krist, go ahead.

5          MR. KRIST:  So, Your Honor, what I'm hearing

6   candidly, is that Mr. Wright transferred this right-of-way

7   to his family members through this new entity that he formed

8   in violation of this Court's prior orders basically to evade

9   my client's abilities to satisfy the judgment in this case.

10          But setting that aside, what I have just been told

11   is that he is not a member.  And so, this Express H2O

12   litigation has no bearing on his ability to satisfy this

13   judgment because he has no path to getting any money from

14   this Express H2O suit, at least not legally, is what I have

15   heard.

16          Ms. Pryor-Baze mentioned that he has some right

17   under this Court's judgment to receive $4.7 million dollars,

18   I candidly just don't believe that's correct.  I don't

19   believe that was the effect of this Court's prior order.

20          But Mr. Wright can't have it both ways.  He can't

21   say oh, I'm getting a bunch of money from this Express H2O

22   litigation but also, I don't own any assets or interest that

23   could give me that such that you could use to satisfy a

24   judgment.  It's just not consistent.

25          And then the second thing I would note, Your

1    Honor, is that even if this Express H2O litigation is

2    successful, and I hear what Mr. Shelton is saying about how

3    they've had some success in the trial court, I think the

4    odds that Westlake Chemical does not appeal this case are

5    vanishingly small.  And it's possible that they could reach

6    some settlement through mediation, but I can't ballpark the

7    odds of that actually happening.

8           And I don't think that my client should have their

9    abilities to enforce the judgment, or at least seek post-

10   judgment discovery on Mr. Wright's assets in light of the

11   convoluted story he has told about his ownership or interest

12   in Express H2O --

13          THE COURT:  Mm hmm.

14          MR. KRIST:  -- simply because he posits that some

15   point down the road, he might indirectly get some money from

16   this Express H2O litigation.

17          THE COURT:  Yeah.

18          MR. KRIST:  The final thing that I would note,

19   Your Honor, is that Mr. Wright is talking about these

20   efforts to sell these minerals, but we have seen very little

21   in the way of actual documentation that he has taken any

22   steps to do that.  We have seen an engagement letter from

23   over a month ago from Vaquero Energy Holdings, and all that

24   said was that they were potentially willing to procure

25   funding and we have not received any further updates since

1   then.

2          The letter references a mutual non-disclosure and

3   fee agreement that would be executed with Vaquero before

4   they actually go out and market the interest.  I haven't

5   received any update on that either.

6          THE COURT:  So --

7          MR. KRIST:  I know that Mr. Wright anticipates

8   that he's going to have three buyers, but truthfully Your

9   Honor, I don't trust Mr. Wright and I don't know what that

10  means.  I don't know if he's contacted these potential

11  buyers, if Vaquero has contacted them --

12         THE COURT:  Mm hmm.

13         MR. KRIST:  -- what the timeline is for an offer,

14  or whether --

15         THE COURT:  What is he selling --

16         MR. KRIST:  -- it's just pure speculation.

17         THE COURT:  -- Mr. Shelton?  I mean, is it a

18  mineral interest?  Is it an overriding royalty or a royalty

19  interest or a working interest?  What is he trying to sell?

20  What does he own?

21         MR. SHELTON:  I don't have enough information to

22  answer that question, Your Honor.  I don't know if Ms.

23  Pryor-Baze does or not.  I've just --

24         THE COURT:  So the --

25         MR. SHELTON:  -- been told (indiscernible).

```
 1              THE COURT:  -- financial statement that he was

 2    supposed to prepare, doesn't address what he owns as far as

 3    --

 4              MR. SHELTON:  That's a good point.

 5              THE COURT:  -- the mineral interest?

 6              MR. SHELTON:  One moment, Your Honor.  I'll see if

 7    that provided sufficient --

 8              THE COURT:  I'll bet he knows what he owns.  I

 9    would be willing to bet that he knows whether it's a working

10    interest, a royalty interest, an overriding royalty, a

11    mineral interest.  I'll bet he knows what he owns.

12              MR. SHELTON:  I would bet so too, Your Honor.

13    Just one moment, let me --

14              THE COURT:  I mean, he's a sophisticated investor,

15    sophisticated businessperson.

16              MR. SHELTON:  Your Honor, give me one moment and

17    I'll pull up the personal financial statement.

18              THE COURT:  Well -- yeah, I'm going to run out of

19    patience pretty soon on this one.  But he better get the

20    minerals sold.  I mean, I think Mr. Krist's point, and I'm

21    going to let Mr. Krist talk more, but I think his point is

22    good that there's a pretty good chance that that litigation

23    in Angelina County's not going to be resolved any time soon.

24              Either because it's not going to settle at

25    mediation or there will be an appeal to the court of appeal
```

1    -- the state court of appeals.  And of course that'll drag

2    it out longer, perhaps years.  I mean, it's like this thing

3    is never going to end.

