# Exhibit 3

```
 1                    UNITED STATES BANKRUPTCY COURT
                      SOUTHERN DISTRICT OF TEXAS
 2                      SAN ANTONIO DIVISION

 3                                   )  CASE NO: 20-50805-rbk
      KRISJENN RANCH LLC             )
 4                                   )  Houston, Texas
                                     )
 5              Debtor.              )  February 26, 2025
                                     )
 6                                   )  11:00 a.m. to 12:57 p.m.
      ------------------------------)
 7    KRISJENN RANCH LLC             )  CASE NO: 20-5027
                                     )  ADVERSARY
 8                   Plaintiffs,     )
                                     )
 9         Vs.                       )
                                     )
10    DMA PROPERTIES INC.            )
                                     )
11                   Defendants.     )
      ------------------------------)
12

13                          MOTION HEARING

14             BEFORE THE HONORABLE RONALD B. KING
                  UNITED STATES BANKRUPTCY JUDGE
15

16    APPEARANCES:

17    For Larry Wright:        HERBERT C. SHELTON, II
                               Hayward PLLC
18                             7600 Burnet Road, Ste 530
                               Austin, TX 78757
19
                               WILLIAM P. GERMANY
20                             Germany Law, PLLC
                               1250 NE LOOP 410, Ste 725
21                             San Antonio, TX 78209

22    For DMA Properties and   AUSTIN HAMMER KRIST
      Frank Daniel Moore:      Cleveland Krist PLLC
23                             303 Camp Craft Road, Ste 325
                               Austin, TX 78746
24

25
```

1    Court Reporter:          Maxine McGee

2    Courtroom Deputy:        Deanna Castleberry

3    Transcribed by:          Veritext Legal Solutions
                              330 Old Country Road, Suite 300
4                             Mineola, NY 11501
                              Tel: 800-727-6396
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   Transcript produced by transcription service.

 1   SAN ANTONIO, TEXAS; WEDNESDAY, FEBRUARY 26, 2025; 11:00 A.M.

 2                        (Call to Order)

 3            THE COURT:  This is Judge King in San Antonio.

 4   Our case at 11:00 a.m. is KrisJenn Ranch, LLC v. DMA

 5   Properties.  So let's get announcements from those of you

 6   that intend to speak this morning.

 7            MR. SHELTON:  Good morning, Your Honor.  This is

 8   Charlie Shelton from Hayward PLLC, appearing on behalf of

 9   Larry Wright.  And with me is Ms. Holly Pryor-Baze of

10   Skelton Slusher Barnhill Watkins Wells, and I believe she

11   has a pro hac on file as well.

12            THE COURT:  Okay.

13            MR. KRIST:  Your Honor, Austin Krist on behalf of

14   counter-plaintiffs, DMA Properties and Frank Daniel Moore.

15            THE COURT:  All right.  No one else.  Mr. Germany,

16   you're not going to be speaking.

17            MR. GERMANY:  No, Your Honor.  I'm turning it over

18   to the capable hands of Mr. Shelton.

19            THE COURT:  Okay.  All right.  So, Mr. Shelton,

20   it's your motion.  Go ahead.

21            MR. SHELTON:  All right.  Well, with Mr. Germany's

22   comments of capable hands, the pressure is on, I guess.  I

23   will just confess, Your Honor, so I've been in this case a

24   very short amount of time and it's undoubted that Mr.

25   Germany, as well as Ms. Pryor-Baze have superior factual

1    knowledge.  I'm going to do my -- I've done my best to get

2    up to speed and I'll do my best to relay the primary issues

3    to the court.  It is very possible I have to turn to them

4    for a little bit of assistance.

5           As Your Honor is aware, we're here on a motion to

6    vacate and I'll just jump sort of straight to the meat of

7    it.  The main thrust of the motion is that -- that I believe

8    requires the most inspection from the court is the argument

9    that the court lacks subject matter jurisdiction under the

10   order, particularly Docket 387, and namely the portion

11   directing Larry Wright to transfer and convey -- or cause to

12   be transferred and conveyed all rights, titles, and interest

13   to the right-of-way to DMA Properties.

14          In my review of the transcript, Your Honor, it

15   appears that some of the relevant information regarding the

16   motion to enforce and particularly regarding jurisdiction

17   wasn't really provided to the court, which I think really

18   effectively deprived this court of the ability to determine

19   at the outset whether or not it had jurisdiction to enter on

20   the motion to enforce.

21          THE COURT:  So my judicial error wasn't my fault?

22          MR. SHELTON:  Absolutely not, it was definitely

23   not your fault.  And I say that not just to -- not just to,

24   you know, to suck up to the court or anything like that and

25   I'll get into it in a little bit.  Actually, you know what,

1    I'll just jump to it right now.

2            In February the 5th, this court asked the movants,

3    Moore and DMA, is this going to affect the court's

4    jurisdiction.  And they indicated quite directly that, no,

5    no decision that was going to come out of that hearing was

6    going to -- sorry -- was going to impact the district

7    court's jurisdiction.  It was a very clear statement.

8            THE COURT:  The U.S. District Court you're talking

9    about?

10           MR. SHELTON:  Correct on the appeal.  And I'm

11   going to pull up some slides in a moment here to sort of

12   walk through so the court has something to look at rather

13   than just listening to me.  But the very next day, the very

14   next day, they filed a brief in the district court saying

15   that this court's ruling, that Your Honor's ruling mooted

16   the appeal or at least parts of the appeal that are before

17   the district court.

18           In other words, they've made not only a judicial

19   admission that, in fact, the appeal was relevant to what

20   they were asking your court to -- Your Honor to decide, but

21   then once Your Honor decided it, they're saying that Your

22   Honor's decision, in fact, moots the district court's

23   appeal.  In other words, this court stepped on the toes of

24   the district court and pulled an issue from the district

25   court's docket, which I think is just -- I don't think it

 1   could be more clear.  But like I said, I don't think that

 2   was actually before the court.

 3          If I may, Your Honor, I'm going to share my screen

 4   if that's okay with you.

 5          THE COURT:  Sure.

 6          MR. SHELTON:  I've created a PowerPoint.  I'm not

 7   going to go through the entire thing.  I'm just going to

 8   share sort of the most relevant portions.  One moment here.

 9   Can Your Honor see this?

10          THE COURT:  Yes, sir.

11          MR. SHELTON:  Your Honor, this is a summary, if

12   you will, of what is currently what is on appeal before the

13   district court as well.  This is a summary of some of the

14   main highlights from the court's judgment following remand,

15   which is at Docket Number 329.

16          That order provided for four things: one, a

17   constructive trust over the right-of-way in the hands of

18   Express; number two, that 20 percent of the net profits from

19   sale or development of the right-of-way would go to DMA in

20   Longbranch; $4.7 million first monies would go to Larry

21   Wright and that Express retains remaining profits from sale

22   and development of the right-of-way.

23          And at this point, it appears that no one believed

24   that the judge's -- sorry -- that your order directed the

25   property to go back to DMA, and notwithstanding the language

1    of the constructive trust.  And I've got some of the

2    language highlighted here from the court's order,

3    particularly ordering provisions Number 2 and Number 3.

4            With respect to ordering provision Number 2 -- and

5    just for the sake of the record, it's Docket Number 329

6    filed in this court, 20-05027 -- the court ordered, as to

7    DMA and Moore's claim for breach of fiduciary duty against

8    Wright regarding the unauthorized Black Duck loan, the court

9    renders judgment that DMA and Moore recover a constructive

10   trust on the right-of-way in the hands of Express H2O, LLC

11   because of the unauthorized transfer by KrisJenn of the

12   right-of-way to Express H2O, LLC.

13           And then later on in ordering provision Number 3

14   after that, DMA and Longbranch will each receive 20 percent

15   out of the net proceeds -- sorry -- out of the net profits

16   from a sale or future development income of the right-of-

17   way.

18           And in the court's opinion -- court's opinion

19   after remand -- this is Docket Number 330 now also in the

20   same docket number -- the court stated, "The Court will

21   render judgment that a constructive trust be imposed on the

22   right-of-way in the hands of Express H2O unless Larry Wright

23   and Express H2O transfer ownership of the right-of-way back

24   to KrisJenn."  And then later on, the court says, "After

25   that, DMA and Longbranch will each receive 20 percent out of

1 the net profits from a sale or future development income of

2 the right-of-way."

3    Shortly thereafter, the court -- shortly

4 thereafter, we got an appeal.  It appears to be timely.  I'm

5 not -- there's no -- I'm not admitting that.  I just -- at a

6 glance, I looked and it appeared to be within the 14 days,

7 but what did they actually ask for.  I'm actually going to

8 leave the PowerPoint for a moment and I'm going to pull up

9 for the court what their statement of issues was.  And I

10 think this -- you know, I don't know how many nails I need

11 in this particular coffin, but let's make this one the

12 first.

13    THE COURT:  Are you screensharing?

14    MR. SHELTON:  I'm about to.

15    THE COURT:  Okay.

16    MR. SHELTON:  And to orient the court a little

17 bit, this is Docket Number 6, filed in Case Number 24-00365,

18 this is the appeal that's currently pending before the

19 district court.

20    We just reviewed what Your Honor ordered.

21 Statement of issues presented, number one.  Number one, it's

22 the very first thing they asked for.  Whether applying de

23 novo review, the bankruptcy court committed reversible error

24 in leaving the property in question, a pipeline easement or

25 right-of-way in the hands of the wrongdoer who acquired his

 1    interest in the easement by breaching his fiduciary duty.

 2    In other words, their question was whether or not this court

 3    made a mistake by leaving the property in the hands of the

 4    either KrisJenn or Express.

 5           But then they come to this court and say, no, no,

 6    no, it's just a motion to enforce the judgment that you've

 7    already entered and in furtherance of that enforcement, you

 8    should transfer -- you should order them to transfer the

 9    property from Express to DMA.  Well, that appears to be

10    exact what's on appeal.

11           I'm going to go a little bit further in just a

12    moment here.

13           THE COURT:  There's no state pending appeal,

14    correct?

15           MR. SHELTON:  That is correct, Your Honor.

16    There's no state pending appeal, which is one of the very

17    first questions that I asked.  And to the extent that

18    there's no state pending -- or to the extent that that's

19    relevant, I will state, Your Honor, that, of course, it is

20    undoubted that the judgment would need to be followed.

