**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Chapter 11 |
| KRISJENN RANCH, LLC, ET AL., | § | |
| | § | Case No. 20-50805-RBK |
| Debtor. | § | |
| | § | |
| _____ | § | |
| | § | |
| KRISJENN RANCH, LLC, ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Adversary No. 20-05027-RBK |
| | § | |
| DMA PROPERTIES, INC., ET AL., | § | |
| | § | |
| Defendants. | § | |

**WRIGHT'S MOTION FOR CLARIFICATION**
**OF THE JUDGMENT AFTER REMAND**

**TO THE HONORABLE RONALD B. KING, UNITED STATES BANKRUPTCY JUDGE:**

Third-party defendant Larry Wright ("Wright") respectfully files this Motion for Clarification of the Court's Final Judgment After Remand (Adv. Proc. Doc. 329) and accompanying Opinion After Remand (Adv. Proc. Doc. 330), both entered March 26, 2024 (together, the "Judgment After Remand" or "Judgment"). Wright does not seek reconsideration, alteration, or amendment of the Judgment. He asks only that the Court confirm the scope of what it decided. Since the Judgment issued, DMA Properties, Inc. ("DMA") and Longbranch Energy, LP ("Longbranch") (together, the "Judgment Creditors") have advanced progressively more expansive constructions of the Judgment—constructions the Judgment does not support and that would convert each party's twenty-percent net-profits interest into a forced conveyance of, and

ultimately the wholesale disgorgement of, the entire right-of-way. In support, Wright respectfully shows as follows:

## I. NATURE OF RELIEF REQUESTED

The Judgment After Remand did three things relevant here: (1) rendered declaratory judgment that the Judgment Creditors' net-profits interests are "valid and subsisting covenants running with the land" in the right-of-way (the "ROW") (Adv. Proc. Doc. 329 ¶ 1); (2) imposed "a constructive trust on the ROW in the hands of Express H2O, LLC," arising from the unauthorized transfer of the ROW to Express H2O (*id.* ¶ 2); and (3) provided that Wright "may recover the $4,700,000 purchase price that he paid for the ROW" and that "[a]fter that, DMA and Longbranch will each receive 20% out of the net profits from a sale or future development income of the ROW" (*id.* ¶ 3). All other requested damages and relief were denied. *Id.* ¶ 7.

The Judgment thus awards the Judgment Creditors a net-profits interest, subordinate to Wright's first-monies recovery; it does not award them title to the ROW, nor does it order Wright or Express H2O to convey the ROW to them. Both the covenant and constructive trust protect the Judgment Creditors' interest if the ROW changes ownership prior to a "sale or development." So understood, the declaration that the interests "run with the land" serves a defined and limited purpose—to secure the net-profits interest against defeat by a transfer of the ROW before that interest is paid—not to fasten a perpetual charge on the property for all time. Yet in the proceedings since, Judgment Creditors have read the Judgment to impose obligations at odds with the Judgment's plain terms. The questions this Motion raises therefore concern the scope and duration of the net-profits covenant—whom it binds and how long it runs. Wright requests that the Court confirm and clarify the scope of the Judgment in the respects set out in Part V below.

## II. BACKGROUND

### A. The Agreements, the Plan, and the Court's Holding.

The interests at issue arise from the Longbranch Assignment (Adv. Proc. Doc. 174-5 (Ex. 8)) and the DMA Agreement (Adv. Proc. Doc. 174-7 (Ex. 20)) (together, the "Assignment Agreements"). Each provides that the assignor "shall be paid twenty percent (20%) ('Net Profits Share') of the Net Profits from [the assignee] or its successors or assigns during the period of time beginning on the date first written above (the 'Period')." DMA Agreement ¶ 1. "Net Profits" is a defined term meaning "gross revenues actually received by [the assignee], or its successors or assigns directly from the operation, use, maintenance or sale . . . of the [ROW] less actual cost of goods and costs and expenses associated with the operation or sale of the same." *Id.* The Assignment Agreements provide that the obligation "shall attach and run" with the ROW and that the assignee "binds its successors and assigns to the payment of the Net Profits Share." *Id*. Nothing in either Agreement provides that the Net Profits Share is payable in perpetuity, or that it is owed on every future sale, development, or use of the ROW by every successive owner for all time.