4            MR. SHELTON:  I understand, Your Honor, and I'll -

5    -

6            THE COURT:  He better sell those minerals if he

7    wants to avoid execution on the judgment, that's all I can

8    say.

9            MR. SHELTON:  I understand, Your Honor, and I'm

10   happy to wait until Mr. Krist is finished or I can respond

11   now.  I do have --

12           THE COURT:  Well, I mean, do you know what the

13   interest is --

14           MR. SHELTON:  I'm --

15           THE COURT:  -- specifically?

16           MR. SHELTON:  I'm currently going through the

17   personal financial statement, Your Honor, just give me -- if

18   Your Honor will give me a moment, I'll be able to identify

19   it, I think.

20           MR. KRIST:  Your Honor, in the meantime, what we

21   would be asking for on behalf of DMA, Longbranch, and Mr.

22   Moore, is we would be asking for the Court to not further

23   stay discovery in this case --

24           THE COURT:  Mm hmm.

25           MR. KRIST:  -- or further stay execution of the

1    judgment.  And hopefully, Mr. Wright will sell these

2    minerals and satisfy the judgment and in that case, we won't

3    need to do anything else.

4         But respectfully, since Mr. Wright didn't appeal

5    and he hasn't posted a bond, we don't believe that there's a

6    basis for staying these things.  Especially given the lack

7    of specificity that we've received from Mr. Wright on his

8    efforts to sell these mineral interests.

9         And for those reasons, Your Honor, we would oppose

10   the relief that Mr. Shelton is seeking and I don't believe

11   that our efforts to enforce the judgment are really the

12   predicate efforts to seek post-judgment discovery are going

13   to enter here with this Westlake litigation which is now set

14   for trial on whatever issues remain in December which is

15   nearly four months away.

16        THE COURT:  Was this financial statement that you

17   got in mid-July, was that helpful Mr. Krist?  Or is it just

18   sort of evasive?

19        MR. KRIST:  Candidly, I would have described it as

20   evasive because it does not explain what Mr. Wright's

21   interests are in Express H2O and it does not identify

22   specifically what the mineral interest is other than to say

23   it's net mineral acres of 1912.508 acres in Webb County.

24        THE COURT:  Webb County.

25        MR. KRIST:  And otherwise, Mr. Wright claims to

1    basically have zero assets aside from this business interest

2    in Express H2O which goes unexplained, and his mineral

3    interest.

4              MR. SHELTON:  Your Honor --

5              THE COURT:  Okay.

6              MR. SHELTON:  -- I mean, Mr. Krist can feel

7    however he wants about that personal financial statement.  I

8    disagree wholeheartedly and there's a part of me that wants

9    to just ask for an in camera review, that way I can just

10   give it to the Court.

11             THE COURT:  Well, yeah, we'll do that at some

12   point.  What --

13             MR. SHELTON:  Yeah, I don't --

14             THE COURT:  Are we going to figure out what the

15   mineral interest is or?

16             MR. SHELTON:  Mr. Krist basically just stated it,

17   I don't have detail yet, and I can certainly --

18             THE COURT:  Okay.

19             MR. SHELTON:  -- provide detail -

20             THE COURT:  But you don't know.

21             MR. SHELTON:  -- the information that I have is

22   745 net mineral acres of 1,912 acres in Webb County.  That's

23   the information that I've got.  And I can certainly

24   supplement with more detail regarding --

25             THE COURT:  I mean, it could be a mineral lease,

1    couldn't it?

2              MR. SACHITANO:  Yeah, Judge I don't --

3              MR. SHELTON:  With that description I suppose it

4    could, Your Honor.

5              THE COURT:  Mr. Sachitano was going to say

6    something.  Yes sir?

7              MR. SACHITANO:  I hate to interject here, my note

8    here from Mr. Wright, it's a complete royalty mineral

9    interest.