21    However, there's a whole litany of case law and because this

22    is on emergency basis, I don't quite have all of the -- I

23    can point to some of it, but it's not fully briefed to the

24    point that I would really like to present.

25           But there's a litany of case law that basically

1    says even in the extent -- even to the extent that the court

2    is enforcing a judgment, it still can't do it if it's going

3    to deprive the district court of jurisdiction.  And the

4    primary rationale is that a case can only exist in one court

5    at a time and we all know that.  And what Moore and DMA did

6    is they failed to tell Your Honor exactly what they were

7    actually asking from the district court, which is the relief

8    that they came in and sought on February the 5th.  I'm

9    looking now at Page 14 of 47:

10            "The bankruptcy court ordered a constructive trust

11   of sorts, but it was a remedy in name only.  The bankruptcy

12   court left the asset in the hands of Wright and his

13   entities, merely requiring that if any profits were ever

14   realized from the right-of-way, DMA and Longbranch would

15   each receive 20 percent of the net profits."

16            But this was not remedy at all; it was the status

17   quo.  In other words, they've gone to the district court and

18   said, by golly, Judge King did not give us this relief.  And

19   then they go to Judge King a year later and say, oh, in

20   fact, you did give us this relief.  Give me an order and as

21   soon as you give me that order saying that you already gave

22   me that relief, it's not going to -- and I'll get to the

23   transcript in a second, but it's not going to moot -- it's

24   not going to moot what the district court is doing.  And

25   then the very next day, they go before the district court

1    and file a brief saying it moots it.  Again, they simply did

2    not relay the facts to Your Honor and they should have.

3              Let's talk about the conclusion and prayer in case

4    there's any...

5              Conclusion and prayer, this is the actual request.

6    Again, just for the sake of the record, I'm looking at

7    Docket Number 6 in Case Number 24-00365, just in case

8    somebody thinks I'm pulling from the wrong document:

9              "For these reasons, Moore, DMA and Longbranch

10   respectfully asks the court to reverse and render the

11   judgment in their favor, ordering that legal title to the

12   right-of-way be transferred to Moore and DMA subject to a

13   first money obligation to Wright for his $4.7 million

14   investment."

15             And what was the order that they -- this isn't a

16   question, this is a rhetorical question.  I'm not actually

17   asking the court.  But what was the order that they actually

18   asked for and got on February the 5th?  To restore legal

19   title to the right-of-way be transferred to Moore and DMA.

20   It's the exact request that's pending before the district

21   court.

22             But let's go one step further, Your Honor, because

23   it's not -- it's not just what they ask for.  Then they went

24   a step further -- I'm going to go back to my slides.

25             THE COURT:  Then we just punt to district court

1    and let them decide what to do with it?

2            MR. SHELTON:  Yes.  That's exactly what should --

3            THE COURT:  How?

4            MR. SHELTON:  I think that -- well, that's the

5    basis of the motion to vacate.  The order that -- the order

6    that was entered orally on February the 5th and then I think

7    was physically entered February the 16th, plus or minus a

8    day, should be vacated for lack of subject matter

9    jurisdiction and the exact issue should go back to the

10   district court.

11           But let me just, if I may, Your Honor, I just want

12   to point out that, again, this isn't just something that I'm

13   making up here.

14           THE COURT:  Well, I mean, doesn't the court have

15   the power to enforce its judgment if there's no stay pending

16   appeal?

17           MR. SHELTON:  Your Honor, yes.  Yes, the court

18   does, as long as it doesn't actually cause a mooting of the

19   issue that's on appeal; that's number one.  Now, the

20   argument on appeal, and I'll bring it up in a second, is not

21   something like equitable mootness, for example, which I know

22   that the Court is familiar with.  If this were a bankruptcy

23   plan and the plan became effective and everybody transferred

24   the property to, you know, three different owners and

25   mezzanine financing and all this kind of stuff and that

1   would cause an equitable mootness issue, that would be one

2   thing, right.  And you could say that effectively as a

3   furtherance of the court's order that caused a mootness.

4          We're not talking about equitable mootness.  We're

5   talking actual, I think, constitutional mootness is the

6   position that they're taking.  There is no case or

7   controversy on that issue at least.  They've tried to

8   reserve the other issues.  I say they tried to --

9          THE COURT:  So they've gotten everything that they

10  ask for in the district court if this order stands

11  basically; that's why it's moot in the district court.

12         MR. SHELTON:  That's right.  And I'm going to pull

13  up their brief.

14         THE COURT:  But, I mean, this order, if I say no

15  and I let the order stand that I signed and entered a week

16  or two ago, that's appealable, right?  I mean, the district

17  court can then decide, okay, yes, the bankruptcy court can

18  enforce its final judgment or, no, the final judgment was

19  wrong and so, therefore, we should do something else.  I

20  mean, I'm not sure why it takes away jurisdiction.

21         MR. SHELTON:  I think I heard kind of two

22  questions there.

23         THE COURT:  Right.

24         MR. SHELTON:  And the first one is really

25  interesting and I was thinking about the same thing this

1    morning and I don't have an answer really.  What I will tell

2    you is that there was a final judgment entered.

3              THE COURT:  Right.

4              MR. SHELTON:  And appeal deadlines have ran.  If

5    this order --

6              THE COURT:  Well, it's on appeal, but only by DMA,

7    right?

8              MR. SHELTON:  Correct, because Mr. Wright was fine

9    living with the form of the court's order.  If the parties

10   had -- for example, this did not happen, but if a motion for

11   clarification had been filed within 14 days of the order

12   following the remand, then all parties may have come to the

13   conclusion that, oh, in fact, Judge King's order causes

14   something different than -- apparently than both parties

15   thought.  And in that event, it is very possible -- I don't

16   know, I wasn't around at the time, but it's very possible

17   that Mr. Wright would have also appealed.  However, in

18   reliance on what we believe that the order said, as well as

19   what the other side believed the order said, an appeal was

20   not taken.

21             So I think if the court -- if this order moots

22   item one on the appeal and then the district court dismisses

23   it or dismissed the entire thing or maybe just dismisses

24   that issue, I'm not entirely sure that we can moot it

25   because -- or we can appeal.  And again, this is under all

1    reservation of rights to make --

2         THE COURT:  I'm trying to think of what the

3    district court's ability to reverse or reverse and remand,

4    reverse, and render, or affirm.  I mean, the district court

5    can do whatever the district court wants to do.  I'm not

6    trying to undercut the appeal to the district court.  And

7    so, the district judge has full power to reverse, remand,

8    reverse and render, affirm, whatever and, you know, you can

9    make these arguments to the U.S. District Court.

10        MR. SHELTON:  I'll tell you my main concern with

11   that.  I hear Your Honor.  But, unfortunately, you're not

12   the one at the district court with the black robe and the

13   gavel and it is very possible that the next judge comes

14   along and has just a different analysis.

15        THE COURT:  Maybe the next judge that comes along

16   thinks it's not a covenant running with the land either.

17        MR. SHELTON:  That's true and that -- that's true,

18   Your Honor.  It's very possible.

19        THE COURT:  It's probably law of the case at this

20   point, at least on the district court level.  If it went to

21   the circuit court, I don't know if it would still be law of

22   the case or not because it wasn't appealed from the U.S.

23   District Court.  It was, but the appeal was dismissed.

24        MR. SHELTON:  Yeah.  Your Honor, I just want to

25   real quick on Docket Number 12, this is back to Case Number

1    24-00365.  This is the brief, the appellant's reply brief

2    that was filed in the district court.  Notice the date.

3    This is February the 6th, 2025.  This is the very next day

4    after they told you unequivocally that this will not impact

5    the district court's jurisdiction.  They filed a brief that

6    said on February the 5th, 2025, the bankruptcy court orally

7    granted Moore and DMA's motion to enforce the judgment.

8    Once the bankruptcy court's order enforcing its judgment is

9    issued and has become final and appealable, that order will

10   likely moot the arguments below in part one related to the

11   constructive trust.

12           THE COURT:  You think Judge Rodriguez is going to

13   buy that?

14           MR. SHELTON:  I don't know if he will or won't.

15   What I do know is that this court was never provided an

16   opportunity to fully investigate whether or not and, in

17   fact, had the jurisdiction required.  And I do know that

18   Moore and DMA explicitly told this court that it was not

19   going to impact jurisdiction and then they explicitly are

20   telling this court that it does impact jurisdiction.  And

21   what they're doing is they're putting the --

22           THE COURT:  Jurisdiction or mootness?  I mean, is

23   that the same thing; is that what you're saying?

24           MR. SHELTON:  I think mootness and jurisdiction in

25   this example are the same thing.  So I tend to think of

1    mootness as being constitutional jurisdiction as opposed to

2    statutory jurisdiction, if that's the distinction Your Honor

3    is making.  I don't know.  But there is probably statutory

4    jurisdiction, but if constitutional jurisdiction is on, it

5    doesn't matter anyway if there's no case or controversy.

6    And what they're -- the position they're taking before the

7    district court is that there's no case or controversy

8    anymore as to that issue.

9           Now, if the court's order stands, my point is I'm

10   not -- again, this is under full reservation to uncover some

11   different argument later.  But I'm not entirely sure that we

12   can appeal because the order that came out is not

13   necessarily a final order.  It's effectively -- well, it's

14   not.  It's an enforcement of an order that went final many,

15   many months ago.  So appeal what; appeal the enforcement

16   action?  That doesn't sound like a particularly logical

17   pattern because what we would actually be appealing would be

18   the substance of the judgment at that point, because the

19   court's ruling would effectively change both parties --

20   again, this is not both, all parties, there's more than two

21   -- all parties' understanding.

22          Not a single party up until this motion to enforce

23   was filed had ever taken the position that I found, that

24   that's what the court's order did.  And, in fact, they have

25   judicial admission that they think that's not what the

1    court's order does.  And then they come before this court

2    and say, no, that's what your order does, notwithstanding

3    having made affirmative representations on numerous

4    occasions on very lengthy appellate briefs.  These things

5    that were put together in slap-dash -- you know, or maybe

6    they were slap-dash, but they weren't put together quickly,

7    right?  They weren't emergency basis.  They had time to

8    think about these things and they put them together and in

9    that thought process, they decide that this court's order

10   did not actually award DMA the property.  It just didn't.