The confirmed plan bears directly on the covenant. The Fourth Amended Substantively Consolidated Plan of Reorganization (Main Bankr. Case Doc. 211) (the "Plan") provides that, if the Judgment Creditors are ultimately determined to hold an interest in the ROW and the Reorganized Debtor disposes of the ROW during the appeal, "the value of the DMA and Longbranch interest in the Express Pipeline . . . shall attach[] solely to the proceeds or interests obtained or retained by the Reorganized Debtor from the sale or operation of the Express Pipeline," and "[t]he interest sold, transferred or otherwise disposed of to a third party shall be free and clear of any claims by DMA or Longbranch." Plan at 7.

The Plan vests title to the ROW in the Reorganized Debtor (Plan § 10.02), and provides that "[n]othing herein shall be construed to enlarge DMA or Longbranch's . . . rights in the Express

Pipeline as determined in the Adversary." Plan at 7. The Plan thus contemplates that the interest attaches to proceeds and is extinguished—"free and clear"—upon a transfer to a third party, not that it binds every successive owner of the ROW indefinitely.

### B. The Judgment After Remand.

On March 14, 2023, the District Court held on appeal that the net-profits interests are covenants that run with the land, and remanded for entry of judgment and for determination of the proper measure of recovery. *In re KrisJenn Ranch, LLC*, 661 F. Supp. 3d 654 (W.D. Tex. 2023). The Court did not hold, and nothing in it suggests, that DMA and Longbranch are entitled to twenty percent of the gross revenue or gross value of the ROW for all sales and development **in perpetuity**.

On remand, this Court entered the Judgment After Remand (Adv. Proc. Doc. 329) and Opinion After Remand (Adv. Proc. Doc. 330), reaffirming its prior findings except as modified by the District Court. The Court rendered declaratory judgment that the interests run with the land; imposed the constructive trust on the ROW "in the hands of Express H2O"; awarded each Judgment Creditor a twenty-percent net-profits interest, subordinate to Wright's recovery of the first $4,700,000; and denied all other relief. Doc. 329 ¶¶ 1–3, 7; Doc. 330 at 4. A net-profits interest, and a constructive trust that leaves the ROW in Express H2O's hands, cannot be enforced as a decree compelling conveyance of fee title to the Judgment Creditors.

### C. Proceedings Since the Judgment.

**The Appeal.** The Judgment Creditors appealed. On August 11, 2025, the District Court affirmed the Judgment After Remand in all respects relevant here, holding that this Court "did not abuse its discretion in leaving the ROW in the hands of Wright," and observing that "[n]either party appeals the imposition of the constructive trust." *KrisJenn Ranch, LLC v. DMA Properties,*

*Inc.,* No. 5:24-CV-00365-XR, at 18–19 (W.D. Tex. Aug. 11, 2025). The court rejected the Judgment Creditors' contention that Texas law required divesting Wright of the ROW, explaining that their authorities "do not require that removal." *Id.* at 14. The affirmance did not address how long the covenant runs.

**The Enforcement Motions.** Beginning in early 2025, the Judgment Creditors moved to enforce the constructive trust (Adv. Proc. Doc. 368, 377), asking this Court to compel Wright to convey all right, title, and interest in the entire ROW to DMA. On February 20, 2025, the Court entered such an order subject to Wright's $4,700,000 recovery (Adv. Proc. Doc. 387); Wright moved to vacate, and the Court withdrew the order without prejudice to avoid interfering with the pending appeal (Adv. Proc. Doc. 403). The Judgment Creditors later renewed their motion and sought leave to add state-law fraudulent-transfer claims (Adv. Proc. Doc. 498); Wright opposed, moving to dismiss or stay on the ground that the Court's post-judgment role is to enforce the Judgment as written (a net-profits interest) not to convey title to, or disgorge, the ROW (Adv. Proc. Doc. 542).