10             THE COURT:  It's a royalty interest?

11             MR. SACHITANO:  (indiscernible) yeah, he's got a

12   royalty interest, he refers to it as a complete royalty

13   mineral interest.

14             THE COURT:  Okay.  I mean, those are something

15   that can be sold, right Mr. Sachitano?

16             MR. SACHITANO:  Yes, sir -- yes, Your Honor,

17   that's the --

18             THE COURT:  And Mr. Satija sells them every so

19   often in his Chapter 7 cases, right?

20             MR. SHELTON:  That's absolutely correct, Your

21   Honor, Mr. Satija does.  In fact, this particular Vaquero, I

22   think Mr. Satija indicated that he was trying to hire them

23   on one of his other matters as well.  It wasn't our referral

24   I don't think, I think they got that on their own.

25             Your Honor, I don't know if it's my turn to

1    respond or if I should sit quietly --

2            THE COURT:  Well, let's have Mr. Krist finish if

3    he has anything else.  Mr. Krist, did you have anything

4    else?

5            MR. KRIST:  I don't, Your Honor.

6            THE COURT:  Okay, all right.  Mr. Shelton, go

7    ahead.

8            MR. SHELTON:  Your Honor, here's what -- in

9    addition to the relief that we've already requested, here's

10   what I would propose.

11           I'm fully aware of -- and I empathize and

12   understand what Mr. Krist is saying and I understand what

13   Your Honor is saying that this needs to get sold and paid.

14   What I would propose Your Honor, is that we still carry

15   things out but that we have one other date and make it I

16   don't know, give it, give me two weeks mostly because of my

17   own time constraint.

18           But maybe by August the 20th we can file a status

19   report and I'm -- you know, as a bankruptcy attorney I know

20   how to do this -- that updates the Court as well as Mr.

21   Krist with details on the efforts -- well, I say details,

22   let me clarify that in a second.  But with details on the

23   efforts to sell the mineral interests, that way we can

24   apprise the Court.

25           Sort of the same way that any professional in a

1  bankruptcy case would do it.  I would request that if we do

2  that, that we at least can avoid providing in a public

3  filing the names and offers and you know, things like that,

4  but that we provide some sort of narrative as well as some

5  more details as to what that mineral interest are.

6       I don't want to provide too much details and sort

7  of undermine any sales process, but at the same time I do

8  think that -- I understand Mr. Krist's point and I

9  understand this Court's point that more details would be

10  helpful to the process so that it's more transparent.

11       The theme, Your Honor, is Larry Wright is selling

12  these mineral interests, and I have -- that's going to go

13  forward.  When it is sold, DMA and Longbranch get paid.  Out

14  of that $4.7 million, the question was raised as to maybe

15  why Larry Wright -- he -- I think the phrase was that he had

16  no legal basis for that.  Well, Your Honor, I'm looking at

17  the document --

18       THE COURT:  It's in the plan.  I mean, it's in the

19  plan, I know about that --

20       MR. SHELTON:  It's not only --

21       THE COURT:  -- it's in the judgment.

22       MR. SHELTON:  It's -- not only is it in the plan,

23  it's Docket Number 329 in this adversary proceeding,

24  Paragraph Number 3 says that Larry Wright may recover the

25  $4.7 million purchase price that he paid for the right-of-

1    way prior to the breach of his fiduciary duty out of income

2    from the right-of-way or the sales proceeds.

3           If we go further back, it's pretty clear that Your

4    Honor was tying that to this transfer to Express H2O.  Such

5    that basically, Larry Wright still has per this Court's

6    order, $4.7 million.  That's why we filed the motion for

7    recoupment or set off in the first place was because we were

8    saying, hey, there's $4.7 million coming.

9           At the time, it was more hope, I understand that.

10   And I get that the Court denied that, and I understand all

11   the arguments and the basis for the denial of that

12   particular request, now we're here on an interim order and

13   the idea remains the same.  Mr. Wright is trying to perform,

14   he's going to sell the mineral interest and pay this.

15          If that happens prior to my requested date of

16   December the 6th, then that hearing's going to be cancelled

17   because the entire thing's going to be moot.  I really don't

18   think we're going to get there.

19          But if we can't for whatever reason sell the

20   mineral interest before that date, or you know, recognize

21   the sale I should say, then we still also have this issue

22   with Westlake that may very well generate sufficient money

23   in some way shape or form.  But we still have the same issue

24   with interference.