11          And I'm not trying to put words in -- I'm not

12   trying to put thoughts in Your Honor's head or read Your

13   Honor's mind or put words in your mouth.  I'm just saying

14   that none of the parties believed that, and if the parties

15   did believe that, the appeal likely would be different.  And

16   I think that this order is effectively going to destroy Mr.

17   Wright's ability to challenge the scope of the order that's

18   coming out.

19          THE COURT:  Well, the only party that filed an

20   appeal to challenge the judgment was DMA, right?

21          MR. SHELTON:  Correct, because Mr. Wright was fine

22   with the idea that a constructive trust would be imposed

23   over the right-of-way.  Typically -- typically, constructive

24   trusts come not only with the trust itself, but an

25   injunction, an affirmative injunction directed toward the

1    party against whom the trust is imposed to take some action.

2    That isn't in here.  The judgment that was entered was

3    actually, as far as I know -- and this I state with a big

4    asterisks that I'm still catching up.  But to my

5    investigation, it appears that the order that -- the

6    judgment that was entered was effectively the one that was

7    requested by DMA and Moore.

8            If they wanted injunctive relief, if they wanted a

9    direction from this court, then to order the property to go

10   to DMA and/or Moore, they could have asked for that at the

11   time.  And, in fact, I think they asked for disgorgement

12   and/or a constructive trust.

13           THE COURT:  I think they asked for everything.

14   They wanted damages and the right-of-way.

15           MR. SHELTON:  Understood.  But disgorgement was

16   what --

17           THE COURT:  They didn't get that, so that's why

18   they're appealing.

19           MR. SHELTON:  Exactly.  That is exactly right.

20   They did not get that.  But the court's order that just came

21   out a few days ago effectively gives them that, so much so

22   that they're willing to say, you know, forget it, we don't

23   even need this appeal anymore.

24           THE COURT:  But did Wright violate the final

25   judgment of a year ago, the judgment after remand?  Did he

1    violate it by transferring the property or failing to re-

2    transfer it back to the original entity?

3         MR. SHELTON:  Your Honor, I might defer to Ms.

4    Pryor-Baze on that, but I don't believe so.  And the reason

5    I don't is because I think that the transfer occurred before

6    the judgment had even come out, number one.

7         If it's okay if I may cede the podium to Ms.

8    Pryor-Baze.

9         THE COURT:  That's fine.

10        MS. PRYOR-BAZE:  I want to make sure you can hear

11   me because we're using Mr. Shelton's --

12        THE COURT:  Yes, ma'am, I can hear you.

13        MS. PRYOR-BAZE:  Okay, thank you.  The final

14   judgment did not order Wright to transfer the property from

15   Express back to KrisJenn.  Everyone knew in 2023 that

16   Express had title to the property and the final judgment

17   recognizes that Express has title and there is no order in

18   the final judgment that Express must transfer the property

19   to KrisJenn or Wright must effectuate that transfer.  In the

20   court's opinion, it says if Wright does not transfer back

21   the property to KrisJenn, then there will be a constructive

22   trust imposed in the hands of Express.  But I cannot any

23   order in the court's record ordering Mr. Wright to transfer

24   the property back to KrisJenn.

25        And that's one thing that DMA repeats repeatedly,

1    we violated a court order.  Mr. Wright violated a court

2    order by not transferring the property back to KrisJenn, but

3    they don't cite to any order because there wasn't one that

4    we can find, no written order ordering KrisJenn to take the

5    property back or Mr. Wright to give the property back to

6    KrisJenn.  But it certainly in the final judgment, Your

7    Honor.

8            THE COURT:  The final judgment was about a year

9    ago; is that right?

10           MS. PRYOR-BAZE:  It was in March, yes, sir.

11           MR. SHELTON:  And I can pull it up if you'd like,

12   Your Honor, or I can --

13           THE COURT:  Sure, pull it up.  I was going to pull

14   it up myself.

15           MS. PRYOR-BAZE:  It's Docket 329.

16           MR. SHELTON:  And I'll share my screen, but it is

17   Docket 329, as Ms. Pryor-Baze says.  And I pulled up for the

18   court the seven ordering provisions, and I can -- either Ms.

19   Pryor-Boze -- Ms. Pryor-Baze or myself can -- I know a Boze,

20   by the way, Mr. Lawrence Boze.  I don't know if Your Honor's

21   ever had him in court.

22           THE COURT:  Not yet.  Okay, Paragraph 2.  The

23   court renders that DMA and Moore recover a constructive

24   trust on the right-of-way in the hands of Express H2O, LLC

25   because of the unauthorized transfer by KrisJenn to Express

1    H2O.  That doesn't cover it?

2         MS. PRYOR-BAZE:  That does not -- that means that

3    the ROW can stay in the hands of Express and there's a

4    constructive trust over it for the benefit of DMA and

5    Moore's 20 percent net profits interest and Mr. Wright's

6    $4.7 purchase for his monies obligation.  The property --

7         THE COURT:  Yeah.  But wasn't there a provision

8    also in the plan of reorganization that was confirmed that

9    related to this?

10         MS. PRYOR-BAZE:  Yes, Your Honor.  The plan says

11   that the eventual purchaser of the right-of-way will hold

12   the property and preserve the net profits interest over

13   proceeds.  Yes, that's correct.  It did not say -- that's

14   right, that's what the plan says.

15         MR. KRIST:  Your Honor, if I may.

16         THE COURT:  Yeah, go ahead.

17         MR. KRIST:  My understanding is that the court's

18   final judgment here imposed a constructive trust both for

19   breach of fiduciary duty and because of the unauthorized

20   transfer by KrisJenn to Express H2O.  The reference to the

21   unauthorized transfer there relates back to the bankruptcy

22   plan at Page 7 where the court-imposed restrictions on

23   KrisJenn's ability to transfer the right-of-way.

24         In order to do a transfer, KrisJenn first had to

25   provide notice and then Moore and DMA and Longbranch had to

1    have an opportunity to object and a hearing before any

2    transfer.  And what the court previously found was that Mr.

3    Wright effectuated this transfer without providing any

4    notice, without providing any opportunity for an objection,

5    and without telling anybody what he was doing just a couple

6    of months before the appeal came down from the district

7    court and that was the basis that the court found for the

8    unauthorized transfer.

9          So it's not a question of whether the transfer

10   violated the final judgment.  As this court already found,

11   it violated the plan itself.  And Express H2O, for that

12   matter, had notice of this plan because it was formed by Mr.

13   Wright, who everybody concedes is the manager.  And Mr.

14   Wright, as you know, has been before this court and well

15   knew what the requirements of the plan were and through him,

16   so did Express H2O.

17         I just wanted to clarify that.  I don't want to

18   interrupt Mr. Shelton or Ms. Pryor-Baze's argument and I'll

19   wait my turn for the rest.

20         MS. PRYOR-BAZE:  Your Honor, we understand that

21   and Wright understood also whenever you entered the final

22   judgment that there was an unauthorized transfer.  But the

23   reason the court imposed the constructive trust on Express

24   is because they were the title holder for the right-of-way

25   and Express agreed to comply with the plan obligations.  And

```
 1    the plan obligation is that DMA and Moore have a 20 percent

 2    net profit's interest from the sale or development of the

 3    ROW.

 4              And so, here in Paragraph 2, Your Honor, you say

 5    that they're going -- the constructive trust is imposed on

 6    the right-of-way in the hands of Express, leaving it in the

 7    hands of Express.  There's no order here or in your opinion,

 8    which is Docket 330, that Wright had to transfer it back to

 9    KrisJenn.  Your order on Docket 330 says, if Wright doesn't

10    transfer it back to KrisJenn, this constructive trust is

11    imposed in the hands of Express.

12              All of this, Your Honor, was known in 2023, that

13    Express -- that the property was now being held by Express

14    and there was not another adversary proceeding opened up to

15    try to get the property back.  There were objections to it

16    to the court at the time of final judgment and this is how

17    the court dealt with it in final judgment and the

18    constructive trust is imposed on Express, who owns the

19    right-of-way.

20              THE COURT:  Okay, another question.  I'm sure you

21    all have looked at the order confirming the plan, which was

22    in February of '22, so that's three years ago.  In the event

23    -- Paragraph 19 on Page 6, "In the event there are any

24    disputes regarding sale, transfer, or encumbrance of the

25    pipeline right-of-way, any party in interest may reopen the
```

1    bankruptcy case to have the bankruptcy court adjudicate the

2    dispute.   The bankruptcy court shall be the primary venue

3    for any such dispute."  That doesn't have any effect on

4    this?

5            MS. PRYOR-BAZE:  I would say it would not -- and,

6    Charlie, you can answer if you'd like.  I would say that it

7    does not have any effect on this because they have never

8    asked the court to make Wright transfer the property back to

9    KrisJenn.  They've never asked that of the court.  Everyone

10   knew at the time of the final judgment Express held it.

11           And, Your Honor, DMA asked in their briefing on

12   remedies and the hearing prior to the final judgment.  We're

13   asking for either a constructive trust on proceeds or we're

14   asking for title disgorgement, and the court entered a

15   constructive trust on court to protect proceeds.

16           THE COURT:  So does that protect DMA if Mr. Wright

17   or one of the entities that's involved in it transfers the

18   property to yet another new entity; are they somehow

19   protected?  I mean, has this been filed in the deed records,

20   for example, or are third parties on notice of this?  And

21   maybe I should ask Mr. Krist.  I mean, what if Mr. Wright or

22   one of his entities transfers the property to ABC

23   Corporation?

24           MS. PRYOR-BAZE:  So, Your Honor, the original

25   assignment that gave each Longbranch and DMA the 20 percent

1    said that it was enforceable against Black Duck and its

2    successors and assigns.  So certainly, DMA could go file a

3    lis pendens over the pry, over -- in each of the counties.

4    They could record something in the deeds, but they haven't

5    done that.  Instead, they're relying on the final judgment,

6    which we understand, Wright understands.  The protection is

7    your final judgment, Your Honor; that's their protection.

8         If Mr. Wright were to transfer the properties to

9    another Wright entity, then their proceeds, net profit

10   interest over proceeds if sale or development, follows that

11   property -- follows that transfer.  It's a covenant that

12   runs with the land.  If it's a third party that the right-

13   of-way is sold to, DMA and Moore have the protection of the

14   final judgment that gives them 20 percent on the proceeds of

15   that sale.