**The District-Court Clarification Motion.** Wright also asked Judge Pulliam to clarify its March 14, 2023 Opinion, reported at *In re KrisJenn Ranch, LLC*, 661 F. Supp. 3d 654 (W.D. Tex. 2023) ("Pulliam Opinion"). The District Court denied that motion, concluding that it "either lacks jurisdiction over this motion[] [g]iven the prior remand to the bankruptcy court," or, to the extent jurisdiction existed, that the motion was untimely and provided no basis for reconsideration. Pulliam Appeal (Case No. SA-21-CV-0358-JKP), Doc. 50. That ruling confirms that this Court— which entered the Judgment and retains jurisdiction to interpret and enforce it—is the proper forum to construe the Judgment.

**Recent Events.** At a hearing on June 4, 2026, the Court confronted the parties' competing views of how long the covenant runs. The Judgment Creditors contended that, even after a sale, "[o]ur interest goes on indefinitely until there's some buy down," and that the interest "attaches and runs with the land" as to every future sale and development. Ex. A, Tr. at 42. Wright's counsel responded that the Agreements created a net-profits interest on the obligor's development and sale of the ROW, not a perpetual charge on every future owner. The Court declined to resolve the question, stating: "we don't have to decide that today. It's out there. I understand." Ex. A, Tr. at 52. The Court has since set a hearing to show cause why the case should not be converted to Chapter 7. Ex. A, Tr. at 56.

### D. *Express's Efforts To Market And Sell The ROW.*

Throughout this period, Express H2O has continued to own, possess, and market the ROW, as the confirmed Plan permits. *See* Plan at 7. The net-profits structure presupposes those efforts: DMA and Longbranch receive their twenty-percent net-profits shares, only upon a "sale or future development income of the ROW." Adv. Proc. Doc. 329. Nothing in the Judgment After Remand prevents a sale of the ROW while it remains in Express H2O's hands.

## III. LEGAL STANDARD

A court that enters a judgment possesses inherent authority to construe, interpret, and clarify it, and retains jurisdiction to do so. *See Travelers Indem. Co. v. Bailey,* 557 U.S. 137, 151 (2009) (a court "plainly ha[d] jurisdiction to interpret and enforce its own prior orders"). A motion for clarification does not ask the Court to alter or amend its decision under Federal Rule of Civil Procedure 59(e); it asks only that the Court state authoritatively what it decided. *See* FED. R. BANKR. P. 9024 (incorporating FED. R. CIV. P. 60(a)); 11 U.S.C. § 105(a). Clarification is appropriate where parties to subsequent proceedings advance materially divergent constructions

of a judgment, such that an authoritative statement of its meaning is necessary to its consistent application. Interpreting the Judgment it rendered—and that the parties are now litigating how to enforce—falls squarely within the Court's continuing and inherent authority.

To be clear, Wright does not seek to alter, amend, modify, or disturb a single word of the March 26, 2024 Judgment After Remand. This Motion is neither an untimely Rule 59(e) motion to alter or amend nor a Rule 60(b) motion for relief from judgment. Rather, it invokes the Court's well-established inherent authority to interpret and enforce its own decrees as written—an exercise made necessary solely by the Judgment Creditors' ongoing, post-judgment attempts to expand the scope of the Judgment during enforcement proceedings beyond what this Court decided.

Clarification is needed now for multiple reasons.

*First,* the unresolved construction of the covenant could cloud title to the ROW in active litigation. In Angelina County, Texas, Express H2O Pipeline & ROW, LLC (the record owner of the ROW) is prosecuting an action to establish and clear its title to the ROW and to redress a trespass upon it. *See Express H2O Pipeline & ROW, LLC v. Westlake*, Cause No. CV-00461-24-08 (Angelina County, Tex.). The state court judge has set for hearing Express's Application for Permanent Injunction to eject the trespasser on October 13, 2026. So long as it remains unsettled whether the ROW is burdened by a perpetual covenant binding every successive owner of the ROW, or instead a net-profits charge owed by the obligor and its successors and assigns, that uncertainty will continue to cloud title to the ROW and could impede the orderly resolution of the Angelina County litigation.