25          If that case is still -- yes, we've been

1    successful on an interim -- sorry, partial motion for

2    summary judgment, yes, it is potentially dispositive all

3    major issues, however, Mr. Wright is still expected to be

4    deposed, he still needs to participate in mediation, and

5    there's still a trial set regardless.

6           So, a lot of the same reasons still apply.  I get

7    that it has changed.  I did not know that they were going to

8    file a motion to continue right after our hearing.  I don't

9    know -- you know, obviously if I had known that I would have

10   pointed it out.

11          Regardless, I think the same exact request still

12   applies, I think the bases still apply, and again, Mr.

13   Wright is working to satisfy this judgment.  We understand

14   that that needs to be -- that needs to happen, and he's not

15   going to stop on that process.

16          So, what I would propose, Your Honor, to sort of

17   ameliorate some of these concerns, would be if Your Honor

18   wants to add some language that we need to provide a

19   narrative update.  And I can file it on the docket, I can

20   send it to the Court, however the Court wants to handle it.

21          Finally, with respect to the personal financial

22   statement being evasive, I think that's just guesswork on

23   the part of DMA and Longbranch.  I don't think they --

24          THE COURT:  It's guesswork for us to figure out

25   what the heck he owns.

```
 1              MR. SHELTON:  I don't agree, Your Honor, the

 2   personal financial statement has sections for liquid assets

 3   which are listed, they have lists -- the name -- it didn't

 4   provide the bank account numbers, I can add that if it's

 5   needed, but provided the name of the bank, it provides -- it

 6   has a section for investments although it does disclose

 7   zeros.

 8              But it specifically has it for stocks, bonds,

 9   retirement accounts, cryptocurrency which the Court asked

10   about.  It provides real estate, his primary resident, it

11   has a value for that.  It provides information --

12              THE COURT:  Yeah, presumably his homestead's

13   exempt, so I mean --

14              MR. SHELTON:  I --

15              THE COURT:  -- you could disclose it but it's not

16   going to be available for execution.

17              MR. SHELTON:  I presume.  But it discloses

18   personal --

19              THE COURT:  It's two houses or one?  I remember

20   hearing that there was two.

21              MR. SHELTON:  I don't know the answer to that

22   question, Your Honor.  I think it's in the file --

23              THE COURT:  It's not in the financial statement?

24              MR. SHELTON:  Well, it's at least implied that

25   it's only one.  It says primary residence but --
```

1          THE COURT:  Implied?

2          MR. SHELTON:  Well --

3          THE COURT:  Do we imply in a financial statement?

4    Or do we actually list assets?

5          MR. SHELTON:  I will clarify that and if there are

6    --

7          THE COURT:  Okay.

8          MR. SHELTON:  -- two addresses on real estate I

9    will make --

10         THE COURT:  Yeah, I mean, there were two addresses

11   is what we heard a couple of months ago and I never heard

12   which one he lives in or whether the other one he owns or

13   not.  I assume --

14         MR. SHELTON:  -- I --

15         THE COURT:  -- it's been transferred to the family

16   or something if it --

17         MR. SHELTON:  I --

18         THE COURT:  -- if it's not his residence.

19         MR. SHELTON:  I don't recall that conversation,

20   Your Honor, but I will --

21         THE COURT:  Okay.

22         MR. SHELTON:  -- investigate that issue.  And --

23         THE COURT:  Well, he needs --

24         MR. SHELTON:  -- that --

25         THE COURT:  -- to get the judgment paid through

1   the sale of the oil and gas interests in Webb County.

2   That's the bottom line.  He needs to get that sold and I'm

3   not saying a fire sale.  I mean, I don't want somebody to

4   give it away, that's not the point.

5          But he's got to take -- I think we finally got his

6   attention on this shall we say, and he needs to take

7   immediate steps to get that property sold and pay this

8   judgment.  And then he can just relax and pursue the lawsuit

9   in Angelina County and get that thing resolved and

10  apparently, he's winning at this point, which is great.

11         And so, I'm trying everything I know how to do to

12  get Mr. Krist's clients paid this judgment for attorneys'

13  fees.  And I think the best way to do it is to have sort of

14  an ordinary course, arms-length sale of these oil and gas

15  interests.

16         If he can't get them sold, this is going to end

17  and they're going to go execute on the judgment on whatever

18  they can find.  And my patience is going to run out pretty

19  soon.  And so, I'm going to reset this and I'm going to

20  expect a disclosure of what this oil and gas interest is to

21  Mr. Krist.  I don't think you have to put it in CMECF, I'm

22  not trying to get somebody to try to fire sale, buy in a

23  fire sale by knowing what this is.