16        THE COURT:  Okay.  I have an 11:30 case that I

17   need to call and announce a ruling in.  So let's take a

18   break in this case for about, say, until 11:45.  Y'all just

19   take a break and you can either remain on or you can log

20   off, whatever you prefer.  Or you can just mute and close

21   the video if you'd prefer, but be sure and mute if you're

22   going to stay on.  We'll come back at 11:45 on KrisJenn.

23        MR. SHELTON:  Thank you, Your Honor.

24        (Recess)

25        THE COURT:  Okay.  Those of you in KrisJenn, I'm

```
 1   sorry.  It took a little bit longer than we thought it
 2   would, but go ahead.  Where were we?  Maybe we should take a
 3   five-minute break?  Few people log off.
 4            CLERK:  Mr. Shelton is in the waiting room waiting
 5   to get invited back in.
 6            THE COURT:  Okay.  I'm not an expert on this
 7   system, but I'll try.
 8            CLERK:  Chris Sachitano is also...
 9            THE COURT:  Okay.
10            CLERK:  Great.  Thank you, Your Honor.
11            THE COURT:  Okay.  I'm looking.  I see -- did Mr.
12   Sachitano get on?
13            MR. SACHITANO:  Yes, Your Honor.
14            CLERK:  Yes, Your Honor, he's here.
15            THE COURT:  Okay.  Mr. Shelton, it looks like he's
16   on.  Is he not on?
17            CLERK:  You just let him in, Your Honor, yes.
18            THE COURT:  Okay.  Mr. Shelton, you're on now?  I
19   think you're muted, Mr. Shelton.
20            MR. SHELTON:  Yes, I'm here.
21            THE COURT:  Okay.  Is everybody on that needs to
22   be on now?
23            MR. SHELTON:  I believe so, Your Honor.
24            THE COURT:  Okay.  So we gave you a chance to
25   reload, everyone.  Mr. Shelton, I guess go ahead with what
```

```
 1    you were doing.

 2              MR. SHELTON:  Okay.

 3              THE COURT:  Or your co-counsel, Ms. Pryor-Baze,

 4    either one.

 5              MR. SHELTON:  I think I'll pick back up, Your

 6    Honor, if I may.

 7              THE COURT:  Okay.

 8              MR. SHELTON:  The next thing I wanted to turn to

 9    really briefly is just to sort of demonstrate the

10    differences between the court's judgment after remand and

11    what came out recently.  Hold on one moment.  Coming up as

12    the full thing, but we'll go with this for now, if that's

13    okay.

14              Your Honor, this compares the differences between

15    Dockets Number 329 and Docket Number 387.  Docket Number 329

16    is the order -- sorry, the judgment after remand, and Docket

17    Number 387 is the recent order enforcing the order -- the

18    judgment after remand.  The original judgment after remand

19    said -- and we've gone over this already -- that there's a

20    constructive trust over the right-of-way in the hands of

21    Express.  Docket Number 387 affects a disgorgement from

22    Express; that's one major difference.

23              The second major difference, and this is perhaps

24    even maybe the biggest point, is the original final judgment

25    -- sorry -- final judgment after remand said 20 percent of
```

1    net profits from sale or development of right-of-way were

2    reserved for DMA and Longbranch.  If a full transfer is done

3    to DMA, then DMA appears to get a hundred percent of the net

4    profits.  I don't see any modification to that sort of

5    affect from the court's orders.

6         The $4.7 million -- other than the $4.7 million of

7    first monies to Mr. Wright, that stays intact.  In the

8    original, it was Express retains a 60 percent net profits

9    from sale and development of the right-of-way.  And in this

10   one, DMA would get a hundred percent of the net profits from

11   sale and development of the right-of-way.  In the original,

12   DMA had a net profit interest and, in this one, DMA gets it

13   all.

14        One of the major points I think cannot be games is

15   that neither DMA nor Moore ever had title to this right-of-

16   way, ever.  The court's order at Docket Number 387

17   essentially -- it doesn't restore a status quo.  It doesn't

18   restore -- constructive trust, I mean, let me say this real

19   quick.

20        So in their motion -- in their motion to enforce

21   the judgment -- and I'm looking at Docket Number 368 in

22   adversary proceeding 20-05027, it's in their second -- it's

23   actually right in their introduction.  I think they bring it

24   up again later, but it's in their introduction.  It says,

25   under Texas law, a constructive trust, "subjects the person

1   by whom the title of the property is held to an equitable

2   duty to convey it to another."  And they cite In re Gouge,

3   2008 WL304730 at 5 for that proposition.  That case does

4   have that language in there; however, it appears either they

5   didn't read it or they don't care what it said.  Because if

6   you actually read that opinion, Your Honor, what actually

7   happened in that case is somebody defrauded another person

8   out of $100,000 and they stuck it into a retirement vehicle,

9   along with $200,000 other dollars.  And the court in that

10  case put a constructive trust over the $100,000 that was

11  taken and did, in fact, order them to return it.

12          In this particular example -- in the case that's

13  currently before Your Honor, again, there's no evidence and

14  there's no finding that Express or KrisJenn took the

15  property from DMA or Moore.  And we know that because DMA

16  and Moore never owned it, so it definitely couldn't have

17  been taken from them.  And so, In re Gouge is, on its face,

18  inapplicable.

19          The second case that they cite, which by the way,

20  also In re Gouge, I will add, was a fraud case, which

21  doesn't apply here either.  And even to the extent that that

22  happened in Gouge, the trust was just over the exact res

23  that was unlawfully obtained.

24          They also cite in Talley v. Howsley as a Texas

25  Supreme Court case and they say same.  Yes, Talley v.

1    Howsley does say that, 100 percent indicta; in fact, Talley

2    v. Howsley found that there was no constructive trust.  So

3    that language, while it's nice to read in a Supreme Court

4    case and it sounds nice, had absolutely no impact whatsoever

5    on the outcome of that case.  The people seeking the

6    constructive trust lost in that case.

7             And the other case they -- the other thing they

8    cite is the Restatement of Law, there is some sort of

9    Restatement of Contracts or Trusts or something.  Well, I

10   think one of my professors used to say the restatement is

11   nothing more than somebody's opinion on what the law is.  It

12   is not the law itself, so I think that that's not really

13   particularly persuasive either.  Nonetheless, so that's kind

14   of -- that's my opinion or, you know, my own take on the

15   impact of all that.

16            So when we go back to what the court ordered,

17   which is delivering title to DMA and Moore, that is a

18   complete -- well, it's not restoring the status quo.  It's

19   not restoring to DMA and Moore anything that they've lost.

20   To the extent that they were concerned about losing

21   anything, the court's order already covers that, which is

22   the 20 percent net profits from sale or development of the

23   right-of-way.  That's what the court ordered and, again,

24   that's the appropriate remedy.  This court has already --

25            THE COURT:  Doesn't the last paragraph of the

1    order say that it's subject to the first monies' obligation

2    of $4.7 million?

3            MR. SHELTON:  Correct, for Mr. Wright, yes.

4            THE COURT:  Right.  I mean, I thought you were

5    saying basically it's taking away everything from Mr. Wright

6    and they'll get to keep everything -- and DMA and Moore get

7    to keep everything.  I mean, that's not what the order says.

8            MR. SHELTON:  I apologize for the lack of

9    precision.  In the current state -- well, current -- up

10    until the order that was just recently issued, under that

11    state of affairs, Express could monetize this right-of-way,

12    either through development or sale or whatever method they

13    deemed appropriate.  There's going to be certain expenses

14    associated with that.  I don't know what those are.  I

15    haven't sold many rights of way in my career, but let's just

16    assume cost of sale is 6 percent.  The 6 percent of the

17    expense is going to come off the top.  And then the next

18    dollars -- sorry -- $4.7 million to Larry Wright.

19            So if, hypothetically, if the whole number were

20    $10 million, you'd have $4.7 million off the top and then

21    you'd have $5.3.  If that's the profit, then you take 20

22    percent of that $5.3 and that's what would go to DMA and

23    Moore.  The other 80 percent would go back to Express.

24            What's changed now --

25            THE COURT:  If that was 20 plus 20.

```
 1              MR. SHELTON:  You're correct, Your Honor.  It is
 2    20 plus 20.
 3              THE COURT:  Okay.
 4              MR. SHELTON:  And again, I harken back to my
 5    caveat at the beginning that --
 6              THE COURT:  You're new in the case.  I understand.
 7              MR. SHELTON:  Yeah.  There is no doubt that Your
 8    Honor, as well as I think every single attorney on this
 9    call, knows more about this case than I did.  If the
10    property is --
11              THE COURT:  Well, (indiscernible) there.
12              MR. SHELTON:  But if the property goes back to DMA
13    -- or not back to DMA -- strike that.  If the property goes
14    to DMA and Moore, is there a constructive trust against them
15    for the 60 percent that Express --
16              THE COURT:  Well, it says it's subject to it.
17              MR. SHELTON:  Well, it's subject to Larry Wright's
18    $4.7 million.
19              THE COURT:  Okay.
20              MS. PRYOR-BAZE:  Your Honor, if I could interject.
21    Express is the current owner of the property and, as the
22    owner, Wright -- excuse me -- Moore as DMA and then
23    Longbranch have a 20 percent right to net profits; that's
24    all they have.  They don't have an ownership interest.  They
25    just have a right to net profits.  And all of those terms
```

1    were defined in the assignment agreements, and the court is

2    familiar with that because you had a whole trial about it.

3              Under your order, Express loses its 60 percent

4    right to net profits.  It's not right; right gets us $4.7

5    million because that was the purchase price.  But there's

6    more to this property than just rights.  The ownership is to

7    Express and Express has --

8              THE COURT:  So we need to add his 60 percent comes

9    in after that?

10             MS. PRYOR-BAZE:  Well, Express owns the property,

11   Your Honor, not Larry Wright.  So Express right now gets 60

12   percent of -- has to pay all the expenses on the property as

13   the legal title owner and also can, as Mr. Shelton said,

14   monetize it.  And in that monetization, it retains 60

15   percent.  Mr. Shelton's point was --

16             THE COURT:  Who owns Express?

17             MS. PRYOR-BAZE:  Pardon?

18             THE COURT:  Who owns Express?

19             MS. PRYOR-BAZE:  Express is an LLC owned by a

20   number of members.  I can't tell you today who the members

21   are, but Mr. Wright is the manager.