*Second*, Express is continuing efforts to market and sell the ROW. The net-profits structure depends on such a sale or development to generate the income from which Wright recovers his investment and DMA and Longbranch are paid. The expansive construction the Judgment

Creditors advance, that a twenty-to-forty-percent net-profits charge perpetually burdens the ROW in the hands of every future owner, discourages prospective buyers and lenders and impedes the very transaction on which payment to all parties depends. A perpetual charge of that magnitude would not merely discourage a sale but effectively prevent one, rendering the ROW unsellable, which is a consequence the parties never bargained for in the Assignment Agreements. This serves no party. Clarifying that the covenant is a net-profits charge owed by the obligor and its successors and assigns and not a perpetual encumbrance on every future owner will allow the ROW to be marketed and sold, which is how the Judgment Creditors are to be paid.

## IV. THE SCOPE AND DURATION OF THE NET-PROFITS COVENANT REQUIRE CLARIFICATION

### A. Covenants Running with the Land Are Disfavored and Are Strictly Construed.

Texas law favors the free and unrestricted use of land; covenants that burden land are not favored, are strictly construed, and all doubts are resolved in favor of the free use of the land and against the party seeking to impose or extend the burden. *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex. 1987). The Supreme Court of Texas has reaffirmed that a covenant's words "may not be enlarged, extended, stretched or changed by construction," and that "all doubts should be resolved in favor of the free and unrestricted use of the premises." *Tarr v. Timberwood Park Owners Ass'n,* 556 S.W.3d 274, 280–81 (Tex. 2018). The elements that make a covenant run with the land are applied strictly, and a covenant will not be construed to burden successive owners beyond what its terms and the parties' intent require. *Inwood N. Homeowners' Ass'n v. Harris*, 736 S.W.2d 632, 635 (Tex. 1987); *In re Energytec, Inc.,* 739 F.3d 215, 221 (5th Cir. 2013); *see also Rancho Viejo Cattle Co. v. ANB Cattle Co*., 642 S.W.3d 850, 862 (Tex. App.—San Antonio 2021, pet. denied) (doubts as to a restrictive covenant's scope are resolved in favor of the free and unrestricted use of the land).

These principles bear directly on the issues before the Court. A construction that fastens a perpetual twenty-to-forty-percent net-profits charge on the ROW in the hands of every future owner would operate as a restraint on alienation and render the property practically unmarketable and both restraints on alienation and perpetual burdens are themselves disfavored. *Sonny Arnold, Inc. v. Sentry Sav. Ass'n,* 633 S.W.2d 811, 813–15 (Tex. 1982). Any doubt as to how long this covenant runs must therefore be resolved against perpetuity and in favor of the free use and alienability of the ROW. Indeed, a covenant that followed the ROW into the hands of every successive owner while exacting a twenty-to-forty-percent net-profits charge on each future sale and development in perpetuity, would render the property virtually unsellable, for no rational buyer would purchase, and no lender would finance, a pipeline carrying a perpetual charge of that magnitude. The Assignment Agreements reflect no agreement by the parties to so encumber the ROW, and a restraint that severe on the property's alienability cannot be supplied by construction where the parties themselves did not adopt it.

**B.** ***The covenant binds only the obligor and its successors and assigns—not every future owner of the ROW in perpetuity.***

The Assignment Agreements define who is bound. The Net Profits Share is payable "from [the assignee] or its successors or assigns," and the assignee "binds its successors and assigns to the payment of the Net Profits Share." DMA Agreement ¶ 1. That is a finite, defined class—the obligor (Black Duck) and those who succeed to or are assigned its position—not every person who may ever own the ROW. Judge Pulliam construed the phrase "its successors and assigns" to refer to the successors and assigns of the obligor and the parties to the Agreements, not to the world at large. Pulliam Opinion at 22.

The Plan confirms that limit: a third-party transferee takes "free and clear of any claims by DMA or Longbranch," Plan at 7, and no construction may "enlarge DMA or Longbranch's . . . rights in the Express Pipeline as determined in the Adversary," *id*.