24         But I think Mr. Krist is entitled to know what it

25  is and it shouldn't be broadcast, Mr. Krist, you don't need

1    to go out and tell the public hey, if you want a good deal,

2    go offer Larry Wright, you know, a bottom line number on

3    this property.  I'm not trying to kill the sale or hurt the

4    sale, chill the billing so to speak.

5          But I'm going to give him a chance to sell this

6    and pay the judgment.  And again, this is just a mercy act

7    on my part.  I'm trying to get it paid to Mr. Krist's

8    clients.  There's no appeal of the judgment; they can't bond

9    the judgment even if they wanted to.

10          Even if he came in with cash or a bonding company,

11    he can't bond the judgment.  He can pay it.  If he wants to

12    pay it, that would be great and this problem goes away.  So

13    -- but he needs to gather the assets to pay this judgment

14    whether it's through the sale of these oil and gas

15    properties or some other way.

16          Because at some point, my patience is going to run

17    out and I'm just going to say carte blanche they can go

18    execute on the judgment.  Which is their legal right and Mr.

19    Krist is 100 percent right about his position that he can

20    just go in and execute.

21          There's nothing that keeps him from doing that

22    other than me who's trying to manage this process to get him

23    paid sooner rather than later and with less pain to Mr.

24    Wright.  But if Mr. Wright can't get it done or doesn't want

25    to get it done, or is not cooperative, then he's going to

1   feel the pain of an execution on the judgment and assets

2   will be seized by the marshals in order to satisfy the

3   judgment.  And I try to avoid that whenever possible but

4   sometimes it's not avoidable.

5        So, we're going to give it about 45 days.  We'll

6   go to mid-September, let's say September 24th, at 10:00.

7   And we'll get an update then.  You don't have to file

8   anything, I don't want anybody looking at the docket and

9   seeing oh, well, I'm just going to wait to make an offer on

10  this property until it's been executed on and then I can buy

11  it for a lot less money.

12       So, I want a fair market price for the property,

13  I'm not trying to get him to fire sale it, but he  needs to

14  take immediate steps to get it sold as quickly as he can for

15  a decent price.  So, we'll take a look at it on September

16  the 24th, so all the orders are continued, the stay if you

17  want to call it that is continued, but it's not going to

18  last a whole lot longer.  Let me just say that.

19       So, I think Mr. Krist is 100 percent right, but

20  I'm trying to get Mr. Krist's clients paid and I think this

21  is -- at this point, it's the best way to get them paid.  At

22  some point, it's not going to be the best way to get them

23  paid and I'm just going to say go ahead and execute.

24       So, take immediate steps, tell your client Mr.

25  Shelton to take immediate steps to get this judgment paid

```
 1    and if necessary sell the oil and gas properties as soon as

 2    possible to get them paid because there's no appeal pending

 3    and there's no way to really stay the judgment other than

 4    what I've been doing to try to manage this to a happy

 5    ending.  At least somewhat happy ending.  All right?

 6           So, it's reset to September 24th at 10:00 and all

 7    the orders are continued in effect until that date.  And so,

 8    Mr. Krist, if you want to do just a one-page order to that

 9    effect.  The prior orders are continued in effect until

10    September 24th at 10:00 at what time -- at which time we'll

11    consider whether they should be continued in effect or

12    whether they should be modified to allow the execution to go

13    forward.  Just a one-page order, Mr. Krist.

14           MR. KRIST:  Yes, Your Honor.

15           THE COURT:  Okay.  All right.  As I said, it's not

16    going to last much longer, Mr. Shelton.

17           MR. SHELTON:  Understood, and I'll get Mr. Krist

18    more details on that mineral interest.

19           THE COURT:  All right.

20           MR. SHELTON:  Thanks.

21           MR. KRIST:  Thank you, Your Honor.

22           THE COURT:  Okay, we'll be in recess.

23           MR. SACHITANO:  Thank you, Your Honor.

24       (Proceedings adjourned at 11:20 a.m.)

25
```

1                          <u>CERTIFICATION</u>

2

3      I certify that the foregoing is a correct transcript from

4      the electronic sound recording of the proceedings in the

5      above-entitled matter.

6

7      *[signature: Sonya M. Ledanski Hyde]*

8

9

10     Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  September 24, 2025