22             THE COURT:  Wright, he's the manager?

23             MS. PRYOR-BAZE:  He's the manager of Express.  He

24   is not the sole owner of Express.  It's an LLC owned by its

25   members.

```
 1            THE COURT:  Is he the majority owner or vast

 2     majority owner or minority or what?

 3            MS. PRYOR-BAZE:  He is not a majority owner, Your

 4     Honor, but I can't tell -- as I understand it, he is not an

 5     owner of Express, he's not a member.  He is only the manager

 6     and I'm getting confirmation that that's correct.

 7            THE COURT:  This is outside the record and I'm not

 8     -- I'm just curious.  Is there any actions being taken to

 9     develop or market the right-of-way?

10            MS. PRYOR-BAZE:  Sure, Your Honor, a couple of big

11     ones that are really important to what we're talking about

12     right now.  The first is we have to clear the title.

13     There's a trespasser right now operating a pipeline through

14     two counties of the right-of-way, and Express has filed suit

15     in Angelina County in order to clear that title.  No one's

16     going to buy the right-of-way of and no one's going to agree

17     to put more pipelines in it with Westlake, the trespasser's

18     pipeline, running through the right-of-way.  So that --

19            THE COURT:  How long has that pipeline been there

20     for Westlake?

21            MS. PRYOR-BAZE:  Sure.  Well, Express had a

22     pipeline there starting in the 1950s; Gulf owned it.  And

23     Westlake's had a pipeline there since about 1998-'99.  They

24     got their easement from the current land owner, who has

25     admitted they should have -- and there's some correspondence
```

1      -- that was probably a mistake.

2              So Express, after your judgment, your final

3      judgment leaving the right-of-way in the hands of Express,

4      Express went to try to clear title so that it can develop or

5      sell.  Right now with that Westlake pipeline in the middle

6      of it with no right to be there, it's going to be impossible

7      to sell or develop.  So that Angelina County suit, which DMA

8      and Moore have known about and participated against

9      Westlake.

10             Westlake filed a motion to dismiss in January,

11     Your Honor, and the attorney for DMA signed an affidavit

12     helping Westlake seek dismissal of our lawsuit -- of

13     Express's lawsuit, excuse me, to dismiss the case against

14     Westlake.  So that's an important point, I think, because I

15     think some of the arguments on February 5th were

16     disingenuous when DMA was acting like the Angelina County

17     lawsuit is prejudicial to DMA, when DMA is interfering in it

18     by helping Westlake, the trespasser, get it dismissed.

19             But, Your Honor, the cloud --

20             MR. KRIST:  Your Honor, if I may?

21             MS. PRYOR-BAZE:  I'm sorry.  I'm speaking.  The

22     cloud of the title is --

23             THE COURT:  Go ahead and finish up.

24             MS. PRYOR-BAZE:  The title has a cloud on it right

25     now and that title -- that cloud has to be removed.  The

1    trespasser has to be kicked out and that is what Express is

2    doing.  Would Express be open if someone came to Express and

3    said, hey, we want to buy your right-of-way, would those

4    conversations take place?  Probably.  But no one's going to

5    do that with a cloud on the title.

6         THE COURT:  Okay.  Mr. Krist.

7         MR. KRIST:  Your Honor, the one point that I

8    wanted to address there was the insinuation that we were

9    somehow disingenuous with the court at the last hearing

10   about the Express lawsuit, and I just want to clarify the

11   record there.  At the prior hearing, I believe what we told

12   the court is that we learned recently -- at this point, I

13   think about a month ago -- about this Express lawsuit.  And

14   the only thing that we did in the Express lawsuit was file a

15   declaration noting that there were currently proceedings in

16   this court related to our effort to enforce the constructive

17   trust, that's all.

18        And I wanted to make sure that the court didn't

19   think that we were otherwise interfering or doing something

20   to prejudice anybody's rights with the right-of-way.  All we

21   did was put everybody on notice that we were seeking to

22   enforce the constructive trust here and that we believe our

23   clients have rights.

24        THE COURT:  Did you file something to either

25   dismiss that lawsuit or to support one side?

 1          MS. PRYOR-BAZE:  Yes, Your Honor.

 2          MR. KRIST:  Your Honor, we provided a declaration

 3    noting the pendency of this proceeding.  And my

 4    understanding is that the district court in that case

 5    subsequently stayed the case so that this court could

 6    resolve these issues.

 7          THE COURT:  Yeah.  When you mention bankruptcy,

 8    that kind of throws a bomb into the whole thing, doesn't it.

 9          MS. PRYOR-BAZE:  Well, Your Honor, what actually

10    -- what the affidavit -- the declaration said that DMA

11    lawyers filed in support of Westlake's motion to dismiss

12    said Express doesn't own the property; that's what they

13    filed.  And so, you know, they come to this court and say

14    the lawsuit was prejudicial to them.  Well, they're working

15    with Westlake to get it dismissed.

16          So it is -- to the extent that the lawsuit

17    affected the court's order, new order, we don't think that

18    that's proper or appropriate.  It wasn't supported by

19    evidence that the lawsuit is prejudicial to DMA.  But one

20    thing that the DMA -- Mr. Krist told the court last hearing

21    was, we're ready to slip in the shoes of Express in that

22    lawsuit.  And the reason why DMA wants to file --

23          THE COURT:  Who's we?  You said we.

24          MS. PRYOR-BAZE:  DMA is ready to slip in the shoes

25    of Express in that lawsuit that Express has had on file and

1     worked up for -- since August, Your Honor, and relying on

2     the final judgment.  And the reason why they want title to

3     this property is because they know how valuable that

4     Angelina County lawsuit is, either getting a lease from

5     Westlake because they're a trespasser with their pipeline

6     that they really need, or getting trespass damages from

7     Westlake because they're trespassing on Express's right-of-

8     way.

9          So they're ready to tell you, Your Honor, that

10    lawsuit is prejudicial, but yet, they're going to slip in

11    the shoes now that -- once title is transferred.

12        MR. KRIST:  Your Honor, our position was not

13    necessarily that the lawsuit is prejudicial.  Our position

14    was that, pursuant to the constructive trust, my clients

15    should be the ones that are making decisions on behalf of

16    the right-of-way.  And if Mr. Wright had appropriately

17    transferred the right-of-way, as this court's order

18    required, then we wouldn't be in this position here today.

19        MS. PRYOR-BAZE:  I'm not sure what order that is,

20    Your Honor, because the final judgment did not order Express

21    or Mr. Wright to do anything with regard to the ownership of

22    the right-of-way.  The right-of-way is owned by Express as

23    of 2024.  The final judgment did not disgorge title of

24    Express; if it had, I think Express would have shown up in

25    this case and done something about it because they're not a

1    party.  And the only time that DMA has asked for

2    disgorgement is prior to the final judgment.  They asked for

3    disgorgement or a constructive trust.  Your Honor gave a

4    constructive trust,  not disgorgement.

5          MR. KRIST:  Your Honor --

6          THE COURT:  And so, in your opinion, should we do

7    now about the constructive trust; just leave it the way it

8    was and not order any kind of transfer to DMA?

9          MS. PRYOR-BAZE:  Your Honor, I don't see an

10   evidentiary reason to transfer to DMA.  These same

11   conversation were had in 2024 when the court considered

12   disgorgement or a constructive trust.  And in your opinion

13   after remand, Your Honor -- Docket 330 -- you say I'm going

14   to order a constructive trust, it's the best remedy and it's

15   what DMA is asking for, because they did.  Nothing has

16   changed, Your Honor, from the date of your final judgment to

17   today in terms of DMA and Moore getting their 20 percent net

18   profit.  Nothing has changed.  If they feel unsecured by

19   just the final judgment that confirms they own 20 percent of

20   net profits, not ownership, but of net profits, then they

21   can go file a lis pendens in the counties.

22          And, Your Honor, Mr. Shelton put on the screen

23   your opinion; Docket 330 in this case.  The better remedy

24   for DMA and more and the one they have elected in their

25   proposed judgment would be an equitable remedy.  Larry

1    Wright would restore ownership of the ROW to KrisJenn or

2    this court would impose a constructive trust on the ROW in

3    the hands of Express, allowing Larry Wright to recover his

4    investment for the purchase price and then after that, the

5    two 20 percent net profit interests would receive -- again,

6    receiving income.

7           Inherent in that award is that Express, as the

8    owner of the ROW currently and at the time in March of 2024

9    when the final judgment was entered, the owner of the ROW

10   would get the 60 percent.  And the order that you just

11   entered, Your Honor, takes away legal ownership, legal

12   ownership of title, of the ROW from Express, and it takes

13   away their 60 percent net profits interest.  It gives it to

14   DMA, who never had ownership of the ROW before, just in

15   order to protect two net profits interest.  They don't have

16   an ownership interest that the court needs to be concerned

17   about.  They have a net profits interest and it's the 20

18   percent each.

19          So the property to go to DMA is entirely

20   inequitable.  It's not -- it's not supported by your factual

21   findings, and it robs Express of title and profits from the

22   property without any evidence that Larry Wright violated the

23   final judgment or that Express has done anything wrong.

24          MR. KRIST:  Your Honor, if I may.

25          MS. PRYOR-BAZE:  So that, Your Honor, was a long-

1    winded answer to the constructive trust should remain the

2    same.  The final judgment secures it, as well as they could

3    go file lis pendens, which puts everyone on notice if they

4    look at the real property records.

5         THE COURT:  Yeah.  Okay, Mr. Krist, go ahead.

6         MR. KRIST:  Thank you, Your Honor.  So to start

7    here, although Mr. Wright had styled his motion as a motion

8    to vacate, as I think Your Honor probably realizes at this

9    point, it's really just a motion for reconsideration that is

10   attempting to re-argue all of the issues that the court

11   addressed at the prior hearing just a couple of weeks ago.

12   There are no new issues being raised here today and

13   everything that we are discussing here was either raised or

14   could have been raised by Mr. Wright at the prior hearing.