The defined measure confirms that limit. The Net Profits Share is calculated on "gross revenues actually received by [the assignee], or its successors or assigns" (DMA Agreement ¶ 1(a))—that is, revenues received by the obligor or those who hold its position. A covenant, moreover, binds a remote purchaser only if that purchaser takes with notice of it; under Texas law, a bona fide purchaser for value without notice takes free of an unrecorded or defectively recorded burden. TEX. PROP. CODE § 13.001; *Tarr,* 556 S.W.3d at 281 (one who "purchases for value and without notice . . . takes the land free from the restriction"); *Jennings v. Bindseil*, 258 S.W.3d 190, 197–98 (Tex. App.—Austin 2008, no pet.); *see also Hazel v. Lonesome Ranch Prop. Owners Ass'n*, 656 S.W.3d 468, 486 (Tex. App.—El Paso 2022, no pet.) (a purchaser for value without actual or constructive notice takes the land free of a restrictive covenant). A construction binding every future owner of the ROW in perpetuity, regardless of notice, cannot be squared with these principles.

Indeed, the Judgment Creditors agree it is a net interest: they describe it as "a percentage in the net profits from the fees obtained" for use of the ROW (Pulliam Appeal, Doc. 34 at 31), measured by gross revenues "less 'the costs and expenses associated,'" and add that "[t]he very name of the interest—a net-profits interest—confirms the parties' intent" (*id*. at 19).

Indeed, the Agreements work no transfer of ownership or use. The Agreements do not prevent Black Duck from taking any action on the land, and they do not permit the Judgment Creditors to enter or utilize the land for any purpose, and they did not affect Black Duck's ownership interest in the ROW or its use. Black Duck owned 100% of the Pipeline before the

Agreements and 100% of the Pipeline after the Agreements. The interest is thus a payment charge by specific and identified types of entities—confirming that it cannot expand into a perpetual burden that divests or binds every future owner of the ROW.

This is where clarification is needed. Judgment Creditors claim that their interest "goes on indefinitely" and "attaches and runs with the land" as to every future sale and development (Ex. A, Tr. at 42)—a reading that would bind every future purchaser of the ROW, anywhere, for all time, read the Plan's free-and-clear provision out of existence, and enlarge Judgment Creditors' rights beyond what this Court determined.

This Court previously found these terms unambiguous, finding that the phrase "successors and assigns" qualifies Black Duck. Doc. 236 at 14. The defined term bears this out: "Net Profits shall mean gross revenues actually received by Black Duck Properties, LLC, or its successors or assigns directly from the operation, use, maintenance, or sale . . . of the pipe." Doc. 236 at 14. That definition keys the obligation to the revenues received by Black Duck and those who succeed to its position.

Thus, Wright respectfully requests that the Court confirm that the covenant binds the obligor and its successors and assigns—those who succeed to or take an assignment of the obligor's position—and that a bona fide third-party purchaser of the ROW, who is not such a successor or assign, takes the ROW free of the interest. Confirming as much gives the covenant its intended, protective effect—securing the net-profits interest until it is paid—while leaving the ROW freely alienable once the interest is satisfied.

### C. *The Assignment Agreements contain no perpetual-duration term.*

The duration question turns on a term the Assignment Agreements do not contain. The parties specified who is bound—the obligor and its successors and assigns—but fixed no perpetual

duration: there is no end date, and no language providing that the Net Profits Share is owed in perpetuity or on every future transaction for all time. *See* DMA Agreement ¶ 1.

A perpetual obligation thus is not found in the parties' words. Texas law does not permit that result: courts enforce the contract the parties made and do not rewrite it, and perpetual obligations are disfavored and will not be implied absent clear and unequivocal language. *Clear Lake City Water Auth. v. Clear Lake Utils. Co.*, 549 S.W.2d 385, 390–91 (Tex. 1977).