15        As Your Honor might recall in connection with that

16   prior hearing, Mr. Wright filed just two-and-a-half pages of

17   briefing, arguing that he had complied with the constructive

18   trust imposed by the final judgment.  Obviously, this court

19   disagreed and granted our motion to enforce.  And it's also

20   worth noting that Mr. Wright never even appealed this

21   court's imposition of a constructive trust under the final

22   judgment.  But nevertheless, Mr. Wright has now filed 27

23   pages of briefing trying to relitigate these issues.  And I

24   think it's avoidably going to be somewhat redundant with

25   what we did a couple of weeks ago, but I'm going to do my

1    best to be concise.

2         THE COURT:  What did Mr. Wright do that led to you

3    filing this motion?

4         MR. KRIST:  Well, Your Honor, what Mr. Wright did

5    is he did not -- it's really more an issue of what Mr.

6    Wright did not do.  Under the final judgment, this court

7    gave Mr. Wright a choice.  It could either -- excuse me --

8    Mr. Wright could either transfer the right-of-way back from

9    Express H2O to KrisJenn or this court was going to impose a

10   constructive trust on the right-of-way.  And as we explained

11   at the prior hearing, a constructive trust under Texas law

12   is really only one thing: it's an equitable device requiring

13   transfer of title to the party that was the victim of the

14   fiduciary breach.

15        And although I heard Mr. Shelton suggest that

16   there's no law supporting our statement of what a

17   constructive trust is, there is no law in Mr. Wright's

18   briefing suggesting that a constructive trust is anything

19   other than what we say it is and we've cited multiple cases

20   to that effect to this court.  I'm happy to go back into

21   them if you would like.  But that's the reason that we're

22   here today is because Mr. Wright did not effectuate the

23   transfer that this court ordered, which in part, was due to

24   Mr. Wright's violation of the bankruptcy plan which required

25   notice to my client and an opportunity to object and be

1  heard before any transfer of this right-of-way.

2      THE COURT:  Who gets the 60 percent?  Assuming

3  that the property is either developed or sold --and this

4  might be a huge assumption that's incorrect -- but assuming

5  Mr. Wright gets paid $4.7 million after that, then DMA and

6  Borders, I guess, or wherever his company was, get 20

7  percent each.  Who gets the 60 percent?

8      MR. KRIST:  So, Your Honor, under this court's

9  order, and I think as we discussed at the last hearing, that

10 remaining 60 percent would go to DMA and/or Mr. Moore.  And

11 the reason for that, as we explained at the last hearing, is

12 under Texas law, a tortfeasor who breaches their fiduciary

13 duties cannot profit from their fiduciary breaches.

14      And in this case, the court imposed a constructive

15 trust for breaches of fiduciary duty and, as a result, all

16 Mr. Wright gets is the $4.7 million purchase money

17 obligation.  In other words, he is made whole on what he put

18 into this, but he can't profit from it more than that

19 because he only obtained title to this right-of-way through

20 his fiduciary breaches.

21      This links to something that Mr. Shelton said

22 earlier, which is that DMA and Moore never had title to the

23 right-of-way.  Well, Your Honor, that's not correct.  Mr.

24 Moore had a 50 percent ownership interest in this right-of-

25 way through Black Duck and Black Duck no longer exists.

1   This court had equitable discretion in that context to

2   fashion an appropriate equitable remedy and there's no

3   dispute that Mr. Wright only got his control and interest in

4   the right-of-way through these fiduciary breaches.

5        And so, Your Honor, I think in my view that

6   answers the Court's question, but I'm happy to expand on

7   that further if you'd like.

8        MS. PRYOR-BAZE:  Your Honor, can I respond

9   directly to that point?

10       THE COURT:  Well, let me ask him another question.

11  So the 60 percent, Moore and Borders get to run away with

12  that as well as their 20 percent, so they get 100 percent

13  between the two of them?

14       MR. KRIST:  So, Your Honor, our position is that

15  Mr. Wright gets his first monies obligation of $4.7 million.

16       THE COURT:  Right, right.  He gets the $4.7, I

17  agree, first.

18       MR. KRIST:  And then --

19       THE COURT:  After that, they get to run away with

20  everything else?

21       MR. KRIST:  To the extent there is anything else

22  after that, our position is that Mr. Moore and DMA would

23  receive any profits on the right-of-way because Mr. Wright

24  only got control of this right-of-way through his breaches

25  of fiduciary duty.  And under Texas law, a tortfeasor who

 1    breaches their fiduciary duties cannot profit from their

 2    wrongdoing.

 3          So, Your Honor, to expand on some of our other

 4    arguments in response to --

 5          MS. PRYOR-BAZE:  (indiscernible) if I could

 6    address it at one point.  Would now be a good time while

 7    we're on it?

 8          MR. KRIST:  Your Honor, I'd prefer to continue

 9    with my argument.  We've been going for about an hour.

10          THE COURT:  Yeah, go ahead and let Mr. Krist

11    finish.  We've let everybody else talk for a long time.

12    He's probably got the least amount of time, talking time.

13    Go ahead, Mr. Krist.

14          MR. KRIST:  So, Your Honor, real quick before I

15    get to our primary legal arguments on Mr. Wright's motion to

16    vacate.  I would like to basically note for the court what's

17    going on here.  We filed this case years ago alleging that

18    Mr. Wright engaged in shell games with various entities to

19    try and take possession of this right-of-way from my

20    clients.

21          And as you know, the court found that Mr. Wright

22    breached his fiduciary duties in doing so and imposed a

23    constructive trust.  It also found that Mr. Wright had

24    violated the bankruptcy plan by transferring the right-of-

25    way of from KrisJenn to Express H2O in the first place.  And

1    Mr. Wright's response here has been to engage in the exact

2    same shell games that brought up before the court in the

3    first place.

4         What Mr. Wright did was he formed this new entity,

5    Express H2O in, I believe, January of, I believe, 2023, a

6    couple months before the district court issued its order on

7    appeal.  And then he trans- -- he was on both sides of the

8    transaction and he transferred the right-of-way from

9    KrisJenn to Express H2O in exchange for no consideration

10   other than membership interests in this newly formed entity,

11   which as far as I know had no assets, which to me is a

12   fraudulent transfer and, indisputably, was in violation of

13   this court's bankruptcy plan.

14        And now, when Mr. Wright is being called out on it

15   -- well, let me back up.  When Mr. Wright was called out on

16   it a little while ago, he promised through counsel he'd

17   reverse the transfer and he failed to do so.  And now, he's

18   before the court today arguing that the end result of these

19   shell games is that this court has no ability to enforce its

20   judgment imposing a constructive trust on the right-of-way.

21   And in our view, this is just part and parcel of the games

22   that Mr. Wright has been playing, even predating the

23   pendency of this lawsuit, to try and evade his obligations

24   to my clients and now to evade this court's judgment.

25        Your Honor, to turn to the first argument that Mr.

1    --

2    THE COURT:  Does it say in the judgment that the

3  60 percent goes to DMA and Borders?  It doesn't say that,

4  does it?

5    MR. KRIST:  Well, Your Honor, the final judgment

6  does not address one way or another who the 60 percent goes

7  to.  It says that there is a constructive trust on the

8  right-of-way and it says that Mr. Wright gets his $4.7

9  million first monies obligation.  And, you know, as we've

10  argued, a constructive trust under Texas law means only one

11  thing: it's a remedy for breach of fiduciary duty and it

12  requires transfer of title.  So pursuant to that

13  constructive trust, we believe that that 60 percent, to the

14  extent there is any money over and above the $4.7 million,

15  would go to our clients.

16    Your Honor, to turn to the first argument that

17  they make in this motion to vacate, they've argued that the

18  constructive trust here somehow amends the final judgment

19  and, Your Honor, that's just not true.  The final judgment

20  awarded a constructive trust and under Texas law, as I've

21  said before and at the prior hearing, a constructive trust

22  is only one thing: it's an equitable device requiring

23  transfer of title.  And this court properly exercised its

24  discretion in awarding a constructive trust and subject to

25  Mr. Wright's $4.7 million first monies obligation.  So my

1    clients aren't asking for any new relief here that was not

2    awarded in the final judgment.

3          I also heard Mr. Shelton say that this court

4    doesn't have jurisdiction because of the appeal that's

5    pending.  As we've pointed out at the prior hearing and also

6    again today in our briefing in our response to the motion to

7    vacate, but this circuit is very clear that this court has

8    continuing jurisdiction to enforce its judgment even after

9    an appeal is filed, and that's exactly what we're seeking to

10   do here, Your Honor.

11         Mr. Shelton also talked at length about the fact

12   that my client filed an appeal in connection with this case

13   and they suggested basically that we conceded on appeal that

14   the judgment left the right-of-way in the hands of Express

15   H2O.  Candidly, that's not accurate, Your Honor.  Our

16   primary objection and the reason for our appeal concern the

17   fact that this court's opinion allowed Mr. Wright an option

18   to transfer the right-of-way back to KrisJenn and avoid the

19   constructive trust.

20         On appeal, we argued that it was improper,

21   candidly, for this court to leave the right-of-way in the

22   hands of Mr. Wright and to allow him to transfer it back to

23   KrisJenn in light of his breaches of fiduciary duty because,

24   again, Texas law does not allow breaching fiduciaries to

25   profit from property that they've obtained through their

1    fiduciary breaches.

2            And also, Your Honor, at the time of the appeal,

3    Mr. Wright hadn't transferred the right-of-way to Express

4    H2O yet and there was still some chance that he would

5    transfer the right-of-way back to KrisJenn.  Actually, Your

6    Honor, I take that back.  At the time of the appeal, we did

7    not know that Mr. Wright had transferred the right-of-way to

8    Express H2O and there was still a chance that Mr. Wright

9    would transfer the right-of-way back to KrisJenn, as his

10   counsel represented he would.

11           And in that context, Your Honor, because of timing

12   considerations with respect to the appeal, we had to go

13   ahead with the appeal in order to preserve our rights to

14   object on that basis.  What we did not object to was, in

15   general, this court imposing a constructive trust, and DMA

16   is not now barred from enforcing the judgment simply because

17   we've also preserved our rights in the appeal.

18           Obviously, if Mr. Wright had transferred the

19   right-of-way back to KrisJenn as he represented that he

20   would, then we would need to continue pursuing the appeal.

21   But since that time, there have been further developments.

22   Mr. Wright did not transfer the right-of-way back, nor did

23   he comply with the constructive trust.  And given that

24   context, we sought assistance from the court to enforce the

25   existing judgment.