To the extent the covenant is read to run in perpetuity against every future owner of the ROW, that durational term originates not in the Assignment Agreements but in a construction of the Court's holding that the parties never adopted.  The record is consistent: Judgment Creditors' own principals testified that the twenty-percent interests were reserved to give themselves negotiating leverage in a contemplated sale, not as a perpetual burden on the pipeline. Pulliam Opinion at 8.

Thus, Wright requests that the Court confirm that the Judgment did not add a perpetual-duration term the Agreements themselves do not contain. Nor did the parties agree to render the ROW practically unsellable, which a charge binding every future owner in perpetuity would do; they bargained for a net-profits share payable by the obligor and its successors, not a permanent encumbrance on the property's alienability.

**D.** ***The Judgment's payment language—net profits "from a sale or future development income of the ROW"—describes a single, alternative monetization, not a perpetual, recurring royalty.***

The Judgment fixes the source of the net-profits payment in precise terms: after Wright recovers his $4,700,000, "DMA and Longbranch will each receive 20% out of the net profits from *a sale or future development income* of the ROW." Adv. Proc. Doc. 329 ¶ 3; accord Adv. Proc. Doc. 330 at 4 ("the two 20% net profits interests would begin receiving income from a sale or

development of the ROW"). Three features of that language foreclose the perpetual, every-owner construction the Judgment Creditors now urge.

*First*, the Judgment speaks of "a sale"—singular, and introduced by the indefinite article. It does not say "each sale," "any and all sales," "every future sale," or "successive sales." A single, discrete disposition of the ROW is not a perpetual charge that reattaches to every resale by every future owner. Because covenants that burden land are strictly construed and their words "may not be enlarged, extended, stretched or changed by construction," *Tarr,* 556 S.W.3d at 280, "a sale" cannot be read to mean "every sale, forever." Had the parties or the Court intended the interest to burden every future transaction, the words to say so were readily available and conspicuously absent.

*Second*, the disjunctive "or" must be given effect. "A sale or future development income" states two alternative ways the owner may monetize the ROW—by selling it, or by developing and operating it for income—and directs that the net-profits share be paid out of whichever the owner realizes. Read as genuine alternatives, "or" does real work: it identifies the events that trigger payment. The Judgment Creditors' construction collapses that alternative into a cumulative, never-ending charge on every sale and all development by every owner for all time—reading both "or" and "a sale" out of the Judgment. Texas law forbids that result; an instrument is construed to give effect to all of its words so that none is rendered surplusage or meaningless. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983).

*Third*, the payment language fixes the source of payment, not its duration. The monetization language cannot itself supply the perpetuity the Judgment Creditors seek; to the contrary, it describes a bounded event—the owner's sale or income-generating development of the ROW—after which, upon a sale, the buyer takes "free and clear of any claims by DMA or

Longbranch." Plan at 7. A durational term must be found in words the Judgment and the Agreements do not contain. A sale that leaves the buyer free and clear is by definition a terminal, monetizing event, not the first in an endless series.

So construed, the payment provision is coherent and complete: Wright recovers his $4,700,000 first; the Judgment Creditors then receive their twenty-percent shares out of the net profits of a sale of the ROW or, absent a sale, out of the income from its development; and a third-party purchaser takes the ROW free of the interest. That reading gives meaning to "a sale," to "or," and to the Plan's free-and-clear provision alike. The perpetual, every-owner reading gives meaning to none of them. The declaration that the interest "runs with the land" thus does real and sensible work on this reading: it keeps the net-profits interest attached to the ROW until Wright recovers his $4,700,000 and the twenty-percent shares are satisfied out of a sale or development, and no further—securing payment of the interest without converting it into an endless royalty on every future owner.

Thus, Wright requests that the Court confirm that the Judgment did not add a perpetual, recurring charge payable on every future sale and development of the ROW, but instead provided for payment out of a single sale or the development income of the ROW.

### E. The Judgment, the Agreements, and the Plan must be harmonized.

Where the language of a judgment and an opinion differ, the judgment controls. *Continental Airlines, Inc. v. Kiefer*, 920 S.W.2d 274, 277 (Tex. 1996). The Judgment After Remand frames the recovery as "20% out of the net profits from a sale or future development income of the ROW"—language describing the owner's monetization of the ROW, not a perpetual royalty exacted from every successive purchaser. Doc. 329 ¶ 3.