1          THE COURT:  Okay.

2          MR. KRIST:  Also, Your Honor, I think I misstated

3    that if Mr. Wright had transferred the right-of-way back to

4    KrisJenn, we would need to continue with the appeal because,

5    in our view, that conditional aspect of the constructive

6    trust was improper.  But the fact that we've contested those

7    issues on appeal does not mean that this court lacks

8    jurisdiction to enforce its judgment.

9          At one point during Mr. Shelton's argument, I

10   heard Your Honor ask if we should just punt this to the

11   district court.  And, Your Honor, the reality is that if we

12   do that, then one of two things could happen: the district

13   court could find that it was wrong to impose a condition on

14   this constructive trust and that Your Honor should have just

15   imposed a constructive trust outright to prevent Mr. Wright

16   from profiting from his breaches of fiduciary duty.  If that

17   happens, then there will be a full constructive trust no

18   conditions and my clients would still get the right-of-way.

19         But even if the court rules in favor of Mr. Wright

20   and finds that this court exercised its discretion in

21   imposing that condition, we'd still be back in the same

22   place we are now with a constructive trust in place because

23   Mr. Wright did not transfer the right-of-way back to

24   KrisJenn.  And on top of that, Mr. Wright never appealed

25   imposition of the constructive trust and he doesn't have any

1    basis for doing so now and the time for doing so, as I think

2    Your Honor recognizes, is long past.

3            Your Honor, I also heard reference to, I believe

4    it was Ms. Pryor-Baze or Mr. Shelton suggested that the

5    final judgment recognizes that Express has final -- that the

6    final judgment does not require a transfer of title.  I

7    don't think the final judgment says anything of that sort,

8    Your Honor.  The final judgment does not say, oh, Express

9    H2O has title now and this is all well and good.  What the

10   final judgment found was that the transfer to Express H2O

11   violated the bankruptcy plan and that Mr. Wright obtained

12   title to the right-of-way in the first place through

13   breaches of fiduciary duty, which was the basis for imposing

14   the constructive trust in the first place, Your Honor.

15           Finally, I don't think that I've heard any arguing

16   on this point, but it was raised in their motion to vacate.

17   Mr. Wright suggested that Express H2O didn't have notice

18   that any of this was going on.  Well, Your Honor, Express

19   H2O was formed by Mr. Wright for the explicit purpose of

20   transferring this right-of-way from KrisJenn to Express H2O

21   in violation of the bankruptcy plan and there's no dispute

22   that Express H2O had notice that all of this was going on

23   through Mr. Wright.  It could have intervened if it wanted

24   to.  It intentionally chose not to.

25           It still hasn't intervened and Mr. Wright,

1    candidly, does not have standing to be raising arguments on

2    behalf of Express H2O here.  To the extent that he does have

3    standing, then Express H2O has been before the court this

4    entire time and it's far too late for Express H2O to be up

5    raising objections now because the final judgment imposing

6    the constructive trust was entered by this at this point

7    almost a year ago.

8          Your Honor, I'm happy to answer further questions

9    that the Court has.  There are their arguments that were

10    raised in the motion to vacate, but they haven't been

11    addressed at the hearing here before the court.  And so,

12    unless Mr. Shelton or Ms. Pryor-Baze intends to argue those

13    things now, we'll just rely on our briefing with respect to

14    those arguments.

15          THE COURT:  Okay.  What else, Ms. Pryor-Baze or

16    Mr. Shelton?

17          MR. SHELTON:  Okay.  Yes, Your Honor.  I'm just

18    going to point out a couple of things and then I'll turn the

19    remainder over to Ms. Pryor-Baze.

20          The argument that a party who breaches their

21    fiduciary duty shouldn't profit.  I don't know, maybe that's

22    right and maybe that's wrong.  What I do know is that it's

23    on appeal before the district court, that exact issue.

24    We're coming back to full circle.  They are trying to do an

25    end run around the district court.

1       The document I've pulled up for the court's

2   convenience -- Docket Number 6, Case Number 24-00365 --

3   right there, the creation of constructive trust that would

4   place the right-of-way in their hands...

5       Hold on.  Hold on, let me find the right one.

6   Now, I can't find it.  One second.  One moment, Your Honor.

7   Here we are.  My apologize.

8       Page 3, "Moore and DMA emphasized that black

9   letter law does not allow fiduciaries to profit from their

10   breaches of fiduciary duty."  And this is a running theme

11   throughout their briefing at the district court.  This is

12   something that they have brought to the district court's

13   attention.  It is currently in the district court's hands,

14   and Mr. Krist appears to have a desire to completely strip

15   the district court of their ability to decide this matter by

16   trying to convince Your Honor that it's what you've always

17   decided.  It's what you've always decided.

18       Again, Your Honor, it's quite literally

19   irrebuttable that they have judicially stated on numerous

20   occasions that that is not, in fact, what this court's order

21   did.  They think Your Honor got it wrong and they appealed.

22   And now, they're saying, no, you actually --

23       THE COURT:  (indiscernible) got it wrong.

24       MR. SHELTON:  I don't necessarily think that.  I

25   haven't said any such thing.  In fact, you've never issued

1   an incorrect opinion in any case that I've had.  But they're

2   saying not only did you -- now they're saying -- so they

3   appeal saying you got it wrong.  And then they come back

4   before you a year later and say, well, not only did you get

5   it right, it actually meant something different than what

6   you actually said it meant.

7          And, Your Honor, that goes back to the underlying

8   point, there's a lack of subject matter jurisdiction here.

9   There's an absolute lack of subject matter jurisdiction.

10  There is no evidence offered or admitted at the hearing.

11  There was argument of counsel and, as helpful as that may be

12  to the court, it is not evidence; that's number one.

13         But the number one takeaway is that what we've got

14  is a complete lack of -- there was actually no evidence

15  offered regarding subject matter jurisdiction.  I think if

16  we had a full hearing, the court would have asked for

17  parties to offer and admit the documents from the district

18  court case so that the court could take a look at them and

19  analyze them with respect to the assertions that are now

20  being asserted.  And the reason that didn't happen, I think,

21  is because they wanted to convince this court that, oh no --

22  in fact, not just convince, they literally said it -- that

23  it will not have any impact on the jurisdiction of the

24  district court.

25         And with that, Your Honor, if I may, I'll just

1    cede the rest and I'll let Ms. Pryor-Baze do the whole

2    closing and the whole closing.

3             THE COURT:  Go ahead.

4             MR. KRIST:  Your Honor, if I could respond to just

5    one point from Mr. Shelton before we move to their closing.

6             THE COURT:  Okay.

7             MS. PRYOR-BAZE:  Well, I'm not closing.  I'm still

8    clarifying and disputing things that you'd --

9             THE COURT:  We're going to get to closing pretty

10   quick here.

11            MR. KRIST:  Well, Your Honor, if I may.

12            THE COURT:  Yeah, go ahead.

13            MR. KRIST:  Your Honor, Mr. Shelton just said that

14   basically we are trying to make an end run around the

15   district court and argue the same things in both places and

16   that is simply not accurate, Your Honor.  Our objection on

17   appeal related largely to the fact that this court gave Mr.

18   Wright a conditional option to transfer the right-of-way

19   back.  When we said on appeal that this could potentially

20   moot those issues, I didn't -- it was not our position that

21   it would constitutionally moot or deprive the appellate

22   court of subject matter jurisdiction because that

23   conditional aspect of the court's ruling is still there for

24   the appellate court to rule on.

25            What we meant is that we may not pursue the appeal

1    further, given the fact that Mr. Wright did not transfer the

2    right-of-way back to KrisJenn, which is, as a practical

3    matter, resolved the thing that we had the dispute with.

4    Because since there was no transfer back, the court's

5    constructive trust applies and we believe that that

6    constructive trust requires transfer of title to our

7    clients.  I do not believe that that's a matter of subject

8    matter jurisdiction.  I also do not believe that that's a

9    matter of constitutional mootness, as Mr. Shelton put it.

10              THE COURT:  Okay.

11              MR. SHELTON:  Your Honor, again, you can't beat

12    the point to death enough.  I said it was the first nail,

13    now we're getting to sort of like the second and third.

14    Document Number 6, 24-00365, statement of issue number one,

15    "The bankruptcy court committed reversible error in leaving

16    the property in question in the hands of the wrongdoer who

17    acquired his interest in the easement."  There is absolutely

18    nothing in there that says the bankruptcy court erred by

19    allowing them to have a choice.  It is pretty clear.

20              One other comment, back to Docket Number 12,

21    regarding the mootness.  Oh no, we meant that it might -- we

22    might resolve it or whatever it was that I heard.  That's,

23    again, not what they actually said, and they did this the

24    day after they told Your Honor that it would affect the

25    district court's jurisdiction.  They filed something the

1    order will likely moot.  At Docket Number 12, I'm looking at

2    Page Number 3, the order will likely moot -- moot -- that is

3    a term of art.  Every attorney on this call knows exactly

4    what that means.  It does not mean that we're happy; that's

5    not mootness.  That's where we might resolve it.

6          And, in fact, they go even further to clarify,

7    that the order will likely moot the arguments in part one

8    below.  Further -- further, may also lead to the voluntary

9    dismissal of the rest of the appeal.  They understand full

10   well the difference between mootness and a voluntary

11   dismissal.  They're telling the court that part one is moot.

12   The issue of whether or not this court erred in leaving the

13   property in the hands of Express.  They did not say anything

14   about a choice, not in their statement of issues at least.

15   I haven't read all the briefing.  But they don't say

16   anything about a choice.

17         And then when they get the order from this court,

18   they say, ah ha, district court, ah ha, sorry we wasted

19   everybody's time.  You've wasted this court's time in

20   preparing this and requiring briefing and the party's time

21   in briefing, it's moot.  It's moot.  They should have filed

22   this exact motion within 14 days after your original

23   judgment on remand came out and they've wasted everybody's

24   time and they know it.

25         Anyway, I'll cede the rest to Ms. Pryor-Baze

1    before I get too fired up.

2            MS. PRYOR-BAZE:  Yes.  Your Honor, I have a couple

3    of clarifications.