A perpetual reading cannot be reconciled with the Assignment Agreements' defined "Period" or the Plan's free-and-clear provision, and it would render the ROW practically inalienable—a result Texas law disfavors. No buyer would purchase, and no lender would finance, a pipeline subject to a twenty- to forty-percent net-profits charge that survives every future sale and development in perpetuity. Texas courts construe contracts to avoid "unreasonable, oppressive, or absurd results." *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 114 (5th Cir. 2010); *accord Cont'l Cas. Co. v. Warren*, 254 S.W.2d 762, 765 (Tex. 1953). A perpetual charge binding every future owner of the ROW is such a result. That unsellability is not a burden the parties assumed: nothing in the Assignment Agreements reflects any agreement to encumber the ROW in perpetuity, and the Court should not read such a term into its Judgment.

Indeed, the Judgment Creditors' own position confirms the covenant is not perpetual. Judgment Creditors' own damages case at trial confirmed the point: they sought a one-time recovery measured by "his portion of the market value of the ROW" (Pulliam Appeal, Doc. 38 at 14), a single valuation, not a perpetual royalty stream. A perpetual reading would also yield untenable results: were a twenty- to forty-percent net-profits charge to bind every owner on every future sale and development for all time, successive owners would face stacking obligations that no purchaser could rationally assume. Judgment Creditors have likewise conceded that their interests "do not restrict the owners' right to sell the ROW" (Pulliam Appeal, Doc. 38 at 6), a concession irreconcilable with the perpetual, title-clouding encumbrance they now invoke to block a sale and contest the owner's title. Recently, the Judgment Creditors' own counsel acknowledged at the June 4 hearing that the interest continues only "until there's some buy down"—conceding that it can be extinguished and is not a permanent feature of the ROW's title. Ex. A, Tr. at 42.

The Court should confirm that its Judgment did not establish a perpetual covenant and should clarify the duration for which the net-profits interest runs.

## V. <u>PRAYER</u>

For the foregoing reasons, Wright respectfully requests that the Court enter an Order:

1)      Setting this Motion for hearing no later than early September 2026, so that the parties and the state court in Angelina County have clear guidance prior to the October 13, 2026 injunction hearing;

2)      clarifying and confirming that its Judgment After Remand:

    a.  recognizes a net-profits covenant that binds only the obligor and its successors and assigns—not every future owner of the ROW, including a bona fide third-party purchaser, in perpetuity—consistent with the Plan's provision that a third-party transferee takes the ROW "free and clear of any claims by DMA or Longbranch"; and

    b.  provides that the net-profits share is payable out of "a sale or future development income of the ROW"—a single, alternative monetization by the owner—and does not attach anew to every subsequent sale or to every future owner in perpetuity; and

    c.  contains no perpetual-duration term and must be harmonized with the Assignment Agreements and the Plan, neither of which contemplates a perpetual interest binding successive owners.

Wright further requests such other and further relief, at law or in equity, to which he may be justly entitled.

Respectfully submitted,

*/s/ Holli Pryor-Baze*
Holli Pryor-Baze
State Bar No. 24013357
**SKELTON SLUSHER BARNHILL
WATKINS WELLS, PLLC**
1616 S. Chestnut St.
Lufkin, Texas 75901
Telephone: 936.632.2300
Facsimile: 936.632.6545
hbaze@ssbww.law

*/s/ Charlie Shelton*
Charlie Shelton
State Bar No. 24079317
**HAYWARD PLLC**
7600 Burnet Road, Suite 530
Austin, Texas 78757
Telephone/Fax: (737) 881-7100
cshelton@haywardfirm.com

**COUNSEL FOR LARRY WRIGHT**


## CERTIFICATE OF SERVICE

I hereby certify that on August 13, 2026, a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF. system.

*/s/ Charlie Shelton*
Charlie Shelton