4            THE COURT:  We lost your audio.

5            MS. PRYOR-BAZE:  Sorry.  Mr. Shelton muted me.

6    The DMA likes to say that the right-of-way was an ill-gotten

7    gain, and so, Wright should not be allowed to profit at all

8    -- should not be allowed to profit at all from the right-of-

9    way.  That is not true.  The breach of fiduciary duty that

10   the court found was that Mr. Wright got a loan, Black Duck

11   -- got a loan for purchase of the right-of-way without Mr.

12   Moore's authorization.  Mr. Wright contributed money and

13   personal loan to Black Duck to buy the right-of-way and then

14   there was a loan.  The only breach of fiduciary duty that

15   the court found to support any sort of equitable relief was

16   not disclosing the loan.  The court called it an ultra vires

17   loan.

18           So the ROW was not taken by fraud from the

19   original owner.  The ROW was not stolen due to misdeeds to

20   the original owner of the right-of-way.  All that the court

21   found was a breach of an informal duty to Mr. Moore, whose

22   organization at that time was SCMED, it was not DMA.  DMA

23   was -- no duty was ever breached to DMA.  And so, the court

24   found that ultra vires loan was wrongful because he didn't

25   disclose it to Mr. Moore.  The right-of-way was not gotten

 1    by any sort of fraud or deception.

 2            To then say that Mr. Moore -- that Express cannot

 3    benefit at all from the right-of-way is not a correct

 4    proposition of law at all.  What Mr. Moore's company, SCMED,

 5    had a 50 percent ownership interest in Black Duck.  He gave

 6    that away, Mr. Moore did, in order to get the 20 percent net

 7    profits interest that was assigned then to DMA.  So all of

 8    the ranting about the ROW being received by fraud or

 9    deception is not accurate.  And then a constructive trust

10    should not apply over the entire right-of-way, only the 20

11    percent net profits interest that DMA and Longbranch have

12    due to contractual agreements and assignment.

13            The other thing that I'd like to point out, Your

14    Honor, is that a constructive trust under Texas law does not

15    mandate a title change; that's incorrect.  There was no

16    injunction portion into the final judgment that ordered

17    KrisJenn or Wright to do anything in terms of the title.

18    And all parties here knew that Express was the owner of the

19    right-of-way at the time of the final judgment.  It says it

20    in your opinion on remand and in the final judgment, that

21    Express owns it.

22            And at that point, there was no order given that

23    Express had to give it to anyone, that Wright had to change

24    title.  It is an incorrect proposition of law that

25    constructive trusts always mean disgorgement of title.  If

1    it did, then DMA would not have, on their brief on remedies

2    or arguments and to the court before the March 24 judgment.

3    They wouldn't have asked the court either for disgorgement

4    or a constructive trust over net proceeds.  The court gave

5    them a constructive trust over net proceeds.  They got what

6    they asked for.  They asked for two things and they got one

7    of them, but disgorgement is not mandatory.  A constructive

8    trust is a flexible remedy designed by the court.

9           And the parameters that this court put over a

10   constructive trust was that the ROW would stay in the hands

11   -- at the final judgment in Docket 329, the ROW would stay

12   in the hands of Express, Larry Wright would get his first

13   monies obligation, and then DMA and Longbranch would receive

14   their 20 percent net profit proceeds.  They did not get an

15   ownership interest.

16          So we do ask the court, Your Honor, due to the

17   jurisdiction issues, the lack of evidence to support any

18   wrongdoing between the final judgment and now of Wright or

19   Express in violating the final judgment, which they have not

20   done nor has there been evidence they have done.  We ask

21   that the court vacate the order enforcing the constructive

22   trust so that the district court on appeal can address all

23   of these issues.

24          MR. SHELTON:  One final evidentiary issue, if I

25   may, Your Honor.  I don't know how required it is, but the

1    court last night received our witness and exhibit list.  I

2    know because it was on an expedited basis, I didn't get it

3    to the court as soon as I would have liked.  But I'd like to

4    request at least some judicial notice of a few documents and

5    then request, for that I don't know, that the court can take

6    judicial notice of offer and admission.  I can go over what

7    they are real quick.

8         THE COURT:  Okay.  One through 7 all look like

9    court documents that I can take judicial notice of, 8 and 9,

10   I don't know about, and 10 is the brief.

11        MR. SHELTON:  Correct.  So, yes, I agree almost

12   exactly with your recitation.

13        THE COURT:  What are 8 and 9; 8 is some sort of

14   summary of that lawsuit in Angelina County?

15        MR. SHELTON:  Correct.

16        THE COURT:  And docket sheet from state court.

17        MR. SHELTON:  What did the docket sheet

18   demonstrate, the case party list?  I'll circle back to that

19   in a second.

20        MS. PRYOR-BAZE:  I think what you're referring to,

21   Your Honor, was attached to our motion to vacate.  It was

22   the service, the file and service list that showed that

23   Westlake -- excuse me -- that DMA's lawyers are on the

24   service list as of mid-January for pleadings.

25        THE COURT:  Yeah, I see.  I see that.

1          MS. PRYOR-BAZE:  Okay.

2          MR. SHELTON:  And Docket Number D-9, Your Honor,

3    is the declaration of Lordes Ortiz offered in that Angelina

4    County case.  That one is not hearsay because it's an

5    admission of the party opponent.  The reply brief is, again,

6    admission of a party opponent, Docket Number 12.  I did not

7    --

8          THE COURT:  Well, was it filed in the Angelina

9    County lawsuit?  I mean, I can take judicial notice.  Mr.

10   Krist, is that in dispute?

11         MR. KRIST:  Your Honor, I don't believe that

12   really any of these are in dispute.  I think the court can

13   take judicial notice of basically all of them because they

14   are all court filings.

15         THE COURT:  All right.  I'll take judicial notice

16   of 1 through 10.

17         MR. SHELTON:  Correct.  And, Your Honor, I'd --

18         THE COURT:  I've got good versions of them.

19         MR. SHELTON:  Understood.  And the one that I did

20   not have on my list that I realized probably this morning

21   that I should have was Docket Number 6, which precedes that

22   Docket Number 12, which is D-10.

23         THE COURT:  I'll take judicial notice of that as

24   well.

25         MR. SHELTON:  Okay.  And what I'll do for the

```
 1    court and the parties' convenience is I'll -- if this is the
 2    way the court prefers -- I'll probably upload an amended
 3    witness and exhibit list adding that.  And then, Ms.
 4    Castleberry has asked for physical copies, so we'll get all
 5    those to Your Honor as soon as we can.
 6              THE COURT:  Okay.
 7              MR. KRIST:  And, Your Honor, if I may just in
 8    closing and respond to just a couple of the arguments that
 9    Ms. Pryor-Baze raised at the end there.
10              THE COURT:  Go ahead.
11              MR. KRIST:  Your Honor, Ms. Pryor-Baze --
12              THE COURT:  We're getting to the last round of
13    responses and replies and rebuttals and sur-rebuttals here.
14              MR. KRIST:  I will be very brief, Your Honor.  Ms.
15    Pryor-Baze suggested that Mr. Wright's fiduciary breaches
16    had nothing to do with how he acquired control of the right-
17    of-way.  As we explained at the prior hearing, that is just
18    not accurate.  The way that KrisJenn got title to this
19    right-of-way in the first place is, as Your Honor found, Mr.
20    Wright entered a conflicted and undisclosed loan transaction
21    with a wraparound deed of trust and then used that to
22    foreclose on the right-of-way and transfer it to KrisJenn.
23    And but for that transaction and Mr. Wright's failure to
24    disclose it to Mr. Moore in breach of fiduciary duty, none
25    of this would have happened and we would not be here today.
```

1        Second, Ms. Pryor-Baze suggested that DMA only

2   asked for a constructive trust over proceeds.  That is just

3   not accurate, Your Honor.  We sought a constructive trust

4   over the right-of-way itself and any of Mr. Wright's direct

5   or indirect interest in the right-of-way.

6        Third, Your Honor, I believe Ms. Pryor-Baze said

7   the final judgment will stay in the hands of Express.  Your

8   Honor, the final judgment does not say that.  It says the

9   right-of-way is in the hands of Express H2O and that this

10  court imposed a constructive trust because Express H2O only

11  received title in violation of the bankruptcy plan, which it

12  knew it had received title in violation of the bankruptcy

13  plan through Mr. Wright who is its manager and who formed

14  that entity for the sole purpose of transferring the right-

15  of-way in violation of the plan, as Your Honor found.

16        With that, Your Honor, I will end.

17        THE COURT:  Okay.  Well, I'm going to stay the

18  effect of this order and I'll give you an answer on the

19  motion in a week or two.  So if there was some deadline, I

20  think it said 21 days or something like that, that's stayed

21  for the time being.  And I'll give you an answer on the

22  motion that's being pursued today, basically a motion to

23  reconsider, a motion for new trial, motion to vacate,

24  whatever you want to call it, all the same to me.  But I'll

25  issue an order in a week or two on that, but in the

1    meantime, the order from a week ago is stayed.

2              MR. SHELTON:  Thank you.

3              THE COURT:  I'm not going to stay it as far as

4    going on appeal to district court, I'll tell you that.  If I

5    deny this motion today, I'm not staying the order.  If I

6    grant the motion today, I'm not staying the order.  I'm just

7    staying the order from a week ago until I decide what to do

8    with this motion to reconsider.

9              MR. KRIST:  Understood, Your Honor.

10             THE COURT:  (indiscernible) stays pending appeal.

11             MR. KRIST:  Understood.

12             MR. SHELTON:  Thank you, Your Honor.  Thank you,

13   Your Honor.  I appreciate your --

14             THE COURT:  I think we're going to wrap it up.

15   Mr. Shelton, what?

16             MR. SHELTON:  I was just going to say I appreciate

17   all your patience.  I know, as you said, there were replies

18   and sur-replies and sur-sur-replies, and I appreciate Your

19   Honor's indulgence on this issue.

20             THE COURT:  Well, that's what lawyers do, right?

21             MR. SHELTON:  Well, try not to sometimes.

22             MS. PRYOR-BAZE:  Thank you, Your Honor.  We

23   appreciate it.

24             THE COURT:  All right.  We'll be in recess.

25        (Proceedings adjourned at 12:57 p.m.)

1                          CERTIFICATION

2

3      I certify that the foregoing is a correct transcript from

4      the electronic sound recording of the proceedings in the

5      above-entitled matter.

6

7      *Sonya M. Ledanski Hyde*

8

9

10     Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  September 24, 2025